**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RURAL EMPOWERMENT ASSOCIATION FOR COMMUNITY HELP, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civ. No. 18-cv-02260-TJK |
| v. | ) ) | **Motion for Summary Judgment** |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | ) ) ) | **And Request for a Hearing** |
| Defendants. | ) ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND REQUEST FOR A HEARING**

Plaintiffs Rural Empowerment Association for Community Help, Animal Legal Defense Fund, Center for Food Safety, Don't Waste Arizona, Environmental Integrity Project, Food & Water Watch, Humane Society of the United States, Sierra Club, Sound Rivers, and Waterkeeper Alliance (collectively, "Plaintiffs") respectfully move this Court for summary judgment on their challenge to Defendants Environmental Protection Agency's ("EPA's")  and Andrew Wheeler's unlawful "guidance" exempting concentrated animal feeding operations ("CAFOs") from reporting their toxic emissions from animal waste under the Emergency Planning and Community Right-to-Know Act ("EPCRA").  There are no material issues of fact in dispute.  As set forth in the accompanying memorandum of points of law and authorities, the undisputed facts lead to the inexorable conclusion that EPA's exemption of CAFOs from EPCRA reporting is procedurally and substantively unlawful, and thus Plaintiffs are entitled to judgment as a matter of law.

**Request for Hearing Pursuant to L.R. 7(f).** Plaintiffs respectfully request that the Court schedule an oral hearing on this Motion as soon as possible after conclusion of the briefing.

Respectfully submitted,

CARRIE APFEL
LAURA DUMAIS
Earthjustice
1625 Massachusetts Avenue NW, Suite 702
Washington, DC 20036
(202) 667-4500
(202) 667-2356 [*FAX*]
capfel@earthjustice.org
ldumais@earthjustice.org

PETER LEHNER*
JONATHAN J. SMITH*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7376
(212) 918-1556 [*FAX*]
plehner@earthjustice.org
jjsmith@earthjustice.org

* *Pro Hac Vice* Applicants

*Counsel for Plaintiffs Rural Empowerment Association for Community Help, Animal Legal Defense Fund, Center for Food Safety, Don't Waste Arizona, Environmental Integrity Project, Food & Water Watch, Humane Society of the United States, Sierra Club, Sound Rivers, and Waterkeeper Alliance*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RURAL EMPOWERMENT ASSOCIATION FOR COMMUNITY HELP, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civ. No. 18-cv-02260-TJK |
| v. | ) ) | **Statement of Undisputed Facts** |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h)(1), Plaintiffs Rural Empowerment Association for Community Help, Animal Legal Defense Fund, Center for Food Safety, Don't Waste Arizona, Environmental Integrity Project, Food &Water Watch, Humane Society of the United States, Sierra Club, Sound Rivers, and Waterkeeper Alliance (collectively, "Plaintiffs") submit the following statement of material facts as to which there is no genuine issue:

1.       A single animal feeding operation ("AFO") can house many hundreds or thousands of large animals such as dairy cows or pigs, or millions of smaller animals such as chickens.  40 C.F.R. §§ 122.23(b)(1), (2), (4), (6).

2.       AFOs generate enormous amounts of urine, feces, and animal carcasses.

3.       EPA classifies larger AFOs as either medium or large "concentrated animal feeding operations" ("CAFOs") based on the number and type of animal confined.  40 C.F.R. § 122.23(b)(2).  For example, a chicken AFO with a dry manure handling system is a "medium

CAFO" if it confines 37,500 chickens or more, and it is a "large CAFO" if it confines 125,000

chickens or more. *Id.* § 122.23(b)(4), (6).

4.    Animal waste stored at CAFOs commonly emits gaseous ammonia and hydrogen

sulfide at levels that exceed the 100 pounds per day reportable quantity for these substances

under EPCRA, 42 U.S.C. § 11004. *See* D. Bruce Harris et al., *Ammonia Emissions Factors from*

*Swine Finishing Operations*, from 10th Annual Emission Inventory Conference, at 1 (2001),

http://www.prairieswine.com/pdf/34465.pdf (AFOs account for 73% of the total ammonia

emissions in the U.S.); EPA, Non-Water Quality Impact Estimates for Animal Feeding

Operations, at 2-30 to 2-31 (2002), https://www3.epa.gov/npdes/pubs/cafo_nonwaterquality.pdf

(large dairy and swine AFOs emit approximately 100,000 pounds of hydrogen sulfide annually).

5.    A single large CAFO can produce more waste than an average city. *See* Carrie Hribar,

Nat'l Ass'n of Local Bd. of Health, Understanding Concentrated Animal Feeding Operations and

Their Impact on Communities, at 2 (2010),

https://www.cdc.gov/nceh/ehs/docs/understanding_cafos_nalboh.pdf.

6.    Unlike a city that treats its sewage at wastewater treatment plants, industrial-scale

CAFOs store untreated animal feces and urine in giant pits or piles that emit ammonia and

hydrogen sulfide. D. Bruce Harris et al., *Ammonia Emissions Factors from Swine Finishing*

*Operations*, from 10th Annual Emission Inventory Conference, at 1; EPA, Non-Water Quality

Impact Estimates for Animal Feeding Operations, at 2-30 to 2-31.

7.    Chronic exposure to ammonia at levels as low as 0.7 parts per million ("ppm")

may trigger decreased lung function and respiratory symptoms, and exposure at far higher

concentrations can lead – and has led – to scarring of the respiratory tract and even death. S.S.

Schiffman et al., *Health Effects of Aerial Emissions from Animal Production and Waste*

*Management Systems*, in Nat'l Ctr. for Manure and Animal Waste Mgmt., White Paper Summaries at 10, 11 (2001) [EPA-HQ-SFUND-2007-0469-0531.17] ("White Paper Summaries"); Iowa State Univ. and The Univ. of Iowa Study Grp., Iowa Concentrated Animal Feeding Operations Air Quality Study, at 123 (2002), https://www.public-health.uiowa.edu/ehsrc/CAFOstudy/CAFO_6-3.pdf ("Iowa Air Quality Study").

8.    Numerous studies have reported ammonia concentrations of greater than 100 ppm at CAFOs, with some concentrations reaching over 200 ppm.  White Paper Summaries at 11; Iowa Air Quality Study at 123.

9.    Exposure to hydrogen sulfide can lead to major health problems, with even low concentrations triggering headaches, nausea, and eye, skin, and respiratory irritation.  U.S. Dep't of Health and Human Servs., Agency for Toxic Substances and Disease Registry, Toxicological Profile for Hydrogen Sulfide, ch. 3 at 26-53, 58-60, 62 (2006).

10.    Hydrogen sulfide targets the nervous system, and chronic low-level exposure can impair balance, visual field performance, color discrimination, hearing, memory, mood, and intellectual function.  *Id*. at 62-68.

11.    Higher levels of exposure to hydrogen sulfide can cause a loss of consciousness and death.  *Id*. at 22-26.

12.    People living near CAFOs show increased rates of ailments such as respiratory problems, headaches, diarrhea, and nausea.  *See* Earthjustice et al, Comments Letter on CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Animal Feeding Operations, at 8-9 & nn.37-41(Mar. 27, 2008) [EPA-HQ-SFUND-2007-0469-0758] ("Earthjustice Comments").

13.     People have become seriously ill and even died as a result of breathing fumes released during manure pit agitation, a process necessary for liquid manure storage systems.  *See* K.J. Donham, *Community & Occupational Health Concerns in Pork Production: A Review*, 88 J. ANIM. SCI. 102, 107 (2010), https://www.gpo.gov/fdsys/pkg/USCOURTS-caDC-09-01017/pdf/USCOURTS-caDC-09-01017-1.pdf, attached hereto as Apfel Decl. Exhibit 1.

14.     The Emergency Planning and Community Right-to-Know Act ("EPCRA") mandates that facilities that release more than a threshold quantity of an "extremely hazardous substance" report that release to local emergency response agencies, and those reports must be made available to the public.  42 U.S.C. §§ 11004, 11044(a).

15.     Under EPCRA, EPA must publish a list of "extremely hazardous substances" that will be subject to its reporting requirements, and must determine, by regulation, "reportable quantities," *i.e.*, threshold quantities of releases above which a report is required.  42 U.S.C. §§ 11002(a), 11004(a)(2)(B).

16.     EPA lists both ammonia and hydrogen sulfide as EPCRA "extremely hazardous substances," with reportable quantities of 100 pounds per day for each.  40 C.F.R. pt. 355, app. A.

17.     Under EPCRA, "release" means "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . of any hazardous chemical, extremely hazardous substance, or toxic chemical." 42 U.S.C. § 11049(8).  The term "environment," in turn, "includes water, air, and land and the interrelationship which exists among and between water, air, and land and all living things."  *Id.* § 11049(2).

18.    Using EPA emission estimation methodologies, one can calculate the minimum number of animals that must be housed at a CAFO before emissions from that CAFO can be expected to exceed EPCRA reportable quantities:

a.    Unless a broiler chicken operation has more than 21,000 birds, it is not expected to emit 100 pounds or more of ammonia per day, and unless it is a large CAFO with more than 3.8 million birds, it is not expected to emit 100 pounds or more of hydrogen sulfide per day.  *See* Hongwei Xin *et al.*, *Ammonia (NH3) and Hydrogen Sulfide (H2S) Emission Rates for Poultry Operations* (2009) (the document was removed from the EPA website but an archived version is attached hereto as Apfel Decl. Exhibit 2).  According to the U.S. Department of Agriculture ("USDA") 2012 Census of Agriculture, 59 percent of farms with broiler chickens sold fewer than 200,000 birds, USDA, *Census of Agriculture* 25 (2012), https://www.agcensus.usda.gov/Publications/2012/Full_Report/Volume_1,_Chapter_1_US/st99_1_032_033.pdf,[1] which is equivalent to having fewer than 24,700 birds on an average day.[2]  The percentage of farms that had fewer than 3.8 million birds was even greater.  *Id*.

b.    Unless a swine operation with grower or finisher pigs is a medium or large CAFO with more than 1,800 pigs, it is not expected to emit 100 pounds or more of

---

[1] At Table 32, under "Broilers and other meat-type chickens," 13,524 farms sold 200,000 or more such chickens in 2012, which was 41 percent of the 32,935 farms selling such chickens in that year.

[2] This assumes continuous production in 45-day production cycles, where the number of birds at any one time on average is given by 200,000 / (365 / 45) = 24,658.

ammonia per day, and unless it is a large CAFO with more than 9,600 pigs, it is not expected to emit 100 pounds or more of hydrogen sulfide per day.  *See* EPA, *Calculation Worksheet – Ammonia and Hydrogen Sulfide Emissions: Swine Operations – Confinement with Liquid Manure Management Systems* (2009) (the document was removed from the EPA website but an archived version is attached hereto as Apfel Decl. Exhibit 3).[3]  According to the 2012 Census of Agriculture, 81 percent of farms with grower or finisher pigs had fewer than 1,000 pigs. USDA, *Census of Agriculture* 23 (2012), https://www.agcensus.usda.gov/Publications/2012/Full_Report/Volume_1,_Chapter_1_US/st99_1_024_027.pdf.[4]  The percentage that had fewer than 9,600 pigs was even greater.  *Id*.

c.  Unless a dairy operation is a large CAFO with more than 1,400 cows, it is not expected to emit 100 pounds or more of ammonia per day, and unless it is a large CAFO with more than 746,000 cows, it is not expected to emit 100 pounds or more of hydrogen sulfide per day.  *See* EPA, *Calculation Worksheet – Ammonia and Hydrogen Sulfide: Dairy Operations* (2009) (EPA removed the document from its website but an archived version is attached hereto as Exhibit 4).[5]

---

[3] The number of animals expected to emit 100 pounds of ammonia or hydrogen sulfide per day was calculated by dividing 100 pounds by the upper bound per-animal emissions constants (0.055 pounds of ammonia per animal day or 0.0104 pounds of hydrogen sulfide per animal per day) given by Apfel Decl. Ex. 3.

[4] At Table 25, under "Farrow to finish" and "Finish only," which are types of operations with grower or finisher pigs, 7,570 farms had 1,000 or more such pigs in 2012, which was 19 percent of the 40,213 farms with such pigs in that year.

[5] The number of animals expected to emit 100 pounds of ammonia or hydrogen sulfide per day was calculated by dividing 100 pounds by the upper bound emission rates (0.07 pounds of

According to the 2012 Census of Agriculture, 97 percent of farms with milk cows had fewer than 1,000 such cows. USDA, *Census of Agriculture* 19 (2012), https://www.agcensus.usda.gov/Publications/2012/Full_Report/Volume_1,_Chapter_1_US/st99_1_012_013.pdf.[6] The percentage that had fewer than 746,000 cows was even greater. *Id.*

d. Unless a beef operation has more than 280 cattle, it is not expected to emit 100 pounds or more of ammonia per day. *See* Rick Stowell and Rick Koelsch, *Ammonia Emissions Estimator (Daily Version)* (2009) (the document was removed from the EPA website but is attached hereto as Exhibit 5.).[7] According to the 2012 Census of Agriculture, 96 percent of farms with beef cattle had fewer than 200 such cattle. USDA, *Census of Agriculture* 20 (2012), https://www.agcensus.usda.gov/Publications/2012/Full_Report/Volume_1,_Chapter_1_US/st99_1_014_016.pdf.[8] EPA did not include a method for estimating hydrogen sulfide emissions from beef operations in the EPCRA Exemption.

---

ammonia per animal per day or 0.000134 pounds of hydrogen sulfide per animal per day) given by Ex. 4.

[6] At Table 12, under "Milk cows," 1,807 farms with milk cows had 1,000 or more such cows in 2012, which was three percent of 64,098 farms with milk cows in that year.

[7] The number of animals expected to emit 100 pounds of ammonia was calculated by dividing 100 pounds by the unit ammonia loss calculated with high-end values (0.35 pounds of ammonia per animal per day) given by Ex. 5. The unit ammonia loss was calculated using values from Table 1 for "Open dirt lots (hot, arid region)" for "Beef," from Table 2 for "Composted manure (no carbon amendment)," and from Table 3 for "Beef – Finishing Cattle."

[8] At Table 16, under "Cattle and calves inventory" and then under "Total," 26,072 farms had 200 or more cattle in 2012, which was four percent of the 727,906 farms with such cattle in that year.

19.     The vast majority of farms are not expected to release the reportable quantity of ammonia or hydrogen sulfide and thus do not need to report agricultural emissions under EPCRA.  *See supra* ¶ 16.

20.     On December 18, 2008, EPA published a final rule that exempted all but the largest AFOs from requirements to report releases of extremely hazardous substances from animal waste under EPCRA.  CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances From Animal Waste at Farms, 73 Fed. Reg. 76,948 (Dec. 18, 2008) ("2008 CERCLA/EPCRA Rule").

21.     The 2008 CERCLA/EPCRA Rule exempted all AFOs from requirements to report releases of hazardous substances from animal waste under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").  *Id.*

22.     During the 2008 CERCLA/EPCRA rulemaking, EPA received a comment that AFOs should be exempt from EPCRA reporting under the "routine agricultural operations" provision of the statute.  *Id.* at 76,951.

23.     In response to the comment requesting that AFOs be exempt from EPCRA reporting under the "routine agricultural operations provision," EPA stated: "Based on the language of [EPCRA], there is no indication that Congress meant to exclude emissions from manure from reporting requirements under [this statute]."  EPA, Resp. to Comment Doc., CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms 15 (Dec. 12, 2008) [EPA-HQ-SFUND-2007-0469-1359], Apfel Decl. Exhibit 6.  In addition, in this Response to Comments document, EPA agreed with a comment that "[s]mall farms should not be affected even if the reporting requirements

stay in place because these farms do not generally have a large enough herd of animals to reach the requisite levels of toxins." *Id.* at 28-29.

24.    Both industry and environmental groups challenged the 2008 CERCLA/EPCRA Rule in the United States Court of Appeals for the District of Columbia Circuit. *See Waterkeeper All. v. EPA*, 853 F.3d 527 (D.C. Cir. 2017).

25.    In the D.C. Circuit litigation challenging the 2008 CERCLA/EPCRA Rule, EPA clarified that its statement in the Response to Comments  that "[b]ased on the language of [EPCRA], there is no indication that Congress meant to exclude emissions from manure from reporting requirements under [this statute]" was a "direct response" to industry's theory that CAFOs are exempt from EPCRA reporting because of "the exclusion of substances 'used in routine agricultural operations' from the scope of 'hazardous chemicals.'"  Brief for Defendant at 37-38 & n.22, *Waterkeeper All. v. EPA*, 853 F.3d 527 (D.C. Cir. 2017) (No. 09-1017), 2016 WL 1569675, Apfel Decl. Exhibit 7.

