# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RURAL EMPOWERMENT ASSOCIATION FOR COMMUNITY HELP, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| | ) Civ. No. 18-cv-02260-TJK |
| v. | ) ) |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF CARRIE APFEL IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR A HEARING

I, Carrie Apfel, declare as follows:

1.      I am counsel for Plaintiffs in this matter.

2.      Attached as Exhibit 1 is a true and accurate copy of the following article: K.J. Donham, *Community & occupational Health Concerns in Pork Production: A Review*, 88 J. ANIM. SCI. 102, 107 (2010).

3.      Attached as Exhibit 2 is a true and accurate copy of the following article: Hongwei Xin *et al.*, *Ammonia (NH3) and Hydrogen Sulfide (H2S) Emission Rates for Poultry Operations* (2009).

4.      Attached as Exhibit 3 is a true and accurate copy of a document from the United States Environmental Protection Agency ("EPA") *Calculation Worksheet – Ammonia and Hydrogen Sulfide Emissions: Swine Operations – Confinement with Liquid Manure Management Systems* (2009).

5.      Attached as Exhibit 4 is a true and accurate copy of and EPA document entitled *Calculation Worksheet – Ammonia and Hydrogen Sulfide: Dairy Operations* (2009).

6.      Attached as Exhibit 5 is a true and accurate copy of a document created by Rick Stowell and Rick Koelsch entitled *Ammonia Emissions Estimator (Daily Version)* (2009).

7.      Attached as Exhibit 6 is a true and accurate copy of EPA's Response to Comments in the 2008 rulemaking procedure, EPA-HQ-SFUND-2007-0469-1359.

8.      Attached as Exhibit 7 is a true and accurate copy of EPA's brief in *Waterkeeper All. v. EPA*, 853 F.3d 527 (D.C. Cir. 2017).

9.      Attached as Exhibit 8 is a true and accurate copy of EPA's Reply Brief *Nat'l Pork Producers Council*, 638 F. Supp. 2d 1020 (2009) (No. 09–cv–73–slc), 2009 WL 1630976.

10.      Attached as Exhibit 9 is a true and accurate copy of a report by EPA's Office of Inspector General, entitled *Improving Air Quality: Eleven Years After Agreement, EPA Has Not Developed Reliable Emission Estimation Methods to Determine Whether Animal Feeding Operations Comply With Clean Air Act and Other Statutes*, Report No. 17-P-0396, at 10–11 (Sept. 19, 2017).

11.      Attached as Exhibit 10 is a true and accurate copy of guidance that EPA posted on its website in October, 2017, entitled *CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms*, ("2017 EPCRA Exemption").

12.      Attached as Exhibit 11 is a true and accurate copy of Questions and Answers EPA posted on its website regarding the 2017 EPCRA Exemption, entitled *Does EPA interpret EPCRA Section 304 to require farms to report releases from animal waste?* ("2017 EPCRA Q&A").

13.    Attached as Exhibit 12 is a true and accurate copy of guidance EPA posted on its website on or about April 30, 2018, entitled *CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms* ("EPCRA Exemption").

14.    Attached as Exhibit 13 is a true and accurate copy of Questions and Answers EPA posted on its website regarding one of the justifications for the EPCRA Exemption, entitled *How do the reporting requirements in EPCRA Section 304 apply to farms engaged in "routine agricultural operations"?* ("EPCRA Q&A").

15.    Attached as Exhibit 14 is a true and accurate copy of Questions and Answers EPA posted on its website regarding a second justification for the EPCRA Exemption, entitled *How does the Fair Agricultural Reporting Method (FARM) Act impact reporting of air emissions from animal waste under CERCLA Section 103 and EPCRA Section 304?* ("FARM Act Q&A").

16.    Attached as Exhibit 15 is a true and accurate copy of EPA's Fall Regulatory Agenda.

17.    Attached as Exhibit 16 is a true and accurate copy of a letter that members of the United States Senate Committee on Environment and Public Works sent to former EPA Administrator Scott Pruitt on May 25, 2018.

18.    Attached as Exhibit 17 is guidance EPA posted on its website on or about October 3, 2018.

19.    Attached as Exhibit 18 is a PDF of organization and individual member declarations from:

- Declaration of Devon J. Hall, Rural Empowerment Association for Community Help

- Declaration of Mark Walden, Animal Legal Defense Fund

- Declaration of Deirdre Durkis, Animal Legal Defense Fund

- Declaration of Cynthia Parke, Animal Legal Defense Fund

- Declaration of Kellan Smith, Center for Food Safety

- Declaration of Candice Cook, Center for Food Safety

- Declaration of Curtis Ramer, Center for Food Safety

- Declaration of Stephen Brittle, Don't Waste Arizona

- Declaration of Lorna Proper, Don't Waste Arizona

- Declaration of Abel Russ, Environmental Integrity Project

- Declaration of Wenonah Hauter, Food & Water Watch

- Declaration of Lisa Inzerillo, Food & Water Watch

- Declaration of Rosemary Partridge, Food & Water Watch

- Declaration of Chris Holbein, Humane Society of the United States

- Declaration of Judy Jolin, Humane Society of the United States

- Declaration of Melissa Siebke, Humane Society of the United States

- Declaration of Lowell Trom, Humane Society of the United States

- Declaration of Jane Williams, Sierra Club

- Declaration of Huda Fashho, Sierra Club

- Declaration of Scott Dye, Sierra Club

- Declaration of Max Wilson, Sierra Club

- Declaration of Heather Jacobs Deck, SoundRivers

- Declaration of Robert Hudkins, SoundRivers

- Declaration of Daniel E. Estrin, Waterkeeper Alliance

- Declaration of Rebecca Jim, Waterkeeper Alliance

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed October 29, 2018.

_/s/_ Carrie Apfel
Carrie Apfel

# Exhibit 1

# Community and occupational health concerns in pork production: A review[1]

## K. J. Donham[2]

Iowa's Center for Agricultural Safety and Health, College of Public Health, University of Iowa, Iowa City 52242

Downloaded from https://academic.oup.com/jas/article-abstract/88/suppl_13/E102/4779698 by Boston University Libraries user on 26 October 2018

**ABSTRACT:** Public concerns relative to adverse consequences of large-scale livestock production have been increasingly voiced since the late 1960s. Numerous regional, national, and international conferences have been held on the subject since 1994. This paper provides a review of the literature on the community and occupational health concerns of large-scale livestock production with a focus on pork production. The industry has recognized the concerns of the public, and the national and state pork producer groups are including these issues as an important component of their research and policy priorities. One reason large-scale livestock production has raised concern is that a significant component of the industry has separated from traditional family farming and has developed like other industries in management, structure, and concentration. The magnitude of the problem cited by environmental groups has often been criticized by the pork production industry for lack of science-based evidence to document environmental concerns. In addition to general environmental concerns, occupational health of workers has become more relevant because many operations now are employing more than 10 employees, which brings many operations in the United States under the scrutiny of the US Occupational Safety and Health Administration. In this paper, the scientific literature is reviewed relative to the science basis of occupational and environmental impacts on community and worker health. Further, recommendations are made to help promote sustainability of the livestock industry within the context of maintaining good stewardship of our environmental and human capital.

**Key words:** environment, health, swine

©2010 American Society of Animal Science. All rights reserved.

J. Anim. Sci. 2010. 88(E. Suppl.):E102–E111 doi:10.2527/jas.2009-2554

## INTRODUCTION

Since the ending of hunter-gatherer societies and the beginning of agricultural societies, there has been a trade-off between the process of producing food for society, and stress on the natural environment and people that provide the food. Furthermore, the advent of the industrial revolution in the early 1800s charted a path of increasing intensification of agricultural and nonagricultural industry that has further stressed the natural environment that we live in. The latter not only challenges the urban environment, but also our rural environments, as urban discharges and emissions reach the streams and air of our rural residents that connect urban and rural landscapes. As the economies of industrialized nations grew strong and basic necessities of life were generally cared for, the political and social controversies have increased as fewer people are involved in production agriculture.

Research has indicated that water and air pollution are now global issues, projecting environmental issues into the international arena. As production agriculture has become more concentrated into larger and more intensive operations, awareness and attention has increased from the public and regulatory agencies regarding water, air, and soil contamination and related community and worker health concerns. Emotions are increased among people who are concerned, complicating specific diagnoses for persons who claim to suffer health problems from these exposures. On the other hand, a large portion of the production agricultural community feels threatened that their industry has been negatively portrayed, and they fear excessive regulation will unnecessarily economically burden their operations, making it impossible to farm. For all these reasons, rural health professionals, livestock producers, veterinarians, and animal scientists should be as aware and concerned about environmental issues and their potential health effects, as are their urban counterparts.

[1]Based on a presentation at the Swine Symposium titled "Environmental concerns based on swine production" at the Joint Annual Meeting, July 12 to 16, 2009, Montreal, Canada. The symposium was sponsored, in part, by Land O'Lakes Purina Feed LLC, with publication sponsored by the *Journal of Animal Science* and the American Society of Animal Science.

[2]Corresponding author: kelley-donham@uiowa.edu
Received October 5, 2009.
Accepted February 5, 2010.

My objective is to review current scientific information to help create, to the extent possible, an unbiased awareness on the part of readers, enabling them to be better prepared to participate in informed public debate and provide information regarding the nature and prevention of resulting community and occupational health effects associated with livestock production and principally swine production. My overarching objective is to provide information that will assist in the sustainability and profitability of livestock production.

## ANIMAL FEEDING OPERATIONS

The proliferation of animal feeding operations (**AFO**) has been a feature of the increased intensity, concentration, specialization, and consolidation that has been occurring in agriculture in industrialized countries over the past 3 decades. The US Environmental Protection Agency (**EPA**) has a specific definition of AFO that includes the confinement of animals for at least 45 d in a 12-mo period, and in a structure or lot where vegetation or crops will not grow. The term confined animal feeding operation (**CAFO**) is used to describe AFO over a specified size that are a risk as a point source for water pollution and, therefore, require regulation (US EPA, 2009). In regard to water, air, and solid waste pollution, CAFO have similar environmental concerns to other agricultural operations. However, there are special concerns for CAFO because of the sheer size, the concentration of animals, feed, manure (usually handled in liquid form), dead animals, flies, associated gases, particulates, odors and odorants, and infectious diseases all concentrated on a small land area. There also are concerns that the manure cannot be recycled without pollution on such a small area and that local and regional air and water quality suffers.

Public concerns relative to adverse consequences of livestock production have been increasingly voiced since the late 1960s (Thu and Durrenberger, 1998). Numerous regional, national, and international conferences and commissions have been held on the subject since 1994 (Thu, 1995; Merchant et al., 2002; Donham et al., 2007). The Pew Foundation recently published its Commission report on Industrial Farm Animal Production 2008 (Pew Commission on Industrial Farm Animal Production, 2008).

Although general water and air quality issues have been raised as concerns by the public, scientists, and regulatory agencies, this paper concentrates on the potential occupational and community health consequences from air emissions of large-scale livestock operations. Physical health as well as social and economic concerns of individuals and communities are considered. A broad definition of health is used here as defined by the World Health Organization (**WHO**). The WHO states that health is "a state of complete physical, mental, and social well-being and not merely the absence of disease or infirmity" (WHO, 1972).

One reason large-scale livestock production has raised public concern is that it has separated from traditional family farming and has developed like other industries in management, structure, employment, and concentration. One of the concerns of the public is that in the US there is 130 times more animal waste produced (by weight) yearly than human waste and this waste generally is not treated sanitarily as is human waste before it is returned to the environment (Esteban, 1998). In the subsequent discussion, the scientific literature is reviewed, and this updates a previous review published in 2006 (Donham and Thelin, 2006), with a focus on the assessed health effects of air contaminants from swine CAFO on community residents and the occupational health of pork producers and employees.

## COMMUNITY HEALTH ISSUES

### Air Emissions from CAFO

Merkel et al. (1969) published the first qualitative assessment of gases emitted from liquid swine manure. Nearly 200 compounds emitted from animal manure have been detected (O'Neill and Phillips, 1992). These compounds can be grouped into the following chemical classes: mercaptans, sulfides, disulfides, amines, organic acids, phenols, alcohols, ketones, indole, skatole, carbonyls, esters, and nitrogen heterocycles. The health risks of most of these substances, at the concentrations present in swine manure, are not known. Some of these substances have a very low odor threshold [e.g., 1 part per billion (**PPB**)]. Ammonia and hydrogen sulfide are the most important emittants from livestock waste in regard to direct human health risks. Methane and carbon dioxide are important greenhouse gases.

The primary sources of gaseous compounds originate from the degradation of feces and urine applied to land and from animal wastes stored in liquid or solid phase. Ammonia is a by-product of almost any treatment method of animal waste. Other fixed compounds and trace compounds come primarily from the anaerobic decomposition of manure in liquid storage systems.

In addition to gases, often overlooked are the particulate substances that are emitted from livestock feeding operations. There is a large quantity of organic dust generated from feed sources and pigs (e.g., hair, dander, and dried feces). This dust contains bioactive substances, including endotoxin and glucans, 2 very important inflammatory substances (Donham et al., 1986; Schulze et al., 2006). Also, there is a bioaerosol component of this dust. Many gram-negative and gram-positive bacteria, fungi, and molds have been identified (Thorne et al., 1992). Some of these organisms also grow within confinement buildings, contributing to concentrations of organisms that are also found in the air outside the building (Kiekhaefer, 1995). The vast majority of organisms identified in the air are saprophytic, and very few pathogens are identified. They are combined with

Downloaded from https://academic.oup.com/jas/article-abstract/88/suppl_13/E102/4779698 by Boston University Libraries user on 26 October 2018

Donham

dust that becomes a part of the total aerosolized particulates. The size of the particulates emitted is relatively small. Approximately 50% are less than 10 μm, which means they are inhalable and will penetrate to the airways.

### Odors, Odorants, and Particulates

Most of the public concern on CAFO has been about odor (Nimmermark, 2004; Radon et al., 2004). An odor is an unpleasant sensation in the presence of an odorous substance or odorant. The odorant may or may not have additional harmful toxic effects. Ritter and Chirnside (1984) identified the classes of compounds from animal manure that are odorants, as previously mentioned. Ammonia and $H_2S$, among the fixed gases, are also odorants. Riskowski (1991) described an odor phenomenon associated with the livestock environments where $NH_3$ and $H_2S$ are detected at lesser odor threshold concentrations than previously published, apparently due to interactions within the mixture of emitted chemicals and particulates.

Researchers have looked at the fixed gases (e.g., $NH_3$ and $H_2S$) as potential surrogates for emissions and odors. However, the results of several researchers have shown that there is a poor correlation between $NH_3$ and $H_2S$ and odor strength (Payne, 1994; Smith and Kelly, 1996).

Goodrich (1975) showed, relative to background, increased amount of viable organisms downwind of manure sprinklers, as well as inside beef and turkey facilities. Pickrell (1991) showed swine barn environments to have significantly greater particle and microbe concentrations compared with other livestock environments. These concentrations are up to $10^6$ times greater inside swine buildings compared with outside (Kiekhaefer, 1995). Very little is known about hazardous concentrations of odorants in outdoor air around CAFO. We do know there are worker health problems caused by $H_2S$ and $NH_3$ and dust in the interior; however, it is difficult to infer health risks outside these buildings based on occupational health studies. Available data (Reynolds et al., 1996) indicate $NH_3$ and $H_2S$ are on the order of $10^3$ times greater inside buildings compared with outside.

Concerns about odors from livestock facilities can be considered a nuisance, which is often how courts treat them. However, there is growing evidence that odors may cause physical illness (Nimmermark, 2004; Radon et al., 2004; Wing et al., 2008). Schiffman et al. (1995) indicated that odors may cause nausea, vomiting, headache, shallow breathing, coughing, sleep disorders, upset stomach, appetite depression, irritated eyes, nose and throat irritation, and mood disturbances including agitation, annoyance, and depression. Ackerman (1990) reported that odors can result in strong emotional and physical responses, particularly after repeated exposures. Schiffman et al. (1995) studied the profile of mood states of 44 people living near large animal facilities. Compared with controls, they found that people living near the facilities were more angry, confused, tense, depressed, and fatigued. To determine acceptable odors relative to distance from the source, Walsh et al. (1995) surveyed persons living in a 5-km area surrounding a large cattle feedlot. Walsh et al. (1995) measured odors according to an odor panel and found acceptable odor levels within the 5-km radius. Results of other research indicate that the physical symptoms (which are more relevant to worker exposure than community residents) may also be caused by chronic inflammation secondary to inhaled dust, and gases (Pickrell, 1991; Donham et al., 1995).

### Physical Health

When considering the health hazards of residents living in the vicinity of CAFO, there is relatively sparse dose-response or objective evidence of physical damage to human tissues from air emissions. For example, Jacobson (1997) and (Davidson et al., 1987) reported $H_2S$ concentrations in the vicinity of CAFO, well under the threshold limit value (**TLV**) for occupational health set at 10 ppm (**PPM**). Also, in a study by Reynolds et al. (1997), concentrations of $NH_3$ in the vicinity of swine CAFO were generally less than 1 PPM. Concentrations of endotoxin and dust were near the minimum limits of detection of the instrumentation used, which was around 10 endotoxin units/$m^3$ of air and <0.5 mg of dust/$m^3$ of air). However, several studies have reported findings of excess respiratory symptoms in community residents compared with controls, including symptoms of bronchitis and asthma (Merchant et al., 2005; Sigurdarson and Kline, 2006; Radon et al., 2007). Possible reasons for this observation include the fact that residents live in the area more than 8 h/d. Also, there may be vulnerable populations that react at much less concentrations than occupational limits. For example, several states have limits for $H_2S$ at 20 to 50 PPB, 3 orders of magnitudes below the occupational exposure limit, and the EPA and Agency for Toxic Substances and Disease Registries limit is 30 PPB for long-term community exposures (Merchant et al., 2002).

Kilburn (1997) reported on neurobehavioral effects of $H_2S$ gas. This small study reported neurological deficits in 16 exposed persons, including decreases in balance, reaction times, visual field performance, color discrimination, hearing, cognition, motor speed, verbal recall, and mood states. Hydrogen sulfide is a toxin with several effects, including tissue irritation and poisoning of cellular respiration mechanisms with a predilection for brain cells. However, the health effect of chronic exposure in the vicinity of CAFO to reduced concentrations of $H_2S$ remains uncertain.

These studies of physical and mental health concerns of residents near CAFO have reported similar findings. These were controlled studies of self-reported symptoms, and no attempts were made to document objective correlates of health impairment (Schiffman et al.,

Downloaded from https://academic.oup.com/jas/article-abstract/88/suppl_13/E102/4779698 by Boston University Libraries user on 26 October 2018

Downloaded from https://academic.oup.com/jas/article-abstract/88/suppl_13/E102/4779698 by Boston University Libraries user on 26 October 2018

1995; Thu et al., 1997; Donham et al., 2007). Thu et al. (1997) reported respiratory symptoms (almost identical in type and pattern to workers in CAFO) at a statistically significant increased rate relative to unexposed community comparison populations. Schiffman et al. (1995) reported excessive mood alterations in CAFO neighbors. There are numerous instances of similar studies in other environmental settings, including concerns of communities around paper pulp mills, hazardous waste sites, refineries, and solid waste disposal sites (Shusterman, 1992). Although most of these studies have not documented objective findings of toxic physical insult to humans, a few studies have reported subtle objective findings, such as increased concentrations of urinary catecholamines or mucosal immune alterations (Avery et al., 2004). Additionally, most of these studies have not shown evidence of known toxic concentrations of substances in the environment.

### Extra-Toxic Mechanisms

Although the concentrations of potentially hazardous air contaminants are usually below known harmful amounts, adverse health symptoms are commonly reported by community residents. One possible explanation for this is the phenomenon described by one researcher as extra-toxic effects of decreased concentrations of emissions (Shusterman, 1992). This literature has focused on trying to explain symptoms of community members who may be exposed to waste sites, sewage treatment plants, and other large population-based community exposures. Medical research and regulatory agencies have difficulty dealing with these situations because they are not clear-cut. Clear-cut findings would include an objective finding (e.g., a measurable effect, such as an altered blood chemistry or abnormal radiograph) of an adverse health effect, measured toxic substances at known toxic concentration, and an obvious dose-response relationship. These community exposures are much more complex because they are a mix of physical, mental, emotional, and social stressors. Genetic memory and other very basic limbic-level self-preservation mechanisms may be involved. The following paragraphs will review some of the literature that helps to explain adverse health symptoms that people in the community may experience where there is an absence of objective health and toxicological data.

### The Somatasization of Adverse Odors

Two cranial nerves innervate the nasal mucosa: the first cranial nerve (i.e., the olfactory nerve) and the fifth cranial nerve (i.e., the trigeminus nerve; Shusterman, 1992). The olfactory nerve is primarily responsible for odor detection. The trigeminus nerve has many branches that penetrate the oral mucosa and provide additional information to the brain on odor sensation, such as irritation or pungency, which trigger protective responses including decreased respiratory rate, rhini-

tis, tearing, cough, gag reflex, and bronchoconstriction. These are all warning indicators that something associated with the odor may be harmful, and our genetically based instinctive-protective mechanisms tell us to make physiologic changes to meet the impending insult or to get out of the area (Shusterman et al., 1988; Shusterman, 1992). Therefore, it makes sense that odors can result in symptoms of mucosal irritation, including respiratory symptoms, nausea, and feelings of "dis-ease" (Shusterman et al., 1988, Shusterman, 1992).

Complexed with these physiological responses to small amounts of irritants and odors, there are behavioral interactions (e.g., perceived loss of property value, loss of control of personal space) that may explain health symptoms of illness associated with odors. There are 5 theoretical mechanisms for extra-toxic odor-related physical symptoms (Shusterman, 1992).

### Innate Odor Aversions

As a basic protective mechanism, our body wants to avoid certain odors that may signify potential harm. For example, odors in putrefaction gases (e.g., $H_2S$, mercaptans, and other sulfur-containing chemicals) are common substances that stimulate physiologic effects and the drive to avoid those substances at less than toxic concentrations. These gases may be associated with spoiled food, but are also associated with animal manure, as are many of the odors associated with these innate odor responses.

### Negation of Normal Pheromonal Phenomena

Pheromones stimulate physiologic responses, especially around sexual reproduction. These are most overt for insects, but many mammals, including humans, respond to them. Some odors may destroy normal positive pheromone responses, resulting in impaired sexual function for people living in the vicinity of CAFO. (Shusterman et al., 1988; Shusterman, 1992; Schiffman et al., 1995)

### Exacerbation of Underlying Conditions

Previous research has shown that workers with underlying conditions (e.g., asthma, atopy, bronchitis, heart conditions) are more susceptible to the CAFO environment than others (Schiffman et al., 1995). Furthermore, it is now evident that individuals differ genetically in their susceptibility to endotoxins. Research by Meggs et al. (1996) and Rylander (2004) also lends strength to the theory that underlying conditions, such as asthma, may amplify exposures.

### Aversive Conditioning

Some people previously exposed to increased concentrations of odorous gases causing toxic effects may respond physiologically to less than toxic amounts (i.e.,

slight odor) of this substance in future exposures. The condition described as multiple chemical sensitivity may have similarities to aversive conditioning (Bell et al., 1992).

This author has observed this condition in several cases of CAFO workers who experience symptoms and anxiety when smelling CAFO odors after a severe CAFO gas exposure episode. This conditioned stimulus is probably an innate protective mechanism. This can also happen with exposures to decreased amounts over a long period of time (i.e., acquired odor intolerance; Meggs et al., 1996).

### Stress-Induced Illness

Odor-related stress-induced illness has been discussed as a component of what is known as environmental stress syndrome. This phenomenon has been seen after disaster sites such as Three Mile Island (Shusterman et al., 1988). Studies have shown there are increased urinary catecholamines in affected individuals (Davidson et al., 1987). Affected individuals also have a feeling of depression, helplessness, and an increased degree of environmental worry, which is exacerbated by detection of the offending odor. Community members may be excessively worried that their property values are falling because of the odor source in their neighborhood. Odors can act as a cue for these individuals stimulating adverse physiologic risks relative to an associated exposure. Long-term stress can be associated with muscle tension, headaches, coronary artery disease, and peptic ulcers.

### Summary of Extra-Toxic Mechanisms

In studies of physical health complaints in communities around CAFO, it would be expected that objective findings of toxicity would be difficult to obtain. However, that does not and should not discount the fact that people experience valid symptoms. The reasons have to do with complex interactions of the brain and somatic systems. First of all, odors may initiate somatic symptoms based on enervations of the trigeminus nerve. Furthermore, odors may initiate physiologic activity as a response to primordially acquired (limbic-level) aversions to toxic substances. These responses may be modulated and exacerbated by the person as the person worries about environmental threats and the frequency with which odors are experienced. Furthermore, these conditions may be exacerbated by previous toxic exposures to the substances in question, creating a learned response of avoidance even when minimal exposures are present. Further exacerbation may occur when combined with a feeling that the person has no control over the situation, with fears of declining property values. The combined physical and psychological effects have been described as resulting in environmental stress syndrome. If an individual has an underlying health condition, such as asthma, further complications may be present.

## OCCUPATIONAL HEALTH OF SWINE PRODUCERS AND EMPLOYEES

Research on the health and safety of people working in swine confinement environments first began in 1977 (Donham et al., 1977). Potentially hazardous dust and gases are present in many swine CAFO buildings. The following paragraphs will review the air exposures, their sources, known health effects, and prevention. There are additional occupational health concerns noted that consist mainly of acute injuries, noise, or infection. These latter conditions will not be addressed in this article.

### What Toxic Dusts and Gases Are Found in Confinement Houses?

The dust in CAFO is a complex mixture of agents that are generated primarily from the animals (i.e., hair and dander), dried feces, and feed (Donham and Gustafson, 1982; Nilsson, 1982; Donham et al., 1985; Donham and Popendorf, 1985). Additional to the dust, gases are generated inside the building that arise from decomposition of animal urine and feces (i.e., $NH_3$ and $H_2S$). In those buildings with manure storage under slatted floors, $H_2S$ is a greater acute health risk. Furthermore, fossil-fuel-burning heaters present in some farrowing and nursery facilities may emit CO at toxic concentrations. The respiration of the animals and the fossil-fuel-burning heaters emit $CO_2$. These dusts and gases often accumulate to concentrations that may be acutely or chronically hazardous to human and animal health (Donham and Gustafson, 1982). The mixture and concentrations of dusts and gases inside CAFO vary depending on numerous factors including management practices, ventilation and other engineering controls, the age, number and type of animals in the building, and the design and management of the feeding and waste handling systems.

Dust particles in CAFO contain approximately 25% protein, and range in size from <2 μm to 50 μm in diameter (Donham and Popendorf, 1985). One-third of the particles are within the inhalable size range (i.e., <10 μm in diameter; Nilsson, 1982; Donham and Popendorf, 1985). Fecal material particles are quite small (i.e., ≤10 μm) relative to other dust components and consist of increased concentrations of gut-flora bacteria and exfoliated gut epithelium. This component of the dust constitutes a major burden to small airways and alveoli. The larger particles are mainly of feed grain origin and primarily affect the upper airways. Also present are animal dander, broken bits of hair, bacteria, endotoxins, pollen grains, insect parts, and fungal spores (Donham et al., 1985; Donham, 1986). In recent years, researchers have focused on the micro-

Downloaded from https://academic.oup.com/jas/article-abstract/88/suppl_13/E102/4779698 by Boston University Libraries user on 26 October 2018

Downloaded from https://academic.oup.com/jas/article-abstract/88/suppl_13/E102/4779698 by Boston University Libraries user on 26 October 2018

bial by-products contained in this dust as the primary hazardous substances. Endotoxin and 1,3-β-D-glucan, respectively, originate from the cell wall of gram-negative bacteria and certain yeasts, molds, and bacteria. They are known toxins and inflammatory mediators. The dust absorbs ammonia and possibly other toxic or irritating gases, adding to the potential hazards of the inhaled particles (Donham and Gustafson, 1982; doPico, 1986; Sigurdarson et al., 2004). A recent study has shown that the mixed exposure to dust and $NH_3$ in CAFO results in 2 to 4 times the health hazard (assessed by decline in pulmonary function over a work period; Donham et al., 2002).

At least 160 different gases are generated in anaerobically degenerating manure. However, $H_2S$, $NH_3$, $CH_4$, $CO_2$, and CO are the primary hazardous gases present (Donham et al., 1982; Donham and Gustafson, 1982; Donham and Popendorf, 1985). These gases may escape into the work environment in buildings with manure pits under the building. Furthermore, 40% of the $NH_3$ measured in-building is released by bacterial action on urine and feces on the confinement house floors (Donham and Gustafson, 1982). Carbon monoxide and $CO_2$ are generally not produced in hazardous concentrations from the manure pit but may rise to toxic concentrations from fossil-fueled heating systems in winter as well as by the respiration of the animal (i.e., $CO_2$; Donham and Gustafson, 1982). These latter gases are usually only hazardous when the heaters or ventilation systems malfunction. Methane is not a respiratory hazard in these buildings. However, $CH_4$ may be an occasional fire or explosive hazard in some buildings.

## Who Is Exposed to These Dusts and Gases, and When?

In the United States, an estimated 700,000 people work in livestock and poultry confinement operations (Donham, 1990). This number includes owner-operators, hired farm workers, women, children, veterinarians, and service technicians. Included in the hired farm workers in the United States are minority populations, including those of Hispanic, Asian, and Bosnian descent, among others. The risk of acute and chronic respiratory health effects in CAFO workers are related to the relative genetic susceptibility to endotoxin or allergens of the individual, the length of time the person has worked, whether the person smokes or not, whether they have other respiratory conditions, and the concentration of exposures in these buildings. Although some individuals may have adverse health effects within the first week of work, most will not develop symptoms unless they have worked more than 2 h daily and for 6 or more yr (Donham et al., 1977, 2000; Donham and Gustafson, 1982).

Dust and gas concentrations increase in winter when houses are tightly closed and ventilation rates are reduced to conserve heat (Donham et al., 1977). Also, dust concentrations increase when animals are being moved, handled, and fed, or when buildings are being cleaned by high-pressure spray washing or sweeping (Nilsson, 1982). Ventilation systems are designed to control heat and humidity in the building and often will not reduce dust or gas adequately to ensure a healthful environment for humans. During the cold seasons, should the ventilation systems fail for several hours, $CO_2$ from animal respiration, combined with $CO_2$ and CO from heaters and manure pits, can rise to toxic or asphyxiating amounts. In the warm seasons, the greater risk to animals from ventilation failure is heat stress from elevated temperature and humidity. Although massive animal losses have been attributed to these latter situations, they would not create an acute human health threat because they are not so acute as to prevent workers from leaving the building in a safe time.

Hydrogen sulfide may pose an acute hazard whenever the liquid manure slurry is agitated (Osbern and Crapo, 1981; Donham et al., 1982). During agitation, $H_2S$ can be released in seconds from usual ambient levels of <5 PPM to lethal levels of >500 PPM (Donham et al., 1988). The greater the agitation, the more rapid and greater the amount of $H_2S$ that is released. Animals and workers have become seriously ill or died in swine CAFO when $H_2S$ has risen from agitated manure in pits under the building. Several workers have died when entering a pit during or soon after the emptying process to repair pumping equipment or clean out solids (Donham et al., 1982; Beaver and Field, 2007). People attempting to rescue these workers also have died. Workers may be exposed to increased $H_2S$ concentrations when they enter the pit to retrieve animals or tools that have fallen in or to repair ventilation systems or cracks in the cement. Hydrogen sulfide exposure is most hazardous when the manure pits are located beneath the houses. However, an acutely toxic environment may result from outside storage facilities if gases backflow into a building, due to inadequate gas traps or other design fault, or if a worker enters a separate confined-space storage facility.

## How Commonly Does Excessive Exposure Occur?

Typical dust concentrations in swine CAFO are 2 to 6 mg/m$^3$ (Donham et al., 1985). Buildings with dust concentrations at 10 to 15 mg/m$^3$ may be seen during cold weather or when moving or sorting the pigs. The maximum recommended safe concentrations of dust to prevent chronic respiratory conditions is 2.5 mg/m$^3$ (Donham et al., 1995; Reynolds et al., 1996), which is considerably less than the 15 mg/m$^3$ for nuisance dust set by the Occupational Health and Safety Administration for industrial standards. The greater relative toxic nature of this dust is due to its high degree of its biological activity, its inflammatory nature, and the additive and synergistic actions of the mixed dust and gas exposures. Nearly 60% of swine confinement workers who have worked for 6 or more years experience

Downloaded from https://academic.oup.com/jas/article-abstract/88/suppl_13/E102/4779698 by Boston University Libraries user on 26 October 2018

one or more respiratory symptoms (Clark et al., 1983; Donham et al., 1989). Prevalence of respiratory symptoms among workers in CAFO is 25%, compared with approximately 12% in nonconfinement swine workers (Donham, 1990).

## Respiratory Effects of Inhaling Confinement House Dusts and Gases

Human health effects of work in swine CAFO were first described in veterinarians by Donham et al. (1977). Since that time, numerous studies by many different authors in various countries around the world have been published regarding the complex set of respiratory responses that include symptoms of acute and chronic bronchitis, nonallergic occupational asthma, mucous membrane irritation, and organic dust toxic syndrome (Mustajbegovic et al., 2001). These inflammatory and toxic processes may occur alone or in combination in combination, resulting in one or perhaps several conditions simultaneously (Donham et al., 1989; Prior et al., 2001).

Cigarette smoking, along with other risk variables mentioned previously, increases the risk and severity of symptoms. In general, the symptoms are more frequent and severe among smokers (Donham and Gustafson 1982; Markowitz et al., 1985) and in those working in larger swine operations (related to longer hours working inside CAFO buildings) or working in buildings with increased amounts of dusts and gases (Donham et al., 1995, 2000; Reynolds et al., 1996).

Although irreversible airway obstruction has not been a general finding in confinement house workers, there is objective evidence that long-term lung damage may be occurring. Pulmonary function studies show evidence of air trapping in the lungs. Lavage studies of bronchial fluids show a persistent leukocytosis, and sputum studies show persistent inflammatory cells and epithelial cells (Schwartz et al., 1990; Djuricic et al., 2001). Baseline pulmonary function studies [i.e., forced vital capacity and forced expiratory volume in one second ($FEV_1$)] of healthy confinement workers usually show that pulmonary function does not differ significantly from those of workers in conventional swine buildings (Donham et al., 1989, 1990). However, flow rates at 25 to 75% of lung volume ($FEF_{25-75}$) are significantly less. Furthermore, work shift declines in $FEV_1$ and flow rate values are seen in most confinement house workers after a 2- to 4-h exposure. These findings indicate that chronic obstructive pulmonary disease may occur among these workers in future years (Schwartz et al., 1990). Although end-stage lung damage in CAFO workers has not yet been systematically studied, the authors have experienced many anecdotal case studies in which workers have quit because of health reasons. One study of owner-operators revealed a dropout rate of 10% over a 6-yr period for respiratory health reasons (Holness et al., 1987).

A point to note is that it is rare to find producers or workers who have allergic asthma (also called atopic asthma) from swine house exposures. This is thought to be the result of early exposures in life to these dusts and, thus, the acceptance of the body of these foreign substances (hygiene hypothesis; Ernst and Cormier, 2000; Riedler et al., 2001). An additional explanation is that workers who are allergic may leave the job early, leaving a healthy workforce.

Although respiratory exposures are extremely common among CAFO workers, there are several other occupational hazards that should be considered. There are certain infectious agents involving the respiratory tract that humans may contract from animals in CAFO. These include, but are not limited to, swine influenza, erysipeloid, *Streptococcus suis*, and methicillin-resistant *Staphylococcus aureus* (Holness et al., 1987; Smith et al., 2009). Injuries to CAFO workers from animals, pinch points in gates and pens, cuts, and needle sticks are common. Furthermore, increased noise levels in these facilities can lead to noise-induced hearing loss. These hazards are discussed elsewhere (Donham and Thelin, 2006).

## Prevention

Health hazards associated with confinement houses must be addressed through improvements in the environment through 1) decreased generation of dusts and gases by improved management procedures and engineering controls, 2) dilution of contaminants once in the air (e.g., ventilation), and 3) proper protection of the individual with respirator use. A prevention model for confinement house problems, based on education and industrial hygiene consultation, has demonstrated its effectiveness (Donham et al., 1990). Some examples of management practices to reduce the sources of dusts and gases include 1) delivering feed by extension spouts into covered feeders, rather than letting feed fall freely several feet from automatic delivery systems into open feeders; 2) using extra fat or oil in the feed to reduce dust; 3) sprinkling or misting the environment with vegetable-based oil, and regular (every 3 to 4 wk) washing of buildings with power sprayers (operators must use respiratory protection during this procedure); 4) using flooring that is relatively self-cleaning (e.g., plastic-coated wire mesh); and 5) assuring that heating units are clean, vented, and functioning properly. Details of control measures are published elsewhere (Donham, 1991). Effectiveness of control techniques can be assessed by measuring dust and gas concentrations. These buildings should be routinely monitored to assure air contaminants are within healthful limits.

Because it is economically impossible to completely eliminate the formation of dusts and gases in CAFO, techniques for removing contaminants from the air of confinement houses are critically important. Ventilation will help reduce dusts and gases to healthful amounts.

Downloaded from https://academic.oup.com/jas/article-abstract/88/suppl_13/E102/4779698 by Boston University Libraries user on 26 October 2018

Ventilation systems must be properly designed and maintained and ventilation rates adjusted to include consideration of air quality. Operators often reduce these rates in winter because of concerns for conserving heat, causing dust and gas concentrations to rise. Several engineering techniques (e.g., use of heat exchangers, which allow increased ventilation while capturing some waste heat) have been tried with varying degrees of success (Donham, 1993).

Anyone working in a swine or poultry confinement house for 2 or more hours per day should be advised, at a minimum, to wear a National Institute for Occupational Safety and Health (**NIOSH**)-approved N-95 2 strapped dust mask, even if the concentrations of dusts and gases are below Occupational Safety and Health Administration threshold exposure limits. Recent research has shown that different tasks in pork production operations have greater exposures than others. Because it is inconvenient and uncomfortable for workers to wear respirators 100% of the time while working, we recommended wearing dust respirators at a minimum during the following tasks: 1) processing piglets, 2) feeding, 3) moving and sorting hogs, and 4) load out (O'Shaughnessy et al., 2010). Persons exposed to houses with increased dust or gas concentrations, or persons with respiratory conditions, may need to use a more sophisticated respirator, such as a half-mask cartridge respirator or powered air-supplying respirator (e.g., 3M air helmet).

Preventing exposure to increased concentrations of $H_2S$ from manure pits requires stringent controls. General safety measures include constructing manure pits outside of the confinement building, constructing openings so that lids or other objects cannot fall into the pit requiring a worker to enter the pit for retrieval, and erecting safety guards around open pits and warning signs. Whenever a pit that is under a confinement house is being agitated, people should stay out of the building, ventilation of the house should be maximized, and animals should be removed or observed from outside the building.

Even when not being agitated, manure pits can seldom be entered safely. If entrance is imperative, adequate protection is only assured when a self-contained breathing apparatus is worn by an individual trained in its use. All operators should understand that increased concentrations of $H_2S$ cannot be smelled and that $H_2S$ greater than 1,000 PPM produces unconsciousness and respiratory arrest in only 1 to 3 breaths. A variety of $H_2S$ gas alarms give an accurate indication of hazard.

Poor air quality in the confinement house has also been shown to be associated with health problems and reduced productivity in swine (Donham, 1991). Advising this economic fact to a swine producer may be the most expedient way to create environmental improvement that would help the person, the animals, and the economics of the operation. Two relevant comprehensive multifactored prevention programs, the Swine Confinement and Respiratory Health Project and the Certified Safe Farm program, have been trialed with success in pork production (Ferguson et al., 1989; Gjerde et al., 1991; Kline et al., 2007). These programs incorporate the combination of environmental assessment, education, health screening, safety audit, health and safety goals setting, with incentives for achieving objectives. These programs work to reduce the risks of adverse occupationally related health incidents and reduce health care costs to address them; however, they do require a commitment and resources to administer and maintain them.

## SUMMARY AND CONCLUSIONS

Michael Savitz suggests that sustainability of any industry depends on a positive "triple bottom line" that includes not only economic viability, but also environmental preservation and care and advancement of its human capital (i.e., the producers and employees; Savitz and Weber, 2006). There will always be ups and downs in agricultural commodity markets. However, Savitz suggests that to help ensure long-term sustainability of the industry, the other 2 legs of the triple bottom line need to be integrated into the daily business of the industry. This author thinks there are sufficient science and program examples to guide this action, and advances are being made in the industry in this regard. However, it seems apparent that broader and more integrated implementation is a work in progress that should be encouraged.

## LITERATURE CITED

Ackerman, D. 1990. A Natural History of the Senses. Chapman, London, UK.

Avery, R., S. Wing, S. Marshall, and S. Schiffman. 2004. Odor from industrial hog farming operations and mucosal immune function in neighbors. Arch. Environ. Health 59:101–108.

Beaver, R., and W. Field. 2007. Summary of documented fatalities in livestock manure storage and handling facilities—1975–2004. J. Agromed. 12:3–23.

Bell, I., C. Miller, and G. Schwartz. 1992. An olfactory-limbic model of multiple chemical sensitivity syndrome: Possible relationships to kindling and affective spectrum disorders. Biol. Psychol. 32:218–242.

Clark, S., R. Rylander, and L. Larsson. 1983. Airborne bacteria, endotoxin and fungi in dust in poultry and swine confinement buildings. Am. Ind. Hyg. Assoc. J. 44:537–541.

Davidson, L., R. Fleming, and A. Baum. 1987. Chronic stress, catecholamines, and sleep disturbance at Three Mile Island. J. Human Stress 13:75–83.

Djuricic, S., M. Zlatkovic, D. Babic, D. Gligorijevic, and P. Dlamenac. 2001. Sputumcytopathological finding in pig farmers. Pathol. Res. Pract. 197:145–155.

Donham, K. 1986. Hazardous agents in agricultural dusts and methods of evaluation. Am. J. Ind. Med. 10:205–220.

Donham, K. 1990. Health effects from work in swine confinement buildings. Am. J. Ind. Med. 17:17–25.

Donham, K. 1991. Association of environmental contaminants with disease and productivity in swine. Am. J. Vet. Res. 52:1723–1730.

Donham, K. 1993. Respiratory disease hazards to workers in livestock and poultry confinement structures. Semin. Respir. Infect. 14:49–59.

Downloaded from https://academic.oup.com/jas/article-abstract/88/suppl_13/E102/4779698 by Boston University Libraries user on 26 October 2018

Donham, K., D. Cumro, and S. Reynolds. 2002. Synergistic effects of dust and ammonia on the occupational health effects of poultry production workers. J. Agromed. 8:57–76.

Donham, K., D. Cumro, S. Reynolds, and J. Merchant. 2000. Dose-response relationships between occupational aerosol exposures and cross-shift declines of lung function in poultry workers: Recommendations for exposure limits. J. Occup. Environ. Med. 42:260–269.

Donham, K., and K. Gustafson. 1982. Human occupational hazards from swine confinement. Ann. Am. Conf. Gov. Ind. Hyg. 2:137–142.

Donham, K., P. Haglind, Y. Peterson, R. Rylander, and L. Belin. 1989. Environmental and health studies of workers in Swedish swine buildings. Br. J. Ind. Med. 46:31–37.

Donham, K., L. Knapp, R. Monson, and K. Gustafson. 1982. Acute toxic exposure to gases from liquid manure. J. Occup. Med. 24:142–145.

Donham, K., J. Merchant, D. Lassise, W. Popendorf, and L. Burmeister. 1990. Preventing respiratory disease in swine confinement workers: Intervention through applied epidemiology, education, and consultation. Am. J. Ind. Med. 18:241–261.

Donham, K., and W. Popendorf. 1985. Ambient levels of selected gases inside swine confinement buildings. Am. Ind. Hyg. Assoc. J. 46:658–661.

Donham, K., S. Reynolds, P. Whitten, J. Merchant, L. Burmeister, and W. Popendorf. 1995. Respiratory dysfunction in swine production facility workers: Dose-response relationships of environmental exposures and pulmonary function. Am. J. Ind. Med. 27:405–418.

Donham, K., M. Rubin, T. Thedell, and J. Kammermeyer. 1977. Potential health hazards of workers in swine confinement buildings. J. Occup. Med. 19:383–387.

Donham, K., L. Scallon, and W. Popendorf. 1986. Characterization of dusts collected from swine confinement buildings. Am. Ind. Hyg. Assoc. J. 47:404–410.

Donham, K., L. Scallon, W. Popendorf, M. Treuhaft, and R. Roberts. 1985. Characterization of dusts collected from swine confinement buildings. Am. Ind. Hyg. Assoc. J. 46:658–661.

Donham, K., and A. Thelin. 2006. Agricultural Medicine: Rural Occupational and Environmental Health for the Health Professions. Blackwell Publ., Ames, IA.

Donham, K., S. Wing, D. Osterberg, J. Flora, C. Hodne, K. Thu, and P. Thorne. 2007. Community health and socioeconomic issues surrounding concentrated animal feeding operations. Environ. Health Perspect. 115:317–320.

Donham, K., J. Yeggy, and R. Dague. 1988. Health implications for workers and animals in swine buildings. Biol. Wastes. 24:161–173.

doPico, G. 1986. Workgroup report on diseases. Am. J. Ind. Med. 10:261–265.

Ernst, P., and Y. Cormier. 2000. Relative scarcity of asthma and atopy among rural adolescents raised on a farm. Am. J. Respir. Crit. Care Med. 161:1563–1566.

Esteban, E. 1998. The Confinement Animal Feeding Operation Workshop, Washington, DC, June 23–24, 1998. Centers for Disease Control and Prevention, National Center for Environmental Health, Atlanta, GA.

Ferguson, K., C. Gjerde, C. Mutel, K. Donham, C. Hradek, K. Johansen, and J. Merchant. 1989. An educational intervention program for prevention of occupational illness in agriculture. J. Rural Health 5:33–47.

Gjerde, C., K. Ferguson, C. Mutel, K. Donham, and J. Merchant. 1991. Results of an educational intervention to improve the health knowledge, attitudes, and self-reported behaviors of swine confinement workers. J. Rural Health 7:278–286.

Goodrich, P. 1975. Airborne health hazards generated while treating and land disposing waste. Pages 7–10 in ASAE Publ. PROC-275. ASAE, St. Joseph, MI.

Holness, D., E. O'Blenis, A. Sass-Kortsak, C. Deliger, and J. Nethercott. 1987. Respiratory effects and dust exposures in hog confinement farming. Am. J. Ind. Med. 11:571–580.

Jacobson, L. 1997. No correlation between hydrogen sulfide and odor; 1997 Nov–Dec. Swine Center, Univ. Minnesota, St. Paul.

Kiekhaefer, M. 1995. Cross seasonal studies of airborne microbial populations and environment in swine buildings: Implications for worker and animal health. Ann. Agric. Environ. Med. 2:37–44.

Kilburn, K. 1997. Exposure to reduced sulfur gases impairs neurobehavioral function. South. Med. J. 90:997–1006.

Kline, A., K. Leedom-Larson, K. Donham, S. Schneiders, and R. Rautiainen. 2007. Farmer assessment of the Iowa Certified Safe Farm program. J. Agromed. 12:33–43.

Markowitz, L., N. Hynes, P. de la Cruz, E. Campos, J. Barbaree, B. Plikaytis, D. Mosier, and A. Kaufmann. 1985. Tick-borne Tularemia: An outbreak of lymphadenopathy in children. JAMA 254:2922–2925.

Meggs, W., T. Elshnick, and W. Metzger. 1996. Nasal pathology and ultrastructure in patients with chronic airway inflammation (RADS and RUDS) following an irritant exposure. Clin. Toxicol. 34:383–396.

Merchant, J., A. Naleway, E. Svendsen, K. Kelley, L. Burmeister, A. Stromquist, C. Taylor, P. Thorne, S. Reynolds, W. Sanderson, and E. Chrischilles. 2005. Asthma and farm exposures in a cohort of rural Iowa children. Environ. Health Perspect. 113:350–356.

Merchant, J., R. Ross, and C. Hodne. 2002. Iowa Concentrated Animal Feeding Operations Air Quality Study. Univ. Iowa and Iowa State Univ., Iowa City, IA.

Merkel, J., T. Hazen, and J. Miner. 1969. Identification of gases in a confinement swine building atmosphere. Trans. Am. Soc. Agric. Eng. 12:310–315.

Mustajbegovic, J., E. Zuskin, E. Schachter, J. Kern, M. Vrcic-Keglevic, K. Vitale, and Z. Ebling. 2001. Respiratory findings in livestock farm workers. J. Occup. Environ. Med. 43:576–584.

Nilsson, C. 1982. Dust investigations in pig houses. Report 25. Department of Farm Buildings, Swedish Univ. Agric. Sci., Lund, Sweden.

Nimmermark, S. 2004. Odour influence on well-being and health with specific focus on animal production emissions. Ann. Agric. Environ. Med. 11:163–173.

O'Neill, D., and V. Phillips. 1992. A Review of the Control of Odor Nuisance from Livestock Buildings: Part 3. Properties of the odorous substances which have been identified in livestock wastes or in the air around them. J. Agric. Eng. Res. 53:23–25.

O'Shaughnessy, P., K. Donham, T. Peters, C. Taylor, R. Altmaier, and K. Kelly. 2010. A task-based assessment of swine worker exposure to airborne dust. J. Occup. Environ. Hyg. 7:7–13.

Osbern, L., and R. Crapo. 1981. Dung lung: A report of toxic exposure to liquid manure. Ann. Intern. Med. 95:312–314.

Pew Commission on Industrial Farm Animal Production. 2008. Putting meat on the table: Industrial farm animal production in America. http://www.ncifap.org/bin/e/j/PCIFAPFin.pdf Accessed Jan. 29, 2010.

Pickrell, J. 1991. Hazards in confinement housing—Gases and dusts in confined animal houses for swine, poultry, horses, and humans. Vet. Hum. Toxicol. 33:32–39.

Prior, C., M. Falk, and A. Frank. 2001. Longitudinal changes of sensitization to farming-related antigens among young farmers. Respiration 68:46–50.

Radon, K., A. Peters, G. Praml, V. Ehrenstein, A. Schulze, O. Hehl, and D. Nowak. 2004. Livestock odours and quality of life of neighbouring residents. Ann. Agric. Environ. Med. 11:59–62.

Radon, K., A. Schulze, V. Ehrenstein, R. van Strien, G. Praml, and D. Nowak. 2007. Environmental exposure to confined animal feeding operations and respiratory health of neighboring residents. Epidemiology 18:300–308.

Reynolds, S., K. Donham, J. Stookesberry, P. Thorne, P. Subramanian, K. Thu, and P. Whitten. 1997. Air quality assessment in the vicinity of swine production facilities. J. Agromed. 4:37–45.

Reynolds, S., K. Donham, P. Whitten, J. Merchant, L. Burmeister, and W. Popendorf. 1996. Longitudinal evaluation of dose-re-

sponse relationships for environmental exposures and pulmonary function in swine production workers. Am. J. Ind. Med. 29:33–40.

Riedler, J., C. Braun-Fahrlander, W. Eder, M. Schreurer, M. Waser, S. Maisch, D. Carr, R. Schierl, D. Nowak, and E. von Mutius. 2001. Exposure to farming in early life and development of asthma and allergy: A cross-sectional survey. Lancet 358:1129–1133.

Riskowski, G. 1991. Methods for evaluating odor from swine manure. Appl. Eng. Agric. 7:248–253.

Ritter, W., and A. Chirnside. 1984. Impact of land use on groundwater quality in southern Delaware. Ground Water 22:38–47.

Rylander, R. 2004. Organic dust and disease: A continuous research challenge. Am. J. Ind. Med. 46:323–326.

Savitz, A., and K. Weber. 2006. The triple bottom line: How companies are achieving economic, social, and environmental success, and how you can too. Jossey Bass, San Francisco, CA.

Schiffman, S., E. Miller, M. Suggs, and B. Graham. 1995. The effect of environmental odors emanating from commercial swine operations on the mood of nearby residents. Brain Res. Bull. 37:369–375.

Schulze, A., R. van Strien, R. Schierl, H. Kuchenhoff, and K. Radon. 2006. Ambient endotoxin level in an area with intensive livestock production. Ann. Agric. Environ. Med. 13:87–91.

Schwartz, D., K. Donham, W. Popendorf, D. Lassise, G. Hunninghake, and J. Merchant. 1990. Are work shift changes in lung function predictive of underlying lung disease? Am. Thor. Soc. 131:A593.

Shusterman, D. 1992. Critical review: The health significance of environmental odor pollution. Arch. Environ. Health 47:76–87.

Shusterman, D., J. Balmes, and J. Cone. 1988. Behavioral sensitization to irritants/odorants after acute overexposures. J. Occup. Environ. Med. 30:565–567.

Sigurdarson, S., K. Donham, and J. Kline. 2004. Acute toxic pneumonitis complicating chronic obstructive pulmonary disease (COPD) in a farmer. Am. J. Ind. Med. 46:393–395.

Sigurdarson, S., and J. Kline. 2006. School proximity to concentrated animal feeding operations and prevalence of asthma in students. Chest 129:1486–1491.

Smith, R., and J. Kelly. 1996. A comparison of two methods for estimating odour emissions from area sources. Pages 263–269 in Proc. Int. Conf. Air Pollution from Agric. Operations, Kansas City, MO, Feb. 7–9, 1996. Midwest Plan Service, Ames, IA.

Smith, T. C., M. Male, A. Harper, J. Kroeger, G. Tinkler, E. Moritz, A. Capuano, L. Herwaldt, and D. Diekema. 2009. Methicillin-resistant *Staphylococcus aureus* (MRSA) strain ST398 is present in Midwestern US swine and swine workers. PLoS ONE 4:e4258.

Thorne, P., M. Keikhaefer, and K. Donham. 1992. Comparison of bioaerosol sampling methods in barns housing swine. Appl. Environ. Microbiol. 58:2543–2551.

Thu, K., ed. 1995. Understanding the Impacts of Large-Scale Swine Production, June 29–30, 1995. Univ. Iowa, Des Moines.

Thu, K., K. Donham, and R. Ziegenhorn. 1997. A control study of the physical and mental health of residents living near a large-scale swine operation. J. Agric. Saf. Health 3:13–26.

Thu, K., and P. Durrenberger, ed. 1998. Pigs, Profits, and Rural Communities. State Univ. New York, Albany, NY.

US Environmental Protection Agency. 2009. What is a CAFO? http://www.epa.gov/region7/water/cafo/index.htm Accessed Oct. 5, 2009.

Walsh, P., C. Lunney, and K. Casey. 1995. Odour impact survey. Milestone Rep. No. 18, Meat Research Corporation Project No. DAQ-079. Department of Primary Industries, Beef Industry Group, Toowomba, Queensland, Australia.

Wing, S., A. Horton, S. Marshall, K. Thu, M. Tajik, L. Schinasi, and S. Schiffman. 2008. Air pollution and odor in communities near industrial swine operations. Environ. Health Perspect. 116:1362–1368.

World Health Organization. 1972. Health Hazards of the Human Environment. Pages 50–65, 119, 158, 201–202, 205–209. World Health Org., Geneva, Switzerland.

Downloaded from https://academic.oup.com/jas/article-abstract/88/suppl_13/E102/4779698 by Boston University Libraries user on 26 October 2018

# Exhibit 2

# Ammonia ($NH_3$) and Hydrogen Sulfide ($H_2S$) Emission Rates for Poultry Operations

## Hongwei Xin, Robert Burns, and Hong Li

**Agricultural and Biosystems Engineering Dept., Iowa State University, Ames, Iowa**
**Email: hxin@iastate.edu (Xin); rburns@iastate.edu (Burns); lwblue@iastate.edu (Li)**

**Ammonia emission rates and number of birds taken to produce a maximum daily emission of 100 lb $NH_3$ for broilers, laying hens and turkeys**

| Poultry Type | Housing Type, Average or Max | Emission Rate | | # birds to emit 100 lb $NH_3$/d |
|---|---|---|---|---|
| | | (g $NH_3$/bird-d) | (lb $NH_3$/bird-d) | |
| Broilers[1] | 63-d broilers on built-up litter (average) | 0.93 | 0.00205 | |
| | 40-d broilers on built-up litter (max) | 1.45 | 0.00319 | 31,310 |
| | 49-d broilers on built-up litter (max) | 1.73 | 0.00381 | 26,240 |
| | 63-d old broilers on built-up litter (max) | 2.16 | 0.00476 | 21,020 |
| Broilers[2] | 52-d broilers on built-up litter (average) | 0.59 | 0.00130 | |
| | 52-d broilers on built-up litter (max) | 1.52 | 0.00335 | 29,870 |
| | 52-d broilers on new bedding (average) | 0.51 | 0.00112 | |
| | 52-d broilers on new bedding (max) | 0.91 | 0.00201 | 49,850 |
| Laying hens | High-rise houses (average) | 0.90 | 0.00198 | |
| | High-rise houses (max) | 1.61 | 0.00355 | 28,200 |
| | Manure-belt houses with daily manure removal (average) | 0.054 | 0.00012 | |
| | Manure-belt houses with daily manure removal (max) | 0.132 | 0.00029 | 343,940 |
| | Manure-belt houses with every 3-4 d manure removal (average) | 0.094 | 0.00021 | |
| | Manure-belt houses with every 3-4 d manure removal (max) | 0.28 | 0.00062 | 162,140 |
| | Manure storage for manure-belt houses | 0.10 | 0.00022 | |
| Turkeys | 21-d brooding period (average) | 0.14 | 0.00032 | |
| | 21-d brooding period (max) | 0.42 | 0.00093 | 108,000 |
| | 28-d brooding period (average) | 0.18 | 0.00039 | |
| | 28-d brooding period (max) | 0.81 | 0.00179 | 56,000 |
| | 35-d brooding period (average) | 0.28 | 0.00063 | |
| | 35-d brooding period (max) | 1.08 | 0.00238 | 42,000 |
| | 36 to 140-d toms on litter (average) | 1.37 | 0.00302 | |
| | 36 to 140 toms on litter (max) | 3.50 | 0.00771 | 12,970 |

**Hydrogen sulfide emission rate and number of birds taken to reach a maximum daily emission of 100 lb $H_2S$ for broilers and laying hens**

| Poultry Type | Housing Type, Mean or Hi | Emission Rate | | # birds to emit 100 lb $H_2S$/d |
|---|---|---|---|---|
| | | (mg $H_2S$/bird-d) | (lb $H_2S$ /bird-d) | |
| Broilers | 52-d broilers on litter (average) | 2.83 | $6.24 \times 10^{-6}$ | |
| | 52-d broilers on litter (max) | 11.80 | $26.00 \times 10^{-6}$ | 3,846,150 |
| Laying hens | High-rise houses (average) | 2.16 | $4.76 \times 10^{-6}$ | |
| | High-rise houses (max) | 5.55 | $12.23 \times 10^{-6}$ | 8,176,615 |

### *Sources of ER data:*

Broiler[1] $NH_3$ ER values are based on one-year intermittent field monitoring in Kentucky and Pennsylvania (Wheeler et al., 2006; Gates et al., 2008).

Broiler[2] $NH_3$ ER values are based on one-year continuous field monitoring in Kentucky (Burns et al, 2007).

Laying-hen $NH_3$ ER values are based one-year intermittent field monitoring in Iowa and Pennsylvania (Liang et al., 2005).

Laying-hen manure storage $NH_3$ ER value is based on laboratory measurements of emission from multiple additions (2" thick each) of hen manure (77% moisture) to the manure stack, every two days, at a constant air temperature of 77°F (25°C) (Li, 2006).

Turkey $NH_3$ ER values for the various brooding periods are based on ER data of broilers on new bedding that were continuously monitored in Kentucky (Burns et al., 2007). Tom turkey $NH_3$ ER data are based on one-year continuous field monitoring in Iowa (Xin et al., 2008, to be published).

Broiler $H_2S$ ER values are based on one-year continuous field monitoring in Kentucky (Li et al, 2008)

Layer $H_2S$ ER values are based on one-year continuous field monitoring with standard commercial layer diets in Iowa (Xin et al., 2008, to be published).

### Instructions for using the above ER data for EPCRA continuous release reporting

The EPCRA continuous release report requires the estimation of lower bound and upper bound emissions during normal operations over a 24-hr period, as well as an estimate of the total annual emissions. We recommend that the lower bound emissions for both $NH_3$ and $H_2S$ be reported as zero because no such emissions occur during some portions of the production cycle. Upper bound daily emissions should be estimated using the appropriate max ER values provided in the above tables. Total annual emissions should be estimated using the average ER values in the above tables times the number of days when birds are present in the house. The calculations for estimating EPCRA total annual and upper bound emissions are as follows.

**Total annual emission = # of birds $\times$ (average daily ER) $\times$ (days per year barn is occupied)**

**Upper bound emission = # of birds $\times$ (max daily ER)**

Refer to the following EPA web sites for reporting form and preparation instructions:

http://www.epa.gov/emergencies/docs/chem/cont_rel/Continuous%20Release%20Form.pdf

http://www.epa.gov/superfund/policy/release/pdfs/part2-fa.pdf

**Examples of emission calculations:**

1. A high-rise laying-hen house with 100,000 birds and with an annual average house occupation of 360 days would have the following estimated $NH_3$ emissions:

   a. Total annual $NH_3$ emission:

   100,000 birds $\times$ 0.00198 lb $NH_3$/bird-d $\times$ 360 d/yr = 71,280 lbs $NH_3$/yr

   b. Upper bound daily (24-hr) $NH_3$ emission:

   100,000 birds $\times$ 0.00355 lb $NH_3$/bird-d = 355 lbs $NH_3$/d

2. A manure-belt laying-hen house with 100,000 birds and daily manure removal into manure storage, and with an annual average house occupation of 360 days would have the following estimated emissions:

   a. Total annual $NH_3$ emission:

   100,000 birds $\times$ (0.00012+0.00022) lb $NH_3$/bird-d $\times$ 360 d/yr = 12,240 lbs $NH_3$/yr

   b. Upper bound daily (24-hr) $NH_3$ emission:

   100,000 birds $\times$ (0.00029+0.00022) lb $NH_3$/bird-d = 51 lbs $NH_3$/d

3. A turkey brooder barn with 10,000 poults on new bedding that is occupied 305 days per year (35 d brooding + 7 day downtime = 8.7 flocks per year) would have the following estimated emissions:

   a. Total annual $NH_3$ emission:

   10,000 birds $\times$ 35 d/flock $\times$ 8.7 flocks/yr $\times$ 0.00063 lb $NH_3$/bird-d = 1,922 lbs $NH_3$/yr

   b. Upper bound daily (24-hr) $NH_3$ emission:

   10,000 birds $\times$ 0.00238 lb $NH_3$/bird-d = 24 lbs $NH_3$/d

4. A turkey barn with 10,000 toms on litter that is occupied 345 days per year (three flocks per year) would have the following estimated emissions:

   a. Total annual $NH_3$ emission:

   10,000 birds $\times$ 115 d/flock $\times$ 3 flocks/yr $\times$ 0.00302 lb $NH_3$/bird-d = 10,419 lbs $NH_3$/yr

   b. Upper bound daily (24-hr) $NH_3$ emission:

   10,000 toms $\times$ 0.00771 lb $NH_3$/bird-d = 77 lbs $NH_3$/d

# Exhibit 3

Calculation Worksheet – Ammonia and Hydrogen Sulfide Emissions

## Swine Operations – Confinement with liquid manure management systems

### February _____, 2009

***KEEP THIS WORKSHEET FOR YOUR RECORDS-DO NOT SUBMIT WITH YOUR REPORT***

The final rule on EPCRA reporting issued by EPA on December 18, 2008 and effective January 20, 2009 requires reporting of ammonia and hydrogen sulfide emissions **if** the swine facility has 2500 or more swine over 55 pounds, or 10,000 swine under 55 pounds; **and** the ammonia exceeds 100 lbs/day **or** the hydrogen sulfide exceeds 100 lbs/day. If the ammonia or hydrogen sulfide is less than 100 lbs/day, enter "N/A" in the appropriate cell in the reporting form.

**Swine Facility Name**: _____.

The emissions estimates are derived from research reported by:

Gay, S.W., D.R. Schmidt, C.J. Clanton, K.A. Janni, L.D. Jacobson, S. Weisberg. 2003. Odor, Total Reduced Sulfur and Ammonia Emissions from Animal Housing Facilities and Manure Storage Units in Minnesota. Applied Engineering in Agriculture, 19(3) 347-360, ASABE, St. Joseph, MI.;

and:

Jacobson, L.D., A.J. Heber, S.J. Hoff, Y. Zhang, D.B. Beasley, J.A. Koziel, and B.P. Hetchler. 2006. Aerial Pollutants Emissions from Confined Animal Buildings. Summary report, Ag Air Workshop, USDA-IFAFS research and demonstration program.

These values are a good faith estimate of emissions from swine operations using typical confinement housing and manure storages and located in a temperate climate.

## AMMONIA (NH₃) EMISSIONS ESTIMATE

Enter your head count in the blank and multiply times the appropriate Emission Rate to equal the emission estimate for the facility.

| AMMONIA (NH₃) EMISSIONS ESTIMATE | | | | | |
|---|---|---|---|---|---|
| | **Lowest** Head Count | | Lower Bound $NH_3$ Emission Rate (pounds/hd/day) | | **$NH_3$ Lower Bound** (pounds/day) |
| **$NH_3$ Lower Bound =** | | X | | = | |
| | **Permitted** Head Count | | Upper Bound $NH_3$ Emission Rate (pounds/hd/day) | | **$NH_3$ Upper Bound** (pounds/day) |
| **$NH_3$ Upper Bound =** | | X | | = | |

## Hydrogen Sulfide (H₂S) EMISSIONS ESTIMATE

Enter your head count in the blank and multiply times the Emission Rate to equal the emission estimate.

| Hydrogen Sulfide (H₂S) EMISSIONS ESTIMATE | | | | | |
|---|---|---|---|---|---|
| | **Lowest** Head Count | | $H_2S$ Emission Rate (pounds/hd/day) | | **$H_2S$ Lower Bound** (pounds/day) |
| **$H_2S$ Lower Bound =** | | X | | = | |
| | **Permitted** Head Count | | $H_2S$ Emission Rate (pounds/hd/day) | | **$H_2S$ Upper Bound** (pounds/day) |
| **$H_2S$ Upper Bound =** | | X | | = | |

**Table 1.  Swine facility per-animal emission constants.  Liquid Manure Systems.  Housing and manure storage estimates are combined.**

| Management group | Pull-plug, scrape, flush, shallow pit | | Deep Pit | |
|---|---|---|---|---|
| | Upper bound | Lower bound | Upper bound | Lower bound |
| Breeding & gestation | $NH_3$ 0.098 $H_2S$ 0.016 | $NH_3$ 0.0098 $H_2S$ 0.0016 | $NH_3$ 0.052 $H_2S$ 0.0085 | $NH_3$ 0.0052 $H_2S$ 0.00085 |
| Farrowing | $NH_3$ 0.16 $H_2S$ 0.030 | $NH_3$ 0.016 $H_2S$ 0.0030 | $NH_3$ 0.022 $H_2S$ 0.0028 | $NH_3$ 0.0022 $H_2S$ 0.00028 |
| Nursery | $NH_3$ 0.019 $H_2S$ 0.0043 | $NH_3$ 0.0019 $H_2S$ 0.00043 | $NH_3$ 0.0046 $H_2S$ 0.0020 | $NH_3$ 0.00046 $H_2S$ 0.00020 |
| Grow-finishing | $NH_3$ 0.055 $H_2S$ 0.0104 | $NH_3$ 0.0055 $H_2S$ 0.00104 | $NH_3$ 0.037 $H_2S$ 0.0080 | $NH_3$ 0.0037 $H_2S$ 0.00080 |

# Exhibit 4

# Calculation Worksheet – Ammonia and Hydrogen Sulfide Emissions
## Dairy Cow Operations
### February _____, 2009
***KEEP THIS WORKSHEET FOR YOUR RECORDS-DO NOT SUBMIT WITH YOUR REPORT***

The final rule on EPCRA reporting issued by EPA on December 18, 2008 and effective January 20, 2009 requires reporting of ammonia and hydrogen sulfide emissions **if** the dairy has 700 or more mature dairy cows **and** the ammonia exceeds 100 lbs/day **or** the hydrogen sulfide exceeds 100 lbs/day. If the ammonia or hydrogen sulfide upper bound is less than 100 lbs/day, enter "N/A" in both of the appropriate cells of Section 4 in the reporting form. The EPA considers only mature cows at a site when establishing if the operation is a CAFO and must report. Heifers need not be included in the animal count when both are present. However, emissions from heifers do need to be reported when both are present. Combine the results of the two worksheets when heifers and cows are present.

The following emissions estimates are derived from research reported by both: Gay, S.W., D.R. Schmidt, C.J. Clanton, K.A. Janni, L.D. Jacobson, S. Weisberg. 2003. Odor, Total Reduced Sulfur and Ammonia Emissions from Animal Housing Facilities and Manure Storage Units in Minnesota. Applied Engineering in Agriculture, 19(3) 347-360. ASAE St. Joseph, MI. and Pinter, R.W., N.J. Pekney, C.I. Davidson, P.J. Adams. 2004. A Process-Based Model of Ammonia Emissions from Dairy Cows: Improved Temporal and Spatial Resolution. Atmospheric Environment 38(2004) 1357-1365. Elsvier. These values are a good faith estimate of emissions from dairy operations of the CAFO size using freestall housing and sloped sided manure storages and located in a temperate climate.

**Dairy Name**:_____.

## AMMONIA (NH₃) EMISSIONS ESTIMATE
The ammonia emission rates below are inclusive of freestall barns and sloped sided manure storages. Ammonia emission rates are generally lower in winter and higher in summer. Enter your head count in the blank and multiply times the Emission Rate to equal the emission estimate.

| AMMONIA (NH₃) EMISSIONS ESTIMATE | | | | | |
|---|---|---|---|---|---|
| | **Lowest** Head Count (number of animals) | | $NH_3$ Emission Rate (pounds/hd/day) | | **$NH_3$ Lower Bound** (pounds/day) |
| $NH_3$ Lower Bound = | | X | **0.025** [a] | = | |
| [a] winter emissions rate | | | | | |
| | **Permitted** Head Count (number of animals) | | $NH_3$ Emission Rate (pounds/hd/day) | | **$NH_3$ Upper Bound** (pounds/day) |
| $NH_3$ Upper Bound = | | X | **0.25** [b] | = | |
| [b] summer emissions rate | | | | | |

## Hydrogen Sulfide (H₂S) EMISSIONS ESTIMATE
The hydrogen sulfide emission rates below are inclusive of freestall barns and sloped sided manure storages. Hydrogen sulfide emission rates are generally lower in winter and higher in summer. Enter your head count in the blank and multiply times the Emission Rate to equal the emission estimate.

| Hydrogen Sulfide (H₂S) EMISSIONS ESTIMATE | | | | | |
|---|---|---|---|---|---|
| | **Lowest** Head Count (number of animals) | | $H_2S$ Emission Rate (pounds/hd/day) | | **$H_2S$ Lower Bound** (pounds/day) |
| $H_2S$ Lower Bound = | | X | **0.005** [a] | = | |
| [a] winter emissions rate | | | | | |
| | **Permitted** Head Count (number of animals) | | $H_2S$ Emission Rate (pounds/hd/day) | | **$H_2S$ Upper Bound** (pounds/day) |
| $H_2S$ Upper Bound = | | X | **0.05** [b] | = | |
| [b] summer emissions rate | | | | | |

Revised 2-9-09

# Calculation Worksheet – Ammonia and Hydrogen Sulfide Emissions
## Dairy Heifer Operations
### February _____, 2009
**KEEP THIS WORKSHEET FOR YOUR RECORDS-DO NOT SUBMIT WITH YOUR REPORT**

The final rule on EPCRA reporting issued by EPA on December 18, 2008 and effective January 20, 2009 requires reporting of ammonia and hydrogen sulfide emissions **if** the operation has 1,000 or more dairy heifers **and** the ammonia exceeds 100 lbs/day **or** the hydrogen sulfide exceeds 100 lbs/day. The EPA considers all cattle other than mature dairy cows at a site when establishing if the operation is a non-dairy CAFO and must report. If the ammonia or hydrogen sulfide is less than 100 lbs/day, enter "N/A" in both of the appropriate cells of Section 4 in the reporting form. Heifers need not be included in the animal count when both cows and heifers are present. However, emissions from heifers do need to be reported when both are present. Combine the results of the two worksheets when heifers and cows are present.

The following emissions estimates are derived from research reported by both: Gay, S.W., D.R. Schmidt, C.J. Clanton, K.A. Janni, L.D. Jacobson, S. Weisberg. 2003. Odor, Total Reduced Sulfur and Ammonia Emissions from Animal Housing Facilities and Manure Storage Units in Minnesota. Applied Engineering in Agriculture, 19(3) 347-360. ASAE St. Joseph, MI. and Pinter, R.W., N.J. Pekney, C.I. Davidson, P.J. Adams. 2004. A Process-Based Model of Ammonia Emissions from Dairy Cows: Improved Temporal and Spatial Resolution. Atmospheric Environment 38(2004) 1357-1365. Elsvier. These values are a good faith estimate of emissions from dairy operations of the CAFO size using freestall housing and sloped sided manure storages and located in a temperate climate.

**Dairy Name**:_____.

## AMMONIA (NH₃) EMISSIONS ESTIMATE

The ammonia emission rates below are inclusive of freestall barns and sloped sided manure storages. Ammonia emission rates are generally lower in winter and higher in summer. Enter your head count in the blank and multiply times the Emission Rate to equal the emission estimate.

| AMMONIA (NH₃) EMISSIONS ESTIMATE | | | | | |
|---|---|---|---|---|---|
| | **Lowest** Head Count (number of animals) | | $NH_3$ Emission Rate (pounds/hd/day) | | **$NH_3$ Lower Bound** (pounds/day) |
| $NH_3$ Lower Bound = | | X | **0.013** [a] | = | |
| [a] winter emissions rate | | | | | |
| | **Permitted** Head Count (number of animals) | | $NH_3$ Emission Rate (pounds/hd/day) | | **$NH_3$ Upper Bound** (pounds/day) |
| $NH_3$ Upper Bound = | | X | **0.125** [b] | = | |
| [b] summer emissions rate | | | | | |

## Hydrogen Sulfide (H₂S) EMISSIONS ESTIMATE

The hydrogen sulfide emission rates below are inclusive of freestall barns and sloped sided manure storages. Hydrogen sulfide emission rates are generally lower in winter and higher in summer. Enter your head count in the blank and multiply times the Emission Rate to equal the emission estimate.

| Hydrogen Sulfide (H₂S) EMISSIONS ESTIMATE | | | | | |
|---|---|---|---|---|---|
| | **Lowest** Head Count (number of animals) | | $H_2S$ Emission Rate (pounds/hd/day) | | **$H_2S$ Lower Bound** (pounds/day) |
| $H_2S$ Lower Bound = | | X | **0.003** [a] | = | |
| [a] winter emissions rate | | | | | |
| | **Permitted** Head Count (number of animals) | | $H_2S$ Emission Rate (pounds/hd/day) | | **$H_2S$ Upper Bound** (pounds/day) |
| $H_2S$ Upper Bound = | | X | **0.025** [b] | = | |
| [b] summer emissions rate | | | | | |

Revised 2-9-09

# Exhibit 5

2/23/2009

# Ammonia Emissions Estimator (Daily Version)
Rick Stowell and Rick Koelsch, University of Nebraska

**Note: This worksheet provides an approximation of ammonia emission based upon currently available information. Significant regional and seasonal variation in emissions occurs due to influences of climate and management of the production or storage system. Additional research should produce improved information on ammonia emissions.**

Farm name: _____

| Animal species and production stage[1] | Capacity  (number of animals) |
|---|---|
|  | Max.: _____    Average: _____ |

Step 1:  Estimate % ammonia loss from:

Animal housing:  Describe housing: _____    Insert range from Table 1: _____%

Manure storage:  Describe storage: _____    Insert range from Table 2: _____%

Step 2.  Estimate combined % ammonia loss (Use high-end values from ranges in Step 1 first, then low-end values):

Ammonia loss (%) =    Housing % loss   +  [ (100 – Housing % loss)  x   Storage % loss / 100]

Ammonia loss (%) =   _____  +  [ (100 – _____)  x   _____ / 100]

Ammonia loss (%) = _____ % [w/high-end values]        = _____ % [w/low-end values]

Step 3.  Identify the animal species row in Table 3 (along left side) that is most relevant to this estimation, and the ammonia loss (%) column that best matches the estimated ammonia loss from Step 2.  Find where this row (appropriate species) and this column (appropriate ammonia loss) intersect and record this value:

Unit ammonia loss  = _____ lbs/animal/day [w/high-end values]    = _____ lbs/animal/day [w/low-end values]

Step 4.  Estimate the upper bound of daily herd/flock ammonia loss.

Daily herd ammonia loss   =   Max. (permitted) capacity   x   Unit ammonia loss (high-end value from Step 3)

Daily herd ammonia loss   =   _____ animals   x   _____ lbs/animal/day

**Peak ammonia loss**   =   _____ lbs ammonia per day

Step 5.  Estimate the lower bound of daily herd/flock ammonia loss.  Repeat Steps 2-3 using the low-end values.

Daily herd ammonia loss   =   Average capacity   x   Unit ammonia loss (new Step 3 value)

Daily herd ammonia loss   =   _____ animals   x   _____ lbs/animal/day

**Minimum ammonia loss**   =   _____ lbs ammonia per day

Table 1.  Typical ammonia losses from animal housing facilities expressed as a percentage of excreted manure nitrogen.[2]

| Facility Description | Applicable Species | % Loss | Facility Description | Applicable Species | % Loss |
|---|---|---|---|---|---|
| Open dirt lots (cool, humid region )<br>Open dirt lots (hot, arid region) | Beef | 30 - 45<br>40 – 60 | Roofed facility (stacked manure under floor…includes storage loss) | Egg producing birds | 25 - 50 |
| Open dirt lots (cool, humid region)<br>Open dirt lots (hot, arid region) | Dairy | 15 - 30<br>30 - 45 | Roofed facility (bedded pack) | Swine, beef, and dairy | 20 - 40 |
| Roofed facility (flushed or scraped)<br>Roofed facility (daily scrape and haul) | Dairy<br>Swine | 5 - 15 | Roofed facility (litter) | Meat producing birds | 25 - 50 |
| Roofed facility (shallow pit under floor) | Swine<br>Dairy | 10 - 20 | Roofed facility (deep pit under floor…includes storage loss) | Swine, beef, dairy | 30 - 40 |

---

[1] If more than one species, production stage, housing system or manure handling system is present on a given site, perform Steps 1-5 for each species, stage and/or system and add resulting emissions together.

[2] Estimates from USDA NRCS Agricultural Waste Management Field Handbook and LPES Lesson 21: Manure Storage Structures.

Table 2. Typical ammonia losses from manure storage as a percentage of nitrogen entering facility.[2]

| Facility Description | % Loss | Facility Description | % Loss |
|---|---|---|---|
| Temporary stacked manure (no turning) | 10-20 | Pit below slatted floor (included in Table 1 values) | 0 |
| Composted manure (no carbon amendment) | 30 to 40 | Earthen storage pit (minimal treatment) | 20 – 35 |
| Composted manure (significant carbon amendment) | 5 to 10 | Formed manure storage (bottom loaded) | 10 |
| Bedded Pack Manure (included in Table 1 values) | 0 | Formed manure storage (top loaded) | 30 |
| Runoff holding pond (precipitation runoff only)[3] | 2 - 3 | Anaerobic Lagoon (significant treatment)* | 65-75 |

[2] Estimates from USDA NRCS Agricultural Waste Management Field Handbook and LPES Lesson 21: Manure Storage Structures.
* Much of the lagoon loss can be due to denitrification ($N_2$ and $N_2O$), so the ammonia loss may only be half of what is shown.

Table 3. Estimates of ammonia nitrogen losses. Excretion estimates based upon 2005 ASABE Standard for typical animals.

| Livestock and Poultry Species | Typical Nitrogen Excretion (lbs per animal per day) | Ammonia Loss (% of excreted nitrogen) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% |
| | | --Estimated Ammonia Loss (lbs per animal per day)…converts N to $NH_3$ by multiplying by 1.21-- | | | | | | | | |
| Beef - Finishing Cattle | 0.36 | 0.044 | 0.087 | 0.13 | 0.18 | 0.22 | 0.26 | 0.31 | 0.35 | 0.39 |
| Beef – Cow (confinement) | 0.42 | 0.051 | 0.10 | 0.15 | 0.20 | 0.26 | 0.31 | 0.367 | 0.41 | 0.46 |
| Beef - Growing Calf (confinement) | 0.29 | 0.035 | 0.070 | 0.11 | 0.14 | 0.18 | 0.21 | 0.25 | 0.28 | 0.32 |
| Dairy – Lactating cow – 100 lbs milk/day | 1.04 | 0.13 | 0.25 | 0.38 | 0.51 | 0.63 | 0.76 | 0.88 | 1.0 | 1.1 |
| Dairy – Lactating cow – 88 lbs milk/day | 0.99 | 0.12 | 0.24 | 0.36 | 0.48 | 0.60 | 0.72 | 0.84 | 0.96 | 1.1 |
| Dairy – Lactating cow – 70 lbs milk/day | 0.83 | 0.10 | 0.20 | 0.30 | 0.40 | 0.50 | 0.60 | 0.71 | 0.81 | 0.91 |
| Dairy – Lactating cow – 50 lbs milk/day | 0.66 | 0.080 | 0.16 | 0.24 | 0.32 | 0.40 | 0.48 | 0.56 | 0.64 | 0.72 |
| Dairy – Dry cow | 0.5 | 0.061 | 0.12 | 0.18 | 0.24 | 0.30 | 0.36 | 0.43 | 0.49 | 0.55 |
| Dairy – Milk fed calves | 0.017 | 0.0021 | 0.0041 | 0.0062 | 0.0083 | 0.010 | 0.012 | 0.014 | 0.017 | 0.019 |
| Dairy - Calf | 0.14 | 0.017 | 0.034 | 0.051 | 0.068 | 0.085 | 0.10 | 0.12 | 0.14 | 0.15 |
| Dairy – Heifer | 0.26 | 0.032 | 0.063 | 0.095 | 0.13 | 0.16 | 0.19 | 0.22 | 0.25 | 0.28 |
| Dairy - Veal | 0.033 | 0.0040 | 0.0080 | 0.012 | 0.016 | 0.020 | 0.024 | 0.028 | 0.032 | 0.036 |
| Horse - Sedentary | 0.2 | 0.024 | 0.049 | 0.073 | 0.097 | 0.12 | 0.15 | 0.17 | 0.19 | 0.22 |
| Horse – Intense exercise | 0.34 | 0.041 | 0.083 | 0.12 | 0.17 | 0.21 | 0.25 | 0.29 | 0.33 | 0.37 |
| Poultry - Broiler | 0.0025 | 0.00031 | 0.00061 | 0.00092 | 0.0012 | 0.0015 | 0.0018 | 0.0021 | 0.0024 | 0.0027 |
| Poultry - Turkey (male) | 0.0090 | 0.0011 | 0.0022 | 0.0033 | 0.0044 | 0.0055 | 0.0066 | 0.0077 | 0.0088 | 0.0099 |
| Poultry - Turkey (females) | 0.0054 | 0.00066 | 0.0013 | 0.0020 | 0.0026 | 0.0033 | 0.0040 | 0.0046 | 0.0053 | 0.0059 |
| Poultry - Duck | 0.0036 | 0.00044 | 0.00087 | 0.0013 | 0.0017 | 0.0022 | 0.0026 | 0.0031 | 0.0035 | 0.0039 |
| Poultry - Layer | 0.0035 | 0.00043 | 0.00085 | 0.0013 | 0.0017 | 0.0021 | 0.0026 | 0.0030 | 0.0034 | 0.0038 |
| Swine - Nursery Pig(27.5 lb) | 0.025 | 0.0031 | 0.0061 | 0.0092 | 0.012 | 0.015 | 0.018 | 0.021 | 0.025 | 0.028 |
| Swine - Grow-finish (154 lb) | 0.083 | 0.010 | 0.020 | 0.030 | 0.040 | 0.051 | 0.061 | 0.071 | 0.081 | 0.091 |
| Swine – Gestating sow | 0.071 | 0.0086 | 0.017 | 0.026 | 0.034 | 0.043 | 0.052 | 0.060 | 0.069 | 0.078 |
| Swine – Lactating sow | 0.19 | 0.023 | 0.046 | 0.069 | 0.092 | 0.12 | 0.14 | 0.16 | 0.18 | 0.21 |
| Swine – Boar | 0.061 | 0.0074 | 0.015 | 0.022 | 0.030 | 0.037 | 0.044 | 0.052 | 0.059 | 0.067 |

# Exhibit 6

**Response to Comment Document**

**CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms**

40 CFR Part 302

December 12, 2008

U.S. Environmental Protection Agency

Office of Solid Waste and Emergency Response

Office of Emergency Management

# TABLE OF CONTENTS

**Response to Comments for CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms**

**Introduction** ................................................................................................................ **3**
**I.      Proposed Definitions** ......................................................................................... **6**
   A.      Proposed Definition of "Animal Waste" ................................................ 6
   B.      Proposed Definition of "Farm" ............................................................. 8
**II.     Proposed Expansion of Reporting Exemption to Other Facility Types** ......... **11**
**III.    Proposed Elimination of Reporting Requirement** ........................................... **12**
   A.      Support Proposed Elimination of Reporting Requirements ............................. 12
   B.      Support - Citing Issue Related to Risk, Harm, and Exposure ........................ 16
   A.      Oppose Proposed Elimination of Reporting Requirements .............................. 17
   B.      Oppose - Citing Issue Related to Risk, Harm, and Exposure ........................ 23
   C.      Possible Situations that Would Necessitate a Response .................................. 26
**V.      Regulatory Flexibility Act** ............................................................................... **28**
**VI.     Other** .................................................................................................................. **29**
**VII.    Comments that Indicate a Misunderstanding of the Proposed Rule** ......... **32**
**Appendix A – Table of Commenters** .............................................................................. **33**
**Appendix B – Summary of Attachments Submitted by Environmental Integrity and Earthjustice to Docket EPA-HQ-SFUND-2007-0469-531** ........................................... **64**

# Introduction

## Purpose of this Document

On December 28, 2007, the U.S. Environmental Protection Agency (EPA) published a notice of proposed rulemaking titled "CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste" (72 FR 73700).  This rule would provide an administrative reporting exemption from particular notification requirements under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, as amended, and the Emergency Planning and Community Right-to-Know Act (EPCRA), also known as Title III of the Superfund Amendments and Reauthorization Act (SARA).  Specifically, the proposed administrative reporting exemption would apply to releases of hazardous substances to the air where the source of those hazardous substances is animal waste at farms. Nothing in the proposed rule, however, would change the notification requirements if hazardous substances are released to the air from any other source other than animal waste at farms (e.g., ammonia tanks) or if hazardous substances from animal waste are released to any other environmental media (e.g., soil, ground water, or surface water) when the release of those hazardous substances is at or above its reportable quantity per 24 hours.

The Agency decided to finalize the CERCLA section 103 administrative reporting exemption portion of the proposed rule and to a limited extent the EPCRA section 304 administrative reporting exemption.  EPA is exempting certain releases of hazardous substances to the air from the notification requirements of CERCLA and to a limited extent EPCRA emergency notifications, as implemented in 40 CFR 302.6 and 40 CFR Part 355, Subpart C-Emergency Notification Requirement, respectively.  Specifically, we are exempting those hazardous substance releases that are emitted to the air from animal waste at farms.  The exemption to the CERCLA section 103 notification requirements will apply to all releases of hazardous substances to the air from animal waste at farms. However, to respond to comments expressing the desire to receive information regarding releases from large concentrated animal feeding operations (CAFOs), EPA is bifurcating these administrative reporting exemptions in order to continue to require EPCRA section 304 emergency notifications for those CAFO operations that confine the large CAFO threshold of an animal species or above, as defined in the National Pollutant Discharge Elimination System (NPDES) program regulations.   As such, the exemption to EPCRA section 304 emergency notification requirements will apply to air releases of hazardous substances from animal waste at farms that are below the thresholds in 40 CFR 355.31(g) and for those farms that have animals that are not stabled or confined.  (See 40 CFR 355,31(h))  For the purposes of this rule, EPA considers animals (i.e., cattle) that reside primarily outside of an enclosed structure (i.e., a barn or a feed lot) and graze on pastures, not to be stabled or confined, and thus are exempted from the reporting requirements under EPCRA Section 304.

The purpose of this document is to summarize public comments received on the proposed rule.

## *Development of This Document*

To develop this response to comment document, we reviewed each submission made to public docket number EPA-HQ-SFUND-2007-0469. Submissions to the public docket for this rulemaking appear in their entirety at http://www.regulations.gov.  We organized the relevant comments according to the Agency's specific requests for public comment in the proposed rule and other topics in the proposal (72 FR 73700, December 28, 2007).

This document includes a summary of comments received and EPA's associated responses to the comments provided for the CERCLA/EPCRA administrative reporting exemption for air releases of hazardous substances from animal waste at farms. The specific comment excerpts that are included in this document were taken verbatim from the submissions to the docket received by the Federal Docket Management System (FDMS). Comment excerpts are included to substantiate the comment summaries and provide additional information on commenter statements and opinions.  Document identification numbers, as assigned by FDMS, are provided in parentheses next to cited text.  Submissions that make similar statements and appear in the same format or include slightly modified wording in similar formats, or are identical are considered form letters. Form letters are cited once using the FDMS identification number of the first identified submission.  Table 1 lists the FDMS identification numbers of the original form letters as identified by FDMS, the first and last name of the author when provided, the author affiliation, and a count of the number of identical submissions (including the first identified submission).

We also received comments that addressed issues outside the scope of the proposed rule and the associated request for comment.  While EPA appreciates these comments, we responded to them to the extent they are relevant to the rulemaking. Appendix A of this document lists the author names and affiliations, when provided, for all submissions received by FDMS for public docket number EPA-HQ-SFUND-2007-0469.  Appendix B of this document is a summary of attachments submitted by the Environmental Integrity Project and Earthjustice to the docket (EPA-HQ-SFUND-2007-0469-531).

| Table 1.  Form Letters Identified by FDMS | | | | Count |
|---|---|---|---|---|
| **FDMS ID** | **First Name** | **Last Name** | **Affiliation** | |
| 310 | Sarah | Alexander | Private Citizen - Mass Mail Campaign | 4,310 |
| 405 | Martha | Rhoades | Private Citizen - Poultry Mass Mail Campaign | 2,537 |
| 85 | Linda | Judd | Private Citizen - Sierra Club Mass Mail Campaign | 2,040 |
| 535 | Mat | Thomas | Private Citizen - Mass Mail Campaign | 1,405 |
| 390 | Henrietta | Hildebrand | Private Citizen - Cattle Mass Mail Campaign | 370 |
| 242 | Gareth | Mackrill | Private Citizen - Mass Mail Campaign | 327 |
| 539 | J. | Weber | Private Citizen - Pork Mass Mail Campaign | 234 |
| 538 | Illegible | Illegible | Private Citizen - Poultry Mass Mail Campaign | 140 |
| 534 | Carolyn | Davis | Private Citizen - Poultry Mass Mail Campaign | 121 |
| 537 | J. | Davis | Private Citizen - Mass Mail Campaign | 106 |
| 1141 | Mitchell | Aaron | Private Citizen - Mass Mail Campaign | 16 |
| 1350 | Steven | Frischknecht | Private Citizen - Mass Mail Campaign | 15 |
| 404 | Thomas | Porter | Private Citizen - Egg Mass Mail Campaign | 13 |
| 403 | Cal | Jackson | Private Citizen - Mass Mail Campaign | 13 |
| 1283 | Amber | Pool | Private Citizen - Mass Mail Campaign | 5 |

| 536 | Stacey | Maloney | Private Citizen - Mass Mail Campaign | 3 |
|---|---|---|---|---|

Several submissions provided explicit support for comments submitted by other organizations, as identified below.

The National Association of State Departments of Agriculture comments (533) are supported by:

- South Carolina Commissioner of Agriculture (522, 523)

- Department of Agriculture and Consumer Services, Commonwealth of Virginia (1042)

- State of Delaware Department of Agriculture (1058)

- Arkansas Agriculture Department (1059)

- West Virginia Department of Agriculture (1101)


The National Milk Producers Federation and the National Council of Farm Cooperatives comments (657) are supported by:

- Land O'Lakes, Inc. (656)

- United Dairymen of Arizona (889)

- Dairy Farmers of America (892)

- Western United Dairymen (886)

- Foremost Farms USA (896)


The National Association SARA Title III Program Officials comments (990) are supported by:

- Oklahoma Hazardous Materials Emergency Response Commission (OHMERC) (994)

- One private citizen (999)


## *CERCLA and EPCRA Comments*

The proposed rule, "CERCLA/EPCRA Administrative Reporting Exemptions for Air Releases of Hazardous Substances from Animal Waste," applied to both CERCLA section 103 notification requirements and EPCRA section 304 emergency notification requirements and many of the comments received during the public comment period apply to both CERCLA and EPCRA.

# COMMENT SUMMARY & RESPONSE

## I.    Proposed Definitions

### A.    Proposed Definition of "Animal Waste"

Issue: EPA proposed to add a definition for "animal waste" to the Code of Federal Regulations that only pertains to regulations promulgated pursuant to CERCLA section 103 and EPCRA section 304, specifically 40 CFR §302.3 (definitions) and 40 CFR §355.20 (definitions). The Agency is not aware of any existing definition for animal waste and thus seeks comment from the public on the appropriateness, clarity and completeness of this definition.

---

### (1)    Support Proposed Definition

## Comment

*Generally Support.*  Several commenters expressed general support for the proposed definition of "animal waste". (565, 730, 815, 1201)  One expressed support based on personal knowledge (82) while others expressed support by stating, "As long as it is understood that this definition is used solely for the purposes of EPCRA/CERCLA, the basic parts of the definition are fine." (529,1160)  Though agreeing with the substance of the definition, several commenters proposed to change the term "animal waste" to "animal nutrients" to reflect that manure is a valuable resource for livestock and crop producers. (557, 1023, 1294)

## Response

EPA intends for the definition of *animal waste* to be limited to use in CERCLA section 103 notification requirements.

EPA disagrees with commenters (557, 1023, and 1294) that proposed to change the term *animal waste* to *animal nutrients*.  This rule is not intended to make any statements regarding the value of manure as a resource for livestock and crop producers.  We are providing the exemption because the Federal government is unlikely to respond to such notifications.

---

### (2)    Other Suggested Definitions

## Comment

*Requests to clarify definition.* Several commenters requested clarification regarding treatment of compost material, and specifically whether composted manure is included in the definition. (469)  Similarly, other commenters suggested that EPA clarify that manure-based compost is included in the definition of animal waste. (479, 718, 883, 1230)  Another questioned the trigger for reporting emissions of compost writing, "[i]t is not clear if the definition is meant to include some forms

of compost and exclude others or what may trigger a requirement to report emissions from compost. Because manure is often the basis for compost, we believe that EPA should clarify the definition to include manure-based compost in the exemption from reporting." (589)  Several commenters requested clarification on whether the soil in a field that has been supplemented with animal waste is considered animal waste.  (529,1160)

## Response

Commenters' (469, 479, 529, 589, 718, 883, 1160, 1230) that requested clarification regarding the treatment of compost material, whether composted manure and manure based compost, and soil in a field that has been supplemented with animal waste is considered animal waste, are included in the definition.  With respect to composted manure and manure based compost, EPA considers both to be included in the definition of animal waste.  With respect to soil in a field that has been supplemented with animal waste, to the extent that the animal waste is being used as a fertilizer and not as a mechanism for disposal of the animal waste, EPA would consider that supplementation to be a *normal application of fertilizer*; hence, not considered a *release into the environment*.  (*See* CERCLA section 101(22)(D).

## Comment

*Alternative definitions.* Several commenters submitted proposed alternative definitions.

To reflect the need for controlling emissions of dangerous and toxic emissions, a commenter suggested that "animal waste" be defined as "manure (livestock produced feces, urine, other excrement, and bedding that has not been composted), digestive emissions, and urea, which emit dangerous and/or toxic gases in any quantity.  This definition includes animal waste when mixed or comingled with bedding, compost, feed, soil and other materials typically found in animal waste." (72)

One commenter suggested an alternate definition which would define animal waste as "all constituents and byproducts of the decomposition of manure (feces, urine, other excrement, and bedding, produced by livestock or poultry that has not been composted), digestive emissions, and urea."  The definition would also include "animal waste when mixed or commingled with water, bedding, compost, feed, soil and other materials typically found with animal waste." (983)

Another commenter contributed the following definition for animals waste, "manure (feces, urine, or other excrement produced by livestock, and including bedding), and any other livestock digestive emissions, regardless of how stored, handled, composted or otherwise stockpiled. The definition includes animal waste used in biogas production or other treatment processes, or when mixed or commingled with bedding, compost, feed, soil, and other materials typically found with animal waste." (894)

## Response

EPA disagrees with commenters (72, 894, and 983) that proposed alternative definitions for the term *animal waste*. The definition does not need to account for controlling emissions of dangerous and toxic emissions because CERCLA notification requirements apply to hazardous substances. The exemption is from CERCLA notification requirements and to a limited extent EPCRA emergency notification. The definition does not need to include all constituents and byproducts of the decomposition of manure. EPA believes that the exemption of air releases of *hazardous substances* is appropriate with respect to the regulations under CERCLA and includes constituents and byproducts of the decomposition of manure if they are *hazardous substances*. Finally, the definition does not need to include animal waste used in biogas production or other treatment processes. The administrative reporting exemption applies to *animal waste* at farms. The suggested alternative definitions would serve to broaden the facility (farm) that is covered under the regulation to other operations; EPA does not agree that broadening the facilities covered by the exemption should be done through the definition of *animal waste*.

---

## Comment

*Definition needs to be broadened.* One commenter suggested the definition be broadened to "reflect manure in all forms used in agricultural operations." This would include composting material and "ponds and land application of animal waste during routine farming operations." (492) Another commenter suggested the definition include emissions from all animals' manure, stating, "We do not see any meaningful distinction between animal waste produced on the farm and animal waste produced on non-farm facilities… We believe that EPA is heading down a slippery slope when it tries to distinguish one animal's manure from another's…" (479)

## Response

EPA disagrees with commenters (479, 492) that suggested that the definition be broadened to "reflect manure in all forms used in agricultural operations," or emissions from all animals' manure. As discussed immediately above, EPA does not agree that broadening the facilities covered by the exemption should be done through the definition of *animal waste*.

---

## B.    Proposed Definition of "Farm"

<u>Issue</u>: EPA proposed to add a definition for "farm" to the Code of Federal Regulations that only pertains to regulations promulgated pursuant to CERCLA §103 and EPCRA §304, specifically 40 CFR §302.3 (definitions) and 40 CFR §355.20 (definitions). For this proposed exemption only, EPA defines "farm" by adopting the definition found in the National Agricultural Statistics Service (NASS) Census of Agriculture. Also, the Agency recognizes that Federal and state research farms utilizing farm animals are subject to the conditions experienced on other farms; therefore, EPA proposed to include Federal and state poultry, swine, dairy and livestock research farms. The Agency seeks

comment on the proposed definition for a "farm", and whether an alternative definition may be more appropriate.

### *(1)    Support Proposed Definition*

## Comment

*Generally Support.*  Several commenters expressed general support for the definition of farm. (82, 479, 557, 565, 589, 730, 815, 894, 1023, 1201, 1230)  Other commenters found the proposed definition acceptable since it is the definition used by USDA and promotes continuity in definitions between agencies. (529,1160)  Several commenters stated that the definition is an accurate description of a commercial agricultural enterprise for this regulation only. (718, 883, 1230)

## Response

EPA recognizes commenters (82, 479, 529, 557, 565, 589, 718, 815, 883, 894, 1023, 1160, 1201, and 1230) who generally supported our definition of *farm*, especially those that found the definition acceptable since it is used by USDA and promotes continuity in definitions between agencies.  However, see response to commenter (72) immediately below.

### *(2)    Oppose Proposed Definition*

## Comment

*Conflicting definitions within the same agency.* One commenter indicated that the proposed definition is inconsistent with the definition at 40 CFR Part 112 (Spill Prevention, Control and Countermeasure rule) (71 FR 77266, December 26, 2006): " …a facility on a tract of land devoted to the production of crops or raising of animals, including fish, which produced and sold, or normally would have produced and sold, $1,000 or more of agricultural products during a year."  The commenter states, "The concept of two differing definitions of the same entity by the same Agency places a hardship on the regulated community.  It also gives the regulated community the impression the Agency is picking and choosing definitions to favor politically powerful communities.  We do not necessarily support the Part 112 definition, but [at] least there should be only [one] definition within the one Agency." (72)

## Response

As noted by commenter (72), the definition proposed is different from that used by the Spill Prevention, Control and Countermeasure (SPCC) rule (71 FR 77266, Dec. 26, 2006).  Our proposed definition added specific facilities, namely "Federal or state poultry, swine, dairy or livestock research farm," to the USDA definition of farm.  EPA agrees with this commenter and thus, we have decided to use the same definition of *farm* as the definition used in the SPCC rule.  EPA believes that this final rule definition is

broad enough so as to cover "Federal or state poultry, swine, dairy or livestock research farm," without explicitly stating as such; thus keeping a clear and consistent definition used within the Agency.

---

## Comment

*No need for the $1,000 sales limit in definition of farm.* One commenter notes that there is no reason to have the limitation because "such small operations would not need to report anyway because the amount of emission would not reach any known reportable quantity." (492)

## Response

EPA disagrees with the commenter (492) that stated noted that there is no reason to have the $1,000 sales limit in the definition of *farm* because such small operations would not need to report anyway because the amount of emission would not reach any known reportable quantity. First, EPA does not have information as to whether *farms* with sales under $1,000 would trigger the CERCLA reportable quantity. Second, EPA wants to have consistency between the definition of *farm* in its regulations.

---

### *(3)    Other Suggested Definitions*

## Comment

*Provide additional specifications.* One commenter agreed with the terms of the definition and suggested adding language to include "[any] operation that produces eggs, poultry, swine, dairy, or other livestock in any amount." The commenter also suggested that the definition should include all production areas and land application areas. (983)

## Response

EPA disagrees with the alternative definition suggested by the commenter (983) to add language to include "[any] operation that produces eggs, poultry, swine, dairy, or other livestock in any amount," and to include all production areas and land application areas. EPA believes that this final rule definition is broad enough so as to cover those specific concerns, without explicitly stating as such; thus keeping a clear and consistent definition.

---

## Comment

*Expand definition to include non-Federal or State research facilities.* One commenter pointed out that the Agency recognized that State and Federal facilities utilize farm animals and are therefore subject to the reporting of releases under CERCLA and EPCRA. "These regulations apply to all research facilities generating animal waste." (1352)

## Response

EPA recognizes the alternative definition suggested by the commenter (1352) to include non-Federal or State research facilities; specifically, "these regulations apply to all research facilities generating animal waste." The final rule definition of *farm* does not include, "(b) a Federal or state poultry, swine, dairy or livestock research farm." EPA believes that this final rule definition is now broad enough so as to cover the specific concerns of the commenter. Thus both Federal and non-Federal and State facilities that meet the final definition of *farm* would be included in these regulations.

## II.    Proposed Expansion of Reporting Exemption to Other Facility Types

<u>Issue:</u> The Agency is aware that animal waste is also generated at other facilities, such as zoos and circuses. Because the focus of this proposal is on animal waste generated or found at farms, EPA is not proposing to expand the reporting exemption beyond such facilities. However, the Agency requests comment on whether the reporting exemption should be expanded to other types of facilities that also generate animal waste, and if so, what other types of facilities should be included in the reporting exemption.

### *(1)    Support and Suggest Other Facility Types to be Provided Exemption*

## Comment

*Exclude other facilities that produce animal manure from reporting requirements.*
"While the rule needs to remain narrowly focused, it would seem reasonable to expand this rule to other animal operations that generate animal waste as well… Again, given that the purpose of reporting these emissions to local, state, federal authorities is so that proper human health can be safeguarded… it is hard to envision how having such facilities as zoos and circuses making these reports would advance these goals… As such, the rule should stay narrowly focused but should include other facilities that produce animal manure." (529, 1160)

## Response

While EPA agrees with the commenters (529, 1160) that there are other facilities that produce animal manure; however, we do not believe that broadening the facilities to operations that generate animal waste is appropriate, because the Agency has not studied these other facilities, such as zoos and circuses, which are very different facilities than farms., and did not receive meaningful comments on those other facilities.

## Comment

*Explicitly exclude "all animal activities" rather than facilities from reporting requirements.* The scope of the rule should also include other facilities.
"[Commenter] believes it is better to exclude all animal activities and not leave it ambiguous as to whether or not circuses, zoos, golf courses need to report." (492)

## Response

CERCLA section 103 notification requirements are that owners or operators of vessels or facilities report releases.  Since CERCLA and EPCRA notification requirements don't regulate activities, use of the phrase "all animal activities" could add regulatory confusion.

## Comment

*Exempt reporting of emissions for all animals' manure rather than specific facilities.* Several commenters stated that because the generation of manure is a normal biological process, all animals' manure should be excluded. (589, 883, 1230)  "As referenced earlier, NFBF believes normal animal biological processes are not an emergency threat to human health or the environment, whether those events and animals reside on-farm or off-farm at other locations (i.e. fairs, zoos, circuses, racetracks or other non-commercial sites). We encourage EPA to include emissions from all animals' manure in the proposed exemption recognizing these are normal biological processes." (883)

## Response

Even if manure is the result of a normal biological process as commenters (589, 883, and 1230) suggest, they are still hazardous substances that are emitted from the manure.  EPA believes that the exclusion should stay narrowly focused and therefore has limited the exemption to *animal waste* at *farms* because the Agency has not studied those other locations and did not receive meaningful comments on them.

## III.    Proposed Elimination of Reporting Requirement

<u>Issue:</u> The Agency believes it is appropriate to propose eliminating the reporting requirement under CERCLA section 103 and EPCRA section 304 for hazardous substances released to the air at farms where the source of those hazardous substances is animal waste.

## A.    *Support Proposed Elimination of Reporting Requirements*

## Comment

*Generally Support.*  Many commenters expressed general support for the proposed elimination of reporting requirements under CERCLA section 103 and EPCRA section 304 for hazardous substances released to the air at farms where the source of those hazardous substances is animal waste.

## Response

EPA acknowledges the commenters' general support for the proposed elimination of reporting requirements.

## Comment

*Rationale also applies to Federal or State research facilities.*  One commenter expressed support and "feel[s] that this rationale also applies to Federal or State research facilities.  Experience has shown that there have been no National Response Center (NRC) responses triggered from releases of hazardous substance from farm waste which includes animal research facilities."

## Response

As discussed in the response to comments under I.B., above, EPA believes that the final rule definition for *farm* is broad enough so as to cover those specific concerns, without explicitly stating as such; thus keeping a clear and consistent definition.

## Comment

*Reporting is not of value.*  Many commenters expressed support for the proposed elimination of reporting requirements, stating that reporting emissions is of little value.  In particular, one commenter stated that "[o]ur county is well aware that routine agriculture operations… release natural by-products such as ammonia at generally low concentrations on an ongoing basis. We believe the public is also well informed that such releases occur regularly… given these circumstances, our county does not believe such notifications would be of value in performing our mission, and in fact may prove to be a hindrance." (458)

## Response

While EPA received comments that the public is well informed that releases from *animal waste* occur regularly, we also received comments that the notifications would be of value.  As such, we have bifurcated the final rule to have an exemption to CERCLA section 103 notification requirements and a limited exemption to the EPCRA section 304 emergency notification requirements.  The limited EPCRA section 304 exemption provides an exemption to those farms that are below the animal threshold for large CAFOs, as defined in 40 CFR 122.23(b)(4).[1]

---

[1] Any release to the air of a hazardous substance from animal waste at farms that stable or confine fewer than the numbers of animal specified in any of the following categories.
(1)    700 mature dairy cows, whether milked or dry
(2)    1,000 veal calves
(3)    1,000 cattle other than mature dairy cows or veal calves.  Cattle includes but is not limited to heifers, steers, bulls and cow/calf pairs
(4)    2,500 swine each weighing 55 pounds or more
(5)    10,000 swine each weighing less than 55 pounds
(6)    500 horses
(7)    10,000 sheep or lambs
(8)    55,000 turkeys
(9)    30,000 laying hens or broilers, if the farm uses a liquid manure handling system

## Comment

*Reporting is costly.*  Many commenters stated that emissions reporting is costly and could put them out of business should they have to adhere to such a regulation. Specifically, one commenter, a flock supervisor, stated that "[m]ost of my growers would not be able to adhere to this policy and would have to close down their operation. With high fuel and feed prices already hurting their bottom line this would push most of them over the edge. We can't risk an abundant, affordable food supply in the name of low-level ammonia. I firmly believe this would put many family farms out of business and be terrible for the already struggling American family farm." (655)

## Response

EPA agrees that complying with reporting requirements of CERCLA section 103 and would create an additional expense for those facilities that are new to reporting. Although compliance with the regulations for reporting releases (i.e., 40 CFR 302) does not require monitoring the releases, some may choose to do so and that could prove to be costly for those operations.

## Comment

*Adoption of the proposed exemption is vital to prevent further state actions and lawsuits from attempting to subject animal agriculture to CERCLA and EPCRA release and reporting provisions.* One commenter stated that, "in the past, a small number of states, lawsuits, and activists have moved to expand federal Superfund provision to regulate family farms and ranches. Whether justified or not, animal agriculture, the storage of manure, and the application of manure as a natural fertilizer are already regulated by various comprehensive federal and state laws including the Clean Water Act and the Clean Air Act.  Adding CERCLA and EPCRA provision would create even more regulatory burdens for those that proactively work to produce food and fiber for our nation." (77)

## Response

While EPA is aware of such lawsuits, they have no bearing on this rulemaking.  EPA is exempting these releases because we believe that a response to the releases is impracticable.

## Comment

---

(10)    125,000 chickens (other than laying hens), if the farm uses other than  liquid manure handling system

(11)    82,000 laying hens, if the farm uses other than a liquid manure handling system

(12)    30,000 ducks (if the farm uses other than a liquid manure handling system)

(13)    5,000 ducks (if the farm uses a liquid manure handling system)

*Exempt CAFOs from requirements until science is more sound.* Many commenters stated that accurately quantifying emissions would be difficult as would be the burden of proof to validate the measurements. One commenter suggested that "[f]arms should be exempt from monitoring and reporting pollutant releases until measuring and testing procedures become more accurate… We recommend the adoption of the proposed rule until feasible monitoring practices may be enacted." (82) Another commenter provided support for the proposed rule, stating that "putting these further regulations on rural growers is unfair when the science surrounding ammonia releases is uncertain." (444)

## Response

EPA recognizes the commenters' concerns with accurately quantifying emissions.

---

## Comment

*Congress never intended to require cattle producers to report these emissions from manure.* "CERCLA was intended to provide for cleanup of hazardous waste sites like Love Canal and Times Beach. To this end, Congress created the Superfund to tax the building blocks (such as petrochemicals, inorganic raw materials, and petroleum oil) used to make all hazardous products and waste. Manure and urea are clearly not among these materials. In addition, '[a]mmonia when used to produce or manufacture fertilizer or when used as a nutrient in animal feed' is specifically exempted from the tax due to the 'unnecessary burden' it would place on agriculture. A similar exemption is in place for pesticides. In fact, the definition of 'hazardous chemical' excludes 'any substance to the extent it is used in agriculture operations.'…These releases pose no threat to public health or the environment, and it would be an utter waste of public resources for authorities to investigate and consider remedial action when it would never lead to any such action." (494, 815) Similarly, one comment stated that the Clean Air Act is an appropriate vehicle to attain important environment objectives, not CERCLA/EPCRA. (1249)

## Response

CERCLA section 103(a) requires any person in charge of a vessel or facility from which a hazardous substance has been released into the environment in a quantity equal to or above its reportable quantity to immediately notify the National Response Center of the release. Similarly, EPCRA section 304 requires the owner or operator of a facility to immediately report to state and local authorities the release of an extremely hazardous substance above its reportable quantity from the facility. Based on the language of these statutes, there is no indication that Congress meant to exclude emissions from manure from reporting requirements under CERCLA section 103(a) and EPCRA section 304. With respect to manure that is used as fertilizer, as we stated above in Section I.A.2. of this document, the normal application of fertilizer is not a release under CERCLA section 101(22)(D) and hence would not be subject to reporting under CERCLA section 103(a) or EPCRA section 304.

## Comment

*It is logical to extend exemption from synthetic fertilizer to manure-based fertilizer.* One commenter pointed out that CERCLA/EPCRA reporting laws already exempt releases of similar or identical substances if a farmer uses synthetic fertilizer; it is only consistent and logical to apply the same provision for manure based fertilizer. (528)

## Response

The definition of a release under CERCLA excludes the normal application of fertilizer. That exclusion would also apply to EPCRA. That definition does not differentiate between synthetic and manure-based fertilizer. However, not all manure is used in the normal application of fertilizer and as such releases from *animal waste,* which includes manure, are not always considered to be excluded as a release under CERCLA. Therefore, we believe that the administrative reporting exemption under CERCLA, and to a limited extent EPCRA, is necessary.

## B.    Support - Citing Issue Related to Risk, Harm, and Exposure

## Comment

*General.* Many commenters provided general comment to the effect that emissions from CAFOs pose no threat to public health or the environment. (390, 435, 458, 466, 494, 852, 1010, 1281, 1305) One commenter expressed concern over the burden of liability from estimating emissions. (397) One commenter from Kansas also cited the good relationship between federally permitted animal feeding operations and the local emergency services saying, "there is a good understanding that there are few if any risks from these facilities releasing hazardous substances, particularly from animal wastes." (469)

## Response

EPA appreciates the perspective of these commenters; however, EPA has not made any independent determinations regarding the risk associated with air releases of hazardous substances from animal waste at farms. The rationale for this exemption is based on the Federal government likelihood of response to a CERCLA section 103 notification of release. The limited exemption under EPCRA section 304 was made to address concerns raised in public comment about emissions from large farms.

## Comment

*Adverse impact to humans is unlikely.* Many commenters submitted comments stating that there is no evidence or studies that emissions pose any public health risks or have environmental impacts that would warrant emergency release reports from

farms at the federal level. One commenter stated that "it is highly improbable that any amount of animal waste on a farm could produce air emissions so concentrated or hazardous that they could threaten an acute exposure to humans or the environment, thus requiring an emergency cleanup response. Commenter agrees with USEPA that emissions from animal waste on farms would occur into the air over a broad, open-space area. This fact alone significantly reduces the potential for exposure to high concentrations of air emissions. Not only do concentrations dissipate quickly in open spaces, but the threat of human exposure is reduced by the fact that fewer people populate rural areas." (83) Another commenter added that "[t]here is no documented incident of deaths occurring as a result of these releases to the atmosphere. Furthermore, there are no records that we could find in the National Institute of Occupational Safety and Health (NIOSH)." (592)

## Response

While EPA received comments that there is no evidence or studies that emissions pose any public health risks, we also received comments opposing the rule that include studies which argue the opposite. However, EPA's basis for this proposed rule does not consider the level of risk associated with air releases of hazardous substances from animal waste at farms. The rationale for this exemption is based on the Federal government likelihood of response to a CERCLA section 103 notification. The limited exemption under EPCRA section 304 was made to address concerns raised in public comment about emissions from large farms.

---

## A.  Oppose Proposed Elimination of Reporting Requirements

## Comment

*Generally Oppose.*  Many commenters expressed general opposition to the proposed elimination of reporting requirements under CERCLA section 103 and EPCRA section 304 for hazardous substances released to the air at farms where the source of those hazardous substances is animal waste.

## Response

EPA acknowledges that commenters that have expressed general opposition to the elimination of reporting requirements under CERCLA section 103 and EPCRA section 304 for hazardous substances release to the air at farms where the source of those hazardous substances is animal waste.

---

## Comment

*EPA does not have the authority to grant exemptions.*  Several commenters stated that CERCLA and EPCRA do not give EPA the authority to grant reporting exemptions (772, 932, 989, 1004, 1311) by any means other than by de-listing the substance as hazardous or creating different reportable quantity thresholds for

different mediums. (990) "EPA has provided no legal justification that would allow it to carve out the proposed exemption from these statutory requirements." (758) "In this case, using the example of ammonia, although it applies to all statutorily regulated substances, there is no authority in either statue to exclude certain types of ammonia discharges." (1004) Another commenter made a similar argument, that "EPA incorrectly states that because many of the releases from animal waste are continuous, they need not be reported. The court in Sierra Club v. Tyson specifically rejected this argument when made by Tyson, citing EPA's own guidance documents on the subject. *See Sierra Club v. Tyson Foods*, 299 F. Supp.2d at 711-12. The court went on to say that the statute requires only reduced reporting requirements when releases are continuous, but to qualify for reduced reporting, there must be reporting in the first place. *Id.* In this rule, EPA ignores this part of EPCRA and CERCLA entirely." (1004) Another commenter stated that it is the responsibility of the National Response Center to determine whether a response is warranted, therefore "the EPA is in no position to remove the primary assessment responsibilities from the expert agency charged with evaluating such releases." (1238)

## Response

EPA disagrees with the statement that CERCLA and EPCRA do not give EPA the authority to grant reporting exemptions by means other than by de-listing the substance as hazardous or creating different reportable quantity thresholds for different mediums (990). The Agency relies on CERCLA sections 102(a), 103, and 115 (the general rulemaking authority under CERCLA) as authority to issue regulations governing CERCLA section 103 notification requirements. CERCLA section 102(a) states that EPA "shall promulgate and revise as may be appropriate" regulations designating hazardous substances and their reportable quantities. CERCLA section 115 gives EPA (through the President) powers to "promulgate any regulations necessary to carry out the provisions" of CERCLA. The Agency relies on EPCRA section 304 as authority to issue regulations governing EPCRA section 304 notification requirements, and EPCRA section 328 for general rulemaking authority. EPCRA section 304 references EPCRA section 302, which authorizes the EPA to publish and revise a list of extremely hazardous substances. EPCRA section 304 also provides for the establishment of reportable quantities, which is one pound "[u]nless and until superseded by regulations." The Agency will continue to require certain reports under EPCRA section 304, specifically for those facilities that meet the size thresholds in 40 CFR 355.31(g) Based on these authorities, EPA could set an unlimited or infinite reportable quantity, which would have the effect of a reporting exemption.

EPA has on two other occasions exercised its authority to extend administrative reporting exemptions to certain well-defined release scenarios. For example, on March 19, 1998, the Agency issued a final rule (see 63 FR 13459) that granted exemptions for releases of naturally occurring radionuclides. The rule entitled, Administrative Reporting Exemptions for Certain Radionuclide Releases ("Radionuclide ARE"), granted exemptions for releases of hazardous substances that pose little or no risk or to which a Federal response is infeasible or inappropriate (see 63 FR 13461). Then on October 4,

2006, the Agency issued a final rule (see 71 FR 58525) that broadened the existing reporting exemptions for releases that are the result of combustion of less than 1,000 pounds of nitrogen oxide (NO) and less than 1,000 pounds of nitrogen dioxide ($NO_2$) to the air in 24 hours ("NOx ARE"). The NO and $NO_2$ exemptions were granted for releases of hazardous substances at levels for which the CAA regulates nitrogen oxides that are considerably higher than 10 pounds.

For this rule, EPA has made a determination that these reports are unnecessary because we would not respond to them since the Agency believes there is no reasonable approach for the response. As stated in the preamble of this final rule, however, EPA is currently overseeing a comprehensive study of CAFO air emissions (air monitoring study) that is being conducted by an independent, non-profit organization. The purpose of the air monitoring study is to develop methodologies to estimate emissions from all animal agricultural operations. Two of the outcomes of the study will be to help ensure that animal feeding operations comply with applicable environmental requirements and to gather scientific data the Agency needs to make informed regulatory determinations.

Finally, the Agency believes it has clearly defined the universe of facilities that are included in the exemption from CERCLA section 103 and to a limited extent EPCRA section 304 notification requirements to be those that release hazardous substances to the air from animal waste at farms. In addition, the Agency does not go so far as to exempt all hazardous substance emissions to air because there could be instances where it would be feasible to respond to an air release (i.e., releases from tanks, valves, pipes, etc.).

## Comment

*Reports provide valuable documentation.* Many commenters opposed the proposed elimination of reporting requirements on the grounds that reports provide good documentation, even if the content is not reviewed and enforcement is lacking. "… the decision to respond should not be taken out of the hands of local officials based on an assumption that agencies are not likely to respond. Even if local agencies typically choose not to respond, notice of releases provides valuable information to the public." (497) Several commenters stated that reporting information about emissions enables citizens to hold companies and local governments accountable in terms of how toxic chemicals are managed (614, 758, 1335) and even allows agencies to identify a facility's proximity to schools where children may be at higher risk of adverse health effects due to exposure. (1004) In a similar vein, one commenter noted that in November 2007, the American Public Health Association adopted a policy which opposes federal or state efforts to exempt agricultural sites from regulations and enforcement, including those related to airborne emissions. The APHA policy calls for improvements in "data collection on food animal production emissions and waste" as well as monitoring and control technologies. (614)

## Response

EPA agrees that some consideration should be paid to the usefulness of the reports, particularly from the largest CAFOs for citizens at the local level. Although EPA does

not anticipate ever responding to a notification under CERCLA section 103, we do recognize from the comments received that communities may have an interest in the reports under EPCRA section 304. In response to that concern, EPA has limited the administrative reporting exemption from EPCRA section 304 emergency notification requirements to those farms that are below the size threshold for a large CAFO.

## Comment

*EPA is providing incentive to pollute.* By giving large livestock operators immunity from this reporting, EPA would be creating an incentive to pollute instead of promoting and rewarding good stewardship practices. (311, 480, 636, 678, 1320)

## Response

EPA disagrees with commenters that assert that by giving large livestock operators immunity from reporting that we are creating an incentive to pollute instead of promoting and rewarding good stewardship practices. This rule is an administrative reporting exemption from CERCLA section 103 and to a limited extent EPCRA section 304 notification regulations. EPA is not limiting the Agency's authority under CERCLA sections 104 (response authorities), 106 (abatement actions), 107 (liability), or any other provisions of CERCLA to address releases of hazardous substances from animal waste at farms. EPA is also not limiting any of the Agency's authority under the Clean Air Act.

## Comment

*EPA's Proposed Exemption is Contrary to the Congressional Intent of CERCLA and EPCRA.* Several commenters expressed the belief that Congress intended for the public to have the right to know about large releases of toxic chemicals, and that this proposed regulation directly contradicts the intent of Congress. (94, 927) Many comments also specifically cite this proposed rule is a violation of the Community-Right-to Know Act. (539, 579, 595, 610)

## Response

The intent of the reporting requirement of CERCLA section 103(a) is to serve as a trigger for informing the Federal government of a release so that Federal personnel can evaluate the need for a response in accordance with the National Contingency Plan. Similarly, EPCRA section 304(a) provides release notification to state and local authorities so that they can assess whether a response action is appropriate. As explained in the preamble to the final rule, the rule is narrowly written to exempt from CERCLA section 103(a) reporting the release of hazardous substances to the air from animal waste at farms because, based on EPA experience, a Federal response would be unlikely. However, in response to comments expressing concerns over such releases, the EPA is maintaining EPCRA section 304 reporting requirements for farms that meet or exceed the size thresholds promulgated in 40 CFR 355.31(g) so that such information will still be available to state and local authorities.

## Comment

*Proposed exemption is in direct opposition to mission of EPA.* Several commenters indicated that exempting farms from reporting requirements violates Americans' right to breathe and the Agency's mission to protect human health and the environment. (243, 246, 329, 335, 433, 1210, 1247) "EPA has broad authority to write rules, but it does not have authority to write rules in direct conflict with the plain language of the statutes. CERCLA and EPCRA provide that releases of certain substances (as determined by EPA), and in certain amounts (as determined by EPA) must be reported to appropriate agencies." Also, "in 2005 and 2006 EPA entered into Air Quality Compliance Agreements with thousands of farms in over forty states. The purpose of these agreements, according to EPA, was 'to ensure that AFOs comply with applicable environmental requirements and to gather scientific data the Agency needs to make informed regulatory and policy determinations.' … While this monitoring is still ongoing, EPA is proposing a rule change that would make this monitoring program almost entirely moot." (932)

## Response

EPA disagrees that the administrative reporting exemptions are in direct opposition to the mission of the Agency. The reporting exemptions do not violate "Americans' right to breathe" nor does it violate our mission to protect human health and the environment. As some of the commenters remind us, EPA has entered into air compliance agreements with farms to do air monitoring studies. Two of the outcomes of the study will be to help ensure that animal feeding operations comply with applicable environmental requirements and to gather scientific data the Agency needs to make informed regulatory determinations. Those determinations will be made under the Clean Air Act as well as CERCLA and EPCRA. The administrative reporting exemptions will allow Federal, State and local governments to use their resources to respond to CERCLA section 103 and EPCRA section 304 notifications where there are practical solutions to addressing the release.

## Comment

*Factory farms should not be protected from the laws that affect all other industries.* "Although it is a burden for industries to have to measure and document how much poison they add to our environment, it is a burden that must be born by someone and the responsible party is most appropriately the industry that is producing the poisons. Measuring and then mitigating those environmental effects is simply part of the cost of doing business responsibly." (239, 1240, 1345) Several commenters pointed out that CAFOs are not family farms, they are industries that produce high amounts of pollutants and should be treated as such. (611, 1214) For instance, "broiler houses usually handle between 20,000 and 30,000 birds per house and swine finishing buildings in Iowa typically house 1,200 to 2,400 pigs each" and produce "thousands of tons of manure." (1214)

## Response

EPA acknowledges the commenters' assertion that factory farms should not be protected from laws that affect all other industries; however, this rule is an administrative reporting exemption from CERCLA section 103 and to a limited extent EPCRA section 304 notification requirements. This rule does not "protect" any industry from CERCLA response, abatement, liability provisions or any other environmental laws, including EPCRA.

## Comment

*Proposed rule limits obligations under Clean Air Act.* "SCAQMD staff believes this exemption will limit our ability to meet obligations under the Clean Air Act and the SIP, including the 2007 Air Quality Management Plan (AQMP), to control and reduce air emissions from manure generated at CAFOs, and respectfully requests that EPA rescind its proposal in its entirety." (1007)

## Response

EPA disagrees that the rule limits obligations under the Clean Air Act. The final rule is an administrative reporting exemption from the CERCLA section 103 and to a limited extent EPCRA section 304 notification requirements for air releases of hazardous substances from animal waste at farms. EPA is not limiting its authorities under the Clean Air Act.

## Comment

*The proposed rule is contradictory to current practices.* "…it is difficult to reconcile EPA's assertion that the exemption would save 3.431 million hours in paperwork burden for the affected industry, while on the other hand, input provided to EPA by SERCs and LEPCs indicate they do not routinely receive air emission notifications from livestock production operations." (614) "…due to the current state of the scientific data regarding the release of hazardous substances from animal waste and the fact that EPA is simultaneously exempting and studying these releases, it is almost certain that a reviewing court would find this contradiction is in and of itself arbitrary and capricious." (990)

## Response

EPA disagrees that the final rule is contradictory to current practices. In order to conduct a burden analysis, EPA has always assumed that there is full compliance with its regulations. We calculate the burden by looking back to see what the historic levels of reporting have been and assume that there will be similar levels of compliance in the future. This methodology for analysis has been reviewed and approved by the Office of Management and Budget for over 20 years.

## B.    Oppose - Citing Issue Related to Risk, Harm, and Exposure

## Comment

*References to the "Iowa Concentrated Animal Feeding Operations Air Quality Study"*
*conducted by Iowa State University and University of Iowa Study Group (2002).*
Several commenters cite a 2002 study titled, "Iowa Concentrated Animal Feeding
Operations Air Quality Study," conducted by Iowa State University and
University of Iowa Study Group. (65, 91, 74, 257, 634, 664, 1161,1284)  The
study concluded that for workers at these operations, "[t]here is now an extensive
literature documenting acute and chronic respiratory diseases and dysfunction
among workers, especially swine and poultry workers, from exposure to complex
mixtures of particulates, gases and vapors within CAFO units." However, the
study notes that while the workers generally come from a healthy population,
communities adjacent and downwind to CAFO facilities have populations of
children, pregnant mothers, and elderly, who are more susceptible to CAFO air
pollution.  (65)

## Response

EPA acknowledges commenters (65, 91, 74, 257, 634, 664, 1161, 1284) that submitted or
cited to the "Iowa Concentrated Animal Feeding Operations Air Quality Study,"
however, the final rule does not limit any of EPA's authorities to address risk, harm, and
exposure in populations that may be affected by emissions from CAFOs.  The
exemptions provided for CERCLA section 103 and EPCRA section 304 were not based
on health or risk.

## Comment

*A toxic material is a toxic material, and has the same health and environmental effects*
*regardless of source.* "CAFO owners should not be exempt from reporting
emissions from their operations, which are after all industrial operations
producing industrial amounts of waste that include ammonia, and are not simply
traditional agricultural operations." (70)

## Response

EPA does not disagree with the commenter (70) that a toxic material is a toxic material
and has the same health and environmental effects regardless of the source; however,
EPA believes that in this instance the source, animal waste at farms, is not one that would
result in a response based on a CERCLA section 103 or EPCRA section 304 notification.

## Comment

*Do not amend existing rules until monitoring study is complete.*  Several commenters
suggested delaying amendment of existing rules until the Agency monitoring
study is complete. (73, 1208)  "Even though EPA says, 'The EPA has not initiated
a response to any NRC notifications of ammonia, hydrogen sulfide, or any other

hazardous substances releases to the air where animal waste at farms is the source of that release,' this does not mean that they should not have or that the EPA will not find that these airborne contaminants are more dangerous to human health than thought. After the EPA 2 year monitoring study, which began in the spring of 2007, the EPA may find these contaminants to be a much larger issue than previously thought and be required to take serious action. Therefore, we recommend and BEG the EPA to not change the existing rules until this 2 year study is completed, analyzed, commented on by the public, and new proposed rules are developed under the new government administration and Congress." (73)

Similarly, one commenter pointed out that the American Public Health Association, concerned by the health impacts of ammonia and other materials released from confined animal feeding operations, resolved to "urge federal, state and local governments and public health agencies to impose a moratorium on new CAFOs until additional scientific data on the attendant risks to public health have been collected and uncertainties resolved." (881)

## Response

EPA neither agrees nor disagrees with the commenters' presumption that the results of the air monitoring study will reveal dangerous levels of contaminants. EPA's rationale for this administrative reporting exemption is based on the purpose of notifying the NRC when a hazardous substance is released, and then the likelihood that a response to that release would be taken by the Federal government. Upon receipt of a notification from the NRC, EPA determines whether a response is appropriate. If it is determined that a response is appropriate, the NCP regulations describe the roles and responsibilities for responding to the release. Thus, EPA considered whether the Agency would ever take a response action, as a result of such notification, for releases of hazardous substances to the air that meet or exceed their RQ from animal waste at farms. Based on EPA's experience, our conclusion is no. Specifically, to date, EPA has not initiated a response to any NRC notifications of ammonia, hydrogen sulfide, or any other hazardous substances released to the air where animal waste at farms is the source of that release. Moreover, we can not foresee a situation where the Agency would initiate a response action as a result of such notification.

Nevertheless, as stated in the preamble of this final rule, EPA is currently overseeing a comprehensive study of CAFO air emissions (air monitoring study) that is being conducted by an independent, non-profit organization. The purpose of the air monitoring study is to develop methodologies to estimate emissions from all animal agricultural operations. At the conclusion of this effort, EPA will have data to decide whether, and under what authorities, air emission controls for CAFOs are warranted.

In addition, EPA retains its authority to respond to citizen complaints of requests for assistance from state or local government agencies to investigate concerns raised by emissions from farms. Furthermore, the Agency does not need to receive such

notifications in order to enforce applicable Clean Water Act (CWA), Clean Air Act (CAA), Resource Conservation and Recovery Act (RCRA), and/or other applicable CERCLA regulations at farms. EPA retains the enforcement authority to address threats to human health and the environment

---

## Comment

*Need to track emissions to protect human health.* "We need to protect citizens from air quality problems due to factory farming. We have significant air quality problems in this county due to particulates. At the very least, we need agricultural industries to report what they are emitting into the air. According to "Air Quality and Emissions from Livestock and Poultry Production/Waste Management Systems", prepared by Jose R. Bicudo (University of Kentucky), Richard Gates (University of Kentucky), Larry D. Jacobson (University of Minnesota), David R. Schmidt (University of Minnesota), Dwaine Bundy (Iowa State University), Steve Hoff (Iowa State University), "…even when best management systems and/or mitigation techniques are used, airborne contaminants or sub-products are generated. Contaminants may build up concentrations inside livestock and poultry buildings that result in animal and human health concerns." The commenter also noted that "if problems occur with particulates, or with avian flu, this needs to be traceable." (487)

## Response

EPA acknowledges the commenter's concerns; however, CERCLA section 103 and EPCRA section 304 notifications were not intended to be used to track emissions. Rather those notifications are intended to alert the Federal, State and local governments that there may be a situation that merits further investigation for a possible response.

---

## Comment

*Adverse Impact on Human Health.* Many commenters who opposed elimination of reporting requirements provided information pertaining to the health impacts associated with CAFOs. Many provided anecdotal evidence and others cited published literature drawing a causal link. This information is summarized below.

Several commenters suggested that emissions of hazardous substances do present an emergency, and in fact have resulted in death or injury at a number of facilities. (614, 989, 1214) More specifically, one commenter cited an article in the *Dayton Daily News* that reported "[a]t least 24 people in the Midwest have died from inhaling hydrogen sulfide and methane from manure since the 1970s, including fifth-generation Michigan dairy farmer Carl Theuerkauf and four members of his family, who collapsed one by one in 1989 after breathing methane gas from a manure pit." (1214) Another commenter referred to a published report by G. Tom Tabler (project manager at University of Arkansas), indicating that large quantities of CAFO-released gases could be fatal. (482) Still another stated

that a 17 year old boy had died from an asthmatic attack associated with constant breathing irritation from the two CAFO operations surrounding his home. (1280)

One commenter referenced a paper documenting that people living near swine CAFOs experience higher rates of headaches, runny noses, sore throats, excessive coughing and diarrhea compared to people living in areas where there are no livestock operations [Chapin, A., Rule, A., Gibson, K., Buckley, T., and Schwab, K. February 2005. Airborne Multidrug Resistant Bacteria Isolated from a Concentrated Swine Feeding Operation. *Environmental Health Perspectives*, 113(2), pages 137-142.] (90)

One commenter summarized a Missouri Department of Health and Senior Services study that reported that "ambient ammonia levels downwind of a swine operation rang[ed] from 153 to 875 ppb" and that "[t]he EPA submitted comments on the Missouri study, comparing the ambient ammonia levels to recommended limits and noted that 'the conclusion could be drawn that a public health hazard did exist at the time the …data was acquired.'"(614)

An environmental attorney representing four families who lived next to an 8,000 head dairy feeding operations recounted how his clients had to vacate their property after being diagnosed with neurological impairment by a medical specialist, and with chronic respiratory disorders by their local primary care physician. Both physicians identified the cause of these health harms as the ammonia and hydrogen sulfide emission from the neighboring diary farm. (262)

A February 2004 memo from EPA's Office of Air Quality Planning and Standards concluded that exposure to ammonia emissions at the 100 pound per day level that triggers the reporting requirement could irritate the respiratory tract, eyes and mucus membranes for a few days. Exposure to hydrogen sulfide at that level could have the same but longer lasting effects accompanied by memory problems, headaches and dizziness. Commenters suggested that adverse health effects should be sufficient to continue to mandate reporting of toxic air emissions and step up enforcement, as well. (489, 781)

## Response

EPA neither agrees nor disagrees with the commenters' assertions that there are adverse impacts on human health associated with emissions from CAFOs. This final rule does not limit EPA's authority to respond to citizen complaints of requests for assistance from State or local government agencies to investigate concerns raised by emissions from farms. Furthermore, the Agency does not need to receive such notifications in order to enforce applicable CWA, CAA, RCRA, and/or other applicable CERCLA and EPCRA regulations at farms. EPA retains the enforcement authority to address threats to human health and the environment.

---

## C.    *Possible Situations that Would Necessitate a Response*

## Comment

---

*There are no circumstances where a response would be triggered.* Several commenters expressed the belief that there are no conditions where a manure related release of emissions would trigger an emergency response. (894, 899, 1249, 1251)

## Response

EPA acknowledges the several commenters (894, 899, 1249, 1251) that expressed the belief that there are no conditions where a manure related release of emissions would trigger an emergency response.

## Comment

*Extreme weather fluctuations and various pit pumping techniques may cause emissions to exceed reportable quantities.* One commenter noted that fluctuations such as "[d]ifferences in temperature, rainfall frequency and intensity, wind speed, topography and soils have a huge impact on the amount of air emissions released from farms." The commenter also cited a 2004 study titled *Concentrated Animal Feeding Operations: Health Risks from Air Pollution Institute for Agriculture and Trade Policy[2], which noted that "when pits are agitated for pumping, some or all of these gases are rapidly released from the manure and may reach toxic levels or displace oxygen, increasing the risk to humans and livestock." (851)

## Response

While it may be true that extreme weather fluctuations and various pit pumping techniques may cause emissions to exceed reportable quantities, it is unclear what response the commenter had in mind.

## Comment

*Emergency responses may be needed to protect children.* "Emergency responses to ammonia releases from intensive animal production facilities may be required in order to protect the health of people, especially infants, children and elderly persons, who live in nearby homes and communities from elevated levels of airborne ammonia and/or the fine particulates the result from the ammonia release… Exceedances can occur through gradual or precipitous increases in ammonia releases at one or more units of a facility. Given the nature of animal production, it seems likely that gradual increases will predominate. With adequate monitoring, which can be accomplished at relatively low cost, facility operators will have sufficient warning to take remedial actions that will reduce ammonia formation and release before regulatory thresholds are breached." (881)

## Response

EPA acknowledges the commenter's concerns for gradual increases in ammonia releases; however, this comment does not describe a situation where a response would be triggered

---

[2] Available online at: http://www.healthobservatory.org/library.cfm?refID=37388

by a notification of the release of hazardous substances to the air from animal waste at farms.

## Comment

*EPA has not examined emergency situations that may arise.* One commenter stated that EPA has not examined such situations that may arise when maintaining feeding operations and that the Agency has not proven that emergency personnel would not benefit from long term, continuous reporting of hazardous substances from these operations when attempting to save lives or prevent injury quickly in the future. (989)

## Response

EPA acknowledges the commenter (989) that stated that EPA has not examined such situations that may arise when maintaining feeding operations and that the Agency has not proven that emergency personnel would not benefit from long term, continuous reporting of hazardous substances from these operations when attempting to save lives or prevent injury quickly in the future. However, this comment does not describe what such a response would be.

## V.    Regulatory Flexibility Act

Issue: EPA proposes to eliminate the reporting requirement for releases of hazardous substances to the air from animal waste at farms, thus reducing regulatory burden. EPA expects the net reporting and recordkeeping burden associated with reporting air releases of hazardous substances from animal waste at farms under CERCLA section 103 and EPCRA section 304 to decrease. This reduction in burden will be realized by businesses of all sizes. EPA has therefore concluded that this proposed rule will relieve regulatory burden for all affected small entities. EPA continues to be interested in the potential impacts of the proposed rule on small entities and welcomes comments on issues related to such impacts.

## Comment

*Small farms should not be affected.* "Small farms should not be affected even if the reporting requirements stay in place because these farms do not generally have a large enough herd of animals to reach the requisite levels of toxins. Reporting requirements also should not be a hindrance to large farms. Other industries with toxic releases are not exempt from reporting obligations and have been able to survive financially. Livestock producers who are using their manure in quantities their crops can absorb are protected under the law. CERCLA includes a specific exception for the 'normal field application of fertilizer.' Only those livestock operators who have so much manure that they have to dump it on the land to get rid of it, rather than use it to fertilize crops, have the potential for liability under the law. In addition, any animal feeding operation that's complying with its Clean Water Act permit is already exempt from CERCLA." (497)

One commenter explicitly concurs with EPA's analysis and conclusion that the proposed rule will provide relief from regulatory burden for small entities. (557)

**Response**

EPA agrees with both of the commenters' assessments of the effect on small farms. With respect to the "normal application of fertilizer," this is an exception from the definition of "release" found in CERCLA section 101(22) and does not include the word "field." Thus the exception may be broader than an application to field(s).

---

# VI.    Other

## Comment

*Submission of poetry.* Many haiku poems were submitted to the docket for this proposed rule (original haiku is identified with FDMS ID 337). The poems do not explicitly support or oppose the proposed rulemaking, though it may be inferred from the content and tone that most oppose the proposed rulemaking. One poem was accompanied by a picture, both of which are included here.

Yaks releasing gas

Pooping yaks swim in rivers

Yaks polluting air (387)



## Response

EPA acknowledges those who submitted poetry, we appreciate your taking the time to express your opinion(s) in a creative manner. We have interpreted these submissions to be in opposition to our proposed rule.

---

## Comment

---

*Use of waste for energy.*  According to one commenter, there are plants that are forming in the Western part of the United States that serve as store houses for donated animal feces. The waste is stored to allow build up of methane gas and the energy source is then filtered and sent to a power plant to supply energy for thousands of residents. "Therefore, ways are trying to be made in order to use feces waste as an advantage and not to increase global warming." (267)

## Response

EPA acknowledges the commenter (267) that advocates the use of feces waste as an advantage and not to increase global warming.  However, that commenter does not seem to understand the purpose of the proposed rule and we consider the comment to be outside the scope of the proposed rule.

## Comment

*Opening summary language of proposed rule is of concern.*  "We do have concerns about EPA's opening 'summary' language referencing 'no change to notification requirements for releases of a hazardous substance from animal waste to any other environmental media, (i.e., soil, ground water, surface water).' EPA should be careful not to imply that releases from normal biological processes (e.g., defecation and urination) and beneficial uses of animal manure (e.g., fertilizer and bioenergy generation) are regulated under CERCLA/EPCRA. EPA has not issued any regulatory framework suggesting such a requirement. And, most importantly, this legal question is being actively litigated, but is yet undecided by the federal court (State of Oklahoma v. Tyson Foods Inc.). We suggest that EPA revise the affected statements by removing this clause altogether, or revising it to clarify that 'nothing in this proposal affects treatment of releases of a listed hazardous substance from animal waste to any other environmental media, (i.e., soil, ground water, surface water)." (469, 479, 1019)

## Response

EPA stands by its statement that such releases of hazardous substances to other environmental media remain reportable if they meet or exceed their reportable quantity. To the extent that any of those releases are federally permitted, they are not reportable.

## Comment

*Clarify intent of CERCLA/EPCRA in rule.* "In proposing an administrative reporting exemption to CERCLA/EPCRA, EPA should clarify that neither CERCLA nor EPCRA was ever intended to cover fugitive air emissions or 'releases' from natural biological activities resulting from animal wastes at farms. EPA should also state that Congress intended to exempt agricultural activities and natural biological activities from CERCLA/EPCRA reporting requirements." (492)

## Response

EPA acknowledges the commenter's suggestions; however, we believe that such request is outside the scope of this final rule, which is to administratively exempt releases to the air of hazardous substances from animal waste at farms.

## Comment

*The comment period is not sufficient for a substantive response.* " This is a complicated proposed action that will have complex indirect impacts on climate change that must be addressed. CAFOs make huge contributions through a number of impacts, including releases that will be impacted by this proposed rule-making." (556)

## Response

EPA acknowledges the commenter's request for a longer comment period; however, we disagree that a longer period is required. The final rule is an administrative reporting exemption from CERCLA section 103 notification requirements. EPA has not limited any of the Agency's other authorities under CERCLA sections 104 (response authorities), 106 (abatement actions), 107 (liability), or any other provisions of CERCLA or EPCRA.

## Comment

*Concentrated Animal Feeding Operations (CAFOs) hurt local economies, tourism, real estate.* A commenter notes that "[a]dding uncontrolled odor emissions will only compound [the] problem and lead to further erosion of [the] tourist and recreational resources and revenue." The commenter also notes that "any other type of business operation would not be permitted to emit these or similar kinds of air emissions" and that "[t]he farms and/or CAFOs should be held to the same standards as any other corporate or business enterprise." (1077)

## Response

EPA acknowledges the commenter's concerns for the local economies, tourism, and real estate; however, the final rule is an administrative reporting exemption from CERCLA section 103 notification requirements. EPA has not limited any of the Agency's other authorities under CERCLA sections 104 (response authorities), 106 (abatement actions), 107 (liability), or any other provisions of CERCLA or EPCRA.

## Comment

*Several Executive Orders are relevant to EPA's proposed rule.* "For example, Executive Order 13045 is important in light of the ever-growing body of science that links asthma to children exposed to CAFO pollution. Similarly, Executive Order 12898 is implicated because CAFO air emissions often have disproportionate impacts on rural, low-income communities." (1004)

## Response

The commenter (1004) pointed out that Executive Order 13045 and Executive Order 12898 are relevant to the proposed rule. EPA disagrees. Executive Order 13045 (Protection of Children from Environmental Health & Safety Risks) does not apply because the final rule does not establish an environmental standard intended to mitigate health or safety risks. Executive Order 12989 (Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations) does not apply because the final rule does not have disproportionately high and adverse human health or environmental effects on minority or low-income populations because it does not affect the level of protection provided to human health or the environment, especially since EPA is not limiting any of its other authorities under CERCLA or EPCRA, such as CERCLA sections 104 (response authorities), 106 (abatement actions), 107 (liability), or any other provisions of CERCLA or EPCRA.

## VII. Comments that Indicate a Misunderstanding of the Proposed Rule

Many comments reflect a misunderstanding of the proposed rule. These comments expressed general opposition to removing air quality and clean air standards; removing clean air protections; reducing pollution or emission standards; exemptions to clean air standards; allowing farms to emit more pollutants; deregulation of hazardous emissions; exemption from the Clean Air Act and Clean Water Act; and allowing unbridled pollution.

# Appendix A – Table of Commenters

This attachment consists of a single table listing all submissions received and posted by the Federal Docket Management System for docket EPA-HQ-SFUND-2007-0469. Comments containment in document numbers 496 and 1108 were withdrawn by the authors.

| FDMS ID | First Name | Last Name | Affiliation |
|---|---|---|---|
| 62 | Diane | Kastel | |
| 63 | Nathali | Jordi | |
| 64 | Edward | Jones, Jr. | |
| 65 | Rex | Dufour | |
| 66 | Mary | Steffenhagen | |
| 67 | Andrea | Ferrante | |
| 68 | Kurt | Baumgartner | |
| 69 | Bertilia | Redfern | |
| 70 | Jerry | Jayne | |
| 71 | Bill | Chisholm | |
| 72 | George | Holliday | Holliday Environmental Services, Inc. |
| 73 | Bob | Patterson | |
| 74 | Claudia | Haynes | |
| 75 | Betty | Slifer | |
| 76 | J. | Fryberger | |
| 77 | Justin | Oldfield | California Cattlemen's Association |
| 78 | Anonymous | | |
| 79 | James | Marinus | |
| 80 | Anonymous | | |
| 81 | Anonymous | | |
| 82 | Anonymous | | |
| 83 | Laurie J. | Fischer | Dairy Business Association, Inc. |
| 84 | Caroline A. | McClimon | |
| 85 | Linda | Judd | Sierra Club Mass Mail Campaign (2,040) |
| 86 | Lane | Neal | |
| 87 | Susan | Martin | |
| 88 | Linda | Sables | |
| 89 | R. | Spaulding | |
| 90 | P. | Middleton | |
| 91 | Debra | Eades | |
| 92 | Melanja | Jones | |
| 93 | Molly | Stewart | |
| 94 | Jennifer | Bielen | |
| 95 | Susan | Dayton | |
| 96 | Marsha | McLean | |

| 97 | Leonora | Anderson | |
| 98 | L. | Dixon | |
| 99 | Richard | Andrews | |
| 100 | Lora | Winsborough | |
| 101 | Mary | Townsend | |
| 102 | Mary | Wentland | |
| 103 | Melva | Hackney | |
| 104 | Ruth | Mohr | |
| 105 | Robert | Allia | |
| 106 | Beverly | Smith | |
| 107 | Joan | Weaver | |
| 108 | Joann | Feist | |
| 109 | Cameron | Scott | |
| 110 | Tom | Heau | |
| 111 | James | Badham | |
| 112 | Charles | Wyrostok | |
| 113 | Cherie | Aukland | |
| 114 | Nicory | Madia | |
| 115 | Matthew | Emmer | |
| 116 | Ellen | Gachesa | |
| 117 | Patricia | Miller | |
| 118 | Laura | Fuderer | |
| 119 | Mary | Miller | |
| 120 | Mack | Rose | |
| 121 | Deborah | Smith | |
| 122 | Barbara | Eisenberg | |
| 123 | Heather | Payne | |
| 124 | Gayle | Janzen | |
| 125 | Patti | Wright | |
| 126 | Alva | Cullnane | |
| 127 | Rhiannon | Sorenson | |
| 128 | Matthew | Keenan | |
| 129 | Joanne | Day | |
| 130 | Sue | Milham | |
| 131 | George | Perkins | |
| 132 | Drury | Bacon | |
| 133 | Marty | Howe | |
| 134 | Lori | Lane | |
| 135 | Dianne | Miller-Boyle | |
| 136 | Anonymous | | Cascade Climate Network |
| 137 | Carol | Campbell | |
| 138 | Sharon | Gross | |
| 139 | Caitlin | Christensen | |
| 140 | Hal | Martinez | |
| 141 | Edith | Davis | |

| 142 | Brenda | Breil |  |
|-----|--------|-------|--|
| 143 | Greg | Grigson |  |
| 144 | Gregory | Karl |  |
| 145 | Julia | Glover |  |
| 146 | Win | Carson |  |
| 147 | Walter | Winch |  |
| 148 | Eileen | Arena |  |
| 149 | Leo | Kuczynski |  |
| 150 | Katie | Bjorkman |  |
| 151 | Hugo | Benoit |  |
| 152 | Mitchell | Dormont |  |
| 153 | Richard | Dyer |  |
| 154 | Sue | Hudson |  |
| 155 | K. | Dykstra |  |
| 156 | Michael | Filip |  |
| 157 | Karen | Gupta |  |
| 158 | Lynn | Henning |  |
| 159 | Patricia | Cooke |  |
| 160 | Eston | Evans |  |
| 161 | Dale | Klingbeil |  |
| 162 | Richard | Schneider |  |
| 163 | Lois | Tutino |  |
| 164 | Claudia | Lucas |  |
| 165 | Susan | Chandler |  |
| 166 | Richard | Cygan |  |
| 167 | Sandra | Conners |  |
| 168 | Dale | Dean |  |
| 169 | Kristine | Hill |  |
| 170 | Linnea | Fronce |  |
| 171 | Charlotte | Stahl |  |
| 172 | Phil | Lipari |  |
| 173 | Jamie | Florida |  |
| 174 | Daniel | McKinley |  |
| 175 | JD | Skinner |  |
| 176 | Janice | Munzke-Deal |  |
| 177 | Roberta | Paro |  |
| 178 | Charles | Donachy |  |
| 179 | Tina | Burns |  |
| 180 | Betty | Van Wicklen |  |
| 181 | Holly | Lubowicki |  |
| 182 | Lorna | Paisley |  |
| 183 | Mary | Markus |  |
| 184 | Tiffany | Haugen |  |
| 185 | Gloria | Green |  |
| 186 | Kristina | Watkins |  |

| 187 | Laura | Garcia | |
| 188 | Susan | Goldberg | |
| 189 | Tony | Valley | |
| 190 | Siddharth | Mehrotra | |
| 191 | Paul | Mayer | |
| 192 | Jerry | Flach | |
| 193 | David | Bretschneider | |
| 194 | Nancy | Holt | |
| 195 | David | Ehrensperger | |
| 196 | Erick | Boustead | |
| 197 | Dick | Artley | |
| 198 | Robert | Kriesel | |
| 199 | Valerie | Lezin | |
| 200 | Allen | Ruddy | |
| 201 | Fred | Black | |
| 202 | Brian | Freehauf | |
| 203 | Myra | Fedyniak | |
| 204 | Michael | Strawn | |
| 205 | Laura | Phail | |
| 206 | Sidne | Baglini | |
| 207 | Dolores | Voorhees | |
| 208 | Georgeann | Calendine | |
| 209 | Dan | Cush | |
| 210 | Mark | Peterson | |
| 211 | Sheila | Desmond | |
| 212 | Melissa | Locher | |
| 213 | Melissa | Kallick | |
| 214 | J. | Knight | |
| 215 | Dwayne | Mundy | North Central Florida Regional Planning Council |
| 216 | Greg | Makepeace | |
| 217 | Amanda | Davis | |
| 218 | S. | Shultz | |
| 219 | Anonymous | | |
| 220 | Linda | Neale | |
| 221 | Jeff | Borkowski | |
| 222 | Charles | Connolly | Aspen Hall Inn |
| 223 | Stacy | Soderholm | |
| 224 | A. | Maishman | |
| 225 | D. | Madsen | |
| 226 | Kathleen | Miller | |
| 227 | Sarah | Kuck | |
| 228 | L. | Richardson | |
| 229 | Anonymous | | |
| 230 | Rachel | Forsmann | |
| 231 | Ron | Jeffries | Golden Manatee Trading Co. |

| 232 | Alexia | Rojahn | |
| 233 | A. | Nicole | |
| 234 | Thomas | Jones | Windt im Wald Farm |
| 235 | Elena | Harper | |
| 236 | Justine | Owen | |
| 237 | Anonymous | | |
| 238 | Helen | Ackerman | |
| 239 | Jan | Balcom | |
| 240 | Erik | Nelson | |
| 241 | Jennifer | Barricklow | |
| 242 | Garreth | Mackrill | Mass Mail Campaign (327) |
| 243 | M. | Langley | |
| 244 | Brian | Jones | |
| 245 | Q. | Majeski | |
| 246 | Sharon | Grant | |
| 247 | Edye | Rowell | North Central Florida Regional Planning Council |
| 248 | Kelly | Page | |
| 249 | Cathy | McMorris | Charleys Farm |
| 250 | D. | Snyder | |
| 251 | Lisa | Ruoff | Eco-Goddess Edibles |
| 252 | Anonymous | | |
| 253 | Anonymous | | |
| 254 | Levin | | |
| 255 | L. | Carollo | |
| 256 | Rosemary | Topar | |
| 257 | J. | Smith | |
| 258 | Anonymous | | |
| 259 | Anonymous | | |
| 260 | W. | Mitchell | |
| 261 | Alex | Johnson | |
| 262 | Gary | Abraham | Law Offices of Gary A. Abraham |
| 263 | David | Bemel | Action for Animals |
| 264 | Anonymous | | |
| 265 | Anonymous | | |
| 266 | Anonymous | | |
| 267 | Anonymous | | |
| 268 | Anonymous | | |
| 269 | T. | Habenicht | |
| 270 | Anonymous | | |
| 271 | Anonymous | | |
| 272 | Anonymous | | |
| 273 | Anonymous | | |
| 274 | Anonymous | | |
| 275 | Anonymous | | |
| 276 | Anonymous | | |

| 277 | Anonymous | | |
|-----|-----------|---|---|
| 278 | Anonymous | | |
| 279 | Anonymous | | |
| 280 | Anonymous | | |
| 281 | Anonymous | | |
| 282 | Anonymous | | |
| 283 | J. | Richardson | |
| 284 | Anonymous | | |
| 285 | Anonymous | | |
| 286 | M. | Jordan | |
| 287 | Anonymous | | |
| 288 | Anonymous | | |
| 289 | Anonymous | | |
| 290 | Anonymous | | |
| 291 | G. | Tuttle | |
| 292 | Anonymous | | |
| 293 | Anonymous | | |
| 294 | Cleary | O'Farrell | Cleary O'Farrell Photography |
| 295 | Anonymous | | |
| 296 | L. | Heissenbuttel | |
| 297 | Anonymous | | |
| 298 | Anonymous | | |
| 299 | Anonymous | | |
| 300 | Anonymous | | |
| 301 | Anonymous | | |
| 302 | Anonymous | | |
| 303 | Anonymous | | |
| 304 | Anonymous | | |
| 305 | Anonymous | | |
| 306 | Jaclyn | Corley | |
| 307 | Anonymous | | |
| 308 | Anonymous | | |
| 309 | Anonymous | | |
| 310 | Sarah | Alexander | Mass Mail Campaign (4,310) |
| 311 | Anonymous | | |
| 312 | Anonymous | | |
| 313 | Anonymous | | |
| 314 | Anonymous | | |
| 315 | Anonymous | | |
| 316 | Anonymous | | |
| 317 | Trevor | Howell | |
| 318 | Anonymous | | |
| 319 | Anonymous | | |
| 320 | Anonymous | | |
| 321 | Anonymous | | |

| 322 | Anonymous | | |
| 323 | Anonymous | | |
| 324 | Anonymous | | |
| 325 | R. | Seltzer | |
| 326 | Anonymous | | |
| 327 | Anonymous | | |
| 328 | Anonymous | | |
| 329 | J. | Caywood | |
| 330 | Anonymous | | |
| 331 | Anonymous | | |
| 332 | Anonymous | | |
| 333 | Anonymous | | |
| 334 | Laurrie | Stoffer | |
| 335 | R . | Riedlinger | |
| 336 | Ken | Robertson | |
| 337 | Erik | Nelson | |
| 338 | Manuel | Kaufmann | |
| 339 | Claire | Holzner | |
| 340 | Linda | Wiener | |
| 341 | Linda | Wiener | |
| 342 | Judy | Skog | |
| 343 | Bill | Bowman | |
| 344 | Doug | Brown | |
| 345 | Carrie | Schudda | |
| 346 | Denise | D'Anne | |
| 347 | Nancy | Sullivan | |
| 348 | Jennifer | Angelone | |
| 349 | Spencer | Beard | |
| 350 | Shani | Nelson | |
| 351 | Joel | Gartland | |
| 352 | Cathy | Balan | |
| 353 | Paula | Barrett | |
| 354 | Kate | McClellan | |
| 355 | Aimee | Lemrise | |
| 356 | David | Allen | |
| 357 | Charles | Walker | |
| 358 | Ken | Granelli | |
| 359 | Jeffrey | Riley | |
| 360 | Martha | Castillo | |
| 361 | A'Llyn | Ettien | |
| 362 | Cynthia | Norris | |
| 363 | Beth | Bussiere-Nichols | |
| 364 | Charmaine | Koehler-Lodge | |
| 365 | Charmaine | Koehler-Lodge | |

| 366 | Marcia | Evers | |
| 367 | John | Collins | |
| 368 | Yvonne | Osborne | |
| 369 | C. | Shandley | |
| 370 | Christine | McElroy | |
| 371 | Lois | Jones | |
| 372 | Ann | Cook-Frantz | |
| 373 | Glenn | Smith | |
| 374 | Shanon | Orrock | |
| 375 | Linda | Newman | |
| 376 | Helen | Reich | |
| 377 | Adele | Kushner | |
| 378 | Diane | Robinson | |
| 379 | Christine | Weber-Kearney | |
| 380 | Nathan | Kenworthy | |
| 381 | Donna | Noonan | |
| 382 | Anonymous | | |
| 383 | Anonymous | | |
| 384 | Anonymous | | |
| 385 | Anonymous | | |
| 386 | Justen | Pritchett | |
| 387 | Anonymous | | |
| 388 | Anonymous | | |
| 389 | Anonymous | | |
| 390 | Henrietta | Hildebrand | Cattle Mass Mail Campaign (370) |
| 391 | Anonymous | | |
| 392 | Anonymous | | |
| 393 | Christy | Zimsen | |
| 394 | Charles | Silliman | Chairman, Hardy County, WV LEPS |
| 395 | Anonymous | | |
| 396 | Phil | Krueger | |
| 397 | David | Lathem | Lathem Farms, Inc. |
| 398 | Mark | Fiorini | |
| 399 | Anonymous | | |
| 400 | Anna | Jacus | |
| 401 | Jo Ann | McNiel | |
| 402 | Anonymous | | |
| 403 | Cal | Jackson | |
| 404 | Thomas | Porter | Egg Mass Mail Campaign (13) |
| 405 | Martha | Rhoades | Poultry Mass Mail Campaign (2,537) |
| 406 | Sidney | White | |
| 407 | Linda | Newman | |
| 408 | Kathryn | Young | |
| 409 | Michelle | Smith | |

| 410 | Jane | Affonso | |
| 411 | Henry | Lagergren | |
| 412 | Barbara | Fankhauser | |
| 413 | Steve | Wells | |
| 414 | Justin | Dortwegt | |
| 415 | Therese | Dowd | |
| 416 | Craig | Bert | |
| 417 | Diana | Strong | |
| 418 | Jordan | Goldman | |
| 419 | Ben | Drenning | |
| 420 | James | Stehn | |
| 421 | Deborah | Levine | |
| 422 | Paul | Converse | |
| 423 | Kimberly | Longey | |
| 424 | Robt | Hershenow | |
| 425 | Matthew | Hein | |
| 426 | Patricia | Lyell | |
| 427 | Hannah | King | |
| 428 | Mike | Turns | |
| 429 | Meredith | Olsen | |
| 430 | Peter | Buck | |
| 431 | Marc | Poris | |
| 432 | Anonymous | | |
| 433 | Bryan | Schultz | |
| 434 | Anonymous | | |
| 435 | J. | Wilson | |
| 436 | Anonymous | | |
| 437 | Anonymous | | |
| 438 | Anonymous | | |
| 439 | Jonathon | Green | Pilgrim's Pride Corporation |
| 440 | Glenn | Elzey | |
| 441 | Roger | High | Ohio Sheep Improvement Association |
| 442 | P. | Mobley | |
| 443 | Anonymous | | |
| 444 | Anonymous | | |
| 445 | Anonymous | | Pilgrims' Pride |
| 446 | Shawn | Dady | |
| 447 | Anonymous | | |
| 448 | Anonymous | | |
| 449 | Anonymous | | |
| 450 | Ted | Beals | |
| 451 | Anonymous | | |
| 452 | Anonymous | | |
| 453 | Bill | Satterfield | Delmarva Poultry Industry, Inc. |
| 454 | John | Satterfield | |

| 455 | Ron Prestage | Prestage | Prestage Farms of South Carolina, LLC |
|---|---|---|---|
| 456 | Anonymous | | |
| 457 | Anonymous | | |
| 458 | Gene | Stewart | Page County Emergency Services |
| 459 | Anonymous | | |
| 460 | Anonymous | | |
| 461 | Stan | Webb | |
| 462 | J. | Dean | |
| 463 | J. | Bethany | |
| 464 | M. | Morphew | |
| 465 | Jeff | Oliver | |
| 466 | Don | McKinnon | Jones County Emergency Management Agency |
| 467 | Jay | Houchin | Farbest Farms, Inc. |
| 468 | Amy | Tsui | |
| 469 | Steve | Swaffar | Kansas Farm Bureau |
| 470 | Brett | McDuffie | |
| 471 | Garnett | Bell | |
| 472 | Michelle | Andria | |
| 473 | Anonymous | | |
| 474 | Anonymous | | |
| 475 | James | Tarlow | New York Animal Advocates |
| 476 | Anonymous | | |
| 477 | Anonymous | | |
| 478 | Jessica | Lowery | |
| 479 | Ron | Litterer | National Corn Growers Association |
| 480 | Anonymous | | |
| 481 | Anonymous | | |
| 482 | Marita | Fields | |
| 483 | Anonymous | | |
| 484 | Anonymous | | |
| 485 | Anonymous | | |
| 486 | Zae | Munn | |
| 487 | Jeanne | Melchior | Protect Our Woods |
| 488 | Anonymous | | |
| 489 | Tim | Schleicher | |
| 490 | Gretta | Irwin | Iowa Turkey Federation |
| 491 | M. | McAtee | |
| 492 | W. Hugh | O'Riordan | Idaho Dairymen's Association |
| 493 | Gregg | Clanton | ISE America, Inc. |
| 494 | Rick | Stott | Agri Beef Co. |
| 495 | Jeremy | Rowland | Bion Environmental Technology, Inc. |
| 496 | Mat | Thomas | Withdrawn |
| 497 | Trent | Dougherty | Ohio Environmental Council |
| 498 | Robert | Symons | Harrisonburg/Rockingham County LEPC |
| 499 | S. | Roberts | |

| 500 | John | Sperry | Sperry Farms |
| 501 | W. | Wampler | Sunny Slope Farm |
| 502 | M. | Varna | |
| 503 | Maida | Genser | |
| 504 | Nancy | Caffall | |
| 505 | Sandra | Britton | |
| 506 | Michael | Kay | |
| 507 | Adriane | Dellorco | |
| 508 | Polly | Heninger | |
| 509 | Virginia | Foote | |
| 510 | Bill | Satterfield | |
| 511 | Marjorie | Van Buren | |
| 512 | Timothy | Biello | |
| 513 | Leslie | Duram | |
| 514 | James | Grimm | Texas Poultry Federation |
| 515 | Aimee | Lemrise | |
| 516 | John | Gangwer | |
| 517 | Anonymous | | |
| 518 | Ron | Darnell | |
| 519 | Jennifer | Dewey | |
| 520 | Michael | Burleson | |
| 521 | Anonymous | | |
| 522 | Tim | W | |
| 523 | Hugh | Weathers | South Carolina Commissioner of Agriculture |
| 524 | Anonymous | | |
| 525 | Scott | Norling | |
| 526 | Scott | Johnson | |
| 527 | Kris | Kohl | |
| 528 | W. | Gordon | Washington State Dairy Federation |
| 529 | Joseph | Miller | Rose Acre Farms |
| 530 | Russell | McGee | |
| 531 | Michele | Merkel | Environmental Integrity |
| 531.1 | Michele | Merkel | Environmental Integrity |
| 531.2 | Michele | Merkel | Environmental Integrity |
| 531.3 | Michele | Merkel | Environmental Integrity |
| 531.4 | Michele | Merkel | Environmental Integrity |
| 531.5 | Michele | Merkel | Environmental Integrity |
| 531.6 | Michele | Merkel | Environmental Integrity |
| 531.7 | Michele | Merkel | Environmental Integrity |
| 531.8 | Michele | Merkel | Environmental Integrity |
| 531.9 | Michele | Merkel | Environmental Integrity |
| 531.1 | Michele | Merkel | Environmental Integrity |
| 531.11 | Michele | Merkel | Environmental Integrity |
| 531.12 | Michele | Merkel | Environmental Integrity |
| 531.13 | Michele | Merkel | Environmental Integrity |

| 531.14 | Michele | Merkel | Environmental Integrity |
|--------|---------|--------|-------------------------|
| 531.15 | Michele | Merkel | Environmental Integrity |
| 531.16 | Michele | Merkel | Environmental Integrity |
| 531.17 | Michele | Merkel | Environmental Integrity |
| 531.18 | Michele | Merkel | Environmental Integrity |
| 531.19 | Michele | Merkel | Environmental Integrity |
| 531.2 | Michele | Merkel | Environmental Integrity |
| 532 | Barrie | Wilcox | Wilcox Farms, Inc. |
| 533 | Leonard | Blackham | The National Association of State Departments of Agriculture |
| 534 | C. | Davis | Poultry Mass Mail Campaign (121) |
| 535 | M. | Thomas | Mass Mail Campaign (1,405) |
| 536 | S. | Maloney | Mass Mail Campaign (3) |
| 537 | J. | Davis | Mass Mail Campaign (106) |
| 538 | | G | Poultry Mass Mail Campaign (140) |
| 539 | J. | Weber | Pork Mass Mail Campaign (234) |
| 540 | S. | Senecal | |
| 541 | K. | Bounds | |
| 542 | D. | Calloway | Pebblestone Farm |
| 543 | P. | Hunter | |
| 544 | S. | Clark | |
| 545 | M. | Shaul | |
| 546 | J. | Farb | |
| 547 | H. | Lenz | |
| 548 | J. | Tunick | |
| 549 | R. | Blevins | |
| 550 | Anonymous | | |
| 551 | W. | Calloway | |
| 552 | Anonymous | | |
| 553 | J. | Newcombe | |
| 554 | B. | Carmean | |
| 555 | C. | Calloway | |
| 556 | George A. | Kimbrell | The Center For Food Safety |
| 557 | Kevin | Vinchattle | Iowa Poultry Association |
| 558 | D. | Brown | |
| 559 | M. | Foskey | |
| 560 | W. | Vickers | |
| 561 | James | Burnett | EMA Director, Winston County |
| 562 | B. | McCane | |
| 563 | B. | Reimbold | |
| 564 | B. | Kirby | |
| 565 | Jay | Lazarus | Dairy Producers of New Mexico |
| 566 | K. | Carmean | |
| 567 | Anonymous | | |
| 568 | M. | Follansbee | |

| | | | |
|---|---|---|---|
| 569 | Anonymous | | |
| 570 | J. | Vickers | |
| 571 | F. | Wells | |
| 572 | L. | Kohlberg | |
| 573 | Michael | Christensen | Flying C Farms, Inc. |
| 574 | L. | Rothrock | |
| 575 | Anonymous | | |
| 576 | Anonymous | | |
| 577 | Leonard | Blackham | NASDA |
| 578 | Anonymous | | |
| 579 | Anonymous | | |
| 580 | D. | West | |
| 581 | Anonymous | | |
| 582 | Doelas | Landes | O.K. Industries, Inc. |
| 583 | Anonymous | | |
| 584 | Anonymous | | |
| 585 | M. | Gebhard | |
| 586 | G. | Youngblood | |
| 587 | R. | Pearce | |
| 588 | D. | Hilliard | |
| 589 | Justin | Schneider | Indiana Farm Bureau, Inc. |
| 590 | C. | Naney | |
| 591 | S. | Adams | |
| 592 | Chad | Gregory | United Egg Producers |
| 593 | Anonymous | | |
| 594 | J. | Hill | |
| 595 | Anonymous | | |
| 596 | Anonymous | | |
| 597 | M. | Barnette | |
| 598 | Michael | Myatt | Cooperative Milk Producers Association |
| 599 | Jo | Schmidt | Salt Lake County, Utah |
| 600 | G. | Stowell | |
| 601 | M. | Wesley | |
| 602 | Anonymous | | |
| 603 | A. | Montapert | |
| 604 | Anonymous | | |
| 605 | Anonymous | | |
| 606 | William | Hammerich | Colorado Livestock Association |
| 607 | Anonymous | | |
| 608 | Anonymous | | |
| 609 | Jeff | Nogan | Pennsylvania Center for Dairy Excellence and Pennsylvania Center for Beef Excellence |
| 610 | F. | Zerbe | |
| 611 | L. | Norton | |
| 612 | C. | Callahan | |

| 613 | J. | Luoma | |
|-----|----|-------|--|
| 614 | Timothy | Wheeler | Society of Environmental Journalists |
| 615 | L. | Hughes | |
| 616 | R. | Setticase | |
| 617 | Todd | LeKites | Salisbury Growout Manager, DMV South |
| 618 | D. | Foss | |
| 619 | B. | Price | |
| 620 | Anonymous | | |
| 621 | Anonymous | | |
| 622 | D. | Wiggins | |
| 623 | S. | Dennis | |
| 624 | M. | Sawyer | |
| 625 | Anonymous | | |
| 626 | M. | Harrison | |
| 627 | K. | Osborne | |
| 628 | D. | Vieau | |
| 629 | D. | Cleven | |
| 630 | T. | Relyea | |
| 631 | R. | Morris | |
| 632 | J. | Carlile | |
| 633 | Anonymous | | |
| 634 | D. | Adent | |
| 635 | B. | Renfro | |
| 636 | S. | Tenney | |
| 637 | Anonymous | | |
| 638 | J. | Wilen | |
| 639 | M. | Tallant | |
| 640 | Troy | Hadrick | Butte Harding Lawrence County Farm Bureau |
| 641 | Kurt | Kreher | Kreher's Farm Fresh Eggs, LLC |
| 642 | Andy | Whittington | Mississippi Farm Bureau Federation |
| 643 | R. | Dykstra | |
| 644 | Bob | Patterson | |
| 645 | B. | Keith | |
| 646 | Colleen | Anderson | Marvin & Colleen Anderson Pullets, Inc. |
| 647 | D. | Ryman | |
| 648 | W. | Bevans | |
| 649 | Anonymous | | |
| 650 | Anonymous | | |
| 651 | Anonymous | | |
| 652 | Larry E. | Sitzman | Nebraska Pork Producers Association |
| 653 | Tim | W. | P W Farm |
| 654 | Anonymous | | |
| 655 | Anonymous | | |
| 656 | Steven | Krikava | Land O'Lakes, Inc. |
| 657 | Robert | Byrne | National Milk Producers Federation |

| 658 | Anonymous | | |
|---|---|---|---|
| 659 | Anonymous | | |
| 660 | Anonymous | | |
| 661 | Anonymous | | |
| 662 | Anonymous | | |
| 663 | Anonymous | | |
| 664 | Anonymous | | |
| 665 | Lisa | Griffith | National Family Farm Coalition |
| 666 | Connie | Smith | South Carolina Poultry Federation |
| 667 | T. | McDonald | |
| 668 | Anonymous | | |
| 669 | G. | White | |
| 670 | Bryan | Black | National Pork Producers Council |
| 670.1 | Bryan | Black | National Pork Producers Council |
| 670.2 | Bryan | Black | National Pork Producers Council |
| 671 | A. | Unger | |
| 672 | J. | Moran | |
| 673 | J. | Faison | |
| 674 | P. | Copeland | |
| 675 | Zippy | Duvall | Georgia Farm Bureau Federation |
| 676 | V. | Crompton | |
| 677 | C. | Connell | |
| 678 | T. | Ereneta | |
| 679 | Anonymous | | |
| 680 | Anonymous | | |
| 681 | Anonymous | | |
| 682 | Abit | Massey | Georgia Poultry Federation |
| 683 | M. | McNamara | |
| 684 | G. | Bell | |
| 685 | Shannon | Wolf | Wisconsin Pork Association |
| 686 | Bruce | Baker | Soncrest Egg Farm |
| 687 | K. | Maclellan-Cohen | |
| 688 | Eric | Pierce | Pierce Turkey Farm |
| 689 | | Mattox | |
| 690 | R. | Browne | |
| 691 | Kerri | Powell | Earthjustice |
| 693 | Michele | Merkel | Environmental Integrity Project |
| 693.01 | Michele | Merkel | Environmental Integrity Project |
| 693.02 | Michele | Merkel | Environmental Integrity Project |
| 693.03 | Michele | Merkel | Environmental Integrity Project |
| 693.04 | Michele | Merkel | Environmental Integrity Project |
| 693.05 | Michele | Merkel | Environmental Integrity Project |
| 693.06 | Michele | Merkel | Environmental Integrity Project |
| 693.07 | Michele | Merkel | Environmental Integrity Project |

| 693.08 | Michele | Merkel | Environmental Integrity Project |
|---|---|---|---|
| 693.09 | Michele | Merkel | Environmental Integrity Project |
| 693.1 | Michele | Merkel | Environmental Integrity Project |
| 693.11 | Michele | Merkel | Environmental Integrity Project |
| 693.12 | Michele | Merkel | Environmental Integrity Project |
| 693.13 | Michele | Merkel | Environmental Integrity Project |
| 693.14 | Michele | Merkel | Environmental Integrity Project |
| 693.15 | Michele | Merkel | Environmental Integrity Project |
| 693.16 | Michele | Merkel | Environmental Integrity Project |
| 693.17 | Michele | Merkel | Environmental Integrity Project |
| 693.18 | Michele | Merkel | Environmental Integrity Project |
| 693.19 | Michele | Merkel | Environmental Integrity Project |
| 693.2 | Michele | Merkel | Environmental Integrity Project |
| 693.21 | Michele | Merkel | Environmental Integrity Project |
| 693.22 | Michele | Merkel | Environmental Integrity Project |
| 693.23 | Michele | Merkel | Environmental Integrity Project |
| 693.24 | Michele | Merkel | Environmental Integrity Project |
| 693.25 | Michele | Merkel | Environmental Integrity Project |
| 694 | Anonymous | | |
| 695 | Anonymous | | |
| 696 | Anonymous | | |
| 697 | W. | Reding | |
| 698 | R. | E hr | |
| 699 | T. | Krell | |
| 700 | M. | Kelly | |
| 701 | E. | Bury | |
| 702 | A. | Hasse | |
| 703 | C. | Dobson | |
| 704 | G. | Boness | |
| 705 | N. | Heilmann | |
| 706 | J. | Fardue | |
| 707 | S. | Grodsky | |
| 708 | Mike | Pepper | Mississippi Poultry Association |
| 709 | John | Fisher | Ohio Farm Bureau |
| 710 | C. | Heinz | |
| 711 | D. | Dean | |
| 712 | M. | Giese | |
| 713 | Don | Daufeldt | D Daufeldt Farms |
| 714 | M. | Grindley | |
| 715 | C. | Weston | |
| 716 | M. | Flynn | |
| 717 | Tim | Wheeler | Society of Environmental Journalists |
| 718 | Mark | Salvador | Iowa Farm Bureau Federation |
| 719 | M. | Clarke | |
| 720 | M. | Anderson | |

| 721 | Mark | Dopp | American Meat Institute |
|---|---|---|---|
| 722 | J. | Bloom | |
| 723 | S. | Perkins | |
| 724 | M. | Yannell | |
| 725 | P. | TRUE | |
| 726 | S. | Cook | |
| 727 | A. | Forrest | |
| 728 | S. | Gunning | |
| 729 | B. | Norwood | |
| 730 | R. | McGee | |
| 731 | T. | W. | |
| 732 | J. | Liotta | |
| 733 | F. | Hasenbein | |
| 734 | M. | Lind | |
| 735 | M. | Glasgow | |
| 736 | I. | Cree | |
| 737 | S. | Stanley | |
| 738 | H. | Schmidt | |
| 739 | Lena | Hall | TN Complex of Pilgrim's Pride Poultry |
| 740 | G. | Carpiniello | |
| 741 | A. | Jarman | |
| 742 | C. | Kozower | |
| 743 | S. | Miller | |
| 744 | D. | Stormdancer | |
| 745 | D. | Painter | |
| 746 | S. | Clark | |
| 747 | E. | Livesey-Fassel | |
| 748 | J. | Dubord | |
| 749 | L. | Lindemulder Harris | |
| 750 | J. | C. Dufresne | |
| 751 | N. | Harrison | |
| 752 | J. | Palmer | |
| 753 | M. | Giese | |
| 754 | L. | Allen | |
| 755 | S. | Avery | |
| 756 | S. | Wallace | |
| 757 | Eric | Stickdorn, | Brookstone Terrace Farm |
| 758 | Keri | Powell | Earthjustice |
| 759 | G. | Thompson | |
| 760 | A. | Bowron | |
| 761 | R. | Lipovec | |
| 762 | S. | Finman | |
| 763 | C. | Eagle | |
| 764 | K. | Godell | |

| 765 | Steven | Woodruff | Woodruff & Howe Environmental |
|---|---|---|---|
| 766 | R. | Clayton | |
| 767 | M. | Potter | |
| 768 | T. | Schuster | |
| 769 | M. | Gargiulo | |
| 770 | Dennis | Gerber | Floating Reservoir Cover Consultant |
| 771 | B. | Reed | |
| 772 | Victor | Flatt | University of Houston Advanced Environmental Law Students |
| 773 | K. | Sellers | |
| 774 | E. | Ciregna | |
| 775 | M. | Glasgow | |
| 776 | Anissa | Reynolds | Southern Properties Realty |
| 777 | B. | Sabo | |
| 778 | P. | Holt | |
| 779 | C. | Cohn | |
| 780 | J. | Bonnheim | |
| 781 | Jill | Godmillow | Notre Dame University |
| 782 | D. | Rusch | |
| 783 | G. | Bell | |
| 784 | P. | White | |
| 785 | J. | Callas | |
| 786 | L. | Ste Marie | |
| 787 | L. | Tutino | |
| 788 | S. | Baker | |
| 789 | Anonymous | | |
| 790 | K. | Lancor | |
| 791 | L. | Cornelison | |
| 792 | K. | Kremer | |
| 793 | M. | Dube | |
| 794 | Anonymous | | |
| 795 | E. | Schulmiller | |
| 796 | R. | Burns | |
| 797 | F. | Tutt | |
| 798 | J. | Essex | |
| 799 | L. | Ogden | |
| 800 | S. | Broughton | |
| 801 | L. | Whalen | |
| 802 | G. | Nofsinger | |
| 803 | D. | Blake | |
| 804 | R. | Eisele | |
| 805 | N. | Ness | |
| 806 | Dustin | Cox | Kane County Farm Bureau |
| 807 | Bina | Robinson | Citizens for Planetary Health |
| 808 | J. | Hallahan | |

| 809 | R. | Vaught | |
|-----|----|--------|---|
| 810 | S. | Nemour | |
| 811 | G. | Eddie | |
| 812 | P. | Gibbons | |
| 813 | M. | Sprague | |
| 814 | B. | Rapach | |
| 815 | Tamara | Thies | The National Cattlemen's Beef Association |
| 816 | M. | Nochimson | |
| 817 | L. | Howe | |
| 818 | Anonymous | | |
| 819 | K. | Houlihan | |
| 820 | J. | Linton | |
| 821 | J. | Neilson | |
| 822 | B. | A. Pieplow-Galey | |
| 823 | C. | O'Meara | |
| 824 | K. | Hart | |
| 825 | S. | Arnold | |
| 826 | S. | Righi | |
| 827 | M. | Herring | |
| 828 | G. | Hasapidis | |
| 829 | C. | Elliot | |
| 830 | P. | Best | |
| 831 | B. | Dale | |
| 832 | D. | Homer | |
| 833 | A. | Hammond | |
| 834 | A. | Holt | |
| 835 | K. | Inomata | |
| 836 | K. | Samoranos | |
| 837 | D. | Hatfield | |
| 838 | S. | Brown | |
| 839 | K. | Corwin | |
| 840 | C. | Huspeka | |
| 841 | Tamra | Langford | Perdue Farms |
| 842 | J. | Erb | |
| 843 | S. | Moore | |
| 844 | J. | Anderson | |
| 845 | A. | Miller | |
| 846 | J. | Gartside | |
| 847 | K. | Rallo | |
| 848 | E. | Saldana | |
| 849 | Michael | Cline | Virginia Department of Emergency Management |
| 850 | Steven | Olsen | Minnesota Turkey Growers Association & Broiler and Egg Association of Minnesota |
| 851 | Meredith | Niles | Cool Foods Campaign Coordinator |

| 852 | George | Watts | National Chicken Council |
|---|---|---|---|
| 853 | S. | Cox | |
| 854 | R. | Watkins | |
| 855 | K. | Martellaro | |
| 856 | D. | Whitmire | |
| 857 | J. | Curtis | |
| 858 | A. | Kroeger | |
| 859 | L. | Lewis | |
| 860 | S. | Sor-Lokken | |
| 861 | M. | Strother | |
| 862 | R. | Cappelletti | |
| 863 | J. | Perkins-Buzo | |
| 864 | N. | Medved | |
| 865 | V. | Pena | |
| 866 | J. | Pendergast | |
| 867 | S. | Cox | |
| 868 | T. | Adams | |
| 869 | J. | Walford | |
| 870 | C. | Elk | |
| 871 | C. | Soraghan | |
| 872 | D. | Radell | |
| 873 | S. | Fortunak | |
| 874 | Bryant | Worely | North Carolina Poultry Farmers |
| 875 | C. | TRUE | |
| 876 | B. | Oakley | |
| 877 | L. | Syverud | |
| 878 | J. | Plapinger | |
| 879 | C. | Carter | |
| 880 | J. | Compere | |
| 881 | P. | Costner | |
| 882 | Jim | Krahn | Oregon Dairy Farmers Association |
| 883 | Craig | Head | Nebraska Farm Bureau Federation |
| 884 | S. | DeWeerdt | |
| 885 | Susan | Joy | Nebraska Poultry Industries |
| 886 | Kathleen | Reuter | Western United Dairymen |
| 887 | Shelia | Burkhardt | Michigan Milk Producers Association |
| 888 | Tom | Stroda | Kansas Polk Association |
| 889 | Mike | Billotte | United Dairymen of Arizona |
| 890 | Joe | Whorley | Dakota Layers |
| 891 | Tom | Miller | Arizona Pork Council |
| 892 | Jim | Carroll | Dairy Farmers of America |
| 893 | Kim | Stefanik | Stefanik Farm Inc. |
| 894 | Caroline | Potter | The Northeast Dairy Producers Association Inc. |
| 895 | J.P. | Cativieta | Community Alliance for Responsible Environmental Stewardship |

| 896 | David | Fuhrmann | Foremost Farms USA |
|---|---|---|---|
| 897 | Zippy | Duvall | Georgia Farm Bureau Federation |
| 898 | Wenonah | Hauter | Food and Water Watch |
| 899 | Scott | Jones | South Dakota Cattlemen's Association |
| 900 | Patricia | Martin | Safe Food and Fertilizer |
| 900.1 | Patricia | Martin | Safe Food and Fertilizer |
| 900.2 | Patricia | Martin | Safe Food and Fertilizer |
| 900.3 | Patricia | Martin | Safe Food and Fertilizer |
| 901 | William | Hammerich | Colorado Livestock Association |
| 902 | Timothy | Wheeler | Society of Environmental Journalists |
| 903 | D. | Olsen | Briarwood Farms-Rochester |
| 904 | Duane | Olsen | Briarwood Farms-Rochester |
| 905 | J. | Sweeney | |
| 906 | L. | McCrink | |
| 907 | P. | McAlpin | |
| 908 | K. | Isaacs | |
| 909 | K. | Seabrook | |
| 910 | J. | Vragel | |
| 911 | S. | Tansky | |
| 912 | N. | Holt | |
| 913 | D. | Serotta | |
| 914 | C. | Orth-Pallavicini | |
| 915 | K. | Simmons | |
| 916 | G. | Shaeffer | |
| 917 | J. | Gingerich | |
| 918 | D. | Cognata | |
| 919 | T. | Kopel | |
| 920 | N. | Gregory | |
| 921 | C. | Rodger | |
| 922 | J. | Frank | |
| 923 | S. | McRae | |
| 924 | C. | Freckmann | |
| 925 | Jay | Bryant | Maryland and Virginia Milk Producers Cooperative |
| 926 | R. | Modrow | |
| 927 | Tarah | Heinzen | Northwest Environmental Defense Center |
| 928 | Mark | Dopp | American Meat Institute (AMI) |
| 929 | Robert | Foster | Foster Brothers Farm Inc. and President, Vermont Natural Ag Products |
| 930 | Jeff | Mayo | Neshoba County Emergency Management Agency |
| 931 | George | Pettus | North Carolina Polk Council |
| 932 | W. | Edmonton | Attorney General of Oklahoma |
| 933 | J. | Schochet | |
| 934 | F. | Greenlee | |
| 935 | M. | Neidell | |

| 936 | B. | Imam | |
|-----|-----|------|---|
| 937 | S. | Gross | |
| 938 | Kevin | Vinchattle | Iowa Poultry Association |
| 939 | David | Sutherland | Sunrise Farms, Inc. |
| 940 | M. | C. Liberman | |
| 941 | K. | Burroughs | |
| 942 | W. | Schmidt | |
| 943 | William | Faulkenberry | White Tail Falls Farm |
| 944 | G. | Philbin | |
| 945 | M. | Andria | |
| 946 | M. | Hadcock | |
| 947 | L. | Whitney | |
| 948 | J. | Holmes | |
| 949 | N. | McDonald | |
| 950 | C. | Allman | |
| 951 | A. | Cohen | |
| 952 | K. | Eble | |
| 953 | R. | Roberts | |
| 954 | D. | Gardecki | |
| 955 | K. | Gholson | |
| 956 | A. | Sen | |
| 957 | J. | Meeks | |
| 958 | E. | Kimber | |
| 959 | E. | Ward | |
| 960 | M. | Meininger | |
| 961 | J. | Wolfson | |
| 962 | D. | Tynan | |
| 963 | K. | Gubrud | |
| 964 | C. | Bunker | |
| 965 | N. | Fleming | |
| 966 | J. | Biss | |
| 967 | S. | Billman | |
| 968 | G. | Cavanaugh | |
| 969 | R. | Rhoads | |
| 970 | J. | Conway | |
| 971 | N. | Quinones | |
| 972 | V. | Nachmias | |
| 973 | V. | Gibbs | |
| 974 | S. | Nemour | |
| 975 | T. | Morrow | |
| 976 | D. | Murphy | |
| 977 | J. | Vincent | |
| 978 | R. | Baumgartner | |
| 979 | J. | Tanner | |
| 980 | B. | Tache | |

| 981 | J. | Burkel | |
| 982 | John | Di Turo | Aqua Dynamic Solutions, LLC |
| 982.1 | John | Di Turo | Aqua Dynamic Solutions, LLC |
| 982.2 | John | Di Turo | Aqua Dynamic Solutions, LLC |
| 983 | Jamie | Burr | Tyson Foods, Inc. (Tyson) |
| 984 | E. | Frounfelter | |
| 985 | A. | Olson | |
| 986 | D. | Cain | |
| 987 | W. | Dehaven | American Veterinary Medical Association (AVMA) |
| 988 | D. | Berthiaume | |
| 989 | Jessica | Werber | Environmental Integrity Project |
| 990 | Timothy | Gabelhouse | National Association SARA Title III Program Officials |
| 991 | Calvin | Parnell | Department of Biological and Agricultural Engineering, Texas A & M |
| 992 | R. | Roman | |
| 993 | T. | Lister | |
| 994 | Montressa | Elder | Oklahoma Hazardous Materials Emergency Response Commission |
| 995 | C. | Etchison | |
| 996 | Annonymous | | |
| 997 | J. | Wilson | |
| 998 | Tood | Staples | Texas Department of Agriculture |
| 999 | D. | Roe | |
| 1000 | C. | Yost | |
| 1001 | L. | Williams | |
| 1002 | A. | Rauch | |
| 1003 | C. | Ebey | |
| 1004 | Charles | Tebbutt | Western Environmental Law Center |
| 1004.1 | Charles | Tebbutt | Western Environmental Law Center |
| 1004.2 | Charles | Tebbutt | Western Environmental Law Center |
| 1004.3 | Charles | Tebbutt | Western Environmental Law Center |
| 1004.4 | Charles | Tebbutt | Western Environmental Law Center |
| 1004.5 | Charles | Tebbutt | Western Environmental Law Center |
| 1005 | R. | Downing | |
| 1006 | J. | Coalgate | |
| 1007 | Laki | Tisopulos | South Coast Air Quality Management District (SCAQMD) |
| 1008 | George | Pettus | North Carolina Pork Council |
| 1009 | Robert | Bloxom | Commonwealth of Virginia office of the Governor |
| 1010 | Ronald | Shortridge | Cattle Empire, LLC |
| 1011 | Edward | Olivera | Olivera Foods Ranch-Pak Eggs |
| 1012 | Tom | Silva | JS West and Companies |
| 1013 | Conrad | Boeck | Featherland Egg Farms |
| 1014 | Brian | Bookey | National Food Corporation |

| 1015 | Philip | Sonstegard | Sunrise Farms, Inc. |
|---|---|---|---|
| 1016 | D. | Applebaum | |
| 1017 | Abit | Massey | Georgia Poultry Federation |
| 1018 | H. | Brandenburg | |
| 1019 | Evan | Teague | Arkansas Farm Bureau Federation |
| 1020 | L. | Sutula | |
| 1021 | S. | Guldenbrein | |
| 1022 | Tom | Fleming | Ohio Dairy Producers Association and Dairy Producer, Allen Co. |
| 1023 | Eldon | McAfee | Iowa Pork Producers Association |
| 1024 | Phil | Overdorf | Phil Overdorf Farms |
| 1025 | Elenore | Gordon | |
| 1026 | Robert | Pike | Braswell Foods |
| 1027 | Dennis | Hughes | Foodonics International,  Inc. |
| 1028 | Roger | Seger | Wabash Valley Produce, Inc.1 |
| 1029 | Linda | Balfour | |
| 1030 | Phil | Pverdorf | Phil Overdorf Farms |
| 1031 | Dick | Isler | Ohio Pork Producers Council |
| 1032 | Helen | Salka | |
| 1033 | Zippy | Duvall | Georgia Farm Bureau Federation |
| 1034 | Hobey | Bauhan | Virginia Poultry Federation |
| 1035 | Jaclyn | Cunningham | MatlinPAttersob Global Advisors |
| 1036 | Betty | Ronour | |
| 1037 | Jane | Edsall | |
| 1038 | Sally | Small | |
| 1039 | Roberta | Evres | |
| 1040 | Ross | Wilson | |
| 1041 | Timothy | Wheeler | Society of Environmental Journalists |
| 1042 | Todd | Haymore | Department of Agriculture and Consumer Services, Commonwealth of Virginia |
| 1043 | Debra | Murdock | Pacific Egg and Poultry Association |
| 1044 | Todd | Staples | Texas Departmen of Agriculture |
| 1045 | Jean | Bradley | |
| 1046 | | Anonymous | |
| 1047 | Jay | Forman | |
| 1048 | Jim | Mansfeld | |
| 1049 | Patricia | Cachopo | |
| 1050 | Gary | Cooper | |
| 1051 | David | Waide | Mississppi Farm Bureau Federation |
| 1052 | Jerry | Welch | |
| 1053 | Gary | Cooper | |
| 1054 | Lindsay | Venele | |
| 1055 | | Tenga | |
| 1056 | | Anonymous | National Family Farm Coalition |
| 1057 | Herbert | Schick | Pennsylvania Pork Producers Council |

| 1058 | Michael | Scuse | Department of Agriculture, State of Delaware |
|------|---------|-------|---------------------------------------------|
| 1059 | Richard | Bell | Arkansas Agricutlre Department |
| 1060 | Patricia | Campbell | |
| 1061 | Richard | Patmos | |
| 1062 | Phil | Borgic | Illinois Pork Producers Association |
| 1063 | Thomas | Sauls | |
| 1064 | Kendall | Pigg | |
| 1065 | Brandon | Olson | |
| 1066 | Brabara | Keenean | |
| 1067 | James | Canlet | |
| 1068 | Richard | Plum | |
| 1069 | Jason | Dalrymple | |
| 1070 | Jessica | Werber | Environmental Integrity Project |
| 1071 | James | Sullivan | |
| 1072 | Christian | Berger | |
| 1073 | | Anonymous | |
| 1074 | Bill | Young | |
| 1075 | | Anonymous | |
| 1076 | Gary | Ward | |
| 1077 | David | McDonald | |
| 1078 | James | Laursen | |
| 1079 | Marietta | Scaltrito | |
| 1080 | Barbara | Boodie | |
| 1081 | Janice | Reine | |
| 1082 | Jerry | Welch | |
| 1083 | Gregg | Clanton | |
| 1084 | Judith | McKellips | |
| 1085 | Stanley | Young | Texas Pork Producers Association, Inc. |
| 1086 | Brandon | Amoroso | |
| 1087 | Helen | Greer | |
| 1088 | Helena | Melone | |
| 1089 | Richard | Patten | |
| 1090 | Theresa | Galvin | |
| 1091 | T | Dawson | |
| 1092 | Helen | Decker | |
| 1093 | Shellee | Davis | |
| 1094 | Ida | DelVecchio | |
| 1095 | Ronald | Gayman | |
| 1096 | Ed | Henderson | |
| 1097 | Kathi | Kruse | |
| 1098 | Katherine | Melmoth | |
| 1099 | Alfred | McGlinsky | |
| 1100 | Ben | Coleman | |
| 1101 | Gus | Douglass | West Virginia Department of Agriculture |
| 1102 | Haven | Hendricks | Utah Pork Producers |

| 1103 | Craig | Giroux | Giroux's Poultry Farm, Inc. |
|---|---|---|---|
| 1104 | Suellen | Savukas | |
| 1105 | Gary | Yew | Shenandoah County Department of Fire and Rescue |
| 1106 | Nancy | Mroczek | |
| 1107 | Terri | Franks | State of Arkansas Hazardous Materials Emergency Response Commission |
| 1108 | Clayton | Kuhles | Kuhles Capital, LLC - Withdrawn |
| 1109 | Blair | Hagy | Kofkoff Egg Farms |
| 1110 | Scott | Patton | Delta Egg Farm |
| 1111 | Ray | Noecker | Ohio Pork Producers Council |
| 1112 | J | | Stiebrs Farms, Inc. |
| 1113 | Mike | Surles | Premier Farms |
| 1114 | Joe | Raith | Morning Fresh Farms |
| 1115 | Neil | Carman | Sierra Club |
| 1116 | Timothy | Weaver | Weaver Bros., Inc. |
| 1117 | K | Bush | |
| 1118 | John | Brown | Idalou Egg Ranch |
| 1119 | Jim | Fisher | Missouri Pork Association |
| 1120 | Donna | Lanciotte | |
| 1121 | Robert | Krouse | Midwest Poultry Services, L.P. |
| 1122 | Marilynn | Grismore | |
| 1123 | Nazen | Merjian | Voices for Animals |
| 1124 | Felix | Vescio | |
| 1125 | Richard | Hiers | |
| 1126 | George | Bowman | |
| 1127 | Margaret | Becker | |
| 1128 | Ingrid | Shipp | Egg Master Farm |
| 1129 | Elaine | Charowski | |
| 1130 | Gary | West | JS West and Companies |
| 1131 | Mallie | Comos-Snider | Hardy County Rural Development Authority |
| 1132 | Ronald | Ballew | Hillandale Gettysburg LP |
| 1133 | Derek | Yancey | Morning Fresh Farms |
| 1134 | Robert | S | Nature's Best Egg Company, Inc. |
| 1135 | Janice | Emich | |
| 1136 | Nell | Rando | |
| 1137 | Sheila | Schmidt | Schwartz Farms |
| 1138 | John | Tallas | Coffee County Office of Emergency Management Office of Homeland Security |
| 1139 | Barbara | Matthes | |
| 1140 | Phillip | Wise | |
| 1141 | Mitchell | Aaron | Mass Mail Campaign (16) |
| 1142 | Glenn | Esbenshade | Esbenshade Farms |
| 1143 | Kent | Woodward | Oakdell Egg Farms, Inc. |
| 1144 | John | Adams | Alabama Poultry & Egg Association |
| 1145 | B.J. | Fordham | |

| 1146 | Rigoberto | Jacobo | Boulder Valley Poultry, Inc. |
|------|-----------|--------|------------------------------|
| 1147 | Cathy | Liss | |
| 1148 | Robert | Howell | Georgia Egg Association |
| 1149 | Julian | Price | |
| 1150 | Jere | Wilkerson | |
| 1151 | J. | Noggle | |
| 1152 | Christopher | Ebenshade | Esbenshade Farms |
| 1153 | Kenneth | Pauze | Southern New England |
| 1154 | Dolph | Baker | Cal Maine Foods Inc. |
| 1155 | Sam | Hines | Pork Producers in Michigan |
| 1156 | Kenneth | Ferrell | MFA Incorporated |
| 1157 | Rodney | Wagner | Green Valley Poultry Farm Inc. |
| 1158 | | | Shepherd's Processed Eggs |
| 1159 | Nancy | | |
| 1160 | Joseph | Miller | Rose Acre Farms |
| 1161 | S. | Melling | |
| 1162 | M. | Wood | |
| 1163 | Gregg | Herbruck | |
| 1164 | Tim | Wheeler | |
| 1165 | D. | Craven | |
| 1166 | R. | Simpson | |
| 1167 | Chuck | Bell | |
| 1168 | Katie | Smith | Mississippi Department of Agriculture |
| 1169 | D. | Efron | |
| 1170 | M. | Efron | |
| 1171 | William | Hammerich | Colorado Livestock Association |
| 1172 | A. | Blackwelder | |
| 1173 | Brent | Booker | Charm Egg Distributors |
| 1174 | J. | McKellips | |
| 1175 | V. | De Wendt | De Wendt Poultry LLC |
| 1176 | Don | Ericson | Kandiyohi County Emergency Management |
| 1177 | M. | Garvey | |
| 1178 | T. | Seltzer | |
| 1179 | S. | Nichols | MCM Poultry Farm |
| 1180 | Abit | Massey | Georgia Poultry Federation |
| 1181 | D. | Rettig | Rembrandt Enterprises |
| 1182 | B. | Kohler | |
| 1183 | M. | Puglisi | Puglisi Egg Farms |
| 1184 | D. | Wheatley | |
| 1185 | M. | Foster | |
| 1186 | M. | Funk | |
| 1187 | P. | Chavis | |
| 1188 | T. | Bebee | Michael Foods Egg Products Company |
| 1189 | M. | Friedow | Sparboe Farms, Inc. |
| 1190 | S. | Gemperle | Gemperle Enterprises |

| 1191 | S. | Troxler | North Carolina Department of Agriculture and Consumer Services |
|------|-----|---------|------|
| 1192 | B. | Russell | |
| 1193 | J. | Methany | Kent County Department of Public Safety |
| 1194 | E. | Pool | New Jersey Farm Bureau Dairy Committee |
| 1195 | Richard | Jenkins | Jenkins Poultry Farms |
| 1196 | Robert | Symons | County of Rockingham Department of Fire and Rescue |
| 1197 | R. | Bell | |
| 1198 | Susan | Joy | Nebraska Poultry Industries, Inc. |
| 1199 | Don | Brown | McAnally Enterprises, L.L.C. |
| 1200 | Bruce | Brown | |
| 1201 | Jay | Lazarus | Dairy Producers of New Mexico |
| 1202 | R. | Willin | Willin Farms Inc. |
| 1203 | F. | Enders | |
| 1204 | G. | Culuko | |
| 1205 | L. | Hunt | |
| 1206 | Tommy | Irvin | Georgia Department of Agriculture |
| 1207 | K. | Malo | |
| 1208 | Carrie | LaSeur | Plains Justice |
| 1209 | Gary | Foster | Eggs West |
| 1210 | Kathy | | |
| 1211 | R. | Welborn | |
| 1212 | Ronald | Gross | Hemmelgarn & Sons |
| 1213 | L. | Mattinen | |
| 1214 | Catherine | Fitzsimmons | Air Quality Bureau of Iowa |
| 1215 | Don | Brown | McAnally Enterprises Inc. |
| 1216 | John | Zoet | Zoet Poultry Inc. |
| 1217 | Robert | Michael | R.C. Michael Company Inc. |
| 1218 | Craig | Willardson | Norco Ranch Inc. |
| 1219 | Dwight | Potter | Circle Four Farms |
| 1220 | Evelyn | Stanton | |
| 1221 | Janine | Weeks | |
| 1222 | D. | P. | Rigtrup Egg Farm, LLC |
| 1223 | Margaret | Reier | Minnich Poultry |
| 1224 | Lester | Spell | Department of Agriculture and Commerce, State of Mississippi |
| 1225 | Louise | Mariana | |
| 1226 | Anonymous | | |
| 1227 | Mark | Davis | |
| 1228 | Pat | Hackett | |
| 1229 | Kim | Smith | |
| 1230 | Nancy | Erickson | Natural and Environmental Resources, Illinois Farm Bureau |
| 1231 | Linda | Burlingame | |

| 1232 | Brooke | Mays | |
| 1233 | Steven | Creel | |
| 1234 | Marcus | Braswell | |
| 1237 | Barbara | Roush | |
| 1238 | Jackie | Lopez | Rocky Mountain Clean Air Action |
| 1239 | Scheuermann | Karen | |
| 1240 | Richard | Stahlhut | |
| 1241 | Judy | Stover | |
| 1242 | S. | Wald | |
| 1243 | D. | Mitchell | |
| 1244 | Ngaz | Emily | |
| 1245 | A. | Evers | |
| 1246 | Alisa | Gaston-Linn | |
| 1247 | Emily | Horton | |
| 1248 | Ruth | Allen | |
| 1249 | Shawn | Reiersgaard | |
| 1250 | W. | Hunter | |
| 1251 | John | Bosma | |
| 1252 | Katie | Frazier | Virginia Agribusiness Council |
| 1253 | Dana | Braswell | |
| 1254 | William | Davis | |
| 1255 | Barb | Ellis | |
| 1256 | Shirley | Cotrotsos | |
| 1257 | Theresa | Benda | |
| 1258 | Lee Ann | Reinfeldt | |
| 1259 | Stan | Dorman | |
| 1260 | Monte | Terry | |
| 1261 | Shockey | R. | |
| 1262 | Eric | Gonder | |
| 1263 | Terry | Maness | |
| 1264 | Nancy Allison | Coleman | |
| 1265 | Patty | Baxter | |
| 1266 | | Anonymous | References comments by John Dingell |
| 1267 | Judith | Peterson | |
| 1268 | Noel | Anderson | |
| 1269 | Barbara | Fullerton | |
| 1270 | Linda | Kalof | |
| 1271 | Rhedona | Rose | Tennessee Farm Bureau |
| 1272 | Mike | Snow | |
| 1273 | Dana | Kindermann | |
| 1274 | Terri | Wolf-King | |
| 1275 | Michael | Joyce | |
| 1276 | Debbie | Goodman | |
| 1277 | Kathy | Barrett | Cayuga Martketing LLC. |

| 1278 | Leocadie | Welling | |
|------|----------|---------|---|
| 1279 | Judith | Embry | |
| 1280 | Diana | Obenauer | |
| 1281 | Isaac | Singletary | |
| 1282 | William | Davis | |
| 1283 | Amber | Pool | Mass Mail Campaign (5) |
| 1284 | Shanon | Melling | |
| 1285 | Mitch | Lutz | |
| 1286 | Jana | Harker | |
| 1287 | Virginia | Ayers | |
| 1288 | Karen | Chamberlain | |
| 1289 | Jane | Bowhers | |
| 1290 | Ellen | Hackett | |
| 1291 | Nell | Wulff | |
| 1292 | Joel | Starkey | |
| 1293 | Nancy | Starkey | |
| 1294 | Therese | Slack | |
| 1295 | Simon | Validzic | |
| 1296 | Michelle | Gramza | |
| 1297 | Williard | Everhart | |
| 1298 | Dustin | Catoe | |
| 1299 | Rex | Catoe | |
| 1300 | Israel | Boone | |
| 1301 | Gerry | Meyer | |
| 1302 | Jamie | Gainey | |
| 1303 | Eric | Hoyer | |
| 1304 | David | Maturen | |
| 1305 | Kendall | Pigg | |
| 1306 | Eric | Horton | |
| 1307 | Joel | Ginsburg | |
| 1308 | Sheila | Horton | |
| 1309 | Frances | de Usabel | |
| 1310 | Katherine | Gifford | |
| 1311 | Kim | Chase | |
| 1312 | AnnMarie | Miller | |
| 1313 | Laura | Kenyon | |
| 1314 | Tony | Deese | |
| 1315 | Louise | Heenan | |
| 1316 | Jon | Ramold | |
| 1317 | Susan | Burkhalter | |
| 1318 | Brenda | Oliver | |
| 1319 | Scarlette | Rouse | |
| 1320 | Adam | Snyder | |
| 1321 | Marshall | Oliver | |
| 1322 | Lawayne | Garrett | |

| 1323 | Pat | McKnight | |
| 1324 | Shannon | Horton | |
| 1325 | Darlene | Snyder | |
| 1326 | William | Boone | |
| 1327 | Ilana | Blatt-Eisengart | |
| 1328 | Kathy | Catoe | |
| 1329 | Bea | Elliott | |
| 1330 | Timmy | Campbell | |
| 1331 | June | Wilson | |
| 1332 | Cindy | Orcutt | |
| 1333 | Bethany | Pugh | |
| 1334 | Steven | Baxter | |
| 1335 | Anne | Millhollen | |
| 1336 | Donna | Arauz | |
| 1337 | Michael | Price | |
| 1338 | Gregory | Cooper | |
| 1339 | Diane | Schroeder | |
| 1340 | Rita | Robinett | |
| 1341 | Corey | Gardner | |
| 1342 | Chris | Chinn | |
| 1343 | Coleen | Mackin | |
| 1344 | Anonymous | | |
| 1345 | Eric | Nelson | |
| 1346 | Maureen | Edwards | |
| 1347 | Wayne | Jamie | |
| 1348 | Gary | Bogue | |
| 1349 | D. | Deem | |
| 1350 | Steven | Frischknecht | Mass Mail Campaign (15) |
| 1351 | Michelle | Hunt | |
| 1352 | Cindy | Walsh | Pfizer Global Manufacturing |
| 1353 | Mary | Bruner | |
| 1354 | B.D. | Knopf | |

## Appendix B – Summary of Attachments Submitted by Environmental Integrity and Earthjustice to Docket EPA-HQ-SFUND-2007-0469-531

On December 28, 2007, EPA published a notice of proposed rulemaking titled, "CERLA/EPCRA Administrative  Reporting Exemption for Air Releases of Hazardous Substances From Animal Waste" (December 28, 2007 72 FR 73700).  This document summarizes documents submitted in response to the Agency's request for comment on the proposed rule.  Specifically, this document summarizes 20 attachments provided as submission EPA-HQ-SFUND-2007-0469-531 from Environmental Integrity and Earthjustice.

**Attachment 531.1**: This document is not available in FDMS since it is a copyrighted publication and may not be reproduced without consent of the copyright holder. Therefore, no summary is provided.

**Attachment 531.2**: "Increased Animal Waste Production From Concentrated Animal Feeding Operations (CAFOs): Potential Implications for Public and Environmental Health."  Nebraska Center for Rural Health Research, January, 2000.

*Summary* – The purpose of this document is to present background information about Concentrated Animal Feeding Operations (CAFOs) from a public health perspective. At the center of public and environmental health discussions concerning the implications of larger and fewer livestock production operations is the increased production of manure per operation. Public health advocates are becoming concerned that as the amount of manure produced in a concentrated area increases, traditional handling techniques may become less effective, and the manure may eventually pose a threat to the public and the environment.

Considerations for Occupational Health: There are several occupational hazards associated with working in livestock operations of all types and sizes. The risk for chronic disease development, such as asthma-like syndrome, asthma, bronchitis, and mucus membrane inflammation syndrome, does appear to be linked to occupational exposure to endotoxins, gases, and dust.

Considerations for Community Health: A table summarizes recently published research about how residents living near intensive livestock farming operations may be affected by odors and other airborne emissions from CAFOs. Also, there is some concern that flies will carry microbes that cause dysentery and diarrhea. Another concern is that large amounts of manure will lead to the transmission of manure based pathogens to residents who live in close proximity.

Considerations for Environmental and Public Health: When manure is spread over crops and pasture lands there is the possibility that the application of nutrients may exceed crop nutrient requirements.

*Relevance to Reporting Exemption* – Document discusses harm and exposure issues related to large quantities of manure.

**Attachment 531.3**: This document is not available in FDMS since it is a copyrighted publication and may not be reproduced without consent of the copyright holder. Therefore, no summary is provided.

**Attachment 531.4**: "Ammonia Emission Factors from Swine Finishing Operations." D. Bruce Harris, Richard C. Shores, and Larry G. Jones, Environmental Protection Agency, Office of Research and Development, National Risk Management Research Laboratory, Research Triangle Park, NC. No date.

*Summary* – Concentrated animal feeding operations are being examined in several regions of the U.S. as major sources of ammonia and particulate matter precursors. The National Risk Management Research Laboratory (NRMRL) has previously measured ammonia concentrations around and estimated emissions from a swine production facility. This paper presents the results from two new studies at swine finishing facilities. New data are collected for tunnel-ventilated pull-plug swine finishing barns using chemiluminescent ammonia measurements from the exhaust fans. Open-path Fourier transform infrared (OP-FTIR) measurements of a naturally ventilated pit recharge barn and its lagoon are used to develop emission factors in the second study. The data suggest that the barns are a significant source of ammonia, and that the current emission factors are not markedly different from these new data.

*Relevance to Reporting Exemption* – Document discusses harm and exposure issues related to large quantities of manure.

**Attachment 531.5**: "Emissions from Animal Feeding Animal Operations, Draft." U.S. Environmental Protection Agency, August, 2001.

Summary – Individual farm operations can confine as many as 10's or 100's of thousands of animals each year. Currently, the trend in most animal sectors is for continued consolidation of production at even larger operations. These large operations must store large amounts of manure because the amount of manure generated exceeds the agronomic demands of local crop land. The microbial breakdown of the organic carbon and nitrogen compounds in manure can result in odors and other emissions to the air. This report presents the results of a preliminary investigation into air pollution from large animal feeding operations (AFOs) for the beef, dairy, swine, and poultry (broilers, layers, and turkeys) animal sectors.

The fundamental goal of this study was to develop a method for estimating emissions at the individual farm level that reflects the different animal production methods that are commonly used at commercial scale operations. The approach to this study was to: (1) identify the manure management systems typically used by large animal feeding

operations for each animal sector, (2) develop model farms based on individual elements of those systems (i.e. confinement, manure collection system, storage sites, land application), (3) search the literature for emission factors that could be associated with each element of the model farm, and (4) apply the emission factors to the model farms to estimate annual mass emissions. The report also summarizes information on emission control techniques that was found in the literature.

The literature search identified a number of control practices that in theory are possible options for reducing the emissions from confinement facilities, manure management systems, and land application. Chapter 9.0 identifies more than 20 technologies that have been used to some extent at full-scale operations in the industry.

*Relevance to Reporting Exemption* –  Documents provides estimates of ammonia, nitrous oxide, methane, hydrogen sulfide, PM, and volatile organic compound (VOC) emissions from farms.

---

**Attachment 531.6**: Environmental and Economic Benefit Analysis of Proposed Revisions to the National Pollutant Discharge Elimination System Regulation and the Effluent Guidelines for Concentrated Animal Feeding Operations.  U.S. Environmental Protection Agency, January, 2001.

---

*Summary* – U.S. livestock and poultry production has risen sharply since the 1970s, resulting in an increase in the amount of manure and wastewater generated annually. As production has increased, the U.S. livestock and poultry sectors have also consolidated animal production into a smaller number of larger-scale, highly specialized operations that concentrate more animals (and manure) in a single location. At the same time, significant gains in production efficiency have increased per-animal yields as has the rate of turnover of animals between farm and market. These large animal feeding operations (AFOs) can present considerable environmental risks because they often do not have an adequate land base for manure disposal through land application. As a result, large facilities must incur the risks associated with storing significant volumes of manure, or must attempt to maximize the application of manure to the limited land they have available. By comparison, smaller manage fewer animals and tend to concentrate less manure nutrients at a single location. These operations are more likely to have sufficient cropland and fertilizer needs to land apply manure nutrients generated at a livestock or poultry business.

Since the 1970s, the combined forces of population growth and re-location of operations closer to consumer markets and processing sectors have resulted in more AFOs located near densely populated areas. The paper reports that surface waters in these areas face additional stresses from urban runoff and other point sources. The proximity of large AFOs to human populations thus increases the potential for human health impacts and ecological damage if manure and wastewater at AFOs is improperly discharged.

*Relevance to Reporting Exemption* – Document discusses harm and exposure issues.

**Attachment 531.7**: "Environmental Assessment of Proposed Revisions to the National Pollutant Discharge Elimination System Regulation and the Effluent Guidelines for Concentrated Animal Feeding Operations." U.S. Environmental Protection Agency, January, 2001.

*Summary* – The purpose of this document is to provide a broad and qualitative assessment of the human health and ecological impacts associated with the release of waste from concentrated animal feeding operations and to assess potential and reported benefits of the implementation of the proposed revisions for the National Pollutant Discharge Elimination System.

The animal feeding operation industry has undergone significant changes, particularly with regard to the increased concentration of confined production units and the large amount of waste associated with them.

The major pollutants of concern associated with animal feeding operations are nutrients, like nitrogen, phosphorus and potassium, nitrogen compounds, phosphorus compounds, ammonia, pathogens, organic matter, salts and trace elements, antibiotics, hormones, and others like particulates and pesticides.

The transport of pollutants can occur through various vectors such as runoff, erosion, discharge to air and subsequent deposition, or directly to surface waters. The potential hazards from AFO pollutants can affect surface water, ground water, air and soil, thus the detrimental impacts on human health and the environment should be of great concern.

*Relevance to Reporting Exemption* – The document addresses the potential harm that ammonia exposure from AFOs can cause to human health and the environment.

**Attachment 531.8**: Iowa Concentrated Animal Feeding Operations Air Quality Study – Final Report. Iowa State University and the University of Iowa Study Group, February 2002.

*Summary* – This document provides a collection of studies that describe the CAFO industry in Iowa and its impact on human and animal health. Specifically, the document provides a review of research and peer-reviewed literature on the emission rates and emission models for dispersion of gases from CAFOs. Emissions originate from the housing ventilation air, manure storage units, and during land application of manure. Refereed publications were sought that identified ammonia, methane, hydrogen sulfide, particulate, bioaerosol, and volatile organic compound (VOCs, including "odor") emission from swine, dairy/cattle, and poultry production systems. The vast majority of published data is related to ammonia emission, and where available, the remaining components were cited and reported. A lack of data exists that reports downwind concentration of gases and particulates from CAFOs as a function of facility type and emission rate.

The document also provides a evaluation of the health effects of airborne substances released from animal production units and states that a valid evaluation should be based on the important and well-established toxicological principles of dosage and response. Many factors can alter animal or human response to toxicants, including those inherent in

the toxicant, the organism, the environment and the combinations of these major factors. Response to exposure by airborne toxicants is likely to involve the respiratory system because it is a portal of entry. Study of CAFO issues suggests consideration of the mechanisms of injury by volatile agents and particulates, as well as understanding the potential effects of both acute and chronic exposure. The study indicates that respiratory system effects are manifest in relatively limited ways (bronchoconstriction, pulmonary edema, asthma, carcinogenesis), and careful attention must be given to evidence for cause and effect from among a wide range of insults and levels of exposure.

The document reports that exposure to high concentrations of ammonia result in severe damage to the upper and lower respiratory tract and alveolar capillaries in humans. Controlled studies with hydrogen sulfide in laboratory animals have shown that levels of 500 ppm or greater are likely to be lethal, similar to the response observed in humans. Exposure to sub-lethal levels of hydrogen sulfide have produced progressive effects ranging from increased respiratory rate, to pulmonary edema, to histopathological changes in the nasal cavity and lung tissue. Endotoxins, glucans, and microorganisms may be important components of bioaerosols associated with animal production units. Inhalation of these compounds has been shown to produce respiratory system effects including airway constriction and obstructive breathing pattern, inflammatory tissue responses, and overt infection of lung tissue.

*Relevance to Reporting Exemption* – This document provides a collection of studies describing CAFO industry structure and trends in Iowa, air quality issues, emissions and community exposures from CAFOS, fate and transport of air pollutants from CAFOs, adverse health effects in humans and animals, and social and community impacts.

---

**Attachment 531.9**: Letter from the U.S. House of Representatives Committee on Energy and Commerce dated March 28, 2008.

*Summary* – This letter raises questions pertaining to the legitimacy of the proposed exemption and discusses why the exemption is ill-considered and contrary to public interest.

The letter indicates that the Congressional Research Service (CRS) uncovered that most of the 26 comments from State and local emergency response agencies that the EPA refers to as supporting the exemption as a part of their justification for the proposed rule are essentially duplicates of each other employing identical text. Even so, the number of those responses is too small to represent all of the local emergency planning commissions and State emergency response commissions. Many of the opposition letters from the State and local air pollution control agencies are largely going ignored by the EPA.

Several EPA reports have stated that ammonia exposure may lead to severe detrimental health effects including burns on the skin, eyes, throat and lungs. EPA scientists have also examined the possibility of acute detrimental health effects from exposure to hydrogen sulfide, downwind effect of which can have serious implications for the central nervous system. An expert panel reporting to Congress assessed the significant risks to human health and environment that industrial farms pose and called for higher levels of inquiry and scrutiny. Because the Clean Air Act does not have specific regulations in

place to control emissions of hydrogen sulfide from animal feeding operations (AFOs) and because ammonia is not a regulated pollutant, CERCLA and EPCRA are the only regulatory sources of information available to citizens and policy makers.

Given the EPA's appeal regarding the case of Association of Irritated Residents, et al vs. Environmental Protection Agency, 494 F. 3d 1027, it seems as though the appeal was just to provide temporary immunity to CAFOs until the EPA can issue a full exemption from the CERCLA and EPCRA requirements which were the subject of the initial agreement which sparked the law suit. The House of Representatives Committee on Energy and Commerce goes further to pose several questions directly to EPA.  Questions include those regarding the Agency's reasoning to exempt large CAFO instead of limiting the exemption to small family farms to address the burden reduction factor, regarding the publication date of EPA's methodology for AFO emission estimation and questions regarding whether emissions from CAFOs are within the typical background concentrations range.

Another document cited in this letter is a U.S. EPA memorandum reflecting a revision of a previous memo titled "Screening-level Acute Risk Estimates for Emissions of Hydrogen Sulfide and Ammonia from Hypothetical Feedlot Wastewater Treatment Lagoons." This memo provides analyses and methodology for estimating downwind pollution concentrations and evaluations of risk to human health.

*Relevance to Reporting Exemption* – Document cites reasons why the exemption is not in the public's best interest and does not represent the view of State and local emergency response commissions.

**Attachment 531.10**: Congressional Research Service Memorandum from Claudia Copeland to Richard Frandsen of the House Energy and Commerce Committee with subject line "Emergency Planning Committee Comments on 'Poultry Petition.'" January, 2008.

*Summary* – This memorandum summarizes the events leading up to EPA's proposed exemption of farms from reporting requirements under CERCLA and EPCRA and discloses requested information regarding the 26 comments from State emergency response commissions and local emergency planning commissions that the EPA claims to support the exemption.

The Congressional Research Service (CRS) states that the 26 comments referenced in the December *Federal Register* Notice were submitted by five state emergency response commissions or agencies (SERCs) and 21 local emergency planning commissions or committees (LEPCs).  The CRS also stated that the 26 comments represent only a small fraction of the 4,491 LEPCs and SERCs that are included in EPA's database.  The majority of the 26 comments (from 17 LEPCs and 1 SERC) are essentially identical letters.

*Relevance to Reporting Exemption* – The memo discloses information regarding comments that appear to be identical and express support for the proposed exemption.

**Attachment 531.11**: This document is not available in FDMS since it is a copyrighted publication and may not be reproduced without consent of the copyright holder. Therefore, no summary is provided.

**Attachment 531.12**: Comments from the Environmental Integrity Project in opposition to the poultry producers' petition ("Poultry Petition") for exemption from the reporting requirements under CERCLA and EPCRA. March, 2006.

*Summary* – This document urges EPA to reconsider the exemption because of detrimental human health impacts and the lack of, and need for, emission information and control. The document also urges the EPA to comply with the recommendations of the National Academy of Sciences, require poultry operations to reduce ammonia emissions and employ a mass balance approach to monitor AFO ammonia emissions via an aggressive field program.

The current livestock industry trend is fewer but bigger operations producing a large amount of waste. This results in a higher geographic concentration of waste which is detrimental to human health and the environment. Ammonia is a human toxin, the largest emitter of which is animal feeding operations. The document states that exposure to ammonia results in severe human health effects and many farms regularly report concentration far greater than those set as maximum by the National Institute of Occupational Safety and Health. Ammonia is not only harmful to humans but is also harmful to birds, surface water, and populations beyond the emitting farms via downwind deposition of volatilized ammonia. The American Public Health Association called for a moratorium on all new CAFOs until more data on public health is collected and uncertainties minimized.

The proposed exemption is at odds with the goals of EPCRA / CERCLA to provide information for the protection of people and the environment. The exemption would also go against several court decisions which upheld the reporting requirement for AFOs. Also, granting this exemption would be "reversing prior positions that [the EPA] has taken in enforcement cases." Retaining reporting requirements under EPCRA / CERCLA is imperative because they are "necessary complements to federal permitting statutes to address emissions of ammonia that would not otherwise be regulated."

The document states that EPA should adhere to the recommendations of the National Academy of Sciences (NAS) to decrease emissions immediately by either reducing the size of the operations or treating the air using washing walls or biofilters. Some other techniques recommended include diet manipulation and adding enzyme additives to litter.

The document states that reporting will not overburden the emergency response systems because the government retains the right to choose what reports to respond to, and thus does not have to respond to every report. Also reporting does not overburden the regulated community because CERCAL and EPCRA only require estimates of emissions. According to NAS, a mass balance approach can be employed to estimate ammonia emissions. The parameters of the calculation, such as purchased feed and nitrogen fertilizer, are readily available to all producers. Also, the reporting administrative burden is extremely low as only a phone call is required under EPCRA. The document also

states that this exemption greatly violates the community right to know about hazardous substances and hampers the EPA ability to gather pertinent data to protect its citizens.

*Relevance to Reporting Exemption* – Document discusses the reasons why the exemption threatens human health and hinders the government ability to protect its citizens.

**Attachment 531.13**: This document is not available in FDMS since it is a copyrighted publication and may not be reproduced without consent of the copyright holder. Therefore, no summary is provided.

**Attachment 531.14**: "National Emission Inventory - Ammonia Emissions from Animal Agricultural Operations Revised Draft Report", U.S. Environmental Protection Agency. April 22, 2005.

*Summary* - On January 30, 2004, EPA released draft estimates of ammonia emissions from U.S. animal agricultural operations for the years 2002, 2010, 2015, 2020, and 2030 (for inclusion in EPA's National Emissions Inventory (NEI)) and a draft report that described the data collected and literature reviewed to develop the inventory, explained the methodology to estimate ammonia emissions, summarized the results at the state level, and discussed the limitations associated with the data used. The draft report was revised based on comments the EPA received from interested parties in the public sector.

This report presents the revised [see next paragraph] ammonia emission estimates for beef, dairy, swine, poultry, sheep, goat, and horse operations. The revised annual ammonia emission estimates by animal group for each county in the United States can be obtained from EPA's national emissions inventory web site at http://www.epa.gov/ttn/chief/eiinformation.html.

*Relevance to Reporting Exemption* – Ammonia emissions are quantified in this document.

**Attachment 531.15**: "Non-Water Quality Impact Estimates for Animal Feeding Operations," U.S. EPA – Engineering and Analysis Division, Office of Water. December, 2002.

*Summary* – This report presents the methodology for and estimates of the non-water quality impact estimates (NWQI) for seven regulatory options that were considered for CAFOs, including beef feedlots, dairies, and heifer, veal, swine, broiler, layer, and turkey operations.  Impacts include:

- Air emissions from the animal production area, including animal housing and manure storage and treatment areas;

- Air emissions from the application of manure to land;

- Air emissions from vehicles, including those involved in the off-site transport of manure and in on-site composting operations; and

- Energy impacts from land application activities, the use of digesters, and the transportation of manure.

*Relevance to Reporting Exemption* – The document presents current estimated emissions levels which are useful in determining whether emissions should be reported.

---

**Attachment 531.16**: Renewal of Information Collection Request for the Continuous Release Reporting Requirement. Office of Management and Budget docket submission, October 1, 2004. SFUND-2000-0008.

*Summary* – This document addresses the reporting and recordkeeping requirements for the Continuous Release Reporting Requirement (CRRR). The document also provides estimates of the total number of facilities affected by the CRRR requirement as well as the costs associated with recordkeeping and information collection.

*Relevance to Reporting Exemption* – Unclear. The document provides discussion of information required by the CRRR and the cost of reporting this information.

---

**Attachment 531.17**: "White Paper Summaries", National Center for Manure and Animal Waste Management – USDA Fund for Rural America Grant. December 11, 2001.

*Summary* – Document consists of summaries of 20 white papers written to update the state of scientific knowledge concerning developing priority areas for animal production and waste management.

*Relevance to Reporting Exemption* – Papers describe the state of scientific knowledge in the emerging areas of manure management.

---

**Attachment 531.18**: This document is not available in FDMS since it is a copyrighted publication and may not be reproduced without consent of the copyright holder. Therefore, no summary is provided.

---

**Attachment 531.19**: Toxicological Profile for Hydrogen Sulfide. Department of Health and Human Services, Agency for Toxic Substances & Disease Registry. July, 2006. (Citation obtained through internet search.)

*Summary* – This chapter provides public health officials, physicians, toxicologists, and other interested individuals and groups with an overall perspective on the toxicology of hydrogen sulfide. It contains descriptions and evaluations of toxicological studies and epidemiological investigations and provides conclusions, where possible, on the relevance of toxicity and toxicokinetic data to public health.

*Relevance to Reporting Exemption* – This profile summarizes toxicological evidence for hydrogen sulfide, a gas associated with CAFOs.

**Attachment 531.20**: This document is not available in FDMS since it is a copyrighted publication and may not be reproduced without consent of the copyright holder. Therefore, no summary is provided.

# Exhibit 7

**NOT YET SCHEDULED FOR ORAL ARGUMENT**

Nos. 09-1017 & 09-1104 (Consolidated)

―――――――――――――

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――――

WATERKEEPER ALLIANCE, SIERRA CLUB, THE HUMANE SOCIETY OF
THE UNITED STATES, ENVIRONMENTAL INTEGRITY PROJECT,
THE CENTER FOR FOOD SAFETY, AND CITIZENS FOR
PENNSYLVANIA'S FUTURE,

Petitioners,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

―――――――――――

On Petitions for Review of Final Regulation Issued by the U.S. Environmental
Protection Agency

―――――――――――

**FINAL BRIEF OF RESPONDENT**

―――――――――――

JOHN C. CRUDEN
*Assistant Attorney General*

*Of Counsel:*

ERIK SWENSON
  *Office of the General Counsel*
  *U.S. Environmental Protection Agency*
  *Washington, D.C.*

ERICA M. ZILIOLI
JONATHAN SKINNER-THOMPSON
  *Attorneys, Environmental Defense Section*
  *Environment and Natural Resources Div.*
  *U.S. Department of Justice*
  *P.O. Box 7611*
  *Washington, D.C. 20044*
  *(202) 514-6390*
  *Erica.Zilioli@usdoj.gov*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.   Parties and Amici Curiae.**

**1.   Petition No. 09-1017.**

The Petitioners in lead petition No. 09-1017 are Waterkeeper Alliance, Sierra Club, the Humane Society of the United States, Environmental Integrity Project, the Center for Food Safety, and Citizens for Pennsylvania's Future (collectively, "Waterkeeper"). The Respondent is the United States Environmental Protection Agency ("EPA" or "Agency"). Intervenors in support of EPA include the National Chicken Council, National Turkey Federation, and United States Poultry and Egg Association. The National Pork Producers Council has also moved to intervene in support of EPA; its motion remains pending as of the filing of this brief. The American Lung Association and American Thoracic Society are participating as Amici Curiae in support of Waterkeeper.

**2.   Petition No. 09-1104.**

The Petitioner in consolidated petition No. 09-1104 is the National Pork Producers Council ("Pork Producers"). The Respondent is EPA. Intervenors in support of EPA include Waterkeeper Alliance, Sierra Club, the Humane Society of the United States, the Center for Food Safety, and Citizens for Pennsylvania's Future.

The United States Poultry and Egg Association has also moved to intervene in support of Pork Producers; its motion remains pending as of the filing of this brief.

### B.    Rulings Under Review.

The petitions for review challenge the final regulation issued by EPA entitled "CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms," 73 Fed. Reg. 76,948-60 (Dec. 18, 2008) (JA 1-13).

### C.    Related Cases.

There are no active related cases besides these consolidated petitions for review.

/s/ *Erica M. Zilioli*
ERICA M. ZILIOLI

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ............................ i

Table of Contents ................................................................................ iii

Table of Authorities ............................................................................ vi

Glossary .............................................................................................. xiv

Statement of Jurisdiction ...................................................................... 1

Statement of the Issues ......................................................................... 2

Pertinent Statutes and Regulations ...................................................... 4

Statement of the Case ........................................................................... 4

    A.    Statutory and Regulatory Background ................................. 4

        1.    CERCLA Release Reporting Framework ...................... 5

        2.    EPCRA Release Reporting Framework. ....................... 6

        3.    Reporting Exemptions ................................................. 7

    B.    Factual Background. ............................................................ 12

        1.    Air Emissions from Animal Waste at Farms. ............. 12

        2.    Measuring Air Emissions from Animal Waste. ........... 12

        3.    The Poultry Petition. .................................................. 14

        4.    The Reporting Exemption Rule. ................................. 16

Summary of Argument .......................................................................... 20

Standard of Review .............................................................................. 21

Argument .............................................................................................. 23

I.      Waterkeeper Lacks Standing to Challenge the Rule's CERCLA
        Provisions. .................................................................................... 23

II.     Jurisdiction over the Petitions for Review of the Reporting
        Exemption Rule's EPCRA Provisions Turns on Whether
        Waterkeeper Has Standing to Challenge the Rule's CERCLA
        Provisions. .................................................................................... 28

        A.      Dismissing Waterkeeper's Challenge to the Rule's
                CERCLA Provisions for Lack of Standing Deprives This
                Court of Independent Jurisdiction over the Petitions for
                Review of the Rule's EPCRA Provisions. ...................................... 28

        B.      In the Alternative, if Waterkeeper Has Standing to
                Challenge the Rule's CERCLA Provisions, This Court
                Should Exercise Supplemental Jurisdiction to Review the
                Rule's EPCRA Provisions. .................................................................. 29

III.    The Reporting Exemption Rule Is Entitled to Deference and Is
        Reasonable. .................................................................................... 30

        A.      The Statutory Language Is Ambiguous Because CERCLA
                and EPCRA Exempt Certain Releases and Give EPA
                Broad Authority to Regulate the Release Reporting
                Requirements. ...................................................................................... 31

                1.      The Text and Structure of CERCLA and EPCRA
                        Leave Room for EPA's Interpretation. ............................... 32

                2.      The Purpose and Legislative History of the
                        CERCLA and EPCRA Reporting Requirements
                        Support EPA's Interpretation. ............................................. 36

        B.      EPA's Interpretation of the Ambiguous Statutes Is
                Permissible and Reasonable. ............................................................ 40

                1.      The Rule Deserves Particular Deference Because It
                        Falls Within EPA's Areas of Expertise. ............................. 40

2.    EPA Has Consistently Considered Exemptions from Reporting Requirements for Releases Where a Government Response Is Unlikely. .................................... 41

3.    The Rule Reduces the Administrative Burden on Federal, State, and Local Response Agencies as Well as Covered Farms. .................................................. 48

4.    The Rule Is Narrowly Crafted and Protective of Human Health and the Environment. ................................. 49

C.    EPA Properly Considered the Public's Desire to Access Information About Releases from the Largest Farms when the Agency Excluded Those Farms from the Rule's EPCRA Provisions. .......................................................... 53

1.    Public Access to Information About Releases Is a Secondary Purpose of the EPCRA Reporting Requirement. .......................................................... 53

2.    The Costs and Burdens Imposed by the Rule Are Minimal. ................................................................. 56

Conclusion ................................................................................ 57

# TABLE OF AUTHORITIES

## Cases

* *Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Entm't, Inc.*,
659 F.3d 13 (D.C. Cir. 2011).................................................................23, 26

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*,
724 F.3d 243 (D.C. Cir. 2013)................................................................21, 22

*Andrus v. Glover Constr. Co.*,
446 U.S. 608 (1980) ....................................................................................35

*Ass'n of Irritated Residents v. EPA*,
494 F.3d 1027 (D.C. Cir. 2007)...................................................................32

*Barrick Goldstrike Mines, Inc. v. Browner*,
215 F.3d 45 (D.C. Cir. 2000)....................................................................1, 28

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Brock*,
838 F.2d 1258 (D.C. Cir. 1988).................................................................22, 40

*Chadmoore Commc'ns, Inc. v. Fed. Commc'ns Comm'n*,
113 F.3d 235 (D.C. Cir. 1997).....................................................................51

* *Chevron, U.S.A., Inc. v. NRDC, Inc.*,
467 U.S. 837 (1984) .................................................................................22, 31

*City of Arlington v. Fed. Commc'ns Comm'n*,
__ U.S. __, 133 S. Ct. 1863 (2013) ...........................................................31

*City of Las Vegas v. Lujan*,
891 F.2d 927 (D.C. Cir. 1989)......................................................................52

*Fed. Election Comm'n v. Akins*,
524 U.S. 11 (1998) ....................................................................................25, 26

*Fertilizer Inst. v. EPA*,
935 F.2d 1303 (D.C. Cir. 1991)................................................................45, 52

*Authorities upon which we chiefly rely are marked with asterisks.

*Gilda Marx, Inc. v. Wildwood Exercise, Inc.,*
    85 F.3d 675 (D.C. Cir. 1996)................................................ 28

*Hercules Inc. v. EPA,*
    938 F.2d 276 (D.C. Cir. 1991)............................................. 39

*Int'l Bhd. of Teamsters v. Pena,*
    17 F.3d 1478 (D.C. Cir. 1994)............................................. 30

*King v. St. Vincent's Hosp.,*
    502 U.S. 215 (1991)........................................................ 33

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)........................................................ 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)......................................................... 21

*Mourning v. Family Publ'ns Serv., Inc.,*
    411 U.S. 356 (1973)........................................................ 35

*Nat. Resources Def. Council v. EPA,*
    489 F.3d 1250 (D.C. Cir. 2007)........................................... 36

*Nat. Resources Def. Council v. EPA,*
    489 F.3d 1364 (D.C. Cir. 2007)........................................... 38

*Nat'l Ass'n of Mfrs. v. Taylor,*
    582 F.3d 1 (D.C. Cir. 2009)............................................... 56

* *New York v. EPA,*
    443 F.3d 880 (D.C. Cir. 2006)........................................ 32, 38

*Petroleum Commc'ns, Inc. v. Fed. Commc'ns Comm'n,*
    22 F.3d 1164 (D.C. Cir. 1994)............................................ 51

*Ragsdale v. Wolverine World Wide, Inc.,*
    535 U.S. 81 (2002)......................................................... 35

*Ratzlaf v. United States,*
    510 U.S. 135 (1994)........................................................ 56

*Ruud v. Dep't of Labor*,
   347 F.3d 1086 (9th Cir. 2003) ................................................................. 29

\* *Shell Oil Co. v. Fed. Energy Regulatory Comm'n*,
   47 F.3d 1186 (D.C. Cir. 1995) ................................................... 1, 29, 30

*Sierra Club v. EPA*,
   129 F.3d 137 (D.C. Cir. 1997) .............................................................. 38

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir. 2002) .............................................................. 23

*Sierra Club v. EPA*,
   992 F.2d 337 (D.C. Cir. 1993) .............................................................. 39

*Sierra Club, Inc. v. Tyson Foods, Inc.*,
   299 F. Supp. 2d 693 (W.D. Ky. 2003) ..................................... 5, 25, 46

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) .................................................................................. 4

*Suburban O'Hare Comm'n v. Dole*,
   787 F.2d 186 (7th Cir. 1986) ................................................................ 30

*Swint v. Chambers Cnty. Comm'n*,
   514 U.S. 35 (1995) ................................................................................ 28

*Thomas Jefferson Univ. v. Shalala*,
   512 U.S. 504 (1994) .............................................................................. 41

*Van Hollen, Jr. v. Fed. Election Comm'n*,
   __ F.3d __, 2016 WL 278200 (D.C. Cir. Jan. 21, 2016) ..................... 22

## **Rules**

D.C. Cir. R. 15(c)(2) ..................................................................................... 23

D.C. Cir. R. 28(a)(7) .................................................................................... 23

## Statutes

5 U.S.C. § 706(2) .................................................................. 21

7 U.S.C. §§ 136-136y ........................................................... 7

15 U.S.C. § 2606 ................................................................. 6

26 U.S.C. § 4662(b)(2)(A) ..................................................... 38

28 U.S.C. § 1331 ............................................................ 1, 28

33 U.S.C. § 1317 ................................................................. 5

33 U.S.C. § 1321(b)(2)(A) ...................................................... 5

42 U.S.C. § 6921 ............................................................. 5, 8

42 U.S.C. § 7412 ................................................................. 5

42 U.S.C. § 9601-75 ............................................................. 4

42 U.S.C. § 9601(14) ................................................... 5, 9, 40, 42

42 U.S.C. § 9601(22) .................................................. 5, 6, 8, 33

42 U.S.C. § 9601(22)(D) ..................................................... 13, 38

42 U.S.C. § 9602 ......................................................... 5, 40, 47

42 U.S.C. § 9602(a) ........................................................ 8, 9, 34

42 U.S.C. § 9602(b) ............................................................. 9

42 U.S.C. § 9603 ........................... 2, 8, 16, 23, 24, 26, 27, 40, 43, 53

42 U.S.C. § 9603(a) ....................... 4, 5, 6, 8, 24, 31, 32, 49

42 U.S.C. § 9603(c) ............................................................. 8

42 U.S.C. § 9603(d) ............................................................. 8

42 U.S.C. § 9603(e) ................................................................................................ 8, 33

42 U.S.C. § 9603(f)(1) ................................................................................................ 33

42 U.S.C. § 9603(f)(2) ........................................................................................ 8, 11, 33

42 U.S.C. § 9604 ................................................................................................ 4

42 U.S.C. § 9604(a) ................................................................................................ 6

42 U.S.C. § 9611(g) ................................................................................................ 26

42 U.S.C. § 9613(a) ................................................................................................ 1, 28

42 U.S.C. § 9615 ................................................................................................ 8, 33, 34, 35

42 U.S.C. § 11001 ................................................................................................ 4

42 U.S.C. § 11001-50 ................................................................................................ 4

42 U.S.C. § 11002 ................................................................................................ 6, 40

42 U.S.C. § 11002(a) ................................................................................................ 9, 34

42 U.S.C. § 11003 ................................................................................................ 4

42 U.S.C. § 11004 ........................................................................ 8, 16, 36, 40, 43, 54, 55, 56, 57

42 U.S.C. § 11004(a) ................................................................................ 4, 6, 31, 32, 49

42 U.S.C. § 11004(a)(1) ................................................................................................ 6, 11

42 U.S.C. § 11004(a)(2) ................................................................................................ 7, 8, 9, 40

42 U.S.C. § 11004(a)(2)(B) ................................................................................................ 9

42 U.S.C. § 11004(a)(2)(C) ................................................................................................ 34

42 U.S.C. § 11004(a)(3) ................................................................................................ 7, 40

42 U.S.C. § 11004(a)(4) ................................................................. 8, 33

42 U.S.C. § 11004(b) .......................................................................... 54

42 U.S.C. § 11004(b)(1) ........................................................................ 7

42 U.S.C. § 11004(b)(2) ........................................................................ 7

42 U.S.C. § 11004(c) ................................................................ 7, 54, 55

42 U.S.C. § 11005 ................................................................................. 4

42 U.S.C. § 11021(a)(1), (e)(5) ........................................................... 38

42 U.S.C. § 11023 .............................................................................. 55

42 U.S.C. § 11044 ................................................................... 7, 17, 54

42 U.S.C. § 11044(a) ................................................................ 54, 55, 56

42 U.S.C. § 11048 .......................................................... 8, 33, 34, 35

42 U.S.C. § 11049(3) ........................................................................... 6

42 U.S.C. § 11049(8) ........................................................................... 6

## **Code of Federal Regulations**

40 C.F.R. § 300.125 ...................................................................... 24, 27

40 C.F.R. § 300.130(c) ........................................................................ 27

40 C.F.R. § 300.155(a) ........................................................................ 26

40 C.F.R. pt. 302 ................................................................................. 1

40 C.F.R. § 302.3 ........................................................................ 17, 30

40 C.F.R. § 302.4(a) & Table 302.4 ............................................... 11, 12

40 C.F.R. § 302.6 .................................................................................... 9

40 C.F.R. § 302.6(a) ....................................................................... 6, 24, 27

40 C.F.R. § 302.6(c)(1) .......................................................................... 10

40 C.F.R. § 302.6(c)(2) .......................................................................... 10

40 C.F.R. § 302.6(c)(3) .......................................................................... 10

40 C.F.R. § 302.6(c)(4) .......................................................................... 10

40 C.F.R. § 302.6(d) ........................................................................ 11, 42

40 C.F.R. § 302.6(e)(1)-(2) ..................................................................... 10

40 C.F.R. § 302.6(e)(3) .......................................................................... 17

40 C.F.R. pt. 355 ..................................................................................... 1

40 C.F.R. pt. 355, App. A ....................................................................... 12

40 C.F.R. § 355.31 ................................................................................... 9

40 C.F.R. § 355.31(c) ............................................................................. 10

40 C.F.R. § 355.31(e)(1) ......................................................................... 10

40 C.F.R. § 355.31(e)(2) ......................................................................... 10

40 C.F.R. § 355.31(e)(3) ......................................................................... 10

40 C.F.R. § 355.31(e)(4) ......................................................................... 10

40 C.F.R. § 355.31(f) ............................................................................. 10

40 C.F.R. § 355.31(g)-(h) ....................................................................... 17

40 C.F.R. § 355.32 .......................................................................... 11, 56

40 C.F.R. § 355.61 .......................................................................... 17, 30

## **Federal Registers**

50 Fed. Reg. 13,456 (Apr. 4, 1985).................................................... 5, 11, 26, 41, 42, 47, 38

54 Fed. Reg. 22,524 (May 24, 1989) ................................................................... 43, 45

55 Fed. Reg. 8666 (Mar. 8, 1990)............................................................................. 24

55 Fed. Reg. 30,166 (July 24, 1990) ......................................................................... 43

63 Fed. Reg. 13,460 (Mar. 19, 1998)...............................................................11, 43, 45

70 Fed. Reg. 76,452 (Dec. 27, 2005) ........................................................................ 14

71 Fed. Reg. 58,525 (Oct. 4, 2006).................................................................... 11, 43

72 Fed. Reg. 73,700 (Dec. 28, 2007) ............................................................ 15, 16, 51, 52

73 Fed. Reg. 76,948 (Dec. 18, 2008). ..................... 1, 8, 12, 14, 16, 17, 19, 30, 37, 39, 41,
                                        44, 48, 49, 50, 51, 54, 55, 56

## **Legislative History**

H.R. Conf. Rep. No. 99-962 (1986) ........................................................................ 55

S. Rep. No. 96-848 (1980) ........................................................................36, 37, 48

## GLOSSARY

| | |
|---|---|
| AFOs | Animal Feeding Operations |
| Agency | United States Environmental Protection Agency |
| CAFOs | Concentrated Animal Feeding Operations |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| EPA | United States Environmental Protection Agency |
| EPCRA | Emergency Planning and Community Right-to-Know Act |
| Pork Producers | National Pork Producers Council |
| Proposed Rule | CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste, Proposed Rule, 72 Fed. Reg. 73,700-08 (Dec. 28, 2007) |
| Reporting Exemption Rule | CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms," 73 Fed. Reg. 76,948-60 (Dec. 18, 2008) |
| Rule | CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms," 73 Fed. Reg. 76,948-60 (Dec. 18, 2008) |
| Waterkeeper | Waterkeeper Alliance, Sierra Club, the Humane Society of the United States, the Center for Food Safety, and Citizens for Pennsylvania's Future |

## STATEMENT OF JURISDICTION

Petitioners Waterkeeper and Pork Producers seek review of the final rule adopted by EPA entitled "CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms," 73 Fed. Reg. 76,948 (Dec. 18, 2008) ("Reporting Exemption Rule" or "Rule") (codified at 40 C.F.R. Parts 302 and 355). Waterkeeper opposes the entire Reporting Exemption Rule; Pork Producers challenge only the Emergency Planning and Community Right-to-Know Act ("EPCRA") provisions.

This Court has exclusive jurisdiction to review the Rule's Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") provisions under 42 U.S.C. § 9613(a). EPCRA regulations, in contrast, are normally first reviewed in district court in accordance with the Administrative Procedure Act and 28 U.S.C. § 1331. *Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 47 (D.C. Cir. 2000). But assuming Waterkeeper's challenge to the Rule's CERCLA provisions is properly before this Court, this Court should exercise supplemental jurisdiction over the Rule's EPCRA provisions and review the Rule as a whole. *See, e.g.*, *Shell Oil Co. v. Fed. Energy Regulatory Comm'n*, 47 F.3d 1186, 1195 (D.C. Cir. 1995).

Waterkeeper, however, cannot establish standing to challenge the Rule's CERCLA provisions.[1]  This results in solely an EPCRA challenge, which must be brought in district court.  Thus, Waterkeeper's CERCLA challenge should be dismissed for lack of standing and both Petitioners' challenges to the Rule's EPCRA provisions should be dismissed or transferred to an appropriate district court.[2]

## STATEMENT OF THE ISSUES

1.  Does Waterkeeper lack standing to challenge the CERCLA provisions of the Reporting Exemption Rule where the statute does not provide any legal right to access reports made under CERCLA section 103, 42 U.S.C. § 9603?

2.  This Court has exclusive jurisdiction over challenges to the Rule's CERCLA provisions, whereas EPCRA regulations are normally first reviewed in district court.  In light of this fact: if the Court finds Waterkeeper has standing to raise its CERCLA claim, should it also exercise supplemental jurisdiction over the Rule's EPCRA provisions, which were developed from a single administrative record as part of the joint CERCLA/EPCRA

---

[1] EPA does not dispute Petitioners' standing with respect to the Rule's EPCRA provisions.

[2] As Pork Producers note, an EPCRA challenge was filed in the U.S. District Court for the Western District of Wisconsin but was administratively closed "subject to immediate reopening if the court of appeals declines to exercise jurisdiction over [Pork Producers' Petition for Review]."  Opinion and Order, *Nat'l Pork Producers Council v. Jackson*, No. 09-cv-73, at 8 (W.D. Wis. Jul. 23, 2009).  EPA takes no position on proper venue.

rulemaking; or, alternatively, if the Court finds Waterkeeper does not have standing to raise its CERCLA claim, should it also dismiss or transfer to district court Waterkeeper and Pork Producers' EPCRA claims?

3. CERCLA only requires releases of hazardous substances into the air to be reported to EPA, not to the public, for the purpose of allowing EPA to determine whether a response action is warranted. Did EPA therefore act reasonably when it exempted farms from reporting under CERCLA releases of hazardous substances into the air from animal waste in order to reduce the administrative burden on regulated entities and federal authorities where the Agency reasonably determined that it is not likely to respond to such releases?

4. Did EPA act reasonably when it exempted all but the largest farms from reporting under EPCRA releases of extremely hazardous substances into the air from animal waste in order to reduce the administrative burden on regulated entities and State and local response agencies where EPA reasonably determined that the agencies are not likely to respond to such releases?

5. Did EPA act reasonably when it decided not to exempt the largest farms from the EPCRA provisions of the Rule where the public had requested access to information about releases from large farms and EPCRA provides that reports of such releases be made publicly available?

3

## PERTINENT STATUTES AND REGULATIONS

Except for the materials reproduced in the Addendum to this brief, all other pertinent statutes and regulatory materials are contained in Waterkeeper's Addendum filed on December 7, 2015, Case No. 09-1017, Doc. 1587300, and Pork Producers' Statutory and Regulatory Addendum filed on December 7, 2015, Case No. 09-1104, Doc. 1587275.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background.

The Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601-75, created broad federal authority to respond to releases or threats of releases of hazardous substances in order to protect public health, welfare, and the environment.  *See, e.g.,* 42 U.S.C. § 9604.  The Emergency Planning and Community Right-to-Know Act, 42 U.S.C. §§ 11001-50, "establishes a framework of state, regional, and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of health-threatening release."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 86 (1998); *see also* 42 U.S.C. §§ 11001, 11003, 11005.

Facilities are required to report—to federal authorities under CERCLA and to state and local authorities under EPCRA—releases of hazardous substances when they exceed certain thresholds established by EPA.  42 U.S.C. §§ 9603(a), 11004(a).  "The reportable quantities do not themselves represent any determination that

releases of a particular quantity are actually harmful to public health or welfare or the environment."  Notification Requirements; Reportable Quantity Adjustments, 50 Fed. Reg. 13,456, 13,459 (Apr. 4, 1985).  Rather, the central purpose of the reporting requirements is to provide immediate notice of releases of hazardous substances that *may* affect public health so that both federal and local government agencies may assess whether actions need to be taken to address such releases.  *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693, 701 (W.D. Ky. 2003).

### 1.    CERCLA Release Reporting Framework.

Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), generally provides that any person in charge of a vessel or facility must immediately notify the National Response Center of a "release"[3] of a "hazardous substance"[4] over a certain threshold amount

---

[3] A "release" is defined as:

> any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . . .

42 U.S.C. § 9601(22).

[4] Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), defines "hazardous substance" broadly to include: (1) any substance designated by EPA as hazardous under section 311(b)(2)(A) of the Clean Water Act, 33 U.S.C. § 1321(b)(2)(A); (2) any substance designated by EPA as hazardous under section 102 of CERCLA, 42 U.S.C. § 9602; (3) any hazardous waste having characteristics identified under section 3001 of the Solid Waste Disposal Ac, 42 U.S.C. § 6921; (4) any toxic pollutant listed under section 307 of the Clean Water Act, 33 U.S.C. § 1317; (5) any hazardous air pollutant listed under section 112 of the Clean Air Act, 42 U.S.C. § 7412; and (6) any "imminently

*Cont.*

known as a reportable quantity. *See also* 40 C.F.R. § 302.6(a). The National Response Center is then tasked with conveying the notification "expeditiously" to "all appropriate Government agencies, including the Governor of any affected State." 42 U.S.C. § 9603(a). EPA or another appropriate federal agency with delegated authority from the President must decide whether and how to respond to the release. *Id.* § 9604(a). CERCLA does not require that these notifications be made available to anyone else.

## 2.    EPCRA Release Reporting Framework.

Section 304 of EPCRA, 42 U.S.C. § 11004(a), requires owners or operators of facilities to report releases under three circumstances. First, owners or operators of facilities where a hazardous chemical is produced, used, or stored must provide immediate notice of a "release"[5] of an "extremely hazardous substance"[6] that would require notification under CERCLA. *Id.* § 11004(a)(1). Second, a release of an extremely hazardous substance that would not require notification under CERCLA must be reported, but only if the release is not a federally permitted release and is in an amount and manner that EPA has determined requires notification. *Id.* §

---

hazardous chemical substance or mixture with respect to which [EPA] has taken action" pursuant to section 7 of the Toxic Substances Control Act, 15 U.S.C. § 2606.

[5] Under EPCRA, "release" is defined nearly the same as under CERCLA. *Compare* 42 U.S.C. § 11049(8), *with* 42 U.S.C. § 9601(22).

[6] "Extremely hazardous substances" are defined as substances so designated by EPA pursuant to section 302 of EPCRA, 42 U.S.C. § 11002. *See* 42 U.S.C. § 11049(3).

11004(a)(2). Third, releases of substances that are not extremely hazardous

substances must be reported if such releases require notification under CERCLA. *Id.*

§ 11004(a)(3).

The initial notice is to be made by telephone, radio, or in person to (1) the

community emergency coordinator for the local emergency planning committee of

any area likely to be affected by the release, and (2) the state emergency planning

commission for any state likely to be affected. *Id.* § 11004(b)(1). The notice should

include information about the release, such as the hazardous substance(s) involved,

the nature, quantity, and duration of the release, and the medium into which the

release occurred. *Id.* § 11004(b)(2).

As soon as practicable after a release, the owner or operator must submit a

"written followup emergency notice" providing more detailed and updated

information on the release. *Id.* § 11004(c). These written followup emergency notices

are to be made available to the public at locations designated by local authorities. *Id.*

§ 11044.

### 3.    Reporting Exemptions.

Both CERCLA and EPCRA exempt certain releases from the above reporting

requirements. For example, under CERCLA, releases from the application, handling,

or storage of pesticide products registered under the Federal Insecticide, Fungicide,

and Rodenticide Act, 7 U.S.C. §§ 136-136y, are exempt from the release reporting

requirements.  42 U.S.C. § 9603(e).[7]  Also exempt are federally permitted releases, i.e.,

releases authorized under an applicable federal environmental statute, *id.* § 9603(a),

and releases that, pursuant to Subtitle C of the Solid Waste Disposal Act, 42 U.S.C. §§

6921-6932, are already reported to the National Response Center, *id.* § 9603(f)(1).

Releases that are continuous in nature and stable in quantity and rate ("continuous

releases") are subject to reduced CERCLA reporting requirements in that such

releases need not be reported after each occurrence but rather only initially, on an

annual basis, and whenever the releases change.  *Id.* § 9603(f)(2).  And the CERCLA

definition of "release" itself excludes certain activities, including certain engines'

exhaust emissions, certain releases of nuclear material, and the "normal application of

fertilizer."  *Id.* § 9601(22).  Releases exempt from the EPCRA reporting requirements

include certain federally permitted releases and releases that result in exposure only to

persons within a facility.  *Id.* § 11004(a)(2), (a)(4).

Both CERCLA and EPCRA authorize EPA, where appropriate, to grant

additional exemptions to the reporting requirements for certain types of releases.  42

U.S.C. §§ 9602(a), 9615, 11004, 11048.  *See also* 73 Fed. Reg. at 76,949-50 (JA 2-3).

Section 115 of CERCLA, 42 U.S.C. § 9615, and section 328 of EPCRA, 42 U.S.C. §

11048, give EPA broad authority to promulgate any regulations that may be

---

[7] Registered pesticide products are exempt from *all* of the requirements of 42 U.S.C. §
9603, including the requirement to notify EPA of the existence of a facility that has
stored, treated, or disposed of hazardous substances, *id.* § 9603(c), and the
recordkeeping requirement, *id.* § 9603(d).

"necessary to carry out" the two statutory schemes.  The statutes also give EPA specific authority to determine which substances and quantities will be subject to the reporting requirements.  For example, under CERCLA, EPA has discretion to promulgate regulations designating additional substances as "hazardous substances" and establishing reportable quantities for hazardous substances—including the discretion to determine whether "one single quantity shall be the reportable quantity for any hazardous substance, regardless of the medium into which the hazardous substance is released." *Id.* § 9602(a).[8]  Likewise, EPA has discretion under EPCRA to promulgate regulations designating substances as "extremely hazardous substances" and establishing reportable quantities for each substance.  *Id.* §§ 11002(a), 11004(a)(2).  Under both statutes, Congress set the reportable quantity at one pound until EPA established the amount for each substance.  *Id.* §§ 9602(b), 11004(a)(2)(B).

Regulations promulgated by EPA exempting certain releases from the CERCLA reporting requirements are set forth at 40 C.F.R. § 302.6.  The EPCRA reporting exemption regulations are set forth at 40 C.F.R. § 355.31.  Releases that EPA has exempted from both statutes' reporting requirements include:

---

[8] Because the definition of "hazardous substance" cross-references substances of concern designated by EPA under other environmental statutes, Congress indirectly gave EPA additional discretion to determine the scope of substances subject to reporting requirements under CERCLA.  *See* 42 U.S.C. § 9601(14).

- Naturally occurring releases of radionuclides from the soil in "land holdings" such as parks, golf courses, and other large tracts of land (40 C.F.R. §§ 302.6(c)(1), 355.31(e)(1));

- Naturally occurring releases of radionuclides from "land disturbance activities," including farming, construction and certain land disturbance incidental to extraction during mining activities (*Id.* §§ 302.6(c)(2), 355.31(e)(2));

- Releases of radionuclides from the dumping and transportation of coal and coal ash (*Id.* §§ 302.6(c)(3), 355.31(e)(3));

- Releases of radionuclides from coal and coal ash piles, including fly ash, bottom ash, and boiler slags (*Id.* §§ 302.6(c)(4), 355.31(e)(4)); and

- Releases of less than 1000 pounds per 24 hours of nitrogen oxide or nitrogen dioxide to the air resulting from combustion related activities (*Id.* §§ 302.6(e)(1)-(2), 355.31(f)).

EPA also extended by regulation the CERCLA statutory exemption for releases from pesticide products to the ECPRA reporting requirements. *Id.* § 355.31(c).

Finally, EPA exempted from the CERCLA reporting requirements releases of reportable quantities of solid particles of antimony, arsenic, beryllium, cadmium, chromium, copper, lead, nickel, selenium, silver, thallium, and zinc where the average

diameter of the particles released is larger than 100 micrometers. *Id.* § 302.6(d).[9]  To the extent EPCRA section 304(a)(1), 42 U.S.C. § 11004(a)(1), requires reporting of releases that must be reported under CERLCA, the exemption for releases of large particles of heavy metals would extend to EPCRA.

In addition to granting these regulatory exemptions, EPA further lessened the reporting burden for continuous releases by extending the continuous release notification framework set forth in section 103(f)(2) of CERCLA, 42 U.S.C. § 9603(f)(2), to EPCRA notifications.  *See* 40 C.F.R. § 355.32.

Exemptions and reduced reporting burdens granted under these statutes apply only to the reporting of releases under specific statutory provisions and do not alleviate the obligation to report releases of hazardous substances or make other notifications under other provisions of these or other laws.  *See, e.g.*, Administrative Reporting Exemptions for Certain Radionuclide Releases, 63 Fed. Reg. 13,460, 13,462 (Mar. 19, 1998) (JA 124); Administrative Reporting Exemption for Certain Air Releases of $NO_X$ (NO and $NO_2$), 71 Fed. Reg. 58,525, 58,527 (Oct. 4, 2006) (JA 331).

---

[9] Releases of certain additional hazardous substances do not require reports because EPA determined that setting a reportable quantity would be impractical.  *See* 40 C.F.R. § 302.4(a) & Table 302.4 (substances designated with two asterisks have no reportable quantity); *see also* 50 Fed. Reg. at 13,461 (explaining why establishing a single reportable quantity for an entire class of compounds collectively considered a hazardous substance would be inappropriate).

### B.    Factual Background.

#### 1.    Air Emissions from Animal Waste at Farms.

When waste generated by animals at farms[10] breaks down, it may emit

pollutants into the air.  National Research Council of the National Academies, *Air*

*Emissions from Feeding Operations: Current Knowledge, Future Needs* 50-55 (The National

Academies Press, 2003) ("National Academies Report") (JA 731-36).  The most

recognized pollutants are ammonia, a by-product of the breakdown of urea and

proteins in animal waste, and hydrogen sulfide, a by-product of the breakdown of

animal waste under anaerobic conditions.  73 Fed. Reg. at 76,950 (JA 3).  If released in

sufficient quantities, these substances could trigger reporting requirements under

CERCLA and EPCRA.  Ammonia and hydrogen sulfide are considered "hazardous

substances" under CERCLA and "extremely hazardous substances" under EPCRA,

and a release of either of these substances of 100 pounds or more in a 24-hour period

generally must be reported.  40 C.F.R. § 302.4(a) & Table 302.4; 40 C.F.R. pt. 355

App. A.

#### 2.    Measuring Air Emissions from Animal Waste.

Although animal waste at farms is a known (and generally ongoing) source of

emissions of ammonia and hydrogen sulfide, measuring these emissions accurately is

---

[10] For purposes of this brief, the term "farm" includes animal feeding operations (or "AFOs") and concentrated animal feeding operations (or "CAFOs"), as those terms are used in the administrative record and other court filings.

difficult, in large part because animal waste is often located in open or spacious areas where emissions are generated and disperse unevenly (e.g., wastewater lagoons, animal feedlots, etc.[11]), as opposed to emissions released through a discrete pipe or opening. National Academies Report at 74-75 (JA 755-56).  Moreover, differences in climatic conditions, configuration of farms, type of feed, operating methods, and other variables tend to make estimating emissions across geographic regions and across animal species difficult and possibly unreliable.  *Id.* at 2, 96-97 (JA 719, 777-78).

At the joint request of EPA and the U.S. Department of Agriculture, the National Academies Board on Agriculture and Natural Resources appointed a committee to review and evaluate the scientific basis for estimating emissions of various air pollutants from such sources.  *Id.* at 1-2 (JA 718-19).  The resulting February 2003 National Academies Report concluded that existing methodologies for estimating air emissions from farms are generally inadequate because of the limited data on which they are based.  *Id.* at 2, 99-101 (JA 719, 780-82).  The National Academies Report recommended that standardized, scientifically sound, and practical protocols for measuring air emissions from animal feeding operations should be developed.  *Id.* at 7-8 (JA 724-25).

---

[11] Emissions from manure spread across fields as fertilizer are also challenging to estimate.  *See* National Academies Report at 75.  However, animal waste used intentionally as fertilizer is not considered a "release" under CERCLA and thus would not trigger the reporting requirements.  *See* 42 U.S.C. § 9601(22)(D); EPA, Resp. to Comments Doc. 7, 15 (Dec. 12, 2008) ("Resp. to Comments") (JA 606, 614).

In order to implement the National Academies Report's recommendations, EPA commissioned a National Air Emissions Monitoring Study in 2005 as part of a consent agreement with participating farms. 73 Fed. Reg. at 76,951 (JA 4). The study involved monitoring a sample of representative farms for at least two years to collect emissions data across all seasons and periodic changes in operations (e.g., pumping out wastewater lagoons). *Id.*

### 3. The Poultry Petition.

On August 5, 2005, the National Chicken Council, National Turkey Federation, and U.S. Poultry and Egg Association petitioned EPA for an administrative reporting exemption from the CERCLA and EPCRA release reporting requirements for releases of ammonia from poultry operations ("Poultry Petition"). *See* Notice of Availability of a Petition for Exemption from EPCRA and CERCLA Reporting Requirements for Ammonia from Poultry Operations, 70 Fed. Reg. 76,452 (Dec. 27, 2005) (JA 326). The December 27, 2005 Federal Register notice announcing the availability of the Poultry Petition also opened a 90-day public comment period. *Id.* EPA specifically solicited comments from state and local response officials "about the usefulness of release reports that are required under EPCRA" as well as comments about the impacts of ammonia emissions. *Id.* at 76,453-54 (JA 327-28).

EPA received approximately 25 comments from state and local response and planning agencies. *See* CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste, Proposed Rule, 72 Fed.

Reg. 73,700, 73,704 (Dec. 28, 2007) (JA 18). These agencies supported granting the Poultry Petition and generally gave three reasons: (a) that they were already aware of animal feeding operations in their jurisdictions; (b) that they were concerned that receiving and processing notifications from poultry operations would divert resources from legitimate emergencies; and (c) that they would not conduct an emergency response action upon notification of a release of ammonia into the air from poultry waste. *Id.*; *see, e.g.,* Letter from Carolyn O'Hare, Chairperson, Local Emergency Planning Comm., Leesport, Pa., to Lynn Beasley, EPA (Mar. 15, 2006) (JA 810); Letter from Peter Connet, Chairman, Local Emergency Planning Comm., Johnston County, N.C., to Lynn Beasley, EPA (Mar. 17, 2006) (JA 428). One state emergency response commission noted that it had received no reports of endangerment from ammonia from poultry farms in the prior 15 years, and estimated that processing regular notifications from the approximately 4000 poultry operations in the State would require 20 "man-years effort" from State personnel, plus additional time for local response agencies. *See* Letter from Carol Couch, Comm'r, Ga. State Emergency Response Comm'n, to Lynn Beasley, EPA (Mar. 30, 2006) (JA 811-12). Another agency explained that CERCLA and EPCRA reports are unnecessary, because the Agency already required animal feeding operations to have permits under the Clean Air Act, the Clean Water Act, and state laws designed to protect human health and the environment. *See* Letter from Charles Chisolm, Executive Director, Miss. Dep't of Envtl. Quality, to EPA Superfund Docket (Mar. 14, 2006) (JA 426-27).

15

### 4.    The Reporting Exemption Rule.

On December 28, 2007, EPA proposed an administrative reporting exemption

from the CERCLA section 103 and EPCRA section 304, 42 U.S.C. §§ 9603, 11004,

emergency response notification requirements for air releases of hazardous substances

exceeding reportable quantities from animal waste at farms ("Proposed Rule").  72

Fed. at 73,700 (JA 14).  Although EPA's analysis of the Poultry Petition, including

comments, informed EPA's reasoning, the Proposed Rule was not intended to be a

response to the Poultry Petition.  73 Fed. Reg. at 76,951 (JA 4).

The public comment period for the Proposed Rule lasted for 90 days and

closed on March 27, 2008.  72 Fed. Reg. at 73,700 (JA 14).  EPA received

approximately 12,900 comments in response to the Proposed Rule, although almost

90% of them were part of mass mail campaigns.  73 Fed. Reg. at 76,951 (JA 4).  Even

though the Proposed Rule would exempt a larger range of farms, not just poultry

operations, comments from state and local response agencies continued to affirm

EPA's conclusion that they were not likely to respond to a release from animal waste

at farms.  *See, e.g.,* Letter from J. Allen Metheny, Sr., Chairperson for Local Emergency

Planning Comm., Kent County, Del., to Lynn Beasley, EPA (Mar. 14, 2008) (JA 441-

42); Comment of Edye Rowell, Chairman, N. Central Fla. Local Emergency Planning

Comm. (Feb. 15, 2008) (JA 440) (noting that prior EPCRA section 304 report of

ammonia release from a chicken farm was not "useful" to the Committee).  Some

government officials opposed an exemption due to the potentially harmful effects of

air emissions from animal waste. *See* 73 Fed. Reg. at 76,953 (JA 6). But even these government officials did not assert that a response action should or would be taken. *Id.*

Several commenters also expressed concerns and a desire for information about emissions from animal waste at large concentrated animal feeding operations. *See, e.g.*, Test. of Catharine Fitzsimmons on Behalf of Nat'l Ass'n of Clean Air Agencies, Before Senate Env't & Public Works Comm. 2 (Sept. 6, 2007) (JA 430) ("NACAA's primary concern is with these industrial-scale CAFOs, those that house hundreds or thousands of animals . . . It is these large CAFOs, not small family farms, that produce thousands of tons of manure and release air pollutants in levels of potential concern."); Comment of Linda Norton (Mar. 26, 2008) (JA 449) ("CAFOs are NOT family farms—they are industries that discharge pollutants into the air and soil.").

On December 18, 2008, EPA promulgated the final Reporting Exemption Rule. 73 Fed. Reg. at 76,948, codified at 40 C.F.R. §§ 302.3, 302.6(e)(3), 355.31(g)-(h), 355.61 (JA 1). The CERCLA reporting exemption is substantially unchanged from the Proposed Rule. In response to public comments expressing the desire to receive information regarding releases from large concentrated animal feeding operations, however, EPA narrowed the scope of the administrative reporting exemption under EPCRA, citing the requirement in section 324 of EPCRA, 42 U.S.C. § 11044, that written followup notices be made publicly available. *Id.* at 76,952-53 (JA 5-6). The

EPCRA reporting exemption applies only to releases from animal waste at farms that "stable or confine" fewer than the following numbers of animals:

- 700 mature dairy cows;

- 1,000 veal calves;

- 1,000 cattle other than mature dairy cows or veal calves;

- 2,500 swine each weighing 55 pounds or more;

- 10,000 swine each weighing less than 55 pounds;

- 500 horses;

- 10,000 sheep or lambs;

- 55,000 turkeys;

- 30,000 laying hens or broilers, if the farm uses a liquid manure handling system;

- 125,000 chickens (other than laying hens) if the farm does not use a liquid manure handling system;

- 82,000 laying hens, if the farm does not use a liquid manure handling system;

- 30,000 ducks if the farm does not use a liquid manure handling system; and

- 5,000 ducks if the farm uses a liquid manure handling system.

*Id.* at 76,959-60 (JA 12-13).[12]  The Rule also provides that animals that are not stabled or confined do not count towards the size threshold, and that air releases from their waste are exempt unless the waste is consolidated into a storage unit.  *Id.* at 76,952 & n.3 (JA 5).

EPA's stated rationale for the Reporting Exemption Rule was to reduce the administrative burden on response agencies and covered farms where there would likely be no response to the releases, while still serving the purposes of the statutory notification requirements by allowing response agencies to focus on releases to which they will actually respond.  *Id.* at 76,953 (JA 6).  The Rule does not apply to releases from animal waste on farms to media besides air (e.g., water or soil) or releases from sources on farms other than animal waste (e.g., ammonia tanks).  *Id.* at 76,948 (JA 1). The Rule also clarifies that it does not limit EPA's authority to enforce other provisions of CERCLA and EPCRA and other environmental statutes like the Clean Water Act and Clean Air Act, to respond to citizen complaints or requests for assistance from states, or to address threats to human health and the environment.  *Id.* at 76,953, 76,956 (JA 6, 9).

---

[12] These thresholds define "concentrated animal feeding operations" under the Clean Water Act's National Pollutant Discharge Elimination System regulations.  *See* 73 Fed. Reg. at 76,950 (JA 3).

# SUMMARY OF ARGUMENT

These petitions should be dismissed for lack of jurisdiction.  Waterkeeper has not established standing to challenge the CERCLA provisions of the Rule because the statute does not provide public access to reports that may be filed under CERCLA. Thus, Waterkeeper's petition for review of the Rule's CERCLA provisions should be dismissed, leaving this Court without a basis to exercise jurisdiction over the EPCRA challenges.

If this Court concludes that Waterkeeper has standing under CERCLA, however, review of the Rule's EPCRA provisions in this Court under a theory of supplemental jurisdiction would be appropriate, because the CERCLA and EPCRA regulations were created during a single rulemaking and share the same administrative record.

If this Court exercises jurisdiction over these petitions for review, it should uphold EPA's administrative reporting exemption for air releases of hazardous substances from animal waste at farms.  Both CERCLA and EPCRA grant EPA general rulemaking authority as well as specific authority to determine which substances, releases, and reportable quantities will trigger the statutes' reporting obligations.  EPA's interpretation that these provisions authorize the Agency to grant administrative reporting exemptions is a permissible reading of the statutes.

The Reporting Exemption Rule is a reasonable exercise of EPA's authority.  It serves the primary purpose of the reporting requirements by enabling federal, state,

and local response agencies to focus their resources on processing and responding to reports of releases threatening human health rather than consuming time processing reports to which the agencies are unlikely to respond. The Rule's EPCRA provisions reasonably limit the exemption to all but the largest farms in recognition of public comments seeking access to information about large, industrial concentrated animal feeding operations and in consideration of statutory differences between CERCLA and EPCRA. Accordingly, the Rule should be upheld.

## STANDARD OF REVIEW

EPA's action in promulgating the Reporting Exemption Rule can be overturned only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or in excess of EPA's "statutory jurisdiction, authority, or limitations . . . ." 5 U.S.C. § 706(2). "[T]he arbitrary and capricious standard is 'highly deferential' and 'presumes agency action to be valid . . . .'" *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir. 2013) (citation omitted). Where the agency has considered the relevant factors and articulated a rational connection between the facts found and the choices made, its regulatory choices must be upheld. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In short, the "challenger must show the agency action is not a product of reasoned decisionmaking … [which] is 'a heavy burden,' since *State Farm* entails a 'very deferential scope of review' that forbids a court from "substitut[ing] its judgment

for that of the agency.'" *Van Hollen, Jr. v. Fed. Election Comm'n*, ___ F.3d ___, 2016 WL 278200, at *8 (D.C. Cir. Jan. 21, 2016) (citations omitted).

With regard to interpretation of any statutory terms, the court applies the familiar two-step analysis announced in *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). Under this standard, the court must first ask whether "Congress has directly spoken to the question at issue," as the court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. But where the statute is "silent or ambiguous with respect to the specific issue," the court must defer to the agency's interpretation so long as it is "based on a permissible construction of the statute." *Id.* at 843. This deference applies even if the agency's interpretation is not the only permissible reading of the statute or the reading that the court might originally have given the statute. *Id.* at 843 n.11. When an agency has acted in an area in which it has "special expertise," "courts are at their most deferential." *Bldg. & Constr. Trades Dep't, AFL-CIO v. Brock*, 838 F.2d 1258, 1266 (D.C. Cir. 1988) (citation omitted). Rather than looking at the agency's decision "as would a scientist," the court exercises a "narrowly defined duty of holding agencies to certain minimal standards of rationality." *Am. Trucking Ass'ns, Inc.*, 724 F.3d at 249 (citation omitted).

# ARGUMENT

## I.    Waterkeeper Lacks Standing to Challenge the Rule's CERCLA Provisions.

Waterkeeper lacks standing to challenge the Reporting Exemption Rule's CERCLA provisions.  Article III standing rests on three essential prongs: (1) an injury-in-fact; (2) that is fairly traceable to the defendant's conduct; and (3) that is likely to be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Absent good cause, a petitioner must substantiate each prong "with the petitioner's opening brief—and not . . . in reply to the brief of the respondent agency."  *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002); *see also* D.C. Cir. R. 15(c)(2), 28(a)(7).  Waterkeeper has failed to meet its burden.  In particular, Waterkeeper cannot demonstrate that it has suffered an injury-in-fact as a result of the CERCLA reporting exemption, because the statute does not give the public direct access to release notifications made under 42 U.S.C. § 9603.  Moreover, any failure to disclose such notifications to the general public is neither traceable to the Reporting Exemption Rule nor would it be redressed by a favorable decision in this case.  As a result, Waterkeeper's challenge to the Rule's CERCLA provisions must be dismissed.

To establish injury for informational standing "a plaintiff must espouse a view of the law under which the defendant (or an entity it regulates) is obligated to disclose certain information that the plaintiff has a right to obtain."  *Am. Soc'y for the Prevention*

*of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 23 (D.C. Cir. 2011) ("*ASPCA*").

Although Waterkeeper claims the Rule "denies information to which [it is] legally

entitled," it fails to articulate any reading of CERCLA that would require public

dissemination of notifications made pursuant to 42 U.S.C. § 9603 or of any

information such notifications may contain. *See* Waterkeeper Br. 17-20.

CERCLA section 103 requires only that release notifications be transmitted to

federal authorities and then "to all appropriate Government agencies, including the

Governor of any affected State." 42 U.S.C. § 9603(a). These notifications are made

telephonically by "[a]ny person in charge of a vessel or an offshore or an onshore

facility" to the National Response Center. *Id.*; 40 C.F.R. §§ 300.125 & 302.6(a); *see also*

73 Fed. Reg. at 76,950 (JA 3). The National Response Center in turn conveys the

notifications to the "appropriate predesignated federal [On-Scene Coordinator]" and

"to any interested [National Response Team] member agency or federal entity that has

established a written agreement or understanding with the [National Response

Center]." 40 C.F.R. § 300.125. At no time in this process does the statute—or EPA's

regulations—require that such notifications be directed to the public or be made

publicly available.[13]

---

[13] Generally, records of these notices are passed to the public "through a written
Freedom of Information Act request" to the National Response Center, *see* 55 Fed.
Reg. 8666, 8676 (Mar. 8, 1990), although some information may be logged online.
These online logs are not required under CERCLA and may be incomplete;
accordingly, the website directs users who "cannot locate the information that you are

*Cont.*

Because Waterkeeper cannot establish an informational right under CERCLA, it cites, instead, cases under EPCRA—which explicitly requires public disclosure of certain release reports and other information about extremely hazardous substances—in which courts have found (or simply refer to) some informational injury. Waterkeeper Br. 19-20. But CERCLA does not grant the same entitlement, and Waterkeeper describes no authority holding otherwise.[14]

Waterkeeper's cursory reference to *Federal Election Commission v. Akins*, 524 U.S. 11 (1998), does not substantiate its claim of an injury-in-fact under CERCLA. Waterkeeper Br. 19-20. True, in *Akins*, the Supreme Court recognized that the denial of information under the Federal Election Campaign Act of 1971 constitutes an injury-in-fact, much as the denial of information under the Freedom of Information

---

looking for" to "submit a Freedom of Information Act request in writing to EFOIA@uscg.mil." USCG, National Response Center, http://www.nrc.uscg.mil/ (last accessed Feb. 19, 2016). That some information may be voluntarily aggregated and disclosed online does not establish a legal requirement under CERCLA.

[14] Waterkeeper cites to *Tyson Foods* for "standing to assert EPCRA claim for failure to report release," Waterkeeper Br. 20, and appropriately does not characterize the case as supporting its claim for standing under CERCLA. Indeed, any effort to claim *Tyson Foods* as recognition of a right to notification under CERCLA would be misplaced. In that case, the court glossed over acute differences between CERCLA and EPCRA in concluding that plaintiffs had been denied access to information to which they were entitled. *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693, 704 (W.D. Ky. 2003) (generalizing Congress' intent underlying the reporting requirements of CERCLA and EPCRA). These differences, however, are not only critical to the merits of the Reporting Exemption Rule but also fatal to Waterkeeper's claim of standing under CERCLA. The case also cannot be squared with this Court's requirements for informational standing.

Act gives rise to an actionable grievance *under that act. See* 524 U.S. at 31. But the law in this case lacks an analogous right.[15]

This Court's decision in *ASPCA* provides guidance that is directly on point. In *ASPCA*, the plaintiffs asserted informational standing under section 10(c) of the Endangered Species Act (requiring public disclosure of information in permit applications) to bring suit under section 9 of the same statute (prohibiting a "take" without first obtaining a section 10 permit). 659 F.3d at 22. The court explained that "unlike the statutes under which plaintiffs sued in *Akins* . . . , nothing in *section 9* gives [plaintiff] a right to any information." *Id.* at 23. While the plaintiffs might have had standing under section 10, the court saw "nothing in *Akins* that would authorize us to extend informational standing to a situation where, as here, the plaintiff's view of the statute would not directly entitle it to the information it seeks." *Id.* at 24.

Waterkeeper asks this Court to reach even further—ignoring *ASPCA*, it seeks standing under CERCLA by relying on EPCRA. Waterkeeper Br. 19-20 (citing cases under EPCRA to establish standing to challenge both EPCRA and CERCLA portions

---

[15] This is not to say that members of the public are never entitled to notification. CERCLA section 111(g) ensures that "potential injured parties" are notified "by an owner and operator of any vessel, or facility from which a hazardous substance has been released." 42 U.S.C. § 9611(g). But these notices are distinct from those made under section 103, 42 U.S.C. § 9603. *See* 50 Fed. Reg. at 13,464. Also, if an incident necessitates a response action, EPA regulations stress that "all appropriate public and private interests" should be "kept informed . . . throughout a response." 40 C.F.R. § 300.155(a).

of the Rule).  But this Court cannot ignore the clear limits in place under *Akins* and

*ASPCA*.  Standing under EPCRA simply cannot confer standing under CERCLA.

Because Waterkeeper has not established any injury in fact, this Court need not

reach the causation and redressability requirements of Article III standing.  But, even

if Waterkeeper could establish an informational injury, it fails to satisfy the second and

third prongs of the *Lujan* test, because the Reporting Exemption Rule does not

change EPA's notification procedures under 40 C.F.R. § 302.6(a) (requiring immediate

notification to the National Response Center) or its notification and communication

regulations under 40 C.F.R. § 300.125 (providing that notifications be distributed to

certain national response team agencies or federal entities).[16]  Thus, the Rule did not

cause Waterkeeper's alleged injury, and a win in this case would not redress the alleged

injury because vacating the reporting exemption would not require that notifications

be distributed to members of the public.

---

[16] To the extent that Waterkeeper's injury-in-fact is indirectly premised on a harm to human health, it also fails to show how the Reporting Exemption Rule is either causally connected to any such impacts or that these harms can be redressed by any changes to the Rule.  First, the Rule is simply a reporting exemption and does not regulate the actual farming practices petitioners may seek to curb.  Also, lifting the exemption will not compel any particular response actions as these decisions are still discretionary.  *See* 40 C.F.R. § 300.130(c).  Finally, because CERCLA release notifications are not made to the public under 42 U.S.C. § 9603, it is not clear how Waterkeeper's members could take "precautionary steps" following any particular release.  *See* Waterkeeper Br. 20.

27

Having failed to make a sufficient demonstration of its standing under CERCLA, Waterkeeper's challenge to the Rule's CERCLA provisions must be dismissed.

## II.    Jurisdiction over the Petitions for Review of the Reporting Exemption Rule's EPCRA Provisions Turns on Whether Waterkeeper Has Standing to Challenge the Rule's CERCLA Provisions.

### A.    Dismissing Waterkeeper's Challenge to the Rule's CERCLA Provisions for Lack of Standing Deprives This Court of Independent Jurisdiction over the Petitions for Review of the Rule's EPCRA Provisions.

Challenges to EPCRA rules—standing alone—must be brought in district court in accordance with the Administrative Procedure Act and 28 U.S.C. § 1331. *Barrick Goldstrike Mines*, 215 F.3d at 47. If, as EPA argues, Waterkeeper lacks standing to challenge the Reporting Exemption Rule's CERCLA provisions, which are directly reviewable under 42 U.S.C. § 9613(a), this Court would not have an independent basis to exercise jurisdiction over any challenges to the Rules' EPCRA provisions. *See generally Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35 (1995) (cautioning against overreliance on "pendent appellate jurisdiction"); *see also Gilda Marx, Inc. v. Wildwood Exercise, Inc.*, 85 F.3d 675, 679 (D.C. Cir. 1996). As a result, the petitions for review of the Rule's EPCRA provisions should be dismissed or transferred to an appropriate district court.

**B.    In the Alternative, if Waterkeeper Has Standing to Challenge the Rule's CERCLA Provisions, This Court Should Exercise Supplemental Jurisdiction to Review the Rule's EPCRA Provisions.**

If this Court concludes that Waterkeeper has standing under CERCLA, review of the Rule's EPCRA provisions under a theory of supplemental jurisdiction would be appropriate, because the CERCLA and EPCRA regulations were created during a single rulemaking and share the same administrative record.  Because "a district court offers no advantage over a court of appeals with respect to on-the-record review of completed administrative proceedings, while a bifurcated approach might lead to confusion and unnecessary duplication," this Court should review the Rule's CERCLA and EPCRA provisions as a whole.  *Shell Oil Co.*, 47 F.3d at 1195; *accord Ruud v. Dep't of Labor*, 347 F.3d 1086, 1090 (9th Cir. 2003) (permitting consolidated review because "the petition involves a common factual background and raises a common legal question.").

In *Shell*, the court faced a similar situation involving separate challenges to the same agency order making distinct rulings under different statutes—one conferring jurisdiction in the court of appeals, the other in district court.  The court concluded that "where an agency order arising from a common factual background and addressing a common question of law relies on two statutory bases that give rise to separate paths for judicial review, the entire order should be reviewed in a

comprehensive and coherent fashion . . . in the court of appeals." *Shell Oil Co.*, 47 F.3d at 1195; *accord Suburban O'Hare Comm'n v. Dole*, 787 F.2d 186, 192 (7th Cir. 1986).

The same logic applies here. EPA promulgated the Rule as a joint action under CERCLA and EPCRA to address each statute's similar reporting provisions.[17] The Rule's requirements draw on identical definitions to target the same emissions and sources. *See* 40 C.F.R. §§ 302.3, 355.61 (defining "animal waste" and "farm"). Indeed, they are based on a single administrative record and use the same rulemaking docket. *See* 73 Fed. Reg. at 76,948 (JA 1). Because this Court has exclusive jurisdiction over the Rule's CERCLA provisions, any displacement of a district court's review of the Rule's EPCRA provisions would be "comparatively modest" vis-à-vis "the interests . . . of treating the case coherently." *Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1482 (D.C. Cir. 1994). Thus, provided that Waterkeeper has standing to challenge the Rule's CERCLA provisions, this Court should exercise jurisdiction over the Rule's EPCRA provisions as well.

## III.   The Reporting Exemption Rule Is Entitled to Deference and Is Reasonable.

Congress vested EPA with general authority to administer CERCLA and EPCRA (plus specific authority to define the scope of releases subject to the reporting requirements), and the Agency exercised its authority by implementing—through

---

[17] As noted above, CERCLA generally addresses notifications made to federal authorities, whereas EPCRA concerns notifications to state and local authorities.

rulemaking—an administrative exemption to the default reporting requirements to further the goal of enabling response agencies to focus their resources on responding to releases of concern. Thus, the Reporting Exemption Rule is entitled to deference under *Chevron*. *See City of Arlington v. Fed. Commc'ns Comm'n*, __ U.S. __, 133 S. Ct. 1863, 1874 (2013) (holding that the "preconditions" to deference under *Chevron* are met where "Congress has unambiguously vested the [agency] with general authority to administer the [relevant] Act through rulemaking and adjudication, and the agency interpretation at issue was promulgated in the exercise of that authority"). If this Court reaches the merits of these petitions for review and applies the *Chevron* two-part test, this Court will find that the Reporting Exemption Rule represents a reasonable interpretation of ambiguous statutory language.

### A. The Statutory Language Is Ambiguous Because CERCLA and EPCRA Exempt Certain Releases and Give EPA Broad Authority to Regulate the Release Reporting Requirements.

Applying traditional tools of statutory interpretation to CERCLA section 103(a), 42 U.S.C. § 9603(a), and EPCRA 304(a), 42 U.S.C. § 11004(a), Congress left open the question of whether EPA may by regulation exempt releases of hazardous substances[18] in reportable quantities from the reporting requirements where the

---

[18] For purposes of this Argument section, the term "hazardous substances" generally includes CERCLA hazardous substances, EPCRA extremely hazardous substances, and any other substance to which the CERCLA or EPCRA release reporting requirements may apply.

reports would not meaningfully satisfy the primary purpose of the reporting requirements—to enable response actions—and could divert agency resources from legitimate emergencies.

### 1. The Text and Structure of CERCLA and EPCRA Leave Room for EPA's Interpretation.

The text of CERCLA section 103(a) and EPCRA section 304(a) appears at first glance to be straightforward: a "person in charge" (CERCLA) or "owner or operator" (ECPRA) of a "facility" must report to the appropriate governmental authorities a "release" of a hazardous substance if the release is above a certain threshold quantity. 42 U.S.C. §§ 9603(a), 11004(a). Unsurprisingly, Waterkeeper argues that there is no ambiguity in the terms "release" or "facility" and that the inquiry should end here. Waterkeeper Br. 22. But this narrow reading misses other key statutory provisions that carve out exemptions from these default reporting requirements and give EPA broad authority to decide which releases trigger the reporting requirements in the first instance.[19] When viewed in conjunction with these other statutory provisions, there is plainly ambiguity in the reporting provisions. As this Court has held, "the sort of ambiguity giving rise to *Chevron* deference 'is a creature not of definitional possibilities, but of statutory context.'" *New York v. EPA*, 443 F.3d 880, 884 (D.C. Cir. 2006)

---

[19] Waterkeeper's claim that this Court "recognized" that farms must report releases from animal waste is also unavailing, because this Court said only that farms "may be required" to report releases—in a case decided before the Rule. *See* Waterkeeper Br. 21 (citing *Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1028 (D.C. Cir. 2007)).

(citations omitted); *see also King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (citation omitted) (restating "cardinal rule that a statute is to be read as a whole . . . since the meaning of statutory language, plain or not, depends on context").

For example, the CERCLA and EPCRA reporting provisions are not absolute. Congress exempted certain releases from the reporting requirements in other portions of the statutes, such as releases from the application of a registered pesticide product, 42 U.S.C. § 9603(e), or releases that expose only persons within a facility, *id.* § 11004(a)(4). Also exempt are federally permitted releases, i.e., releases authorized under an applicable federal environmental statute, *id.* § 9603(a), and releases that are already reported to the National Response Center under the Solid Waste Disposal Act, *id.* § 9603(f)(1). These exemptions form a pattern of avoiding duplication of effort, e.g., where releases are regulated or reported under other environmental statutes, and minimizing the burden on both regulated entities and government response agencies. The fact that continuous releases are explicitly subject to less burdensome reporting requirements, *id.* § 9603(f)(2), also suggests that Congress did not intend to unduly burden either the regulated community or response agencies. And the CERCLA definition of "release" itself excludes certain engines' exhaust emissions, certain releases of nuclear material, and the "normal application of fertilizer." *Id.* § 9601(22).

Section 115 of CERCLA, 42 U.S.C. § 9615, and section 328 of EPCRA, *id.* § 11048, also provide important statutory context. In those provisions, Congress

granted EPA broad, general rulemaking authority to promulgate any regulations that may be necessary to administer CERCLA and EPCRA. *Id.* Moreover, Congress granted EPA specific authority over the scope of releases subject to the reporting requirements. Under CERCLA, EPA has discretion to designate additional hazardous substances and establish the quantity of any hazardous substance that must be reported—including the discretion to determine whether "one single quantity shall be the reportable quantity for any hazardous substance, regardless of the medium into which the hazardous substance is released." *Id.* § 9602(a). Likewise, EPA has discretion under EPCRA to designate extremely hazardous substances and establish the quantity of each substance that must be reported. *Id.* §§ 11002(a), 11004(a)(2)(C).

These statutory provisions collectively create ambiguity as to whether Congress intended for all releases of hazardous substances above reportable quantities from all facilities under all conditions to be reported. They also give EPA authority, in effect, to exempt certain releases from the reporting requirements through establishing high reportable quantities of hazardous substances. After all, an administrative reporting exemption is like setting a reportable quantity of infinity for a narrow set of circumstances.

Notwithstanding its initial argument that the express language of the CERCLA and EPCRA reporting provisions requires all facilities to report all releases, Waterkeeper later acknowledges the various exemptions in the statutes, but argues that these prove that Congress did not intend to create any additional exemptions like

34

the one here.  Waterkeeper Br. 25-27.  While it is generally true that when Congress "enumerates certain exceptions to a general [rule], additional exceptions are not to be implied," courts should also consider "contrary legislative intent."  *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980) (citation omitted).  Here, the fact that existing exemptions are designed to reduce the burden of the reporting requirements, the delegation of significant authority to EPA to determine which releases are subject to the requirements, and the legislative history, discussed below, provide contrary legislative intent.

Waterkeeper also dismisses EPA's broad rulemaking authority under CERCLA section 115, 42 U.S.C. § 9615, and EPCRA section 328, 42 U.S.C. § 11048, citing two cases for the proposition that a regulation promulgated under a statutory provision authorizing an agency to craft regulations "as may be necessary to carry out" the statute must be reasonably related to the purpose of the statute and cannot be arbitrary, capricious, or manifestly contrary to the statute.  Waterkeeper Br. 29-30 (citing *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 369 (1973); *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002)).  But these cases actually support EPA's position, because EPA acted pursuant to nearly identical "as may be necessary to carry out" language in 42 U.S.C. §§ 9615 and 11048 when it promulgated the Reporting Exemption Rule, and the Rule is reasonably related to the key purpose of the release reporting requirements, i.e., facilitating actual responses to releases.

## 2.    The Purpose and Legislative History of the CERCLA and EPCRA Reporting Requirements Support EPA's Interpretation.

The legislative history of CERCLA[20] indicates that Congress intended for EPA to have flexibility in implementing the reporting requirements. *See Nat. Resources Def. Council v. EPA*, 489 F.3d 1250, 1259 (D.C. Cir. 2007) (holding that a statute's legislative history may "shed new light on congressional intent, notwithstanding statutory language that appears superficially clear") (internal quotation marks and citations omitted).  One Senate Report, for example, noted that EPA would have "broad discretion" in setting reportable quantities to trigger the notification requirements and that the Agency "may consider any factors deemed relevant to administrating the reporting requirements or the [Agency's] other responsibilities under this Act."  S. Rep. No. 96-848, at 29 (1980).  Significantly, the report stated that "*[a]dministrative feasibility and practicality should be primary factors*" and that EPA could "revise such regulations from time to time if under-reporting or over-reporting is occurring . . . ."  *Id.* (emphasis added).  Thus, Congress recognized that EPA may need to adjust its approach over time, and specifically directed the Agency to consider feasibility, practicality, and burden.

The purpose behind the CERCLA and EPCRA release reporting requirements further supports the conclusion that Congress left open the question of whether all

---

[20] As noted by Pork Producers, the legislative history for EPCRA, particularly 42 U.S.C. § 11004, is "sparse."  Pork Producers Br. 18.

releases should be subject to the reporting requirements.  Specifically, the primary

purpose of these reporting requirements is to notify response agencies of a release of

a hazardous substance so that they may determine whether an emergency response

action is necessary to protect human health or welfare or the environment.[21]  *See* 73

Fed. Reg. at 76,953 (JA 6); *see also* S. Rep. No. 96-848, at 50 (1980) ("Notice is crucial

to the removal and remedial operations which are central to [CERCLA].").

In light of the statutes' purpose and legislative history, it is reasonable to ask

the question, as EPA did here, did Congress intend for the reporting requirements to

burden agencies even if the release notifications would not lead to emergency

response actions?

Waterkeeper claims that EPA answered this question in the affirmative when

the Agency said, in its document responding to public comments on the Proposed

Rule, "[b]ased on the language of [CERCLA and EPCRA], there is no indication that

Congress meant to exclude emissions from manure from reporting requirements

under [these statutes.]"  Waterkeeper Br. (quoting Resp. to Comments 15 (JA 614)).

Far from being an admission that the Rule is illegal, as Waterkeeper contends, EPA's

_____

[21] Pork Producers argue that this is the *sole* purpose of EPCRA section 304.  Pork
Producers Br. 18-20.  EPA disagrees.  *See infra* Part III.C.1.  Waterkeeper also points
out that the CERCLA and EPCRA reporting requirements may increase the
likelihood that facilities will voluntarily reduce or eliminate emissions and that the
reports themselves provide information to governmental agencies that could aid the
evaluation of additional regulations and permitting requirements.  Waterkeeper Br. 9.
EPA recognizes that these may be additional benefits of the reporting requirements,
but they are not the purpose behind the statutes.

statement was a direct response to industry commenters arguing that an assortment of agriculture-related exclusions in the two statutes[22] indicated that Congress did not intended for manure to be subject to any release reporting requirements. Resp. to Comments at 15.

Finally, the cases cited by Waterkeeper on pages 30-31 of its Brief are distinguishable. For example, in *Natural Resources Defense Council v. EPA*, 489 F.3d 1364 (D.C. Cir. 2007), EPA exempted a subcategory of "major sources" from a Clean Air Act emission control standard although the Clean Air Act instructed the Agency to promulgate emission standards for all subcategories. In *New York*, 443 F.3d at 883, EPA exempted equipment replacements from the list of physical changes triggering a Clean Air Act emission control. And in *Sierra Club v. EPA*, 129 F.3d 137 (D.C. Cir. 1997), EPA granted a one-year grace period for transportation projects to comply with certain Clean Air Act requirements in areas newly designated as nonattainment. Here, EPA is not exempting farms from complying with entire emission control standards; the Rule expressly reserves EPA's ability to enforce applicable provisions of the Clean Air Act, Clean Water Act, Resource Conservation and Recovery Act, as

---

[22] The exclusions the commenters cited include: (a) the exclusion for "the normal application of fertilizer" from the CERCLA definition of "release," 42 U.S.C. § 9601(22)(D); (b) the exclusion of substances "used in routine agricultural operations" from the scope of "hazardous chemicals" for which facilities must submit material safety data sheets to local and state emergency planning agencies under section 311 of EPCRA, *id.* § 11021(a)(1), (e)(5); and (c) the exclusion from the Superfund tax on the sale of chemicals for certain substances used in the manufacture of fertilizer, including ammonia, 26 U.S.C. § 4662(b)(2)(A).

well as other provisions of CERCLA and EPCRA to protect human health and the environment. *See* 73 Fed. Reg. at 76,953 (JA 6).

In *Sierra Club v. EPA*, 992 F.2d 337 (D.C. Cir. 1993), the Court held that EPA improperly exempted small landfills from certain groundwater monitoring requirements where the Agency switched positions from the proposed rule and the pertinent statutory language was clear that EPA was to, "[a]t a minimum . . . require ground water monitoring" at all landfills. This case is distinguishable from *Sierra Club* because Congress has not spoken directly to the question of whether air releases from animal waste at farms should be exempt from the CERCLA and EPCRA reporting requirements, and because EPA has consistently found that administrative reporting exemptions are appropriate where response agencies are unlikely to respond to releases. Finally, in *Hercules Inc. v. EPA*, 938 F.2d 276 (D.C. Cir. 1991), this Court found that EPA's interpretation that a CERCLA requirement that federal agencies disclose in land transfer agreements information about the storage or release of hazardous substances on the land only applied when the storage or release occurred during U.S. ownership was a "drastic" limitation of the statute. That case is likewise distinguishable because the disclosure provision in CERCLA, which expressly included the date(s) of the storage or release as information that must be disclosed, left no room for EPA's temporal limitation.

In conclusion, CERCLA section 103, 42 U.S.C. § 9603, and EPCRA section 304, *id.* § 11004, are ambiguous as to whether Congress intended to allow administrative reporting exemptions like the Reporting Exemption Rule.

## B.    EPA's Interpretation of the Ambiguous Statutes Is Permissible and Reasonable.

In light of the statutory ambiguity, EPA's interpretation that CERCLA and EPCRA authorize the Agency to promulgate administrative exemptions from the reporting requirements is not only permissible but also reasonable.  EPA has articulated a rational basis for exempting air releases of hazardous substances from animal waste at farms as set forth in the Reporting Exemption Rule, particularly because the Rule concerns an area within EPA's expertise.

### 1.    The Rule Deserves Particular Deference Because It Falls Within EPA's Areas of Expertise.

It is well-established that an agency's decision is entitled to particular deference when the agency is acting within the scope of its expertise.  *Bldg. & Constr. Trades Dep't, AFL-CIO*, 838 F.2d at 1266 (citation omitted).  The provisions of CERCLA and EPCRA expressly giving EPA the task of designating hazardous substances and determining reportable quantities for those substances also demonstrate that Congress intended to defer to the Agency's expertise in determining which releases would be subject to the release reporting requirements.  *See* 42 U.S.C. §§ 9601(14), 9602, 11002, 11004(a)(2)-(3).  Moreover, in promulgating the Reporting Exemption Rule, EPA appropriately drew on its technical expertise in the areas of hazardous waste

management and emergency response to determine the need for and feasibility of emergency reporting for releases of hazardous substances to the air from animal waste at farms. *See* 73 Fed. Reg. at 76,953 (JA 6). In short, because the Rule falls squarely within EPA's technical expertise, the Court should give it particular deference.

### 2.   EPA Has Consistently Considered Exemptions from Reporting Requirements for Releases Where a Government Response Is Unlikely.

The Rule is not arbitrary or capricious because it is consistent with EPA's prior interpretations of the scope of the CERCLA and EPCRA release notification requirements. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994) (holding that an agency's interpretation of a statute is entitled to more deference if it is a "consistently held agency view" than if it is a conflicting interpretation) (internal quotation marks and citation omitted). EPA has consistently interpreted CERCLA and EPCRA to authorize the promulgation of administrative reporting exemptions where reporting would not serve or would run counter to the primary purpose of the requirements: enabling response actions.

In 1985, for example, when EPA established an exemption for releases of metals over a certain particle size, called a "cutoff size," from the CERCLA release reporting requirements, EPA stated that part of its rationale was that "it is extremely unlikely that a release of solid metal particles of 100 micrometers or larger would require a response . . . ." 50 Fed. Reg. at 13,461. EPA did not characterize its action as an "administrative reporting exemption," but establishing a particle cutoff size had

the same practical effect—releases of the metals exceeding the reportable quantities would not have to be reported if the particles were big enough. *See* 40 C.F.R. § 302.6(d) ("[N]otification of the release of an RQ of solid particles of antimony, arsenic, beryllium, cadmium, chromium, copper, lead, nickel, selenium, silver, thallium, or zinc is not required if the mean diameter of the particles release is larger than 100 micrometers (0.004 inches).").

In that 1985 rule, EPA also decided not to establish a reportable quantity for several "broad generic classes of organic and metallic compounds" (e.g., "chlorinated phenols" or "zinc and compounds") that fall within the CERCLA definition of hazardous substances, *see* 42 U.S.C. § 9601(14), because they are considered toxic pollutants under section 307 of the Clean Water Act. 50 Fed. Reg. at 13,461. Drawing on its expertise, EPA concluded that it would be "virtually impossible" to establish one reportable quantity for a broad class of substances that could encompass hundreds or even thousands of specific compounds because no single reportable quantity "would take into account the varying characteristics of all of the specific compounds in the class." *Id.* Again, EPA's decision not to require reporting for these classes of compounds was not characterized as an administrative reporting exemption, but it is nonetheless another example where the Agency appropriately exercised its discretion to regulate CERCLA's reporting requirements.

EPA introduced the concept of an administrative reporting exemption in 1989, saying that if it determined that "the federal government would never, or would only

42

rarely, take a response action as a consequence of the harm posed by the release or because of the infeasibility of a federal response, a basis for an exemption from the [CERCLA] section 103 reporting requirements may exist." Reportable Quantity Adjustment—Radionuclides, 54 Fed. Reg. 22,524, 22,529 (May 24, 1989) (JA 679). EPA has consistently reiterated these principles in the course of promulgating additional regulations governing the CERCLA section 103 and EPCRA section 304, 42 U.S.C. §§ 9603, 11004, reporting requirements. *See, e.g.,* Reporting Continuous Releases of Hazardous Substances, 55 Fed. Reg. 30,166, 30,181 (July 24, 1990) (JA 709) (stating that EPA would consider exempting certain releases if it determined "that certain releases pose a hazard only rarely and that the government would rarely, if ever, respond to such releases, or if the Agency concludes that it is technically or administratively infeasible or inappropriate to respond to such releases"); 63 Fed. Reg. at 13,461 (JA 123) ("[E]xemptions may be granted for releases of hazardous substances that pose little or no risk or to which a Federal response is infeasible or inappropriate."); 71 Fed. Reg. at 58,527 (JA 331) (stating that one purpose of the reporting exemption for $NO_X$ releases from combustion-related activities was "that a CERCLA response to the release otherwise reportable would be very unlikely and possibly infeasible or inappropriate").

Here, EPA determined that it would not likely respond to air releases of hazardous substances from animal waste at farms for several reasons. First, EPA has not responded to any releases of hazardous substances from animal waste at farms

above reportable quantities to date. 73 Fed. Reg. at 76,953 (JA 6); Resp. to

Comments 24 (JA 623). Second, the releases generally occur on a regular, ongoing

basis. 73 Fed. Reg. at 76,952 (JA 5). Third, responding to such releases would be

infeasible because there is not yet a reasonable method to estimate (and therefore

mitigate) emissions from animal waste. Resp. to Comments at 18-19 (JA 617-18).

The record also shows that state and local agencies are unlikely to respond to

such releases, because they are aware of the ongoing releases from farms in their

jurisdiction, they had not received complaints about adverse health effects from such

releases, and they did not believe a response would be effective at correcting the

emissions. *See, e.g.,* Letter from J. Allen Metheny, Sr., Chairperson for Local

Emergency Planning Comm., Kent County, Del., to Lynn Beasley, EPA (Mar. 14,

2008) (JA 441-42); Comment of Edye Rowell, Chairman, N. Central Fla. Local

Emergency Planning Comm. (Feb. 15, 2008) (JA 440); Letter from Carol Couch,

Comm'r, Ga. State Emergency Response Comm'n, to Lynn Beasley, EPA (Mar. 30,

2006) (JA 811-12); Letter from Peter Connet, Chairman, Local Emergency Planning

Comm., Johnston County, N.C., to Lynn Beasley, EPA (Mar. 17, 2006) (JA 428);

Letter from Carolyn O'Hare, Chairperson, Local Emergency Planning Comm.,

Leesport, Pa., to Lynn Beasley, EPA (Mar. 15, 2006) (JA 810).

No court has ruled on the merits of EPA's prior administrative reporting

exemptions, set forth in 40 C.F.R. §§ 302.6 and 355.31, or EPA's rationale that

exemptions are appropriate where responses to covered releases are unlikely.

However, this Court has allowed administrative reporting exemptions to remain in place pending the completion of further administrative proceedings. *See Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1313 (D.C. Cir. 1991). *Fertilizer Institute* concerned a challenge to EPA's administrative reporting exemption for certain releases of radionuclides. *Id.* at 1306-07 (citing 54 Fed. Reg. at 22,524). The petitioners challenged the administrative reporting exemption on both procedural and substantive grounds. *Id.* This Court agreed with the petitioners' procedural argument—that EPA had not completed proper notice and comment procedures—and thus did not reach the merits of the reporting exemption.[23] *Id.* at 1310. But, significantly, this Court allowed the reporting exemption for radionuclides to remain in place while EPA completed notice and comment.[24] *Id.* at 1312. Citing EPA's position that the exempted reports could divert response agencies' resources from actual emergencies, Court reasoned that "[b]ecause the removal of the EPA's exemptions may affect the EPA's ability to respond adequately to serious safety hazards, we are reluctant to remove the exemptions here." *Id.* at 1312 & n.6. Thus, the Court appropriately recognized that

---

[23] On the merits, the petitioners did not challenge EPA's authority to promulgate an administrative reporting exemption for radionuclides but rather the scope of the exemption; like Pork Producers in this case, the petitioners in *Fertilizer Institute* argued that EPA should have issued a broader exemption. 935 F.2d at 1310.

[24] Following extensive administrative proceedings, including multiple rounds of public commenting, EPA issued the final, revised administrative reporting exemption for radionuclides in 1998. 63 Fed. Reg. at 13,460. No one filed a petition for review of the revised rule even though it was broader than the 1989 version.

reports that would not result in a response would not advance the primary purpose of the reporting requirements. The same is true for this Rule.

Waterkeeper cites two cases for the proposition that district courts "have rejected arguments by AFOs that they are immune from CERCLA/EPCRA reporting requirements." Waterkeeper Br. 22. But both cases—citizen suits against farms for violations of CERCLA and EPCRA's reporting requirements, among other claims— deal with the obligations of facilities to comply with reporting requirements. They do not address EPA's authority to revise reporting requirements. Moreover, they were filed before EPA even promulgated the Reporting Exemption Rule in December 2008. *See Avila v. Olivera Egg Ranch, LLC*, No. 2:08-cv-02488-JAM-KJN (E.D. Cal.) ("*Avila*") (complaint filed Oct. 20, 2008); *Tyson Foods, Inc.*, 299 F. Supp. 2d at 693 (complaint filed Apr. 25, 2002). Thus, the courts' observations that CERCLA and EPCRA did not contain exemptions for animal feeding operations and rejection of the defendant farms' attempts to read exemptions into the statutes are not authoritative in these petitions for review challenging EPA's December 18, 2008 Rule. *See Avila*, Oral Argument Tr. 7 (Aug. 11, 2010) (included in Waterkeeper's Statutory Addendum at A-82, Doc. 1587300 in Case No. 09-1017); *Tyson Foods, Inc.*, 299 F. Supp. 2d at 706. Moreover, in *Tyson Foods*, the court's determination was largely supported by the impression that failing to report "impaired the ability of government agencies to properly respond to releases." *Id.* at 704. Here, EPA has reasonably determined—based on its experience and input from state and local agencies—that

governmental response authorities are unlikely to respond to notifications of air releases of hazardous substances from animal waste at farms. Thus the outcomes of those cases in view of these facts could be remarkably different; at the very least, the cases are not persuasive.

Waterkeeper also argues that the Rule is an "about-face" from EPA's 1985 rule adjusting the reportable quantities for certain hazardous substances, including ammonia and hydrogen sulfide. Waterkeeper Br. 34 (citing 50 Fed. Reg. at 13,459). In particular, Waterkeeper points to a passage in that rule where EPA rejected comments arguing that reporting quantities should take into account whether releases would result in a federal response action and stated that the Agency "should not design a notification system on such a basis." 50 Fed. Reg. at 13,459. That passage is not inconsistent with the Rule at issue here, especially in context. CERCLA was enacted in 1980 and tasked EPA with establishing reportable quantities for hazardous substances. *See* 42 U.S.C. § 9602. In 1985, EPA was still at the early stages of setting reportable quantities; the 1985 rule set reportable quantities for 340 substances. 50 Fed. Reg. at 13,457. To have determined reportable quantities for all of these substances based on the likelihood of a response action would have been contrary to CERCLA's mandate, especially when EPA was still learning which releases would require a response at that point in time. However, even in 1985, EPA took the position that "these reportable quantity adjustments are intended to reduce the burdens of reporting on the regulated community, allow EPA to focus its resources

47

on the most serious releases, and protect public health and welfare and the environment more effectively." *Id.* at 13,456. The legislative history of CERCLA confirms EPA's position. *See, e.g.,* S. Rep. No. 96-848, at 29 (1980) (noting that *"[a]dministrative feasibility and practicality should be primary factors"* in implementing CERCLA's reporting requirements). Thus, EPA's positions in the 1985 rule and the Reporting Exemption Rule are consistent with each other and with Congress's intent.

### 3. The Rule Reduces the Administrative Burden on Federal, State, and Local Response Agencies as Well as Covered Farms.

The Reporting Exemption Rule is reasonable because it reduces the burden on federal, state, and local response agencies and covered farms where the reports will not be used to enable response actions.

First, EPA estimated that the Rule would reduce the burden on federal, state, and local government agencies by a total of approximately 160,000 hours and $8,000,000 over the ten-year period of 2009-2018. 73 Fed. Reg. at 76,954 (JA 7); *see also* EPA, Economic Analysis 41-42, Ex. 16b (Dec. 11, 2008) ("Economic Analysis") (JA 595-96). Approximately 150,000 of these saved hours are federal. Economic Analysis at 41-42 (JA 595-96). These figures do not even include the burden on the National Response Center, which receives an average of approximately 34,000 notifications of releases each year (from all facilities), 99 percent of which are conveyed to EPA. *See* 73 Fed. Reg. at 76,950 (JA 3).

Second, EPA estimates that the Rule will reduce the burden on covered farms by a total of approximately 1,300,000 hours and $60,000,000 over the 2009-2018 period. 73 Fed. Reg. at 76,954 (JA 7); *see also* Economic Analysis at 39-40, Ex. 15b (JA 593-94).

Third, by reducing the time and resources that federal, state, and local agencies spend processing reports of air releases from animal waste at farms, which are not likely to lead to a response action, those agencies can focus their resources on evaluating and responding to emergencies that are likely to require response actions. *See, e.g.*, Resp. to Comments at 21 (JA 620). While not reduced to a dollar figure or number of hours in EPA's analysis, this benefit is nonetheless significant in carrying out the primary purposes of the notification requirements.

Thus, EPA appropriately considered whether the reporting burden of CERCLA section 103(a), 42 U.S.C. § 9603(a), and EPCRA section 304(a), 42 U.S.C. § 11004(a), could be reduced where such reduction would serve the primary purpose of the statutes.

### 4. The Rule Is Narrowly Crafted and Protective of Human Health and the Environment.

The Reporting Exemption Rule is reasonable because it is narrowly crafted in several aspects that serve the purposes of the reporting requirements while being protective of human health and the environment:

1. The Rule does not apply to releases of hazardous substances exceeding reportable quantities to media other than air (e.g., groundwater, surface water bodies, or soil). 73 Fed. Reg. at 76,948 (JA 1); Resp. to Comments at 3, 30 (JA 602, 629).

2. The Rule does not apply to air releases of hazardous substances exceeding reportable quantities from sources other than animal waste at farms (e.g., ammonia tanks). 73 Fed. Reg. at 76,948 (JA 1); Resp. to Comments at 3 (JA 602).

3. The Rule does not apply to air releases of hazardous substances exceeding reportable quantities from animal waste at facilities other than farms (e.g., zoos and circuses). 73 Fed. Reg. at 76,957 (JA 10); Resp. to Comments at 3, 30 (JA 602, 629).

4. The Rule has no effect on EPA's (or local response agencies') authority to respond to any releases in the event of a citizen complaint[25] or referral from another agency. 73 Fed. Reg. at 76,953 (JA 6); Resp. to Comments at 26 (JA 625).

5. The Rule has no effect on EPA's authority to enforce other provisions of CERCLA and EPCRA, as well as applicable provisions of the Clean

---

[25] Both ammonia and hydrogen sulfide have strong odors; if air emissions from animal waste at a farm are particularly high, members of the community would be able to know and notify local authorities.

Air Act, Clean Water Act, Resource Conservation and Recovery Act, and other environmental laws that may regulate air emissions from animal waste at farms.  73 Fed. Reg. at 76,953 (JA 6); Resp. to Comments at 24-26 (JA 623-25).

Waterkeeper surprisingly argues that some of these protective limitations render the Rule arbitrary and capricious by treating similar facilities and releases differently. Waterkeeper Br. 35-37.  But the fact that different facilities or sources producing similar hazardous substances might be subject to different requirements does not make a rule arbitrary or capricious; EPA merely needs to provide an explanation for its different treatment.  *See Chadmoore Comm'cns, Inc. v. Fed. Commc'ns Comm'n*, 113 F.3d 235, 242 (D.C. Cir. 1997) (citing *Petroleum Comm'cns, Inc. v. Fed. Commc'ns Comm'n*, 22 F.3d 1164, 1172 (D.C. Cir. 1994)).

Here, EPA explained that a response would be possible for air releases of hazardous substances from sources other than animal waste at farms, such as from an ammonia storage tank.  72 Fed. Reg. at 73,704 (JA 18); Resp. to Comments at 19 (JA 618).  Similarly, releases of hazardous substances from animal waste at farms to media other than air, such as the burst of a wastewater storage lagoon, are more likely to result in a response action.  72 Fed. Reg. at 73,704 (JA 18).  EPA also explained that it did not have sufficient information about releases from animal waste at zoos and circuses to determine the likelihood that the Agency would respond to releases there, thereby appropriately not extending an exemption to such facilities.  73 Fed. Reg. at

51

76,957 (JA 10); Resp. to Comments at 11 (JA 610). Thus, Waterkeeper has failed to carry its "heavy burden" of establishing that EPA acted irrationally. *City of Las Vegas v. Lujan*, 891 F.2d 927, 935 (D.C. Cir. 1989).

It is also significant that, when EPA was determining the appropriate reportable quantities for CERCLA hazardous substance, the Agency initially considered assigning different reportable quantities for the media into which a release occurred. 72 Fed. Reg. at 73,702 (JA 16). For ammonia, EPA concluded that quite different reportable quantities would be appropriate for releases into water (100 pounds per 24 hours) and air (1000 pounds per 24 hours) based on the difference in toxicological effects of such releases. *Id.* at 73,702-03 (JA 16-17). Ultimately, however, EPA decided to assign one reportable quantity across all media to simplify the reporting process. *Id.* at 73,703 (JA 17). But, the fact that EPA concluded that a reportable quantity for air releases of ammonia ten times higher than the current level would still be protective of human health supports the reasonableness of the Rule.

Finally, the Rule as a whole is protective of human health and the environment by allowing federal, state, and local response agencies to focus their resources on processing and responding to reports of releases that actually pose serious threats rather than consuming their time with processing reports of releases to which they will not likely respond. *See, e.g., Fertilizer Inst.,* 935 F.2d at 1312 & n.11 (leaving intact EPA administrative reporting exemption for certain releases of radionuclides during administrative notice and comment proceedings where response agencies' ability to

respond to serious threats could be compromised if their resources were consumed with processing reports of releases that would not require a response). Even Waterkeeper does not argue that EPA should be responding to all air emissions of hazardous substances from animal waste at farms that exceed reportable quantities or that the Agency even has a basis for taking corrective action. Rather, Waterkeeper wants access to the information for educational and advocacy purposes. Waterkeeper Br. 17-20.

### C. EPA Properly Considered the Public's Desire to Access Information About Releases from the Largest Farms when the Agency Excluded Those Farms from the Rule's EPCRA Provisions.

#### 1. Public Access to Information About Releases Is a Secondary Purpose of the EPCRA Reporting Requirement.

Pork Producers' petition for review of the ECPRA provisions of the Reporting Exemption Rule rests on a single argument: that "EPA's decision to mandate EPCRA Section 304 reporting by large farms is arbitrary and capricious because it is based on a consideration—providing information for non-emergency purposes—that Congress did not include in Section 304." Pork Producers Br. 16; *see also id.* at 14-25. They contend that the *only* purpose of section 304 of EPCRA is "to facilitate federal, state, and local government responses to releases." *Id.* at 20.

Unlike the CERCLA reporting requirements under 42 U.S.C. § 9603, the EPCRA reporting requirements are not designed *solely* to enable governmental authorities to determine whether to respond to releases; a secondary purpose of the

release notifications is to inform the public. After providing initial notification to local response agencies of a reportable release under EPCRA section 304(b), owners and operators of covered facilities must submit more detailed written "followup emergency notices" under EPCRA section 304(c). 42 U.S.C. § 11004(b)-(c). Those written followup notices must be made publicly available under section 324(a) of EPCRA. *Id.* § 11044(a). When 42 U.S.C. § 11004 is read in context with the remainder of the statute, i.e., in connection with 42 U.S.C. § 11044, the secondary purpose of 42 U.S.C. § 11004—providing information to the public—emerges.[26] Thus, EPA appropriately considered public comments expressing a desire to have access to information about releases from large concentrated animal feeding operations when the Agency exercised its discretion not to exempt those farms from the EPCRA release reporting requirements. *See* 73 Fed. Reg. at 76,953-54 (JA 6-7).

Pork Producers nonetheless cite various EPA statements in preambles to proposed and final rules administering section 304, 42 U.S.C. § 11004, and a single statement in the legislative history for the proposition that there is only one purpose of EPCRA section 304 reports. *Id.* at 18-20 (citations omitted). EPA does not dispute—and indeed has stated repeatedly—that the *primary* purpose of EPCRA's

---

[26] Pork Producers argue that this Court should ignore section 324, 42 U.S.C. § 11044, because it is located in a different subtitle of EPCRA than section 304, 42 U.S.C. § 11004. Pork Producers Br. 24-25. But section 324 expressly references section 304 and thus should not be discounted.

emergency reporting requirements in section 304 is to provide information to State and local officials[27] to enable them to respond to releases of hazardous substances. And if the Reporting Exemption Rule applied only to the immediate emergency response notification required in section 304(b), Pork Producers might be correct that the sole purpose of such notice is enabling emergency response. But the Rule extends to written followup emergency notices required by EPCRA section 304(c), 42 U.S.C. § 11004(c), and those written followup notices must be made publicly available under EPCRA section 324(a), 42 U.S.C. § 11044(a). *See* 73 Fed. Reg. at 76,953 (JA 6).

Pork Producers' reliance on the House Conference Report for the proposition that "the legislative history plainly shows that emergency response is the sole purposes of Section 304 emergency reporting . . ." is also unavailing, for two reasons. Pork Producers Br. 18-19 (citing H.R. Conf. Rep. No. 99-962, at 292 (1986)). First, the quoted passage simply explains how annual reports made under 42 U.S.C. § 11023 would differ from reporting for "abnormal, emergency releases" under 42 U.S.C. § 11004. H.R. Conf. Rep. No. 99-962, at 292 (1986), *quoted in* Pork Producers Br. 19. It does not mention the purpose behind the reporting requirements at all, let alone "plainly" show a "sole" purpose, as Pork Producers contend. Pork Producers Br. 18. Second, "courts should 'not resort to legislative history to cloud a statutory text that is

---

[27] EPA does dispute that facilitating *federal* response actions is a primary purpose of section 304 of EPCRA, 42 U.S.C. § 11004.

clear.'" *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 12 (D.C. Cir. 2009) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994)).  Since Congress intended followup notices submitted under 42 U.S.C. § 11004 to be made publicly available, the plain language of the statute indicates that a secondary purpose of the reporting requirements is to inform the public about covered releases in their community.  *See* 42 U.S.C. § 11044(a).

### 2.    The Costs and Burdens Imposed by the Rule Are Minimal.

The Rule's EPCRA provisions do not impose any new obligations on the largest farms.  *See, e.g.*, 73 Fed. Reg. at 76,957 (JA 10) ("This action does not impose any new information collection burden.").  Rather, the Rule maintains the status quo that releases of hazardous substances to the air from animal waste at the largest farms in amounts that exceed reportable quantities must be reported under EPCRA section 304, 42 U.S.C. § 11004.  The existing reporting burden on the largest farms is minimal.  Because releases of hazardous substances from animal waste are generally ongoing in nature, many of the largest farms could qualify for the reduced reporting requirements set forth in 40 C.F.R. § 355.32.  *See* 73 Fed. Reg. at 76,952 (JA 5). According to EPA's Economic Analysis, the average annual cost to a farm to make EPCRA notifications under 42 U.S.C. § 11004 would be $314.  Economic Analysis at 32 (JA 586).  Large farms could easily absorb this cost, particularly since the Rule's CERCLA provisions are expected to save them approximately $8,500 over three years (assuming continuous reporting).  *See id.* at 26 (JA 580).

In sum, Pork Producers' arguments should be rejected, because EPA reasonably considered the text, context, and purpose of 42 U.S.C. § 11004 in requiring the largest farms to continue reporting under EPCRA, and the burden on those farms, in any case, is minimal.

## CONCLUSION

The petitions for review should be dismissed, because Waterkeeper lacks standing to challenge the CERCLA provisions of the Reporting Exemption Rule, thus depriving this Court of a basis to exercise supplemental jurisdiction over the challenges to the Rule's EPCRA provisions. In the alternative, if the Court finds that Waterkeeper has standing to challenge the CERCLA provisions of the Reporting Exemption Rule, this Court should exercise jurisdiction over both petitions for review and uphold the Rule in full.

Respectfully submitted,

JOHN C. CRUDEN
 *Assistant Attorney General*

*Of Counsel:*

        /s/ *Erica M. Zilioli*
        ERICA M. ZILIOLI
ERIK SWENSON     JONATHAN SKINNER-THOMPSON
 *Office of the General Counsel*   *Attorneys, Environmental Defense Section*
 *U.S. Environmental Protection Agency* *Environment and Natural Resources Div.*
 *Washington, D.C.*     *U.S. Department of Justice*
        *P.O. Box 7611*
        *Washington, D.C. 20044*
        *(202) 514-6390*
        *Erica.Zilioli@usdoj.gov*

APRIL 2016
90-11-5-18484

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

This brief complies with the requirements of Fed. R. App. P. 32(a)(7)(B) because it contains 13808 words, excluding the parts of the brief exempted by Fed. R. App. R. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

/s/ *Erica M. Zilioli*
ERICA M. ZILIOLI

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2016, I electronically filed the foregoing final

brief with the Clerk of the Court for the United States Court of Appeals for the

District of Columbia Circuit by using the appellate CM/ECF system.  The

participants in the case are registered CM/ECF users and service will be accomplished

by the appellate CM/ECF system.  In addition, hard copies will be hand delivered to

the Court and served on counsel for the parties by Federal Express.


/s/ *Erica M. Zilioli*
ERICA M. ZILIOLI

# STATUTORY AND REGULATORY ADDENDUM

# Addendum Contents

## **Statutes**

Comprehensive Environmental Response, Compensation, and Liability Act

42 U.S.C. § 9604…………………………………………………...ADD1

Emergency Planning and Community Right-to-Know Act

42 U.S.C. § 11044…………………………………………...ADD16

## **Regulations**

40 C.F.R. § 300.125……………………………………………ADD17

40 C.F.R. § 302.3………………………………………………ADD18

40 C.F.R. § 355.61……………………………………………...ADD22

**(f) Exemptions from notice and penalty provisions for substances reported under other Federal law or is in continuous release, etc.**

No notification shall be required under subsection (a) or (b) of this section for any release of a hazardous substance—

(1) which is required to be reported (or specifically exempted from a requirement for reporting) under subtitle C of the Solid Waste Disposal Act [42 U.S.C. 6921 et seq.] or regulations thereunder and which has been reported to the National Response Center, or

(2) which is a continuous release, stable in quantity and rate, and is—

(A) from a facility for which notification has been given under subsection (c) of this section, or

(B) a release of which notification has been given under subsections (a) and (b) of this section for a period sufficient to establish the continuity, quantity, and regularity of such release:

*Provided,* That notification in accordance with subsections (a) and (b) of this paragraph shall be given for releases subject to this paragraph annually, or at such time as there is any statistically significant increase in the quantity of any hazardous substance or constituent thereof released, above that previously reported or occurring.

(Pub. L. 96–510, title I, § 103, Dec. 11, 1980, 94 Stat. 2772; Pub. L. 96–561, title II, § 238(b), Dec. 22, 1980, 94 Stat. 3300; Pub. L. 99–499, title I, §§ 103, 109(a)(1), (2), Oct. 17, 1986, 100 Stat. 1617, 1632, 1633; Pub. L. 104–208, div. A, title I, § 101(a) [title II, § 211(b)], Sept. 30, 1996, 110 Stat. 3009, 3009–41.)

REFERENCES IN TEXT

The Clean Water Act, referred to in subsec. (a), is act June 30, 1948, ch. 758, as amended generally by Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 816, also known as the Federal Water Pollution Control Act, which is classified generally to chapter 26 (§ 1251 et seq.) of Title 33, Navigation and Navigable Waters. For complete classification of this Act to the Code, see Short Title note set out under section 1251 of Title 33 and Tables.

The Magnuson-Stevens Fishery Conservation and Management Act, referred to in subsec. (b)(2), is Pub. L. 94–265, Apr. 13, 1976, 90 Stat. 331, which is classified principally to chapter 38 (§ 1801 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1801 of Title 16 and Tables.

The Solid Waste Disposal Act, referred to in subsecs. (c) and (f)(1), is title II of Pub. L. 89–272, Oct. 20, 1965, 79 Stat. 997, as amended generally by Pub. L. 94–580, § 2, Oct. 21, 1976, 90 Stat. 2795. Subtitle C of the Solid Waste Disposal Act is classified generally to subchapter III (§ 6921 et seq.) of chapter 82 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6901 of this title and Tables.

This chapter, referred to in subsec. (d)(3), was in the original "this Act", meaning Pub. L. 96–510, Dec. 11, 1980, 94 Stat. 2767, known as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 9601 of this title and Tables.

The Federal Insecticide, Fungicide, and Rodenticide Act, referred to in subsec. (e), is act June 25, 1947, ch. 125, as amended generally by Pub. L. 92–516, Oct. 21, 1972, 86 Stat. 973, which is classified generally to subchapter II (§ 136 et seq.) of chapter 6 of Title 7, Agri-

culture. For complete classification of this Act to the Code, see Short Title note set out under section 136 of Title 7 and Tables.

AMENDMENTS

1996—Subsec. (b)(2). Pub. L. 104–208 substituted "Magnuson-Stevens Fishery" for "Magnuson Fishery".

1986—Subsec. (b). Pub. L. 99–499, §§ 103, 109(a), adjusted left-hand margin of text following "federally permitted release," third place appearing so that there is no indentation of that text, inserted "or who submits in such a notification any information which he knows to be false or misleading", and substituted "in accordance with the applicable provisions of title 18 or imprisoned for not more than 3 years (or not more than 5 years in the case of a second or subsequent conviction), or both" for "not more than $10,000 or imprisoned for not more than one year, or both" and "subsection" for "paragraph".

Subsec. (d)(2). Pub. L. 99–499, § 109(a)(2), substituted "in accordance with the applicable provisions of title 18 or imprisoned for not more than 3 years (or not more than 5 years in the case of a second or subsequent conviction), or both" for "not more than $20,000, or imprisoned for not more than one year, or both" as the probable intent of Congress, notwithstanding directory language that the substitution be made for "not more than $20,000, or imprisoned for not more than one year or both".

1980—Subsec. (b)(2). Pub. L. 96–561 substituted "Magnuson Fishery Conservation and Management Act" for "Fishery Conservation and Management Act of 1976".

EFFECTIVE DATE OF 1996 AMENDMENT

Pub. L. 104–208, div. A, title I, § 101(a) [title II, § 211(b)], Sept. 30, 1996, 110 Stat. 3009, 3009–41, provided that the amendment made by that section is effective 15 days after Oct. 11, 1996.

EFFECTIVE DATE OF 1980 AMENDMENT

Pub. L. 96–561, title II, § 238(b), Dec. 22, 1980, 94 Stat. 3300, provided that the amendment made by that section is effective 15 days after Dec. 22, 1980.

CONTIGUOUS ZONE OF UNITED STATES

For extension of contiguous zone of United States, see Proc. No. 7219, set out as a note under section 1331 of Title 43, Public Lands.

**§ 9604. Response authorities**

**(a) Removal and other remedial action by President; applicability of national contingency plan; response by potentially responsible parties; public health threats; limitations on response; exception**

(1) Whenever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment. When the President determines that such action will be done properly and promptly by the owner or operator of the facility or vessel

or by any other responsible party, the President may allow such person to carry out the action, conduct the remedial investigation, or conduct the feasibility study in accordance with section 9622 of this title. No remedial investigation or feasibility study (RI/FS) shall be authorized except on a determination by the President that the party is qualified to conduct the RI/FS and only if the President contracts with or arranges for a qualified person to assist the President in overseeing and reviewing the conduct of such RI/FS and if the responsible party agrees to reimburse the Fund for any cost incurred by the President under, or in connection with, the oversight contract or arrangement. In no event shall a potentially responsible party be subject to a lesser standard of liability, receive preferential treatment, or in any other way, whether direct or indirect, benefit from any such arrangements as a response action contractor, or as a person hired or retained by such a response action contractor, with respect to the release or facility in question. The President shall give primary attention to those releases which the President deems may present a public health threat.

(2) REMOVAL ACTION.—Any removal action undertaken by the President under this subsection (or by any other person referred to in section 9622 of this title) should, to the extent the President deems practicable, contribute to the efficient performance of any long term remedial action with respect to the release or threatened release concerned.

(3) LIMITATIONS ON RESPONSE.—The President shall not provide for a removal or remedial action under this section in response to a release or threat of release—

(A) of a naturally occurring substance in its unaltered form, or altered solely through naturally occurring processes or phenomena, from a location where it is naturally found;

(B) from products which are part of the structure of, and result in exposure within, residential buildings or business or community structures; or

(C) into public or private drinking water supplies due to deterioration of the system through ordinary use.

(4) EXCEPTION TO LIMITATIONS.—Notwithstanding paragraph (3) of this subsection, to the extent authorized by this section, the President may respond to any release or threat of release if in the President's discretion, it constitutes a public health or environmental emergency and no other person with the authority and capability to respond to the emergency will do so in a timely manner.

(b) Investigations, monitoring, coordination, etc., by President

(1) Information; studies and investigations

Whenever the President is authorized to act pursuant to subsection (a) of this section, or whenever the President has reason to believe that a release has occurred or is about to occur, or that illness, disease, or complaints thereof may be attributable to exposure to a hazardous substance, pollutant, or contaminant and that a release may have occurred or be occurring, he may undertake such investigations, monitoring, surveys, testing, and other information gathering as he may deem necessary or appropriate to identify the existence and extent of the release or threat thereof, the source and nature of the hazardous substances, pollutants or contaminants involved, and the extent of danger to the public health or welfare or to the environment. In addition, the President may undertake such planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations as he may deem necessary or appropriate to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this chapter.

(2) Coordination of investigations

The President shall promptly notify the appropriate Federal and State natural resource trustees of potential damages to natural resources resulting from releases under investigation pursuant to this section and shall seek to coordinate the assessments, investigations, and planning under this section with such Federal and State trustees.

(c) Criteria for continuance of obligations from Fund over specified amount for response actions; consultation by President with affected States; contracts or cooperative agreements by States with President prior to remedial actions; cost-sharing agreements; selection by President of remedial actions; State credits: granting of credit, expenses before listing or agreement, response actions between 1978 and 1980, State expenses after December 11, 1980, in excess of 10 percent of costs, item-by-item approval, use of credits; operation and maintenance; limitation on source of funds for O&M; recontracting; siting

(1) Unless (A) the President finds that (i) continued response actions are immediately required to prevent, limit, or mitigate an emergency, (ii) there is an immediate risk to public health or welfare or the environment, and (iii) such assistance will not otherwise be provided on a timely basis, or (B) the President has determined the appropriate remedial actions pursuant to paragraph (2) of this subsection and the State or States in which the source of the release is located have complied with the requirements of paragraph (3) of this subsection, or (C) continued response action is otherwise appropriate and consistent with the remedial action to be taken[1] obligations from the Fund, other than those authorized by subsection (b) of this section, shall not continue after $2,000,000 has been obligated for response actions or 12 months has elapsed from the date of initial response to a release or threatened release of hazardous substances.

(2) The President shall consult with the affected State or States before determining any appropriate remedial action to be taken pursuant to the authority granted under subsection (a) of this section.

(3) The President shall not provide any remedial actions pursuant to this section unless the State in which the release occurs first enters

---

[1] So in original. Probably should be followed by a comma.

into a contract or cooperative agreement with the President providing assurances deemed adequate by the President that (A) the State will assure all future maintenance of the removal and remedial actions provided for the expected life of such actions as determined by the President; (B) the State will assure the availability of a hazardous waste disposal facility acceptable to the President and in compliance with the requirements of subtitle C of the Solid Waste Disposal Act [42 U.S.C. 6921 et seq.] for any necessary offsite storage, destruction, treatment, or secure disposition of the hazardous substances; and (C) the State will pay or assure payment of (i) 10 per centum of the costs of the remedial action, including all future maintenance, or (ii) 50 percent (or such greater amount as the President may determine appropriate, taking into account the degree of responsibility of the State or political subdivision for the release) of any sums expended in response to a release at a facility, that was operated by the State or a political subdivision thereof, either directly or through a contractual relationship or otherwise, at the time of any disposal of hazardous substances therein. For the purpose of clause (ii) of this subparagraph, the term ''facility'' does not include navigable waters or the beds underlying those waters. In the case of remedial action to be taken on land or water held by an Indian tribe, held by the United States in trust for Indians, held by a member of an Indian tribe (if such land or water is subject to a trust restriction on alienation), or otherwise within the borders of an Indian reservation, the requirements of this paragraph for assurances regarding future maintenance and cost-sharing shall not apply, and the President shall provide the assurance required by this paragraph regarding the availability of a hazardous waste disposal facility.

(4) SELECTION OF REMEDIAL ACTION.—The President shall select remedial actions to carry out this section in accordance with section 9621 of this title (relating to cleanup standards).

(5) STATE CREDITS.—

(A) GRANTING OF CREDIT.—The President shall grant a State a credit against the share of the costs, for which it is responsible under paragraph (3) with respect to a facility listed on the National Priorities List under the National Contingency Plan, for amounts expended by a State for remedial action at such facility pursuant to a contract or cooperative agreement with the President. The credit under this paragraph shall be limited to those State expenses which the President determines to be reasonable, documented, direct out-of-pocket expenditures of non-Federal funds.

(B) EXPENSES BEFORE LISTING OR AGREEMENT.—The credit under this paragraph shall include expenses for remedial action at a facility incurred before the listing of the facility on the National Priorities List or before a contract or cooperative agreement is entered into under subsection (d) of this section for the facility if—

(i) after such expenses are incurred the facility is listed on such list and a contract or cooperative agreement is entered into for the facility, and

(ii) the President determines that such expenses would have been credited to the State under subparagraph (A) had the expenditures been made after listing of the facility on such list and after the date on which such contract or cooperative agreement is entered into.

(C) RESPONSE ACTIONS BETWEEN 1978 AND 1980.—The credit under this paragraph shall include funds expended or obligated by the State or a political subdivision thereof after January 1, 1978, and before December 11, 1980, for cost-eligible response actions and claims for damages compensable under section 9611 of this title.

(D) STATE EXPENSES AFTER DECEMBER 11, 1980, IN EXCESS OF 10 PERCENT OF COSTS.—The credit under this paragraph shall include 90 percent of State expenses incurred at a facility owned, but not operated, by such State or by a political subdivision thereof. Such credit applies only to expenses incurred pursuant to a contract or cooperative agreement under subsection (d) of this section and only to expenses incurred after December 11, 1980, but before October 17, 1986.

(E) ITEM-BY-ITEM APPROVAL.—In the case of expenditures made after October 17, 1986, the President may require prior approval of each item of expenditure as a condition of granting a credit under this paragraph.

(F) USE OF CREDITS.—Credits granted under this paragraph for funds expended with respect to a facility may be used by the State to reduce all or part of the share of costs otherwise required to be paid by the State under paragraph (3) in connection with remedial actions at such facility. If the amount of funds for which credit is allowed under this paragraph exceeds such share of costs for such facility, the State may use the amount of such excess to reduce all or part of the share of such costs at other facilities in that State. A credit shall not entitle the State to any direct payment.

(6) OPERATION AND MAINTENANCE.—For the purposes of paragraph (3) of this subsection, in the case of ground or surface water contamination, completed remedial action includes the completion of treatment or other measures, whether taken onsite or offsite, necessary to restore ground and surface water quality to a level that assures protection of human health and the environment. With respect to such measures, the operation of such measures for a period of up to 10 years after the construction or installation and commencement of operation shall be considered remedial action. Activities required to maintain the effectiveness of such measures following such period or the completion of remedial action, whichever is earlier, shall be considered operation or maintenance.

(7) LIMITATION ON SOURCE OF FUNDS FOR O&M.—During any period after the availability of funds received by the Hazardous Substance Superfund established under subchapter A of chapter 98 of title 26 from tax revenues or appropriations from general revenues, the Federal share of the payment of the cost of operation or maintenance pursuant to paragraph (3)(C)(i) or paragraph (6) of this subsection (relating to op-

Case 1:18-cv-02260-TJK    Document 10-2    Filed 10/29/18    Page 184 of 470
USCA Case #09-1017    Document #1609103    Filed: 04/18/2016    Page 80 of 100

§ 9604    TITLE 42—THE PUBLIC HEALTH AND WELFARE    Page 6870

eration and maintenance) shall be from funds received by the Hazardous Substance Superfund from amounts recovered on behalf of such fund under this chapter.

(8) RECONTRACTING.—The President is authorized to undertake or continue whatever interim remedial actions the President determines to be appropriate to reduce risks to public health or the environment where the performance of a complete remedial action requires recontracting because of the discovery of sources, types, or quantities of hazardous substances not known at the time of entry into the original contract. The total cost of interim actions undertaken at a facility pursuant to this paragraph shall not exceed $2,000,000.

(9) SITING.—Effective 3 years after October 17, 1986, the President shall not provide any remedial actions pursuant to this section unless the State in which the release occurs first enters into a contract or cooperative agreement with the President providing assurances deemed adequate by the President that the State will assure the availability of hazardous waste treatment or disposal facilities which—

(A) have adequate capacity for the destruction, treatment, or secure disposition of all hazardous wastes that are reasonably expected to be generated within the State during the 20-year period following the date of such contract or cooperative agreement and to be disposed of, treated, or destroyed,

(B) are within the State or outside the State in accordance with an interstate agreement or regional agreement or authority,

(C) are acceptable to the President, and

(D) are in compliance with the requirements of subtitle C of the Solid Waste Disposal Act [42 U.S.C. 6921 et seq.].

(d) Contracts or cooperative agreements by President with States or political subdivisions or Indian tribes; State applications, terms and conditions; reimbursements; cost-sharing provisions; enforcement requirements and procedures

(1) COOPERATIVE AGREEMENTS.—

(A) STATE APPLICATIONS.—A State or political subdivision thereof or Indian tribe may apply to the President to carry out actions authorized in this section. If the President determines that the State or political subdivision or Indian tribe has the capability to carry out any or all of such actions in accordance with the criteria and priorities established pursuant to section 9605(a)(8) of this title and to carry out related enforcement actions, the President may enter into a contract or cooperative agreement with the State or political subdivision or Indian tribe to carry out such actions. The President shall make a determination regarding such an application within 90 days after the President receives the application.

(B) TERMS AND CONDITIONS.—A contract or cooperative agreement under this paragraph shall be subject to such terms and conditions as the President may prescribe. The contract or cooperative agreement may cover a specific facility or specific facilities.

(C) REIMBURSEMENTS.—Any State which expended funds during the period beginning September 30, 1985, and ending on October 17, 1986, for response actions at any site included on the National Priorities List and subject to a cooperative agreement under this chapter shall be reimbursed for the share of costs of such actions for which the Federal Government is responsible under this chapter.

(2) If the President enters into a cost-sharing agreement pursuant to subsection (c) of this section or a contract or cooperative agreement pursuant to this subsection, and the State or political subdivision thereof fails to comply with any requirements of the contract, the President may, after providing sixty days notice, seek in the appropriate Federal district court to enforce the contract or to recover any funds advanced or any costs incurred because of the breach of the contract by the State or political subdivision.

(3) Where a State or a political subdivision thereof is acting in behalf of the President, the President is authorized to provide technical and legal assistance in the administration and enforcement of any contract or subcontract in connection with response actions assisted under this subchapter, and to intervene in any civil action involving the enforcement of such contract or subcontract.

(4) Where two or more noncontiguous facilities are reasonably related on the basis of geography, or on the basis of the threat, or potential threat to the public health or welfare or the environment, the President may, in his discretion, treat these related facilities as one for purposes of this section.

(e) Information gathering and access

(1) Action authorized

Any officer, employee, or representative of the President, duly designated by the President, is authorized to take action under paragraph (2), (3), or (4) (or any combination thereof) at a vessel, facility, establishment, place, property, or location or, in the case of paragraph (3) or (4), at any vessel, facility, establishment, place, property, or location which is adjacent to the vessel, facility, establishment, place, property, or location referred to in such paragraph (3) or (4). Any duly designated officer, employee, or representative of a State or political subdivision under a contract or cooperative agreement under subsection (d)(1) of this section is also authorized to take such action. The authority of paragraphs (3) and (4) may be exercised only if there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant. The authority of this subsection may be exercised only for the purposes of determining the need for response, or choosing or taking any response action under this subchapter, or otherwise enforcing the provisions of this subchapter.

(2) Access to information

Any officer, employee, or representative described in paragraph (1) may require any person who has or may have information relevant to any of the following to furnish, upon reasonable notice, information or documents relating to such matter:

(A) The identification, nature, and quantity of materials which have been or are gen-

erated, treated, stored, or disposed of at a vessel or facility or transported to a vessel or facility.

(B) The nature or extent of a release or threatened release of a hazardous substance or pollutant or contaminant at or from a vessel or facility.

(C) Information relating to the ability of a person to pay for or to perform a cleanup.

In addition, upon reasonable notice, such person either (i) shall grant any such officer, employee, or representative access at all reasonable times to any vessel, facility, establishment, place, property, or location to inspect and copy all documents or records relating to such matters or (ii) shall copy and furnish to the officer, employee, or representative all such documents or records, at the option and expense of such person.

**(3) Entry**

Any officer, employee, or representative described in paragraph (1) is authorized to enter at reasonable times any of the following:

(A) Any vessel, facility, establishment, or other place or property where any hazardous substance or pollutant or contaminant may be or has been generated, stored, treated, disposed of, or transported from.

(B) Any vessel, facility, establishment, or other place or property from which or to which a hazardous substance or pollutant or contaminant has been or may have been released.

(C) Any vessel, facility, establishment, or other place or property where such release is or may be threatened.

(D) Any vessel, facility, establishment, or other place or property where entry is needed to determine the need for response or the appropriate response or to effectuate a response action under this subchapter.

**(4) Inspection and samples**

**(A) Authority**

Any officer, employee or representative described in paragraph (1) is authorized to inspect and obtain samples from any vessel, facility, establishment, or other place or property referred to in paragraph (3) or from any location of any suspected hazardous substance or pollutant or contaminant. Any such officer, employee, or representative is authorized to inspect and obtain samples of any containers or labeling for suspected hazardous substances or pollutants or contaminants. Each such inspection shall be completed with reasonable promptness.

**(B) Samples**

If the officer, employee, or representative obtains any samples, before leaving the premises he shall give to the owner, operator, tenant, or other person in charge of the place from which the samples were obtained a receipt describing the sample obtained and, if requested, a portion of each such sample. A copy of the results of any analysis made of such samples shall be furnished promptly to the owner, operator, tenant, or other person in charge, if such person can be located.

**(5) Compliance orders**

**(A) Issuance**

If consent is not granted regarding any request made by an officer, employee, or representative under paragraph (2), (3), or (4), the President may issue an order directing compliance with the request. The order may be issued after such notice and opportunity for consultation as is reasonably appropriate under the circumstances.

**(B) Compliance**

The President may ask the Attorney General to commence a civil action to compel compliance with a request or order referred to in subparagraph (A). Where there is a reasonable basis to believe there may be a release or threat of a release of a hazardous substance or pollutant or contaminant, the court shall take the following actions:

(i) In the case of interference with entry or inspection, the court shall enjoin such interference or direct compliance with orders to prohibit interference with entry or inspection unless under the circumstances of the case the demand for entry or inspection is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

(ii) In the case of information or document requests or orders, the court shall enjoin interference with such information or document requests or orders or direct compliance with the requests or orders to provide such information or documents unless under the circumstances of the case the demand for information or documents is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

The court may assess a civil penalty not to exceed $25,000 for each day of noncompliance against any person who unreasonably fails to comply with the provisions of paragraph (2), (3), or (4) or an order issued pursuant to subparagraph (A) of this paragraph.

**(6) Other authority**

Nothing in this subsection shall preclude the President from securing access or obtaining information in any other lawful manner.

**(7) Confidentiality of information**

(A) Any records, reports, or information obtained from any person under this section (including records, reports, or information obtained by representatives of the President) shall be available to the public, except that upon a showing satisfactory to the President (or the State, as the case may be) by any person that records, reports, or information, or particular part thereof (other than health or safety effects data), to which the President (or the State, as the case may be) or any officer, employee, or representative has access under this section if made public would divulge information entitled to protection under section 1905 of title 18, such information or particular portion thereof shall be considered confidential in accordance with the purposes of that section, except that such record, report, docu-

ment or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, or when relevant in any proceeding under this chapter.

(B) Any person not subject to the provisions of section 1905 of title 18 who knowingly and willfully divulges or discloses any information entitled to protection under this subsection shall, upon conviction, be subject to a fine of not more than $5,000 or to imprisonment not to exceed one year, or both.

(C) In submitting data under this chapter, a person required to provide such data may (i) designate the data which such person believes is entitled to protection under this subsection and (ii) submit such designated data separately from other data submitted under this chapter. A designation under this paragraph shall be made in writing and in such manner as the President may prescribe by regulation.

(D) Notwithstanding any limitation contained in this section or any other provision of law, all information reported to or otherwise obtained by the President (or any representative of the President) under this chapter shall be made available, upon written request of any duly authorized committee of the Congress, to such committee.

(E) No person required to provide information under this chapter may claim that the information is entitled to protection under this paragraph unless such person shows each of the following:

(i) Such person has not disclosed the information to any other person, other than a member of a local emergency planning committee established under title III of the Amendments and Reauthorization Act of 1986 [42 U.S.C. 11001 et seq.], an officer or employee of the United States or a State or local government, an employee of such person, or a person who is bound by a confidentiality agreement, and such person has taken reasonable measures to protect the confidentiality of such information and intends to continue to take such measures.

(ii) The information is not required to be disclosed, or otherwise made available, to the public under any other Federal or State law.

(iii) Disclosure of the information is likely to cause substantial harm to the competitive position of such person.

(iv) The specific chemical identity, if sought to be protected, is not readily discoverable through reverse engineering.

(F) The following information with respect to any hazardous substance at the facility or vessel shall not be entitled to protection under this paragraph:

(i) The trade name, common name, or generic class or category of the hazardous substance.

(ii) The physical properties of the substance, including its boiling point, melting point, flash point, specific gravity, vapor density, solubility in water, and vapor pressure at 20 degrees celsius.

(iii) The hazards to health and the environment posed by the substance, including

physical hazards (such as explosion) and potential acute and chronic health hazards.

(iv) The potential routes of human exposure to the substance at the facility, establishment, place, or property being investigated, entered, or inspected under this subsection.

(v) The location of disposal of any waste stream.

(vi) Any monitoring data or analysis of monitoring data pertaining to disposal activities.

(vii) Any hydrogeologic or geologic data.

(viii) Any groundwater monitoring data.

**(f) Contracts for response actions; compliance with Federal health and safety standards**

In awarding contracts to any person engaged in response actions, the President or the State, in any case where it is awarding contracts pursuant to a contract entered into under subsection (d) of this section, shall require compliance with Federal health and safety standards established under section 9651(f) of this title by contractors and subcontractors as a condition of such contracts.

**(g) Rates for wages and labor standards applicable to covered work**

(1) All laborers and mechanics employed by contractors or subcontractors in the performance of construction, repair, or alteration work funded in whole or in part under this section shall be paid wages at rates not less than those prevailing on projects of a character similar in the locality as determined by the Secretary of Labor in accordance with sections 3141–3144, 3146, and 3147 of title 40. The President shall not approve any such funding without first obtaining adequate assurance that required labor standards will be maintained upon the construction work.

(2) The Secretary of Labor shall have, with respect to the labor standards specified in paragraph (1), the authority and functions set forth in Reorganization Plan Numbered 14 of 1950 (15 F.R. 3176; 64 Stat. 1267) and section 3145 of title 40.

**(h) Emergency procurement powers; exercise by President**

Notwithstanding any other provision of law, subject to the provisions of section 9611 of this title, the President may authorize the use of such emergency procurement powers as he deems necessary to effect the purpose of this chapter. Upon determination that such procedures are necessary, the President shall promulgate regulations prescribing the circumstances under which such authority shall be used and the procedures governing the use of such authority.

**(i) Agency for Toxic Substances and Disease Registry; establishment, functions, etc.**

(1) There is hereby established within the Public Health Service an agency, to be known as the Agency for Toxic Substances and Disease Registry, which shall report directly to the Surgeon General of the United States. The Administrator of said Agency shall, with the cooperation of the Administrator of the Environmental Protection

Case 1:18-cv-02260-TJK    Document 10-2    Filed 10/29/18    Page 187 of 470
USCA Case #09-1017    Document #1609103    Filed: 04/18/2016    Page 83 of 100

Page 6873          TITLE 42—THE PUBLIC HEALTH AND WELFARE          § 9604

Agency, the Commissioner of the Food and Drug Administration, the Directors of the National Institute of Medicine, National Institute of Environmental Health Sciences, National Institute of Occupational Safety and Health, Centers for Disease Control and Prevention, the Administrator of the Occupational Safety and Health Administration, the Administrator of the Social Security Administration, the Secretary of Transportation, and appropriate State and local health officials, effectuate and implement the health related authorities of this chapter. In addition, said Administrator shall—

(A) in cooperation with the States, establish and maintain a national registry of serious diseases and illnesses and a national registry of persons exposed to toxic substances;

(B) establish and maintain inventory of literature, research, and studies on the health effects of toxic substances;

(C) in cooperation with the States, and other agencies of the Federal Government, establish and maintain a complete listing of areas closed to the public or otherwise restricted in use because of toxic substance contamination;

(D) in cases of public health emergencies caused or believed to be caused by exposure to toxic substances, provide medical care and testing to exposed individuals, including but not limited to tissue sampling, chromosomal testing where appropriate, epidemiological studies, or any other assistance appropriate under the circumstances; and

(E) either independently or as part of other health status survey, conduct periodic survey and screening programs to determine relationships between exposure to toxic substances and illness. In cases of public health emergencies, exposed persons shall be eligible for admission to hospitals and other facilities and services operated or provided by the Public Health Service.

(2)(A) Within 6 months after October 17, 1986, the Administrator of the Agency for Toxic Substances and Disease Registry (ATSDR) and the Administrator of the Environmental Protection Agency ("EPA") shall prepare a list, in order of priority, of at least 100 hazardous substances which are most commonly found at facilities on the National Priorities List and which, in their sole discretion, they determine are posing the most significant potential threat to human health due to their known or suspected toxicity to humans and the potential for human exposure to such substances at facilities on the National Priorities List or at facilities to which a response to a release or a threatened release under this section is under consideration.

(B) Within 24 months after October 17, 1986, the Administrator of ATSDR and the Administrator of EPA shall revise the list prepared under subparagraph (A). Such revision shall include, in order of priority, the addition of 100 or more such hazardous substances. In each of the 3 consecutive 12-month periods that follow, the Administrator of ATSDR and the Administrator of EPA shall revise, in the same manner as provided in the 2 preceding sentences, such list to include not fewer than 25 additional hazardous substances per revision. The Administrator of ATSDR and the Administrator of EPA shall not

less often than once every year thereafter revise such list to include additional hazardous substances in accordance with the criteria in subparagraph (A).

(3) Based on all available information, including information maintained under paragraph (1)(B) and data developed and collected on the health effects of hazardous substances under this paragraph, the Administrator of ATSDR shall prepare toxicological profiles of each of the substances listed pursuant to paragraph (2). The toxicological profiles shall be prepared in accordance with guidelines developed by the Administrator of ATSDR and the Administrator of EPA. Such profiles shall include, but not be limited to each of the following:

(A) An examination, summary, and interpretation of available toxicological information and epidemiologic evaluations on a hazardous substance in order to ascertain the levels of significant human exposure for the substance and the associated acute, subacute, and chronic health effects.

(B) A determination of whether adequate information on the health effects of each substance is available or in the process of development to determine levels of exposure which present a significant risk to human health of acute, subacute, and chronic health effects.

(C) Where appropriate, an identification of toxicological testing needed to identify the types or levels of exposure that may present significant risk of adverse health effects in humans.

Any toxicological profile or revision thereof shall reflect the Administrator of ATSDR's assessment of all relevant toxicological testing which has been peer reviewed. The profiles required to be prepared under this paragraph for those hazardous substances listed under subparagraph (A) of paragraph (2) shall be completed, at a rate of no fewer than 25 per year, within 4 years after October 17, 1986. A profile required on a substance listed pursuant to subparagraph (B) of paragraph (2) shall be completed within 3 years after addition to the list. The profiles prepared under this paragraph shall be of those substances highest on the list of priorities under paragraph (2) for which profiles have not previously been prepared. Profiles required under this paragraph shall be revised and republished as necessary, but no less often than once every 3 years. Such profiles shall be provided to the States and made available to other interested parties.

(4) The Administrator of the ATSDR shall provide consultations upon request on health issues relating to exposure to hazardous or toxic substances, on the basis of available information, to the Administrator of EPA, State officials, and local officials. Such consultations to individuals may be provided by States under cooperative agreements established under this chapter.

(5)(A) For each hazardous substance listed pursuant to paragraph (2), the Administrator of ATSDR (in consultation with the Administrator of EPA and other agencies and programs of the Public Health Service) shall assess whether adequate information on the health effects of such substance is available. For any such substance for which adequate information is not available

Case 1:18-cv-02260-TJK    Document 10-2    Filed 10/29/18    Page 188 of 470
USCA Case #09-1017    Document #1609103    Filed: 04/18/2016    Page 84 of 100

§ 9604    TITLE 42—THE PUBLIC HEALTH AND WELFARE    Page 6874

(or under development), the Administrator of ATSDR, in cooperation with the Director of the National Toxicology Program, shall assure the initiation of a program of research designed to determine the health effects (and techniques for development of methods to determine such health effects) of such substance. Where feasible, such program shall seek to develop methods to determine the health effects of such substance in combination with other substances with which it is commonly found. Before assuring the initiation of such program, the Administrator of ATSDR shall consider recommendations of the Interagency Testing Committee established under section 4(e) of the Toxic Substances Control Act [15 U.S.C. 2603(e)] on the types of research that should be done. Such program shall include, to the extent necessary to supplement existing information, but shall not be limited to—

   (i) laboratory and other studies to determine short, intermediate, and long-term health effects;

   (ii) laboratory and other studies to determine organ-specific, site-specific, and system-specific acute and chronic toxicity;

   (iii) laboratory and other studies to determine the manner in which such substances are metabolized or to otherwise develop an understanding of the biokinetics of such substances; and

   (iv) where there is a possibility of obtaining human data, the collection of such information.

(B) In assessing the need to perform laboratory and other studies, as required by subparagraph (A), the Administrator of ATSDR shall consider—

   (i) the availability and quality of existing test data concerning the substance on the suspected health effect in question;

   (ii) the extent to which testing already in progress will, in a timely fashion, provide data that will be adequate to support the preparation of toxicological profiles as required by paragraph (3); and

   (iii) such other scientific and technical factors as the Administrator of ATSDR may determine are necessary for the effective implementation of this subsection.

(C) In the development and implementation of any research program under this paragraph, the Administrator of ATSDR and the Administrator of EPA shall coordinate such research program implemented under this paragraph with the National Toxicology Program and with programs of toxicological testing established under the Toxic Substances Control Act [15 U.S.C. 2601 et seq.] and the Federal Insecticide, Fungicide and Rodenticide Act [7 U.S.C. 136 et seq.]. The purpose of such coordination shall be to avoid duplication of effort and to assure that the hazardous substances listed pursuant to this subsection are tested thoroughly at the earliest practicable date. Where appropriate, consistent with such purpose, a research program under this paragraph may be carried out using such programs of toxicological testing.

(D) It is the sense of the Congress that the costs of research programs under this paragraph

be borne by the manufacturers and processors of the hazardous substance in question, as required in programs of toxicological testing under the Toxic Substances Control Act [15 U.S.C. 2601 et seq.]. Within 1 year after October 17, 1986, the Administrator of EPA shall promulgate regulations which provide, where appropriate, for payment of such costs by manufacturers and processors under the Toxic Substances Control Act, and registrants under the Federal Insecticide, Fungicide, and Rodenticide Act [7 U.S.C. 136 et seq.], and recovery of such costs from responsible parties under this chapter.

(6)(A) The Administrator of ATSDR shall perform a health assessment for each facility on the National Priorities List established under section 9605 of this title. Such health assessment shall be completed not later than December 10, 1988, for each facility proposed for inclusion on such list prior to October 17, 1986, or not later than one year after the date of proposal for inclusion on such list for each facility proposed for inclusion on such list after October 17, 1986.

(B) The Administrator of ATSDR may perform health assessments for releases or facilities where individual persons or licensed physicians provide information that individuals have been exposed to a hazardous substance, for which the probable source of such exposure is a release. In addition to other methods (formal or informal) of providing such information, such individual persons or licensed physicians may submit a petition to the Administrator of ATSDR providing such information and requesting a health assessment. If such a petition is submitted and the Administrator of ATSDR does not initiate a health assessment, the Administrator of ATSDR shall provide a written explanation of why a health assessment is not appropriate.

(C) In determining the priority in which to conduct health assessments under this subsection, the Administrator of ATSDR, in consultation with the Administrator of EPA, shall give priority to those facilities at which there is documented evidence of the release of hazardous substances, at which the potential risk to human health appears highest, and for which in the judgment of the Administrator of ATSDR existing health assessment data are inadequate to assess the potential risk to human health as provided in subparagraph (F). In determining the priorities for conducting health assessments under this subsection, the Administrator of ATSDR shall consider the National Priorities List schedules and the needs of the Environmental Protection Agency and other Federal agencies pursuant to schedules for remedial investigation and feasibility studies.

(D) Where a health assessment is done at a site on the National Priorities List, the Administrator of ATSDR shall complete such assessment promptly and, to the maximum extent practicable, before the completion of the remedial investigation and feasibility study at the facility concerned.

(E) Any State or political subdivision carrying out a health assessment for a facility shall report the results of the assessment to the Administrator of ATSDR and the Administrator of EPA and shall include recommendations with respect to further activities which need to be

Page 6875    TITLE 42—THE PUBLIC HEALTH AND WELFARE    § 9604

carried out under this section. The Administrator of ATSDR shall state such recommendation in any report on the results of any assessment carried out directly by the Administrator of ATSDR for such facility and shall issue periodic reports which include the results of all the assessments carried out under this subsection.

(F) For the purposes of this subsection and section 9611(c)(4) of this title, the term "health assessments" shall include preliminary assessments of the potential risk to human health posed by individual sites and facilities, based on such factors as the nature and extent of contamination, the existence of potential pathways of human exposure (including ground or surface water contamination, air emissions, and food chain contamination), the size and potential susceptibility of the community within the likely pathways of exposure, the comparison of expected human exposure levels to the short-term and long-term health effects associated with identified hazardous substances and any available recommended exposure or tolerance limits for such hazardous substances, and the comparison of existing morbidity and mortality data on diseases that may be associated with the observed levels of exposure. The Administrator of ATSDR shall use appropriate data, risk assessments, risk evaluations and studies available from the Administrator of EPA.

(G) The purpose of health assessments under this subsection shall be to assist in determining whether actions under paragraph (11) of this subsection should be taken to reduce human exposure to hazardous substances from a facility and whether additional information on human exposure and associated health risks is needed and should be acquired by conducting epidemiological studies under paragraph (7), establishing a registry under paragraph (8), establishing a health surveillance program under paragraph (9), or through other means. In using the results of health assessments for determining additional actions to be taken under this section, the Administrator of ATSDR may consider additional information on the risks to the potentially affected population from all sources of such hazardous substances including known point or nonpoint sources other than those from the facility in question.

(H) At the completion of each health assessment, the Administrator of ATSDR shall provide the Administrator of EPA and each affected State with the results of such assessment, together with any recommendations for further actions under this subsection or otherwise under this chapter. In addition, if the health assessment indicates that the release or threatened release concerned may pose a serious threat to human health or the environment, the Administrator of ATSDR shall so notify the Administrator of EPA who shall promptly evaluate such release or threatened release in accordance with the hazard ranking system referred to in section 9605(a)(8)(A) of this title to determine whether the site shall be placed on the National Priorities List or, if the site is already on the list, the Administrator of ATSDR may recommend to the Administrator of EPA that the site be accorded a higher priority.

(7)(A) Whenever in the judgment of the Administrator of ATSDR it is appropriate on the basis of the results of a health assessment, the Administrator of ATSDR shall conduct a pilot study of health effects for selected groups of exposed individuals in order to determine the desirability of conducting full scale epidemiological or other health studies of the entire exposed population.

(B) Whenever in the judgment of the Administrator of ATSDR it is appropriate on the basis of the results of such pilot study or other study or health assessment, the Administrator of ATSDR shall conduct such full scale epidemiological or other health studies as may be necessary to determine the health effects on the population exposed to hazardous substances from a release or threatened release. If a significant excess of disease in a population is identified, the letter of transmittal of such study shall include an assessment of other risk factors, other than a release, that may, in the judgment of the peer review group, be associated with such disease, if such risk factors were not taken into account in the design or conduct of the study.

(8) In any case in which the results of a health assessment indicate a potential significant risk to human health, the Administrator of ATSDR shall consider whether the establishment of a registry of exposed persons would contribute to accomplishing the purposes of this subsection, taking into account circumstances bearing on the usefulness of such a registry, including the seriousness or unique character of identified diseases or the likelihood of population migration from the affected area.

(9) Where the Administrator of ATSDR has determined that there is a significant increased risk of adverse health effects in humans from exposure to hazardous substances based on the results of a health assessment conducted under paragraph (6), an epidemiologic study conducted under paragraph (7), or an exposure registry that has been established under paragraph (8), and the Administrator of ATSDR has determined that such exposure is the result of a release from a facility, the Administrator of ATSDR shall initiate a health surveillance program for such population. This program shall include but not be limited to—

(A) periodic medical testing where appropriate of population subgroups to screen for diseases for which the population or subgroup is at significant increased risk; and

(B) a mechanism to refer for treatment those individuals within such population who are screened positive for such diseases.

(10) Two years after October 17, 1986, and every 2 years thereafter, the Administrator of ATSDR shall prepare and submit to the Administrator of EPA and to the Congress a report on the results of the activities of ATSDR regarding—

(A) health assessments and pilot health effects studies conducted;

(B) epidemiologic studies conducted;

(C) hazardous substances which have been listed under paragraph (2), toxicological profiles which have been developed, and toxicologic testing which has been conducted or which is being conducted under this subsection;

(D) registries established under paragraph (8); and

(E) an overall assessment, based on the results of activities conducted by the Administrator of ATSDR, of the linkage between human exposure to individual or combinations of hazardous substances due to releases from facilities covered by this chapter or the Solid Waste Disposal Act [42 U.S.C. 6901 et seq.] and any increased incidence or prevalence of adverse health effects in humans.

(11) If a health assessment or other study carried out under this subsection contains a finding that the exposure concerned presents a significant risk to human health, the President shall take such steps as may be necessary to reduce such exposure and eliminate or substantially mitigate the significant risk to human health. Such steps may include the use of any authority under this chapter, including, but not limited to—

(A) provision of alternative water supplies, and

(B) permanent or temporary relocation of individuals.

In any case in which information is insufficient, in the judgment of the Administrator of ATSDR or the President to determine a significant human exposure level with respect to a hazardous substance, the President may take such steps as may be necessary to reduce the exposure of any person to such hazardous substance to such level as the President deems necessary to protect human health.

(12) In any case which is the subject of a petition, a health assessment or study, or a research program under this subsection, nothing in this subsection shall be construed to delay or otherwise affect or impair the authority of the President, the Administrator of ATSDR, or the Administrator of EPA to exercise any authority vested in the President, the Administrator of ATSDR or the Administrator of EPA under any other provision of law (including, but not limited to, the imminent hazard authority of section 7003 of the Solid Waste Disposal Act [42 U.S.C. 6973]) or the response and abatement authorities of this chapter.

(13) All studies and results of research conducted under this subsection (other than health assessments) shall be reported or adopted only after appropriate peer review. Such peer review shall be completed, to the maximum extent practicable, within a period of 60 days. In the case of research conducted under the National Toxicology Program, such peer review may be conducted by the Board of Scientific Counselors. In the case of other research, such peer review shall be conducted by panels consisting of no less than three nor more than seven members, who shall be disinterested scientific experts selected for such purpose by the Administrator of ATSDR or the Administrator of EPA, as appropriate, on the basis of their reputation for scientific objectivity and the lack of institutional ties with any person involved in the conduct of the study or research under review. Support services for such panels shall be provided by the Agency for Toxic Substances and Disease Registry, or by the Environmental Protection Agency, as appropriate.

(14) In the implementation of this subsection and other health-related authorities of this chapter, the Administrator of ATSDR shall assemble, develop as necessary, and distribute to the States, and upon request to medical colleges, physicians, and other health professionals, appropriate educational materials (including short courses) on the medical surveillance, screening, and methods of diagnosis and treatment of injury or disease related to exposure to hazardous substances (giving priority to those listed in paragraph (2)), through such means as the Administrator of ATSDR deems appropriate.

(15) The activities of the Administrator of ATSDR described in this subsection and section 9611(c)(4) of this title shall be carried out by the Administrator of ATSDR, either directly or through cooperative agreements with States (or political subdivisions thereof) which the Administrator of ATSDR determines are capable of carrying out such activities. Such activities shall include provision of consultations on health information, the conduct of health assessments, including those required under section 3019(b) of the Solid Waste Disposal Act [42 U.S.C. 6939a(b)], health studies, registries, and health surveillance.

(16) The President shall provide adequate personnel for ATSDR, which shall not be fewer than 100 employees. For purposes of determining the number of employees under this subsection, an employee employed by ATSDR on a part-time career employment basis shall be counted as a fraction which is determined by dividing 40 hours into the average number of hours of such employee's regularly scheduled workweek.

(17) In accordance with section 9620 of this title (relating to Federal facilities), the Administrator of ATSDR shall have the same authorities under this section with respect to facilities owned or operated by a department, agency, or instrumentality of the United States as the Administrator of ATSDR has with respect to any nongovernmental entity.

(18) If the Administrator of ATSDR determines that it is appropriate for purposes of this section to treat a pollutant or contaminant as a hazardous substance, such pollutant or contaminant shall be treated as a hazardous substance for such purpose.

**(j) Acquisition of property**

**(1) Authority**

The President is authorized to acquire, by purchase, lease, condemnation, donation, or otherwise, any real property or any interest in real property that the President in his discretion determines is needed to conduct a remedial action under this chapter. There shall be no cause of action to compel the President to acquire any interest in real property under this chapter.

**(2) State assurance**

The President may use the authority of paragraph (1) for a remedial action only if, before an interest in real estate is acquired under this subsection, the State in which the interest to be acquired is located assures the President, through a contract or cooperative agreement or otherwise, that the State will accept transfer of the interest following completion of the remedial action.

Page 6877          TITLE 42—THE PUBLIC HEALTH AND WELFARE          § 9604

**(3) Exemption**

No Federal, State, or local government agency shall be liable under this chapter solely as a result of acquiring an interest in real estate under this subsection.

**(k) Brownfields revitalization funding**

**(1) Definition of eligible entity**

In this subsection, the term "eligible entity" means—

(A) a general purpose unit of local government;

(B) a land clearance authority or other quasi-governmental entity that operates under the supervision and control of or as an agent of a general purpose unit of local government;

(C) a government entity created by a State legislature;

(D) a regional council or group of general purpose units of local government;

(E) a redevelopment agency that is chartered or otherwise sanctioned by a State;

(F) a State;

(G) an Indian Tribe other than in Alaska; or

(H) an Alaska Native Regional Corporation and an Alaska Native Village Corporation as those terms are defined in the Alaska Native Claims Settlement Act (43 U.S.C. 1601 and following) and the Metlakatla Indian community.

**(2) Brownfield site characterization and assessment grant program**

**(A) Establishment of program**

The Administrator shall establish a program to—

(i) provide grants to inventory, characterize, assess, and conduct planning related to brownfield sites under subparagraph (B); and

(ii) perform targeted site assessments at brownfield sites.

**(B) Assistance for site characterization and assessment**

**(i) In general**

On approval of an application made by an eligible entity, the Administrator may make a grant to the eligible entity to be used for programs to inventory, characterize, assess, and conduct planning related to one or more brownfield sites.

**(ii) Site characterization and assessment**

A site characterization and assessment carried out with the use of a grant under clause (i) shall be performed in accordance with section 9601(35)(B) of this title.

**(3) Grants and loans for brownfield remediation**

**(A) Grants provided by the President**

Subject to paragraphs (4) and (5), the President shall establish a program to provide grants to—

(i) eligible entities, to be used for capitalization of revolving loan funds; and

(ii) eligible entities or nonprofit organizations, where warranted, as determined by the President based on considerations under subparagraph (C), to be used directly for remediation of one or more brownfield sites owned by the entity or organization that receives the grant and in amounts not to exceed $200,000 for each site to be remediated.

**(B) Loans and grants provided by eligible entities**

An eligible entity that receives a grant under subparagraph (A)(i) shall use the grant funds to provide assistance for the remediation of brownfield sites in the form of—

(i) one or more loans to an eligible entity, a site owner, a site developer, or another person; or

(ii) one or more grants to an eligible entity or other nonprofit organization, where warranted, as determined by the eligible entity that is providing the assistance, based on considerations under subparagraph (C), to remediate sites owned by the eligible entity or nonprofit organization that receives the grant.

**(C) Considerations**

In determining whether a grant under subparagraph (A)(ii) or (B)(ii) is warranted, the President or the eligible entity, as the case may be, shall take into consideration—

(i) the extent to which a grant will facilitate the creation of, preservation of, or addition to a park, a greenway, undeveloped property, recreational property, or other property used for nonprofit purposes;

(ii) the extent to which a grant will meet the needs of a community that has an inability to draw on other sources of funding for environmental remediation and subsequent redevelopment of the area in which a brownfield site is located because of the small population or low income of the community;

(iii) the extent to which a grant will facilitate the use or reuse of existing infrastructure;

(iv) the benefit of promoting the long-term availability of funds from a revolving loan fund for brownfield remediation; and

(v) such other similar factors as the Administrator considers appropriate to consider for the purposes of this subsection.

**(D) Transition**

Revolving loan funds that have been established before January 11, 2002, may be used in accordance with this paragraph.

**(4) General provisions**

**(A) Maximum grant amount**

**(i) Brownfield site characterization and assessment**

**(I) In general**

A grant under paragraph (2) may be awarded to an eligible entity on a community-wide or site-by-site basis, and shall not exceed, for any individual brownfield site covered by the grant, $200,000.

**(II) Waiver**

The Administrator may waive the $200,000 limitation under subclause (I) to

permit the brownfield site to receive a grant of not to exceed $350,000, based on the anticipated level of contamination, size, or status of ownership of the site.

**(ii) Brownfield remediation**

A grant under paragraph (3)(A)(i) may be awarded to an eligible entity on a community-wide or site-by-site basis, not to exceed $1,000,000 per eligible entity. The Administrator may make an additional grant to an eligible entity described in the previous sentence for any year after the year for which the initial grant is made, taking into consideration—

(I) the number of sites and number of communities that are addressed by the revolving loan fund;

(II) the demand for funding by eligible entities that have not previously received a grant under this subsection;

(III) the demonstrated ability of the eligible entity to use the revolving loan fund to enhance remediation and provide funds on a continuing basis; and

(IV) such other similar factors as the Administrator considers appropriate to carry out this subsection.

**(B) Prohibition**

**(i) In general**

No part of a grant or loan under this subsection may be used for the payment of—

(I) a penalty or fine;

(II) a Federal cost-share requirement;

(III) an administrative cost;

(IV) a response cost at a brownfield site for which the recipient of the grant or loan is potentially liable under section 9607 of this title; or

(V) a cost of compliance with any Federal law (including a Federal law specified in section 9601(39)(B) of this title), excluding the cost of compliance with laws applicable to the cleanup.

**(ii) Exclusions**

For the purposes of clause (i)(III), the term "administrative cost" does not include the cost of—

(I) investigation and identification of the extent of contamination;

(II) design and performance of a response action; or

(III) monitoring of a natural resource.

**(iii) Exception**

Notwithstanding clause (i)(IV), the Administrator may use up to 25 percent of the funds made available to carry out this subsection to make a grant or loan under this subsection to eligible entities that satisfy all of the elements set forth in section 9601(40) of this title to qualify as a bona fide prospective purchaser, except that the date of acquisition of the property was on or before January 11, 2002.

**(C) Assistance for development of local government site remediation programs**

A local government that receives a grant under this subsection may use not to exceed 10 percent of the grant funds to develop and implement a brownfields program that may include—

(i) monitoring the health of populations exposed to one or more hazardous substances from a brownfield site; and

(ii) monitoring and enforcement of any institutional control used to prevent human exposure to any hazardous substance from a brownfield site.

**(D) Insurance**

A recipient of a grant or loan awarded under paragraph (2) or (3) that performs a characterization, assessment, or remediation of a brownfield site may use a portion of the grant or loan to purchase insurance for the characterization, assessment, or remediation of that site.

**(5) Grant applications**

**(A) Submission**

**(i) In general**

**(I) Application**

An eligible entity may submit to the Administrator, through a regional office of the Environmental Protection Agency and in such form as the Administrator may require, an application for a grant under this subsection for one or more brownfield sites (including information on the criteria used by the Administrator to rank applications under subparagraph (C), to the extent that the information is available).

**(II) NCP requirements**

The Administrator may include in any requirement for submission of an application under subclause (I) a requirement of the National Contingency Plan only to the extent that the requirement is relevant and appropriate to the program under this subsection.

**(ii) Coordination**

The Administrator shall coordinate with other Federal agencies to assist in making eligible entities aware of other available Federal resources.

**(iii) Guidance**

The Administrator shall publish guidance to assist eligible entities in applying for grants under this subsection.

**(B) Approval**

The Administrator shall—

(i) at least annually, complete a review of applications for grants that are received from eligible entities under this subsection; and

(ii) award grants under this subsection to eligible entities that the Administrator determines have the highest rankings under the ranking criteria established under subparagraph (C).

**(C) Ranking criteria**

The Administrator shall establish a system for ranking grant applications received under this paragraph that includes the following criteria:

(i) The extent to which a grant will stimulate the availability of other funds for environmental assessment or remediation, and subsequent reuse, of an area in which one or more brownfield sites are located.

(ii) The potential of the proposed project or the development plan for an area in which one or more brownfield sites are located to stimulate economic development of the area on completion of the cleanup.

(iii) The extent to which a grant would address or facilitate the identification and reduction of threats to human health and the environment, including threats in areas in which there is a greater-than-normal incidence of diseases or conditions (including cancer, asthma, or birth defects) that may be associated with exposure to hazardous substances, pollutants, or contaminants.

(iv) The extent to which a grant would facilitate the use or reuse of existing infrastructure.

(v) The extent to which a grant would facilitate the creation of, preservation of, or addition to a park, a greenway, undeveloped property, recreational property, or other property used for nonprofit purposes.

(vi) The extent to which a grant would meet the needs of a community that has an inability to draw on other sources of funding for environmental remediation and subsequent redevelopment of the area in which a brownfield site is located because of the small population or low income of the community.

(vii) The extent to which the applicant is eligible for funding from other sources.

(viii) The extent to which a grant will further the fair distribution of funding between urban and nonurban areas.

(ix) The extent to which the grant provides for involvement of the local community in the process of making decisions relating to cleanup and future use of a brownfield site.

(x) The extent to which a grant would address or facilitate the identification and reduction of threats to the health or welfare of children, pregnant women, minority or low-income communities, or other sensitive populations.

**(6) Implementation of brownfields programs**

**(A) Establishment of program**

The Administrator may provide, or fund eligible entities or nonprofit organizations to provide, training, research, and technical assistance to individuals and organizations, as appropriate, to facilitate the inventory of brownfield sites, site assessments, remediation of brownfield sites, community involvement, or site preparation.

**(B) Funding restrictions**

The total Federal funds to be expended by the Administrator under this paragraph shall not exceed 15 percent of the total amount appropriated to carry out this subsection in any fiscal year.

**(7) Audits**

**(A) In general**

The Inspector General of the Environmental Protection Agency shall conduct such reviews or audits of grants and loans under this subsection as the Inspector General considers necessary to carry out this subsection.

**(B) Procedure**

An audit under this subparagraph shall be conducted in accordance with the auditing procedures of the Government Accountability Office, including chapter 75 of title 31.

**(C) Violations**

If the Administrator determines that a person that receives a grant or loan under this subsection has violated or is in violation of a condition of the grant, loan, or applicable Federal law, the Administrator may—

(i) terminate the grant or loan;
(ii) require the person to repay any funds received; and
(iii) seek any other legal remedies available to the Administrator.

**(D) Report to Congress**

Not later than 3 years after January 11, 2002, the Inspector General of the Environmental Protection Agency shall submit to Congress a report that provides a description of the management of the program (including a description of the allocation of funds under this subsection).

**(8) Leveraging**

An eligible entity that receives a grant under this subsection may use the grant funds for a portion of a project at a brownfield site for which funding is received from other sources if the grant funds are used only for the purposes described in paragraph (2) or (3).

**(9) Agreements**

Each grant or loan made under this subsection shall—

(A) include a requirement of the National Contingency Plan only to the extent that the requirement is relevant and appropriate to the program under this subsection, as determined by the Administrator; and

(B) be subject to an agreement that—

(i) requires the recipient to—

(I) comply with all applicable Federal and State laws; and
(II) ensure that the cleanup protects human health and the environment;

(ii) requires that the recipient use the grant or loan exclusively for purposes specified in paragraph (2) or (3), as applicable;

(iii) in the case of an application by an eligible entity under paragraph (3)(A), requires the eligible entity to pay a matching share (which may be in the form of a contribution of labor, material, or services) of at least 20 percent, from non-Federal sources of funding, unless the Administrator determines that the matching share would place an undue hardship on the eligible entity; and

(iv) contains such other terms and conditions as the Administrator determines to be necessary to carry out this subsection.

**(10) Facility other than brownfield site**

The fact that a facility may not be a brownfield site within the meaning of section 9601(39)(A) of this title has no effect on the eligibility of the facility for assistance under any other provision of Federal law.

**(11) Effect on Federal laws**

Nothing in this subsection affects any liability or response authority under any Federal law, including—

(A) this chapter (including the last sentence of section 9601(14) of this title);

(B) the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.);

(C) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.);

(D) the Toxic Substances Control Act (15 U.S.C. 2601 et seq.); and

(E) the Safe Drinking Water Act (42 U.S.C. 300f et seq.).

**(12) Funding**

**(A) Authorization of appropriations**

There is authorized to be appropriated to carry out this subsection $200,000,000 for each of fiscal years 2002 through 2006.

**(B) Use of certain funds**

Of the amount made available under subparagraph (A), $50,000,000, or, if the amount made available is less than $200,000,000, 25 percent of the amount made available, shall be used for site characterization, assessment, and remediation of facilities described in section 9601(39)(D)(ii)(II) of this title.

(Pub. L. 96–510, title I, § 104, Dec. 11, 1980, 94 Stat. 2774; Pub. L. 99–499, title I, §§ 104, 110, title II, § 207(b), Oct. 17, 1986, 100 Stat. 1617, 1636, 1705; Pub. L. 99–514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub. L. 102–531, title III, § 312(h), Oct. 27, 1992, 106 Stat. 3506; Pub. L. 107–118, title II, § 211(b), Jan. 11, 2002, 115 Stat. 2362; Pub. L. 108–271, § 8(b), July 7, 2004, 118 Stat. 814; Pub. L. 109–59, title I, § 1956, Aug. 10, 2005, 119 Stat. 1515.)

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 96–510, Dec. 11, 1980, 94 Stat. 2767, known as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 9601 of this title and Tables.

The Solid Waste Disposal Act, referred to in subsecs. (c)(3), (9)(D), (i)(10)(E), and (k)(11)(B), is title II of Pub. L. 89–272, Oct. 20, 1965, 79 Stat. 997, as amended generally by Pub. L. 94–580, § 2, Oct. 21, 1976, 90 Stat. 2795, which is classified generally to chapter 82 (§ 6901 et seq.) of this title. Subtitle C of the Act is classified generally to subchapter III (§ 6921 et seq.) of chapter 82 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6901 of this title and Tables.

Title III of the Amendments and Reauthorization Act of 1986, referred to in subsec. (e)(7)(E)(i), probably means title III of the Superfund Amendments and Reauthorization Act of 1986, Pub. L. 99–499, Oct. 17, 1986, 100 Stat. 1728, known as the Emergency Planning and Community Right-To-Know Act of 1986, which is classified generally to chapter 116 (§ 11001 et seq.) of this title. For complete classification of title III to the Code, see Short Title note set out under section 11001 of this title and Tables.

Reorganization Plan Numbered 14 of 1950, referred to in subsec. (g)(2), is set out in the Appendix to Title 5, Government Organization and Employees.

The Toxic Substances Control Act, referred to in subsecs. (i)(5)(C), (D) and (k)(11)(D), is Pub. L. 94–469, Oct. 11, 1976, 90 Stat. 2003, which is classified generally to chapter 53 (§ 2601 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 2601 of Title 15 and Tables.

The Federal Insecticide, Fungicide, and Rodenticide Act, referred to in subsec. (i)(5)(C), (D), is act June 25, 1947, ch. 125, as amended generally by Pub. L. 92–516, Oct. 21, 1972, 86 Stat. 973, which is classified generally to subchapter II (§ 136 et seq.) of chapter 6 of Title 7, Agriculture. For complete classification of this Act to the Code, see Short Title note set out under section 136 of Title 7 and Tables.

The Alaska Native Claims Settlement Act, referred to in subsec. (k)(1)(H), is Pub. L. 92–203, Dec. 18, 1971, 85 Stat. 688, which is classified generally to chapter 33 (§ 1601 et seq.) of Title 43, Public Lands. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of Title 43 and Tables.

The Federal Water Pollution Control Act, referred to in subsec. (k)(11)(C), is act June 30, 1948, ch. 758, as amended generally by Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 816, which is classified generally to chapter 26 (§ 1251 et seq.) of Title 33, Navigation and Navigable Waters. For complete classification of this Act to the Code, see Short Title note set out under section 1251 of Title 33 and Tables.

The Safe Drinking Water Act, referred to in subsec. (k)(11)(E), is title XIV of act July 1, 1944, as added Dec. 16, 1974, Pub. L. 93–523, § 2(a), 88 Stat. 1660, which is classified generally to subchapter XII (§ 300f et seq.) of chapter 6A of this title. For complete classification of this Act to the Code, see Short Title note set out under section 201 of this title and Tables.

CODIFICATION

In subsec. (g)(1), "sections 3141–3144, 3146, and 3147 of title 40" substituted for "the Davis-Bacon Act" and, in subsec. (g)(2), "section 3145 of title 40" substituted for "section 276c of title 40 of the United States Code", on authority of Pub. L. 107–217, § 5(c), Aug. 21, 2002, 116 Stat. 1303, the first section of which enacted Title 40, Public Buildings, Property, and Works.

AMENDMENTS

2005—Subsec. (k)(4)(B)(iii). Pub. L. 109–59 added cl. (iii).

2004—Subsec. (k)(7)(B). Pub. L. 108–271 substituted "Government Accountability Office" for "General Accounting Office".

2002—Subsec. (k). Pub. L. 107–118 added subsec. (k).

1992—Subsec. (i)(1). Pub. L. 102–531 substituted "Centers for Disease Control and Prevention" for "Centers for Disease Control".

1986—Subsec. (a)(1). Pub. L. 99–499, § 104(a), substituted provisions authorizing the President to allow owner or operator of facility or vessel or any other responsible party to carry out action, conduct the remedial investigation, or conduct feasibility study under section 9622 of this title, specifying conditions under which a remedial investigation or feasibility study would be authorized, providing for treatment of potentially responsible parties, and requiring President to give primary attention to those releases which the President deems may present a public health threat, for ", unless the President determines that such removal and remedial action will be done properly by the owner or operator of the vessel or facility from which the release or threat of release emanates, or by any other responsible party."

Subsec. (a)(2). Pub. L. 99–499, §104(b), amended par. (2) generally. Prior to amendment, par. (2) read as follows: "For the purposes of this section, 'pollutant or contaminant' shall include, but not be limited to, any element, substance, compound, or mixture, including disease-causing agents, which after release into the environment and upon exposure, ingestion, inhalation, or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavioral abnormalities, cancer, genetic mutation, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring. The term does not include petroleum, including crude oil and any fraction thereof which is not otherwise specifically listed or designated as hazardous substances under section 9601(14)(A) through (F) of this title, nor does it include natural gas, liquefied natural gas, or synthetic gas of pipeline quality (or mixtures of natural gas and such synthetic gas)."

Subsec. (a)(3), (4). Pub. L. 99–499, §104(c), added pars. (3) and (4).

Subsec. (b). Pub. L. 99–499, §104(d), designated existing provisions as par. (1), inserted par. (1) heading, and added par. (2).

Subsec. (c)(1). Pub. L. 99–499, §104(e)(1), substituted "$2,000,000" for "$1,000,000" and "12 months" for "six months".

Subsec. (c)(1)(C). Pub. L. 99–499, §104(e)(2), added cl. (C).

Subsec. (c)(3). Pub. L. 99–499, §§104(f), 207(b), substituted text of cl. (C)(ii) and sentence providing that "facility" does not include navigable waters or beds underlying those waters for "(ii) at least 50 per centum or such greater amount as the President may determine appropriate, taking into account the degree of responsibility of the State or political subdivision, of any sums expended in response to a release at a facility that was owned at the time of any disposal of hazardous substances therein by the State or a political subdivision thereof. The President shall grant the State a credit against the share of the costs for which it is responsible under this paragraph for any documented direct out-of-pocket non-Federal funds expended or obligated by the State or a political subdivision thereof after January 1, 1978, and before December 11, 1980, for cost-eligible response actions and claims for damages compensable under section 9611 of this title relating to the specific release in question: Provided, however, That in no event shall the amount of the credit granted exceed the total response costs relating to the release." and inserted provisions relating to remedial action to be taken on land or water held by an Indian tribe, held by the United States in trust for Indians, held by a member of an Indian Tribe (if such land or water is subject to a trust restriction on alienation), or otherwise within the borders of an Indian reservation.

Subsec. (c)(4). Pub. L. 99–499, §104(g), amended par. (4) generally. Prior to amendment, par. (4) read as follows: "The President shall select appropriate remedial actions determined to be necessary to carry out this section which are to the extent practicable in accordance with the national contingency plan and which provide for that cost-effective response which provides a balance between the need for protection of public health and welfare and the environment at the facility under consideration, and the availability of amounts from the Fund established under subchapter II of this chapter to respond to other sites which present or may present a threat to public health or welfare or the environment, taking into consideration the need for immediate action."

Subsec. (c)(5). Pub. L. 99–499, §104(h), added par. (5).
Subsec. (c)(6). Pub. L. 99–499, §104(i), added par. (6).
Subsec. (c)(7). Pub. L. 99–514 substituted "Internal Revenue Code of 1986" for "Internal Revenue Code of 1954", which for purposes of codification was translated as "title 26" thus requiring no change in text.

Pub. L. 99–499, §104(i), added par. (7).

Subsec. (c)(8). Pub. L. 99–499, §104(j), added par. (8).
Subsec. (c)(9). Pub. L. 99–499, §104(k), added par. (9).
Subsec. (d)(1). Pub. L. 99–499, §104(l), amended par. (1) generally. Prior to amendment, par. (1) read as follows: "Where the President determines that a State or political subdivision thereof has the capability to carry out any or all of the actions authorized in this section, the President may, in his discretion, enter into a contract or cooperative agreement with such State or political subdivision to take such actions in accordance with criteria and priorities established pursuant to section 9605(8) of this title and to be reimbursed for the reasonable response costs thereof from the Fund. Any contract made hereunder shall be subject to the cost-sharing provisions of subsection (c) of this section."

Subsec. (e)(1). Pub. L. 99–499, §104(m), added par. (1), and struck out former par. (1) which provided for access to, and copying of, records relating to covered substances, and entry by officers, employees or representatives of the President or a State into places where hazardous substances were or had been generated, stored, treated or disposed of, or transported from, and inspection and obtaining of samples of such substances and samples of containers or labeling for such substances.

Subsec. (e)(2) to (6). Pub. L. 99–499, §104(m), added pars. (2) to (6). Former par. (2) redesignated (7).

Subsec. (e)(7). Pub. L. 99–499, §104(m), (n), redesignated par. (2) as (7), aligned margin of par. (7) with pars. (1) through (6), and added par. heading and subpars. (E) and (F).

Subsec. (i). Pub. L. 99–499, §110, designated existing provisions as par. (1), redesignated former pars. (1) to (5) as subpars. (A) to (E), respectively, of par. (1), in introductory provisions of par. (1), struck out "and" after "Health Administration," and inserted "the Secretary of Transportation, and appropriate State and local health officials," in par. (1)(D), inserted "where appropriate", and added pars. (2) to (18).

Subsec. (j). Pub. L. 99–499, §104(o)(1), added subsec. (j).

TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of provisions in subsec. (i)(10) of this section relating to the requirement that the Administrator of ATSDR submit a biennial report to Congress, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and the 13th item on page 154 of House Document No. 103–7.

COORDINATION OF TITLES I TO IV OF PUB. L. 99–499

Any provision of titles I to IV of Pub. L. 99–499, imposing any tax, premium, or fee; establishing any trust fund; or authorizing expenditures from any trust fund, to have no force or effect, see section 531 of Pub. L. 99–499, set out as a note under section 1 of Title 26, Internal Revenue Code.

## § 9605. National contingency plan

### (a) Revision and republication

Within one hundred and eighty days after December 11, 1980, the President shall, after notice and opportunity for public comments, revise and republish the national contingency plan for the removal of oil and hazardous substances, originally prepared and published pursuant to section 1321 of title 33, to reflect and effectuate the responsibilities and powers created by this chapter, in addition to those matters specified in section 1321(c)(2)[1] of title 33. Such revision shall include a section of the plan to be known as the national hazardous substance response plan which shall establish procedures and standards for responding to releases of hazardous sub-

[1] See References in Text note below.

Page 7251          TITLE 42—THE PUBLIC HEALTH AND WELFARE          § 11045

section (d) of this section and a statement setting forth the items listed in paragraphs (1) through (3) as soon as circumstances permit.

**(c) Preventive measures by local health professionals**

**(1) Provision of information**

An owner or operator of a facility subject to the requirements of section 11021, 11022, or 11023 of this title shall provide the specific chemical identity, if known, of a hazardous chemical, an extremely hazardous substance, or a toxic chemical to any health professional (such as a physician, toxicologist, or epidemiologist)—

(A) who is a local government employee or a person under contract with the local government, and

(B) who requests such information in writing and provides a written statement of need under paragraph (2) and a written confidentiality agreement under subsection (d) of this section.

Following such a written request, the owner or operator to whom such request is made shall promptly provide the requested information to the local health professional. The authority to withhold the specific chemical identity of a chemical under section 11042 of this title when such information is a trade secret shall not apply to information required to be provided under this subsection, subject to the provisions of subsection (d) of this section.

**(2) Written statement of need**

The written statement of need shall be a statement that describes with reasonable detail one or more of the following health needs for the information:

(A) To assess exposure of persons living in a local community to the hazards of the chemical concerned.

(B) To conduct or assess sampling to determine exposure levels of various population groups.

(C) To conduct periodic medical surveillance of exposed population groups.

(D) To provide medical treatment to exposed individuals or population groups.

(E) To conduct studies to determine the health effects of exposure.

(F) To conduct studies to aid in the identification of a chemical that may reasonably be anticipated to cause an observed health effect.

**(d) Confidentiality agreement**

Any person obtaining information under subsection (a) or (c) of this section shall, in accordance with such subsection (a) or (c) of this section, be required to agree in a written confidentiality agreement that he will not use the information for any purpose other than the health needs asserted in the statement of need, except as may otherwise be authorized by the terms of the agreement or by the person providing such information. Nothing in this subsection shall preclude the parties to a confidentiality agreement from pursuing any remedies to the extent permitted by law.

**(e) Regulations**

As soon as practicable after October 17, 1986, the Administrator shall promulgate regulations describing criteria and parameters for the statement of need under subsection[1] (a) and (c) of this section and the confidentiality agreement under subsection (d) of this section.

(Pub. L. 99–499, title III, § 323, Oct. 17, 1986, 100 Stat. 1750.)

**§ 11044. Public availability of plans, data sheets, forms, and followup notices**

**(a) Availability to public**

Each emergency response plan, material safety data sheet, list described in section 11021(a)(2) of this title, inventory form, toxic chemical release form, and followup emergency notice shall be made available to the general public, consistent with section 11042 of this title, during normal working hours at the location or locations designated by the Administrator, Governor, State emergency response commission, or local emergency planning committee, as appropriate. Upon request by an owner or operator of a facility subject to the requirements of section 11022 of this title, the State emergency response commission and the appropriate local emergency planning committee shall withhold from disclosure under this section the location of any specific chemical required by section 11022(d)(2) of this title to be contained in an inventory form as tier II information.

**(b) Notice of public availability**

Each local emergency planning committee shall annually publish a notice in local newspapers that the emergency response plan, material safety data sheets, and inventory forms have been submitted under this section. The notice shall state that followup emergency notices may subsequently be issued. Such notice shall announce that members of the public who wish to review any such plan, sheet, form, or followup notice may do so at the location designated under subsection (a) of this section.

(Pub. L. 99–499, title III, § 324, Oct. 17, 1986, 100 Stat. 1752.)

**§ 11045. Enforcement**

**(a) Civil penalties for emergency planning**

The Administrator may order a facility owner or operator (except an owner or operator of a facility designated under section 11002(b)(2) of this title) to comply with section 11002(c) of this title and section 11003(d) of this title. The United States district court for the district in which the facility is located shall have jurisdiction to enforce the order, and any person who violates or fails to obey such an order shall be liable to the United States for a civil penalty of not more than $25,000 for each day in which such violation occurs or such failure to comply continues.

**(b) Civil, administrative, and criminal penalties for emergency notification**

**(1) Class I administrative penalty**

(A) A civil penalty of not more than $25,000 per violation may be assessed by the Administrator in the case of a violation of the requirements of section 11004 of this title.

---

[1] So in original. Probably should be "subsections".

**Environmental Protection Agency** §300.130

(3) The RPM shall participate in all decision-making processes necessary to ensure compliance with the NCP, including, as appropriate, agreements between EPA or other federal agencies and the state. The RPM may also review responses where EPA has preauthorized a person to file a claim for reimbursement to determine that the response was consistent with the terms of such preauthorization in cases where claims are filed for reimbursement.

(g)(1) Where a support agency has been identified through a cooperative agreement, Superfund Memorandum of Agreement (SMOA), or other agreement, that agency may designate a support agency coordinator (SAC) to provide assistance, as requested, by the OSC/RPM. The SAC is the prime representative of the support agency for response actions.

(2) The SAC's responsibilities may include:

(i) Providing and reviewing data and documents as requested by the OSC/RPM during the planning, design, and cleanup activities of the response action; and

(ii) Providing other assistance as requested.

(h)(1) The lead agency should provide appropriate training for its OSCs, RPMs, and other response personnel to carry out their responsibilities under the NCP.

(2) OSCs/RPMs should ensure that persons designated to act as their on-scene representatives are adequately trained and prepared to carry out actions under the NCP, to the extent practicable.

**§300.125  Notification and communications.**

(a) The National Response Center (NRC), located at USCG Headquarters, is the national communications center, continuously manned for handling activities related to response actions. The NRC acts as the single point of contact for all pollution incident reporting, and as the NRT communications center. Notice of discharges and releases must be made telephonically through a toll free number or a special local number (Telecommunication Device for the Deaf (TDD) and collect

calls accepted). (Notification details appear in §§300.300 and 300.405.) The NRC receives and immediately relays telephone notices of discharges or releases to the appropriate predesignated federal OSC. The telephone report is distributed to any interested NRT member agency or federal entity that has established a written agreement or understanding with the NRC. The NRC evaluates incoming information and immediately advises FEMA of a potential major disaster situation.

(b) The Commandant, USCG, in conjunction with other NRT agencies, shall provide the necessary personnel, communications, plotting facilities, and equipment for the NRC.

(c) Notice of an oil discharge or release of a hazardous substance in an amount equal to or greater than the reportable quantity must be made immediately in accordance with 33 CFR part 153, subpart B, and 40 CFR part 302, respectively. Notification shall be made to the NRC Duty Officer, HQ USCG, Washington, DC, telephone (800) 424–8802 or (202) 267–2675. All notices of discharges or releases received at the NRC will be relayed immediately by telephone to the OSC.

**§300.130  Determinations to initiate response and special conditions.**

(a) In accordance with CWA and CERCLA, the Administrator of EPA or the Secretary of the department in which the USCG is operating, as appropriate, is authorized to act for the United States to take response measures deemed necessary to protect the public health or welfare or environment from discharges of oil or releases of hazardous substances, pollutants, or contaminants except with respect to such releases on or from vessels or facilities under the jurisdiction, custody, or control of other federal agencies.

(b) The Administrator of EPA or the Secretary of the department in which the USCG is operating, as appropriate, is authorized to initiate and, in the case of a discharge posing a substantial threat to public health or welfare of the United States is required to initiate and direct, appropriate response activities when the Administrator or Secretary determines that any oil or CWA hazardous substance is discharged

33

§ 302.2                                                    **40 CFR Ch. I (7–1–15 Edition)**

section 311(b)(2)(A) of the Clean Water Act.

## § 302.2 [Reserved]

## § 302.3 Definitions.

As used in this part, all terms shall have the meaning set forth below:

*The Act, CERCLA,* or *Superfund* means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (Pub. L. 96–510);

*Administrator* means the Administrator of the United States Environmental Protection Agency (''EPA'');

*Animal waste* means manure (feces, urine, and other excrement produced by livestock), digestive emissions, and urea. The definition includes animal waste when mixed or commingled with bedding, compost, feed, soil and other typical materials found with animal waste.

*Consumer product* shall have the meaning stated in 15 U.S.C. 2052;

*Environment* means (1) the navigable waters, the waters of the contiguous zone, and the ocean waters of which the natural resources are under the exclusive management authority of the United States under the Fishery Conservation and Management Act of 1976, and (2) any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States;

*Facility* means (1) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (2) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel;

*Farm* means a facility on a tract of land devoted to the production of crops or raising of animals, including fish, which produced and sold, or normally would have produced and sold, $1,000 or more of agricultural products during a year.

*Hazardous substance* means any substance designated pursuant to 40 CFR part 302;

*Hazardous waste* shall have the meaning provided in 40 CFR 261.3;

*Navigable waters* or *navigable waters of the United States* means waters of the United States, including the territorial seas;

*Offshore facility* means any facility of any kind located in, on, or under, any of the navigable waters of the United States, and any facility of any kind which is subject to the jurisdiction of the United States and is located in, on, or under any other waters, other than a vessel or a public vessel;

*Onshore facility* means any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under, any land or non-navigable waters within the United States;

*Person* means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body;

*Release* means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes:

(1) Any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons;

(2) Emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine;

(3) Release of source, byproduct, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954, if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act, or for the purposes of section 104 of the Comprehensive Environmental Response, Compensation, and Liability

**Environmental Protection Agency**  §302.3, Nt.

Act or any other response action, any release of source, byproduct, or special nuclear material from any processing site designated under section 102(a)(1) or 302(a) of the Uranium Mill Tailings Radiation Control Act of 1978; and

(4) The normal application of fertilizer;

*Reportable quantity* (''RQ'') means that quantity, as set forth in this part, the release of which requires notification pursuant to this part;

*United States* include the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction; and

*Vessel* means every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.

[50 FR 13474, Apr. 4, 1985, as amended at 67 FR 45321, July 9, 2002; 73 FR 76959, Dec. 18, 2008]

EFFECTIVE DATE NOTE: At 80 FR 37123, June 29, 2015, §302.3 was amended by revising the definition of ''Navigable waters'', effective Aug. 28, 2015. For the convenience of the user, the revised text is set forth as follows:

§302.3  **Definitions.**

\*    \*    \*    \*    \*

*Navigable waters* means the waters of the United States, including the territorial seas.

(1) For purposes of the Clean Water Act, 33 U.S.C. 1251 *et seq.* and its implementing regulations, subject to the exclusions in paragraph (2) of this definition, the term ''waters of the United States'' means:

(i) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(ii) All interstate waters, including interstate wetlands;

(iii) The territorial seas;

(iv) All impoundments of waters otherwise identified as waters of the United States under this section;

(v) All tributaries, as defined in paragraph (3)(iii) of this definition, of waters identified in paragraphs (1)(i) through (iii) of this definition;

(vi) All waters adjacent to a water identified in paragraphs (1)(i) through (v) of this

definition, including wetlands, ponds, lakes, oxbows, impoundments, and similar waters;

(vii) All waters in paragraphs (1)(vii)(A) through (E) of this definition where they are determined, on a case-specific basis, to have a significant nexus to a water identified in paragraphs (1)(i) through (iii) of this definition. The waters identified in each of paragraphs (1)(vii)(A) through (E) of this definition are similarly situated and shall be combined, for purposes of a significant nexus analysis, in the watershed that drains to the nearest water identified in paragraphs (1)(i) through (iii) of this definition. Waters identified in this paragraph shall not be combined with waters identified in paragraph (1)(vi) of this definition when performing a significant nexus analysis. If waters identified in this paragraph are also an adjacent water under paragraph (1)(vi), they are an adjacent water and no case-specific significant nexus analysis is required.

(A) *Prairie potholes.* Prairie potholes are a complex of glacially formed wetlands, usually occurring in depressions that lack permanent natural outlets, located in the upper Midwest.

(B) *Carolina bays and Delmarva bays.* Carolina bays and Delmarva bays are ponded, depressional wetlands that occur along the Atlantic coastal plain.

(C) *Pocosins.* Pocosins are evergreen shrub and tree dominated wetlands found predominantly along the Central Atlantic coastal plain.

(D) *Western vernal pools.* Western vernal pools are seasonal wetlands located in parts of California and associated with topographic depression, soils with poor drainage, mild, wet winters and hot, dry summers.

(E) *Texas coastal prairie wetlands.* Texas coastal prairie wetlands are freshwater wetlands that occur as a mosaic of depressions, ridges, intermound flats, and mima mound wetlands located along the Texas Gulf Coast.

(viii) All waters located within the 100-year floodplain of a water identified in paragraphs (1)(i) through (iii) of this definition and all waters located within 4,000 feet of the high tide line or ordinary high water mark of a water identified in paragraphs (1)(i) through (v) of this definition where they are determined on a case-specific basis to have a significant nexus to a water identified in paragraphs (1)(i) through (iii) of this definition. For waters determined to have a significant nexus, the entire water is a water of the United States if a portion is located within the 100-year floodplain of a water identified in paragraphs (1)(i) through (iii) of this definition or within 4,000 feet of the high tide line or ordinary high water mark. Waters identified in this paragraph shall not be combined with waters identified in paragraph (1)(vi) of this definition when performing a significant nexus analysis. If waters identified in this paragraph are also an adjacent

289

water under paragraph (1)(vi), they are an adjacent water and no case-specific significant nexus analysis is required.

(2) The following are not ''waters of the United States'' even where they otherwise meet the terms of paragraphs (1)(iv) through (viii) of this definition.

(i) The following ditches:

(A) Ditches with ephemeral flow that are not a relocated tributary or excavated in a tributary.

(B) Ditches with intermittent flow that are not a relocated tributary, excavated in a tributary, or drain wetlands.

(C) Ditches that do not flow, either directly or through another water, into a water identified in paragraphs (1)(i) through (iii) of this definition.

(ii) The following features:

(A) Artificially irrigated areas that would revert to dry land should application of water to that area cease;

(B) Artificial, constructed lakes and ponds created in dry land such as farm and stock watering ponds, irrigation ponds, settling basins, fields flooded for rice growing, log cleaning ponds, or cooling ponds;

(C) Artificial reflecting pools or swimming pools created in dry land;

(D) Small ornamental waters created in dry land;

(E) Water-filled depressions created in dry land incidental to mining or construction activity, including pits excavated for obtaining fill, sand, or gravel that fill with water;

(F) Erosional features, including gullies, rills, and other ephemeral features that do not meet the definition of tributary, nonwetland swales, and lawfully constructed grassed waterways; and

(G) Puddles.

(iii) Groundwater, including groundwater drained through subsurface drainage systems.

(iv) Stormwater control features constructed to convey, treat, or store stormwater that are created in dry land.

(v) Wastewater recycling structures constructed in dry land; detention and retention basins built for wastewater recycling; groundwater recharge basins; percolation ponds built for wastewater recycling; and water distributary structures built for wastewater recycling.

(3) In this definition, the following terms apply:

(i) *Adjacent.* The term *adjacent* means bordering, contiguous, or neighboring a water identified in paragraphs (1)(i) through (v) of this definition, including waters separated by constructed dikes or barriers, natural river berms, beach dunes, and the like. For purposes of adjacency, an open water such as a pond or lake includes any wetlands within or abutting its ordinary high water mark. Adjacency is not limited to waters located laterally to a water identified in paragraphs

(1)(i) through (v) of this definition. Adjacent waters also include all waters that connect segments of a water identified in paragraphs (1)(i) through (v) or are located at the head of a water identified in paragraphs (1)(i) through (v) of this definition and are bordering, contiguous, or neighboring such water. Waters being used for established normal farming, ranching, and silviculture activities (33 U.S.C. 1344(f)) are not adjacent.

(ii) *Neighboring.* The term *neighboring* means:

(A) All waters located within 100 feet of the ordinary high water mark of a water identified in paragraphs (1)(i) through (v) of this definition. The entire water is neighboring if a portion is located within 100 feet of the ordinary high water mark;

(B) All waters located within the 100-year floodplain of a water identified in paragraphs (1)(i) through (v) of this definition and not more than 1,500 feet from the ordinary high water mark of such water. The entire water is neighboring if a portion is located within 1,500 feet of the ordinary high water mark and within the 100-year floodplain;

(C) All waters located within 1,500 feet of the high tide line of a water identified in paragraphs (1)(i) or (iii) of this definition, and all waters within 1,500 feet of the ordinary high water mark of the Great Lakes. The entire water is neighboring if a portion is located within 1,500 feet of the high tide line or within 1,500 feet of the ordinary high water mark of the Great Lakes.

(iii) *Tributary* and *tributaries.* The terms *tributary* and *tributaries* each mean a water that contributes flow, either directly or through another water (including an impoundment identified in paragraph (1)(iv) of this definition), to a water identified in paragraphs (1)(i) through (iii) of this definition that is characterized by the presence of the physical indicators of a bed and banks and an ordinary high water mark. These physical indicators demonstrate there is volume, frequency, and duration of flow sufficient to create a bed and banks and an ordinary high water mark, and thus to qualify as a tributary. A tributary can be a natural, man-altered, or man-made water and includes waters such as rivers, streams, canals, and ditches not excluded under paragraph (2) of this definition. A water that otherwise qualifies as a tributary under this definition does not lose its status as a tributary if, for any length, there are one or more constructed breaks (such as bridges, culverts, pipes, or dams), or one or more natural breaks (such as wetlands along the run of a stream, debris piles, boulder fields, or a stream that flows underground) so long as a bed and banks and an ordinary high water mark can be identified upstream of the break. A water that otherwise qualifies as a tributary under this definition does not lose its status as a tributary if it contributes flow through a water of the

**Environmental Protection Agency**                                    **§ 302.4**

United States that does not meet the definition of tributary or through a non-jurisdictional water to a water identified in paragraphs (1)(i) through (iii) of this definition.

(iv) *Wetlands.* The term *wetlands* means those areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.

(v) *Significant nexus.* The term *significant nexus* means that a water, including wetlands, either alone or in combination with other similarly situated waters in the region, significantly affects the chemical, physical, or biological integrity of a water identified in paragraphs (1)(i) through (iii) of this definition. The term "in the region" means the watershed that drains to the nearest water identified in paragraphs (1)(i) through (iii) of this definition. For an effect to be significant, it must be more than speculative or insubstantial. Waters are similarly situated when they function alike and are sufficiently close to function together in affecting downstream waters. For purposes of determining whether or not a water has a significant nexus, the water's effect on downstream (1)(i) through (iii) waters shall be assessed by evaluating the aquatic functions identified in paragraphs (3)(v)(A) through (I) of this definition. A water has a significant nexus when any single function or combination of functions performed by the water, alone or together with similarly situated waters in the region, contributes significantly to the chemical, physical, or biological integrity of the nearest water identified in paragraphs (1)(i) through (iii) of this definition. Functions relevant to the significant nexus evaluation are the following:

(A) Sediment trapping,

(B) Nutrient recycling,

(C) Pollutant trapping, transformation, filtering, and transport,

(D) Retention and attenuation of flood waters,

(E) Runoff storage,

(F) Contribution of flow,

(G) Export of organic matter,

(H) Export of food resources, and

(I) Provision of life cycle dependent aquatic habitat (such as foraging, feeding, nesting, breeding, spawning, or use as a nursery area) for species located in a water identified in paragraphs (1)(i) through (iii) of this section.

(vi) *Ordinary high water mark.* The term *ordinary high water mark* means that line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.

(vii) *High tide line.* The term *high tide line* means the line of intersection of the land with the water's surface at the maximum height reached by a rising tide. The high tide line may be determined, in the absence of actual data, by a line of oil or scum along shore objects, a more or less continuous deposit of fine shell or debris on the foreshore or berm, other physical markings or characteristics, vegetation lines, tidal gages, or other suitable means that delineate the general height reached by a rising tide. The line encompasses spring high tides and other high tides that occur with periodic frequency but does not include storm surges in which there is a departure from the normal or predicted reach of the tide due to the piling up of water against a coast by strong winds such as those accompanying a hurricane or other intense storm.

## § 302.4 Designation of hazardous substances.

(a) *Listed hazardous substances.* The elements and compounds and hazardous wastes appearing in table 302.4 are designated as hazardous substances under section 102(a) of the Act.

(b) *Unlisted hazardous substances.* A solid waste, as defined in 40 CFR 261.2, which is not excluded from regulation as a hazardous waste under 40 CFR 261.4(b), is a hazardous substance under section 101(14) of the Act if it exhibits any of the characteristics identified in 40 CFR 261.20 through 261.24.

NOTE: The numbers under the column headed "CASRN" are the Chemical Abstracts Service Registry Numbers for each hazardous substance. The "Statutory Code" column indicates the statutory source for designating each substance as a CERCLA hazardous substance: "1" indicates that the statutory source is section 311(b)(2) of the Clean Water Act, "2" indicates that the source is section 307(a) of the Clean Water Act, "3" indicates that the source is section 112 of the Clean Air Act, and "4" indicates that the source is section 3001 of the Resource Conservation and Recovery Act (RCRA). The "RCRA Waste Number" column provides the waste identification numbers assigned to various substances by RCRA regulations. The "Pounds (kg)" column provides the reportable quantity adjustment for each hazardous substance in pounds and kilograms. Appendix A to § 302.4, which lists CERCLA hazardous substances in sequential order by CASRN, provides a per-substance grouping of regulatory synonyms (*i.e.*, names

291

**Environmental Protection Agency**                                  **§ 355.61**

(b) For a release that occurs during transportation or from storage incident to transportation, you may meet the requirements of this subpart by notifying the 911 operator (or in the absence of a 911 emergency telephone number, the operator) of the immediate notification information listed in §355.40(a). You are not required under this subpart to submit a written follow-up notification, as described in §355.40(b), for such a release.

### § 355.43 When must I submit the information?

(a) You must provide the required emergency release notification information described under §355.40(a), immediately.

(b) You must provide the written follow-up emergency notice (or notices, as more information becomes available)

described under §355.40(b), as soon as practicable after the release.

## Subpart D—Additional Provisions

### § 355.60 What is the relationship between the emergency release notification requirements of this part and the release notification requirements of CERCLA?

The emergency release notification requirements of this part are in addition to the release notification requirements of CERCLA. If you have a release of a CERCLA hazardous substance, you must comply with the emergency release notification requirements of this part and the release notification requirements of CERCLA section 103, codified at 40 CFR part 302. Use this table to determine which emergency release notification requirements apply to your release:

| If a reportable quantity of a substance is released within a 24-hour period at your facility | And if the release is reportable under EPCRA Section 304, you must | And if the release is reportable under CERCLA Section 103, you must |
|---|---|---|
| (a) And the substance is on BOTH the list of EHSs (Appendices A and B of this part) AND the list of CERCLA Hazardous Substances (40 CFR 302.4). | Notify the LEPC and the SERC in accordance with §§355.40 through 355.43 of this part (except for a release during transportation or from storage incident to transportation; see §355.42(b)). | Comply with the release notification requirements of CERCLA section 103 and its implementing regulations (40 CFR part 302). Call the NRC at 800–424–8802. |
| (b) And the substance is on the list of CERCLA Hazardous Substances (40 CFR 302.4) and not on the list of EHSs (Appendices A and B of this part). | Notify the LEPC and the SERC, in accordance with §§355.40 through 355.43 of this part (except for a release during transportation or from storage incident to transportation; see in §355.42(b)). | Comply with the release notification requirements of CERCLA section 103 and its implementing regulations (40 CFR part 302). Call the NRC at 800–424–8802. |
| (c) And the substance is on the list of EHSs (Appendices A and B of this part) and not the list of CERCLA Hazardous Substances (40 CFR 302.4). | Notify the LEPC and the SERC in accordance with §§355.40 through 355.43 of this part (except for a release during transportation or from storage incident to transportation; see §355.42(b)). | |

**Note:** This table only applies to reportable releases, not to exempt releases.

### § 355.61 How are key words in this part defined?

*Animal waste* means manure (feces, urine, and other excrement produced by livestock), digestive emissions, and urea. The definition includes animal waste when mixed or commingled with bedding, compost, feed, soil and other typical materials found with animal waste.

*CERCLA* means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

*CERCLA hazardous substance* means a substance defined in section 101(14) of CERCLA and listed in Table 302.4 of 40 CFR 302.4.

*Chief Executive Officer of the Tribe* means the person who is recognized by the Bureau of Indian Affairs as the chief elected administrative officer of the Tribe.

*Environment* includes water, air, and land and the interrelationship that exists among and between water, air, and land and all living things.

445

*EPCRA* means the Emergency Planning and Community Right-To-Know Act of 1986.

*Extremely hazardous substance (EHS)* means a substance listed in Appendices A and B of this part.

*Facility* means all buildings, equipment, structures, and other stationary items that are located on a single site or on contiguous or adjacent sites and that are owned or operated by the same person (or by any person that controls, is controlled by, or under common control with, such person). *Facility* includes manmade structures, as well as all natural structures in which chemicals are purposefully placed or removed through human means such that it functions as a containment structure for human use. For purposes of emergency release notification, the term includes motor vehicles, rolling stock, and aircraft.

*Farm* means a facility on a tract of land devoted to the production of crops or raising of animals, including fish, which produced and sold, or normally would have produced and sold, $1,000 or more of agricultural products during a year.

*Hazardous chemical* means any hazardous chemical as defined under 29 CFR 1910.1200(c), except that this term does not include:

(1) Any food, food additive, color additive, drug, or cosmetic regulated by the Food and Drug Administration.

(2) Any substance present as a solid in any manufactured item to the extent exposure to the substance does not occur under normal conditions of use.

(3) Any substance to the extent it is used:

(i) For personal, family, or household purposes, or is present in the same form and concentration as a product packaged for distribution and use by the general public. Present in the same form and concentration as a product packaged for distribution and use by the general public means a substance packaged in a similar manner and present in the same concentration as the substance when packaged for use by the general public, whether or not it is intended for distribution to the general public or used for the same purpose as when it is packaged for use by the general public;

(ii) In a research laboratory or hospital or other medical facility under the direct supervision of a technically qualified individual; or

(iii) In routine agricultural operations or is a fertilizer held for sale by a retailer to the ultimate customer.

*Indian Country* means Indian country defined in 18 U.S.C. 1151 as:

(1) All land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation;

(2) All dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a State; and

(3) All Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

*Indian Tribe or Tribe* means those Tribes federally recognized by the Secretary of the Interior.

*LEPC* means the Local Emergency Planning Committee appointed by the State Emergency Response Commission.

*Medium or media* means the environment (*i.e.*, air, water, land).

*Mixture* means, for the purposes of 40 CFR part 355, a heterogeneous association of substances where the various individual substances retain their identities and can usually be separated by mechanical means. This definition includes, for the purposes of 40 CFR part 355, solutions but does not include alloys or amalgams.

*Non-reactive solid* means any substance listed in Appendix A or B of this part with two threshold planning quantity values, the higher TPQ being 10,000 pounds.

*Person* means any individual, trust, firm, joint stock company, corporation (including a government corporation), partnership, association, State, municipality, commission, political subdivision of a State, or interstate body.

*Reactive solid* means any extremely hazardous substance denoted with ''a'' in the ''Notes'' column in Appendix A or B of this part.

**Environmental Protection Agency**                              **Pt. 355, App. A**

*Release* means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles) of any hazardous chemical, EHS, or CERCLA hazardous substance.

*Reportable quantity* means, for any CERCLA hazardous substance, the quantity established in Table 302.4 of 40 CFR 302.4, for such substance. For any EHS, reportable quantity means the quantity established in Appendices A and B of this part for such substance. Unless and until superseded by regulations establishing a reportable quantity for newly listed EHSs or CERCLA hazardous substances, a weight of 1 pound shall be the reportable quantity.

*SERC* means the State Emergency Response Commission for the State in which the facility is located except where the facility is located in Indian Country, in which case, SERC means the Emergency Response Commission for the Tribe under whose jurisdiction the facility is located. In the absence of a SERC for a State or Indian Tribe, the Governor or the chief executive officer of the tribe, respectively, shall be the SERC. Where there is a cooperative agreement between a State and a Tribe, the SERC shall be the entity identified in the agreement.

*Solution* means any aqueous or organic solutions, slurries, viscous solutions, suspensions, emulsions, or pastes.

*State* means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Northern Mariana Islands, any other territory or possession over which the United States has jurisdiction and Indian Country.

*Threshold planning quantity* means, for a substance listed in Appendices A and B of this part, the quantity listed in the column ''threshold planning quantity'' for that substance.

[73 FR 65462, Nov. 3, 2008, as amended at 73 FR 76960, Dec. 18, 2008; 77 FR 16688, Mar. 22, 2012]

APPENDIX A TO PART 355—THE LIST OF EXTREMELY HAZARDOUS SUBSTANCES AND THEIR THRESHOLD PLANNING QUANTITIES

[Alphabetical Order]

| CAS No. | Chemical name | Notes | Reportable quantity * (pounds) | Threshold planning quantity (pounds) |
|---|---|---|---|---|
| 75–86–5 | Acetone Cyanohydrin | | 10 | 1,000 |
| 1752–30–3 | Acetone Thiosemicarbazide | | 1,000 | 1,000/10,000 |
| 107–02–8 | Acrolein | | 1 | 500 |
| 79–06–1 | Acrylamide | f | 5,000 | 1,000/10,000 |
| 107–13–1 | Acrylonitrile | f | 100 | 10,000 |
| 814–68–6 | Acrylyl Chloride | d | 100 | 100 |
| 111–69–3 | Adiponitrile | f | 1,000 | 1,000 |
| 116–06–3 | Aldicarb | b | 1 | 100/10,000 |
| 309–00–2 | Aldrin | | 1 | 500/10,000 |
| 107–18–6 | Allyl Alcohol | | 100 | 1,000 |
| 107–11–9 | Allylamine | | 500 | 500 |
| 20859–73–8 | Aluminum Phosphide | a | 100 | 500 |
| 54–62–6 | Aminopterin | | 500 | 500/10,000 |
| 78–53–5 | Amiton | | 500 | 500 |
| 3734–97–2 | Amiton Oxalate | | 100 | 100/10,000 |
| 7664–41–7 | Ammonia | f | 100 | 500 |
| 300–62–9 | Amphetamine | f | 1,000 | 1,000 |
| 62–53–3 | Aniline | f | 5,000 | 1,000 |
| 88–05–1 | Aniline, 2,4,6-Trimethyl- | | 500 | 500 |
| 7783–70–2 | Antimony Pentafluoride | | 500 | 500 |
| 1397–94–0 | Antimycin A | b | 1,000 | 1,000/10,000 |
| 86–88–4 | ANTU | | 100 | 500/10,000 |
| 1303–28–2 | Arsenic Pentoxide | | 1 | 100/10,000 |
| 1327–53–3 | Arsenous Oxide | d | 1 | 100/10,000 |
| 7784–34–1 | Arsenous Trichloride | | 1 | 500 |
| 7784–42–1 | Arsine | | 100 | 100 |
| 2642–71–9 | Azinphos-Ethyl | | 100 | 100/10,000 |
| 86–50–0 | Azinphos-Methyl | | 1 | 10/10,000 |
| 98–87–3 | Benzal Chloride | | 5,000 | 500 |

447

ADD24

# Exhibit 8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NATIONAL PORK PRODUCERS COUNCIL, et al.,

Plaintiffs,

v.                                                    Case No. 3:09-cv-00073-slc

LISA P. JACKSON,
Administrator, U.S. EPA,

Defendant.

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO
DISMISS OR IN THE ALTERNATIVE TO TRANSFER TO
THE COURT OF APPEALS FOR THE D.C. CIRCUIT**

## INTRODUCTION

Defendant's Motion to Dismiss raises a simple issue: should multiple challenges to a single agency rulemaking be permitted to proceed in separate courts, or should they instead be adjudicated by a single court so that all claims, by all parties, can be addressed in a coherent and consistent fashion?  Applying basic concepts of fairness, avoidance of duplicative and inconsistent rulings, and judicial economy, all courts that have addressed this issue have declared that where jurisdiction over challenges to different portions of an agency rulemaking are, respectively, to be filed in a district court and in a court of appeals that has exclusive jurisdiction over at least one of the claims, the entire case *must* be heard by the court of appeals.  While Plaintiffs try mightily to distinguish this unbroken line of cases, they are left merely to describe distinctions which have no bearing on the bases or rationale for the creation of this well-reasoned doctrine.

Plaintiffs assert that even if Counts II-IV of their Complaint -- which directly challenge the Rulemaking[1] simultaneously being challenged in the Court of Appeals for the D.C. Circuit -- may be appropriate for review by the D.C. Circuit, Count I of the Complaint nevertheless requires consideration by this Court because: (a) it is based on the underlying statute, not the Rulemaking at issue; and (b) it requires factual development.  First, it is clear that the Court of Appeals can not rule on the validity of the exemptions granted by the Environmental Protection Agency ("EPA") in its Rulemaking without first considering what parties are subject to reporting requirements under the statute; the very issue that Plaintiffs raise in Count I of their Complaint.

Moreover, it is readily apparent that Count I of Plaintiffs' Complaint does not raise any actual controversy over which this Court has jurisdiction.  Indeed, the reason Plaintiffs contend that Count I requires factual development is because no factual dispute has been presented to EPA.  Plaintiffs do not allege that a *single* farmer or feed operation (including any of the farmers who submitted declarations in support of Plaintiffs' Motion for Summary Judgment),[2] has been denied application of the exception to reporting requirements available for "routine agricultural operations" that is the subject of Count I of the Complaint.

Regardless of how Plaintiffs characterize their claims, it is clear that they arise from the same EPA actions and involve the same operative facts and administrative record as those presently before the D.C. Circuit.  While there otherwise might be jurisdiction to pursue Plaintiffs' EPCRA claims in this Court, the existence of the D.C. Circuit case forecloses that

---

[1] The rulemaking being challenge is entitled "CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms," 73 Fed. Reg. 76,948 (Dec. 18, 2008) (hereinafter the "Rulemaking").

[2] On March 20, 2009 Plaintiffs filed a Motion for Summary Judgment (Dkt. No. 21).  All briefing on that Motion, as well as all discovery, has been stayed pending the decisions of the Court on Defendant's Motion to Dismiss.  See Order at Dkt. No. 32.

opportunity. Plaintiffs can not circumvent this restriction by creating controversies that do not exist or asserting factual issues that are irrelevant and unripe.

## PROCEDURAL UPDATE

In its opening brief in support of its Motion to Dismiss or in the Alternative to Transfer to the Court of Appeals filed on March 3, 2009 ("EPA Br."), Defendant Lisa Jackson (hereinafter "EPA") set forth the procedural posture of both this case and the pending case in the Court of Appeals, as of the date of the filing of its Motion on March 3, 2009. On March 23, 2009, Plaintiff National Pork Producers Council ("Pork Council"), which is also a Petitioner in the case before the Court of Appeals, filed a motion in the D.C. Circuit seeking to stay briefing with regard to all EPCRA claims. (A copy of that Motion was filed in this Court at Dkt. No. 33). On April 3, 2009, the Initial Petitioners in the D.C. Circuit case filed a response ("Initial Petitioners' Response," attached as Ex. A), stating that while they had no objection to a stay of the briefing schedule, the Court of Appeals had jurisdiction over the EPCRA claims as well as CERCLA claims. On April 6, 2009, EPA filed its own response, stating that it too had no objection to a stay of the entire briefing schedule pending this Court's ruling on the Motion to Dismiss, and that the Court of Appeals had jurisdiction over all claims, including the EPCRA claims presented in this action. Ex. B.

## ARGUMENT

## I.     COUNTS II-IV OF THE COMPLAINT MUST BE ADJUDICATED IN THE COURT OF APPEALS

Plaintiffs do not dispute that Counts II-IV of their Complaint challenge the identical Rulemaking being challenged in the D.C. Circuit. Nor do Plaintiffs dispute that the Initial Petitioners in the Court of Appeals action are challenging EPA's Rulemaking as it relates to EPCRA as well as CERCLA, and do so based on the identical bases as Plaintiffs do here.

Compare Plaintiffs' challenge in this case ("In those Counts [II, III, and IV] the Farm Groups allege that the EPCRA rule is arbitrary, capricious, and abuse of discretion [and] in excess of EPA's authority . . . ." Plaintiffs' Opposition brief ("Opp. Br.") at 3), with Initial Petitioners' EPCRA challenge in the Court of Appeals (EPA's orders under CERCLA and EPCRA are "arbitrary, capricious or otherwise contrary to the law."  EPA Br. at Ex. B).[3]  Accordingly, Plaintiffs do not – and can not – dispute that this Court and the D.C. Circuit will, based on the identical administrative record, be addressing the identical issues in adjudicating the EPCRA claim; whether EPA exceeded its statutory authority in issuing the type of reporting exemption it promulgated and whether the granting of that exemption was arbitrary and capricious.

As detailed in EPA's opening brief, the courts have uniformly held that where a rulemaking or other agency decision involves multiple statutes and claims, some of which would be reviewable in the district court and some of which must be reviewed exclusively by the court of appeals, notions of fairness, judicial economy, and the need to avoid duplicative and potentially inconsistent rulings, require that all claims be adjudicated by the court of appeals. EPA Br. at 8-13, citing Suburban O'Hare Comm'n v. Dole, 787 F.2d 186, 192 (7th Cir. 1986), and related decisions.

In response to an unbroken line of cases adopting this view, Plaintiffs rely on one case, this Court's decision in Barnes v. Shalala, 865 F. Supp. 550 (W.D. Wis. 1994), but that case is quite obviously inapposite.  In Barnes this Court simply found that the Order being challenged did not fit within the parameters for submitting the dispute to the Court of Appeals under the jurisdictional statute at issue in that case.  Thus, the Court found Suburban O'Hare inapplicable because Suburban O'Hare "does not address situations like this one where no basis for the

---

[3] See also Initial Petitioners' April 3, 2009 brief to the Court of Appeals, Ex. A at 3: "Waterkeeper Alliance [Petitioners] intends to challenge both the CERCLA and the EPCRA reporting exemptions on the basis that they are unlawful, arbitrary and capricious."

agency action is exclusively within the jurisdiction of the courts of appeals." 865 F. Supp. at 557. In this case, there is no dispute that a significant portion of the single Rulemaking at issue (the challenge under CERCLA) can *only* be challenged in the D.C. Circuit Court of Appeals.

Lacking any contrary authority, Plaintiffs seek to distinguish the Suburban O'Hare line of cases. Plaintiffs assert that all these cases dealt with "unitary" rulemakings. Plaintiffs then contend that because, in their view, the Rulemaking at issue contained two different rulings, one under CERCLA and one under EPCRA, the Suburban O'Hare line of cases has no application. Opp. Br. at 9-10.

First, Plaintiffs' description of the Suburban O'Hare line of cases is not accurate. For example, in Shell Oil Co. v. FERC, 47 F.3d 1186 (D.C. Cir. 1995), two separate parties challenged the agency's decision made under two separate statutes in a single rulemaking, just like here. Even though the court recognized that the order contained two distinct rulings ("The court is thus presented with two petitions challenging different rulings in the same order;" "the instant case involves separate petitioners seeking review of two distinct rulings in a single declaratory order," 47 F.3d at 1194-95), and that the district court had original jurisdiction over one of those rulings, it nevertheless concluded that all claims needed to be adjudicated by the court of appeals. Id. at 1195. As the court explained, the need to ensure that review of the order is treated with "uniformity and consistency" overrides a plaintiff's right to pursue his particular claim in the district court. Id. at 1195 & n.20.

Indeed, Suburban O'Hare itself included a claim not only that the FAA had violated various statutes but also that it had violated a separate consent decree. Although the 7th Circuit recognized that this claim was markedly different from the statutory claims and this is "primarily [an assertion of] a breach of contractual obligations," which is factually based and which on its

own would be subject to district court jurisdiction, it arose out of the same operative set of facts and, accordingly, should be heard by the Court of Appeals.  787 F.2d at 193.

In any event, this  is not a case, as Plaintiffs imply (Opp. Br. at 3), where EPA conducted two distinct "unitary" administrative proceedings and merely announced them in one rulemaking so as to secure court of appeals jurisdiction over all facets of its order.  Instead, as previously outlined, from the outset the CERCLA and EPCRA portions of the rulemaking were considered together, commented on together, and adopted together.  And, doing so was clearly the appropriate administrative path, since the reporting requirements under Section 103 of CERCLA, 42 U.S.C. § 9603,  and Section 304 of EPCRA, 42 U.S.C. § 11004,  cover the same types of events and, in the case of at least part of the EPCRA reporting requirements, are expressly based on CERCLA reporting requirements.  See  42 U.S.C. § 11004 (a)(1): "If a release of an extremely hazardous substance referred to in section 11002(a) of this title [EPCRA] occurs from a facility at which a hazardous chemical is produced, used, or stored, and such release requires notification under section 103(a) of [CERCLA] . . . , the owner or operator of the facility shall immediately provide notice as described in subsection (b) of this section."

In the end, the Suburban O'Hare line of cases make clear that the doctrine they prescribe does not depend upon how the rulemaking is structured, or how many rulings are contained within the single rulemaking, or whether a particular plaintiff is interested in only a portion of the rulemaking.  The doctrine was developed to ensure that multiple courts are not reviewing the same administrative record, to address issues that arise from a common set of operative facts, leading to decisions which may not only be duplicative but have a substantial chance of being inconsistent.   As the court stated in City of Rochester v. Bond, 603 F.2d 927, 936 (D.C. Cir. 1979), review of an order should not depend on "the substantive infirmity alleged," and that a

single review to be conducted by the court of appeals reflects a policy that "disfavors bifurcating jurisdiction over various substantive grounds between district court and the court of appeals. The likelihood of duplication and inconsistency would exist in either case."

The very real potential for inconsistent decisions with regard to the Rulemaking at issue in this case is obvious.   For example, the Initial Petitioners in the D.C. Circuit allege that EPA's granting of both a full exemption under CERCLA and a partial exemption under EPCRA was arbitrary and capricious, based on the record before the Agency.  In this case, Plaintiffs allege essentially the opposite; that the record supports only a full exemption and the partial exemption granted under EPCRA is not supported by the record and is arbitrary and capricious.  Thus, there will be – indeed, there already is -- a "race to the courthouse" to see which court rules first on this (and other) issues.

This race to a judgment would occur even if Petitioners in the D.C. Circuit were only claiming that EPA's rulemaking violated CERCLA (which is not the case).  In both cases, the respective courts will need to review and assess the record supporting the factual determinations made by EPA supporting the exemption it granted.  Thus, there clearly is an opportunity for each Court to make very different findings about the adequacy of the identical administrative record. Under these circumstances, the courts have made clear that they will not participate in the race to judgment; all claims should be addressed by a single court, the court of appeals.

## II.    THIS COURT LACKS JUSRIDICTION TO ADJUDICATE COUNT I OF THE COMPLAINT

Plaintiffs assert that regardless of whether the D.C. Circuit addresses the claims in Counts II-IV of their Complaint, Count I raises a wholly different claim that can only be addressed by this Court.  According to Plaintiffs, Count I of the Complaint is based on a single sentence included in the Preamble to the Rulemaking, not in the final rule itself.  Opp. Br. at 4-5.

Plaintiffs assert that the statement in the Preamble, that farms are like all other facilities and must follow EPCRA reporting requirements, is a misstatement of the law and so threatening to the existence of animal feeding operations ("AFOs") that it demands that this Court issue a Declaratory Judgment explaining that EPCRA should not be so interpreted.  Opp. Br. at 4-5.  The allegedly offending language actually reads as follows:

> Owners and operators of farms, like all other facilities, are required to report the release of hazardous substances into the environment in accordance with CERCLA section 103 and EPCRA section 304 when it meets or exceeds the RQ [reporting quantities] of the hazardous substance.

Id. quoting 73 Fed. Reg. at 76,951.  Plaintiffs assert that farms are not like all other facilities and that "*most* farms" may be excluded from EPCRA's reporting requirements under the statutory exclusion for "routine agricultural operations" set forth in section 311(e) of EPCRA, 42 U.S.C. § 11021(e).  Opp. Br. at 5 (emphasis added).[4]

To buttress their attempt to obtain from this Court a declaratory judgment based on a single sentence included in the preamble to the Rulemaking, Plaintiffs imply that the notion that farms might be subject to EPCRA reporting requirements is a new position of EPA, thereby requiring this Court to clear up the purported confusion.  Opp. Br. at 3 (characterizing the above-quoted language as "EPA's recent position").  See also Complaint at ¶ 20.  To further support their contention that this claim needs to be addressed in the District Court, where discovery can be obtained, Plaintiffs assert that "the meaning and extent of the exemption for substances used in 'routine agricultural operations' [can not be determined] without an inquiry into how farmers use substances on their farms."  Id. at 6.

---

[4] Under section 304 of EPCRA, 42 U.S.C. §11004(a), releases of hazardous substances must be reported if they occur at a facility at which a "hazardous chemical" is produced, used or stored.  Under section 311(e)(5), 42 U.S.C. §11021(e)(5), a "hazardous chemical" does not include "any substance to the extent it is used in routine agricultural operations or is a fertilizer held for sale by a retailer to the ultimate customer."

Plaintiffs' allegations in Count I are, at best, an overreaction to a non-binding, single sentence generally describing the underlying regulatory framework of EPCRA or, at worst, an artifice to try to create jurisdiction in this Court.  It is clear that: (a) this Court – or any Court, for that matter – lacks jurisdiction to consider the claims in Count I; (b) to the extent any claims exist, they are not ripe, since neither Plaintiffs nor their declarants have been threatened with any prosecution or other imminent harm nor have they even been informed that they are precluded from  applying  the "routine agricultural operations" exception; and (c) even if this Court had jurisdiction to address Count I, its underlying premise (whether farms are subject to EPCRA in the first instance) is so inextricably intertwined with the claims before the D.C. Circuit, it must be heard in that court.

A.    The Court Lacks Jurisdiction to Consider the Claims in Count I of Plaintiffs' Complaint

It is a fundamental rule of administrative law that federal courts have jurisdiction to review only the final actions of a federal agency.  Bennett v. Spear, 520 U.S. 154, 177-78 (1997); 5 U.S.C. §704.  Agency policy statements, enforcement letters, applicability determinations and other statements of an agency's view on legislation that do not have binding applicability on specific parties are not final agency actions.  See e.g., P&V Enters v. Corps of Eng'rs, 516 F.3d 1021( D.C. Cir. 2008); Village of Bensenville v. FAA, 457 F.3d 52, 68-69 (D.C. Cir. 2006); General Motors Corp. v.  EPA, 363 F.3d 442 (D.C. Cir. 2004).  Even an agency order is "non-final [where it] 'does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action.'"  Nat. Ass'n of Home Builders v. Norton, 415 F.3d 8, 15 (D.C. Cir. 2005), quoting DRG Funding Corp. v. Sec'y of Housing and Urban Dev., 76 F. 3d 1212, 1214 (D.C. Cir. 1996).

Similarly, a claim must be ripe in order for the Court to have jurisdiction, so as to ensure that federal courts are not deciding abstract disagreements. Abbott Labs v. Gardner, 387 U.S. 136, 148 (1967). In order for a claim to be ripe, a plaintiff must establish that he will suffer significant hardship if review is delayed and that the issue is fit for judicial review at this time. Whitman v. American Trucking Ass'ns, 531 U.S. 457, 479 (2001). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998). See also id. at 301, quoting Longshoremen v. Boyd, 347 U.S. 222, 224(1954) (" Here, as is often true, '[d]etermination of the scope . . . of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function.'").

Finally, in order to exercise jurisdiction over a claim, the plaintiff must have standing. Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979). To establish standing, a petitioner must have suffered an "injury in fact" that: (a) is personal, distinct, palpable, actual, concrete, and imminent, not conjectural, speculative or hypothetical; (b) was caused by the conduct complained of; and (c) is likely to be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

It is abundantly clear that the single sentence contained in the Preamble relating to the general applicability of EPCRA to farms is not a final rule subject to challenge. Plaintiffs readily admit that the Preamble statement at issue is not part of the regulation being challenged. Opp. Br. at 4. Indeed, at no time has EPA announced that it was even considering the issue of whether farms could or could not take advantage of the exception to the definition of "hazardous

chemicals" for substances "used in routine agricultural operations." Thus, there is nothing binding or final about the Preamble statement Plaintiffs complain about.

Similarly, Plaintiffs' assertion in Count I of their Complaint is neither ripe for adjudication nor is it based on anything more than speculation that EPA might, in some unknown future circumstance, deny the application of the "routine agricultural use" exclusion to a specific farmer based on the particular circumstances of that future case. The single sentence in the Preamble that Plaintiffs find so offensive merely says that farms, like all other facilities, are subject to EPCRA reporting requirements. EPCRA reporting requirements apply to all "facilities" where reportable substances are present in amounts in excess of the threshold quantities for such substances. 42 U.S.C. § 11002(b). A "facility" is defined broadly, as "buildings, equipment, structures, and other stationary items located on a single site or contiguous or adjacent sites and which are owned or operated by the same person, [and] includes motor vehicles, rolling stock, and aircraft." 42 U.S.C. § 11049(4). Any farm with a building is clearly a facility and thereby subject to EPCRA reporting requirements.[5]

Notwithstanding the clear statutory language related to the type of entities covered by EPCRA, nowhere does EPA state in the Rulemaking, the Preamble, or otherwise, that farms can no longer seek to be excluded from reporting requirements where they use the reportable

---

[5] EPA's statement of general applicability of EPCRA contained in the Preamble is not, as Plaintiffs imply, some new position or earth shattering declaration. For example, on January 31, 2005, EPA published a Notice of "Animal Feeding Operations Consent Agreement and Final Order." 70 Fed. Reg. 4958 (Jan. 31, 2005) ("Consent Agreement"). In that Consent Agreement, EPA offered to enter into agreements with farmers (Animal Feeding Operations or "AFOs") whereby the farmers would pay a penalty for reporting violations of EPCRA (and CERCLA and the Clean Air Act) and fund a study designed to better ascertain when and how to report releases of hazardous substances. Id. In turn, EPA agreed not to sue those farmers who entered into the agreement and stay in compliance. Id. At least one of the declarants who submitted a declaration with Plaintiffs' Motion for Summary Judgment, along with nearly 9,000 other farmers or feed operators, signed the agreements at issue and, accordingly, may not be sued at this time by EPA. Aff. of Doug Wolf submitted with Plaintiffs' Motion for Summary Judgment, Dkt. No. 26 at ¶ 21. While there are no admissions of liability or applicability of any specific EPCRA provisions in the Consent Agreement, quite obviously EPA took the position that the statute covered AFOs. See also Association of Irritated Residents v. EPA, 494 F.3d 1027 (D.C. Cir. 2007), upholding the Consent Agreement rulemaking and describing EPA's enforcement of EPCRA as it relates to AFOs.

substance "routine agricultural operations," as specifically provided for at section 311(e) of EPCRA, 42 U.S.C. § 11021(e). Nor has EPA threatened to prosecute or penalize farmers – or any specific farmer – for seeking to utilize this exception. Perhaps most importantly, nowhere have Plaintiffs alleged that a single farmer – including those who submitted declarations with Plaintiffs' Motion for Summary Judgment – has been denied the right to assert that its specific farming operation falls within the "routine agricultural operations" exception under 42 U.S.C. § 11021(e).

Plaintiffs' entire claim in Count I is, in fact, based on ascribing to EPA an intent that EPA has never expressed – and which it certainly does not express in the Preamble. EPCRA requires the reporting of releases of hazardous substances above reportable quantities which occurs at a facility at which a hazardous chemical is produced, used or stored. 42 U.S.C. § 11004. As set forth in section 11021(e), a "hazardous chemical" does not include, inter alia, "[a]ny substance to the extent it is used in routine agricultural operations or is a fertilizer held for sale by a retailer to the ultimate customer." Thus, if a farm uses a covered substance in "routine agricultural operations," it presumably would not be a facility covered by the reporting requirements, at least with regard to the substance so used. Nothing about EPA's statement in the Preamble alters or modifies any of this statutory language nor did EPA declare – or even imply -- that farms can not fall within this exception.

The exception for "routine agricultural operations" is quite obviously directed at farms or other agricultural operations, but that does not mean that farms are not subject to EPCRA in the first instance, which is all EPA stated in the Preamble. As noted in Sierra Club, Inc. v. Tysons Foods, Inc, 299 F. Supp. 2d 693, 713-14 (W.D. Ky 2003), operating a farm or animal feeding operation and utilizing a covered substance in "routine agricultural operations," are not

necessarily synonymous.   The question of whether a particular farm falls within the "routine agricultural operations" exception depends on a factual determination to be made based on the specific farm being subjected to a specific enforcement action.  In <u>Sierra Club</u>, the court found that because Tysons Foods did not store gaseous ammonia in its chicken houses for agricultural purposes at the site at issue, it was not entitled to take advantage of the "routine agricultural operations" exception in that case.  <u>Id.</u>

Of course, here there is no enforcement action nor are there any claims or assertions that any specific farm or group of farms is precluded from avoiding EPCRA reporting requirements by establishing that the release of otherwise reportable substances comes from the use of such substances in "routine agricultural operations."  Quite simply, there is no active dispute over the application of the exception for "routine agricultural operations" and Plaintiffs can not create one – and thereby invoke the jurisdiction of this Court -- by asserting that some farmers may be able to fit within this exception.

Similarly, Plaintiffs can not create jurisdiction in this Court by submitting declarations from farmers and then declaring that their claims in Count I involve factual issues that can only be addressed by a district court that can hear evidence.  Opp. Br. at 3.  The factual record for Count I can only come into existence if some specific farmer seeks to apply the "routine agricultural operations" statutory exception based on the specific operations of his farm, and is denied that status by EPA.  It can not be generated through submission of declarations based on a dispute over the application of the "routine agricultural operations" exclusion that has never occurred.

There is a little doubt that Plaintiffs are asking for an advisory opinion regarding how and when the "routine agricultural operations" exception will be applied in the future.  In order to

provide such an opinion, mountains of evidence would need to be developed and presented, since Plaintiffs are seeking industry-wide standards as to when the "routine agricultural operations" exception can be utilized.  This requires regulatory action, not action by this Court.  Absent actual denial of the "routine agricultural operations" exception by EPA to a specific farmer and/or any final decision by EPA eviscerating the statutory exclusion, Plaintiffs lack standing, ripeness and a final order to present to this Court.  Accordingly, the Court lacks jurisdiction to address the claims in Count I of the Complaint.

> **B.** The Subject of the Claims in Count I of Plaintiffs' Complaint is Inextricably Intertwined with the Claims Before the D.C. Circuit Court of Appeals

Although no Court has jurisdiction to address Plaintiffs' declaratory judgment action with regard to Count I, the underlying issue contained in Count I of the Complaint (whether farms are subject to EPCRA in the first instance) most assuredly can be addressed by the Court of Appeals in the Rulemaking challenge.  Needless to say, the Court of Appeals must consider the general applicability of EPCRA to farms in order to decide whether the partial exemption established in the Rulemaking is arbitrary, capricious or beyond EPA's authority.  Clearly, if farms are excluded from EPCRA in the first instance, it is likely to impact that Court's decision on whether EPA exceeded its authority by granting only a partial exemption to a group of entities that were not even subject to the statute in the first place.  Since all parties in the Court of Appeals action – those claiming that EPA went too far in granting an exemption under EPCRA and those parties who assert that EPA did not go far enough – contend that EPA acted beyond its statutory authority with regard to its regulation of AFOs, the Court must address EPA's statutory authority to require AFOs to report releases of hazardous substances, the very issue raised in Count I of Plaintiffs' Complaint.

Accordingly, if any court is to hear the substance of the claims raised by Plaintiffs in Count I of the Complaint, it is the Court that is hearing the challenge to the regulatory exemptions granted in the Rulemaking, the D.C. Circuit Court of Appeals.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this case.  Alternatively, the Court should transfer this case to the D.C. Circuit.

Respectfully submitted,

JOHN C. CRUDEN
Acting Assistant Attorney General
Environment and Natural Resources Division


/s/   Perry M. Rosen
PERRY M. ROSEN
United States Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington D.C.  20026-3986
Tel:  (202) 353-7792
Fax: (202) 514-8865

Counsel for Defendant

Of Counsel:

Erik Swenson
Office of General Counsel
U.S. Environmental Protection Agency
Ariel Rios Building,
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

April 10, 2009

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing REPLY MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS OR IN THE ALTERNATIVE TO TRANSFER TO THE COURT OF
APPEALS FOR D.C. CIRCUIT was electronically filed with the Clerk of Court using the
CM/ECF system, which will send notification of said Notice to the attorneys of record/parties
who have registered as CM/ECF participants.


Date: April 10, 2009                                    /s/   Perry M. Rosen
                                                        Perry M. Rosen

# Exhibit 9



U.S. ENVIRONMENTAL PROTECTION AGENCY

## OFFICE OF INSPECTOR GENERAL

*Improving air quality*

# Eleven Years After Agreement, EPA Has Not Developed Reliable Emission Estimation Methods to Determine Whether Animal Feeding Operations Comply With Clean Air Act and Other Statutes

Report No. 17-P-0396                September 19, 2017




**Report Contributors:**                         Richard Jones

                                                 Erica Hauck

                                                 Jim Hatfield

                                                 Kevin Good

                                                 Julie Narimatsu

**Abbreviations**

| | |
|---|---|
| AFO | Animal Feeding Operation |
| CAA | Clean Air Act |
| CAFO | Concentrated Animal Feeding Operation |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| DQO | Data Quality Objective |
| EEM | Emissions Estimating Methodology |
| EPA | U.S. Environmental Protection Agency |
| EPCRA | Emergency Planning and Community Right-to-Know Act |
| GAO | U.S. Government Accountability Office |
| NAEMS | National Air Emissions Monitoring Study |
| NAS | National Academy of Sciences |
| OAQPS | Office of Air Quality Planning and Standards |
| OIG | Office of Inspector General |
| PM | Particulate Matter |
| SAB | Science Advisory Board |
| USDA | U.S. Department of Agriculture |
| VOC | Volatile Organic Compound |

**Cover photos:**   Hogs (left) and chickens (right) in confined spaces at animal feeding operations. (EPA photos)

**Are you aware of fraud, waste or abuse in an EPA program?**

**EPA Inspector General Hotline**
1200 Pennsylvania Avenue, NW (2431T)
Washington, DC  20460
(888) 546-8740
(202) 566-2599 (fax)
OIG_Hotline@epa.gov

Learn more about our OIG Hotline.

**EPA Office of Inspector General**
1200 Pennsylvania Avenue, NW (2410T)
Washington, DC  20460
(202) 566-2391
www.epa.gov/oig

Subscribe to our Email Updates
Follow us on Twitter @EPAoig
Send us your Project Suggestions



**U.S. Environmental Protection Agency**
**Office of Inspector General**

17-P-0396
September 19, 2017

# At a Glance

### Why We Did This Review

We conducted this review to determine what actions the U.S. Environmental Protection Agency (EPA) has taken to evaluate air emissions from animal feeding operations.

The EPA estimates there are about 18,000 large animal feeding operations nationwide, which can potentially emit air pollutants in high-enough quantities to subject these facilities to Clean Air Act and other statutory requirements. A lack of reliable methods for estimating these emissions prevented the EPA and state and local agencies from determining whether these operations are subject to statutory requirements.

In 2005, the EPA and the animal feeding operations industry entered into a compliance agreement to address this challenge. As part of this agreement, the industry agreed to fund an air emissions monitoring study that the EPA would use to develop improved emission estimating methodologies for the industry.

**This report addresses the following:**

- *Improving air quality*.

Send all inquiries to our public affairs office at (202) 566-2391 or visit www.epa.gov/oig.

Listing of OIG reports.

## *Eleven Years After Agreement, EPA Has Not Developed Reliable Emission Estimation Methods to Determine Whether Animal Feeding Operations Comply With Clean Air Act and Other Statutes*

### What We Found

The industry-funded National Air Emissions Monitoring Study (NAEMS) and the EPA's analyses of the study's results comprised the agency's primary actions to evaluate air emissions from animal feeding operations over the past decade. The NAEMS monitoring was completed more than 7 years ago at a cost of about $15 million, but the EPA had not finalized any emission estimating methodologies for animal feeding operations. In addition, the EPA had only drafted methodologies for about one-fourth of the emission source and pollutant combinations studied in the NAEMS. The EPA expected to develop and begin publishing emission estimating methodologies by 2009, so the methodologies could be used by the EPA, state and local agencies, and industry operators to determine the applicability of Clean Air Act and other statutory requirements.

> **Until the EPA develops sound methods to estimate emissions, the agency cannot reliably determine whether animal feeding operations comply with applicable Clean Air Act requirements.**

Delays in developing the emission estimating methodologies stemmed from limitations with NAEMS data, uncertainty about how to address significant feedback from the EPA's Science Advisory Board, and a lack of EPA agricultural air expertise and committed resources. The EPA had not finalized its work plan or established timeframes to finish the methodologies. As a result, the applicability of requirements to control emissions from individual animal feeding operations remained undetermined, enforcement protections for consent agreement participants remained in effect longer than anticipated, and a number of agency actions on animal feeding operation emissions continued to be on hold. Further, because the EPA had not conducted systematic planning, the agency was at risk of developing emission estimating methodologies that cannot be widely applied to animal feeding operations.

### Recommendations and Planned Corrective Actions

We recommend that the EPA conduct systematic planning for future development of emission estimating methodologies. Based on the results of this planning, the EPA should determine whether it can develop emission estimating methodologies of appropriate quality for each of the emission source and pollutant combinations studied. If the EPA determines that it cannot develop certain emission estimating methodologies, it should notify agreement participants and end civil enforcement protections. For the emission estimating methodologies that can be developed, the EPA should establish public milestones for issuing the draft methodologies. The EPA agreed with our recommendations, and we accepted the agency's planned corrective actions.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

THE INSPECTOR GENERAL

September 19, 2017

<u>**MEMORANDUM**</u>

**SUBJECT:**   Eleven Years After Agreement, EPA Has Not Developed
Reliable Emission Estimation Methods to Determine Whether
Animal Feeding Operations Comply With Clean Air Act and Other Statutes
Report No. 17-P-0396

**FROM:**   Arthur A. Elkins Jr.

**TO:**   Sarah Dunham, Acting Assistant Administrator
Office of Air and Radiation

Lawrence Starfield, Acting Assistant Administrator
Office of Enforcement and Compliance Assurance

This is our report on the subject evaluation conducted by the Office of Inspector General (OIG)
of the U.S. Environmental Protection Agency (EPA). The project number for this evaluation was
OPE-FY16-0018. This report contains findings that describe the problems the OIG has identified and
corrective actions the OIG recommends. This report represents the opinion of the OIG and does not
necessarily represent the final EPA position. Final determinations on matters in this report will be made
by EPA managers in accordance with established audit resolution procedures.

**Action Required**

In accordance with EPA Manual 2750, your office provided planned corrective actions in response to
the OIG recommendations. We consider the planned corrective actions for all recommendations to be
acceptable. Therefore, you are not required to provide a written response to this final report. The OIG
may make periodic inquiries on your progress in implementing these corrective actions. Please update
the EPA's Management Audit Tracking System as you complete planned corrective actions.

We will post this report to our website at www.epa.gov/oig.

Eleven Years After Agreement, EPA Has Not
Developed Reliable Emission Estimation Methods to
Determine Whether Animal Feeding Operations
Comply With Clean Air Act and Other Statutes

17-P-0396

# *Table of Contents*

## Chapters

1   **Introduction** ........................................................................  1

    Purpose ...........................................................................  1
    Background ......................................................................  1
    Responsible Offices .........................................................  8
    Scope and Methodology ..................................................  8
    Prior Report ....................................................................  9

2   **EPA Plans for Finalizing EEMs Were Not Accomplished
    and Potential Air Quality Impacts Continue** ..................  10

    Development of EEMs Is Years Behind Schedule.................  10
    Responding to SAB Concerns and a Lack of Resources
        Slowed Development of EEMs  ....................................  12
    AFO Air Emissions Remain Largely Uncharacterized and
        Important Agency Actions Are on Hold ..........................  16
    Conclusion ......................................................................  18

3   **EPA Needs to Implement Systematic Planning to
    Assure That EEMs Have Sufficient Quality** ...................  19

    EPA Quality System ........................................................  19
    EPA Has Not Fully Implemented a Systematic Planning Process
        to Assure a Desired Level of Quality for EEMs ..............  21
    Conclusion ......................................................................  22
    Recommendations ...........................................................  23
    Agency Response and OIG Evaluation. ............................  24

4   **EPA Has Not Updated Some Stakeholders and Public on
    Current Status of EEM Efforts** ......................................  25

    EPA Provided Extensive Public Outreach During Early Stages.................  25
    EPA Has Not Publicly Communicated on EEM Development
        Efforts Since 2013 ......................................................  25
    Conclusion ......................................................................  26
    Recommendation..............................................................  26
    Agency Response and OIG Evaluation .............................  26

    **Status of Recommendations and Potential Monetary Benefits** ...........  27

*- continued -*

**Eleven Years After Agreement, EPA Has Not
Developed Reliable Emission Estimation Methods to
Determine Whether Animal Feeding Operations
Comply With Clean Air Act and Other Statutes**

17-P-0396

## Appendices

| A | Office of Air and Radiation Response to Draft Report | 28 |
|---|---|---|
| B | Office of Enforcement and Compliance Assurance Response to Draft Report | 31 |
| C | Distribution | 34 |

# Chapter 1
## Introduction

## Purpose

We conducted this evaluation to determine what actions the U.S. Environmental Protection Agency (EPA) has taken to evaluate air emissions from animal feeding operations (AFOs), including the status of the National Air Emissions Monitoring Study (NAEMS).

## Background

AFOs are agriculture operations where animals are kept and raised in confined areas. The U.S. Department of Agriculture (USDA) has estimated that there are about 450,000 AFOs nationwide. While the majority of these are small operations with fewer than 300 animals, the EPA has estimated there are more than 18,000 large AFOs[1] that may raise thousands of animals. For more than two decades, movements to improve profitability within the agriculture industry have resulted in larger AFO facilities that often are geographically concentrated. As facility size has increased and greater numbers of animals are housed in confined spaces, concerns have arisen regarding these facilities' impacts on the environment and public health.

The EPA regulates certain larger AFOs under the Clean Water Act's National Pollutant Discharge Elimination System permit program, which regulates the discharge of pollutants to the waters of the United States. AFO air emissions are not regulated by any AFO-specific standards under the Clean Air Act (CAA), but AFOs that emit air pollutants in sufficient quantities can trigger CAA permit requirements. In the late 1990s, the EPA recognized that it did not have sufficient AFO air emissions data to develop reliable emission estimating methodologies (EEMs) for determining whether individual AFOs are subject to CAA permit requirements or emission reporting requirements under two other statutes: the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the Emergency Planning and Community Right-to-Know Act (EPCRA).[2] Both CAA permitting requirements and CERCLA/EPCRA release

---

[1] EPA water regulations define AFOs and a subset of larger AFOs called concentrated animal feeding operations (CAFOs), and the Clean Water Act includes CAFOs as a type of point source. The CAA does not define or reference these terms, and the EPA's Office of Air and Radiation does not distinguish between an AFO and a CAFO. Thus, we use the term "AFO" throughout our report, even when referring to a facility that would meet the definition of a CAFO under the Clean Water Act.

[2] EPCRA and CERCLA require facilities to report emissions of certain hazardous substances if they are released in quantities at or above certain thresholds. This includes two hazardous substances commonly released by AFOs: ammonia and hydrogen sulfide.

reporting requirements are triggered only if a facility emits certain pollutants at or above specific regulatory thresholds.

The agency began discussions with representatives of the AFO industry in 2001 to address uncertainty in determining the applicability of statutory requirements for air emissions. As a result, the EPA and certain sectors of the AFO industry[3] (e.g., pork and broiler producers, egg layers, and dairy) negotiated a consent agreement, which was published in 2005[4] and entered into by AFO owners/operators who elected to participate. Under this agreement, participating AFO owners/operators agreed to pay a civil penalty, comply with all applicable requirements of the agreement, and participate (if selected) in a national monitoring study. The AFO sectors agreed to fund the monitoring study to provide data the EPA would use to develop EEMs for various AFO pollutants and emission sources.

### *Air Emissions From AFOs*

AFOs can release several pollutants, including but not limited to: ammonia, hydrogen sulfide, particulate matter (PM), volatile organic compounds (VOCs) and hazardous air pollutants. AFO air emissions come from lagoons, barns and other structures, and manure spread on fields. Table 1 lists the key pollutants emitted from AFOs, along with their common emission sources and associated health and air quality effects.

**Table 1: Emission sources and health effects of key pollutants from AFOs**

| Pollutant | Common emission sources | Health and air quality effects |
|---|---|---|
| Ammonia ($NH_3$) | Decomposition of animal manure. | Can cause severe cough and chronic lung disease. It also contributes directly to the formation of $PM_{2.5}$ and deposition can impact sensitive ecosystems. |
| Volatile organic compounds (VOCs) | Animal feed and waste. | Can cause eye, nose and throat irritation; damage to liver, kidney and central nervous system; and cancer. VOCs also contribute to the formation of ground-level ozone. |
| Particulate matter (PM)* | Dry manure, bedding and feed materials, and dirt feed lots. | Exposure is linked to a variety of problems, including decreased lung function, increased respiratory symptoms, and premature death in people with heart or lung disease. |
| Hydrogen Sulfide ($H_2S$) | Decomposition of animal manure stored in wet conditions such as lagoons. | Can cause eye and respiratory irritation at lower concentrations. At higher concentrations, paralysis of the respiratory center can lead to rapid death. Excess emissions can contribute to the formation of $PM_{2.5}$ and acid rain. |

Source: EPA Office of Inspector General (OIG) analysis.

* PM includes both fine particles ($PM_{2.5}$) and coarser particles ($PM_{10}$).

---

[3] According to the EPA, state and local agencies, and an environmental organization also participated in initial discussions on the agreement.

[4] Animal Feeding Operations Consent Agreement and Final Order, 70 Fed. Reg. 4958-4977 (Jan. 31, 2005).

AFOs can be located near residences, and some communities have multiple AFOs nearby. For example, several counties in eastern North Carolina have the highest concentration of swine AFOs in the United States. Some studies have raised concerns that lower-income and minority communities are disproportionately impacted by air emissions from AFOs. Studies conducted in North Carolina found that residents living near swine AFOs were disproportionately low-income people of color. Air pollution from these AFOs is associated with the potential health impacts listed in Table 1 above, as well as a reduced quality of life due to persistent odors[5] and declining property values.[6]

> **Highlights from external studies on impacts from AFO air emissions:**
>
> ➢ **Residential property values were reduced by an average of almost 23 percent within 1.25 miles of a large swine AFO.[a]**
> ➢ **The closer children go to school near a large AFO, the greater the risk of asthma symptoms.[b]**
> ➢ **Living in close proximity to large swine AFOs may result in impaired mental health and negative mood states, such as tension, depression or anger.[c, d]**

[a] Simons, R.A. et al., 2014. The Effect of a Large Hog Barn Operation on Residential Sales Prices in Marshall County, KY. JOSRE. 6(1).
[b] Mirabelli, M. C. et al., 2006. Asthma Symptoms Among Adolescents Who Attend Public Schools That Are Located Near Confined Swine Feeding Operations. Pediatrics. 118;66-75.
[c] Bullers, S., 2005. Environmental Stressors, Perceived Control, and Health: The Case of Residents Near Large-Scale Hog Farms in Eastern North Carolina. Human Ecology. 33(1).
[d] Schiffman, S. S. et al., 1995. The Effect of Environmental Odors Emanating From Commercial Swine Operations on the Mood of Nearby Residents. Brain Research Bulletin. 37(4): 369-375.

Characterizing air emissions from AFOs is difficult due to a number of factors. AFOs can have many and varied sources of air emissions, including barns, houses, feedlots, pits, lagoons, basins and manure spray fields. Each of these emission sources can emit a variety of air pollutants, and emission rates can fluctuate depending on climate and geographical conditions, among other factors. Further, characterizing AFO air emissions requires expertise in multiple scientific disciplines, including animal nutrition, AFO practices and atmospheric chemistry.

The EPA and the USDA have been collaborating on a manual of voluntary best management practices to provide AFO owner/operators and state and local governments with options to reduce AFO air emissions. The manual contains best management practices for reducing particulate matter, ammonia, hydrogen sulfide, and other air emissions through various aspects of AFO management, including feed management, manure management, land application, and other areas. The EPA plans to publish the manual before the end of 2017, pending agency administration approval.

---

[5] Odors are not regulated by the EPA, but may be addressed under some state and local laws.
[6] Simons, R.A. et al., 2014. The Effect of a Large Hog Barn Operation on Residential Sales Prices in Marshall County, KY. JOSRE. 6(1).
Kim, J. et al., 2009. A Spatial Hedonic Approach to Assess the Impact of Swine Production on Residential Property Values. Environ Resource Econ. 42: 509-534.

### National Academy of Sciences Report on AFO Air Emissions

In 2001, the EPA and USDA jointly requested that the National Academy of Sciences (NAS) evaluate the body of scientific information used for estimating various kinds of air emissions from AFOs. In 2003, the NAS reported[7] that accurate emissions estimates were needed to determine AFOs' potential impacts and to assess the implementation of measures to control emissions. The NAS also reported that the EPA had not dedicated the necessary resources to estimate AFO air emissions, and that the agency's approach to estimating emissions was inadequate. That approach involved deriving emission factors from published emissions data, as well as gathering emission factors from existing literature. These emission factors were then applied to representative farms to estimate annual mass emissions. The NAS reported that this approach did not account for the variability among AFOs (e.g., differences in geography and climate) and thus cannot adequately estimate air emissions from an individual AFO.

The NAS recommended that the EPA develop a "process-based" approach to estimate AFO air emissions. The NAS favored such an approach for most types of emissions as the primary focus for both short- and long-term research,[8] but also stated that short-term research should focus on providing "defensible estimates of air emissions that could be used to support responsible regulation."[9] The NAS described process-based models as mathematical models "that describe the movement of various substances of interest at each major stage of the process of producing livestock products: movement into the next stage, movement in various forms to the environment, and ultimately movement into products used by humans."[10]

### Air Compliance Agreement With AFO Industries

In 2002, spurred in part by uncertainty about emission levels from AFOs and concerns about applicability of CAA requirements, representatives of the pork, egg producers, and other AFO sectors proposed a plan to EPA officials to produce air emissions monitoring data from AFOs. Negotiations between the EPA and AFO sectors[11] lasted for more than 2 years before an agreement was finalized in 2005. As a condition of the 2005 Air Compliance Agreement (henceforth, the "Agreement"), the industry agreed to fund a large-scale emissions monitoring study. The EPA was to use the emissions monitoring data to develop EEMs that

---

[7] *Air Emissions from Animal Feeding Operations: Current Knowledge, Future Needs*, NAS National Research Council (2003).
[8] 2003 NAS report, pp. 152-153.
[9] 2003 NAS report, p. 25.
[10] 2003 NAS report, p. 9.
[11] Participating AFO sectors included egg layers, broiler chickens, dairy cattle and swine. The turkey sector was a part of the negotiations as well, but not enough turkey AFO owners/operators signed up to fund monitoring. The Agreement did not cover beef cattle.

AFOs could apply to estimate their emissions and determine the applicability of CAA permitting and CERCLA/EPCRA release reporting requirements. Once a facility applied the EEMs to determine its emissions, the facility was to submit all required CAA permit applications and/or report any hazardous substance releases requiring notice under CERCLA/EPCRA.[12]

The Federal Register Notice (henceforth, the "Notice") that published the Agreement included the EPA's expectation that the emissions monitoring study would begin in 2005 and last 2 years. The Notice also described the EPA's expected timeframes for completing the tasks subsequent to the study. Based on these original expectations, the EPA would begin publishing final EEMs in 2009, and AFOs would have obtained any necessary permits and installed emission controls by 2010. Figure 1 shows the timing for these different activities.

**Figure 1: Expected timeframes for monitoring study and EEM development**



Source: OIG analysis of the Notice publishing the Agreement. 70 Fed. Reg. 4958-4977 (Jan. 31, 2005).

---

[12] In a 2008 rule, the EPA exempted from CERCLA Section 103 reporting requirements all releases of hazardous substances to the air from animal waste at AFOs. The rule also exempted such releases from EPCRA Section 304 reporting requirements, except when AFOs confine a number of animals at or above the large CAFO threshold, as defined under Clean Water Act regulations. However, on April 11, 2017, the U.S. Court of Appeals for the District of Columbia Circuit ruled in favor of a group of environmental organizations that challenged the exemption and ordered that the 2008 rule be vacated (*Waterkeeper Alliance et al. v. EPA*). On July 17, 2017, the EPA filed a motion requesting the Court grant a stay of the ruling for six months to allow the EPA time to develop guidance for farms on reporting requirements. On August 16, 2017, the Court ordered a stay of the ruling through November 14, 2017. The EPA has 75 days from August 16, 2017, to request an extension of the stay if needed.

**Primary provisions for AFOs participating in the Air Compliance Agreement include:**

➤ Pay up to $2,500 per farm to fund a 2-year emissions study.
➤ Agree to make their property available for emissions monitoring if selected as a monitoring site for the study.
➤ Pay a civil penalty ranging from $200 to $1,000, depending on the size and number of AFOs covered by the participant's Air Compliance Agreement.
➤ Receive protection from enforcement actions for civil violations of the CAA, CERCLA and EPCRA, to last until either (1) the EPA finalizes EEMs, or (2) the EPA notifies the facility that it was unable to finalize EEMs.

Under the Agreement, participating AFOs were granted a release and covenant not to sue for potential CAA, CERCLA and EPCRA violations alleged in the Agreement (henceforth, "civil enforcement protections") until the EEMs are developed and AFOs apply for applicable CAA permits and report qualifying releases under CERCLA and EPCRA, or the EPA determines it cannot develop EEMs and notifies Agreement participants accordingly.

The EPA entered into 2,568 separate agreements with AFO owners and operators, which covered about 13,900 AFOs in 42 states. According to the EPA, these 13,900 AFOs comprise more than 90 percent of the largest AFOs in the United States. Figure 2 illustrates the percentage of all Agreement participants by type of animal raised.

**Figure 2: Agreement participants by type of animal raised**



Source: EPA

## *Monitoring Study Methodology*

About $15 million was collected from the AFO sectors participating in the Agreement to fund the NAEMS emissions study. The NAEMS protocol provided the framework for the field sampling plan, and was developed through a collaborative effort of industry experts, university scientists, EPA and other government scientists, and other stakeholders knowledgeable in the field. The Agricultural Air Research Council—a nonprofit organization established by industry—was responsible for managing and disbursing funds for the study.

The Agricultural Air Research Council was also responsible for selecting a Science Advisor to develop a detailed study design and quality assurance plan, and to oversee the emissions monitoring work, including work conducted by the contracted principal investigators. The principal investigators—most of whom were researchers at land grant universities with expertise in animal agriculture and/or emissions measurement—carried out the monitoring at selected sites. EPA staff did not collect monitoring data, but conducted audits at monitoring sites to ensure that proper techniques and protocols were followed.

Monitoring was conducted at 27 total sites (i.e., specific sources of emissions such as a barn or a lagoon).[13] Measurements of ammonia, particulate matter ($PM_{10}$ and $PM_{2.5}$),[14] total suspended particulates, VOCs, hydrogen sulfide, and carbon dioxide[15] were taken at broiler chicken, egg layer, swine, and dairy confinement sites (e.g., houses and barns). Measurements of ammonia, hydrogen sulfide, and VOCs were taken at swine and dairy open-source sites (e.g., lagoons and basins). Figure 3 shows the location of monitoring sites across the country.

**Figure 3: NAEMS monitoring site locations**



Source: OIG analysis of NAEMS site reports.

Other types of measurements were also taken at monitoring sites to help characterize emissions. These measurements included meteorological data (such as temperature and wind speed), and information on the number of animals at AFO monitoring locations, how the animals were housed, and how their waste was managed. The Agreement stated that the EPA would use data from the NAEMS and any other relevant data to develop EEMs.

---

[13] The 27 monitoring sites were located at 23 AFOs. Monitoring was conducted at two sites (emission sources) for four of the 23 participating AFOs.

[14] $PM_{10}$ describes inhalable particles with diameters that are generally 10 micrometers and smaller. $PM_{2.5}$ describes fine inhalable particles with diameters that are generally 2.5 micrometers and smaller.

[15] While carbon dioxide was measured at confinement sites as part of the NAEMS, the EPA never intended to create EEMs for carbon dioxide emissions.

## Responsible Offices

The EPA office primarily responsible for development of the Agreement was the Office of Enforcement and Compliance Assurance. The EPA office responsible for developing EEMs from the NAEMS data is the Office of Air Quality Planning and Standards within the EPA's Office of Air and Radiation, while the Office of Research and Development plays a supporting role.

## Scope and Methodology

We conducted our performance audit from April 2016 through May 2017, in accordance with generally accepted government auditing standards. Those standards require that we obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our objective. We believe the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective.

To address our objective, we identified and reviewed applicable statutes, regulations, policies and guidance, including sections of the CAA and the Clean Water Act, CAA permitting requirements and thresholds, and the Agreement and associated monitoring protocol. To help us determine the status of the EPA's NAEMS, as well as other efforts to evaluate AFO air emissions, we obtained and reviewed EPA emission reports and analyses, NAEMS-related reports and studies, an EPA Science Advisory Board (SAB) report, and documents related to EPA legal proceedings.

To determine state efforts to address AFO air emissions, we reviewed state regulations and programs for a selected number of states. We also reviewed petitions requesting that the EPA regulate AFO air emissions, and an administrative complaint alleging discrimination against minorities in North Carolina in permitting AFOs. In addition, we reviewed academic studies and reports to determine AFO air emissions and health impacts, and potential disparate impacts in overburdened communities.

We interviewed EPA staff and managers in the Office of Air Quality Planning and Standards, the Office of Enforcement and Compliance Assurance, the Office of Research and Development, the Office of Civil Rights, the Office of Water, and EPA Region 4 (which covers North Carolina), to gain an understanding of EPA actions to evaluate and address AFO air emissions. We also interviewed the following stakeholders to discuss the Agreement and the history and status of the NAEMS:

- USDA's Natural Resources Conservation Service staff.
- SAB members who reviewed the EPA's draft EEMs.
- An AFO industry advisor.
- AFO academic researchers at Purdue University, North Carolina State University, and University of North Carolina-Chapel Hill.

In addition, we interviewed organizations (Sierra Club, Food & Water Watch, EarthJustice, Waterkeeper Alliance) that submitted CAA petitions to regulate AFO emissions. We also interviewed organizations that submitted a Title VI administrative complaint (the North Carolina Environmental Justice Network and the Rural Empowerment Association for Community Help) alleging discrimination in AFO permitting in North Carolina.

To assess internal controls, we reviewed EPA policies and guidance on quality assurance, including the following:

- The EPA's Quality Policy.
- The EPA's Procedure for Quality Policy.
- The EPA's *Guidance on Systematic Planning Using the Data Quality Objectives Process*.
- The EPA's Office of Air Quality Planning and Standards' Quality Management Plan.

We also reviewed the quality assurance project plans developed for the NAEMS and early draft EEM development.

## Prior Report

In September 2008, the U.S. Government Accountability Office (GAO) issued a report on AFOs titled *Concentrated Animal Feeding Operations: EPA Needs More Information and a Clearly Defined Strategy to Protect Air and Water Quality from Pollutants of Concern* (GAO-08-944). GAO reported that the EPA did not have the data needed to effectively regulate CAFO air emissions; specifically, the EPA lacked data on air emission from CAFOs, which the EPA is trying to address through the NAEMS. GAO found that the EPA lacked consistent and accurate data for CAFOs regulated under the Clean Water Act, and that such data—like the locations of the CAFOs—could assist with an assessment of CAFO air emissions. GAO reported that two, then-recent decisions by the EPA suggest that the agency had not yet determined how it intended to regulate air emissions from CAFOs:

- The EPA proposed to exempt releases to the air of hazardous substances from farm manure from both CERCLA and EPCRA notification requirements.

- The EPA stated it will not make key regulatory decisions on how federal air regulations apply to CAFOs until after the NAEMS is completed.

GAO recommended that the EPA (1) reassess the data collection efforts of the NAEMS, and (2) establish a strategy and timetable for developing process-based emission estimating protocols for CAFOs. GAO determined that the EPA has implemented the first recommendation but has not completed the second one.

# Chapter 2
## EPA Plans for Finalizing EEMs
## Were Not Accomplished and
## Potential Air Quality Impacts Continue

The EPA had not published any final EEMs for AFOs, and had not finalized its workplan or established timeframes for completing them. Moreover, progress had been limited since 2013, when the EPA's SAB concluded that draft EEMs developed by the EPA should not be applied on a national scale as intended, and made several recommendations to improve the EPA's statistical analyses. At the time of the Agreement in 2005, the EPA expected that it would begin publishing final EEMs in 2009. Further, the EPA expected that by 2010 the AFO industry would have used the EEMs to assess their emissions, apply for any applicable CAA permits, and install any necessary emission reduction controls.

The EPA collaborated with a committee of external stakeholders to develop a protocol they believed would provide sufficient, representative data for the EPA's EEM development efforts. However, public comments submitted to the EPA on the planned NAEMS protocol, and the 2008 GAO report, questioned whether the NAEMS would provide enough data to produce scientifically and statistically valid EEMs. As a result of the delays, individual AFOs have not applied EEMs to determine whether their air emissions were significant enough to require CAA permits and related emissions controls, while civil enforcement protections for Agreement participants remained in effect.

## Development of EEMs Is Years Behind Schedule

Based on the original expectations for completion of the tasks in the Notice, the NAEMS monitoring would have been completed in 2007, and the EPA would have begun publishing EEMs in 2009. By 2010 all facilities would have done the following:

1. Applied the EEMs to determine whether they met or exceeded CAA permitting and/or CERCLA/EPCRA release reporting thresholds, and whether permitting and reporting were required.

2. Submitted any required CAA permit applications and CERCLA/EPCRA release notifications.

3. Implemented the mitigation and emission control requirements described in their permits. At this point, the protections from civil enforcement actions under the Agreement would have ended for participating AFOs.

However, EPA staff told us that this timeline did not account for time required for the EPA's Environmental Appeals Board to approve individual agreements, which took longer than anticipated and was not completed until December 2006. Further, it did not account for monitoring that occurred on a rolling basis, and thus took more than 2 years to complete.

The NAEMS monitoring was completed in early 2010, about 2 years later than originally expected. The EPA began developing draft EEMs after monitoring was completed. In 2012, the EPA placed its draft EEMs on its public website for public comment. Draft EEMs covered eight[16] of the 36[17] emission source and pollutant combinations described in the Agreement. The EPA's Office of Air and Radiation also submitted the draft EEMs to the SAB to obtain feedback on EEM development and related questions. The SAB conducted its review of draft EEMs in 2012 and issued its final report[18] on April 19, 2013.

At the time we finished our review in May 2017, the EPA had not finalized any draft EEMs, or developed any additional draft EEMs. According to the 2005 Agreement, the EPA expected to begin publishing final EEMs within 18 months after completion of the NAEMS monitoring.

Figure 4 shows a timeline of expected and actual NAEMS and EEM development activities up to the 2013 SAB final report.

---

[16] These included EEMs to estimate six different types of emissions from broiler chicken houses, and EEMs to estimate ammonia emissions from dairy and swine lagoons/basins. Also, see Table 2.

[17] According to the Office of Air and Radiation, the number of EEMs that will ultimately be developed will be influenced by factors such as differences in production, management and building conditions, as well as availability of sufficient data.

[18] *SAB Review of Emissions-Estimating Methodologies for Broiler Animal Feeding Operations and for Lagoons and Basins at Swine and Dairy Animal Feeding Operations*, EPA-SAB-13-003 (2013).

**Figure 4: Expected and actual NAEMS/EEM development timeline**



Source: OIG analysis of EPA documents.

## Responding to SAB Concerns and a Lack of Resources Slowed Development of EEMs

The SAB identified several concerns with the draft EEMs, and the Office of Air and Radiation did not agree with some of the concerns. Since that time, EEM development slowed considerably, as the EPA decided how to address the SAB's concerns. The EPA also encountered resource constraints and a lack of available technical expertise.

Table 2 shows all emission source and pollutant combinations from the Agreement,[19] and the draft EEMs that were developed and submitted to the SAB for review.

**Table 2: Status of EEM development**



**AFO Type/Emission Source**

Source: OIG analysis.

| | |
|---|---|
| $PM_{2.5}$: Particulate matter < 2.5 micrometers | $H_2S$: Hydrogen Sulfide |
| $PM_{10}$: Particulate matter < 10 micrometers | VOC: Volatile organic compounds |
| TSP: Total suspended particulates | $NH_3$: Ammonia |

### SAB Review of Draft EEMs and EPA Response

The SAB concluded that the data and methodology used to develop the draft EEMs limited the ability of the models to estimate emissions beyond the small number of AFOs in the NAEMS data set. Specifically, the SAB concluded that the number of sites monitored was too small relative to the size of the industry; the models were based on variables that did not accurately predict emissions; the EPA should not have combined swine and dairy lagoon/basin data; and there were significant limitations with the VOC data for broiler houses. Thus, the SAB recommended that the EPA not apply the current version of the EEMs beyond the AFOs in the EPA's dataset.

---

[19] This included EEMs for both naturally ventilated (NV) and mechanically ventilated (MV) dairy barns, as discussed in the Agreement.

The SAB made a number of other recommendations, including having the EPA do the following:

- Expand its dataset by collecting data from monitoring efforts outside of the NAEMS, and using NAEMS data that were initially excluded due to the EPA's data completeness criteria.

- Not generate an EEM for VOC emissions from broiler operations based on current data limitations.

- Separate swine and dairy lagoon/basin data that had been combined for EEM development.

The SAB also advocated a process-based modeling approach to EEM development. The NAS had advocated a process-based modeling approach to estimating emissions in its 2003 report. Further, in its 2008 report, GAO recommended that the EPA establish a strategy and timetable for developing process-based emission estimating protocols for CAFOs. The SAB noted the following:

> Process-based models would be more likely to be successful in representing a broad range of conditions than the current models because process-based models represent the chemical, biological and physical processes and constraints associated with emissions.

According to the Notice publishing the Agreement, the EPA believed process-based modeling to be a large and complex, multiyear research effort. Therefore, the EPA planned to develop an interim modeling approach, which would be a critical first step to developing a process-based modeling approach. The modeling approach the EPA ultimately selected for the draft EEMs used a statistical software program to analyze the various measurements taken during the NAEMS and identify those variables that predict emissions. The SAB recognized that the EPA may need to apply statistical approaches to assess emissions while it was developing and evaluating process-based models, and thus made recommendations to improve the EPA's chosen approach, as discussed above.

### *Prior Stakeholder Feedback Questioned the NAEMS Monitoring Approach*

The SAB's concerns about the number of monitoring sites being able to support statistically based EEMs was raised in public comments on the Agreement and protocol before the EPA began developing EEMs, and was also raised by GAO in its 2008 report on the EPA's efforts to characterize AFO pollution.

After the NAEMS protocol was made available for public comment in 2005, a number of external groups expressed concerns about the study design and whether it would lead to credible scientific data. Some commenters noted that the number of

sites was too limited to account for all the differences in types of manure management systems, building types, ventilation rates, feeding practices, animal type/age, animal management practices, geography and climate. The commenters noted that even for the types of AFOs monitored, there may not be a sufficient number of samples to establish statistically valid EEMs. Similarly, in its 2008 report, GAO cautioned that the NAEMS may not supply the data needed for the EPA to develop comprehensive EEMs. Further, the GAO report stated that members of the USDA Agricultural Air Quality Task Force had raised concerns about the quality and quantity of data collected, and had pushed for the EPA to review the first 6 months of monitoring data to determine whether the study needed to be revised to yield more useful information.

According to the NAEMS Science Advisor, the NAEMS protocol could be viewed as a compromise between compliance-minded EPA, budget-minded industry, and publication-minded universities. The protocol developers decided on an approach that focused on collecting a comprehensive set of monitoring data (i.e., 2 years of monitoring many different AFO conditions and parameters) at a smaller number of sites, as opposed to collecting a smaller set of data at more sites. According to the EPA, costs were a factor in this decision because mobilizing and demobilizing equipment and then re-deploying at new sites would have depleted funds that could be used for monitoring. The protocol developers believed the chosen monitoring plan would produce sufficient data for EEM development if the selected monitoring sites represented how the majority of animals are raised in the different AFO sectors.

Although the monitoring protocol was developed as a joint effort of researchers knowledgeable about AFO operations and/or monitoring techniques, there was no comprehensive internal or external assessment to determine the amount of data needed to produce scientifically and statistically sound EEMs that could be extrapolated nationwide. The EPA did not perform such an assessment prior to the NAEMS, in part, because it did not know which variables would most impact air emissions at AFOs, and the agency wanted to see the data before selecting a modeling approach for EEM development. Also, the NAEMS protocol and detailed monitoring plans were not peer reviewed to ensure that the NAEMS would provide sufficient data for the EPA to produce a comprehensive suite of EEMs.

### *EPA's EEM Development Activities Since 2013 Have Been Limited*

The EPA planned to continue EEM development using its statistically based approach, and had addressed some of the SAB's recommendations by acquiring additional data sets from other external studies, and reassessing data completeness criteria for the NAEMS. However, the draft EEMs that were submitted to the SAB for review had not been revised, and the EPA had not begun developing EEMs for the remaining 28 emission source and pollutant combinations.

A lack of expertise and resources slowed the agency's work on the EEMs in recent years. According to EPA managers, the agency in recent years did not have staff with combined expertise in agricultural emissions, air quality and statistical analysis. At the time the NAEMS protocol was developed, the EPA had more applicable expertise, but the key staff involved in the NAEMS protocol development retired. Further, competing priorities resulted in the EPA's Office of Air and Radiation putting the EEM effort largely on hold. The EPA had dedicated few agency resources to develop EEMs since the SAB's 2013 final report. The few remaining agency staff who worked on the NAEMS and subsequent data analysis were reassigned to other work, and the EPA stopped funding the contract for NAEMS analysis.

The EPA's most recent draft EEM development work plan, dated March 2016, provided a general framework for how the EPA intended to finish all planned EEMs. The draft plan stated that a new staff person with appropriate expertise, along with student contractor support, would complete the EEMs. The EPA hired the new staff person and a student contractor in January 2017 but had not yet finalized timeframes for completing EEM development.

## AFO Air Emissions Remain Largely Uncharacterized and Important Agency Actions Are on Hold

Eleven years after the Agreement was entered, and 7 years after NAEMS monitoring was completed, the EPA, state, local and tribal permitting authorities, and AFO owners/operators, did not have scientifically defensible EEMs needed to make CAA and CERCLA/EPCRA compliance determinations. In addition, the civil enforcement protections for the approximately 14,000 AFOs that participated in the Agreement remained in effect more than 6 years after intended expiration, and several important EPA actions were on hold pending development of the EEMs.

### CAA Permit and CERCLA/EPCRA Reporting Determinations Have Not Been Made

Per the Agreement, facilities were not required to determine whether CAA permitting and CERCLA/EPCRA reporting requirements apply to them until the EPA publishes final EEMs. However, once final EEMs are published, participating AFOs are required to use the EEMs to estimate their emissions and come into compliance with applicable CAA and CERCLA/EPCRA requirements.

The Agreement states that a source with emissions exceeding CAA major source permitting thresholds[20] would have to do one of the following:

1. Apply for and obtain a permit that contains a federally enforceable limitation or condition that limits the potential emissions to less than the applicable major source threshold for the area where the source is located.

2. Install either best available control technology in attainment areas,[21] or lowest achievable emission rate technology in nonattainment areas;[22] and then obtain a federally enforceable permit that incorporates the appropriate best available control technology or lowest achievable emission rate limit.

Delays in issuing the EEMs resulted in facilities continuing to have civil enforcement protections even if their emissions were exceeding CAA permit or CERCLA/EPCRA reporting thresholds. Given the lack of reliable EEMs, it was difficult to estimate how many facilities could be exceeding these thresholds. However, monitoring conducted as part of an EPA enforcement case in 2003 demonstrated that some large AFOs can exceed the 250-tons-per-year permitting threshold for PM emissions. That monitoring showed total PM emissions of 550 and 700 tons per year at two large egg-layer AFOs.

The NAEMS Science Advisor analyzed NAEMS data for the pork and egg-layer industries, which indicated that pork and egg-layer AFOs could frequently exceed the EPCRA reporting threshold for ammonia of 100 pounds per day. This analysis indicated that pork and egg layer AFOs were unlikely to exceed 250 tons per year of $PM_{10}$ or VOC emissions. However, the Science Advisor's analysis did not address whether pork or egg-layer AFOs would trigger permitting requirements in poor air quality areas where regulatory thresholds are lower.

Paragraph 38 of the Agreement required the EPA to end civil enforcement protections for those emission sources/types for which the EPA determined it was unable to develop EEMs. As described earlier, the SAB concluded in its 2013 report that the EPA did not have sufficient data to develop an EEM for VOC emissions from broiler houses. Further, more than 7 years since completion of the NAEMS, the EPA had only developed draft EEMs for eight of a possible 36 emission source and pollutant combinations. However, the EPA had not yet determined that it could not develop any of the EEMs, and thus has not waived enforcement protections for any of the emissions sources covered under the 2005 Agreement.

---

[20] Applicable regulatory thresholds range from 10 tons per year in areas with very poor air quality (called extreme nonattainment areas) to 250 tons per year in areas with adequate air quality (called attainment areas).

[21] A geographic area is generally designated as being in attainment for a particular criteria air pollutant if the concentration of that pollutant is found to be at or below the regulated or "threshold" level for the associated National Ambient Air Quality Standard.

[22] A geographic area is generally designated as being in nonattainment for a particular criteria air pollutant if the concentration of that pollutant is found to exceed the regulated or "threshold" level for the associated National Ambient Air Quality Standard.

### Agency Actions on Hold

Delays in completing EEMs have also caused important agency efforts to address or mitigate AFO air emissions to remain on hold. The EPA stated it would not take the following actions until the EEMs are finalized because they are needed to inform the agency's decision-making:

> **Responding to citizen petitions to regulate AFOs**. The EPA has received petitions to address AFO emissions in regulations beyond the current permitting CAA provisions, which include a 2009 petition to list and regulate AFOs as a source category under CAA Section 111, and a 2011 petition to regulate ammonia as a criteria pollutant under CAA Sections 108 and 109. EPA staff told us they did not plan to evaluate the need for additional regulations as laid out in these petitions until the EEMs are finalized.

> **Defining "source" for aggregation purposes.** The aggregation of sources pertains to how many individual emission sources are counted together to determine whether a facility exceeds CAA major source status, and thus impacts how many facilities could exceed permitting thresholds. For example, if a barn at an AFO rather than the entire AFO is a "source," fewer AFOs could be impacted by CAA permitting requirements. The EPA had not issued guidance on this issue, and said it planned to do so after developing the EEMs.

In our view, final EEMs are also necessary for the EPA to develop compliance and enforcement strategies for Agreement non-participants, and to assess whether AFO emissions may contribute to disproportionate health risks to certain communities.

## Conclusion

The EPA's ability to characterize and address AFO air emissions is unchanged since its 2005 Agreement with the AFO industry intended to produce reliable emissions estimation methods. As a result, individual AFOs have not estimated their emissions to determine whether they are required to implement controls to reduce emissions and/or report their emissions to the appropriate emergency responders. Additionally, other important agency actions pertaining to AFO air emission estimates continue to be on hold.

Timeframes for completing EEM development were uncertain, as staffing and contract support needed to finish EEMs only recently became available and the EPA had not yet finalized its work plan at the time we completed our review. Further, SAB concerns about the EPA's EEM development methodology have not been resolved. Despite these uncertainties, parties to the 2005 Agreement continue to receive protections from civil enforcement actions. We make recommendations in Chapters 3 and 4 of this report.

# Chapter 3
## EPA Needs to Implement Systematic Planning to Assure That EEMs Have Sufficient Quality

The EPA's planning for EEM development did not describe the desired level of quality needed for the EEMs' intended purpose of estimating individual AFO air emissions nationwide. The establishment of such criteria is a key component of systematic planning for agency projects. In accordance with the agency's data quality policies, EPA organizations should conduct systematic planning to ensure that projects will result in scientific products that are defensible and useful for their intended purpose. The agency's most recent EEM development draft work plan used the terms "appropriate" and "meaningful" to describe final EEM products, but did not explain how those terms would be used to evaluate the quality or acceptability of the final EEMs.

As noted in Chapter 2, the agency's SAB concluded that the EPA's 2012 draft EEMs were not suitable for their intended purpose. Consequently, if the agency does not fully implement systematic planning for future EEM development, the EPA is at risk of producing additional draft EEMs that are not sufficient for estimating air emissions at individual AFOs across the United States.

## EPA Quality System

The EPA's Procedure for its Quality Policy[23] establishes management principles and responsibilities for ensuring that EPA products and services meet agency quality-related requirements, and are of sufficient quality for their intended use and support the EPA's mission to protect human health and the environment. The policy applies to agency products and services developed for external distribution or dissemination. Each EPA organization is responsible for implementing the EPA Quality Policy and Program within its organization. Requirements for implementing the program include conforming to the minimum specifications of the American National Standards Institute and the American Society for Quality Control standard, ANSI/ASQC E4-1994.[24]

---

[23] EPA Chief Information Officer's CIO Order 2106-P-01.0 (October 20, 2008).
[24] *Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs,* the American National Standards Institute and the American Society for Quality Control (1994). This standard is the basis for the EPA's Quality System.

At the project level, these minimum specifications include the following:

- Using a systematic planning approach (e.g., the data quality objectives process) to develop acceptance or performance criteria covered by the EPA Quality Policy.

- Having approved quality assurance project plans, or equivalent documents, for all applicable tasks involving environmental data.

To implement the EPA's Quality Policy, each EPA organization must develop a quality management plan that describes its quality system, documents its quality policies, and identifies the environmental programs to which the quality system applies. The EPA's Office of Air Quality Planning and Standards (OAQPS) developed a quality management plan that describes options for ensuring that OAQPS projects are of appropriate quality for their intended purpose. These options include elements of systematic planning to ensure that quality considerations are built into a product at the beginning, and consist of (1) developing a quality assurance project plan or similar document, and/or (2) conducting pre-dissemination review (e.g., peer review) of information.

According to the OAQPS quality management plan, quality documentation describes in detail the activities that must be implemented to assure that the results of work will satisfy the stated performance criteria. The performance criteria may be stated in the form of data quality objectives (DQOs). DQOs are qualitative or quantitative statements that clarify project technical and quality objectives, define the appropriate type of data, and specify tolerable levels of potential decision errors (e.g., uncertainty) that will be used as the basis for identifying the data needed to support decisions. EPA quality assurance guidance[25] recommends that systematic planning include DQOs when data are to be used to make a regulatory decision or emission estimations.

> **The DQO process is the agency's recommendation when data are to be used to make some type of decision (e.g., compliance or noncompliance with a standard) or estimation (e.g., ascertain the mean concentration level of a contaminant).**
>
> *Guidance on Systematic Planning Using the Data Quality Objectives Process*, EPA QA/G-4, February 2006

Further, DQOs should be specified for a project before the agency develops its plan for collecting the data, since the DQOs will drive key data collection decisions. For estimation, the guidance states that DQOs are typically expressed in terms of acceptable uncertainty (e.g., width of an uncertainty band or interval) associated with a point estimate at a desired level of statistical confidence.

---

[25] The EPA's *Guidance on Systematic Planning Using the Data Quality Objectives Process* (2006).

The OAQPS quality management plan also provides for the pre-dissemination review of OAQPS information as a way to provide assurance that quality has been built into the information that the office disseminates. The quality management plan cites peer review as an example of pre-dissemination review, and notes that it can be appropriate to incorporate the pre-dissemination review for project planning documents, such as the quality assurance project plan, prior to beginning the project.

## EPA Has Not Fully Implemented a Systematic Planning Process to Assure a Desired Level of Quality for EEMs

The EPA's planning process for EEM development had yet to establish data quality objectives describing the performance or acceptance criteria for the final EEMs. While extensive planning went into assuring the quality of the monitoring data collected during the NAEMS, this planning did not describe the desired quality of the end products resulting from EPA analysis of the NAEMS data (i.e., the EEMs), or the type and extent of emissions monitoring data needed to produce EEMs of desired quality.

### Planning for Draft Development of EEMs Was Not Systematic

Ideally, under a systematic planning process, a methodology for producing a final product at the desired quality is determined up front. This methodology then drives the data collection efforts. When data are to be used to make some type of decision or estimation, the EPA recommends that the desired level of quality be expressed in the form of DQOs. As noted in Chapters 1 and 2, the EPA collaborated with external scientists to develop the monitoring protocol. However, several factors influenced the scope of the NAEMS, and that effort was not specifically designed to produce data to satisfy acceptance criteria for the EEMs. Among these factors was that, prior to the study, the EPA did not know which variables most impact air emissions at AFOs. Thus, the EPA tried to create an EEM development methodology using the data that was available from the NAEMS.

> **Unless some form of planning is conducted prior to investing the necessary time and resources to collect data, the chances can be unacceptably high that these data will not meet specific project needs.**
>
> *Guidance on Systematic Planning Using the Data Quality Objectives Process*, EPA QA/G-4, February 2006

The NAEMS protocol stated that the NAEMS and subsequent data analyses and interpretation would allow the EPA and livestock and poultry producers to "reasonably determine" which AFOs were subject to CAA regulatory provisions and CERCLA/EPCRA reporting requirements. However, as part of its planning, the EPA did not define what was meant by "reasonably determine." The EPA developed a quality assurance project plan for its efforts to develop the draft EEMs that were published in 2012, but it focused on assessing the quality of incoming data from the NAEMS and other sources. The quality assurance project

plan did not include DQOs or other performance criteria defining the acceptable level of uncertainty for EEM predictions, or the quality control measures the EPA would use to assure its statistical models were scientifically and statistically sound.

The EPA had its draft EEMs peer reviewed by the SAB, but the agency did not involve the SAB in its planning process to ensure that the NAEMS would provide sufficient data for EEM development. As discussed in Chapter 2, the SAB concluded that the EPA's draft EEMs were not useful for making compliance determinations nationwide due to problems with the underlying data and analysis.

### *Plans for Completing Development of EEMs Can Be Strengthened*

The EPA had not yet conducted systematic planning for the EEM completion effort, but had developed a draft work plan. That draft work plan contained little information about systematic planning to assure the quality of future EEMs. The plan did not address whether a quality assurance project plan would be developed, or commit to peer review of the planned methodology or the draft or final EEMs.[26]

The draft work plan described a future scoping study that would allow the EPA to plan activities and resources for developing "appropriate" EEMs, and stated that EEMs developed in the future would be tested to determine whether they can reproduce "meaningful" emissions estimates. However, the work plan did not define or establish acceptance criteria for "appropriate" or "meaningful" EEMs. Staff from OAQPS stated that they planned to make quality planning decisions once the new staff person had been hired to conduct the scoping study and subsequent EEM development.

## Conclusion

As explained in the EPA's quality assurance guidance, systematic planning that defines the level of quality required for an end product should be conducted prior to data collection efforts, to reduce the risk that the data collected is not sufficient. Such planning for the EEMs was not conducted prior to the NAEMS or draft EEM development efforts, in part, because the EPA did not have a full understanding of the factors that influence AFO air emissions. Further, the NAEMS protocol and monitoring plans were not developed exclusively to provide data needed for EEM development. Based on its experience and peer review feedback in developing the initial set of draft EEMs, the EPA should be in a better position to conduct systematic planning for the EEM completion effort.

---

[26] In the draft plan, the EPA stated it will provide developed EEMs to "appropriate stakeholders and possibly the Science Advisory Board" for review, and then modify the EEMs based on comments received. However, the plan does not commit to obtaining independent, external peer review of the EEMs or the planned methodology that will be used to develop the EEMs.

Without adequate systematic planning, the EPA is at risk of spending additional time and resources to develop EEMs that still are not sufficient for estimating AFO emissions nationwide.

## Recommendations

We recommend that the Assistant Administrator for Air and Radiation:

1. In accordance with EPA quality assurance guidance, conduct comprehensive systematic planning for future emission estimating methodology development through either the quality assurance project plan or pre-dissemination review processes.

   - If the EPA chooses to develop a quality assurance project plan, it should first develop data quality objectives for the emission estimating methodologies.

   - If the EPA chooses to conduct a pre-dissemination review, it should obtain independent, external feedback on the adequacy of its emission estimating methodologies development and plans prior to beginning the project.

2. Based on the results of systematic planning, determine and document the decision as to whether the EPA is able to develop scientifically and statistically sound emission estimating methodologies for each originally planned emission source and pollutant combination.

3. For the emission source and pollutant combinations for which the Office of Air and Radiation determines it can develop scientifically and statistically sound emission estimating methodologies, establish public milestone dates for issuing each draft emission estimating methodology. For any emission source and pollutant combinations for which the Office of Air and Radiation determines that it cannot develop scientifically and statistically sound emission estimating methodologies, notify the Office of Enforcement and Compliance Assurance of that determination.

We recommend that the Assistant Administrator for Enforcement Compliance and Assurance:

4. For any emission source and pollutant combinations for which the Office of Air and Radiation determines it cannot develop emission estimating methodologies, notify Air Compliance Agreement participants of this determination, and that the release and covenant not to sue for those emission sources and pollutant types will expire in accordance with paragraph 38 of the 2005 Air Compliance Agreement.

## Agency Response and OIG Evaluation

The Office of Air and Radiation agreed with Recommendations 1, 2 and 3, and provided acceptable planned corrective actions and completion dates. The Office of Enforcement and Compliance Assurance agreed with Recommendation 4 and provided an acceptable corrective action plan.

The agency also provided technical comments that were incorporated into our final report as appropriate. Appendices A and B contain the responses to our report from the Office of Air and Radiation, and the Office of Enforcement and Compliance Assurance, respectively.

# Chapter 4
## EPA Has Not Updated Some Stakeholders and Public on Current Status of EEM Efforts

The 2005 Air Compliance Agreement between the AFO industry and the EPA generated significant stakeholder and public interest in AFO air emissions, and any actions the agency would take to address those emissions. Leading up to the monitoring study, and for 2 years after monitoring data was available, the EPA provided frequent public updates related to the NAEMS and EEMs. However, since the SAB's 2013 final report, the agency had provided only high-level updates to selected stakeholders. This left many stakeholders and the public uninformed about the current status of the work, the reasons for delays, and current timelines for finalizing the EEMs. The EPA should resume providing public updates on the status of EEM development through its website or other public means, to ensure the transparency of its process and accountability in setting completion dates.

## EPA Provided Extensive Public Outreach During Early Stages

The EPA issued four press releases in 2006 announcing individual agreements entered into between the EPA and AFOs. Further, in the years after it received all monitoring data in 2010, the EPA provided frequent updates on EEM development efforts and the SAB's review of draft EEMs. In 2011, the EPA published data from the NAEMS monitoring, issued a Call for Information to collect information to supplement the NAEMS data, and updated the public on processes related to the planned SAB review. In 2012, the EPA released its draft EEMs for public comment.

## EPA Has Not Publicly Communicated on EEM Development Efforts Since 2013

Since the EPA posted the SAB's 2013 final report on its public website, the EPA had not updated some stakeholders and the public on recent aspects of its NAEMS data analysis and EEM development efforts. An OAQPS manager told us that the agency planned to post final EEMs on its public webpage, but used other mechanisms to provide updates on the status of EEM development. Such updates were provided only upon request, and typically to groups with which the agency had regular contact, such as the USDA's Agricultural Air Quality Task Force. Numerous interested parties—including the SAB Chair, a SAB panel member, and three external groups—told us that they had no information about the ongoing NAEMS data analysis, the reasons for delays, or how long it might take the EPA to publish final EEMs.

Further, staff at the USDA told us that while they periodically received high-level updates from the EPA at Agricultural Air Quality Task Force and intra-agency

workgroup meetings, they were not aware of the EPA's current plans for completing EEM development. The EPA's 2016 update to the Agricultural Air Quality Task Force provided the SAB's recommendations regarding the draft EEMs, as previous updates had done, and stated that the EPA will continue developing EEMs to account for air emissions from AFOs.

## Conclusion

Despite being years behind schedule in finalizing the EEMs, the EPA has not provided public updates since 2013 on the NAEMS data analysis and the agency's current efforts to finalize the EEMs. Thus, stakeholders and the public do not know where the EPA currently stands with respect to EEM development. To ensure transparency and accountability in completing EEMs for the $15 million investment in the NAEMS study, the EPA should provide public updates on the status of EEM development and establish public milestones for completion of each draft EEM.

## Recommendation

We recommend that the Assistant Administrator for Air and Radiation:

5. Provide the public with the status of emission estimating methodology development and the agency's planned next steps for analyzing the National Air Emissions Monitoring Study data and finalizing the emission estimating methodologies, including the completion of milestone dates for each draft emission estimating methodology it plans to develop.

## Agency Response and OIG Evaluation

The Office of Air and Radiation agreed with Recommendation 5, and provided an acceptable corrective action plan and completion date. The Office of Air and Radiation also provided technical comments that were incorporated into our final report as appropriate. Appendix A contains the Office of Air and Radiation's response to our report.

# *Status of Recommendations and Potential Monetary Benefits*

RECOMMENDATIONS

| Rec. No. | Page No. | Subject | Status[1] | Action Official | Planned Completion Date | Potential Monetary Benefits (in $000s) |
|---|---|---|---|---|---|---|
| 1 | 23 | In accordance with EPA quality assurance guidance, conduct comprehensive systematic planning for future emission estimating methodology development through either the quality assurance project plan or pre-dissemination review processes. <br> o If the EPA chooses to develop a quality assurance project plan, it should first develop data quality objectives for the emission estimating methodologies. <br> o If the EPA chooses to conduct a pre-dissemination review, it should obtain independent, external feedback on the adequacy of its emission estimating methodologies development and plans prior to beginning the project. | R | Assistant Administrator for Air and Radiation | 3/31/18 | |
| 2 | 23 | Based on the results of systematic planning, determine and document the decision as to whether the EPA is able to develop scientifically and statistically sound emission estimating methodologies for each originally planned emission source and pollutant combination. | R | Assistant Administrator for Air and Radiation | 6/30/18 | |
| 3 | 23 | For the emission source and pollutant combinations for which the Office of Air and Radiation determines it can develop scientifically and statistically sound emission estimating methodologies, establish public milestone dates for issuing each draft emission estimating methodology. For any emission source and pollutant combinations for which the Office of Air and Radiation determines that it cannot develop scientifically and statistically sound emission estimating methodologies, notify the Office of Enforcement and Compliance Assurance of that determination. | R | Assistant Administrator for Air and Radiation | 6/30/18 | |
| 4 | 23 | For any emission source and pollutant combinations for which the Office of Air and Radiation determines it cannot develop emission estimating methodologies, notify Air Compliance Agreement participants of this determination, and that the release and covenant not to sue for those emission sources and pollutant types will expire in accordance with paragraph 38 of the 2005 Air Compliance Agreement. | R | Assistant Administrator for Enforcement and Compliance Assurance | 9/30/18 [2] | |
| 5 | 26 | Provide the public with the status of emission estimating methodology development and the agency's planned next steps for analyzing the National Air Emissions Monitoring Study data and finalizing the emission estimating methodologies, including the completion of milestone dates for each draft emission estimating methodology it plans to develop. | R | Assistant Administrator for Air and Radiation | 6/30/18 | |

[1]   C = Corrective action completed.
     R = Recommendation resolved with corrective action pending.
     U = Recommendation unresolved with resolution efforts in progress.

[2]   If applicable, based on the Office of Air and Radiation's determination in response to Recommendation 3.

**Appendix A**

# *Office of Air and Radiation*
# *Response to Draft Report*



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

JUN 2 3 2017

OFFICE OF<br>AIR AND RADIATION

**MEMORANDUM**

**SUBJECT:**   Response to the Office of Inspector General's Draft Report, *Emissions From Animal Feeding Operations Remain Largely Uncharacterized More Than 7 Years After Study Completed* (Project No. OPE-FY16-0018)

**FROM:**   Sarah Dunham
Acting Assistant Administrator

**TO:**   Carolyn Copper
Assistant Inspector General
Office of Program Evaluation
Office of Inspector General

The EPA's Office of Air and Radiation (OAR) appreciates the opportunity to review and comment on the Office of Inspector General (OIG) draft report titled "*Emissions From Animal Feeding Operations Remain Largely Uncharacterized More Than 7 Years After Study Completed.*" OAR agrees in general with the OIG's recommendations.

OAR's current task is the development of Emissions Estimating Methodologies (EEMs) for animal feeding operations (AFOs), using statistically-based methodologies to develop emissions factors for select types of AFOs from data collected through the National Air Emissions Monitoring Study (NAEMS). In partnership with the Office of Research and Development (ORD), we are undertaking this effort and incorporating a National Academy of Sciences (NAS) recommendation that the EPA develop an interim method for estimating emissions while we participate in a longer-term effort to develop process-based EEMs. In addition, our work will include objectives outlined in the 2005 Air Compliance Agreement (Agreement) the EPA entered into with participating AFOs. The AFO sectors represented in the Agreement covered the monitoring study costs. Individual participating AFOs did not directly pay monitoring study funds. The EPA remains committed to fulfilling this goal of developing EEMs for AFOs based on scientifically and statistically sound methods. The

statistically-based EEMs must also be easily implemented by the agricultural community and other users, and be based on non-proprietary inputs.

While we generally agree with your characterizations of the Agreement and the associated NAEMS, there are a few places where information in the draft report is slightly unclear where the information differs from our understanding of specific facts. Please refer to the attached list of these instances and suggested revisions intended to help clarify and improve the draft report's accuracy.

Below are OAR's responses to the OIG's specific recommendations (recommendation numbers 1, 2, 3 and 5), which we developed in consultation with ORD. On June 9, 2017, OECA provided a separate response to recommendation number 4 as it is assigned to their office. In the attached technical comments, we provide suggested additional detailed changes in the form of a markup.

**Recommendation 1: In accordance with EPA quality assurance guidance, conduct comprehensive systematic planning for future emission estimating methodology development through either the quality assurance project plan or pre-dissemination review processes.**

- **If the EPA chooses to develop a quality assurance project plan, it should first develop data quality objectives for the emission estimating methodologies.**

- **If the EPA chooses to conduct a pre-dissemination review, it should obtain independent, external feedback on the adequacy of its emission estimating methodologies development and plans prior to beginning the project.**

**Response 1:** OAR and ORD agree with this recommendation and have initiated development of a quality assurance project plan (QAPP) for evaluation of the data and completion of the EEMs. As part of the QAPP development, appropriate data quality objectives will be defined. We intend to make this document publicly available on our website (see below).

**Planned completion date:** FY 2018, Q2 (March).

**Recommendation 2: Based on the results of systematic planning, determine and document the decision as to whether the EPA is able to develop scientifically and statistically sound emission estimating methodologies for each originally planned emission source and pollutant combination.**

**Response 2:** OAR agrees with this recommendation. As noted, completion of this task is contingent upon the results and decisions made during the QAPP development. Upon completion of the QAPP, OAR and ORD will determine which EEMs can be completed and the appropriate schedules for their completion. We intend to make the schedules publicly available on our website (see below).

**Planned Completion Date**: As stated above, development of the QAPP is ongoing with completion anticipated in the second quarter of FY 2018. Upon completion of the QAPP, decisions

on EEM development and schedules will be determined and transmitted to the Office of Enforcement and Compliance Assurance (OECA). We anticipate that the schedules will be established in third quarter of FY 2018.

**Recommendation 3: For the emission source and pollutant combinations for which the Office of Air and Radiation determines it can develop scientifically and statistically sound emission estimating methodologies, establish public milestone dates for issuing each draft emission estimating methodology. For any emission source and pollutant combinations for which the Office of Air and Radiation determines that it cannot develop scientifically and statistically sound emission estimating methodologies, notify the Office of Enforcement and Compliance Assurance of that determination.**

**Response 3:** OAR agrees with this recommendation and will develop a schedule for completion of the EEMs after completion of data review and QAPP development, which is currently planned for completion in the second quarter of FY 2018.

**Planned Completion Date:** As stated above, development of the QAPP is ongoing with completion anticipated in the second quarter of FY 2018. Upon completion of the QAPP, decisions on EEM development and schedules will be determined and transmitted to OECA and made available to the public. We anticipate that the schedules will be established in the third quarter of FY 2018.

**Recommendation 5: Provide the public with the status of emission estimating methodology development and the agency's planned next steps for analyzing the National Air Emissions Monitoring Study data and finalizing the emission estimating methodologies, including the completion milestone dates for each draft emission estimating methodology it plans to develop.**

**Response 5:** OAR agrees with this recommendation and will post the schedule on our website for completion of the EEMs after completion of data review and QAPP development, which is currently planned for completion in the second quarter of FY 2018. We anticipate providing updates on our progress with subsequent website postings.

**Planned Completion Date**: As stated above, development of the QAPP is ongoing with completion anticipated in the second quarter of FY 2018. Upon completion of the QAPP, decisions on EEM development and schedules will be determined and milestones will be made available to the public. We anticipate that the schedules will be established in the third quarter of FY 2018.

If you have any questions regarding this response, please contact Mike Jones, Office of Air Quality Planning and Standards (OAQPS) Audit Liaison, at (919) 541-0528.

Attachment

# *Office of Enforcement and Compliance Assurance Response to Draft Report*

 **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

JUN - 9 2017

OFFICE OF
ENFORCEMENT AND
COMPLIANCE ASSURANCE

## MEMORANDUM

**SUBJECT:**   Response to the Office of Inspector General Draft Report: "Emissions from Animal Feeding Operations Remain Largely Uncharacterized More Than 7 Years After Study Completed," Project No. OPE-FY16-0018 (May 12, 2017)

**FROM:**   Lawrence E. Starfield
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance

**TO:**   Carolyn Copper
Assistant Inspector General
Office of Program Evaluation
Office of Inspector General

Thank you for the opportunity to respond to the Office of Inspector General (OIG) Draft Report, "Emissions from Animal Feeding Operations Remain Largely Uncharacterized More Than 7 Years After Study Completed" (Draft Report). The Office of Enforcement and Compliance Assurance (OECA) appreciates OIG's careful examination of this issue, and we are committed to following the terms of the Animal Feeding Operations (AFO) Air Compliance Agreement (Agreement) and OIG's recommendation for OECA – Recommendation Number 4. We concur with Recommendation Number 4, and we provide a high-level intended corrective action with an estimated completion date below.

While we generally agree with your characterizations of the Agreement and its associated National Air Emissions Monitoring Study (NAEMS), there are a few places where the Draft Report is slightly unclear or where the information differs from our understanding of specific facts. Enclosed for your consideration, we include a list of these instances and suggested revisions intended to help clarify and improve the Draft Report's accuracy.

OECA has discussed the Draft Report with the Office of Air and Radiation (OAR) and we understand that OAR will be providing a separate response addressing the Draft Report's findings and recommendations for OAR – Recommendation Numbers 1, 2, 3, and 5.

**OECA Response to Recommendation Number 4 – Concur**

| No. | Recommendation | High-Level Intended Corrective Action | Planned Completion Date |
|-----|----------------|---------------------------------------|-------------------------|
| 4 | For any emission source and pollutant combinations for which the Office of Air and Radiation determines it cannot develop emission estimating methodologies, notify Air Compliance Agreement participants of this determination and that the release and covenant not to sue for those emission sources and pollutant types will expire in accordance with paragraph 38 of the 2005 Air Compliance Agreement. | If the EPA determines it cannot develop emission estimating methodologies for any emission source and pollutant combinations, OECA will notify Agreement participants in writing that the EPA has made such a determination and that the release and covenant not to sue will expire in accordance with paragraph 38 of the Agreement. | If necessary, OECA will complete the intended corrective action within 60 days of OAR finalizing its determination. |

We concur with OIG's recommendation that OECA notify Agreement participants if OAR determines that it cannot develop emission estimating methodologies for any emission source and pollutant combinations. OECA notes that this recommendation will only require a corrective action if OAR determines it cannot develop emission estimating methodologies for any source and pollutant combinations. Paragraph 38 of the Agreement requires the EPA to notify Agreement participants in writing if the Agency makes such a determination. OECA intends to continue abiding by the Agreement's terms, and we will notify Agreement participants if the Agency determines it cannot develop emission estimating methodologies for any emission source and pollutant combinations.

If you have any questions regarding this response, please contact OECA Audit Liaison, Gwendolyn Spriggs, at 202.564.2439.

Attachment

cc:  Susan Shinkman, OECA/OCE
    Rosemarie Kelley, OECA/OCE
    Lauren Kabler, OECA/OCE
    Apple Chapman, OECA/OCE
    Tim Sullivan, OECA/OCE

Gwendolyn Spriggs, OECA/OAP
Sarah Dunham, OAR
Robin Dunkins, OAR/OAQPS
Mike Jones, OAR/OAQPS

**Appendix C**

# *Distribution*

The Administrator
Chief of Staff
Chief of Staff for Operations
Deputy Chief of Staff for Operations
Assistant Administrator for Air and Radiation
Assistant Administrator for Enforcement and Compliance Assurance
Agency Follow-Up Official (the CFO)
Agency Follow-Up Coordinator
General Counsel
Associate Administrator for Congressional and Intergovernmental Relations
Associate Administrator for Public Affairs
Career Deputy Assistant Administrator, Office of Air and Radiation
Deputy Assistant Administrator, Office of Enforcement and Compliance Assurance
Audit Follow-Up Coordinator, Office of the Administrator
Audit Follow-Up Coordinator, Office of Air and Radiation
Audit Follow-Up Coordinator, Office of Enforcement and Compliance Assurance

# Exhibit 10

11/1/2017    CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms | Emergency Planning a...

Case 1:18-cv-02260-TJK   Document 10-2   Filed 10/29/18   Page 264 of 470

We've made some changes to EPA.gov. If the information you are looking for is not here, you may be able to find it on the EPA Web Archive or the January 19, 2017 Web Snapshot.

 United States
Environmental Protection
Agency

# CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms

- | **Attention!**

   Farms with continuous releases must submit their initial continuous release notification on November 15, 2017.

  Overview
- Reporting Exemption and Resulting Litigation
- Purpose
- Frequent Questions
- Resources

## Overview

The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and Emergency Planning and Community Right to Know Act (EPCRA) require facilities to report releases of hazardous substances that are equal to or greater than their reportable quantities (RQ) within any 24-hour period. Following a hazardous substance reportable release, a facility owner or operator must notify federal authorities under CERCLA and state and local authorities under EPCRA.

## Reporting Exemption for Animal Waste and Resulting Litigation

On December 18, 2008, EPA published a final rule that exempted most farms from certain release reporting requirements in CERCLA and EPCRA. Specifically, the rule exempted farms releasing hazardous substances from animal

waste to the air above threshold levels from reporting under CERCLA. For EPCRA reporting, the rule exempted reporting of such releases if the farm had fewer animals than a large concentrated animal feeding operation (CAFO).

In short, all farms were relieved from reporting hazardous substance air releases from animal waste under CERCLA, and only large CAFOs were subject to EPCRA reporting.

A number of citizen groups challenged the validity of the final rule in the U.S. Court of Appeals for the District of Columbia Circuit. On April 11, 2017, the Court struck down the final rule, eliminating the reporting exemptions for farms. EPA sought additional time from the Court to delay the effective date so that EPA could develop guidance materials to help farmers understand their reporting obligations.

Unless the DC Circuit Court takes further action, the court's ruling takes effect on November 15, 2017.

# Purpose

EPA developed this interim guidance to assist farms in complying with requirements to report air releases of hazardous substances from animal waste under CERCLA and EPCRA. EPA welcomes comments and suggestions from the regulated community and the public on these resources and other additional resources that should be included here. Please email comments or suggestions by November 24, 2017, to: CERCLA103.guidance@epa.gov. EPA will revise this guidance, as necessary, to reflect additional information to assist farm owners and operators to meet reporting obligations.

# Frequent Questions

## What are my requirements to report air releases from animal waste under CERCLA section 103?

Farm owners/operators must comply with CERCLA section 103 reporting requirements for air releases of hazardous substances from animal waste at their farms. Farm owners/operators must notify the National Response Center (NRC) at 1-800-424-8802 when their facilities have air releases of hazardous substances from animal wastes that are equal to or greater than their reportable quantities (RQs) within any 24-hour period.

Alternatively, you can follow a streamlined reporting process known as "continuous release reporting." This requires the facility owner or operator to:

- Call the NRC at 1-800-424-8802 and identify your reportable release as an "initial continuous release notification;"
- Submit an initial written notification to the EPA Regional Office;

- One year later submit an additional follow-up written notification to the EPA Regional Office.

For more information on continuous release reporting, see: How do I report a continuous release under CERCLA? and Resources.

## What are my requirements to report under EPCRA section 304?

EPA interprets the statute to exclude farms that use substances in "routine agricultural operations" from reporting under EPCRA section 304. For more information, see: EPCRA Q&A. EPA intends to conduct a rulemaking to clarify its interpretation of "used in routine agricultural operations" as it pertains to EPCRA reporting requirements.

## When do I have to comply?

Unless the DC Circuit Court takes further action, the court's ruling takes effect on November 15, 2017. Starting on this date, farms releasing hazardous substances to air from animal wastes, equal to or greater than their reportable quantities, within any 24-hour period, must notify the NRC. For farms with continuous releases, this means that the initial continuous release notification needs to be made as of the effective date of the Court action (currently November 15, 2017).

## What substances need to be reported?

Typical hazardous substances associated with animal wastes include ammonia and hydrogen sulfide. Both ammonia and hydrogen sulfide have a reportable quantity of 100 lbs. If a farm releases ammonia and/or hydrogen sulfide in amounts ≥ the reportable quantity (100 lbs) within a 24-hour period, then the farm owner or operator must notify the NRC. For a complete list, see: CERCLA hazardous substances and their reportable quantities (RQs).

## Do I have to report when I apply fertilizers or pesticides to crops?

No, farm owners/operators do not need to report the normal application of fertilizers (including normal application of manure as a fertilizer) or the handling, storage or application of pesticide products registered under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). However, under CERCLA section 103, any spills or accidents involving these substances must be immediately reported to the NRC when they meet or exceed the reportable quantity.

## Do I have to report if I am participating in the EPA's Animal Feeding Operation Air Compliance Agreement?

At this time, farm owners/operators in compliance with their Animal Feeding Operation Air Compliance Agreement (70 FR 4958) are not expected to report air releases of hazardous substances from animal wastes under CERCLA and

EPCRA. Per their Agreement, participants must report air releases of hazardous substances equal to or exceeding the hazardous substances' reportable quantities under CERCLA when EPA completes the National Air Emissions Monitoring Study.

For additional information on EPCRA reporting, see: EPCRA Q&A.

## How do I estimate the releases for reporting?

Some farms that raise animals will have reportable releases of ammonia and/or hydrogen sulfide (i.e. release of ≥ 100 lbs in a 24-hour period) from animal wastes. These resources may assist farmers in estimating emissions.

EPA recognizes that it will be challenging for farmers to report releases from animal wastes because there is no generally accepted methodology for estimating emission quantities at this time. CERCLA section 103 allows "continuous releases" to be reported in ranges. EPA understands that farmers may need to report their releases in broad ranges that reflect the high degree of uncertainty and variability of these releases.

## How can I reduce emissions?

EPA and United States Department of Agriculture (USDA) developed a reference guide that provides options for improving air quality from livestock and poultry operations. The guide provides a compilation of conservation measures for reducing air pollutant emissions and/or reducing air quality impacts from livestock and poultry operations.

## Who do I notify if I need to report?

You must immediately notify the NRC at **1-800-424-8802** when you have a release of any CERCLA hazardous substance at or above its reportable quantity within any 24-hour period. However, there is an exception for the normal application of fertilizers or the handling, storage or application of pesticide products as described above.

## Can I request an extension?

No, CERCLA section 103 requires the facility owner or operator to immediately notify the NRC of a reportable release of a hazardous substance.

The one exception is for farm owners/operators participating in the Agency's Animal Feeding Operation Air Compliance Agreement, and that are in compliance with their Agreements. For more information, see: Do I have to report if I am participating in the EPA's Animal Feeding Operation Air Compliance Agreement?

## Do I have to notify the NRC every time my emissions exceed the reportable quantity in a 24-hour period?

No. If your farm has releases that are continuous and stable in quantity and rate, you can follow a streamlined reporting process known as "continuous release reporting." EPA considers emissions from animal waste to be continuous and stable in quantity and rate, and therefore eligible for this streamlined reporting option.

For more information on the regulation and guidance for continuous release reporting requirements, see: Resources.

## How do I report a continuous release under CERCLA?

You may follow these steps to report air emissions from animal wastes (e.g. ammonia and hydrogen sulfide releases):

**Step 1:**  Notify the NRC at **1-800-424-8802**.

In order to qualify as a continuous release notification, **the caller must inform the NRC representative that this is an "initial continuous release notification."**

Provide the NRC representative with:

- The name and location of the farm
- The name(s) of the hazardous substance(s) released

The NRC representative will provide an identification number (CR-ERNS) for your farm. You will have to use this number for any follow-up report or notification that is required under the continuous release reporting requirements.

**Note: The NRC does not require personally identifiable information, such as an address for a private residence. As an alternative, a generic location (such as name of city/town and state) may be sufficient.**

**Step 2:** Submit an initial written notification to the EPA Regional Office.

Submit an initial written notification to the EPA Regional Office for the area where the release occurs, within 30 days of the call to the NRC.

Farms can use this continuous release reporting form to provide the initial written notification. *Please note that this continuous release form is intended for multiple sectors and provides directions to send information to the EPA Regional Offices and to LEPCs and SERCs.* **Farms not reporting under EPCRA should not send information to the LEPCs and SERCs.**

EPA is developing a streamlined continuous release reporting form for farm facility owners and operators and plans to make this form available once it is finalized.

**Step 3:** A one-time first anniversary follow-up report to the EPA Regional Office.

Within 30 days of the first anniversary date of the initial written notification (i.e., the first continuous release report), the person in charge of the farm must submit a one-time anniversary report to the EPA Regional Office. The farm owner/operator must verify and update the information initially submitted for each of the hazardous substances reported to the NRC and to the EPA Regional Office. This follow-up report should be re-certified by the person in charge of the farm.

EPA's guide Reporting Requirements for Continuous Releases of Hazardous Substances includes forms to assist you with developing written reports. The guide provides an overview of the information required for the initial and first anniversary follow-up reports.

## Are there additional continuous release reporting requirements?

There are two additional types of continuous release reporting requirements:

- statistically significant increase (SSI) notification and
- notification of changes to previously submitted continuous release information.

You must immediately notify the NRC of any statistically significant increases (SSI) or of a change in previously submitted release information. This is most likely to be triggered by:

- an increase in the number of animals maintained on the farm (beyond the range used for the initial report) or
- a significant change (or disruption) in waste handling systems or procedures.

This is an ongoing requirement.

## What is an SSI?

An SSI is an episodic release of a hazardous substance that exceeds the release quantity described in the upper bound of the normal range of the facility's continuous release report. The normal range includes all releases of a hazardous substance (from all sources at the facility) occurring over any 24-hour period under normal operating conditions during the preceding year.

Only those releases that are both continuous and stable in quantity and rate may be included in the normal range.

## How often do I need to estimate emissions?

You must annually review emissions from the farm. You'll also need to estimate emissions following any significant changes in operations that may result in SSI in emissions.

**A farm owner/operator filed the continuous release and one-time anniversary report to comply with CERCLA section 103 for their facility before the 2008 exemption. If the information is still valid, do they have to file again?**

No, if there have been no SSI in emissions or other changes to the report filed before 2008, then the farm owner/operator need not submit another report.

# Resources

40 CFR part 302 - Designation, Reportable Quantities, and Notification

Reporting Requirements for Continuous Releases of Hazardous Substances

### Emission Estimates

Farm owners/operators may consider any of the resources provided in this section (or any other studies available to you) for estimating releases. You can also coordinate with your trade associations or the land-grant universities in your area (see Appendix A.3: List of AFO Air Quality Programs & Land-Grant Universities available in reference guide).

You may establish estimated quantities of releases by relying on:

- past release data,
- engineering estimates,
- your knowledge of the facility's operations and release history, or
- your best professional judgment.

Monitoring data is not required.

*Disclaimer: This listing does not constitute EPA endorsement. These are provided solely as available resources for farms to use while EPA finalizes its methodologies for estimating air emissions of ammonia and hydrogen sulfide from animal wastes. Farms may use any other approaches that are available to develop these estimates.*

### Dairy Operations

To estimate ammonia and hydrogen sulfide emissions from dairy operations, see: Dairy Report worksheet (3 pp, 87 K, About PDF)(go to page 3)  EXIT  . Emission estimates are inclusive of ammonia emissions from animal pen surfaces and the runoff holding pond(s). Ammonia emission rates vary between summer and winter months. The worksheet indicates that hydrogen sulfide levels are fairly stable throughout the year.

Although the Dairy Report includes a draft letter and template for continuous release reports for dairy operations, please use the <u>continuous release reporting form</u>.

*(Source: These emission estimates are based on research data collected by Texas AgriLife Research, Texas AgriLife Extension Service, Texas A&M University, USDA-Agricultural Research Service, and West Texas A&M University.)*

**Swine operations**

To estimate ammonia and hydrogen sulfide emissions from swine operations, see: <u>Swine Report worksheet</u> (4 pp, 91 K, <u>About PDF</u>) (go to page 3)   EXIT   . The worksheet considers typical confinement housing and manure storages that are located in a temperate climate. Emission rates are provided for shallow and deep storage pits.

Although the Swine Report worksheet includes a draft letter and template for continuous release reports for swine operations, please use the <u>continuous release reporting form</u>.

*(Source: The emissions estimates are derived from research reported by: Gay, S.W., D.R. Schmidt, C.J. Clanton, K.A. Janni, L.D. Jacobson, S. Weisberg. 2003. Odor, Total Reduced Sulfur and Ammonia Emissions from Animal Housing Facilities and Manure Storage Units in Minnesota. Applied Engineering in Agriculture, 19(3) 347-360, ASABE, St. Joseph, MI.*
*and:*
*Jacobson, L.D., A.J. Heber, S.J. Hoff, Y. Zhang, D.B. Beasley, J.A. Koziel, and B.P. Hetchler. 2006. Aerial Pollutants Emissions from Confined Animal Buildings. Summary report, Ag Air Workshop, USDA-IFAFS research and demonstration program.) This study indicates that these values are a good faith estimate of emissions from swine operations using typical confinement housing and manure storages and located in a temperate climate.)*

**Poultry Operations**

<u>Ammonia and Hydrogen Sulfide Emission Rates for Poultry Operations</u>
 (3 pp, 36 K, <u>About PDF</u>)   EXIT    provides ammonia and hydrogen sulfide emission rates for poultry operations, including broilers, laying hens and turkeys. This study lists emission rates for various housing type for each species. It also includes instructions for using the emission rates to calculate emissions for these substances, as well as examples on calculating emissions.

*(Source: Hongwei Xin, Robert Burns, and Hong Li. January 2009. Ammonia (NH3) and Hydrogen Sulfide (H2S) Emission Rates for Poultry Operations. Agricultural and Biosystems Engineering Dept., Iowa State University, Ames, Iowa.)*

**General emission estimates for ammonia from beef, dairy, horse, swine, poultry operations**

11/1/2017   CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste Farms | Emergency Planning a…

Case 1:18-cv-02260-TJK   Document 10-2   Filed 10/29/18   Page 272 of 470

An <u>ammonia emissions estimator</u> (2 pp, 16 K, <u>About PDF</u>)   EXIT   is available for beef, dairy, horse, poultry (broiler, turkey, and ducks), and swine. This study was completed by the University of Nebraska on ammonia losses from animal housing facilities in various conditions (i.e. open dirt lots, on cool and humid days) for different species. Example ammonia emissions estimator worksheets are available for swine and cattle:

- <u>Swine example</u> (2 pp, 31 K, <u>About PDF</u>)   EXIT   for calculating emissions of ammonia for a farm that houses 5,000 swine.
- <u>Cattle example</u> (2 pp,33 K, <u>About PDF</u>)   EXIT   for calculating emissions of ammonia for a beef feedlot with 1,000 head of cattle.

*(Source:  Rick Stowell and Rick Koelsch, University of Nebraska.)*

*A summary of the resources above are included in the following table:*

The following links exit the site   EXIT

## Resources for Emissions Estimates

| Type | Ammonia | Hydrogen Sulfide | Inpu |
|------|---------|------------------|------|
| Beef | <u>Ammonia emissions estimator</u> (2 pp, 31 K, <u>About PDF</u>)<br><br><u>Cattle example</u> (2 pp,33 K, <u>About PDF</u>) | -- | - Num of anin - Anin hous - Man stora |
| Dairy | <u>Dairy Report worksheet</u> (3 pp, 87 K, <u>About PDF</u>) (see page 3) | <u>Dairy Report worksheet</u> (3 pp, 87 K, <u>About PDF</u>) (see page 3) | - Num of anin - Sea |

11/1/2017    CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste Farms | Emergency Planning a…

Case 1:18-cv-02260-TJK  Document 10-2  Filed 10/29/18  Page 273 of 470

| Type | Ammonia | Hydrogen Sulfide | Inpu |
|---|---|---|---|
| | Ammonia emissions estimator (2 pp, 16 K, About PDF) | -- | - Num of anin - Anin hous - Man stora |
| Swine | Swine Report worksheet (4 pp, 91 K, About PDF) (see page 3) | Swine Report worksheet (4 pp, 91 K, About PDF) (see page 3) | - Num of sv - Faci type - Man syste |
| | Ammonia emissions estimator (2 pp, 16 K, About PDF)  Swine example (2 pp, 31 K, About PDF) | -- | - Num of anin - Anin hous - Man stora |

11/1/2017    CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms | Emergency Planning a…

Case 1:18-cv-02260-TJK   Document 10-2   Filed 10/29/18   Page 274 of 470

| Type | Ammonia | Hydrogen Sulfide | Inpu |
|------|---------|------------------|------|
| Poultry | Ammonia and Hydrogen Sulfide Emission Rates for Poultry Operations (3 pp, 36 K, About PDF) | Ammonia and Hydrogen Sulfide Emission Rates for Poultry Operations (3 pp, 36 K, About PDF) | - Num of anin - Poul type - Hou type |
| | Ammonia emissions estimator (2 pp, 16 K, About PDF) | -- | - Num of anin - Anir hous - Man stora |
| Horse | Ammonia emissions estimator (2 pp, 16 K, About PDF) | -- | - Num of anin - Anir hous - Man stora |

LAST UPDATED ON OCTOBER 26, 2017

**Exhibit 11**

EPA
United States
Environmental Protection
Agency

Office of Land
and
Emergency Management

October 25, 2017
www.epa.gov/epcra

# Does EPA interpret EPCRA Section 304 to require farms to report releases from animal waste?

EPA interprets the statute to exclude farms that use substances in "routine agricultural operations" from reporting under EPCRA section 304.

As written, EPCRA section 304 requires all facilities "at which a hazardous chemical is produced, used or stored" to report releases of reportable quantities of any EPCRA Extremely Hazardous Substance and of any CERCLA hazardous substance. Congress, however, created an exception relevant to farms. As indicated above, EPCRA reporting turns on whether a facility produces, uses, or stores a hazardous chemical. The term "hazardous chemical," as defined in EPCRA sections 329(5) and 311(e), does not include "any substance to the extent it is used in routine agricultural operations."

Therefore, if a farm only uses substances in "routine agricultural operations", the farm would not be a facility that produces, uses or stores "hazardous chemicals," and would therefore not be within the universe of facilities which are subject to EPCRA section 304 release reporting. Because such farms fall outside of EPCRA section 304, they are not required to report any releases of EPCRA extremely hazardous substances or CERCLA hazardous substances, including any releases from animals or animal waste.

Based on the language of the statute described above, EPA believes Congress did not intend to impose EPCRA reporting requirements on farms engaged in routine agricultural operations. The statute does not define "routine agricultural operations," and EPA has previously identified examples of routine agricultural operations. Those examples were not intended to be exhaustive. EPA clarifies here that it interprets the term "routine agricultural operations" to encompass regular and routine operations at farms, animal feeding operations, nurseries, other horticultural operations and aquaculture.

Additionally, as stated in previous policy interpretations, the following are examples of substances used in routine agricultural operations:
- Paint used for maintaining farm equipment;
- Fuel used at the farm to operate machinery or to heat buildings in a farm for housing animals; and
- Chemicals used for growing and breeding fish and aquatic plants in an aquacultural operation.

These examples were not intended to be exhaustive. EPA interprets the statute to include other substances used in routine agricultural operations, including animal waste stored on a farm and animal waste that is used as fertilizer. EPA also notes that use of a substance in routine agricultural operations includes the storage of that substance necessitated by such use. To illustrate based on one of the examples cited above, an inherent part of using fuel to operate machinery is storage of that fuel.

EPA clarifies here that, just as an aquacultural operation involving the feeding and breeding of fish would be considered a routine agricultural operation, the feeding and breeding of animals, as well as the expected handling and storage of the animals' waste, would also be considered a routine agricultural operation. EPA thus interprets the phrase "used in routine agricultural operations" to include, for example, the handling and storage of waste for potential use as fertilizer. In creating the routine agricultural operation exception, Congress demonstrated its intent to treat farms differently than other types of facilities. EPA does not believe Congress intended the generation, handling or storage of animal waste to subject farms to reporting if they do not otherwise produce, use or store hazardous chemicals.

Under EPA's interpretation, a farm where substances are used only in routine agricultural operations is not within the scope of EPCRA section 304; however, farms are still required to report releases of CERCLA hazardous substances under CERCLA 103 (see EPA's implementing regulations at 40 CFR part 302 and the continuous release reporting form).

*Note: EPA intends to conduct a rulemaking on the interpretation of "used in routine agricultural operations" as it pertains to EPCRA reporting requirements.*

# Exhibit 12

 An official website of the United States government.



# CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms

---

**Attention!**

Due to legislative changes in the Consolidated Appropriations Act, 2018 (Omnibus Bill), "air emissions from animal waste at a farm" are exempt from reporting under CERCLA. When the D.C. Circuit Court of Appeals issues its mandate vacating the 2008 final rule (expected as soon as May 1, 2018), farms will remain exempt from the CERCLA reporting requirements as a result of the FARM Act. Additionally, these types of releases do not need to be reported under EPCRA.

---

- Overview
- History
- Frequent Questions

## Overview

Two environmental laws, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and Emergency Planning and Community Right-to-Know Act (EPCRA), require reporting of releases of hazardous substances that exceed reportable quantities within a 24-hour period. The purpose of the notification is for federal, state, and local officials to evaluate the need for an emergency response to mitigate the effects of a release to the community.

However, due to legislative changes in the "Fair Agricultural Reporting Method Act" or "FARM Act" in March 2018, "air emissions from animal waste at a farm" are exempt from reporting under CERCLA. These types of releases also do not need to be reported under EPCRA. For more information, please see: FARM Act Q&A.

## History

### Regulatory Reporting Exemption for Animal Waste and Resulting Litigation

On December 18, 2008, EPA published a final rule that exempted most farms from certain release reporting requirements in CERCLA and EPCRA. Specifically, the rule exempted farms releasing hazardous substances from animal waste to the air above threshold levels from reporting under CERCLA. For EPCRA reporting, the rule exempted reporting of such releases if the farm had fewer animals than a large concentrated animal feeding operation (CAFO).

In short, all farms were relieved from reporting hazardous substance air releases from animal waste under CERCLA, and only large CAFOs were subject to EPCRA reporting.

Several citizen groups challenged the validity of the final rule in the U.S. Court of Appeals for the District of Columbia Circuit. On April 11, 2017, the Court struck down the final rule, eliminating the regulatory reporting exemptions for farms. The Court is expected (as soon as May 1, 2018) to issue its mandate vacating the final rule.

## Legislative Changes

On March 23, 2018, the Consolidated Appropriations Act, 2018 (Omnibus Bill), was signed into law. Title XI of Division S of the Omnibus Bill, called the "FARM Act" exempts the reporting of "air emissions from animal waste at a farm" under CERCLA. When the D.C. Circuit Court of Appeals issues its mandate vacating the 2008 final rule (expected as soon as May 1, 2018), farms will remain exempt from the CERCLA reporting requirements as a result of the FARM Act.

# Frequent Questions

| Questions? |
| :--- |
| For compliance assistance, please call the EPCRA, RMP & Oil Information Center at: 1-800-424-9346. |

## Reporting Requirements

- CERCLA Requirements
- EPCRA Reporting Requirements

## CERCLA Requirements

### Do I need to submit a CERCLA report?

No. The FARM Act amended CERCLA section 103(e) to exempt reporting of air emissions from animal waste (including decomposing animal waste) at a farm. Other release of hazardous substances exceeding reportable quantities still require reporting under CERCLA.

**If a farmer made an initial notification to the National Response Center before the FARM Act was passed, do they need to submit a written report to the EPA regional office?**

No. Additional reporting is not required.

**EPCRA Reporting Requirements**

**Do I need to submit an EPCRA report?**

No. In light of the FARM Act's exemption of air emissions from animal waste (including decomposing animal waste) at a farm from reporting under CERCLA, these types of releases do not need to be reported under EPCRA. For more information, see: FARM Act Q&A.

Furthermore, the statute excludes farms that only use substances in "routine agricultural operations" from reporting releases of hazardous substances under EPCRA section 304. For more information, please see: EPCRA Q&A.

LAST UPDATED ON APRIL 30, 2018

**Exhibit 13**

EPA
United States
Environmental Protection
Agency

Office of Land
and
Emergency Management

April 27, 2018
www.epa.gov/epcra

# How do the reporting requirements in EPCRA Section 304 apply to farms engaged in "routine agricultural operations"?

EPA interprets the EPCRA statute to exclude farms that only use substances in "routine agricultural operations" from reporting under EPCRA section 304.

As written, the reporting requirements in EPCRA section 304 apply only to facilities "at which a hazardous chemical is produced, used or stored." Congress, however, created an exception relevant to farms. As indicated above, EPCRA reporting turns on whether a facility produces, uses or stores a hazardous chemical. The term "hazardous chemical," as defined in EPCRA sections 329(5) and 311(e), does not include "any substance to the extent it is used in routine agricultural operations."

Therefore, if a farm only uses substances in "routine agricultural operations," the farm would not be a facility that produces, uses or stores "hazardous chemicals," and would therefore not be within the universe of facilities which are subject to EPCRA section 304 release reporting. Because such farms fall outside of section 304, they are not required to report any releases of EPCRA extremely hazardous substances or CERCLA hazardous substances under EPCRA, including any releases from animals or animal waste.

Based on the language of the statute described above, EPA believes Congress did not intend to impose EPCRA reporting requirements on farms engaged solely in routine agricultural operations. The statute does not define "routine agricultural operations," but EPA has previously identified examples of routine agricultural operations. Those examples were not intended to be exhaustive. EPA clarifies here that it interprets the term "routine agricultural operations" to encompass regular and routine operations at farms, animal feeding operations, nurseries, other horticultural operations and aquaculture.

Additionally, as stated in previous policy interpretations, the following are examples of substances used in routine agricultural operations:

- Paint used for maintaining farm equipment;
- Fuel used at the farm to operate machinery or to heat buildings in a farm for housing animals; and
- Chemicals used for growing and breeding fish and aquatic plants in an aquacultural operation.

These examples are not intended to be exhaustive. EPA interprets the statute to include other substances used in routine agricultural operations, including animal waste stored on a farm and animal waste that is used as fertilizer. EPA also notes that use of a substance in routine agricultural operations includes the storage of that substance necessitated by such use. To illustrate based on one of the examples cited above, an inherent part of using fuel to operate machinery is storage of that fuel.

EPA clarifies here that, just as an aquacultural operation involving the feeding and breeding of fish would be considered a routine agricultural operation, the feeding and breeding of animals, as well as the expected handling and storage of the animals' waste, would also be considered a routine agricultural operation. EPA thus interprets the phrase "used in routine agricultural operations" to include, for example, the handling and storage of waste for potential use as fertilizer. In creating the routine agricultural operation exception, Congress demonstrated its intent to treat farms differently than other types of facilities. EPA does not believe Congress intended the generation, handling or storage of animal waste to subject farms to reporting if they do not otherwise produce, use or store hazardous chemicals.

Under EPA's interpretation, a farm where substances are used only in routine agricultural operations is not within the scope of EPCRA section 304. However, farms that use hazardous substances on their facility for purposes other than routine agricultural operations (e.g., an automobile repair shop) are subject to EPCRA reporting.

**Exhibit 14**

**EPA**
United States
Environmental Protection
Agency

Office of Land
and
Emergency Management

April 27, 2018
www.epa.gov/epcra

## How does the Fair Agricultural Reporting Method (FARM) Act impact reporting of air emissions from animal waste under CERCLA Section 103 and EPCRA Section 304?

Farms do not need to report air emissions from animal waste at farms under either CERCLA or EPCRA.

On March 23, 2018, Congress signed into law the Consolidated Appropriations Act, 2018 ("Omnibus Bill"). Title XI of the Omnibus Bill, called the "Fair Agricultural Reporting Method Act" or "FARM Act," expressly exempts "air emissions from animal waste (including decomposing animal waste) at a farm" from reporting under CERCLA section 103.

In line with the Agency's prior statements interpreting EPCRA section 304(a)(2), air emissions from animal waste at farms do not need to be reported under EPCRA because these types of releases are now exempt from CERCLA. Under EPCRA section 304(a)(2), releases that are not subject to reporting under CERCLA section 103 need only be reported if the release:

    (a)  is not federally permitted as defined in CERCLA,

    (b)  exceeds the reportable quantity, and

    (c)  occurs in a manner which would require notification under CERCLA section 103.

The release must meet all three criteria in order to be reported under EPCRA section 304(a)(2). As an initial matter, air emissions from animal waste at farms are generally not federally permitted and so would meet (a). For such emissions that exceed a reportable quantity (and thus meet (b)), the question then becomes whether the release "occurs in a manner which would require notification" under CERCLA. The FARM Act expressly excludes certain types of releases—air emissions from animal waste—from CERCLA reporting. Air emissions from animal waste thus do not "occur in a manner" which would require notification under CERCLA, and thus do not meet (c); therefore, these releases fall out of the reporting requirements of EPCRA section 304.

It is important to note that the FARM Act's reporting exemption is tied to the nature or manner of these releases rather than to a specific substance. The FARM Act does not exempt substances typically associated with animal waste (such as ammonia and hydrogen sulfide) from reporting altogether; rather, it exempts from reporting only the release of these substances from animal waste *into the air*. Because air emissions from animal waste do not "occur in a manner" which would require notification under CERCLA, they do not meet the requirement under (c). As a result, the three requirements to trigger reporting under EPCRA section 304(a)(2) are not met and these releases do not need to be reported.

EPA's interpretation based on the recent FARM Act is in line with prior statements the Agency has made to promote consistency between CERCLA and EPCRA release reporting. For example, in the 1987 final rule promulgating the EPCRA regulations, EPA cited to EPCRA section 304(a)(2) to adopt the reporting of continuous releases and exempt the application of registered pesticide products from EPCRA release reporting, noting: "Because such releases are not reportable under [CERCLA], they are also exempt from release reporting under [EPCRA]. ... These releases, which include emissions from engine exhaust, certain nuclear material releases, and the normal application of fertilizer, are also excluded from release notification under [EPCRA]." *See 52 Federal Register 13384-13385 (April 22, 1987)*. Similarly, in a 1989 technical amendment to its EPCRA regulations, EPA excluded four categories of releases of radionuclides from EPCRA reporting which had been excluded from CERCLA reporting, stating: "Because of today's exemptions of certain radionuclide releases from CERCLA notification requirements . . . such exempted releases also are exempt from the reporting requirements of section 304 of [EPCRA]." *See 54 Federal Register 22543 (May 24, 1989)*.

EPA intends to conduct a rulemaking to address the impact of the FARM Act on the reporting of air emissions from animal waste at farms under EPCRA.

## How does the FARM Act impact reporting of other types of releases (i.e., those that are not air emissions from animal waste)?

The FARM Act applies only to the reporting of air emissions from animal waste. The Act does not exempt any other type of release at a farm from reporting. In other words, the FARM Act does not apply to releases of substances from animal waste into non-air environmental media, nor to releases into air from sources other than animal waste at farms. For example, a release from animal waste into water (*e.g.*, a lagoon breach) or a release from an anhydrous ammonia storage tank into the air would trigger reporting requirements under CERCLA if they exceed reportable quantities.

# Exhibit 15

Search: ◉ Agenda   ○ Reg Review   ○ ICR

| Home | Unified Agenda | Regulatory Review | Information Collection Review | FAQs / Resources | Contact Us |

Go

# Agency Rule List - Fall 2018

### Environmental Protection Agency

| Agency | Agenda Stage of Rulemaking | Title | RIN |
|---|---|---|---|
| EPA/RODENVER | Proposed Rule Stage | Federal Implementation Plan for Oil and Natural Gas Sources; Uintah and Ouray Indian Reservation in Utah | 2008-AA03 |
| EPA/OP | Proposed Rule Stage | Increasing Consistency and Transparency in Considering Costs and Benefits in the Rulemaking Process | 2010-AA12 |
| EPA/OEI | Proposed Rule Stage | Environmental Protection Agency Freedom of Information Act Regulations Update | 2025-AA38 |
| EPA/OEI | Proposed Rule Stage | Revisions to the EPA's Privacy Act Regulations for Systems of Records Notices | 2025-AA43 |
| EPA/OW | Proposed Rule Stage | Federal Aluminum Aquatic Life Criteria Applicable to Oregon | 2040-AF70 |
| EPA/OW | Proposed Rule Stage | Revised Definition of "Waters of the United States" | 2040-AF75 |
| EPA/OW | Proposed Rule Stage | Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category | 2040-AF77 |
| EPA/OW | Proposed Rule Stage | Updates to eReporting Rule Data Elements to Reflect MS4 General Permit Remand Rule | 2040-AF78 |
| EPA/OW | Proposed Rule Stage | Federal Selenium Criteria for Aquatic Life and Aquatic-Dependent Wildlife Applicable to California | 2040-AF79 |
| EPA/OW | Proposed Rule Stage | Peak Flows Management | 2040-AF81 |
| EPA/OW | Proposed Rule Stage | Clean Water Act Methods Update Rule for the Analysis of Effluent | 2040-AF84 |
| EPA/OW | Proposed Rule Stage | Clean Water Act Section 404(c) Regulatory Revision | 2040-AF88 |
| EPA/OW | Proposed Rule Stage | National Primary Drinking Water Regulations for Lead and Copper: Regulatory Revisions | 2040-AF15 |
| EPA/OW | Proposed Rule Stage | National Primary Drinking Water Regulations: Regulation of Perchlorate | 2040-AF28 |
| EPA/OW | Proposed Rule Stage | Compensatory Mitigation for Losses of Aquatic Resources--Review and Approval of Mitigation Banks and In-Lieu Fee Programs | 2040-AF90 |
| EPA/OW | Final Rule Stage | National Pollutant Discharge Elimination System (NPDES): Specific Provisions Affecting Application and Program Updates Rule | 2040-AF25 |
| EPA/OW | Final Rule Stage | Uniform National Discharge Standards for Vessels of the Armed Forces--Phase II--Batch Two (UNDS) | 2040-AF53 |
| EPA/OW | Final Rule Stage | Federal Numeric Nutrient Criteria Applicable to Missouri Lakes | 2040-AF69 |
| EPA/OW | Final Rule Stage | Rule to Withdraw Certain Federal Water Quality Criteria for Lead, Chlorodibromomethane, and Dichlorobromomethane Applicable to California | 2040-AF71 |
| EPA/OW | Final Rule Stage | Definition of "Waters of the United States"--Recodification of Preexisting Rule | 2040-AF74 |
| EPA/OW | Final Rule Stage | Use of Lead Free Pipes, Fittings, Fixtures, Solder and Flux for Drinking Water | 2040-AF55 |
| EPA/OLEM | Prerule Stage | Municipal Solid Waste Landfill Liquids Management Regulations Under RCRA Subtitle D | 2050-AG86 |
| EPA/OLEM | Proposed Rule Stage | Exemption for Air Emissions From Animal Waste at Farms From the Emergency Release Notification Requirements; Emergency Planning and Community Right-to-Know Act | 2050-AH00 |
| EPA/OLEM | Proposed Rule Stage | Modernizing Ignitable Liquids Determinations | 2050-AG93 |
| EPA/OLEM | Proposed Rule Stage | Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residues From Electric Utilities: Amendments to the National Minimum Criteria (Phase 2) | 2050-AG98 |
| EPA/OLEM | Proposed Rule Stage | Financial Responsibility Requirements Under CERCLA Section 108(b) for the Additional Classes | 2050-AH03 |
| EPA/OLEM | Proposed Rule Stage | Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residues From Electric Utilities: Updating Notification Requirements | 2050-AH04 |
| EPA/OLEM | Final Rule Stage | Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Reconsideration of Amendments | 2050-AG95 |
| EPA/OLEM | Final Rule Stage | Management Standards for Hazardous Waste Pharmaceuticals | 2050-AG39 |
| EPA/OLEM | Final Rule Stage | Increasing Recycling: Adding Aerosol Cans to the Universal Waste Regulations | 2050-AG92 |
| EPA/OLEM | Final Rule Stage | Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residues From Electric Utilities: Amendments to the National Minimum Criteria (Phase 1, Part 2) | 2050-AH01 |
| EPA/OLEM | Final Rule Stage | Facilitating Safe Management of Recalled Airbags | 2050-AH02 |
| EPA/OLEM | Final Rule Stage | Clean Water Act Hazardous Substances Spill Prevention | 2050-AG87 |
| EPA/OAR | Prerule Stage | Standards of Performance for New Residential Wood Heaters and New Residential Hydronic Heaters and Forced-Air Furnaces | 2060-AU07 |
| EPA/OAR | Proposed Rule Stage | Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act | 2060-AM75 |
| EPA/OAR | Proposed Rule Stage | Plywood and Composite Wood Products (PCWP) Residual Risk and Technology Review and Amendments | 2060-AO66 |
| EPA/OAR | Proposed Rule Stage | Protection of the Stratospheric Ozone: Motor Vehicle Air Conditioning System Servicing | 2060-AO75 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants: Polyvinyl Chloride and Copolymers Reconsideration | 2060-AR73 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants Risk and Technology Review Reconsideration: Oil and Natural Gas Sector | 2060-AS13 |
| EPA/OAR | Proposed Rule Stage | General Provisions to Emissions Monitoring and Reporting Requirements for Fossil Fuel-Fired Electric Generating Units | 2060-AS74 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants: Stationary Combustion Turbine Residual | 2060-AT00 |

| | | Risk and Technology Review | |
|---|---|---|---|
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants for Engine Test Cells/Stands Residual Risk and Technology Review | 2060-AT01 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants: Generic Maximum Achievable Control Technology Standards Residual Risk and Technology Review for Ethylene Production | 2060-AT02 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants for Integrated Iron and Steel Manufacturing Facilities | 2060-AT03 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing Residual Risk and Technology Review | 2060-AT05 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants for Rubber Tire Manufacturing Risk and Technology Review | 2060-AT07 |
| EPA/OAR | Proposed Rule Stage | Lime Manufacturing Risk and Technology Review | 2060-AT08 |
| EPA/OAR | Proposed Rule Stage | National Emission Standard for Hazardous Air Pollutants: Reinforced Plastics Composites and Boat Manufacturing Residual Risk and Technology Review | 2060-AT12 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutant Emissions: Hard and Decorative Chromium Electroplating and Chromium Anodizing Tanks | 2060-AT20 |
| EPA/OAR | Proposed Rule Stage | Vehicle Test Procedure Adjustments for Tier 3 Test Fuel | 2060-AT21 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants for Clay Ceramics Manufacturing Reconsideration | 2060-AT25 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants for Iron and Steel Foundries | 2060-AT30 |
| EPA/OAR | Proposed Rule Stage | Fuels Regulatory Streamlining | 2060-AT31 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants: Asphalt Processing and Asphalt Roofing Manufacturing Residual Risk and Technology Review | 2060-AT34 |
| EPA/OAR | Proposed Rule Stage | NESHAP: Surface Coating of Automobiles and Light-Duty Trucks, Plastic Parts, and Miscellaneous Metal Parts Residual Risk and Technology Review | 2060-AT49 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants: Surface Coating of Metal Cans and Metal Coil Residual Risk and Technology Review | 2060-AT51 |
| EPA/OAR | Proposed Rule Stage | Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Reconsideration | 2060-AT54 |
| EPA/OAR | Proposed Rule Stage | Review of Standards of Performance for Greenhouse Gas Emissions From New, Modified, and Reconstructed Stationary Sources: Electric Generating Units | 2060-AT56 |
| EPA/OAR | Proposed Rule Stage | Emission Guidelines for Greenhouse Gas Emissions From Existing Electric Utility Generating Units; Revisions to Emission Guideline Implementing Regulations; Revisions to New Source Review Program | 2060-AT67 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants for Hydrochloric Acid Production Residual Risk and Technology Review | 2060-AT74 |
| EPA/OAR | Proposed Rule Stage | Light-Duty Vehicle GHG Program Technical Amendments | 2060-AT75 |
| EPA/OAR | Proposed Rule Stage | Protection of Stratospheric Ozone: Listing of Substitutes Under the Significant New Alternatives Policy Program | 2060-AT78 |
| EPA/OAR | Proposed Rule Stage | Revisions to Appendix P to 40 CFR Part 51, Concerning Minimum Emission Reporting Requirements in SIPs | 2060-AT80 |
| EPA/OAR | Proposed Rule Stage | Protection of Stratospheric Ozone: Revisions to the Refrigerant Management Requirements Under the Clean Air Act | 2060-AT81 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants: Miscellaneous Organic Chemical Manufacturing Residual Risk and Technology Review | 2060-AT85 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants: Organic Liquids Distribution (Non-Gasoline) Residual Risk and Technology Review | 2060-AT86 |
| EPA/OAR | Proposed Rule Stage | Prevention of Significant Deterioration (PSD) and Nonattainment New Source Review (NSR): Project Emissions Accounting | 2060-AT89 |
| EPA/OAR | Proposed Rule Stage | Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Review | 2060-AT90 |
| EPA/OAR | Proposed Rule Stage | Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Several Areas Classified as Moderate for the 2008 Ozone NAAQS | 2060-AT97 |
| EPA/OAR | Proposed Rule Stage | Mercury and Air Toxics Standards for Power Plants Residual Risk and Technology Review and Cost Review | 2060-AT99 |
| EPA/OAR | Proposed Rule Stage | Standards of Performance for New Residential Wood Heaters and New Residential Hydronic Heaters and Forced-Air Furnaces Amendments | 2060-AU00 |
| EPA/OAR | Proposed Rule Stage | Protection of Visibility: Amendments to Requirements for State Plans | 2060-AU01 |
| EPA/OAR | Proposed Rule Stage | Response to the Section 126(b) Petition From New York | 2060-AU04 |
| EPA/OAR | Proposed Rule Stage | Update to NOX SIP Call Regulations--Addition of Monitoring Flexibility and General Streamlining of Provisions | 2060-AU08 |
| EPA/OAR | Proposed Rule Stage | The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks | 2060-AU09 |
| EPA/OAR | Proposed Rule Stage | Protection of Stratospheric Ozone: Updates to the Significant New Alternatives Policy Program | 2060-AU11 |
| EPA/OAR | Proposed Rule Stage | Revisit Area Designation for 2010 1-Hour SO2 NAAQS for Williamson County, Illinois | 2060-AU14 |
| EPA/OAR | Proposed Rule Stage | Revisit Area Designation for 2010 1-Hour SO2 NAAQS in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas | 2060-AU15 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants: Miscellaneous Coating Manufacturing Residual Risk and Technology Review | 2060-AU16 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants: Solvent Extraction for Vegetable Oil Production | 2060-AU17 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants: Municipal Solid Waste Landfills Residual Risk and Technology Review | 2060-AU18 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants: Site Remediation Residual Risk and Technology Review | 2060-AU19 |
| EPA/OAR | Proposed Rule Stage | Mercury and Air Toxics Standards for Power Plants Technical Corrections, Electronic Reporting Revisions, and Clarifications | 2060-AU21 |

| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants: Paper and Other Web Coatings Residual Risk and Technology Review | 2060-AU22 |
|---|---|---|---|
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants (NESHAP) for Cellulose Products Manufacturing | 2060-AU23 |
| EPA/OAR | Proposed Rule Stage | Reconsideration of Standards of Performance and Emission Guidelines for Municipal Solid Waste Landfills | 2060-AU24 |
| EPA/OAR | Proposed Rule Stage | National Emission Standards for Hazardous Air Pollutants: Phosphoric Acid Production Mercury Limit Reconsideration | 2060-AU25 |
| EPA/OAR | Proposed Rule Stage | Protection of Stratospheric Ozone: Adjustments to the Allowance System for Controlling HCFC Production and Import, 2020-2030, and Other Updates | 2060-AU26 |
| EPA/OAR | Proposed Rule Stage | Standards of Performance for Stationary Compression Ignition (CI) Internal Combustion Engines Amendments | 2060-AU27 |
| EPA/OAR | Proposed Rule Stage | Renewable Fuel Standard Program Modification of Applicable Volumes, 2020 Standards, and Other Changes | 2060-AU28 |
| EPA/OAR | Proposed Rule Stage | Amendments Related to Marine Diesel Engine Emission Standards | 2060-AU30 |
| EPA/OAR | Proposed Rule Stage | Improvements to Vehicle Design Criteria for Dual-Fueled Natural Gas Vehicles Within the Light-Duty Greenhouse Gas Emissions Program | 2060-AU31 |
| EPA/OAR | Proposed Rule Stage | Timing Requirements in Emission Guidelines and Compliance Times for Municipal Solid Waste Landfills | 2060-AU33 |
| EPA/OAR | Proposed Rule Stage | Modifications to Fuel Regulations to Provide Flexibility for E15; Modifications to RFS RIN Market Regulations | 2060-AU34 |
| EPA/OAR | Final Rule Stage | Reconsideration of the Prevention of Significant Deterioration and Nonattainment New Source Review (NSR) Project Aggregation | 2060-AP80 |
| EPA/OAR | Final Rule Stage | National Emission Standards for Hazardous Air Pollutants: Manufacture of Amino/Phenolic Resins Risk and Technology Review Reconsideration | 2060-AS79 |
| EPA/OAR | Final Rule Stage | Implementation of the 2015 National Ambient Air Quality Standards for Ozone: State Implementation Plan Requirements | 2060-AS82 |
| EPA/OAR | Final Rule Stage | Revisions to Method 202: Dry Impinger Method for Determining Condensable Particulate Emissions From Stationary Sources | 2060-AS91 |
| EPA/OAR | Final Rule Stage | Revisions to Testing Regulations for Air Emission Sources | 2060-AS95 |
| EPA/OAR | Final Rule Stage | National Emission Standards for Hazardous Air Pollutant Emissions: Petroleum Refinery Sector | 2060-AT18 |
| EPA/OAR | Final Rule Stage | Response to the July 2016 Section 126 Petition From Delaware | 2060-AT36 |
| EPA/OAR | Final Rule Stage | Response to the August 2016 Section 126 Petition From Delaware | 2060-AT37 |
| EPA/OAR | Final Rule Stage | Response to the November 2016 Section 126 Petition From Delaware | 2060-AT38 |
| EPA/OAR | Final Rule Stage | Response to the August 2016 Section 126 Petition From Maryland | 2060-AT39 |
| EPA/OAR | Final Rule Stage | Response to the November 28, 2016 Section 126 Petition From Delaware | 2060-AT40 |
| EPA/OAR | Final Rule Stage | National Emission Standards for Hazardous Air Pollutants for Wet-Formed Fiberglass Mat Production | 2060-AT47 |
| EPA/OAR | Final Rule Stage | National Emission Standards for Hazardous Air Pollutant Emissions: Petroleum Refinery Sector | 2060-AT50 |
| EPA/OAR | Final Rule Stage | Air Quality: Revision to Definition of Volatile Organic Compounds--Exclusion of cis-1,1,1,4,4,4-Hexafluorobut-2-ene (HFO-1336mzz-Z) | 2060-AT52 |
| EPA/OAR | Final Rule Stage | Repeal of Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units | 2060-AT55 |
| EPA/OAR | Final Rule Stage | National Emission Standards for Hazardous Air Pollutants for Friction Materials Manufacturing Facilities Residual Risk and Technology Review | 2060-AT66 |
| EPA/OAR | Final Rule Stage | Review of the Primary National Ambient Air Quality Standards for Sulfur Oxides | 2060-AT68 |
| EPA/OAR | Final Rule Stage | National Emission Standards for Hazardous Air Pollutants for Leather Finishing Operations Residual Risk and Technology Review | 2060-AT70 |
| EPA/OAR | Final Rule Stage | National Emission Standards for Hazardous Air Pollutants: Surface Coating of Wood Building Products Residual Risk and Technology Review | 2060-AT71 |
| EPA/OAR | Final Rule Stage | NESHAP: Surface Coating of Metal Furniture, Surface Coating of Large Appliances, and Printing, Coating, and Dyeing of Fabrics and Other Textiles Residual Risk and Technology Review | 2060-AT72 |
| EPA/OAR | Final Rule Stage | National Emission Standards for Hazardous Air Pollutants for Asbestos: Notice of Request for Approval of an Alternative Work Practice for Asbestos Cement Pipe Replacement | 2060-AT73 |
| EPA/OAR | Final Rule Stage | Notice of Withdrawal of the Control Techniques Guidelines for the Oil and Natural Gas Industry | 2060-AT76 |
| EPA/OAR | Final Rule Stage | Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Commercial and Industrial Solid Waste Incineration Units; Technical Amendments | 2060-AT84 |
| EPA/OAR | Final Rule Stage | Relaxation of the Federal Reid Vapor Pressure (RVP) Gasoline Volatility Standard for the 5-Parish Baton Rouge, Louisiana Area | 2060-AT91 |
| EPA/OAR | Final Rule Stage | Determination Regarding Good Neighbor Obligations for the 2008 Ozone NAAQS | 2060-AT92 |
| EPA/OAR | Final Rule Stage | Renewable Fuel Volume Standards for 2019 and Biomass-Based Diesel (BBD)Volume for 2020 | 2060-AT93 |
| EPA/OAR | Final Rule Stage | Amendments to Federal Implementation Plan for Managing Air Emissions From True Minor Sources in Indian Country in the Oil & Natural Gas Processing Segments of the Oil & Natural Gas Sector | 2060-AT96 |
| EPA/OAR | Final Rule Stage | National Emission Standards for Hazardous Air Pollutant Emissions: Petroleum Refinery Sector Amendments | 2060-AU12 |
| EPA/OAR | Final Rule Stage | Revision of 40 CFR Part 192--Health and Environmental Protection Standards for Uranium and Thorium Mill Tailings and Uranium In Situ Leaching Processing Facilities | 2060-AP43 |
| EPA/OAR | Final Rule Stage | Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards: Error Corrections | 2060-AU29 |
| EPA/OAR | Final Rule Stage | Regulation of Fuels and Fuel Additives: Removal of the Reformulated Gasoline Program from the Northern Kentucky Portion of the Cincinnati-Hamilton Ozone Maintenance Area | 2060-AU32 |
| EPA/OCSPP | Proposed Rule Stage | Pesticides; Expansion of Crop Grouping Program | 2070-AJ28 |
| EPA/OCSPP | Proposed Rule Stage | Pesticides; Procedural Rule Amendment; Requirement for Certain Pesticide Actions to Publish Notices in the Federal Register | 2070-AK06 |
| EPA/OCSPP | Proposed Rule Stage | Pesticides; Administrative Corrections and Removal of Obsolete Information | 2070-AK13 |
| EPA/OCSPP | Proposed Rule Stage | Restoration of Inadvertently--Removed Exemption From the Requirements of FIFRA | 2070-AK25 |
| EPA/OCSPP | Proposed Rule Stage | Pesticides; Certification of Pesticide Applicators Rule; Reconsideration of the Minimum Age | 2070-AK37 |

| | | Requirements | |
|---|---|---|---|
| EPA/OCSPP | Proposed Rule Stage | Pesticides; Agricultural Worker Protection Standard; Reconsideration of Several Requirements | [2070-AK43](#) |
| EPA/OCSPP | Proposed Rule Stage | Microorganisms: General Exemptions From Reporting Requirements; Revisions of Recipient Organisms Eligible for Tier I and Tier II Exemptions | [2070-AJ65](#) |
| EPA/OCSPP | Proposed Rule Stage | Long-Chain Perfluoroalkyl Carboxylate and Perfluoroalkyl Sulfonate Chemical Substances; Significant New Use Rule | [2070-AJ99](#) |
| EPA/OCSPP | Proposed Rule Stage | Procedural Rule: Review of CBI Claims for the Identity of Chemicals on the TSCA Inventory--Amended TSCA Section 8(b)(4)(C) | [2070-AK21](#) |
| EPA/OCSPP | Proposed Rule Stage | TSCA Chemical Data Reporting Revisions and Small Manufacturer Definition Update for Reporting and Recordkeeping Requirements Under TSCA Section 8(a) | [2070-AK33](#) |
| EPA/OCSPP | Proposed Rule Stage | Regulation of Persistent, Bioaccumulative, and Toxic Chemicals Under TSCA Section 6(h) | [2070-AK34](#) |
| EPA/OCSPP | Proposed Rule Stage | Technical Issues; Formaldehyde Emission Standards for Composite Wood Products. | [2070-AK47](#) |
| EPA/OCSPP | Proposed Rule Stage | Toxic Release Inventory (TRI); Response to Petition From the Toxics Use Reduction Institute (TURI) to Add 25 Chemicals | [2070-AK26](#) |
| EPA/OCSPP | Proposed Rule Stage | Parent Company Definition for Toxics Release Inventory (TRI) Reporting | [2070-AK42](#) |
| EPA/OCSPP | Final Rule Stage | Pesticides; Technical Amendment to Data Requirements for Antimicrobial Pesticides | [2070-AK41](#) |
| EPA/OCSPP | Final Rule Stage | Review of Dust-Lead Hazard Standards and the Definition of Lead-Based Paint | [2070-AJ82](#) |
| EPA/OCSPP | Final Rule Stage | Significant New Use Rule for Toluene Diisocyanates (TDI) and Related Compounds | [2070-AJ91](#) |
| EPA/OCSPP | Final Rule Stage | Significant New Uses of Chemical Substances; Updates to the Hazard Communication Program and Regulatory Framework; Minor Amendments to Reporting Requirements for Premanufacture Notices | [2070-AJ94](#) |
| EPA/OCSPP | Final Rule Stage | Certain Nonylphenols and Nonylphenol Ethoxylates; Significant New Use Rule | [2070-AJ96](#) |
| EPA/OCSPP | Final Rule Stage | Methylene Chloride; Rulemaking Under TSCA Section 6(a) | [2070-AK07](#) |
| EPA/OCSPP | Final Rule Stage | Service Fees for the Administration of the Toxic Substances Control Act | [2070-AK27](#) |
| EPA/OCSPP | Final Rule Stage | Asbestos; Significant New Use Rule | [2070-AK45](#) |
| EPA/ORD | Proposed Rule Stage | Harmonize 40 CFR Part 26 Subparts C, D, and K With Subpart A (the Common Rule) | [2080-AA13](#) |

About Us  ·  Related Resources  ·  Disclosure  ·  Accessibility  ·  Privacy Policy  ·  Contact Us




# Exhibit 16

JOHN BARRASSO, WYOMING, *CHAIRMAN*

JAMES M. INHOFE, OKLAHOMA
SHELLEY MOORE CAPITO, WEST VIRGINIA
JOHN BOOZMAN, ARKANSAS
ROGER WICKER, MISSISSIPPI
DEB FISCHER, NEBRASKA
JERRY MORAN, KANSAS
MIKE ROUNDS, SOUTH DAKOTA
JONI ERNST, IOWA
DAN SULLIVAN, ALASKA
RICHARD SHELBY, ALABAMA

THOMAS R. CARPER, DELAWARE
BENJAMIN L. CARDIN, MARYLAND
BERNARD SANDERS, VERMONT
SHELDON WHITEHOUSE, RHODE ISLAND
JEFF MERKLEY, OREGON
KIRSTEN GILLIBRAND, NEW YORK
CORY A. BOOKER, NEW JERSEY
EDWARD J. MARKEY, MASSACHUSETTS
TAMMY DUCKWORTH, ILLINOIS
CHRIS VAN HOLLEN, MARYLAND

RICHARD M. RUSSELL, *MAJORITY STAFF DIRECTOR*
MARY FRANCES REPKO, *MINORITY STAFF DIRECTOR*

# United States Senate

COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS

WASHINGTON, DC 20510-6175

May 25, 2018

The Honorable Scott Pruitt
Administrator
Environmental Protection Agency
1200 Pennsylvania Ave, NW
Washington DC 20004

Dear Administrator Pruitt:

We write to you today regarding guidance recently published by the Environmental Protection
Agency with respect to air emissions reporting requirements under Section 304 of the
Emergency Planning and Community Right-to-Know Act (EPCRA). We believe the guidance
you have issued is legally flawed and is based on an erroneous interpretation of the law with
implications beyond reporting of releases from animal waste. We ask you to rescind this
guidance immediately.

The FARM Act, which was enacted in March of this year as part of the Consolidated
Appropriations Act, 2018 (P.L. 115-141), exempted farms from reporting requirements for
releases of hazardous substances under Section 103 of the Comprehensive Environmental
Response, Compensation, and Liability Act (CERCLA) that arise from animal waste and that are
released into the air. On April 27, 2018 EPA issued guidance regarding farms' reporting
obligations under CERCLA and EPCRA.[1] In that guidance, EPA states, "[A]ir emissions from
animal waste at farms do not need to be reported under EPCRA because these types of releases
are now exempt from CERCLA." The guidance goes on to state: "Because air emissions from
animal waste do not 'occur in a manner' which would require notification under CERCLA... the
three requirements to trigger reporting under EPCRA section 304(a)(2) are not met and these
releases do not need to be reported." This interpretation has no legal basis in statute, is starkly
contradicted by the FARM Act's legislative history, and is inconsistent with EPA's decades-long
implementation of EPCRA.

The text of the FARM Act in Title XI of Division S of Consolidated Appropriations Act, 2018 is
identical to the text of S. 2421, which was introduced on February 13, 2018, and which was
referred to the Senate Committee on Environment and Public Works (the Committee). As part of
the Committee's consideration of the FARM Act, the Committee asked the Congressional
Research Service to analyze the potential effects of these amendments to CERCLA. In response,
the Congressional Research Service produced two memoranda which were made part of both

---

[1] https://www.epa.gov/sites/production/files/2018-04/documents/cercla_epcra_q_and_a_farm_act_4-28-18.pdf

hearing records. CRS notes: "In implementation, EPA has treated the phrase "occurs in a manner" in EPCRA Section 304(a)(2)(C) to mean the nature of the release in terms of how a substance enters the environment, not that reporting *is* required under Section 103 of CERCLA. Otherwise, Section 304(a)(2) would be rendered meaningless in covering releases of extremely hazardous substances that do not require reporting as hazardous substances under CERCLA."[2] (emphasis in original). Indeed, EPA has designated hundreds of substances as "extremely hazardous substances" under EPCRA but which are not designated as "hazardous substances" under CERCLA.[3] Releases of such substances are not subject to the reporting requirements under CERCLA Section 103. If EPA's April 27 guidance were valid, such substances would never be subject to reporting under EPCRA. Obviously, this is inconsistent with longstanding EPA policy with respect to such substances.

EPA's April 27 guidance is also inconsistent with clear Congressional intent with respect to the FARM Act and its unambiguous legislative history. The Committee held two legislative hearings on this language, first on March 8, 2018,[4] and then on March 14, 2018.[5] At both hearings, witnesses testified in response to questions from members that enacting the FARM Act would have no impact on reporting requirements under EPCRA, and the bill sponsors stated repeatedly that the language under consideration makes no changes to EPCRA reporting for farms.[6] None of the hearing statements of the Committee members, witnesses, or materials entered into either the Committee record or the Congressional Record at the time of the FARM Act's passage support EPA's new interpretation of EPCRA Section 304. To the contrary, EPA's legal analysis is at odds with the legislative record.

EPA is required to faithfully execute the laws as passed by Congress. It is clear that your April 27 guidance changes EPCRA reporting policies in ways that exceed EPA's statutory authority and countermands Congressional intent. We ask again that you rescind it immediately.

Sincerely,

Thomas R. Carper
Ranking Member

Benjamin L. Cardin
United States Senator

---

[2] Congressional Research Service memorandum to Senate Committee on Environment and Public Works, "Supplemental Analysis: Fair Agricultural Reporting Method Act/FARM Act (S. 2421)," March 13, 2018, pp. 3-4.
[3] https://www.epa.gov/sites/production/files/2015-03/documents/list_of_lists.pdf
[4] https://www.epw.senate.gov/public/index.cfm/hearings?ID=E0663FDD-1020-4DA3-AD29-960C3E31652D
[5] https://www.epw.senate.gov/public/index.cfm/hearings?ID=270F9E69-740C-46D8-9D03-7CFAB6581FEE
[6] See *"Legislative Hearing on S. 2421, the Fair Agricultural Reporting Method Act," transcript, p. 10; p. 17-18; p. 65; and "Legislative hearing on "S. ___, the Agriculture Creates Real Employment (ACRE) Act,"" transcript, pp. 49-50.*

Bernard Sanders
United States Senator

Sheldon Whitehouse
United States Senator

Jeffrey A. Merkley
United States Senator

Kirsten Gillibrand
United States Senator

Cory A. Booker
United States Senator

Edward J. Markey
United States Senator

Tammy Duckworth
United States Senator

Chris Van Hollen
United States Senator

# Exhibit 17

An official website of the United States government.

We've made some changes to EPA.gov. If the information you are looking for is not here, you may be able to find it on the EPA Web Archive or the January 19, 2017 Web Snapshot.

Close

 United States
Environmental Protection
Agency

# CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms

- Overview
- Amendments and Requirements
- Reporting Requirements Frequent Questions
- History

# Overview

Two environmental laws, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the Emergency Planning and Community Right-to-Know Act (EPCRA), require reporting of releases of hazardous substances that meet or exceed reportable quantities within a 24-hour period. The purpose of the notification is for federal, state, and local officials to evaluate the need for an emergency response to mitigate the effects of a release to the community.

# Amendments and Requirements

## FARM Act and Legislative Amendments to CERCLA

On March 23, 2018, the Consolidated Appropriations Act (Omnibus Bill) was signed into law. Title XI of Division S of the Omnibus Bill, known as the Fair Agricultural Reporting Method Act (FARM Act), amended CERCLA section 103(e) to exempt air emissions from animal waste at a farm from reporting under CERCLA.

## CERCLA Reporting Requirements

Due to the FARM Act's legislative amendments to CERCLA, "air emissions from animal waste at a farm" are exempt from reporting under CERCLA. Accordingly, on August 1, 2018, EPA published a final rule revising the CERCLA reporting regulations to incorporate the FARM Act's amendments to CERCLA.

This final rule is available at: Vacatur Response – CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substance from Animal Waste at Farms; FARM Act Amendments to CERCLA Release Notification Requirements (83 FR 37444) (3 pp, 204 K, About PDF)

## EPCRA Reporting Requirements

Based on the criteria for EPCRA section 304 release reporting, EPA maintains that air emissions from animal waste at farms do not need to be reported under EPCRA. For more information, please see: EPCRA Q&A.

EPA is working on a proposed rule to amend the release notification regulations under EPCRA to codify the agency's interpretation that air emissions from animal waste at farms are not subject to EPCRA reporting.

# Reporting Requirements Frequent Questions

- CERCLA Requirements
- EPCRA Reporting Requirements

## CERCLA Requirements

### Do I need to submit a CERCLA report?

No. The FARM Act amended CERCLA section 103(e) to exempt air emissions from animal waste (including decomposing animal waste) at a farm from CERCLA reporting. Other releases of hazardous substances that meet or exceed reportable quantities still require reporting under CERCLA. For more information, please see:

- CERCLA and EPCRA Continuous Release Reporting Requirements
- When Are You Required to Report an Oil Spill or Hazardous Substance Release

### If a farmer made an initial notification to the National Response Center before the FARM Act was passed, do they need to submit a written report to the EPA regional office?

No. Additional reporting is not required.

### EPCRA Reporting Requirements

### Do I need to submit an EPCRA report?

No. Based on the criteria for EPCRA section 304 release reporting, air emissions from animal waste (including decomposing animal waste) at a farm do not need to be reported under EPCRA.

Furthermore, the statute excludes farms that only use substances in "routine agricultural operations" from reporting releases of hazardous substances under EPCRA section 304. For more information, please see: EPCRA Q&A.

# History

## Regulatory Reporting Exemption for Animal Waste and Resulting Litigation

On December 18, 2008, EPA published a final rule that exempted most farms from certain release reporting requirements under CERCLA and EPCRA. Specifically, the rule exempted farms releasing hazardous substances from animal waste to the air above threshold levels from reporting under CERCLA. For EPCRA reporting, the rule exempted reporting of such releases if the farm had fewer animals than a large concentrated animal feeding operation (CAFO).

In short, all farms were relieved from reporting hazardous substance air releases from animal waste under CERCLA, and only large CAFOs were subject to EPCRA reporting.

Several citizen groups challenged the validity of the final rule in the U.S. Court of Appeals for the D.C. Circuit. On April 11, 2017, the court vacated the final rule. On May 2, 2018, the court issued a mandate effectuating its vacatur, thereby eliminating the CERCLA and EPCRA administrative reporting exemption for farms.

## Legislative Changes

On March 23, 2018, the Consolidated Appropriations Act, 2018 (Omnibus Bill), was signed into law. Title XI of Division S of the Omnibus Bill, known as the Fair Agricultural Reporting Method Act (FARM Act), exempts the reporting of air emissions from animal waste at a farm under CERCLA. On May 2, 2018, the U.S. Court of Appeals for the D.C. Circuit issued a mandate vacating the 2008 administrative reporting exemption. However, air emissions from animal waste at farms remain exempt from CERCLA reporting requirements as a result of the FARM Act.

LAST UPDATED ON OCTOBER 3, 2018

**Exhibit 18**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| Rural Empowerment Association for Community Help, et al., | |
| Plaintiffs, | **CASE NO. 18-cv-02260-TJK** |
| v. | |
| United States Environmental Protection Agency, et al., | **DECLARATION OF DEVON HALL** |
| Defendants. | |

---

## DECLARATION OF DEVON HALL

I, DEVON HALL, declare and state as follows:

1.      I am the Co-Founder and Program Manager at the Rural Empowerment Association for Community Help ("REACH").  Since 2002, REACH has worked to address social, economic, and environmental inequities in and around Duplin County, North Carolina, a rural area with a significant proportion of low-income African-American residents.  REACH's primary focus is educating and empowering our community about issues that matter.  We work to help people understand that everybody is somebody and has a right to be heard.  REACH has about 20 official members, and more than 60 people in our community regularly attend our meetings.  In connection with our mission, we often provide our members with information about pollution from industrial animal operations.

2.      I am African-American.  I was born and raised in Duplin County, and I've lived here my whole life.  I am now 63 years old.  My three brothers and three sisters live in Duplin County too, and our children grew up together.  Our roots are here.  I started REACH because I saw that there was a lack of resources in Duplin County to help people like us, and I worried that my grandchildren's generation might not have any future here.

3.      According to the North Carolina Department of Environmental Quality, there are more than 520 industrial hog operations in Duplin County.  Together, these facilities confine almost two-and-a-half million pigs.  Over the past ten years or so, the poultry industry has expanded in Duplin County as well.  It can be difficult to find information about the poultry industry because many poultry facilities are exempt from permit requirements.  I am aware of one report indicating that industrial poultry operations confine more than 16 million turkeys and chickens in our county alone.

4.      Industrial animal operations generate a staggering quantity of waste.  Hog facilities in Duplin County produce nearly two-and-a-half billion gallons of urine and feces every year.  Most facilities store that waste in giant uncovered pits, before spraying it on fields without any prior treatment or disinfection.  Industrial poultry operations here generate more than 190,000 pounds of urine- and feces-soiled litter each year.  Like hog operations, poultry facilities usually dispose of their waste by spreading it on fields without any prior treatment.

5.      I live at 2584 West Wards Bridge Road in Warsaw, North Carolina.  REACH's office is located less than a mile away, at 2394 West Wards Bridge Road.  There are 39 industrial hog operations and 11 poultry facilities within three miles of my home and the REACH office. *See* Attachment 1.  The number of poultry facilities keeps growing.  It seems like I can't travel two miles from my house or from REACH's office without seeing a new poultry facility being built.

6.      The first thing most people notice about industrial animal operations is the terrible odor.  To avoid the nearly constant stench of animal waste, most people in Duplin County close their windows and stay indoors, relying on expensive air conditioning to keep cool.  People here have given up some of the most cherished aspects of rural life, like gardening, drying clothes on a line, hosting cookouts, and spending time outdoors.  Many of us worry about declining home values.  One REACH member has said that he looks for excuses to leave home and stays away longer than necessary, "because the smell that is there depresses [him]."

7.      REACH uses scientific research as a tool to educate and empower our community.  Common sense tells you that it is not healthy to breathe air that smells bad enough to make you gag, that makes your nose run and your eyes water.  At first, I didn't know what chemicals were in the air, causing it to smell so terrible.  I began to work as a citizen scientist in

2

2004, because I wanted to understand exactly what I was breathing and how it was likely to affect my body, so that I could better protect myself and help my neighbors protect themselves.

8.    Through my work at REACH, I've learned that industrial animal operations smell terrible because they release toxic gases, like ammonia and hydrogen sulfide.  I have spoken to hundreds of people whose health has suffered as a result of exposure to these gases.  I have personally experienced watery eyes, headaches, and nausea on days when the smell is bad.  I know one gentleman who was overcome by hydrogen sulfide while working at a rendering plant—that is, a facility that converts dead animals into industrial fats and oils.  He is currently disabled.

9.    As REACH's Program Manager, I have co-authored nine published studies documenting the threats that under-regulated industrial animal operations pose to community health.  I recently contributed to a study showing that kids who attend school downwind of industrial hog operations are exposed to relatively high levels of hydrogen sulfide, putting them at greater risk of symptoms like difficulty breathing and impaired lung function.  *See* Virginia T. Guidry et al., *Hydrogen Sulfide Concentrations at Three Middle Schools Near Industrial Livestock Facilities*, 27 J. of Exposure Science and Envtl. Epidemiology 167 (2017), https://www.nature.com/articles/jes20167.

10.    There are probably many people who have suffered health consequences that I do not know about.  If you are not aware that industrial animal operations emit toxic gases, you probably would not realize that exposure to those gases could be the cause of your breathing problems.

11.    REACH has no interest in putting anybody out of business.  But we believe it is possible for industrial animal operations to be more environmentally-friendly and more

community-friendly.  It is not enough for members of our community to talk about our

symptoms and our diminished quality of life.  No matter what we say, there will always be some

people who think we are just complaining or making things up.  My neighbors and I need access

to reliable information about toxic air emissions from industrial animal operations so that we can

convince government officials to pay attention and take some kind of action to protect us from

the chemicals that we breathe on a daily basis.

12.     I am aware that the U.S. Environmental Protection Agency has published

guidance exempting industrial animal operations from the requirement to report dangerous

emissions of toxic gases under the Emergency Planning and Community Right-to-Know Act

"EPCRA").  Because of this exemption, I believe industrial animal feeding operations will not

make information about their emissions publicly available.  If REACH had been given the

opportunity to comment on the guidance, we absolutely would have opposed it.  It seems to me

that government officials have bent over backwards to protect the livestock industry, but they

haven't given much thought to protecting ordinary people who suffer and get sick because they

live near industrial animal operations.

13.     If REACH could access EPCRA reports about toxic gases released from industrial

animal operations, we would find a way to share that information with our community, so that

everyone would have a better chance of staying healthy.  Daycare centers and schools might

decide to keep kids inside on days when the air quality is especially bad.  I hope that government

officials would help spread this information too.  When a bad storm comes to town, the

government sends out alerts on television and radio.  I don't see why releases of toxic gases

should be treated any differently.

14.     Over the past few years, the odor from industrial animal operations in Duplin County has gotten much worse, because existing facilities haven't changed their practices and new poultry facilities keep opening up.  Unless the government starts to regulate toxic gases from industrial animal operations, the odor will keep getting worse.  As long as they can keep their emissions a secret from community-members and government regulators, these facilities have no incentive to clean up.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.  Executed this 26th day of October 2018, in Warsaw, North Carolina.

Devon Hall
Rural Empowerment Association for Community Help

**ATTACHMENT 1**

# Hog and Poultry CAFOs Near Warsaw, NC



# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Rural Empowerment Association for
Community Help, et al.,

$\qquad$ Plaintiffs,

v.

United States Environmental Protection
Agency, et al.,

$\qquad$ Defendants.

**CASE No. 1:18-cv-02260**

**DECLARATION OF
MARK WALDEN**

## DECLARATION OF MARK WALDEN

I, Mark Walden, declare that if called as a witness in this action I would competently testify of my own personal knowledge, as follows:

1.     I am the Chief Programs Officer at the Animal Legal Defense Fund (ALDF). I have served in this capacity since 2016. In this role, I am responsible for coordinating ALDF's activities across programs, including ALDF's civil Litigation Program, Criminal Justice Program, and Animal Law Program. I also coordinate among these programs and executive leadership, ALDF's communications department, and donor and member outreach.

2.     ALDF is a national nonprofit animal protection organization founded in 1979 that uses education, public outreach, legislation, and litigation to protect the lives and advance the interests of animals, including those raised for food on animal feeding operations (AFOs). ALDF is supported by hundreds of dedicated attorneys and more than 230,000 members and supporters nationwide, many of whom live and recreate in close proximity to AFOs.

3.     ALDF works against AFOs in order to decrease the suffering and improve the lives of farmed animals who are forced to suffer at ground zero of AFO pollution throughout their entire lives.[1] Just as they are to humans, AFO emissions are extremely hazardous to the pigs, cows, and birds confined in these facilities, as well. In 2015, more than 1,000 pigs were killed after being overcome by noxious gas emissions from manure lagoons at a hog farm near Tracy, Iowa. Excess ammonia has also been associated with lower weaning rates, arthritis, porcine stress syndrome, muscle lesions, abscesses, and liver damage in pigs. Likewise, high ammonia levels in chicken sheds can cause painful skin conditions, respiratory problems,

---

[1] *See generally*, Robert E. Holland et al., Iowa Concentrated Animal Feeding Operation Air Quality Study, Chapter 6.2: Animal Health Effects (2002), available at https://www.public-health.uiowa.edu/ehsrc/CAFOstudy/CAFO_6-2.pdf.

pulmonary congestion, swelling, hemorrhage, and blindness in the birds. Ammonia also destroys the cilia in the chickens responsible for preventing other bacteria from being inhaled. During winter, when the ventilators are closed to conserve heat, ammonia levels may reach 200 parts per million; healthy ammonia levels should never surpass 20 parts per million. The ammonia levels created by the poor ventilation in grower houses limit the broiler chicken's sense of smell, rendering them unable to truly perceive their environments. Cattle facilities fare no better: ammonia has been considered as the most significant air pollutant in cattle barns, where it acts as a respiratory irritant and negatively effects the animals' pulmonary function. In order to bring an end to the practices that lead to such dismal lives for farmed animals, ALDF's advocacy to improve the lives of farmed animals focuses on increasing transparency and regulation of the AFO industry.

4.    ALDF also advocates for more responsible animal agriculture practices that protect the health of the surrounding communities, which include ALDF members. Noises, odors, and air and water pollution from AFOs impact ALDF members' health and quality of life.  ALDF members avoid opening their windows, spending time outdoors on their property, or recreating in nearby rivers and open spaces because AFO pollution makes those activities unbearable. In addition, ALDF members across the country – not just those that live near AFOs – are concerned about the negative impacts that these facilities have on the health and wellbeing of the thousands of animals confined within them.

5.    ALDF has an extensive docket of false advertising and consumer protection litigation that aims to increase transparency in the AFO industry through truth in labeling. For example, ALDF recently settled litigation with Trader Joe's regarding misleading hen raising representations on Trader Joe's Cage Free eggs cartons. *See Carolyn Claybaugh v. Trader Joe's*

*Company*, Case No. RG18897085 (Cal. Sup. Ct. 2018). ALDF also served as counsel for the Organic Consumers Association in a 2016 action over misleading "pasture raised" labeling and marketing claims made by egg seller Handsome Brook Farm. *Organic Consumers Association v. Handsome Brook Farm et al.*, Case No. 2016 CA 006223 B (D.C. Sup. Ct. 2016).

6.    ALDF also regularly submits rulemaking petitions and administrative comments to, and files complaints and lawsuits against, state and federal agencies seeking transparent and adequate regulation of the AFO industry with respect to their effects on animals and the environment, including air and water. In 2010 ALDF submitted rulemaking petitions to the Food and Drug Administration (FDA), Federal Trade Commission (FTC), and U.S. Department of Agriculture (USDA) seeking disclosure of egg production method (caged, cage-free, or free-range) on egg cartons, to correct rampant consumer deception in the egg market. ALDF later served as both plaintiff and counsel in litigating the agency denials that followed. In 2013, ALDF submitted a rulemaking petition to USDA seeking accurate labeling of antibiotic use in meat and poultry products. From 2014 to 2017 ALDF litigated against FDA for its failure to comply with the National Environmental Policy Act (NEPA) when approving the animal drug ractopamine, which is used widely on AFOs and is toxic to aquatic organisms when released into the environment.

7.    In 2016 and 2017 ALDF submitted comments in response to a proposal by the Arkansas Farm Service Agency to provide federal funding to establish a 30,000-head chicken AFO in northern Arkansas. ALDF's advocacy was successful in forcing the agency to consider the environmental impacts of AFOs in two Environmental Assessments under NEPA. In 2017, ALDF submitted a rulemaking petition to the agency requesting, among other things, that the agency prepare a programmatic Environmental Impact Statement adequately considering the

cumulative effects of funding AFOs in the region under NEPA before providing any additional

funds. In 2018 ALDF submitted comments to the Arkansas Department of Environmental

Quality opposing modification of a National Pollutant Discharge Elimination System under the

Clean Water Act that would have allowed a poultry processing facility to discharge untreated

waste into the municipal wastewater treatment plant. The Department ultimately required the

facility to pre-treat its wastewater.

8.      Similarly in California, in 2014, ALDF submitted a petition for rulemaking urging

the California Air Resources Board to regulate greenhouse gas emissions from dairy AFOs under

the state's cap-and-trade program. The Board formally committed to regulating the dairy

industry's greenhouse gas emissions in 2017. In 2016, ALDF submitted a rulemaking petition to

the California Department of Water Resources and State Water Resources Control Board seeking

a moratorium on new water rights permits and registrations for AFOs, curtailment on surface

water diversion for AFOs, and inclusion of AFOs in Future groundwater sustainability plans.

The petition highlighted the harmful environmental impacts of the overuse of water at AFOs in

California, especially during drought years.

9.      ALDF also regularly seeks information through the Freedom of Information Act

(FOIA), and brings suit to compel compliance with FOIA when the government withholds

information. Specifically with regard to AFOs, in 2013, ALDF sued FDA for withholding

documents related to the animal drug ractopamine; the suit is ongoing. ALDF also brought suit to

challenge the Food and Drug Administration's decision to withhold information about hen

population and living conditions on large AFOs, which ALDF had requested through the

Freedom of Information Act. In 2016 the Ninth Circuit Court of Appeals reversed the district

court's judgment and remanded the case for a trial, which took place earlier this year. More

broadly, in 2017 ALDF sued the U.S. Department of Agriculture for removing publicly-available records related to Animal Welfare Act violations from its website.

10.     Access to information and transparency about AFO practices and emissions are central to ALDF's efforts on behalf of itself, its members, and the farmed animals whose interests it represents. ALDF relies heavily on access to public data about AFOs and AFO pollution to further its organizational mission and achieve its goals, including the litigation and administrative advocacy described above. ALDF utilizes information about the environmental impacts of AFOs to advance its legal advocacy on behalf of the farmed animals who are directly harmed by air emissions from the facilities in which they are confined.

11.     Like FOIA, the Emergency Planning and Community Right-to-Know Act (EPCRA) is an essential information gathering tool that, if properly implemented, would provide ALDF with information it would use in furtherance of its mission. This information is especially valuable in light of the general dearth of publicly-available information about AFO emissions and practices due to, for example, many AFOs being exempt from animal cruelty laws and permitting requirements under the Clean Water Act. As a result of the U.S. Environmental Protection Agency (EPA)'s decision to exempt AFOs from EPCRA reporting requirements, many AFOs have never reported emissions data under EPCRA, further depriving ALDF, its members, and the public of information about AFO emissions.

12.     ALDF members are also harmed by EPA's decision to exempt AFOs from EPCRA's reporting requirements. ALDF members are forced to live and recreate in close proximity to AFOs. Air pollution from AFOs impacts their quality of life and health, air quality, and water quality. AFO emissions contain hundreds of gases and compounds, including ammonia and hydrogen sulfide, both of which are subject to reporting requirements under

EPCRA if emitted in sufficient quantities—and both of which can cause serious physical harm to nearby residents.

13.    ALDF members seek and are denied information from their local governments about AFOs in their communities, which results in exposure to unknown quantities of hazardous pollutants, decreased ability to use and enjoy their homes, and harm to their aesthetic and recreational interests in their communities. EPCRA's reporting requirement for AFOs is critical to helping these individuals protect themselves from exposure and empowering them to advocate for themselves before their local decisionmakers.

14.    If EPA were enforcing EPCRA's reporting mandate, rather than exempting AFOs from it, ALDF and its members would have access to information about AFO emissions to use in our respective advocacy work. AFO reporting under EPCRA would provide ALDF and its members with the opportunity to obtain accurate emissions information generated by AFOs and reported directly to responsible agencies. This information would empower ALDF and its members to advocate for more effective regulation of AFOs and to hold AFO operators accountable for hazardous emissions. It would also increase transparency by making the public and regulators aware of the true effects of the AFO industry.

15.    ALDF and its members are likewise harmed by EPA's failure to follow proper rulemaking procedures under the Administrative Procedure Act when exempting AFOs from EPCRA's reporting requirements. ALDF and its members would have provided comments to EPA during a public notice-and-comment period, and would be entitled to a response from EPA. EPA's failure to follow proper procedure deprived ALDF and its members of information about EPA's actions, as well as the opportunity to submit comments, which denied ALDF and its members of public participation and other procedural rights.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted this 25th day of September, 2018, in Las Altos, California.

Mark Walden

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Rural Empowerment Association for
Community Help, et al.,

                    Plaintiffs,

            v.

United States Environmental Protection
Agency, et al.,

                    Defendants.

**CASE No. 1:18-cv-02260**


**DECLARATION OF
DEIRDRE DURKIS**

## DECLARATION OF DEIRDRE DURKIS

I, Deirdre Durkis, declare that if called as a witness in this action I would competently testify of my own personal knowledge, as follows:

1.      I am a resident of Lake Village, Newton County, Indiana. I purchased the land on which I currently live in 2012 with the intent to build a home where I could live together with my parents. I moved here six years ago from a nearby city; my parents moved here four years ago.

2.      I began supporting the Animal Legal Defense Fund two years ago when I reached out for help stopping a concentrated animal feeding operation (CAFO) with 6,000 pigs from being constructed 2 miles from my home.

3.      My parents and I chose to move to Newton County with the specific goal of living in a place with clean, fresh air and water, in part because I wanted my parents to have a healthy, pleasant retirement. Fresh air free from pollution was and is particularly important for my mother, who suffers from an unclassified progressive restrictive pulmonary disease that affects her lungs. Clean water is also very important—not just because I care about the environment, but because my parents and I rely on our wells for drinking water.

4.      Since moving here, I have taken great steps to maintain my land in a way that benefits the environment and ensures clean air and water. I am a registered farmer with the U.S. Department of Agriculture (USDA). I pay close attention to the natural balance of species and resources on my land and make planting decisions that maximize clean air and water. For example, I have planted trees, enrolled in the USDA's Conservation Reserve Program, and I haul my trash to licensed landfills to make sure it is being disposed of in a way that does not pollute groundwater.

5.      There has been an influx of CAFOs in my community over the past few years. The closest CAFO to my house is 5 or 6 miles away. Ten miles away is one of the largest dairy facilities in the country, which has tens of thousands of cows. They also have hogs and chickens. New facilities have been proposed for permitting in the area, too.

6.      It is very difficult to get information about existing or new facilities in my community. I do not typically receive any notice about new or expanding facilities; I do not know anything is planned until after construction starts. My local government generally supports this industry. My local commissioners do not respond to my emails about my concerns, and have themselves expressed concern that so many members of the public are beginning to speak out against it. When I do learn of new facilities I attempt to monitor developments and any challenges in the local courts. I have taken matters into my own hands and started a phone chain to alert concerned neighbors to what I am able to find out. In some cases I also contact attorneys, like those at the Animal Legal Defense Fund, who may be able to help in certain instances.

7.      These facilities are increasingly affecting my water and air. From my experience it seems they do not have much regard for protecting the environment or the local community. They do not have any incentive to do so since they can move on to new locations after they have depleted their current sites.

8.      Water quality greatly concerns me. Our community sits in the Kankakee River Basin, on the old Beaver Lake bed. Beaver Lake was a shallow lake that had a diverse ecosystem and provided important stopover habitat for migratory birds in the Western Hemisphere. The lake was drained for farmland 100 years ago. The water table is very close to the surface, and our environment is very sensitive. The Willow Slough Fish and Wildlife Area is nearby, as well as many acres protected by The Nature Conservancy. Despite this, CAFOs in my community run

irrigation with liquefied manure, even when it is raining and in the winter months when the ground is frozen solid. The manure runs off into ditches that flow through the Willow Slough Fish and Wildlife Area and into the Kankakee River, a tributary of the Illinois River. I visit the Willow Slough Fish and Wildlife Area and Kankakee River to enjoy nature and observe the animals who live there. I am concerned that air and water emissions from CAFOs will negatively impact these ecologically sensitive areas, the animals who live there, and my ability to enjoy them.

9.     In addition to their impacts on nearby waterways, these facilities can also impact my drinking water quality and quantity. My family uses well water, so groundwater is especially important to me. Previously my property and the surrounding farms had ponds that were 15 to 20 feet deep and full of life. As a result of the nearby CAFOs' overuse of water, these ponds are now 6 to 8 feet deep and stagnant; they no longer support fish. There were also seven shallow wells on my property, which I was told were in working order; by the time I moved in, six of the seven were dry, and I had to dig down 60 feet to get clean water. Because we rely on this water in my household, I am extremely concerned about contamination from manure at the nearby CAFOs. I do not want to increase my risk of cancer or other diseases from drinking coliform bacteria in my water.

10.     With regard to air quality, there are many days I have to keep my windows closed and run an air conditioner; this is not what I imagined when I decided to move to the country. At times the air smells like sewage so strongly that guests have remarked that my septic tank must be leaking. The smell can be unbearable.

11.     I am very concerned with the lack of notice about potential contamination of my air or water. From my experience with these facilities and with my local government, it is

apparent they will not alert me to potential contamination if not required to do so. I could be drinking contaminated water from my well or breathing contaminated air and would have no idea, nor any way of finding out.

12.     If I had learned that the U.S. Environmental Protection Agency (EPA) was exempting CAFOs from these reporting requirements, I would have opposed this action. But because EPA provided no notice of the proposed exemption or an opportunity for me to submit comments, I was not able to express my opposition to EPA.

13.     If CAFOs were required to provide notice of hazardous emissions to me or my local emergency planning board, I could protect myself from potential contamination. I would monitor any website, section of the newspaper, or other source of information about hazardous emissions from nearby CAFOs. Any time I received notice of potential hazards I would have my wells tested to make sure my drinking water was not impacted. I would also notify other neighbors through the phone chain so they could take steps to protect themselves and take action to protect our environment. I could also feel confident that my air and water were safe, clean, and being protected in the absence of any notice to the contrary.

14.     The health of our environment is not only important to me on a personal level, but it is essential to the health of my community and local economy. Many of my neighbors depend on a healthy environment for their livelihoods. Without a healthy environment free from pollution, we have nothing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted this 3rd day of October, 2018, in Lake Village, Indiana.

Deirdre Durkis

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Rural Empowerment Association for
Community Health, et al.,

                Plaintiffs,

       v.

United States Environmental Protection
Agency, et al.,

              Defendants.

**CASE No. 1:18-cv-02260**

**DECLARATION OF
CYNTHIA PARKE**

## DECLARATION OF CYNTHIA PARKE

I, Cynthia Parke, declare that if called as a witness in this action I would competently testify of my own personal knowledge, as follows:

1.     I am a resident of Imboden, in Randolph County, Arkansas. My county is ground zero for chicken houses, or concentrated animal feeding operations (CAFOs), in Arkansas. Randolph County is home to a Peco Foods processing facility, which has expanded the chicken CAFO industry in our area.

2.     I became a member of the Animal Legal Defense Fund (ALDF) because I care about animals and believe they need to be protected. ALDF stands up for animals who cannot do it on their own.

3.     My husband is 78 years old. He and I moved to our current home about eight years ago, when we sold our home and left California, because we wanted to live in a rural place where we could keep our windows and doors open in a house full of fresh air. While we both have health issues, we now also suffer from allergies that have become worse since CAFOs have been built locally.

4.     Unfortunately, the CAFOs near us have ruined our air quality to the point that we cannot enjoy any fresh air in our community. Many days, our air quality is horrible. We live 3 miles southeast of 6 to 8 chicken CAFOs concentrated in one area, about .5 miles from a major highway, and about 15 miles from flat farmland. In heavy wind when the trucks drive down the highway to dump chicken litter from the CAFOs onto the farmland, so much dust, dirt, feathers, and particles blow out the back of the trucks onto our cars, the road, trees, bushes, everything. It gets picked up in the wind and deposited everywhere in such a thick layer that it is clearly visible.

5.      The days when the chickens are moved out are especially bad, with feathers flying out of the trucks doing the transporting. On those days, big rig trucks carrying cages full of chickens can drive back and forth for twelve hours straight. When residents started complaining, they started to make these trips in the middle of the night. We do not receive any notice in advance of these days and when the trucks drive overnight we are even less able to prepare ourselves since we cannot see it happening. They really degrade our quality of life.  Now we keep our windows closed and air conditioning running constantly. Many students, especially those with asthma, cannot go to school on the days when the chicken houses .5 miles from the school are being cleaned out due to how severely the litter trucks impact air quality.

6.      Our water quality has also suffered a great deal. We rely on well water. The chicken CAFOs pump so much water out of the ground that wells in our community have gone dry. Neighbors have had to shut down their farming businesses because they no longer have enough water to irrigate their crops. Without our wells we have no other water source; there are no water lines out to our neighborhood and we cannot afford to pay the water company to pipe water out to us.

7.      CAFO pollution has affected our ability to enjoy the Eleven Point River, as well. The Eleven Point River became one of the 8 initial units of the National Wild and Scenic River system in 1968, but that designation stops at the Arkansas border. There are approximately 60 CAFOs along the Eleven Point River just within the first fourteen miles or so south from the Missouri border along Highway 93. In heavy rain events, they all drain into the river. The river used to be full of fish and fishermen, but now they are few and far between. Plenty of people have stopped fishing on the Eleven Point River altogether, and I personally will

not eat fish caught there anymore. My husband and I head to the Lake of the Ozarks for fishing, swimming, and boating now.

8.      It is nearly impossible to get information about plans for existing or future CAFOs in my community. I first realized the lack of transparency in February 2014 when the Quorum Court approved $150,000 in funding for an unknown infrastructure project. (The Quorum Court functions as a Board of Supervisors, made up of the Justices of the Peace from each of nine districts within Randolph County. They approve loans/grants, the County budget, et cetera.) Only after the Quorum Court approved the funding did they inform us it was actually for a chicken processing plant, and only *then* did they call a public meeting. This lack of access to information makes it very difficult to stay informed about what is happening in my community, and to protect myself accordingly.

9.      I am very concerned about the potential for these CAFOs to contaminate the air and water. Many more people are concerned about the effects of these CAFOs and would be interested in learning more about them, but it is very difficult to inquire openly because we are a very close-knit community. Everyone knows everyone, and everyone is someone's brother or sister-in-law or fellow member of their church. Plus there is a very tense relationship between the business owners and the local residents. It is not a safe environment to speak out against the industry, or to ask questions about their effects on our environment and our health.

10.      Part of my concern stems from local weather events and our location in the floodplain. At least once a year for the past eight years there has been a big weather event; either heavy rains flood the area or there are ice storms that cause power outages. Early in 2017 the town of Pocahontas flooded and the National Guard had to rescue people by boat. I have seen heavy rains wash out access to the CAFOs nearby, which leads me to believe the rains are

washing away manure and litter from the facilities, too. In these big weather events the utility companies seem to make sure power is restored to the CAFOs first and the local residents second, even when residents are on oxygen and at risk during storms. This makes it clear to me that, short of being required to by law, neither these companies nor the local authorities feel obligated to protect the environment or do what is right for our communities.

11.    One of my only sources of information about water quality for the waters around me is the Randolph County Conservation District, which started water testing in different locations. Their tests have shown some really high numbers of nitrates and other pollutants. However, they will not disclose the location of testing, and they only provide monthly reports for the previous month. There is no way for me to know about water contamination in real time, so that I can avoid certain waterways to protect myself.

12.    I am very concerned with the lack of notice about potential contamination of my air or water. I could be drinking contaminated water from my well. To protect myself against this, I must pay the local health department to run minor tests; no in-depth testing is available locally whatsoever. And I could be breathing toxic air and have no way of knowing that, either. Because I am not able to use stairs I have stopped attending the monthly meetings of the Quorum Court, but I still review the minutes each month and send in my thoughts. If the Court ever announced any emissions leak—which I am not confident it would—
it would likely be too late for me to protect myself by the time I learned about it. If the U.S. Environmental Protection Agency (EPA) required CAFOs to provide notice of hazardous emissions to me or my local emergency planning board, I would monitor the designated sources to stay informed and act accordingly.

13.     If CAFOs were required to provide notice of hazardous emissions to me or my local emergency planning board, I could stay informed and protect myself from potential contamination without having to speak out at public meetings or draw any attention to myself. I would have my wells tested to make sure my drinking water was not impacted. I would keep my clothes off the line in the yard and stay inside. These minor changes are important to me since I already suffer from health issues that are made worse by poor air quality.

14.     I also value my right to know what is happening in my community, which the EPA has undermined by exempting CAFOs from regulations that apply to other potentially hazardous industries. Without access to information, it is impossible to participate in my local government in a meaningful way. It also takes away my ability to organize with my neighbors, and to be informed about effects to my property value, environment, and personal health.

15.     EPA has also denied me the ability to participate in the government by issuing the EPCRA exemption without providing for a meaningful opportunity for the public to comment. Had EPA heard my concerns and the concerns of others around the country who live near CAFOs, it might have come to a different decision.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted this 27th day of September 2018, in Imboden, Arkansas.

Cynthia Parke

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Rural Empowerment Association for
Community Help, et al.,

                    Plaintiffs,

          v.

United States Environmental Protection
Agency, et al.,

                    Defendants.

CASE NO. 18-cv-02260-TJK


**DECLARATION OF**
**KELLAN SMITH**

## DECLARATION OF KELLAN SMITH

I, KELLAN SMITH, declare that if called as a witness in this action I would competently testify of my own personal knowledge as follows:

1.      I submit this declaration in support of the motion for summary judgment filed by Plaintiffs Rural Empowerment Association for Community Help, Animal Legal Defense Fund, Center for Food Safety, Don't Waste Arizona, Environmental Integrity Project, Food and Water Watch, Humane Society of the United States, Sierra Club, Sound Rivers, and Waterkeeper Alliance (collectively, "Plaintiffs") challenging the Environmental Protection Agency's ("EPA") decision to exempt Animal Feeding Operations ("AFOs") from requirements to inform state and local officials about releases of dangerous levels of air pollutants as required by Section 304 of the Emergency Planning and Community Right-to-Know Act ("EPCRA").

2.      I am an attorney at the Center for Food Safety ("CFS").

3.      CFS is a tax-exempt, nonprofit membership organization with offices in the District of Columbia; San Francisco, California; and Portland, Oregon. CFS has over 950,000 members across the country. CFS's fundamental mission is to empower people, support farmers, and protect the environment from the harms of industrial agriculture, while supporting sustainable ecological and organic farming.

4.      CFS works to protect the environment from harmful food production

methods. These include concentrated animal feeding operations ("CAFOs"). Chief among CFS's concerns are the negative environmental impacts of industrial agriculture technologies: water and air contamination from factory farming, pollution from chemical pesticides, and biological pollution from genetically engineered crops and animals. In addition, CFS protects the interests of its staff and its members in ensuring that food and agriculture are safe for human health and the environment, which includes protecting the natural habitats and wildlife that CFS's staff and members enjoy.

5.      I know that many of our members live in communities where industrial livestock operations are present. For many of them, the experience of living near these facilities—especially due to the emissions of odors, gases, and particulate matter—is a large part of what motivated them to join CFS.

6.      To that end, CFS provides oversight of governmental activities surrounding industrial agriculture. CFS develops a wide array of educational and informational materials that address the environmental impacts of industrial agriculture, and disseminates the materials to CFS members; policymakers; local, state and federal government personnel; international governmental officials; nonprofit organizations; and interested members of the public. These educational and informational materials include, but are not limited to, reprints of news articles, policy reports, legal briefs, press releases, newsletters, action alerts, and

fact sheets. Through these materials, CFS provides its members with a means of identifying the origin of foods on the market, supporting the public's right to know, and to encourage full public participation in defining the issues presented by industrial agriculture. CFS sends out action alerts to its members, who submit comments and letters to government agencies and officials, respectively, on issues related to industrial agriculture and other issues affecting the sustainability of our food system.

7.     Due to CFS's concerns about the human health impacts of emissions of harmful contaminants into the air from CAFOs, we submitted comments to EPA on March 25, 2008, on proposed CAFO exemptions to the release reporting requirements of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and EPCRA. After EPA finalized that rule, CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances From Animal Waste at Farms, 73 Fed. Reg. 76948 (Dec. 18, 2008), CFS was a petitioner in a legal challenge to the rule. *See Waterkeeper Alliance v. EPA*, Nos. 09-1017, 09-1104 (consolidated) (D.C. Cir. filed Jan. 15, 2009). In 2017, the D.C. Circuit vacated EPA's 2008 CERCLA/EPCRA exemption, rejecting EPA's argument that the statutory reporting requirements serve no regulatory purpose. *See Waterkeeper All. v. EPA*, 853 F.3d 527, 537-38 (D.C. Cir. 2017).

8.      CFS has a vested interest in opposing CAFOs given the significant

negative environmental and human health impacts that result from their use of

industrial agriculture methods. One of the greatest threats to the environment that

CAFOs present stems from their significant concentration and production of

animal waste, estimated at 500 million tons annually. Environmental

mismanagement of animal waste results in excessive pollution of our nation's

waterways, causing eutrophication and hypoxia that deplete waters of their

nutrients, reduce biodiversity and aquatic life, and exacerbate greenhouse gas

emissions. Large concentrations of animal waste can also result in emissions of

harmful contaminants into the air, including ammonia, hydrogen sulfide,

endotoxins, particulate matter, and volatile organic compounds. Residents and

farmworkers living near CAFOs are greatly affected by animal waste. Groundwater

contamination by nitrates is common in areas with shallow water supplies located

near CAFOs. In addition, mounting research suggests that as CAFOs are

established in certain areas, corresponding health problems, including respiratory,

intestinal, and neurological issues, increase in local communities. These symptoms

are consistent with those found in CAFO workers. The human health effects on our

children may be even greater.

9.      Just recently, CFS published a report, *Opting Out of Industrial Meat:*

*How to Stand Against Cruelty, Secrecy, and Chemical Dependency in Food Animal*

*Production*. The report provides tools and information to help people shift away from eating meat sourced from CAFOs and to identify alternative, healthier protein sources. Contemporaneous with the publication of this report, CFS launched a companion website. *See* https://endindustrialmeat.org. The website provides a wealth of information about how industrial meat impacts human health and the environment, including how CAFOs impact nearby communities from enormous levels of manure and toxic emissions.

10.    The challenge to the EPCRA Exemption is of fundamental importance to CFS, as information about pollution from CAFOs is critical to our advocacy, to our oversight of governmental activities related to CAFOs, and to the interests of our members.  Because of the EPCRA Exemption, CFS and its members are denied information about emissions from CAFOs to which they have a statutory right.  This information is central to CFS's purpose and mission, and is vital for CFS members to be able to live healthy and enjoyable lives on their properties.

11.    CFS and its members have also been harmed by EPA's failure to provide the public with the statutorily required opportunity to comment on a proposed exemption before EPA instituted that exemption.  If EPA had conducted a proper notice and comment period through the Federal Register, and responded to the public's comments, CFS would have commented in opposition to EPA's misguided EPCRA Exemption.

I declare under penalty of perjury that the foregoing is true and correct.

Executed October 18, 2018 in San Francisco, California.


Kellan Smith

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Rural Empowerment Association for Community Help, et al., | |
| Plaintiffs, | **CASE NO. 18-cv-02260-TJK** |
| v. | |
| United States Environmental Protection Agency, et al., | **DECLARATION OF CANDICE COOK** |
| Defendants. | |

## DECLARATION OF CANDICE COOK

I, CANDICE COOK, declare that if called as a witness in this action I would competently testify of my own personal knowledge as follows:

1.    I submit this declaration in support of the motion for summary judgment filed by Plaintiffs Rural Empowerment Association for Community Help, Animal Legal Defense Fund, Center for Food Safety, Don't Waste Arizona, Environmental Integrity Project, Food and Water Watch, Humane Society of the United States, Sierra Club, Sound Rivers, and Waterkeeper Alliance (collectively, "Plaintiffs") challenging the Environmental Protection Agency's ("EPA") decision to exempt Animal Feeding Operations ("AFOs") from requirements to inform state and local officials about releases of dangerous levels of air pollutants as required by Section 304 of the Emergency Planning and Community Right-to-Know Act ("EPCRA").

2.    I am a member of Center for Food Safety ("CFS"). I joined CFS because I am concerned about the environmental, health, and public safety impacts of food and agriculture. I support CFS's efforts to advocate for better and more accurate environmental reporting and for agencies, including EPA, to be more vigilant in requiring animal factories to turn over significant information to the public.

2

3.     I am a resident of Huntingburg, Indiana. My home is approximately seven miles southwest of Huntingburg in an area that is largely agricultural mixed with wooded areas.

4.     I am retired from the Gibson-Pike-Warrick Special Education Cooperative, Oakland City, Indiana.

5.     I am concerned about how the EPA's EPCRA Exemption may affect my health and quality of life.

6.     When my husband and I moved to the Huntingburg area in 1999, there were no animal feeding operations ("AFOs") or confined animal feeding operations ("CAFOs") near our home. We moved here because we love the outdoors and the rural setting outside of Huntingburg. Our property is wooded and borders a small lake. For many years, we spent a lot of time outside in the woods and enjoying the lake. All of that drastically changed about three years ago.

7.     Approximately three years ago, the Denu Turkey House began operation one-half mile from my home. The Denu Turkey House is a CAFO that confines an estimated 20,000 – 25,000 turkeys. The Denu Turkey CAFO consists of three barns. Each barn is approximately 500 feet long by 65 feet wide. I based my estimation of 20,000 – 25,000 turkeys on two sources that said CAFO turkeys get 2.5 – 4.0 square feet per bird. In addition, I found a permit online that showed some building sizes and a number of turkeys proposed in each.

8.     The operation of the Denu Turkey CAFO has significantly affected my quality of life and enjoyment of my property. When the wind blows out of the southeast, I cannot open my windows because the foul odor is overpowering. There are even times when the odor is overpowering without the wind blowing. This overpowering smell impacts me at least once a week and sometimes as many as 4-5 days per week.

9.     The foul odor from the Denu Turkey CAFO is a rotten, disgusting stench similar to sulfur (rotten eggs) mixed with confined feces. It is not the natural, earthy aroma of manure from farm animals on pasture land that most rural people are used to.

10.     The stench from the Denu Turkey CAFO affects us in many ways. My husband and I used to sit out on a screened-in porch enjoying the sights, sounds, and clean air of the country, but now we often cannot because of the stench from the Denu Turkey CAFO. We often cannot take our dog for a walk or spend time with our grandchildren outside because of the smell. Sometimes, when I open the door just to let our dog outside, the smell hits me in the face and I have to immediately clap my hand over my nose and retreat into the house.

11.     The Denu Turkey CAFO affects me in other ways as well. The Denu Turkey CAFO has almost certainly lowered my property value. I am aware that one study shows that property values on average decrease by 6.6% within a 3-mile

4

radius of a CAFO and by 88% within one-tenth of a mile from a CAFO. Knowing that the smell from the Denu Turkey CAFO could impact our health, our property value, and the enjoyment of our property at any time has caused constant stress and significant worry about our health and future well-being. I am very concerned that in addition to our reduced quality of life, air-borne particulates from the CAFO are damaging to our health. I worked hard for years and expected to enjoy my retirement but the operation of the Denu Turkey CAFO has substantially and negatively affected the realization of those expectations.

12.     I do not believe that the risks of exempting AFOs from reporting under EPCRA have been properly assessed in regards to public health. Had the EPA announced a public comment period on what it was proposing to do with the updated EPCRA Exemption, I would have submitted comments. I pay hard-earned taxes for an EPA that protects my health and well-being, not an EPA that serves big business at the expense of public health. Facilities such as the Denu Turkey CAFO should not be exempt from federal reporting requirements.

13.     The EPCRA Exemption threatens my health by allowing industrial facilities like the Denu Turkey CAFO to avoid reporting toxic releases of air pollutants that are known to be hazardous to human health. If the Denu Turkey CAFO followed EPCRA's requirement to report its toxic emissions, then I would be better equipped to protect my health and avoid these toxic gases and smells. In

addition, my local emergency responders would be able to use the information to better protect my health and the health of my neighbors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 15th, 2018 in Huntingburg, Indiana.

_Candice Cook_

CANDICE COOK

6

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Rural Empowerment Association for Community Help, et al., | |
| Plaintiffs, | **CASE NO. 18-cv-02260-TJK** |
| v. | |
| United States Environmental Protection Agency, et al., | **DECLARATION OF CURTIS RAMER** |
| Defendants. | |

## DECLARATION OF CURTIS RAMER

I, CURTIS RAMER, declare that if called as a witness in this action I would competently testify of my own personal knowledge as follows:

1.     I submit this declaration in support of the motion for summary judgment filed by Plaintiffs Rural Empowerment Association for Community Help, Animal Legal Defense Fund, Center for Food Safety, Don't Waste Arizona, Environmental Integrity Project, Food and Water Watch, Humane Society of the United States, Sierra Club, Sound Rivers, and Waterkeeper Alliance (collectively, "Plaintiffs") challenging the Environmental Protection Agency's ("EPA") decision to exempt Animal Feeding Operations ("AFOs") from requirements to inform state and local officials about releases of dangerous levels of air pollutants as required by Section 304 of the Emergency Planning and Community Right-to-Know Act ("EPCRA").

2.     I am a member of Center for Food Safety ("CFS"). I joined CFS because I am concerned about the environmental, health, and public safety impacts of food and agriculture. I support CFS's efforts to advocate for better and more accurate environmental reporting and for agencies, including EPA, to be more vigilant in requiring animal factories to turn over significant information to the public.

3.      I am a resident of Winchester, Indiana. Winchester is the county seat of Randolph County. Randolph County is rural and agricultural. I have lived at this residence since 2002.

4.      I earned a Bachelor of Science degree in mechanical engineering from Purdue University. I am an engineer by trade and work in Indianapolis, which is about an hour and a half from my home in Winchester. I have an apartment near my job and live there during the week. I spend weekends at my home in Winchester.

5.      I am worried about how the EPA's EPCRA Exemption may affect my health and quality of life.

6.      When I moved to Winchester in 2002, there were no animal feeding operations ("AFOs") or concentrated animal feeding operations ("CAFOs") near my home.  In 2005, Union-Go Dairy opened a 2000-cow dairy operation approximately 1.3 miles northeast from my home.  Union-Go Dairy is classified as a CAFO.

7.      Around 2007-2008, Maxwell Foods (aka Maxwell Farms) opened its Buena Vista Sow Farm approximately a half-mile east from my home.  The Buena Vista Sow Farm is classified as a CAFO and is permitted for 6,000 sows.  The Buena Vista CAFO is also permitted to have an additional 1,500 pigs over various stages of development.

3

8. The Buena Vista CAFO consists of four barns. Two barns are approximately 600 feet long by 75 feet wide. The other two barns are approximately 550 feet long by 80 feet wide. Manure is gathered and stored in a pit under each barn. Each pit is approximately 7-9 feet deep.

9. Buena Vista CAFO spreads manure from these pits on its fields every spring and fall. The manure is spread by a drag line system. The manure is pumped out of the pits with a pumper truck and pumped through a large hose that is connected to a tractor. An assemblage attached to the tractor allows the manure to be sprayed onto the ground as the tractor operator drives across the farm field.

10. The operation of the Buena Vista CAFO has significantly affected my quality of life. Not long after Buena Vista CAFO began operating, I stopped using the sunroom in my home. The sunroom faces east in the direction of the Buena Vista CAFO and it is not possible to enjoy this part of my home anymore because of the smell from Buena Vista CAFO.

11. For approximately five years, I kept a calendar of how bad the smell was from Buena Vista CAFO. I used a scale of 1 to 10, with 1 being "no smell" and 10 being "overpowering." I would estimate that 20%-25% of the time, the smell is significant and at times overpowering. The smell is especially bad when the wind shifts and blows from the east. It is also really bad in the evenings when the wind dies down and the moisture in the air drags the particulates straight down.

4

I never sleep with the windows open anymore because there have been too many times when I woke up in the middle of the night and the whole house is saturated with the smell of manure.

12.    The Buena Vista CAFO has also affected my relationships with friends. I used to have friends over to visit before the Buena Vista CAFO began operating. I also used to have friends from church over to play softball before the Buena Vista CAFO began operating. Now, I do not have friends over as often because of the smell of manure from the Buena Vista CAFO.

13.    The opening and operation of the Buena Vista CAFO (and the Union-Go Dairy CAFO) has divided this community. When the CAFOs moved in, they bought most of the surrounding residential properties. Of the residents who remain, some have been outspoken about the air quality impacts of the CAFOs while others have not been. Those residents who are not as directly impacted by the CAFOs' air emissions are not sympathetic and consider me and others who are affected by the emissions to be troublemakers.

14.    I have attended meetings with the Indiana Department of Environmental Management ("IDEM"), emailed IDEM, and called IDEM about improper manure handling and application, as well as other issues, with respect to the Union-Go Dairy and the Maxwell Sow Facility.

15.    The barns and pits at the Buena Vista CAFO, however, are the main problem.  While the manure spreading only lasts for a couple of weeks in the spring and fall, the barns and pits are permanent fixtures on the land.  When the exhaust fan kicks on at the end of each barn, the smell of manure permeates the surrounding area, including my home.  During the summer, these exhaust fans run almost all of the time and there is sometimes no escaping the overpowering smell of manure.

16.    I do not believe that the risks of exempting AFOs from reporting under EPCRA have been properly assessed in regards to public health.  I would have commented on the updated EPCRA Exemption had the EPA followed proper notice and comment procedures.  Facilities such as the Buena Vista CAFO and Union-Go Dairy CAFO are industrial factory farms that should not be exempt from federal reporting requirements.

17.    The EPCRA Exemption threatens my health by allowing AFOs, such as the ones located near my home, to avoid reporting toxic releases of air pollutants that are known to be hazardous to human health.  If these AFOs reported their toxic emissions like EPCRA requires, then I would be able to take steps to protect my health and avoid these toxic gases and smells.  Also, my local emergency responders would be able to use the information to better protect my health and the health of my neighbors.

6

I declare under penalty of perjury that the foregoing is true and correct.


Executed on September 25, 2018 in Winchester, Indiana.


CURTIS RAMER

7

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Rural Empowerment Association for
Community Help, et al.,

                 Plaintiffs,

        v.

United States Environmental Protection
Agency, et al.,

                Defendants.

**CASE NO. 18-cv-02260-TJK**

**DECLARATION OF
STEPHEN BRITTLE**

# DECLARATION OF STEPHEN BRITTLE

I, Stephen Brittle, do hereby declare that if called as a witness in this action I would competently testify of my own personal knowledge as follows:

1. I am the president and co-founder of Don't Waste Arizona (DWAZ).

2. DWAZ is a tax-exempt, nonprofit membership organization with one office in Phoenix, Arizona. DWAZ has about 100 members across the state of Arizona. I know that many of our members live in communities where industrial livestock operations are present. For many of them, the experience of living near these facilities—especially due to the emissions of odors, gases, and particulate matter—is a large part of what motivated them to join DWAZ.

3. I co-founded DWAZ in 1990, but DWAZ formally incorporated in 1992 to be eligible to participate in a TAG grant for the Motorola Superfund site in Phoenix, Arizona. In so doing, I helped create its organizational purpose and goals. I am a member of DWAZ's Board of Directors, and have been since the organization's inception. Since the organization's founding, DWAZ's activities have focused on the environmental, human health, and economic impacts of environmental pollution, especially toxic chemical exposure from reportable hazardous chemical releases. DWAZ has always been an advocate for environmental justice. Starting in 2015, DWAZ has focused on the development of industrial agriculture. Principal among these activities are analyses and actions to mitigate the impact of industrial agriculture and its emissions of ammonia and hydrogen sulfide on human health and the environment.

4. In creating DWAZ, I sought to establish a nonprofit organization that addressed many of my personal interests in protecting the environment from harmful chemicals and pollution. This includes concentrated animal feeding operations (CAFOs). Chief among my concerns about CAFOs are the negative environmental impacts of industrial agriculture technologies: water and air contamination from factory farming, and reportable quantity releases under the Emergency Planning and Community Right-To-Know Act (EPCRA) and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of ammonia and hydrogen sulfide from CAFOs. In addition, I created DWAZ to protect the interests of its members

in ensuring that the environment is safe for human health and the environment.

5. Among the ideals that DWAZ was built upon is the education of its members and the public about the various environmental laws, including the information that is available to the public through permitting processes and the regulatory agencies. This education of its members and the public also includes education about federal citizen suit enforcement of the various environmental laws. DWAZ has conducted over 90 successful federal citizen suit enforcement actions, ranging from the Clean Water Act and the Resource, Conservation, and Recovery Act (RCRA) to EPCRA.

6. To that end, DWAZ provides oversight of governmental activities surrounding environmental regulations and the emergency response and planning system set up by EPCRA. This includes the state emergency response commission, the local emergency planning committees, and fire departments, especially regarding two severe chemical fire disasters in an ethnic minority community in south Phoenix.

7. As president of DWAZ, I served for ten years as a member of the Maricopa County LEPC, where I also chaired the committee that reviewed and updated that LEPCs Emergency Plan as required by EPCRA. DWAZ also has participated in numerous hazardous materials and EPCRA conferences over a period of years so that it would be proficient in its expertise in these matters.

8. DWAZ has also engaged in the following activities: worked cooperatively with the EPA to develop internet resources regarding EPCRA and other emergency response laws (www.chemicalspill.org); required a defendant in an EPCRA Section 313 case (Toxics Releases Inventory) to fund a Supplemental Environmental Project to increase citizen awareness of the Toxics Releases Inventory; prepared a curriculum for LEPC members in Arizona to better understand the members' responsibilities under EPCRA pursuant to a contract with the Arizona Emergency Response Commission; and got media attention for issues related to the different types of community right to know information.

DWAZ has developed educational and informational materials that address the environmental impacts of various forms of pollution in a variety of industries, focusing largely on EPCRA, and disseminates the materials to

DWAZ members; policymakers; local, state and federal government personnel; international governmental officials; nonprofit organizations; and interested members of the public. These educational and informational materials include, but are not limited to, websites, press releases, newsletters, action alerts, and fact sheets.

9. Through these materials, DWAZ provides its members with a means of supporting the public's right to know, and to encourage full public participation in defining the issues presented by industrial agriculture. DWAZ sends out action alerts to its members, who submit comments and letters to government agencies and officials, respectively, on issues related to industrial agriculture.

10. DWAZ also engages in litigation to enforce federal environmental laws. DWAZ has conducted over 90 successful federal citizen suit enforcement actions, ranging from Clean Water Act and RCRA to EPCRA. The EPCRA cases involved enforcing Section 313 (Toxics Release Inventory), Section 312/302, which requires reporting quantities of chemicals stored on-site, and Section 304, for failing to provide the written follow-up report when there has been a reportable quantity release. The Section 304 citizen suit is currently pending in federal court.

11. DWAZ has also worked on multiple campaigns that aim to mitigate the effects of pollution and chemical exposures that harm the environment and the public, as well as environmental justice education.

12. DWAZ has a vested interest in opposing CAFOs given the significant negative environmental and human health impacts that result from their use of industrial agriculture methods. One of the greatest threats to the environment that CAFOs present stems from their significant concentration and production of animal waste, estimated at 500 million tons annually. Large concentrations of animal waste can also result in emissions of harmful contaminants into the air, including ammonia, hydrogen sulfide, endotoxins, particulate matter, and volatile organic compounds. Residents and farmworkers living near CAFOs are greatly affected by animal waste and their emissions. Mounting research suggests that as CAFOs are established in certain areas, corresponding health problems, including respiratory, intestinal, and neurological issues, increase in local communities. These symptoms are consistent with those found in CAFO workers. The human health effects on our children may be even greater.

13. DWAZ has been concerned about the environmental and human health impacts of industrial agriculture for more than three years, when members of the public asked for assistance in response to environmental issues caused by two CAFO facilities in Arizona.

14. Due to DWAZ's concerns about the human health impacts of emissions of harmful contaminants into the air from CAFOs, DWAZ has contacted EPA Region 9, the various environmental regulatory agencies in Arizona, the governor of Arizona, the Maricopa County Board of Supervisors, fire departments, the Arizona Emergency Response Commission, the Maricopa County LEPC and the Maricopa County Department of Emergency Management, the Maricopa County Board of Health, and others about these concerns.

15. It is my opinion as a ten year LEPC member that the information contained in the written follow up reports from CAFOs is useful to LEPCs. This is because the LEPC has a duty to include in its comprehensive emergency plan, which has to be updated annually, a method to determine that a reportable quantity release -- a release of ammonia and/or hydrogen sulfide -- has occurred, as well as a statutory obligation for the plan to have a way to notify affected communities when a release has occurred.

16. The releases of ammonia and hydrogen sulfide from CAFOs may cause ambient air concentrations of these hazardous chemicals to reach levels that require shelter in place or evacuations. The LEPC would use the daily release amounts reported by CAFOs to calculate the off-site consequences, generally using the ALOHA software developed by EPA that determines the footprint of the release into affected areas downwind. Then there should be planning for an emergency response.

17. I was first alerted that a nearby CAFO was emitting dangerous levels of ammonia when I emerged from a meeting at a school three miles from a CAFO. Given my Ammonia Safety Training I had as an LEPC member, I instantly realized there was an immediate health threat that warranted shelter in place or an evacuation because I was suffering from burning eyes and choking on the fumes. This led me to contact emergency response agencies to determine what releases were being reported by the CAFO, only to learn that it had not been reporting at all.

18. The challenge to the EPCRA reporting exemption for CAFOs is of fundamental importance to DWAZ, as information about pollution from CAFOs is critical to our advocacy, to our oversight of governmental activities related to CAFOs, and to the interests of our members.  Without this information, we cannot effectively conduct our advocacy activities or adequately inform our members about how to protect their health.

19. The failure of EPA to follow the Administrative Procedure Act's procedural requirements for notice and comment when it exempted CAFOs from reporting also harmed Don't Waste Arizona, as we normally would have filed comments, but have been illegally denied that opportunity.

20. There are many issues with the guidance that fly in the face of EPCRA and the intent of EPCRA to provide information to the public and physicians in the event of a release.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____9/20/18_____

_Stephen Brittle_

Stephen Brittle

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Rural Empowerment Association for
Community Help, et al.,

      Plaintiffs,

    v.

United States Environmental Protection
Agency, et al.,

      Defendants.

**CASE NO. 18-cv-02260-TJK**

**DECLARATION OF
LORNA PROPER**

**DECLARATION OF LORNA PROPER**

I, Lorna Proper, declare that if called as a witness in this action I would competently testify of my own personal knowledge, as follows:

1.  I live approximately 3 miles from Hickman's Family Farm located in Arlington, Arizona.

2.  When my husband and I first bought our house around 2010, we planned to rehab it and live there for about 2 years before moving back to our home in Tonopah, Arizona.  We began the rehab working mostly on Saturdays as my husband, Theron, worked full time for the Federal Reserve Bank in Phoenix.

3.  I am allergic to certain construction dust and as a result I was stuck out on the back patio mixing mortar mix and such for the ceramic tile job we were doing or running for supplies.  I spent several hours on the patio each weekend and even though Hickman's had a good size egg ranch we rarely, if ever, smelled it.  It took us about 2 years to complete our home and move in.

4.  In the meantime, Hickman's started the next phase of their expansion.  They built their feed mill, added more chicken barns, and also added the manure processing plant.  As they grew so did our problems.

5.  I used to be able to go outside and sit on my patio at any time and play with our dogs, but now I find myself trapped in my house.  The events at the Arlington Hickman's facility and the wind direction determine what odors we have to contend with.  At times it is a strong ammonia smell, other times it is the sulfur smell of rotten eggs or rotting meat.  Imagine walking into the largest locker room where they never clean it or remove the dirty laundry – it is like that, or worse.

6.  There are mornings when it reeks so bad outside that when I open the door to let the dogs out, they stop and give me a look like, "I don't have to go that bad" and stay inside.

7.  Many times I will open my door and the air is so toxic I have an instant asthma attack.  I have had to wear a respirator if I want to spend a little bit of time out back with the dogs.  This

causes our youngest dog to go nuts trying to take it off my face as he does not like it, not fun! Sometimes the air burns your mucus membranes and causes headaches and nausea. These symptoms seem to indicate something is wrong in our air as I do not experience these issues when I am on vacation or gone for the day.

8.   When we were getting to that 2 year mark of living in our Arlington home we were considering exactly when to put the house on the market and move back to our home in Tonopah. Well in November 2013, I heard a rumor that the Hickmans were buying land very near my home in Tonopah. I called my then boss, Michael Wirth, of Saddle Mountain RV Park and warned him that we may have a real problem here in Tonopah. After checking we found out that they had indeed purchased over 300 acres and planned to build a new facility on Indian School Road. This location puts the facility about one half mile from my Tonopah house. Well that convinced us that moving back to that house was no longer an option as we did not want to live that close to that facility. I knew that it would become intolerable. They started building the Tonopah facility in 2014.

9.   Now that the new facility has been built it has made living near the Arlington factory even worse as they truck the manure from millions of chickens from Tonopah to Arlington for processing. They also bring their ground up chickens: when the chickens are about 92 weeks old are no longer producing a sufficient quantity of eggs, they dispose of them.

10. I can testify to the fact that living near one of Hickmans' egg factories, which is not a family farm by any stretch of the imagination, is awful.

11. Ever since I had started smelling ammonia from the CAFOs (Concentrated Animal Feeding Operations) near me, I have wanted to know how much ammonia and hydrogen sulfide they were emitting. I wanted to know if the ammonia and hydrogen sulfide were being released in enough quantities to harm my health, as other people I know in the community have complained of adverse health symptoms that might be attributed to ammonia and/or hydrogen sulfide. I researched, and I

learned that these CAFOs are industrial in nature.  I also began to wonder what damage is being done to the environment.  Are there quantities of ammonia and hydrogen sulfide sufficient to warrant reporting under EPCRA?  Citizens have the right to know and understand what is happening in their neighborhood and what the consequences of living by such a facility are.

12. Is inhaling air with ammonia, hydrogen sulfide, manure particles, dust, dander, chicken feathers and God only knows what else, good for anyone to breathe?  Will the children going to the pre and elementary schools located about 3 miles from the Arlington facility be harmed by breathing this air?  Will the residents of Tonopah and Arlington living near these facilities suffer health issues from them?  These are questions we need answered.  What is in our air? Is it at a toxic level?  Is it sufficient that the Hickmans alone monitor their own emissions?  Are they trained in proper procedures and using the right equipment? Are they reporting accurate and true information? These are just a few questions that need to be addressed.

13. Every year it gets more difficult to live here.  It is a nice location, few neighbors and state trust land across the street with beautiful views.  We just cannot enjoy it because it has become unbearable to be outside at times and you never know exactly when the wind direction will change or the "fowl" odors will get unbearable.

14. My husband, Theron, used to work for the Federal Reserve as a Stationary Engineer, if they had released large quantities of ammonia into the air just once it would have had to be reported, addressed, and remedied immediately.  That does not seem to be the case at Hickmans.

15. If Hickmans were required to report its air emissions, I would be better informed about impacts to my and my husband's health, and we could take better steps to protect our health.  And our local emergency responders could use that information to protect our health as well.

16. If EPA had given me the opportunity to submit comments on whether Hickmans should be required to report its emissions, I would have commented that yes, of course they should have to

report their emissions, just like my husband's old workplace has to report emissions. But EPA did not give me that opportunity, and instead exempted all CAFOs without hearing from the public.

Respectfully submitted this _18_ day of October, 2018, in Tonopah, Arizona.

Lorna Proper

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Rural Empowerment Association for
Community Help, et al.,

                        Plaintiffs,

              v.

United States Environmental Protection
Agency, et al.,

                    Defendants.

**CASE NO. 18-cv-02260-TJK**

**DECLARATION OF
ABEL RUSS**

## DECLARATION OF ABEL RUSS

I, Abel Russ, declare and state as follows:

1. My name is Abel Russ, I am over 18 years of age, and I suffer from no impairment or disability affecting my ability to give truthful testimony. I have been an attorney at the Environmental Integrity Project (EIP) since September, 2010.

2. EIP is a non-profit organization based in Washington, D.C. and Austin, Texas, dedicated to ensuring the effective enforcement of state and federal environmental laws to protect public health and the environment from Animal Feeding operations (AFOs) and other large sources of pollution. EIP's offices are located at 1000 Vermont Avenue, NW, Suite 1100, Washington, D.C., 20005; and 1206 San Antonio Street, Austin, Texas, 78701; and EIP also has staff located in Maryland, Pennsylvania and Vermont.

3. EIP prioritizes work related to AFOs because these industrial facilities are a significant source of air and water pollution. AFOs emit many hazardous air pollutants, including ammonia, hydrogen sulfide, and volatile organic compounds. These pollutants are associated with numerous adverse public health and environmental impacts.

4. EIP's work takes many forms. We routinely monitor compliance with environmental statutes such as the Clean Air Act and the Clean Water Act, reviewing discharge monitoring data, comparing pollution loads to permit limits, and evaluating the impacts of pollution loads on air quality and water quality.

5. EIP also files petitions for rulemaking with the EPA, seeking stronger environmental regulation of AFOs. For example, together with a coalition of other environmental and public health organizations, EIP filed a petition asking EPA to regulate industrial AFOs as stationary sources of air pollutants under the Clean Air Act, and filed a separate petition asking EPA to list ammonia as a criteria pollutant under the Clean Air Act.

6. EIP's efforts rely heavily on access to information. Regulatory agencies can only effectively protect environmental quality if they have access to information, and citizens deserve to know how nearby sources of pollution may be affecting their health. Pollution data is often hard to synthesize, interpret, and use. EIP devotes considerable time and effort, using its technical and legal expertise, to making technical information available to the public and useful to state and federal agencies. This is true for all of the sources of pollution that we work with, including AFOs.

7. EIP operates on the premise that when the public learns that a company or facility is polluting the environment, or that regulators are failing to adequately regulate that pollution, the company is more likely to voluntarily eliminate or reduce its pollution and regulators are more likely to strengthen oversight. I am aware of at least one study showing that mandated reporting of toxic emissions is likely to result in reduced emissions and improved environmental performance. *See, e.g.*, Konar, S., et al., *Information as Regulation: The Effect of Community Right to Know Laws on Toxic Emissions*, 32 Journal of Environmental Economics and Management 109 (1997).

8. EIP uses public pollution data to advocate on behalf of the public for policies promoting environmental protection and the well-being of rural communities impacted by pollution from AFOs. EIP also regularly drafts data-driven reports about various industrial sources of pollution, including AFO pollution. This helps us fulfil our goal of empowering citizens exposed to AFO pollution by helping them gain access to environmental data for use in their community-based advocacy efforts.

9. EIP has been engaged in efforts to secure better pollution reporting from AFOs for over ten years. In 2008, EIP submitted comments to EPA opposing the Agency's exemption of AFOs from certain reporting requirements, including the requirements of the Emergency Planning and Community Right-to-Know Act (EPCRA). In 2009, EIP joined a legal challenge of that 2008 exemption as a petitioner. *See Waterkeeper Alliance, et al., v. United States Environmental Protection Agency*, Nos. 09-1017, 09-1104 (consolidated) (D.C. Cir., filed Jan. 15, 2009).

10. I am aware that in 2005, EPA entered into a consent agreement with a large number of AFOs whereby participating AFOs were granted immunity from EPA enforcement of certain reporting requirements (including EPCRA requirements) in exchange for their participation in a national study of AFO emissions. That study came to be known as the National Air Emissions Monitoring Study, or NAEMS.

11. EIP closely followed EPA's progress with respect to the NAEMS study because EIP has a strong organizational interest in ensuring that AFO pollution is accurately estimated and reported. In 2010, 2013 and 2016, EIP submitted Freedom of Information Act Requests to EPA seeking records associated with the NAEMS study.

12. In 2011, EIP released a report that analyzed NAEMS pollution data. See EIP,

    *Hazardous Pollution from Factory Farms* (Mar. 9, 2011), available at

    http://www.environmentalintegrity.org/reports/hazardous-pollution-from-factory-

    farms/.

13. In March and June of 2012, EIP submitted comments to EPA on draft Emissions

    Estimating Methodologies that the Agency developed pursuant to the 2005 consent

    agreement and in association with the NAEMS study, providing our professional

    opinions regarding the best ways to ensure accurate emissions estimates, but also

    expressing our strong organizational interest in having EPA finalize Emissions

    Estimating Methodologies as quickly as possible.

14. After more than ten years, EPA has not yet concluded the NAEMS study, or finalized

    any Emissions Estimating Methodologies. As a result, the public has virtually no way

    of knowing how much ammonia, hydrogen sulfide, volatile organic compounds, and

    other pollutants are being emitted from AFOs.

15. EIP has devoted significant organizational resources to trying to fill the information

    gap created by EPA. For example, in January, 2018, I authored an EIP report that

    analyzed ammonia emissions studies, including the NAEMS study and other

    published research, in order to provide the public with some sense of how much

    ammonia is emitted by AFOs that produce broiler chickens. See EIP, Ammonia

    Emissions from Broiler Operations Higher than Previously Thought (Jan. 2018),

    available at http://www.environmentalintegrity.org/reports/ammonia-emissions/. EIP

    concluded that a typical broiler operation on the Delmarva Peninsula emits between

    19 and 24 tons of ammonia each year. EIP is trying to compensate for the absence of

information caused by EPA's regulatory failures. However, EIP's organizational

interest in informing the public and evaluating the impact of AFO emissions on

communities and the environment would be much better served if we could provide

the public with analyses of actual emissions monitoring data, or with site-specific,

empirically based estimates of emissions.

16. I am aware that the D.C. Circuit Court of Appeals vacated EPA's 2008

CERCLA/EPCRA reporting exemption rule, and that EPA implemented that vacatur

in July, 2018. I am also aware that Congress exempted AFOs from CERCLA

reporting obligations in March, 2018.

17. I am aware that EPA, through guidance, is informing AFOs that they do not have to

report any releases under EPCRA. EPA's position deprives the public of critical

information about pollution releases that may affect their health, and it further

frustrates EIP's longstanding efforts to secure, for the public, information about such

releases.

18. If AFOs were required to publicly report their pollution releases under EPCRA, EIP

would use the information in a variety of ways to serve the interests of our clients and

the public, many of whom reside near AFOs. EIP would use this information to

improve transparency regarding industrial livestock operations in order to encourage

voluntary measures to reduce pollution releases and promote better regulation of

these releases.

19. In addition, one of EIP's longstanding objectives is to ensure environmental justice,

meaning that EIP seeks to ensure that the burdens of environmental pollution do not

fall disproportionately on low-income communities or communities of color. One of the first steps in ensuring that communities are not over-burdened is ensuring equal access to information about hazardous substances to which community members are potentially exposed. EPA's impermissible interpretation of EPCRA deprives low-income communities and communities of color of critical information about their air quality and the risks they face, while also minimizing the likelihood that polluting facilities will voluntarily reduce their emissions.

20. As explained above, EIP has a longstanding interest in ensuring that AFOs report their air emissions. If EPA had issued public notice and conducted a public comment period as required by the Administrative Procedure Act, EIP would have submitted comments to EPA opposing the adoption of the reporting exemption. But EIP was denied that opportunity because EPA did not follow the procedure required by law.

21. While EPA continues to obstruct public access to information, AFOs will continue to emit undisclosed amounts of toxic pollutants, communities will continue to live under a cloud of uncertainty about the risks they face, and EIP will continue to suffer from a lack of information that it could use to inform the public and regulatory agencies about AFO pollution.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 28th day of Sept., 2018.

Abel Russ, Senior Attorney

Environmental Integrity Project

7

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Rural Empowerment Association for
Community Help, et al.,

                           Plaintiffs,

                  v.

United States Environmental Protection
Agency, et al.,

                         Defendants.

**CASE NO. 18-cv-02260-TJK**

**DECLARATION OF
WENONAH HAUTER**

## DECLARATION OF WENONAH HAUTER

I, Wenonah Hauter, declare that I am over 18 years of age and competent to testify. Unless otherwise stated, I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1.    I am the Executive Director of Food & Water Watch (FWW), a position I have held since the organization's founding in 2005. In my capacity as Executive Director, I oversee and am intimately familiar with the organization's mission, membership, activities, and operations. My business address is 1616 P St. NW, Suite 300, Washington, D.C. 20036.

2.    In addition to being Executive Director of FWW, I also reside on a farm in the Chesapeake Bay watershed where we employ a diversified system of crop and animal production, including chickens. My experience living on the farm has made me acutely aware of the need for diversification and sustainability in our food production systems.

3.    I make this declaration in support of FWW's challenge to the U.S. Environmental Protection Agency's (EPA) unlawful guidance exempting animal feeding operations (AFOs) from emissions reporting requirements under the Emergency Planning and Community Right-to-Know Act (EPCRA) ("EPCRA Guidance").

4.    FWW is a national non-profit membership organization with its headquarters in Washington, D.C. and offices in Illinois, Maryland, New York, New Jersey, Oregon, California, Colorado, Florida, Pennsylvania, and New Mexico. We have more than one million members and supporters. Our organization's mission is to champion healthy food and clean water for all, stand up to corporations that put profits before people, and advocate for a democracy that improves people's lives and protects our environment.

2

FWW uses grassroots organizing, policy advocacy, research, communications, and litigation to further this mission.

5. One of our organization's primary purposes is to educate the public regarding food systems that guarantee safe, wholesome food produced in a humane, sustainable manner that simultaneously protect the environment. Integral to this purpose is working to both counter the many harms of our current food system and promote cleaner, healthier, and more equitable systems of food production. FWW advocates on behalf of the public for policies promoting environmental protection and the long-term wellbeing of communities.

6. FWW works to empower people through advocating for clean, healthy, and sustainable food systems. Part of our work within this mission is to ensure that our food production systems, including livestock production systems, operate sustainably with minimal impacts on both community and environmental health. Pollution from large animal feeding operations (AFOs), or factory farms, including air emissions subject to reporting under EPCRA, is one of FWW's priority issues.

7. We believe transparency is vital to all of our work, including our AFO work. We strive to obtain and provide citizen access to information about AFO activities and pollution data, including helping citizens obtain access to information about pollution from AFOs in their community. FWW relies heavily on access to public data about AFOs and AFO pollution to further our goal of increasing transparency about how factory farms operate, where they are located, and the pollutants they emit into communities and waterways, as well as to further our goal of reducing that pollution and improving EPA regulation of the AFO industry.

8.      We also believe that it is vitally important that the EPA fulfill its mission to protect our

      environment and communities from the harm of pollution from facilities like AFOs. We

      are aware that, to date, EPA has failed to properly oversee and regulate this industry,

      including its air emissions of ammonia, hydrogen sulfide, and other toxic pollutants.

      EPA's ongoing failure harms FWW and its many members.

9.      FWW is aware that EPA has previously illegally exempted many AFOs from EPCRA

      reporting requirements, has failed to enforce EPCRA reporting requirements against large

      AFOs, and has failed to finalize emissions estimating tools for AFOs to use to accurately

      estimate and report air emissions. FWW is also aware that EPA issued its informal

      EPCRA Guidance on October 25, 2017, revising its interpretation of EPCRA and

      declaring that AFOs are no longer required to report emissions. EPA subsequently issued

      updated Guidance, asserting a second basis for its exemption. As a result of these actions

      and failures to act, many AFOs have never reported emissions data under EPCRA and the

      public has very little information about AFO emissions and community exposures to

      those emissions.

10.     One of our organizational responsibilities is to provide information to members regarding

      AFOs and their pollution.

11.     To that end, we maintain a website and communications network whereby we keep our

      members, policy makers, media, and the public informed about the current model of food

      production in the United States, including the operation of AFOs. Access to publicly

      reported pollution documents and other records related to the AFO industry is an integral

      part of our work.

12.    To help fill gaps in public access to information about factory farms, FWW created and
       maintains a Factory Farm Map, www.factoryfarmmap.org, which maps public data about
       the locations and density of livestock production across the U.S., which FWW obtains
       through Freedom of Information Act (FOIA) requests to the U.S. Department of
       Agriculture. The Map also contains information about the changes in the industry over
       time and facts.

13.    FWW also regularly drafts data-driven policy reports, white papers, fact sheets, and web
       pieces about the factory farm industry and its pollution. Access to information about
       individual AFOs and their pollution is essential to this work. Due to the lack of air
       emissions reporting from AFOs, however, it is impossible for our organization to
       understand the true breadth of AFO air pollution and the harmful impacts of that
       pollution, and subsequently to provide this information to our members and the public.

14.    FWW advocates extensively for greater transparency and regulation of AFO air
       emissions to fill these gaps. This work includes advocating against the 2018 federal Fair
       Agricultural Reporting Method (FARM) Act, which exempted AFOs from emissions
       reporting requirements under the Comprehensive Environmental Response,
       Compensation, and Liability Act; campaigning in support of Maryland's proposed
       Community Healthy Air Act legislation to measure AFO air emissions; petitioning the
       Iowa Environmental Protection Commission to increase local control and air pollution
       protections over factory farms in Iowa; and petitioning EPA to strengthen its Clean Water
       Act regulation of CAFOs, including controlling deposition of pollutants like ammonia,
       which are emitted via ventilation systems, into waterways.

15. FWW's members understand that there is inadequate information about air emissions from AFOs available to the public. One consequence of these gaps in information is that our members are exposed to unknown quantities of hazardous air pollutants in their communities and at their homes. Their ability to use and enjoy their homes, as well as their aesthetic and recreational interests in their communities, are negatively impacted. EPCRA's reporting requirement for AFOs is critical to helping close this information gap about air emissions exposures.

16. Air pollution from AFOs impacts communities' quality of life and public health, air quality, and even water quality across the country. AFO emissions contain hundreds of gases and compounds, including ammonia and hydrogen sulfide, both of which are subject to reporting requirements under EPCRA if emitted in sufficient quantities.

17. Ammonia is a potent respiratory irritant with an offensive odor, and can cause eye, nose, throat, and chest irritation, headache, dizziness, and general discomfort. Ammonia gas reacts with other gases to form ammonium aerosols, which are extremely small particles that are inhalable and increase the risk of aggravated asthma symptoms, bronchitis, heart attack, and premature death. Ammonia emitted by AFOs also subsequently deposits on land and waterways, where it contributes to nitrogen pollution. Nitrogen is a nutrient responsible for numerous impairments of waterways across the country, causing algae blooms and areas known as dead zones that are devoid of oxygen needed to sustain fish and other aquatic life.

18. Hydrogen sulfide is a dangerous neurotoxin with the odor of rotten eggs, and causes headaches, nausea, aggravated asthma symptoms, convulsions, and eye and skin irritation. Hydrogen sulfide is heavier than air, and sinks in valleys and other low places,

where it can adversely affect health and quality of life. Despite its odor, sense of smell alone is insufficient to detect hydrogen sulfide and warn of potentially harmful conditions, because continuous low-level exposure can cause people to lose their ability to smell the gas. It can also prove fatal, and has been responsible for several incidents of asphyxiation and death in and near manure pits at large AFOs.

19.    As an organization that works to inform the public about pollution from AFOs and partner with community groups and rural residents to mitigate the harms of this pollution, FWW is concerned that the EPCRA Guidance will permanently prevent access to a critical source of information about AFO emissions and pollution exposure for rural communities impacted by factory farms. In this absence of nationwide emissions reporting under EPCRA, FWW is largely unable to provide emissions information to our members and the public, despite our efforts to obtain similar information by searching for alternative sources of data or estimates of AFO air emissions and advocating to fill the gaps created by EPA through state legislation, such as the proposed Community Healthy Air Act in Maryland.

20.    If EPA had begun enforcing EPCRA's reporting mandate, rather than issuing the EPCRA Guidance, FWW would have far more information about AFO emissions to use in our communications and advocacy work. Specifically, FWW would benefit from reinstatement of EPCRA's AFO reporting requirements because it would provide FWW with the opportunity to obtain emissions estimates reported by AFOs directly from responsible agencies. FWW could analyze this information and provide the data and analysis to our members. This would shed significant light on hazardous emissions exposures in rural communities across the country, increasing transparency around the

7

impacts of an unsustainable industry whose air pollution remains virtually unregulated. These issues are closely related to FWW's mission.

21.    FWW is further harmed by EPA's failure to follow proper procedure in adopting its new interpretation of EPCRA and exempting AFOs from reporting requirements. FWW submitted comments to EPA on the first iteration of the EPCRA Guidance, but EPA did not respond to public comments or otherwise follow the procedures required by the federal Administrative Procedure Act (APA) for rulemakings. This inadequate public process deprived FWW of information about the purported bases for EPA's actions and about what other comments EPA received and did or did not take into consideration. EPA did not even solicit informal comments on its updated Guidance, and thus FWW could not submit comments or other information opposing EPA's newly asserted basis for the exemption. FWW relies on the APA's procedural requirements to effectively engage in advocacy on behalf of our organization and our members and to preserve our rights to challenge unlawful agency actions. EPA's circumvention of rulemaking requirements denied FWW of its public participation and other procedural rights.

22.    FWW believes that the nation's environmental laws have been successful in large part due to transparency. An open government that requires AFOs to provide basic information estimating their air pollution emissions would greatly benefit our work and promote FWW's goals and mission. Transparency would empower our members who are adversely affected by AFOs. FWW would use this information to advocate for stronger regulation of dangerous AFO air pollution and to otherwise help address the suffering that our members living on the fence lines of AFOs are forced to endure. We believe that EPA must reinstate emissions reporting requirements and enable citizens to access

8

information about what toxic pollution they are being exposed to, if it is to get closer to fulfilling its mandate to protect the nation's citizens from the dangers of AFOs.

I hereby certify that the facts set forth above are true and correct to the best of my knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Wenonah Hauter

Dated: 9/24, 2018

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Rural Empowerment Association for Community Help, et al., | **CASE NO. 18-cv-02260-TJK** |
| Plaintiffs, | |
| v. | **DECLARATION OF** |
| United States Environmental Protection Agency, et al., | **LISA INZERILLO** |
| Defendants. | |

## DECLARATION OF LISA INZERILLO

I, Lisa Inzerillo, declare that I am over 18 years of age and competent to testify. Unless otherwise stated, I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1.    I reside at my family's fourth generation family farm in Princess Anne, Maryland, where I have lived for the past eight years. I am a member of Food & Water Watch (FWW), and I make this declaration in support of FWW's Motion for Summary Judgment in *REACH, et al., v. EPA, et al.*, which challenges EPA's unlawful guidance exempting livestock operations from requirements to publicly report toxic air emissions under the Emergency Planning and Community Right-to-Know Act (EPCRA).

2.    I have lived on the Delmarva Peninsula for my entire life. The land, ocean, and bays are incredibly beautiful. Twenty years ago, I inherited my family's farm from my grandmother, and my husband and I have lived there ever since. I spent most of my time on the farm growing up, where we raised cattle and chickens and grew vegetables. I love my farm, and used to be extremely happy living on it.

3.    We own about 70 acres, and had a lot of plans for our property. One of our main plans was to build a pole barn that could be used as an outdoor event space on the farm for weddings, parties, scout group campouts, and other gatherings so that we could share our land with our community. As part of this plan to create a beautiful event space, my husband dug a pond on the property near where we planned to build the barn. This cost us about $13,000. Because managing 70 acres will likely become too much work for us when we are older, we also intended to eventually build a house on a smaller lot on our land, move there, and sell some of our other acreage.

2

4.     About three years ago, a six-house broiler chicken concentrated animal feeding operation
       (CAFO) was built across the street from our house, to our south. Each house has 18 fans
       on it that blow emissions out of the chicken houses, and many of these are directed at my
       property and home. The houses combined are approximately the size of a Super Walmart.
       The closest chicken house is only about 300 feet from our property, and about 1,000 feet
       from our house. This is just the closest of many CAFOs near my home; there are a total
       of about 108 broiler chicken confinement buildings within three miles of us.

5.     The CAFO has had a huge, detrimental impact on our quality of life, health, and ability to
       use and enjoy our home and property. Frequently, including when the wind blows in our
       direction, when it is hot in summer, when the air is very still, and when it is cloudy or
       foggy, the stench and air pollution from the facility become oppressive and linger in the
       air over our farm and home.

6.     We never open our windows anymore, because when the air pollution is bad, allowing it
       in makes our home unbearable. And even when it is not bad, we cannot leave windows
       open because the weather or wind could change and let the odor and pollution into our
       home unexpectedly.

7.     We built two porches on our barn because we love sitting outside and looking out on our
       farm and the Eastern Shore. But the CAFO's fans are directed right at our porches, and it
       is no longer enjoyable to sit outside much of the time. As a result, the CAFO has driven
       us into our home and we don't use our porches nearly as frequently as we used to.

8.     Sometimes when I cannot avoid being outside, the ammonia emissions are so strong that
       they make my eyes burn. The smell and pollution from the CAFO can be so strong that it
       is physically sickening, and makes me feel like I am coated in it. When I walk my dog

3

while the pollution is bad, the smell lingers on me and her after we go back indoors. At night when we have the porch light or our car headlights on we can even see particles of pollution, dust, and debris emitted into the air from the CAFO, falling like snow. We do not know exactly what is in these particles, or how they may be affecting our health.

9.   My husband and I have both experienced health problems since the CAFO began operating. We have both been sick more frequently than we used to be. Both of us have allergies, and my allergic reactions have been far more frequent than they were before the CAFO began operating. My doctor has recommended that I take my allergy medication and nasal spray every day, instead of every once in a while, which had been sufficient in the past. I now also suffer from chronic sinus infections that I never had before, and my husband, a medical doctor, has had bronchitis several times since the CAFO began operating across the street. I worry that the air emissions from this CAFO and other CAFOs near our home are harming our health, and that we lack the information we need to better protect ourselves from allergy attacks, sinusitis, respiratory illness, and other health impacts.

10.  The CAFO and its air pollution have also completely changed our plans for our property. We stopped working on creating an event space and decided not to build a pole barn by our pond, because our farm is no longer a desirable location for weddings, scout trips, or other events due to the frequent foul odors. We also no longer plan to move to a smaller parcel of our property, because the CAFO has made our land and farm so undesirable that we will likely be unable to sell other parts of our property. Having a CAFO across the road and many more in the surrounding area has harmed our property value and, although we had planned to live on a part of our farm for the rest of our lives, we now realize we

4

will probably have to eventually buy a home elsewhere and move even if we cannot sell any of our land.

11. I am aware that ammonia chemically reacts with other pollutants to form fine particle pollution that is extremely dangerous and contributes to the risk of heart disease and premature death. I am not able to get the information I need about whether emissions from the CAFO and other CAFOs in the area are contributing to these threats. I am also aware that ammonia can re-deposit and contribute to nitrogen water pollution, which is already a major problem on the Eastern Shore and throughout the Chesapeake Bay watershed. We also lack adequate information about what impact the area's CAFOs and their ammonia emissions are having on the health of our local waterways.

12. Due to the lack of information about what CAFO air pollution we and other Eastern Shore residents are being exposed to, I coordinated with researchers in 2016 and 2017 to enable them to conduct some short-term air quality monitoring for ammonia on our property near the CAFO. The monitoring was not comprehensive enough to inform us about our average exposures, how we could best avoid the worst exposures, or the potential risks of those exposures over time, but showed that ammonia traveled quite a ways from the chicken houses, and that ammonia levels on our property were elevated compared to background samples taken in a nearby location without CAFOs in close proximity. The ammonia levels at the monitor on our farm spiked to high levels more than once during the monitoring.

13. For the past two years, Maryland legislators have introduced a bill, the Community Healthy Air Act, which would require the state to conduct more extensive air quality monitoring around CAFOs to help fill the gaps in information about what these

operations are emitting and what risks their emissions pose to public health and community well-being. The bill has not passed, but I have spent significant time and energy preparing and providing testimony to legislators about our experience breathing unknown amounts of ammonia, hydrogen sulfide, and other pollutants from the CAFOs surrounding our home. I have testified in support of this bill several times, and once traveled back to Maryland during a trip to Florida just to testify at a hearing that was scheduled on short notice. I have been willing to spend significant time and resources advocating for the Community Healthy Air Act and other policy measures because EPA has failed to require livestock operations to provide information to me and the rest of the public about their air emissions, and as a result we remain in the dark about our exposures to toxic pollution.

14. Having more information about what the CAFOs in my community are emitting into the air would help me understand the risks of my and my husband's overall exposures to air pollution and make decisions about how to use and enjoy our farm as much as possible without endangering our health. We would be able to better plan when we could work outside and have people over to our home. This information would also help me more effectively advocate for common sense regulation of CAFO air pollution and CAFO siting, including measures to reduce air emissions vented through confinement fans and restrictions on the concentration of these operations in certain communities, like mine.

15. EPA's exemption guidance not only prevents me from obtaining information about pollution that I need to protect my health, but it also denied me of my right to fully participate in a public process because EPA did not go through a rulemaking. As an informed and engaged citizen who testifies before my elected officials and participates in

6

community and advocacy organizations, I am harmed by EPA's refusal to allow me to

tell my story through public comments that EPA must consider before making a final

decision about what information animal feeding operations must report.

I hereby certify that the facts set forth above are true and correct to the best of my

knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. §

1746.

Lisa Inzerillo

Dated: 9 - 27 , 2018

7

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Rural Empowerment Association for
Community Help, et al.,

                    Plaintiffs,

           v.

United States Environmental Protection
Agency, et al.,

                  Defendants.

**CASE NO. 18-cv-02260-TJK**

**DECLARATION OF
ROSEMARY PARTRIDGE**

## DECLARATION OF ROSEMARY PARTRIDGE

I, Rosemary Partridge, declare that I am over 18 years of age and competent to testify. Unless otherwise stated, I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1.    I reside on a family farm in rural Iowa outside the town of Wall Lake in Sac County. I have lived there with my husband for 40 years. I am a member of Food & Water Watch (FWW), and I make this declaration in support of FWW's Motion for Summary Judgment in *REACH, et al., v. EPA, et al.*, which challenges EPA's unlawful guidance exempting livestock operations from requirements to publicly report toxic air emissions under the Emergency Planning and Community Right-to-Know Act (EPCRA).

2.    When I moved to Sac County 40 years ago, the community was mainly made up of small family farms, including many independent hog farmers who owned their livestock. During the time that I have lived here, agriculture in the county and in my neighborhood has become far more industrialized. There are fewer independent, small family farmers, and most of the hogs raised in the county are now raised in confinement in large animal feeding operations (AFOs) where the animals are owned by corporate integrators. There are currently approximately 42,500 finishing (near market-weight) hogs within four miles of our house. These hogs are in concentrated animal feeding operations (CAFOs) housing approximately 2,500 hogs each. About 10,000 of these hogs are within half a mile of our house; one large confinement operation is about half a mile to our west, and another is about a mile to our east, and each of these houses approximately 5,000 finishing hogs. These operations spread millions of gallons of liquid manure on fields surrounding my farm and directly across from my house. The field across from our house receives one

2

and a half million gallons of liquid manure every other year. Our bedroom is about 175 feet from where the manure is spread.

3.    The influx of CAFO development in our community has harmed our quality of life and affected how we live our lives in numerous ways. One of the most serious problems is that we are frequently subjected to significant air pollution – including ammonia, hydrogen sulfide, particulates, and odors – emitted by the CAFO confinement buildings, waste storage facilities, and land application fields.

4.    We frequently cannot spend time outside on our farm due to the air pollution, particularly on hot summer evenings. When it begins cooling down at night, an inversion layer often forms where warmer air overlies cooler air, preventing mixing that would allow the air pollution to dissipate and causing the ammonia and other emissions to sink and linger over our house and farm. When this happens, if we have windows or the patio door open we have to immediately shut them to keep the odor out. But even when it is not unbearable, we can almost always smell hydrogen sulfide. We recognize the odor, which is like the smell of "rotten eggs," and it causes us to feel sick if we are exposed for more than a few minutes.

5.    My husband was diagnosed with chronic obstructive pulmonary disease (COPD) after the two CAFOs nearest our home began operating. Ammonia irritates it, making it difficult for him to breathe. Summer nights are the worst times for the emissions, particularly after 8:00 p.m. As a result, he often stays at our lake cottage at night to avoid the emissions, even though we have work to do on the farm, and returns during the next day. The cottage is only eight miles north of our home, but because it does not have any CAFOs

close to it, it does not have the emissions we have at home. The night breezes from the lake also help keep the air a little cleaner.

6.   When a CAFO is spreading manure on the fields across the street from our house, the air pollution has sometimes been so bad that we have both had to leave our home. But the pollution continues after spreading. Some odor can last for months under certain conditions, such as when the manure is applied to frozen or partially frozen ground. The soil doesn't seal in the manure under these conditions, and the emissions can continue until a hard freeze or until snow covers it.

7.   I am also concerned about the air emissions we are exposed to that we cannot always smell or identify, and worry about the impacts those emissions may be having on our health. My doctor has expressed similar concerns. I am aware that people chronically exposed to hydrogen sulfide can lose their ability to smell it, and realize that could happen to me and my husband. If that happens, we will be even less able to take precautions like going indoors or leaving home when the emissions may be most harmful to our health.

8.   The air pollution is not constant and is unpredictable, which makes it impossible to plan when we can safely invite people to our home. We enjoy having guests to sit on the porch and enjoy the farm and the breeze. When we have guests and the air pollution gets bad, they often have to leave. I had visitors from Alabama in October when the manure was being spread, and it was so embarrassing to hear their children complain that it smells like poop at Grandma Rosie's house, but yes, it did.

9.   This summer we also hosted visitors from Texas and California, and they got sore throats from the CAFO emissions. I have a sore throat more often than not from the pollution

4

when it is bad, even though I am not sick. When my daughter visits, even when the pollution and odor are not at their worst, the hydrogen sulfide emissions make her nauseated. Several years ago, we hired a roofer, who was working while one of the CAFOs was spreading manure on nearby fields. The air emissions were so bad that he began throwing up and could not continue working. I had to tell him to stop and go home.

10. Sometimes we also smell dead animals and other foul odors from the CAFOs, and it disturbs me that we do not know what we are being exposed to and breathing on a daily basis.

11. Although we do not know exactly what we are being exposed to on our farm and in our home, we know that these emissions are extremely toxic and dangerous at high levels. My close friend's son used to work at a CAFO to earn the extra income that he needed to continue farming. He was spreading manure when the tank became plugged. After he went into the waste storage area to fix it, he became overcome with hydrogen sulfide and asphyxiated and died. In rural communities with many CAFOs, such accidental deaths due to hydrogen sulfide are not uncommon.

12. My own grandson, like many young people in our community, works at a CAFO, and has no protection at all from the emissions he is exposed to on a daily basis. I fear for his safety. Many others in our area work at CAFOs because there are very few other jobs for those who want to stay in the community, and they are not aware of what they are exposing themselves to because that information is not available. These CAFOs are visited daily by feed truck drivers, crews that load and unload the hogs, rendering truck drivers that load and haul away the dead animals, the regular workers who check on the operation once a day, and the workers who remove and spread the liquid manure in the

fields. All of these people are exposed to the emissions at high levels, and there is no way for them to know how much they are being exposed to or what the possible health effects are until it is too late.

13. Because the air pollution is affected by the weather, some months and years are worse than others. This summer we had record-breaking heat waves in Iowa, and very little wind to alleviate the inversions that occur after high temperature days. Hot summer days are becoming more and more frequent, and as a result our exposures to odors and toxic emissions will likely continue to worsen over time.

14. I have worked to learn more about CAFO pollution in my community and fill the gaps in information created by lax EPA and state oversight of this industry's water and air pollution. For example, EPA has previously proposed, and then withdrawn, a rule that would have collected basic information about CAFOs, including where they are and what they are discharging, leaving me and other rural citizens in the dark about the safety of our water. Because EPA and Iowa's Department of Natural Resources have failed to track and report this information to the public, I became a trained IOWATER volunteer water monitor years ago. Through this work, I was seeking to at least partially fill information gaps about what CAFOs are discharging into my local waterways.

15. EPA's recent guidance similarly leaves me and my neighbors in the dark about what toxic CAFO emissions we are being exposed to. I am unable to even partially address this lack of information myself by monitoring the air quality at my farm for ammonia and hydrogen sulfide, much less monitor the total quantity of these pollutants emitted by specific nearby CAFOs. Nor should I or other citizens have to expend time and resources attempting to estimate exposure to toxic emissions from industrial livestock operations.

6

EPA is responsible for ensuring that polluters like CAFOs report this information as the law requires. These facilities are factories, not farms, and their pollution should be reported and regulated like air pollution emitted by smokestacks.

16.    If I had access to reports of emissions from the CAFOs in my community, and therefore knew more about what my husband and I are being exposed to, I would be able to make wiser decisions about when we need to leave our house, avoid having people over to our home, or avoid being outside on our farm. It would also help me and my husband inform our doctor about issues that may be affecting our health, and could help us determine whether the CAFO emissions are causing or contributing to our ongoing health issues.

17.    Having access to publicly reported data about livestock emissions would also help me educate my community about how they can similarly act to better protect their health and avoid the worst toxic exposures to ammonia and hydrogen sulfide. I believe that many of my neighbors are unaware of the risks of exposure to CAFO emissions, and if they knew more about the pollution in our community they could be smarter about their own activities and more informed about how they can reduce their exposures.

18.    Having access to the required emissions reports would also help me better educate policymakers about the need for real regulation of CAFO air pollution. This transparency would not only make people more aware of the scale and impact of this pollution, it would also help them stand up and demand policy changes, including requirements that livestock operations use technology to achieve actual reductions in emissions and restrictions on locating CAFOs so close to residences.

19.    Air pollution from livestock operations does not get enough attention from policymakers, and I believe this is in part because we have so little information and transparency about

what these facilities are emitting. But these emissions are one reason rural home values – including mine – are declining and rural towns are depopulating. I do not want to have to leave my farm like so many of my neighbors have, and I want my grandchildren to be able to farm here without risking their health and wellbeing. Having the information about CAFO air pollution we need to protect our home, health, and quality of life is essential to my ability to stay on my farm and try to make my family and community safer.

20.    I regularly engage my local, state, and federal decision-makers on issues related to transparency and regulation of pollution from industrial livestock operations. I have testified before my state Environmental Protection Commission, written letters to the editor, spoken in person to my Sac County Supervisors and at public meetings, as well as signed numerous petitions to agencies conducting rulemakings, asking them to take or not take specific policy actions. As a civically engaged citizen who participates in public processes to have my voice heard and protect my rights, I am also harmed by EPA's failure to use a rulemaking process to adopt its new interpretation of EPCRA's requirements. EPA's improper use of guidance for this action denied me of my right to submit a public comment in opposition to EPA's new approach and explain the many benefits I would gain from more transparency and information about the CAFO air emissions that I am exposed to. I would benefit from the opportunity to participate in a rulemaking on EPA's application of EPCRA to AFO air pollution.

I hereby certify that the facts set forth above are true and correct to the best of my knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

8

_Rosemary Partridge_

Rosemary Partridge

Dated: _Sept. 25,_ ____, 2018

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RURAL EMPOWERMENT ASSOCIATION
FOR COMMUNITY HELP, et al.,

        Plaintiffs,

        v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Civ. No. 1:18-cv-02260-TJK

**DECLARATION OF
CHRIS HOLBEIN IN SUPPORT
OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

1

## DECLARATION OF CHRIS HOLBEIN

I, Chris Holbein, am over 18 years of age and am competent to testify. I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1. I serve as Public Policy Director of Farm Animal Protection for the Humane Society of the United States ("HSUS"). I have worked for HSUS from 2013 to present. I am responsible for coordinating our public policy efforts to improve the welfare of farm animals.

2. In my capacity with the organization, I am familiar with HSUS' structure, function, purpose, and membership. I have personal knowledge of the following based on my experience and based on materials I have reviewed.

3. HSUS is a national nonprofit organization that promotes the protection of all animals; it has millions of members and constituents nationwide, including members in all 50 states and in the District of Columbia. HSUS is headquartered in the Washington, D.C. area, and has offices, affiliates, or staff throughout the country. Since its inception in 1954, HSUS has actively advocated for better laws to protect animals and their environment; conducted campaigns to combat animal abuse and promote strong animal welfare policies; and advocated against practices that injure, harass, or otherwise harm animals. Specifically, with its mission to create a humane and sustainable world for all animals—including people and their communities—HSUS endeavors to ensure that its members are aware of, and not injured by, practices that can result in animal feeding operations ("AFOs") releasing or otherwise discharging pollutants into the natural environment.

4. HSUS' work on the issue of farm animal welfare—and its relation to the environment and public health and safety—is a top organizational priority. In addition to the Farm Animal Protection team of which I am a part, HSUS employs veterinarians and a PhD animal behaviorist,

2

who, along with other experts and HSUS staff, focus on the animal welfare, human health, and environmental impacts of industrialized animal agriculture.

5. HSUS' farm animal welfare campaign is strongly committed to educating the public about pollution from AFOs and the consequences these operations have on the health and quality of life of the communities surrounding them. Due to the amount of animal waste an AFO can produce, the number of animals it maintains, and common AFO waste management practices, these facilities can generate and release numerous environmental pollutants, including ammonia and hydrogen sulfide. Such emissions from industrial farms affect not only wildlife and farm animals, but also the neighbors, independent farmers, and employees of these farms.

6. Exposure to ammonia and hydrogen sulfide emissions can cause numerous human health problems, including respiratory symptoms, nausea, headaches, exacerbated asthma, eye irritation, and effects on mood. HSUS has members throughout the United States, including members who work and reside in communities neighboring AFOs, and they are concerned about the negative impacts these emissions could have on their health and the health of their families and communities.

7. The organization's members rely on HSUS for information regarding the impacts of animal agriculture on human health, the environment (including wildlife), and farm animal welfare. And the organization engages in efforts to mitigate these impacts on behalf of its members. To these ends, HSUS has invested considerable organizational resources in public education, research and investigation, and litigation concerning farm animal welfare, public health, and the environment. *See, e.g.*, HSUS, *Factory Farming in America: The True Cost of Animal Agibusiness for Rural Communities, Public Health, Families, Farmers, the Environment, and Animals, available at* http://www.humanesociety.org/assets/pdfs/farm/hsus-factory-farming-in-

3

america-the-true-cost-of-animal-agribusiness.pdf; HSUS, *An HSUS Report: Human Health Implications of Non-Therapeutic Antibiotic Use in Animal Agriculture, available at* http://www.humanesociety.org/assets/pdfs/farm/HSUS-Human-Health-Report-on-Antibiotics-in-Animal-Agriculture.pdf; HSUS, *An HSUS Report: The Impact of Industrialized Animal Agriculture on Rural Communities, available at* http://www.humanesociety.org/assets/pdfs/farm/hsus-the-impact-of-industrialized-animal-agriculture-on-rural-communities.pdf; HSUS, *An HSUS Report: The Impact of Industrialized Animal Agriculture on the Environment, available at* http://www.humanesociety.org/assets/pdfs/farm/hsus-the-impact-of-industrialized-animal-agriculture-on-the-environment.pdf; *see also Humane Soc'y of U.S. v. HVFG, LLC*, No. 06 CV 6829(HB), 2010 WL 1837785 (S.D.N.Y. May 6, 2010); *Avila v. Olivera Egg Ranch, LLC*, No. 2:08-cv-02488-JAM-KJN, Dkt 1 (E.D. Cal. Oct. 20, 2008).

8. In addition, HSUS supports public policies addressing AFOs' environmental, health, and animal welfare impacts at the federal, state, and local levels. To this end, HSUS regularly drafts and participates in sign-on letters, mobilizes its members and other organizations with similar interests, participates in coalitions to support or oppose proposals on key issues, works directly with legislators and agency officials, and provides testimony before legislative bodies.

9. Relatedly, HSUS actively participates in the federal regulatory process with respect to AFOs and their impacts by submitting comments on relevant rulemakings and other regulatory actions, petitioning agencies for regulatory actions, and challenging unlawful agency actions. For instance, HSUS, together with a coalition of environmental and public health organizations, petitioned the Environmental Protection Agency ("EPA") to regulate AFOs under the federal Clean Air Act as stationary sources of air pollution. *See* HSUS et al., *Petition to List Concentrated*

*Animal Feeding Operations Under Clean Air Act Section 111(B)(1)(A) of the Clean Air Act, and to Promulgate Standards of Performance under Clean Air Act Sections 111(B)(1)(B) and 111(D)* (Sept. 21, 2009), *available at* http://www.humanesociety.org/assets/pdfs/litigation/hsus-et-al-v-epa-cafo-caa-petition.pdf. The petition urged EPA to hold industrial animal feeding operations accountable for the harm they inflict on local communities, independent farmers, and the environment, and discussed how reduction of emissions from these operations will improve human health, reduce suffering of farm animals, protect habitat for wildlife, and reduce the effects of climate change. HSUS, together with a coalition of environmental and public health organizations, also petitioned EPA to list ammonia as a criteria pollutant under the federal Clean Air Act due to the substantial impacts of ammonia on human health and the environment. *See* Envtl. Integrity Project et al., *Petition for the Regulation of Ammonia as a Criteria Pollutant under Clean Air Act Sections 108 and 109, available at* http://www.environmentalintegrity.org/documents/PetitiontoListAmmoniaasaCleanAirActCriteriaPollutant.pdf.

10. In addition, HSUS, with a coalition of environmental groups, filed a challenge against a rule that EPA promulgated in 2008 under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and Emergency Planning and Community-Right-to-Know Act ("EPCRA"). This rule exempted most farms from reporting air releases of hazardous substances emitted by animal waste. HSUS, with other nonprofits and concerned citizens, first raised its concerns about the lawfulness of the rule through comments to EPA during the rulemaking process. HSUS and the coalition ultimately prevailed in their legal challenge; the U.S. Court of Appeals for the D.C. Circuit vacated the 2008 rule. *Waterkeeper All. v. Envtl. Prot. Agency*, 853 F.3d 527 (D.C. Cir. 2017).

11. HSUS, in collaboration with environmental and public health focused nonprofits, also submitted comments in response to the Interim Guidance EPA issued for AFOs regarding their EPCRA and CRCLA reporting obligations after the 2008 rule was vacated. *See* Letter from Earthjustice et al. to Envtl. Prot. Agency re: CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms (Nov. 22, 2017); Letter from Food & Water Watch et al. to Envtl. Prot. Agency re: Interim Guidance on CERCLA and ECPRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms (Nov. 22, 2017).

12. The varied work HSUS undertakes with respect to industrialized animal agriculture is central to the organization's mission and to protecting HSUS members from the deleterious impacts of AFOs on their lives, animals, and property, as well as on the environment and the habitats of the wild animals our members cherish. HSUS often relies upon information about pollutants released from AFOs when it engages in this work to protect animals, disseminate information to the public and our members, and pressure authorities for changes regarding pollutant releases.

13. I am aware that EPCRA is intended to provide the public—including HSUS and its members—and government authorities with access to information about industrial facilities' releases of extremely hazardous substances above certain threshold amounts. I am also aware that ammonia and hydrogen sulfide are classified as "extremely hazardous substances" under EPCRA. Additionally, I am aware that EPCRA requires the owner or operator of a facility to report the release of more than 100 pounds of ammonia or hydrogen sulfide per day to the relevant local and state authorities. I am aware that EPCRA further requires this reported information to be made available to the general public.

14. AFOs can release more than 100 pounds of ammonia or hydrogen sulfide into the air per day. I understand that EPA's Interim Guidance exempts AFOs from reporting, to relevant state and local authorities, the specific information required by EPCRA about these releases, which also prevents this information from being made available to the general public, including HSUS and its members.

15. The EPCRA reporting exemption for AFOs in EPA's Interim Guidance harms HSUS' members and the organization itself because it deprives both HSUS and its members of information to which they are entitled under EPCRA, because it could lead to adverse health impacts for HSUS members living or working near AFOs, and because the exemption's promulgation deprived HSUS of its procedural rights.

16. The EPCRA reporting exemption for AFOs deprives HSUS members of information, including the types and amounts of extremely hazardous substances, such as ammonia and hydrogen sulfide, released from AFOs.

17. EPA's exemption of AFOs from EPCRA reporting could also cause harm to the health of HSUS members living or working near AFOs. Exposure to ammonia and hydrogen sulfide emissions can be harmful to human health, causing respiratory symptoms, nausea, headaches, exacerbated asthma, eye irritation, and effects on mood. If HSUS members do not have access to information about the types and amounts of extremely hazardous substances released from AFOs, they may not be able to take steps to protect themselves from these adverse health impacts. In addition, EPA's EPCRA reporting exemption harms HSUS members because it deprives them of protections they otherwise would have if local response authorities received release reports from AFOs and were better informed about the sources of toxic emissions in their jurisdictions. Further,

this lack of information could undermine opportunities for citizen-driven legal and legislative actions aimed at preventing the health and environmental harms caused by AFOs.

18. Further, HSUS is harmed because, without information about extremely hazardous substances released from AFOs, the organization is limited in its ability to adequately educate and serve its membership, protect animals and wildlife from further harm, and advocate for meaningful change in the regulation of pollution from AFOs, all of which negatively impact its organizational mission and goals. In short, when HSUS cannot obtain this information—because EPA has exempted AFOs from EPCRA reporting requirements—work central to HSUS' mission is made impossible. Ensuring that HSUS has reasonable access to information about the releases of extremely hazardous substances from AFOs, such as ammonia and hydrogen sulfide, will save HSUS the time, money, and effort associated with attempting to obtain this information through other means, to the extent it can be obtained at all.

19. HSUS has also suffered harm because EPA did not engage in the rulemaking process required by the Administrative Procedure Act ("APA") before exempting AFOs from EPCRA reporting. Although the agency accepted comments on the Interim Guidance implementing this exemption, EPA did not do so through public notice in the Federal Register as required by the APA, and the exemption went into effect immediately, thereby depriving HSUS, on behalf of its members, of the opportunity to meaningfully comment on the EPCRA reporting exemption. The EPA's approach with the EPCRA reporting exemption runs counter to the purpose of an APA-mandated comment period; such comment periods are meant to allow interested members of the public an opportunity to provide an agency with information, concerns, and criticism before a rule goes into effect.

20. Had EPA engaged in proper notice-and-comment rulemaking to promulgate the EPCRA reporting exemption, HSUS would absolutely have submitted comments. HSUS would have submitted comments demonstrating that EPA's exemption of AFOs from EPCRA reporting is unlawful because it is based on an implausible reading of EPCRA's statutory language, that the exemption is inconsistent with the D.C. Circuit's opinion in *Waterkeeper Alliance v. EPA*, and that the exemption runs counter to EPA's prior reading of EPCRA. Indeed, HSUS submitted comments, in partnership with other nonprofits, to EPA when EPA first published its Interim Guidance that made exactly these points. *See* Letter from Earthjustice et al. to Envtl. Prot. Agency re: CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms (Nov. 22, 2017); Letter from Food & Water Watch et al. to Envtl. Prot. Agency re: Interim Guidance on CERCLA and ECPRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms (Nov. 22, 2017). However, because EPA had already implemented and adopted the Interim Guidance (including the EPCRA reporting exemption for AFOs) when it solicited comments and because EPA never considered these comments before publishing the Interim Guidance, the comment period was merely illusionary. Put differently, HSUS was given no meaningful opportunity to participate in the rulemaking process.

21. EPA's decision to issue the EPCRA reporting exemption outside of the formal rulemaking process deprived HSUS and its members of the APA's procedural safeguards. Because EPA did not publish a proposed rule, obtain comments on that rule, and *respond* in a reasoned fashion to all significant comments, the EPA has deprived HSUS and its members of their rights to process, rights guaranteed by the APA and designed to ensure reasoned agency decision-making. That failure also harms HSUS and its members because EPA has failed to provide a well-

9

developed record allowing for the sort of judicial review of its action that the APA contemplates. Also, because the agency implemented the exemption before seeking public comment, it did not use those comments in crafting (or withdrawing) the exemption. In other words, EPA was not forced to evaluate its proposed rule in light of those comments; yet, such an evaluation could have led to a change in the final version of the rule. Had EPA followed the APA-mandated process all or at least some of the injuries I describe in this declaration might have been averted.

22. If this Court were to rule for the plaintiffs, the harms I have outlined above would be significantly reduced or eliminated. If the Court finds EPA violated its procedural obligations under the APA and orders the agency to undertake such procedures before exempting AFOs from EPCRA reporting requirements, HSUS will participate in the process, as it has done with respect to EPA's actions regarding AFO EPCRA reporting for many years. Specifically, HSUS will explain why such an exemption is unlawful under EPCRA's statutory language and describe the harms such an exemption will cause to HSUS and its members.

23. Further, if the Court vacates the Interim Guidance's EPCRA reporting exemption for AFOs, these operations would be required to comply with EPCRA and report information about the extremely hazardous substances they release in excess of threshold amounts (including ammonia and hydrogen sulfide releases of more than 100 pounds per day) to state and local authorities, and this information would be made available to the general public, including HSUS and its members. HSUS would use this information to educate its members and advance its mission in the ways detailed above. In addition, HSUS members living near AFOs could use this information to protect themselves and their families from the adverse health impacts exposure to pollutants released from AFOs can cause. HSUS members could also use this information to

protect their animals and property from the harms pollutants released from AFOs cause or threaten to cause.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this ___ day of October 2018, in _____.

Chris Holbein

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RURAL EMPOWERMENT ASSOCIATION
FOR COMMUNITY HELP, et al.,

        Plaintiffs,

      v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)

Civ. No. 1:18-cv-02260-TJK

**DECLARATION OF
JUDY JOLIN IN SUPPORT
OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

## DECLARATION OF JUDY JOLIN

I, Judy Jolin, declare that I am over 18 years of age and that if called as a witness in this action I would competently testify of my own personal knowledge as follows:

1. I am a member of the Humane Society of the United States ("HSUS"). I am not sure exactly when I joined HSUS, but I think it was probably about ten years ago. I joined HSUS because I appreciate that the organization is broad in what it represents—that it represents all animals. I was particularly impressed when I learned that the organization does work to protect farm animals, animals that many other nonprofits don't represent.

2. I live in Picket, Wisconsin in a home that my husband and I purchased in the 1970s. In addition to our home, we own a 95-acre property in Rosendale Township. This property is about two miles from our home.

3. I grew up on a dairy farm in Wisconsin. My dad was a farmer, and he had about 100 cows on his farm.

4. I have long had a deep respect for the natural world and have always loved animals. As a result of these interests, I am a member of various environmental and animal welfare nonprofits.

5. In recent years, several large concentrated animal feeding operations ("CAFOs") have been built in my community and in neighboring communities in Wisconsin. I don't think local authorities in Wisconsin have ever denied a CAFO permit. These farms are nothing like the traditional farms I grew up with. I don't even like to call them farms. In my view, they are industrial operations, not farms.

6. Given the industrial nature of CAFOs, I am very concerned about the impact these operations have on the environment, public health, and animal welfare. CAFOs have so many animals. My dad's farm had 100 cows. At the time, we thought that was big, but the CAFOs being

2

built in Wisconsin now can have thousands of animals. In addition, many of these CAFOs store the massive amounts of animal waste they produce in lagoons, where the waste ferments and produces terrible smells and air emissions. The smell from these lagoons is totally different from manure produced on traditional (and much smaller) farms. I sometimes smell the noxious odors emitted from these lagoons when I am driving in various parts of Wisconsin.

7. In 2008, a CAFO began to operate about a quarter mile from the property we own in Rosendale Township ("Rosendale property"). The CAFO has at least 10,000 dairy cows. It stores the massive amounts of feces these animals produce in manure lagoons.

8. My husband and I, along with other concerned community members, tried to fight the building of the CAFO but were ultimately unsuccessful.

9. This CAFO has drastically impacted our everyday lives. The traffic near our home has increased significantly with semi-trucks coming to and from the CAFO, hauling feed and manure. The smell coming from the manure trucks is terrible, and I try to avoid leaving my home when I see one coming.

10. In addition, the construction of the CAFO has had a significant impact on our use of the Rosendale property.

11. My husband and I purchased the Rosendale property with several other couples around 1990. At the time, we used it for recreating—we enjoyed walking on the property, swimming in the pond there, and observing the wildlife living on the land. In addition, we regularly had family picnics on the property, enjoying the chance to spend time outdoors with our family and friends.

12. Over time, my husband and I purchased the other couples' shares of the Rosendale property and became the sole owners around 2000. We purchased the property in its entirety with the intention of building our retirement home there.

13. When the CAFO began operating in 2008, my husband and I realized that we would not be able to build our retirement home on the Rosendale property. When the wind blows from the south, the stench of the waste produced by the cows on the CAFO is unbearable. It overwhelms your entire being. Your eyes smart, your throat hurts, and you begin to feel sick to your stomach if you are exposed for too long. Once the CAFO was built, my husband and I knew there was no way that we could live on the Rosendale property.

14. We thought about selling the property but didn't know how much money we would be able to get for it once the CAFO was built. And, we truly love the land. So, we decided to keep the Rosendale property and continue to use it for recreating as much as we are able.

15. However, when the wind blows from the south, we cannot use the Rosendale property because of the smell. The effect is even worse when it's humid. So, when we want to use the Rosendale property, we drive over from our house in Picket. If we get out of our truck and can smell the CAFO's animal waste, we return home. If the smell is absent, we use our property.

16. When the CAFO was first built, we were unable to use the Rosendale property for recreating about a third of the time. The CAFO covered its manure lagoons a few years ago, after being pressured by the local community, and we are able to use our property a little more now. But even with the covered lagoons, we are still frequently unable to use the Rosendale property for recreating because of the smells emitting from the CAFO.

17. We can no longer have family picnics at the Rosendale property. We can't predict which way the wind will be blowing, so we can't plan big events outside for fear that the smell will be unbearable on the day of the event.

18. When we can use the Rosendale property, my husband tends to the garden he planted there, and we walk on the land twice a day for exercise. We also swim in the pond on the property

4

and enjoy observing the wildlife on the land. We have developed a prairie for wildlife, and we see deer, coyote, waterfowl, sand hill cranes, opossum, raccoons, song birds, frogs, snakes, monarch butterflies, dragonflies, and other species of insects. Our daughter and granddaughters often come with us to the property.

19. I am aware that there is a federal law—the Emergency Planning and Community-Right-to-Know Act ("EPCRA")—that is intended to provide the public and local government authorities with access to information about industrial facilities' releases of extremely hazardous substances above certain threshold amounts, including the types and amounts of substances released. I am also aware that ammonia and hydrogen sulfide, which are produced by CAFOs as animal waste decomposes, must be reported if they are released above certain threshold amounts. I understand that the Environmental Protection Agency ("EPA") recently exempted CAFOs and other animal feeding operations from reporting these types of emissions under EPCRA.

20. I am concerned that the EPA has exempted CAFOs from reporting their air emissions under EPCRA. I am harmed by EPA's action because it deprives me of information that I am entitled to under EPCRA.

21. I would like to have access to information about the types and amounts of hazardous pollutants coming from the CAFO near the Rosendale property, including the amounts of hydrogen sulfide and ammonia released.

22. I have often wondered about what I—and my husband and other family members—are inhaling when we use the Rosendale property and when we travel to the property and have to leave because of the smells being blown onto our property from the CAFO. I am concerned about the impact inhaling the air pollutants coming from the CAFO could have on my health, my husband's health, and my other family members' health.

23. If I had access to information about the types and amounts of air pollutants coming from the CAFO, I could use it to make informed decisions about how to protect my health and the health of my family members. I would share this information with my doctor, so that we could use this information to make decisions about my health.

24. In addition, depending on what we learned about the types and amounts of pollutants emitted from the CAFO, my husband and I may change how we use our property. We are both nearing 80 years of age and are fortunate to be in relatively good health. We would not want to jeopardize this if we learned that dangerous levels of air pollutants are being released from the CAFO near the Rosendale property. This is especially true for my husband, who has allergies and heart problems.

25. In addition, I would share information about the emissions from the CAFO with members of my community, including family members and friends, so that they could make informed decisions about their health and well-being.

26. I would also share this information with local representatives to help them understand the impact CAFOs have on the surrounding communities and to attempt to influence their decisions about approving future CAFOs.

27. I also think that it is possible that requiring CAFOs to publicly reveal information about their emissions of hazardous air pollutants could serve as a first step in forcing them to change their production practices and to consider the impact they have on local communities. CAFOs have been trying to hide this information for years, and making them disclose it could have an impact on how they operate. My family, friends, and I could benefit from measures that would lead to reductions in the volume of pollutants released from the CAFO near the Rosendale property and other CAFOs in Wisconsin.

28.    If the Court were to rule for the plaintiffs in this case, I believe that the harms I have outlined above would be significantly reduced or eliminated because CAFOS, like the one near the Rosendale property, would be subject to EPCRA reporting and would have to provide local officials and the general public with information about the extremely hazardous substances they are releasing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 3rd day of October 2018, in *Pickett, Wi.* .

*Judy Jolin*

Judy Jolin

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RURAL EMPOWERMENT ASSOCIATION FOR COMMUNITY HELP, et al.,   ) <br><br> Plaintiffs,   ) <br><br> v.   ) <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,   ) <br><br> Defendants.   ) | Civ. No. 1:18-cv-02260-TJK <br><br> **DECLARATION OF MELISSA SIEBKE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

## DECLARATION OF DOCTOR MELISSA SIEBKE

I, Melissa Siebke, declare that I am over 18 years of age and that if called as a witness in this action I would competently testify of my own personal knowledge as follows:

1. I am a member of the Humane Society of the United States ("HSUS"). I joined HSUS about five or six years ago because I'm very impressed by how the group advocates for animals and works to educate people in the U.S. and abroad on how helping animals can and should go hand in hand with helping people. HSUS does a great job of moving society towards recognizing this interconnectedness between protecting animals, the environment, and human wellbeing. I believe people can't do better unless they know better, and that's why I value HSUS's work to educate the public, legislators, agencies, and the general public on these issues that are very close to my heart.

2. I spent my childhood in Medford and I currently live in Owatonna, which are both in Steele County in Minnesota. My mom also lives in Steele County. I teach Spanish, French, English and English as a Second Language for a community college with several campuses. I primarily teach in Owatonna, but I also teach some classes in Austin, Minnesota (in Mower County) and Albert Lea, Minnesota. I also frequently take classes at a university in Mankato, Minnesota.

3. Growing up in Steele County on my parents' small pig and crop farm of about 100 acres, I learned to appreciate pigs as sensitive and intelligent animals, and to appreciate the then-unspoiled countryside around our family home. As a child, I spent a good deal of time around the pigs in the barns, helping my dad. I always loved petting and interacting with the pigs, and this may be where my general lifelong love of animals originated.

4. I've always profoundly appreciated the pastoral beauty of parts of Steele County, and I try to enjoy it still by regularly taking my dog on long walks in the country near my home. I am a

2

lifelong animal and nature lover, so I also greatly enjoy walking in the countryside to take in the beautiful diversity of wildlife, plant life, and scenery around where I live, work, and visit. Because the welfare of non-human animals and the preservation of our natural environment are so important to me, I regularly contact my state and federal legislators to express my views on these issues.

5. Given my interest in animal welfare and the environment, I'm worried about the risks associated with the increasing proliferation of the large industrial factory farms in Minnesota that confine animals by the thousands in cruel and dangerous conditions. I am very concerned about the impacts these factory farms' production practices have on the welfare of the farmed animals, the environment (including wildlife), and the health of humans and their pets. A few years ago, after learning from HSUS of a pending bill to insulate factory farms from nuisance lawsuits in Minnesota, I wrote letters to the editors of two local newspapers and contacted a state legislator to voice my opposition to the measure.

6. During my lifetime things have changed so much in Steele County and Minnesota's other agricultural counties. In a lot of ways, they've changed for the worse for animals, people, and the environment. For example, over the years I've seen an increase in factory farm operations filled with pigs or other farm animals in Steele and Mower Counties. This greatly concerns me because it's bad for animals, the environment, and wildlife, and could be dangerous for my family and me as well.

7. I really enjoy the scenery I see when I drive to the various community college campuses where I work. I look forward to my drives, in part because I've always loved the Minnesota countryside and the great diversity of plant and animal life it supports. However, these days, my drives remind me that factory farms are prevalent in Steele and Mower Counties. During my drives, I often see evidence of these farms, for example, semi-trucks packed with pigs being

3

transported in horrible conditions. In addition, I know Hormel Foods—which produces various meat products—has a large presence in the area.

8. I know that factory farms produce huge amounts of animal waste. I can remember when I was a child in Steele County, smelling noxious odors from the waste produced at a neighbor's hog farm. The hog waste was stored in a pit as liquid manure, which our neighbor would spread on his fields. When he did so, the smell was horrible. My neighbor had a lot of animals, but it was nothing compared to the number of animals factory farms in Minnesota house today. Given the numbers of animals they have, today's factory farms produce huge amounts of waste.

9. Sometimes when I am walking my dog within a half a mile of my home, or when I am driving to work in Owatonna or Austin, I smell a noxious odor of what I believe to be liquid manure.

10. I am concerned about my exposure to pollutants released by factory farms when I travel to work and also when I am near my home and in other areas of my community.

11. I have learned that there are at least two hog farms within three miles of my house. Each has more than 1,000 hogs, according to the Minnesota Pollution Control Agency ("MPCA"), and one of the facilities has 4,800 hogs according to MPCA. I also believe that I come within five miles of factory farms when I drive to the Owatonna and Austin campuses for work.

12. I have learned that exposure to hydrogen sulfide can harm the respiratory tract and the nervous system. I have also learned that exposure to low concentrations of hydrogen sulfide could cause headaches, poor memory, tiredness, and balance problems. In addition, I have learned that there is evidence that communities neighboring factory farms have higher rates of asthma. And, I have learned that exposure to odors from factory farms can lead to mental health deterioration and an increased sensitization to smell for those living near these farms.

4

13. I am aware that there is a federal law—the Emergency Planning and Community-Right-to-Know Act ("EPCRA")—that is intended to provide the public and local government authorities with access to information about industrial facilities' releases of extremely hazardous substances above certain threshold amounts, including the types and amounts of substances released. I am also aware that factory farms must report the release of ammonia and hydrogen sulfide from animal waste if they are released above certain threshold amounts. I understand that the Environmental Protection Agency ("EPA") recently exempted factory farms from reporting these types of emissions under EPCRA.

14. The fact that EPA has exempted factory farms from EPCRA reporting—and thus allowed them to hide information about the extremely hazardous substances they release, including the air pollutants created by the animal waste—makes me angry, sad, and concerned. As a community college professor, I know how important it is to have access to credible and reliable information. The more information and knowledge we have, the better we can do for ourselves, our families, and the world.

15. The fact that EPA is permitting factory farms to hide information about the pollutants they release into our communities is deeply concerning to me, and it harms me because it deprives me of information to which I am entitled under EPCRA.

16. I would like to have access to information about the types and amounts of hazardous pollutants coming from factory farms in the communities where I live, work, and commute. In fact, I believe that my family, my community, and I have the right to know about the hazardous air pollutants to which we are potentially being exposed. As mentioned above, I smell noxious gases sometimes when I am walking my dog and driving, but I am also concerned about other pollutants that could be released without exuding smells. I am concerned about the impacts factory

5

farms' emissions of pollutants could have on my health, my family and friends' health, and my pets' health. And, I am worried about the impacts these releases have on the environment, including wildlife. I am not only concerned about present effects but also about how this will harm the environment and future generations of animals including wildlife and people.

17. If information about factory farms' release of pollutants above the threshold amounts set by EPCRA were made publicly available, I would regularly access these EPCRA reports submitted by factory farms located in the areas where I live, work, and commute. I would check this information as frequently as once a month if it changed that often.

18. If I had access to this information, I would use it to assess my risk of exposure to dangerous pollutants released by factory farms. I would try to avoid areas where there are factory farms releasing high levels of pollutants when I drive to work and in other aspects of my day-to-day life. But, without the reports required under EPCRA—which EPA has exempted factory farms from submitting—I don't have a way of knowing what pollutants factory farms in my area are releasing.

19. If I had access to factory farms' EPCRA reports, I would also share this information with family, friends, and like-minded colleagues, and I would encourage them to check and track this information for themselves. In fact, I have shared information about the social ramifications of factory farms' production practices with family members in the past. For example, I knew my brother and his family ate chicken produced by Tyson, so I provided him with information about the company's practices that are harmful to the chickens' welfare. Especially because he has three sons, I think he would be concerned about the pollutants released by factory farms in Steele County since he and his family visit my mom and me here. So, I would share this information with him if

I had access to it. I think it's important for people to have this information so that they can take better care of themselves and their loved ones.

20. I also think it is important for people to have access to information about the substances factory farms release because it could serve as a rallying cry for people to hold industry accountable for the harm it causes to human health and the environment through their purchasing decisions. But, without this type of information, people may not know that they need to act.

21. Additionally, I think it is important for communities to have access to this information so that they can make informed decisions about the types of facilities that are coming into their communities. They could use information in factory farms' EPCRA reports to influence local decision-makers to do what is truly best for the community, not the animal agriculture industry. If I had this information, I would share it with my legislators to better inform them about the harmful effects factory farms have on us, their constituents. In addition, I would use this information to ask my legislators to push forward legislation to help protect non-human animals (including wildlife) and the environment.  Having the data required under EPCRA reporting requirements would give me concrete, credible, and reliable data to show my legislators to support my requests.

22. If factory farms are required to publicly report their release of hazardous pollutants, I believe it is possible that these operations will take voluntary measures to reduce and potentially even eliminate their releases of such pollutants. My family, friends, colleagues and I could benefit from measures that would lead to reductions in the volume of pollutants released from factory farms in the communities where we live and work.

23. If the Court were to rule for the plaintiffs in this case, I believe that the harms I have outlined above would be significantly reduced or eliminated because factory farms would be

subject to EPCRA reporting and would have to provide local officials and the general public with information about the extremely hazardous substances they are releasing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 30th day of September 2018, in _Owatonna, MN (Steele County)._

_Melissa Siebke_

Melissa Siebke

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RURAL EMPOWERMENT ASSOCIATION
FOR COMMUNITY HELP, et al.,

        Plaintiffs,

        v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Civ. No. 1:18-cv-02260-TJK

**DECLARATION OF
LOWELL TROM IN
SUPPORT OF PLAINTIFFS'
MOTION FOR
SUMMARY JUDGMENT**

1

## DECLARATION OF LOWELL TROM

I, Lowell Trom, declare that I am over 18 years of age and that if called as a witness in this action I would competently testify of my own personal knowledge as follows:

1. I recently became a member of the Humane Society of the United States.

2. I live in rural Dodge County, Minnesota. I own a 760-acre farm, and my home is on the same property. My parents and grandparents owned the farm before me, but it was smaller then.

3. I am 89 years old. I was born in 1929 in the farmhouse on the property on which I still live. I have been active in farming my entire life. I still actively farm the land with the help of my sons, Brad and Jim Trom. We grow soybeans and corn.

4. I grew up on the farm, and I have spent my entire adult life farming the land. The way livestock is raised has changed drastically during my lifetime. It used to be that a farmer had a few hogs, a few chickens, and a few cows. Now, factory farms have thousands of animals, and these animals—chickens, hogs, and everything else—are raised in confinement. It's no way to raise livestock in confinement like that.

5. When thousands of animals are concentrated in one place, it gets to be a problem. There are so many animals, and they produce so much waste. The pollutants that come from this waste aren't good for the people living near the factory farms, the environment, or the animals.

6. There are 11 hog confinement operations within a 3-mile radius of my farm. A twelfth one has been approved, but construction hasn't begun on it yet.

7. Around 1994, a swine factory farm began operating about a mile north of my farm. Today that farm has nearly 4,000 pigs. Around 2014, a swine factory farm began operating about

half a mile west of my farm. It has about 2,400 pigs. In total, there are about 30,000 pigs within a 3-mile radius of my farm.

8. The factory farms near me store the manure produced by the hogs under the buildings that house the animals. These pits hold about one year's worth of manure, and they emit a rancid odor. Lots of the people who own buildings that house animals like this won't even go into the buildings themselves. They just hire someone else to go in them to tend to the animals instead. I don't eat pork anymore because I don't think it's fit to eat—the hogs are breathing in the fumes from the waste they produce all the time, and it gets into the meat.

9. In the fall, the manure is pumped out of the pits and applied to the land. When this happens, the stench is horrifying.

10. The awful smell produced by the hog manure on these factory farms comes onto my property from all directions. It can travel a long way too, so it's impossible to know which operations are producing the noxious odors I smell at any given time.

11. I have to deal with the stench from the hog farms around my farm every day, and it's even worse on the days they spread manure on the fields. Sometimes they'll spread manure on the ground when it's frozen, and that's even worse.

12. Depending on the weather conditions, gases produced by the animal waste often roll in towards night, and when the wind dies down at that time of day, the smell and gases move in and just float over the land.

13. People used to like to live in the country, but not now. You can't get fresh air in the country anymore.

14. There are also times that I know gases without a smell have moved onto my property because I get a headache from breathing in the fumes.

3

15. I am very worried about the impact the emissions coming from the farms are having on my health and on my family members' health. When you work on a farm, the work is outside until the winter comes. So, my sons and I spend a lot of time outside. Given the wretched stench and how ill I feel as a result, it just can't be safe or healthy to inhale the pollutants coming from the nearby hog confinement operations.

16. When the stench is strong, I can't stand to be outside. It makes my eyes and nose burn, and it can make me sick to my stomach. There are some days when I can't work outside because the stench is so bad; I just have to try to work inside. But, I'm a farmer, and most of my work is outside. I don't know how farmers who don't raise hogs are supposed to put up with this.

17. There was one particularly bad day in November 2017. On that day, my neighbor was spreading manure from his two factory farms on frozen ground. I was picking corn using my combine at the time, and I had to get off of it because the stench made it impossible to operate the machine. When I got off the combine, I vomited.

18. I get headaches pretty often now. I think they are from the smell and gases coming from the nearby factory farms because I didn't get headaches before those farms went up.

19. Two of my sons, Brad and Jim, help me with the daily operations of the farm, so they are exposed to the smell and gases too. Like me, I know they have had physical reactions to the stench and gases.

20. I also think that the smell and gases get into the buildings on my farm.

21. The nearby factory farms have changed the way my family uses my property. I am one of ten children, and we used to have family reunions and picnics at our farm with all of the children, grandchildren, and great-grandchildren. We can't do that anymore because the neighboring factory farms could spread manure that day and ruin the event.

4

22. My family also used to celebrate significant life events at my farm. Three of my six children had their weddings or wedding receptions on my property. We could never plan something like that now because of the risk that the stench of hog manure would be in the air.

23. People have come to my property to track air emissions before, and I'm sure the emissions were way too high.

24. I am aware that there is a federal law—the Emergency Planning and Community-Right-to-Know Act ("EPCRA")—that is intended to provide the public and state and local government authorities with access to information about industrial facilities' releases of extremely hazardous substances above certain threshold amounts, including the types and amounts of substances released. I am also aware that ammonia and hydrogen sulfide, which are produced by factory farms as animal waste decomposes, must be reported if they are released above certain threshold amounts. I understand that the Environmental Protection Agency ("EPA") recently exempted concentrated animal feeding operations ("CAFOs") and other animal feeding operations from reporting these types of emissions under EPCRA.

25. I am concerned about EPA's decision to exempt factory farms from submitting EPCRA reports. EPA is supposed to work to help the people, but they're not doing that. I wonder if EPA thinks farmers are second-rate citizens.

26. EPA's decision to exempt animal feeding operations from reporting their air emissions under EPCRA harms me because it deprives me of information to which I am entitled under federal law.

27. I would like to have information about the types and amounts of air pollutants released from the hog confinement operations near my farm. I would use this information myself, and I would share it with everyone possible.

28. If I had access to information about the types and amounts of air pollutants coming from these hog operations, I could use it to take steps to protect my health. I would share this information with my doctor, so that we could use this information to make informed decisions about my health.

29. I am also concerned about my sons' health and the health of my other family members who visit the farm. If I had access to information about the types and amounts of air emissions of dangerous pollutants that were coming from neighboring hog operations, I would share it with them too.

30. I'm not the only person who has to deal with the stench and gases coming from these operations. My neighbors have to deal with these impacts too although they're not as outspoken about it as I am. I would share this information with them so that they could take steps to protect themselves and their loved ones.

31. I would also share this information with federal, state, and local officials so that they can understand the impact CAFOs have on the communities that neighbor them.

32. If the Court were to rule for the plaintiffs in this case, I believe that the harms I have outlined above would be significantly reduced or eliminated because some, if not all, of the hog operations near my property would be subject to EPCRA reporting and would have to provide local officials and the general public with information about the extremely hazardous substances they are releasing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 28th day of September 2018, in Blooming Prairie, Minn.

Lowell Trom

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Rural Empowerment Association for
Community Help, et al.,

Plaintiffs,

v.

United States Environmental Protection
Agency, et al.,

Defendants.

**CASE NO. 18-cv-02260-TJK**

**DECLARATION OF
JANE WILLIAMS**

## DECLARATION OF JANE WILLIAMS

I, Jane Williams, declare that I am over 18 years of age and am competent to testify. I have

personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1.  I am the Chair of the Sierra Club's national Air Grassroots Network Team. The Sierra

Club is a national nonprofit organization of approximately 795,000 members dedicated to

exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the

responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to

protect and restore the quality of the natural and human environment; and to using all lawful

means to carry out these objectives.

2.  The Sierra club is very concerned about pollution and public health impacts from

Concentrated Animal Feeding Operations (CAFOs). Sierra Club's CAFO campaign began over

two decades ago when it was designated one of our four national priority campaigns.  Its goal

was to keep factory farm pollution out of America's drinking water, lakes and rivers, and

eliminating the threats that CAFOs pose to our public health and rural heritage.

3.  Sierra Club members live near CAFOs, recreate downstream from CAFOs and receive

drinking water from sources that may be affected by pollution from CAFOs. CAFOs are poorly

controlled or uncontrolled sources of nutrients, pathogens, hormones, antibiotics and toxic

chemicals. Pollution from CAFOs poses a threat to our members, recreational activities, health

and quality of life.

4.  Sierra Club lobbies for stronger environmental controls over CAFOs at the federal and

state levels. It comments on proposed rules and challenges inadequate agency actions through

litigation. It engages in shareholder actions as a means of improving the environmental

performance of companies that own or operate CAFOs. It sues individual CAFOs that violate laws. It produces training material to strengthen our members' ability to fight CAFO pollution.

5.   I myself, along with many other Sierra club volunteers and staff, have worked for many years with Sierra Club members around the nation who are confronting CAFO facilities operating in or attempting to locate in their communities. In assisting these communities the Sierra Club has been a major player in the national effort to address pollution from factory farms. Specific examples of Sierra Club's work in some states follows:

6.   In Mississippi, we worked with our Mississippi chapter to address the environmental justice problems associated with where CAFOs were located. In Iowa, the local Club became involved as large CAFO operations bought out small farms and turned family farmers into contract laborers. In Missouri and Oklahoma, Sierra Club staff assisted local residents faced with air and water pollution. Rivers in Texas are impacted by many large dairy operations, so the Sierra Club funded a water sentinels project for these watersheds for years – creating teams of trained volunteers to sample and develop a database of water quality on these rivers.

7.   Ultimately, CAFO developers moved west and Sierra Club staff and volunteers have now assisted communities in many western states. California has always had many large factory farms, but opposition to CAFOs increased because of threats to the Central Valley, the headwaters of the rivers that feed the San Francisco Bay Delta. Here the Sierra Club legal team won a major victory by preventing a 29,000-cow dairy from locating near Bakersfield.

8.   I am aware also that the Kansas Chapter recently sponsored a lawsuit challenging the expansion of a large hog operation where the state sought to avoid restrictions on the size of CAFOs by arbitrarily treating the operation as two separate CAFOs.  I am aware that the Atlantic

Chapter recently won a challenge to New York's general discharge permit for CAFOs that failed to provide adequate opportunities for public participation in the permitting process.

9.    More broadly, the Club has fought to secure strong air reporting requirements for CAFOs by challenging EPA's 2008 decision to exempt CAFOS from hazardous substance reporting requirements under the Emergency Planning and Community Right-to-Know Act (EPCRA) and Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). I am aware that, in *Waterkeeper Alliance v. EPA*, 853 F.3d 527, 537–38 (D.C. Cir. 2017), the D.C. Circuit struck down EPA's attempt to exempt CAFOs from reporting requirements under both EPCRA and CERCLA.

10. I am also aware that, despite the D.C. Circuit ruling striking down EPA's exemption of CAFOs form air reporting requirements, EPA has nevertheless implemented new guidance that exempts CAFOs from reporting under EPCRA.  EPA has denied the public information about CAFO air emissions for over a decade now.  This lack of information hampers Sierra Club's efforts to inform its members about the harms of CAFO air emissions and to advocate for decreases or better protections from these emissions.

11. EPA also failed to provide adequate public notice and opportunity for public comment when it published its air reporting exemption guidance.  EPA failed to provide any notice in the federal register or invite public comment through the Administrative Procedure Act, which is an obstacle to Sierra Club's and the public's participation in the rulemaking process as required by law.  It is only by hiding its actions from public scrutiny that EPA was able to pass such an illegal and harmful "guidance."

I declare under penalty of perjury that the foregoing is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 9, 2018

Jane Williams

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Rural Empowerment Association for
Community Help, et al.,

                                   Plaintiffs,

                    v.

United States Environmental Protection
Agency, et al.,

                                   Defendants.

**CASE NO. 18-cv-02260-TJK**


**DECLARATION OF
HUDA FASHHO**

## DECLARATION OF HUDA FASHHO

I, Huda Fashho, declare that I am over 18 years of age and am competent to testify. I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1.    My name is Huda Fashho. I am the Director of Member Care for the Sierra Club, a non-profit corporation organized under the laws of the State of California. I work in Sierra Club's national office in Oakland, California. I became Manager of Member Care in 2011. In that capacity, I am responsible for planning, developing, and directing the programs, operations, and Club staff responsible for: providing information services to members, the operational and user aspects of the Club's member/donor database, the delivery of member/donor acknowledgments and membership renewals. My work also requires me to be familiar with the nature and scope of the Club's membership programs, its membership records, and the manner in which information on members can be retrieved.

2.    The Sierra Club regularly maintains membership records that include the address of each member. Membership information listed in this declaration was determined by consulting this record system.

3.    Sierra Club has over 795,000 individual members, residing in all fifty states, the District of Columbia, Puerto Rico, and the Virgin Islands.

4.    Sierra Club members live near facilities in counties across the country that have high concentrations of CAFOs. For example, using the Food & Water Watch Factory Farm Map (https://www.factoryfarmmap.org/), the Sierra Club has identified the following number of members living in counties with an "extreme" density level of CAFO operations:

- **Allegan County, MI:** 202 Sierra Club members live in Allegan County, Michigan, which is estimated to have had 2,088 cattle, 13,113 dairy animals, 248,069 hogs, and 5,460,532 egg-laying animals in 2012;

- **Ottawa County, MI:** 435 Sierra Club members live in Ottawa County, Michigan, which is estimated to have had 1,044 cattle, 7,868 dairy animals, 32,460 hogs, 182,312 broiler chickens, and 2,730,266 egg-laying animals in 2012;

- **Pitt, NC:** 272 Sierra Club members live in Pitt County, North Carolina, which is estimated to have had 273,458 hogs and 896,162 broiler chickens in 2012;

- **Fresno, CA:** 1,164 Sierra Club members live in Fresno County, California, which is estimated to have had 39,475 cattle, 109,195 dairy animals, 10,965 hogs, and 17,877,062 broiler chickens in 2012; and

- **Stanislaus, CA:** 752 Sierra Club members live in Stanislaus County, California, which is estimated to have had 165,740 dairy animals, 10,965 hogs, 10,726,237 broiler chickens, and 2,325,962 egg-laying animals in 2012.

I declare under penalty of perjury that the foregoing is true and

correct. Executed on: October 9, 2018

Huda Fashho

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Rural Empowerment Association for Community Help, et al., | |
| Plaintiffs, | **CASE NO. 18-cv-02260-TJK** |
| v. | |
| United States Environmental Protection Agency, et al., | **DECLARATION OF SCOTT DYE** |
| Defendants. | |

# DECLARATION OF SCOTT DYE

I, Scott Dye, declare as follows:

1.      My name is Scott Dye. I am over 18 years old. The information in this

declaration is based on my personal experience and my review of publicly

available information.

2.      My primary residence is in Columbia, Missouri. I have lived at my current

address since 2004.

Since 2012 I have been a Field Coordinator for the Socially

Responsible Agricultural Project (SRAP). In this capacity, I help communities

across the United States by (a) Organizing educational public meetings to discuss and

present peer-reviewed research on the economic and social impact of Confined Animal Feeding

Operations ("CAFOs") in rural communities, specifically the employment possibilities

associated with CAFOs, the health implications of CAFOs, and the source and magnitude of

subsidies to CAFOs; (b)  Providing advice and consultation to local community groups on issues

relating to CAFOs and their effect on the current food system and the environment; and (c)

Assisting local community groups with formation, organization, and the evaluation of

agricultural use permits.

3.      I am a member of the Sierra Club. I joined the Sierra Club in 1996. Sierra

Club is a nationwide non-profit environmental membership organization,

which has as its purpose to explore, enjoy, and protect the wild places of the

earth; to practice and promote the responsible use of the earth's ecosystems

and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

4.   I joined the Sierra Club in the 1990s while the CAFO nearby my family farmhouse was being constructed; since I believe that the Sierra Club has been consistently active in fighting industrial animal agriculture that has impacted its members. The Sierra Club has continued to remain active on CAFO issues in order to protect public health, welfare, and the environment. I support Sierra Club in its efforts to ensure the safety of individuals and communities that live near industrial animal operations.

5.   The CAFO facility adjacent to my family farmhouse has 80,000 finishing hogs. There are nine pods of eight buildings per pod within the facility. Each building holds 1,108 hogs, and each pod of eight buildings drains into a lagoon that is 4 surface-acres large. Each of the nine lagoons holds 25 million gallons of liquefied feces and urine.

6.   Our family farmhouse is located in the middle of our 300 acre property. The farmhouse was built in 1924, and the property has been in the family since 1885. I have three siblings, whose families all are free to use the farmhouse. The closest lagoon of the CAFO facility is only 3,305 feet away from our

farmhouse. The facility is our immediate neighbor on both the north and west side of the farm property.

7.     The CAFO construction started in 1994 and the facility was fully operational by March 1995. WH Group Limited owns and operates the facility. They are a Chinese-owned company, and are the largest hog producer in the world. The company controls 27% percent of American hog production.

8.     As soon as I realized the facility was being built, I began to educate myself on industrial animal operations. I volunteered with the Sierra Club from 1995 to 1998, and then began working as a CAFO organizer from 1998 to 2001. From 2001 to 2012 I was the National Director of the Water Sentinels Program, where I led program staff in training community members across the United States how to perform water quality monitoring in their neighborhoods.

9.     I live at the farmhouse a total of six to eight weeks out of the year, on average. It is still a working farm, so when I am at the farm, I maintain crossings and ponds, as well as fencing and building maintenance. Besides the work it takes to maintain the farm, I enjoy outdoors activities such as hunting, fishing, and searching for arrowheads in creeks.

10.    Other members of my family spend more time out of the year at the farmhouse. For instance, my middle brother spends a minimum of five

months out of the year at the farm. He spends his time hunting and fishing during turkey and deer season, as well as engaging in other outdoor activities. If we are at the farmhouse, we are outside.

11.    Unfortunately, it is difficult to be outside at the farm for long amounts of time. There are health concerns due to the neighboring CAFO facility. The CAFO facility emits hazardous pollutants such as ammonia, methane, and hydrogen sulfide. When I am outside, I have eye and throat irritation, as well as headaches. If I am outside my farmhouse long, my lungs begin to burn. The odors are also stupefying. It is nauseating being outside for too much time. Before my mother passed away seven years ago of Alzheimer's disease, she had been prescribed an inhaler while living on the farm because she had been diagnosed with respiratory distress.

12.    Depending on weather conditions, the wind can carry the odors emitted from the CAFO facility up to nine to ten miles away. When the wind is out of the northeast, it travels four miles into the town of Unionville, MO. There are slightly less than 2,000 people now living in the town, as people have moved away since the hogs came in.

13.    I understand that Sierra Club is filing a federal lawsuit challenging guidance issued by the Environmental Protection Agency (EPA) that unlawfully directs CAFOs that they do not need to follow hazardous air pollution

reporting requirements under the Emergency Planning and Community Rights-to-Know Act (EPCRA). I am participating in this case because my family and I would benefit from CAFOs' finally being forced to report information about the hazardous air pollutants they emit. If this type of information were publically available, environmental and health regulators would better be able to take action and develop more efficient regulations for CAFO facilities. And if I had access to this information, I would take steps to better protect my health and the health of my family.

14. As a Field Coordinator for the Socially Responsible Agricultural Project, I would have liked the opportunity to comment on EPA's exemption of CAFOs from this reporting requirement. But EPA denied me that opportunity by failing to properly notify the public about a proposed exemption, and failing to properly accept and consider comments from the public.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed September 30, 2018.

_____
Scott Dye

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Rural Empowerment Association for
Community Help, et al.,

                    Plaintiffs,

          v.

United States Environmental Protection
Agency, et al.,

                    Defendants.

**CASE NO. 18-cv-02260-TJK**

**DECLARATION OF
MAX WILSON**

## DECLARATION OF MAX WILSON

I, Max Wilson, declare that I am over 18 years of age and am competent to testify. I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1.     I am a member of the Sierra Club and have been since approximately 2007. I joined the Sierra Club because I am concerned and personally affected by the large animal feeding operations near my home. I believe that Sierra Club does important work on my behalf and on behalf of its other members who are affected by industrial animal agriculture. I support Sierra Club in its efforts to ensure the safety of individuals and communities that live near animal feeding operations.

2.     I reside in Hickman, Kentucky.

3.     At least three animal feeding operations that house approximately 5,000 hogs each are located within 3.5 miles of my home.

4.     I understand that the breakdown of animal waste at animal feeding operations, such as those located near my home, generates toxic gases such as ammonia and hydrogen sulfide. I am very concerned about the negative impact that such toxic releases may have on my health and the health of my family.

5.     I regularly spend time outdoors near my home for professional and recreational purposes. I own and operate a crop farming operation and have my shop and machinery storage area next to my residence. I work outside nearly every day during warm weather and many days during the winter months. My home is the basis of operations for my 575-acre farm operation.

6.     The yard around my home is approximately three acres and requires about five hours of weekly maintenance. My wife and I frequently enjoy spending time in our yard and on

2

our deck where we grill, entertain guests and relax. We also take walks and ride bicycles on the road next to our home.

7.    We began to experience foul odors after a hog feeding operation began operating near our home in 2008. Since that time we have frequently experienced extremely powerful odors or fumes at our residence and in the shop work area. At times, the fumes become so overpowering that I feel a sense of physical panic and urgent desire to get away from the odor as quickly as possible. I have often experienced a burning of the airway passages when I inhale these fumes. During such times, I am forced to stop working and go inside to get away from the smell. When I've had no choice but to remain outside, I've gotten headaches. I've seen the odor make an employee of mine gag, and would describe it as intensely nauseating.

8.    When the odors are present around our home, we retreat inside. We have been forced to curtail entertainment activities and outside recreation because of these odors. The fumes invade our home, even though we make sure to keep the doors and windows closed when they are present. My wife and I find it difficult to sleep while smelling these odors and we have been kept up at night because of them.

9.    Because of my concern about the effects from these facilities on my health and the health of my family and neighbors, I took part in an effort to stop the State of Kentucky from permitting these large animal feeding operations without adequate emissions controls. I have participated in Sierra Club efforts to educate and inform people and the media about the problems and personal effects on neighbors of these large animal feeding operations. I have notified the state air quality department on numerous occasions about experiencing these strong odors and toxic gases.

10.     Access to information about toxic gases being released from animal feeding operations located in my community would benefit me by enabling me to take steps as needed to protect my health and that of my family. I would make use of this information to support my advocacy efforts to persuade these local large animal feeding operations to take steps to reduce or even eliminate such releases. This might involve voluntary actions by the operations in response to local community pressure, or it might involve government intervention.

11.     Information about the toxic chemicals emitted from animal feeding operations would also benefit my health and safety. If such information were routinely provided to emergency responders in Kentucky and the National Response Center, under severe circumstances, the government may decide to evacuate the area or take other action to reduce my community's exposure to toxic gases from animal feeding operations. Simply knowing that emergency responders are receiving information needed to ensure that my family and community are not being subjected to unsafe levels of noxious gases would benefit me, my family, and my community.

12.     I would also benefit from animal feeding operations being required to provide information about their toxic air releases to regulators, whom I rely on to regulate such operations in a way that is protective of my health and the health of those around me. Ensuring that environmental regulators have access to reliable information about emissions from animal feeding operations is critical for developing effective regulations for these facilities. I am aware that this argument has been made by the U.S. Government Accountability Office in a September 2008 report entitled "Concentrated Animal Feeding Operations: EPA Needs More Information and a Clearly Defined Strategy to Protect Air and Water Quality from Pollutants of Concern." (http://www.gao.gov/assets/290/280229.pdf).

13.    Finally, if animal feeding operations are required to report publicly their toxic chemical releases, this would encourage some operations to take voluntary steps to reduce and perhaps even eliminate emissions above reportable levels. My family and I would benefit from any such reductions that occur at animal feeding operations located in our community.

14.    For all of these reasons, I oppose EPA's exemption of CAFOs from having to report their toxic releases.  I would have liked to express that opposition to EPA by commenting on a proposed rule, but EPA denied me that opportunity by ramming through the exemption without any public notice or public comment period.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 25ᵗʰ day of September, 2018.

_Max Wilson_

Max Wilson

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Rural Empowerment Association for
Community Help, et al.,

Plaintiffs,

v.

United States Environmental Protection
Agency, et al.,

Defendants.

**CASE NO. 18-cv-02260-TJK**

**DECLARATION OF
HEATHER JACOBS DECK**

**DECLARATION OF HEATHER JACOBS DECK**

I, Heather Jacobs Deck, declare that I am over 18 years of age and am competent to testify. I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1. I am the Executive Director of Sound Rivers, Inc. (Sound Rivers), formerly the Pamlico-Tar River Foundation. Prior to becoming Executive Director, from 2003 to 2017, I served as the Riverkeeper for Sound Rivers.

2. Sound Rivers is a member organization of the Waterkeeper Alliance.

3. Sound Rivers works to monitor, protect, and enhance the Neuse and Tar-Pamlico Rivers and their watersheds through advocacy, conservation, and education. These watersheds cover more than 12,000 square miles and include the Pamlico Sound—a major component of the second largest estuary in the United States. Sound Rivers has three Riverkeepers who serve as investigators, advocates, and educators for the watersheds. Sound Rivers further represents the interests of its thousands of members and donors who live in, visit, or love this beautiful region of North Carolina. Sound Rivers and its members seek to ensure clean, safe water, and an ecologically sound and healthy environment for today and for future generations.

4. I reside in Washington, North Carolina with my husband and two daughters.

5. As the Executive Director of Sound Rivers, I am responsible for supervising all employees of Sound Rivers and for providing overall direction to the organization's campaigns and fulfillment of the organization's mission. In addition, I continue some of the activities of my prior role as Riverkeeper when support is required by Sound Rivers' three Riverkeepers. These duties included serving as an advocate for the Tar-Pamlico River, its tributaries and estuarine areas; observing, documenting, and reporting environmentally harmful activities; responding to and investigating citizen complaints; and when necessary, calling for enforcement action or initiating litigation. I maintained an on-the-river presence to investigate pollution sources, help support monitoring efforts and clean-up programs, and

administer Sounds Rivers' volunteer programs. My work also entailed coordinating and providing educational programs, as well as assisting with fundraising, membership activities, and grants.

6.   In addition to these duties, I keep abreast of academic studies, reports, and publications relating to the health of the Tar-Pamlico River Basin.  I regularly communicate with state and federal agencies about threats to the watershed, water quality in the watershed, and what more can be done to protect the watershed's environmental integrity.

7.   Since its founding in 1981, Sound Rivers' efforts to protect the Tar-Pamlico and Neuse Rivers and the interests of its members have taken a number of forms.  Our work has included efforts to mitigate adverse impacts on the watershed caused by air pollution and toxic releases.  For over fifteen years, Sound Rivers has worked with the Department of Environmental Quality's (DEQ's) Estuarine Monitoring team, by alerting them to environmental problems facing the Rivers, such as fish kills or pollutant discharges.

8.   Sound Rivers has focused much of its water quality advocacy on protecting the Tar-Pamlico and Neuse Rivers from degradation resulting from too many nutrients (primarily nitrogen, phosphorus and ammonia) in the water.  As a result of human activities, the levels of nitrogen and phosphorus entering the Tar-Pamlico and Neuse Rivers has increased, greatly exceeding natural levels.  Excessive amounts of nitrogen and phosphorus result in an ecosystem out of balance that leads to extensive algae blooms. When the algae die, the decomposition process robs the water of oxygen, particularly during the summer months.  This results in fish kills, including crabs and other biota, in the estuary. Algae blooms also pose a public health risk and the public is advised to avoid contact with waters while blooms are occurring.

9.   Unfortunately, the waters of the Tar-Pamlico River Basin have far higher nutrient levels than is optimal. Indeed, the River has been designated by the State, in part as a result of Sound Rivers' advocacy, as "nutrient sensitive."  Since the "nutrient sensitive" designation was made, Sound Rivers has worked extensively with the State and other stakeholders to develop implementation strategies to reduce the flow of nitrogen, ammonia, phosphorous, and other nutrients into the River.  In particular, Sound Rivers helped develop buffer rules for the Tar-Pamlico, and currently holds seats on the Basinwide Oversight

Committee, Sedimentation Control Commission, Albermarle-Pamlico National Estuarine Partnership, and also participates in the Tar-Pamlico Basin Association.

10. Sound Rivers and its members have long been concerned about the impacts of concentrated animal feeding operations ("CAFOs") on the waters of the Tar-Pamlico and Neuse River Basins. Sound Rivers staff, including myself, has spoken at numerous public meetings advocating for Tar-Pamlico and Neuse nutrient management programs and improved management for CAFOs to prevent nutrient impacts to our waterways.

11. One of the key contributors to degradation of water quality in our Basin is deposition of nitrogen caused by the emission of ammonia from livestock operations such as CAFOs. Ammonia from CAFOs is carried by prevailing winds for up to 100 miles, and is deposited through wet and dry deposition on land and in water in the form of nitrogen. As a result of emissions from CAFOs, ammonia levels and other forms of nitrogen in the Tar-Pamlico and Neuse watersheds have increased. This contributes to the eutrophication of the waters, which degrades water quality and interferes with our members' ability to safely and enjoyably recreate and live in the River Basins. Through my work with local scientists, I understand that approximately 40% of nitrogen entering the estuary is attributable to ammonia from livestock operations.

12. Despite Sound Rivers' efforts to improve the water quality and reduce the nutrient loading in the Tar-Pamlico and Neuse River Basins, Sound Rivers and its members' interests are injured by the EPA's failure to adequately regulate and monitor air emissions from animal waste at livestock operations.

13. One of the biggest challenges faced by Sound Rivers and its members is the lack of information regarding air emissions of toxic chemicals such as ammonia from CAFOs. Sound Rivers staff members and regulators and emergency responders lack the information necessary to protect the water quality of the Tar-Pamlico and Neuse Rivers. Without monitoring and mandatory reporting of air emissions from CAFOs, accurate estimation of the impacts of these emissions on water quality is impossible.

14. If information about the emissions from animal waste at livestock operations had to be reported in the same way that emissions from other industrial emissions were reported, emergency responders would

be better able to protect the health and safety of the surrounding communities, and Sound Rivers and its members could use this information to take actions to protect their health.  This would benefit me and my family. In addition, Sound Rivers would directly benefit from such information and would use it to better assess and address the impacts that air emission from CAFOs have on the Tar- Pamlico and Neuse River Basins.  Furthermore, providing regulators with accurate and consistent information on emissions of hazardous pollutants from livestock operations would enable them to better regulate these sources to protect the community's health and support sustained environmental quality. This would provide Sound Rivers with additional legal tools for improving water quality, better enabling us to fulfill our mission.

15.  EPA denied Sound Rivers and its members the ability to comment on the agency's decision to exempt CAFOs from having to report their air emissions.  If EPA had publicized notice of a proposed rule and invited comments as required by law, Sound Rivers would have submitted comments opposing the exemption and requesting the EPA require CAFOs to report these emissions, just like any other industry.

I declare under penalty of perjury that the foregoing is true and correct.

Executed ___October 19___, 2018

_____

Heather Jacobs Deck

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Rural Empowerment Association for
Community Help, et al.,

Plaintiffs,

v.

United States Environmental Protection
Agency, et al.,

Defendants.

**CASE NO. 18-cv-02260-TJK**

**DECLARATION OF
ROBERT HUDKINS**

## DECLARATION OF ROBERT HUDKINS

I, Robert Hudkins, declare that I am over 18 years of age and am competent to make this declaration. I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1.   I reside in Rocky Mount NC. I have lived in Rocky Mount for over 30 years, raising two sons in the area.

2.   I am a member of Sound Rivers, Inc. (Sound Rivers). I have been a member of Sound Rivers, as it is currently known and previously the Pamlico-Tar River Foundation, for approximately 25 years.

3.   I am a member for 30 years of the Sierra Club.

4.   I am a member of the City of Rocky Mount Planning board since 2013.

5.   I am aware of industrial swine facilities located in the region, including the Hanor Company facility, that is located on the Tar River and called the "Shellbank" facility.

6.   I am very concerned about the pollution and air contaminants that are released from these facilities, including from Shellbank. I am an avid kayaker and nature enthusiast, and enjoy the recreational and aesthetic qualities of the Tar River and the environment that surrounds it. I often paddle and do environmental conservation activities, like *the Kayaking for Kids* program, in and around the Tar River, including the stretch of the river that is adjacent to the Shellbank facility. I enjoy the act of kayaking because of its closeness with nature, including the area's wildlife, birds, and flora, which I value very much. I also enjoy kayaking for the exercise that it provides me and at times, the solitude.

7.   The biodiversity in eastern North Carolina is awe inspiring, and, to me, very special. I am deeply concerned about the effects that air contaminants and other pollution from industrial swine facilities, including the Shellbank facility, may have on the quality of my environment, including the Tar river and its biodiversity. I am concerned for the specific impacts of that pollution, not only on the environment, but also on my healthy and my recreational and aesthetic enjoyment of the area, including the river.

8.   I also appreciate the Tar River for its important educational value for the residents – including the children – of Rocky Mount. I was an educator in the Rocky Mount area for thirty-two years, until my

retirement in 2007. During my career, I taught almost all of the scientific disciplines, including environmental science, biology , earthy science, and physical science, to multiple age groups. It was through this work and because of my students' interest that I first became engaged in Tar River conservation projects – a passion that I carry forward to this day – including through my work with the *Kayaking for Kids* program. I believe that it is important for children to be able to connect with and understand the nature around them. I am concerned about what will happen if pollution continues, unreported, in and around the Tar River, and the extent to which it may negatively affect the health of the children in the area and their enjoyment and appreciation of the area's ecosystem.

9.   Indeed, I have two grandchildren that live in the Rocky Mount area. They join me on kayaking trips on the Tar River and other area waterways. I very much want to share the river and love of the sport of kayaking with my grandchildren, but I am concerned about whether and to what extent kayaking and recreating on the Tar River may expose them to dangerous pollution, including from the Shellbank facility.

10.  I am especially concerned because I have specifically experienced strong, nauseating odors while kayaking on the stretch of the Tar River next to the Shellbank facility, and I believe those odors are indicative of large air pollution problems from the facility. I understand that large industrial livestock facilities, like Shellbank, have a legal duty under the federal Emergency Planning and Community Right-to-Know Act (EPCRA) to report their releases of hazardous aerial pollutants, such as ammonia, to local and state officials, if those releases exceed a certain threshold amount.

11.  Sound Rivers on behalf of its members, sought copies of any EPCRA report for releases of ammonia from the Shellbank facility, and it was unable to locate this information. I am aware that the reason this information is unavailable is because the Hanor Company has not provided any such report(s) to local and state officials.

12.  I believe that people have the right to know about the hazardous air pollutant to which they are being exposed. I also believe that people, including the owners and operators of industrial facilities, should strive to be good neighbors and valuable assets to the community. Some important ways to do so

are to maintain a clean operation, enhance the quality of the surrounding environment, and accurately report air pollution as the law requires.

13. I am very active in the community and can use the information shared through EPCRA reports to make informed decision about my own recreation and other activities, including the activities that I participate in on behalf of the community. I believe that access to information about the air contaminants released from industrial animal facilities will help to keep me, my family, and my community mindful of the hazardous pollutants that are being introduced into our bodies and the environment. It will also help me make informed decision about whether to take my grandchildren kayaking with me on the Tar River, as I do not want to put them in harm's way.

14. I believe that, through dissemination of pollution information, the general public will become more informed about the large amounts of hazardous air pollutants emitted from industrial livestock facilities and the causes of those emissions. I believe that such knowledge will inform the public, and may lead to effective changes in how these operations are regulated.

15. If I had a copy of the EPCRA release report(s) for the Shellbank facility, I would use the information, as declared above, to inform myself, my family, and my community about the air contaminants, including ammonia, being released from the facility; to ascertain our risks of exposure as a result of those releases; and to reasonably evaluate my safety, and the safety of anyone who I may be with, while enjoying the area surrounding this facility. Without this report, I have no way of knowing what hazardous air pollutants are being released by the Shellbank or any other facility in my community, or amounts. Therefore, as discussed above, I would use this information to inform myself and others about the amount of hazardous pollution released and would ideally help preserve the environment and create meaningful change in the process.

16. I also believe that the public has a right to participate in government processes.  But EPA denied us that right when it told industrial animal facilities like Shellbank that they do not have to report their hazardous pollutants, without giving the public an opportunity to comment on that new regulation.  If EPA had provided notice and an opportunity for me to comment on the regulation, I would have

explained to EPA how the Shellbank facility harms my way of life, and why EPA's exemption is a bad idea.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of October, 2018 in Nash Count, North Carolina.


_____

Robert Hudkins

## Acknowledgement

STATE OF NORTH CAROLINA

COUNTY OF _Nash_

I certify that _Robert Hudkins_ personally appeared before me this day, acknowledging to me that he or she signed the foregoing document: _Declaration of Robert Hudkins_

<span style="font-size:smaller">Name or description of attached document</span>

I further certify that (select one of the following identification options):

☐ I have personal knowledge of the identity of the principal(s)

☑ I have seen satisfactory evidence of the principal's identity, by a current state or federal identification with the principal's photograph in the form of a _NCDL_ .

<span style="font-size:smaller">type of identification</span>

☐ A credible witness, _____, has sworn or affirmed to me the

<span style="font-size:smaller">name of credible witness</span>

identity of the principal, and that he or she is not a named party to the foregoing document, and has no interest in the transaction.

Date: _October 19th, 2018_

*(Official Seal)*

_Carol E. Manning_
<span style="font-size:smaller">Notary Public</span>

_Carol E. Manning_
<span style="font-size:smaller">Typed or Printed Notary Name</span>

My commission expires: _04/30/2019_

CAROL E. MANNING
NOTARY PUBLIC
NASH COUNTY, NC

_Robert D. Hudkins_
_October 26, 2018_

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Rural Empowerment Association for
Community Help, et al.,

                    Plaintiffs,

            v.

United States Environmental Protection
Agency, et al.,

                    Defendants.

**Civ. No. 18-cv-02260-TJK**


**DECLARATION OF
DANIEL E. ESTRIN**

## DECLARATION OF DANIEL E. ESTRIN

I, Daniel E. Estrin, declare that I am over 18 years of age and am competent to testify. I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1.    I am the General Counsel and Advocacy Director of Waterkeeper Alliance, Inc. ("Waterkeeper Alliance"), and have worked with the Waterkeeper movement for more than 25 years. As Waterkeeper Alliance's General Counsel and Advocacy Director, I am responsible for supervising all of Waterkeeper Alliance's legal advocacy work, including all litigation to which Waterkeeper Alliance is a party.

2.    Waterkeeper Alliance is a not-for-profit corporation organized under the laws of the State of New York, and is a charitable corporation under section 501(c)(3) of the Internal Revenue Code. Waterkeeper Alliance maintains its headquarters at 180 Maiden Lane, Suite 603, New York, New York 10038.

3.    Waterkeeper Alliance is a global movement of on-the-water advocates who patrol and protect over 2.5 million square miles of rivers, streams and coastlines in North and South America, Europe, Australia, Asia, and Africa. Waterkeeper Alliance seeks to protect water quality in every major watershed around the world, and to restore and maintain all waterways as drinkable, fishable, and swimmable, consistent with the goals of the federal Clean Water Act, the Emergency Planning and Community Right-to-Know Act ("EPCRA"), and other state and federal laws.

4.    Waterkeeper Alliance works toward this vision through direct advocacy and through the grassroots advocacy of its Waterkeeper Member and Affiliate organizations ("Waterkeeper Organizations"), which are connected and supported by

Waterkeeper Alliance to provide a voice for waterways and their communities. Waterkeeper Alliance (1) supports and empowers Waterkeeper Organizations to protect communities, ecosystems and water quality; (2) promotes the Waterkeeper model for watershed protection worldwide; and (3) advocates for issues common to Waterkeeper Organizations.

5.    Waterkeeper Alliance currently connects approximately 275 Waterkeeper member organizations and approximately 55 Waterkeeper affiliate organizations in 44 countries on six continents. This includes approximately 150 Basinkeepers, Baykeepers, Bayoukeepers, Canalkeepers, Channelkeepers, Coastkeepers, Creekkeepers, Inletkeepers, Lakekeepers, Riverkeepers, Shorekeepers, Soundkeepers, and Waterkeepers chartered and licensed by Waterkeeper Alliance in the United States ("U.S. Member Organizations") and approximately 25 Waterkeeper affiliate organizations in the United States ("U.S. Affiliate Organizations").

6.    Waterkeeper Alliance supports its U.S. Member and Affiliate Organizations, and individual members of all these organizations, in a number of ways. For example, we engage in direct litigation and other advocacy coordinated with the organizations. We also provide a centralized hub for sharing scientific, legal, and administrative resources with these programs across the country. We expand local Waterkeeper abilities to address environmental issues, and help to provide legal support to member programs. And we protect and administer the trademarks covering the U.S. Member Organization license names described above.

7.    Many of Waterkeeper Alliance's U.S. Member and Affiliate Organizations are actively working to protect their watersheds from pollution caused by

dense concentrations of cattle, dairy, poultry, and/or swine Animal Feeding Operations ("AFOs) and Concentrated Animal Feeding Operations ("CAFOs"). Additionally, these U.S. Member and Affiliate Organizations cumulatively have tens of thousands of individual members who live, work and recreate on waterways and in watersheds across the United States. Some of these members live, work, and recreate in areas affected by AFOs and CAFOs, and they are detrimentally affected by the EPA's failure to monitor and regulate air emissions from animal waste at these facilities.

8.    Several Waterkeeper Member and Affiliate Organizations, their members, and their communities are adversely affected by emissions of hazardous substances such as ammonia and hydrogen sulfide released from nearby AFOs and CAFOs. For example, Local Environmental Action Demanded Agency, Inc. ("L.E.A.D. Agency"), an Oklahoma nonprofit corporation, has been a licensed Waterkeeper Member Organization since on or about January 3, 2005 for its Grand Riverkeeper program and since on or about May 13, 2016 for its Tar Creekkeeper program. L.E.A.D. Agency and its members are adversely impacted by ammonia and hydrogen sulfide emissions, and the resulting water pollution, from a dense concentration of poultry AFOs and CAFOs throughout the Grand River and Tar Creek watersheds, as well as from large mushroom growing operation that utilizes poultry waste for composting.

9.    L.E.A.D. Agency is also aware of a rapid expansion of poultry AFOs and CAFOs in northeast Oklahoma over the last twelve months within Grand River watershed. Ammonia and hydrogen sulfide emissions from these facilities are currently or will, in the near future, adversely affect these programs, their members, and the

surrounding communities. Based on L.E.A.D. Agency reports to Waterkeeper Alliance, many community members in the areas where new poultry AFOs and CAFOs are located have reported severe impacts on their health and quality of life from the newly constructed poultry AFOs and CAFOs, including children reporting increasingly severe allergies, older residents with Chronic Obstructive Pulmonary Disease being unable to go outdoors, and breathing problems in people with asthma.

10.    Similar issues impact the Pamlico Tar Riverkeeper, Lower Neuse Riverkeeper, and Upper Neuse Riverkeeper, programs of Sound Rivers, a not-for-profit North Carolina corporation licensed as a Waterkeeper Member Organization since on or about June 23, 2015. Sound Rivers and its members are adversely impacted by ammonia emissions and the resulting water pollution from a dense concentration of swine and poultry CAFOs throughout the Neuse and Tar Pamlico watersheds.

11.    Waterkeeper Alliance also has approximately 11,500 individual members that support Waterkeeper Alliance through financial contributions. Waterkeeper Alliance supports these members by advocating on behalf of their interests in local and national forums, including legislative bodies, government agencies, and courts of law, and keeping them informed about environmental issues that impact their communities and others around the country. Some of these members live, work, and recreate in areas affected by AFOs and CAFOs, and are detrimentally affected by the EPA's failure to regulate air emissions from animal waste at AFOs and CAFOs.

12.    Waterkeeper Alliance is a strong advocate for controlling pollution from AFOs and CAFOs. Waterkeeper Alliance regularly organizes training courses and informational panels at topic summits, regional meetings, and at annual Waterkeeper

Alliance conferences that include workshops addressing air and land emissions from AFOs and CAFOs and how such pollution affects neighboring waterbodies and communities. Additionally, Waterkeeper Alliance maintains information on a webpage devoted to AFOs and CAFOs, including information on their regulation, their impacts, and legislative measures to prevent or reduce such impacts. Waterkeeper Alliance also advocates for more stringent regulation of AFOs and CAFOs before state and national officials, and for implementation and enforcement of existing law through litigation. *See e.g.*, *Waterkeeper All. v. EPA*, 853 F.3d 527, 537–38 (D.C. Cir. 2017) (D.C. Circuit held EPA's exemption of CAFOs from the statutory reporting mandates under CERCLA and EPCRA unlawful and vacated the rule) and *Waterkeeper All. v. EPA*, 399 F.3d 486 (2d Cir. 2005) (Second Circuit held portions of EPA's CAFO Regulations were unlawful).

13.    As a result of my work at Waterkeeper Alliance and with Waterkeeper Organizations, including my work on previous litigation challenging EPA's attempt to exempt CAFOs from reporting hazardous substances under EPCRA, I am aware that AFOs and CAFOs emit ammonia and hydrogen sulfide that can pollute the air and be deposited into surface waters, contaminating the receiving waters with nitrogen and other substances. This process can result in water quality degradation, community health problems, and significant environmental harm, particularly contributing to algal blooms that can become widespread and toxic. I am also aware that pollutants released from AFOs and CAFOs, such as ammonia and hydrogen sulfide, pose a health and welfare risk to Waterkeeper Alliance's and Waterkeeper Organization's members and their communities, and impact the environment in a variety of ways that limit the use and

enjoyment of the environment by Waterkeeper Alliance members and their communities.

14.     Waterkeeper Alliance's, Waterkeeper Organizations' and their members' interests are injured by the EPA's continued efforts to exempt AFOs and CAFO's from their statutory legal obligation to report emissions of hazardous substances under EPCRA, including this attempt to exempt AFOs and CAFOs from reporting their emissions through a "guidance" document posted on EPA's website. Access to information about the hazardous substances emitted from AFOs and CAFOs would benefit Waterkeeper Alliance and Waterkeeper Organizations by providing data that will help our advocacy efforts to combat the negative impacts of air emissions from these facilities. Waterkeeper Alliance would use such data to advocate for better regulation of AFO's and CAFOs' air emissions, as well as distribute this information to our members who have a right to know about the hazardous air pollutants released from these facilities near their homes and in their communities, especially given the serious health impacts than can be caused by AFO and CAFO emissions.

15.     Waterkeeper Alliance's and Waterkeeper Organizations' members would benefit from the information and knowledge that AFOs and CAFOs are required to provide to regulators about releases of hazardous pollutants so that those regulators can adequately assess and respond to the releases in a manner that is protective of public health and safety. Waterkeeper Alliance believes that if environmental regulators have accurate information about releases of hazardous air pollutants, they will better regulate these sources. This information is also necessary for emergency responders to

effectively monitor and respond to communities exposed to unsafe levels of hazardous air pollutants.

16.     If AFOs and CAFOs are required to publicly report their releases of hazardous aerial pollutants, Waterkeeper Alliance expects that some facilities will take voluntary measures to mitigate or even eliminate emissions of hazardous substances from animal waste. Waterkeeper Alliance's mission to protect the environment from AFOs and CAFOs would directly benefit from any mitigation measures undertaken by these facilities in response to reporting requirements.

17.     Waterkeeper Alliance's, Waterkeeper Organizations' and their members' interests are also harmed by EPA's failure to follow proper procedures when issuing the "guidance." Rather than providing an opportunity for public comment and considering those comments when adopting this rule, EPA instead posted the guidance on its website. Had EPA performed the notice and comment required under federal law, Waterkeeper Alliance would have submitted comments opposing this harmful exemption, for all the reasons set forth above.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on this 24th day of October, 2018.

_____
             Daniel E. Estrin

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Rural Empowerment Association for
Community Help, et al.,

                     Plaintiffs,

        v.

United States Environmental Protection
Agency, et al.,

                   Defendants.

**CIV. NO. 18-cv-02260-TJK**

**DECLARATION OF
REBECCA JIM**

## DECLARATION OF REBECCA JIM

I, Rebecca Jim, declare that I am over 18 years of age and am competent to testify. I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1)      I am a co-founder and current Executive Director of Local Environmental Action Demanded Agency, Inc. ("L.E.A.D. Agency"), a non-profit corporation organized under the laws of Oklahoma in 1997, with offices located in Vinita and Miami, Oklahoma. L.E.A.D. Agency was established to achieve the following goals: (1) Educating the community on environmental concerns in Northeast Oklahoma; (2) taking action to counter environmental hazards that put Northeast Oklahoma's residents at risk both physically and financially; (3) conducting environmental workshops and seminars concerning environmental issues in Northeast Oklahoma and other areas; and (4) enhancing our efforts by partnering with other environmental organizations throughout Oklahoma and the nation.

2)      I also serve as the Tar Creekkeeper, a program of L.E.A.D. Agency, the mission of which is to protect and restore Tar Creek, a tributary of the Neosho River. Beginning in 1984, portions of the Tar Creek watershed have been designated as a part of a large-scale Superfund site due to extensive industrial pollution of surface water and groundwater, surrounding residential areas, and the sites of several former mining, milling, smelting, storage, disposal, and other related operations. Tar Creek, its watershed and the surrounding community, including L.E.A.D Agency members, are also increasingly being adversely impacted by ammonia and hydrogen sulfide emissions from animal waste generated by large poultry Animal Feeding Operations ("AFOs") and/or Concentrated Animal Feeding Operations ("CAFOs"), including J&M Farms, which operates a large mushroom farm with animal waste composting

and a poultry AFO.

3)     Grand Riverkeeper is another program of the L.E.A.D. Agency, and my colleague Earl L. Hatley serves as Grand Riverkeeper. The mission of Grand Riverkeeper is to protect and restore the Grand River watershed, which is located in the northeastern portion of Oklahoma and encompasses the Neosho and Spring Rivers and their tributaries. The two rivers merge and form the Grand River at the southern edge of Ottawa County, before they converge at the top portion of Grand Lake. Below Grand Lake, the Neosho flows northeast into two other important reservoirs and ultimately flows into the Arkansas River north of Muskogee, Oklahoma. The Neosho and Spring Rivers are important water resources to the nine tribes of the Inter-Tribal Council of North Eastern Oklahoma and other subsistence and sports users, and Grand Lake is an important resource to the Cherokee Nation, in whose jurisdiction it is located. Grand River, its watershed and the surrounding community, including its members, are also increasingly being adversely impacted the proliferation of large poultry AFOs and CAFOs.

4)     Both Grand Riverkeeper and Tar Creekkeeper are programs of L.E.A.D. Agency and are licensed members of Waterkeeper Alliance.

5)     I am aware that poultry AFOs and CAFOs emit ammonia and hydrogen sulfide that can pollute the air and be deposited into surface water, contaminating water with nitrogen and other substances. This can cause water pollution, community health problems, and significant environmental harm, including dissolved oxygen problems, fish kills and toxic algal blooms. I am also aware that pollutants released from poultry AFOs and CAFOs, such as ammonia and hydrogen sulfide, pose a health and welfare risk to our members and their communities, and impact the environment in a variety of ways that limit the use and enjoyment of the environment by our members and their communities.

6)      Ammonia emissions from poultry AFOs and CAFOs have adversely impacted water quality in the Grand and Tar Creek watersheds.  For example, Grand Lake is polluted by excess nutrients that cause low dissolved oxygen and periodic toxic algal blooms, which have resulted in closure of the lake.

7)      Hydrogen sulfide and ammonia emissions from J&M Mushroom farm and the associated poultry AFO have adversely impacted air and water quality in the Tar Creek watershed.

8)      There has also been a rapid expansion of poultry AFOs and CAFOs in northeast Oklahoma over the last twelve months, including within the Grand River watershed. In the last year, Oklahoma has issued more than 30 permits for new or expanding poultry CAFOs with more than 140 poultry confinement barns that will house more than 5,000,000 birds – the majority of which are concentrated in one area near communities, homes, schools, and businesses in Delaware County, Oklahoma near Spring Creek, a tributary of the Grand River. An aerial map showing the Grand Lake watershed, including Tar Creek, poultry AFO and CAFO density, and new or expanding poultry AFOs is attached as Attachment 1 to this declaration.

9)      Ammonia and hydrogen sulfide emissions from these facilities are currently or will, in the near future, adversely affect L.E.A.D. Agencies' programs, their members, and the surrounding communities. Many community members are reporting severe impacts on their health and quality of life from the newly constructed poultry AFOs and CAFOs, including children reporting increasingly severe allergies, older residents with Chronic Obstructive Pulmonary Disease being unable to go outdoors, and breathing problems in people with asthma.

10)    Data regarding the amount of hydrogen sulfide and ammonia emissions, which is

currently unavailable, is desperately needed to protect the public health in northeast Oklahoma. On September 12, 2018, the State of Oklahoma and the Cherokee Nation, in response to public outcry regarding the impacts to their environment, health and quality of life from the newly permitted poultry AFOs and CAFOs, announced the formation of the Poultry Coordinating Council on Poultry Growth to study the impacts of the rapid expansion on citizens. Additionally, on October 8, 2018, the Oklahoma Department of Agriculture announced a suspension on the issuance of additional permits for new or expanding operations until the impacts are evaluated.

11)     L.E.A.D Agency and its members interests are injured by the EPA's continued efforts to exempt AFOs and CAFOs from their statutory legal obligation to report emissions of hazardous substances under EPCRA, including this attempt to exempt AFOs and CAFOs from reporting their emissions through a "guidance" document posted on EPA's website. Access to information about the hazardous substances emitted from AFOs and CAFOs would benefit L.E.A.D Agency and its members by providing data that will help our advocacy efforts to combat the negative impacts of air emissions from AFOs and CAFOs. L.E.A.D Agency and its members would use this data to advocate for better regulation of AFO's and CAFOs' air emissions, as well as distribute this information to our members who have a right to know about the hazardous air pollutants released from the operations near their homes and in their communities, especially given the serious health impacts that emissions from poultry AFO and CAFO can cause.

12)     L.E.A.D Agency and its members would benefit from knowing that AFOs and CAFOs are required to provide regulators with information about releases of hazardous pollutants so that those regulators can adequately assess and respond to the releases in a manner

that is protective of public health and safety. L.E.A.D Agency believes that if environmental regulators have accurate information about releases of hazardous air pollutants, they will better regulate these sources. This information is also necessary for emergency responders to effectively monitor and respond to communities exposed to unsafe levels of hazardous air pollutants.

13)     L.E.A.D Agency's and its members' interests are also harmed by EPA's failure to follow proper procedures when issuing the "guidance." Rather than providing an opportunity for public comment and considering those comments when adopting this rule, EPA instead posted the guidance on its website. Had EPA done the notice and comment required under federal law, L.E.A.D Agency would have joined Waterkeeper Alliance's comments opposing this harmful exemption, for all the reasons set forth above.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 25th day of October 2018

Rebecca Jim

**ATTACHMENT 1**

Declaration of Rebecca Jim
ATTACHMENT 1



Source: Cherokee Nation, Poultry Operations within Oklahoma: http://geodata.cherokee.org/poultry/