**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RURAL EMPOWERMENT ASSOCIATION FOR COMMUNITY HELP, 2389 W. Wards Bridge Road, Warsaw, NC 28398, ANIMAL LEGAL DEFENSE FUND, 525 East Cotati Avenue, Cotati, CA 94931, CENTER FOR BIOLOGICAL DIVERSITY, P.O. Box 2155, St. Petersburg, FL 33731, CENTER FOR FOOD SAFETY, 660 Pennsylvania Avenue, SE, Suite 302, Washington, DC 20003, DON'T WASTE ARIZONA, INC., 2934 West Northview Avenue, Phoenix, AZ 85042, ENVIRONMENTAL INTEGRITY PROJECT, 1000 Vermont Avenue, NW, 11th Floor, Washington, DC 20005, FOOD & WATER WATCH, 1616 P Street NW Suite 300, Washington, DC 20036, HUMANE SOCIETY OF THE UNITED STATES, 2100 L Street, NW, Washington, DC 20037, SIERRA CLUB, 2101 Webster Street, Suite 1300, Oakland, CA 94612, SOUND RIVERS, 2207 Trent Blvd, New Bern, NC 28562, and WATERKEEPER ALLIANCE, 180 Maiden Lane, Suite 603, New York, NY 10038 | Civ. No. 18-cv-02260-TJK |

Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and ANDREW
WHEELER, Administrator,
U.S. Environmental Protection Agency,
William Jefferson Clinton Building,
1200 Pennsylvania Avenue, N.W.
Mail Code 1101A
Washington, D.C. 20460

Defendants.

**FIRST AMENDED COMPLAINT
FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      Plaintiff nonprofit groups Rural Empowerment Association for Community Help, Animal Legal Defense Fund, Center for Biological Diversity, Center for Food Safety, Don't Waste Arizona, Inc., Environmental Integrity Project, Food & Water Watch, Humane Society of the United States, Sierra Club, Sound Rivers, and Waterkeeper Alliance (collectively, "Plaintiffs") challenge guidance that the U.S. Environmental Protection Agency ("EPA"), first issued on October 26, 2017, and updated on April 30, 2018, exempting Concentrated Animal Feeding Operations ("CAFOs") from requirements to inform state and local officials about releases of dangerous levels of pollutants as required by Section 304 of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11004, *see* EPA, CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms (Apr. 30, 2018) ("EPCRA Exemption") (attached as Exhibit 1), as well as a Final Rule entitled Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act, 84 Fed. Reg. 27,533 (June 13, 2019) ("Final Rule" or "Rule") (attached as Exhibit 2), that codifies the exemption originally set forth in the EPCRA Exemption.

2.      CAFOs are industrial livestock operations that concentrate large numbers of animals and their waste.  The vast majority of livestock operations in the United States are smaller animal feeding operations that are not likely to emit hazardous substances at levels that trigger reporting requirements.  But the fewer, largest CAFOs commonly do emit dangerous quantities of toxic gases.

3.      Emissions generated from animal waste at CAFOs are highly toxic and are sickening communities across the country.

4.      Exposure to ammonia and hydrogen sulfide released from the highly concentrated animal waste produced at CAFOs causes a multitude of health problems, including, but not limited to, respiratory problems, nasal and eye irritation, headaches, nausea, and even death.

5.      EPCRA protects communities from toxic exposure to CAFO emissions by requiring parties to report to state and local authorities information about their releases of hazardous material into the environment, when releases exceed threshold "reportable quantities." This information – which must be made available to the public – enables community members and responders to develop remedial measures, investigate facilities, and protect against future releases.

6.      For more than a decade, EPA has taken steps to undermine the effectiveness of EPCRA's reporting requirement by exempting CAFOs from this obligation.  These efforts weaken the protections against toxic releases that EPCRA provides to local communities.

7.      In 2008, EPA issued a rule exempting all but the largest CAFOs from reporting air releases from animal waste under EPCRA, asserting that the animal waste reports that inform communities about toxic releases were unnecessary.  CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms, 73 Fed. Reg. 76,948 (Dec. 18, 2008) ("2008 CERCLA/EPCRA Rule").

8.      In 2017, the United States Court of Appeals for the District of Columbia vacated EPA's 2008 CERCLA/EPCRA Rule, rejecting EPA's argument that the reporting requirements serve no regulatory purpose.  *Waterkeeper All. v. EPA*, 853 F.3d 527, 537–38 (D.C. Cir. 2017). In doing so, the court emphasized benefits EPCRA reporting provides to communities exposed to hazardous releases, including providing information about the hazardous substances "rapidly released from the manure" during pit agitation that "may reach toxic levels or displace oxygen,

increasing the risk to humans and livestock," and enabling authorities to respond with investigations, clean-ups, abatement orders, or other remedial measures, such as requiring a change in a CAFO's waste management system.  *Id.* at 536–37.

9.      Despite this clear rejection of its attempt to exempt CAFOs from EPCRA's reporting requirements, EPA is now going even further by eliminating the critical community protections afforded by EPCRA altogether.  Just six months after the D.C. Circuit ruling – but prior to issuance of the court's mandate that would have required CAFOs to report their emissions – on October 26, 2017, EPA issued the original EPCRA Exemption, initially labeled by EPA as "Interim Guidance," exempting CAFOs from EPCRA's toxic release reporting requirement based solely on its new interpretation of the EPCRA "routine agricultural operations" provision.  *See* EPA, CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms (Oct. 26, 2017) ("2017 EPCRA Exemption") (attached as Exhibit 3); EPA, Does EPA interpret EPCRA Section 304 to require farms to report releases from animal waste? (Oct. 25, 2017) ("2017 EPCRA Q&A") (attached as Exhibit 4).

10.      In April 2018, EPA updated its EPCRA Exemption to include a second basis to exempt CAFOs from EPCRA's reporting requirement: the March 2018 amendments to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") Congress passed through the Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, § 1102, 132 Stat. 348, 1148 (2018), known as the "FARM Act."  *See* EPCRA Exemption, Ex. 1; EPA, How do the reporting requirements in EPCRA Section 304 apply to farms engaged in "routine agricultural operations"? (Apr. 27, 2018) ("EPCRA Q&A") (attached as Exhibit 5); EPA, How does the Fair Agricultural Reporting Method (FARM) Act impact reporting of air

2

emissions from animal waste under CERCLA Section 103 and EPCRA Section 304? (Apr. 27, 2018) ("FARM Act Q&A") (attached as Exhibit 6).  This version of the EPCRA Exemption included both bases for exempting CAFOs from EPCRA's reporting requirement.

11.     On November 14, 2018 – more than a year after first promulgating the EPCRA Exemption and after amending it at least six times, and shortly after Plaintiffs filed a lawsuit challenging the EPCRA Exemption, *see* Dkt No. 1 – EPA published a Notice of Proposed Rulemaking, Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act, 83 Fed. Reg. 56,791 (Nov. 14, 2018) ("Proposed Rule") (attached as Exhibit 7), in which EPA proposed to formalize its unlawful guidance.

12.     The Proposed Rule aimed to "amend the EPCRA release notification regulations . . . to include the reporting exemption for air emissions from animal waste at farms," relying on the FARM Act's exemption of such emissions from reporting under CERCLA as justification.  *See* 83 Fed. Reg. at 56,792 ("[T]his proposed rulemaking is based on the relationship of the EPCRA section 304 reporting requirements to the CERCLA section 103 reporting requirements, as recently amended.").

13.     A number of the Plaintiffs filed detailed comments opposing the Proposed Rule. *See, e.g.*, Comments of Earthjustice et al. (Dec. 14, 2018) [EPA-HQ-OLEM-2018-0318-0398; EPA-HQ-OLEM-2018-0318-0399; EPA-HQ-OLEM-2018-0318-0400] (attached as Exhibit 8); Comments of Ctr. for Biological Diversity & John Hopkins Ctr. For a Livable Future (Dec. 13, 2018) [EPA-HQ-OLEM-2018-0318-0376] (attached as Exhibit 9).

14.     EPA received 87,473 comments of which at least 87,091 (more than 99%) were from organizations and individuals opposing the Proposed Rule.  *See* 84 Fed. Reg. at 27,535.

3

15.     On June 13, 2019, EPA published the Final Rule, entitled Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act.  84 Fed. Reg. 27,533.  This Rule finalizes the Proposed Rule's exemption of CAFOs from reporting their toxic air emissions under EPCRA, and thus codifies the EPCRA Exemption into EPA's EPCRA regulations.  *Id.*

16.     The EPCRA Exemption and the Final Rule leave communities without the information necessary to protect against harmful releases of ammonia and hydrogen sulfide from animal waste – information that could be used to avoid exposure, initiate clean-ups, investigate facilities, propose remedial measures, and otherwise keep communities safe from these poisonous substances.  This, in turn, leaves them vulnerable to exposure to hazardous chemicals released by animal waste at CAFOs.

