# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Rural Empowerment Association for Community Help, et al., | **CASE NO. 18-cv-02260-TJK** |
| Plaintiffs, | |
| v. | **Plaintiffs' Opposition to Motion For Remand Without Vacatur** |
| United States Environmental Protection Agency, et al., | **Memorandum of Points and Authorities** |
| Defendants, and | |
| National Cattlemen's Beef Association, et al., | |
| Intervenor-Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR REMAND WITHOUT VACATUR**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

STATEMENT OF THE CASE................................................................................2

    I.      LEGAL BACKGROUND .....................................................................2

    II.    FACTUAL BACKGROUND ................................................................4

        A.    The Animal Production Facilities at Issue are Highly Polluting Industrial Operations. ....................................................4

        B.    The D.C. Circuit Struck Down EPA's 2008 EPCRA and CERCLA Exemption as Unlawful.........................................7

        C.    EPA Issued a New, Broader Exemption Without Going Through Notice-and-Comment Rulemaking. .............................8

        D.    The FARM Act Codified an Exemption for Animal Production Operations in CERCLA. ........................................9

        E.    EPA Amended the Exemption in Response to the FARM Act. .................9

        F.    After Plaintiffs Challenged the Guidance, EPA Initiated Notice and Comment Rulemaking. ...............................................10

    III.   PROCEDURAL HISTORY................................................................11

JURISDICTION AND VENUE ............................................................................12

STANDING ...........................................................................................................12

SUMMARY JUDGMENT STANDARD AND STANDARD OF REVIEW ............................16

ARGUMENT .........................................................................................................18

    I.      THE RULE CONTRAVENES THE UNAMBIGUOUSLY EXPRESSED INTENT OF CONGRESS. ...............................................18

        A.    The Rule Contravenes the Plain, Unambiguous Language of EPCRA........................................................................18

        B.    The FARM Act's Legislative History Demonstrates Congress' Intent to Require Industrial Livestock Operations to Report Under EPCRA........................................................26

    II.    THE RULE IS ARBITRARY AND CAPRICIOUS. ...........................................29

A.    EPA Failed to Provide a Reasoned Analysis for its Changed View of EPCRA. ....................................................................29

B.    EPA Failed To Consider Important Safety and Public Health Benefits of Maintaining EPCRA Reporting. ...............................30

III.    EPA FAILED TO COMPLY WITH NEPA IN ISSUING THE RULE..............33

IV.    EPA'S GUIDANCE EXEMPTING INDUSTRIAL LIVESTOCK OPERATIONS' TOXIC AIR EMISSIONS IS UNLAWFUL. ...........................33

A.    EPA's "Guidance" is Reviewable Final Agency Action. .........................34

B.    EPA's "Guidance" Contravenes the Plain Language of EPCRA. .............35

V.    VACATUR IS THE APPROPRIATE REMEDY. .................................................36

A.    Vacatur is the Standard Remedy Where a Rule is Unlawful. ...................36

B.    EPA Has Not Demonstrated Remand Without Vacatur Is Warranted.....................................................................................................37

C.    Vacatur is Appropriate Because Leaving the Rule in Place Will Do Affirmative Harm........................................................................................39

D.    The Court Should Deny EPA's Motion for Voluntary Remand. ..............40

CONCLUSION....................................................................................................................44

# TABLE OF AUTHORITIES

**Cases**

*62 Cases, More or Less, Each Containing Six Jars of Jam v. U.S.*,
340 U.S. 593 (1951) ....................................................................................................25

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
429 F.3d 1136 (D.C. Cir. 2005) ..............................................................................37, 40

*\*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ...........................................................................17, 37, 38

*Allina Health Servs. v. Sebelius*,
746 F.3d 1102 (D.C. Cir. 2014) ...............................................................................17, 36

*Am. Ass'n of Cosmetology Sch. v. DeVos*,
258 F. Supp. 3d 50 (D.D.C. 2017) .................................................................................35

*Am. Lung Ass'n v. EPA*,
985 F.3d 914 (D.C. Cir. 2021) ...............................................................................25, 37

*Am. Waterways Operators v. Wheeler*,
427 F. Supp. 3d 95 (D.D.C. 2019) .................................................................................40

*Amax Land Co. v. Quarterman*,
181 F.3d 1356 (D.C. Cir. 1999) .....................................................................................28

*Avila v. Olivera Egg Ranch, LLC*,
No. 2:08-cv-02488 JAM KJN (E.D. Cal. Aug. 26, 2010) ..........................................15, 16

*Bd. of Cty. Comm'rs of Kay Cty., Okla. v. Fed. Hous. Fin. Agency*,
754 F.3d 1025 (D.C. Cir. 2014) .....................................................................................18

*Bennett v. Spear*,
520 U.S. 154 (1997)........................................................................................................34

Bowsher v. Synar,
478 U.S. 714 (1986)........................................................................................................13

*Bragdon v. Abbott*,
524 U.S. 624 (1998)........................................................................................................28

*Caraco Pharm. Laboratories, Ltd. v. Novo Nordisk A/S*,
566 U.S. 399 (2012)........................................................................................................24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................................................16

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*,
    467 U.S. 837 (1984) ................................................................................17, 28

*Chlorine Chemistry Council v. EPA*,
    206 F.3d 1286 (D.C. Cir. 2000) ...............................................................41

*Conservation L. Found. v. Pritzker*,
    37 F. Supp. 3d 254 (D.D.C. 2014) ...........................................................39

*Corley v. U.S.*,
    556 U.S. 303 (2009)..................................................................................24

*Ctr. for Biological Diversity v. U.S. Army Corps of Engineers*,
    No. CV 20-103 (RDM), 2021 WL 14929 (D.D.C. 2021)..........................44

*Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
    704 F.3d 413 (5th Cir. 2013) ...........................................................15, 33

*D.C. v. Nahass*,
    699 F. Supp. 2d 175 (D.D.C. 2010) ..........................................................20

*D.C. v. Straus*,
    590 F.3d 898 (D.C. Cir. 2010) ..................................................................20

*Durant v. D.C. Gov't*,
    875 F.3d 685 (D.C. Cir. 2017) ..................................................................16

*Ethyl Corp. v. Browner*,
    989 F.2d 522 (D.C. Cir. 1993) ..................................................................43

*Fed. Commc'n Comm'n v. Fox Television Stations, Inc*.,
    556 U.S. 502 (2009)..................................................................................29

*Fed. Election Comm'n v. Akins*,
    524 U.S. 11 (1998)....................................................................................15

*Huls Am. Inc. v. Browner*,
    83 F.3d 445 (D.C. Cir. 1996) ....................................................................32

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)..................................................................................12

*Immigration & Naturalization Servs. v. Cardoza-Fonseca*,
    480 U.S. 421 (1987)..................................................................................43

*In re Clean Water Act Rulemaking*,
    No. C 20-04636 WHA, 2021 WL 4924844 (N.D. Cal. Oct. 21, 2021) .............37

v

*In re Navy Chaplaincy*,
    697 F.3d 1171 (D.C. Cir. 2012) ........................................................13

*Kiewit Power Constructors Co. v. Sec'y of Lab., U.S. Dep't of Lab.*,
    959 F.3d 381 (D.C. Cir. 2020) .........................................................18

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976).........................................................................33

*Lake Carriers' Ass'n v. EPA*,
    652 F.3d 1 (D.C. Cir. 2011) ............................................................43

*Loughrin v. U.S.*,
    573 U.S. 351 (2014).........................................................................21

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)...................................................................12, 15

*Lutheran Church-Mo. Synod v. Fed. Commc'n Comm'n*,
    141 F.3d 344 (D.C. Cir. 1998) ........................................................41

*Mackey v. Lanier Collection Agency & Serv., Inc.*,
    486 U.S. 825 (1988)...................................................................20, 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...........................................................................30

*N. Haven Bd. of Ed. v. Bell*,
    456 U.S. 512 (1982).........................................................................26

*Nat. Res. Def. Council v. EPA*,
    489 F.3d 1250 (D.C. Cir. 2007) ......................................................37

*Nat. Res. Def. Council v. EPA*,
    755 F.3d 1010 (D.C. Cir. 2014) ......................................................15

*Nat. Res. Def. Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) .....................................................38, 39

*Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*,
    921 F.3d 1102 (D.C. Cir. 2019) ......................................................33

*Nat'l Parks Conservation Ass'n v. Jewell*,
    62 F. Supp. 3d 7 (D.D.C. 2014) ......................................................37

*Owens v. Republic of Sudan*,
    864 F.3d 751 (D.C. Cir. 2017) ........................................................24

*Prill v. Nat'l Lab. Rels. Bd.*,
    755 F.2d 941 (D.C. Cir. 1985) .........................................................................25

*Radio-Television News Directors Ass'n v. Fed. Commc'n Comm'n*,
    184 F.3d 872 (D.C. Cir. 1999) .........................................................................38

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)..........................................................................................33

*Russello v. U.S.*,
    464 U.S. 16 (1983).....................................................................................21, 24

*Scenic Am., Inc. v. U.S. Dep't of Transp.*,
    836 F.3d 42 (D.C. Cir. 2016) ...........................................................................34

*Sierra Club v. Morton*,
    405 U.S. 727 (1972)..........................................................................................15

*Sierra Club, Inc. v. Tyson Foods, Inc.*,
    299 F. Supp. 2d 693 (W.D. Ky. 2003) ..............................................16, 35, 36

*SKF USA Inc. v. U.S.*,
    254 F.3d 1022 (Fed. Cir. 2001).........................................................................17

*Standing Rock Sioux Tribe v. U. S. Army Corps of Engineers*,
    985 F.3d 1032 (D.C. Cir. 2021) .................................................................36, 37

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)............................................................................................32

*U.S. Army Corps of Engineers v. Hawkes Co.*,
    136 S. Ct. 1807 (2016) .....................................................................................34

*Util. Solid Waste Activities Grp. v. EPA*,
    901 F.3d 414 (D.C. Cir. 2018) .............................................................40, 41, 44

*Vaden v. Discover Bank*,
    556 U.S. 49 (2009)............................................................................................20

*Waterkeeper All. v. EPA*,
    853 F.3d 527 (D.C. Cir. 2017). ............................6, 12, 15, 18, 31, 35, 39, 41, 42

*Women Prisoners of D.C. Dep't of Corr. v. D.C.*,
    899 F. Supp. 659 (D.D.C. 1995) ......................................................................26

*Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*,
    550 U.S. 81 (2007)......................................................................................18, 21

**Statutes**

28 U.S.C. § 1391(e)(1) ........................................................................................12

28 U.S.C. § 2201 ................................................................................................12

42 U.S.C. § 11002(a) .......................................................................................3, 25

42 U.S.C. § 11004 ...............................................................................................3

*42 U.S.C. § 11004(a)(1) ..............................................................3, 18, 21, 24, 35

*42 U.S.C. § 11004(a)(2) ....................................................................3, 18, 19, 20

*42 U.S.C. § 11004(a)(2)(C) ......................................................19, 20, 23, 26

*42 U.S.C. § 11004(a)(3) ..............................................................................4, 18

