# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Rural Empowerment Association for Community Help, et al., | |
| Plaintiffs, | **CASE NO. 18-cv-02260-TJK** |
| v. | |
| United States Environmental Protection Agency, et al., | **Declaration of Abel Russ** |
| Defendants, and | |
| National Cattlemen's Beef Association, et al., | |
| Intervenor-Defendants. | |

# DECLARATION OF ABEL RUSS

I, Abel Russ, declare and state as follows:

1. My name is Abel Russ, I am over 18 years of age, and I suffer from no impairment or disability affecting my ability to give truthful testimony. I have been an attorney at the Environmental Integrity Project (EIP) since September, 2010, and I also serve as the Director of EIP's Center for Applied Environmental Science.

2. EIP is a non-profit organization based in Washington, D.C. and Austin, Texas, dedicated to ensuring the effective enforcement of state and federal environmental laws to protect public health and the environment from Animal Feeding operations (AFOs) and other large sources of pollution. EIP's offices are located at 1000 Vermont Avenue, NW, Suite 1100, Washington, D.C., 20005; and 1206 San Antonio Street, Austin, Texas, 78701; and EIP also has staff located in Maryland, Pennsylvania and Vermont.

3. EIP prioritizes work related to AFOs because these industrial facilities are a significant source of air and water pollution. AFOs emit many hazardous air pollutants, including ammonia, hydrogen sulfide, and volatile organic compounds. These pollutants are associated with numerous adverse public health and environmental impacts.

4. EIP's work takes many forms. We routinely monitor compliance with environmental statutes such as the Clean Air Act and the Clean Water Act, reviewing discharge

1

monitoring data, comparing pollution loads to permit limits, and evaluating the impacts of pollution loads on air quality and water quality.

5. EIP also files petitions for rulemaking with the EPA, seeking stronger environmental regulation of AFOs. For example, together with a coalition of other environmental and public health organizations, EIP filed a petition asking EPA to regulate industrial AFOs as stationary sources of air pollutants under the Clean Air Act, and filed a separate petition asking EPA to list ammonia as a criteria pollutant under the Clean Air Act.

6. EIP's efforts rely heavily on access to information. Regulatory agencies can only effectively protect environmental quality if they have access to information, and citizens deserve to know how nearby sources of pollution may be affecting their health. Pollution data is often hard to synthesize, interpret, and use. EIP devotes considerable time and effort, using its technical and legal expertise, to making technical information available to the public and useful to state and federal agencies. This is true for all sources of pollution that we work with, including AFOs.

7. EIP operates on the premise that when the public learns that a company or facility is polluting the environment, or that regulators are failing to adequately regulate that pollution, the company is more likely to voluntarily eliminate or reduce its pollution and regulators are more likely to strengthen oversight. I am aware of at least one study showing that mandated reporting of toxic emissions is likely to result in reduced emissions and improved environmental performance. *See, e.g.*, Konar, S., et al., *Information as Regulation: The Effect of Community Right to Know Laws on*

*Toxic Emissions*, 32 Journal of Environmental Economics and Management 109 (1997).

8. EIP uses public pollution data to advocate on behalf of the public for policies promoting environmental protection and the well-being of rural communities impacted by pollution from AFOs. EIP also regularly drafts data-driven reports about various industrial sources of pollution, including AFO pollution. This helps us fulfil our goal of empowering citizens exposed to AFO pollution by helping them gain access to environmental data for use in their community-based advocacy efforts.

9. EIP has been engaged in efforts to secure better pollution reporting from AFOs for over ten years. Among other things, in 2008 EIP submitted comments to EPA opposing the Agency's exemption of AFOs from certain reporting requirements, including the requirements of the Emergency Planning and Community Right-to-Know Act (EPCRA). In 2009, EIP joined a legal challenge of that 2008 exemption as a petitioner. *See Waterkeeper Alliance, et al., v. United States Environmental Protection Agency*, Nos. 09-1017, 09-1104 (consolidated) (D.C. Cir., filed Jan. 15, 2009).

