# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Rural Empowerment Association for Community Help, et al., | |
| Plaintiffs, | **CASE NO. 18-cv-02260-TJK** |
| v. | |
| United States Environmental Protection Agency, et al., | **Declaration of Josh Balk** |
| Defendants, and | |
| National Cattlemen's Beef Association, et al., | |
| Intervenor-Defendants. | |

## DECLARATION OF JOSH BALK

I, Josh Balk, am over 18 years of age and am competent to testify. I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1. I serve as Vice President of Farm Animal Protection for the Humane Society of the United States ("HSUS"). I have worked for HSUS from 2005 to present. I am responsible for coordinating our public policy efforts to improve the welfare of farm animals.

2. In my capacity with the organization, I am familiar with HSUS' structure, function, purpose, and membership. I have personal knowledge of the following based on my experience and based on materials I have reviewed.

3. HSUS is a national nonprofit organization that promotes the protection of all animals; it has millions of members and constituents nationwide, including members in all 50 states and in the District of Columbia. HSUS is headquartered in the Washington, D.C. area, and has offices, affiliates, or staff throughout the country. Since its inception in 1954, HSUS has actively advocated for better laws to protect animals and their environment; conducted campaigns to combat animal abuse and promote strong animal welfare policies; and advocated against practices that injure, harass, or otherwise harm animals. Specifically, with its mission to create a humane and sustainable world for all animals—including people and their communities—HSUS endeavors to ensure that its members are aware of, and not injured by, practices that can result in animal feeding operations ("AFOs") releasing or otherwise discharging pollutants into the natural environment.

4. HSUS' work on the issue of farm animal welfare—and its relation to the environment and public health and safety—is a top organizational priority. In addition to the Farm Animal Protection team of which I am a part, HSUS employs veterinarians and a PhD animal behaviorist,

who, along with other experts and HSUS staff, focus on the animal welfare, human health, and environmental impacts of industrialized animal agriculture.

5. HSUS' farm animal welfare campaign is strongly committed to educating the public about pollution from AFOs and the consequences these operations have on the health and quality of life of the communities surrounding them. Due to the amount of animal waste an AFO can produce, the number of animals it maintains, and common AFO waste management practices, these facilities can generate and release numerous environmental pollutants, including ammonia and hydrogen sulfide. Such emissions from industrial farms affect not only wildlife and farm animals, but also the neighbors, independent farmers, and employees of these farms.

6. Exposure to ammonia and hydrogen sulfide emissions can cause numerous human health problems, including respiratory symptoms, nausea, headaches, exacerbated asthma, eye irritation, and effects on mood. HSUS has members throughout the United States, including members who work and reside in communities neighboring AFOs, and they are concerned about the negative impacts these emissions could have on their health and the health of their families and communities.

7. The organization's members rely on HSUS for information regarding the impacts of animal agriculture on human health, the environment (including wildlife), and farm animal welfare. And the organization engages in efforts to mitigate these impacts on behalf of its members. To these ends, HSUS has invested considerable organizational resources in public education, research and investigation, and litigation concerning farm animal welfare, public health, and the environment. *See, e.g.*, HSUS, *Factory Farming in America: The True Cost of Animal Agibusiness for Rural Communities, Public Health, Families, Farmers, the Environment, and Animals*, *available at* http://www.humanesociety.org/assets/pdfs/farm/hsus-factory-farming-in-

america-the-true-cost-of-animal-agribusiness.pdf; HSUS, *An HSUS Report: Human Health Implications of Non-Therapeutic Antibiotic Use in Animal Agriculture*, available at http://www.humanesociety.org/assets/pdfs/farm/HSUS-Human-Health-Report-on-Antibiotics-in-Animal-Agriculture.pdf; HSUS, *An HSUS Report: The Impact of Industrialized Animal Agriculture on Rural Communities*, available at http://www.humanesociety.org/assets/pdfs/farm/hsus-the-impact-of-industrialized-animal-agriculture-on-rural-communities.pdf; HSUS, *An HSUS Report: The Impact of Industrialized Animal Agriculture on the Environment*, available at http://www.humanesociety.org/assets/pdfs/farm/hsus-the-impact-of-industrialized-animal-agriculture-on-the-environment.pdf; *see also Humane Soc'y of U.S. v. HVFG, LLC*, No. 06 CV 6829(HB), 2010 WL 1837785 (S.D.N.Y. May 6, 2010); *Avila v. Olivera Egg Ranch, LLC*, No. 2:08-cv-02488-JAM-KJN, Dkt 1 (E.D. Cal. Oct. 20, 2008).

