UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Rural Empowerment Association for Community Help, et al., <br><br>    Plaintiffs, <br><br> v. <br><br> United States Environmental Protection Agency, et al., <br><br>    Defendants, <br>    and <br><br> National Cattlemen's Beef Association, et al., <br><br>    Intervenor-Defendants. | **CASE NO. 18-cv-02260-TJK** <br><br><br> **Declaration of Lori Ann Burd** |

**DECLARATION OF LORI ANN BURD**

I, Lori Ann Burd, state and declare as follows:

1. I am over eighteen years of age and a citizen of the United States. I have personal knowledge of the facts and statements contained herein and, if called as a witness, could and would competently testify thereto.

2. I am the director of the Environmental Health program at the Center for Biological Diversity (Center), and I have been since 2015. I am also a member of the Center, and I have been since 2012.

3. The Center is a 501(c)(3) non-profit, membership organization based in Tucson, Arizona with approximately 89,600 members throughout the United States and the world, including in North Carolina, Iowa, California, and other states with significant numbers of industrial animal feeding operations (AFOs). In addition to maintaining its headquarters in Tucson, Arizona, the Center also maintains offices across the United States and Mexico, including in Asheville, North Carolina; Oakland, California; Denver, Colorado; Portland, Oregon; and Washington, D.C.

4.     The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and water, and public health through science, policy, and law. Based on an understanding that the health and vigor of human societies and the natural environment are closely linked, the Center works to protect natural resources like air and water and to secure a future for animals and plants, especially those hovering on the brink of extinction, for the ecosystems they need to survive, and for the people that interact with, depend on, and cherish these natural resources.

5.     The Environmental Health program, which I direct, is focused on protecting biodiversity and human health from toxic substances. In my role at the Center, I am involved in strategic decision making and setting policy priorities for the work that the Center does to reduce threats to the environment and public health from such toxic substances, including from industrial animal agriculture and as they relate to air pollution.

6.     The Center's Environmental Health program works to help reduce the threats to people and the environment posed by air pollution, for example, through scientific, legal, and policy mechanisms. I have a personal interest in environmental protection and believe that we have a responsibility to keep clean the air we breathe and the water we drink for use for ourselves, wildlife, and future generations. I strive to represent the interests of our members in areas affected by air pollution and am concerned about how negative air quality impacts them, their families, and the environment that they enjoy.

7.     Combating air pollution, in particular, is an issue that is very important to me, as well as to the Center, because I understand the health impacts of air pollutants. I am deeply troubled by the effects that they have on the environment and human health. I am aware of studies linking air pollution such as ammonia and hydrogen sulfide to a range of health

impacts, such as respiratory problems, increased incidences of hospitalization and premature mortality. I have a close friend, a physician, who suffers from severe asthma, and on many occasions have witnessed the devastating effects asthma has had on her ability to work, care for her young child, and function. I have seen specific instances where increased air pollution has exacerbated her asthma.

8. I am further aware that air pollution can also negatively affect the health of the wildlife and plant life that I and the Center seek to protect and that the Center's members appreciate viewing in the outdoors. Air pollution can lead to haze and negatively affect my and other Center members' experiences in nature and the outdoors. Air pollution can also lead to broader ecosystem effects, including by affecting water quality and nutrient cycles, which harms the Center's mission and objectives.

9. The Center's Environmental Health program also works to advance public programs and campaigns to combat the extensive risks that pollution from industrial animal agriculture poses to ecosystems, public health, sustainable food systems, and environmental health. The Center prioritizes work related to industrial animal agricultural operations because of their significant role in producing air and water pollution, causing freshwater scarcity issues, and driving climate change and harmful land-use practices. Among other actions, the Center has been involved in litigation, policy advocacy, and campaigns that seek to improve transparency around, and federal oversight over, pollution from industrial-scale animal agriculture, including AFOs, slaughterhouses, and rendering facilities, under the United States Constitution, Freedom of Information Act, the Clean Water Act, the Clean Air Act, the Safe Drinking Water Act, and the National Environmental Policy Act. The Center further uses public pollution data to advocate on behalf of the public and its members for

policies promoting environmental protection and public health.

