UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Rural Empowerment Association for Community Help, et al., | |
| Plaintiffs, | **CASE NO. 18-cv-02260-TJK** |
| v. | |
| United States Environmental Protection Agency, et al., | **Declaration of Mark Walden** |
| Defendants, and | |
| National Cattlemen's Beef Association, et al., | |
| Intervenor-Defendants. | |

## DECLARATION OF MARK WALDEN

I, Mark Walden, declare that if called as a witness in this action I would competently testify of my own personal knowledge, as follows:

1.  I am the Chief Programs Officer at the Animal Legal Defense Fund (ALDF). I have served in this capacity since 2016. In this role, I am responsible for overseeing ALDF's seven programs: its Litigation Program, Criminal Justice Program, Legislative Affairs Program, Animal Law Program, Pro Bono Program, Legal Campaigns, and Policy Program. I also coordinate among these programs and executive leadership, ALDF's communications department, and donor and member outreach.

2.  ALDF is a national nonprofit animal protection organization founded in 1979 that uses education, public outreach, legislation, and litigation to protect the lives and advance the interests of animals, including those raised for food on animal feeding operations (AFOs). ALDF is supported by thousands of dedicated attorneys and more than 300,000 members and supporters nationwide, many of whom live and recreate in close proximity to AFOs.

3.  ALDF works against AFOs in order to decrease the suffering and improve the lives of farmed animals who are forced to suffer at ground zero of AFO pollution throughout their entire lives.[1] Just as they are to humans, AFO emissions are extremely hazardous to the pigs, cows, and birds confined in these facilities, as well. In 2015, more than 1,000 pigs were killed after being overcome by noxious gas emissions from manure lagoons at a hog farm near Tracy, Iowa. Excess ammonia has also been associated with lower weaning rates, arthritis, porcine stress syndrome, muscle lesions, abscesses, and liver damage in pigs. Likewise, high

---

[1] *See generally*, Robert E. Holland et al., Iowa Concentrated Animal Feeding Operation Air Quality Study, Chapter 6.2: Animal Health Effects (2002), available at https://www.public-health.uiowa.edu/ehsrc/CAFOstudy/CAFO_6-2.pdf.

ammonia levels in chicken sheds can cause painful skin conditions, respiratory problems, pulmonary congestion, swelling, hemorrhage, and blindness in the birds. Ammonia also destroys the cilia in the chickens responsible for preventing other bacteria from being inhaled. During winter, when the ventilators are closed to conserve heat, ammonia levels may reach 200 parts per million; healthy ammonia levels should never surpass 20 parts per million. The ammonia levels created by the poor ventilation in grower houses limit the chickens' sense of smell, rendering them unable to truly perceive their environments. Facilities that confine cows fare no better: ammonia has been considered as the most significant air pollutant in cattle barns, where it acts as a respiratory irritant and negatively effects the animals' pulmonary function.

4. In order to bring an end to the practices that lead to such dismal lives for farmed animals, ALDF's advocacy to improve the lives of farmed animals focuses on increasing transparency, accountability, and regulation of the AFO industry. ALDF regularly participates in federal administrative advocacy related to factory-farmed animal products. When necessary, ALDF engages in litigation against private corporations and the federal government to address the mistreatment of factory-farmed animals and misleading labeling of factory-farmed animal products under applicable law.

5. ALDF also advocates for more responsible animal agriculture practices that protect the health of the surrounding communities, which include ALDF members. Noises, odors, and air and water pollution from AFOs impact ALDF members' health and quality of life.  ALDF members avoid opening their windows, spending time outdoors on their property, or recreating in nearby rivers and open spaces because AFO pollution makes those activities unbearable. In addition, ALDF members across the country – not just those that live near AFOs –

are concerned about the negative impacts that these facilities have on the health and wellbeing of the thousands of animals confined within them.

