**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RURAL EMPOWERMENT ASSOCIATION FOR COMMUNITY HELP et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY et al., <br><br> *Defendants,* <br><br> and <br><br> NATIONAL CATTLEMEN'S BEEF ASSOCIATION et al., <br><br> *Intervenor-Defendants.* | Civil Action No. 18-2260 (TJK) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Carrie F. Apfel, D.C. Bar No. 974342
Kara Goad, D.C. Bar No. 1725197
Earthjustice
1001 G Street N.W., Suite 1000
Washington, D.C. 20001
(202) 667-4500
capfel@earthjustice.org
kgoad@earthjustice.org

Peter Lehner
Alexis Andiman
Earthjustice
48 Wall Street, 15th Floor
New York, N.Y. 10005
(212) 845-7376
plehner@earthjustice.org
aandiman@earthjustice.org

*Counsel for Plaintiffs Rural Empowerment Association for Community Help; Animal Legal Defense Fund, Inc.; Center for Biological Diversity; Center for Food Safety; Don't Waste Arizona; Environmental Integrity Project; Food & Water Watch, Inc.; Humane Society of the United States; Sierra Club; Sound Rivers; and Waterkeeper Alliance, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ......................................................................................................2

LEGAL FRAMEWORK ........................................................................................................5

PROCEDURAL HISTORY.....................................................................................................8

STANDARD OF REVIEW ...................................................................................................10

ARGUMENT .........................................................................................................................10

    I.      THE 2019 RULE CONTRAVENES EPCRA AND MISCONSTRUES
           THE FARM ACT. ..................................................................................10

           A.      The 2019 Rule Contravenes EPCRA's Plain Language and
                   Violates Principles of Statutory Construction............................................11

           B.      The 2019 Rule Contravenes the FARM Act's Legislative History. ..........15

    II.     THE 2019 RULE IS ARBITRARY AND CAPRICIOUS. ..................................18

           A.      EPA Failed to Consider the Public's Right to Access Information
                   about Releases of Extremely Hazardous Substances. ................................18

           B.      EPA Failed to Provide a Reasoned Analysis for its Changed
                   Interpretation of EPCRA and the Importance of EPCRA
                   Reporting....................................................................................................19

    III.    EPA FAILED TO COMPLY WITH NEPA IN ISSUING THE 2019
           RULE. ..................................................................................................................21

CONCLUSION.......................................................................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Bread Pol. Action Comm v. Fed. Election Comm'n*,
    455 U.S. 577 (1982)............................................................................................10

*Coal. for Common Sense in Gov't Procurement v. U.S.*,
    671 F. Supp. 2d 48 (D.D.C. 2009)..............................................................11, 15

*Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
    704 F.3d 413 (5th Cir. 2013) .............................................................................6

*D.C. v. Straus*,
    590 F.3d 898 (D.C. Cir. 2010) ..........................................................................14

*Env't Def. Fund, Inc. v. EPA*,
    489 F.2d 1247 (D.C. Cir. 1973)..........................................................................22

*Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)............................................................................................18

*Goldring v. District of Columbia*,
    416 F.3d 70 (D.C. Cir. 2005) ............................................................................15

*Hibbs v. Winn*,
    542 U.S. 88 (2004)..............................................................................................14

*Kiewit Power Constructors Co. v. Sec'y of Lab., U.S. Dep't of Lab.*,
    959 F.3d 381 (D.C. Cir. 2020) ..........................................................................10

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024)........................................................................................10

*Loughrin v. United States*,
    573 U.S. 351 (2014)............................................................................................17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..............................................................................................18

*N. Haven Bd. of Ed. v. Bell*,
    456 U.S. 512 (1982)............................................................................................16

*Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*,
    921 F.3d 1102 (D.C. Cir. 2019) ........................................................................18

*Nat'l Oilseed Processors Ass'n v. Browner*,
    924 F. Supp. 1193 (D.D.C. 1996) ..................................................................5, 19

*Nat. Res. Def. Council, Inc. v. EPA*,
   822 F.2d 104 (D.C. Cir. 1987) ...................................................................................17

*Neighbors for a Toxic Free Cmty. v. Vulcan Materials Co.*,
   964 F. Supp. 1448 (D. Colo. 1997) .............................................................................7

*Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*,
   471 F.3d 1350 (D.C. Cir. 2006) ...........................................................................10, 17

*Russello v. United States*,
   464 U.S. 16 (1983) .....................................................................................................13

*Sierra Club, Inc. v. Tyson Foods, Inc.*,
   299 F. Supp. 2d 693 (W.D. Ky. 2003) ..................................................................12, 13

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   255 F. Supp. 3d 101 (D.D.C. 2017) ..........................................................................10

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   985 F.3d 1032 (D.C. Cir. 2021) ...........................................................................10, 21

*United States v. Gibson Wine Co.*,
   No. 15-cv-1900, 2017 WL 1064658 (E.D. Cal. Mar. 20, 2017) ..................................7

*United States v. Monzel*,
   641 F.3d 528 (D.C. Cir. 2011) ...................................................................................13

*United States v. Lancaster*,
   968 F.2d 1250 (D.C. Cir. 1992) .................................................................................14

*Waterkeeper All. v. EPA*,
   853 F.3d 527 (D.C. Cir. 2017) .........................................................................1, 3, 5, 6, 8

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*,
   899 F. Supp. 659 (D.D.C. 1995) ................................................................................16

**Statutes**

5 U.S.C. § 551 ....................................................................................................................2

5 U.S.C. § 706(2)(A), (D) ................................................................................................10

42 U.S.C. § 4321 ................................................................................................................2

42 U.S.C. § 9601(9) .........................................................................................................13

42 U.S.C. § 9601(22) .......................................................................................................12

42 U.S.C. § 9603 ...................................................................................................6

42 U.S.C. § 9603(a) ............................................................................................12

42 U.S.C. § 9603(e)(1)(B) ....................................................................................7

42 U.S.C. § 11001 ................................................................................................1

42 U.S.C. § 11004 ................................................................................................6

42 U.S.C. § 11004(a)(1) .....................................................................................12

42 U.S.C. § 11004(a)(2) ..........................................................................13, 14, 15

42 U.S.C. § 11004(a)(2)(C) ...............................................................................12

42 U.S.C. § 11004(a)(3) .....................................................................................12

42 U.S.C. § 11044 ................................................................................................6

**Other Authorities**

40 C.F.R. § 6.101(a) ...........................................................................................21

40 C.F.R. § 122.23(b)(1) ......................................................................................2

40 C.F.R. § 302.4(a) ............................................................................................6

40 C.F.R. § 355 App. A ...................................................................................6, 13

40 C.F.R. § 1500.1(a) .........................................................................................21

40 C.F.R. § 1508.1(w)(1)(ii) ..............................................................................21

73 Fed. Reg. 76,948 (Dec. 18, 2008) ..............................................................8, 20

84 Fed. Reg. 27,533 (June 13, 2019) ...............................................1, 12, 13, 14, 15

88 Fed. Reg. 80,222 (Nov. 17, 2023) ...............................................................3, 5

89 Fed. Reg. 35,442 (May 1, 2024) ...................................................................22

*115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018) (statement of Sen. Carper),
2018 WL 1443252 ....................................................................................7, 11, 16