26.    The National Pork Producers Council challenged the 2008 CERCLA/EPCRA Rule in the United States District Court for the Western District of Wisconsin, arguing, among other things, that EPCRA's "routine agricultural operations" provision exempted all AFOs from all EPCRA reporting. *See Nat'l Pork Producers Council v. Jackson*, 638 F. Supp. 2d 1020, 1023 (W.D. Wis. 2009).

27.    In its brief responding to the National Pork Producers Council's argument that EPCRA's "routine agricultural operations" provision exempted all AFOs from all EPCRA reporting, EPA explained,

> The exception for "routine agricultural operations" is quite obviously directed at farms or other agricultural operations, but that does not mean that farms are not subject to EPCRA in the first

> instance . . . As noted in *Sierra Club, Inc. v. Tyson Foods, Inc*., 299 F. Supp. 2d 693, 713–14 (W.D. Ky. 2003), operating a farm or animal feeding operation and utilizing a covered substance in "routine agricultural operations," are not necessarily synonymous. The question of whether a particular farm falls within the "routine agricultural operations" exception depends on a factual determination to be made based on the specific farm being subjected to a specific enforcement action.

Reply Brief for Defendant at 12–13, *Nat'l Pork Producers Council*, 638 F. Supp. 2d 1020 (W.D. Wis. 2009) (No. 09–cv–73–slc), 2009 WL 1630976, Apfel Decl. Exhibit 8.

28.     On April 11, 2017, the U.S. Court of Appeals for the District of Columbia issued an opinion vacating as unlawful the 2008 CERCLA/EPCRA Rule. *Waterkeeper All.*, 853 F.3d at 537–38.

29.     The court's mandate in *Waterkeeper All.*, 853 F.3d 527, did not issue until May 2, 2018. Mandate, *Waterkeeper All.*, 853 F.3d 527 (D.C. Cir. 2018) (No. 09-1017).

30.     On September 19, 2017, the EPA Office of Inspector General published a report noting that, as of May 2017, EPA had still "not finalized its work plan or established timeframes to finish the methodologies" to estimate emissions from AFOs that EPA had represented, in 2005, that it would begin publishing by 2009. Office of Inspector General, EPA, Improving Air Quality: Eleven Years After Agreement, EPA Has Not Developed Reliable Emission Estimation Methods to Determine Whether Animal Feeding Operations Comply With Clean Air Act and Other Statutes, Report No. 17-P-0396, at 10–11 (Sept. 19, 2017), Apfel Decl. Exhibit 9.

31.     On or before October 26, 2017, EPA published a webpage entitled "CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms." EPA, *CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms* ("2017 EPCRA Exemption") (2017), Apfel Decl. Exhibit 10.

32.     EPA's webpage entitled "CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms" included links to methodologies that AFOs could use to calculate their emissions for the purpose of submitting release reports under CERCLA.  *Id.*

33.     The 2017 EPCRA Exemption linked to a document that explained that, under EPA's new interpretation of an EPCRA provision concerning "routine agricultural operations," AFOs do not need to report releases of extremely hazardous substances from animal waste under EPCRA.  EPA, *Does EPA interpret EPCRA Section 304 to require farms to report releases from animal waste?* (2017) ("2017 EPCRA Q&A"), Apfel Decl. Exhibit 11.

34.     EPA stated that the exemption took immediate effect, even before the start of any rulemaking procedure.  *Id.*

35.     On March 23, 2018, Congress enacted the Consolidated Appropriations Act, 2018, whose Title XI (the "FARM Act") exempts "air emissions from animal waste (including decomposing animal waste) at a farm" from CERCLA's reporting requirements.  Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, § 1102, 132 Stat. 348, 1148 (2018).

36.     The FARM Act does not make reference to EPCRA or to EPCRA reporting requirements.  *Id*.

37.     When enacting the FARM Act, U.S. Senate Committee on Environment and Public Works Ranking Member and FARM Act Co-Sponsor Thomas Carper inserted a statement into the legislative record explaining that AFOs must still report under EPCRA notwithstanding the FARM Act's exemption from CERCLA reporting.  115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018).

38.     On or about April 27, 2018, EPA updated its EPCRA Exemption webpage to more directly instruct AFOs that they should not report releases of extremely hazardous substances under EPCRA.  EPA, *CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms* (Apr. 30, 2018) ("EPCRA Exemption"), Apfel Decl. Exhibit 12.

39.     Under the new EPCRA Exemption, EPA asserted that because Congress exempted CAFOs from reporting under CERCLA, and because some EPCRA reporting is linked to emissions that "occur in a manner" that would require CERCLA reporting, CAFOs need not report under EPCRA either.  *Id.*

40.     This update to the EPCRA Exemption linked to an updated document explaining EPA's interpretation that EPCRA's "routine agricultural operations" provision exempted AFOs from reporting releases under EPCRA.  EPA, *How do the reporting requirements in EPCRA Section 304 apply to farms engaged in "routine agricultural operations"?* (Apr. 27, 2018) ("EPCRA Q&A"), Apfel Decl. Exhibit 13.

41.     The updated EPCRA Exemption also linked to a new document explaining a second basis to exempt AFOs from EPCRA's reporting requirement based on the FARM Act. EPA, *How does the Fair Agricultural Reporting Method (FARM) Act impact reporting of air emissions from animal waste under CERCLA Section 103 and EPCRA Section 304?* (2018) ("FARM Act Q&A"), Apfel Decl. Exhibit 14.

42.     In the EPCRA Exemption posted in April 2018, EPA explained that large CAFOs were subject to EPCRA reporting prior to the EPCRA Exemption, *see* EPCRA Exemption at 1, and it also acknowledged that the two purported legal bases for the Exemption are newly adopted, *see id.* ("air emissions from animal waste at farms do not need to be reported under

EPCRA because these types of releases are ***now exempt*** from CERCLA") (emphasis added); *id.* (noting that EPA's "previously identified examples of routine agricultural operations" did not include EPA's newly adopted expansion of the scope of the "routine agricultural operations" exemption).

43.     In the FARM Act Q&A, EPA notes that it "intends to conduct a rulemaking to address the impact of the FARM Act on the reporting of air emissions from animal waste at farms under EPCRA." FARM Act Q&A, Apfel Decl. Exhibit 14.

44.     In versions of the EPCRA Q&A available online in 2017, EPA explained that it "intends to conduct a rulemaking on the interpretation of 'used in routine agricultural operations.'" 2017 EPCRA Q&A, Apfel Decl. Exhibit 11.

45.     EPA listed the EPCRA Exemption as a rulemaking in its Fall 2018 Unified Agenda of Regulatory and Deregulatory Actions, the most recent public listing of EPA's planned future rulemakings. *See* Office of Information and Regulatory Affairs, Agency Rule Lists – Fall 2018, EPA, Apfel Decl. Exhibit 15 (listing "Exemption for Air Emissions From Animal Waste at Farms From the Emergency Release Notification Requirements; Emergency Planning and Community Right-to-Know Act" under "Proposed Rule Stage" and "Interpretation of 'Used in Routine Agricultural Operations' Under EPCRA" under "Long-Term Actions").

46.     EPA itself characterizes the EPCRA Exemption as a rulemaking that requires notice and comment. *Id.*

47.     On May 25, 2018, ten members of the U.S. Senate Committee on Environment and Public Works – including two co-sponsors of the FARM Act – asked EPA to immediately rescind the EPCRA Exemption because it is "legally flawed and is based on an erroneous interpretation of the law with implications beyond reporting of releases from animal waste," and

because it "exceed[s] EPA's statutory authority."  Letter from Thomas R. Carper et al., Ranking

Member, United States Senate, to Scott Pruitt, Administrator, EPA, at 1, 2 (May 25, 2018),

https://www.epw.senate.gov/public/_cache/files/8/e/8e31f21c-0805-4cab-aa96-

2e084d6e03e5/3FCE938E06E8830762AE52C34B36D2F5.5.25.2018-letter-to-epa-on-emission-

reporting-under-epcra.pdf, Apfel Decl. Exhibit 16.

48.     Shortly after Plaintiffs filed their Complaint in this case, EPA again revised its

EPCRA Exemption, this time to remove the FARM Act justification as a supporting rationale for

why CAFOs need not report their emissions.  *See* CERCLA and EPCRA Reporting

Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms (Oct. 3,

2018) ("October 2018 EPCRA Exemption"), https://www.epa.gov/epcra/cercla-and-epcra-

reporting-requirements-air-releases-hazardous-substances-animal-waste-farms, Apfel Decl.

Exhibit 17.

49.     From the first version of the EPCRA Exemption that EPA published online in

October 2017 to its current form, EPA has not changed or qualified its directive that AFOs need

not report any releases into the air of EPCRA extremely hazardous substances from animal

waste.

50.     Prior to the 2017 EPCRA Exemption, large CAFOs were still required to report

releases of EPCRA extremely hazardous substances that exceeded reportable quantities, even

under the now-vacated 2008 CERCLA/EPCRA Rule.  *See Ass'n of Irritated Residents v. EPA*,

494 F.3d 1027, 1028 (D.C. Cir. 2007) ("An [animal feeding operation] that releases these

pollutants in sufficient quantities may be required to report them under . . . EPCRA"); 2008

CERCLA/EPCRA Rule, 73 Fed. Reg. 76,954 (Dec. 18, 2008) (noting that under EPA's 2008

CERCLA/EPCRA Rule, large CAFOs "will still be required to notify . . . release[s] . . . under EPCRA").

51.     As of the date of this filing, EPA has not published a notice in the Federal Register of either a proposed or final rule concerning the EPCRA Exemption.

52.     As of the date of this filing, EPA has not made public an administrative record of the documents it used to develop the EPCRA Exemption.

53.     As of the date of this filing, EPA has not made public any public comments it received regarding the EPCRA Exemption.

54.     As of the date of this filing, EPA has not published any response to the public comments it received regarding the EPCRA Exemption.

55.     Plaintiffs and their members have sustained injuries from damage to their aesthetic, recreational, and economic interests, and they have grave concerns about health risks from pollution. *See, e.g*., Apfel Decl. Exhibit 18 (Declaration of D. Hall ¶¶ 7-10; Declaration of C. Cook ¶¶ 8-11; Declaration of D. Durkis ¶¶ 7-10; Declaration of S. Dye ¶¶ 10-11; Declaration of R. Hudkins ¶¶ 6-7, 9-10; Declaration of L. Inzerillo ¶¶ 5-10; Declaration of J. Jolin ¶¶ 6, 9-18; Declaration of C. Parke ¶¶ 4-7; Declaration of R. Partridge ¶¶ 3-12; Declaration of L. Proper ¶¶ 5-7; Declaration of C. Ramer ¶¶ 10-15; Declaration of M. Siebke ¶¶ 7-11; Declaration of Lowell Trom ¶¶ 8-23; Declaration of M. Wilson ¶¶ 7-8).

56.     Plaintiffs have many members who live, work, or recreate near CAFOs. *See, e.g.*, Apfel Decl. Exhibit 18 (Declaration of D. Hall ¶¶ 1-3, 5; Cook Decl. ¶¶ 6-7; Durkis Decl. ¶¶ 1, 5; Dye Decl. ¶¶ 5-6; Fashho Decl. ¶ 4; Hudkins Decl. ¶ 5; Inzerillo Decl. ¶ 4; Jolin Decl. ¶¶ 5, 7; Parke Decl. ¶¶ 1, 4; Partridge Decl. ¶ 2; Proper Decl. ¶ 1; Ramer Decl. ¶¶ 6-7; Siebke Decl. ¶¶ 6, 11; Trom Decl. ¶¶ 6-7; Wilson Decl. ¶ 3.

57.    Plaintiffs' members that live near CAFOs suffer from headaches and sinus and respiratory ailments, Apfel Decl. Exhibit 18 (Declaration of S. Dye ¶ 10, Declaration of L. Inzerillo ¶ 9, Declaration of R. Partridge ¶ 5; Declaration of L. Proper ¶ 7; Declaration of L. Trom ¶ 18), and even know family friends who have died from emissions when working at CAFOs, *id*. (Declaration of R. Partridge ¶ 11).

58.    EPA's EPCRA Exemption injures Plaintiffs' members by exposing them to increased levels of pollutants such as ammonia and hydrogen sulfide, which EPA lists as "extremely hazardous substances" under EPCRA.  40 C.F.R. pt. 355, app. A.

59.    Plaintiffs and their members have suffered an injury from the deprivation of information to which they are entitled.  If Plaintiffs had access to information from EPCRA release reports, they would use it to educate their members about such exceedances and the steps that people who live or recreate near these facilities could take to protect themselves from dangerous animal waste emissions – actions that are central to their organizational purposes. *See, e.g.*, Apfel Decl. Exhibit 18 (Declaration of D. Hall ¶ 1; Declaration of S. Brittle ¶¶ 5-6, 18; Declaration of H. Deck Decl. ¶¶ 12-14; Declaration of W. Hauter ¶¶ 7, 10-15, 19-20, 22; Declaration of C. Holbein ¶¶ 7, 15-18, 23; Declaration of A. Russ ¶¶ 6-8, 14, 16-19; Declaration of K. Smith ¶ 10; Declaration of M. Walden ¶¶ 10-14; Declaration of J. Williams ¶ 10).

60.    If Plaintiffs' members had access to information from EPCRA reports, either directly from their local emergency response agency or through Plaintiff organizations, they would use this information to take measures to protect their health and quality of life.  *See, e.g.*, Apfel Decl. Exhibit 18 (Declaration of D. Hall ¶ 13; Declaration of C. Cook ¶ 13; Declaration of D. Durkis ¶¶ 6, 11, 13; Declaration of S. Dye ¶ 12; Declaration of R. Hudkins ¶¶ 13; Declaration of L. Inzerillo ¶¶ 11-14; Declaration of J. Jolin ¶¶ 20-28; Declaration of C. Parke ¶¶ 8-14;

Declaration of R. Partridge ¶¶ 13-18; Declaration of L. Proper ¶¶ 11-12, 15; Declaration of M.

Siebke ¶¶ 16-24; Declaration of L. Trom ¶¶ 26-32; Declaration of J. Wilson ¶¶ 10-13).

61.     Plaintiffs and their members have suffered injury to their procedural rights and

protections provided by the Administrative Procedure Act.  *See, e,g.*, Apfel Decl. Exhibit 18

(Declaration of D. Hall ¶ 12; Declaration of S. Brittle ¶ 19; Declaration of C. Cook ¶ 12;

Declaration of D. Durkis ¶ 12; Declaration of W. Hauter ¶ 21; Declaration of C. Holbein ¶¶ 19-

22; Declaration of L. Inzerillo ¶ 15; Declaration of C. Parke ¶ 15; Declaration of R. Partridge ¶

20; Declaration of L. Proper ¶ 16; Declaration of C. Ramer ¶ 16; Declaration of A. Russ ¶ 20;

Declaration of K. Smith ¶ 11; Declaration of M. Walden ¶ 15; Declaration of J. Williams ¶ 11).

62.     Plaintiffs' missions and purposes include educating their members and the public

about harmful air pollution from CAFOs, helping people protect themselves against it, and

advocating for better public health protections.  *See e.g*., Apfel Decl. Exhibit 18 (Declaration of

D. Hall ¶ 1; Declaration of S. Brittle ¶¶ 2-4, 9-12; Declaration of H. Deck ¶¶ 6-11; Declaration of

W. Hauter ¶¶ 4-6; Declaration of C. Holbein ¶¶ 3-5, 12; Declaration of A. Russ ¶¶ 3-5, 8-9;

Declaration of K. Smith ¶¶ 4-7; Declaration of M. Walden ¶¶ 2-4; Declaration of J. Williams

Decl. ¶¶ 1-5).

63.     The U.S. Court of Appeals for the District of Columbia determined that the

plaintiffs in that case – many of whom are Plaintiffs here – have standing to challenge EPA's

exemption of CAFOs from EPCRA reporting.  *Waterkeeper All.*, 853 F.3d at 533 (citing *FEC v.*

*Akins*, 524 U.S. 11, 21 (1998).