17.     Plaintiffs bring this action on their own behalf and on behalf of their members and supporters who live in close proximity to CAFOs that release massive quantities of hazardous pollutants such as ammonia and hydrogen sulfide into the air they breathe.

18.     The EPCRA Exemption is a legislative rule affecting legal rights and duties of CAFOs that would have to report their toxic releases but for the EPCRA Exemption.

19.     EPA promulgated the EPCRA Exemption outside of the Administrative Procedure Act ("APA") rulemaking process.  EPA issued the EPCRA Exemption without:

    a.  publishing a notice of proposed rulemaking in the Federal Register for the EPCRA Exemption;

    b.  referencing the legal authority under which EPA proposed the EPCRA Exemption;

    c.   publishing a final rule with a concise general statement of its basis and purpose;

    d.   publishing a response to the comments submitted by the public or otherwise made those comments publicly available; or

    e.   setting an effective date at least 30 days after publication of a final rule.

20.    As of the date of this filing, EPA has amended the EPCRA Exemption at least eight times since first posting the exemption on its website in October 2017.  The EPCRA Exemption website now points solely to the Final Rule as the legal basis for the EPCRA reporting exemption.  But EPA could easily amend its website a ninth time to reinstate additional legal bases for its EPCRA reporting exemption distinct from the Final Rule, such as the "routine agricultural operations" rationale or other new rationales.

21.    The EPCRA Exemption and the Final Rule contravene the clear precedent established by the United States Court of Appeals for the D.C. Circuit, which held that EPCRA's broad reporting mandate requires CAFOs to report their toxic air emissions from animal waste to state and local officials.

22.    The EPCRA Exemption and the Final Rule both violate the mandatory reporting requirements of EPCRA, 42 U.S.C. § 11004(a), and contravene the text and legislative history of the FARM Act.  *See* 115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018).

23.    Plaintiffs respectfully request that the Court hold the EPCRA Exemption to be arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and published without observance of legally required procedure, in violation of the APA.  In addition, Plaintiffs respectfully request that the Court hold the Final Rule to be arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law, and unsupported by substantial evidence, in violation of the APA.  Plaintiffs also seek an order

vacating the EPCRA Exemption, vacating the Final Rule, and requiring CAFOs to comply with

EPCRA reporting requirements by a date certain, not to exceed 30 days after issuance of the

Court's Order.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

question).

25.     The EPCRA Exemption is a final agency action subject to judicial review.  5

U.S.C. §§ 702, 704, 706.

26.     The Final Rule is a final agency action subject to judicial review.  *Id.*

27.     Plaintiffs have a right to bring this action under the APA.  *Id.* §§ 701–706.

28.     An actual controversy exists between the parties within the meaning of 28 U.S.C.

§ 2201.  This Court has authority to issue the relief requested under 28 U.S.C. § 2201(a)

(declaratory judgment and further relief).

29.     Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(e)(1),

because Defendants reside in this district, Plaintiffs Center for Food Safety, Environmental

Integrity Project, Food & Water Watch, and the Humane Society of the United States reside in

this district, and Defendants issued the EPCRA Exemption and the Final Rule in this district.

## PARTIES

30.     Plaintiffs are nonprofit organizations whose purposes include ensuring that their

members are aware of, and are not sickened or otherwise negatively impacted by, hazardous

emissions emanating from animal waste at CAFOs.  Because exposure to emissions from CAFOs

is associated with a range of deleterious health impacts, Plaintiffs and their members would

benefit from knowing whether and when CAFOs in their communities release hazardous

substances in excess of EPA's reportable quantities, because such information could help them avoid exposures and any resulting adverse health impacts.  In addition, the health of Plaintiffs and their members would be better protected if local response authorities received release reports from CAFOs and were better informed about the sources of toxic emissions in their jurisdictions.

31.     Plaintiff **Rural Empowerment Association for Community Help ("REACH")** is a nonprofit organization dedicated to empowering the citizens in Duplin County, North Carolina, which is the top hog-producing county in the nation.  Among other goals, the organization works to protect residents from harmful air pollution from CAFOs by fighting against the state's lax regulation of hog waste disposal, which discriminates against communities of color in eastern North Carolina.  Many REACH members live in homes that are surrounded by multiple swine CAFOs.  EPA's EPCRA Exemption and Final Rule harm REACH and its members by denying them information about toxic air emissions from these CAFOs that they would use to protect their health and push for emission decreases.  The EPCRA Exemption and Final Rule also harm REACH and its members by depriving them of protections they would otherwise have if local response authorities received release reports from CAFOs and were better informed about the sources of toxic emissions in their jurisdictions.

32.     Plaintiff **Animal Legal Defense Fund** is a national nonprofit organization whose mission is to protect the lives and advance the interests of animals through the legal system.  The organization accomplishes this mission by filing lawsuits, administrative comments, and rulemaking petitions to increase legal protections for animals, by supporting strong animal protection legislation, and by fighting legislation harmful to animals.  The Animal Legal Defense Fund conducts this work on behalf of itself and more than 235,000 members and supporters throughout the United States, many of whom live near, recreate near, and closely monitor

CAFOs.  The Animal Legal Defense Fund utilizes information about the environmental impacts of CAFOs to advance its legal advocacy on behalf of the farmed animals who are directly harmed by air emissions from the facilities in which they are confined.  EPA's EPCRA Exemption and Final Rule harm the Animal Legal Defense Fund and its members by depriving them of information and protections they otherwise would have if CAFO operators were required to provide release reports and local authorities were better informed about the sources of toxic emissions in their jurisdictions.

33.     Plaintiff **Center for Biological Diversity ("CBD")** is a national, public interest environmental organization that works through science, law, and policy to secure a future for all species, great and small, hovering on the brink of extinction.  For decades CBD has worked to protect imperiled plants and wildlife, open spaces, and air and water quality, as well as to preserve the overall quality of life for people and animals.  Central to CBD's mission is an understanding that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked.  In support of its mission, CBD and its more than 69,500 members regularly participate in efforts to address threats to imperiled species and public health from air pollution and other contaminants.  CBD further advances programs and campaigns to combat the extensive risks to ecosystems, sustainable food systems, and public health from industrial animal agricultural operations, including by working to increase transparency around CAFO facilities and to oppose the unjust and environmentally destructive practices that these facilities employ.  CBD is harmed by EPA's EPCRA Exemption and Final Rule because they deny the organization crucial information about toxic releases from CAFOs that it needs to carry out its mission.  If CBD had access to the hazardous substance reporting information concealed by the EPCRA Exemption and Final Rule, it would provide that information to its members and

use it to advocate on their behalf for increased protections.  EPA's EPCRA Exemption and Final

Rule harm CBD and its members by depriving them of protections they otherwise would have if

local response authorities received release reports from CAFOs and were better informed about

the sources of toxic emissions in their jurisdictions.

34.     Plaintiff **Center for Food Safety** is a national nonprofit organization

headquartered in the District of Columbia that works to protect human health and the

environment by curbing the proliferation of harmful food production technologies and promoting

sustainable alternatives.  Principal among its activities are analyses and actions to mitigate the

impact of industrial agriculture – including CAFOs – on human health and the environment.  The

Center for Food Safety serves its 950,000 members in part by developing a wide array of

educational and informational materials that address the impacts of industrial agriculture.  It

disseminates these materials – which include policy reports, press releases, newsletters, action

alerts, and fact sheets – to its members as well as to policymakers, government officials, other

nonprofit organizations, and the public.  The Center for Food Safety also engages in litigation

strategies to ensure that the nation's environmental laws are enforced with respect to food and

agriculture.  If the Center for Food Safety had access to the pollution reporting information that

the EPCRA Exemption and Final Rule purport to exempt, it would provide that information to its

members and use it to advocate on their behalf for increased protections.  Center for Food Safety

members cannot take steps to protect their health and wellbeing from air emissions from CAFOs

because EPA has denied them access to this information.  In addition, EPA's EPCRA Exemption

and Final Rule harm the Center for Food Safety and its members by depriving them of

protections they otherwise would have if local response authorities received release reports from

CAFOs and were better informed about the sources of toxic emissions in their jurisdictions.

35.     Plaintiff **Don't Waste Arizona, Inc.,** is a nonprofit environmental organization created for the protection, conservation, and preservation of the human and natural environment in and around Phoenix, and the state of Arizona.  The organization helps its members fight against polluting industries and protect their own health and welfare.  Without access to the pollution information that the EPCRA Exemption and Final Rule purport to exempt CAFOs from having to report, Don't Waste Arizona, Inc. is severely hampered in its mission and would not be able to easily obtain information about releases of harmful air pollutants or share that information with its members.  Don't Waste Arizona, Inc. members cannot take steps to protect their health and wellbeing from emissions from CAFOs because EPA has denied them access to this information.  In addition, EPA's EPCRA Exemption and Final Rule harm Don't Waste Arizona and its members by depriving them of protections they otherwise would have if local response authorities received release reports from CAFOs and were better informed about the sources of toxic emissions in their jurisdictions.