42 U.S.C. § 11004(b) ..........................................................................................3

42 U.S.C. § 11004(c) ..........................................................................................3

42 U.S.C. § 11049(2) ..........................................................................................4

42 U.S.C. § 11049(4) ..........................................................................................4

42 U.S.C. § 11049(8) ..........................................................................................4

42 U.S.C. § 9601 ...........................................................................................3, 22

42 U.S.C. § 9601(9) ............................................................................................22

42 U.S.C. § 9601(22) ..........................................................................................22

42 U.S.C. § 9602 ...........................................................................................3, 25

42 U.S.C. § 9603(a) ......................................................................................3, 4, 22

42 U.S.C. § 9603(e)(1)(B) .........................................................................4, 19, 22

42 U.S.C. § 9603(e)(2)(B) ...................................................................................4

5 U.S.C. § 702 .............................................................................................11, 16

5 U.S.C. § 704 ...................................................................................................11

5 U.S.C. § 706 ....................................................................................................................11

5 U.S.C. § 706(2)(A) ....................................................................................................17, 31

5 U.S.C. § 706(2)(C) ..........................................................................................................17

5 U.S.C. § 706(2)(D) ..........................................................................................................17

42 U.S.C. § 11021(e)(5) ......................................................................................................35

Pub. L. No. 115-141, § 1102, 132 Stat. 348 (2018) ............................................................9

## Rules

*Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act, 84 Fed. Reg. 27,533-01 (June 13, 2019). .............................................1, 11, 19, 22–23, 25–26

CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms, 73 Fed. Reg. 76,948-01 (Dec. 18, 2008) ..........7, 29–31

Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act, 83 Fed. Reg. 56,791 (Nov. 4, 2018) ......................................................................................................10

Fed. R. Civ. P. 56 ...............................................................................................................16

## Regulations

40 C.F.R. § 302.4(a) ......................................................................................................3, 22

40 C.F.R. pt. 355, app. A ....................................................................................................3

40 C.F.R. § 6.101(a) ...........................................................................................................33

40 C.F.R. § 1508.18(b)(1) ..................................................................................................33

40 C.F.R. § 1502.5(d) ........................................................................................................33

## Other Authorities

115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018) ..................................................9, 26–28

## INTRODUCTION

This action defends the right of communities living near industrial animal production facilities to access information about toxic air pollution that may be endangering their health. Industrial livestock operations housing pigs, chickens, cattle, dairy cows, and other animals produce millions of tons of animal waste per year – including feces, urine, and carcasses – and are some of the country's largest sources of highly toxic air emissions such as hydrogen sulfide and ammonia.  Plaintiffs Rural Empowerment Association for Community Help, Animal Legal Defense Fund, Center for Biological Diversity, Center for Food Safety, Don't Waste Arizona, Environmental Integrity Project, Food & Water Watch, The Humane Society of the United States, Sierra Club, Sound Rivers, and Waterkeeper Alliance (collectively, Plaintiffs) challenge the U.S. Environmental Protection Agency's (EPA's or the Agency's) "guidance" and final rule impermissibly exempting highly polluting industrial livestock operations from reporting these toxic emissions to local and state emergency responders and communities despite Congress' clear mandate that they do so.  *See* Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act*, 84 Fed. Reg. 27,533-01 (June 13, 2019) (the "Rule").

In the Emergency Planning and Community Right-to-Know Act (EPCRA), Congress mandated that facilities releasing more than 100 pounds per day of certain "extremely hazardous" chemicals, including ammonia and hydrogen sulfide, report these emissions to state and local emergency responders.  This information – which must be made publicly available – enables community members and responders to develop response plans, craft remedial measures, investigate facilities, and protect against future releases.

Large industrial livestock operations easily release enough of these hazardous substances to trigger EPCRA's reporting requirement.  Yet, for years EPA has instructed that these operations need not comply with this statutory duty to report their toxic air emissions.  EPA has maintained this unlawful exemption for over a decade through tactics such as characterizing the policy as unreviewable "guidance," ignoring court rulings, and – as it is doing now – seeking to avoid judicial review of the merits while leaving the exemption in place.

Meanwhile, community members and emergency responders continue to suffer public health harms while being denied their statutory right to information about these toxic air emissions.  Thus, Plaintiffs oppose EPA's motion to remand without vacatur as this would leave the unlawful and unjust exemption in place for an indeterminate amount of time as EPA undertakes a new rulemaking process with an unknown outcome.

Instead, the Court should reach the merits, grant summary judgment for the Plaintiffs, and vacate the illegal exemption.  The plain language of EPCRA leaves no room for EPA to exempt Concentrated Animal Feeding Operations (CAFOs) from reporting their toxic air emissions.  The statute issues a sweeping mandate that large-volume toxic releases *must be reported*.  Nothing EPA points to limits this mandate.  For this reason, the "guidance" and the Rule are unlawful and must be vacated.

**STATEMENT OF THE CASE**

## I.    LEGAL BACKGROUND

The Emergency Planning and Community Right-to-Know Act (EPCRA), 42 U.S.C. § 11001 et seq., ensures that communities have information about chemical hazards in their area so they can plan for and respond to chemical releases, including continuous releases.  EPCRA also provides first responders with information to assess and safely respond to citizen complaints of suspicious or noxious odors, such as those emanating from industrial livestock operations.

EPCRA requires facilities that "release" more than a threshold quantity of an "extremely hazardous substance" to report that release to local emergency response agencies, and those reports must be made available to the public. 42 U.S.C. §§ 11004, 11044(a). EPA publishes a list of extremely hazardous substances that are subject to this reporting requirement and by regulation determines "reportable quantities," or threshold amounts of releases above which a report is required. *See* 42 U.S.C. §§ 11002(a), 11004(a)(2)(B). Ammonia and hydrogen sulfide are both "extremely hazardous substances" with reportable quantities of 100 pounds per day. 40 C.F.R. pt. 355, app. A.

A related statute, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq., similarly requires EPA to list "hazardous substances" with reportable quantities and requires facilities to report both isolated and continuous releases. *See* 42 U.S.C. §§ 9602, 9603(a). EPCRA requires facilities to report releases to state and local responders; CERCLA requires facilities to report releases to the federal government. *Compare id*. § 9603(a) *with id*. § 11004(b), (c). Ammonia and hydrogen sulfide are "hazardous substances" under CERCLA with a reportable quantity of 100 pounds per day for each (the same reportable quantity EPA established under EPCRA). 40 C.F.R. § 302.4(a).

EPCRA's notification provision refers to CERCLA's notification provision and requires reporting of three types of releases:

1. "A release of an extremely hazardous substance. . . from a facility at which a hazardous chemical is produced, used, or stored [that] requires a notification under [CERCLA]," 42 U.S.C. § 11004(a)(1);

2. "A release of an extremely hazardous substance . . . from a facility at which a hazardous chemical is produced, used, or stored, [that] is not subject to the notification requirements under [CERCLA] . . . but only if the release. . . (A) is not a federally permitted release . . . (B) is in an amount in excess of a quantity which the Administrator has determined (by regulation) requires notice, and (C) occurs in a manner which would require notification under [CERCLA]," *id.* § 11004(a)(2); and

3

3. "A release of a substance which is not [classified as an extremely hazardous substance that] occurs at a facility at which a hazardous chemical is produced, used, or stored [that] requires notification under [CERCLA]," *id.* § 11004(a)(3).

EPCRA defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . of any hazardous chemical, extremely hazardous substance, or toxic chemical." *Id.* § 11049(8). The term "environment" "includes water, air, and land and the interrelationship which exists among and between water, air, and land and all living things." *Id.* § 11049(2). "Facility" means "all buildings, equipment, structures, and other stationary items which are located on a single site or on contiguous or adjacent sites and which are owned or operated by the same person (or by any person which controls, is controlled by, or under common control with, such person)." *Id.* § 11049(4).

CERCLA requires notification of "any release (other than a federally permitted release) of a hazardous substance from. . . [a] vessel or facility in quantities equal to or greater than [reportable quantities]." *Id.* § 9603(a). Subsection (e) of § 9603, however, provides that "[t]his section shall not apply to. . . air emissions from animal waste (including decomposing animal waste) at a farm." *Id.* § 9603(e)(1)(B). Subsection (e) also provides definitions of "animal waste" and "farm." *Id.* § 9603(e)(2).

## II.   FACTUAL BACKGROUND

### A.   The Animal Production Facilities at Issue are Highly Polluting Industrial Operations.

The large-scale animal production operations at issue here are nothing like the bucolic vision of a "farm" one commonly sees in advertisements or political statements. Instead, they are industrial facilities where vast numbers of animals are confined in concentrated areas for eggs, dairy, or slaughter. They generate enormous quantities of urine and feces, in addition to

4

animal carcasses.  A single large operation can produce more waste than an average city.  *See* Carrie Hribar, Nat'l Ass'n of Local Bd. of Health, *Understanding Concentrated Animal Feeding Operations and Their Impact on Communities*, at 2 (2010), JA __.  Unlike a city that treats its sewage at wastewater treatment plants, industrial-scale livestock operations store untreated animal feces and urine in giant pits or piles that emit ammonia and hydrogen sulfide.  *See* D. Bruce Harris et al., *Ammonia Emissions Factors from Swine Finishing Operations*, from 10th Ann. Emission Inventory Conference, at 1, JA __; *see also* EPA, *Non-Water Quality Impact Estimates for Animal Feeding Operations*, at 2-30–2-31 (2002), JA __.  Large industrial livestock operations are one of the largest sources of hydrogen sulfide and ammonia – larger than power plants or chemical factories.  *See* D. Bruce Harris et al., *Ammonia Emissions Factors from Swine Finishing Operations*, from 10th Ann. Emission Inventory Conference, at 1, JA __.

Chronic exposure to ammonia at levels as low as 0.7 parts per million ("ppm") may trigger decreased lung function and respiratory symptoms, and exposure at higher concentrations can lead to scarring of the respiratory tract and even death.  *See* S.S. Schiffman et al., *Health Effects of Aerial Emissions from Animal Production and Waste Management Systems*, in Nat'l Ctr. for Manure and Animal Waste Mgmt., White Paper Summaries at 10, 11 (2001), Docket No. EPA-HQ-SFUND-2007-0469-0531.17 ("White Paper Summaries"), JA __; *see also* Iowa State Univ. and The Univ. of Iowa Study Grp., Iowa Concentrated Animal Feeding Operations Air Quality Study, at 123 (2002), https://www.public-health.uiowa.edu/ehsrc/CAFOstudy/CAFO_6-3.pdf ("Iowa Air Quality Study"), JA __.  Numerous studies have reported ammonia concentrations of greater than 100 ppm at industrial livestock operations, with some concentrations reaching over 200 ppm.  *See* White Paper Summaries at 11, JA __; *see also* Iowa Air Quality Study at 123, JA __.