10. I am aware that in 2005, EPA entered into a consent agreement with a large number of AFOs whereby participating AFOs were granted immunity from EPA enforcement of certain reporting requirements (including EPCRA requirements) in exchange for their participation in a national study of AFO emissions. That study came to be known as the National Air Emissions Monitoring Study, or NAEMS.

11. EIP closely follows EPA's progress with respect to the NAEMS study because EIP has a strong organizational interest in ensuring that AFO pollution is accurately estimated and reported. In 2010, 2013 and 2016, EIP submitted Freedom of Information Act Requests to EPA seeking records associated with the NAEMS study.

12. In 2011, EIP released a report that analyzed NAEMS pollution data. See EIP, *Hazardous Pollution from Factory Farms* (Mar. 9, 2011), available at http://www.environmentalintegrity.org/reports/hazardous-pollution-from-factory-farms/.

13. In March and June of 2012, EIP submitted comments to EPA on draft Emissions Estimating Methodologies that the Agency developed pursuant to the 2005 consent agreement and in association with the NAEMS study, providing our professional opinions regarding the best ways to ensure accurate emissions estimates, but also expressing our strong organizational interest in having EPA finalize Emissions Estimating Methodologies as quickly as possible.

14. After more than ten years, EPA has not yet concluded the NAEMS study, or finalized any Emissions Estimating Methodologies. As a result, the public has virtually no way of knowing how much ammonia, hydrogen sulfide, volatile organic compounds, and other pollutants are being emitted from AFOS.

15. EIP has devoted significant organizational resources to trying to fill the information gap created by EPA. For example, in January, 2018, I authored an EIP report that analyzed ammonia emissions studies, including the NAEMS study and other published research, in order to provide the public with some sense of how much

ammonia is emitted by AFOs that produce broiler chickens. See EIP, Ammonia Emissions from Broiler Operations Higher than Previously Thought (Jan. 2018), available at http://www.environmentalintegrity.org/reports/ammonia-emissions/. EIP concluded that a typical broiler operation on the Delmarva Peninsula emits between 19 and 24 tons of ammonia each year. EIP is trying to compensate for the absence of information caused by EPA's regulatory failures. However, EIP's organizational interest in informing the public and evaluating the impact of AFO emissions on communities and the environment would be much better served if we could provide the public with analyses of actual emissions monitoring data, or with site-specific, empirically based estimates of emissions.

16. I am aware that the D.C. Circuit Court of Appeals vacated EPA's 2008 CERCLA/EPCRA reporting exemption rule, and that EPA implemented that vacatur in July, 2018. I am also aware that Congress exempted AFOs from CERCLA reporting obligations in March, 2018.

17. I am aware that in 2019, EPA formally exempted AFOs from EPCRA reporting requirements. EPA's position deprives the public of critical information about pollution releases that may affect their health, and it further frustrates EIP's longstanding efforts to secure, for the public, information about such releases.

18. If AFOs were required to publicly report their pollution releases under EPCRA, EIP would use the information in a variety of ways to serve the interests of our clients and the public, many of whom reside near AFOs. EIP would use this information to improve transparency regarding industrial livestock operations in order to encourage

voluntary measures to reduce pollution releases and promote better regulation of these releases.

19. In addition, one of EIP's longstanding objectives is to ensure environmental justice, meaning that EIP seeks to ensure that the burdens of environmental pollution do not fall disproportionately on low-income communities or communities of color. One of the first steps in ensuring that communities are not over-burdened is ensuring equal access to information about hazardous substances to which community members are potentially exposed. EPA's impermissible interpretation of EPCRA deprives low-income communities and communities of color of critical information about their air quality and the risks they face, while also minimizing the likelihood that polluting facilities will voluntarily reduce their emissions.

20. While EPA continues to obstruct public access to information, AFOs will continue to emit undisclosed amounts of toxic pollutants, communities will continue to live under a cloud of uncertainty about the risks they face, and EIP will continue to suffer from a lack of information that it could use to inform the public and regulatory agencies about AFO pollution.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 14th day of DEC., 2021.

Abel Russ, Senior Attorney

Environmental Integrity Project

6