8. In addition, HSUS supports public policies addressing AFOs' environmental, health, and animal welfare impacts at the federal, state, and local levels. To this end, HSUS regularly drafts and participates in sign-on letters, mobilizes its members and other organizations with similar interests, participates in coalitions to support or oppose proposals on key issues, works directly with legislators and agency officials, and provides testimony before legislative bodies.

9. Relatedly, HSUS actively participates in the federal regulatory process with respect to AFOs and their impacts by submitting comments on relevant rulemakings and other regulatory actions, petitioning agencies for regulatory actions, and challenging unlawful agency actions. For instance, HSUS, together with a coalition of environmental and public health organizations, petitioned the Environmental Protection Agency ("EPA") to regulate AFOs under the federal Clean Air Act as stationary sources of air pollution. *See* HSUS et al., *Petition to List Concentrated*

*Animal Feeding Operations Under Clean Air Act Section 111(B)(1)(A) of the Clean Air Act, and to Promulgate Standards of Performance under Clean Air Act Sections 111(B)(1)(B) and 111(D)* (Sept. 21, 2009), *available at* http://www.humanesociety.org/assets/pdfs/litigation/hsus-et-al-v-epa-cafo-caa-petition.pdf. The petition urged EPA to hold industrial animal feeding operations accountable for the harm they inflict on local communities, independent farmers, and the environment, and discussed how reduction of emissions from these operations will improve human health, reduce suffering of farm animals, protect habitat for wildlife, and reduce the effects of climate change. HSUS, together with a coalition of environmental and public health organizations, also petitioned EPA to list ammonia as a criteria pollutant under the federal Clean Air Act due to the substantial impacts of ammonia on human health and the environment. *See* Envtl. Integrity Project et al., *Petition for the Regulation of Ammonia as a Criteria Pollutant under Clean Air Act Sections 108 and 109*, *available at* http://www.environmentalintegrity.org/documents/PetitiontoListAmmoniaasaCleanAirActCriteriaPollutant.pdf.

10. In addition, HSUS, with a coalition of environmental groups, filed a challenge against a rule that EPA promulgated in 2008 under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and Emergency Planning and Community-Right-to-Know Act ("EPCRA"). This rule exempted most farms from reporting air releases of hazardous substances emitted by animal waste. HSUS, with other nonprofits and concerned citizens, first raised its concerns about the lawfulness of the rule through comments to EPA during the rulemaking process. HSUS and the coalition ultimately prevailed in their legal challenge; the U.S. Court of Appeals for the D.C. Circuit vacated the 2008 rule. *Waterkeeper All. v. Envtl. Prot. Agency*, 853 F.3d 527 (D.C. Cir. 2017).

11. HSUS, in collaboration with environmental and public health focused nonprofits, also submitted comments in response to the 2017 Interim Guidance EPA issued for AFOs regarding their EPCRA and CRCLA reporting obligations after the 2008 rule was vacated. *See* Letter from Earthjustice et al. to Envtl. Prot. Agency re: CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms (Nov. 22, 2017); Letter from Food & Water Watch et al. to Envtl. Prot. Agency re: Interim Guidance on CERCLA and ECPRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms (Nov. 22, 2017). In addition to this 2017 guidance, in 2019 EPA finalized a rule which contains the same purported reporting exemptions as the earlier Interim Guidance does. Envtl. Prot. Agency, *Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to Know Act,* 84 Fed. Reg. 27533 (June 13, 2019) (collectively with the 2017 guidance: "Reporting Exemptions"). As with the 2017 Interim Guidance, HSUS submitted comments (also in collaboration with environmental and public health focused nonprofits) opposing EPA's proposed regulatory AFO reporting loophole.