10. The Center regularly submits rulemaking petitions and administrative comments to, and files complaints and lawsuits against, state and federal agencies seeking transparent and adequate regulation of the animal agricultural industry. For example, in 2020 the Center submitted two petitions to the U.S. Department of Agriculture seeking to ensure the humane killing and safe disposal of farm animals killed during COVID-19 on AFOs rather than being shipped to slaughter facilities for further processing. Since 2016, the Center has also filed numerous petitions and lawsuits related to improving the regulation of animal agricultural operations under the federal clean water laws, including the Clean Water Act and Safe Drinking Water Act, and federal clean air laws, including the Clean Air Act.

11. I am aware that the U.S. Environmental Protection Agency (EPA) enacted a rule in 2019 that exempts industrial AFOs from having to comply with hazardous substance emission reporting requirements under the Emergency Planning and Community Right to Know Act (EPCRA). EPA, *Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to Know Act,* 84 Fed. Reg. 27533 (June 13, 2019). I am further aware that because of this rule many industrial facilities that emit reportable quantities of ammonia and hydrogen sulfide—two air pollutants that EPA has defined as "extremely hazardous" under EPCRA—will no longer be required to report those emissions and make that information available for use by affected communities, emergency responders, and the public, despite Congress's clear mandate that they do so.

12. In exempting industrial AFOs from essential air pollution reporting requirements under EPCRA, this rule harms the Center and its members' long-standing interests in

improving air quality; protecting front-line communities, the environment, and wildlife against exposure to air pollution, including from industrial AFOs; and advocating for greater transparency around, and federal oversight over, pollution from industrial AFOs. For example, the Center has members in California who experience air pollution from industrial AFOs in their communities and who would benefit from being able to access EPCRA reports detailing the amount and type of hazardous pollution coming from these operations. If available, those members could use the information that is required to be reported under EPCRA to protect themselves and their fellow community members against preventable exposure to reported pollution. Understanding where and to what extent these facilities are releasing reportable amounts of hazardous air pollution, both individually and cumulatively, could also inform Center members' use and enjoyment of nature, including by informing them about where they are able to hike, birdwatch, or otherwise recreate without being exposed to reportable air pollution from AFOs. It harms the Center's interests and the interests of its members to not have access to these reports, which should lawfully be required under EPCRA, or to be able to share these reports with other potentially affected community members.

13. Further, access to information and transparency about AFO practices and pollution emissions are central to the Center's efforts on behalf of itself and its members. Indeed, the Center relies heavily on access to public data about AFOs to further its organizational mission and to achieve its goals, as described in the preceding paragraphs. EPCRA is an essential transparency law that, if properly implemented, would provide the Center with valuable information that it would use in furtherance of its mission. The information required to be reported under EPCRA is especially valuable to the Center since

the EPA does not effectively regulate or otherwise make available information about AFO air emissions. As a result of the EPA's decision to exempt AFOs from EPCRA reporting requirements, many AFOs have never reported emissions data under EPCRA, further depriving the Center, its members, and the public of vital pollution information.

14.     In sum, if EPA were to enforce EPCRA's reporting mandate, rather than exempting AFOs from it, the Center and its members would have access to essential information about AFO emissions to use in our advocacy work and to protect public health and the environment. AFO reporting under EPCRA would provide the Center and its members with the opportunity to obtain accurate emissions information generated by AFOs and reported directly to responsible agencies. This information would help the Center and its members advocate for more effective regulation of AFOs and to hold AFO operators accountable for hazardous emissions.

15.     For the foregoing reasons, the Center, its missions-specific goals, and its members are injured by EPA's action to exempt industrial AFOs from lawfully complying with EPCRA's hazardous substance reporting requirements. An order from the Court vacating EPA's 2019 rulemaking and thereby requiring industrial AFOs to fully comply with the reporting obligations of EPCRA, would remedy the injuries experienced by the Center and its members. Such an order would also help guarantee that EPA will act lawfully under EPCRA to protect the environment and public health from extremely hazardous air pollutants such as ammonia and hydrogen sulfide, which would remedy the Center and its members concerns in this regard. Participation of the Center's individual members in this lawsuit is not required to achieve this requested relief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 17, 2021 in Tucson, Arizona.

_____

Lori Ann Burd