6.  ALDF has an extensive docket of false advertising and consumer protection litigation that aims to increase transparency in the AFO industry through truth in labeling. ALDF regularly engages with administrative agencies and companies that mislead consumers into purchasing factory-farmed products that are deceptively advertised and labeled as high-welfare and sustainable, essentially making conventional products appear to align with consumers' perceptions of organic products. One such example is ALDF's settlement with Trader Joe's regarding misleading hen raising representations on Trader Joe's Cage Free eggs cartons. *See Carolyn Claybaugh v. Trader Joe's Company*, Case No. RG18897085 (Cal. Sup. Ct. 2018). ALDF also served as counsel for the Organic Consumers Association in a 2016 action over misleading "pasture raised" labeling and marketing claims made by egg seller Handsome Brook Farm. *Organic Consumers Association v. Handsome Brook Farm et al.*, Case No. 2016 CA 006223 B (D.C. Sup. Ct. 2016). In 2020, ALDF submitted regulatory comments to USDA regarding the Food Safety and Inspection Service's (FSIS's) unlawful rubber-stamping of misleading animal raising claims such as "free range" on factory-farmed products without any uniform definitions of the claims or adequate method to ensure their accuracy. Most recently, in June 2021, ALDF sued the FSIS for approving poultry product labels that depict pastured animals, when in fact they are factory-farmed without access to the outdoors. The suit specifically challenges FSIS's approval of a line of Perdue products, as well as the agency's overall failure to consider imagery when approving product labels.

7.  ALDF also regularly submits rulemaking petitions and administrative comments to, and files complaints and lawsuits against, state and federal agencies seeking transparent and

adequate regulation of the AFO industry with respect to their effects on animals and the environment, including air and water. In 2010 ALDF submitted rulemaking petitions to the Food and Drug Administration (FDA), Federal Trade Commission (FTC), and U.S. Department of Agriculture (USDA) seeking disclosure of egg production method (caged, cage-free, or free-range) on egg cartons, to correct rampant consumer deception in the egg market. ALDF later served as both plaintiff and counsel in litigating the agency denials that followed. In 2013, ALDF submitted a rulemaking petition to USDA seeking accurate labeling of antibiotic use in meat and poultry products. From 2014 to 2017 ALDF litigated against FDA for its failure to comply with the National Environmental Policy Act (NEPA) when approving the animal drug ractopamine, which is used widely on AFOs and is toxic to aquatic organisms when released into the environment. In April 2018, ALDF submitted comments in opposition to an FSIS proposed rule to expand nationwide a dangerous pilot program allowing privatized, high-speed hog slaughter; ALDF then sued FSIS in December 2019 for finalizing the flawed rule and allowing implementation of the dangerous program. At the same time, ALDF sued FSIS for failing to respond to a rulemaking petition seeking regulations prohibiting the slaughter of non-ambulatory pigs. ALDF also continues to litigate years-long suits that seek to force the Environmental Protection Agency to regulate slaughterhouse emissions, to force the Farm Service Agency and the Council on Environmental Quality to comply with the National Environmental Policy Act when granting loans to AFOs, and to stop a chicken slaughterhouse's flagrant abuse of water resources in Central California. These are just a small fraction of ALDF's factory farming docket.

8. ALDF also engages in administrative advocacy to curb AFO pollution. In 2016 and 2017 ALDF submitted comments in response to a proposal by the Arkansas Farm Service

Agency to provide federal funding to establish a 30,000-head chicken AFO in northern Arkansas. ALDF's advocacy was successful in forcing the agency to consider the environmental impacts of AFOs in two Environmental Assessments under NEPA. In 2017, ALDF submitted a rulemaking petition to the agency requesting, among other things, that the agency prepare a programmatic Environmental Impact Statement adequately considering the cumulative effects of funding AFOs in the region under NEPA before providing any additional funds. In 2018 ALDF submitted comments to the Arkansas Department of Environmental Quality opposing modification of a National Pollutant Discharge Elimination System under the Clean Water Act that would have allowed a poultry processing facility to discharge untreated waste into the municipal wastewater treatment plant. The Department ultimately required the facility to pre-treat its wastewater.