132 Cong. Rec. S14,895-02 (daily ed. Oct. 3, 1986) (statement of Sen. Stafford),
1986 WL 788210 ...............................................................................6, 7, 11, 19

*In re Noveon Kalama, Inc.*, EPCRA-10-2006-0268,
   2006 WL 4093152 (EPA Region X May 19, 2006) ...............................................17

Pet. For Review, *Waterkeeper All. v. EPA*,
   No. 09-1017 (D.C. Cir. Jan. 15, 2009) ........................................................................8

Pub. L. No. 115-141, 132 Stat. 348 (2018)........................................................................7

## INTRODUCTION

Animal manure emits the extremely hazardous substances ammonia and hydrogen sulfide.  For the vast majority of farms, and even for most industrial animal feeding operations ("AFOs"), these emissions do not occur at levels that trigger reporting requirements under federal law.  But the largest AFOs are leading sources of ammonia and hydrogen sulfide emissions, and they release these substances in quantities that cause serious and potentially fatal harm to workers and people living nearby.  Congress has long recognized that the public has a right to know about significant releases of extremely hazardous substances and, accordingly, reporting of those releases is required under the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11001 *et seq.*, which includes provisions to make information from reports available to the public.  Plaintiffs and their members seek to use this information—to which they are statutorily entitled—to protect their health and communities.

EPA has acknowledged that exposure to AFO air pollution carries serious health risks and that those risks are borne primarily by people of color, people with low incomes, and children. Nonetheless, EPA has repeatedly taken action to exempt AFOs from their congressionally mandated duty to report releases of ammonia and hydrogen sulfide under EPCRA.  In 2017, the U.S. Court of Appeals for the D.C. Circuit concluded that EPA lacks authority to exempt AFOs from EPCRA reporting.  *Waterkeeper All. v. EPA*, 853 F.3d 527, 535 (D.C. Cir. 2017). Undeterred, EPA issued its most recent rule unlawfully exempting AFOs from EPCRA reporting just two years later.  Amendment to Emergency Release Notification Regulations on Reporting

Exemption for Air Emissions from Animal Waste at Farms, 84 Fed. Reg. 27,533 (June 13, 2019), EPA-HQ-OLEM-2018-0318-0402, attached as Ex. 1 ("2019 Rule").[1]

In issuing the 2019 Rule, EPA expressly refused to consider the health or environmental effects of AFO pollution, asserting instead that the 2019 Rule was necessary under a new law, the Fair Agricultural Reporting Method Act ("FARM Act"). This assertion fails because the FARM Act did not change reporting requirements for releases of extremely hazardous substances under EPCRA. In fact, far from being required by law, EPA's 2019 Rule conflicts with EPCRA and misconstrues the FARM Act. In addition, EPA failed to comply with the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., in the rulemaking process. For these reasons, EPA's 2019 Rule is invalid, and Plaintiffs are entitled to summary judgment.

## STATEMENT OF FACTS

As this Court is by now undoubtedly aware, AFOs are industrial facilities that confine hundreds, thousands, or even over one million animals for the production of meat, poultry, dairy, or eggs. *See* 40 C.F.R. § 122.23(b)(1). Together, these animals generate staggering quantities of manure, which releases dangerous air pollution as it decomposes. Earthjustice et. al., *Comments on Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act* 8 (Dec. 14, 2018), EPA-HQ-OLEM-2018-0318-0398, attached as Ex. 2 ("Earthjustice Comments"). The majority of ammonia and hydrogen sulfide emissions from animal waste are traceable to a small percentage of large AFOs. Indeed, EPA estimates that only three percent of all U.S. farms,

---

[1] Pursuant to Local Rule 7(n)(3), Plaintiffs have moved to submit a separate appendix with this memorandum, as an alternative to filing a joint appendix.

including AFOs, emit more than 100 pounds of ammonia or hydrogen sulfide each day.  EPA, *Emergency Release Notification Requirements for Animal Waste Air Emissions under the Emergency Planning and Community Right-to-Know Act (EPCRA) Technical Background Document* 12 (2023), attached as Ex. 3.  For example, according to EPA's estimates, a swine finishing facility—that is, a facility that confines pigs for a few months prior to their slaughter— must confine more than 685 pigs to generate waste that emits 100 pounds of ammonia each day, and swine finishing facilities are unlikely to emit more than 100 pounds of hydrogen sulfide each day.  *Id.* at 10, Tbl. 2-2.

EPA expressly declined to consider the "health or environmental effects" of AFO air pollution in connection with the 2019 Rule.  EPA, *Response to Comment Document: Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal Waste at Farms* at 18 (May 2019), EPA-HQ-OLEM-2018-0318-0405, attached as Ex. 4 ("Response to Comment Document").  However, as evidence included in EPA's administrative record makes clear, a well-established and growing body of scientific research shows that exposure to AFO air pollution causes a range of serious and potentially fatal health problems, including decreased lung function, scarring of the respiratory tract, headaches, and nausea, as well as impairments to balance, vision, hearing, memory, mood, and intellectual function.  Earthjustice Comments at 9; *see Waterkeeper All.*, 853 F.3d at 536 (recognizing that "people have become seriously ill and even died" as result of exposure to AFO pollution).  Elsewhere, EPA has admitted that AFOs are disproportionately located near "communities with environmental justice concerns, including those comprising people of color, low-income individuals, and children," meaning that AFO pollution "has the potential to result in significant health impacts on the members of these communities."  Potential Future Regulation for

Emergency Release Notification Requirements for Animal Waste Air Emissions Under the

Emergency Planning and Community Right-to-Know Act (EPCRA), 88 Fed. Reg. 80,222/3,

80,227 (Nov. 17, 2023), attached as Ex. 5.