DATED:        October 29, 2018            Respectfully submitted,

CARRIE APFEL
LAURA DUMAIS
Earthjustice
1625 Massachusetts Avenue NW, Suite 702
Washington, DC 20036
(202) 667-4500
(202) 667-2356 [*FAX*]
capfel@earthjustice.org
ldumais@earthjustice.org

PETER LEHNER*
JONATHAN J. SMITH*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7376
(212) 918-1556 [*FAX*]
plehner@earthjustice.org
jjsmith@earthjustice.org

* *Pro Hac Vice* Applicants

*Counsel for Plaintiffs Rural Empowerment Association for Community Help, Animal Legal Defense Fund,*
*Center for Food Safety, Don't Waste Arizona, Environmental Integrity Project, Food & Water Watch,*
*Humane Society of the United States, Sierra Club, Sound Rivers, and Waterkeeper Alliance*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RURAL EMPOWERMENT ASSOCIATION FOR COMMUNITY HELP, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civ. No. 18-cv-02260-TJK |
| v. | ) ) | **Memorandum of Points** |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | ) ) ) | **And Authorities** |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ..................................................................................................................1

FACTUAL AND REGULATORY BACKGROUND ....................................................2

I.      EMISSIONS OF EXTREMELY HAZARDOUS SUBSTANCES AT
         CONCENTRATED ANIMAL FEEDING OPERATIONS .................................2

II.     REPORTING REQUIREMENTS UNDER EPCRA .........................................4

III.    EPA'S EFFORTS TO EXEMPT CAFOS FROM REPORTING UNDER EPCRA..........6

JURISDICTION, VENUE, AND STANDING................................................................9

I.      JURISDICTION AND VENUE ........................................................................9

II.     PLAINTIFFS AND THEIR MEMBERS SUFFER HEALTH, QUALITY OF
         LIFE, INFORMATIONAL, AND PROCEDURAL HARMS FROM THE
         EPCRA EXEMPTION........................................................................................9

ARGUMENT ....................................................................................................................16

I.      STANDARD OF REVIEW ..............................................................................16

II.     THIS COURT MUST VACATE THE EPCRA EXEMPTION BECAUSE EPA
         ISSUED IT IN VIOLATION OF APA PROCEDURAL REQUIREMENTS.................17

         A.      The EPCRA Exemption is a Reviewable Final Agency Action. ............17

         B.      Notice and Comment Requirements Apply to the EPCRA Exemption
               Because it is a Substantive Rule with the Force and Effect of Law. ....................19

               1.      The EPCRA Exemption Has Actual Legal Effect Because It
                        Creates a Substantive Change to the Regulatory Regime that
                        Governs CAFOs.....................................................................................21

               2.      EPA Itself Characterizes Its Action as One That Requires Notice
                        and Comment. ......................................................................................23

               3.      The EPCRA Exemption Uses Mandatory Language That Is
                        Binding as a Practical Matter. ............................................................24

          C.      EPA Failed to Comply with the APA's Procedural Requirements in
               Issuing the EPCRA Exemption............................................................26

D.      Given EPA's Failure to Comply with APA Procedural Requirements, the
        Court Must Vacate the EPCRA Exemption...........................................................27

III.    THE EPCRA EXEMPTION MUST BE VACATED BECAUSE IT VIOLATES
        THE CLEAR STATUTORY LANGUAGE AND PURPOSE OF EPCRA. ...................29

A.      The Plain Language of EPCRA's "Sweeping Reporting Mandate"
        Prevents EPA From Creating Reporting Exemptions for CAFOs.........................30

B.      This Circuit Has Held that EPA Has No Room to Craft Exemptions from
        EPCRA's "Sweeping Reporting Mandate." ........................................................32

C.      EPA's Exemption of CAFOs from EPCRA Reporting Contravenes Plain
        Statutory Language and Fails under *Chevron* Step One.......................................33

        1.      The Text of EPCRA Clearly Requires CAFOs to Report Releases
                Regardless of CERCLA's Reporting Requirements...................................33

        2.      EPA's Reading of EPCRA's "Routine Agricultural Operations"
                Provision Contravenes Clear Statutory Language and Cannot
                Justify the EPCRA Exemption. ................................................................37

                a.      EPA's New Interpretation Cannot Be Squared with the
                        Plain Meaning of EPCRA and Thus Fails Under *Chevron*
                        Step One.......................................................................................37

                b.      This Circuit – and EPA Itself – Already Rejected EPA's
                        "Routine Agricultural Operations" Interpretation. .......................40

D.      EPA's Interpretation of EPCRA Is Arbitrary, Capricious, and An Abuse of
        Discretion and Thus Also Fails Under *Chevron* Step Two...................................42

CONCLUSION...............................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*,
    340 U.S. 593 (1951)........................................................................................................35

*Advocate Health Care Network v. Stapleton*,
    137 S. Ct. 1652 (2017)..................................................................................................40

*Aera Energy LLC v. Salazar*,
    642 F.3d 212 (D.C. Cir. 2011) ................................................................................42 n.23

*Am. Ass'n of Cosmetology Sch. v. DeVos*,
    258 F. Supp. 3d 50 (D.D.C. 2017) ................................................................................39

*Am. Mining Cong.v. Mine Safety & Health Admin.*,
    995 F.2d 1106 (D.C. Cir. 1993) ............................................................................22, 23 n.13

*Appalachian Power Co. v. EPA*,
    208 F.3d 1015 (D.C. Cir. 2000) ....................................................................................24

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
    785 F.3d 710 (D.C. Cir. 2015) ......................................................................................25

*Ass'n of Irritated Residents v. EPA*,
    494 F.3d 1027 (D.C. Cir. 2007) ................................................................................21, 32

*Avila v. Olivera Egg Ranch, LLC*,
    No. 2:08-cv-02488 JAM KJN (E.D. Cal. Aug. 26, 2010) ......................................................13

*Bennett v. Spear*,
    520 U.S. 154 (1997)....................................................................................................18

*United States v. Bestfoods*,
    524 U.S. 51 (1998)......................................................................................................30

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*,
    566 U.S. 399 (2012)....................................................................................................35

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)....................................................................................................16

*Chamber of Commerce of U.S. v. Occupational Safety & Health Admin.*,
    636 F.2d 464 (D.C. Cir. 1980) ..................................................................................24, 28

iv

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837, 842 (1984) ...................................................................16

*Christensen v. Harris Cty.*,
  529 U.S. 576 (2000) ..........................................................20 n.10, 23

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ..........................................................19, 20 n.10

*Comcast Corp. v. F.C.C.*,
  579 F.3d 1 (D.C. Cir. 2009) ...........................................................10 n.5

*Consumer Elec. Ass'n v. FCC*,
  347 F.3d 291 (D.C. Cir. 2003) ...........................................................32

*Corley v. United States*,
  556 U.S. 303 (2009) ...........................................................................34

*Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
  704 F.3d 413 (5th Cir. 2013) .............................................................13

*Daimler Trucks N. Am. LLC v. EPA*,
  737 F.3d 95 (D.C. Cir. 2013) .............................................................27

*Durant v. D.C. Gov't*,
  875 F.3d 685 (D.C. Cir. 2017) ...........................................................16

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
  653 F.3d 1 (D.C. Cir. 2011) ...................................20 n.11, 24, 25

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) ...............................................................42-43

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ...........................................................................42

*Friedman v. Fed. Aviation Admin.*,
  841 F.3d 537 (D.C. Cir. 2016) ...........................................................18

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ...........................................................11, 12, 29 n.17

*Gen. Elec. Co. v. EPA*,
  290 F.3d 377 (D.C. Cir. 2002) ...................................................21, 25

*Gray v. Sanders*,
  372 U.S. 368 (1963) ...........................................................................30 n.17

*Heartland Reg'l Med. Ctr. v. Sebelius*,
    566 F.3d 193 (D.C. Cir. 2009) ........................................................................27

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ........................................................................................10

*In Re Lang Ice Co.*,
    CERCLA-05-2006-0006, 2005 WL 4755401 (EPA Region V Nov. 7, 2005) ...............36 n.19

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ....................................................................................20 n.10

*Loughrin v. United States*,
    134 S. Ct. 2384 (2014) ..............................................................................34, 35

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..................................................................................10, 13

*Mack Trucks, Inc. v. EPA*,
    682 F.3d 87 (D.C. Cir. 2012) ....................................................... 18 n.8, 27-28

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) ....................................................................24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................42, 43, 45 n.24

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ........................................................ 20-22, 25

*Nat. Res. Def. Council v. EPA*,
    489 F.3d 1364 (D.C. Cir. 2007) ....................................................................10

*Nat. Res. Def. Council v. EPA*,
    755 F.3d 1010 (D.C. Cir. 2014) ................................................................10, 12

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*,
    894 F.3d 95 (2d Cir. 2018) ..........................................................................28

*In re Noveon Kalama, Inc.*,
    EPCRA-10-2006-0268, 2006 WL 4093152 (EPA Region X May 19, 2006) ...............36 n.19

*Owens v. Republic of Sudan*,
    864 F.3d 751 (D.C. Cir. 2017) ......................................................................34

*Perez v. Mortg. Bankers Ass'n*,
    135 S. Ct. 1199 (2015) ........................................................................20 n.9, 26

*In re Rainbow Glacier, Inc.*,
   EPCRA-10-2003-0109, 2003 WL 23413789 (EPA Region X Oct. 8, 2003) ................36 n.19

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
   547 U.S. 47 (2006) ....................................................................................................10 n.5

*S.C. Coastal Conservation League v. Pruitt*,
   No. 18-CV-330-DCN, 2018 WL 3933811 (D.S.C. Aug. 16, 2018) ..............................27 n.15

*Safari Club Int'l v. Jewell*,
   842 F.3d 1280 (D.C. Cir. 2016) ............................................................................................18

*Scenic Am., Inc. v. U.S. Dep't of Transp.*,
   836 F.3d 42 (D.C. Cir. 2016) ........................................................................................18, 19

*Shalala v. Guernsey Memorial Hosp.*,
   514 U.S. 87 (1995) ..................................................................................................20 n.9, 22

*Sierra Club, Inc. v. Tyson Foods, Inc.*,
   299 F. Supp. 2d 693 (W.D. Ky. 2003) ............................................................................. 38-41

*Sierra Club v. EPA*,
   699 F.3d 530 (D.C. Cir. 2012) ............................................................................................14

*Sierra Club v. EPA*,
   873 F.3d 946 (D.C. Cir. 2017) ..............................................................................20, 23, 24

*Sierra Club v. Morton*,
   405 U.S. 727 (1972) ..............................................................................................................10

*Syncor Int'l Corp. v. Shalala*,
   127 F.3d 90 (D.C. Cir. 1997) ....................................................................................20 n.10, 22

*U.S. Army Corps of Engineers v. Hawkes Co.*,
   136 S. Ct. 1807 (2016) ................................................................................................ 17-18

*Massachusetts v. U.S. Dep't of Transp.*,
   93 F.3d 890 (D.C. Cir. 1996) ..............................................................................................17

*Vill. of Barrington, Ill. v. Surface Transp. Bd.*,
   636 F.3d 650 (D.C. Cir. 2011) ..............................................................................................17

*In re Wash. Fruit & Produce Co.*,
   EPCRA-10-2003-0105, 2003 WL 22891299 (EPA Region X Sept. 10, 2003)..............36 n.19

*Waterkeeper All. v. EPA*,
   853 F.3d 527 (D.C. Cir. 2017) ........................................................................................ *passim*

**Federal Statutes**

Administrative Procedure Act, 5 U.S.C. § 551 ..................................................19

5 U.S.C. § 553 ...........................................................................................19, 26, 28

5 U.S.C. § 702 .........................................................................................................16

5 U.S.C. §§ 702, 704, 706 ........................................................................................9

28 U.S.C. §1331 .......................................................................................................9

28 U.S.C. § 1391 ......................................................................................................9

28 U.S.C. § 2201 ......................................................................................................9

Comprehensive Environmental Response, Compensation, and Liability Act, 42
        U.S.C. § 9601 *et seq.* ...............................................................................4

42 U.S.C. § 9602 ................................................................................................4, 35

42 U.S.C. § 9603 ..................................................................................................4, 5

Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 *et
        seq.* .......................................................................................... *passim*

42 U.S.C. § 11002 ..................................................................4, 31, 35, 37 n.20

42 U.S.C. § 11004 ..................................................................................... *passim*

442 U.S.C. § 11021 ......................................................... 37 & n.20, 38, 39, 41

42 U.S.C. § 11023 ..................................................................................................40

42 U.S.C. § 11044 ....................................................................................................4

42 U.S.C. § 11045 ..................................................................................................22

42 U.S.C.§ 11049 ...................................................... 5, 30-31, 37 n.20, 41

Consolidated Appropriations Act, 2018. Consolidated Appropriations Act of
        2018, Pub. L. 115-141, § 1102, 132 Stat. 348, 1148 (2018) ("FARM Act") ................. *passim*

**Regulations**

29 C.F.R. § 1910.119 app. A ............................................................37 n.21

29 C.F.R. § 1910.1200(c) ................................................................37 n.20

40 C.F.R. pt. 355, app. A ............................................................. 4, 30, 37 nn.20 & 21

40 C.F.R. § 122.23 ..............................................................................3 n.2, 30

40 C.F.R. § 302.4 ......................................................................................5

70 Fed. Reg. 4958 ...................................................................................6 n.3

73 Fed. Reg. 76,948 ............................................................................ *passim*

**Other Authorities**

115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018) ..................................36, 43

Fed. R. Civ. P. 56.......................................................................................16

**INTRODUCTION**

Industrial livestock operations housing pigs, chickens, dairy cows, and other animals

produce millions of tons of animal waste per year and are some of the country's largest sources

of highly toxic air emissions such as hydrogen sulfide and ammonia.  Plaintiffs Rural

Empowerment Association for Community Help, Animal Legal Defense Fund, Center for Food

Safety, Don't Waste Arizona, Environmental Integrity Project, Food & Water Watch, Humane

Society of the United States, Sierra Club, Sound Rivers, and Waterkeeper Alliance (collectively,

"Plaintiffs") challenge the U.S. Environmental Protection Agency's ("EPA's" or "the

Agency's") procedurally and substantively illegal "guidance" that instructs concentrated animal

feeding operations ("CAFOs") that these emissions "do not need to be reported" to their local

and state emergency responders and communities, despite Congress's clear mandate that they

report such emissions.

CAFOs, especially the larger ones at issue here, often house many hundreds or thousands

of large animals such as dairy cows or pigs, or millions of smaller animals such as chickens.

These operations produce a prodigious amount of waste – in the form of feces, urine, and

carcasses – every day.  This waste is typically stored on-site in large pits, piles, sheds, or barns

before being sprayed or spread on fields (supposedly as fertilizer but often as nothing more than

waste disposal).  Not only does this create nuisance odors, but it also creates poisonous gases.

Given the toxic nature of these gases, Congress, in the Emergency Planning and Community

Right-To-Know Act ("EPCRA"), mandated that facilities releasing more than 100 pounds per

day of certain "extremely hazardous" chemicals, including ammonia and hydrogen sulfide,

report those emissions to state and local emergency responders.  This information – which must

be made publicly available – enables community members and responders to develop response

plans, craft remedial measures, investigate facilities, and protect against future releases.  Larger CAFOs easily release enough extremely hazardous substances to trigger EPCRA reporting requirements.

For more than a decade, EPA has taken steps to undermine the effectiveness of EPCRA's reporting requirement by exempting these industrial-scale CAFOs from their clear statutory obligations to report high volumes of toxic releases.  Most recently, just months after the United States Court of Appeals for the District of Columbia concluded that EPCRA does not give EPA authority to exempt smaller CAFOs from reporting releases of hazardous air pollutants from animal waste, EPA attempted to create just such an exemption through a rule the Agency posted on its website and styled as "guidance."  As a result of EPA's new "guidance," for the first time ever, even the largest CAFOs do not have to report their emissions under EPCRA.  EPA's rulemaking through "guidance," and without notice and comment, flouts basic tenets of administrative law.  And even if EPA's rulemaking were procedurally sound, the plain language of EPCRA provides no room for EPA to craft the reporting exemption instituted by the guidance. The statute sets forth a sweeping mandate that large-volume toxic releases ***must be reported***, and the provisions on which EPA bases its exemptions do not limit this mandate.  Plaintiffs thus challenge the EPCRA reporting exemption as blatantly illegal, both in procedure and substance.