36.     Plaintiff **Environmental Integrity Project** is a national nonprofit organization headquartered in the District of Columbia and dedicated to strengthening environmental laws and improving their enforcement.  Its purpose includes ensuring that affected communities have information about toxic emissions from CAFOs.  EPA's EPCRA Exemption and Final Rule harm Environmental Integrity Project because they deny the organization data about toxic releases from CAFOs that it needs to advocate for policies that promote environmental protection and the wellbeing of rural communities.

37.     Plaintiff **Food & Water Watch ("FWW")** is a national, public interest, membership organization headquartered in the District of Columbia with over one million members and supporters.  FWW's mission is to stand up to corporations that put profits before

people and advocate for a democracy that improves people's lives and protects our environment. FWW uses grassroots organizing, policy advocacy, research, communications, and litigation to further this mission. Pollution from factory farms, including CAFO air emissions subject to reporting under EPCRA, is one of FWW's priority issues. FWW works to increase transparency about how factory farms operate, where they are located, and the pollutants they emit into communities and waterways, as well as towards reducing that pollution and improving EPA regulation of the CAFO industry. The pollution information that EPCRA guarantees will be publicly available is key to FWW's ability to carry out its work, including providing emissions information to its members. This work is hampered by EPA's attempts to exempt CAFOs from reporting under EPCRA. Without this information, FWW members are not able to protect themselves from harmful emissions from CAFOs. EPA's illegal actions deny FWW and its members and supporters access to information to which EPCRA legally entitles them. In addition, EPA's EPCRA Exemption and Final Rule harm FWW and its members by depriving them of protections they otherwise would have if local response authorities received release reports from CAFOs and were better informed about the sources of toxic emissions in their jurisdictions.

38. Plaintiff **Humane Society of the United States ("HSUS")** is a national nonprofit organization headquartered in the District of Columbia with millions of members and constituents nationwide, including members in all 50 states and in the District of Columbia, many of whom live in close proximity to CAFOs. Since its inception in 1954, HSUS has actively advocated for better laws to protect animals and their environment; conducted campaigns to combat animal abuse and promote strong animal welfare policies; and advocated against practices that injure, harass, or otherwise harm animals. HSUS's mission is to end

11

suffering for all animals, including farm animals.  As part of its efforts to protect farm animals,

HSUS works to ensure that its members are aware of, and not injured by, practices related to

CAFOs releasing or otherwise discharging pollutants into the natural environment.  HSUS

regularly researches, publishes reports about, and advocates against agricultural practices that

impair the welfare of farmed animals and negatively impact the surrounding communities and

environments.  On behalf of itself and its members, who experience air quality impacts from

CAFOs, HSUS provides education, submits public comments, files litigation, and advocates for

policies and regulatory and legislative changes to mitigate the harmful environmental and social

impacts of CAFOs.  The information guaranteed by EPCRA is vital to the organization's

functions and would assist its members and constituents in making informed choices affecting

their health.  In addition, EPA's EPCRA Exemption and Final Rule harm HSUS and its members

by depriving them of protections they otherwise would have if local response authorities

received release reports from CAFOs and were better informed about the sources of toxic

emissions in their jurisdictions.

39.    Plaintiff **Sierra Club** is a national nonprofit organization of approximately

788,793 members dedicated to protecting and promoting the enjoyment of the environment.

Sierra Club has had an active CAFO campaign for over ten years, with the goal of keeping

CAFO pollution from harming public health and rural heritage.  Many Sierra Club members live

near CAFOs, and air pollution from CAFOs threaten these members' health, quality of life, and

recreational activities.  Sierra Club has helped members address pollution from CAFOs in many

states including California, Idaho, Iowa, Kentucky, Michigan, Missouri, New Mexico, New

York, Oklahoma, and Texas.  If the Sierra Club had access to the pollution reporting information

that the EPCRA Exemption purports to exempt, it would provide that information to its members

12

and use it to advocate for increased protections on their behalf.  In the absence of this information, Sierra Club and its members remain in the dark about the harmful toxins emitted by CAFOs and how they could protect their health.  In addition, EPA's EPCRA Exemption and Final Rule harm Sierra Club and its members by depriving them of protections they otherwise would have if local response authorities received release reports from CAFOs and were better informed about the sources of toxic emissions in their jurisdictions.

40.     Plaintiff **Sound Rivers** is a North Carolina-based nonprofit organization that guards the health of the Neuse and Tar-Pamlico River Basins.  Sound Rivers is a licensed Waterkeeper Alliance Member Organization with licensed programs for the Pamlico Tar Riverkeeper, Lower Neuse Riverkeeper, and Upper Neuse Riverkeeper.  It unites with concerned citizens to monitor, protect, and preserve the watersheds covering nearly one quarter of North Carolina, and its work has included holding the hog industry to account for the pollution it produces.  EPA's EPCRA Exemption and Final Rule harm Sound Rivers and its members by denying them information about toxic emissions from these CAFOs that they would use to protect their health and push for emission decreases.  In addition, EPA's EPCRA Exemption and Final Rule harm Sound Rivers and its members by depriving them of protections they otherwise would have if local response authorities received release reports from CAFOs and were better informed about the sources of toxic emissions in their jurisdictions.

41.     Plaintiff **Waterkeeper Alliance** is a nonprofit organization headquartered in New York that seeks to restore and protect all major waterways around the world as drinkable, fishable, and swimmable.  Waterkeeper Alliance works toward this vision through direct advocacy, and through the grassroots advocacy of its Waterkeeper Member and Affiliate organizations.  Waterkeeper Alliance currently supports and connects more than 340

Waterkeeper Member Organizations and Affiliate Organizations in 44 countries on 6 continents. In the United States, this includes more than 150 Waterkeeper Member Organizations chartered and licensed by Waterkeeper Alliance ("U.S. Member Organizations") and approximately 19 Waterkeeper Affiliate Organizations ("U.S. Affiliate Organizations").  Many of Waterkeeper Alliance's U.S. Member and Affiliate Organizations are actively working to protect their watersheds and communities from pollution caused by CAFOs, and Waterkeeper Alliance has a long history of working with and supporting U.S. Member Organizations to address CAFO impacts.  Additionally, Waterkeeper Alliance has approximately 12,000 individual members, and its U.S. Member and Affiliate Organizations cumulatively have tens of thousands of individual members who live, work, and recreate in watersheds across the United States, including individual members that live, work, and recreate in areas affected by CAFOs.  Waterkeeper Alliance supports these Waterkeeper Member Organizations, Affiliates and individual members by advocating on behalf of their interests in local and national forums, and keeping them informed about the issues and impacts to their communities.  Waterkeeper Alliance regularly organizes training courses and informational panels that include workshops addressing air and land emissions from CAFOs, and maintains information on a webpage devoted to CAFOs, including information on their regulation, their impacts, and legislative measures to prevent or reduce such impacts.  Waterkeeper Alliance also advocates for more stringent regulation of CAFOs before state and national officials, and for implementation and enforcement of existing law through litigation.  *See e.g., Waterkeeper All. v. EPA*, 853 F.3d 527, 537–38 (D.C. Cir. 2017).   Hazardous air pollutants from animal waste at CAFOs, including ammonia and hydrogen sulfide, pose clear health and welfare risks to Waterkeeper Alliance's U.S. Member and Affiliate Organizations and, in turn, to the individual members in the communities they

serve.  EPA's EPCRA Exemption and Final Rule harm Waterkeeper Alliance by making it more difficult for it to help its members avoid exposure to hazardous CAFO emissions that could harm their health, and by denying the organization, its U.S. Member and Affiliate Organizations, and their respective individual members information to which they are legally entitled that could be used to protect members and communities.  In addition, EPA's EPCRA Exemption and Final Rule harm Waterkeeper Alliance and these organizational and individual members by depriving them of protections they otherwise would have if local response authorities received release reports from CAFOs and were better informed about the sources of toxic emissions in their jurisdictions.

42.    Plaintiffs and their members and supporters have been and will continue to be injured by EPA's EPCRA Exemption and Final Rule, which deprive them of public health and safety information that federal law gives them the right to know.  Together, Plaintiffs have millions of members and supporters, many of whom rely on EPCRA reporting to conduct their daily activities in ways that protect their health, for example, by remaining indoors when CAFOs are releasing large amounts of harmful emissions.

43.    Without access to this information, Plaintiffs are hindered in their ability to educate the public about the health risks associated with air pollution from animal waste, advocate for government policies that limit the public's exposure to harmful animal waste emissions, and ensure that state and local first responders possess the information needed to protect themselves and the public appropriately.