Exposure to hydrogen sulfide can similarly lead to major health problems, with even low concentrations triggering headaches, nausea, and eye, skin, and respiratory irritation. *See* U.S. Dep't of Health and Human Servs., Agency for Toxic Substances & Disease Registry, Toxicological Profile for Hydrogen Sulfide, ch. 3 at 26–53, 58–60, 62 (2006), JA __. Hydrogen sulfide also targets the nervous system, and chronic low-level exposure can impair balance, visual field performance, color discrimination, hearing, memory, mood, and intellectual function. *Id.* at 62–68, JA __. Higher levels of exposure can cause a loss of consciousness and death. *Id.* at 22–26, JA __. People living near such operations show increased rates of ailments such as respiratory problems, headaches, diarrhea, and nausea. *See* Earthjustice et al., *Comments Letter on CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Animal Feeding Operations*, at 8–9 & nn.37–41 (Mar. 27, 2008), Docket No. EPA-HQ-SFUND-2007-0469-0758, JA __. People have become seriously ill and even died as a result of breathing fumes released during manure pit agitation, a process necessary for liquid manure storage. *See* K.J. Donham, *Community & Occupational Health Concerns in Pork Production: A Review*, 88 J. Animal Sci. 102, 107 (2010), JA __; *see also Waterkeeper All. v. EPA*, 853 F.3d 527, 536 (D.C. Cir. 2017).

CAFOs, which house thousands or even millions of animals, are a small percentage of total farms but produce the vast majority of animal food products and associated emissions.[1]

---

[1] For example based on emission estimates and data from the 2012 USDA Census of Agriculture: Approximately 59 percent of broiler chicken operations are not expected to emit 100 pounds or more of ammonia per day, and an even greater percentage are not expected to emit 100 pounds or more of hydrogen sulfide per day. *See* Hongwei Xin et al., *Ammonia (NH3) and Hydrogen Sulfide (H2S) Emission Rates for Poultry Operations* (2009), JA __. Approximately 91 percent of swine operations with grower or finisher pigs are not expected to emit 100 pounds or more of ammonia per day, and an even greater percentage are not expected to emit 100 pounds or more of hydrogen sulfide per day. *See* EPA, *Calculation Worksheet – Ammonia and Hydrogen Sulfide*

Indeed, most farms are much smaller, emit less than 100 pounds per day of ammonia and hydrogen sulfide, and do not need to report under EPCRA. However, the vast majority of farmed animals are raised in massive industrial-scale operations that *do* emit ammonia and hydrogen in large enough quantities to trigger EPCRA's reporting requirement.

### B.     The D.C. Circuit Struck Down EPA's 2008 EPCRA and CERCLA Exemption as Unlawful.

For almost three decades, industrial livestock operations, like all facilities, were required to report eligible releases of hazardous substances under CERCLA and EPCRA. In 2008, in response to an industry petition, EPA finalized a rule exempting all animal production operations from reporting hazardous substances released into the air from animal waste under CERCLA, and exempting all but the largest animal production operations from reporting such releases of extremely hazardous substances under EPCRA. *See* CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms, 73 Fed. Reg. 76,948-01 (Dec. 18, 2008) ("2008 Rule").

Shortly thereafter, several organizations, including some plaintiffs in this action, challenged the rule as a violation of CERCLA and EPCRA. Before merits briefs were filed, EPA moved for and was granted voluntary remand without vacatur "to reevaluate the policy choices reflected in the Final Rule." EPA's Reply to Pet'r's Opp'n to EPA's Mot. for Voluntary Remand at 1, *Waterkeeper All. v. EPA*, No. 09-1017 (D.C. Cir. Aug. 9, 2010). EPA left the rule

---

*Emissions: Swine Operations – Confinement with Liquid Manure Management Systems* (2009), JA __. Approximately 97 percent of dairy operations are not expected to emit 100 pounds or more of ammonia per day, and an even greater percentage are not expected to emit 100 pounds or more of hydrogen sulfide per day. *See* EPA, *Calculation Worksheet – Ammonia and Hydrogen Sulfide: Dairy Operations* (2009), JA __. Approximately 96 percent of beef operations are not expected to emit 100 pounds or more of ammonia per day. *See* Rick Stowell & Rick Koelsch, Univ. of Nebraska, *Ammonia Emissions Estimator (Daily Version)* (2009), JA __.

in place, without proposing revisions, for four years until petitioners moved for, and the Court

granted, recall of the mandate.  *See* Order, *Waterkeeper All. v. EPA*, No. 09-1017 (D.C. Cir.

Sept. 23, 2015) (order granting motion to recall the mandate).

 Finally, in 2017, the court found the rule unlawful on the merits given the "sweeping

reporting mandate[s]" of EPCRA and CERCLA and vacated the rule.  *Waterkeeper All*., at 537–

38.

### C. EPA Issued a New, Broader Exemption Without Going Through Notice-and-Comment Rulemaking.

Despite the D.C. Circuit's ruling, on October 25, 2017, EPA promulgated a new

exemption, this time without going through notice and comment rulemaking.  Specifically, EPA

released what it referred to as "guidance" documents directing that *all* industrial livestock

operations need not comply with EPCRA's reporting requirement (without maintaining the

requirement to report for the largest livestock operations as it had previously).  *See* EPA,

*CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from

Animal Waste at Farms* (2017) ("2017 EPCRA Exemption"), JA __.

In the 2017 guidance (which Plaintiffs aver is a final, legislative rule), EPA newly

interpreted EPCRA to exempt "farms" that "use" hazardous substances in "routine agricultural

operations" from reporting, despite that, on at least three prior occasions, EPA had rejected this

theory, *see infra*, section IV.B.  EPA, *Does EPA Interpret EPCRA § 304 to Require Farms to

Report Releases from Animal Waste?* (2017) ("2017 EPCRA Q&A"), JA __.  Although EPA

intended to "conduct a rulemaking to clarify its interpretation" in the future, the exemption took immediate effect. *Id.*

### D.    The FARM Act Codified an Exemption for Animal Production Operations in CERCLA.

On March 23, 2018, Congress enacted the Consolidated Appropriations Act, 2018. *See* Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, § 1102, 132 Stat. 348, 1148 (2018). Title XI – known as the Fair Agricultural Reporting Method Act, or "FARM Act" – expressly exempts "air emissions from animal waste (including decomposing animal waste) at a farm" from CERCLA's reporting requirements. The FARM Act did not amend any provision of EPCRA. FARM Act Co-Sponsor Thomas Carper inserted a statement into the legislative record explaining that the EPCRA reporting provisions were to remain intact. *See* 115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018), JA __.

### E.    EPA Amended the Exemption in Response to the FARM Act.

In April 2018, EPA amended its guidance to add a new legal theory. EPA asserted that because Congress exempted livestock operations from reporting under CERCLA, and because some EPCRA reporting is linked to emissions that "occur in a manner" that would require CERCLA reporting, livestock operations similarly need not report under EPCRA. *See* EPA, *CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms* (Last Updated Apr. 30, 2018), JA __. As with the initial 2017 guidance, EPA stated its plans to conduct a rulemaking on the new legal theory, yet made the exemption effective immediately. EPA, *How does the Fair Agricultural Reporting Method (FARM) Act impact reporting of air emissions from animal waste under CERCLA § 103 and EPCRA § 304?* (2018), JA __.

9

After EPA issued its guidance, ten members of the Senate Committee on Environment and Public Works – including two co-sponsors of the FARM Act – wrote a letter asking EPA to immediately rescind the guidance. They asserted the guidance was "legally flawed," "based on an erroneous interpretation of the law," and "exceed[ed] EPA's statutory authority." Letter from Thomas R. Carper et al., Ranking Member, U.S. Senate, to Scott Pruitt, Adm'r, EPA, at 1, 2 (May 25, 2018), JA __. They noted EPA's new interpretation of EPCRA was "at odds with the legislative record," which offered no support for the interpretation, and was "[o]bviously . . . inconsistent with longstanding EPA policy." *Id.* at 2.

### F.    After Plaintiffs Challenged the Guidance, EPA Initiated Notice and Comment Rulemaking.

In September 2018, Plaintiffs initiated this action challenging the guidance on multiple grounds, including failure to go through notice and comment rulemaking. While the challenge was pending, in November 2018, EPA published a proposed rule, mirroring the guidance, to exempt air emissions from animal waste at farms from EPCRA reporting. *See* Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act, 83 Fed. Reg. 56, 791 (Nov. 4, 2018). EPA restated its belief that the FARM Act's exemption of these emissions from CERCLA reporting requirements created a parallel exemption under EPCRA as a matter of law. *Id.* at 56,793. Plaintiffs submitted comments on the proposed rule. *See* Earthjustice et. al., *Comments on Emergency Release Notification Regulations on Reporting Exemption for Air*

*Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act* (Dec. 14, 2018), Docket No. EPA-HQ-OLEM-2018-0318-0398, JA __.

In June 2019, EPA signed the final rule, *see* the Rule, 84 Fed. Reg. 27,533-01 (June 13, 2019).

## III.    PROCEDURAL HISTORY

On September 28, 2018, Plaintiffs filed a Complaint challenging EPA's guidance for failure to go through notice-and-comment rulemaking and for violating EPCRA and CERCLA. *See* Compl., ECF No. 1.  In July, 2019, after EPA finalized the Rule, Plaintiffs amended their complaint to add three additional counts, challenging the Rule for (1) violating EPCRA, (2) violating the Administrative Procedure Act, and (3) failing to comply with procedural requirements of the National Environmental Policy Act.  *See* First Am. Compl., ECF No. 29.

On July 23, 2019, EPA filed a motion to dismiss the challenges to the guidance, arguing (1) that the challenge was moot because EPA had withdrawn the guidance after the Rule was finalized and (2) that the guidance was unreviewable.  *See* EPA's Mot. to Dismiss, ECF No. 30. The Court dismissed two of the counts challenging the guidance but allowed the claim that the guidance was agency action outside of statutory authority to stand.  *See* Order, May 15, 2020, ECF No. 40.  In September 2020, a number of industry organizations filed a motion to intervene in the action.  *See* Mot. to Intervene, Sept. 1, 2020, ECF No. 46. The Court granted this motion on August 2, 2021.  *See* Min. Order Granting Mot. to Intervene In November 2021, EPA filed a motion for voluntary remand without vacatur.  *See* EPA Mot. to Remand Without Vacatur, Nov. 23, 2021, ECF No. 58.

## JURISDICTION AND VENUE

This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, as it presents a federal question. The guidance and the Rule are final agency actions subject to review pursuant to the Administrative Procedure Act (APA). *See* 5 U.S.C. §§ 702, 704, 706. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201, and the Court has authority to issue the requested relief. *Id*. § 2201(a). Venue is proper in the District of Columbia because Defendants and a number of Plaintiffs (Center for Food Safety, Food & Water Watch, and The Humane Society of the United States) reside in this district, and because the events giving rise to the cause of action occurred in this district. *See* 28 U.S.C. § 1391(e)(1).

## STANDING

An organization has "associational standing" and may sue on behalf of its members "when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). An organization's members have standing to sue in their own right if they suffer an injury in fact that is: (1) actual or imminent, not conjectural or hypothetical; (2) fairly traceable to an agency's challenged action; and (3) likely to be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs plainly meet this standard, as the D.C. Circuit found in the challenge to EPA's 2008 EPCRA/CERCLA exemption for industrial livestock facilities. *See Waterkeeper All.*, 853 F.3d at 532–34.