12. The varied work HSUS undertakes with respect to industrialized animal agriculture is central to the organization's mission and to protecting HSUS members from the deleterious impacts of AFOs on their lives, animals, and property, as well as on the environment and the habitats of the wild animals our members cherish. HSUS often relies upon information about pollutants released from AFOs when it engages in this work to protect animals, disseminate information to the public and our members, and pressure authorities for changes regarding pollutant releases.

13. I am aware that EPCRA is intended to provide the public—including HSUS and its members—and government authorities with access to information about industrial facilities' releases of extremely hazardous substances above certain threshold amounts. I am also aware that ammonia and hydrogen sulfide are classified as "extremely hazardous substances" under EPCRA. Additionally, I am aware that EPCRA requires the owner or operator of a facility to report the release of more than 100 pounds of ammonia or hydrogen sulfide per day to the relevant local and state authorities. I am aware that EPCRA further requires this reported information to be made available to the general public.

14. AFOs can release more than 100 pounds of ammonia or hydrogen sulfide into the air per day. I understand that EPA's Reporting Exemptions exempt AFOs from reporting, to relevant state and local authorities, the specific information required by EPCRA about these releases, which also prevents this information from being made available to the general public, including HSUS and its members.

15. The EPCRA Reporting Exemptions for AFOs harms HSUS' members and the organization itself because it deprives both HSUS and its members of information to which they are entitled under EPCRA, because it could lead to adverse health impacts for HSUS members living or working near AFOs, and because the exemption's promulgation deprived HSUS of its procedural rights.

16. The EPCRA reporting exemption for AFOs deprives HSUS members of information, including the types and amounts of extremely hazardous substances, such as ammonia and hydrogen sulfide, released from AFOs.

17. EPA's exemption of AFOs from EPCRA reporting could also cause harm to the health of HSUS members living or working near AFOs. Exposure to ammonia and hydrogen sulfide

7

emissions can be harmful to human health, causing respiratory symptoms, nausea, headaches, exacerbated asthma, eye irritation, and effects on mood. If HSUS members do not have access to information about the types and amounts of extremely hazardous substances released from AFOs, they may not be able to take steps to protect themselves from these adverse health impacts. In addition, EPA's EPCRA reporting exemption harms HSUS members because it deprives them of protections they otherwise would have if local response authorities received release reports from AFOs and were better informed about the sources of toxic emissions in their jurisdictions. Further, this lack of information could undermine opportunities for citizen-driven legal and legislative actions aimed at preventing the health and environmental harms caused by AFOs.

18. Further, HSUS is harmed because, without information about extremely hazardous substances released from AFOs, the organization is limited in its ability to adequately educate and serve its membership, protect animals and wildlife from further harm, and advocate for meaningful change in the regulation of pollution from AFOs, all of which negatively impact its organizational mission and goals. In short, when HSUS cannot obtain this information—because EPA has exempted AFOs from EPCRA reporting requirements—work central to HSUS' mission is made impossible. Ensuring that HSUS has reasonable access to information about the releases of extremely hazardous substances from AFOs, such as ammonia and hydrogen sulfide, will save HSUS the time, money, and effort associated with attempting to obtain this information through other means, to the extent it can be obtained at all.

19. If this Court were to rule for the plaintiffs, the harms I have outlined above would be significantly reduced or eliminated. If the Court vacates the EPCRA Reporting Exemptions, AFO's would be required to comply with EPCRA and report information about the extremely hazardous substances they release in excess of threshold amounts (including ammonia and

hydrogen sulfide releases of more than 100 pounds per day) to state and local authorities, and this information would be made available to the general public, including HSUS and its members. HSUS would use this information to educate its members and advance its mission in the ways detailed above. In addition, HSUS members living near AFOs could use this information to protect themselves and their families from the adverse health impacts exposure to pollutants released from AFOs can cause. HSUS members could also use this information to protect their animals and property from the harms pollutants released from AFOs cause or threaten to cause.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 20th day of December 2021, in Stinson Beach, California.

_____

Josh Balk