9.      Similarly in California, in 2014, ALDF submitted a petition for rulemaking urging the California Air Resources Board to regulate greenhouse gas emissions from dairy AFOs under the state's cap-and-trade program. The Board formally committed to regulating the dairy industry's greenhouse gas emissions in 2017. In 2016, ALDF submitted a rulemaking petition to the California Department of Water Resources and State Water Resources Control Board seeking a moratorium on new water rights permits and registrations for AFOs, curtailment on surface water diversion for AFOs, and inclusion of AFOs in Future groundwater sustainability plans. The petition highlighted the harmful environmental impacts of the overuse of water at AFOs in California, especially during drought years. This year ALDF also submitted a rulemaking petition urging the California Air Resources Board to stop allowing AFOs to profit from air pollution by selling manure methane credits under California's Low Carbon Fuel Standard program.

10. ALDF also regularly seeks information through the Freedom of Information Act (FOIA), and brings suit to compel compliance with FOIA when the government withholds information. Specifically with regard to AFOs, in 2013, ALDF sued FDA for withholding documents related to the animal drug ractopamine; the suit is ongoing. ALDF also brought suit to challenge the Food and Drug Administration's decision to withhold information about hen population and living conditions on large AFOs, which ALDF had requested through the Freedom of Information Act. In 2016 the Ninth Circuit Court of Appeals reversed and remanded the decision, eventually leading to a landmark victory for AFO transparency in 2021.

11. Access to information and transparency about AFO practices and emissions are central to ALDF's efforts on behalf of itself, its members, and the farmed animals whose interests it represents. ALDF relies heavily on access to public data about AFOs and AFO pollution to further its organizational mission and achieve its goals, including the litigation and administrative advocacy described above. ALDF utilizes information about the environmental impacts of AFOs to advance its legal advocacy on behalf of the farmed animals who are directly harmed by air emissions from the facilities in which they are confined.

12. Like FOIA, the Emergency Planning and Community Right-to-Know Act (EPCRA) is an essential information gathering tool that, if properly implemented, would provide ALDF with information it would use in furtherance of its mission. This information is especially valuable in light of the general dearth of publicly-available information about AFO emissions and practices due to, for example, many AFOs being exempt from animal cruelty laws and permitting requirements under the Clean Water Act. As a result of the U.S. Environmental Protection Agency (EPA)'s decision to exempt AFOs from EPCRA reporting requirements, many AFOs have never reported emissions data under EPCRA, further depriving ALDF, its

members, and the public of information about AFO emissions.

13. ALDF members are also harmed by EPA's decision to exempt AFOs from EPCRA's reporting requirements. ALDF members are forced to live and recreate in close proximity to AFOs. Air pollution from AFOs impacts their quality of life and health, air quality, and water quality. AFO emissions contain hundreds of gases and compounds, including ammonia and hydrogen sulfide, both of which are subject to reporting requirements under EPCRA if emitted in sufficient quantities—and both of which can cause serious physical harm to nearby residents.

14. ALDF members seek and are denied information from their local governments about AFOs in their communities, which results in exposure to unknown quantities of hazardous pollutants, decreased ability to use and enjoy their homes, and harm to their aesthetic and recreational interests in their communities. EPCRA's reporting requirement for AFOs is critical to helping these individuals protect themselves from exposure and empowering them to advocate for themselves before their local decisionmakers.

15. If EPA were enforcing EPCRA's reporting mandate, rather than exempting AFOs from it, ALDF and its members would have access to information about AFO emissions to use in our respective advocacy work. AFO reporting under EPCRA would provide ALDF and its members with the opportunity to obtain accurate emissions information generated by AFOs and reported directly to responsible agencies. This information would empower ALDF and its members to advocate for more effective regulation of AFOs and to hold AFO operators accountable for hazardous emissions. It would also increase transparency by making the public and regulators aware of the true effects of the AFO industry.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted this 16th day of December, 2021, in Los Altos, California.

_____
Mark Walden