According to Plaintiffs' members—many of whom live, work, and recreate in areas

where AFOs are concentrated—AFO pollution carries an "unbearable,"[2] "powerful,"[3] and

"disgusting stench similar to . . . []rotten eggs[] mixed with . . . feces,"[4] which "saturate[s]" their

homes.[5]  Exposure to this pollution exacerbates allergies,[6] causes "watery eyes, headaches, and

nausea,"[7] induces vomiting,[8] and at times, gives rise to "a sense of physical panic and [an] urgent

desire to get away . . . as quickly as possible."[9]  To avoid this pollution, Plaintiffs' members

"close their windows and stay indoors, relying on expensive air conditioning to keep cool."[10]

Some members "have given up . . . the most cherished aspects of rural life, like gardening,

drying clothes on a line, hosting cookouts, and spending time outdoors."[11]

---

[2] Decl. of Rosemary Partridge ¶ 4 (sworn to on Aug. 22, 2024), attached as Ex. 6 ("Partridge Decl.").

[3] Decl. of Max Wilson ¶ 7 (sworn to on Aug. 27, 2024), attached as Ex. 7 ("Wilson Decl.").

[4] Decl. of Candice Cook ¶ 9 (sworn to on Dec. 20, 2021), attached as Ex. 8 ("Cook Decl.").

[5] Decl. of Curtis Ramer ¶ 11 (sworn to on Dec. 20, 2021), attached as Ex. 9 ("Ramer Decl.").

[6] *See* Decl. of Cynthia Parke ¶ 3 (sworn to on Dec. 17, 2021), attached as Ex. 10 ("Parke Decl.").

[7] Decl. of Devon Hall ¶ 10 (sworn to on Aug. 26, 2024), attached as Ex. 11 ("Hall Decl.").

[8] *See* Partridge Decl. ¶ 10.

[9] Wilson Decl. ¶ 7; *see* Decl. of Judy Jolin ¶ 13 (sworn to on Aug. 20, 2024), attached as Ex. 12 ("Jolin Decl.") (explaining that AFO pollution "overwhelms your entire being," and when you are exposed, "[y]our eyes smart, your throat hurts, and you begin to feel sick to your stomach"); *see also* Partridge Decl. ¶ 10 ("I have a sore throat more often than not from the pollution when it is bad, even though I am not sick.").

[10] Hall Decl. ¶ 8.

[11] *Id.*; *see also* Cook Decl. ¶ 10 (reporting that, as a result of AFO pollution, Ms. Cook and her husband "often cannot take [their] dog for a walk or spend time with [their] grandchildren outside," and they no longer are able to "sit out on a screened-in porch enjoying the sights, sounds, and clean air of the country"); Ramer Decl. ¶ 12 (explaining that concerns about AFO pollution prevent Mr. Ramer from inviting "friends from church over to play softball," an activity he once enjoyed).

If Plaintiffs and their members had access to information about AFO pollution, as Congress intended, they could "assess [their] risk of exposure to dangerous pollutants,"[12] "protect [their] health,"[13] "participate in . . . local government in a meaningful way,"[14] and "share . . . information with [their] community, so that everyone would have a better chance of staying healthy."[15] Mandated reporting might induce AFOs to reduce emissions voluntarily, as other industries have done.[16] But "[a]s long as [AFOs] can keep their emissions a secret from community-members and government regulators," Plaintiffs and their members fear that "these facilities have no incentive to clean up."[17, 18]

## LEGAL FRAMEWORK

Congress constructed EPCRA around the "central premise" that "[s]tate and local governments, as well as the public at large, are entitled to access information concerning potential chemical hazards in their communities." *Nat'l Oilseed Processors Ass'n v. Browner*,

---

[12] Decl. of Dr. Melissa Siebke ¶ 18 (sworn to on Aug. 26, 2024), attached as Ex. 13.

[13] *See* Cook Decl. ¶ 13; *see also* Jolin Decl. ¶ 23 ("I would share . . . information [about air pollution from a nearby AFO] with my doctor, so that we could use this information to make decisions about my health.").

[14] Parke Decl. ¶ 14.

[15] *See* Hall Decl. ¶ 16.

[16] *See* Decl. of Abel Russ ¶ 7 (sworn to on Aug. 23, 2024), attached as Ex. 14.

[17] Hall Decl. ¶ 17.

[18] For all these reasons, Plaintiffs have standing to bring this challenge. *See Waterkeeper All.*, 853 F.3d at 534 (finding that non-profit organizations, including several plaintiffs here, had standing to challenge a rule "cutting back on EPCRA reporting and disclosure requirements," because the rule limited the availability of "information, the public disclosure of which would otherwise be required by EPCRA"); *see also* Decl. of Anthony T. Eliseuson (sworn to on Aug. 27, 2024), attached as Ex. 15; Decl. of Lori Ann Burd (sworn to on July 22, 2024), attached as Ex. 16; Decl. of Jaydee Hanson (sworn to on Aug. 13, 2024), attached as Ex. 17; Decl. of Stephen Brittle (sworn to on Aug. 14, 2024), attached as Ex. 18; Decl. of Wenoah Hauter (sworn to on July 24, 2024), attached as Ex. 19; Decl. of Christopher Holbein (sworn to on Aug. 21, 2024), attached as Ex. 20; Decl. of Jane Williams (sworn to on Aug. 23, 2024), attached as Ex. 21; Decl. of Heather Deck (sworn to on Aug. 23, 2024), attached as Ex. 22; Decl. of Daniel E. Estrin (sworn to on July 26, 2024), attached as Ex. 23; Decl. of Rebecca Jim (sworn to on July 27, 2024), attached as Ex. 24.

924 F. Supp. 1193, 1197 (D.D.C. 1996); *see also* Potential Future Regulation for Emergency Release Notification Requirements for Animal Waste Air Emissions Under the Emergency Planning and Community Right-to-Know Act (EPCRA), 88 Fed. Reg. at 80,225 (acknowledging that, "[a]s stated in the title of the statute, EPCRA . . . has an important community right-to-know component").[19]  Accordingly, EPCRA mandates that any facility that releases more than a threshold quantity of an "extremely hazardous substance," such as ammonia or hydrogen sulfide, must report the release to state, tribal, and local authorities, who in turn, must make information from the report available to the public.  *See* 42 U.S.C. §§ 11004, 11044; 40 C.F.R. § 355 App. A (listing ammonia and hydrogen sulfide as "extremely hazardous substances").  In this way, EPCRA ensures that "vital health information [is] available in one easily accessible place," providing an "obvious advantage" to people at risk.  *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 430 (5th Cir. 2013).  EPCRA includes no exemption for AFOs, and the D.C. Circuit has made clear that, given EPCRA's "sweeping reporting mandate," EPA lacks authority to create exemptions where Congress did not.  *See Waterkeeper All.*, 853 F.3d at 535.