## FACTUAL AND REGULATORY BACKGROUND[1]

## I.    EMISSIONS OF EXTREMELY HAZARDOUS SUBSTANCES AT CONCENTRATED ANIMAL FEEDING OPERATIONS

The large-scale CAFOs at issue here are nothing like the bucolic vision of a "farm" one

---

[1] A statement of material facts for which there are no issues in dispute sets forth in detail the facts of this case and accompanies this filing.  Citations to this statement will appear as "SUF" in this Memorandum.

commonly sees in advertisements or political statements. Instead, they are industrial facilities where vast numbers of animals are raised in concentrated areas for eggs, dairy, or slaughter, generating enormous quantities of urine and feces, in addition to animal carcasses.[2] SUF ¶ 2. A single large CAFO can produce more waste than an average city, SUF ¶ 5, but unlike a city that treats its sewage at wastewater treatment plants, industrial-scale CAFOs store untreated animal feces and urine in giant pits or piles that emit ammonia and hydrogen sulfide. SUF ¶ 6.

Chronic exposure to ammonia at levels as low as 0.7 parts per million ("ppm") may trigger decreased lung function and respiratory symptoms, and exposure at higher concentrations can lead – and has led – to scarring of the respiratory tract and even death. SUF ¶ 7. Numerous studies have reported ammonia concentrations of greater than 100 ppm at CAFOs, with some concentrations reaching over 200 ppm. SUF ¶ 8. Exposure to hydrogen sulfide can similarly lead to major health problems, with even low concentrations triggering headaches, nausea, and eye, skin, and respiratory irritation. SUF ¶ 9. Hydrogen sulfide also targets the nervous system, and chronic low-level exposure can impair balance, visual field performance, color discrimination, hearing, memory, mood, and intellectual function. SUF ¶ 10. Higher levels of exposure can cause a loss of consciousness and death. SUF ¶ 11. People living near CAFOs show increased rates of ailments such as respiratory problems, headaches, diarrhea, and nausea.

---

[2] Under EPA regulations, the general term "animal feeding operation" ("AFO") applies to any facility that confines animals but does not sustain crops or vegetation during the normal growing season. 40 C.F.R. § 122.23(b)(1). EPA classifies larger AFOs as either medium or large "concentrated animal feeding operations" ("CAFOs") based on the number and type of animal confined. SUF ¶ 3; 40 C.F.R. § 122.23(b)(2). For example, a chicken AFO with a dry manure handling system is a "medium CAFO" if it confines 37,500 chickens or more, and it is a "large CAFO" if it confines 125,000 chickens or more. *Id.* § 122.23(b)(4), (6). This brief uses the term "CAFO" throughout because an AFO that is not large enough to be classified as a medium or large CAFO is generally not expected to emit toxics at levels that trigger EPCRA reporting. *See infra* Factual and Regulatory Background, Section II.

SUF ¶ 12.  People have become seriously ill and even died as a result of breathing fumes released during manure pit agitation, a process necessary for liquid manure storage systems. SUF ¶ 13.

## II.    REPORTING REQUIREMENTS UNDER EPCRA

EPCRA, 42 U.S.C. § 11001 *et seq.*, is a federal law that ensures that local communities have adequate information about chemical hazards in their area so they can effectively plan for and respond to chemical releases – including continuous releases – and other dangerous situations.  Release reporting under EPCRA also provides first responders with information critical to appropriately assess and safely respond to citizen complaints of suspicious or noxious odors, such as those emanating from CAFOs.

More specifically, EPCRA requires facilities that "release" more than a threshold quantity of an "extremely hazardous substance" to report that release to local emergency response agencies, and those reports must be made available to the public.  *See* SUF ¶ 14; 42 U.S.C. §§ 11004, 11044(a).  Under EPCRA, EPA must publish a list of extremely hazardous substances that will be subject to this reporting requirement, and must also determine, by regulation, "reportable quantities," *i.e.*, threshold quantities of releases above which a report is required.  SUF ¶ 15; 42 U.S.C. §§ 11002(a), 11004(a)(2)(B).  Ammonia and hydrogen sulfide are both on EPA's list of EPCRA "extremely hazardous substances," with reportable quantities of 100 pounds per day for each.  SUF ¶ 16; 40 C.F.R. pt. 355, app. A.

These EPCRA provisions are similar to provisions of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") that likewise require EPA to list "hazardous substances" with reportable quantities and require facilities to report both isolated and continuous releases.  *See* 42 U.S.C. §§ 9602, 9603(a).  While EPCRA requires submission of

release reports to state and local emergency response agencies, CERCLA requires submission of such reports to the federal government. *Compare id.* § 9603(a) with *id.* § 11004(b), (c). Under CERCLA, EPA lists ammonia and hydrogen sulfide as "hazardous substances" with a reportable quantity of 100 pounds per day for each, just as under EPCRA. 40 C.F.R. § 302.4(a).

Under EPCRA, "release" means "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . of any hazardous chemical, extremely hazardous substance, or toxic chemical." SUF ¶ 17; 42 U.S.C. § 11049(8). The term "environment," in turn, "includes water, air, and land and the interrelationship which exists among and between water, air, and land and all living things." SUF ¶ 17; 42 U.S.C.§ 11049(2).

Large-scale CAFOs – which house a huge proportion of the country's food-producing animals – emit significant volumes of air pollutants that commonly exceed EPCRA's reportable quantities. SUF ¶ 4. But the majority of farms are either (a) pasture or grazing operations that might not meet EPCRA's definition of "facility," *see* 42 U.S.C. § 11049(4), or (b) smaller operations that do not need to report emissions of ammonia and hydrogen sulfide under EPCRA because their emissions do not exceed the applicable reportable quantity of 100 pounds per day. For example:

- Approximately 59 percent of broiler chicken operations are not expected to emit 100 pounds or more of ammonia per day, and an even greater percentage are not expected to emit 100 pounds or more of hydrogen sulfide per day. *See* SUF ¶ 18(a).

- Approximately 91 percent of swine operations with grower or finisher pigs are not expected to emit 100 pounds or more of ammonia per day, and an even greater percentage are not expected to emit 100 pounds or more of hydrogen sulfide per day. *See* SUF ¶ 18(b).

5

- Approximately 97 percent of dairy operations are not expected to emit 100 pounds or more of ammonia per day, and an even greater percentage are not expected to emit 100 pounds or more of hydrogen sulfide per day.  *See* SUF ¶ 18(c).

- Approximately 96 percent of beef operations are not expected to emit 100 pounds or more of ammonia per day.  *See* SUF ¶ 18(d).

The vast majority of farms are not expected to release the reportable quantity of these toxic chemicals and thus would not need to report agricultural emissions under EPCRA.  SUF ¶ 19. Rather, it is the larger, industrial animal feeding operations – typically those that house thousands or even millions of animals – that release toxic emissions surpassing the reportable quantities of ammonia and hydrogen sulfide and that pose grave public health risks to surrounding communities.

## III.    EPA'S EFFORTS TO EXEMPT CAFOS FROM REPORTING UNDER EPCRA

In 2008, in response to an industry petition, EPA finalized a rule exempting all animal feeding operations from reporting hazardous substances released into the air from animal waste under CERCLA, and exempting all but the largest CAFOs from reporting such releases of extremely hazardous substances under EPCRA.[3]  CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste, 73 Fed. Reg. 76,948

---

[3] Even prior to this rulemaking, EPA had attempted to undermine CERCLA and EPCRA's reporting mandate for CAFOs.  In 2005, EPA entered into an agreement with thousands of AFOs – including over 90% of large CAFOs in operation at the time – to suspend the Agency's CERCLA/EPCRA reporting enforcement while it developed methodologies to estimate air emissions from CAFOs.  *See* Animal Feeding Operations Consent Agreement and Final Order, 70 Fed. Reg. 4958 (Jan. 31, 2005).  EPA has delayed its development and publication of these estimating methodologies for over a decade.  According to a recent EPA Office of Inspector General report, EPA represented that it would begin publishing these methodologies by 2009, but as of May 2017, EPA had still "not finalized its work plan or established timeframes to finish the methodologies." SUF ¶ 30.

(Dec. 18, 2008) ("2008 CERCLA/EPCRA Rule"); SUF ¶¶ 20, 21.[4]  In April 2017, after years of

litigation, the D.C. Circuit found EPA's exemption from the statutory reporting mandates under

CERCLA and EPCRA unlawful and vacated the rule.  *Waterkeeper All. v. EPA*, 853 F.3d 527,

537–38 (D.C. Cir. 2017); SUF ¶ 28.

On October 25, 2017, despite the D.C. Circuit's ruling, EPA released guidance

documents directing animal feeding operations that they need not comply with EPCRA's

reporting requirement.  *See* SUF ¶¶ 31, 33.  In the 2017 EPCRA Exemption, EPA explained that

it is now interpreting EPCRA to exclude "farms" that use substances in "routine agricultural

operations" from EPCRA reporting.  SUF ¶ 33.  EPA stated that although it intended to "conduct

a rulemaking to clarify its interpretation," the exemption nonetheless took immediate effect, even

before the start of the proposed rulemaking process EPA alluded to.  SUF ¶ 34.  Notably, and as

discussed in detail below, EPA's new rational for the 2017 EPCRA Exemption is contrary to

EPA's longstanding prior position on EPCRA reporting.  On at least three occasions prior to the

2017 EPCRA Exemption, EPA expressly rejected the "routine agricultural operations" theory.

*See infra* Argument, Section III.C.2.b; *see also* SUF ¶¶ 23, 25, 27.

On March 23, 2018, Congress enacted the Consolidated Appropriations Act, 2018.

Consolidated Appropriations Act of 2018, Pub. L. 115-141, § 1102, 132 Stat. 348, 1148 (2018).

SUF ¶ 35.  Title XI – known as the "Fair Agricultural Reporting Method Act" or "FARM Act" –

expressly exempts "air emissions from animal waste (including decomposing animal waste) at a

---

[4] When finalizing the rule, EPA agreed with a comment that "[s]mall farms should not be
affected even if the reporting requirements stay in place because these farms do not generally
have a large enough herd of animals to reach the requisite levels of toxins."  SUF ¶ 23; *see also*
2008 CERCLA/EPCRA Rule, 73 Fed. Reg. at 76,958 (acknowledging in its Regulatory Impact
Analysis of the 2008 Rule that "small farms would probably not be affected by the reporting
requirements" of EPCRA).

farm" from reporting under CERCLA Section 103.  *Id*.  The FARM Act did not exempt farms from reporting under EPCRA, or otherwise make any mention of EPCRA.  SUF ¶ 36.  Instead, when enacting the CERCLA exemption in the FARM Act, legislators expressly stated that EPCRA reports are still required.  SUF ¶ 37 (FARM Act Co-Sponsor Senator Carper stated on the record that the Act "leaves intact reporting requirements under [EPCRA].").

Despite this, in April 2018, EPA amended its EPCRA Exemption to add an additional legal theory: because Congress exempted CAFOs from reporting under CERCLA, and because some EPCRA reporting is linked to emissions that "occur in a manner" that would require CERCLA reporting, EPA asserted that CAFOs similarly need not report under EPCRA.  SUF ¶¶ 38-41.  CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms (April 30, 2018) ("EPCRA Exemption").  As with the initial 2017 EPCRA Exemption, EPA stated its plans to conduct a rulemaking on the new legal theory, yet the Agency made the exemption effective immediately.  SUF ¶ 43.

After EPA issued its EPCRA Exemption, ten members of the Senate Committee on Environment and Public Works – including two co-sponsors of the FARM Act – asked EPA to immediately rescind the EPCRA Exemption because it is "legally flawed and is based on an erroneous interpretation of the law with implications beyond reporting of releases from animal waste," and because it "exceed[s] EPA's statutory authority."  SUF ¶ 47.  The letter additionally noted that "[n]one of the hearing statements of the Committee members, witnesses, or materials entered into either the Committee record or the Congressional Record at the time of the FARM Act's passage support EPA's new interpretation of EPCRA" and that EPA's new reading of EPCRA is "[o]bviously . . . inconsistent with longstanding EPA policy."  *Id*.

Shortly after Plaintiffs filed their Complaint in this case, EPA again revised its EPCRA

Exemption, this time to remove the FARM Act justification as a supporting rationale for why CAFOs need not report their emissions.  SUF ¶ 48.

## JURISDICTION, VENUE, AND STANDING

### I.    JURISDICTION AND VENUE

This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, as it presents a federal question.  The EPCRA Exemption is a final agency action subject to review pursuant to the APA.  *See* 5 U.S.C. §§ 702, 704, 706.  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201, and the Court has authority to issue the requested relief.  *Id.* § 2201(a).  Venue is proper in the District of Columbia because Defendants and a number of Plaintiffs (Center for Food Safety, Food & Water Watch, and the Humane Society of the United States) reside in this district, and because the events giving rise to the cause of action occurred in this district.  28 U.S.C. § 1391(e)(1).

### II.    PLAINTIFFS AND THEIR MEMBERS SUFFER HEALTH, QUALITY OF LIFE, INFORMATIONAL, AND PROCEDURAL HARMS FROM THE EPCRA EXEMPTION.

Plaintiffs and their members have standing to sue here, as they did in their D.C. Circuit challenge to another CAFO reporting exemption.  *See Waterkeeper All.*, 853 F.3d at 532-34; SUF ¶ 63.  Toxic releases from CAFOs negatively affect Plaintiffs' members' health and their aesthetic and recreational interests, it is within Plaintiffs' missions to protect against such harms, and an order from this Court requiring CAFOs to comply with the statutory reporting requirements will allow Plaintiffs and their members to protect against these harms.

An organization has "associational standing" and may sue on behalf of its members "when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted

nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977).  An organization's members have standing to sue in their own right if they suffer an injury in fact that is: (1) actual or imminent, not conjectural or hypothetical; (2) fairly traceable to an agency's challenged action; and (3) likely to be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Plaintiffs unquestionably have standing under either of these tests.  They have suffered three distinct actual injuries, which each independently qualifies as an injury-in-fact sufficient to confer organizational and associational standing.[5]

The first injury Plaintiffs and their members have sustained is injury from damage to their aesthetic, recreational, and economic interests, and they have grave concerns about health risks from pollution.  SUF ¶ 55.  Plaintiffs need only show that they or their members use the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity.  *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972); *see also Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1016-17 (D.C. Cir. 2014) (environmental group had standing where its members spent time near polluting facilities and were "concerned about the emissions' effects on their health"); *Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1370–71 (D.C. Cir. 2007) (environmental organizations could challenge EPA rules regulating hazardous

---

[5] "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," so if this Court finds that one Plaintiff has standing, it "need not determine whether the other plaintiffs have standing" as well.  *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,* 547 U.S. 47, 52 n.2 (2006); *see also Comcast Corp. v. F.C.C.*, 579 F.3d 1, 6 (D.C. Cir. 2009) (quoting *Ry. Labor Executives' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993)) ("if one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case.").

air pollutants when some of their members lived near regulated facilities and experienced diminished enjoyment of outdoor activities due to the facilities' air pollution). *See also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 183–84 (2000) (members' reasonable concerns about the effects of pollutant discharges on their recreational and aesthetic interests are sufficient to confer standing on environmental group).