44.    Because the Final Rule and the EPCRA Exemption deprive state and local response agencies of critical information about CAFO air emissions, state and local response agencies are kept in the dark about sources of substantial toxic pollution within their

jurisdictions, potentially placing the health and safety of Plaintiffs and their members at greater risk.

45.     In addition, EPA's failure to comply with mandatory rulemaking procedures when issuing the EPCRA Exemption – which changed the legal status quo by exempting CAFOs from reporting their toxic air emissions under EPCRA – harmed Plaintiffs and their members and supporters by depriving them of administrative processes integral to their ability to protect their interests.  Although EPA accepted comments on its 2017 EPCRA Exemption, published on October 26, 2017 – including comments submitted by a number of Plaintiffs here – it never made those comments available to the public nor published any response to them.  EPA did not accept comments when, without prior notice, it published the updated EPCRA Exemption on April 30, 2018, even though the updated EPCRA Exemption added an entirely new basis for the purported exemption to EPCRA reporting requirements.

46.     Finally, the Final Rule and EPCRA Exemption contribute to environmental and health harms that injure Plaintiffs' members and supporters.  As EPA has acknowledged, requiring reporting increases the likelihood that a facility will take voluntary steps to reduce or eliminate its emissions.  EPA, 1 Regulatory Impact Analysis of Reportable Quantity Adjustments Under Sections 102 and 103 of the Comprehensive Environmental Response, Compensation, and Liability Act, at 34 (1985) [EPA-HQ-SFUND-2007-0469-0013].  The Final Rule and the EPCRA Exemption excuse CAFOs from reporting, thereby decreasing the likelihood of these voluntary emission reductions.

47.     EPCRA reports also inform local regulators and the public about which facilities in their communities pollute the most, allowing for campaigns to pressure the facilities to adopt less polluting operational practices.  Information about sources of toxic air pollution also allows

community members to avoid recreating or otherwise spending time near those toxic sources.

48.     These injuries are actual, concrete, and irreparable.  Plaintiffs and their members

and supporters will continue to suffer harm as a result of EPA's unlawful EPCRA Exemption

and Final Rule unless and until this Court provides the relief prayed for in this Complaint.

49.     An Order vacating the Final Rule and the EPCRA Exemption and all the

supporting documents, mandating compliance with EPCRA reporting requirements by a date

certain, and declaring that regulating by website guidance violates the APA would redress

Plaintiffs' injuries.

50.     Defendant **EPA** is a federal agency charged with protecting public and

environmental health, in part, by assuring that citizens and first responders have access to

information about emissions of hazardous pollutants from agricultural operations.

51.     Defendant **Andrew Wheeler** is the Administrator of EPA.  Administrator

Wheeler, whom Plaintiffs sue in his official capacity, has legal responsibility for administering

and overseeing EPA.

**FACTUAL BACKGROUND**

52.     Animal Feeding Operations can concentrate millions of animals in a single

facility, where they generate massive quantities of urine and feces.  This waste, along with the

animals' flatulence and piles of dead animal carcasses, in turn generates toxic emissions.

Although a single CAFO can produce more waste than the average city, unlike a city that treats

its sewage at wastewater treatment plants, CAFOs often store their animal feces and urine

untreated in giant pits that emit large quantities of ammonia and hydrogen sulfide into the air.

*See* D. Bruce Harris et al., *Ammonia Emissions Factors from Swine Finishing Operations*, from

10th Annual Emission Inventory Conference, at 1 (2001),

17

http://www.prairieswine.com/pdf/34465.pdf (CAFOs account for nearly 75% of the total

ammonia emissions in the U.S.); EPA, *Non-Water Quality Impact Estimates for Animal Feeding*

*Operations*, at 2-30 to 2-31 (2002), https://www3.epa.gov/npdes/pubs/cafo_nonwaterquality.pdf

(large and medium dairy and swine CAFOs emit nearly 190,000 pounds of hydrogen sulfide

annually).

53.     Exposure to ammonia triggers respiratory problems, causes nasal and eye

irritation, and in extreme circumstances can lead to scarring of the respiratory tract or even death.

Iowa State Univ. and The Univ. of Iowa Study Grp., *Iowa Concentrated Animal Feeding*

*Operations Air Quality Study*, at 123 (2002), https://www.public-

health.uiowa.edu/ehsrc/CAFOstudy/CAFO_6-3.pdf.  Ammonia concentrations of greater than

100 parts per million ("ppm") have been regularly reported on CAFOs.  *Id.*  These ammonia

concentrations are over 1,000 times levels considered unsafe by the U.S. Department of Health

and Human Services' Agency for Toxic Substances & Disease Registry ("ATSDR").  *See*

ATSDR, *Toxicological Profile for Ammonia*, at 19–20 (Sept. 2004),

https://www.atsdr.cdc.gov/toxprofiles/tp126.pdf (setting 0.1 ppm chronic-duration Minimum

Risk Level for ammonia inhalation exposure).

54.     Exposure to hydrogen sulfide can lead to major health problems, with even small

concentrations triggering headaches, nausea, and eye, skin, and respiratory irritation.  ATSDR,

*Toxicological Profile for Hydrogen Sulfide and Carbonyl Sulfide*, ch. 3 at 32–82 (2016),

https://www.atsdr.cdc.gov/toxprofiles/tp114.pdf.  Hydrogen sulfide also targets the nervous

system, and chronic low-level exposure can impair balance, visual field performance, color

discrimination, hearing, memory, mood, and intellectual function.  *Id.* at 74–82.  Higher levels of

exposure can cause a loss of consciousness and possibly death.  *Id.* at 28–32.

55.     People living near CAFOs are suffering as a result of exposure to these toxic chemicals.  They exhibit increased rates of ailments such as respiratory problems, headaches, diarrhea, and nausea.  *See* Earthjustice et al., Comment Letter on CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances From Animal Waste at Animal Feeding Operations, at 8–9 & nn.37–41 (Mar. 27, 2008), http://earthjustice.org/sites/default/files/library/legal_docs/signed-final-cafo-comments.pdf. People have become seriously ill and even died as a result of breathing fumes released during manure pit agitation, a process necessary to operate liquid manure storage systems.  *See* K.J. Donham, *Community and Occupational Health Concerns in Pork Production: A Review*, 88 J. ANIM. SCI. 102, 107 (2010), https://www.gpo.gov/fdsys/pkg/USCOURTS-caDC-09-01017/pdf/USCOURTS-caDC-09-01017-1.pdf.

56.     The largest and most highly-concentrated animal production facilities contribute disproportionately to the harmful emissions from animal agriculture.  Less than twenty percent of livestock feeding operations produce over 90 percent of the country's livestock animals, including beef cattle, dairy cows and finisher swine.[1]  The poultry sector is even more concentrated, with around six percent of operations producing 90 percent of the nation's broiler chickens, turkeys, and laying hens.[2]  These operations confine at least the minimum number of animals to be

---

[1] Livestock and poultry production data were collected from the 2012 United States Department of Agriculture National Agriculture Statistics Service Census of Agriculture, and sorted by "farm size" based on the total number of animals at the operation.  Of the 113,795 total operations producing cattle on feed, dairy cows, and finishing swine in 2012, 20,701 operations (18%) were above the size threshold to be classified as a medium CAFO. *See infra* note 3; USDA Census of Agriculture, 2012 Census, Volume 1 Chapter 1: U.S. National Level Data (2012), https://www.agcensus.usda.gov/Publications/2012/Full_Report/Volume_1,_Chapter_1_US/.

[2] Six percent represents 14,938 operations within the same size class out of 231,217 total operations producing broilers, turkeys and layer hens. *See supra* note 1; *infra* note 3.

classified as a medium or large CAFO, per EPA's regulatory definition.[3]  For example, out of 1.1 million animal feeding operations, just 24,500 operations of at least this medium or large CAFO size produced over one billion beef cattle, finisher hogs, and broiler chickens in 2012.[4]  The animals in these operations generate a significant amount of manure, which emits a large proportion of the country's total manure-related air emissions.[5]

57.    The vast majority of animal agriculture operations are smaller operations that would not need to report emissions of ammonia and hydrogen sulfide under EPCRA because their emissions do not exceed the applicable reportable quantity of 100 pounds per day.  For example, approximately 59 percent of operations with broiler chickens are not expected to emit 100 pounds or more of ammonia per day, and an even greater percentage are not expected to emit 100 pounds or more of hydrogen sulfide per day.[6]  Approximately 81 percent of swine operation with grower or finisher pigs are not expected to emit 100 pounds or more of ammonia per day, and an even greater percentage are not expected to emit 100 pounds or more of hydrogen sulfide per day.[7]

---

[3] An operation is classified as a medium or large CAFO if the operation confines at least a certain number of animals and discharges pollutants into surface waters.  A medium or large CAFO confines at least between 300 cattle or cow/calf pairs, 200 mature dairy cattle, 750 swine weighing over 55 pounds, and 37,500 meat-producing chickens on dry litter systems. *See* 40 C.F.R. § 122.23.