Plaintiffs are nonprofit organizations whose missions include raising awareness of, and limiting, pollution from animal production facilities to protect human health, the environment, and animal welfare. *See, e.g.*, Hall Decl. ¶ 1, Russ Decl. at ¶¶ 2–3; Estrin Decl. ¶¶ 3, 7; Balk

Decl. ¶ 3; Hauter Decl. ¶¶ 5, 6; Deck Decl.¶¶ 5, 10–11; Burd Decl. ¶¶ 4–5, 9; Brittle Decl. ¶¶ 3–4; Walden Decl. ¶ 3; Hanson Decl. ¶ 4; Williams Decl. ¶ 1–2.  These organizations have standing to bring this action on behalf of themselves and their many members who live, work, and recreate near areas polluted by animal production facilities.[2]  The guidance and Rule deny Plaintiffs and their members information about the level of hazardous emissions from animal production facilities—associated with numerous adverse health impacts—to which they are exposed.

In particular, the guidance and Rule injure Plaintiffs and their members in two ways: *first*, they frustrates their ability to avoid harmful exposures to toxic pollution from industrial livestock operations; *second*, they deny them information to which they are legally entitled.

Plaintiffs' members rightfully are concerned about the impact to their health from breathing contaminated air near animal production facilities.  *See, e.g.*, Sibeke Decl. ¶ 12; Hudkins Decl. ¶¶ 7, 10.  For example, Cynthia Parke, member of the Animal Legal Defense Fund, lives in an area rife with chicken production facilities that heavily pollute the surrounding area:

> We live 3 miles southeast of 6 to 8 chicken CAFOs concentrated in one area . . . .
> In heavy wind when the trucks drive down the highway to dump chicken litter from
> the CAFOs onto the farmland, so much dust, dirt, feathers, and particles blow out
> the back of the trucks onto our cars, the road, trees, bushes, everything. It gets
> picked up in the wind and deposited everywhere in such a thick layer that it is
> clearly visible.

---

[2] While each plaintiff in this action has standing, only one plaintiff need have standing for the Court to retain jurisdiction.  *See, e.g., Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (if one party has standing, the court need not consider the issue as to other parties); *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012) ("Because only one plaintiff must have standing, we have no need to consider either the Navy's motion to dismiss certain retired and former chaplains from the appeal for lack of standing or whether the organizational plaintiffs have standing to pursue their claims.").

Parke Decl. ¶ 4. *See also* Siebke Decl. ¶ 11 ("there are at least twenty very large animal farms within my county"); *see also* Hudkins Decl. ¶ 6 (explaining that they often kayak and spend time in and around the Tar River adjacent to an industrial swine facility). Because the Rule exempts these facilities from reporting releases under EPCRA, she and other members similarly situated "could be breathing toxic air and have no way of knowing." Parke Decl. ¶ 12.

By limiting information about the level and types of toxic pollution emanating from livestock facilities, the guidance and Rule make it more difficult for Plaintiffs' members to avoid this pollution. If Plaintiffs' members had notice about hazardous emissions from animal production facilities, they could and would take steps to avoid exposures. *See, e.g.*, Parke Decl. ¶ 13 ("I would have my wells tested to make sure my drinking water was not impacted. I would keep my clothes off the line in the yard and stay inside."); Siebke Decl. ¶ 18 ("I would try to avoid areas where there are factory farms releasing high levels of pollutants when I drive to work and in other aspects of my day-to-day life."); Hudkins Decl. ¶ 15 ("I would use the information. . . to inform myself, my family, and [my] community about the air contaminants, including ammonia being released from [the industrial swine facility]; to ascertain our risks of exposure. . . and to reasonably evaluate my safety. . . while enjoying the area.").

In addition, the reporting exemption contributes to increased levels of emissions from industrial livestock operations. According to EPA itself, requiring reporting serves as a check on emissions, increasing the likelihood a facility will take voluntary steps to reduce its emissions below the reporting threshold or eliminate its emissions. *See* EPA, *1 Regulatory Impact Analysis*

*of Reportable Quantity Adjustments Under §§ 102 and 103 of the Comprehensive Environmental Response, Compensation, and Liability Act,* at 34 (1985), JA __.

The guidance and Rule therefore cause Plaintiffs' members injury-in-fact. *See Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) (standing satisfied by showing "aesthetic and recreational values of the area will be lessened" by the challenged activity); *see also Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1016–17 (D.C. Cir. 2014) (environmental group had standing where its members spent time near polluting facilities and were "concerned about the emissions' effects on their health").

Plaintiffs and their members also suffer injury from being deprived of information to which they are entitled. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) ("Indeed, this Court has previously held that a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute.").

As the Court found in *Waterkeeper All.*, EPCRA "mandate[s] that the information from [release] reports be disclosed to the general public." *Waterkeeper All.*, 853 F.3d at 532–34 (citing 42 U.S.C. § 11044(a)). The guidance and Rule "cut back on EPCRA reporting and disclosure requirements "and thus "deprives [Plaintiffs] of information, the public disclosure of which would otherwise be required by EPCRA." *Id.* at 534. Plaintiffs thus have informational standing. *Id.; see also Defs. of Wildlife*, 504 U.S. at 572 n.7; *cf Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 429–30 (5th Cir. 2013) (finding informational harms conferred standing under EPCRA, and citing cases); Order Denying Plaintiffs' Motion for Partial Summary Judgment and Denying Defendant's Motions to Dismiss, *Avila v. Olivera Egg Ranch, LLC*, No. 2:08-cv-02488 JAM KJN (E.D. Cal. Aug. 26, 2010) at Docket 160, *id.* at Docket 159, Hearing Transcript of Oral Argument re Motion to Dismiss and Cross-Motion for Summary

Judgment at 47–48 (E.D. Cal. Aug. 11, 2010) (denying defendant CAFO's motion to dismiss based on finding that The Humane Society of the United States had standing to sue CAFO for failure to file EPCRA and CERCLA reports based on allegations of informational injury indistinguishable from those made by Plaintiffs in the instant case).

The increased risk of medical harm and the informational injury suffered by Plaintiffs and their members are both directly traceable to the guidance and Rule, and both would be redressed if the EPCRA reporting requirements were in effect. *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693, 705 (W.D. Ky. 2003) ("notice [by AFO] that a specific episodic release of a hazardous substance has occurred or that specific continuous releases will occur in the future . . . would allow the [citizen] Plaintiffs to take whatever precautionary steps necessary to protect themselves from the ammonia releases"). For these reasons, Plaintiffs have standing to bring this challenge.

## SUMMARY JUDGMENT STANDARD AND STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, federal courts must grant summary judgment when, viewing the facts in the light most favorable to the nonmoving party, the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Durant v. D.C. Gov't*, 875 F.3d 685, 693 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 2608 (2018). Once the moving party has satisfied this burden, it is entitled to summary judgment if the non-moving party fails to cite "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal citation and quotation marks omitted); *accord* Fed. R. Civ. P. 56(c)(1)(A).

The APA provides for judicial review of agency action. *See* 5 U.S.C. § 702. It requires that reviewing courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or that are adopted "without observance of procedure required by law." *Id*. § 706(2)(A), (C), (D).

Courts review whether an agency action is authorized by statute through a two-step process set out in *Chevron*, *U.S.A. v. Natural Resources Defense Council*. 467 U.S. 837, 842 (1984). The court first determines whether "the intent of Congress is clear." *Id*. If so, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842–43. If, instead, an ambiguity in the statute allows for agency interpretation, the court asks whether the agency's interpretation is "a permissible construction of the statute." *Id.* at 843.

Although an "agency may request a remand (without confessing error) in order to reconsider its previous position . . . the reviewing court has discretion over whether to remand." *SKF USA Inc. v. U.S.*, 254 F.3d 1022, 1029 (Fed. Cir. 2001). Furthermore, a "remand may be refused if the agency's request is frivolous or in bad faith." *Id.*

The normal remedy for an APA violation is vacatur. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). However, "[t]he decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (internal quotations omitted).

17

ARGUMENT

## I.    THE RULE CONTRAVENES THE UNAMBIGUOUSLY EXPRESSED INTENT OF CONGRESS.

"It is well settled that the starting point for interpreting a statute is the language of the statute itself." *Bd. of Cty. Comm'rs of Kay Cty., Okla. v. Fed. Hous. Fin. Agency*, 754 F.3d 1025, 1028 (D.C. Cir. 2014) (internal quotations omitted). "[I]f the intent of Congress is clear and unambiguously expressed by the statutory language at issue, that [is] the end of [the] analysis." *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 93 (2007). In addition to the statutory language, Courts will consider "the statutory. . . structure, purpose and its legislative history" in order "to discern the Congress's intent." *Kiewit Power Constructors Co. v. Sec'y of Lab., U.S. Dep't of Lab.*, 959 F.3d 381, 395 (D.C. Cir. 2020) (internal quotations omitted). The language of EPCRA and the legislative history of the FARM Act demonstrate Congress' clear intent that industrial livestock facilities report their toxic air emissions under EPCRA.

### A.    The Rule Contravenes the Plain, Unambiguous Language of EPCRA.

EPCRA's plain language requires that, when other statutory criteria are met, industrial livestock facilities must report toxic air emissions from animal waste. EPA's interpretation is inconsistent with this clear language, which sets forth EPCRA's "sweeping reporting mandate." *Waterkeeper All.*, 853 F.3d at 535.

#### 1.    EPCRA Requires Reporting of Releases Exempt from CERCLA but that Satisfy the Factual Predicates of Reporting Under CERCLA.

Pursuant to EPCRA, facilities must report releases that are exempt from CERCLA's notification requirement but that nonetheless "occur in a manner which would" require notification under CERCLA. EPCRA's reporting provision consists of three prongs. *See* 42 U.S.C. § 11044(a)(1)-(3). The first and third prongs are triggered only when notification is also required under CERCLA. Congress exempted air emissions from animal waste from CERCLA's

18

reporting requirements, *id.* § 9603(e)(1)(B), so these emissions also need not be reported under these two prongs of EPCRA.  Conversely, the second prong, § 1104(a)(2), requires reporting of releases when "such release *is not subject to* the notification requirements under. . . CERCLA" but "only if" the following three conditions are met:

> the release is not a federally permitted release as defined in . . . CERCLA, is in an amount in excess of a quantity which the Administrator has determined (by regulation) requires notice, and occurs in a manner which would require notification under § 103(a) of CERCLA.

*Id.* § 1104(a)(2)(A)–(C).

It is undisputed that "air emissions from animal waste at farms could meet the first two [conditions] because such releases are generally not federally permitted and may exceed the applicable reportable quantity."  Rule at 27,535.  The question in this case is whether air emissions from animal waste at industrial livestock facilities "occur[] in a manner which would require notification under § 103(a) of CERCLA," § 1104(a)(2)(C), despite CERCLA's exemption.  EPCRA's plain language provides that they do.