EPCRA's notification requirements build upon similar, preexisting notification provisions set out in the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), which directs facilities to alert authorities upon releasing significant quantities of ammonia, hydrogen sulfide, or any other "hazardous substance."  *See* 42 U.S.C. § 9603; *see also* 40 C.F.R. § 302.4(a) (listing ammonia and hydrogen sulfide as hazardous substances that trigger

---

[19] EPCRA was "developed in large part as a result of the terrible disaster in Bhopal, India, at which deadly fumes of methyl isocyanate . . . were released accidentally into a sleeping community, resulting in death or injury to thousands of people."  *See* 132 Cong. Rec. S14,895-02 (daily ed. Oct. 3, 1986) (statement of Sen. Stafford), 1986 WL 788210.  However, EPCRA "goes beyond concern about accidental releases of . . . toxic and hazardous chemicals."  *Id.*  "It also recognizes that the public has a right to be informed about *routine* releases of these chemicals to the air and the water and the land."  *Id.* (emphasis added).

CERCLA notification requirements if released above the threshold quantity of 100 pounds per day). However, "EPCRA . . . has a public-disclosure requirement that's missing from the relevant CERCLA provisions." *See Waterkeeper All.*, 853 F.3d at 530. As a result, EPCRA and CERCLA serve "entirely different purpose[s]." *Neighbors for a Toxic Free Cmty. v. Vulcan Materials Co.*, 964 F. Supp. 1448, 1452 (D. Colo. 1997). Whereas CERCLA is intended to facilitate cleanup, EPCRA ensures "that the community at the local level is prepared and knowledgeable" about hazardous releases, whether those releases are accidental or routine. *Id.*; *see also U.S. v. Gibson Wine Co.*, No. 15-cv-1900, 2017 WL 1064658, at *10 (E.D. Cal. Mar. 20, 2017) (explaining that, "unlike CERCLA, EPCRA's purpose goes beyond cleanup—it seeks to ensure public access to health-related information"); *see* 132 Cong. Rec. S14,895-02 (daily ed. Oct. 3, 1986) (statement of Sen. Stafford), 1986 WL 788210 ("Just as the public has a right to know about releases that might happen as a result of an accident, the public also has a right to know about releases that do happen every hour and every day.").

In March 2018, Congress enacted the FARM Act, which amended CERCLA to eliminate reporting requirements for "air emissions from animal waste (including decomposing animal waste) at a farm." 42 U.S.C. § 9603(e)(1)(B); *see* Pub. L. No. 115-141, 132 Stat. 348 (2018). The FARM Act "did not change reporting requirements for releases of extremely hazardous substances under EPCRA." 115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018) (statement of Sen. Carper), 2018 WL 1443252. In this way, the FARM Act balanced Congress's desire to excuse AFO operators from CERCLA reporting requirements that could appear "complex and confusing," *id.*, with the D.C. Circuit's conclusion that members of the public, including AFO workers and people living nearby, derive "real benefits" from accessing information about AFO pollution under EPCRA. *Waterkeeper All.*, 853 F.3d at 537.

## PROCEDURAL HISTORY

EPA has repeatedly taken action to exempt AFOs from their congressionally mandated duty to report releases of ammonia and hydrogen sulfide under EPCRA.[20]  Most relevant here, in 2008, EPA finalized a rule that excused all AFOs from reporting under CERCLA and all but the largest AFOs from reporting under EPCRA.  *See* CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms, 73 Fed. Reg. 76,948/3 (Dec. 18, 2008), EPA-HQ-OLEM-2018-0318-0013, attached as Ex. 25 ("2008 Rule").  EPA concluded that reporting was "unnecessary because, in most cases, a federal response is impractical and unlikely (*i.e.*, [EPA] would not respond to [reported releases of hazardous substances from AFOs] since there is no reasonable approach for the response)." *Id.* at 76,956.  However, EPA did not purport to eliminate EPCRA reporting requirements for the largest AFOs, also known as large CAFOs, because "many commenters . . . argued that reporting, especially for large CAFOs, is important." *Id*. at 76, 954.  A coalition of community and environmental organizations, including several plaintiffs in this action, promptly petitioned the D.C. Circuit for review, alleging that the 2008 Rule violated CERCLA and EPCRA.  *See* Pet. For Review, *Waterkeeper All. v. EPA*, No. 09-1017 (D.C. Cir. Jan. 15, 2009).  After years of EPA-driven delay, the D.C. Circuit vacated the 2008 Rule based on its conclusion that EPA lacked authority to create exemptions where Congress had unambiguously mandated reporting.  *See Waterkeeper All.*, 853 F.3d at 537.

---

[20] As Plaintiffs have explained, EPA first exempted AFOs from EPCRA nearly two decades ago, and during the intervening years, EPA has advanced a variety of arguments in its attempts to justify expanding and maintaining the exemption.  *See generally* Pls.' Mot. for a Deadline on Remand or, in the Alternative, Expedited Summ. J., Jan. 16, 2024, ECF No. 72.

Shortly thereafter, EPA published on its website new guidance purporting to exempt all "farms," including AFOs, from EPCRA reporting.  *See* EPA, *Does EPA Interpret EPCRA Section 304 to Require Farms to Report Releases from Animal Waste?* (Oct. 25, 2017), ECF No. 32-1, No. 1, attached as Ex. 26 ("October Guidance").  Instead of contending that reporting was unnecessary (as it had in the 2008 Rule), EPA argued that "Congress did not intend to impose EPCRA reporting requirements on farms engaged in routine agricultural operations."  *Id.*  After Congress passed the FARM Act, EPA revised the October Guidance to assert that AFO emissions no longer would trigger the requirement to report under CERCLA or EPCRA.  *See* EPA, *CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms* (last updated Apr. 30, 2018), ECF No. 32-1, No. 6, attached as Ex. 27 (together with the October Guidance, "EPA Guidance" or "Guidance").