As Plaintiffs and their members vividly describe in their declarations, they unquestionably satisfy this standard. *See, e.g*., Hall Decl. ¶¶ 7-10;[6] Cook Decl. ¶¶ 8-11; Durkis Decl. ¶¶ 7-10; Dye Decl. ¶¶ 10-11; Hudkins Decl. ¶¶ 6-7, 9-10; Inzerillo Decl. ¶¶ 5-10; Jolin Decl. ¶¶ 6, 9-18; Parke Decl. ¶¶ 4-7; Partridge Decl. ¶¶ 3-12; Proper Decl. ¶¶ 5-7; Ramer Decl. ¶¶ 10-15; Siebke Decl. ¶¶ 7-11; Trom Decl. ¶¶ 8-23; Wilson Decl. ¶¶ 7-8. Plaintiffs have many members who live, work, or recreate near CAFOs. SUF ¶ 56; Hall Decl. ¶ 5; Cook Decl. ¶¶ 6-7; Durkis Decl. ¶¶ 1, 5; Dye Decl. ¶¶ 5-6; Fashho Decl. ¶ 4; Hudkins Decl. ¶ 5; Inzerillo Decl. ¶ 4; Jolin Decl. ¶¶ 5, 7; Parke Decl. ¶¶ 1, 4; Partridge Decl. ¶ 2; Proper Decl. ¶ 1; Ramer Decl. ¶¶ 6-7; Siebke Decl. ¶¶ 6, 11; Trom Decl. ¶¶ 6-7; Wilson Decl. ¶ 3. Plaintiffs' members who live near CAFOs suffer from headaches and sinus and respiratory ailments, Dye Decl. ¶ 10, Inzerillo Decl. ¶ 9, Partridge Decl. ¶ 5; Proper Decl. ¶ 7; Trom Decl. ¶ 18, and even know family friends who have died from emissions when working at CAFOs, Partridge Decl. ¶ 11; SUF ¶ 57. Plaintiffs' members are also keenly aware that pollution from nearby CAFOs has decreased the value of their property or made it unmarketable. Cook Decl. ¶¶ 8-11; Inzerillo Decl. ¶ 10; Partridge Decl. ¶ 19. Plaintiffs' members include a previous member of an EPCRA local emergency planning committees who knows firsthand the "immediate health threat" that CAFO

---

[6] All declarations are attached as Exhibit 18 to the declaration of Carrie Apfel.

emissions can pose.  Brittle Decl. ¶¶ 7, 15-17.   In addition, some Plaintiffs and their members have suffered related injuries because CAFOs' release of toxic air emissions can be harmful to both the welfare of animals raised for food in these facilities and the wildlife living near these facilities.  *See, e.g.*, Holbein Decl. ¶¶ 4-5; Siebke Decl. ¶ 1, 16; Trom Decl. ¶¶ 4-5, 8. Walden Decl. ¶¶ 2-4.

EPA's EPCRA Exemption injures Plaintiffs' members by exposing them to increased levels of pollutants.  In addition, the EPCRA Exemption is likely to increase emissions because, according to EPA itself, requiring reporting serves as a check on emissions, increasing the likelihood that a facility will take voluntary steps to reduce its emissions below the reporting threshold or eliminate its emissions.  EPA, 1 Regulatory Impact Analysis of Reportable Quantity Adjustments Under Sections 102 and 103 of the Comprehensive Environmental Response, Compensation, and Liability Act, at 34 (1985).

Finally, these injuries are particularized: the standing declarants live, work, and recreate near CAFOs that emit large amounts of animal waste pollution and thus Plaintiffs' members are affected in a way distinct from the general population.  SUF ¶ 56; *see also, e.g.*, Hall Decl. ¶¶ 5-6; Cook Decl. ¶¶ 6-7; Durkis Decl. ¶¶ 1, 5; Dye Decl. ¶¶ 5-6; Fashho Decl. ¶ 4; Hudkins Decl. ¶ 5; Inzerillo Decl. ¶ 4; Jolin Decl. ¶¶ 5, 7; Parke Decl. ¶¶ 1, 4; Partridge Decl. ¶ 2; Proper Decl. ¶ 1; Ramer Decl. ¶¶ 6-7; Siebke Decl. ¶¶ 6, 11; Trom Decl. ¶¶ 6-7; Wilson Decl. ¶ 3.  These injuries qualify as injuries in fact sufficient for standing.  *Laidlaw*, 528 U.S. at 183–84; *Nat. Res. Def. Council*, 755 F.3d at 1016-17.

The second injury Plaintiffs and their members have suffered is a deprivation of information to which they are entitled.  This is sufficient injury in fact for organizational or associational standing.  Indeed, when determining that some of the same Plaintiffs here had

standing to challenge EPA's 2008 attempt to exempt CAFOs from reporting under EPCRA, the

D.C. Circuit recently emphasized that "[a] plaintiff suffers an 'injury in fact' when agency action

cuts him off from 'information which must be publicly disclosed pursuant to a statute.'"

*Waterkeeper All.*, 853 F.3d at 533 (citing *FEC v. Akins*, 524 U.S. 11, 21 (1998)); *see also*

*Defenders of Wildlife*, 504 U.S. at 572 n.7; *cf Ctr. for Biological Diversity, Inc. v. BP Am. Prod.*

*Co.*, 704 F.3d 413, 429–30 (5th Cir. 2013) (finding informational harms conferred standing

under EPCRA, and citing cases); *see also* Order Denying Plaintiffs' Motion for Partial Summary

Judgment and Denying Defendant's Motions to Dismiss, *Avila v. Olivera Egg Ranch, LLC*, No.

2:08-cv-02488 JAM KJN (E.D. Cal. Aug. 26, 2010) at Docket 160, *and id*. at Document 159,

Hearing Transcript of Oral Argument re Motion to Dismiss and Cross-Motion for Summary

Judgment at 47-48 (E.D. Cal. Aug. 11, 2010) (denying defendant CAFO's motion to dismiss

based on finding that HSUS had standing to sue CAFO for failure to file EPCRA and CERCLA

reports based on allegations of informational injury indistinguishable from those made by

Plaintiffs in the instant case).

 The EPCRA Exemption here deprives Plaintiffs and their members who live, work, or

recreate near CAFOs of the ability to know when CAFOs release toxic air pollutants in amounts

that exceed EPCRA reportable quantities and deprives them of their right to know the quantity of

those emissions, and thus causes informational injuries.  *See Waterkeeper All.*, 853 F.3d at 532-

34; SUF ¶¶ 59-60.  If Plaintiffs had access to such information, they would use it to educate their

members about such exceedances and the steps that people who live or recreate near these

facilities could take to protect themselves from dangerous animal waste emissions – actions that

are central to their organizational purposes.  SUF ¶ 59; Hall Decl. ¶¶ 1, 13; Brittle Decl. ¶¶ 5-6,

18; Deck Decl. ¶¶ 12-14; Hauter Decl. ¶¶ 7, 10-15, 19-20, 22; Holbein Decl. ¶¶ 7, 15-18, 23;

Russ Decl. ¶¶ 6-8, 14, 16-19; Smith Decl. ¶ 10; Walden Decl. ¶¶ 10-14; Williams Decl. ¶ 10.  If Plaintiffs' members had access to this information, either directly from their local emergency response agency or through Plaintiff organizations, they would use this information to take measures to protect their health and quality of life.  SUF ¶ 60; Hall Decl. ¶ 13; Cook Decl. ¶ 13; Durkis Decl. ¶¶ 6, 11, 13; Dye Decl. ¶ 12; Hudkins Decl. ¶¶ 13; Inzerillo Decl. ¶¶ 11-14; Jolin Decl. ¶¶ 20-28; Parke Decl. ¶¶ 8-14; Partridge Decl. ¶¶ 13-18; Proper Decl. ¶¶ 11-12, 15; Siebke Decl. ¶¶ 16-24; Trom Decl. ¶¶ 26-32; Wilson Decl. ¶¶ 10-13.

The third injury Plaintiffs and their members have suffered is injury to the procedural rights and protections provided by the Administrative Procedure Act.  SUF ¶ 61.  EPA did not issue a formal notice for the EPCRA Exemption, never published the comments it received (comments that were submitted separately, outside of the required rulemaking process), and never issued a response to comment document or separate final rule that explains how it considered and either accepted or rejected any comments it received, as required by the APA.  Plaintiffs and their members have thus been denied a voice in the rulemaking process.  This too is sufficient to confer standing.  *See, e.g.*, *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012) (environmental organization had standing where denied certain notice-and-comment rulemaking procedures).

All three types of injuries described above are traceable to the EPCRA Exemption, and would be redressed by a court order vacating the Exemption.  The Exemption allows CAFOs to forego EPCRA reporting, and Plaintiffs' health, aesthetic, economic, and informational injuries would be remedied by vacating the Exemption.  Similarly, Plaintiffs' procedural harms continue so long as the Exemption is in force, and would be remedied by vacatur of the Exemption and the right to publicly comment on any proposed rule through the normal rulemaking process.

14

Plaintiffs would avail themselves of this right if and when the opportunity to comment on a proposed rule related to EPCRA reporting were provided. SUF ¶ 61; *see also, e.g.*, Hall Decl ¶ 12; Brittle Decl. ¶ 19; Cook Decl. ¶ 12; Durkis Decl. ¶ 12; Hauter Decl. ¶ 21; Holbein Decl. ¶¶ 19-22; Inzerillo Decl. ¶ 15; Parke Decl. ¶ 15; Partridge Decl. ¶ 20; Proper Decl. ¶ 16; Ramer Decl. ¶ 16; Russ Decl. ¶ 20; Smith Decl. ¶ 11; Walden Decl. ¶ 15; Williams Decl. ¶ 11. In fact, many of the Plaintiffs commented on the 2008 CERCLA/EPCRA Rule that the D.C. Circuit recently vacated, *see, e.g.*, Comments of Earthjustice et al. (Mar. 27, 2008) [EPA-HQ-SFUND-2007-0469-0758] (comments on behalf of Environmental Integrity Project, Food & Water Watch, the Humane Society of the United States, Sierra Club, and Waterkeeper Alliance), and submitted comments to EPA on the 2017 EPCRA Exemption, even in the absence of the required APA rulemaking process, *see* Hauter Decl. ¶ 21; Holbein Decl. ¶ 20.

Finally, the interests this lawsuit seeks to protect are germane to the organizations' respective missions and purposes, which include educating their members and the public about harmful air pollution from CAFOs, helping people protect themselves against it, and advocating for better public health protections. SUF ¶ 62; Hall Decl. ¶ 1; Brittle Decl. ¶¶ 2-4, 9-12; Deck Decl. ¶¶ 6-11; Hauter Decl. ¶¶ 4-6; Holbein Decl. ¶¶ 3-5, 12; Russ Decl. ¶¶ 3-5, 8-9; Smith Decl. ¶¶ 4-7;[7] Walden Decl. ¶¶ 2-4; Williams Decl. ¶¶ 1-5. Neither the claims asserted nor the relief requested requires the participation of individual members in this case.

---

[7] As noted in the declaration of Kellan Smith, Plaintiff CFS has over 950,000 members. *See* Smith Decl. ¶ 3. The Complaint incorrectly alleged that CFS has only 75,000 members. *Cf.* Compl. ¶ 24.

**ARGUMENT**

I.    **STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56, federal courts must grant summary judgment when, viewing the facts in the light most favorable to the nonmoving party, the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Durant v. D.C. Gov't*, 875 F.3d 685, 693 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 2608 (2018).  Once the moving party has satisfied this burden, it is entitled to summary judgment if the non-moving party fails to cite "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal citation and quotation marks omitted); *accord* Fed. R. Civ. P. 56(c)(1)(A).

The APA provides the basic framework for judicial review of agency action, inaction, and delays.  *See* 5 U.S.C. § 702.  It provides that reviewing courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions" when the court finds those actions "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or the action has been adopted "without observance of procedure required by law."  *Id.* § 706(2)(A), (B).

Under *Chevron, U.S.A. v. Natural Resources Defense Council*, a court's review of a final agency action is a two-step process.  467 U.S. 837, 842 (1984).  Under Step One, the court first determines whether "the intent of Congress is clear."  *Id.*  If so, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress," and agency action not in accordance with this unambiguous law must be rejected.  *Id.* at 842–43.

If, instead, an ambiguity in the statute allows for agency interpretation, the court then proceeds to *Chevron* Step Two and asks whether the agency's interpretation is "a permissible

construction of the statute," or whether it is instead arbitrary, capricious, or an abuse of

discretion. *Id*. at 843; *see Massachusetts v. U.S. Dep't of Transp*., 93 F.3d 890, 893 (D.C. Cir.

1996) (at Step Two, the court should look to "whether the agency's interpretation is a reasonable

resolution of whatever ambiguity precluded a clear declaration of congressional intent in the first

step"). A reviewing court must reject the agency's interpretation if, among other things, the

interpretation "diverges from any realistic meaning of the statute," *id*. at 893, or "the agency has

[not] offered a reasoned explanation for why it chose that interpretation," *Vill. of Barrington, Ill.*

*v. Surface Transp. Bd*., 636 F.3d 650, 660 (D.C. Cir. 2011).

## II.   THIS COURT MUST VACATE THE EPCRA EXEMPTION BECAUSE EPA ISSUED IT IN VIOLATION OF APA PROCEDURAL REQUIREMENTS.

There is no dispute that EPA issued the EPCRA Exemption without following the APA's

notice and comment rulemaking procedural requirements. The only question at issue is whether

the APA required EPA to follow such procedures in this case – a question of law that is proper

for summary judgment. As discussed below, there can be no doubt that the EPCRA Exemption

is a substantive rule that required EPA to provide notice and an opportunity for comment, as well

as a number of other procedural protections, before it could promulgate the EPCRA Exemption.

EPA unquestionably failed to do so, and this Court should therefore grant summary judgment in

favor of Plaintiffs and vacate the EPCRA Exemption.

### A.   The EPCRA Exemption is a Reviewable Final Agency Action.

As an initial matter, the EPCRA Exemption constitutes a final agency action.

> [T]wo conditions . . . generally must be satisfied for agency action
> to be 'final' under the APA.  'First, the action must mark the
> consummation of the agency's decisionmaking process—it must
> not be of a merely tentative or interlocutory nature.  And second,
> the action must be one by which rights or obligations have been
> determined, or from which legal consequences will flow.

*U.S. Army Corps of Engineers v. Hawkes Co*., 136 S. Ct. 1807, 1813 (2016); *see also Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (same).

Here, the EPCRA Exemption easily satisfies these requirements. *First*, it represents the "consummation" of EPA's decision-making process. Although EPA added (and recently removed) new legal theories to bolster its EPCRA Exemption, EPA has not changed or qualified its directive that CAFOs need not report under EPCRA. SUF ¶ 49. Nor does the potential for future reconsideration of the Exemption mean that it is not reviewable, as an agency cannot "avoid judicial review by holding out a vague prospect of reconsideration" once its actions suggest that it has already "made up its mind." *Friedman v. Fed. Aviation Admin.*, 841 F.3d 537, 543 (D.C. Cir. 2016). "The fact that a regulation might be interpreted again at some point in the indeterminate future cannot, by itself, prevent the initial interpretation from being final." *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016), *cert. denied*, 138 S. Ct. 2 (2017). EPA has clearly "made up its mind" by repeatedly and consistently instructing CAFOs that they need not report under EPCRA, an instruction that is not altered by any promise of future rulemaking. *See also Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016), ("[t]he 'possibility' that the [agency] 'may revise [its decision] . . . based on 'new information' . . . is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal.'" (quoting *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1814 (2016)).[8]

---

[8] For these reasons, even if EPA were to initiate a rulemaking procedure, that does not change the fact that the Exemption serves as a "final" action. *See, e.g.*, *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012) (vacating an EPA rule for failure to provide notice and comment, even though "EPA [was] currently in the process of promulgating a final rule – with the benefit of notice and comment – on this precise issue").

18

*Second*, as explained in more detail below, "legal consequences . . . flow" from the EPCRA Exemption because it alters what operations must report under EPCRA.  SUF ¶ 50; *see also infra* Argument, Section II.B.  The EPCRA Exemption removes legal obligations on CAFOs and shields them from reporting requirements and thereby removes them from EPA enforcement authority of the reporting requirements.  It also deprives communities of a legal right to emission information.  Consequently, EPA's labelling of the Exemption as "guidance" cannot shield it from judicial review.  *See Scenic Am.*, 836 F.3d at 56 (finding agency "guidance" reviewable as final agency action because it was the consummation of the agency's decisionmaking process and determined the rights and obligations of parties).  Thus, the EPCRA Exemption is a final, reviewable agency action.

B.    Notice and Comment Requirements Apply to the EPCRA Exemption Because it is a Substantive Rule with the Force and Effect of Law.

The APA's procedural requirements unquestionably apply to the EPCRA Exemption because it is a substantive rule with the force and effect of law.  The APA defines "rule" as, *inter alia*, "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4).  "The central distinction among agency regulations found in the APA is that between 'substantive rules' on the one hand and 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice' on the other."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 301 (1979) (quoting 5 U.S.C. § 553(b)).  Agencies must "afford interested persons general notice of proposed rulemaking and an opportunity to comment before a substantive rule is promulgated," while "'interpretative rules, general statements of policy or rules of agency organization, procedure or practice' are exempt from these requirements."  *Id.* at 313–14.

Substantive rules, or "legislative rules," are rules that "affect[] individual rights and obligations," and are "binding" or have the "force and effect of law." *Id.* at 302 (quoting *Morton v. Ruiz*, 415 U.S. 199, 232 (1974)).  This contrasts with the other types of agency actions more appropriately labeled as "guidance" – for example, interpretive rules,[9] general statements of policy,[10] and procedural rules[11] – that are exempt from notice and comment requirements because they lack the "force and effect of law."