[4] 3.6% of cattle feedlot operations produced 92.1% of beef cattle, 31% of finisher swine operations produced 98.6% of finisher hogs, and 33.2% of broiler operations produced 88.8% of meat chickens.

[5] The amount of manure excreted and the amount of ammonia and hydrogen sulfide emissions generally scale proportionately to the number of animals at an operation.  Variability may arise due to differences in feed quality, feed intake, and manure management. *See* American Society of Agricultural Engineers, *Manure Production and Characteristics* 1 (2005), http://www.agronext.iastate.edu/immag/pubs/manure-prod-char-d384-2.pdf.

[6] *See* Hongwei Xin et al., *Ammonia (NH3) and Hydrogen Sulfide (H2S) Emission Rates for Poultry Operations* (2009) (linked to in 2017 EPCRA Exemption), https://articles.extension.org/sites/default/files/w/5/51/Poultry_NH3_and_H2S_emissions.pdf.

[7] *See* Calculation Worksheet – Ammonia and Hydrogen Sulfide Emissions: Swine Operations – Confinement with Liquid Manure Management Systems (2009) (linked to in 2017 EPCRA

Approximately 97 percent of dairy operations are not expected to emit 100 pounds or more of ammonia per day, and an even greater percentage are not expected to emit 100 pounds or more of hydrogen sulfide per day.[8]  Approximately 96 percent of beef operations are not expected to emit 100 pounds or more of ammonia per day.[9]

58.      Thus the majority of operations do not release the reportable quantity of these toxic chemicals and thus do not need to report emissions under EPCRA.  Accordingly, in responding to comments on the 2008 CERCLA/EPCRA Rule, EPA agreed with the comment that "[s]mall farms should not be affected even if the reporting requirements stay in place because these farms do not generally have a large enough herd of animals to reach the requisite levels of toxins."  EPA, Response to Comment Document, CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms

---

Exemption), http://livestocktrail.illinois.edu/uploads/manure/papers/EPCRA_Swine_Calc.pdf. The number of animals expected to emit 100 pounds of ammonia or hydrogen sulfide per day was calculated by dividing 100 pounds by the upper bound per-animal emissions constants (0.055 pounds of ammonia per animal day or 0.0104 pounds of hydrogen sulfide per animal per day) given by this document.

[8] *See* Calculation Worksheet – Ammonia and Hydrogen Sulfide: Dairy Operations (2009) (linked to in 2017 EPCRA Exemption), https://www.michigan.gov/documents/deq/deq-ess-cafo-worksheet-dairyemissions_266406_7.pdf.  The number of animals expected to emit 100 pounds of ammonia or hydrogen sulfide per day was calculated by dividing 100 pounds by the upper bound emission rates (0.07 pounds of ammonia per animal per day or 0.000134 pounds of hydrogen sulfide per animal per day) given by this document.

[9] *See* Rick Stowell and Rick Koelsch, Ammonia Emissions Estimator (Daily Version) (2009) (linked to in 2017 EPCRA Exemption), https://water.unl.edu/documents/Ammonia%20Emissions%20Estimator%20-%20Daily%20VersionV03.pdf.  The number of animals expected to emit 100 pounds of ammonia was calculated by dividing 100 pounds by the unit ammonia loss calculated with high-end values (0.35 pounds of ammonia per animal per day) given by this document.  The unit ammonia loss was calculated using values from Table 1 for "Open dirt lots (hot, arid region)" for "Beef," from Table 2 for "Composted manure (no carbon amendment)," and from Table 3 for "Beef – Finishing Cattle." The 2017 EPCRA Exemption did not include a method for estimating hydrogen sulfide emissions from beef operations.

28-29 (Dec. 12, 2008) [EPA-HQ-SFUND-2007-0469-1359]; *see also* 2008 CERCLA/EPCRA

Rule, 73 Fed. Reg. at 76,958 (acknowledging in its Regulatory Impact Analysis of the 2008 Rule

that "small farms would probably not be affected by the reporting requirements" of EPCRA).

59.     In addition to these reportable releases into air, CAFOs may also release

extremely hazardous substances above reportable quantities into water during flooding and storm

events, or other occurrences of waste pit failure.

60.     Communities around CAFOs rely on information from EPCRA reports to protect

against and respond to hazardous materials released by CAFOs into the environment that

threaten their health and wellbeing.  *Waterkeeper All.*, 853 F.3d at 536 (discussing comments

explaining "scenarios where the reports could be quite helpful in fulfilling [EPCRA's] goals").

**LEGAL BACKGROUND**

**I.     The Emergency Planning and Community Right-to-Know Act**

61.     Congress passed the Emergency Planning and Community-Right-to-Know Act to

support emergency planning and preparedness in local communities, and to provide local

governments and communities with information about chemical hazards in their area.

62.     To achieve these ends, EPCRA contains a general requirement that facilities that

"release" more than a threshold quantity of an "extremely hazardous substance" must report that

release to local emergency response agencies, and that those reports must be made available to

the public.  *See* 42 U.S.C. §§ 11004, 11044(a).

63.     Immediate release reporting under EPCRA provides local and state emergency

responders with information critical to appropriately assessing and safely responding to citizen

complaints of suspicious or noxious odors.

64.     The EPCRA reporting requirement increases the likelihood that a facility will take

voluntary steps to reduce or eliminate its emissions.

22

65.     EPCRA requires EPA to publish a list of extremely hazardous substances that will be subject to this reporting requirement.  *Id.* § 11002(a)(2).  EPA must also determine, by regulation, threshold quantities of releases above which a report is required, commonly known as the "reportable quantity."  *Id.* § 11002(a)(3)(A).

66.     The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") contains provisions that require EPA to list "hazardous substances" with reportable quantities, and require facilities to report the release of any such hazardous substance. *See id*. §§ 9602, 9603(a).

67.      EPCRA reports must be submitted to local emergency response agencies, while CERCLA reports must be submitted to the federal government.  *Compare id*. § 9603(a), *with id.* § 11004(b), (c).

68.     EPA lists ammonia and hydrogen sulfide as "extremely hazardous substances" under EPCRA, and lists a reportable quantity of 100 pounds per day for each.  40 C.F.R. pt. 355, app. A.

69.     EPA lists ammonia and hydrogen sulfide as "hazardous substances" under CERCLA, with a reportable quantity of 100 pounds per day for each.  *Id*. § 302.4(a).

70.     EPCRA broadly defines "release" to mean "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles) of any hazardous chemical, extremely hazardous substance, or toxic chemical."  42 U.S.C. § 11049(8).  CERCLA's definition of "release" is narrower than EPCRA's, and includes exclusions from the definition of "release" not contained in the EPCRA definition.

71.     EPCRA's definition of "environment," in turn, "includes water, air, and land and the interrelationship which exists among and between water, air, and land and all living things." *Id.* § 11049(2).

72.     Under EPCRA, polluters must submit reports to local emergency response agencies for three types of releases: (1) release of an EPCRA extremely hazardous substance that also requires reporting under CERCLA; (2) release of an EPCRA extremely hazardous substance that does *not* require reporting under CERCLA; and (3) releases of a substance listed as a CERCLA hazardous substance, but not as an EPCRA extremely hazardous substance.  *Id.* § 11004(a).  Under all three situations, written release reports "shall be made available to the general public."  *Id.* §§ 11004(c); 11044(a).

73.     For the second category of release, EPCRA requires release reports "[i]f a release of an extremely hazardous substance . . . is not subject to the notification requirements under . . . CERCLA . . . but only if the release . . . occurs in a manner which would require notification under . . . CERCLA."  *Id.* § 11004(a)(2).

74.     In other words, notwithstanding the lack of any parallel CERCLA reporting requirement for that release, EPCRA requires reporting of that release so long as the substance enters the environment in a manner that "would require notification" assuming a parallel CERCLA reporting requirement did exist.

75.     Under all three circumstances, the reporting requirement applies to releases from a "facility at which a hazardous chemical is produced, used, or stored."  *Id.*

76.     EPCRA broadly defines the term "facility" to mean "all buildings, equipment, structures, and other stationary items which are located on a single site or on contiguous or adjacent sites and which are owned or operated by the same person (or by any person which

controls, is controlled by, or under common control with, such person).  For purposes of [the release reporting provisions of] section 11004 of this title, the term includes motor vehicles, rolling stock, and aircraft."  *Id.* § 11049(4).

77.     For the term "hazardous chemical," EPCRA adopts the definition of that term from Occupational Safety and Health Administration ("OSHA") regulations, but with certain added exceptions.  *See id.* §§ 11021(e), 11049(5).  The OSHA regulations broadly define "hazardous chemical" as "any substance, or mixture of substances" "which is classified as a physical hazard or a health hazard, a simple asphyxiant, combustible dust, pyrophoric gas, or hazard not otherwise classified."  29 C.F.R. § 1910.1200(c).