The phrase "occurs in a manner which would require notification under . . . CERCLA" plainly means that the factual circumstances of the release conform to those that generally trigger CERCLA reporting.  42 U.S.C. § 11004(a)(2)(C).  This reading is compelled by *first*, the overall structure of EPCRA's reporting provision, *second*, Congress' use of the subjunctive mood in this phrase, and *third*, the contrast between this phrase and the phrase "is not subject to the [CERCLA] notification requirements" also appearing in this subsection.  *Id.* § 11004(a)(2).

*First*, to avoid rendering § 11004(a)(2) superfluous, a release must be able to "occur in a manner which would" require CERCLA reporting without actually being subject to CERCLA's reporting requirement.  Section 11004(a)(2) requires reporting when "such release is *not* subject to the notification requirements under. . . CERCLA," whereas subsections (1) and (3) require

reporting only when a release *is* subject to notification under CERCLA. *Id.* § 11004(a)(2)
(emphasis added). This demonstrates Congress' will that facilities report releases under EPCRA
even when they do not have to report them under CERCLA. Consequently, the three sub-criteria
at § 11004(a)(2)(A)–(C) must be capable of being met even when CERCLA reporting is not
required. Otherwise, there would be no situation in which § 11004(a)(2) would have effect.
This would impermissibly render this provision superfluous. *See Mackey v. Lanier Collection
Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988) (counseling against "adopt[ing] an interpretation
of a congressional enactment which renders superfluous another portion of that same law").

　　*Second*, the subjunctive mood in the phrase "occurs in a manner which *would*" suggests
that the phrase refers to a *hypothetical* – not factual – situation. Congress did not write "occurs
in a manner which *does* require" CERCLA notification. *See* 42 U.S.C. § 11004(a)(2)(C).
Instead, Congress wrote "occurs in a manner which *would* require" CERCLA notification. *Id.*
The term "would" frames the clause in the subjunctive, which is used to describe counterfactual
or hypothetical scenarios. *See, e.g., Vaden v. Discover Bank*, 556 U.S. 49, 68 n.16 (2009)
(labeling statutory language "would have jurisdiction" as "the statute's subjunctive
construction"); *D.C. v. Straus*, 590 F.3d 898, 901 (D.C. Cir. 2010) (describing phrase "'*would
have faced* an uphill burden of proving' educational harm" as "counterfactual subjunctive"
language that was "speculation about what might have happened.") (emphasis original); *cf. D.C.
v. Nahass*, 699 F. Supp. 2d 175, 183 (D.D.C. 2010) (contrasting this subjunctive language with
the indicative phrase "'suffered no educational harm' . . . [which] can hardly be construed as
'speculation.'"). It follows that this phrase describes a situation when CERCLA reporting is not
required, but *would be* required but for some legal exemption.

*Third*, this reading is necessitated because § 11004(a)(2) uses distinct language to refer to two different types of release: (1) "a release. . . subject to the notification requirements [of CERCLA]" and (2) "[a] release [that]. . . would require notification under. . . CERCLA"). These phrases cannot be read as having the same meaning because "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. U.S.*, 464 U.S. 16, 23 (1983). Therefore, the phrase "would require notification" must refer to a different release than one that "does require notification." Comparing the language of § 11004(a)(2) ("would require notification") with §§ 11004(a)(1), and (a)(3) ("requires a notification") further demonstrates that §§ 11004(a)(1), and (a)(3) apply to situations in which CERCLA notification *is* legally required. *See* 42 U.S.C. § 11004(a)(1), (a)(3) (using "requires a notification" and "requires notification" respectively). Reading these different phrases as referring to the same type of release is impermissible. *See Loughrin v. U.S.*, 573 U.S. 351, 358 (2014).

The language and structure of EPCRA provide that the phrase "subject to the notification requirements" refers to the *legal* determination of whether the release must be reported pursuant to CERCLA, and the phrase "occurs in a manner which would require notification" refers to the *factual* determination of whether the release would otherwise require CERCLA reporting. Because the language is clear and unambiguous, the analysis ends there. *See Zuni Pub. Sch. Dist. No. 89*, 550 U.S. at 93 (2007).

### 2. Toxic Air Emissions from Animal Waste at Industrial Livestock Operations Meet the Factual Predicate of "Occur[ing] in a Manner Which Would Require Notification Under CERCLA."

Toxic air emissions from animal waste at industrial livestock facilities do "occur in a manner which would require notification under CERCLA" and thus must be reported under

EPCRA. CERCLA requires notification of "any *release* (other than a federally permitted release) of *a hazardous substance* from [a] *facility* in [reportable] quantities equal to or greater than those" included in the statute. 42 U.S.C. § 9603(a) (emphasis added). Certain air emissions from animal waste at industrial livestock facilities meet these qualifications notwithstanding the FARM Act.

*First*, CERCLA's definition of "release" tracks that of EPCRA's as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . ." of any hazardous substance. 42 U.S.C. § 9601(22). CERCLA lists hydrogen sulfide and ammonia as "hazardous substances" with reportable quantities of 100 pounds per day for each – the same reportable quantities that EPCRA dictates. *See* 40 C.F.R. § 302.4(a). As EPA itself acknowledges, many air emissions from animal waste at industrial livestock facilities qualify as "releases" under this definition. *See* Rule at 27,535 ("air emissions from animal waste at farms could" be a "release").

*Second*, CERCLA defines "facilities" as:

any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or [] any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9). Industrial livestock facilities, which deposit, store, dispose of, and place ammonia and hydrogen sulfide producing animal waste on site, also qualify as "facilities."

Thus, pursuant to the plain language of CERCLA and EPCRA, air emissions from animal waste from industrial livestock facilities that emit reportable quantities of extremely hazardous substances such as ammonia and hydrogen sulfide *are* releases that "occur[] in a manner which

would require notification under . . . CERCLA" and thus require reporting under EPCRA.  42 U.S.C. § 11004(a)(2)(C).

Congress did not alter the requirement to report under EPCRA when it enacted the FARM Act.  Rather than amend the definition of "release" to exclude "air emissions from animal waste," Congress amended CERCLA's notification provision, § 9603, to say: "This *section* shall not apply to . . . air emissions from animal waste (including decomposing animal waste) at a farm."  *Id.* § 9603(e)(1)(B) (emphasis added).  Although the notification requirements in § 9603 no longer apply to air emissions from animal waste, the definition of release in § 9601 remains intact.  Therefore, industrial livestock facilities must continue to report air emissions from animal waste under EPCRA.

### 3.    EPA's Proffered Interpretation Contravenes the Unambiguous Plain Language of EPCRA.

For the same reasons discussed in section (1) *supra*, EPA's assertion that "[a]ir emissions from animal waste at farms no longer 'occur[ ] in a manner' that would require notification under CERCLA § 103(a) because the FARM Act exempted these types of releases from CERCLA reporting" cannot be squared with the plain meaning of EPCRA.  Rule at 27,535.  Specifically, EPA's interpretation equates a release that "occurs in a manner which *would* require notification" with a release that "occurs in a manner which *does* require notification."  *See* 42 U.S.C § 11004(a)(2)(C).  This is impermissible for three reasons: *first*, it leads to a nonsensical outcome, *second*, it impermissibly ascribes the same meaning to two distinct statutory phrases by ignoring Congress' use of the subjunctive mood, and *third*, it would render § 11004(a)(2) superfluous.

*First*, Congress did not write "occurs in a manner which *does* require notification."  *See* 42 U.S.C. § 11004(a)(2)(C).  Read this way, § 11004(a)(2) would require reporting when "such

release is not subject to the notification requirements under . . . CERCLA . . . but only if the release . . . [does] require notification under . . . CERCLA." *Id.* This makes no sense and must be rejected. *See Owens v. Republic of Sudan*, 864 F.3d 751, 774 (D.C. Cir. 2017); *see also Corley v. U.S.*, 556 U.S. 303, 314 (2009) (rejecting reading that "renders [a phrase] nonsensical and superfluous").

*Second*, EPA's reading impermissibly reads two distinct statutory phrases as identical. The phrase "would require notification" used in § 11004(a)(2) plainly means something different from "requires notification," which is used in §§ 11004(a)(1) and (a)(3) and notably *not* used in § 11004(a)(2)(C). *See* 42 U.S.C. § 11004(a)(1), (a)(3) (using "requires a notification" and "requires notification" respectively). EPA cannot give the same meaning to these two distinct phrases. *See Russello*, 464 U.S. at 23 (rejecting statutory interpretation that would lead "the differing language in the two subsections [to have] the same meaning in each").

*Finally*, EPA's reading of § 11004(a)(2) "effectively deletes" that entire provision from the statute because it would exempt *all* releases that do not have to be reported under CERCLA from being reported under EPCRA. *See Caraco Pharm. Laboratories, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 421 (2012) (rejecting a statutory interpretation that fails to give meaning to all terms). However, § 11004(a)(2) indicates that Congress wanted facilities to report certain releases under EPCRA when not required to do so under CERCLA, as this provision only applies to releases that specifically *are* exempt from reporting under CERCLA. *See* 42 U.S.C. § 11004(a)(2) (requiring reporting of releases "not subject to the notification requirements under [CERCLA]"). Thus, because EPA's interpretation effectively reads this provision out of the statute, it is invalid. *See Mackey*, 486 U.S. at 837.

Because EPA's justification rests on an erroneous view of the law, namely, that CERCLA's exemption of emissions from animal waste *compels* exemption of these same emissions from EPCRA, the Rule "cannot stand." *See Prill v. Nat'l Lab. Rels. Bd.*, 755 F.2d 941, 947 (D.C. Cir. 1985) ("[a]n agency decision cannot be sustained . . . where it is based not only on the agency's own judgment but on an erroneous view of the law"); *see also Am. Lung Ass'n v. EPA*, 985 F.3d 914, 944 (D.C. Cir. 2021) (holding that where an agency bases a rule "on the unjustified assumption that it was Congress' judgment that such a regulation is desirable or required" the rule "must be declared invalid").

Had Congress wanted to confine EPCRA reporting only to releases that must be reported under CERCLA, it would not have included § 11004(a)(2) in the statute. Nor would Congress have directed EPA to create an entirely new list of EPCRA-specific "extremely hazardous substances" required to be reported under EPCRA when Congress had already directed EPA to create a list of "hazardous substances" required to be reported under CERCLA. *See* 42 U.S.C. §§ 9602, 11002(a). EPA cannot contravene the statutory structure of EPCRA and effectively delete § 11004(a)(2) to suit its policy ends. *See 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951) ("Congress expresses its purpose by words. It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort.").

### 4. The Plain Language of EPCRA Makes No Distinction Between the Substance Released and the Mode of Release.

To justify its interpretation, EPA creates an arbitrary distinction between exemptions from CERCLA reporting requirements based on the *substance* emitted and exemptions from CERCLA reporting requirements based on the *mode of release* (*i.e.*, emission into the air). *See* Rule at 27, 535. Followed to its logical conclusion, EPA's interpretation would exempt facilities from reporting all releases of "extremely hazardous substances" that are listed under EPCRA but

not required to be reported under CERCLA. The Congressional Research Service determined that this interpretation would "render[] [§ 11004(a)(2)] meaningless in covering releases of extremely hazardous substances that do not require reporting as hazardous substances under CERLCA," while requiring reporting under CERCLA at the same time. 115 Cong. Rec. S1926 (daily ed. Mar. 22, 2018), JA __. To avoid this result, EPA proposes that releases of petroleum and trimethylchlorosilane – substances listed under EPCRA but not CERCLA – must still be reported under EPCRA notwithstanding the lack of any parallel requirement for CERCLA reporting because Congress exempted the *substance* released, not the *mode* of release (*i.e.* the type of emission) from reporting under CERCLA. *See* Rule at 27,536. But no statutory language, structure, or purpose, and no legislative history, supports this distinction.