In September 2018, Plaintiffs initiated this action, challenging the substance of the EPA Guidance, as well as EPA's failure to comply with mandatory rulemaking procedures.  *See* Compl., Sept. 28, 2018, ECF No. 1.  EPA subsequently issued the 2019 Rule, which formalized the EPA Guidance and again exempted AFOs from EPCRA reporting, and Plaintiffs amended their complaint to challenge the 2019 Rule.  *See* First Amend. Compl., July 9, 2019, ECF No. 29. In November 2021, EPA successfully moved the Court for remand without vacatur, based on EPA's assertion that it had "decided to initiate a new rulemaking to either revise or rescind the [2019] Rule."  EPA Mot. to Remand Without Vacatur, at 7, Nov. 23, 2021, ECF No. 58.  After several years of delay, however, EPA now "represents that it is not in a position to proceed with a new rulemaking."  Joint Mot. to Lift the Remand and Propose a Briefing Schedule, at ¶5, Aug. 2, 2024, ECF No. 81.  Accordingly, on August 2, 2024, Plaintiffs and EPA jointly moved the Court to lift the remand and issue a briefing schedule.  *Id.*  The Court granted the motion.  Min. Order,

Aug. 5, 2024.  Consistent with the Court-ordered schedule, Plaintiffs now move for summary judgment.

## STANDARD OF REVIEW

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the [APA] standard of review."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 121 (D.D.C. 2017) (quoting *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010)).  The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that was adopted "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).  Accordingly, "[t]he ordinary practice . . . is to vacate unlawful agency action."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021) (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).

## ARGUMENT

## I.    THE 2019 RULE CONTRAVENES EPCRA AND MISCONSTRUES THE FARM ACT.

"Courts interpret statutes, no matter the context, based on the traditional tools of statutory construction."  *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2268 (2024); *see also Kiewit Power Constructors Co. v. Sec'y of Lab., U.S. Dep't of Lab.*, 959 F.3d 381, 395 (D.C. Cir. 2020) ("To discern Congress's intent, [courts] generally examine the statutory text, structure, purpose and legislative history.").  A court's statutory interpretation "must begin with the language of the statute itself," and "that language must ordinarily be regarded as conclusive."  *Bread Pol. Action Comm v. Fed. Election Comm'n*, 455 U.S. 577, 580 (1982) (quoting *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 187 (1980)).  When an agency rule rests on a statutory interpretation,

a court must declare the rule invalid if the agency "wrongly 'believes that [its] interpretation is compelled by Congress.'" *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004); *see also Coal. for Common Sense in Gov't Procurement v. U.S.*, 671 F. Supp. 2d 48, 55 (D.D.C. 2009) (explaining that when an agency bases a rule "on the unjustified assumption that it was Congress' judgment that such a regulation is desirable or mandated," the rule "must be declared invalid" (internal quotation marks omitted) (quoting *Prill v. NLRB*, 755 F.2d 941, 948 (D.C. Cir. 1985)).

Here, the traditional tools of statutory construction reveal that Congress enacted EPCRA to protect the public's right to access information about extremely hazardous emissions. *See* 132 Cong. Rec. S14,895-02 (daily ed. Oct. 3, 1986) (statement of Sen. Stafford), 1986 WL 788210 (acknowledging the public's "right to know about releases," even if those releases "happen every hour and every day"). Approximately thirty years later, Congress took care to preserve this right by ensuring that the FARM Act "left intact" AFOs' obligations to report emissions of ammonia and hydrogen sulfide under EPCRA. 115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018) (statement of Sen. Carper), 2018 WL 1443252. The 2019 Rule impermissibly contravenes EPCRA and misconstrues the FARM Act, and it rests entirely on EPA's "unjustified assumption that it was Congress's judgment that such a regulation [was] . . . mandated." *Coal. for Common Sense in Gov't Procurement*, 671 F. Supp. 2d at 55. Therefore, and as explained more fully below, the 2019 Rule is invalid.

## A.    The 2019 Rule Contravenes EPCRA's Plain Language and Violates Principles of Statutory Construction.

EPA contends that the FARM Act must have excused AFOs from reporting "air emissions from animal waste" under EPCRA simply because the FARM Act exempts those emissions from

notification requirements under CERCLA. But this contention cannot be squared with EPCRA's plain language. To the contrary, EPCRA unambiguously requires facilities to report any release of an extremely hazardous substance, even if that release "is not subject to the notification requirements . . . of CERCLA," provided the release satisfies three conditions:

> (A) [it] is not a federally permitted release as defined in . . . CERCLA,
> (B) [it] is in an amount in excess of a quantity which . . . requires notice, and
> (C) [it] occurs in a manner which would require notification under . . . CERCLA."[21]

42 U.S.C. § 11004(a)(2)(C). EPA admits that AFO emissions satisfy the first two conditions, because those emissions "are generally not federally permitted and may exceed the applicable reportable quantity." 2019 Rule at 27,535. Thus, the only question is whether AFO emissions "occur[] in a manner which *would* require notification under . . . CERCLA," *id.* (emphasis added), even though the FARM Act exempted AFO emissions from CERCLA's notification requirements.

Applying CERCLA's notification requirements, as EPCRA plainly instructs, reveals that AFO emissions do, in fact, occur in a manner that *would* require notification under CERCLA. CERCLA provides that notification is required when a person in charge of a facility knows of: (1) a release, (2) of a hazardous substance, (3) from the facility, (4) that is not federally permitted, and (5) that is above the reportable quantity. *See* 42 U.S.C. § 9603(a). AFOs' emissions of ammonia and hydrogen sulfide satisfy each of these factors. First, they meet

---

[21] EPCRA requires reporting under two other circumstances that are not relevant here, because they apply to releases that *are* subject to CERCLA's notification requirements. *See* 42 U.S.C. §§ 11004(a)(1), 11004(a)(3).

CERCLA's definition of "release," which includes "emitting" into the environment.[22] *Id.*

§ 9601(22). Second, ammonia and hydrogen sulfide both are extremely hazardous substances.[23]

*See* 40 C.F.R. § 355 App. A. Third, AFOs meet CERCLA's definition of a "facility," which

includes a "building," "lagoon," or "area" where the substance is located. 42 U.S.C. § 9601(9);

*see also Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693, 708 (W.D. Ky. 2003)

(explaining that a poultry AFO is a "facility" under CERCLA). Fourth, AFO emissions are not

federally permitted. And fifth, AFOs emit ammonia and hydrogen sulfide above the relevant

reportable quantities.[24] *See* 2019 Rule at 27,535. Thus, air emissions from animal waste occur

in a manner that would require notification under CERCLA.