This Circuit generally considers three factors when determining whether an agency action is a substantive rule that must undergo notice and comment rulemaking: "(1) 'the actual legal effect (or lack thereof) of the agency action in question on regulated entities'; (2) 'the agency's characterization of the guidance'; and (3) 'whether the agency has applied the guidance as if it were binding on regulated parties.'"  *Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. Cir. 2017) (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252-53 (D.C. Cir. 2014)).

Application of these factors to the EPCRA Exemption leaves no doubt that it is a substantive, legislative rule that required promulgation though notice and comment.

---

[9] Interpretive rules, for example, "are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers,'" and therefore "'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'"  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015) (quoting *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99 (1995)).

[10] General statements of policy are "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.*, 441 U.S. at 302 n.31).  Such statements "are binding on neither the public, nor the agency," *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997), and therefore "lack the force of law."  *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000).

[11] Procedural rules – which include rules of agency organization, procedure, or practice — do[] not [themselves] 'alter the rights or interests of parties, although [they] may alter the manner in which the parties present themselves or their viewpoints to the agency.'"  *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 5 (D.C. Cir. 2011) (quoting *Chamber of Com. of U.S. v. U.S. Dep't of Labor*, 174 F.3d 206, 211 (D.C. Cir. 1999)).

1.    *The EPCRA Exemption Has Actual Legal Effect Because It Creates a Substantive Change to the Regulatory Regime that Governs CAFOs.*

To determine whether a rule is substantive under the APA, "[t]he most important factor concerns the actual legal effect . . . of the agency action in question on regulated entities." *Nat'l Mining Ass'n*, 758 F.3d at 252; *see also Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002) (EPA conceding that this factor is the most important).  Here, the actual legal effect is obvious: whereas CAFOs that release large quantities of ammonia or hydrogen sulfide above the reportable quantity had a legal obligation to inform local and state emergency responders of these releases under EPCRA, the guidance now explicitly excuses them from doing so.  SUF ¶¶ 49-50.  And where communities and responders had a right to access this public information about releases of hazardous material reported under EPCRA, they no longer do.

Prior to the EPCRA Exemption, large CAFOs were required to report their high-volume releases of extremely hazardous substances from animal waste that exceeded the daily reportable quantity threshold.  SUF ¶ 50; *see also Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1028 (D.C. Cir. 2007) ("An [animal feeding operation] that releases these pollutants in sufficient quantities may be required to report them under . . . EPCRA"); 2008 CERCLA/EPCRA Rule, 73 Fed. Reg. 76,954 (Dec. 18, 2008) (noting that under EPA's 2008 CERCLA/EPCRA Rule, large CAFOs "will still be required to notify . . . release[s] . . . under EPCRA").[12]  The EPCRA Exemption changed this legal landscape, and states that toxic releases from animal waste from *all* animal feeding operations, including large CAFOs, "do not need to be reported under EPCRA."  EPCRA Exemption at 1; SUF ¶¶ 38-41, 49.

---

[12] Notably, this prior rules followed APA's procedures for legislative rules and was thus promulgated pursuant to APA's notice-and-comment procedures.

EPA expressly recognizes that the EPCRA Exemption effectuates such a change, noting that large CAFOs "were subject to EPCRA reporting" prior to the EPCRA Exemption. *See id.* at 1; SUF ¶ 42. EPA also acknowledges that the two purported legal bases for the Exemption were newly adopted. *Id.*; *see also* FARM Act Q&A at 1 ("air emissions from animal waste at farms do not need to be reported under EPCRA because these types of releases are now exempt from CERCLA"); EPCRA Q&A at 1 (noting that EPA's "previously identified examples of routine agricultural operations" did not include EPA's newly adopted expansion of the scope of the "routine agricultural operations" exemption). Thus, by EPA's own admission, the EPCRA Exemption has the legal effect of amending the prior rule that required large CAFOs to report their releases, removing CAFOs from the Agency's enforcement authority and thus substantively changing "the governing legal norms." *See Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 96 (D.C. Cir. 1997) (to determine whether a rule is substantive, the court considers "whether the disputed rule really adds content to the governing legal norms"); *see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 111 (1995) (O'Connor, J., dissenting) (interpretive rules "must ***explain*** existing law and ***not contradict*** what the regulations require") (emphasis original). EPA can no longer take enforcement action or any "other agency action to . . . ensure the performance of [CAFOs'] duties" to report releases under EPCRA. *Am. Mining Cong.*, 995 F.2d at 1112; *see also* 42 U.S.C. § 11045(b) (authorizing EPA to assess civil and criminal penalties on facilities that fail to report releases under EPCRA). Thus, under the "most important factor" considered by this Circuit, *Nat'l Mining Ass'n*, 758 F.3d at 252, the Exemption qualifies as a substantive rule.[13]

---

[13] A related four-part test, which also has been used in this Circuit, asks: (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or

2.       *EPA Itself Characterizes Its Action as One That Requires Notice and Comment.*

The second factor this Circuit applies to determine whether a rule is substantive or interpretive asks how the agency itself has "characteriz[ed] the guidance."  *Sierra Club*, 873 F.3d at 951.  Though it labels the EPCRA Exemption as "guidance," EPA recognizes that the action requires notice and comment, stating that it "intends to conduct a rulemaking" on the rationales used to justify the exemptions.[14]  Consistent with this understanding, EPA listed the EPCRA Exemption as a rulemaking in the Fall 2018 Unified Agenda of Regulatory and Deregulatory Actions.  *See* SUF ¶ 45.  Thus, EPA itself characterizes the EPCRA Exemption as an agency action that requires notice and comment rulemaking.

EPA's labeling of the EPCRA Exemption as "guidance" does not change this.   An agency cannot, "under the guise of interpreting a regulation . . . create *de facto* a new regulation."  *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000).  "It is well-established that an agency may

---

other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule. *Am. Mining Cong. v. Mine Safety & Health Admin.,* 995 F.2d 1106, 1112 (D.C. Cir. 1993). "If the answer to *any* of these questions is affirmative, we have a legislative . . . rule." *Id.* (emphasis added).  Because the EPCRA Exemption changes the governing legal norms as discussed above, under the *American Mining* test, it is a legislative, substantive rule.  *Id.*

[14] In the first iteration of the EPCRA Exemption, EPA's EPCRA Q&A document explained that "EPA intends to conduct a rulemaking on the interpretation of 'used in routine agricultural operations' as it pertains to EPCRA reporting requirements."  2017 EPCRA Q&A at 1.  When EPA added the FARM Act justification to the EPCRA Exemption, the Agency deleted this note about a rulemaking intent from the EPCRA Q&A, but included in the new FARM Act Q&A a note that "EPA intends to conduct a rulemaking to address the impact of the FARM Act on the reporting of emissions from animal waste at farms under EPCRA."  FARM Act Q&A at 1.  After EPA removed the FARM Act Q&A from the EPCRA Exemption website, it amended the body of the EPCRA Exemption website to read, "EPA is working on a proposed rule to amend the release notification regulations under EPCRA to codify the agency's interpretation that air emissions from animal waste at farms are not subject to EPCRA reporting."  *See* October 2018 EPCRA Exemption.

not escape the notice and comment requirements . . . by labeling a major substantive legal addition to a rule a mere interpretation." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000) (collecting cases) (setting aside EPA's self-stylized "guidance" – issued without notice and comment – because it was, in fact, a legislative rule).  "[I]t is the substance of what the (agency) has purported to do and has done which is decisive.'" *Chamber of Commerce of U.S. v. Occupational Safety & Health Admin.*, 636 F.2d 464, 468 (D.C. Cir. 1980) (quoting *Columbia Broadcasting Sys., Inc. v. United States*, 316 U.S. 407, 416 (1942)) (vacating an action the agency had labeled an "interpretive rule" – issued without notice and comment – because it was, in fact, a legislative rule).  After all, "[t]he purpose of the APA would be disserved if an agency with a broad statutory command . . . could avoid notice-and-comment rulemaking simply by promulgating a comparably broad regulation . . . and then invoking its power to interpret that statute and regulation in binding the public to a strict and specific set of obligations." *Mendoza v. Perez*, 754 F.3d 1002, 1022 (D.C. Cir. 2014) (quoting *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 7 (D.C. Cir. 2011)).  EPA thus cannot escape the APA's requirements by labeling the EPCRA Exemption as mere "guidance" when EPA itself recognizes that the Exemption requires notice and comment, and when the Exemption affects substantive legal rights.

>    3.    *The EPCRA Exemption Uses Mandatory Language That Is Binding as a Practical Matter.*

Under the third factor used to determine whether a rule is substantive in nature, this Court must look at whether EPA has applied the EPCRA Exemption as if it were "binding on regulated parties." *Sierra Club*, 873 F.3d at 951.  EPA unquestionably has.  The EPCRA Exemption uses mandatory language that makes clear CAFOs have no obligation to report releases under EPCRA.  *See* EPCRA Exemption, Apfel Decl. Ex. 12 ("air emissions from animal waste at a

24

farm . . . . do not need to be reported under EPCRA").  "[A]n agency pronouncement will be considered binding as a practical matter if it . . . appears on its face to be binding."  *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 7 (D.C. Cir. 2011) (quoting *Gen. Elec. Co.*, 290 F.3d at 383).  "The language employed by the agency may play an important role in this analysis: a document that reads like an edict is likely to be binding, while one riddled with caveats is not."  *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015) (citing *Nat'l Mining Ass'n*, 758 F.3d at 252–53).  Notably, "if the language of the document is such that private parties can rely on it as a norm or safe harbor by which to shape their actions, it can be binding as a practical matter."  *Gen. Elec. Co.*, 290 F.3d at 383 (citations omitted).

The EPCRA Exemption is "binding as a practical matter" because it uses unambiguous language to instruct CAFOs that they have a "safe harbor" from EPCRA reporting requirements. *Id.*  The EPCRA Exemption unequivocally states that "air emissions from animal waste at a farm . . . ***do not need to be reported under EPCRA***."  EPCRA Exemption at 1 (emphasis added).  In response to the question, "Do I need to submit an EPCRA report?" the EPCRA Exemption unequivocally instructs: "***No***. . . . [A]ir emissions from animal waste (including decomposing animal waste) at a farm . . . ***do not need to be reported under EPCRA***."  *Id.* at 3 (emphasis added).  EPA provides no conditions or carve-outs from this safe harbor; the language is conclusive and is neither precatory nor hortatory.  *See Ass'n of Flight Attendants-CWA, AFL-CIO*, 785 F.3d at 718 (citing *Judd v. Billington*, 863 F.2d 103, 106 (D.C. Cir. 1988)) (instructing that provisions are "precatory, not mandatory" if they use "language like 'may' and 'should' instead of 'shall' or 'must'").  The EPCRA Exemption thus "reads like an edict," *id.* at 717, and

therefore qualifies as a substantive rule requiring public notice and an opportunity for comment before EPA can finalize it.

    C.    <u>EPA Failed to Comply with the APA's Procedural Requirements in Issuing the EPCRA Exemption.</u>

This Court must set aside the EPCRA Exemption because EPA failed to abide by the APA procedural requirements that apply to substantive rules, such as notice-and-comment, when it promulgated the Exemption.  The APA clearly sets forth the procedures that agencies must follow when promulgating rules: "General notice of proposed rule making shall be published in the Federal Register" and this notice "shall include— (1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b).  After the required publication of the notice, (4) "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  *Id*. § 553(c).  In addition, (5) "[a]n agency must consider and respond to significant comments received during the period for public comment."  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015).  Then, (6) after it considers "the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."  *Id.*  And finally, (7) in most circumstances, the required publication of the final rule "shall be made not less than 30 days before its effective date."  5 U.S.C. § 553(d).

Here, EPA failed to comply with *any* of these APA requirements.  SUF ¶¶ 51-54.  There are no material facts in dispute concerning EPA's process in issuing the EPCRA Exemption: EPA simply posted the Exemption on its website without the required bare minimum of public notice, public comment, or public involvement mandated for agency rulemaking.  Specifically,

EPA violated the APA because it promulgated the EPCRA Exemption without any of the required steps (1) through (7) above.[15]  Any one of these violations, in isolation, warrants vacatur of the EPCRA Exemption.  Given EPA's blatant disregard of the entire rulemaking process, the EPCRA Exemption cannot survive this Court's review.  There are no triable factual issues in dispute, and Plaintiffs are entitled to summary judgment on this issue as a matter of law.

       D.       <u>Given EPA's Failure to Comply with APA Procedural Requirements, the Court Must Vacate the EPCRA Exemption.</u>

Because the EPCRA Exemption is a substantive rule, the APA requires EPA to abide by a number of procedural requirements.  "Failure to provide the required notice and to invite public comment . . . is a fundamental flaw that 'normally' requires vacatur of the rule." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (quoting *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97–98 (D.C. Cir. 2002)); *see also Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 103 (D.C. Cir. 2013) (quoting *Shell Oil Co. v. EPA*, 950 F.2d 741, 752 (D.C. Cir. 1991)) ("[T]he court typically vacates rules when an agency 'entirely fail[s]' to provide notice and comment.").  Courts must vacate procedurally noncompliant rules even if the agency has already begun the process of promulgating the same rule in accordance with the APA.  *See Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012) (vacating an EPA rule for

---

[15] Though the EPCRA Exemption website did initially direct the public to submit comments on the EPCRA Exemption to an epa.gov email address, *see* 2017 EPCRA Exemption at 2, it did so entirely outside of the APA process, and EPA neither made those comments available to the public nor responded to those comments.  Thus, the public is entirely unaware about what comments were submitted or if EPA even read them, let alone thoroughly considered them.  *See S.C. Coastal Conservation League v. Pruitt*, No. 18-CV-330-DCN, 2018 WL 3933811, at *5 (D.S.C. Aug. 16, 2018) ("An illusory opportunity to comment is no opportunity at all.").

failure to provide notice and comment, even though "EPA [was] currently in the process of

promulgating a final rule – with the benefit of notice and comment – on this precise issue").[16]

  In this case, vacatur is an appropriate remedy in light of the severity of EPA's violations.

As this Circuit has explained,

> [An agency] should not treat the procedural obligations under the
> APA as meaningless ritual.  Parties affected by the proposed
> legislative rule are the obvious beneficiaries of proper procedures.
> Prior notice and an opportunity to comment permit them to voice
> their objections before the agency takes final action.  Congress
> enacted 5 U.S.C. s 553 in part to "'afford adequate safeguards to
> private interests.'"  Given the lack of supervision over agency
> decisionmaking that can result from judicial deference and
> congressional inattention, this protection, as a practical matter, may
> constitute an affected party's only defense mechanism.
>
> * * * Finally, and most important of all, highhanded agency
> rulemaking is more than just offensive to our basic notions of
> democratic government; a failure to seek at least the acquiescence
> of the governed eliminates a vital ingredient for effective
> administrative action.  Charting changes in policy direction with the
> aid of those who will be affected by the shift in course helps dispel
> suspicions of agency predisposition, unfairness, arrogance,
> improper influence, and ulterior motivation.  Public participation in
> a legislative rule's formulation decreases the likelihood that
> opponents will attempt to sabotage the rule's implementation and
> enforcement.

*Chamber of Commerce of U.S. v. Occupational Safety & Health Admin*., 636 F.2d 464, 470–71

(D.C. Cir. 1980) (internal citations omitted); *see also Nat. Res. Def. Council v. Nat'l Highway*

*Traffic Safety Admin*., 894 F.3d 95, 115 (2d Cir. 2018) ("Notice and comment are not mere

formalities.  They are basic to our system of administrative law.  They serve the public interest

by providing a forum for the robust debate of competing and frequently complicated policy

---

[16] For this reason, even if EPA were to issue a Notice of Proposed Rulemaking on the EPCRA
Exemption, the EPCRA Exemption should nonetheless be vacated for failure to comply with
notice and comment.

considerations having far-reaching implications and, in so doing, foster reasoned decisionmaking.").

There are no issues of material fact in dispute on this issue.  When issuing the EPCRA Exemption – a substantive rule affecting the legal rights of third parties – EPA unquestionably failed to follow the procedural requirements mandated by the APA.  SUF ¶¶ 51-54.  In just the past year, EPA has substantively amended its EPCRA Exemption ***three times*** merely by updating a website instead of following required APA procedure.  This is precisely the sort of informal rulemaking affecting substantive rights that the APA was designed to protect against.  Accordingly, this Court should grant summary judgment in favor of Plaintiffs and vacate the EPCRA Exemption.