78.     OSHA classifies anhydrous ammonia and hydrogen sulfide as "toxic and reactive highly hazardous chemicals which present a potential for a catastrophic event at or above [a] threshold quantity."  *Id.* § 1910.119 app. A.  In addition, OSHA classifies both substances as air contaminants.  *See id.* § 1910.1000(e) tbl.Z-1.

79.     As noted above, the EPCRA reporting requirement applies to facilities that either produce, store, or use a hazardous chemical.  As relevant to this last category of facilities, EPCRA contains an exception from its definition of "hazardous chemical" that states that this term does not include "[a]ny substance to the extent it is ***used*** in routine agricultural operations or is a fertilizer held for sale by a retailer to the ultimate customer."[10]  42 U.S.C. § 11021(e)(5) (emphasis added).  EPCRA contains no parallel "routine agricultural operations" exception for facilities that ***produce*** or ***store*** hazardous chemicals.  *See id.*

80.     Ammonia and hydrogen sulfide are thus "hazardous chemicals" for the purposes

---

[10] Though not relevant to the claims here, Plaintiffs disagree that the waste management or other practices conducted at many AFOs qualify as "routine agricultural operations."  *See* 42 U.S.C. § 11021(e)(5).

of EPCRA, and any facility that either produces or stores ammonia or hydrogen sulfide is a facility that is subject to the EPCRA reporting requirement.  *Id.* § 11004(a).

## II.    The Administrative Procedure Act

81.    The APA governs how federal agencies may propose and establish regulations, and provides the basic framework for judicial review of such agency actions.  *See* 5 U.S.C. § 702.

82.    The APA defines "rule," in relevant part as, "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."  *Id*. § 551(4).

83.    Courts in this Circuit have defined a substantive or legislative rule – as compared to an interpretive rule, general statement of policy, or a rule of agency organization, procedure or practice – as one that affects individual rights and obligations and has the force and effect of law. Agencies must provide for notice and comment when promulgating substantive or legislative rules.

84.    The APA requires that, before adopting a new rule, "General notice of proposed rule making shall be published in the Federal Register."  *Id.* § 553(b).  This notice "shall include— (1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."  *Id.*

85.    After the required publication of the notice, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation.  After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general

statement of their basis and purpose." *Id.* § 553(c).

86.     In most circumstances, the APA requires that publication of the final rule "shall be made not less than 30 days before its effective date." *Id.* § 553(d).

87.     In addition to these procedural requirements concerning the promulgation of rules, the APA provides that reviewing courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions" when the court finds that those actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," where the action has been adopted "without observance of procedure required by law," or where the action is "unsupported by substantial evidence." *Id.* § 706(2)(A),(C),(D),(E).

## III.     National Environmental Policy Act

88.     The National Environmental Policy Act requires agencies to carefully examine the environmental consequences of their actions.  *See* 42 U.S.C. § 4332(2)(C).  The statute's "twin aims" are to "place[] upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. . . . [and] ensure[] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc*., 462 U.S. 87, 97 (1983).

89.     Specifically, when contemplating a "major Federal action[] significantly affecting the quality of the human environment," an agency must prepare an environmental impact statement and an environmental assessment to analyze reasonable alternatives to achieve the agency's purpose and need, as well as an analysis of the direct, indirect, and cumulative effects of the proposed action and the reasonable alternatives to it.  42 U.S.C. § 4332(2)(C); *see* 40 C.F.R. § 1508.25.

90.     Promulgation of rules adopted pursuant to the APA qualifies as a type of action subject to the requirements of NEPA. *See* 40 C.F.R. § 1508.18(b)(1); *see also* 40 C.F.R. § 1502.5(d) ("For informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule.").

91.     No provision of EPCRA or other law exempts EPA from its legal obligations to comply with NEPA when promulgating regulations under EPCRA.

## PROCEDURAL HISTORY:
## EPA'S NON-COMPLIANCE WITH EPCRA AND CERCLA

92.     In the early 2000s, as community organizations began using the reporting requirements of CERCLA and EPCRA to learn about hazardous emissions from local CAFOs, CAFO industry groups asked EPA for a "safe harbor" from enforcement of CERCLA and EPCRA reporting.  Testimony of Catherine Fitzsimmons, Chief, Air Quality Bureau, Iowa Dep't of Natural Res., on behalf of the Nat'l Ass'n of Clean Air Agencies before the Senate Environment and Public Works Committee 4–5 (Sept. 6, 2007) [EPA-HQ-SFUND-2007-0469-1214].

93.     In 2005, EPA began to enter into consent agreements with CAFOs to settle their prior CERCLA and EPCRA reporting violations for a nominal fine, and EPA agreed to suspend its CERCLA and EPCRA reporting enforcement while the Agency developed methodologies to estimate air emissions from CAFOs.  Animal Feeding Operations Consent Agreement and Final Order, 70 Fed. Reg. 4958 (Jan. 31, 2005).

94.     Two years later, in response to an industry petition, EPA went even further: it proposed exempting all animal feeding operations from reporting releases into the air of any hazardous substance from animal waste.  CERCLA/EPCRA Administrative Reporting

Case 1:18-cv-02260-TJK   Document 29   Filed 07/09/19   Page 31 of 44

Exemption for Air Releases of Hazardous Substances from Animal Waste, 72 Fed. Reg. 73,700

(Dec. 28, 2007); *see also* Notice of Availability of a Petition for Exemption from EPCRA and

CERCLA Reporting Requirements for Ammonia from Poultry Operations, 70 Fed. Reg. 76,452

(Dec. 27, 2005) (petition submitted on Aug. 5, 2005).

95.    In 2008, EPA finalized the rule exempting animal feeding operations from

requirements under CERCLA and EPCRA to report releases of hazardous air pollutants that

exceed EPA's reportable quantity levels.  2008 CERCLA/EPCRA Rule, 73 Fed. Reg. 76,948

(Dec. 18, 2008).  EPA's 2008 CERCLA/EPCRA Rule exempted all animal feeding operations

from release reporting under CERCLA, and all but the largest CAFOs from release reporting

under EPCRA.  *Id.* at 76,950.

96.    Some of Plaintiffs filed a petition to review EPA's 2008 CERCLA/EPCRA Rule,

and in April 2017, the D.C. Circuit vacated the 2008 CERCLA/EPCRA Rule, finding it

unlawful.  *Waterkeeper All.*, 853 F.3d at 537–38.  The Court stayed its mandate through May 2,

2018, based, in part, on EPA's representation that it needed time to develop "guidance" for

CAFOs on how to measure or estimate their emissions.  *See, e.g.*, EPA's Mot. to Stay Issuance

of Mandate 1, *Waterkeeper All.*, No. 09-1017 (July 17, 2017), ECF No. 1684518.

97.    Instead of instructing CAFOs about how they could comply with EPCRA and the

court's opinion, the "guidance" that EPA published on its website on October 25, 2017 instructed

CAFOs that they need not comply with EPCRA's reporting requirement at all.  *See* 2017 EPCRA

Exemption, Ex. 3; 2017 EPCRA Q&A, Ex. 4.  In this EPCRA Exemption, EPA explained that it

was now interpreting EPCRA to exempt CAFOs that use substances – including animal waste

that produces ammonia and hydrogen sulfide – in "routine agricultural operations" from the

EPCRA reporting requirement.  EPA stated that although it intended to "conduct a rulemaking to

clarify its interpretation," the exemption would nonetheless take immediate effect, even before the start of its proposed rulemaking process.  *Id.*

98.     CAFOs neither capture nor use any of the ammonia or hydrogen sulfide that they produce and release into the environment.

99.     Prior to issuing the EPCRA Exemption, EPA had expressly rejected the "routine agricultural operations" theory at least three times.

100.     On March 23, 2018, Congress enacted the Consolidated Appropriations Act, 2018 ("Omnibus Bill").  Title XI of the Omnibus Bill, called the "Fair Agricultural Reporting Method Act" or "FARM Act," expressly exempts "air emissions from animal waste (including decomposing animal waste) at a farm" from CERCLA's reporting requirements.  Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, § 1102, 132 Stat. 348, 1148.  The FARM Act defines the term "farm" as a site or area (including associated structures) that (i) is used for (I) the production of a crop; or (II) the raising or selling of animals (including any form of livestock, poultry, or fish); and (ii) under normal conditions, produces during a farm year any agricultural products with a total value equal to not less than $1,000."  *Id.*

101.     The FARM Act did not exempt CAFOs or farms from reporting under EPCRA.

102.     In April 2018, EPA amended its EPCRA Exemption website, adding to the "routine agricultural operations" theory a new theory that CAFOs need not report under EPCRA because Congress, through the FARM Act, exempted them from reporting under CERCLA.  *See* EPCRA Exemption, Ex. 1; FARM Act Q&A, Ex. 6.  EPA based this new theory on its view that because CAFO emissions do not "occur in a manner" that would require CERCLA reporting, CAFOs need not report under EPCRA.  *Id.*

103.     The updated EPCRA Exemption stated that EPA planned to conduct a rulemaking

on the new legal theory, yet the exemption went into effect immediately.