EPA's theory that Congress intended a method-based CERCLA exemption to automatically create an EPCRA exemption only holds if § 11004(a)(2) requires reporting solely of releases that also require reporting under CERCLA. But as discussed *supra*, that is not the case. Additionally, if Congress wanted to exempt these emissions from EPCRA reporting, it could have removed "air emissions from animal waste" from CERCLA's definition of "release" as opposed to simply exempting them from CERCLA's reporting provision. But it did not. The plain language of EPCRA can only be read to require reporting of releases that are exempt from CERCLA reporting based on (1) the substance involved *or* (2) the mode of release when the release, if not for that CERCLA exemption, factually "occurs in a manner which would require notification under [CERCLA]." 42 U.S.C. § 11004(a)(2)(C).

### B. The FARM Act's Legislative History Demonstrates Congress' Intent to Require Industrial Livestock Operations to Report Under EPCRA.

The FARM Act's legislative history supports this plain language reading of EPCRA. Contemporaneous statements by the sponsors of the legislation and a memorandum from the

Congressional Research Service make clear that Congress intended industrial livestock facilities to report air emissions from animal waste under EPCRA despite the CERCLA exemption.

As Co-Sponsor of the FARM Act, Senator Carper's floor statements "are an authoritative guide to the statute's construction." *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 526–27 (1982). In his remarks, he stated that the Act "leaves intact reporting requirements under [EPCRA]." 115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018), JA __. Indeed, the Senator "worked hard" with the FARM Act's other co-sponsors "to ensure that, at the same time we exempted farms from hazardous substance reporting requirements under . . . CERCLA, *we chose to make no changes to how extremely hazardous substances should be reported under EPCRA*." *Id.* (emphasis added). Congress thus intended industrial livestock operations to continue reporting under EPCRA. *See Women Prisoners of D.C. Dep't of Corr. v. D.C.*, 899 F. Supp. 659, 668 (D.D.C. 1995) (relying on statement by sponsor to evince scope of legislation).

The Congressional Research Service drafted a memorandum on the impact of the FARM Act on EPCRA's reporting requirements, which further supports this view. The memorandum – submitted into the Congressional Record by Senator Carper – noted that the FARM Act "would not have a bearing on the reporting of releases of extremely hazardous substances under [§ 11004(a)(2)] as this provision is not contingent upon reporting required under [CERCLA]." 115 Cong. Rec. S1926 (daily ed. Mar. 22, 2018), JA __. It thus concluded: "If [the FARM Act] were enacted, the applicability of [§ 11004(a)(2)] therefore would remain the same as in current law." *Id.* The memorandum also highlighted that this interpretation was consistent with how EPA had historically read EPCRA: "In implementation, EPA has treated the phrase 'occurs in a manner' in EPCRA . . . to mean the nature of the release in terms of how a substance enters the environment, not that reporting is required under [CERCLA]." *Id.*

27

Senator Carper submitted the Congressional Research Service's memorandum to the Congressional Record prior to the vote on the FARM Act. *Id.* at S1925. Thus, at the time of voting, Congress knew that the prevailing interpretation of EPCRA was to require reporting of releases that were exempt from CERCLA. "When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well." *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998). Congress did not change the language of EPCRA, and so we must presume that Congress intended for the existing interpretation to continue, which would require industrial livestock facilities to report under EPCRA despite their exemption from reporting under CERCLA.[3]

Therefore, the plain language and legislative history demonstrate that "Congress has directly spoken to the precise question at issue" and thus "that is the end of the matter." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). EPCRA plainly requires industrial livestock facilities to report their toxic air emissions from animal waste, and the Rule's exemption of these releases is therefore unlawful. Because there is no gap in the statute, and because EPA has not maintained it is interpreting any statutory ambiguity, the Court need not proceed to *Chevron* Step Two.

---

[3] Any claim that general statements in the Congressional Record when EPCRA was passed in 1986 that indicate that EPCRA requires notification when there is a release of an extremely hazardous substance that would require notice under CERCLA except that the substance is not listed in CERCLA does not undermine Plaintiffs' reading of EPCRA as requiring reporting of air emissions from animal waste. In determining what Congress intended through the FARM Act, the legislative history of the FARM Act is more relevant than the older legislative history of EPCRA. *See Amax Land Co. v. Quarterman*, 181 F.3d 1356, 1363 (D.C. Cir. 1999) ("A later Congress' views can be relevant . . . in interpreting the meaning of its own duly enacted legislation.").

## II.    THE RULE IS ARBITRARY AND CAPRICIOUS.

Not only does the Rule violate EPCRA, but it is also arbitrary and capricious in violation

of the APA.

### A.    EPA Failed to Provide a Reasoned Analysis for its Changed View of EPCRA.

EPA interprets EPCRA in a new way but does not recognize that it changed positions or

adequately explain this change in the Rule.  Although an agency may change its view, settled

principles of administrative law require that the agency "display awareness that it is changing

position" and "show that there are good reasons for the new policy."  *Fed. Commc'n Comm'n v.*

*Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (internal citations omitted).  And when a

new policy "rests upon factual findings that contradict those which underlay its prior policy; or

when its prior policy has engendered serious reliance interests that must be taken into account,"

"reasoned explanation is needed for disregarding facts and circumstances that underlay or were

engendered by the prior policy."  *Id.* at 515–16.  EPA's failure to do so here renders the Rule

arbitrary and capricious.

In particular, during the 2008 CERCLA/EPCRA rulemaking, EPA understood that an

exemption from CERCLA did not *require* an exemption from EPCRA.  In the 2008 Rule, EPA

required the largest animal production facilities to report their toxic air emissions under EPCRA

while exempting them from reporting under CERCLA.  *See* 2008 Rule at 76,952.  EPA does not

explain why it now believes a CERCLA exemption automatically creates an EPCRA exemption.

In addition, EPA fails to explain why it no longer believes it is "important" for large

animal production facilities to report their toxic air emissions.  *Id.* at 76,954.  In the 2008 Rule,

EPA retained the EPCRA reporting requirement in light of "comments expressing a concern that

air emissions of hazardous substances from animal waste at the largest animal feeding operations

may pose a risk and therefore State and local governments and the public should continue to

receive reports of such emissions." *Id.* at 76,953. EPA acknowledged that "the public may have a . . . use for the notifications," *id.* at 76,955, and, more specifically, "reporting information about emissions enables citizens to hold companies and local governments accountable in terms of how toxic chemicals are managed and even allows agencies to identify a facility's proximity to schools where children may be at higher risk of adverse health effects due to exposure." *Id.* at 76,954.

EPA fails to acknowledge or explain its about-face. For this reason too, the Rule is unlawful.

### B.    EPA Failed To Consider Important Safety and Public Health Benefits of Maintaining EPCRA Reporting.

In the 2008 rulemaking, EPA considered the safety and public health benefits of maintaining EPCRA reporting requirements for the largest industrial livestock operations. Here, EPA entirely failed to do so.

To pass muster under the APA's standard of review, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (internal quotations omitted). "Normally, an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency . . . ." *Id.*

EPA failed to consider at least two "important aspects of the problem" here: (1) that state and local agencies would be deprived of information needed to respond to emergency situations and to make regulatory decisions, and (2) that individuals would be deprived of information to

avoid exposure to dangerous pollution.  Thus, the Rule is "arbitrary, capricious, [and] an abuse

of discretion," in violation of the APA, 5 U.S.C. § 706(2)(A).

*First*, the Rule arbitrarily denies state and local emergency response agencies and

communities important release information about extremely hazardous substances.  EPA's denial

of public health information to state and local emergency response agencies is particularly

egregious because these entities are the ones best equipped to use release information to respond

to potentially lethal emission events at industrial livestock operations.

Comments in the rulemaking record demonstrate that local and state agencies use

EPCRA release information to protect local communities.  For example, the South Coast Air

Quality Management District noted that agencies use release information to reduce air pollution

through other regulatory programs:

> [I]t is necessary for state and local air pollution control agencies . . . to have the
> benefit of better quantification and inventory of such emission releases from
> CAFOs to implement key provisions of SIPS (State Implementation Plans) to
> reduce emissions and make further progress in attaining state and federal health-
> based air quality standards.

Comments of S. Coast Air Quality Mgmt. Dist., at 2 (Mar. 27, 2008), JA __.

The Rule denies local emergency response agencies information not only about

continuous releases of harmful toxins, but also spikes in releases such as from pit agitation – a

process through which "hydrogen sulfide, methane, and ammonia 'are rapidly released from the

manure and may reach toxic levels or displace oxygen, increasing the risk to humans and

livestock,'" leading to illness and even death.  *See, e.g.*, *Waterkeeper All.*, 853 F.3d at 536

(quoting 2008 Rule, 73 Fed. Reg. at 76,957).

*Second*, the Rule deprives the public of health information that communities find

valuable.  Ample evidence in the record demonstrates the desire of communities to access this

release information given serious concerns about exposure to pollution from industrial livestock operations. *See Comments of Nw. Env't Def. Ctr. & Friends of the Columbia Gorge* (Mar. 27, 2008), Docket No. EPA-HQ-SFUND-2007-0469-0927, JA __; *see also Comments of the Dairy Educ. All.* et al., (with exhibits A, B, and D) (Mar. 27, 2008), Docket No. EPA-HQ-SFUND-2007-0469-1004], JA __; *Comments of Env't Integrity Project* (Mar. 27, 2008), Docket No. EPA-HQ-SFUND-2007-0469-0989, JA __; *Comments of Soc'y of Env't Journalists* (Mar. 27, 2008), Docket No. EPA-HQ-SFUND-2007-0469-1164, JA __.

Declarations in the administrative record further explain that if the public had access to information from EPCRA reports, either from their local emergency response agency or advocacy organizations, they would use this information to take measures to protect their health and quality of life. *See, e.g.*, Durkis Decl. ¶ 13, JA __ ("If CAFOs were required to provide notice . . . I could protect myself from potential contamination . . . Any time I received notice of potential hazards I would have my wells tested to make sure my drinking water was not impacted. I would also notify other neighbors . . . ."); Cook Decl. ¶ 13, JA __ ("If the Denu Turkey CAFO followed EPCRA's requirement to report its toxic emissions, then I would be better equipped to protect my health and avoid these toxic gases and smells.").