EPA refuses to grapple with EPCRA's text, instead asserting without explanation that

"[a]ir emissions from animal waste at farms no longer 'occur[ ] in a manner' that would require

notification under CERCLA . . . because the FARM Act exempted these types of releases from

CERCLA reporting." *Id.* Not only is EPA's reading unsupported, but it also fails to comply with

two interrelated principles of statutory construction. *First*, when Congress uses different phrases

---

[22] Notably, the FARM Act did not alter CERCLA's definition of "release" to exclude "air emissions from animal waste," as Congress has done for other releases. *See, e.g.*, 42 U.S.C. § 9601(22) (excluding "emissions from the engine exhaust of a motor vehicle" from the term "release"); *see also Sierra Club, Inc.*, 299 F. Supp. 2d 693 at 706 ("Congress clearly knew how to exempt certain items from the reporting requirements of CERCLA and EPCRA as demonstrated by the fertilizer exclusion . . . which exempts 'the normal application of fertilizer' from the definition of release." (quoting 42 U.S.C.§ 9601(22)(D) (emphasis added)).

[23] Because EPCRA requires reporting for a release of any extremely hazardous substance, whereas CERCLA requires reporting for a release of any hazardous substance, it is necessary to substitute "extremely hazardous substance" for "hazardous substance" when evaluating whether notification would be required under CERCLA. *See* 42 U.S.C. § 11004(a)(2) ("If a release of an *extremely hazardous substance* . . . occurs from a facility . . . the owner or operator of the facility shall immediately provide notice" if the release "occurs in a manner which would require notification under . . . CERCLA." (emphasis added)).

[24] Because EPCRA requires reporting for a release in excess of the reportable quantity for an extremely hazardous substance, it is necessary to substitute the extremely hazardous substance reportable quantity for the reportable quantity applicable to a hazardous substance. *See* 42 U.S.C. § 11004(a)(2).

in the same part of a statute—here, "is . . . subject to the notification requirements . . . of CERCLA" and "occurs in a manner which would require notification under . . . CERCLA," 42 U.S.C. § 11004(a)(2)—courts must give distinct meanings to those different phrases.  *See Russello v. United States*, 464 U.S. 16, 23 (1983); *see also United States v. Monzel*, 641 F.3d 528, 533 (D.C. Cir. 2011) (applying "the usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended" (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004)).  *Second*, courts must give effect to every provision of a statute, to avoid rendering any provision superfluous. *Hibbs v. Winn*, 542 U.S. 88, 101 (2004).

The relevant EPCRA provision uses two distinct phrases: "*is . . . subject* to the notification requirements . . . of CERCLA" and "occurs in a manner which *would* require notification under . . . CERCLA."  42 U.S.C. § 11004(a)(2) (emphasis added).  By its plain language, "is . . . subject to the notification requirements of CERCLA" refers to a release that triggers CERCLA's notification requirements.  The phrase "occurs in a manner which would require notification under CERCLA," therefore, must have a distinct meaning—and it does, because, unlike "is," "would" is "counterfactual," calling for "speculation about what might . . . happen[]" under different circumstances.  *D.C. v. Straus*, 590 F.3d 898, 901 (D.C. Cir. 2010); *see also United States v. Lancaster*, 968 F.2d 1250, 1257 n.9 (D.C. Cir. 1992) (explaining that the term "would" in a sentencing provision referring to offenses that "would require grouping of multiple counts" indicates a "contrary-to-fact condition" and, thus, concluding that the provision applies only if the "defendant has *not* been convicted" of offenses that require grouping) (internal citation omitted).  Thus, "occurs in a manner which would require notification under . . . CERCLA" calls for a determination as to whether the release in question *would* require

14

notification under CERCLA, if the release were "subject to the notification requirements under . . . CERCLA." 42 U.S.C. § 11004(a)(2).

In asserting that "[a]ir emissions from animal waste at farms no longer 'occur[ ] in a manner' that would require notification under CERCLA . . . because the FARM Act exempted these types of releases from CERCLA," 2019 Rule at 27,535, EPA violates both principles of statutory construction. By reading the different language of the two phrases as meaning the same thing, EPA impermissibly lumps the two phrases into a single requirement: the emission must be subject to the notification requirements of CERCLA. Substituting EPA's reading of the relevant provision into the statute would mean that EPCRA nonsensically requires reporting when "such release *is not* subject to the notification requirements under CERCLA," but only if the release *is* subject to the notification requirements under CERCLA. 42 U.S.C. § 11004(a)(2) (emphasis added). EPA's reading thus renders the phrase "occurs in a manner which *would* require notification under CERCLA" superfluous and leads to an illogical conclusion. For all these reasons, EPA's assertion fails.

## B.    The 2019 Rule Contravenes the FARM Act's Legislative History.

Because EPCRA's plain language makes clear that AFOs must report emissions of ammonia and hydrogen sulfide, this Court need not look to legislative history. *See Goldring v. District of Columbia*, 416 F.3d 70, 74–75 (D.C. Cir. 2005). However, the FARM Act's legislative history further demonstrates that Congress did not intend to exempt *any* AFO releases from EPCRA. To overcome Congress's clearly expressed intent, EPA takes the strained and illogical position that Congress *wrongly interpreted* the FARM Act. *See* 2019 Rule at 27,540 (asserting that "[t]he legislative history of the FARM Act is correct *to the extent* that the amendment does not exempt *all* releases from animal waste at farms from reporting under

EPCRA" because, for example, EPCRA reporting might still be required if an AFO released

extremely hazardous substances from animal waste into water (emphasis added)).  Contrary to

EPA's suggestion, it is Congress's intent that controls, not EPA's "unjustified assumption[s]."

*Coal. for Common Sense in Gov't Procurement v. United States*, 671 F. Supp. 2d at 55.

During the FARM Act's floor debate, FARM Act Co-Sponsor Senator Tom Carper made

eminently clear that the FARM Act did not amend any of EPCRA's reporting requirements.  115

Cong. Rec. S1925 (daily ed. Mar. 22, 2018), 2018 WL 1443252.  Senator Carper emphasized

that he had "worked hard" with the FARM Act's other co-sponsors "to ensure that, at the same

time we exempted farms from hazardous substance reporting requirements under . . . CERCLA,

we chose to make *no changes* to how extremely hazardous substances should be reported under

EPCRA."  *Id.* (emphasis added); *see also id.* (explaining that the Senate version of the bill that

became the FARM Act, which mirrored the FARM Act, exempted most farms from reporting

their "air emissions from animal waste" under CERCLA but "[left] intact reporting requirements

under [EPCRA]").  Senator Carper's floor statements "are an authoritative guide to the statute's

construction."  *See N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 526–27 (1982); *see also Women*

*Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 899 F. Supp. 659, 668 (D.D.C. 1995)

(relying on a statement by a bill's sponsor to determine the statute's scope).