## III.   THE EPCRA EXEMPTION MUST BE VACATED BECAUSE IT VIOLATES THE CLEAR STATUTORY LANGUAGE AND PURPOSE OF EPCRA.

Summary judgment is equally appropriate for Plaintiffs' substantive claims, because whether the EPCRA Exemption violates the clear language and intent of EPCRA is a question of law appropriate for summary disposition.  As explained below, the EPCRA Exemption contravenes the statutory text and legislative history of both EPCRA and the FARM Act, and because it was arbitrarily promulgated with unexplained inconsistencies, Plaintiffs are entitled to judgment as a matter of law, and the Court should vacate the EPCRA Exemption on this ground.[17]

---

[17] Though EPA removed a link to the FARM Act Q&A and any reference to the FARM Act rationale from its EPCRA Exemption website shortly after Plaintiffs filed their Complaint in this case, SUF ¶ 48, EPA may very well reassert this basis just as quickly as it removed it.  "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. . . . [otherwise] the courts would be compelled to leave [t]he defendant . . . free to return to his old ways."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 189 (2000) (internal citations and quotation marks omitted).  Accordingly, Plaintiffs' claims that this FARM Act justification is unlawful

29

A.    The Plain Language of EPCRA's "Sweeping Reporting Mandate" Prevents EPA From Creating Reporting Exemptions for CAFOs.

The plain language of EPCRA unambiguously mandates reporting (1) by "facilities" of (2) any "release" of (3) an "extremely hazardous substance" that exceeds a "reportable quantity." 42 U.S.C. § 11004(a).  All components of this reporting requirement plainly apply to CAFOs.

*First*, EPCRA's expansive definition of "facility" covers "all buildings, equipment, structures, and other stationary items which are located on a single site or on contiguous or adjacent sites and which are owned or operated by the same person (or by any person which controls, is controlled by, or under common control with, such person)."  *Id.* § 11049(4); *see also United States v. Bestfoods*, 524 U.S. 51, 56 (1998) (characterizing similar definition of "facility" in CERCLA as "broad").  By definition, CAFOs confine up to millions of animals in "buildings" and "structures" on a single site or contiguous sites that are owned or operated by the same entity, and thus CAFOs meet EPCRA's definition of a "facility."  *See* 40 C.F.R. § 122.23(b) (defining "animal feeding operation" as a "lot or facility" where animals are "stabled or confined" at least 45 days a year).

*Second*, EPCRA defines "release" broadly to include "***any*** spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles) of any hazardous chemical, extremely hazardous substance, or toxic

---

remain ripe for this Court's consideration and are not mooted by EPA's voluntary cessation of this rationale, seemingly in response to this litigation.  Indeed, "the voluntary abandonment of a practice does not relieve a court of adjudicating its legality, particularly where the practice is deeply rooted and long standing."  *Gray v. Sanders*, 372 U.S. 368, 376 (1963).  EPA's long history of illegal attempts to exempt CAFOs from statutory reporting requirements thus strongly weighs in favor of this Court's ruling on the legality of the FARM Act rationale.  *See supra* Factual and Regulatory Background, Section III.

chemical."  42 U.S.C. § 11049(8) (emphasis added); SUF ¶ 17.  Emissions into the air from

animal waste fall within this broad definition of "release."

*Third*, EPA's implementing regulations include ammonia and hydrogen sulfide in the list

of extremely hazardous substances and set reportable quantities for both substances at 100

pounds per day or more.  SUF ¶ 16; 40 C.F.R. pt. 355, app. A; *see also* 42 U.S.C. § 11002(a)(2)

(directing EPA to "publish a list of extremely hazardous substances.").  Industrial CAFOs

commonly release 100 pounds per day or more of one or both of these two extremely hazardous

substances.  SUF ¶¶ 4, 6.

In addition to defining what facilities need to report releases of which substances and

when, Congress made clear that the EPCRA reporting mandate applies regardless of any duty to

report hazardous releases under CERLCA.  Specifically, Congress delineated three situations

that require EPCRA reporting, one of which is wholly independent from any CERCLA reporting

requirement:

1. Releases of EPCRA extremely hazardous substances that require CERCLA
   reporting (42 U.S.C. § 11004(a)(1));

2. Releases of EPCRA extremely hazardous substances that ***do not*** require CERCLA
   reporting (42 U.S.C. § 11004(a)(2)); and

3. Releases of substances that require CERCLA reporting but are not listed as
   extremely hazardous substances under EPCRA (42 U.S.C. § 11004(a)(3)).

Thus, because certain larger CAFOs are "facilities" that "release" a "reportable quantity" (i.e.,

100 pounds or more per day) of ammonia and/or hydrogen sulfide, these CAFOs are

unquestionably subject to the EPCRA's "sweeping reporting mandate" regardless of any duty to

report under CERCLA.  42 U.S.C. § 11004(a); *see also Waterkeeper All.*, 853 F.3d at 535.

31

B.    This Circuit Has Held that EPA Has No Room to Craft Exemptions from EPCRA's "Sweeping Reporting Mandate."

This Circuit has already definitively concluded that EPCRA's "sweeping reporting mandate" requires CAFOs to comply with statutory reporting requirements for releases. *Waterkeeper All.*, 853 F.3d at 535; *see also Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1028 (D.C. Cir. 2007) (similarly finding that release reporting applies to CAFOs). Thus, binding Circuit precedent prohibits EPA from yet again trying to exempt CAFOs from this broad reporting requirement. *See Consumer Elec. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003) ("statutes written in broad, sweeping language should be given broad, sweeping application"). When reviewing EPA's prior attempt to exempt all but the largest CAFOs from EPCRA reporting, the D.C. Circuit concluded under *Chevron* Step One that the 2008 exemption – which was not as broad as the current EPCRA Exemption – was illegal.[18] *Waterkeeper All.*, 853 F.3d at 535. The court found that the exemption "r[uns] afoul of the underlying statute[] (and [is] therefore outside the EPA's delegated authority)." *Id.* at 530; *see also id.* at 538 (J. Brown, concurring). The court invalidated the 2008 CERCLA/EPCRA Rule, finding that "Congress has

---

[18] Though EPA attempted to move the analysis to *Chevron* Step Two by arguing that "*unrelated* exemptions" in EPCRA collectively create ambiguity and give EPA discretion to "create *new* exemptions," the court denied EPA's invitation, finding that the Agency's "conclusion doesn't follow from the premise." *Waterkeeper All.*, 853 F.3d at 534 (emphasis original). After reviewing these unrelated statutory exemptions, the court concluded that "*none* of those provisions *even hints* at the type of reporting exemption the EPA adopted." *Id.* at 535 (emphasis added). It further noted that, given EPCRA's "sweeping reporting mandate," EPA has no "discretion to fashion other exemptions." *Id.* at 534. Even *de minimis* exceptions to EPCRA reporting are unavailable because EPA does not have "carte blanche to ignore the statute whenever it decides the reporting requirements aren't worth the trouble." *Id.* at 535 (citing *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2446 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.")). Thus, any EPA action to exempt AFOs from EPCRA reporting requirements "can't be justified either as a reasonable interpretation of any statutory ambiguity or implementation of a *de minimis* exception." *Id.* at 537.

directly spoken to [the] issue . . . [so] any agency interpretation contradicting what Congress has said would be unreasonable," *id.* at 534; *see also id.* at 535 ("Conspicuously missing [from EPCRA] is any language of delegation, such as that reports be 'as appropriate,' 'effective,' 'economical,' or made 'under circumstances to be determined by the EPA.'").  As explained below, this same analysis applies here.

> C.    EPA's Exemption of CAFOs from EPCRA Reporting Contravenes Plain
>        Statutory Language and Fails under *Chevron* Step One.

EPA offers two distinct rationales in the EPCRA Exemption for exempting CAFOs from EPCRA's reporting requirements: *first*, the 2018 FARM Act's exemption of CAFOs from CERCLA reporting excuses CAFOs from their reporting obligations under EPCRA; and *second*, because CAFOs use manure as part of their "routine agricultural operations," they need not report releases of hazardous materials that emanate from that manure.  *See* EPCRA Exemption. These justifications contravene the clear statutory text, which requires CAFOs to report releases of hazardous materials under EPCRA.  Accordingly, the EPCRA Exemption cannot pass muster under *Chevron* Step One.

> 1.    *The Text of EPCRA Clearly Requires CAFOs to Report Releases*
>        *Regardless of CERCLA's Reporting Requirements.*

EPA's attempt to shoehorn its EPCRA Exemption into the FARM Act's exemption of CAFOs from reporting under CERCLA fails as a matter of law.  EPCRA clearly requires release reporting even in instances when CERCLA does not.  EPA ignores this plain language and attempts to create a new exemption that does not exist in the statute.

As explained above, the plain text of EPCRA requires the reporting of three types of releases, including releases of EPCRA extremely hazardous substances that do not require

CERCLA reporting.  42 U.S.C. § 11004(a)(2).  EPA nevertheless relies on this provision to

justify its EPCRA Exemption.  42 U.S.C. § 11004(a)(2)(C).  This reliance is sorely misplaced.

More specifically, Section 11004(a)(2) requires reporting of a "release of an extremely

hazardous substance . . . [when] such release is ***not subject to notification requirements*** under . .

. CERCLA . . . but only if the release . . . ***occurs in a manner which would require notification***

under . . . CERCLA."  42 U.S.C. § 11004(a)(2) (emphasis added).  Yet according to EPA,

> The FARM Act expressly excludes certain types of releases—air
> emissions from animal waste—from CERCLA reporting.   Air
> emissions from animal waste thus do not "occur in a manner" which
> would require notification under CERCLA, and thus do not meet
> [subsection] (c); therefore, these releases fall out of the reporting
> requirements of EPCRA.

FARM Act Q&A at 1.  EPA's reading contravenes basic principles of statutory interpretation

and renders EPCRA's statutory language superfluous.  EPA's reading effectively rewrites the

statutory language "occurs in a manner which would require notification" to read as "subject to

notification requirements."  Substituting EPA's proffered understanding of the phrase "occurs in

a manner which would require notification" into the statutory language would mean EPCRA

nonsensically requires reporting "when such release is not subject to notification requirements

under . . . CERCLA . . . but only if the release . . . [is subject to notification requirements] under .

. . CERCLA."  EPA's "reading of this phrase leads to an illogical conclusion," and therefore

must be rejected.  *Owens v. Republic of Sudan*, 864 F.3d 751, 774 (D.C. Cir. 2017); *see also*

*Corley v. United States*, 556 U.S. 303, 314 (2009) (rejecting reading that "renders [a phrase]

nonsensical and superfluous").

Moreover, EPA impermissibly "would have [the Court] construe the two entirely distinct

statutory phrases . . . as containing an identical element."  *Loughrin v. United States*, 134 S. Ct.

2384, 2390 (2014); *see also id.* (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)) ("We

34

have often noted that when 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—this Court 'presume[s]' that Congress intended a difference in meaning."). The phrase "occurs in a manner which would require notification" plainly must mean something different from "subject to notification requirements." Equally problematic, this reading would construe "entirely distinct" provisions – § 11004(a)(2) on the one hand, and §§ 11004(a)(1) and (a)(3) on the other – "as containing an identical element," *Loughrin*, 134 S. Ct. at 2390. Both Sections 11004(a)(1) and (a)(3) apply to releases "which require[] CERCLA notice," 42 U.S.C. § 11004(a), so EPA's interpretation of the EPCRA Exemption would make § 11004(a)(2) a redundant rephrasing of those two separate provisions.

Similarly problematic, EPA's reading of Section 11004(a)(2) "effectively deletes" that entire provision from the statute because it would exempt release reporting for ***any*** extremely hazardous substance whenever there is no parallel CERCLA reporting requirement. *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 421 (2012). That simply cannot be the case, given that § 11004(a)(2) demonstrates that Congress ***does*** want EPCRA reporting even in situations in which no CERCLA reporting is required. Had Congress wanted to confine EPCRA reporting only to releases that must be reported under CERCLA, it would not have included § 11004(a)(2) in EPCRA. Nor, for that matter, would Congress have directed EPA to create an entirely new list of EPCRA-specific "extremely hazardous substances" when Congress had already directed EPA to create a list of "hazardous substances" under CERCLA. *See* 42 U.S.C. §§ 9602; 11002(a). EPA cannot contravene the statutory structure of EPCRA and effectively delete § 11004(a)(2) to suit its policy ends. *See 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951) ("Congress expresses its purpose by words. It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort.").

35

The Congressional Research Service ("CRS") reached a similar conclusion.  It prepared a memorandum during Congress's consideration of the FARM Act on the proper interpretation of EPCRA Section 11004(a)(2), and found that the interpretation that EPA thereafter adopted was contrary to the statute, noting:

> In implementation, EPA has treated the phrase ''occurs in a manner'' in EPCRA Section [11004](a)(2)(C) to mean **the nature of the release in terms of how a substance enters the environment**, **not that reporting is required under Section 103 of CERCLA**. Otherwise, Section [11004](a)(2) **would be rendered meaningless** in covering releases of extremely hazardous substances that do not require reporting as hazardous substances under CERCLA, while requiring reporting under CERCLA at the same time.

115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018)  (emphasis added).[19]

Accordingly, the statutory text leaves no doubt that Congress intended for CAFOs to report releases of hazardous materials even when there is no obligation to report the releases under CERCLA.  The EPCRA Exemption based on the FARM Act therefore fails under *Chevron* Step One.

---

[19] It has indeed been EPA's practice to treat the phrase "occurs in a manner" as meaning something different than "required."  For example, EPA has entered into numerous consent agreements and final orders against violators of the EPCRA reporting requirement, and these orders state that EPCRA requires reporting of a "release [that] required, *or* occurred in a manner which would require, notice under . . . CERCLA."  *In re Noveon Kalama, Inc.*, EPCRA-10-2006-0268, 2006 WL 4093152, at *1 (EPA Region X May 19, 2006) (emphasis added); *see also In Re Lang Ice Co.,* CERCLA-05-2006-0006, 2005 WL 4755401, at *2 (EPA Region V Nov. 7, 2005) (emphasis added); *In re Wash. Fruit & Produce Co.,* EPCRA-10-2003-0105,, 2003 WL 22891299, at *1 (EPA Region X Sept. 10, 2003) (emphasis added); *In re Rainbow Glacier, Inc.*, EPCRA-10-2003-0109, 2003 WL 23413789, at *1 (EPA Region X Oct. 8, 2003) (emphasis added).  These consent agreements show that EPA's understanding has traditionally been that to "occur in a manner which would require" CERCLA reporting has a different meaning than simply "requiring" CERCLA reporting.  *See Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014) (quoting *United States v. Woods*, 134 S. Ct. 557, 567 (2013) ("[The] ordinary use [of the term "or"] is almost always disjunctive, that is, the words it connects are to be given separate meanings.").

36

2.    *EPA's Reading of EPCRA's "Routine Agricultural Operations" Provision Contravenes Clear Statutory Language and Cannot Justify the EPCRA Exemption.*

EPA's second justification for the EPCRA Exemption – that CAFOs are exempt from reporting under EPCRA because "[a]ny substance to the extent it is used in routine agricultural operations" is not included in that statute's definition of "hazardous chemical," 42 U.S.C. § 11021(e)(5) – fares no better. Here too, EPA's strained reading contravenes the clear language of EPCRA and fails under *Chevron* Step One.

a.    EPA's New Interpretation Cannot Be Squared with the Plain Meaning of EPCRA and Thus Fails Under *Chevron* Step One.

EPA's newly adopted reading of the "routine agricultural operations" provision violates the clear language of the statute and cannot stand. Under EPCRA, any facility that "produce[s], use[s], or store[s]" a "hazardous chemical" must report releases of "extremely hazardous substances" above reportable quantities. 42 U.S.C. § 11004(a).[20] Ammonia and hydrogen sulfide are classified as both "hazardous chemicals" and "extremely hazardous substances" under EPCRA.[21] Because these pollutants are "hazardous chemicals" under EPCRA, and CAFOs *produce* these "serious pollutants," *Waterkeeper All.*, 853 F.3d at 529, CAFOs are facilities at

---

[20]  EPCRA defines "hazardous *chemical*" based on the definition in Occupational Safety and Health Administration ("OSHA") regulations, with certain added exceptions. *See* 42 U.S.C. §§ 11021(e), 11049(5). EPCRA defines "extremely hazardous *substance*" as a substance included in EPA's list of such substances. *See* 42 U.S.C. §§ 11002(a), 11049(3); 40 C.F.R. pt. 355, app. A. OSHA defines "hazardous chemical" as "any substance, or mixture of substances" "which is classified as a physical hazard or a health hazard, a simple asphyxiant, combustible dust, pyrophoric gas, or hazard not otherwise classified." 29 C.F.R. § 1910.1200(c).