104.    Though EPA originally styled the EPCRA Exemption as a "guidance," EPA intended for the EPCRA Exemption to affect the legal rights and duties of third parties and to have the force and effect of law, and it therefore constitutes a substantive, legislative rule – not "guidance" – within the meaning of the APA.

105.    When enacting the CERCLA exemption in the FARM Act, legislators expressly stated that EPCRA reports are still required notwithstanding the "occur in a manner" language. *See, e.g.,* 115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018) (statement by FARM Act Co-Sponsor Senator Carper noting that the Act "leaves intact reporting requirements under [EPCRA]").

106.    After EPA issued its EPCRA Exemption, ten members of the Senate Committee on Environment and Public Works – including two co-sponsors of the FARM Act – asked EPA to immediately rescind the EPCRA Exemption because it is "legally flawed and is based on an erroneous interpretation of the law with implications beyond reporting of releases from animal waste," and because it "exceed[s] EPA's statutory authority."  Letter from Thomas R. Carper et al., Ranking Member, United States Senate, to Scott Pruitt, Administrator, EPA, at 1, 2 (May 25, 2018) (attached as Exhibit 10), https://www.epw.senate.gov/public/_cache/files/8/e/8e31f21c-0805-4cab-aa96-2e084d6e03e5/3FCE938E06E8830762AE52C34B36D2F5.5.25.2018-letter-to-epa-on-emission-reporting-under-epcra.pdf (additionally noting that "[n]one of the hearing statements of the Committee members, witnesses, or materials entered into either the Committee record or the Congressional Record at the time of the FARM Act's passage support EPA's new interpretation of EPCRA" and that EPA's new reading of EPCRA is "[o]bviously . . . inconsistent with longstanding EPA policy" that requires reporting of releases of the "hundreds of substances" that are designated as extremely hazardous substances under EPCRA but not

CERCLA.).

107.    On August 1, 2018, EPA published in the Federal Register a rule that amended its

EPCRA regulations to do away with the regulatory provision promulgated in 2008 – the

provisions vacated by the D.C. Circuit's mandate in 2018 – that exempted CAFOs from EPCRA

reporting.  Vacatur Response – CERCLA/EPCRA Administrative Reporting Exemption for Air

Releases of Hazardous Substances From Animal Waste at Farms; FARM Act Amendments to

CERCLA Release Notification Requirements, 83 Fed. Reg. 37,444 (Aug. 1, 2018).

108.    Notwithstanding EPA's formal compliance with the D.C. Circuit's mandate, the

EPCRA Exemption remained on EPA's webpage and continued to direct CAFOs that they need

not report their releases of EPCRA extremely hazardous substances.  *See* EPA, CERCLA and

EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste

at Farms (Aug. 30, 2018) (attached as Exhibit 11) (directing that "air emissions from animal

waste (including decomposing animal waste) at a farm do not need to be reported under

EPCRA" notwithstanding the fact that "[o]n May 2, 2018, the U.S. Court of Appeals for the D.C.

Circuit issued a mandate vacating the 2008 administrative reporting exemption.").

109.    On November 14, 2018, shortly after Plaintiffs filed their Original Complaint

challenging the EPCRA Exemption, Dkt. No. 1, EPA issued the Proposed Rule "to amend the

release notification regulations under the Emergency Planning and Community Right-to-Know

Act (EPCRA) to add the reporting exemption for air emissions from animal waste at farms

provided in section 103(e) of the Comprehensive Environmental Response, Compensation and

Liability Act (CERCLA)," as well as "to add definitions of 'animal waste' and 'farm' to the

EPCRA regulations to delineate the scope of this reporting exemption."  *See* Proposed Rule, Ex.

7.  The Proposed Rule sought to codify the EPCRA Exemption as part of EPA's EPCRA

regulations.

110.    A number of Plaintiffs submitted detailed comments to EPA expressing strong

opposition to the Proposed Rule. *See, e.g.,* Comments of Earthjustice et al., Ex. 8; Comments of

Ctr. for Biological Diversity & John Hopkins Ctr. For a Livable Future, Ex. 9.

111.    EPA received over 87,000 comments in opposition to the Proposed Rule.  *See* 84

Fed. Reg. at 27,535.

112.    Despite strong opposition to the Proposed Rule, on June 13, 2019, EPA published

the Final Rule, codifying the EPCRA Exemption that already had been in effect since EPA first

published it on its website in October 2017.  *See* Final Rule, Ex. 2.

113.    In its Final Rule, EPA states that "[t]his final rule is not based on health or

environmental effect" and that, contrary to the evidence before the Agency, the Final Rule "does

not have any impact on human health or the environment." 84 Fed. Reg. at 27,541–42.

114.    In the text of the Final Rule, EPA formally withdrew the FARM Act Q&A that

EPA had previously included on its EPCRA Exemption website.  *Id.* at 27,535.  Accordingly,

EPA removed this Farm Act Q&A from the website.  *See* EPA, CERCLA and EPCRA Reporting

Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms (June 13,

2019) (attached as Exhibit 12), https://www.epa.gov/epcra/cercla-and-epcra-reporting-

requirements-air-releases-hazardous-substances-animal-waste-farms (pointing to the Final Rule,

instead of the FARM Act Q&A, as the legal basis for the EPCRA reporting exemption).

115.    The Final Rule makes no mention of the distinct EPCRA Q&A focused on the

routine agricultural use theory to support EPA's EPCRA reporting exemption.  EPA has not

formally withdrawn the EPCRA Q&A or the legal rationale explained therein.

116.    EPA finalized the Rule without conducting the requisite analysis under the

National Environmental Policy Act to assess the environmental consequences of the agency action.

117.     EPA finalized the Rule without conducting the requisite environmental justice analysis despite the extreme risk to environmental health and safety posed by the Final Rule.

## FIRST CLAIM FOR RELIEF

### Violation of the APA: Failure to Comply with Mandatory Rulemaking Procedures When Issuing the EPCRA Exemption

118.     The allegations set forth above are incorporated by reference.

119.     The EPCRA Exemption constituted final agency action that affected the legal rights and duties of third parties and had the force and effect of law.

120.     EPA failed to publish in the Federal Register a notice of proposed rulemaking for the EPCRA Exemption before publishing it on its website and instructing CAFOs not to report their toxic air emissions under EPCRA.

121.     EPA failed to reference the legal authority under which it issued the EPCRA Exemption.

122.     EPA failed to make public any comments the Agency received in response to the EPCRA Exemption.[11]

123.     EPA failed to publish a response to the comments it received from the public about the EPCRA Exemption.

124.     EPA failed to publish in the Federal Register a final rule for the EPCRA

---

[11] In response to a separate information collection request about AFOs and continuous release reports, some Plaintiffs and other organizations submitted the comments they made in response to the 2017 EPCRA Exemption.  Thus, there are some comments that are publicly available on regulations.gov as part of the information collection request, but not because EPA made the comments available as part of the rulemaking process related to the EPCRA Exemption as required by the APA.

Exemption (which is a separate final agency action from the Final Rule published more than 18 months after issuing the EPCRA Exemption).

125.     EPA failed to set an effective date for the EPCRA Exemption at least 30 days after publication of a final rule in the Federal Register.

126.     The EPCRA Exemption is not an interpretative rule, general statement of policy, or rule of agency organization, procedure, or practice.

127.     EPA did not have good cause to determine that notice and public procedure were impracticable, unnecessary, or contrary to the public interest for the EPCRA Exemption, as exemplified by the fact that over a year after issuing the EPCRA Exemption, EPA did, in fact, follow proper procedures when promulgating the Final Rule.

128.     EPA did not include in the EPCRA Exemption a brief statement explaining any finding that notice and public procedure were impracticable, unnecessary, or contrary to the public interest.

129.     EPA failed to comply with one or more procedural rulemaking requirements of the APA when issuing the EPCRA Exemption.  *See* 5 U.S.C. § 553.

130.     The APA prohibits the EPCRA Exemption (or any future rulemaking EPA undertakes by posting substantive guidance on its website) from having the force and effect of law until all necessary procedural rulemaking requirements are satisfied.

131.      The EPCRA Exemption affected legal rights and duties of third parties and had the force and effect of law notwithstanding EPA's failure to satisfy all necessary procedural rulemaking requirements of the APA, and will continue to affect the legal rights and duties and have the force and effect of law should EPA decide to re-post it on its website (if, for example, this Court strikes down the Final Rule).