Congress enacted EPCRA "to provide communities with information on potential chemical hazards within their boundaries and to foster state and local emergency planning efforts to control any accidental releases." *Huls Am. Inc. v. Browner*, 83 F.3d 445, 446 (D.C. Cir. 1996); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 86 (1998) ("EPCRA establishes a framework of state, regional, and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of health-threatening release."); *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*,

704 F.3d 413, 429 (5th Cir. 2013) ("EPCRA . . . ensures that the public is given access to

important health-related information."). It is arbitrary and capricious for EPA not to consider

that the Rule would hinder the very purposes EPCRA. *See Nat'l Lifeline Ass'n v. Fed. Commc'ns

Comm'n*, 921 F.3d 1102, 1111 (D.C. Cir. 2019) (finding agency policy arbitrary and capricious

where agency "did not consider the impact" of policy on "furthering [statute's] primary goals").

## III.    EPA FAILED TO COMPLY WITH NEPA IN ISSUING THE RULE.

The Rule also is illegal because EPA failed to conduct the environmental impact analysis

required by federal law. The National Environmental Policy Act ("NEPA") requires that

"agencies take a 'hard look at environmental consequences'" of their action. *Robertson v.

Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427

U.S. 390, 410 n.21 (1976)). EPA's implementing regulations make clear that NEPA applies to

EPA's "development and issuance of regulations." 40 C.F.R. § 6.101(a); *see id.* § 1508.18(b)(1)

(listing "[a]doption of official policy, such as rules, regulations, and interpretations adopted

pursuant to the Administrative Procedure Act" as a "federal action" for the purposes of NEPA).

EPA's regulations instruct that a draft NEPA environmental impact statement be issued together

with any proposed rule. *See* 40 C.F.R. § 1502.5(d). No such analysis appears in the

administrative record, and for this reason too, the Rule is unlawful.

## IV.    EPA'S GUIDANCE EXEMPTING INDUSTRIAL LIVESTOCK OPERATIONS' TOXIC AIR EMISSIONS IS UNLAWFUL.

EPA's guidance exempting industrial livestock operations from reporting under EPCRA

is illegal for the same reasons that render the Rule illegal. Moreover, EPA's additional

justification for the guidance – that industrial livestock operations need not report releases of

ammonia and hydrogen sulfide because these are "used in routine agricultural operations" and

thus not deemed "hazardous chemicals" subject to reporting 42 U.S.C. § 11021(e)(5) – fares no

33

better.  *See* 2017 EPCRA Q&A; *see also* EPA, *How do the Reporting Requirements in EPCRA §*
*304 apply to Farms Engaged in "Routine Agricultural Operations"?* (Apr. 27, 2018).  Here too,
EPA's strained reading contravenes the clear language of EPCRA and fails under *Chevron* Step
One.

> ### A.    EPA's "Guidance" is Reviewable Final Agency Action.

As an initial matter, the EPCRA guidance constitutes a final agency action.  An agency
action is final if it "mark[s] the consummation of the agency's decisionmaking process" and if it
is "one by which rights or obligations have been determined, or from which legal consequences
will flow." *U.S. Army Corps of Engineers v. Hawkes Co*., 136 S. Ct. 1807, 1813 (2016); *see*
*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (same).  The guidance satisfies these
requirements.

*First*, EPA had clearly "made up its mind" by repeatedly and consistently instructing
animal livestock operations that they need not report under EPCRA.  As discussed *supra*, EPA
maintained this exemption even though Congress intended to keep EPCRA's reporting
provisions in place in the FARM Act, and despite a D.C. Circuit ruling to the contrary.

*Second*, "legal consequences . . . flowed" from the guidance because it altered what
operations must report under EPCRA.  It removed legal obligations on animal production
facilities and shielded them from reporting requirements, thereby limiting EPA's enforcement
authority of those reporting requirements.  It also deprived communities of a legal right to
emission information.  Thus, the EPCRA Exemption is a final, reviewable agency action.  *See*
*Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016) (finding agency
"guidance" reviewable as final agency action because it "comes to a definitive conclusion" and
"creates a safe harbor" with "clear legal effect on regulated entities." ).

**B.     EPA's "Guidance" Contravenes the Plain Language of EPCRA.**

The "routine agricultural operations" justification fails because livestock operations do

not "use" ammonia and hydrogen sulfide.  Instead, industrial livestock operations *produce* these

"serious pollutants," *Waterkeeper All.*, 853 F.3d at 529, and so industrial livestock operations are

facilities at which hazardous chemicals are "produced," 42 U.S.C. § 11004(a)(1).

Though EPCRA excludes "[a]ny substance to the extent it is *used* in routine agricultural

operations," from the definition of "hazardous chemical," *id.* § 11021(e)(5) (emphasis added),

that provision is inapposite.  The "routine agricultural operations" provision might apply to

industrial livestock operations if they did indeed *use* their gaseous ammonia and hydrogen

sulfide emissions as part of their agricultural operations, but they do not; these hazardous

substances are simply waste products, as this Circuit determined.  *See Waterkeeper All.*, 853 F.3d

at 536 (quoting 2008 Rule, 73 Fed. Reg. at 76,957) (explaining that, rather than being used in

agricultural operations, "hydrogen sulfide . . . and ammonia are rapidly released from the manure

[into air]" as a byproduct of pit agitation).

These releases are never recaptured and used as part of the operations at all.  Indeed, the

Western District of Kentucky directly addressed this precise issue and concluded that chicken

CAFOs do not "use . . . ammonia in an agricultural operation. . . . [but instead] . . .  try to get rid

of it because it is harmful to the chickens," and thus "*the routine agricultural use exemption does

not apply*" to these ammonia emissions.  *Sierra Club, Inc.,* 299 F. Supp. 2d at 714.

Notably, EPA did not explain the basis for its factual assumption that industrial livestock

operations somehow "use[]" toxic gases emitted from decomposing animal waste.  42 U.S.C. §

11021(e)(5); *see Am. Ass'n of Cosmetology Sch. v. DeVos*, 258 F. Supp. 3d 50, 72 (D.D.C. 2017)

("When an agency's reasoning involves a non-obvious, essential factual assumption, the agency

must justify that assumption.").  Nor could it, because the premise is false; CAFOs plainly "do

35

not use ammonia [or hydrogen sulfide emissions] in an agricultural operation." *Sierra Club*, 299 F. Supp. 2d at 714.  Tellingly, EPA also expressly rejected the view that these toxic air emissions are used in routine agricultural operations in the 2008 rulemaking.  In response to a comment stating that "[i]n fact, the definition of 'hazardous chemical' excludes 'any substance to the extent it is used in agriculture operations'" in defense of their point, *see* EPA, *Response to Comment Document, CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms* at 15 (Dec. 12, 2008), JA __, EPA rejected this interpretation: "Based on the language of these statutes, there is no indication that Congress meant to exclude emissions from manure from reporting requirements under CERCLA . . . and EPCRA." *Id.*

EPA's current justification has no basis in EPCRA's plain language.  Accordingly, it cannot pass muster under *Chevron* Step One.

*******

For all of these reasons, Plaintiffs are entitled to judgment as a matter of law.

## V.    VACATUR IS THE APPROPRIATE REMEDY.

The Court should vacate the Rule because "vacatur is the normal remedy" for an APA violation, *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014), and EPA fails to show that remand without vacatur is appropriate.

### A.    Vacatur is the Standard Remedy Where a Rule is Unlawful.

Where a court determines that a rule is unlawful, vacatur is the standard remedy. *Standing Rock Sioux Tribe v. U. S. Army Corps of Engineers*, 985 F.3d 1032, 1050 (D.C. Cir. 2021) ("The ordinary practice. . . is to vacate unlawful agency action . . .").  Thus, whether the Court determines that the Rule is contrary to the statute, inadequately supported, or procedurally deficient, vacatur is appropriate.  *See, e.g.*, *Nat. Res. Def. Council v. EPA,* 489 F.3d 1250, 1261

(D.C. Cir. 2007) (vacating agency rule that "conflicts with the plain meaning of [the statute]");
*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151
(D.C. Cir. 2005) ("unsupported agency action normally warrants vacatur"); *Am. Lung Ass'n,* 985
F.3d at 995 (holding rule "must be vacated" because it "rests squarely on the erroneous legal
premise that the statutory text expressly foreclosed [other interpretations]"); *Standing Rock Sioux
Tribe*, 985 F.3d at 1050 ("[D]istrict courts in this circuit routinely vacate agency actions taken in
violation of NEPA.") (internal quotations omitted).

Moreover, a court has authority to order vacatur where, as here, it will "ha[ve] before it
the full administrative record, as well as fully briefed []motions for summary judgement [and
thus will be] able to undertake a determination of the merits." *Nat'l Parks Conservation Ass'n v.
Jewell*, 62 F. Supp. 3d 7, 14 (D.D.C. 2014). Indeed, courts have determined that they have the
authority to vacate agency actions even *without* reaching the judicial merits. For example, courts
in the Ninth Circuit have noted that, "because vacatur is an equitable remedy, and because the
APA does not expressly preclude the exercise of equitable jurisdiction, the APA does not
preclude the granting of vacatur without a decision on the merits." *In re Clean Water Act
Rulemaking*, No. C 20-04636 WHA, 2021 WL 4924844, at *5 (N.D. Cal. Oct. 21, 2021) (internal
quotations omitted).

**B.    EPA Has Not Demonstrated Remand Without Vacatur Is Warranted.**

In determining whether to stray from the "normal remedy" of vacatur, two factors guide a
court's decision: (1) "the seriousness of the order's deficiencies" and (2) "the disruptive
consequences of an interim change that may itself be changed." *Allied-Signal, Inc.*, 988 F.2d at
150–51 (internal quotations omitted). The burden is on the agency to overcome the presumption
of vacatur. EPA cannot meet that burden here.

1.    **The Rule's Serious Deficiencies and Violation of EPCRA Warrant Vacatur.**

When evaluating whether remand without vacatur is appropriate, courts first look to the seriousness of the deficiency of the agency action, "determined at least in part by whether there is 'a significant possibility that the [agency] may find an adequate explanation for its actions' on remand." *Standing Rock Sioux Tribe*, 985 F.3d at 1051. This factor considers "the extent of doubt whether the agency chose correctly." *Allied-Signal, Inc.*, 988 F.2d at 150.

As discussed *supra*, the Rule conflicts directly with the plain, unambiguous language of EPCRA, which requires that animal production operations report their toxic air emissions. This is a serious deficiency and one EPA *cannot* correct on remand by offering an alternative explanation. Thus, EPA's "reasoning . . . is 'so crippled as to be unlawful'" and the Rule is not merely "potentially lawful but insufficiently or inappropriately explained." *Radio-Television News Directors Ass'n v. Fed. Commc'n Comm'n*, 184 F.3d 872, 888 (D.C. Cir. 1999). In such cases "the court's practice is to vacate the agency's order." *Id.* The Court should thus deny EPA's request to leave the unlawful Rule intact.

2.    **Vacatur is Warranted Because it Will Cause Limited Disruptive Consequences.**

Courts next look to whether vacatur will be disruptive. Here, EPA fails to show that vacatur would lead to disruptive consequences.

EPA has not "identified any serious disruptive consequences of vacatur." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020). Although EPA avers that vacatur "may" be disruptive because CAFOs "have been operating without the requirement of reporting air emissions of hazardous substances from animal waste," EPA Br. at 11–12, that is of the Agency's own unlawful doing, and this Circuit has rejected arguments like this that rest solely on

"the regulatory uncertainty that typically attends vacatur of any rule." *Nat. Res. Def. Council,*
955 F.3d at 85.