In addition, before voting on the FARM Act, Congress considered a memorandum from

the Congressional Research Service ("CRS"), which similarly concluded that the FARM Act

"would not have a bearing on the reporting of releases of extremely hazardous substances under

[EPCRA] as this provision is not contingent upon reporting required under [CERCLA]."  115

Cong. Rec. S1925 (daily ed. Mar. 22, 2018), 2018 WL 1443252.  CRS explained that if the

FARM Act were enacted, "the applicability of [EPCRA's reporting requirement] therefore would

remain the same as in current law." *Id.*; *see also id.* (explaining that "[a]n air release of an extremely hazardous substance emitted by animal waste at a farm would be subject to [EPCRA's reporting requirement]").  CRS observed that its interpretation was consistent with EPA's then-current reading of EPCRA: "In implementation, EPA has treated the phrase 'occurs in a manner' in EPCRA . . . to mean the nature of the release in terms of *how* a substance enters the environment, *not that reporting is required under [CERCLA*]." *Id.* (emphasis added).[25]  Based on EPA's interpretation of EPCRA, CRS concluded that AFO emissions would continue to be subject to EPCRA's reporting requirements even if the FARM Act exempted them from CERCLA's requirements.

Thus, Congress was well aware, before voting on the FARM Act, that the FARM Act would not exempt any AFO releases from EPCRA's reporting requirement.  If Congress had intended to exempt AFO emissions from EPCRA, it would have responded to Senator Carper's statements and the CRS memorandum by modifying the FARM Act's language.  But Congress did nothing of the sort, so we must presume that it intended AFOs to continue reporting their emissions under EPCRA.  *See Nat. Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 111 (D.C. Cir. 1987) (explaining that a statute's legislative history "binds both agency and court").

EPA's interpretation of the FARM Act directly conflicts with the FARM Act's legislative history, including the "authoritative guide" set out through Senator Carper's statements.  As a

---

[25] For example, EPA has repeatedly explained that EPCRA requires reporting if a "release requires, *or* occurred in a manner that would require" notification under CERCLA.  *See, e.g.*, *In re Noveon Kalama, Inc.*, EPCRA-10-2006-0268, 2006 WL 4093152, at *1 (EPA Region X May 19, 2006) (emphasis added). "[The] 'ordinary use [of the term "or"] is almost always disjunctive, that is, the words it connects are to be given separate meanings.'"  *Loughrin v. United States*, 573 U.S. 351, 357 (2014) (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)).  But as explained above, EPA's current interpretation fails to distinguish a release that requires CERCLA notification from a release that would require CERCLA notification.

result, there can be no doubt that EPA "wrongly 'believes that [its] interpretation is compelled by Congress.'" *Peter Pan Bus Lines, Inc.*, 471 F.3d at 1354 (quoting *PDK Labs., Inc.*, 362 F.3d at 798). Accordingly, this Court must declare EPA's interpretation invalid.

* * *

EPCRA and the FARM Act demonstrate Congress's clear intent that AFOs continue reporting their toxic ammonia and hydrogen sulfide emissions under EPCRA. The 2019 Rule exempts AFOs from this requirement, in direct contravention of EPCRA and in open disregard of Congress's intent in passing the FARM Act. Therefore, the 2019 Rule cannot stand.

## II.    THE 2019 RULE IS ARBITRARY AND CAPRICIOUS.

Not only does the 2019 Rule contravene EPCRA and misconstrue the FARM Act, but it also is arbitrary and capricious in violation of the APA. A rule is arbitrary and capricious if the agency "entirely fail[s] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). In addition, a rule is arbitrary and capricious if the agency adopts a new policy that reflects a change in position from a prior one, but the agency fails to "display awareness that it is changing position" and "show that there are good reasons for the new policy." *Fed. Commc'n Comm'n v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (internal citations omitted). And, if the agency rests its new policy "upon factual findings that contradict those which underlay its prior policy" without a "reasoned explanation . . . for disregarding [those] facts," the rule is also arbitrary and capricious. *Id.* at 515–16. Here, the 2019 Rule is arbitrary and capricious for all these reasons: EPA entirely failed to consider the public's right to access information about releases of extremely hazardous substances, and EPA failed to explain its new position that an exemption from CERCLA automatically triggers an exemption from EPCRA, as well as its

decision to disregard its prior finding that it is important for large AFOs to report their emissions under EPCRA.

### A.    EPA Failed to Consider the Public's Right to Access Information about Releases of Extremely Hazardous Substances.

A rule is arbitrary and capricious if the agency fails to consider the rule's impact on "the [statute's] primary goals." *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1111 (D.C. Cir. 2019). Accordingly, when issuing the 2019 Rule, EPA was required to consider the Rule's effect on EPCRA's goal of protecting the public's "right to know about releases" of extremely hazardous substances. 132 Cong. Rec. S14,895-02 (daily ed. Oct. 3, 1986) (statement of Sen. Stafford), 1986 WL 788210. Ample evidence in the record demonstrates that people who live, work, and recreate near AFOs have a strong desire to access information about AFO emissions. *See, e.g.*, Earthjustice Comments at 32 (citing numerous declarations). In addition, record evidence shows that "[i]f the public had access to information from EPCRA reports, either directly from their local emergency response agency or through advocacy organizations, they would use this information to take measures to protect their health and quality of life. *Id.*

Rather than confront the fact that the 2019 Rule prevents the public from accessing information about releases of extremely hazardous substances, and thereby *undermines* EPCRA's goal, EPA swept this issue aside, relying entirely on the unlawful and incorrect conclusion that the FARM Act necessarily exempts AFO emissions from EPCRA's reporting requirements. *See Response to Comment Document* at 23 (explaining that "[b]ecause reporting for these releases [is] not required under EPCRA . . . , there are no reports to be made available to the public"); *see also id.* at 19 (explaining that the 2019 Rule is "not based on environmental, health or safety risks"). In so doing, EPA turned a blind eye to EPCRA's "central premise." *Nat'l Oilseed Processors Ass'n*, 924 F. Supp. at 1197. As a result, the 2019 Rule is unlawful.