[21]  OSHA classifies anhydrous ammonia and hydrogen sulfide as "toxic and reactive *highly hazardous chemicals* which present a potential for a catastrophic event at or above [a] threshold quantity." 29 C.F.R. § 1910.119 app. A (emphasis added); *see also id.* § 1910.1000 tbl.Z-1 (listing ammonia and hydrogen sulfide as air contaminants). These substances are therefore "hazardous chemicals" under EPCRA. *See* 42 U.S.C. §§ 11021(e), 11049(5). In addition, ammonia and hydrogen sulfide both appear in EPA's list of EPCRA "extremely hazardous substances." 40 C.F.R. pt. 355, app. A; SUF ¶ 16.

which hazardous chemicals are "produced,"  42 U.S.C. § 11004(a).  Therefore, CAFOs fall

within the category of facilities "at which a hazardous chemical is produced, used, or stored,"

that must report releases of EPCRA extremely hazardous substances above reportable

quantities.[22]  *Id.*

       EPA's EPCRA Exemption relies on EPCRA's exclusion of "[a]ny substance to the extent

it is ***used*** in routine agricultural operations," from the definition of "hazardous chemical," *id.* §

11021(e)(5) (emphasis added), but that provision is inapposite.  The "routine agricultural

operations" provision might apply to CAFOs if CAFOs did indeed ***use*** their gaseous ammonia

and hydrogen sulfide emissions as part of their agricultural operations, but they do not; these

hazardous substances are simply waste products, as this Circuit recently determined.  *See*

*Waterkeeper All.*, 853 F.3d at 536 (quoting 2008 CERCLA/EPCRA Rule, 73 Fed. Reg. at

76,957) (explaining that, rather than being used in agricultural operations, "hydrogen sulfide . . .

and ammonia 'are rapidly released from the manure [into air] and may reach toxic levels or

displace oxygen, increasing the risk to humans and livestock'" as a byproduct of pit agitation).

These releases are never recaptured and used as part of the operations at all.  Indeed, the Western

District of Kentucky directly addressed this issue and concluded that chicken CAFOs do not "use

. . . ammonia in an agricultural operation. . . . [but instead] . . .  try to get rid of it because it is

harmful to the chickens," and thus "***the routine agricultural use exemption does not apply***" to

these ammonia emissions.  *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693, 713–14

(W.D. Ky. 2003) (emphasis added).

---

[22] CAFOs may produce, use, or store other substances, in addition to ammonia and hydrogen
sulfide, that would satisfy EPCRA's broad definition of "hazardous chemical."  This is an
additional reason they are subject to the EPCRA reporting requirement.

Notably, EPA did not even attempt to explain the basic factual assumption at the heart of its "routine agricultural operations" justification – that CAFOs somehow "use[]" toxic gases emitted from decomposing animal waste.  42 U.S.C. § 11021(e)(5); *see also Am. Ass'n of Cosmetology Sch. v. DeVos*, 258 F. Supp. 3d 50, 72 (D.D.C. 2017) ("When an agency's reasoning involves a non-obvious, essential factual assumption, the agency must justify that assumption.").  Nor could it, because the premise is false; CAFOs plainly "do not use ammonia [or hydrogen sulfide emissions] in an agricultural operation."  *Sierra Club*, 299 F. Supp. 2d at 713–14.

Furthermore, basic statutory text and structure preclude EPA's current construction of the "routine agricultural operations" provision as exempting all CAFOs from all EPCRA reporting. Congress required reporting by facilities where a hazardous chemical is "produced, used, or stored," 42 U.S.C. § 11004(a), but exempted from the definition of hazardous chemical only those substances "to the extent" they are "used" in routine agricultural operations, *id.* § 11021(e)(5).  Under any plain reading of the statute, the phrase "produced, used, or stored" is broader than the term "used."  The reporting mandate – which applies to facilities that "produce[], use[], or store[]" hazardous chemicals – must therefore be broader than its exemption – which applies only to those chemicals "used" in "routine agricultural operations."

Another flaw of EPA's reasoning is that it treats the phrase "produced, used, or stored" in the reporting mandate, 42 U.S.C. § 11004(a), as coextensive with the term "used" in the reporting exemption, *id.* § 11021(e)(5).  By doing so, EPA impermissibly reads the words "produced" or "stored" out of EPCRA's reporting mandate provision.  *See* EPCRA Q&A ("if a farm only *uses* substances in 'routine agricultural operations,' the farm would not be a facility that *produces, uses or stores* 'hazardous chemicals'") (emphasis added).  EPA thus treats the

words "produced" and "stored" "as stray marks on a page – notations that Congress regrettably

made but did not really intend." *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652,

1659 (2017).  But a plain reading must "give effect, if possible, to every clause and word" of

EPCRA.  *Id*. (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)).  EPA's failure to give

effect to each word in the statute is fatal to its interpretation.

The EPCRA Exemption contorts EPCRA's language to find a total CAFO exemption, but

EPA can "cite no authority which exempts animal production facilities from the reporting

requirements of EPCRA . . . .  If Congress had intended such a result, it could have excluded

animal production facilities, such as poultry and swine, from the reporting requirements." *Sierra

Club*, 299 F. Supp. 2d at 706; *cf*. 42 U.S.C. § 11023(b)(1) (exempting agricultural facilities from

EPCRA Toxic Release Inventory provisions – but not from the EPCRA reporting provisions at

issue in this case).  A plain reading of EPCRA does not permit a statutory construction wholly

divorced from the text.  Accordingly, EPA's reliance on the "routine agricultural operations"

provision cannot pass muster under *Chevron* Step One, and thus Plaintiffs are entitled to

judgment as a matter of law.

            b.     This Circuit – and EPA Itself – Already Rejected EPA's "Routine
                     Agricultural Operations" Interpretation.

This Circuit has already tacitly rejected EPA's "routine agricultural operations"

justification as supporting an exemption from EPCRA reporting.  The D.C. Circuit considered

this interpretation in the challenge to the 2008 CERCLA/EPCRA Rule when cross-Petitioner

National Pork Producers Council ("NPPC") unsuccessfully petitioned for review of the EPCRA

portions of the 2008 CERCLA/EPCRA Rule.  Specifically, NPPC argued (as EPA now does)

that "manure that is 'used in routine agricultural operations' is excluded from the definition of

'hazardous chemical' and thus, is not subject to any of EPCRA's requirements."  Brief for NPPC

at 20–21, *Waterkeeper All.*, 853 F.3d 527 (D.C. Cir. 2017) (No. 09-1017), 2016 WL 1569676

(citing 42 U.S.C. §§ 11021(e), 11049); *see also id.* at 6 n.3 ("farms that release hazardous

chemicals as part of routine agricultural operations are not subject to EPCRA reporting

requirements").  The court acknowledged NPPC's arguments, *Waterkeeper All.*, 853 F.3d at 532,

but dismissed NPPC's petition when it vacated the 2008 CERCLA/EPCRA Rule, *id.* at 538.

Notably, EPA itself has ***expressly rejected*** at least three times the "routine agricultural

operations" interpretation upon which it now relies.  *First*, during the 2008 CERCLA/EPCRA

rulemaking, in response to industry comments that CAFOs should be exempt from EPCRA

reporting under the "routine agricultural operations" provision, EPA flatly rejected this reading,

stating: "Based on the language of [EPCRA], there is no indication that Congress meant to

exclude emissions from manure from reporting requirements under [this statute]."  SUF ¶ 23.

*Second*, in defending the 2008 CERCLA/EPCRA Rule in a brief before the D.C. Circuit, EPA

clarified that the Agency's statement in the Response to Comments was a "direct response" to

industry's theory that CAFOs are exempt from EPCRA reporting because of "the exclusion of

substances 'used in routine agricultural operations' from the scope of 'hazardous chemicals.'"

SUF ¶ 25.  *Third*, in defending the 2008 CERCLA/EPCRA Rule in a challenge brought by

NPPC in the Western District of Wisconsin seeking to rely on the routine agricultural operations

theory to support an exemption, EPA wrote,

> The exception for "routine agricultural operations" is quite
> obviously directed at farms or other agricultural operations, but that
> does not mean that farms are not subject to EPCRA in the first
> instance . . . As noted in *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299
> F. Supp. 2d 693, 713–14 (W.D. Ky. 2003), operating a farm or
> animal feeding operation and utilizing a covered substance in
> "routine agricultural operations," are not necessarily synonymous.

SUF ¶ 27.[23]

    D.    <u>EPA's Interpretation of EPCRA Is Arbitrary, Capricious, and An Abuse of<br>Discretion and Thus Also Fails Under *Chevron* Step Two.</u>

The plain language of EPCRA prohibits EPA from interpreting either the FARM Act or

the "routine agricultural operations" provision in a way that justifies the EPCRA Exemption.

Thus, *Chevron* Step One mandates vacatur of the EPCRA Exemption.  But even if there were

some statutory ambiguity that would warrant moving on to *Chevron* Step Two, the EPCRA

Exemption would fail under Step Two as well because EPA has not provided a reasoned analysis

for a change in position and has contravened clear legislative intent.

It has long been held that "[a]n agency's view . . . may change . . . . But an agency

changing its course must supply a reasoned analysis."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*

*State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 57 (1983).  This requirement

> would ordinarily demand that [the agency] display awareness that
> it is changing position.  An agency may not, for example, depart
> from a prior policy *sub silentio* or simply disregard rules that are
> still on the books.  And of course the agency must show that there
> are good reasons for the new policy.

*F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (internal citations omitted).

Similarly, "a reasoned explanation is needed for disregarding facts and circumstances that

underlay or were engendered by the prior policy."  *Id.* at 516.  An "'[u]nexplained inconsistency'

in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious

change from agency practice,'" and therefore unlawful.  *Encino Motorcars, LLC v. Navarro*, 136

---

[23] Based on this prior litigation position, EPA is judicially estopped from arguing that the
"routine agricultural operations" provision exempts all farms from all EPCRA reporting.  *See*
*Aera Energy LLC v. Salazar*, 642 F.3d 212, 219 (D.C. Cir. 2011) (quoting *New Hampshire v.*
*Maine*, 532 U.S. 742, 749 (2001)) ("Where a party assumes a certain position in a legal
proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his
interests have changed, assume a contrary position . . . .").

S. Ct. 2117, 2126 (2016) (quoting *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

In the EPCRA Exemption here, EPA espouses new interpretations of the EPCRA phrases "routine agricultural operations" and "occurs in a manner" that the Agency has expressly rejected before. *See supra* Argument, Sections III.C.1 & III.C.2.a. Yet EPA does not even acknowledge that the Agency is making an about-face in its position, let alone supply the "reasoned analysis" for why such a change in position is necessary. *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 57. EPA's inconsistency is entirely "[u]nexplained," and the EPCRA Exemption must be set aside on that basis. *See Encino Motorcar*, 136 S. Ct. at 2126.

Additionally, the EPCRA Exemption is arbitrary and capricious because EPA plainly ignored clearly-worded Congressional intent for CAFOs to report under EPCRA. When passing the FARM Act, Congress made clear that it intended that CAFOs would still be required to report under EPCRA. SUF ¶ 37. Numerous statements in the Congressional Record confirm this. For example, FARM Act Co-Sponsor Senator Carper's Congressional Record statements note that the Act "leaves intact reporting requirements under [EPCRA]." 115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018). As Senator Carper explained, EPCRA reporting is "quite different" from CERCLA reporting because "large CAFOs have been successfully reporting these releases to their State emergency response commissions and to their local emergency planning committees" under EPCRA for years, whereas CAFOs had not been reporting under CERCLA during that time. *Id.* The Senator "worked hard" with the FARM Act's other co-sponsors "to ensure that, at the same time we exempted farms from hazardous substance reporting requirements under . . . CERCLA, *we chose to make no changes to how extremely hazardous substances should be reported under EPCRA*." *Id.* (emphasis added). The Congressional

Research Service memorandum included in the Congressional Record similarly finds that EPA's interpretation would "render meaningless" EPCRA's text.  *See supra* Argument, Section III.C.1. Thus, Congress's understanding of EPCRA and its intent when passing the FARM Act was that the Act would have no effect on EPCRA reporting requirements.  EPA's construction of the EPCRA is directly at odds with these clear congressional statements and is thus arbitrary, capricious, and an abuse of discretion, and as a result, it fails under *Chevron* Step Two.

Indeed, as further evidence of Congressional understanding and intent, after EPA issued its updated EPCRA Exemption, ten members of the Senate Committee on Environment and Public Works – including two co-sponsors of the FARM Act – sent a letter to EPA asking for the immediate rescission of the EPCRA Exemption because it is "legally flawed and is based on an erroneous interpretation of the law with implications beyond reporting of releases from animal waste," and because it "exceed[s] EPA's statutory authority."  SUF ¶ 47; Sen. Carper Letter at 1, 2, Apfel Decl. Ex. 16.  According to the letter, the EPCRA Exemption is "inconsistent with clear Congressional intent with respect to the FARM Act and its unambiguous legislative history" because "bill sponsors stated repeatedly that the language under consideration makes no changes to EPCRA reporting for farms," and "[n]one of the hearing statements of the Committee members, witnesses, or materials entered into either the Committee record or the Congressional Record at the time of the FARM Act's passage support EPA's new interpretation of EPCRA." *Id.* at 2.  In addition, the Senators noted that EPA's newfound reading of EPCRA is "[o]bviously . . . inconsistent with longstanding EPA policy" that requires reporting of releases of the "hundreds of substances" that are designated as extremely hazardous substances under EPCRA but not CERCLA.  *Id.* at 2.

Thus, EPA's nonsensical reading of EPCRA contravenes not only EPCRA's clear language, but also clear statements made by EPA about the limits of the routine agricultural operations provision, as well as clear statements in the FARM Act's legislative history demonstrating Congress's understanding that EPCRA requires reporting in certain instances even where CERCLA reporting is not required. Thus, even if this Court were to determine that EPA does have discretion to fashion an EPCRA Exemption – which it does not – Congress's clearly worded intent forecloses EPA's ability to issue the EPCRA Exemption under *Chevron* Step Two. For these reasons, summary judgment in Plaintiffs' favor is warranted.[24]

## CONCLUSION

EPA's EPCRA Exemption is procedurally and substantively illegal. There are no issues of material fact in dispute, and the law is clear that EPA failed to follow requisite procedures and violated EPCRA when issuing the EPCRA Exemption. Accordingly, Plaintiffs are entitled to summary judgment as a matter of law on their procedural and substantive claims. For the foregoing reasons, Plaintiffs respectfully request that this Court enter summary judgment in their favor and vacate EPA's EPCRA Exemption.

Respectfully submitted on October 29, 2018.

/s/ Carrie F. Apfel
Carrie F. Apfel, D.C. Bar No. 974342
Laura Dumais, D.C. Bar No. 1024007
Earthjustice
1625 Massachusetts Avenue, N.W., Suite 702
Washington, D.C. 20036
T:      (202) 667-4500

---

[24] The EPCRA Exemption also fails *Chevron* Step Two because EPA issued it without any administrative record, without making any factual findings in support of the Exemption, and without explaining or justifying the factual assumptions that support the Exemption. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

E:      capfel@earthjustice.org
        ldumais@earthjustice.org


Jonathan J. Smith*
Peter Lehner*
Earthjustice
48 Wall Street, 19th Floor
New York, NY 10005
T:      (212) 845-7376
E:      jsmith@earthjustice.org
        plehner@earthjustice.org

*Counsel for Plaintiffs*

* Admitted *Pro Hac Vice*

46

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing MOTION FOR SUMMARY JUDGMENT, STATEMENT OF UNDISPUTED FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES will be served via the Court's electronic filing system and will therefore be served on Defendants and their counsel.

Dated this 29th day of October, 2018.          */s/ Carrie F. Apfel*
                                                    Carrie F. Apfel