35

132.     Accordingly, the EPCRA Exemption is an agency action "without observance of procedure required by law," in violation of the APA.  *Id.* § 706(2)(D).

133.     More than eighteen months after its first issuance, EPA voluntarily amended the EPCRA Exemption website to point solely to the Final Rule as the basis for the EPCRA reporting exemption.  Should this Court strike down the Final Rule, EPA could amend its website yet again to point to distinct legal rationales such as the "routine agricultural operations" rationale in the original Q&A documents as the basis of the EPCRA reporting exemption.

### SECOND CLAIM FOR RELIEF

### Violation of the APA and EPCRA: The EPCRA Exemption is Agency Action Outside of Statutory Authority

134.     The allegations set forth above are incorporated by reference.

135.     EPCRA's "sweeping" reporting mandate – as described by this Circuit, *see Waterkeeper All.*, 853 F.3d at 535 – requires CAFOs to report releases of extremely hazardous substances above reportable quantities.  *See* 42 U.S.C. § 11004.

136.     EPA's EPCRA Exemption exempts all CAFOs from any such release reporting under EPCRA.

137.     The EPCRA Exemption constituted final agency action that affected the legal rights and duties of third parties and had the force and effect of law while it was in place, and will affect the legal rights and duties of third parties and have the force and effect of law should EPA re-post it on its website (if, for example, this Court strikes down the Final Rule).

138.     EPA issued the EPCRA Exemption in violation of the clear statutory language of EPCRA that requires all facilities, including CAFOs, to report releases of extremely hazardous substances above reportable quantities.

139.     Accordingly, the EPCRA Exemption is an agency action that violates EPCRA, *id.*

36

§ 11004, and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA, 5 U.S.C. § 706(2)(C).

## THIRD CLAIM FOR RELIEF

### Violation of the APA and EPCRA: The EPCRA Exemption is Arbitrary and Capricious Agency Action

140.   The allegations set forth above are incorporated by reference.

141.   EPCRA's reporting mandate requires CAFOs to report releases of extremely hazardous substances above reportable quantities.  *See* 42 U.S.C. § 11004.

142.   EPA's EPCRA Exemption exempts all CAFOs from any such release reporting under EPCRA.

143.   The EPCRA Exemption constituted final agency action that affected the legal rights and duties of third parties and had the force and effect of law while it was in place, and will affect the legal rights and duties of third parties and have the force and effect of law should EPA re-post it on its website (if, for example, this Court strikes down the Final Rule).

144.   EPA issued the EPCRA Exemption without any administrative record.

145.   EPA issued the EPCRA Exemption without making any findings in support of the exemption.

146.   EPA issued the EPCRA Exemption without explaining or justifying the factual assumptions that support the EPCRA Exemption.

147.   EPA issued the EPCRA Exemption without recognizing that it was changing its position and without supplying a reasoned analysis for its change in position.

148.   EPA issued the EPCRA Exemption in contravention to clear legislative intent.

149.   EPA issued the EPCRA Exemption without considering an important aspect of the problem, namely, the health and environmental impacts of the exemption.

150.     Accordingly, the EPCRA Exemption is an agency action that violates EPCRA, *id.* § 11004, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA, 5 U.S.C. § 706(2)(A).

## FOURTH CLAIM FOR RELIEF

### Violation of the APA and EPCRA: The Final Rule is Agency Action Outside of Statutory Authority

151.     The allegations set forth above are incorporated by reference.

152.     EPCRA's "sweeping" reporting mandate – as described by this Circuit, *see Waterkeeper All.*, 853 F.3d at 535 – requires CAFOs to report releases of extremely hazardous substances above reportable quantities.  *See* 42 U.S.C. § 11004.

153.     The Final Rule exempts all CAFOs from any such release reporting under EPCRA.

154.     The Final Rule constitutes final agency action that affects the legal rights and duties of third parties and has the force and effect of law.

155.     EPA issued the Final Rule in violation of the clear statutory language of EPCRA that requires all facilities, including CAFOs, to report releases of extremely hazardous substances above reportable quantities.

156.     Accordingly, the Final Rule is an agency action that violates EPCRA, *id.* § 11004, and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA, 5 U.S.C. § 706(2)(C).

## FIFTH CLAIM FOR RELIEF

### Violation of the APA and EPCRA: The Final Rule is Arbitrary and Capricious Agency Action

157.     The allegations set forth above are incorporated by reference.

158.    A reviewing court must hold unlawful and set aside agency action found to be arbitrary and capricious or an abuse of discretion, or otherwise not in accordance with law.  *See* 5 U.S.C. § 706(2)(A).

159.    EPCRA's reporting mandate requires CAFOs to report releases of extremely hazardous substances above reportable quantities.  *See* 42 U.S.C. § 11004.

160.    The Final Rule exempts all CAFOs from any such release reporting under EPCRA.

161.    The Final Rule constitutes final agency action that affects the legal rights and duties of third parties and has the force and effect of law.

162.    EPA issued the Final Rule without recognizing that it was changing its position and without supplying a reasoned analysis for its change in position.

163.    EPA issued the Final Rule in contravention to clear legislative intent.

164.    EPA issued the Final Rule without substantial evidence supporting the Final Rule.

165.    Accordingly, the Final Rule is an agency action that violates EPCRA, *id.* § 11004, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA, 5 U.S.C. § 706(2)(A).

## SIXTH CLAIM FOR RELIEF

### Violation of APA and NEPA: Failure to Conduct Environmental Impact Analysis for Final Rule

166.    The allegations set forth above are incorporated by reference.

167.    A federal agency's adoption of rules and regulations pursuant to the APA constitutes a "major federal action" subject to NEPA requirements.  40 C.F.R. § 1508.18(b)(1).

168.    The Final Rule is a major federal action that significantly affects the quality of the human environment.

169.    EPA did not prepare or make public a draft Environmental Assessment, draft Environmental Impact Statement, or other draft NEPA document when publishing the Proposed Rule.

170.    EPA did not prepare or make public a final Environmental Assessment, final Environmental Impact Statement, or other final NEPA document when publishing the Final Rule.

171.    EPA's failure to conduct any environmental review before promulgating the Final Rule is agency action that violates NEPA, 42 U.S.C. § 4332(2)(C), and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and is "without observance of procedure required by law," in violation of the APA, 5 U.S.C. §§ 706(2)(A), (D).

## PRAYER FOR RELIEF

172.    For the foregoing reasons, Plaintiffs respectfully request that this Court enter an Order:

    a.  Declaring that the EPCRA Exemption is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA, 5 U.S.C. §706(2)(A);

    b.  Declaring that the EPA promulgated the EPCRA Exemption "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA, *id.* § 706(2)(C);

    c.  Declaring that the EPA promulgated the EPCRA Exemption "without observance of procedure required by law," in violation of the APA, *id.* § 706(2)(D);

    d.  Declaring that EPA cannot regulate by posting substantive "guidance" on

its website that has the force and effect of law and that changes legal

obligations, in violation of the APA, *id*.;

e.   Declaring that the Final Rule is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," in violation of the

APA, 5 U.S.C. § 706(2)(A);

f.   Declaring that EPA promulgated the Final Rule "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right," in

violation of the APA, *id*. § 706(2)(C);

g.   Declaring that EPA promulgated the Final Rule "without observance of

procedure required by law," in violation of the APA, *id*. § 706(2)(D), and

NEPA, 42 U.S.C. § 4332(2)(C);

h.   Vacating all versions of the Final Rule, EPCRA Exemption, the EPCRA

Q&A, and the FARM Act Q&A;

i.   Declaring that compliance with EPCRA reporting is required by a date

certain, not to exceed 30 days after the Order is issued;

j.   Awarding Plaintiffs attorneys' fees and all other reasonable expenses

incurred in pursuit of this action; and,

k.   Granting other such injunctive and/or declaratory relief as the Court deems

necessary, just, and proper.

Respectfully submitted this 9th day of July, 2019.

/s/ Carrie Apfel
Carrie Apfel
Earthjustice
1625 Massachusetts Avenue NW, Suite 702
Washington, DC 20036
Tel: (202) 667-4500
Fax: (202) 667-2356
capfel@earthjustice.org

Peter Lehner*
Jonathan J. Smith*
Earthjustice
48 Wall Street, 19th Floor
New York, NY 10005
Tel: (212) 845-7376
Fax: (212) 918-1556
plehner@earthjustice.org
jjsmith@earthjustice.org

* Admitted *Pro Hac Vice*

*Counsel for Plaintiffs Rural Empowerment Association for Community Help, Animal Legal Defense Fund, Center for Biological Diversity, Center for Food Safety, Don't Waste Arizona, Inc., Environmental Integrity Project, Food & Water Watch, Humane Society of the United States, Sierra Club, Sound Rivers, and Waterkeeper Alliance.*