In addition, disruption is unlikely because vacating the Rule will simply return the status
quo that existed prior to EPA's 2008 Rule. Since the enactment of EPCRA and CERCLA, until
EPA's 2008 exemption, industrial livestock facilities were required to report air emissions from
animal waste. Indeed, EPA has provided resources on its website to assist farm owners and
operators in estimating their emissions for purposes of complying with EPCRA and CERCLA.
*See, e.g.*, 2017 EPCRA Exemption, JA __. There is no reason livestock facilities cannot
continue to report releases using existing methodologies even as EPA works on finalizing more
refined methodologies.

Thus, EPA has failed to satisfy its burden for remand without vacatur.

### C.    Vacatur is Appropriate Because Leaving the Rule in Place Will Do Affirmative Harm.

While vacating the Rule will not be disruptive, leaving it intact will have grave
consequences. Though it is enough that EPA has failed to meet the burden of demonstrating why
the normal remedy of vacatur should not apply, the Court should additionally grant Plaintiffs'
requested relief because the equities favor it. Specifically, "when considering the real-world
impact of vacatur," courts in this Circuit "should not turn a blind eye to the danger of leaving the
current rule in place." *Conservation L. Found. v. Pritzker*, 37 F. Supp. 3d 254, 271 (D.D.C.
2014).

In this case, "[p]eople have become seriously ill and even died" from exposure to
hydrogen sulfide and methane emissions from animal waste. *Waterkeeper All.,* 853 F.3d at 536.
Plaintiffs have extensively documented the Rule's harm to frontline communities through
declarations and scientific studies. *See, e.g.*, Brittle Decl. ¶ 17 ("I was suffering from burning

eyes and choking on the fumes" from a nearby CAFO); Partridge Decl. ¶ 5 ("My husband was diagnosed with chronic obstructive pulmonary disease (COPD) after the two CAFOs nearest our home began operating, and it has become much more severe in recent years. Ammonia irritates it, making it difficult for him to breathe . . . We both often experience red, itchy eyes, runny noses, and sore throats when manure is spread nearby"); Hauter Decl. ¶¶ 17–18 (The health impacts associated with exposure to ammonia include "eye, nose, throat, and chest irritation, headache, dizziness," while hydrogen sulfide "is a dangerous neurotoxin" that can cause "headaches, nausea, aggravated asthma symptoms, convulsions, and eye and skin irritation.").

As long as the Rule remains in place, local authorities and community members will lack information necessary to respond to emergencies and communities will continue to be in the dark about the toxic chemicals to which they are exposed. The grave public health harms stemming from this deprivation of information clearly outweigh the burden livestock operations "may" experience in complying with the law. Because leaving the Rule in place will not "do no affirmative harm," vacatur is the proper remedy. *Advocs. for Highway & Auto Safety,* 429 F.3d at 1151.

### D.    The Court Should Deny EPA's Motion for Voluntary Remand.

Although "[a]n agency's professed intent to revisit the challenged decision is a necessary condition to obtain remand . . . it is not always a sufficient condition." *Am. Waterways Operators v. Wheeler*, 427 F. Supp. 3d 95, 98–99 (D.D.C. 2019), reconsideration denied, 507 F. Supp. 3d 47 (D.D.C. 2020). Indeed, Courts have "broad discretion to grant or deny an agency's motion to remand." *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 436 (D.C. Cir. 2018). In deciding a motion to remand, courts "consider whether remand would unduly prejudice the non-moving party." *Id.* Additionally, "if the agency's request appears to be frivolous or made in bad faith, it is appropriate to deny remand." *Id.*; *see also Lutheran Church-*

40

*Mo. Synod v. Fed. Commc'n Comm'n*, 141 F.3d 344, 349 (D.C. Cir. 1998) (denying motion to remand where it appeared to be a "tactic[] … to avoid judicial review"); *Chlorine Chemistry Council v. EPA*, 206 F.3d 1286, 1288 (D.C. Cir. 2000) (denying a motion for voluntary remand where EPA "made no offer to vacate the rule" and, thus, "would have left petitioners subject to a rule they claimed was invalid.").

### 1.    EPA's Proposed Remand Would Prejudice Plaintiffs.

For over a decade, Plaintiffs have been denied their "statutory right" to information about releases of hazardous substances from livestock operations. *Waterkeeper All.,* 853 F.3d at 533. Now EPA again seeks to deny Plaintiffs access to information to which they are entitled without providing any assurances that Plaintiffs will receive relief upon remand.  Notably, EPA admits no error, does not profess to have changed its view about the legality of the Rule, and provides no guarantees as to the timeline or content of the new rulemaking.  If remand without vacatur were granted, and EPA did not timely institute a new rulemaking, or took some action less than a full rescission of the Rule, Plaintiffs would have to go through another time-and resource-intensive legal process to challenge the new rule's legality.

EPA's prior actions give good reason to deny its motion to remand without vacatur.  The last time this Circuit granted EPA's request to reconsider an EPCRA exemption (during the *Waterkeepers Alliance* litigation), EPA sat on its hands *for four years* until, upon a motion by the plaintiffs, the court recalled the mandate.  *See* Order, *Waterkeeper All. v. EPA*, No. 09-1017 (D.C. Cir. Sept. 23, 2015) (order granting motion to recall the mandate).  The parties then continued the litigation, and the court ultimately decided the case on the merits, finding the 2008 Rule unlawful.  It then vacated the rule *nine years* after the plaintiffs first filed suit.  *See Waterkeeper All.,* 853 F.3d at 527.  EPA has given this Court no reason to think it will not

engage in similar conduct here, as it has provided no guarantee of the timeline for completing its reassessment.

Even after the Court's decision in *Waterkeeper Alliance*, 853 F.3d at 537–38, EPA pursued an EPCRA exemption for animal production facilities. EPA has undermined the protections and purpose of EPCRA for over a decade, depriving Plaintiffs and their members of vital information to which they are lawfully entitled, and nothing suggests that it will do otherwise should this Court remand the Rule without vacatur.

Plaintiffs are significantly prejudiced by each additional day they are unable to access information about emissions of hazardous substances from animal waste at livestock operations. As Plaintiffs' declarations bear out, access to this information would allow Plaintiffs and their members to enhance their advocacy for stronger public health protections, to hold livestock facility operators accountable for hazardous emissions, and to make informed decisions about their health and the health of their communities. *See, e.g.*, Walden Decl. ¶ 15 ("This information would empower ALDF and its members to advocate for more effective regulation of AFOs and to hold AFO operators accountable for hazardous emissions. It would also increase transparency by making the public and regulators aware of the true effects of the AFO industry."); Deck Decl. ¶ 14 ("Sound Rivers would directly benefit from such information and would use it to better assess and address the impacts that air emission from CAFOs have on the Tar-Pamlico and Neuse River Basins."); Hauter Decl. ¶ 19 ("In this absence of nationwide emissions reporting under EPCRA, FWW is largely unable to provide emissions information to our members and the public, despite our efforts to obtain similar information by searching for alternative sources of data.")

Any additional delay by EPA to evade judicial review of this Rule will further an injustice that has already gone on for far too long.

### 2.     EPA's Grounds for Remand Without Vacatur Are Unconvincing.

Although Courts may grant remand without vacatur in situations where it would preserve "the courts' and parties' resources" and "allow the agency to consider the new evidence and make a new decision," those interests are not served here. *Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993). Because this is a case that purely involves statutory interpretation, there is no new evidence for EPA to consider. Yet, any new rulemaking may take years to complete, leaving Plaintiffs and their members without critical information about toxic air emissions.

EPA's failure to admit legal error casts doubt on whether judicial economy would be served by remand. It is clear from the preamble of the Rule – and from the lack of factual or policy justifications in the preamble – EPA believes the exemption to be a necessary consequence of the FARM Act and the interaction between EPCRA and CERCLA. The only decision to be made through a new rulemaking is whether EPCRA compels livestock operations to report emissions from animal waste or whether it does not. Yet, EPA has not indicated that it has changed its position on whether the FARM Act exempts reporting under EPCRA. If EPA has not changed its legal interpretation, then no amount of "policy considerations" or "input from stakeholders" will support a different rule and it is likely that this Court will again be called upon to settle this legal question with no new relevant record evidence. *See Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 10 (D.C. Cir. 2011) (declining to remand for agency to provide notice and opportunity to comment when it "would. . . serve[] no purpose" and be "a futile thing" and citing cases). Whether or not EPCRA requires livestock facilities to report air emissions from animal waste is "a pure question of statutory construction for the courts to decide." *Immigration & Naturalization Servs. v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987).

A useful example is provided by *Utility Solid Waste Activities Group v. Environmental Protection Agency*, 901 F.3d 414, 436–37 (D.C. Cir. 2018), *judgment entered,* No. 15-1219, 2018 WL 4158384 (D.C. Cir. Aug. 21, 2018).  There, the court declined to remand the case to EPA "to reconsider its interpretation of the statute" because the claim at issue involved "a question—the scope of the EPA's statutory authority—that is intertwined with any exercise of agency discretion going forward."  *Id.*  The same is true here.  It will serve everyone's interests for the Court to decide the merits of this case now before time and resources are expended on a rulemaking process EPA completes without clarity on the scope of its legal authority. Accordingly, vacatur is the appropriate remedy.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request the Court grant them summary judgement, declare the guidance and Rule unlawful, and vacate the Rule.  If the Court decides to remand the Rule to EPA without vacatur, Plaintiff's request the Court retain jurisdiction over the matter.  *See Ctr. for Biological Diversity v. U.S. Army Corps of Engineers*, No. CV 20-103 (RDM), 2021 WL 14929, at *2 (D.D.C. 2021).  The Court should also require EPA to publish a proposed rule no fewer than 90 days from the Court's order and to provide status reports at least every 30 days.  In the event that EPA fails to meet the deadline to propose a rule, and the Rule remains in effect, this litigation should return to active status.

Respectfully submitted on December 23, 2021.

<u>/s/ Carrie F. Apfel</u>
Carrie F. Apfel, D.C. Bar No. 974342
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
202.797.4310
capfel@earthjustice.org

Jonathan J. Smith*
Peter Lehner*
Earthjustice 48 Wall Street, 19th Fl.
New York, NY 10005
212.845.7376
jsmith@earthjustice.org
plehner@earthjustice.org

*Admitted Pro Hac Vice*

*Counsel for Plaintiffs Rural Empowerment
Association for Community Help, Animal
Legal Defense Fund, Center for Biological
Diversity, Center for Food Safety, Don't
Waste Arizona, Environmental Integrity
Project, Food & Water Watch, The Humane
Society of the United States, Sierra Club,
Sound Rivers, and Waterkeeper Alliance*

45

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2021, I electronically filed the foregoing document by using the Court's CM/ECF system. I certify that the foregoing document is being served this day on all counsel of record, and that service will be accomplished by the Court's CM/ECF system.

Dated this 23rd day of December 2021.           */s/ Carrie F. Apfel*
                                                 Carrie F. Apfel