B.    **EPA Failed to Provide a Reasoned Analysis for its Changed Interpretation of EPCRA and the Importance of EPCRA Reporting.**

Not only is the 2019 Rule arbitrary and capricious because EPA refused to consider the public's right to information about releases of extremely hazardous substances, but it also is unlawful because EPA changed its interpretation of EPCRA and its judgment about the importance of EPCRA reporting without acknowledgment or adequate explanation. *See Fox Television Stations, Inc*., 556 U.S. at 515. During the 2008 rulemaking, EPA clearly understood that an exemption from CERCLA did *not* require an exemption from EPCRA, because the 2008 Rule purported to exempt all AFOs from reporting under CERCLA, while still requiring large AFOs to report under EPCRA. *See* 2008 Rule at 76,952. EPA rested the 2008 Rule in part on its judgment that it was "important" for large AFOs to continue reporting under EPCRA, in light of "comments expressing a concern that air emissions of hazardous substances from animal waste at the largest animal feeding operations may pose a risk and therefore State and local governments and the public should continue to receive reports of such emissions." *Id.* at 76,953. EPA acknowledged that "the public may have a . . . use for the notifications," *id.* at 76,955, and more specifically, that "reporting information about emissions enables citizens to hold companies and local governments accountable in terms of how toxic chemicals are managed and even allows agencies to identify a facility's proximity to schools where children may be at higher risk of adverse health effects due to exposure," *id.* at 76,954.

The 2019 represents an about-face, and EPA failed to offer any explanation for its new position. In the 2019 Rule, EPA concluded that AFOs must be exempt from reporting under EPCRA because, pursuant to the FARM Act, AFOs are exempt from reporting under CERCLA—even though EPA had concluded in the 2008 Rule that AFOs could be required to report under EPCRA despite their purported exemption from reporting under CERCLA. And, in

issuing the 2019 Rule, EPA failed even to consider the many benefits of reporting, let alone explain why reporting is no longer important.  *See Response to Comment Document* at 19 (explaining that the rule is "not based on environmental, health or safety risks").  EPA's failure to explain its change in position is especially troubling given evidence showing that AFO emissions continue to threaten public health and that AFO workers and people living nearby need information to protect their health and the health of their family members.  *See* Earthjustice Comments at 32–33.  Thus, the 2019 Rule is arbitrary and capricious.

### III.    EPA FAILED TO COMPLY WITH NEPA IN ISSUING THE 2019 RULE.

The 2019 Rule is also unlawful because EPA failed to comply with the requirements of the National Environmental Policy Act ("NEPA").  NEPA is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  As this Court has recognized, NEPA both "'places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action,' and . . . 'ensures that the agency will inform the public that is has indeed considered environmental concerns in its decisionmaking process."  *Standing Rock Sioux Tribe*, 255 F. Supp. at 112 (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)).  Although "NEPA does not mandate particular consequences," it does require that agency actions with adverse environmental effects proceed only after "the agency has considered those effects and determined that competing policy values outweigh [the] costs."  *See id.* at 113 (first quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 193–34 (D.C. Cir. 1991), then quoting *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009)).  As the D.C. Circuit has recognized, "district courts in this circuit routinely vacate agency actions taken in violation of NEPA."  *Standing Rock Sioux*

*Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050–51 (D.C. Cir. 2021).  For the reasons below, vacatur is appropriate here.

EPA generally must comply with NEPA in the "development and issuance of regulations." 40 C.F.R. § 6.101(a); *see also id.* § 1508.1(w)(1)(ii) (providing that the "[a]doption of official policy, such as rules, regulations, and interpretations adopted under the [APA]" trigger NEPA requirements).  There is no dispute that EPA failed to comply with NEPA in developing and issuing the 2019 Rule.  EPA attempts to justify its non-compliance by asserting that the 2019 Rule "is legal in nature" and "EPA rulemakings are exempt from the requirements of NEPA." *Response to Comment Document* at 19-20.  Both attempted justifications fail.

*First*, even if EPA were correct that NEPA does not apply to legally mandated actions, that principle is inapplicable here; far from being mandated by law, the 2019 Rule runs directly counter to EPCRA's requirements, as explained above.  *Second*, contrary to EPA's claim, the D.C. Circuit has expressly declined to "formulat[e] a broad exemption from NEPA for all environmental agencies," even when those agencies are pursuing "environmentally protective regulatory actions," which is certainly not the case here.  *Env't Def. Fund, Inc. v. EPA*, 489 F.2d 1247, 1257 (D.C. Cir. 1973).  Formal compliance with NEPA might be excused "where an agency is engaged primarily in an examination of environmental questions [and] where substantive and procedural standards ensure full and adequate consideration of environmental issues."[26]  *Id*.  However, EPA admits that it has done nothing to satisfy those conditions here. *See Response to Comment Document* at 18 (asserting that "EPA takes no position in this

---

[26] In May 2024, the Council on Environmental Quality declined to finalize regulations that "could be construed to expand . . . the narrow contexts in which" EPA can avoid its general obligation to comply with NEPA.  *National Environmental Policy Act Implementing Regulations Revisions Phase 2*, 89 Fed. Reg. 35,442/1, 35,459 (May 1, 2024).

rulemaking on the health or environmental effects of air emissions from animal waste at farms" and explaining that, in EPA's view, "it was not necessary to consider health or environmental effects and related studies," because the 2019 Rule "is not based on health or risk"). EPA cannot justify its failure to comply with NEPA, and this Court should vacate the 2019 Rule as a result.

## CONCLUSION

Relatively few very large AFOs release dangerous levels of ammonia and hydrogen sulfide, extremely hazardous substances that can cause serious injury or death. In enacting EPCRA, Congress recognized that people have a right to know about extremely hazardous releases. Congress took care to preserve this right for decades, even as it sought to reduce perceived burdens on AFO operators through the FARM Act. EPA's 2019 Rule upset the careful balance that Congress struck. Not only is the 2019 Rule inconsistent with EPCRA and the FARM Act, but it also runs afoul of the APA and NEPA. For the reasons set forth above, Plaintiffs respectfully request that the Court grant their motion for summary judgment, vacate the 2019 Rule, and direct EPA to mandate prompt compliance with EPCRA's reporting requirements.

Respectfully submitted,


Dated: August 27, 2024

*/s/ Carrie F. Apfel*
Carrie F. Apfel, D.C. Bar No. 974342
Kara Goad, D.C. Bar No. 1725197
Earthjustice
1001 G Street N.W., Suite 1000
Washington, D.C. 20001
(202) 667-4500
capfel@earthjustice.org
kgoad@earthjustice.org

Peter Lehner

Alexis Andiman
Earthjustice
48 Wall Street, 15th Floor
New York, N.Y. 10005
(212) 845-7376
plehner@earthjustice.org
aandiman@earthjustice.org

*Counsel for Plaintiffs Rural Empowerment
Association for Community Help; Animal Legal
Defense Fund, Inc.; Center for Biological Diversity;
Center for Food Safety; Don't Waste Arizona;
Environmental Integrity Project; Food & Water
Watch, Inc.; Humane Society of the United States;
Sierra Club; Sound Rivers; and Waterkeeper
Alliance, Inc.*