**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RURAL EMPOWERMENT ASSOCIATION FOR COMMUNITY HELP et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 18-2260 (TJK) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY et al., | |
| *Defendants*, | |
| and | |
| NATIONAL CATTLEMEN'S BEEF ASSOCIATION et al., | |
| *Intervenor-Defendants.* | |

**APPENDIX TO MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX CONTENTS

Exhibit 1:     Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal Waste at Farms, 84 Fed. Reg. 27,533 (June 13, 2019), EPA-HQ-OLEM-2018-0318-0402

Exhibit 2:     Earthjustice Comments, EPA-HQ-OLEM-2018-0318-0398

Exhibit 3:     EPA, *Emergency Release Notification Requirements for Animal Waste Air Emissions under the Emergency Planning and Community Right-to-Know Act (EPCRA) Technical Background Document* (2023)

Exhibit 4:     EPA, *Response to Comment Document: Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal Waste at Farms* (May 2019), EPA-HQ-OLEM-2018-0318-0405

Exhibit 5:     Potential Future Regulation for Emergency Release Notification Requirements for Animal Waste Air Emissions Under the Emergency Planning and Community Right-to-Know Act (EPCRA), 88 Fed. Reg. 80,222 (Nov. 17, 2023)

Exhibit 6:     Decl. of Rosemary Partridge (sworn to on Aug. 22, 2024)

Exhibit 7:     Decl. of Max Wilson (sworn to on Aug. 27, 2024)

Exhibit 8:     Decl. of Candice Cook (sworn to on Dec. 20, 2021)

Exhibit 9:     Decl. of Curtis Ramer (sworn to on Dec. 20, 2021)

Exhibit 10:    Decl. of Cynthia Parke (sworn to on Dec. 17, 2021)

Exhibit 11:    Decl. of Devon Hall (sworn to on Aug. 26, 2024)

Exhibit 12:    Decl. of Judy Jolin (sworn to on Aug. 20, 2024)

Exhibit 13:    Decl. of Dr. Melissa Siebke (sworn to on Aug. 26, 2024)

Exhibit 14:    Decl. of Abel Russ (sworn to on Aug. 23, 2024)

Exhibit 15:    Decl. of Anthony T. Eliseuson (sworn to on Aug. 27, 2024)

Exhibit 16:    Decl. of Lori Ann Burd (sworn to on July 22, 2024)

Exhibit 17:    Decl. of Jaydee Hanson (sworn to on Aug. 13, 2024)

Exhibit 18:    Decl. of Stephen Brittle (sworn to on Aug. 14, 2024)

Exhibit 19:    Decl. of Wenonah Hauter (sworn to on July 24, 2024)

Exhibit 20:    Decl. of Christopher Holbein (sworn to on Aug. 21, 2024)

Exhibit 21:    Decl. of Jane Williams (sworn to on Aug. 23, 2024)

Exhibit 22:    Decl. of Heather Deck (sworn to on Aug. 23, 2024)

Exhibit 23:    Decl. of Daniel E. Estrin (sworn to on July 26, 2024)

Exhibit 24:    Decl. of Rebecca Jim (sworn to on July 27, 2024)

Exhibit 25:    CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms, 73 Fed. Reg. 76,948/3 (Dec. 18, 2008), EPA-HQ-OLEM-2018-0318-0013

Exhibit 26:    EPA, *Does EPA Interpret EPCRA Section 304 to Require Farms to Report Releases from Animal Waste?* (Oct. 25, 2017), ECF No. 32-1, No. 1

Exhibit 27:    EPA, *CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms* (last updated Apr. 30, 2018), ECF No. 32-1, No. 6

# EXHIBIT 1

effect on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. We have analyzed this rule under that Order and have determined that it is consistent with the fundamental federalism principles and preemption requirements described in Executive Order 13132.

Also, this rule does not have tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes. If you believe this rule has implications for federalism or Indian tribes, please contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

*E. Unfunded Mandates Reform Act*

The Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) requires Federal agencies to assess the effects of their discretionary regulatory actions. In particular, the Act addresses actions that may result in the expenditure by a State, local, or tribal government, in the aggregate, or by the private sector of $100,000,000 (adjusted for inflation) or more in any one year. Though this rule will not result in such an expenditure, we do discuss the effects of this rule elsewhere in this preamble.

*F. Environment*

We have analyzed this rule under Department of Homeland Security Directive 023–01 and Environmental Planning COMDTINST 5090.1 (series), which guide the Coast Guard in complying with the National Environmental Policy Act of 1969 (42 U.S.C. 4321–4370f), and have determined that this action is one of a category of actions that do not individually or cumulatively have a significant effect on the human environment. This rule involves a safety zone lasting 2.5 hours that will prohibit entry within a portion of the Upper Potomac River, including the Tidal Basin, in Washington, DC. It is categorically excluded from further review under paragraph L60(a) in Table 3–1 of U.S. Coast Guard Environmental Planning Implementing Procedures 5090.1. A Record of Environmental Consideration supporting this determination is available in the docket where indicated under **ADDRESSES**.

*G. Protest Activities*

The Coast Guard respects the First Amendment rights of protesters. Protesters are asked to contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section to coordinate protest activities so that your message can be received without jeopardizing the safety or security of people, places or vessels.

**List of Subjects in 33 CFR Part 165**

Harbors, Marine safety, Navigation (water), Reporting and recordkeeping requirements, Security measures, Waterways.

For the reasons discussed in the preamble, the Coast Guard amends 33 CFR part 165 as follows:

**PART 165—REGULATED NAVIGATION AREAS AND LIMITED ACCESS**

■ 1. The authority citation for part 165 continues to read as follows:

**Authority:** 46 U.S.C. 70034, 70051; 33 CFR 1.05–1, 6.04–1, 6.04–6, and 160.5; Department of Homeland Security Delegation No. 0170.1.

■ 2. Add § 165.T05–0221 to read as follows:

**§ 165.T05–0221   Safety Zone for Fireworks Display; Upper Potomac River, Washington, DC.**

(a) *Location.* The following area is a safety zone: All navigable waters of the Upper Potomac River, including the Tidal Basin, within 1,000 feet of the fireworks discharge site at West Potomac Park in approximate position latitude 38°53′07.1″ N, longitude 077°02′49.5″ W, located at Washington, DC. All coordinates refer to datum NAD 1983.

(b) *Definitions.* As used in this section:

(1) *Captain of the Port (COTP)* means the Commander, U.S. Coast Guard Sector Maryland-National Capital Region.

(2) *Designated representative* means any Coast Guard commissioned, warrant, or petty officer who has been authorized by the Captain of the Port Maryland-National Capital Region to assist in enforcing the safety zone described in paragraph (a) of this section.

(c) *Regulations.* (1) Under the general safety zone regulations in subpart C of this part, you may not enter the safety zone described in paragraph (a) of this section unless authorized by the COTP or the COTP's designated representative. All vessels underway within this safety zone at the time it is activated are to depart the zone.

(2) To seek permission to enter, contact the COTP or the COTP's designated representative by telephone at 410–576–2693 or on Marine Band Radio VHF–FM channel 16 (156.8 MHz). The Coast Guard vessels enforcing this section can be contacted on Marine Band Radio VHF–FM channel 16 (156.8 MHz).

(3) Those in the safety zone must comply with all lawful orders or directions given to them by the COTP or the COTP's designated representative.

(d) *Enforcement officials.* The U.S. Coast Guard may be assisted in the patrol and enforcement of the safety zone by Federal, State, and local agencies.

(e) *Enforcement period.* This section will be enforced from 8 p.m. to 10:30 p.m. on July 4, 2019, or if necessary due to inclement weather, from 8 p.m. to 10:30 p.m. on July 5, 2019.

Dated: June 10, 2019.

**Joseph B. Loring,**

*Captain, U.S. Coast Guard, Captain of the Port Maryland-National Capital Region.*

[FR Doc. 2019–12508 Filed 6–12–19; 8:45 am]

**BILLING CODE 9110–04–P**

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 355**

**[EPA–HQ–OLEM–2018–0318; FRL–9995–03–OLEM]**

**RIN 2050–AH00**

**Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA or the Agency) is amending the release notification regulations under the Emergency Planning and Community Right-to-Know Act (EPCRA) to add the reporting exemption for air emissions from animal waste at farms provided in section 103(e) of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). In addition, EPA is adding definitions of "animal waste" and "farm" to the EPCRA regulations to delineate the scope of this reporting exemption. This amendment maintains consistency between the emergency release notification requirements of EPCRA and CERCLA in

accordance with the statutory text, framework and legislative history of EPCRA, and is consistent with the Agency's prior regulatory actions.

**DATES:** This final rule is effective July 15, 2019.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–HQ–OLEM–2018–0318. All documents in the docket are listed on the *http://www.regulations.gov* website. Although listed in the index, some information is not publicly available,

*e.g.,* CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically through *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Sicy Jacob, United States Environmental Protection Agency, Office of Land and

Emergency Management, 1200 Pennsylvania Ave. NW, (Mail Code 5104A), Washington, DC 20460; telephone number: (202) 564–8019; email address: *jacob.sicy@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. General Information**

*A. Does this action apply to me?*

A list of entities that could be affected by this final rule include, but are not necessarily limited to:

| Type of entity | Examples of affected entities |
|---|---|
| Industry ........................................................ | NAICS code 111—Crop production. |
| | NAICS code 112—Animal production. |
| States and/or Local Governments ................ | NAICS code 999200—State Government, excluding schools and hospitals. |
| | NAICS code 999300—Local Government, excluding schools and hospitals. |
| | State Emergency Response Commissions, Tribal Emergency Response Commissions, Tribal Emergency Planning Committees and Local Emergency Planning Committees. |

This table is not intended to be exhaustive, but rather provide a guide for readers regarding the types of entities that EPA is aware could be involved in the activities affected by this action. However, other types of entities not listed in this table could be affected by this final rule. To determine whether your entity is affected by this action, you should carefully examine the applicability criteria found in § 355.30 of title 40 of the Code of Federal Regulations (CFR). If you have questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

*B. What action is the Agency taking?*

The EPA is amending the EPCRA emergency release notification regulations to include the reporting exemption for air emissions from animal waste at farms provided in CERCLA section 103(e). In addition, EPA is adding definitions of "animal waste" and "farm" to the EPCRA regulations to delineate the scope of this reporting exemption.

*C. What is the Agency's authority for taking this action?*

This final rule is being issued under EPCRA, which was enacted as Title III of the Superfund Amendments and Reauthorization Act (SARA) of 1986 (Pub. L. 99–499). EPA finalizes this action under the authority of EPCRA section 304 (42 U.S.C. 11004) and the Agency's general rulemaking authority under EPCRA section 328 (42 U.S.C. 11048).

*D. What is the background of this final rule?*

Section 103 of CERCLA requires the person in charge of a vessel or facility to immediately notify the National Response Center (NRC) when there is a release of a hazardous substance, as defined under CERCLA section 101(14), in an amount equal to or greater than the reportable quantity for that substance within a 24-hour period. In addition to these CERCLA reporting requirements, EPCRA section 304 requires owners or operators of certain facilities to immediately notify state and local authorities when there is a release of an extremely hazardous substance (EHS), as defined under EPCRA section 302, or of a CERCLA hazardous substance in an amount equal to or greater than the reportable quantity for that substance within a 24-hour period.

EPCRA and CERCLA are two separate but interrelated environmental laws that work together to provide emergency release notifications to Federal, state and local officials. Notice given to the NRC under CERCLA serves to inform the Federal government of a release so that Federal personnel can evaluate the need for a response in accordance with the National Oil and Hazardous Substances Contingency Plan (NCP),[1] the Federal government's framework for responding to both oil discharges and hazardous substance releases. Relatedly, notice under EPCRA is given to the State Emergency Response Commission (SERC) for any state likely to be affected by the release and to the community emergency coordinator for the Local Emergency Planning Committee (LEPC)

for any area likely to be affected by the release so that state and local authorities have information to help protect the community.

Release reporting under EPCRA depends, in part, on whether reporting is required under CERCLA.[2] Specifically, EPCRA section 304(a) provides for reporting under the following three release scenarios:

• EPCRA section 304(a)(1) requires notification if a release of an EPCRA EHS occurs from a facility at which a hazardous chemical is produced, used or stored, and such release requires a notification under CERCLA section 103(a).

• EPCRA section 304(a)(2) requires notification if a release of an EPCRA EHS occurs from a facility at which a hazardous chemical is produced, used or stored, and such release is not subject to the notification requirements under CERCLA section 103(a), but only if the release:

○ Is not a federally permitted release as defined in CERCLA section 101(10),

○ Is in an amount in excess of the reportable quantity as determined by EPA, and

○ Occurs in a manner that would require notification under CERCLA section 103(a).

• EPCRA section 304(a)(3) requires notification if a release of a substance not designated as an EPCRA EHS occurs from a facility at which a hazardous chemical is produced, used or stored, and such release requires a notification under CERCLA section 103(a).

On March 23, 2018, the President signed into law the Consolidated

---

[1] 40 CFR part 300.

[2] In this document, emergency release notification and release reporting are used interchangeably.

Appropriations Act, 2018 ("Omnibus Bill"). Title XI of the Omnibus Bill is entitled the "Fair Agricultural Reporting Method Act" or the "FARM Act." *See* Fair Agricultural Reporting Method Act, Public Law 115–141, sections 1101–1103 (2018). The FARM Act expressly exempts reporting of air emissions from animal waste (including decomposing animal waste) at a farm from CERCLA section 103. The FARM Act also provides definitions for the terms "animal waste" and "farm."

The FARM Act amended CERCLA by providing an exemption from reporting air emissions from animal waste at farms. Because these types of releases are exempted under CERCLA, based on the release reporting criteria under EPCRA section 304, these types of releases are also exempt under EPCRA section 304.

Consequently, on November 14, 2018, EPA published a proposed rule to amend the release reporting regulations under EPCRA section 304. The comment period closed on December 14, 2018. EPA received 87,473 comments, of which 87,091 are mass mail campaigns opposing the proposed rule. The remaining were individual letters that either supported or opposed the proposed rule. EPA's response to significant comments are generally addressed below in Section V of this preamble. EPA developed a response to comment document to address all the comments received by the Agency on the proposed rule, which is in the docket EPA–HQ–OLEM–2018–0318 to this final rule. In addition, this rulemaking generally tracks the guidance document EPA had previously issued after enactment of the FARM Act. Thus, EPA formally withdraws the guidance document entitled, "How does the Fair Agricultural Reporting Method (FARM) Act impact reporting of air emissions from animal waste under CERCLA Section 103 and EPCRA Section 304?" dated April 27, 2018.

## II. Summary of This Final Rule

This final rule amends the release reporting regulations under EPCRA section 304 by adding the reporting exemption in 40 CFR 355.31 for air emissions from animal waste at farms, as proposed. EPA is also adding definitions of "animal waste" and "farm" to the definition section of the EPCRA regulations in 40 CFR 355.61 to delineate the scope of this reporting exemption, as proposed. EPA believes this final rule appropriately reflects the relationship between CERCLA and EPCRA release reporting requirements and is consistent with the statutory text, framework and legislative history of EPCRA, as well as the Agency's prior regulatory actions.

## III. Legal Rationale for This Final Rule

This rulemaking maintains consistency between the emergency release notification requirements of EPCRA and CERCLA in accordance with the statutory text, framework and legislative history of EPCRA, and is consistent with the Agency's prior regulatory actions. Specifically, this rulemaking is based on the relationship of the EPCRA section 304 reporting requirements to the CERCLA section 103 reporting requirements, as recently amended. As previously noted, EPCRA section 304 reporting depends, in part, on whether reporting is required under CERCLA section 103. EPCRA's legislative history further indicates that the EPCRA section 304 reporting requirements are designed to be consistent with the reporting requirements of CERCLA section 103. EPA has thus revised the EPCRA emergency release notification regulations from time to time, as appropriate, to maintain consistency with the CERCLA reporting requirements.

Consistent with the Agency's interpretation of EPCRA section 304 and the Agency's prior regulatory actions, EPA is amending the EPCRA release notification regulations to explicitly exempt air emissions from animal waste at farms from reporting under EPCRA section 304.

### A. Statutory Text and Framework

EPCRA section 304 provides for release reporting under three scenarios, each of which depends in some way on whether the release requires notice under CERCLA. If a release requires notice under CERCLA section 103(a), the release may be subject to reporting under EPCRA if the release meets the requirements of EPCRA section 304(a)(1) or 304(a)(3). Because the FARM Act exempted air emissions from animal waste at farms from CERCLA reporting, these types of releases no longer require notice under CERCLA section 103(a). If a release is *not* subject to notification under CERCLA section 103(a), the release may nonetheless be subject to reporting under EPCRA if the release meets the requirements of EPCRA section 304(a)(2). Pursuant to EPCRA section 304(a)(2), a release of an EPCRA EHS that is not subject to notification under section 103(a) of CERCLA need only be reported under EPCRA if the release:

• Is not a federally permitted release as defined in section 101(10) of CERCLA,

• Is in an amount in excess of the reportable quantity as determined by EPA, and

• Occurs in a manner that would require notification under section 103(a) of CERCLA.

A release that is not subject to CERCLA section 103(a) reporting must meet all three criteria in EPCRA section 304(a)(2) to be subject to EPCRA reporting. Here, air emissions from animal waste at farms could meet the first two criteria because such releases are generally not federally permitted and may exceed the applicable reportable quantity. Yet these types of releases do not "occur[ ] in a manner" that would require notification under CERCLA section 103(a) and thus do not meet the third criterion of EPCRA section 304(a)(2). Because air emissions from animal waste at farms do not meet all three criteria under EPCRA section 304(a)(2), and do not fall within the EPCRA section 304(a)(1) or (a)(3) reporting scenarios, these types of releases are not subject to EPCRA reporting. As such, EPA is amending the EPCRA's emergency release notification regulations to clarify reporting exemptions for certain types of releases under EPCRA section 304.

Air emissions from animal waste at farms no longer "occur[ ] in a manner" that would require notification under CERCLA section 103(a) because the FARM Act exempted these types of releases from CERCLA reporting. Importantly, the CERCLA reporting exemption is specifically tied to the nature or manner of these releases rather than to a specific substance. For example, the FARM Act amendment does not exempt specific substances typically associated with animal waste (such as ammonia and hydrogen sulfide) from reporting; rather, it exempts from reporting releases of any substance from animal waste at a farm *into the air.* Because air emissions from animal waste do not "occur[ ] in a manner" that would require notification under CERCLA section 103(a), these types of releases do not meet the third criterion of EPCRA section 304(a)(2) and are thus not subject to EPCRA reporting.

EPCRA section 304(a)(2) promotes consistency between the reporting requirements of EPCRA and CERCLA by ensuring that only releases that "occur[ ] in a manner" that would require CERCLA notification be reported under EPCRA. Yet, the provision also contemplates scenarios where releases not subject to reporting under CERCLA may still need to be reported under EPCRA, such as releases of substances designated as EHSs under EPCRA but not as hazardous substances under

CERCLA. For example, trimethylchlorosilane (Chemical Abstract Service No. 75–77–4) is designated as an EPCRA EHS but not as a CERCLA hazardous substance. Since trimethylchlorosilane is not a CERCLA hazardous substance, its releases are not subject to notification under CERCLA section 103(a) and need only be reported under EPCRA if such releases meet the criteria of EPCRA section 304(a)(2). A trimethylchlorosilane release that (1) is not a federally permitted release as defined in CERCLA section 101(10); (2) exceeds the applicable reportable quantity; and (3) ''occurs in a manner'' that would require notification under CERCLA section 103(a) would still be subject to EPCRA reporting. In this example, a release of trimethylchlorosilane ''occurs in a manner'' that would require notification under CERCLA section 103(a) where it is not one of the excluded or exempted types of releases described in CERCLA sections 101(22), 103(e), or 103(f). (See section C of this preamble, for further explanation of these exemptions.) The reason the release is not subject to notification under CERCLA section 103(a) is because trimethylchlorosilane is not a CERCLA hazardous substance, not because there is anything particular about the release that renders it exempt.

As another example, petroleum (including crude oil or any fraction thereof) is expressly excluded from the definition of ''hazardous substance'' in CERCLA section 101(14). Because of this ''petroleum exclusion,'' releases of petroleum are not subject to notification under CERCLA section 103(a) and so need to be reported under EPCRA only if such releases meet the criteria of EPCRA section 304(a)(2). Where a petroleum release meets the first two criteria of EPCRA section 304(a)(2), the question becomes whether the release ''occurs in a manner'' that would require notification under CERCLA section 103(a). Notably, unlike air emissions from animal waste at farms, Congress did not exempt petroleum releases from CERCLA reporting based on the manner or nature of these releases. Instead, Congress exempted these types of releases from CERCLA reporting by excluding petroleum (including crude oil or any fraction thereof) from the definition of ''hazardous substance.'' *See* 42 U.S.C. 9601(14). As such, these types of releases still ''occur[ ] in a manner'' that would require notification under CERCLA section 103(a) and could thus be subject to reporting under EPCRA section 304(a)(2) where the petroleum

release contains an EHS. *See* 52 FR 13378, 13385 (April 22, 1987). In sum, where a CERCLA reporting exemption or the reason a release is not subject to CERCLA reporting is *unrelated to the manner* in which such releases occur, EPCRA section 304(a)(2) may compel reporting of such releases.

In addition to the statutory text of EPCRA section 304(a)(2), the statutory framework of EPCRA's reporting requirements indicates a desire to maintain consistency between the EPCRA and CERCLA reporting requirements. Indeed, ''[i]n drafting the EPCRA reporting requirements, Congress expressly tied them to CERCLA's'' such that ''all of EPCRA's reporting mandates are piggybacked on the CERCLA mandates in one form or another.'' *Waterkeeper Alliance* v. *EPA,* 853 F.3d 527, 532 (D.C. Cir. 2017). Under EPCRA sections 304(a)(1) and (a)(3), EPCRA reporting depends on whether a release requires notification under CERCLA section 103(a), and under EPCRA section 304(a)(2), EPCRA reporting depends on whether a release ''occurs in a manner'' that would require notification under CERCLA section 103(a). Therefore, EPCRA requires reporting only for releases that require notification under CERCLA or occur in a manner that would require notification under CERCLA. Under CERCLA section 103 as amended, air emissions from animal waste at farms do not require notification under CERCLA section 103(a) and do not occur in a manner that would require such notification. As a result, these types of releases are not subject to reporting under EPCRA section 304(a)(1), (a)(2) or (a)(3). Thus, to clarify that these types of releases are not subject to reporting under EPCRA section 304, EPA is amending the EPCRA release notification regulations to exempt air emissions from animal waste at farms from reporting under section 304. In doing so, EPA seeks to avoid inconsistent regulation of these types of releases under EPCRA and CERCLA, in furtherance of the underlying purpose of this statutory framework.

*B. Legislative History*

EPA's understanding of EPCRA section 304(a)(2) is informed by the legislative history of EPCRA itself. In 1986, Congress passed EPCRA pursuant to Title III of the Superfund Amendments and Reauthorization Act (SARA). In the committee conference report addressing EPCRA, Congress discussed the three scenarios requiring release reporting under EPCRA section 304. With respect to EPCRA section

304(a)(2), the report states: ''This requires notification where there is a release of an extremely hazardous substance that would require notice under section 103(a) of CERCLA but for the fact that the substance is not specifically listed under CERCLA as requiring such notice.'' *See* 99 Cong. Conf. Report H. Rep. 962, October 3, 1986; SARA Leg. Hist. 38 (Section 304 Emergency Notification).

Congress thus expressed its intent that state and local authorities be notified of a qualifying release under EPCRA, even if the substance released is not identified as a hazardous substance under CERCLA, when the release occurs in a manner as the types of releases that require notification under CERCLA section 103(a). Conversely, if the release occurs in a manner that Congress determines does not require notification under CERCLA section 103(a)—such as air emissions from animal waste at farms—then no reporting is required under EPCRA section 304(a)(2) (*i.e.,* the third criterion of EPCRA section 304(a)(2) has not been met).

The legislative history also reveals that Congress intended EPCRA section 304(a)(2) to operate to exclude continuous releases from EPCRA's immediate notification requirements because such releases do not occur in a manner that requires reporting under CERCLA section 103(a).[3] The committee conference report explains: ''[R]eleases which are continuous or frequently recurring and do not require reporting under CERCLA are not required to be reported under [EPCRA section 304].'' Rather, continuous releases are subject to reduced reporting requirements pursuant to CERCLA section 103(f). As explained in section C.3. of this preamble, EPA incorporated an alternative for continuous releases into EPCRA and promulgated regulations that allow continuous releases to be reported in a manner consistent with CERCLA's continuous release reporting requirements.

Congress's intent in adopting the three scenarios in EPCRA section 304(a)(1)–(3) was to ensure that when

---

[3] CERCLA section 103(a) requires the person in charge of a vessel or facility to ''immediately notify'' the NRC when there is a release of a hazardous substance in an amount equal to or greater than the reportable quantity for that substance within a 24-hour period. In contrast, releases that are continuous and stable in quantity and rate may qualify for reduced, ''continuous release'' reporting under CERCLA section 103(f)(2). Similarly, EPCRA section 304 requires owners or operators of certain facilities to ''immediately'' notify state and local authorities of qualifying releases, and EPA has promulgated regulations that allow continuous releases to be reported under EPCRA in a manner consistent with CERCLA's continuous release reporting requirements.

Federal authorities receive notice of a release under CERCLA section 103(a), state and local authorities receive similar notice under EPCRA. Note that CERCLA notification applies to the list of hazardous substances (located in 40 CFR 302.4), while EPCRA notification applies to the lists of both CERCLA hazardous substances *and* EPCRA EHSs (located in 40 CFR part 355 Apps. A and B). When a substance is not a listed CERCLA hazardous substance (or a federally permitted release and is above the applicable reportable quantity), but is on the EPCRA EHSs list, EPCRA section 304(a)(2) provides for notification only if the release of such substance occurs in a manner as the types of releases that require notification under CERCLA section 103(a). On the other hand, if Congress determines that a release occurs in a manner that does not require notification under CERCLA section 103(a), EPCRA section 304(a)(2) works to logically exclude that release from EPCRA reporting.

*C. Prior Regulatory Actions*

As noted, CERCLA release notification was established to alert Federal authorities to a release so that the need for a response can be evaluated and any necessary response undertaken in a timely fashion. EPCRA release notification supplements CERCLA release notification by similarly preparing the community at the state and local level. Based on the criteria for EPCRA section 304 release reporting, and to promote consistency between CERCLA and EPCRA release notification requirements, the Agency has incorporated many of CERCLA's release notification exemptions into the EPCRA release notification regulations through prior rulemakings. Each of these prior regulatory actions are summarized below.

1. Exemptions From the Definition of ''release'' Under CERCLA and EPCRA

Both CERCLA and EPCRA define the term ''release.'' Under CERCLA section 101(22), the term ''release'' generally means ''any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant),'' but also includes specific exclusions for workplace releases, vehicle emissions, nuclear material releases and fertilizer application. Similar to the CERCLA workplace exposure exclusion, EPCRA

section 304(a)(4) exempts from reporting any release which results in exposure to persons solely within the site or sites on which a facility is located. Though the definition of ''release'' under EPCRA section 329 mirrors the CERCLA definition, it does not contain three exclusions provided in the CERCLA section 101(22) definition of ''release'': (1) Emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel or pipeline pumping station engine; (2) releases of source, byproduct or special nuclear material from a nuclear incident; and (3) the normal application of fertilizer. However, because the types of releases excluded from CERCLA's definition of ''release'' do not occur in a manner that would be reportable under CERCLA section 103(a), these types of releases do not meet the reporting requirements under EPCRA section 304. *See* 52 FR 13381, 13384–85 (April 22, 1987) and related Response to Comments document, April 1987, Docket Number 300PQ. Thus, EPA adopted these statutory CERCLA exclusions into the EPCRA regulations codified at 40 CFR 355.31.[4]

2. Exemptions From Immediate Notification Requirements

There are four types of statutory exemptions from the immediate notification requirements for releases of hazardous substances provided in CERCLA sections 101(10) and 103(e) and (f). Specifically, these statutory exemptions include: (1) Federally permitted releases, as defined in section 101(10); (2) the application of a pesticide product registered under the Federal Insecticide, Fungicide and Rodenticide Act or from the handling and storage of such pesticide product by an agricultural producer (section 103(e)); (3) certain releases of hazardous wastes that are required to be reported under the provisions of the Resource Conservation and Recovery Act and that are reported to the NRC (section 103(f)(1)); and (4) certain releases that are determined to be continuous under the provisions of section 103(f)(2).

In the final rulemaking on April 22, 1987 (52 FR 13378) for emergency planning and release notification requirements under EPCRA, the Agency adopted exemptions from CERCLA section 103(a) reporting ''based on the language in EPCRA section 304(a) which requires that releases reportable under that Section occur in a manner which would require notification under

section 103(a) of CERCLA.'' 52 FR 13378, 13381 (April 22, 1987).

Although EPA stated in the April 1987 rulemaking that it was incorporating CERCLA reporting exemptions into the EPCRA regulations based on the criteria for EPCRA section 304 release reporting, the Agency inadvertently omitted the exclusion for the ''application of a pesticide product registered under the Federal Insecticide, Fungicide, and Rodenticide Act or to the handling and storage of such a pesticide product by an agricultural producer'' from the EPCRA section 304 regulations at that time. Thus, in a technical amendment published on May 24, 1989 (54 FR 22543), EPA added a provision to the EPCRA regulations in 40 CFR 355.40(a)(2)(iv) (currently codified at 40 CFR 355.31(c)) providing that releases exempted from reporting by CERCLA section 103(a) reporting by CERCLA section 103(e) are also exempt from reporting under EPCRA section 304. In addition, the May 1989 technical amendment clarified the language in paragraph (a)(2)(v) of 40 CFR 355.40 (currently codified at 40 CFR 355.31(d)), explaining that this section exempts from EPCRA section 304 reporting ''any occurrence not meeting the definition of release under section 101(22) of CERCLA,'' as ''[s]uch occurrences are also exempt from reporting under CERCLA section 103(a).'' *See* 54 FR 22543, 22543 (May 24, 1989).

3. Continuous Release Reporting

CERCLA section 103(f) provides relief from the immediate notification requirements of CERCLA section 103(a) for a release of a hazardous substance that is continuous and stable in quantity and rate. Instead, continuous releases are subject to a significantly reduced reporting requirement under regulations promulgated pursuant to CERCLA section 103(f). In adopting the implementing regulations for EPCRA in 40 CFR part 355, EPA relied on EPCRA section 304(a)(2) to likewise exclude continuous releases from the immediate notification requirement of EPCRA section 304, reasoning: ''Because such releases do not 'occur in a manner' which requires immediate release reporting under section 103(a) of CERCLA, they are also not reportable under section 304 of [EPCRA].'' *See* 52 FR 13381, 13384 (April 22, 1987). EPA later promulgated continuous release reporting regulations for EPCRA that cross-reference and follow the CERCLA continuous release reporting regulations, finding that EPCRA release reporting is ''closely tied'' and ''parallel'' to CERCLA release reporting. *See* 55 FR 30169, 30179 (July 24, 1990).

---

[4] The 1987 rule codified these exemptions at 40 CFR 355.40(a)(2), which was later reorganized into 40 CFR 355.31. *See* 73 FR 65451 (November 3, 2008).

At that time, the Agency also reiterated that "[t]o the extent that releases are continuous and stable in quantity and rate as defined by CERCLA section 103(f)(2) . . . , they do not *occur in a manner* that requires notification under CERCLA section 103(a)" and are thus not subject to the EPCRA section 304 immediate notification requirements. *Id.* (emphasis added).

### IV. Scope of the Final Rule

The scope of this rulemaking is limited to air emissions from animal waste (including decomposing animal waste) at a farm. The Agency is adding this reporting exemption to the EPCRA section 304 emergency release notification regulations as implemented in 40 CFR part 355, subpart C, entitled "Emergency Release Notification." The scope of this rulemaking stems from existing requirements under EPCRA section 304(a)(2) and under CERCLA section 103(e), as amended, and is tied to the nature or manner of these releases rather than to a specific substance. In other words, the Agency is not exempting substances typically associated with animal waste (such as ammonia or hydrogen sulfide) from reporting. Rather, this rulemaking codifies EPA's interpretation that air emissions from animal waste at farms are not subject to EPCRA section 304 release reporting by explicitly exempting releases from animal waste *into the air* at farms from reporting. Thus, the Agency is excluding all releases to the air from animal waste at a farm from reporting under EPCRA section 304.

This rulemaking does not apply to releases of substances from animal waste into non-air environmental media, nor to releases into the air from sources other than animal waste or decomposing animal waste at a farm. For example, a release from animal waste into water (*e.g.,* a lagoon breach) or a release from an anhydrous ammonia storage tank into the air might trigger reporting requirements if the release exceeds the applicable reportable quantities.

This exemption is added to those currently listed in the EPCRA regulations codified at 40 CFR 355.31, entitled "What types of releases are exempt from the emergency release notification requirements of this subpart?"

To delineate the scope of this exemption, EPA is finalizing, as proposed, the definitions of "animal waste" and "farm" to be consistent with CERCLA section 103(e). See 40 CFR 355.61 for the full text of these definitions.

### V. Response to Comments

EPA received comments from various organizations, including the National Association of SARA Title III Program Officials (NASTTPO), agricultural trade associations, farm bureaus, a university research center and environmental groups. EPA also received individual comment letters. This section provides a summary of major comments received and EPA's responses. A detailed summary of the comments and EPA's responses are in the Response to Comments document, a copy of which is in the docket for this rulemaking.

#### A. General Comments Supporting the Proposed Rule

Several commenters, NASTTPO, agricultural trade associations, the Department of Agriculture from West Virginia and North Dakota, farm bureaus and a few private citizens, expressed general support for the proposed amendment to the EPCRA section 304 release reporting regulations to add the reporting exemption for air emissions from animal waste at farms provided in CERCLA section 103(e). In support of the proposed amendment, commenters stated that the proposed rule lays out the proper reading of the law and is consistent with Congress' clear intent that EPCRA section 304 and CERCLA release reporting requirements should be applied consistently except in certain very limited circumstances. Some of the commenters stated that EPCRA was never intended to govern agricultural operations, where emissions from livestock are a part of everyday life and are certainly not emergency situations. The natural breakdown of livestock manure does not constitute an emergency release pursuant to the CERCLA and EPCRA laws. One commenter stated that EPCRA was created to protect citizens from disasters such as 1984 Bhopal tragedy, however, animal agriculture cannot be compared to or included in a similar category designed to address toxic chemicals, hazardous substances and chemical emergencies.

#### B. General Comments Opposing the Proposed Rule

EPA received numerous mass mail campaigns which include anonymous private citizens, citizen & environmental groups opposing the proposed amendment to add the reporting exemption to the EPCRA section 304 emergency release notification regulations for air emissions from animal waste at farms. Several commenters strongly urge the EPA to withdraw the proposed rule, which

commenters said would exempt concentrated animal feeding operations (CAFOs) from EPCRA reporting requirements so that reports of hazardous substance releases will be available to the public. Certain members of the Senate Environment and Public Works (SEPW) Committee strongly urged EPA to withdraw the proposed rule and faithfully execute and enforce EPCRA and CERCLA reporting requirements consistent with the laws passed by Congress.

EPA also received individual comment letters opposing the proposed amendment. One commenter stated that it is the job of the EPA to regulate sources of hazardous emissions and protect the population from known sources of these emissions. One commenter asked EPA not to ignore and vacate their right-to-know by exempting the CAFO's responsibility to control and report the toxic emissions they are required to control and report.

*EPA's Response:* While EPA recognizes commenters' concerns regarding animal waste emissions, this amendment is based on the statutory language in EPCRA section 304 and its relationship to CERCLA section 103 release reporting requirements. The basic purpose of emergency release notification requirements under EPCRA section 304 is for facilities to inform state and local agencies of accidental releases so that these agencies can exercise the local emergency response plan if necessary. This may include, but is not limited to, providing shelter or evacuating the community to prevent acute exposure from accidental releases of chemicals. EPCRA section 304 serves as a notification requirement for chemical accidental releases, it is not intended to regulate emissions.

In their letter to EPA dated June 1, 2017, the members of NASTTPO indicated that the release reports for air emissions from animal waste at farms provide little value to local agencies and first responders, and are generally ignored. NASTTPO states that open dialogue and coordination among farms and local agencies can be more effective than release reporting to address animal waste management at farms. NASTTPO reiterated this principle in its comment to this rulemaking, dated December 14, 2018. In addition, regardless of reporting, EPA can still enforce applicable laws and regulations to address threats to human health and the environment. This rulemaking does not limit the Agency's authority under CERCLA sections 104 (response authorities), 106 (abatement actions), 107 (liability), or any other provisions of

CERCLA to address releases of hazardous substances at farms.

*C. Comments on the Proposal To Add Definitions of "animal waste" and "farm"*

EPA requested comments on adding the definitions of "animal waste" and "farm" to the definition section of EPCRA regulations in 40 CFR part 355.

1. Support

A few commenters supported adding the definitions of "animal waste" and "farm" to EPCRA regulations in 40 CFR part 355. These commenters expressed that the incorporation of the FARM Act's definitions of "animal waste" and "farm" into the ECPRA regulations provides important regulatory clarity to agricultural producers. In their comments, NASTTPO expressed that EPA has crafted a narrow and specific exemption from the reporting of releases from animal waste from farms.

2. Oppose

Many commenters as part of mass mail campaigns as well as few individual commenters opposed adding the definitions of "animal waste" and "farm" to the EPCRA regulations in 40 CFR part 355. One of the commenters specifically stated that limiting definitions of what constitutes a farm, or animal waste merely hides problems and that we should be striving for more transparency on issues concerning emissions that affect climate and public health, not trying to limit transparency. Another commenter stated that it is only the large CAFOs that can release sufficient volumes of toxic pollutants, as ammonia and hydrogen sulfide into the air which obviously will then end up in our soil and water.

*EPA's Response:* On March 23, 2018, the Fair Agricultural Reporting Method (FARM) Act of 2018 amended CERCLA section 103 to exempt the reporting of air emissions from animal waste at a farm. *See* Fair Agricultural Reporting Method Act, Public Law 115–141 §§ 1101–1103 (2018). The FARM Act includes definitions for "animal waste" and "farm." On August 1, 2018, EPA promulgated a final rule to incorporate the FARM Act legislation into the CERCLA reporting regulations at 40 CFR part 302 (see 83 FR 37446), including definitions for "animal waste" and "farm." This amendment is based on EPA's interpretation of EPCRA section 304(a)(2) and its relationship to CERCLA section 103 as amended by the FARM Act. Thus, the Agency believes it is reasonable to promulgate the same definitions for "animal waste" and "farm" into the EPCRA release reporting regulations to maintain consistency between the statutes and to effectuate the exemption under EPCRA.

*D. Comments on the Legal Rationale for the Proposed Rule*

EPA received comments supporting and opposing the legal rationale for the proposed rule. Below is a summary of the significant comments received and EPA's responses. Details of these comments and the Agency's responses are addressed in the Response to Comments document which can be found in the docket for this rulemaking.

1. Support

A few commenters state that Congress intended for EPCRA reporting requirements to be consistent with or "linked to" CERCLA reporting requirements, which is evinced by the statutory language in EPCRA section 304(a)(2). Commenters stated that EPA has the authority to amend the EPCRA emergency release notification regulations to include the reporting exemption for air emissions from animal waste at farms provided in CERCLA section 103(e). Commenters also note that an analysis prepared by the Congressional Research Service (CRS) at the request of the Senate Committee on Environment and Public Works (EPW) supports EPA's interpretation as presented in the proposed rule. In sum, commenters state the proposed rule is a sound and lawful codification based on the statutory language in EPCRA and CERCLA.

2. Oppose

EPA received comments with a wide range of arguments opposing the Agency's legal rationale for the proposed rule. The following is a brief summary of comments on each topic presented in the preamble to the proposed rule. Details of comments received and the Agency's response can be found in the Response to Comments document at the docket for this rulemaking.

i. Statutory Text

A few commenters argue the proposed rule is in direct contravention of the plain language of EPCRA and CERCLA and is therefore "fundamentally flawed" and "illegal." One commenter argues that the phrase "occurs in a manner" makes it clear that even if a release is not reported under CERCLA, EPCRA reporting would still be required if the "factual" circumstances of the release would otherwise require CERCLA reporting. The commenter also stated that EPA arbitrarily based its interpretation of "occurs in a manner"

on the method or type of release (*i.e.,* into the air) rather than on the substance emitted. Additionally, this commenter argues that the statute provides no support for such an interpretation. Another commenter expressed that the plain language of EPCRA is unambiguous in that it prohibits EPA from exempting animal feeding operations from EPCRA's reporting requirements; but even if there was some ambiguity in the statute, the proposed rule is arbitrary and capricious because EPA has not provided a reasoned explanation to justify its departure from the statute or supported that explanation with substantive record evidence.

*EPA's Response:* EPA's interpretation is lawful and based on the plain language of EPCRA and CERCLA. EPA reasonably interpreted the operative language in EPCRA section 304(a)(2) as requiring EPCRA reporting when the release "occurs in a manner" which would require notification under CERCLA section 103(a). Because air emissions from animal waste at farms do not "occur in a manner" that would require notification under CERCLA section 103(a), such releases are not reportable under EPCRA section 304(a)(2).

EPA disagrees with commenters' analysis that reporting of these types of air emissions would still be required under EPCRA so long as they are factually releases under CERCLA. EPA understands these comments to propose that the "occurs in a manner" language in EPCRA section 304(a)(2) means that a release only has to satisfy the definition of a "release" under CERCLA to be eligible for EPCRA reporting. Such a reading is unnecessary as the definition of a "release" in EPCRA already mirrors the definition of a "release" in CERCLA. (see the definition of "release" under EPCRA section 329(8) and CERCLA section 101(22). While the CERCLA definition may focus more on hazardous substances and the EPCRA definition focusses more on extremely hazardous substances and hazardous or toxic chemicals, both definitions list similar types, ways, or manners of a release.

EPA believes it is not a full and fair reading of EPCRA section 304(a)(2) to say that EPCRA reporting would still be necessary if a release to the environment qualifies as a release to the environment under CERCLA, regardless of whether reporting is legally required under CERCLA. An EPCRA release into the environment already follows the definition of a release into the environment under CERCLA. Applied to the present rulemaking, emissions into

the air from animal waste at farms already qualify as releases into the environment under both statutes (*i.e.,* they are "emitting" or "escaping" under the statutory definitions). Further analysis of what factually is a release to the environment does not shed light on the Congressional intent of EPCRA section 304(a)(2) and does not follow the plain language of the statute, which requires, in part, that a release occurs in a manner which would require notification under CERCLA section 103(a).

In enacting the FARM Act, the Senate EPW requested an analysis from the Congressional Research Service (CRS) of the potential effects of the FARM Act's amendments to CERCLA and EPCRA release reporting. The CRS issued two memorandums, March 7, 2018 (an overview of CERCLA and EPCRA release reporting, statutory exemptions, the 2008 CERCLA/EPCRA rule and resulting litigation, etc.) and March 13, 2018 ("Supplemental Analysis: Fair Agricultural Reporting Method Act/ FARM Act (S.2421"). CRS agreed with this interpretation in its memorandum dated March 7, 2018, which states:

[T]he phrase "occurs in a manner" generally has been implemented over time to mean the nature of the release in terms of how the substance enters the environment. [CRS March 7, 2018 memorandum page 6].

The next question is whether the release would require notification under CERCLA section 103(a). As discussed earlier, the FARM Act exempted only releases of a certain kind or manner— air emissions from animal waste at farms—from notification under CERCLA section 103(a). Accordingly, these types of releases do not occur in a manner that would require notification under CERCLA section 103(a). Because the third criteria of EPCRA section 304(a)(2) is not met, no reporting under EPCRA is required.

EPA believes its interpretation follows the plain language of the statute and carries out the Congressional intent of EPCRA section 304(a)(2).

ii. Legislative History and Prior Agency Actions

Commenters opposing the proposal argue that the legislative history of the FARM Act makes it clear that Congress intended for EPCRA reporting to continue notwithstanding the FARM Act's CERCLA exemption. The letter from certain Senate EPW members cites to testimony by Senators and witnesses explaining that the FARM Act makes no changes to reporting requirements for releases of extremely hazardous substances under EPCRA. Commenters

assert that the proposed rule violates the legislative intent of the FARM Act. One commenter argues that EPCRA's legislative history does not support EPA's prior actions exempting certain releases from EPCRA reporting, such as the CERCLA continuous release provision.

*EPA's Response:* In enacting the FARM Act, Congress amended the CERCLA section 103 reporting requirements; it did not amend the EPCRA section 304 reporting requirements. While the FARM Act legislative history has relevance with respect to the statutory changes to reporting under CERCLA section 103, EPA considered the text of EPCRA section 304 and its legislative history in issuing this rule. As stated throughout the proposed rule, EPA has interpreted EPCRA section 304(a)(2) as carrying over CERCLA reporting exemptions related to the manner or nature of release. In this way, EPCRA section 304(a)(2) promotes consistency between EPCRA and CERCLA reporting. The legislative history of the FARM Act does not address the legislative history of EPCRA, and if Congress wished to ensure that the exemption in the FARM Act did not carry over into EPCRA reporting, it could have expressly enacted such statutory text, but it did not.

The legislative history of the FARM Act is correct to the extent that the amendment does not exempt all releases from animal waste at farms from reporting under EPCRA. Rather, the amendment only exempts certain types of releases, and this rule tracks the FARM Act to provide that a limited type of release, air emissions from animal waste at farms, are not subject to reporting under EPCRA. This rule does not apply to releases of substances from animal waste into non-air environmental media, nor to releases into the air from sources other than animal waste or decomposing animal waste at a farm. For example, a release from animal waste into water (*e.g.,* a lagoon breach) or a release from an anhydrous ammonia storage tank into the air might trigger reporting requirements if the release exceeds the applicable reportable quantities. This is because the releases occur in a manner that require reporting under CERCLA because they are releases into a non-air media or they are not emissions from animal waste.

The proposed rule also explains how, in the 1986 committee conference report addressing EPCRA, Congress expressed its intent that EPCRA release reporting be aligned with CERCLA reporting. As an example, the committee conference

report explains how continuous releases which are not subject to immediate reporting requirements under CERCLA should likewise not be subject to EPCRA reporting. As result, EPA promulgated reduced reporting requirements that cross-reference and follow the CERCLA reduced reporting requirements for continuous releases. In this manner, EPA reasonably followed Congressional intent to state that numerous types of releases are not subject to reporting under EPCRA when reporting wasn't required under CERCLA, including vehicle emissions, the normal application of fertilizer, and the application of registered pesticide products (see the **Federal Register** notice for the proposed rule for a more detailed discussion).

The legislative history of the FARM Act's amendment to CERCLA did not nullify the statutory text in EPCRA section 304(a)(2). EPA reasonably interpreted that text and the proposed rule is supported by EPCRA's legislative history.

*E. Other Comments*

EPA also received adverse comments on the rulemaking and its impact on environment and public health. These commenters expressed that the proposed exemption will prevent local emergency responders from accessing information to protect the community. Some commenters assert that the proposed rule is arbitrary and capricious because the Agency failed to consider environmental justice, the National Environmental Policy Act, and the Endangered Species Act prior to issuing the proposed rule.

*EPA's Response:* Although these comments are outside the scope of this rulemaking, the Agency's response to these comments are provided in the Response to Comments document, which can be found in the docket to this rulemaking.

*F. Request for Public Comment Period Extension & Public Hearings*

Three commenters, a university research organization, mass mail campaign and community group, requested EPA to extend the public comment period for the proposed rule. These commenters stated that the proposed rule may have significant consequences on the ability of local governments and their residents to protect their health and wellbeing, none of which seems to have been considered by EPA during the preparation of the proposed rule. Additionally, these commenters expressed that they need an additional 60 days to collect information from studies on health and

environmental impacts of CAFO air emissions on surrounding communities as rulemaking docket does not contain any scientific studies or other documents about toxic emissions from CAFOs and their impact on surrounding communities.

Two groups, mass mail campaigns and community organization, requested public hearings on the proposed rule stating that given the impact that the proposed rule will have on communities across the country, including a disproportionate number of low-income and minority communities, EPA should schedule at least three public hearings in various locations across the country to ensure adequate public participation in the rulemaking process. EPA should hold these hearings in locations near to communities affected by CAFOs, for example, communities in North Carolina, Maryland, Iowa, or Oklahoma, to name a few.

*EPA's Response:* EPA believes that the 30-day comment period was appropriate. The proposed rule is based on a reasonable interpretation of the statutory language in EPCRA section 304(a)(2) and its relationship with CERCLA section 103 as amended by the FARM Act. EPA's rationale is set out in the **Federal Register** notice for the proposed rule and all the supporting documents the Agency relied on are available in the associated docket.

The proposed rule is not based on health or environmental risk, so no such associated studies are necessary. Because the proposed rule is based on a statutory interpretation, the record is not extensive, and therefore EPA did not believe such an extension should be granted. EPA also generally set out its statutory interpretation in the guidance document entitled "How does the Fair Agricultural Reporting Method (FARM) Act impact reporting of air emissions from animal waste under CERCLA Section 103 and EPCRA Section 304?" dated April 2018. That guidance document states: "EPA intends to conduct a rulemaking to address the impact of the FARM Act on the reporting of air emissions from animal waste at farms under EPCRA." Accordingly, the commenters were provided a meaningful opportunity to comment and no extensions were necessary to comment on EPA's statutory interpretation. Similarly, no public meetings or hearing were required or deemed necessary to allow for comment on EPA's interpretation.

## VI. Statutory and Executive Orders

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is a significant regulatory action that was submitted to the Office of Management and Budget (OMB) for review. Any changes made in response to OMB recommendations have been documented in the docket.

### B. Executive Order 13771: Reducing Regulations and Controlling Regulatory Costs

This action is not subject to Executive Order 13771 because this final rule does not result in additional costs.

### C. Paperwork Reduction Act (PRA)

This action does not impose any new information collection burden under the PRA. The Agency is codifying a provision exempting farms from reporting air releases from animal waste under EPCRA section 304 release notification regulations.

### D. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. In making this determination, the impact of concern is any significant adverse economic impact on small entities. An agency may certify that a rule will not have a significant economic impact on a substantial number of small entities if the rule relieves regulatory burden, has no net burden or otherwise has a positive economic effect on the small entities subject to the rule. Consistent with the Agency's interpretation that air emissions from animal waste at farms are not subject to EPCRA section 304 release reporting, this final rule explicitly exempts these types of releases from EPCRA reporting and would not result in additional costs.

### E. Unfunded Mandates Reform Act (UMRA)

This action does not contain any unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector. The Agency is amending the EPCRA section 304 release notification regulations to add the reporting exemption for air emissions from animal waste at farms provided in CERCLA section 103(e), as amended.

### F. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

### G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action does not have tribal implications as specified in Executive Order 13175. The EPA is amending the EPCRA section 304 release notification regulations to add the reporting exemption for air emissions from animal waste at farms provided in CERCLA section 103(e), as amended. Thus, Executive Order 13175 does not apply to this action.

### H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

The EPA interprets Executive Order 13045 as applying to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of *covered regulatory action* in section 2–202 of the Executive Order. This final rule is not based on health or environmental effect, rather, it is intended to maintain consistency between EPCRA section 304 and CERCLA section 103(a) emergency release notification requirements by exempting reporting of air emissions from animal waste at farms.

### I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use

This action is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution or use of energy. The EPA is amending the EPCRA section 304 release notification regulations to add the reporting exemption for air emissions from animal waste at farms provided in CERCLA section 103(e), as amended.

### J. National Technology Transfer and Advancement Act (NTTAA)

This rulemaking does not involve technical standards.

*K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes that this action is not subject to Executive Order 12898 (59 FR 7629, February 16, 1994) because it does not establish an environmental health or safety standard. EPA has no authority under EPCRA to prevent or reduce emissions from certain facilities or their operations. The rule presents a statutory interpretation intended to maintain consistency between EPCRA section 304(a) and CERCLA section 103 release notification requirements and does not have any impact on human health or the environment.

*L. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

**List of Subjects in 40 CFR Part 355**

Environmental protection, Chemicals, Disaster assistance, Hazardous substances, Hazardous waste, Natural resources, Penalties, Reporting and recordkeeping requirements, Superfund.

Dated: June 4, 2019.

**Andrew R. Wheeler,**

*Administrator.*

For the reasons set forth in the preamble, EPA amends 40 CFR part 355 as follows:

**PART 355—EMERGENCY PLANNING AND NOTIFICATION**

■ 1. The authority citation for part 355 continues to read as follows:

**Authority:** Sections 302, 303, 304, 325, 327, 328, and 329 of the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA) (42 U.S.C. 11002, 11003, 11004, 11045, 11047, 11048, and 11049).

■ 2. Amend § 355.31 by adding paragraph (g) to read as follows:

**§ 355.31  What types of releases are exempt from the emergency release notification requirements of this subpart?**

*       *       *       *       *

(g) Air emissions from animal waste (including decomposing animal waste) at a farm.

■ 3. Amend § 355.61 by adding in alphabetical order definitions for "Animal waste" and "Farm" to read as follows:

**§ 355.61  How are key words in this part defined?**

*Animal waste* means feces, urine, or other excrement, digestive emission, urea, or similar substances emitted by animals (including any form of livestock, poultry, or fish). This term includes animal waste that is mixed or commingled with bedding, compost, feed, soil, or any other material typically found with such waste.

*       *       *       *       *

*Farm* means a site or area (including associated structures) that—

(1) Is used for—

(i) The production of a crop; or

(ii) The raising or selling of animals (including any form of livestock, poultry, or fish); and

(2) Under normal conditions, produces during a farm year any agricultural products with a total value equal to not less than $1,000.

*       *       *       *       *

[FR Doc. 2019–12411 Filed 6–12–19; 8:45 am]

**BILLING CODE 6560–50–P**

# EXHIBIT 2



December 14, 2018

***<u>Via Regulations.Gov and Email to</u>*** <u>jacob.sicy@epa.gov</u>

The Honorable Andrew Wheeler
Acting Administrator
Environmental Protection Agency
1200 Pennsylvania Ave., NW (Mail Code 1101A)
Washington, DC 20460

**<u>Re:</u>**    ***Emergency Release Notification Regulations on Reporting Exemption for Air***
          ***Emissions From Animal Waste at Farms;***
          ***Emergency Planning and Community Right-to-Know Act***
          ***(Docket No. EPA–HQ–OLEM–2018–0318; FRL–9986–40–OLEM)***

Dear Acting Administrator Wheeler:

Earthjustice, on behalf of itself, Animal Legal Defense Fund, Association of Irritated
Residents, CATA – The Farmworkers Support Committee, Center for Food Safety, Don't Waste
Arizona, Environmental Integrity Project, Farm Aid, Food & Water Watch, Friends of the Earth
U.S., Humane Society of the United States, Northern Plains Resource Council, Public Justice,
Sierra Club, Sound Rivers, Waterkeeper Alliance, and Western Organization of Resource
Councils submits the following comments on the U.S. Environmental Protection Agency's
("EPA's" or the "Agency's") proposed rule, Emergency Release Notification Regulations on
Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and
Community Right-to-Know Act, 83 Fed. Reg. 56,791 (Nov. 14, 2018) ("Proposed Rule").

The Proposed Rule is EPA's latest maneuver in its decade-long attempt to flout the clear
statutory requirements of Emergency Planning and Community Right-to-Know Act ("EPCRA"),
as well as Congress's unambiguous intent that concentrated animal feeding operations
("CAFOs") comply with the same basic emission reporting requirements that apply to any other
polluting facility. CAFO emissions of ammonia and hydrogen sulfide severely impair the health
and quality of life of rural communities across the country, causing various ailments – and even
death – among farmers and community members. The simple reporting requirements of EPCRA
impose minimal burdens on CAFOs but provide maximal benefit to local officials and
community members who need to know about the air emissions that are affecting their health.

And only a limited number of the largest CAFOs, which confine a huge proportion of the
country's food-producing animals, are expected to emit ammonia or hydrogen sulfide at levels
that would require EPCRA reporting. Essentially, EPA's Proposed Rule provides a free pass to
the industrial facilities that most pollute our air and our water – CAFOs that house hundreds,
thousands, or even millions of animals and emit harmful levels of toxic chemicals. Based on

EPA's own guidance documents from 2017, only the largest CAFOs are expected to emit ammonia and hydrogen sulfide at levels requiring EPCRA reporting. The reporting requirement does not apply to smaller farms – nearly 59% of chicken facilities, 91% of hog facilities, 96% of beef facilities, and 97% of dairy facilities – because they are not expected to release these substances in sufficient quantities. The Proposed Rule is of no benefit to the vast majority of facilities, which have never had to report – and will continue to have no reporting obligation – irrespective of whether EPA finalizes the Proposed Rule or not. Instead, the Proposed Rule is a purely political move, catering to the commercial interests of the large CAFOs that most pollute our air and water, exempting them from providing critical and legally required information to the public about their harmful air releases. EPA is yet again prioritizing political and commercial interests over public health.

The Proposed Rule is not only an affront to the many rural communities whose health EPA is tasked to protect, but also to the statutes that Congress entrusted EPA to implement. Earlier this year, Congress directly considered whether to exempt CAFOs from EPCRA's reporting requirement and conclusively decided not to do so. Instead, it unambiguously determined that CAFOs must continue to report under EPCRA. Congress therefore directly considered the legal theory at the heart of the Proposed Rule and found it to be "an erroneous interpretation of the law" that is "legally flawed" and "exceed[s] EPA's statutory authority."[1]

EPA's efforts to shield CAFOs from reporting their toxic emissions are not new. Rather, EPA has been trying to protect these polluters for more than a decade. Indeed, many of the same issues EPA raises in its Proposed Rule were raised during EPA's related 2008 rulemaking to exempt CAFOs from release reporting. Notably, the 2008 rule – which imposed a narrower exemption than the one EPA currently proposes – was struck down as illegal by the D.C. Circuit last year. *See Waterkeeper All. v. EPA*, 853 F.3d 527, 537-38 (D.C. Cir. 2017). Relevant documents from that rulemaking docket are submitted with these comments, and have the same force today as they did ten years ago.[2] The undersigned also submit comments from EPA's most recent request for comments on its related 2017 guidance document,[3] as well as declarations from a court filing challenging the illegality of that guidance.[4]

---

[1] Letter from Thomas R. Carper et al., Ranking Member, United States Senate, to Scott Pruitt, Administrator, EPA, at 1, 2 (May 25, 2018), https://www.epw.senate.gov/public/_cache/files/8/e/8e31f21c-0805-4cab-aa96-2e084d6e03e5/3FCE938E06E8830762AE52C34B36D2F5.5.25.2018-letter-to-epa-on-emission-reporting-under-epcra.pdf ("Sen. Carper Letter") (submitted as Exhibit 1).

[2] *See* Exhibits 2 through 11 to Comments of Earthjustice et al. on EPA Interim Guidance (Nov. 22, 2017) ("2017 Earthjustice Comments") (submitted as Exhibit 2).

[3] *See* 2017 Earthjustice Comments, Ex. 2; Comments of Keeve E. Nachman, PhD, MHS et al. on EPA Interim Guidance (Nov. 24, 2017) ("2017 Public Health Professionals Comments") (submitted as Exhibit 3).

[4] *See* Declarations submitted in *Rural Empowerment Association for Community Help v. EPA*, No. 18-2260-TJK (D.D.C.) (submitted as Exhibit 4).

These documents show that state and local emergency response agencies found the disclosure of pollutant information from CAFOs – the very information EPA aims to exempt under the Proposed Rule – useful to further their public health and safety goals.[5] Communities across the country also commented in support of disclosure of the toxic pollutants emanating from nearby CAFOs.[6] In addition, multiple studies in the record showed that CAFOs emit large quantities of ammonia and hydrogen sulfide emissions, causing serious health impacts on

---

[5] *See* Nat'l Ass'n of Clean Air Agencies, Testimony of Catherine Fitzsimmons on behalf of the Nat'l Ass'n of Clean Air Agencies (NACAA) before the Senate Env't & Pub. Works Comm. regarding *Human Health, Water Quality and Other Impacts of the Confined Animal Feeding Operation Industry* (Sept. 6, 2007) [EPA-HQ-SFUND-2007-0469-1214], Exhibit 2 to 2017 Earthjustice Comments, Ex. 2; Comments of Att'y Gen. of Okla. (Mar. 27, 2008) [EPA-HQ-SFUND-2007-0469-0932], Exhibit 3 to 2017 Earthjustice Comments, Ex. 2; Comments of the Nat'l Ass'n of SARA Title III Program Officials (Mar. 27, 2008) [EPA-HQ-SFUND-2007-0469-0990], Exhibit 4 to 2017 Earthjustice Comments, Ex. 2; Comments of S. Coast Air Quality Mgmt. Dist. (Mar. 27, 2008) [EPA-HQ-SFUND-2007-0469-1007] , Exhibit 5 to 2017 Earthjustice Comments, Ex. 2; Comments of Kalamazoo Cty. Bd. of Comm'rs (Mar. 27, 2008) [EPA-HQ-SFUND-2007-0469-1304], Exhibit 6 to 2017 Earthjustice Comments, Ex. 2; Brittle Decl., Ex. 4.

[6] *See* Comments of Earthjustice et al. (Mar. 27, 2008) ("2008 Earthjustice Comments") (with documents submitted to docket) [EPA-HQ-SFUND-2007-0469-0758] and [EPA-HQ-SFUND-2007-0469-0531], Exhibit 7 to 2017 Earthjustice Comments, Ex. 2; Comments of Nw. Envtl. Def. Ctr. & Friends of the Columbia Gorge (Mar. 27, 2008) [EPA-HQ-SFUND-2007-0469-0927] , Exhibit 8 to 2017 Earthjustice Comments, Ex. 2; Comments of the Dairy Education Alliance et al. (with exhibits A, B, and D) (Mar. 27, 2008) [EPA-HQ-SFUND-2007-0469-1004], Exhibit 9 to 2017 Earthjustice Comments, Ex. 2; Comments of Envtl. Integrity Project (Mar. 27, 2008) [EPA-HQ-SFUND-2007-0469-0989], Exhibit 10 to 2017 Earthjustice Comments, Ex. 2; Comments of Soc'y of Envtl. Journalists (March 27, 2008) [EPA-HQ-SFUND-2007-0469-1164], Exhibit 11 to 2017 Earthjustice Comments, Ex. 2.

communities.[7]  Notably, as the record here reveals, EPA failed to consider ***any*** of this evidence when proposing this nearly identical rule ten years later.

     The undersigned organizations therefore strongly urge EPA to fully implement all statutory reporting requirements mandated by EPCRA for CAFOs, and to withdraw the unlawful, ill-conceived, and harmful Proposed Rule.

---

[7] *See, e.g.*, 2017 Public Health Professionals Comments and Exhibits thereto, Ex. 3; Ji-Qin Ni et al., Emission factors and characteristics of ammonia, hydrogen sulfide, carbon dioxide, and particulate matter at two high-rise layer hen houses, 154 Atmospheric Env't 260 (2017), https://www.sciencedirect.com/science/article/pii/S1352231017300663 (submitted as Exhibit 5); Kaiying Wang et al., The National Air Emissions Monitoring Study's southeast layer site: Part V. Hydrogen sulfide and volatile organic compounds, 59(2) Transactions of the ASABE 681 (2016), https://www.researchgate.net/publication/303148183_The_National_Air_Emissions_Monitoring_study's_southeast_layer_site_Part_V_Hydrogen_sulfide_and_volatile_organic_compounds (submitted as Exhibit 6); Carrie Hribar, Nat'l Ass'n of Local Bd. of Health, Understanding Concentrated Animal Feeding Operations & Their Impact on Communities (Mark Schultz, MEd ed. 2010), https://www.cdc.gov/nceh/ehs/docs/understanding_cafos_nalboh.pdf (submitted as Exhibit 7); Steve Wing et al., Air pollution and odor in communities near industrial swine operations, 116(10) Envtl. Health Perspectives 1362 (2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2569096/ (submitted as Exhibit 8); Fetra J. Andriamanohiarisoamananaa et al., Effects of handling parameters on hydrogen sulfide emission from stored dairy manure, 154 J. of Envtl. Mgmt. 110 (2015), https://www.sciencedirect.com/science/article/pii/S0301479715000717 (submitted as Exhibit 9) (noting manure from cattle on CAFO feeds emits more hydrogen sulfide than manure from cattle on forage diet); Peter S. Thorne et al., Concentrations of bioaerosols, odors, and hydrogen sulfide inside and downwind from two types of swine livestock operations, 6(4) J. of Occupational and Envtl. Hygiene 211 (2009), https://www.tandfonline.com/doi/abs/10.1080/15459620902729184 (submitted as Exhibit 10) (comparing emissions between confined and hoop barns for pigs in Iowa); Richard H. Grant & Matthew T. Boehm, Manure ammonia and hydrogen sulfide emissions from a western dairy storage basin, 44(1) J. of Envtl. Quality 127 (2015), https://dl.sciencesocieties.org/publications/jeq/abstracts/44/1/127 (submitted as Exhibit 11); Xiao-Rong Dai, Characteristics of pollutant gas releases from swine, dairy, beef, and layer manure, and municipal wastewater, 76 Water Research 110 (2015), https://www.sciencedirect.com/science/article/abs/pii/S0043135415001232 (submitted as Exhibit 12); Dick Heederik et al., Health effects of airborne exposures from concentrated animal feeding operations, 115(2) Envtl. Health Perspectives 298 (2007), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1817709/pdf/ehp0115-000298.pdf (submitted as Exhibit 13); Susanna G. Von Essen & Brent W. Auvermann, Health effects from breathing air near CAFOs for feeder cattle or hogs, 10(4) J. of Agromedicine 55 (2005), http://agrilifecdn.tamu.edu/envsys/files/2016/03/Von-Essen-and-Auvermann-2005.pdf (submitted as Exhibit 14); Mich. Dep't of Envtl. Quality, Concentrated animal feedlot operations (CAFOs): chemicals associated with air emissions (May 10, 2006), https://www.michigan.gov/documents/CAFOs-Chemicals_Associated_with_Air_Emissions_5-10-06_158862_7.pdf (submitted as Exhibit 15); James A. Merchant et al., Asthma and farm exposures in a cohort of rural Iowa children, 113(3) Envtl. Health Perspectives 350 (2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253764/pdf/ehp0113-000350.pdf (submitted as Exhibit 16); Susan S. Schiffman et al., Symptomatic effects of exposure to diluted air sampled from a swine confinement atmosphere on healthy human subjects, 113(5) Envtl. Health Perspectives 567 (2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1257549/pdf/ehp0113-000567.pdf (submitted as Exhibit 17); Steve Wing and Susanne Wolf, Intensive livestock operations, health, and quality of life among eastern North Carolina residents, 108(3) Envtl. Health Perspectives 233 (2000), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1637983/pdf/envhper00304-0089.pdf (submitted as Exhibit 18); Bruce Harris et al., *Ammonia Emissions Factors from Swine Finishing Operations*, from 10th Annual Emission Inventory Conference (2001), http://www.prairieswine.com/pdf/34465.pdf, submitted with 2008 Earthjustice Comments Exhibit 7 to 2017 Earthjustice Comments, Ex. 2; Nat'l Ctr. for Manure & Animal Waste Mgmt., White Paper Summaries (2001) ("White Paper Summaries"), submitted with 2008 Earthjustice Comments; Iowa State Univ. & the Univ. of Iowa Study Grp., Iowa Concentrated Animal Feeding Operations Air Quality Study (2002) ("Iowa Air Quality Study"), https://www.public-health.uiowa.edu/ehsrc/CAFOstudy/CAFO_6-3.pdf, submitted with 2008 Earthjustice

**TABLE OF CONTENTS**

I.  FACTUAL BACKGROUND ................................................................................ 8

    A.  Hydrogen Sulfide and Ammonia Emissions at CAFOs and their Public
        Health Impacts ............................................................................................ 8

    B.  Smaller Animal Feeding Operations and Ranching/Grazing Operations are
        Unlikely to Be Subject to EPCRA Reporting Requirements, Even Without
        the Proposed Rule. ...................................................................................... 9

II.  STATUTORY AND REGULATORY BACKGROUND ................................... 12

    A.  EPCRA and CERCLA ............................................................................. 12

    B.  EPA's Previous Illegal CERCLA/EPCRA Waste Emissions Exemption ............ 13

    C.  Publication of the EPCRA Exemption ..................................................... 15

    D.  The FARM Act and EPA's Revisions of Its EPCRA Exemption ......... 16

    E.  EPA's FARM Act Proposed Rule ........................................................... 17

III.  THE PROPOSED RULE IS ILLEGAL. ......................................................... 18

    A.  The Proposed Rule Violates the Plain Meaning of EPCRA, As Well As
        Congress's Clear Legislative Intent. ........................................................ 18

        1.  The Proposed Rule Violates the Plain Meaning of EPCRA's
            Reporting Requirement. ............................................................... 18

        2.  The Proposed Rule Contravenes the D.C. Circuit Opinion that EPA
            Has No Discretion to Carve Out Exemptions from EPCRA's
            "Sweeping Reporting Mandate." ................................................ 20

        3.  The Proposed Rule Contravenes Clear Statutory Language that
            CAFOs Must Still Report Under EPCRA Notwithstanding Any
            CERCLA Exemption. ................................................................. 21

---

Comments, Exhibit 7 to 2017 Earthjustice Comments, Ex. 2; EPA, Non-Water Quality Impact Estimates for Animal Feeding Operations (2002), https://www3.epa.gov/npdes/pubs/cafo_nonwaterquality.pdf, submitted with 2008 Earthjustice Comments, Exhibit 7 to 2017 Earthjustice Comments, Ex. 2; U.S. Dep't of Health & Human Servs., Agency for Toxic Substances and Disease Registry, Toxicological Profile for Hydrogen Sulfide (drft. 2006), submitted with 2008 Earthjustice Comments, Exhibit 7 to 2017 Earthjustice Comments, Ex. 2; Nat'l Research Council of the Nat'l Academies, Air Emissions from Feeding Operations: Current Knowledge, Future Needs (The National Academies Press, 2003), submitted with 2008 Earthjustice Comments, Exhibit 7 to 2017 Earthjustice Comments, Ex. 2.

a. EPCRA Requires Reporting of Releases Exempt from CERCLA Reporting When the Release Satisfies the Factual Predicates for Reporting Under CERCLA...................................22

b. EPA's Construction Renders EPCRA Section 11004(a)(2) Meaningless and Leads to Illogical Results..................................23

c. EPA's Distinction Between Exemptions for Substances and Exemptions for Methods of Emission Finds no Basis in the Law and Makes No Sense.............................................................25

4. The Proposed Rule Contravenes Clear Legislative Intent that CAFOs Must Still Report Under EPCRA Notwithstanding the FARM Act's CERCLA Exemption. ........................................27

B. The Proposed Rule is Arbitrary and Capricious ...................................29

1. EPA Arbitrarily Fails to Explain the Inconsistency Between its Newfound Understanding of EPCRA and its Previous Understanding of the Statute.................................................29

2. The Rule Arbitrarily Deprives State and Local Agencies of Critical Information with No Added Benefit to CAFOs.........................................31

3. EPA Has Arbitrarily Failed to Consider Any of the Human Health Impacts of CAFO Air Emissions. .............................................32

C. The Proposed Rule is Procedurally Unlawful..........................................34

1. EPA Failed to Conduct the Required NEPA and Environmental Justice Analyses for the Proposed Rule.....................................34

IV. EPA'S ILLEGALLY PROMULGATED EPCRA EXEMPTION CONTINUES TO BE IN FORCE. ................................................................36

CONCLUSION...................................................................................37

# I. FACTUAL BACKGROUND

## A. Hydrogen Sulfide and Ammonia Emissions at CAFOs and their Public Health Impacts

The large-scale CAFOs at issue here are nothing like the bucolic vision of a "farm" one commonly sees in advertisements or political statements.[8]  Instead, they are industrial facilities that confine vast numbers of animals in concentrated areas for eggs, dairy, or slaughter.  These facilities generate enormous quantities of urine and feces, in addition to animal carcasses.  A single large CAFO can produce more waste than an average city,[9] but unlike a city that treats its sewage at wastewater treatment plants, industrial-scale CAFOs store untreated animal feces and urine in giant pits or piles that emit ammonia and hydrogen sulfide.[10]  Ambient monitoring studies have shown that large CAFOs are often the largest sources of ammonia emissions, creating ammonia "hot spots" around them, and that these ammonia emissions contribute not only to nearby toxic impacts but to regional air quality harms.[11]  In California's Central Valley, one of the regions with the worst air quality in the nation, ammonia emissions from livestock waste are thought to be a major contributor to the region's PM2.5 concentrations.[12]  According to EPA, livestock waste is the single largest source of ammonia emissions (accounting for over 2 million tons of emissions per year) and the second largest source of hydrogen sulfide emissions (3,150 tons per year) nationwide.[13]

---

[8] *Compare, e.g.*, https://www.epa.gov/sites/production/files/2018-10/kansas2.jpg (photo of Wheeler announcing the Proposed Rule with scenic trees and a tractor in the background) (submitted as Exhibit 19) *with* Photographs of Concentrated Animal Feeding Operations (submitted as Exhibit 20) *and* images in Waterkeeper Alliance, The True Cost of Industrial Meat Production Video Playlist (2016) (nine videos), https://www.youtube.com/watch?v=pA4s0WZM4AY&list=PLfJ3gw1urripjnHhMpeJCu3BsYDvnrXOu.

[9] *See* Carrie Hribar, *supra* note 7, Ex. 7.

[10] D. Bruce Harris et al., *Ammonia Emissions Factors from Swine Finishing Operations*, from 10th Annual Emission Inventory Conference, at 1, submitted with 2008 Earthjustice Comments, Exhibit 7 to 2017 Earthjustice Comments, Ex. 2; EPA, Non-Water Quality Impact Estimates for Animal Feeding Operations, at 2-30 to 2-31, submitted with 2008 Earthjustice Comments, Exhibit 7 to 2017 Earthjustice Comments, Ex. 2.

[11] *See* Martine Van Damme et al., Industrial and Agricultural Ammonia Point Sources Exposed, 564 Nature 99 (2018), https://www.nature.com/articles/s41586-018-0747-1 (submitted as Exhibit 21) (noting "The 83 [ammonia] hotspots in the agricultural class were consistently found to be associated with intensive animal farming, either in the form of open feedlots or within enclosed housings, as identified by aerial photographs.; Universite Libre De Bruxelles, *Atmospheric Ammonia As Seen by the IASI Satellite Instrument* (last visited Dec. 13, 2018), http://www.ulb.ac.be/cpm/NH3-IASI.html (map showing ammonia emission hotspots).

[12] Brendan Borrell, *In California's Fertile Valley, Industry and Agriculture Hang Heavy in the Air*, Undark, Dec. 3, 2018, https://undark.org/article/air-pollution-california/ (submitted as Exhibit 22).

[13] *See* EPA, 2014 Nat'l Emissions Inventory (NEI) Data (last visited Dec. 13, 2018), https://www.epa.gov/air-emissions-inventories/2014-national-emissions-inventory-nei-data (accessed November 26, 2018) and Tab 3 to 2017 Public Health Professionals Comments, Ex. 3.

Chronic exposure to ammonia at levels as low as 0.7 parts per million ("ppm") may trigger decreased lung function and respiratory symptoms, and exposure at higher concentrations can lead – and has led – to scarring of the respiratory tract and even death.[14]  Numerous studies have reported ammonia concentrations of greater than 100 ppm inside CAFO facilities, with some concentrations reaching over 200 ppm.[15]  Exposure to hydrogen sulfide can similarly lead to major health problems, with exposure to even low concentrations triggering headaches, nausea, and eye, skin, and respiratory irritation.[16]  Hydrogen sulfide also targets the nervous system, and chronic low-level exposure can impair balance, visual field performance, color discrimination, hearing, memory, mood, and intellectual function.[17]  Higher levels of exposure can cause a loss of consciousness and death.[18]  People living near CAFOs show increased rates of ailments such as respiratory problems, headaches, diarrhea, and nausea.[19]  And people have become seriously ill and even died as a result of breathing fumes released during manure pit agitation, a process necessary for liquid manure storage systems.[20]

### B.    Smaller Animal Feeding Operations and Ranching/Grazing Operations are Unlikely to Be Subject to EPCRA Reporting Requirements, Even Without the Proposed Rule.

As explained further below, EPCRA requires CAFOs to report their releases of hydrogen sulfide or ammonia only if those releases meet or exceed 100 pounds per day.  *See* 40 C.F.R. pt. 355, app. A.  Only large-scale CAFOs[21] – a minority of facilities that confine a huge proportion of the country's food-producing animals – emit significant volumes of air pollutants that

---

[14] White Paper Summaries at 10, 11, submitted with 2008 Earthjustice Comments, Exhibit 7 to 2017 Earthjustice Comments, Ex. 2; Iowa Air Quality Study at 123, submitted with 2008 Earthjustice Comments, Exhibit 7 to 2017 Earthjustice Comments, Ex. 2.

[15] *Id*.

[16] U.S. Dep't of Health and Human Servs., Agency for Toxic Substances and Disease Registry, Toxicological Profile for Hydrogen Sulfide, ch. 3 at 26-53, 58-60, 62 (2006), submitted with 2008 Earthjustice Comments, Exhibit 7 to 2017 Earthjustice Comments, Ex. 2.

[17] *Id*. at 62-68.

[18] *Id*. at 22-26.

[19] *See* 2008 Earthjustice Comments at 8-9 & nn.37-41, Exhibit 7 to 2017 Earthjustice Comments, Ex. 2.

[20] *See* K.J. Donham, *Community & Occupational Health Concerns in Pork Production: A Review*, 88 J. Anim. Sci. 102, 107 (2010), https://www.gpo.gov/fdsys/pkg/USCOURTS-caDC-09-01017/pdf/USCOURTS-caDC-09-01017-1.pdf (submitted as Exhibit 23).

[21] EPA classifies CAFOs as small, medium, or large based on the number of animals the facility contains. *See* 40 C.F.R. § 122.23(b).  Thus, for example, a chicken facility that does not use a liquid manure handling system is classified as a medium CAFO if it confines between 37,500 and 124,999 chickens, and it is classified as a large CAFO if it confines over 125,000 chickens.  *See id.* § 122.23(b)(4)(x), (b)(6)(i)(J).

commonly exceed these reportable quantities.[22]  In contrast, the majority of farms are either (a) pasture or grazing operations that might not meet EPCRA's definition of "facility," *see* 42 U.S.C. § 11049(4); or (b) smaller operations that do not need to report emissions of ammonia and hydrogen sulfide under EPCRA because their emissions do not exceed the reportable quantity of 100 pounds per day.  For example:

- Approximately 59% of broiler chicken operations are not expected to emit 100 pounds or more of ammonia per day, and an even greater percentage are not expected to emit 100 pounds or more of hydrogen sulfide per day.[23]

---

[22] *See* D. Bruce Harris et al., *Ammonia Emissions Factors from Swine Finishing Operations*, from 10th Annual Emission Inventory Conference, at 1, submitted with 2008 Earthjustice Comments, Exhibit 7 to 2017 Earthjustice Comments, Ex. 2 (AFOs account for 73% of the total ammonia emissions in the U.S.); EPA, Non-Water Quality Impact Estimates for Animal Feeding Operations, at 2-30 to 2-31, submitted with 2008 Earthjustice Comments, Exhibit 7 to 2017 Earthjustice Comments, Ex. 2 (large dairy and swine AFOs emit approximately 100,000 pounds of hydrogen sulfide annually).

[23] Unless a broiler chicken operation has more than 21,000 birds, it is not expected to emit 100 pounds or more of ammonia per day, and unless it is a large CAFO with more than 3.8 million birds, it is not expected to emit 100 pounds or more of hydrogen sulfide per day.  *See* Hongwei Xin et al., *Ammonia (NH3) and Hydrogen Sulfide (H2S) Emission Rates for Poultry Operations* (2009) (the document was removed from the EPA website but an archived version is submitted as Exhibit 24).  According to the U.S. Department of Agriculture ("USDA") 2012 Census of Agriculture, 59 percent of farms with broiler chickens sold fewer than 200,000 birds, USDA, Census of Agriculture 25 (2012), https://www.agcensus.usda.gov/Publications/2012/Full_Report/Volume_1,_Chapter_1_US/st99_1_032_0 33.pdf (at Table 32, under "Broilers and other meat-type chickens," 13,524 farms sold 200,000 or more such chickens in 2012, which was 41 percent of the 32,935 farms selling such chickens in that year), which is equivalent to having fewer than 24,700 birds on an average day (assuming continuous production in 45-day production cycles, where the number of birds at any one time on average is given by 200,000 / (365 / 45) = 24,658).   The percentage of farms that had fewer than 3.8 million birds was even greater.  *Id.*

- Approximately 91 percent of swine operations with grower or finisher pigs are not expected to emit 100 pounds or more of ammonia per day, and an even greater percentage are not expected to emit 100 pounds or more of hydrogen sulfide per day.[24]

- Approximately 97 percent of dairy operations are not expected to emit 100 pounds or more of ammonia per day, and an even greater percentage are not expected to emit 100 pounds or more of hydrogen sulfide per day.[25]

---

[24] Unless a swine operation with grower or finisher pigs is a medium or large CAFO with more than 1,800 pigs, it is not expected to emit 100 pounds or more of ammonia per day, and unless it is a large CAFO with more than 9,600 pigs, it is not expected to emit 100 pounds or more of hydrogen sulfide per day. *See* EPA, *Calculation Worksheet – Ammonia and Hydrogen Sulfide Emissions: Swine Operations – Confinement with Liquid Manure Management Systems* (2009) (the document was removed from the EPA website but an archived version is submitted as Exhibit 25). The number of animals expected to emit 100 pounds of ammonia or hydrogen sulfide per day was calculated by dividing 100 pounds by the upper bound per-animal emissions constants (0.055 pounds of ammonia per animal day or 0.0104 pounds of hydrogen sulfide per animal day) given by Exhibit 25. According to the 2012 Census of Agriculture, 81 percent of farms with grower or finisher pigs had fewer than 1,000 pigs. USDA, *Census of Agriculture* 23 (2012), https://www.agcensus.usda.gov/Publications/2012/Full_Report/Volume_1,_Chapter_1_US/st99_1_024_0 27.pdf (at Table 25, under "Farrow to finish" and "Finish only," which are types of operations with grower or finisher pigs, 7,570 farms had 1,000 or more such pigs in 2012, which was 19 percent of the 40,213 farms with such pigs in that year). The percentage that had fewer than 9,600 pigs was even greater. *Id.*

[25] Unless a dairy operation is a large CAFO with more than 1,400 cows, it is not expected to emit 100 pounds or more of ammonia per day, and unless it is a large CAFO with more than 746,000 cows, it is not expected to emit 100 pounds or more of hydrogen sulfide per day. *See* EPA, *Calculation Worksheet – Ammonia and Hydrogen Sulfide Emissions: Dairy Cow Operations* (2009) (EPA removed the document from its website but an archived version is submitted as Exhibit 26). The number of animals expected to emit 100 pounds of ammonia or hydrogen sulfide per day was calculated by dividing 100 pounds by the upper bound emission rates (0.07 pounds of ammonia per animal per day or 0.000134 pounds of hydrogen sulfide per animal per day) given by Exhibit 19. According to the 2012 Census of Agriculture, 97 percent of farms with milk cows had fewer than 1,000 such cows. USDA, *Census of Agriculture* 19 (2012), https://www.agcensus.usda.gov/Publications/2012/Full_Report/Volume_1,_Chapter_1_US/st99_1_012_0 13.pdf (at Table 12, under "Milk cows," 1,807 farms with milk cows had 1,000 or more such cows in 2012, which was three percent of 64,098 farms with milk cows in that year). The percentage that had fewer than 746,000 cows was even greater. *Id.*

- Approximately 96 percent of beef operations are not expected to emit 100 pounds or more of ammonia per day.[26]

The vast majority of farms are not expected to release the reportable quantity of these toxic chemicals and thus would not need to report agricultural emissions under EPCRA. Rather, it is the larger, industrial animal feeding operations – typically those that house thousands or even millions of animals[27] – that release toxic emissions surpassing the reportable quantities of ammonia and hydrogen sulfide and that pose grave public health risks to surrounding communities. These massive industrial facilities that emit hundreds of pounds of toxic chemicals into the air every day are the facilities that EPA seeks to exempt from EPCRA's reporting requirements under the Proposed Rule.

## II.    STATUTORY AND REGULATORY BACKGROUND

### A.    EPCRA and CERCLA

EPCRA, 42 U.S.C. § 11001 *et seq*., is a federal law that ensures that local communities have adequate information about the chemical hazards that threaten them, so they can effectively plan for and respond to chemical releases – including continuous releases – and other dangerous situations. Release reporting under EPCRA also provides first responders with information critical to appropriately assess and safely respond to citizen complaints of suspicious or noxious odors, such as those emanating from CAFOs.

More specifically, EPCRA requires facilities that "release" more than a threshold quantity of an "extremely hazardous substance" to report that release to local emergency response agencies, and those reports must be made available to the public. 42 U.S.C. §§ 11004(a), 11044(a). Under EPCRA, "release" means "any spilling, leaking, pumping, pouring,

---

[26] Unless a beef operation has more than 280 cattle, it is not expected to emit 100 pounds or more of ammonia per day. *See* Rick Stowell and Rick Koelsch, *Ammonia Emissions Estimator (Daily Version)* (2009) (the document was removed from the EPA website but is submitted as Exhibit 27). The number of animals expected to emit 100 pounds of ammonia was calculated by dividing 100 pounds by the unit ammonia loss calculated with high-end values (0.35 pounds of ammonia per animal per day) given by Exhibit 27. The unit ammonia loss was calculated using values from Table 1 for "Open dirt lots (hot, arid region)" for "Beef," from Table 2 for "Composted manure (no carbon amendment)," and from Table 3 for "Beef – Finishing Cattle." According to the 2012 Census of Agriculture, 96 percent of farms with beef cattle had fewer than 200 such cattle. USDA, *Census of Agriculture* 20 (2012), https://www.agcensus.usda.gov/Publications/2012/Full_Report/Volume_1,_Chapter_1_US/st99_1_014_0 16.pdf (at Table 16, under "Cattle and calves inventory" and then under "Total," 26,072 farms had 200 or more cattle in 2012, which was four percent of the 727,906 farms with such cattle in that year.). EPA did not include a method for estimating hydrogen sulfide emissions from beef operations in the EPCRA Exemption.

[27] An egg CAFO in Tonopah, Arizona, for example, is designed to confine 5.5 million hens. Laura Gomez, *Is the Smell from Hickman's Egg Farms Harmful? West Valley Residents Will Soon Find Out*, AZ Central (Feb. 28, 2018), https://www.azcentral.com/story/news/local/southwest-valley/2018/02/28/smell-hickmans-egg-farms-west-valley-residents-tonopah-air-quality/791164001/ (submitted as Exhibit 28).

emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . of any hazardous chemical, extremely hazardous substance, or toxic chemical." *Id.* § 11049(8). The term "environment," in turn, "includes water, air, and land and the interrelationship which exists among and between water, air, and land and all living things." *Id.* § 11049(2).

Under EPCRA, EPA must publish a list of extremely hazardous substances that will be subject to this reporting requirement and must also determine, by regulation, "reportable quantities," *i.e.*, threshold quantities of releases above which a report is required. *Id.* §§ 11002(a), 11004(a)(2)(B). Ammonia and hydrogen sulfide are both on EPA's list of EPCRA "extremely hazardous substances," with reportable quantities of 100 pounds per day for each. 40 C.F.R. pt. 355, app. A.

When EPCRA requires a report, notice of the release must be given to the designated state emergency response commission ("SERC") and the emergency coordinator for the appropriate local emergency planning commission ("LEPC"). 42 U.S.C. § 11004(b). The statute also requires a written follow-up emergency notice to the SERC and the LEPC "as soon as practicable after a release." *Id.* § 11004(c). This follow-up emergency notice must be made available to the general public during normal working hours at a location specified by EPA, the state, the SERC, or the LEPC. *Id.* § 11044(a). These notices are the only federally mandated source providing information to the public about the hazardous releases from CAFOs in their communities.[28]

These EPCRA provisions are similar to provisions of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") that likewise require EPA to list "hazardous substances" with reportable quantities and require facilities to report both isolated and continuous releases. *See id.* §§ 9602, 9603(a). While EPCRA requires submission of release reports to state and local emergency response agencies, CERCLA requires submission of such reports to the federal government. *Compare id.* § 9603(a), *with id.* § 11004(b), (c). Under CERCLA, EPA lists ammonia and hydrogen sulfide as "hazardous substances" with a reportable quantity of 100 pounds per day for each, just as under EPCRA. 40 C.F.R. § 302.4(a).

**B.    EPA's Previous Illegal CERCLA/EPCRA Waste Emissions Exemption**

In 2008, in response to an industry petition, EPA adopted a final rule entitled CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances From Animal Waste at Farms, 73 Fed. Reg. 76,948 (Dec. 18, 2008) (codified at 40

---

[28] CAFOs need only provide the most basic information about their operations in the EPCRA reports. *See See* Exhibit B to Dairy Education Comments, Exhibit 9 to 2017 Earthjustice Comments, Ex. 2 (sample CAFO release report). But in most communities, these EPCRA reports are the only source available for even this basic information. The Proposed Rule thus denies rural communities important information about local polluting facilities.

C.F.R. pts. 302 & 355) ("2008 CERCLA/EPCRA Rule").[29]  The 2008 CERCLA/EPCRA Rule amended CERCLA's release reporting mandate to exempt from reporting requirements all "[r]eleases to the air of any hazardous substance from animal waste at farms."  *See* 73 Fed. Reg. at 76,960 (amending 40 C.F.R. § 302.6(e)(3)).  Together with the CERCLA exemption, EPA promulgated a partial – but not total – EPCRA exemption that still required "large CAFOs," as defined under Clean Water Act regulations, to continue to report their releases of extremely hazardous substances under EPCRA.  *Id.* at 76,953 (amending 40 C.F.R. § 355.31(g), (h)).  Notably, under EPA's understanding of EPCRA, its CERCLA exemption did not, by operation of law, create a parallel exemption from EPCRA reporting.

In 2009, many of the undersigned organizations, as well as several industrial agriculture trade associations, challenged the 2008 CERCLA/EPCRA Rule in the D.C. Circuit.  The court's April 11, 2017 opinion vacated that Rule because it "can't be justified either as a reasonable interpretation of any statutory ambiguity or implementation of a *de minimis* exception."  *Waterkeeper All.*, 853 F.3d at 537.

On July 17, 2017, EPA asked the court to stay the mandate so that the Agency could "develop guidance for farms on how to measure emissions of hazardous substances from animal waste into the air in order to report releases of the substances exceeding threshold levels in compliance with [CERCLA] and [EPCRA]."  EPA's Mot. to Stay Issuance of Mandate at 1, *Waterkeeper All. v. EPA* (D.C. Cir. July 7, 2017) (Nos. 09-1017 & 09-1104).  The court finally issued the mandate on May 2, 2018, after having granted a second extension to the issuance of the mandate.  Mandate, *Waterkeeper All. v. EPA* (D.C. Cir. May 2, 2018) (Nos. 09-1017 & 09-1104).

To comply with the mandate, on August 1, 2018, EPA published in the Federal Register a rule amending its EPCRA regulations to remove the 2008 CECLA/EPCRA Rule's regulatory provisions vacated by the D.C. Circuit.  Vacatur Response – CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances From Animal Waste at Farms; FARM Act Amendments to CERCLA Release Notification Requirements, 83 Fed. Reg. 37,444 (Aug. 1, 2018).  Unfortunately, as explained below, EPA's vacatur of the 2008 CERCLA/EPCRA Rule had no substantive effect, because in the interim, EPA had issued guidance instructing CAFOs that they do not need to report their emissions under EPCRA.

---

[29] EPA issued the 2008 CERCLA/EPCRA Rule amidst the backdrop of a 2005 agreement with thousands of CAFOs in which EPA agreed to suspend its CERCLA/EPCRA reporting enforcement while the Agency developed methodologies to estimate air emissions from CAFOs.  Animal Feeding Operations Consent Agreement and Final Order, 70 Fed. Reg. 4958 (Jan. 31, 2005).  As a recent EPA Office of Inspector General report notes, EPA represented that it would begin publishing these methodologies by 2009, but as of May 2017, EPA had still "not finalized its work plan or established timeframes to finish the methodologies."  Office of Inspector General, EPA, Report No. 17-P-0396, Improving Air Quality: Eleven Years After Agreement, EPA Has Not Developed Reliable Emission Estimation Methods to Determine Whether Animal Feeding Operations Comply With Clean Air Act and Other Statutes, at 1 (2017), Exhibit 1 to 2017 Earthjustice Comments, Ex. 2.

### C.    Publication of the EPCRA Exemption

On October 26, 2017, after the D.C. Circuit issued its ruling but before it issued the mandate, EPA published online the first version of guidance with a stated purpose "to assist farms in complying with requirements to report air releases of hazardous substances from animal waste under CERCLA and EPCRA."  EPA, *CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms* ("2017 EPCRA Exemption") (2017) (submitted as Exhibit 29).  However, the 2017 EPCRA Exemption does nothing of the sort.  Rather than helping farms comply with EPCRA, the 2017 EPCRA Exemption entirely *exempts* CAFOs from reporting hazardous air emissions under EPCRA.  Specifically, the 2017 EPCRA Exemption stated: "EPA interprets [EPCRA] to exclude farms that use substances in 'routine agricultural operations' from reporting under EPCRA section 304."  *Id*. at "Frequent Questions."  Linked to this 2017 EPCRA Exemption was a separate document entitled, "Does EPA interpret EPCRA Section 304 to require farms to report releases from animal waste?" ("2017 EPCRA Q&A").  EPA, *Does EPA interpret EPCRA Section 304 to require farms to report releases from animal waste?* (2017) ("2017 EPCRA Q&A") (submitted as Exhibit 30).  That document explained,

> As written, EPCRA section 304 requires all facilities "at which a hazardous chemical is produced, used or stored" to report releases of reportable quantities of any EPCRA Extremely Hazardous Substance and of any CERCLA hazardous substance.  Congress, however, created an exception relevant to farms.  As indicated above, EPCRA reporting turns on whether a facility produces, uses, or stores a hazardous chemical.  The term "hazardous chemical," as defined in EPCRA sections 329(5) and 311(e), does not include "any substance to the extent it is used in routine agricultural operations."
>
> Therefore, if a farm only *uses* substances in "routine agricultural operations", the farm would not be a facility that *produces, uses or stores* "hazardous chemicals," and would therefore not be within the universe of facilities which are subject to EPCRA section 304 release reporting.  Because such farms fall outside of EPCRA section 304, *they are not required to report any releases of EPCRA extremely hazardous substances or CERCLA hazardous substances, including any releases from animals or animal waste*.

2017 EPCRA Q&A (emphasis added).  Thus, under the guise of instructing CAFOs on how to comply with EPCRA, the 2017 EPCRA Exemption instead directed CAFOs *not to comply at all* with that statute.  And it did so by espousing an industry theory that EPA had consistently rejected for nearly a decade.  *See* Final Br. of Resp't at 37–38 & n.22, *Waterkeeper All. v. EPA* (D.C. Cir. Apr. 18, 2016) (Nos. 09-1017 & 09-1104), 2016 WL 1569675 (submitted as Exhibit 31) (clarifying that EPA's 2008 statement that "there is no indication that Congress meant to exclude emissions from manure from [EPCRA] reporting requirements" was a "direct response" to industry's theory that CAFOs are exempt from EPCRA reporting because of the "routine agricultural operations" provision); EPA, Resp. to Comments on 2008 CERCLA/EPCRA Rule

15 (Dec. 12, 2008) [EPA-HQ-SFUND-2007-0469-1359] (submitted as Exhibit 32). In addition, because the 2017 EPCRA Exemption would exempt *all* CAFOs from *all* EPCRA reporting, it had an even broader effect with respect to EPCRA than the illegal 2008 CERCLA/EPCRA Rule, which still required large CAFOs to disclose under EPCRA releases into the air from animal waste, and required all CAFOs to disclose releases into media other than air (*e.g.*, water) or from sources other than animal waste (*e.g.*, ammonia tanks). *See* 2008 CERCLA/EPCRA Rule, 73 Fed. Reg. at 76,948.

To make matters worse, the 2017 EPCRA Exemption went into effect immediately. *See* 2017 EPCRA Q&A, Ex. 30 ("EPA interprets the statute to exclude farms that use substances in 'routine agricultural operations' from reporting under EPCRA section 304."); 2017 EPCRA Exemption at "Frequent Questions," Ex. 29 (providing detailed instructions on how to report under CERCLA, but as to EPCRA, instructing only that "[f]arms not reporting under EPCRA should not send information to the LEPCs and SERCs."). Nevertheless, perhaps recognizing its obligation to conduct notice and comment given the legal impact of the 2017 EPCRA Exemption, EPA stated its intent "to conduct a rulemaking to clarify its interpretation of 'used in routine agricultural operations' as it pertains to EPCRA reporting requirements." 2017 EPCRA Exemption at "Frequent Questions," Ex. 29; *see also* EPA's Motion for Further Stay of Issuance of Mandate at 3, Doc. 1702059, *Waterkeeper All. v. EPA* (D.C. Cir. Oct. 30, 2017) (Nos. 09-1017 & 09-1104) (submitted as Exhibit 33) ("The preliminary guidance consists of . . . EPA's preliminary interpretation of EPCRA to exclude farms that use substances in routine agricultural operations from reporting under EPCRA section 304, until the Agency completes a rulemaking on the interpretation of 'used in routine agricultural operations' as it pertains to EPCRA reporting requirements.").

### D.    The FARM Act and EPA's Revisions of Its EPCRA Exemption

On March 23, 2018, Congress enacted the Consolidated Appropriations Act of 2018. Pub. L. No. 115-141, § 1102, 132 Stat. 348, 1148 (2018). Title XI – known as the Fair Agricultural Reporting Method Act or "FARM Act" – expressly exempts "air emissions from animal waste (including decomposing animal waste) at a farm" from reporting under CERCLA Section 103. *Id.* The FARM Act did not exempt farms from reporting under EPCRA, or otherwise make any mention of that Act. *Id.* Instead, when enacting the CERCLA exemption in the FARM Act, legislators expressly stated that EPCRA reports are still required. 115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018) (submitted as Exhibit 34) (FARM Act Co-Sponsor Senator Carper stated on the record that the Act "leaves intact reporting requirements under [EPCRA].").

Despite this, in April 2018, EPA amended its 2017 EPCRA Exemption to add an additional legal theory: because Congress exempted CAFOs from reporting under CERCLA, and because some EPCRA reporting is linked to emissions that "occur in a manner" that would require CERCLA reporting, EPA asserted that CAFOs similarly need not report under EPCRA. EPA, *CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms* (Apr. 30, 2018) ("April 2018 EPCRA Exemption") (submitted as Exhibit 35); EPA, *How does the Fair Agricultural Reporting Method (FARM) Act impact reporting of air emissions from animal waste under CERCLA Section 103 and EPCRA Section 304?* (2018) ("April 2018 FARM Act Q&A") (submitted as Exhibit 36). As with the initial 2017 EPCRA Exemption, EPA stated its plans to conduct a rulemaking on the new legal theory, yet

the Agency made the exemption effective immediately prior to providing notice or accepting and addressing public comments on it. April 2018 FARM Act Q&A, Ex. 36. EPA's revised EPCRA Exemption continued to rely on the "routine agricultural operations" theory as an additional basis to exempt CAFOs from EPCRA reporting, although EPA deleted references to a forthcoming rulemaking with regard to this theory. *See* EPA, *How do the reporting requirements in EPCRA Section 304 apply to farms engaged in "routine agricultural operations"?* (Apr. 27, 2018) ("April 2018 EPCRA Q&A") (submitted as Exhibit 37).

After EPA issued its updated EPCRA Exemption, ten members of the Senate Committee on Environment and Public Works – including two co-sponsors of the FARM Act – asked EPA to immediately rescind the EPCRA Exemption because it is "legally flawed and is based on an erroneous interpretation of the law with implications beyond reporting of releases from animal waste," and because it "exceed[s] EPA's statutory authority." Sen. Carper Letter at 1, 2, Ex. 1. The letter additionally noted that "[n]one of the hearing statements of the Committee members, witnesses, or materials entered into either the Committee record or the Congressional Record at the time of the FARM Act's passage support EPA's new interpretation of EPCRA" and that EPA's new reading of EPCRA is "[o]bviously . . . inconsistent with longstanding EPA policy." *Id.*

On September 28, 2018, some of the undersigned organizations filed a complaint in the United States District Court for the District of Columbia claiming that EPA issued the EPCRA Exemption in violation of EPCRA and the procedural rulemaking requirements of the Administrative Procedure Act. *See* Compl., *Rural Empowerment Ass'n for Cmty Help v. EPA* (D.D.C. Sept. 28, 2018) (No. 18-02260). Shortly after the complaint was filed, EPA again revised its EPCRA Exemption, this time removing the FARM Act justification as a supporting rationale for why CAFOs need not report their emissions. *See* CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms (Oct. 3, 2018) ("October 2018 EPCRA Exemption") (submitted as Exhibit 38).

### E.    EPA's FARM Act Proposed Rule

On November 14, 2018, six weeks after its unlawful guidance was challenged in court and a little over a month after removing references to the FARM Act from its EPCRA Exemption, EPA published the instant Proposed Rule in the Federal Register. The Proposed Rule largely repackages the legal theory that EPA added to, then removed from, its EPCRA Exemption: namely, that the FARM Act's amendment of CERCLA, with no mention of EPCRA, creates a parallel reporting exemption in EPCRA. *Compare* April 2018 FARM Act Q&A, Ex. 36 ("The FARM Act expressly excludes certain types of releases—air emissions from animal waste—from CERCLA reporting. Air emissions from animal waste thus do not 'occur in a manner' which would require notification under CERCLA, and thus do not meet [the third criterion of EPCRA section 304(a)(2)]; therefore, these releases fall out of the reporting requirements of EPCRA section 304."), *with* Proposed Rule, 83 Fed. Reg. at 56,793 ("Here, air emissions from animal waste at farms . . . do not 'occur[] in a manner' that would require notification under CERCLA section 103(a) and thus do not meet the third criterion of EPCRA section 304(a)(2). Because air emissions from animal waste at farms do not meet all three criteria under EPCRA section 304(a)(2), and do not fall within the EPCRA section 304(a)(1) or (a)(3) reporting scenarios, these types of releases are not subject to EPCRA reporting.").

One week after the publication of the Proposed Rule, EPA yet again revised its EPCRA Exemption, this time adding references to the Proposed Rule while removing its "routine agricultural operations" justification for the exemption.  *See* CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms (Nov. 21, 2018) ("November 2018 EPCRA Exemption"), https://www.epa.gov/epcra/cercla-and-epcra-reporting-requirements-air-releases-hazardous-substances-animal-waste-farms (submitted as Exhibit 39).  Despite setting forth no legal theory to explain why CAFOs need not comply with EPCRA reporting, the November 2018 EPCRA Exemption continues to instruct CAFOs that EPCRA reporting is not required.  *Id.*

In sum, EPA has attempted several different approaches to delay, dilute, and deny the CAFO industry's statutory obligations to report hazardous emissions.  Since the Court of Appeals for the D.C. Circuit struck down the 2008 CERCLA/EPCRA Rule as unlawful, EPA has tried to come up with a new way to exempt CAFOs from reporting requirements, issuing, amending, withdrawing, reissuing, and amending again its rationale for why CAFOs need not report toxic emissions into the air from animal waste.  Specifically, in the course of one year, EPA issued two different rationales, then withdrew each one in turn, but all the while continued to instruct CAFOs that they need not report their animal waste emissions under EPCRA.  All told, EPA has issued at least seven different versions of the EPCRA Exemption since October 2017, changing the EPCRA Exemption at a rate of about once every two months.  As discussed below, EPA's strategy of testing different theories to see what ultimately sticks while avoiding judicial review is both substantively and procedurally unlawful, and simply cannot stand.

## III.    THE PROPOSED RULE IS ILLEGAL.

### A.    The Proposed Rule Violates the Plain Meaning of EPCRA, As Well As Congress's Clear Legislative Intent.

#### 1.    The Proposed Rule Violates the Plain Meaning of EPCRA's Reporting Requirement.

Congress unambiguously mandates, through the clear language of EPCRA, reporting (1) by "facilit[ies]" of (2) any "release" of (3) an "extremely hazardous substance" that exceeds a "reportable quantity." 42 U.S.C. § 11004(a).  All components of this reporting requirement plainly apply to CAFOs.

*First*, EPCRA's expansive definition of "facility" covers "all buildings, equipment, structures, and other stationary items which are located on a single site or on contiguous or adjacent sites and which are owned or operated by the same person (or by any person which controls, is controlled by, or under common control with, such person)."  *Id.* § 11049(4); *see also United States v. Bestfoods*, 524 U.S. 51, 56 (1998) (characterizing similar definition of "facility" in CERCLA as "broad").  By definition, CAFOs can confine thousands or even millions of animals in "buildings" and "structures" on a single site or contiguous sites that are owned or operated by the same entity, and thus CAFOs meet EPCRA's definition of a "facility."  *See* 40 C.F.R. § 122.23(b) (defining "animal feeding operation" as a "lot or facility" where animals are

"stabled or confined" at least 45 days a year).  EPA does not dispute that CAFOs meet this definition.

*Second*, EPCRA defines "release" broadly to include "***any*** spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles) of any hazardous chemical, extremely hazardous substance, or toxic chemical." 42 U.S.C. § 11049(8) (emphasis added).  The term "environment," in turn, "includes water, air, and land and the interrelationship which exists among and between water, air, and land and all living things." *Id.* § 11049(2).  Emissions into the air from animal waste fall within this broad definition of "release."  EPA does not dispute that animal waste emissions would fall within this definition of "release" absent the proposed exemption.

*Third*, EPA's implementing regulations include ammonia and hydrogen sulfide in the list of extremely hazardous substances and set reportable quantities for both substances at 100 pounds per day or more.  40 C.F.R. pt. 355, app. A; *see also* 42 U.S.C. § 11002(a)(2) (directing EPA to "publish a list of extremely hazardous substances.").  Industrial CAFOs commonly release 100 pounds per day or more of one or both of these two extremely hazardous substances. EPA does not dispute that ammonia and hydrogen sulfide are extremely hazardous substances under EPCRA, or that the reportable quantity for each is 100 pounds per day or more.  Nor does it dispute that CAFOs commonly release these extremely hazardous substances in amounts that exceed the reportable quantities.[30]

In addition to defining what facilities need to report releases of which substances and when, Congress made clear that the EPCRA reporting mandate applies regardless of any duty to report hazardous releases under CECRLA.  Specifically, Congress delineated three situations that require EPCRA reporting, the second of which is wholly independent from any CERCLA reporting requirement:

- Releases of EPCRA extremely hazardous substances that "require[] a notification under" CERCLA (42 U.S.C. § 11004(a)(1));

- Releases of EPCRA extremely hazardous substances that are "***not*** subject to the notification requirements under" CERCLA but "occur[] in a manner which ***would*** require" CERCLA reporting (*Id.* § 11004(a)(2) (emphasis added)); and

- Releases of substances that "require[] notification under" CERCLA but are not listed as extremely hazardous substances under EPCRA (*Id.* § 11004(a)(3)).

Thus, because certain larger CAFOs are "facilities" that "release" a "reportable quantity" (i.e., 100 pounds or more per day) of ammonia and/or hydrogen sulfide, their releases of these extremely hazardous substances are unquestionably subject to EPCRA's "sweeping reporting mandate." *Waterkeeper All.*, 853 F.3d at 535.  And though the FARM Act exempts CAFOs from

---

[30] Indeed, by EPA's own calculations, livestock waste is the nation's number one emitter of ammonia and number two emitter of hydrogen sulfide.  *See supra* Section I.A.

reporting these releases under CERCLA, these releases fall under the EPCRA provision requiring EPCRA reporting even where reporting under CERCLA is not required, as discussed in detail below, *see infra* Section III.A.3; 42 U.S.C. § 11004(a).

> **2.    The Proposed Rule Contravenes the D.C. Circuit Opinion that EPA Has No Discretion to Carve Out Exemptions from EPCRA's "Sweeping Reporting Mandate."**

The D.C. Circuit has already definitively concluded that EPCRA's "sweeping reporting mandate" requires CAFOs to comply with statutory reporting requirements for releases. *Waterkeeper All.*, 853 F.3d at 535; *see also Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1028 (D.C. Cir. 2007) (similarly finding that release reporting applies to CAFOs). Thus, the law prohibits EPA from yet again trying to exempt CAFOs from this broad reporting requirement. *See Consumer Elec. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003) ("statutes written in broad, sweeping language should be given broad, sweeping application").

When reviewing EPA's prior attempt to exempt all but the largest CAFOs from EPCRA reporting, the D.C. Circuit concluded under *Chevron* Step One that the 2008 exemption – which was narrower than the current EPCRA Exemption – was illegal. *Waterkeeper All.*, 853 F.3d at 535. The court's Opinion concluded that the "sweeping reporting mandate[s]" of CERCLA and EPCRA contain no "language of delegation" to EPA. *Id.* EPA thus has neither the "discretion to fashion other exemptions" from the statutes' mandates, *id.* at 534, nor "carte blanche to ignore the statute[s] whenever it decides the reporting requirements aren't worth the trouble," *id.* at 535. Nor does the *de minimis* doctrine allow EPA to craft exemptions from CERCLA or EPCRA's reporting mandates because of the many benefits that stem from release reporting by CAFOs – including, for example, reporting to state and local agencies under EPCRA and providing them with information about air pollution emanating from CAFOs. *Id.* at 535–37. In short, EPA "may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Id.* at 535 (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 134 S. Ct. 2427, 2446 (2014)).

As explained further below, this same analysis applies here, and nothing in Congress's passage of the FARM Act – which expressly and intentionally amended CERCLA only while leaving EPCRA intact – changes this analysis. If anything, Congress's unambiguous intention not to amend EPCRA at the time the FARM Act was passed further emphasizes EPA's lack of authority to craft an exemption that undermines EPCRA's broad reporting requirements.

To avoid the clear rulemaking prohibition of *Waterkeeper*, EPA does logical gymnastics to mischaracterize the authority it uses to propose the current rulemaking. In doing so, EPA gravely misconstrues the law.

In the Proposed Rule, EPA recognizes that the *Waterkeeper* decision vacated the 2008 CERCLA/EPCRA Rule because EPA "could not rely on general rulemaking authority or a de minimis exception to issue an administrative reporting exemption [under EPCRA] for this category of releases." 83 Fed. Reg. at 56,795. Nevertheless, EPA argues that the administrative reporting exemption it now proposes is "not constrained by the D.C. Circuit's decision in *Waterkeeper*," because, as EPA argues, the Proposed Rule "is not an administrative reporting exemption stemming from EPA's general rulemaking authority. . . [but] is instead rooted in

EPCRA section 304 and its relationship with CERCLA section 103 and as informed by EPCRA section 304's statutory text, framework and legislative history." *Id.* at 56,795-56,796. EPA's argument is wholly untethered from the law.

An agency typically promulgates rules under a statute pursuant to "general" rulemaking authority unless a "specific grant of authority" in the statute allows the rulemaking in question. *See Boeing Co. v. United States*, 537 U.S. 437, 448 (2003). A rule that claims to interpret statutory terms is an exercise of general rulemaking authority whenever Congress has not provided the agency with the specific statutory authority to so implement the rule. *See id.*; *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 307 (2013) ("Congress has unambiguously vested the FCC with general authority to administer the Communications Act through rulemaking and adjudication, and the agency interpretation at issue was promulgated in the exercise of that authority."); *Lomont v. O'Neill*, 285 F.3d 9, 16 (D.C. Cir. 2002) (describing agency's "interpretative rulemaking power" as a "general grant" under the statute).

Contrary to EPA's assertion, EPCRA contains no specific grant of authority to EPA to conduct this particular rulemaking, and therefore, the Proposed Rule is indeed an exercise of EPA's general rulemaking authority under EPCRA. Though EPA tries to characterize its authority as stemming from "the authority of EPCRA section 304 (42 U.S.C. 11004) and the Agency's general rulemaking authority under EPCRA section 328 (42 U.S.C. 11048)," 83 Fed. Reg. at 56,791-92, no such rulemaking authority arises from these provisions. Instead, the only rulemaking authority Congress specifically provided in EPCRA section 11004 is EPA's authority to establish reportable quantities for EPCRA extremely hazardous substances, which is categorically not what the Proposed Rule does. *See* 42 U.S.C. § 11004(a)(2). And the authority vested from EPCRA section 11048 is indeed "general" rulemaking authority, as EPA itself acknowledges. *See id.* § 11048 ("[EPA] may prescribe such regulations as may be necessary to carry out [EPCRA].").

Unfortunately for EPA, the D.C. Circuit has already ruled that EPCRA's general rulemaking authority does not give EPA the power to exempt medium and small CAFOs from reporting air emissions from animal waste under EPCRA. *Waterkeeper All.*, 853 F.3d at 537–38. Surely, then, *Waterkeeper* forecloses EPA's promulgation of the Proposed Rule, which is even broader than the rule vacated in *Waterkeeper* because the instant Proposed Rule would also exempt large CAFOs from EPCRA reporting.

The Proposed Rule thus falls squarely within the prohibition of *Waterkeeper*. EPCRA contains no specific grant of authority to EPA to promulgate the Proposed Rule – and EPA cites none. The D.C. Circuit has already held that EPA has ***no*** authority to promulgate this rule, and EPA's attempt to create one out of whole cloth does not survive scrutiny.

### 3.    The Proposed Rule Contravenes Clear Statutory Language that CAFOs Must Still Report Under EPCRA Notwithstanding Any CERCLA Exemption.

EPA's attempt to shoehorn the FARM Act's amendment of CERCLA – and CERCLA only – into EPCRA violates the plain language of EPCRA, which forecloses such an interpretation. EPCRA clearly requires release reporting even in instances when CERCLA does

not.  EPA misconstrues this plain language in an effort to create a new exemption that does not exist in the statute.  EPA's interpretation fails, for three reasons: *first*, the statutory language makes clear that EPCRA reporting requirements for releases that do not require reporting under CERCLA are contingent upon the manner in which the release occurs as a matter of fact, not how the release is regulated as a matter of law; *second*, EPA's construction of "occurs in a manner which would require notification under . . . CERCLA" renders the statutory provision meaningless, and leads to illogical results; and *third*, EPA's attempt to distinguish between an exemption for a substance and an exemption for the method of emission finds no basis in the law and makes no sense.  For each and all of these reasons, EPA's interpretation cannot stand.

### a. EPCRA Requires Reporting of Releases Exempt from CERCLA Reporting When the Release Satisfies the Factual Predicates for Reporting Under CERCLA.

As explained above, the plain text of EPCRA requires the reporting of three types of releases, one of which applies to releases of EPCRA extremely hazardous substances that do not require CERCLA reporting.  42 U.S.C. § 11004(a)(2).  More specifically, Section 11004(a)(2) requires reporting of a "release of an extremely hazardous substance . . . [when] such release is ***not subject to the notification requirements*** under . . . CERCLA . . . but only if the release . . . ***occurs in a manner which would require notification*** under . . . CERCLA."  42 U.S.C. § 11004(a)(2) (emphasis added).  This language is not limited to just the legal or the factual predicates of the release, but rather applies to both.  It makes clear that even if a release need not be reported under CERCLA, that release must still be reported under EPCRA if the ***factual*** circumstances of the release would otherwise require CERCLA reporting.

An example illustrates this distinction.  As EPA has previously explained, a "'key element' of [CERCLA's] definition of 'release' is the phrase 'into the environment.'" Notification Requirements; Reportable Quantity Adjustments, 48 Fed. Reg. at 23,555 (May 24, 1983).  So

> the spill of a hazardous substance onto the concrete floor of a manufacturing facility may not, for [CERCLA] notification purposes, be 'into the environment' if wholly contained in the facility.  [But i]f part of the substance does enter the environment, e.g., seeps into the ground or volatilizes into the atmosphere, there would be a release into the environment and, if released in a quantity equal to or greater than the reportable quantity for that substance, the release would be subject to notification requirements of [CERCLA].

*Id.*  Assuming Congress exempted this hypothetical release from the reporting requirements of CERCLA but not EPCRA (thus not requiring CERCLA reporting as a legal matter), the release would be reportable under EPCRA if it "seeps into the ground or volatilizes into the atmosphere," but not if it were "wholly contained in the facility," because, factually, this latter release would not occur in a manner that would require CERCLA reporting.  *Id.*

22

The Proposed Rule itself provides another more general example where reporting of a release is not legally required under CERCLA, but the nature of the release nonetheless requires reporting under EPCRA because of the factual circumstances. EPA notes that a release of a non-CERCLA hazardous substance must still be reported under EPCRA whenever it "'occurs in a manner' that would require notification under CERCLA section 103(a), where, for example, the release is 'into the environment' as defined in CERCLA section 101(22)." 83 Fed. Reg. at 56,793. Though such a release does not legally require CERCLA reporting, the method of release, *i.e.*, into the environment, provides the factual predicate that triggers EPCRA's reporting requirement.

Thus, under EPA's own interpretation of EPCRA, CAFO releases of ammonia and hydrogen sulfide must be reported under EPCRA notwithstanding the FARM Act's legal exemption from CERCLA reporting if, as a factual matter, they are not entirely contained within the facility – which they never are – and if, as a factual matter, they are released "into the environment" – which they always are. As in the example provided by the Proposed Rule, the method of release, *i.e.*, beyond the confines of a facility and into the environment, provides the factual predicate triggering EPCRA's reporting requirement even if the release does not require reporting under CERCLA as a matter of law.

As the statutory language makes clear – and as EPA itself recognizes in the above examples –where CERCLA does not require reporting of a certain release, Congress made EPCRA reporting of that release contingent upon the manner in which a release "occurs" as a matter of fact, and not the manner in which a release is regulated as a matter of law.

### b.    EPA's Construction Renders EPCRA Section 11004(a)(2) Meaningless and Leads to Illogical Results.

The Proposed Rule misconstrues EPCRA section 11004(a)(2)'s third requirement, which requires reporting for a release that "occurs in a manner which would require notification under section 103(a) of CERCLA." 42 § 11004(a)(2)(C). EPA nonsensically misinterprets the phrase "occurs in a manner" to mean whether or not CERCLA requires reporting as a matter of law. Yet the language is not so limited.

The Proposed Rule states,

> Under CERCLA section 103 as amended [by the FARM Act], air emissions from animal waste at farms do not require notification under CERCLA section 103(a) and do not occur in a manner that would require such notification. As a result, these types of releases are not subject to reporting under EPCRA . . .
>
> . . . .
>
> Air emissions from animal waste at farms no longer "occur[] in a manner" that would require notification under CERCLA section 103(a) because the recent amendment exempted these types of releases from CERCLA reporting.

23

Proposed Rule, 83 Fed. Reg. at 56,793.  This interpretation misconstrues the statutory language of EPCRA section 11004(a)(2).  To make any sense, EPA's interpretation must equate EPCRA's phrase "occurs in a manner **which would** require notification" with "occurs in a manner **which** [**does**] require notification," effectively rewriting the statutory language.  Substituting EPA's proffered understanding of the phrase "occurs in a manner which would require notification" into the statutory language would mean EPCRA nonsensically requires reporting "when such release is not subject to notification requirements under . . . CERCLA . . . but only if the release . . . [does] require notification under . . . CERCLA."  EPA's "reading of this phrase leads to an illogical conclusion," and therefore must be rejected.  *Owens v. Republic of Sudan*, 864 F.3d 751, 774 (D.C. Cir. 2017); *see also Corley v. United States*, 556 U.S. 303, 314 (2009) (rejecting reading that "renders [a phrase] nonsensical and superfluous").

Despite EPA's creative efforts, Congress included the counterfactual "would" in its phrase "occurs in a manner which **would** require notification under [CERCLA]" rather than the term "does."  This use of the term "would" indicates that the clause is in the subjunctive mood – and not the indicative.  *See, e.g.*, *Vaden v. Discover Bank*, 556 U.S. 49, 68 n.16 (2009) (labeling statutory language "would have jurisdiction" as "the statute's subjunctive construction").  This mood is used to describe counterfactual or hypothetical scenarios, and contrasts with the indicative mood which expresses statements of fact.  *See e.g.*, *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 392 (2d Cir. 2005) ("[C]lauses envision a hypothetical or constructive (as opposed to actual) time frame . . . as evidenced, for example, by their use of the subjunctive 'would.'"); *see also District of Columbia v. Straus*, 590 F.3d 898, 901 (D.C. Cir. 2010) (describing phrase "*would have faced* an uphill burden of proving' educational harm" as "counterfactual subjunctive" language that was "speculation about what might have happened.") (emphasis original); *cf. District of Columbia v. Nahass*, 699 F. Supp. 2d 175, 183 (D.D.C. 2010) (contrasting this subjunctive language with the indicative phrase "'suffered no educational harm' . . . [which] can hardly be construed as 'speculation.'").  Thus, Congress's use of the term "would" has meaning – it plainly describes a situation in which CERCLA reporting is not required, but **would** be required but for some factual predicate or operation of law that excludes it from CERCLA's reporting requirements. It must mean something other than occurs in a manner that **does** require reporting under CERCLA.

Notably, Congress chose to use the subjunctive mood in this clause only – all other clauses of EPCRA section 11004(a) use the indicative mood.  *See, e.g.*, 42 U.S.C. § 11004(a)(2) ("If a release . . . **occurs** . . . and such release *is* not subject to the notification requirements . . . the facility *shall* immediately ***provide*** notice . . . but only if the release . . . *is* not a federally permitted release . . . *is* in an amount in excess of a quantity . . . [and] ***occurs*** in a manner which ***would require*** notification . . . .") (emphasis added).  Here, "'Congress includes particular language in one section of a statute but omits it in another,'" so we must "presume[] that Congress intended a difference in meaning" with its differential use of the subjunctive mood. *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (citation omitted).

EPA's interpretation of section 11004(a)(2)(C) forces Congress's phrase "occurs in a manner which **would** require notification under [CERCLA]" to say, instead, "occurs in a manner which [**does**] require notification under [CERCLA]."  *See* 42 U.S.C. § 11004(a)(2)(C) (emphasis added).  But that is not what Congress wrote.  Because Congress instead chose to use the

subjunctive mood here, we must understand that Congress considered the existence of the CERCLA reporting obligation to be the **counterfactual** or **hypothetical** scenario against which the manner of the release (*e.g.*, contained or not contained) is compared, and not a necessary **condition** on EPCRA reporting, as EPA would have it.

Not only does EPA's reading lead to an illogical result, but it also impermissibly requires the construction of "two entirely distinct statutory phrases . . . as containing an identical element." *Loughrin*, 573 U.S. at 358; *see also id.* (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)) ("We have often noted that when 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—this Court 'presume[s]' that Congress intended a difference in meaning."). The phrase "would require notification" plainly must mean something different from "does require notification." *Compare* 42 U.S.C. § 11004(a)(2) *with id.* §§ 11004(a)(1), 11004(3). Equally problematic, this reading would construe "entirely distinct" provisions – Section 11004(a)(2)(C) on the one hand, and Sections 11004(a)(1) and 11004(a)(3) on the other – "as containing an identical element," *Loughrin*, 573 U.S. at 358. Both Sections 11004(a)(1) and (a)(3) apply to releases "which require[] CERCLA notice," 42 U.S.C. § 11004(a), so EPA's interpretation of the EPCRA Exemption would make § 11004(a)(2) a redundant rephrasing of those two separate provisions.

Similarly problematic, EPA's reading of Section 11004(a)(2) "effectively deletes" that entire provision from the statute because it would exempt release reporting for **any** extremely hazardous substance whenever there is no parallel CERCLA reporting requirement. *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 421 (2012). That simply cannot be the case, given that § 11004(a)(2) demonstrates that Congress *does* want EPCRA reporting even in situations in which no CERCLA reporting is required. Had Congress wanted to confine EPCRA reporting only to releases that must be reported under CERCLA, it would not have included § 11004(a)(2) in EPCRA. Nor, for that matter, would Congress have directed EPA to create an entirely new list of EPCRA-specific "extremely hazardous substances" when Congress had already directed EPA to create a list of "hazardous substances" under CERCLA. *See* 42 U.S.C. §§ 9602, 11002(a). EPA cannot contravene the statutory structure of EPCRA and effectively delete § 11004(a)(2) to suit its policy ends. *See 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951) ("Congress expresses its purpose by words. It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort."); *see also Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 700 (9th Cir. 2004) ("One provision should not be interpreted in a way which is internally contradictory **or that renders other provisions of the same statute inconsistent or meaningless**.") (emphasis added) (internal quotation marks omitted); *Negonsott v. Samuels*, 507 U.S. 99 (1993) (courts must give meaning to all words of a statute); *E.E.O.C. v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742, 766 (9th Cir.2003) ("We must give meaning to all words in the statute, not just the ones that support our chosen result.").

        **c.**        **EPA's Distinction Between Exemptions for Substances and Exemptions for Methods of Emission Finds no Basis in the Law and Makes No Sense.**

To try to justify its nonsensical reading of the statute, EPA attempts to explain circumstances under its new interpretation in which "occurs in a manner which would require

notification under [CERCLA]" still means something different from the phrase "[does] require notification under [CERCLA]." Proposed Rule, 83 Fed. Reg. at 56,793. To do this, EPA reads into EPCRA an arbitrary distinction between CERCLA legal exemptions based on the **substance** emitted and CERCLA legal exemptions based on the **type of emission** (*e.g.*, into the air). EPA explains that releases of petroleum and trimethylchlorosilane – substances listed under EPCRA but not CERCLA – must still be reported under EPCRA notwithstanding the lack of any parallel requirement for CERCLA reporting because Congress exempted the **substance** released, not the **method** of release (*i.e.* the type of emission). *Id*. But according to EPA – with no explanation as to why – where a **type of emission** is excluded from CERCLA's reporting requirements but not from EPCRA's, the logic it uses for CERCLA-exempt substances somehow does not apply. Thus, even though air emissions from animal waste at CAFOs "occur[] in a manner that would require CERCLA reporting" but for the FARM Act's exemption of these releases from CERCLA, – just as releases of petroleum and trimethylchlorosilane "occur in a manner that would require CERCLA reporting" but for their exclusion from the CERCLA hazardous substance list – EPA argues that by operation of law these emissions no longer require EPCRA reporting even though emissions of petroleum and trimethylchlorosilane do. This arbitrary definition defies logic.

In an effort to justify this nonsensical distinction, EPA slices its rationale so thinly that you can see right through it: EPA creates brand new distinctions from whole cloth simply to reach its desired result, that is, ignoring Congress's text and intent so that CAFOs no longer have to comply with EPCRA's reporting mandates. But the only way that EPA's theory can hold water is if the Agency rewrites the statute – something it has no power to do. *Waterkeeper All.*, 853 F.3d at 537–38.

Indeed, EPA's new theory falls apart upon examination of its past practices. As discussed *supra*, under the 2008 CERCLA/EPCRA Rule, when EPA exempted CAFOs from reporting their emissions from animal waste under CERCLA, it did not conclude that, by operation of law, CAFOs were automatically exempted from reporting under EPCRA. Instead, it created a separate exemption under EPCRA.

EPA's theory that Congress intended a **method**-based CERCLA exemption to automatically create an EPCRA exemption only holds if EPCRA's language were that a release must be reported if it "occurs in a manner which [does] require notification under [CERCLA]" – but, as discussed *supra*, that is not what EPCRA says. Instead, Congress chose its words carefully – using "would" instead of "does" – and EPA's method versus substance distinction is left without a leg to stand on.

*******

For all of these same reasons, the Congressional Research Service ("CRS") similarly concluded the EPA's interpretation violates EPCRA. It prepared a memorandum during Congress's consideration of the FARM Act on the proper interpretation of EPCRA Section 11004(a)(2), and found that the interpretation EPA thereafter adopted was contrary to the statute, noting:

> In implementation, EPA has treated the phrase "occurs in a manner" in EPCRA Section [11004](a)(2)(C) to mean the nature of the release in terms of how a substance enters the environment, not that reporting is required under Section 103 of CERCLA.   Otherwise, Section [11004](a)(2) **would be rendered meaningless** in covering releases of extremely hazardous substances that do not require reporting as hazardous substances under CERCLA, while requiring reporting under CERCLA at the same time.

115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018) (emphasis added).

Accordingly, the statutory text leaves no doubt that Congress intended for CAFOs to report releases of hazardous materials even when there is no obligation to report the releases under CERCLA, regardless of whether the CERCLA reporting exemption is based on the substance released or the method of release.  The text of EPCRA itself precludes EPA's Proposed Rule.

<blockquote>

**4.     The Proposed Rule Contravenes Clear Legislative Intent that CAFOs Must Still Report Under EPCRA Notwithstanding the FARM Act's CERCLA Exemption.**

</blockquote>

Though one need look no further than the plain language of EPCRA to see that CAFOs must still report releases under that statute, the legislative history of the FARM Act also makes clear that Congress intended that CAFOs must still report under EPCRA notwithstanding the FARM Act's CERCLA exemption.  Numerous statements in the Congressional Record confirm this.

For example, FARM Act Co-Sponsor Senator Carper's Congressional Record statements note that the Act "leaves intact reporting requirements under [EPCRA]."  115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018).  As Senator Carper explained, EPCRA reporting is "quite different" from CERCLA reporting because "large CAFOs have been successfully reporting these releases to their State emergency response commissions and to their local emergency planning committees" under EPCRA for years, whereas CAFOs had not been reporting under CERCLA during that time.  *Id.*  The Senator "worked hard" with the FARM Act's other co-sponsors "to ensure that, at the same time we exempted farms from hazardous substance reporting requirements under . . . CERCLA, **we chose to make no changes to how extremely hazardous substances should be reported under EPCRA**."  *Id.* (emphasis added).

As noted above, the Congressional Research Service similarly finds that EPA's interpretation would "render meaningless" EPCRA's text.  *See supra* Section III.A.3.  Thus, Congress's understanding of EPCRA and its intent when passing the FARM Act was that the Act would have no effect on EPCRA reporting requirements.  If Congress wanted to provide for such an exemption, it certainly had the power and ability to do so, but instead chose to maintain the reporting requirements in place under EPCRA at the time it amended CERCLA.

Indeed, as further evidence of Congressional understanding and intent, after EPA updated its EPCRA Exemption to add the FARM Act as an additional basis for the exemption, ten

27

members of the Senate Committee on Environment and Public Works – including two co-sponsors of the FARM Act – sent a letter to EPA asking for the immediate rescission of the EPCRA Exemption because it is "legally flawed and is based on an erroneous interpretation of the law with implications beyond reporting of releases from animal waste," and because it "exceed[s] EPA's statutory authority."  Sen. Carper Letter at 1, 2, Ex. 1.  According to the letter, the EPCRA Exemption is "inconsistent with clear Congressional intent with respect to the FARM Act and its unambiguous legislative history" because "bill sponsors stated repeatedly that the language under consideration makes no changes to EPCRA reporting for farms," and "[n]one of the hearing statements of the Committee members, witnesses, or materials entered into either the Committee record or the Congressional Record at the time of the FARM Act's passage support EPA's new interpretation of EPCRA."  *Id.* at 2.  In addition, the Senators noted that EPA's newfound reading of EPCRA is "[o]bviously . . . inconsistent with longstanding EPA policy" that requires reporting of releases of the "hundreds of substances" that are designated as extremely hazardous substances under EPCRA but not CERCLA.  *Id.*

The legislative history above makes clear that Congress's amendment of CERCLA but not EPCRA was not mere happenstance, but rather was a deliberate choice to impact reporting requirements in one statute but not the other.  Though EPA claims a stated purpose of the Proposed Rule is to "maintain[] consistency between the emergency release notification requirements of EPCRA and CERCLA," 83 Fed. Reg. at 56,792, Congress deliberately decided to treat the statutes differently for purposes of reporting air emissions from animal waste, and EPA cannot supplant its regulatory intent in place of Congress's clear legislative intent.

The Proposed Rule entirely ignores these clear statements in the FARM Act's legislative history demonstrating Congress's understanding that EPCRA reporting is still required, and instead points to general congressional statements when EPCRA was passed in 1986 in an attempt to argue that the Proposed Rule's reading of EPCRA aligns with Congress's intent.  But the statements on which EPA relies hardly support its proposition and, even if they did, would not control in the face of the above legislative history that is much more recent and on point.

In support of its contorted reading of EPCRA, EPA cites a 1986 conference report that states that EPCRA section 11004(a)(2) "requires notification where there is a release of an extremely hazardous substance that would require notice under section 103(a) of CERCLA but for the fact that the substance is not specifically listed under CERCLA as requiring such notice."  *Id.* at 56,794 (quoting 99 Cong. Conf. Report H. Rep. 962, October 3, 1986; SARA Leg. Hist. 38 (Section 304 Emergency Notification)).  This statement accords with the undersigned organizations' understanding of the plain language of EPCRA: EPCRA reporting is required notwithstanding the lack of a parallel requirement to report under CERCLA.  EPA cites to no other section of the legislative history in which Congress even hints that it intended to carve out from this general proposition a rule that EPCRA reporting is somehow not required whenever the CERCLA exemption is based on the type of emission, which is telling.  After all, "Congress . . . does not, one might say, hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

EPA then cites the same 1986 conference report's statement that "[r]eleases which are continuous or frequently recurring and do not require reporting under CERCLA are not required

to be reported under [EPCRA section 304]," in support of the notion that Congress must have meant to incorporate the CERCLA's continuous release provisions through EPCRA's "occurs in a manner" language.  83 Fed. Reg. at 56,794 (quoting 99 Cong. Conf. Report H. Rep. 962, October 3, 1986; SARA Leg. Hist. 38 (Section 304 Emergency Notification)).  But contrary to EPA's suggestion, Congress does not reference the "occurs in a manner" language at all in its discussion of continuous releases, and nothing in the conference report suggests that the "occurs in a manner" language is the portal through which CERCLA's continuous release provisions apply to EPCRA.

Thus, the 1986 conference report's general propositions about EPCRA do nothing to support the Proposed Rule's thinly-sliced interpretation of the statute.  But even if it did, Congress's more recent statements that the FARM Act "makes no changes to EPCRA reporting for farms" must control.  Sen. Carper Letter at 2, Ex. 1.

## B.  The Proposed Rule is Arbitrary and Capricious

### 1.  EPA Arbitrarily Fails to Explain the Inconsistency Between its Newfound Understanding of EPCRA and its Previous Understanding of the Statute.

The Proposed Rule marks a drastic departure from EPA's prior interpretation of EPCRA, yet EPA fails to recognize that it is changing positions, let alone to adequately explain why it feels compelled to do so.  This failure renders the Proposed Rule arbitrary, capricious, and illegal.

It has long been held that "[a]n agency's view . . . may change . . . . But an agency changing its course must supply a reasoned analysis."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983).  This requirement

> would ordinarily demand that [the agency] display awareness that it is changing position.  An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.  And of course the agency must show that there are good reasons for the new policy.

*F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (internal citations omitted).  Similarly, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *Id.* at 516.  An "'[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice,'" and therefore unlawful.  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs*., 545 U.S. 967, 981 (2005)).

EPA's current rulemaking flouts these fundamental principles.  In the Proposed Rule, EPA espouses new interpretations of the EPCRA phrases "occurs in a manner" that the Agency has rejected before.  Notably, in the 2008 CERCLA/EPCRA Rule, EPA continued to require large CAFOs to report releases into the air under EPCRA notwithstanding the fact that that Rule

exempted those same CAFOs from reporting under CERCLA.  In other words, exemption under CERCLA did not, by operation of law, lead to a parallel exemption under EPCRA.  Instead, EPA created inconsistent reporting requirements under the two statutes.  This is in stark contrast to its position now, where it argues that the statutory scheme does not permit any inconsistency between the two statutes.   Indeed, if EPA were to apply its current rationale to the 2008 CERCLA/EPCRA Rule, it would be forced to declare its own rulemaking unlawful.

Moreover, until now, EPA has treated the phrase "occurs in a manner that would require reporting" as meaning something different than "requires reporting."  For example, EPA has entered into numerous consent agreements and final orders against violators of the EPCRA reporting requirement, and these orders state that EPCRA requires reporting of a "release [that] require[d], or occurred in a manner that would require, notice under . . . CERCLA."  *In re Noveon Kalama, Inc*., EPCRA-10-2006-0268, 2006 WL 4093152, at \*1 (EPA Region X May 19, 2006) (emphasis added); *see also In re Lang Ice Co.*, CERCLA-05-2006-0006, 2005 WL 4755401, at \*2 (EPA Region V Nov. 7, 2005); *In re Wash. Fruit & Produce Co.*, EPCRA-10-2003-0105, 2003 WL 22891299, at \*1 (EPA Region X Sept. 10, 2003); *In re Rainbow Glacier, Inc.*, EPCRA-10-2003-0109, 2003 WL 23413789, at \*1 (EPA Region X Oct. 8, 2003).  These consent agreements show that EPA's understanding has traditionally been that to "occur in a manner which would require" CERCLA reporting has a different meaning than simply "requiring" CERCLA reporting.  *See Loughrins*, 573 U.S. at 357 (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013) ("[The] ordinary use [of the term "or"] is almost always disjunctive, that is, the words it connects are to be given separate meanings.").  EPA's current interpretation would render these agreements nonsensical.

EPA fails to acknowledge that the Agency is making an about-face in its position, and it fails to supply the necessary "reasoned analysis" for why such a change in position is necessary.  *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 57.  Contrary to governing law, EPA illegally leaves its inconsistency entirely "[u]nexplained."  *See Encino Motorcars*, 136 S. Ct. at 2126.

In an effort to mask the inconsistencies between the Proposed Rule and EPA's most recent and most directly relevant rulemaking – the 2008 CERCLA/EPCRA Rule – EPA relies on previous, general EPCRA rulemakings of decades past in an attempt to show consistency with EPA's current interpretation of EPCRA.  *See* 83 Fed. Reg. at 56,794 (discussing Extremely Hazardous Substances List and Threshold Planning Quantities; Emergency Planning and Release Notification Requirements, 52 Fed. Reg. 13378, 13,381, 13,384-85 (Apr. 22, 1987) and its Response to Comments document at 22; Reportable Quantity Adjustment—Radionuclides, 54 Fed. Reg. 22,543 (May 24, 1989); Reporting Continuous Releases of Hazardous Substances, 55 Fed. Reg. 30,166, 30,179 (July 24, 1990)).  This effort fails, because these prior rules contain the same logical flaws as EPA's current interpretation.  All of these prior rulemakings impermissibly read EPCRA section 11004(a)(2) out of the statute either by equating EPCRA's "subject to notification" language with its "occurs in a manner which would require notification" language or by reading the subjunctive "would require" as an affirmative "does require."  *See, e.g.,* 55 Fed. Reg. at 30,179 ("To the extent that releases are continuous . . . they do not occur in a manner *that requires* notification under CERCLA . . . .") (emphasis added).  As discussed *supra*, this is not the proper test.  Moreover, unlike the CAFO exemption at issue here, these prior rulemakings did not have clear, recent legislative history indicating an unambiguous congressional intent to

afford different treatment to the reporting requirements of these releases under CERCLA and EPCRA. For these reasons, EPA's reliance on these prior rules is sorely misplaced.[31]

### 2. The Rule Arbitrarily Deprives State and Local Agencies of Critical Information with No Added Benefit to CAFOs.

The Proposed Rule is "arbitrary, capricious, [and] an abuse of discretion," in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), because it arbitrarily denies state and local emergency response agencies and communities important release information about extremely hazardous substances while sparing CAFOs a minimal reporting burden.

EPA's decision to deny public health information to state and local emergency response agencies is particularly egregious given the critical information these reports provide to the very entities best equipped to respond to potentially lethal emission events at CAFOs. State and local regulatory and response agencies find this disclosure useful because it enables them to better perform their jobs and accomplish their goals.[32] Indeed, state health officials instructed residents near a Minnesota dairy CAFO to avoid excessive hydrogen sulfide emissions from the CAFO – emissions that were more than 200 times the levels that are considered safe.[33] The emissions were so nauseating that "neighbors [were] throw[ing] up in their driveways."[34]

Under the Proposed Rule, local emergency response agencies are denied critical information not only about continuous releases of harmful toxins, but also about spikes in such releases from activities such as pit agitation – a process through which "hydrogen sulfide, methane, and ammonia 'are rapidly released from the manure and may reach toxic levels or displace oxygen, increasing the risk to humans and livestock,'" leading to illness and even death. *See, e.g.*, *Waterkeeper All.*, 853 F.3d at 536 (quoting 2008 CERCLA/EPCRA Rule, 73 Fed. Reg. at 76,957).

Moreover, by instructing CAFOs that they need not report their toxic releases to SERCs or LEPCs – thereby also depriving the public of these data, *see* 42 U.S.C. § 11033(a) – the

---

[31] Notably, EPA also points to a response to comments in its 1987 rulemaking, where EPA stated that, "for release reporting purposes under [EPCRA] Section 304, the four CERCLA release exclusions will apply because releases are reportable under Section 304 only if the release *is or would be* reportable under CERCLA Section 103." EPA, Responses to Comments on the Interim Final Rule and Notice of Proposed Rulemaking on Superfund Amendments and Reauthorization Act of 1986 (SARA) Sections 302, 304 (Apr. 1987) [EPA-HQ-OLEM-2018-0318-0016] (submitted as Exhibit 40) (emphasis added). In this response, EPA itself recognizes the distinction between "is required" and "would be required," even if it fails to see that distinction in the Proposed Rule.

[32] *See supra* note 5 (listing comments from state and local agencies in opposition to the 2008 CERCLA/EPCRA Rule's reporting exemption).

[33] Assoc. Press, Residents near stinky Thief River Falls feedlot evacuate, June 9, 2008, https://www.twincities.com/2008/06/09/residents-near-stinky-thief-river-falls-feedlot-evacuate/ (submitted as Exhibit 41).

[34] *Id.*

Proposed Rule denies the communities that live among CAFOs and amidst their daily harmful emissions this basic public health information, which the communities find valuable.[35]

In exchange for denying communities and local governments these substantial benefits, the Proposed Rule does not provide any real benefit. As noted above, only the largest CAFOs must report under EPCRA because the vast majority of animal operations are too small to emit above 100 pounds per day of ammonia or hydrogen sulfide. *See supra* Section I.B. The remaining large CAFOs that must report need only comply with simple, non-burdensome reporting requirements. And considering that CAFOs have been required to report their emissions under EPCRA for years – the 2008 CERCLA/EPCRA Rule did not exempt large CAFOs from reporting under EPCRA – there is no reasonable argument that continued compliance by CAFOs is sufficiently burdensome to warrant the elimination of the public health benefits that come from these release reports.

It is entirely arbitrary for EPA to ignore the very real benefits to public health and safety from EPCRA reporting all to save the largest CAFOs from a few minutes of paperwork.

### 3.    EPA Has Arbitrarily Failed to Consider Any of the Human Health Impacts of CAFO Air Emissions.

As noted above, according to EPA's own estimates, livestock waste is the largest source of airborne ammonia emissions in the country, and the second largest source of hydrogen sulfide emissions, causing chronic respiratory problems, decreased quality of life, and even death to members of rural communities. Astonishingly, the Proposed Rule makes no mention of any of these impacts, and instead paints its EPCRA exemption as a mere legal formality with no environmental or public health consequences. This omission renders the Proposed Rule arbitrary and capricious.

Individuals who live near CAFOs suffer from headaches and sinus and respiratory ailments, *see, e.g.*, Exhibit 4 (Declaration of S. Dye ¶ 10, Declaration of L. Inzerillo ¶ 9, Declaration of R. Partridge ¶ 5; Declaration of L. Proper ¶ 7; Declaration of L. Trom ¶ 18), and even know family friends who have died from emissions when working at CAFOs, *id.* (Declaration of R. Partridge ¶ 11). If the public had access to information from EPCRA reports, either directly from their local emergency response agency or through advocacy organizations, they would use this information to take measures to protect their health and quality of life. *See, e.g.*, *id.* (Declaration of D. Hall ¶ 13; Declaration of C. Cook ¶ 13; Declaration of D. Durkis ¶¶ 6, 11, 13; Declaration of S. Dye ¶ 12; Declaration of R. Hudkins ¶¶ 13; Declaration of L. Inzerillo ¶¶ 11-14; Declaration of J. Jolin ¶¶ 20-28; Declaration of C. Parke ¶¶ 8-14; Declaration of R. Partridge ¶¶ 13-18; Declaration of L. Proper ¶¶ 11-12, 15; Declaration of L. Trom ¶¶ 26-32; Declaration of M. Wilson ¶¶ 10-13).

Indeed, exposure to ammonia, regardless of its source, triggers respiratory problems,

---

[35] *See supra* note 6 (listing comments from environmental groups and community members).

causes nasal and eye irritation, and in extreme circumstances can lead to scarring of the respiratory tract or even death.[36]  And even small concentrations of hydrogen sulfide can trigger headaches, nausea, and eye, skin, and respiratory irritation.[37]  Hydrogen sulfide also targets the nervous system, and chronic low-level exposure can impair balance, visual field performance, color discrimination, hearing, memory, mood, and intellectual function.[38]  Higher levels of exposure can cause a loss of consciousness and possibly death.[39]

An agency "must examine the relevant data and articulate a satisfactory explanation for its action" whenever it engages in rulemaking.  *Motor Vehicle Mfrs. Ass'n of U.S.,* 463 U.S. at 43.  "Normally, an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency. . . ."  *Id.*

Here, EPA has plainly failed to consider not just "an important aspect of the problem" but the entire problem itself by failing to even mention the human health impacts or remedial purpose of EPCRA.  Nor does the rulemaking docket contain any scientific study or other information concerning CAFO air emissions or their impact on health and the environment.  For all the failings of the 2008 CERCLA/EPCRA Rule, EPA did at least recognize the health and safety impacts of CAFO air emissions and included various relevant studies in the rulemaking docket.  *See, e.g.*, 2008 CERCLA/EPCRA Rule, 73 Fed. Reg. at 76,957 (citing study which noted that "when pits are agitated for pumping, some or all of these gases are rapidly released from the manure and may reach toxic levels or displace oxygen, increasing the risk to humans and livestock.").

The fact that the Proposed Rule ignores the multitude of scientific studies that show detrimental impacts of CAFO air emissions does not mean that those studies do not exist or that they are irrelevant to the current rulemaking.  Comments submitted in response to EPA's 2008 CERCLA/EPCRA Rule,[40] and the 2017 EPCRA Exemption,[41] submitted here, show clear public health and environmental impacts from the millions of tons of ammonia and thousands of tons of hydrogen sulfide emitted annually by CAFOs across the country.  *See also supra* n.7 (listing discussing health harms from CAFOs).  EPA cannot just pretend that these data do not exist or

---

[36] White Paper Summaries at 10, 11, submitted with 2008 Earthjustice Comments, Exhibit 7 to 2017 Earthjustice Comments, Ex. 2; Iowa Air Quality Study at 123, submitted with 2008 Earthjustice Comments, Exhibit 7 to 2017 Earthjustice Comments, Ex. 2.

[37] U.S. Dep't of Health & Human Servs., Agency for Toxic Substances and Disease Registry, Toxicological Profile for Hydrogen Sulfide (2006), ch. 3 at 26–53, 58–60, 62, submitted with 2008 Earthjustice Comments, Exhibit 7 to 2017 Earthjustice Comments, Ex. 2.

[38] *Id*. at 62–68.

[39] *Id*. at 22–26.

[40] *See supra* note 2.

[41] *See supra* note 3.

that they have no impact on the Proposed Rule.  Rather, EPA's total failure to consider these detrimental impacts in the Proposed Rule renders the rule arbitrary, capricious, and illegal.[42]

### C.    The Proposed Rule is Procedurally Unlawful.

#### 1.    EPA Failed to Conduct the Required NEPA and Environmental Justice Analyses for the Proposed Rule.

Finally, EPA's Proposed Rule is illegal because it fails to conduct the environmental impact, environmental health, and environmental justice analyses required by federal law.

The National Environmental Policy Act ("NEPA") requires "agencies take a ''hard look' at environmental consequences' of their action.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).  EPA's implementing regulations make clear that NEPA applies to EPA's "development and issuance of regulations."  40 C.F.R. § 6.101(a); *see also id.* § 1508.18(b)(1) (listing "[a]doption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act" as a "federal action" for the purposes of NEPA).  EPA's regulations instruct that, in the case of rulemaking action, a draft NEPA environmental impact statement should be issued together with the proposed rule.  *See* 40 C.F.R. § 1502.5(d).

In addition to NEPA, Executive Order 12898 requires EPA to identify and address, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority and low-income populations. Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7,629 (Feb. 16, 1994).  Executive Order 13045, meanwhile, requires EPA to evaluate the environmental health and safety risks of proposed rules on children and explain why the proposed rule is preferable to other effective and reasonably feasible alternatives.  Protection of Children From Environmental Health Risks and Safety, 62 Fed. Reg. 19,885 (Apr. 21, 1997).

EPA provided no NEPA document with its issuance of the Proposed Rule and the Proposed Rule itself does not even acknowledge the Agency's NEPA obligations.  As to the necessary environmental health and justice analyses under the executive orders, EPA claims those are not required under the faulty premise that the Proposed Rule "does not pose an environmental health risk or safety risk" or "does not establish an environmental health or safety standard."  Proposed Rule, 83 Fed. Reg. at 56,796.  Nothing could be further from the truth. Indeed, the Proposed Rule impacts environmental and public health and safety in a number of ways.

*First*, EPA has already determined that releases of more than 100 pounds per day of ammonia or hydrogen sulfide meet CERCLA's standard of a release which "may present substantial danger to the public health or welfare or the environment," 42 U.S.C. § 9602(a), and

---

[42] Over 140 individuals and groups, including the undersigned, submitted a letter to EPA on November 21, 2018, seeking to extend the Proposed Rule's comment period, in part, for more time to address the stark lack of any scientific studies in the rulemaking docket.  In a letter dated December 4, 2018, EPA denied this request.

EPA incorporated this same 100 pound per day standard for these two substances under EPCRA, *see* 40 C.F.R. pt. 355, app. A. EPA has expressly recognized that "public health or welfare or environmental damages may occur under [a] higher [reportable quantity] that would not have occurred under [a] lower [reportable quantity]." EPA, *Regulatory Impact Analysis of Reportable Quantity Adjustments Under Sections 102 and 103 of the Comprehensive Environmental Response, Compensation, and Liability Act*, Vol. 1 (Mar. 1985), at 34, Docket ID No. EPA-HQ-SFUND-2007-0469-0013-2 (submitted as Exhibit 42). Thus, a lower reportable quantity encourages releasers to clean up smaller releases that might not otherwise be cleaned up if a releaser need only report under a higher reportable quantity. *Id*. By exempting CAFOs from reporting their air emissions from animal waste, the Proposed Rule eliminates the existing reportable quantity for ammonia and hydrogen sulfide emitted as waste decomposes. In doing so, EPA creates public health, welfare, and environmental damages at the same time it eliminates the primary driver of release mitigation. Given the harmful environmental impacts, NEPA requires EPA to submit an environmental impact statement analyzing the impact of its Proposed Rule. EPA failed to do so here.

*Second*, these reports benefit members of the public by notifying them of hazardous releases and making it possible to track and avoid such releases. As EPA has recognized, the public uses release reports "to become aware of the releases that have occurred in their communities and throughout the nation and to learn of actions, if any, that are being taken to protect public health and welfare and the environment." EPA, Renewal of Information Collection Request for Notification of Episodic Releases of Oil and Hazardous Substances, ICR No. 1049.10, at 3 (May 13, 2004) (submitted as Exhibit 43). Indeed, communities have discovered major sources of air pollution through CAFO release reporting.[43] These release reports "would allow the [citizens] to take whatever precautionary steps necessary to protect themselves from the ammonia releases." *Sierra Club v. Tyson Foods*, 299 F. Supp. 2d 693, 705 (W.D. Ky. 2003).

*Third*, local and state emergency response agencies may use these reports to take actions to prevent environmental harms and hazardous emissions from CAFOs.[44]

*Finally*, evidence shows a clear disparate impact of CAFO air emissions on low-income communities and communities of color. For example, studies in Mississippi and North Carolina find that pig CAFOs are disproportionately located in low-income areas and areas with nonwhite

---

[43] *See* Dairy Education Comments at 7–8 & n.17, and Ex. B thereto, Exhibit 9 to 2017 Earthjustice Comments, Ex. 2 (noting that after a threat of a citizen suit one Washington State dairy reported ammonia releases of between 344,000 and 688,000 pounds per year within a mile of an elementary school); NEDC Comments, Exhibit 8 to 2017 Earthjustice Comments, Ex. 2 (noting that release reports reveal an Oregon AFO to be the third highest source of ammonia emissions in the country).

[44] *See* supra note 5.

populations.[45]  Similarly, schools with larger percentages of nonwhite students and students receiving subsidized lunches were more likely to be located near a CAFO than other schools.[46]

EPA must not shirk its responsibilities to conduct mandatory NEPA, environmental health, and environmental justice analyses by falsely claiming that the Proposed Rule has no impacts on environmental health or safety.  *See e.g.*, *Del. Riverkeeper Network v. F.E.R.C.*, 753 F.3d 1304, 1310 (D.C. Cir. 2014).  For these reasons and all the reasons noted above, promulgation of the Proposed Rule would be illegal, so EPA must withdraw the Proposed Rule immediately.

## IV.   EPA'S ILLEGALLY PROMULGATED EPCRA EXEMPTION CONTINUES TO BE IN FORCE.

While EPA has amended its online EPCRA Exemption webpage to note that it has published the Proposed Rule, that same webpage continues to illegally instruct CAFOs not to submit release reports under EPCRA.  *See* November 2018 EPCRA Exemption, Ex. 39.  This EPCRA Exemption is illegal not only for the same substantive reasons as the Proposed Rule, as explained above, but also because the EPCRA Exemption (as articulated on EPA's website) and its instruction that CAFOs need not report their toxic emissions from animal waste was promulgated entirely outside of the required APA process.  EPA's effort to change the law by posting instructions on its website impermissibly subverts the procedural protections imposed by the APA and simply cannot stand.

The EPCRA Exemption is a "legislative-type rule" that "affect[s] individual rights and obligations" and has the "force and effect of law," *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) (quoting *Morton v. Ruiz*, 415 U.S. 199, 232 (1974)), so it requires promulgation under the APA notice-and-comment procedure.  This APA procedure requires agencies to publish "[g]eneral notice of proposed rule making . . . in the Federal Register" and this notice "shall include— (1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b).  After the required publication of the notice, (4) "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  *Id*. § 553(c).  In addition, (5) "[a]n agency must consider and respond to significant comments received during the period for public comment."  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015).  Then, (6) after it

---

[45] *See* S. Wing et al., Environmental injustice in North Carolina's hog industry, 108 Envtl. Health Perspectives 225 (2000), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1637958/pdf/envhper00304-0081.pdf (submitted as Exhibit 44); Sacoby M. Wilson et al., Environmental injustice and the Mississippi hog industry, 110 Envtl. Health Perspectives 195 (2002), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241163/pdf/ehp110s-000195.pdf (submitted as Exhibit 45).

[46] *See* Maria C. Mirabelli et al., Race, Poverty, and Potential Exposure of Middle-School Students to Air Emissions from Confined Swine Feeding Operations, 114 Envtl. Health Perspectives 691 (2006), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1440786/pdf/ehp0114-000591.pdf (submitted as Exhibit 46).

considers "the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." *Id.* And finally, (7) in most circumstances, the required publication of the final rule "shall be made not less than 30 days before its effective date." 5 U.S.C. § 553(d).

EPA failed to comply with ***all*** of these APA requirements when it promulgated the EPCRA Exemption: EPA simply posted the EPCRA Exemption on its website without the required bare minimum of public notice, public comment, or public involvement mandated for agency rulemaking. Indeed, EPA recognized the procedural insufficiency of the EPCRA Exemption in the Exemption's own supporting documents, which themselves indicate the Agency's intent to conduct formal rulemaking for the very same legal theories EPA was already advancing in the EPCRA Exemption posted to its website. *See* FARM Act Q&A; EPCRA Q&A.

The mere fact that EPA has now commenced an EPA notice-and-comment process with the Proposed Rule does not cure the EPCRA Exemption's procedural flaws. The EPCRA Exemption changed the legal status quo without going through proper procedures. And it remains in effect because EPA's webpage continues to instruct CAFOs not to report their emissions of ammonia or hydrogen sulfide. *See* November 2018 EPCRA Exemption. But now that EPA has removed from its website both supporting documents that previously set forth a legal rationale for the exemption, the current EPCRA Exemption is simply an assertion without support – not that the support previously provided excused EPA's procedural violations. To the extent that EPA intends the EPCRA Exemption to adopt the legal reasoning of the Proposed Rule by its mere reference to the Proposed Rule, that legal reasoning is infirm and illegal for all the reasons described above. The EPCRA Exemption has no substantive leg to stand on, is procedurally flawed, and must be rescinded immediately.

## CONCLUSION

For over a decade, communities across the country have been fighting for basic information about toxic releases from CAFOs to which they are entitled by statute. Over a year ago, the D.C. Circuit affirmed that EPA has no authority to exempt CAFOs from these reporting requirements. Earlier this year, Congress reaffirmed that CAFOs must continue to report their toxic releases under EPCRA. EPA's latest attempt to keep information about CAFO emissions secret flies in the face of the mandates of Congress and the D.C. Circuit, and are motivated entirely by political interests.[47] The Proposed Rule and the parallel EPCRA Exemption currently in force are both illegal, and must be done away with immediately.

---

[47] *See, e.g.*, Eric Lipton, *Scott Pruitt Met With Lobbyist Whose Wife Rented Him a $50-a-Night Condo*, N.Y. Times, Apr. 21, 2018, https://www.nytimes.com/2018/04/21/climate/pruitt-hart-condo-epa-lobbying.html (submitted as Exhibit 47) (noting that registered lobbyist J. Steven Hard lobbied EPA on behalf of Smithfield Foods, the world's largest pork processor and hog producer, during the same time period that his wife rented below-market apartment to then-EPA Administrator Scott Pruitt).

The undersigned therefore strongly urge that EPA withdraw its illegal and irremediable Proposed Rule and rescind the similarly illegal EPCRA Exemption at once.

Sincerely,

Carrie Apfel
Earthjustice
1625 Massachusetts Avenue, NW, Suite 702
Washington, DC  20036
202-797-4310
capfel@earthjustice.org

Jonathan J. Smith
Peter Lehner
Earthjustice48 Wall Street, 15th Floor
New York, NY 10005
212-845-7379
jjsmith@earthjustice.org


*On behalf of itself, Animal Legal Defense Fund, Association of Irritated Residents, CATA – The Farmworkers Support Committee, Center for Food Safety, Don't Waste Arizona, Environmental Integrity Project, Farm Aid, Food & Water Watch, Friends of the Earth U.S., Humane Society of the United States, Northern Plains Resource Council, Public Justice, Sierra Club, Sound Rivers, Waterkeeper Alliance, and Western Organization of Resource Councils*

# EXHIBIT 3

# Emergency Release Notification Requirements for Animal Waste Air Emissions under the Emergency Planning and Community Right-to-Know Act (EPCRA)

# Technical Background Document

**October 2023**

U.S. Environmental Protection Agency (EPA)
Office of Land and Emergency Management (OLEM)
Office of Emergency Management (OEM)
1200 Pennsylvania Avenue, NW
Washington, DC 20460 USA

# Table of Contents

**Executive Summary** ........................................................................................................ vi

Summary of the Potential Rulemaking ............................................................................ vi
Animal Operations Affected by a Potential Rulemaking .............................................. vi
Summary of Costs and Benefits....................................................................................... viii

**Chapter 1: Introduction** ................................................................................................ 1

1.1. Background ................................................................................................................ 1
1.2. Regulatory and Legal Background ........................................................................ 2
1.3. Statutory Authority and Need for Action............................................................. 3
1.4. Organization of this Report.................................................................................... 3

**Chapter 2: Universe of Potentially Regulated Facilities**..................................... 4

2.1. Estimating Total Number of Animal Operations in the United States .............. 4
2.2. Ammonia and Hydrogen Sulfide Emission Factors............................................. 5
    2.2.1.   Cattle and Calves ...................................................................................... 5
    2.2.2.   Poultry Operations .................................................................................... 7
    2.2.3.   Hogs and Pigs ............................................................................................ 8
    2.2.4.   Sheep ........................................................................................................... 9
    2.2.5.   Summary of Emission Factors by Animal Category ............................. 9
2.3. Estimating Animal Operations that Meet or Exceed the RQ ............................ 10
2.4. Assessing RQ Adjustments...................................................................................... 12

**Chapter 3: Cost Analysis** ............................................................................................... 14

3.1. Labor Rates ............................................................................................................... 15
3.2. Rule Familiarization and Determining Applicability of a Potential Rulemaking............ 16
    3.2.1.   Emissions Calculator for Applicability Determination......................... 17
    3.2.2.   Rule Familiarization for Non-Reporting Farms..................................... 18
3.3. Continuous Release Reporting Requirements ...................................................... 20
    3.3.1.   Initial Continuous Release Notification to the SERC (or TERC) and LEPC (or TEPC)  20
    3.3.2.   Initial Written Report to SERC (or TERC) and LEPC (or TEPC) ........................ 20
    3.3.3.   Notification of a Statistically Significant Increase (SSI) or a New Release.......... 23
    3.3.4.   Total Cost for Reporting Operations....................................................... 24
3.4. State, Local, and Tribal Government Costs .......................................................... 25
3.5. Total Cost of the Potential Rulemaking................................................................. 25

**Chapter 4: Benefits** ......................................................................................................... 27

**Chapter 5: Small Entities Potentially Affected by the Action** .............................. 29

5.1. Definition of Small Entity........................................................................................ 29
5.2. Potentially Affected Small Entities......................................................................... 29
5.3. Cost-to-Sales Test ..................................................................................................... 36
5.4. Conclusion ................................................................................................................. 37

**Chapter 6: Assessment of Effects on Communities with Environmental Justice Concerns  38**

   6.1.  County-Level Analysis .................................................................. 39

   6.2.  Tribal-Level Analysis ................................................................... 45

   6.3.  Census Block Group-Level Analysis of Select States ...................... 51

**Chapter 7: References** ........................................................................ **67**

**Appendix A – USDA 2017 Census of Agriculture Data** ........................ **69**

**Appendix B – Animal Waste Health Impacts Literature Review** ........... **73**

**Appendix C – Summary of EPCRA Literature Search and Review Activities for Beef and Turkey Animal Feeding Operations** ........................................................ **95**

**Appendix D – EPA Animal Feeding Operation (AFO) Air Emissions Calculator** ............. **99**

**Appendix E – Emissions Modeling for Low-End Cutoffs** ...................... **108**

# List of Tables and Figures

Table ES-1. Number of Farms Potentially Subject to Reporting under EPCRA Section 304...... vii

Table ES-2. Number of Farms Exceeding 100 lb/day RQ for Ammonia, by CAFO Size .......... vii

Table ES-3. Total Annualized Cost of a Potential Rulemaking (2022$)................................... viii

Table ES-4. Total Cost by Year (undiscounted) (2022$) ......................................................... viii

Table 2-1. Total Operations with Animal Inventory ................................................................... 5

Table 2-2. Ammonia and Hydrogen Sulfide Emission Factors .................................................. 10

Table 2-3. Farm Universe Potentially Subject to Reporting........................................................ 11

Table 2-4. Number of Farms Exceeding 100 lb/day RQ for Ammonia, by CAFO Size ............. 11

Table 2-5. Farm Universe Potentially Subject to Reporting under Different RQ Thresholds...... 12

Table 2-6. Farm Universe Potentially Subject to Reporting, by CAFO Size and RQ Threshold. 12

Table 3-1. Labor Category Occupations ..................................................................................... 15

Table 3-2. Average Hourly Labor Rates, by Industry and Occupation (2022$)......................... 15

Table 3-3. Average Hourly Labor Rates, State and Local Government Workers (2022$) .......... 16

Table 3-4. Labor Burden and Unit Cost per Farm for Rule Familiarization and Applicability
Determination ............................................................................................................................ 17

Table 3-5. Number of Operations below Preliminary Applicability Cutoffs ............................... 19

Table 3-6. Total Rule Familiarization Cost for Reporting and Non-Reporting Operations ........ 19

Table 3-7. Unit Burden and Cost for Initial Continuous Release Notification per Farm ............ 20

Table 3-8. Unit Burden and Labor Cost for Initial Written Report per Farm.............................. 22

Table 3-9. O&M Costs per Farm - Initial Report (2022$)........................................................... 22

Table 3-10. Estimated Unit Burden and Labor Cost for SSI or New Release Report per Farm .. 23

Table 3-11. Total Reporting Cost (undiscounted, by year) (2022$)............................................ 24

Table 3-12. Total Annualized Reporting Cost (2022$) .............................................................. 24

Table 3-13. SERC (or TERC) and LEPC (or TEPC) Unit Burden and Cost per Reporting
Activity ..................................................................................................................................... 25

Table 3-14. Total Government Cost ........................................................................................... 25

Table 3-15. Total Annualized Cost of a Potential Rulemaking .................................................. 26

Table 5-1. Potentially Affected Farm Sectors and Corresponding NAICS Industries ................ 29

Table 5-2. NAICS Codes, Industry Descriptions, and Small Business Size Standards for Affected
Entities ...................................................................................................................................... 30

Table 5-3. Operations that Meet SBA Small Entity Criteria and Average Revenue per Entity ... 30

Table 5-4. Number of SBA Small Operations Potentially Subject to Reporting......................... 33

Table 5-5. Average Revenue for SBA Small Operations Subject to Reporting ........................... 36

Table 5-6. Average Cost per Affected SBA Small Operation ..................................................... 37

Table 6-1. National Summary of Counties with Animal Operations and Those Not Reporting
Heads, 2017............................................................................................................................... 38

Table 6-2. Contribution Factors of Ammonia for each Animal Sector ....................................... 39

Table 6-3. County-Level Daily Ammonia Emissions by Quintile ................................................ 43

Table 6-4. Top 10 Counties in Daily Ammonia Emissions ........................................................ 43

Table 6-5. Counties With Farms Exceeding the RQ and the Percentage of Total Counties ........ 45

Table 6-6. Ammonia Emission Factors Used in the Tribal-Level Analysis .................................. 47

Table 6-7. Top Ten Reservations for Estimated Daily Ammonia Emissions................................. 47

Table 6-8. Select Reservations Ranked by Ammonia Emissions (lb) per Square Mile ............... 49

Table 6-9. Description of State-Level Data Sources ................................................................. 51

Table 6-10. Percent of Population in BGs, Counties, and BGs with Farms ................................. 52

Table 6-11. Ammonia Emissions Applied per Animal Head ....................................................... 53

Table 6-12. Indiana's Top Emitting BGs as Potential EJ Communities ...................................... 56

Table 6-13. Indiana's 20 BGs with the Largest Estimated Ammonia Emissions ........................ 56

Table 6-14. Iowa's Top Emitting BGs as Potential EJ Communities .......................................... 57

Table 6-15. Iowa's 20 BGs with the Largest Estimated Ammonia Emissions ............................ 58

Table 6-16. Michigan's Top Emitting BGs as Potential EJ Communities.................................... 58

Table 6-17. Michigan's 20 BGs with the Largest Estimated Ammonia Emissions .................... 59

Table 6-18. Minnesota's Top Emitting BGs as Potential EJ Communities .................................. 60

Table 6-25. Minnesota's 20 BGs with the Largest Estimated Ammonia Emissions.................... 60

Table 6-20. North Carolina's Top Emitting BGs as Potential EJ Communities .......................... 62

Table 6-21. North Carolina's BGs with the Largest Estimated Ammonia Emissions ................. 62

Table 6-22. Percent of BGs that are Potential Minority and Low-Income Communities, based on
Joint Race and Income Criteria.................................................................................................. 65


Figure 6-1. National Daily Ammonia Emissions from Select Animal Operations with EJ
Considerations........................................................................................................................... 41

Figure 6-2. County-Level Estimated Daily Ammonia Emissions on Tribal Lands*.................... 46

Figure 6-3. Tribal-Level Estimated Daily Ammonia Emissions per Square Mile from 73 Select
Reservations.............................................................................................................................. 48

Figure 6-4. Zoomed in Section of North Carolina's Southeast Region, Comparing Thresholds . 64

Figure 6-5. Percent of BGs that Meet Joint Criteria, by Animal Operation Status ..................... 65

# List of Acronyms

| | |
|---|---|
| BLS | Bureau of Labor Statistics |
| CAFO | Concentrated Animal Feeding Operation |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act |
| CRRR | Continuous Release Reporting Regulations |
| D.C. | District of Columbia |
| EPA | Environmental Protection Agency |
| EPCRA | Emergency Planning and Community Right-to-Know Act |
| EHS | Extremely hazardous substance |
| HS | Hazardous substance |
| $H_2S$ | Hydrogen Sulfide |
| LEPC | Local Emergency Planning Committee |
| NAEMS | National Air Emissions Monitoring Study |
| NASS | National Agricultural Statistics Service |
| $NH_3$ | Ammonia |
| NRC | National Response Center |
| O&M | Operations and maintenance |
| OEWS | Occupational Employment and Wage Statistics |
| OMB | Office of Management and Budget |
| RQ | Reportable Quantity |
| SARA | Superfund Amendments and Reauthorization Act |
| SERC | State Emergency Response Commission |
| SSI | Statistically significant increase |
| TEPC | Tribal Emergency Planning Committee |
| TERC | Tribal Emergency Response Commission |
| U.S. | United States |
| USDA | U.S. Department of Agriculture |

# Executive Summary

The reporting of animal waste air emissions from farms has been subject to a complex history of EPA regulatory actions, subsequent legal challenges, and Congressional legislation. Animal waste can generate potentially harmful air emissions of ammonia and hydrogen sulfide which are listed as hazardous substances (HSs) under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and as extremely hazardous substances (EHSs) under the Emergency Planning and Community Right-to-Know Act (EPCRA).

## Summary of the Potential Rulemaking

The EPA is considering a potential rulemaking to amend the emergency release notification regulations under EPCRA to reinstate the reporting for air emissions from animal waste at farms. Reinstatement would require the rescission of a prior Agency final rule, entitled "Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act" 84 FR 27533 (June 13, 2019). If EPCRA reporting is reinstated, farms with air emission above the Reportable Quantity (RQ) for ammonia and hydrogen sulfide would need to report to their state, tribal, and/or local agencies, however, reporting farms may qualify for reduced reporting requirements under existing EPCRA 304 regulations for releases that are continuous and stable in quantity and rate (i.e., "continuous releases"). Under the EPCRA Continuous Release Reporting Regulations (CRRR) codified at 40 CFR 355.32, facilities are required to report only the following to their State Emergency Response Commission (SERC) or Tribal Emergency Response Commission (TERC) and Local Emergency Planning Committee (LEPC) or Tribal Local Emergency Planning Committee (TEPC):

- Initial telephone notification,

- Initial 30-day written notification,

- Notification of any increase in the quantity of the hazardous substance being released during any 24-hour period, which represents a statistically significant increase (SSI), and

- Notification of a new release, which is a change in source or composition of the release.

A first anniversary written report is not required under EPCRA section 304.

## Animal Operations Affected by a Potential Rulemaking

EPA estimated the per-farm and total burden for farms estimated to meet or exceed a Reportable Quantity (RQ) threshold of 100 lb/day for ammonia and hydrogen sulfide emissions. Table ES-1 presents the universe of farms potentially subject to a rulemaking. The number of farms was obtained from the 2017 USDA Census of Agriculture data (hereafter referred to as the 2017 USDA Census) of farm operations by head-count size for the following animal categories: Beef Pasture, Confined Dairy Operations, Beef Feedlots, Swine Finishing (>55lb), Swine (All Other), Turkeys, Sheep, Poultry Layers, and Poultry Broilers (see Section 2, Universe of Regulated Facilities, for additional detail).

Using the 2017 USDA Census data and the emission threshold for each category (i.e., the number of heads needed to meet or exceed the 100 lb/day RQ for ammonia and hydrogen sulfide), EPA estimated that 37,891 farms could be subject to reporting. This is approximately 3 percent of the 1.25 million total farms with animal operations. The poultry broilers category contributes the largest share of farms by a wide margin, accounting for 36 percent of the 37,891 affected farms. Note that the 3,551 farms estimated to exceed the RQ for hydrogen sulfide are a subset of the 37,891 farms estimated to exceed the RQ for ammonia, and thus, are not considered additional farms subject to reporting.

**Table ES-1. Number of Farms Potentially Subject to Reporting under EPCRA Section 304**

| Animal Category | All Farms | Contribution Factors and Head Thresholds | | | | Farms Subject to Reporting (exceed RQ) | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Ammonia | | Hydrogen Sulfide | | | |
| | | Contribution Factor (lb/head/day) | No. Animals for 100 lb RQ | Contribution Factor (lb/head/day) | No. Animals for 100 lb RQ | Ammonia | Hydrogen Sulfide |
| Beef Pasture | 729,046 | 0.0348 | 2,874 | n/a | n/a | 176 | 0 |
| Confined Dairy | 54,599 | 0.4160 | 240 | 0.0395 | 2,532 | 6,777 | 707 |
| Beef Feedlots | 25,776 | 0.1070 | 935 | n/a | n/a | 1,581 | 0 |
| Swine Finishing | 21,032 | 0.1460 | 685 | n//a | n/a | 6,402 | 0 |
| Swine, Other | 45,407 | 0.2270 | 441 | 0.0752 | 1,330 | 5,175 | 2,843 |
| Sheep or Lambs | 101,387 | 0.0348 | 2,874 | n/a | n/a | 236 | 0 |
| Turkeys | 11,154 | 0.0032 | 30,960 | n/a | n/a | 946 | 0 |
| Poultry Layers | 232,500 | 0.0088 | 11,364 | n/a | n/a | 3,016 | 0 |
| Poultry Broilers | 32,751 | 0.0033 | 30,211 | n/a | n/a | 13,583 | 0 |
| **Total** | **1,253,652** | | | | | **37,891** | **3,551** |

EPA also estimated the number of farms by Concentrated Animal Feeding Operation (CAFO) size. CAFO size definitions are based on EPA's regulatory definitions of large, medium, and small CAFOs.[1] Table ES-2 presents the estimated number of farms by CAFO size. EPA estimated that 2,999 of the 37,891 reporting farms are small CAFOs, approximately 9,500 are medium CAFOs, and the remaining 25,400 are large CAFOs. Of the 2,999 small CAFOs, more than 2,100 are in the Swine (All Other) category.

**Table ES-2. Number of Farms Exceeding 100 lb/day RQ for Ammonia, by CAFO Size**

| Animal Operation Type | Small | Medium | Large | Total |
| --- | --- | --- | --- | --- |
| Beef Pasture | 0 | 0 | 176 | 176 |

---

[1] U.S. Environmental Protection Agency, 2015. Regulatory Definitions of Large CAFOs, Medium CAFO, and Small CAFOs. Available at https://www.epa.gov/sites/default/files/2015-08/documents/sector_table.pdf

| Animal Operation Type | Small | Medium | Large | Total |
|---|---|---|---|---|
| Confined Dairy Operations | 751 | 4,073 | 1,953 | 6,777 |
| Beef Feedlots | 0 | 236 | 1,345 | 1,581 |
| Swine Finish (Only >55lb) | 88 | 2,067 | 4,246 | 6,402 |
| Swine (All Other) | 2,153 | 1,498 | 1,524 | 5,175 |
| Sheep or lambs | 8 | 171 | 58 | 236 |
| Turkeys | 0 | 0 | 946 | 946 |
| Poultry Layers | 0 | 1,440 | 1,575 | 3,016 |
| Poultry Broilers | 0 | 0 | 13,583 | 13,583 |
| **Total, Reporting Farms** | **2,999** | **9,485** | **25,407** | **37,891** |

## Summary of Costs and Benefits

The Agency prepared this Technical Background Document (TBD) to assess the costs and benefits of a potential rulemaking.

Table ES-3 presents the total annualized cost of a potential rulemaking, combining costs for reporting operations and government costs over a 10-year analysis period. The total cost of a potential rulemaking is estimated at approximately $2.9 or $2.8 million using three and seven percent discount rates, respectively.

**Table ES-3. Total Annualized Cost of a Potential Rulemaking (2022$)**

| Compliance Requirement | 3% Discount Rate | | | 7% Discount Rate | | |
|---|---|---|---|---|---|---|
| | Animal Operations | State, Local, Tribal Gov't | Total | Animal Operations | State, Local, Tribal Gov't | Total |
| **Rule Familiarization and Applicability Determination** | $422,291 | $0 | $422,291 | $406,504 | $0 | $406,504 |
| **Reporting** | | | | | | |
| Initial Notification | $270,929 | $245,902 | $516,831 | $260,801 | $236,709 | $497,510 |
| Initial Written Report | $1,218,925 | $491,803 | $1,710,729 | $1,173,358 | $473,418 | $1,646,776 |
| Reporting an SSI or New Release | $145,734 | $95,731 | $241,465 | $117,388 | $77,111 | $194,499 |
| **Total Annualized Cost** | **$2,057,880** | **$833,436** | **$2,891,315** | **$1,958,052** | **$787,238** | **$2,745,289** |

Table ES-4 summarizes the total undiscounted cost of a potential rulemaking, by year. For reporting farms, first-year costs are $16.8 million, and total first-year costs for SERCs/TERCs and LEPCs/TEPCs is $6.5 million. Costs in years 2 through 10 of the analysis are significantly lower, at approximately $0.1 million per year for both sets of affected entities. These estimates are based on the assumption that 100 percent of farms will be able and willing to report under the continuous emissions procedures. To the extent that this is not the case, the costs will be underestimated for years 2 through 10.

**Table ES-4. Total Cost by Year (undiscounted) (2022$)**

| Compliance Requirement | Animal Operations | | State, Local, Tribal Gov't | |
|---|---|---|---|---|
| | First Year | Years 2 – 10 | First Year | Years 2 – 10 |
| **Rule Familiarization and Applicability Determination** | $3,710,295 | $0 | $0 | $0 |

| Compliance Requirement | Animal Operations | | State, Local, Tribal Gov't | |
|---|---|---|---|---|
| | First Year | Years 2 – 10 | First Year | Years 2 – 10 |
| **CRRR Reporting** | | | | |
| *Labor Costs* | *$11,782,802* | *$164,451* | *$6,481,555* | *$108,026* |
| Initial Notification | $1,073,190 | $0 | $2,160,518 | $0 |
| Initial Written Report | $10,709,612 | $0 | $4,321,037 | $0 |
| Reporting an SSI | $0 | $164,451 | $0 | $108,026 |
| *O&M Costs* | *$1,307,223* | *$0* | *$0* | *$0* |
| Initial Notification | $0 | $0 | $0 | $0 |
| Initial Written Report | $1,307,223 | $0 | $0 | $0 |
| Reporting an SSI or New Release | $0 | $0 | $0 | $0 |
| **Total Cost** | **$16,800,321** | **$164,451** | **$6,481,555** | **$108,026** |

The Agency also estimated the burden and cost for small farms. The Agency used sales data from the 2017 USDA Census in the affected NAICS codes, along with SBA-specified small business thresholds within the set of potentially affected operations. EPA combined these data with the affected universe data to estimate the subset of reporting farms that meet SBA criteria for small entities. EPA estimates that 31,921 out of the 37,891 reporting operations (84 percent) are small operations. EPA performed a cost-to-sales test for these entities and found that none of the affected operations would experience costs greater than one or three percent of annual sales.

The benefits of a potential rulemaking to reinstate the reporting requirements for animal waste air emissions under EPCRA include improved understanding, awareness, and decision making related to the provision and distribution of information. The information shared with SERCs/TERCs and LEPCs/TEPCs could enable the public to make more informed decisions on where to live and work, strengthen the public's ability to adequately protect themselves from potential harm, and provide a greater capacity for meaningful involvement in the development and implementation of local pollution management policies.

Availability of information could be useful in advancing the Agency's environmental justice goals by increasing the availability of information on air emissions from animal waste in or near communities with environmental justice concerns. This information could also lead to voluntary initiatives by farms to modify animal waste management processes and set goals for reductions in emissions. This analysis does not attempt to estimate the costs or benefits associated with such actions.

# Chapter 1:  Introduction

The U.S. Environmental Protection Agency (EPA or the Agency) is considering a rulemaking to amend the emergency release notification regulations under EPCRA to reinstate the reporting requirements for animal waste air emissions at farms. Reinstatement would require the EPA to rescind a prior Agency final rule, entitled "Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act" 84 FR 27533 (June 13, 2019).

The Agency prepared this Technical Background Document (TBD) to assess the costs and benefits of a potential rulemaking.

## 1.1. Background

EPA is considering amending the emergency release notification regulations under EPCRA to reinstate the reporting of animal waste air emissions at farms by rescinding a prior Agency final rule.[2] The reporting of animal waste air emissions from farms has been subject to a complex history of EPA regulatory exemption actions, subsequent legal challenges, and Congressional legislation. Animal waste can generate potentially harmful air emissions of ammonia and hydrogen sulfide, which are listed as hazardous substances (HSs) under CERCLA and as extremely hazardous substances (EHSs) under EPCRA.

CERCLA and EPCRA are separate but interrelated environmental statutes that work together to provide notification of qualifying releases of HSs and EHSs to the appropriate government authorities. In general, CERCLA section 103 provides for notice to federal officials, whereas EPCRA 304 provides for notice to state, tribal and local officials. CERCLA section 103 requires the person in charge of a vessel or facility to immediately notify the National Response Center (NRC) when there is a release of a HS, as defined under CERCLA section 101(14), in an amount equal to or greater than the reportable quantity (RQ) for that substance within a 24-hour period. These requirements are codified in the CERCLA regulations at 40 CFR part 302. In addition to these CERCLA reporting requirements, EPCRA 304 requires owners or operators of certain facilities to immediately notify state, tribal, and local authorities when there is a release of an EHS, as defined under EPCRA section 302, or of a CERCLA hazardous substance in an amount equal to or greater than the RQ for that substance within a 24-hour period. These requirements are codified in the EPCRA regulations at 40 CFR part 355 subpart C.

Notice under EPCRA is given to the State or Tribal Emergency Response Commission (SERC or TERC) for any state or tribal area likely to be affected by the release and to the community emergency coordinator for the Local or Tribal Emergency Planning Committee (LEPC or TEPC) for any area likely to be affected by the release so that state, tribal and local authorities have information to help protect the community. As stated in the title of the statute, EPCRA also has

---

[2] The previous final rule was entitled "Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act" 84 FR 27533 (June 13, 2019).

an important community right-to-know component that provides for public availability of release notifications pursuant to EPCRA section 324.

Under the EPCRA continuous release reporting regulations codified at 40 CFR 355.32, facilities, with qualifying releases, are required to report only the following to their SERC or TERC and LEPC or TEPC:

- Initial telephone notification,

- Initial 30-day written notification, and,

- Notification of any increase in the quantity of the hazardous substance being released during any 24-hour period, which represents a statistically significant increase (SSI), and

- Notification of a new release, which is a change in source or composition of the release.

A first anniversary written report is not required under EPCRA 304.

## 1.2. Regulatory and Legal Background

In December 2008, EPA published a final rule that exempted all farms from reporting air emissions from animal waste under CERCLA and exempted small and medium Concentrated Animal Feeding Operation (CAFOs) from reporting such emissions under EPCRA.[3] See 73 FR 76948 (Dec. 18, 2008). Large CAFOs with emissions meeting or exceeding an RQ were still required to report under EPCRA and would have the option of using the continuous release reporting option if the release qualified. EPA intended the rulemaking to reduce the burden of reporting on farms and emergency response agencies.

In April 2017, the 2008 rule was vacated by the Circuit Court of Appeals for the District of Columbia (D.C.) as arbitrary and capricious. See *Waterkeeper Alliance, et al. v. EPA*, 853 F.3d 527 (D.C. Cir. 2017). In its decision, the court acknowledged the potential health risks of some animal waste emissions and found that reporting could be useful to local and state authorities who may need to investigate or respond to these releases. The effect of the court's vacatur was to reinstate reporting requirements for air emissions from animal waste at all farms under CERCLA and EPCRA. The court did, however, delay the effective date of its ruling until May 2, 2018, to grant EPA time to develop guidance to assist farms with meeting their reporting obligations.

On March 23, 2018, the Consolidated Appropriations Act, 2018 ("Omnibus Bill") was signed into law. Title XI of the Omnibus Bill is entitled the "Fair Agricultural Reporting Method Act" or the "FARM Act." See Fair Agricultural Reporting Method Act, Public Law 115–141, sections 1101–1103 (2018). The FARM Act expressly exempts reporting of air emissions from animal waste (including decomposing animal waste) at a farm from CERCLA section 103. As a result, in August 2018, the Agency published a final rule to amend the CERCLA regulations at 40 CFR part 302 by adding the reporting exemption for air emissions from animal waste at farms and adding definitions of "animal waste" and "farm" from the FARM Act. See 83 FR 37444 (August

---

[3] See EPA (2015) for a table of CAFO sizes.

1, 2018). The FARM Act had the effect of exempting all farms from reporting air emissions from animal waste under CERCLA.

EPA proposed a rule on November 14, 2018, to exempt all farms from reporting air emissions from animal waste under EPCRA. See 83 FR 56791 (Nov. 14, 2018). EPA finalized the rule to promulgate the EPCRA exemption on June 13, 2019. See 84 FR 27533 (June 13, 2019) (the June 2019 EPCRA Rule). On July 9, 2019, several environmental groups amended an existing complaint to challenge the final rule in the U.S. District Court for D.C. *See REACH v. EPA*, No. 1:18-CV-02260 (Sept. 28, 2018) (the *REACH* case).

On January 20, 2021, E.O. 13990 directed federal agencies to "immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with these important national objectives, and to immediately commence work to confront the climate crisis." Upon completion of this review, EPA moved to remand the June 2019 EPCRA Rule. The district court granted the remand on February 14, 2022 "without vacatur," meaning the EPCRA exemption for farms remains in place while EPA reconsiders the rule.

## 1.3. Statutory Authority and Need for Action

A potential rulemaking would be conducted under EPCRA, which was enacted as Title III of the Superfund Amendments and Reauthorization Act (SARA) of 1986 (Pub. L. 99–499). EPA would conduct a potential rulemaking under the authority of EPCRA 304 (42 U.S.C. 11004) and the Agency's general authority under EPCRA section 328 (42 U.S.C. 11048).

## 1.4. Organization of this Report

This TBD quantifies and monetizes the costs of a potential rulemaking and includes a qualitative analysis of a potential rulemaking's benefits. The remainder of this TBD is organized as follows:

- Chapter 2 presents the universe of potentially regulated animal operations.
- Chapter 3 presents the Agency's estimates of burden and cost.
- Chapter 4 discusses the benefits of a potential rulemaking.
- Chapter 5 presents the Agency's assessment of affected small AFOs.
- Chapter 6 presents the Agency's assessment of the environmental justice implications of a potential rulemaking.

This analysis relies on a variety of secondary data sources and other assumptions to estimate the burden and cost of a potential rulemaking. At the end of each section below, EPA highlights the key data and other assumptions on which EPA is seeking comment.

# Chapter 2:    Universe of Potentially Regulated Facilities

This chapter presents the universe of agricultural operations EPA estimates meet or exceed the RQs of 100 lb/day for air releases of ammonia and hydrogen sulfide. EPA estimates the universe of facilities using the following steps, which are detailed in Sections 2.1, 2.2, and 2.3.

1. **Estimate the number of animal operations** nationally, and their animal inventory (hereafter referred as inventory), using the U.S. Department of Agriculture's 2017 Census of Agriculture (hereafter referred to as the USDA Census) (U.S. Department of Agriculture 2022). These data provide a size distribution of animal operations based on inventory, which allows EPA to estimate the numbers of operations with inventory that meets or exceeds the RQ.

2. **Obtain emission factors** from National Air Emissions Monitoring Study (NAEMS)[4] for ammonia and hydrogen sulfide and estimate the inventory threshold that meets or exceeds the RQ by animal species.

3. **Estimate the number of animal operations that meet or exceed the daily RQ threshold** by combining the above data to estimate the average farm inventory and daily emissions for each animal and operation size category.

---

**Key Data Inputs and Other Assumptions**

- The U.S. Department of Agriculture's 2017 Census of Agriculture's animal operation and their inventory are the data used to establish the baseline universe.

- EPA assumes a static baseline of affected farms for simplicity, but requests comment on that assumption and whether an alternative assumption would be preferable.

- The analysis uses NAEMS for estimated emission from animal feeding operations (AFO) by animal species (raising pigs, broiler chickens, egg-laying operations, and dairies). NAEMS monitored barns and lagoons at 25 AFOs in 10 states over two years to measure emissions of ammonia, hydrogen sulfide, particulate matter, and volatile organic compounds.

---

## 2.1. Estimating Total Number of Animal Operations in the United States

Table 2-1 presents the number of operations nationally, obtained from the 2017 USDA Census, with inventory of the following commodity categories: Beef Pasture, Confined Dairy Operations, Beef Feedlots, Swine Finishing (>55lb), Swine (All Other), Turkeys, Sheep, Poultry Layers, and Poultry Broilers (USDA 2022). There are 1.25 million total animal operations with inventory of the above commodities.[5]

The 2017 USDA Census provides publicly available data on the number of operations with inventory and the total inventory of each commodity. Each commodity is broken down into brackets based on size. For example, the number of operations and total inventory for swine is provided for the following inventory size ranges: *Total; 1–24; 25–49; 50–99; 100–199; 200–*

---

[4] For more information on NAEMS, see EPA's website: https://www.epa.gov/afos-air/national-air-emissions-monitoring-study
[5] Operations with no reported heads are excluded from the analysis.

*499; 500–999; 1,000–2,499; 2,500–4,999; and, 5,000 or more.*[6] The size distribution data allows for a more precise estimate of the number of operations expected to exceed the RQ (i.e., relative to a single average size for each animal category).

**Table 2-1. Total Operations with Animal Inventory**

| Animal Category | Operations |
|---|---|
| Beef Pasture | 729,046 |
| Confined Dairy Operations | 54,599 |
| Beef Feedlots | 25,776 |
| Swine Finishing | 21,032 |
| Swine (All Other) | 45,407 |
| Sheep or Lambs | 101,387 |
| Turkeys | 11,154 |
| Poultry Layers | 232,500 |
| Poultry Broilers | 32,751 |
| **Total** | **1,253,652** |

Source: USDA (2022)

---

**Key Data Inputs and Other Assumptions**

- EPA used the best data available for this analysis; however, the USDA data do not differentiate operations by confinement or manure management practices. For example,
  - Farm operations data do not include pastured dairy. Emissions from pastured dairy are likely different emissions from confinement-based dairy.
  - Farm operations data do not distinguish feedlot sheep and lambs from grazing sheep and lambs, where again, the emissions may be different.
  - Farm operations data do not distinguish types of layer operations, such as high-rise houses, manure belts, cage-free, etc., which can have different emissions.
- Operations with no reported heads are excluded from the analysis.

---

## 2.2. Ammonia and Hydrogen Sulfide Emission Factors

EPA analyzed monitoring data gathered during NAEMS for maximum daily emission rates of ammonia and hydrogen sulfide from various animal species to estimate the minimum number of animals that could produce emissions that meet or exceed the RQ under a potential rule. EPA supplemented these rates with emission factors gathered from the literature for other animal species to derive conservative estimates of the number of animals that could produce waste emitting ammonia and hydrogen sulfide meeting or exceeding the RQs for ammonia and hydrogen sulfide air releases from animal waste at farms.

### 2.2.1. Cattle and Calves

Three major types of farms were analyzed for the Cattle and Calves category – confined dairy operations, beef feedlots, and beef cattle on pasture.

---

[6] The Census of Agriculture data is presented in *Appendix A – Census of Agriculture Data.*

***Confined Dairy Operations.*** EPA analyzed barn emissions data from NAEMS and selected data, from a Holstein dairy farm in Yakima County, Washington ("WA5B") that housed cows in naturally vented, free stall barns with access to corrals/exercise pens. The maximum daily ammonia emissions rate from this dataset was 0.416 lb/head/day and the maximum daily hydrogen sulfide emissions rate was 0.0395 lb/head/day.[7] Using these emission rates, 240 dairy cows would be needed to release ammonia at the 100 lb/day RQ, and 2,532 dairy cows would be needed to release hydrogen sulfide at the 100 lb/day RQ.

***Beef Feedlots.*** Beef feedlot emissions were not monitored during NAEMS. Therefore, a conservative ammonia emissions factor from the literature, 0.107 lb/head/day, was used for the estimate.[8] Estimates of hydrogen sulfide emissions are not available but are not expected to result in reportable quantities of the substance because typical manure handling systems at feedlots minimize anaerobic conditions, which generate hydrogen sulfide. Using the ammonia emission rate from literature, 935 cattle would be needed to release ammonia at the 100 lb/day RQ.

***Beef Cattle on Pasture.*** Pasture-based cattle emissions were not monitored during NAEMS. Therefore, a conservative ammonia emissions factor from the literature, 0.0348 lb/head/day, was used for the estimate.[9] Estimates of hydrogen sulfide emissions are not available but are not expected to result in reportable quantities of the substance because manure deposition in pastures minimizes anaerobic conditions which generate hydrogen sulfide. Using the ammonia emission rate from literature, 2,874 cows would be needed to release ammonia at the 100 lb/day RQ.

Research is ongoing to assess the quality of the above emission factor assumptions (i.e., 0.416, 0.107, and 0.0348, for confined, feedlots, and pasture, respectively). Appendix C of this TBD presents a memorandum summarizing ongoing literature review activities conducted by the Agency to identify information and data that could be used to develop emissions factors for ammonia ($NH_3$) and hydrogen sulfide ($H_2S$) released from beef animal feeding operations (AFOs).

---

[7] Ramirez-Dorronsoro, J.C., H.S. Joo, P. Ndegwa, and A.J. Heber. 2010. National Air Emissions Monitoring Study: Data from Two Dairy Freestall Barns in Washington WA5B, Final Report. Purdue University, West Lafayette, IN, July 30. https://archive.epa.gov/airquality/afo2012/web/pdf/wa5bsummaryreport.pdf

[8] Hutchinson, G.L., A.R. Moser, and C.E. Andre. 1982. Ammonia and Amine Emissions from a Large Cattle Feedlot. Journal of Environmental Quality 11(2): 288-293. The reported emission factor of 1.67 g N/head/hour was converted using conversion factors of 24 hours/day, 1 lb/453.6 g, and 17 $NH_3$/14 N.

[9] Bouwman, A.F., D.S. Lee, W.A.H. Asman, F.J. Dentener, K.W. Van der Hoek and J.G.J. Olivier, 1997. A Global High-Resolution Emission Inventory for Ammonia. Global Biogeochemical Cycles 11(4): 561-587. The reported emission factor of 8 percent of N was converted using a conversion factor of 17 $NH_3$/14 N and the 2005 ASABE Standard typical nitrogen excretion rate for beef – finishing cattle of 0.36 lb N/animal/day.

---

**Key Data Inputs and Other Assumptions**

- Cattle and calf production are assigned to three general categories for this analysis: confined dairy operations, beef feedlots, and beef on pasture.

- For all confined dairy operations, this analysis uses the NAEMS findings of the maximum daily ammonia emissions rate of 0.416 lb/head/day and the maximum daily hydrogen sulfide emissions rate of 0.0395 lb/head/day as estimates.

- NAEMS did not monitor beef feedlots, thus this analysis uses the estimate of 0.107 lb/head/day as the daily ammonia emissions rate for all beef feedlots. The estimate of 0.107 lb/head/day was derived from Hutchinson, Moser, and Andre (1982). Hydrogen sulfide emissions rates were not evaluated due to a lack of data.

- NAEMS did not monitor beef on pasture operations, thus this analysis uses the estimate of 0.0348 lb/head/day as the daily ammonia emissions rate for all beef on pasture. The estimate of 0.0348 lb/head/day was derived from Bouwman, Lee, Asman, Dentener, Van der Hoek and Olivier (1997). Hydrogen sulfide emissions rates were not evaluated due to a lack of data.

---

### 2.2.2. Poultry Operations

EPA analyzed three major types of farms for the poultry category – broilers, layers, and turkeys.

***Broilers.*** EPA analyzed barn emissions data from NAEMS and selected data from a broiler ranch in San Joaquin County, California ("CA1B") which housed birds in mechanically vented houses and completely replaced the litter after every three flocks. The maximum daily ammonia emissions rate from this dataset was 0.00331 lb/head/day.[10] Using these emission rates, 30,211 broilers would be needed to release ammonia at the 100 lb/day RQ. This number was multiplied by 5 to account for the number of flocks typically raised each year because the USDA Census data presents data by the number of birds sold by farm.

***Layers.*** EPA analyzed barn emissions data from NAEMS and selected data from an egg production facility in Wabash County, Indiana ("IN2H") that housed birds in high-rise caged layer houses that stored manure on the floor for at least one year. The maximum daily ammonia emissions rate from this dataset was 0.0088 lb/head/day.[11] Using these emission rates, 11,364 layers would be needed to release ammonia at the 100 lb/day RQ.

***Turkeys.*** Turkey emissions were not monitored during NAEMS. For this analysis, EPA utilizes an ammonia emissions factor of 0.00323 lb/head/day.[12] Using this emission factor, 30,960 turkeys would be needed to release ammonia at the 100 lb/day RQ. Research is ongoing to assess

---

[10] Cortus, E.L., X.-J. Lin, R. Zhang, and A.J. Heber. 2010. National Air Emissions Monitoring Study: Emissions Data from Two Broiler Chicken Houses in California - Site CA1B. Final Report. Purdue University, West Lafayette, IN, July 2. https://archive.epa.gov/airquality/afo2012/web/pdf/ca1bsummaryreport.pdf

[11] Ni, Ji-Qin, Claude A. Diehl, Teng Teeh Lim, Bill W. Bogan, Lide Chen, Lilong Chai, and Albert J. Heber. 2010. National Air Emissions Monitoring Study: Emissions Data from Two High-Rise Layer Houses in Indiana - Site IN2H. Final Report. Purdue University, West Lafayette, IN, July 30. https://archive.epa.gov/airquality/afo2012/web/pdf/in2hsummaryreport.pdf

[12] This value is consistent with the emission rate used for turkeys in EPA's 2018 NPRM, *Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act,* (Federal Register Docket ID EPA-HQ-OLEM-2018-0318-0001). However, prior to pursing a future rulemaking, the Agency will seek to update this value with more recent literature or NAEMS data. Table 2 of Appendix C, for example, includes candidate studies, and the Agency continues to evaluate these and sources. The Agency also seeks input from commenters regarding emissions rates for all animal categories.

the quality of this emission factor. Appendix C of this TBD presents a memorandum summarizing ongoing literature review activities conducted by the Agency to identify information and data that could be used to develop emissions factors for ammonia ($NH_3$) and hydrogen sulfide ($H_2S$) released from turkey animal feeding operations (AFOs). This number was multiplied by 3 to account for the number of flocks typically raised each year because the USDA Census data presents data by the number of birds sold by farm.

***Other Poultry***. EPA could not obtain sufficient data to estimate the potential number of farms that could be subject to reporting requirements for the following categories of poultry, as presented by the 2017 USDA Census: Chukars, Ducks, Emus, Geese, Guineas, Hungarian partridge, Ostriches, Peacocks or peahens, Pheasants, and Pigeons. While some ducks are raised on very large operations, the 2017 USDA Census does not delineate these farms by size. Based on the emissions data from the broilers and layers as well as consideration of the total population and number of ducks, EPA assumed there would not be a significant number of farms that would house enough ducks to emit ammonia and hydrogen sulfide in reportable quantities. Further, EPA expects that the broad approach taken to estimate poultry farms in this section adequately accounts for the small number of farms housing other types of poultry that could be subject to reporting requirements under a potential rulemaking.

---

**Key Data Inputs and Other Assumptions**

- Poultry production is assigned to four general categories for this analysis: broilers, layers, turkeys, and other poultry.

- For all broiler operations, this analysis uses the NAEMS findings of the maximum daily ammonia emissions rate of 0.00331 lb/head/day as an estimate.

- For all layer operations, this analysis uses the NAEMS findings of the maximum daily ammonia emissions rate of 0.0088 lb/head/day as an estimate.

- NAEMS did not monitor turkey operations, thus this analysis uses the estimate of 0.00323 lb/head/day as the daily ammonia emissions rate for all turkey operations. The estimate was derived from Asman (1992). Hydrogen sulfide emissions rates were not evaluated due to a lack of data.

- Due to data limitations regarding the scope of other poultry operations, they are not included in the analysis of potentially affected operations.

---

### 2.2.3. Hogs and Pigs

Farms raising hogs and pigs were grouped into two major categories for purposes of estimation – finish only and all other hogs and pigs.

***Hogs and Pigs – Finish Only.*** EPA analyzed barn emissions data from NAEMS and selected data from a finishing farm in Duplin County, North Carolina ("NC3B") that housed swine in tunnel ventilated barns with shallow pits for manure storage under each barn, which were emptied weekly. The maximum daily ammonia emissions rate from this dataset was 0.146

lb/head/day.[13] Using these emission rates, 685 swine would be needed to release ammonia at the 100 lb/day RQ.

***Hogs and Pigs – All Others.*** EPA analyzed barn emissions data from NAEMS and selected data from a gestation and farrowing farm in Marshall County, Iowa ("IA4B") that housed swine in mechanically ventilated barns with deep pit manure storage, which was emptied every 6 months. The maximum daily ammonia emissions rate from this dataset calculated for this estimation was 0.227 lb/head/day and the maximum daily hydrogen sulfide emissions rate was 0.0752 lb/head/day.[14] Using these emission rates, 441 swine would be needed to release ammonia at the 100 lb/day RQ, and 5,175 swine would be needed to release hydrogen sulfide at the 100 lb/day RQ.

---

**Key Data Inputs and Other Assumptions**

- Hog and pig production is assigned to two general categories for this analysis: finishing and all others.

- For finishing operations, this analysis uses the NAEMS findings of the maximum daily ammonia emissions rate of 0.146 lb/head/day as an estimate.

- For all other hog and pig operations, this analysis uses the NAEMS findings of the maximum daily ammonia emissions rate was 0.227 lb/head/day as an estimate and the maximum daily hydrogen sulfide emissions rate was 0.0752 lb/head/day as an estimate.

---

### 2.2.4. Sheep

Sheep emissions were not monitored during NAEMS. To develop a conservative emissions estimate, EPA applied the data for emissions from cattle raised on pasture to sheep based on the assumption that sheep farms would raise the animals on pasture. Using these emission rates, 2,874 sheep would release ammonia at 100 lb/day RQs. Estimates of hydrogen sulfide emissions are not available but are not expected to result in reportable quantities of the substance because manure deposition in pasture minimizes anaerobic conditions that generate hydrogen sulfide.

---

**Key Data Inputs and Other Assumptions**

- NAEMS did not monitor sheep operations, nor did EPA find sheep operation estimates of ammonia emissions in the literature. Due to data limitations, this analysis uses the beef pasture operations estimate of 0.0348 lb/head/day as the daily ammonia emissions rate for all sheep operations.

---

### 2.2.5. Summary of Emission Factors by Animal Category

Table 2-2 summarizes the emission factors, expressed as lb/head/day, for each animal category, along with the associated inventory threshold that meets the 100 lb/day RQ.

---

[13] Bogan, B.W., K. Wang, W.P. Robarge, J. Kang, and A.J. Heber. 2010. National Air Emissions Monitoring Study: Emissions Data from Three Swine Finishing Barns in North Carolina - Site NC3B. Final Report. Purdue University, West Lafayette, IN, July 2. https://archive.epa.gov/airquality/afo2012/web/pdf/nc3bsummaryreport.pdf

[14] Cortus, E.L., J. Koziel, L. Cai, S.J. Hoff, J. Harmon, J. Mickelson, and A.J. Heber. 2010. National Air Emissions Monitoring Study: Emissions Data from Two Sow Barns and One Swine Farrowing Room in Iowa- Site IA4B. Final Report. Purdue University, West Lafayette, IN, July 26. https://archive.epa.gov/airquality/afo2012/web/pdf/ia4bsummaryreport.pdf

**Table 2-2. Ammonia and Hydrogen Sulfide Emission Factors**

| Animal Category | Ammonia | | Hydrogen Sulfide | |
|---|---|---|---|---|
| | Emission Factor (lb/head/day) | No. Animals for 100 lb RQ | Emission Factor (lb/head/day) | No. Animals for 100 lb RQ |
| Beef Pasture | 0.0348 | 2,874 | n/a | n/a |
| Confined Dairy | 0.4160 | 240 | 0.0395 | 2,532 |
| Beef Feedlots | 0.1070 | 935 | n/a | n/a |
| Swine Finishing | 0.1460 | 685 | n//a | n/a |
| Swine, Other | 0.2270 | 441 | 0.0752 | 1,330 |
| Sheep or Lambs | 0.0348 | 2,874 | n/a | n/a |
| Turkeys | 0.0032 | 92,879 | n/a | n/a |
| Poultry Layers | 0.0088 | 11,364 | n/a | n/a |
| Poultry Broilers | 0.0033 | 151,057 | n/a | n/a |

*n/a = contribution amount is generally below levels for the purpose of estimating the regulated universe*

## 2.3. Estimating Animal Operations that Meet or Exceed the RQ

EPA then combined the data from the prior two steps to estimate the number of operations with inventory sufficient to meet or exceed the RQ. As noted above, the 2017 USDA Census data report operations by inventory size. Animal operations where all inventory size ranges are below the inventory thresholds from Table 2-2 do not have inventory sufficient to meet or exceed the RQ. Animal operations with animal inventories in size ranges that exceed the inventory thresholds in Table 2 would be required to report.

For example, Table 2-2 shows that operations with more than 685 animals in the Swine Finishing category, would meet or exceed the RQ. The 2017 USDA Census data report operations for the following inventory size ranges of swine: 1–24; 25–49; 50–99; 100–199; 200–499; 500–999; 1,000–2,499; 2,500–4,999; and 5,000 or more. In this case, all operations in the size ranges below 500–999 swine are below the RQ threshold, and all operations in the ranges above 500–999 swine have average inventory sufficient to meet or exceed the RQ. The threshold of 685 falls within the 500–999 size range. For this size range, EPA assumed swine operations are distributed uniformly across the range, and therefore EPA estimates the percentage of operations above the threshold based on the percentage of range that exceeds the threshold, i.e., 1 - [(685 - 500) / (999 - 500)] = 63 percent of operations in that range have more than 685 heads.

Table 2-3 summarizes the estimated subset of operations in each animal category that could be required to report under a potential rule, given their average inventory. EPA estimated that 37,891 operations would report, based on meeting or exceeding 100 lb RQ for ammonia. An estimated 3,551 operations would meet or exceed the RQ for hydrogen sulfide as well, but these operations overlap with those exceeding for ammonia, and therefore the total number of regulated operations is 37,891 (3 percent of all 1.25 million operations with inventory). This is the universe of operations for which the Agency has estimated burden and cost in Chapter 3 of this TBD.

**Table 2-3. Farm Universe Potentially Subject to Reporting**

| Animal Category | All Farms | Farms Subject to Reporting (meet or exceed the RQ) | |
|---|---|---|---|
| | | Ammonia | Hydrogen Sulfide |
| Beef Pasture | 729,046 | 176 | 0 |
| Confined Dairy Operations | 54,599 | 6,777 | 707 |
| Beef Feedlots | 25,776 | 1,581 | 0 |
| Swine Finishing (>55lb) | 21,032 | 6,402 | 0 |
| Swine (All Other) | 45,407 | 5,175 | 2,843 |
| Sheep or Lambs | 101,387 | 236 | 0 |
| Turkeys | 11,154 | 946 | 0 |
| Poultry Layers | 232,500 | 3,016 | 0 |
| Poultry Broilers | 32,751 | 13,583 | 0 |
| **Total** | **1,253,652** | **37,891** | **3,551** |

Source: USDA (2022) and literature cited in Section 2.2.

---

**Key Data Inputs and Other Assumptions**
- EPA's estimates of the number of potentially affected operations are subject to the assumptions and limitations outlined above regarding the USDA operations data and the NAEMS emission factors.

---

EPA also estimated the number of farms by Concentrated Animal Feeding Operation (CAFO) size. CAFO size definitions are based on EPA's regulatory definitions of large, medium, and small CAFOs.[15] Table 2-4 presents the estimated number of farms by CAFO size. EPA estimated that 2,999 of the 37,891 reporting farms are small CAFOs, approximately 9,500 are medium CAFOs, and the remaining 25,400 are large CAFOs. Of the 2,999 small CAFOs, more than 2,100 are in the Swine (All Other) category.

**Table 2-4. Number of Farms Exceeding 100 lb/day RQ for Ammonia, by CAFO Size**

| Animal Operation Type | Small | Medium | Large | Total |
|---|---|---|---|---|
| Beef Pasture | 0 | 0 | 176 | 176 |
| Confined Dairy Operations | 751 | 4,073 | 1,953 | 6,777 |
| Beef Feedlots | 0 | 236 | 1,345 | 1,581 |
| Swine Finish (Only >55lb) | 88 | 2,067 | 4,246 | 6,402 |
| Swine (All Other) | 2,153 | 1,498 | 1,524 | 5,175 |
| Sheep or lambs | 8 | 171 | 58 | 236 |
| Turkeys | 0 | 0 | 946 | 946 |
| Poultry Layers | 0 | 1,440 | 1,575 | 3,016 |
| Poultry Broilers | 0 | 0 | 13,583 | 13,583 |
| **Total, Reporting Farms** | **2,999** | **9,485** | **25,407** | **37,891** |

---

[15] U.S. Environmental Protection Agency, 2015. Regulatory Definitions of Large CAFOs, Medium CAFO, and Small CAFOs. Available at https://www.epa.gov/sites/default/files/2015-08/documents/sector_table.pdf

## 2.4. Assessing RQ Adjustments

Based on publicly available information, EPA developed preliminary estimates of the reporting universe and the numbers of small farms under several different RQs. As described above, under the existing RQ of 100 lbs, approximately 37,891 of the 1.25 million farms would be required to report releases of air emissions from animal waste. This is approximately 3% of farms. Also noted above, using the NPDES CAFO size categories discussed previously, this estimate of 37,891 farms includes approximately 3,000 small farms.

If the RQ were raised to 500 lbs, the preliminary estimated regulated universe would decrease from 37,891 to approximately 14,825 farms. At 1,000 lbs, the estimated regulated universe would decrease even further to approximately 5,332 reporting farms (Table 2-5). Additionally, at an RQ of 1,000 lbs, EPA estimates that under the NPDES definition, no small farms would exceed the reportable quantity. Table 2-6 presents the distribution of potentially in-scope operations by RQ threshold and NPDES CAFO size.

**Table 2-5. Farm Universe Potentially Subject to Reporting under Different RQ Thresholds**

| Operation Type | Ammonia RQ | | | | Hydrogen Sulfide RQ | | | |
|---|---|---|---|---|---|---|---|---|
| | 100 lb/day | 500 lb/day | 1,000 lb/day | 5,000 lb/day | 100 lb/day | 500 lb/day | 1,000 lb/day | 5,000 lb/day |
| Beef Pasture | 176 | 19 | 0 | 0 | NA | NA | NA | NA |
| Confined Dairy Operations | 6,777 | 1,786 | 793 | 117 | 707 | 110 | 0 | 0 |
| Beef Feedlots | 1,581 | 640 | 511 | 0 | NA | NA | NA | NA |
| Swine Finish (Only >55lbs) | 6,402 | 3,288 | 1,449 | 0 | NA | NA | NA | NA |
| Swine (All Other) | 5,175 | 3,452 | 2,263 | 518 | 2,843 | 1,504 | 1,041 | 0 |
| Sheep or lambs | 236 | 15 | 0 | 0 | NA | NA | NA | NA |
| Turkeys | 946 | 0 | 0 | 0 | NA | NA | NA | NA |
| Poultry Layers | 3,016 | 550 | 317 | 224 | NA | NA | NA | NA |
| Poultry Broilers | 13,583 | 5,076 | 0 | 0 | NA | NA | NA | NA |
| **Total** | **37,891** | **14,825** | **5,332** | **859** | **3,550** | **1,614** | **1,041** | **0** |

**Table 2-6. Farm Universe Potentially Subject to Reporting, by CAFO Size and RQ Threshold**

| Operation Type | Small CAFO | Medium CAFO | Large CAFO | Total |
|---|---|---|---|---|
| **100 lb. RQ Threshold** | | | | |
| Beef Pasture | 0 | 0 | 176 | 176 |
| Confined Dairy Operations | 751 | 4,073 | 1,953 | 6,777 |
| Beef Feedlots | 0 | 236 | 1,345 | 1,581 |

12

| Operation Type | Small CAFO | Medium CAFO | Large CAFO | Total |
|---|---|---|---|---|
| Swine Finish (Only >55lbs) | 88 | 2,067 | 4,246 | 6,402 |
| Swine (All Other) | 2,153 | 1,498 | 1,524 | 5,175 |
| Sheep or lambs | 8 | 171 | 58 | 236 |
| Turkeys | 0 | 0 | 946 | 946 |
| Poultry Layers | 0 | 1,440 | 1,575 | 3,016 |
| Poultry Broilers | 0 | 0 | 13,583 | 13,583 |
| **Total** | **2,999** | **9,485** | **25,407** | **37,891** |
| **500 lb. RQ Threshold** | | | | |
| Beef Pasture | 0 | 0 | 19 | 19 |
| Confined Dairy Operations | 0 | 0 | 1,786 | 1,786 |
| Beef Feedlots | 0 | 0 | 640 | 640 |
| Swine Finish (Only >55lbs) | 0 | 0 | 3,288 | 3,288 |
| Swine (All Other) | 430 | 1,498 | 1,524 | 3,452 |
| Sheep or lambs | 0 | 0 | 15 | 15 |
| Turkeys | 0 | 0 | 0 | 0 |
| Poultry Layers | 0 | 0 | 550 | 550 |
| Poultry Broilers | 0 | 0 | 5,076 | 5,076 |
| **Total** | **430** | **1,498** | **12,898** | **14,825** |
| **1,000 lb. RQ Threshold** | | | | |
| Beef Pasture | 0 | 0 | 0 | 0 |
| Confined Dairy Operations | 0 | 0 | 793 | 793 |
| Beef Feedlots | 0 | 0 | 511 | 511 |
| Swine Finish (Only >55lbs) | 0 | 0 | 1,449 | 1,449 |
| Swine (All Other) | 0 | 739 | 1,524 | 2,263 |
| Sheep or lambs | 0 | 0 | 0 | 0 |
| Turkeys | 0 | 0 | 0 | 0 |
| Poultry Layers | 0 | 0 | 317 | 317 |
| Poultry Broilers | 0 | 0 | 0 | 0 |
| **Total** | **0** | **739** | **4,594** | **5,332** |
| **5,000 lb. RQ Threshold** | | | | |
| Beef Pasture | 0 | 0 | 0 | 0 |
| Confined Dairy Operations | 0 | 0 | 117 | 117 |
| Beef Feedlots | 0 | 0 | 0 | 0 |
| Swine Finish (Only >55lbs) | 0 | 0 | 0 | 0 |
| Swine (All Other) | 0 | 0 | 518 | 518 |
| Sheep or lambs | 0 | 0 | 0 | 0 |
| Turkeys | 0 | 0 | 0 | 0 |
| Poultry Layers | 0 | 0 | 224 | 224 |
| Poultry Broilers | 0 | 0 | 0 | 0 |
| **Total** | **0** | **0** | **859** | **859** |

13

# Chapter 3:  Cost Analysis

This chapter presents EPA's estimate of the cost of a potential rulemaking. EPA adopts a baseline where there is no change in the current regulatory program and no farm operations are currently reporting emissions to SERCs/TERCs and LEPCs/TEPCs.

Under a potential rulemaking, farm owners and operators would be required to notify their SERC or TERC and LEPC or TEPC when their facility generates air releases of ammonia or hydrogen sulfide from animal waste that are equal to or greater than the applicable RQ (100 lb/day) within any 24-hour period. The 37,891 animal operations that EPA estimates emit ammonia or hydrogen sulfide in quantities that meet or exceed the RQ would be required to report.

Eligible farm operations with releases of ammonia or hydrogen sulfide from animal waste that meet or exceed the RQ could utilize the continuous release reporting option in the Continuous Release Reporting Regulations (CRRR; 40 CFR 355.32) to comply with EPCRA 304. The animal waste that farms handle or manage as part of their normal operations of raising animals may be expected to have regular air emissions which could reasonably fall within the scope of these definitions for continuous release reporting. A farm that uses knowledge of its operations or best professional judgment to determine whether animal waste air emissions qualify for continuous release reporting would need to make only one initial telephone notification and one initial written report to comply with EPCRA's continuous release reporting provision at 40 CFR 355.32, unless there are new releases or SSI to report. No first anniversary report would be required.[16] For the purposes of this analysis, EPA assumes that all reporting farms use this option.

The CRRR includes the following requirements:[17]

- Provide initial continuous release notification to the SERC (or TERC) and LEPC (or TEPC).

- Submit initial written report to the appropriate SERC (or TERC) and LEPC (or TEPC).

- Provide notification of a statistically significant increase (SSI) in a release to the SERC (or TERC) and LEPC (or TEPC).

- Notification of a new release, which is a change in source or composition of the release.

The labor burden and cost for operations subject to reporting are presented in Sections 3.1 and 3.2. The action may also result in burden for SERCs/TERCs and LEPCs/TEPCs that receive notifications. EPA's labor burden estimates assume that submitters will use a consistent report format for their reports submitted to SERCs/TERCs and LEPCs/TEPCs. Government burden and cost are presented in Section 3.3. EPA estimated the annualized cost of compliance over a 10-year period, which EPA believes is a sufficient period to capture the long-term, steady-state effects of a potential rulemaking. EPA presents all costs in 2022 dollars and applied OMB-required discount rates of 3 and 7 percent (OMB 2003).

---

[16] For more information, refer to the guidance provided at https://www.epa.gov/epcra/cercla-and-epcra-reporting-requirements-air-releases-hazardous-substances-animal-waste-farms.

[17] Provided at: https://www.ecfr.gov/current/title-40/chapter-I/subchapter-J/part-302

> **Key Data Inputs and Other Assumptions**
> - These estimates are based on the assumption that all farms will be able to report under the continuous emissions procedures. To the extent that this is not the case (e.g., seasonality of grazing operations or "lay out" between crops of broilers), costs may be underestimated for years 1 through 10 of the analysis.
> - This analysis applies a 10-year timeframe and OMB-required discount rates of 3 and 7 percent to annualize costs.

## 3.1. Labor Rates

EPA developed costs for farm labor burdens using hourly labor rates obtained from the Bureau of Labor Statistics' (BLS) Occupational Employment and Wage Statistics (OEWS) program (BLS 2022a). OEWS produces employment and wage estimates annually for nearly 800 occupations. This analysis applies the national wages for the occupations shown in Table 3-1 for managerial, technical, and clerical labor in farming operations. EPA selected these three labor categories to reflect a mix of labor, on average, for affected operations that is consistent with current and prior assessments of CRRR burden. EPA realizes that many farms may not employ staff in these specific labor categories (e.g., some operations may not have technical and clerical staff). To the extent that the owner/operator of a given operation would perform all labor-related activities, EPA's labor costs may be understated.

**Table 3-1. Labor Category Occupations**

| Labor Category | OEWS Occupation | OEWS Occupation No. |
|---|---|---|
| Management | Farmers, Ranchers, and Other Agricultural Managers | 11-9010 |
| Technical | Animal Breeders | 45-2020 |
| Clerical | File Clerks | 43-4070 |

Note: Occupational wages are specific to the Agriculture, Forestry, Fishing and Hunting sector.

EPA adjusted the hourly wages to account for the employer's costs for employee compensation using a multiplier of 1.42 (1 ÷ 0.705=1.42), which includes Social Security, worker's compensation, unemployment insurance, insurance, paid leave, retirement, overhead and general and administrative costs (BLS 2022b). Table 3-2 presents the total hourly labor rates used to estimate reporting costs.

**Table 3-2. Average Hourly Labor Rates, by Industry and Occupation (2022$)**

| Labor Category* | Hourly Wage | Fully Loaded Labor Rate ($/hr)** |
|---|---|---|
| Management | $37.55 | $56.65 |
| Technical | $19.99 | $30.16 |
| Clerical | $14.74 | $22.24 |

\* The percent of wages of total compensation uses the estimate for all private industry workers
\*\* These rates reflect the employer costs for employee compensation, including employer costs for legally required benefits, other important fringe benefit categories, and overhead and general and administrative costs. Labor rates are adjusted from 2021 to 2022 dollars using the U.S. Bureau of Economic Analysis GDP price deflator (BEA 2022)
Sources: BLS (2022a), BLS (2022b), BEA (2022)

A potential rulemaking would reinstate reporting of ammonia and hydrogen sulfide air releases by farm operations to the SERC (or TERC) and LEPC (or TEPC), which would then process the reports. The hourly labor rate for SERC (or TERC) and LEPC (or TEPC) employees is calculated from the BLS (2022c; Table 3. State and local government workers by occupational and industry group). The reported wage rate includes fringe benefits.

**Table 3-3. Average Hourly Labor Rates, State and Local Government Workers (2022$)**

| Labor Category | Total Labor Rate |
|---|---|
| State and local government workers | $57.02 |

Source: BLS (2022c)

---

**Key Data Inputs and Other Assumptions**

- EPA applied hourly labor rates from BLS OEWS for a mix of labor for managerial, technical, and clerical farm labor burdens, consistent with current and prior assessments of CRRR burden. EPA applied hourly labor rates from BLS OEWS for a mix of labor for managerial, technical, and clerical farm labor burdens, consistent with current and prior assessments of CRRR burden and cost. Occupational wages applied are specific to the Agriculture, Forestry, Fishing and Hunting sector. Occupational wages applied are specific to the Agriculture, Forestry, Fishing and Hunting industry.

- Fully loaded labor rates reflect the employer costs for employee compensation, including employer costs for legally required benefits, other important fringe benefit categories, and overhead and general and administrative costs. This is consistent with prior assessments of CRRR burden and cost.

---

## 3.2. Rule Familiarization and Determining Applicability of a Potential Rulemaking

The estimated familiarization and applicability determination burden is generally consistent with previous EPA estimates of reporting burden, but also reflects the process EPA anticipates for this potential rulemaking specifically. As presented in Table 3-1, EPA estimated the rule familiarization and applicability determination burden for farms subject to reporting under a potential rulemaking would affect 37,891 farms with releases meeting or exceeding the 100lb/day RQ.

If the Agency reinstate reporting requirements, the Agency anticipates developing implementing guidance for farms to understand a final rule and how it applies to them. The guidance could include following:
- Generally, explain the rule,
- Provide EPA estimates for the number of each livestock typically needed to exceed the RQ,
- Provide cutoffs for number of animals where under typical farming operations under any location/weather conditions a farm would not exceed the RQ,
- Directions to use EPA-developed web-based emissions calculator and how to submit to state, tribal and local agencies, and
- Guidance on the application of continuous release reporting regulations to animal waste air emissions.

16

EPA assumed that reading the implementation guide would require an average of 15 minutes (0.25 hours) of management time ($13.33). In addition, EPA assumed that farms would determine the applicability of the rule to their operation utilizing a web-based emissions calculator tool.[18] EPA estimated a total unit burden of 2.5 hours per farm for the entire rule familiarization and applicability determination process, at a cost of $97.92. Applying the estimated cost per farm ($97.92) to the 37,891 farm operations subject to rule familiarization yields an estimated total cost of approximately $3.7 million.

**Table 3-4. Labor Burden and Unit Cost per Farm for Rule Familiarization and Applicability Determination**

| Activity | Labor Category | Labor Burden | Labor Rate | Cost per Farm |
|---|---|---|---|---|
| Read the implementation guide | Managerial | 0.25 | $56.65 | $14.16 |
| Read the rule | Managerial | 0.75 | $56.65 | $42.49 |
| Data collection for webtool | Technical | 1.0 | $30.16 | $30.16 |
| Webtool screening | Clerical | 0.5 | $22.24 | $11.12 |
| **Total** | | **2.5** | | **$97.92** |

### 3.2.1. Emissions Calculator for Applicability Determination

As noted above, the Agency is considering developing an emissions calculator for farms to estimate their animal waste air emissions. The web-based emissions calculator is based on the NAEMS methodologies, enabling farms to input a limited number of variables to estimate the amount of ammonia and hydrogen sulfide air releases from animal waste. The input variables include information that farmers are assumed to already know, such as location of the farm, species of animals at the farm, species population or beginning and ending animal weight, waste management method(s) and if applicable, the housing type and number of days without animals in the barn or house.

The emission calculator could use the farm location (e.g., county or ZIP code) to obtain meteorological data (e.g., ambient relative humidity, ambient relative temperature, wind speed) and would perform the calculations using the NAEMS formulas which provide an estimate of release amount per day in lbs. This screening step would identify whether a farm meets or exceeds the RQ and therefore, be subject to reporting under EPCRA. If the emissions calculator shows that the RQ reportable quantity is exceeded, the farm may be able to meet the reporting requirements with continuous release reporting. The applicable information in the emissions calculator could then auto-populate an EPA webform for the Continuous Release Report form. Finally, webform instructions could direct the farmer how to submit the continuous release report to their appropriate state and/or local agency responsible for collecting EPCRA release reports. Appendix D of this TBD includes screenshots of the draft calculator under development by the Agency.

---

[18] Screenshots of a draft EPA Animal Feeding Operation (AFO) Air Emissions Calculation Web Tool can be found in Appendix D.

---

**Key Data Inputs and Other Assumptions**

- EPA estimated a total unit burden of 2.5 hours per farm for the entire rule familiarization and applicability determination process, including use of a web tool to aid with compliance.
- The estimated burden for the calculator (1.5 hours) assumes all the data required for the calculator is readily available to farmers, and that affected operations have internet access.

---

### 3.2.2. Rule Familiarization for Non-Reporting Farms

As presented above, the estimated rule familiarization cost, including use of the calculator, is approximately $3.7 million for the estimated 37,891 reporting operations. The Agency recognizes that additional farms will also need to familiarize themselves with the rule, to determine that they are not required to report (i.e., some or all of the approximately 1.21 million non-reporting farms). First, the Agency estimates an upper-bound assuming that all 1.25 million operations conduct rule familiarization, including use of the emissions calculator to determine applicability: $122.8 million total cost ($97.92 per operation * 1,253,652 operations). Approximately $119 million of that total cost would be associated with non-reporting farms. This estimate, however, is likely overstated because many farms may be able to determine whether the rule would apply to their operation without using of the emissions calculator.

EPA is considering developing guidance with *de minimis* thresholds which would make clear that a farm with livestock inventory below the threshold could not conceivably produce over 100 lbs of ammonia or hydrogen sulfide in a 24-hour period, and thus would not have to estimate air emissions nor have to report under EPCRA. EPA may provide these types of cutoffs on EPA's website and on the front end of the emissions calculator, so that farms with numbers of animals below the cutoff, can quickly determine they would not need to report.

The Agency has included some preliminary draft cutoffs in this TBD for estimating the initial burden to all farms when determining whether they will exceed the RQ. EPA understands this may not provide the level of regulatory certainty needed to assure farmers that they are complying with the regulations, and thus would not be subject to an enforcement action. Appendix E of this TBD include the results of Agency ammonia emissions modeling of a wide range of animal operation scenarios for swine, dairy cattle, and poultry. Models were tested with a variety of meteorological conditions to determine whether a specific size farm would exceed the 100 lb/day RQ. These scenarios were tested against head-counts that align with the smallest operation size category available in the USDA operations data (e.g., 25 heads for swine). For example, NAEMS' initial effort on swine indicates that farm operations with fewer than 25 have virtually zero possibility of exceeding a 100 lb. RQ under every reasonable combination of temperature, humidity, and manure handling approach. EPA is soliciting comment on the utility of establishing minimum inventory thresholds for each animal category based on NAEMS (see Appendix E).

The Agency assumes that farms in this circumstance only would need to read the implementation guide in order to determine that the rule does not apply to their farm. Therefore, EPA estimates that these farms would incur only 1 hour of burden because they would not need to use the

emissions calculator. As preliminary draft cutoffs for the estimates presented here, the Agency assumes that farms that fall within the Census of Agriculture's lowest population size range, by animal category, would use this approach for rule familiarization.

As shown in Table 3-5, EPA estimates that approximately 610,700 farms (approximately 50 percent of all farms) have fewer heads than the lowest Census size category and may be able to determine applicability without use of the calculator.

The Agency assumes that the remaining approximately 605,000 non-reporting farms would use the calculator before determining that they do not need to report. These farms therefore incur the same rule familiarization burden of 2.5 hours per farm as the 37,891 reporting farms.

**Table 3-5. Number of Operations below Preliminary Applicability Cutoffs**

| Animal Operation Type | All Farms | Reporting Farms | Non-Reporting Farms | | |
|---|---|---|---|---|---|
| | | | Cutoff (heads per operation) | Farms below the Cutoff | Farms above the Cutoff |
| Beef Pasture | 729,046 | 176 | <10 | 244,836 | 484,034 |
| Confined Dairy Operations | 54,599 | 6,777 | <10 | 16,932 | 30,890 |
| Beef Feedlots | 25,776 | 1,581 | <20 | 3,563 | 20,632 |
| Swine Finish (>55lbs) only | 21,032 | 6,402 | <25 | 13,048 | 1,582 |
| Swine (All Other) | 45,407 | 5,175 | <25 | 33,427 | 6,805 |
| Sheep or Lambs | 101,387 | 236 | <25 | 70,455 | 30,696 |
| Turkeys | 11,154 | 946 | <2000 | 8,640 | 1,568 |
| Poultry Layers | 232,500 | 3,016 | <50 | 202,403 | 27,081 |
| Poultry Broilers | 32,751 | 13,583 | <2000 | 17,403 | 1,765 |
| **Total** | **1,253,652** | **37,891** | | **610,707** | **605,054** |

The Agency estimated total potential rule familiarization cost for this scenario, as shown in Table 3-6. The below estimates assume that reporting farms ($3.7 million), as well as non-reporting farms that exceed the cutoff ($59.2 million), would use the emissions calculator to determine applicability, and incur a higher burden. Operations that fall below the cutoff are assumed to use the implementation guide only and incur a total cost of $34.5 million. Together, rule familiarization costs under this approach total $97.6 million.

**Table 3-6. Total Rule Familiarization Cost for Reporting and Non-Reporting Operations**

| Animal Operation Type | Total | Reporting Farms* | Non-Reporting Farms | | |
|---|---|---|---|---|---|
| | | | Cutoff (heads per operation) | Farms below the Cutoff** | Farms above the Cutoff* |
| Beef Pasture | $61,283,732 | $17,237 | <10 | $13,869,198 | $47,397,298 |
| Confined Dairy Operations | $4,647,552 | $663,584 | <10 | $959,145 | $3,024,822 |
| Beef Feedlots | $2,376,962 | $154,788 | <20 | $201,833 | $2,020,341 |

19

| Animal Operation Type | Total | Reporting Farms* | Non-Reporting Farms | | |
|---|---|---|---|---|---|
| | | | Cutoff (heads per operation) | Farms below the Cutoff** | Farms above the Cutoff* |
| Swine Finish (>55lbs) only | $1,520,933 | $626,845 | <25 | $739,129 | $154,960 |
| Swine (All Other) | $3,066,634 | $506,705 | <25 | $1,893,536 | $666,394 |
| Sheep or Lambs | $7,019,962 | $23,137 | <25 | $3,991,057 | $3,005,769 |
| Turkeys | $735,604 | $92,656 | <2000 | $489,429 | $153,518 |
| Poultry Layers | $14,412,642 | $295,298 | <50 | $11,465,500 | $2,651,843 |
| Poultry Broilers | $2,488,724 | $1,330,046 | <2000 | $985,826 | $172,852 |
| Total | $97,552,744 | $3,710,295 | | $34,594,652 | $59,247,797 |

*Farms that determine applicability using the emissions calculator
**Farms that determine applicability using Agency guidance (e.g., factsheet).

## 3.3. Continuous Release Reporting Requirements

### 3.3.1. Initial Continuous Release Notification to the SERC (or TERC) and LEPC (or TEPC)

The initial notification serves to notify government authorities of the farm's intent to report an extremely hazardous substance release under CRRR. Facilities incur a one-time, first-year burden associated with notifying the SERC (or TERC) and LEPC (or TEPC) of the occurrence of an extremely hazardous substance release. EPA estimated that farms would incur 0.25 hours (15 minutes) each, or 0.5 hours total, of management time to notify via phone, fax, or email to both the SERC (or TERC) and LEPC (or TEPC).

Affected farm operations utilizing the reduced reporting option are also required to provide the initial notification to the appropriate SERC (or TERC) and LEPC (or TEPC).

**Table 3-7. Unit Burden and Cost for Initial Continuous Release Notification per Farm**

| Phone Call to Agency | Management Labor (hours) | Labor Rate | Unit Cost |
|---|---|---|---|
| SERC (or TERC) | 0.25 | $56.65 | $14.16 |
| LEPC (or TEPC) | 0.25 | $56.65 | $14.16 |
| Total | 0.5 | $56.65 | $28.32 |

| Key Data Inputs and Other Assumptions |
|---|
| • EPA assumes 0.25 hours per SERC (or TERC) and per LEPC (or TEPC) to receive a farm's intent to report under CRRR. |

### 3.3.2. Initial Written Report to SERC (or TERC) and LEPC (or TEPC)

The initial written report is sent to the SERC (or TERC) and LEPC (or TEPC) and provides a full description of the release. The initial written report must be submitted within 30 days of the initial notification. EPA assumes that eligible farms would use the continuous release reporting form, Form No. 6100-10, under OMB control number 2050-0086.

The data elements requested in the initial written report include:

- The name and location of the farm, city, state and zip code; the longitude and latitude; the Dun & Bradstreet number of the facility (if available); and the name and phone number of the farm owner or operator (the person in charge).

- The population density within a one-mile radius of the farm, described in terms of the following ranges: 0-50 persons, 51-100 persons, 101-500 persons, 501-1,000 persons and more than 1,000 persons.

- The identity and location of sensitive populations and ecosystems within a one-mile radius of the farm (e.g., elementary schools, hospitals, retirement communities or wetlands).

- A signed statement that the extremely hazardous substance release described is continuous and stable in quantity and rate and that all reported information is accurate and current to the best knowledge of the person in charge.

In addition, farms that are required to report must provide the following substance-specific information for each continuous release:

- The name and identity of the hazardous substance; and the Chemical Abstracts Service (CAS) Registry Number for the substance: *Ammonia (CAS No. 7664-41-7) and Hydrogen Sulfide (CAS No. 7783-06-04).*

- The upper and lower bounds of the normal range of the release.

- The source of the release: *Animal Waste.*

- The frequency of the release and the period over which it occurs.

- A brief statement describing the basis for stating that the release is continuous and stable in quantity and rate.

- An estimate of the total annual amount of the hazardous substance released in the previous year (in lbs or kilograms).

- The environmental medium (a) affected by the release: *Air.*

Providing the initial written report entails a one-time burden in year one of the analysis. Much of the information required for the initial written report (e.g., facility identification, hazardous substance identification, frequency and source of the release) is readily available to the farm. The Agency can provide tools to assist determining population density, and the EPA is also seeking comment on providing guidance for the identity and location of sensitive populations and ecosystems. The Agency could provide data on communities with environmental justice concerns. EPA assumes farms that have emissions within the scope of continuous release regulations and that are required to report the releases will use EPA's continuous release reporting form (EPA Form No. 6100-10) to minimize report organization and formatting burden. EPA estimates the preparation of the initial written report at 3 hours of managerial time, 3 hours of technical time and 1 hour of clerical time. Thus, the total burden associated with the initial written report is 7 hours (Table 3-8).

Farms would be able to submit the same report prepared for the SERC (or TERC) to the LEPC (or TEPC). Table 3-7 presents the costs for photocopying and mailing this report and all other reports to the appropriate SERC (or TERC) and LEPC (or TEPC).

**Table 3-8. Unit Burden and Labor Cost for Initial Written Report per Farm**

| Action | Management | Technical | Clerical | Total | Unit Cost |
|---|---|---|---|---|---|
| | Hours | | | | |
| Prepare report for SERC (or TERC) | 3 | 3 | 1 | 7 | $282.65 |
| Submit a copy to LEPC (or TEPC)* | 0 | 0 | 0 | 0 | $0.00 |
| **Total** | **3** | **3** | **1** | **7** | **$282.65** |

\* The same report sent to the SERC (or TERC) can be copied and mailed to the LEPC (or TEPC). The O&M costs for photocopying and mailing are shown in Table 3-4.
Source: U.S. EPA (2017)

The cost of compliance would also include operations and maintenance (O&M) costs for photocopies and mailing the reports, as shown in Table 3-9. All reporting farms would incur $34.50 in O&M cost to submit copies of the initial report to the SERC (or TERC) and LEPC (or TEPC).

**Table 3-9. O&M Costs per Farm – Initial Report (2022$)**

| Collection Activity | Copies* | Number of pages | O&M Component Costs | | Unit Cost |
|---|---|---|---|---|---|
| | | | Photocopying | Mailing** | |
| | | | $0.30/pg | $15.75/rpt | |
| Initial Written Report | 2 | 5 | $3.00 | $31.50 | $34.50 |

\* The reports would be submitted, one each, to a LEPC (or TEPC) and a SERC (or TERC).
\*\* Postage includes Priority Mail Flat Rate Envelope at $8.95, certified mail at $3.75, and return receipt at $3.05.

---

**Key Data Inputs and Other Assumptions**

- EPA assumes that the 30-day period allows for an initial evaluation of the release.
- EPA assumes that eligible farms would use the continuous release reporting form, Form No. 6100-10, under OMB control number 2050-0086 to minimize reporting requirements.
- EPA assumes that, as the Agency is reinstating a previous reporting requirement, the dissemination of the compliance assistance information and outreach will be adequate to ensure that agricultural producers fully understand reporting requirements.
- EPA assumes that, by utilizing the emissions calculator as well as any guidance that EPA develops, farms will be able to predict whether the releases are stable in quantity and rate. In addition, EPA assumes that farms will set reasonable upper and lower bounds for potential release amount.
- EPA assumes that much of the information required for the initial written report (e.g., facility identification, hazardous substance identification, frequency and source of the release) is readily available to the farm.
- EPA includes O&M related costs for these activities.

### 3.3.3. Notification of a Statistically Significant Increase (SSI) or a New Release

The CRRR defines an SSI as a release of a hazardous substance that exceeds the upper bound of the normal range of the release as established by the facility. The normal range is defined to include all the releases (in lbs or kilograms) of a hazardous substance reported or occurring over any 24-hour period under normal operating conditions during the preceding year. Therefore, an SSI does not include releases within the reported normal range of release. An SSI release is considered an episodic release because it exceeds the reported upper bound (also above the RQ for the substance). The information collected in an SSI notification includes the same information supplied when reporting any other episodic release (e.g., quantity of the release, source of the release and a description of any response actions taken). The SERC (or TERC) and LEPC (or TEPC) would be notified of an SSI under EPCRA 304. If there is any change in the composition or source(s) of the release, the release is considered a new release from a reporting farm and would be subject to reporting requirements of initial notification and written notification.

Note that the person in charge of the farm that had reported a continuous release and has an SSI may modify the previously established normal range as an alternative to reporting multiple SSIs. To modify the normal range of the release over a 24-hour period under normal operating procedures, the person in charge of the farm must report at least one SSI as an episodic release (to facilitate immediate evaluation) describing the change in the continuous release to the appropriate SERC (or TERC) and LEPC (or TEPC), including the reasons for the change. For example, if a farm doubles its animal inventory, thereby doubling its release level, the farm may want to double its reported normal range of the continuous release, rather than report multiple SSIs.

EPA estimates that a total of 5 percent of the universe of farms that reported initially may have an SSI or a new release in each year. The unit burden for this activity is 2.0 hours (1 hour each of management and technical time).

**Table 3-10. Estimated Unit Burden and Labor Cost for SSI or New Release Report per Farm**

| Action | Management | Technical | Clerical | Total | Unit Cost* |
|---|---|---|---|---|---|
| | Hours | | | | |
| Notify SERC (or TERC) and LEPC (or TEPC) | 1 | 1 | 0 | 2 | $86.80 |

*Cost applies to 5 percent of reporting operations per year.

| Key Data Inputs and Other Assumptions |
|---|
| • EPA assumes that a total of 5 percent of the universe of farms that reported initially may have an SSI or a new release in each year. |
| • For the purposes of this rough cost estimate, EPA assumes no SSIs would occur in year 1. |

23

### 3.3.4. Total Cost for Reporting Operations

Table 3-11 summarizes the total cost per farm and overall total cost across the 37,891 affected farms. The total, one-time cost per farm is $443, of which $345 is reporting cost and $98 is rule familiarization and applicability determination cost. Reporting farms also incur $4 per year in ongoing costs, on average.

In the aggregate, EPA estimates the total cost for reporting operations to be $16.8 million in the first year of the rule and approximately $0.2 million annually thereafter.

**Table 3-11. Total Reporting Cost (undiscounted, by year) (2022$)**

| Compliance Requirement | Total Cost | | Cost per Farm | |
|---|---|---|---|---|
| | First Year | Years 2 – 10 | First Year | Years 2 – 10 |
| **Rule Familiarization and Applicability Determination** | **$3,710,295** | **$0** | **$98** | **$0** |
| **CRRR Reporting** | | | | |
| *Labor Costs* | *$11,782,802* | *$164,451* | *$311* | *$4* |
|   Initial Notification | $1,073,190 | $0 | $28 | $0 |
|   Initial Written Report | $10,709,612 | $0 | $283 | $0 |
|   Reporting an SSI or New Release | $0 | $164,451 | $0 | $4 |
| *O&M Costs* | *$1,307,223* | *$0* | *$35* | *$0* |
|   Initial Notification | $0 | $0 | $0 | $0 |
|   Initial Written Report | *$1,307,223* | $0 | $35 | $0 |
|   Reporting an SSI or New Release | $0 | $0 | $0 | $0 |
| **Total Reporting Cost** | **$13,090,026** | **$164,451** | **$345** | **$4** |
| **Total Cost** | **$16,800,321** | **$164,451** | **$443** | **$4** |

Table 3-12 presents the 10-year annualized reporting cost for operations affected by a potential rulemaking. EPA estimates annualized costs of $2.06 and $1.96 million using 3 and 7 percent discount rates, respectively. The annualized cost per farm is $54 using the 3 percent discount rate and $52 using the 7 percent discount rate.

**Table 3-12. Total Annualized Reporting Cost (2022$)**

| Compliance Requirement | 3% Discount Rate | | | 7% Discount Rate | | |
|---|---|---|---|---|---|---|
| | Total | Labor | O&M | Total | Labor | O&M |
| **Rule Familiarization and Applicability Determination** | **$422,291** | **$422,291** | **$0** | **$406,504** | **$406,504** | **$0** |
| **Reporting** | **$1,635,589** | **$1,491,178** | **$148,783** | **$1,551,547** | **$1,416,543** | **$143,221** |
| Initial Notification | $270,929 | $122,146 | $148,783 | $260,801 | $117,580 | $143,221 |
| Initial Written Report | $1,218,925 | $1,218,925 | $0 | $1,173,358 | $1,173,358 | $0 |
| Reporting an SSI or New Release | $145,734 | $150,106 | $0 | $117,388 | $125,605 | $0 |
| **Total Annualized Cost** | **$2,057,880** | **$1,913,469** | **$148,783** | **$1,958,052** | **$1,823,048** | **$143,221** |
| **Annualized Cost per Farm** | **$54** | **$50** | **$4** | **$52** | **$48** | **$4** |

Totals may not sum due to rounding.

## 3.4. State, Local, and Tribal Government Costs

Under a potential rulemaking, farms subject to EPCRA 304 reporting would submit notifications of their ammonia and hydrogen sulfide air releases to the SERC (or TERC) and LEPC (or TEPC). Table 3-13 shows the estimated unit burden hours and costs per information collection activity for SERCs/TERCs and LEPCs/TEPCs.

**Table 3-13. SERC (or TERC) and LEPC (or TEPC) Unit Burden and Cost per Reporting Activity**

| Collection Activity | Burden Hours | | Unit Cost | |
|---|---|---|---|---|
| | First Year | Years 2 – 10* | First Year | Years 2 – 10* |
| Initial Notification (received from farms) | 1 | NA | $57.02 | NA |
| Initial Written Report (received from farms) | 2 | NA | $114.04 | NA |
| SSI or New Release Notification (received from farms) | 0 | 1 | $0.00 | $57.02 |
| Total | 3 | 1 | $171.06 | $57.02 |

\* On an annual basis, EPA estimates that 5 percent of the farm universe that reported initially may have an SSI.
NA=Not applicable.

Table 3-14 presents the total cost to SERCs and LEPCs based on applying the above unit costs and the frequency of each activity (i.e., 37,891 one-time submissions and SSI notifications). EPA estimates annualized costs of approximately $0.8 million for SERCs/TERCs and LEPCs/TEPCs.

**Table 3-14. Total Government Cost**

| Collection Activity | Undiscounted Total Cost | | Annualized Cost | |
|---|---|---|---|---|
| | First Year | Years 2 – 10 | 3% | 7% |
| SERCs/TERCs and LEPCs/TEPCs | | | | |
| Initial Notification | $2,160,518 | $0 | $245,902 | $236,709 |
| Initial Written Report | $4,321,037 | $0 | $491,803 | $473,418 |
| SSI or New Release Notification | $0 | $108,026 | $95,731 | $77,111 |
| Total | $6,481,555 | $108,026 | $833,436 | $787,238 |

> **Key Data Inputs and Other Assumptions**
> - EPA assumes a static baseline with no new farms in future years.
> - EPA does not account for SERCs, TERCs, LEPCs and TEPCs providing guidance to non-reporting farms.

## 3.5. Total Cost of the Potential Rulemaking

Table 3-15 presents the total annualized cost of a potential rulemaking, combining costs for reporting operations and government burden. The total cost of a potential rulemaking is approximately $2.9 or $2.8 million using 3 and 7 percent discount rates, respectively.

**Table 3-15. Total Annualized Cost of a Potential Rulemaking**

| Compliance Requirement | 3% Discount Rate | | | 7% Discount Rate | | |
|---|---|---|---|---|---|---|
| | Animal Operations | State, Local, Tribal Gov't | Total | Animal Operations | State, Local, Tribal Gov't | Total |
| **Rule Familiarization and Applicability Determination** | $422,291 | $0 | $422,291 | $406,504 | $0 | $406,504 |
| **Reporting** | | | | | | |
| Initial Notification | $270,929 | $245,902 | $516,831 | $260,801 | $236,709 | $497,510 |
| Initial Written Report | $1,218,925 | $491,803 | $1,710,729 | $1,173,358 | $473,418 | $1,646,776 |
| Reporting an SSI or New Release | $145,734 | $95,731 | $241,465 | $117,388 | $77,111 | $194,499 |
| **Total Annualized Cost** | **$2,057,880** | **$833,436** | **$2,891,315** | **$1,958,052** | **$787,238** | **$2,745,289** |

# Chapter 4: Benefits

The benefits of a potential rulemaking to reinstate the reporting requirements for animal waste air emissions under EPCRA include improved understanding, awareness, and decision making related to the provision and distribution of information. The information submitted to SERCs/TERCs and LEPCs/TEPCs could enable the public to make more informed decisions on where to live and work and provide a greater capacity for meaningful involvement in the development and implementation of local pollution management policies.

The distribution of information could also lead to additional benefits such as voluntary initiatives by farms to review farming and waste management practices and set goals for reductions in emissions. Potential changes in farm operations—including reductions in the releases and changes in the waste management practices—will yield health and environmental benefits. While behavioral changes from the provision of information may result from the rule and are, in fact, one goal of these types of policies, they would not be mandated by a potential rulemaking. Such behavioral changes also have impacts associated with them that are included in this analysis.

EPA has not attempted to quantify the benefits of a potential rulemaking due to a lack of quantitative information characterizing the range of users and non-users of data on animal waste air emissions and the substantial analytical challenges associated with accurately predicting behavioral responses to the provision of information. The analysis is not able to consider variations in quality or other attributes of EPCRA animal waste air emission reporting data access methods. Research indicates that the way EPCRA data are made available matters. For instance, Bae, et al. (2010) found that public provision of raw Toxic Release Inventory data reduced reported emissions but does not necessarily translate into reduced health risks. But the processing of those data by states to aid in access and interpretation did lead to significant reductions in health risks. A potentially large number of beneficiaries who are not users or who are otherwise unaware of the data (e.g., the public) further limits EPA's ability to quantify potential benefits.

Availability of information on animal waste air emissions can also be used to advance the Agency's environmental justice goals by increasing the understanding the potential magnitude of air emissions from animal waste on minority and disadvantaged communities who have been historically burdened by hidden and undisclosed pollution.

Communities in the vicinity of animal feeding operations (AFO) have been shown to be at a greater risk of exposure to these pollutants, which may be associated with adverse health outcomes. Appendix B of this TBD contains a literature search conducted by the Agency that identified several studies showing a correlation between proximity and exposure to animal waste and respiratory health effects, including increased likelihood of asthma in both adults and children and reduced lung function. Some of the studies also identified exposure to animal waste as being correlated with mortality rates, gastrointestinal illness, and other human health effects. The size and type of operation, number of animals, and species may affect the intensity of animal waste exposure. The studies also concluded that populations located in close proximity to animal farm operations are at an increased risk for adverse health effects when compared to populations

located farther away or residing in areas without animal farm operations. In addition, the studies presented in Appendix B provide evidence that Environmental Justice-relevant demographic groups, including people of color and low-income individuals, in the South, Southeast, and parts of the Midwest of the United States may be disproportionately located near AFOs. This finding is also consistent with the Agency's analysis of populations in proximity to AFOs, detailed in Chapter 6 of this TBD.

---

**Key Data Inputs and Other Assumptions**

- EPA has not attempted to quantify the benefits of a potential action due to a lack of quantitative information characterizing the range of users and non-users of data on animal waste air emissions.

- EPA does not have data regarding potential behavioral changes resulting from other emissions reporting rules.

---

# Chapter 5: Small Entities Potentially Affected by the Action

EPA has prepared a screening analysis to estimate the number of small operations that may be subject to a potential rule.

## 5.1. Definition of Small Entity

The Agency uses the definition of "small business" found in the Small Business Act (5 U.S.C. 601(3)). The Small Business Act authorizes the Small Business Administration (SBA) to define "small business" by issuing rulemakings. SBA periodically reviews and reissues these definitions (SBA 2017). SBA has established size standards for various types of economic activities, or industries, under the NAICS. These size standards generally define small businesses based on the number of employees or annual receipts, and the standards vary across different industries. Note that the SBA definition of a small business applies to the parent company and all affiliates as a single entity.

Table 5-1 presents the various farm sectors affected by a potential rulemaking and the NAICS code that most closely aligns with each sector.

**Table 5-1. Potentially Affected Farm Sectors and Corresponding NAICS Industries**

| Farm Sector | Corresponding NAICS Code | Description of NAICS Code |
|---|---|---|
| Beef Pasture | 112111 | The **Beef Cattle Ranching and Farming** subsector comprises establishments primarily engaged in raising cattle (including cattle for dairy herd replacements). |
| Confined Dairy Operations | 11212 | The **Dairy Cattle and Milk Production** subsector comprises establishments primarily engaged in milking dairy cattle. |
| Beef Feedlots | 112112 | This **Cattle Feedlots** subsector comprises establishments primarily engaged in feeding cattle for fattening. |
| Swine Finish (Only >55lb) Swine (All Other) | 1122 | The **Hog and Pig Farming** comprises establishments primarily engaged in raising hogs and pigs. These establishments may include farming activities, such as breeding, farrowing, and the raising of weanling pigs, feeder pigs, or market size hogs. |
| Sheep or Lambs | 112410 | The **Sheep Farming** subsector comprises establishments primarily engaged in raising sheep and lambs, or feeding lambs for fattening. The sheep or lambs may be raised for sale or wool production. |
| Turkeys | 112330 | The **Turkey Production** subsector comprises establishments primarily engaged in raising turkeys for meat or egg production. Maps to Turkey. |
| Poultry Layers | 112310 | The **Chicken Egg Farming** subsector comprises establishments primarily engaged in raising chickens for egg production. The eggs produced may be for use as table eggs or hatching eggs. |
| Poultry Broilers | 112320 | The **Broilers and Other Meat Type Chicken Production** subsector comprises establishments primarily engaged in raising broilers, fryers, roasters, and other meat type chickens. |

## 5.2. Potentially Affected Small Entities

To identify small entities, the Agency used data from the 2017 USDA Census providing sales for operations in the affected NAICS codes. The 2017 USDA provides data on sales for entities in various brackets based on heads sold, which can be compared to the applicable SBA thresholds.

Table 5-2 presents the NAICS codes for the affected sectors at the 4-, 5- and 6-digit levels, the NAICS industry description, and the SBA small business size standard for each NAICS code.

**Table 5-2. NAICS Codes, Industry Descriptions, and Small Business Size Standards for Affected Entities**

| NAICS Codes (6 Digit) | NAICS Codes (5 digit) | NAICS Codes (4 digit) | NAICS Industry Description | Small Business Size Standards (millions) |
|---|---|---|---|---|
| 112111 | 11211 | 1121 | Beef Cattle Ranching and Farming | $2.25 |
| 112120 | 11212 | 1121 | Dairy Cattle and Milk Production | $3.25 |
| 112112 | 11211 | 1121 | Cattle Feedlots | $19.50 |
| 112210 | 11221 | 1122 | Hog and Pig Farming | $3.50 |
| 112410 | 11241 | 1124 | Sheep Farming | $3.00 |
| 112330 | 11233 | 1123 | Turkey Production | $3.25 |
| 112310 | 11231 | 1123 | Chicken Egg Production | $16.50 |
| 112320 | 11232 | 1123 | Broilers and Other Meat Type Chicken Production | $3.00 |

Next, EPA used the sales data from the 2017 USDA Census to calculate the percentage of entities in each NAICS code that would be considered small based on the SBA definitions for each industry. For most affected industries, the SBA threshold aligns with a break in sales categories in the 2017 USDA Census, and the process for determining the percentage and number of small entities is thus straightforward. For other industries, the SBA threshold falls within one of the categories of entities as grouped by annual sales. One example is Beef and Cattle Ranching, where the SBA threshold of $2.25 million in annual sales is in the middle of the 2017 USDA Census category of entities with annual sales between $1 million and $2,499,999. In these cases, EPA estimated the percentage of the sales category that is below the SBA threshold and estimated the resulting percentage and number of total small entities based on the percentage of the sales category assumed to be below the SBA threshold.

Table 5-3 presents the estimated percentage of entities that meet SBA small business criteria, by sales size category, along with the average sales per entities in each size category. Note that for the poultry categories (turkeys, layers, broilers), the 2017 USDA Census does not provide sales data 1) for those individual animal categories, or 2) by heads sold size ranges. Instead, sales data are provided for total poultry, aggregated across subcategories, for various sales size ranges (Table 5-3). Based on the range of SBA thresholds for poultry ($3M - $16.5M) and the average revenue per entities, EPA assumes that all poultry entities are SBA small entities. As shown in Table 5-3, SBA small entities include the great majority of operations, except in some cases, for the largest sales size categories.

**Table 5-3. Operations that Meet SBA Small Entity Criteria and Average Revenue per Entity**

| Animal Category (NAICS) | Operation Size, Heads Sold | Percent SBA Small | Average Sales per Entity |
|---|---|---|---|
| Beef Cows (11211) | 1 to 9 Head | 100% | $3,943 |
| | 10 to 19 Head | 100% | $11,988 |
| | 20 to 49 Head | 100% | $28,273 |
| | 50 to 99 Head | 100% | $65,491 |

| Animal Category (NAICS) | Operation Size, Heads Sold | Percent SBA Small | Average Sales per Entity |
|---|---|---|---|
| | 100 to 199 Head | 100% | $141,614 |
| | 200 to 499 Head | 100% | $335,588 |
| | 500 to 999 Head | 100% | $806,639 |
| | 1,000 to 2,499 Head | 59% | $1,725,120 |
| | 2,500 to 4,999 Head | 0% | $4,149,235 |
| | 5,000 or More Head | 0% | $38,970,660 |
| Milk Cows (11212) | 1 to 9 Head | 100% | $16,438 |
| | 10 to 19 Head | 100% | $56,875 |
| | 20 to 49 Head | 100% | $134,228 |
| | 50 to 99 Head | 100% | $272,295 |
| | 100 to 199 Head | 100% | $561,749 |
| | 200 to 499 Head | 100% | $1,373,002 |
| | 500 to 999 Head | 35% | $3,250,772 |
| | 1,000 to 2,499 Head | 0% | $7,322,829 |
| | 2,500 to 4,999 Head | 0% | $15,255,993 |
| | 5,000 or More Head | 0% | $38,230,338 |
| Beef Feedlots (112112) | 1 to 19 Head | 100% | $21,742 |
| | 20 to 49 Head | 100% | $28,273 |
| | 50 to 99 Head | 100% | $65,491 |
| | 100 to 199 Head | 100% | $141,614 |
| | 200 to 499 Head | 100% | $335,588 |
| | 500 to 999 Head | 100% | $806,639 |
| | 1,000 to 2,499 Head | 59% | $1,725,120 |
| | 2,500 to 4,999 Head | 0% | $4,149,235 |
| Swine, Finishing (1122) | 1 to 24 Head | 100% | $1,231 |
| | 25 to 49 Head | 100% | $5,060 |
| | 50 to 99 Head | 100% | $10,309 |
| | 100 to 199 Head | 100% | $21,057 |
| | 200 to 499 Head | 100% | $49,922 |
| | 500 to 999 Head | 100% | $123,189 |
| | 1,000 to 1,999 Head | 100% | $262,690 |
| | 2,000 to 4,999 Head | 100% | $645,694 |
| | 5,000 or More Head | 48% | $3,596,610 |
| Swine, Other (1122) | 1 to 24 Head | 100% | $1,231 |
| | 25 to 49 Head | 100% | $5,060 |
| | 50 to 99 Head | 100% | $10,309 |
| | 100 to 199 Head | 100% | $21,057 |
| | 200 to 499 Head | 100% | $49,922 |
| | 500 to 999 Head | 100% | $123,189 |
| | 1,000 to 1,999 Head | 100% | $262,690 |
| | 2,000 to 4,999 Head | 100% | $645,694 |
| | 5,000 or More Head | 48% | $3,596,610 |
| Sheep and Lambs (1124) | 1 to 24 Head | 100% | $1,612 |
| | 25 to 49 Head | 100% | $5,693 |
| | 100 to 299 Head | 100% | $21,140 |
| | 300 to 999 Head | 100% | $71,138 |
| | 1,000 to 2,499 Head | 100% | $253,008 |
| | 2,500 to 4,999 Head | 100% | $494,517 |
| | 5,000 or More Head | 66% | $2,569,023 |
| Poultry Totals (Turkeys, Poultry Layers, Poultry Broilers (1123)), | Less than $1,000 | 100% | $373 |
| | $1,000 to $2,499 | 100% | $754 |
| | $2,500 to $4,999 | 100% | $955 |

| Animal Category (NAICS) | Operation Size, Heads Sold | Percent SBA Small | Average Sales per Entity |
|---|---|---|---|
| | $5,000 to $9,999 | 100% | $1,292 |
| | $10,000 to $24,999 | 100% | $1,854 |
| | $25,000 to $49,999 | 100% | $3,838 |
| | $50,000 to $99,999 | 100% | $9,151 |
| | $100,000 to $249,999 | 100% | $40,828 |
| | $250,000 to $499,999 | 100% | $220,100 |
| | $500,000 to $999,999 | 100% | $726,634 |
| | $1,000,000 or more | 100% | $3,421,237 |

A potential rulemaking, however, affects only entities with releases at or above the 100 lb/day RQ threshold, which is a small subset (37,891) of all entities (1.25 million) and includes relatively larger entities. As presented in Section 3, EPA estimated the number of entities subject to reporting based on the average number of heads per entity, by size category. EPA combined the above small business percentages and revenues with the data describing the number of entities subject to reporting, by inventory size category. This allows EPA to estimate specifically the number of SBA small entities among the 37,891 farms EPA estimates would be subject to reporting. Note that this analysis assumes a one-to-one relationship between operation and entity, given that the Agricultural Census data does not provide information to describe possible parent entities that own or operate more than one operation. Therefore, each operation is also an entity in this analysis. This assumption may result in overstating the number of small entities potentially affected by a rulemaking.

Table 5-4 presents these data, showing the percentage of SBA small entities by size category along with the number of reporting entities by size category. Combining these yields estimates of the number of reporting entities that meet SBA criteria, which EPA estimates is 31,921 of the 37,891 entities reporting under a potential rulemaking.

32

**Table 5-4. Number of SBA Small Operations Potentially Subject to Reporting**

| Animal Category (NAICS) | Operation Size Category | Total Operations with Inventory [A] | Percent SBA Small [B] | Total SBA Small Operations [C] | Farms Subject to Reporting [D] | SBA Small Operations Subject to Reporting |
|---|---|---|---|---|---|---|
| | | *See Chapter 2* | *See Table 5-3* | *=A\*B* | *See Chapter 2\** | *=B\*D* |
| **Total** | | **1,253,652** | | **1,247,166** | **37,891** | **31,921** |
| Beef Cows (11211) | 1 to 9 Head | 244,836 | 100% | 244,836 | 0 | 0 |
| | 10 to 19 Head | 148,259 | 100% | 148,259 | 0 | 0 |
| | 20 to 49 Head | 183,640 | 100% | 183,640 | 0 | 0 |
| | 50 to 99 Head | 80,411 | 100% | 80,411 | 0 | 0 |
| | 100 to 199 Head | 42,774 | 100% | 42,774 | 0 | 0 |
| | 200 to 499 Head | 23,188 | 100% | 23,188 | 0 | 0 |
| | 500 to 999 Head | 4,538 | 100% | 4,538 | 0 | 0 |
| | 1,000 to 2,499 Head | 1,202 | 59% | 708 | 0 | 0 |
| | 2,500 to 4,999 Head | 147 | 0% | 0 | 125 | 0 |
| | 5,000 or More Head | 51 | 0% | 0 | 51 | 0 |
| Milk Cows (11212) | 1 to 9 Head | 16,932 | 100% | 16,932 | 0 | 0 |
| | 10 to 19 Head | 2,556 | 100% | 2,556 | 0 | 0 |
| | 20 to 49 Head | 8,923 | 100% | 8,923 | 0 | 0 |
| | 50 to 99 Head | 12,137 | 100% | 12,137 | 0 | 0 |
| | 100 to 199 Head | 6,757 | 100% | 6,757 | 0 | 0 |
| | 200 to 499 Head | 3,830 | 100% | 3,830 | 3,313 | 3,313 |
| | 500 to 999 Head | 1,511 | 35% | 530 | 1,511 | 530 |
| | 1,000 to 2,499 Head | 1,239 | 0% | 0 | 1,239 | 0 |
| | 2,500 to 4,999 Head | 525 | 0% | 0 | 525 | 0 |
| | 5,000 or More Head | 189 | 0% | 0 | 189 | 0 |
| Beef Feedlots (112112) | 1 to 19 Head | 3,563 | 100% | 3,563 | 0 | 0 |
| | 20 to 49 Head | 6,476 | 100% | 6,476 | 0 | 0 |
| | 50 to 99 Head | 5,215 | 100% | 5,215 | 0 | 0 |
| | 100 to 199 Head | 3,907 | 100% | 3,907 | 0 | 0 |
| | 200 to 499 Head | 3,444 | 100% | 3,444 | 0 | 0 |
| | 500 to 999 Head | 1,826 | 100% | 1,826 | 236 | 236 |
| | 1,000 to 2,499 Head | 645 | 59% | 380 | 645 | 380 |
| | 2,500 to 4,999 Head | 700 | 0% | 0 | 700 | 0 |
| Swine, Finishing (1122) | 1 to 24 Head | 13,048 | 100% | 13,048 | 0 | 0 |
| | 25 to 49 Head | 412 | 100% | 412 | 0 | 0 |
| | 50 to 99 Head | 246 | 100% | 246 | 0 | 0 |
| | 100 to 199 Head | 164 | 100% | 164 | 0 | 0 |

| Animal Category (NAICS) | Operation Size Category | Total Operations with Inventory [A] | Percent SBA Small [B] | Total SBA Small Operations [C] | Farms Subject to Reporting [D] | SBA Small Operations Subject to Reporting |
|---|---|---|---|---|---|---|
| | | *See Chapter 2* | *See Table 5-3* | *=A\*B* | *See Chapter 2\** | *=B\*D* |
| | 200 to 499 Head | 507 | 100% | 507 | 0 | 0 |
| | 500 to 999 Head | 684 | 100% | 684 | 431 | 431 |
| | 1,000 to 1,999 Head | 1,208 | 100% | 1,208 | 1,208 | 1,208 |
| | 2,000 to 4,999 Head | 3,105 | 100% | 3,105 | 3,105 | 3,105 |
| | 5,000 or More Head | 1,658 | 48% | 802 | 1,658 | 802 |
| Swine, Other (1122) | 1 to 24 Head | 33,427 | 100% | 33,427 | 0 | 0 |
| | 25 to 49 Head | 3,347 | 100% | 3,347 | 0 | 0 |
| | 50 to 99 Head | 1,643 | 100% | 1,643 | 0 | 0 |
| | 100 to 199 Head | 1,056 | 100% | 1,056 | 0 | 0 |
| | 200 to 499 Head | 944 | 100% | 944 | 185 | 185 |
| | 500 to 999 Head | 621 | 100% | 621 | 621 | 621 |
| | 1,000 to 1,999 Head | 808 | 100% | 808 | 808 | 808 |
| | 2,000 to 4,999 Head | 1,619 | 100% | 1,619 | 1,619 | 1,619 |
| | 5,000 or More Head | 1,942 | 48% | 939 | 1,942 | 939 |
| Sheep and Lambs (1124) | 1 to 24 Head | 70,455 | 100% | 70,455 | 0 | 0 |
| | 25 to 49 Head | 24,089 | 100% | 24,089 | 0 | 0 |
| | 100 to 299 Head | 4,750 | 100% | 4,750 | 0 | 0 |
| | 300 to 999 Head | 1,438 | 100% | 1,438 | 0 | 0 |
| | 1,000 to 2,499 Head | 396 | 100% | 396 | 0 | 0 |
| | 2,500 to 4,999 Head | 152 | 100% | 152 | 129 | 129 |
| | 5,000 or More Head | 107 | 66% | 71 | 107 | 71 |
| Turkeys (1123) | 1 to 1,999 Head | 8,640 | 100% | 8,640 | 0 | 0 |
| | 2,000 to 7,999 Head | 67 | 100% | 67 | 0 | 0 |
| | 8,000 to 15,999 Head | 97 | 100% | 97 | 0 | 0 |
| | 16,000 to 29,999 Head | 222 | 100% | 222 | 0 | 0 |
| | 30,000 to 59,999 Head | 645 | 100% | 645 | 0 | 0 |
| | 60,000 to 99,999 Head | 653 | 100% | 653 | 116 | 116 |
| | 100,000 Or More Head | 830 | 100% | 830 | 830 | 830 |
| Poultry Layers (1123) | 1 to 49 Head | 202,403 | 100% | 202,403 | 0 | 0 |
| | 50 to 99 Head | 17,066 | 100% | 17,066 | 0 | 0 |
| | 100 to 399 Head | 7,871 | 100% | 7,871 | 0 | 0 |
| | 400 to 3,199 Head | 1,482 | 100% | 1,482 | 0 | 0 |
| | 3,200 to 9,999 Head | 513 | 100% | 513 | 0 | 0 |
| | 10,000 to 19,999 Head | 1,095 | 100% | 1,095 | 946 | 946 |
| | 20,000 to 49,999 Head | 1,484 | 100% | 1,484 | 1,484 | 1,484 |

34

| Animal Category (NAICS) | Operation Size Category | Total Operations with Inventory [A] | Percent SBA Small [B] | Total SBA Small Operations [C] | Farms Subject to Reporting [D] | SBA Small Operations Subject to Reporting |
|---|---|---|---|---|---|---|
| | | *See Chapter 2* | *See Table 5-3* | *=A*B* | *See Chapter 2** | *=B*D* |
| | 50,000 to 99,999 Head | 266 | 100% | 266 | 266 | 266 |
| | 100,000 Or More Head | 320 | 100% | 320 | 320 | 320 |
| Poultry Broilers (1123) | 1 to 1,999 Head | 17,403 | 100% | 17,403 | 0 | 0 |
| | 2,000 to 15,999 Head | 599 | 100% | 599 | 0 | 0 |
| | 16,000 to 29,999 Head | 93 | 100% | 93 | 0 | 0 |
| | 30,000 to 59,999 Head | 100 | 100% | 100 | 0 | 0 |
| | 60,000 to 99,999 Head | 263 | 100% | 263 | 0 | 0 |
| | 100,000 to 199,999 Head | 1,391 | 100% | 1,391 | 681 | 681 |
| | 200,000 to 299,999 Head | 1,965 | 100% | 1,965 | 1,965 | 1,965 |
| | 300,000 to 499,999 Head | 3,726 | 100% | 3,726 | 3,726 | 3,726 |
| | 500,000 Or More Head | 7,211 | 100% | 7,211 | 7,211 | 7,211 |

*Chapter 2 presents the estimated total universe based on the USDA size range data. This column shows the set of affected entities *by size category*, which is not presented in Chapter 2.

35

## 5.3. Cost-to-Sales Test

Table 5-5 shows the average revenue per operation (from Table 5-3) for the categories that include the 31,921 SBA small operations that are also subject to reporting. As noted previously, poultry sales data are not available by head-size category, and therefore EPA assigned all operations the average revenue for all poultry operations ($351,928), which likely understates the average revenue for poultry operations subject to reporting. Regardless, given the annualized cost per operation, even under this conservative assumption no poultry operations have costs exceeding 1 or 3 percent of sales. This finding applies across all categories, where the annualized cost is a de minimis fraction of annual sales for operations subject to reporting under the rule.

**Table 5-5. Average Revenue for SBA Small Operations Subject to Reporting**

| Animal Category (NAICS) | Operation Size, Heads Sold | SBA Small Operations Subject to Reporting | Average Sales per Reporting Operation |
|---|---|---|---|
| Milk Cows (11212) | 200 to 499 Head | 3,313 | $1,373,002 |
| | 500 to 999 Head | 530 | $3,250,772 |
| Beef Feedlots (112112) | 500 to 999 Head | 236 | $806,639 |
| | 1,000 to 2,499 Head | 380 | $1,725,120 |
| Swine, Finishing (1122) | 500 to 999 Head | 431 | $123,189 |
| | 1,000 to 1,999 Head | 1,208 | $262,690 |
| | 2,000 to 4,999 Head | 3,105 | $645,694 |
| | 5,000 or More Head | 802 | $3,596,610 |
| Swine, Other (1122) | 200 to 499 Head | 185 | $49,922 |
| | 500 to 999 Head | 621 | $123,189 |
| | 1,000 to 1,999 Head | 808 | $262,690 |
| | 2,000 to 4,999 Head | 1,619 | $645,694 |
| | 5,000 or More Head | 939 | $3,596,610 |
| Sheep and Lambs (1124) | 2,500 to 4,999 Head | 129 | $494,517 |
| | 5,000 or More Head | 71 | $2,569,023 |
| Turkeys (1123) | 60,000 to 99,999 Head | 116 | $351,928 |
| | 100,000 Or More Head | 830 | |
| Poultry Layers (1123) | 10,000 to 19,999 Head | 946 | |
| | 20,000 to 49,999 Head | 1,484 | $351,928 |
| | 50,000 to 99,999 Head | 266 | |
| | 100,000 Or More Head | 320 | |
| Poultry Broilers (1123) | 100,000 to 199,999 Head | 681 | |
| | 200,000 to 299,999 Head | 1,965 | $351,928 |
| | 300,000 to 499,999 Head | 3,726 | |
| | 500,000 Or More Head | 7,211 | |

As detailed in Section 3.3.4 of the TBD, the average annualized compliance cost of a potential rulemaking is $54 or $52 per farm at discount rates of 3 and 7 percent, respectively. The average cost per farm in year one is $443. EPA then compared these estimated compliance costs to the average annual sales for operations subject to reporting. As shown in Table 5-6, the annual sales required to result in a 1 percent sales impact, given the potential rule's cost, is below the average sales for all affected operation categories.

**Table 5-6. Average Cost per Affected SBA Small Operation**

|  | First-Year | Annualized Cost | |
|---|---|---|---|
|  |  | 3% | 7% |
| Cost per Farm | $443 | $54 | $52 |
| Revenue Threshold for 1% Impact | $44,339 | $5,431 | $5,168 |

## 5.4. Conclusion

EPA estimates that across all affected sectors, 37,891 farms will have releases greater than the 100 lb/day RQ and would be subject to a potential rulemaking. Of these, EPA estimated that most (31,921; or 84 percent) are small entities using SBA size standards. The cost-to-sales screening test results indicated that none of the affected operations would experience costs greater than one or three percent of annual sales. Based on the results of the cost-to-sales test, EPA concludes that potential requirements will not have a significant economic impact on a substantial number of small entities (i.e., operations).

---

**Key Data Inputs and Other Assumptions**

- To identify small entities, EPA used data from the 2017 USDA Census providing sales for operations in the affected NAICS codes.
- EPA then used the sales data from the 2017 USDA Census to calculate the percentage of entities in each NAICS code that would be considered small based on the SBA definitions for each industry.

---

# Chapter 6: Assessment of Effects on Communities with Environmental Justice Concerns

Although this potential rulemaking does not directly address human health or environmental conditions, the EPA investigated potential environmental justice concerns by conducting geospatial analyses. To conduct a thorough, national-level environmental screening analysis, transparent, publicly available data on where exactly the point source of air emissions are required. Unfortunately, these data do not exist at the national level. While the 2017 USDA Census is a complete count of U.S. farms and ranches and the individuals who operate them, publicly available data is aggregated to the county level to protect the confidentiality of the information provided by individual respondents. The National Agricultural Statistics Service (NASS) is bound by law (Title 7, U.S. Code, and the Confidential Information Protection and Statistical Efficiency Act or CIPSEA, Public Law 107-347) – and pledges to every data provider – to use the information for statistical purposes only. NASS publishes only aggregated data, not individual or farm-specific data.[19] They will also withhold data to avoid disclosing information on individual operations.[20] As described in Table 6-1, 12 to 30 percent of counties that report having animal operations do not report data on number of heads in the publicly available 2017 Census of Agriculture data.

**Table 6-1. National Summary of Counties with Animal Operations and Those Not Reporting Heads, 2017**

| Animal Operations | # Counties with Animal Operations | # Counties Reporting Animal Operations, but No Heads | |
|---|---|---|---|
| Beef | 3,056 | 731 | 24% |
| Broilers | 2,314 | 684 | 30% |
| Dairy | 2,412 | 704 | 29% |
| Layers | 3,041 | 360 | 12% |
| Swine | 2,900 | 520 | 18% |

Source: USDA 2022

As a result, the publicly available data include numbers of farm operations and farm type at the county level, except for counties that contain fewer than the number of operations required to protect farm-specific data. The EPA conducted three levels of analysis to identify communities that may be affected by the reporting rule based on the level of animal operations emissions at the county-level, tribal-level, and at the Census block group (BG) level of five select states. Ammonia and hydrogen sulfide are considered pollutants of local concern due to their odor and potential health effects. Despite its lower emissions in comparison to ammonia, hydrogen sulfide is considered to be of greater local concern due to its extremely low odor threshold. However, for this EJ analysis, ammonia was selected as an example pollutant due to the availability of

---

[19] USDA. 2022. Census of Agriculture. https://www.nass.usda.gov/AgCensus/

[20] "Not all data will be available. If publishing a particular data item would identify an operation (for example, if there is only one producer of a particular commodity in a county), NASS does not publish the information. In such cases, the data are suppressed and shown as "(D)," meaning "withheld to avoid disclosing data for individual operations." - https://www.nass.usda.gov/AgCensus/FAQ/2017

emission factors. Also, it should be noted that ammonia emissions can also have a regional impact as it contributes to the formation of $PM_{2.5}$, which can potentially affect human health.

## 6.1. County-Level Analysis

The county-level analysis applies the national, county-level, publicly available data from the 2017 USDA Census (USDA 2022) and compares the U.S. Census Bureau's (USCB) American Community Survey (ACS)[21] as well as American Indian/Alaska Native/Native Hawaiian Areas.[22] The county-level analysis first estimated the amount of ammonia emissions created in each county. EPA applied the NAEMS emissions data (see Table 6-2) to the total number of heads for beef, broilers, dairy, layers, and swine in each county.

**Table 6-2. Contribution Factors of Ammonia for each Animal Sector**

| Animal Type | Maximum Daily Ammonia Emissions Rate per Head[1] |
|---|---|
| Dairy Cows | 0.416 |
| Beef[2] | 0.107 |
| Broilers | 0.003 |
| Layers | 0.009 |
| Average Swine[3] | 0.187 |

[1] For full citations of the NAEMS data, please refer to Section 3.
[2] EPA assumes conservatively that beef applies to feedlots.
[3] Due to data restrictions, EPA calculates the average emission factor for all swine [(0.146+0.227)/2=0.1865].

Using the ammonia emission factors per head, EPA estimated total daily ammonia emissions per county. EPA merged the county-level ammonia emissions data with ACS county-level data. It should be noted that the methodology for determining ammonia emissions assumes that all farms have a maximum emission on the same day and thus will likely result in an over estimation of actual emissions. Figure 6-1 depicts the county-level analysis of counties emitting ammonia in quintile groupings.[23] Table 6-3 displays the demographic data by ammonia quintile grouping and the national average. The top quintile represents the counties emitting above the 80th percentile. The top quintile contained roughly 15.5 percent of the U.S. population in 2017, exceeding the national average populations percentages for American Indian or Alaskan Native (1.0% compared to 0.8% nationally), Hispanic or Latino (20.9% compared to 17.6% nationally), and the population below the poverty level (15.4% compared to 14.6% nationally).

Note that there are several drawbacks to using the 2017 USDA Census data. First, as the data is at the county-level, per EPA's guidance, "[County-level data's] lack of detail is problematic given that racial, ethnic, and income diversity, as well as differences in ambient concentrations,

---

[21] U.S. Census Bureau. 2017a. American Community Survey. Table B02001: Race. Available at: https://data.census.gov/table?q=B02001&tid=ACSDT5Y2017.B02001. U.S. Census Bureau. 2017b. American Community Survey. Table B03002: HISPANIC OR LATINO ORIGIN BY RACE. Available at: https://data.census.gov/table?q=B03002&tid=ACSDT5Y2017.B03002. U.S. Census Bureau. 2017c. American Community Survey. Table S1701: Poverty Status in the Past 12 Months. Available at: https://data.census.gov/table?q=S1701&tid=ACSST1Y2021.S1701

[22] U.S. Census Bureau. 2022. TIGER/Line Shapefile, 2019, nation, U.S., Current American Indian/Alaska Native/Native Hawaiian Areas National (AIANNH) National. https://catalog.data.gov/dataset/tiger-line-shapefile-2019-nation-u-s-current-american-indian-alaska-native-native-hawaiian-area

[23] Quintile means that they are in five equal groups along which the counties are divided.

could vary widely with the level of geospatial resolution."[24] Second, as described in Table 6-1, 12 to 30 percent of counties that report having animal operations do not report data on number of heads in the publicly available 2017 Census of Agriculture data.

---

[24] EPA. 2016. Technical Guidance for Assessing Environmental Justice in Regulatory Analysis. Available at: https://www.epa.gov/sites/default/files/2016-06/documents/ejtg_5_6_16_v5.1.pdf

**Figure 6-1. National Daily Ammonia Emissions from Select Animal Operations with EJ Considerations**



**Ammonia Emissions (daily lbs.)**

- No Data
- > 0 - 59.72 (20%)
- 59.73 - 451.02 (40%)
- 451.03 - 1693.24 (60%)
- 1693.25 - 9046.35 (80%)
- 9046.36 - 421280.05 (100%)

**Sources**
USDA National Agricultural Statistics Service, 2017 Census of Agriculture.
Complete data available at www.nass.usda.gov/AgCensus

**Notes**
*Animal operations are agricultural operations where animals are kept and raised in confined situations. Animal sectors include beef, broilers, dairy, layers, and swine
**County-level ammonia emissions from animal operations are binned into 5 equal groups by percentile (e.g., each color includes 20% of all counties).

**Table 6-3. County-Level Daily Ammonia Emissions by Quintile**

| Quintile of Ammonia Emissions[1] | Population | Black or African American Only | | American Indian or Alaskan Native Only | | Asian or Pacific Islander Only | | Other and Two or More Races[2] | | Hispanic or Latino | | Total Minority Population | | Income Below Poverty Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Number | % | Number | % | Number | % | Number | % | Number | % | Number | % | % |
| 1 (20%) | 92,717,621 | 16,988,010 | **18.3%** | 525,416 | 0.6% | 7,785,860 | **8.4%** | 9,452,683 | **10.2%** | 18,238,854 | **19.7%** | 45,348,477 | **48.9%** | **14.9%** |
| 2 (40%) | 74,244,517 | 8,993,841 | 12.1% | 620,052 | 0.8% | 3,390,135 | 4.6% | 5,079,223 | 6.8% | 14,567,961 | **19.6%** | 29,020,454 | **39.1%** | 13.9% |
| 3 (60%) | 50,943,951 | 4,509,648 | 8.9% | 509,431 | **1.0%** | 2,428,806 | 4.8% | 3,061,881 | 6.0% | 7,385,661 | 14.5% | 15,852,311 | 31.1% | 13.7% |
| 4 (80%) | 42,990,978 | 3,723,996 | 8.7% | 346,356 | 0.8% | 1,247,525 | 2.9% | 2,109,462 | 4.9% | 3,609,905 | 8.4% | 9,813,382 | 22.8% | 14.4% |
| 5 (100%) | 49,933,270 | 3,586,990 | 7.2% | 510,990 | **1.0%** | 2,118,912 | 4.2% | 4,566,323 | **9.1%** | 10,454,338 | **20.9%** | 17,598,054 | 35.2% | **15.4%** |
| Quintile Totals | 310,830,337 | 37,802,485 | 12.2% | 2,512,245 | 0.8% | 16,971,238 | 5.5% | 24,269,572 | 7.8% | 54,256,719 | 17.5% | 117,632,678 | 37.8% | 14.4% |
| No Emissions[3] | 10,174,070 | 2,808,330 | 27.6% | 119,857 | 1.2% | 785,198 | 7.7% | 1,365,280 | 13.4% | 2,253,852 | 22.2% | 6,093,940 | 59.9% | 18.8% |
| National Totals | 321,004,407 | 40,610,815 | 12.7% | 2,632,102 | 0.8% | 17,756,436 | 5.5% | 25,634,852 | 8.0% | 56,510,571 | 17.6% | 123,726,618 | 38.5% | 14.6% |

Sources: USCB (2017a, 2017b, 2017c) and USDA (2022)

Notes: 3,142 counties are included in the ACS Dataset compared to the 3,069 counties included in the Census of Agriculture, of which 3,041 counties report ammonia emissions from beef, broilers, dairy, hogs, and layers.

Note: **Bolded** values are those exceeding the national average.

[1] The quintile value maximums are: 0.08 (20%), 117.4 (40%), 575.2 (60%), 10,077.2 (80%), 421,280 (100%). The quintiles are listed in order of increasing ammonia emissions (i.e., the quintile "5 (100%)" is the top 20% of counties with the highest estimates for ammonia air emissions)

[2] This column represents the sum of the following race categories: "Some other race alone" and "Two or more races".

[3] The "No Emissions" row represents the 384 counties that do not report ammonia emissions from cattle, hogs, chickens, or turkeys. Note that NASS does not publish data when counties have limited numbers. In such cases, the data are suppressed and shown as "(D)," meaning "withheld to avoid disclosing data for individual operations." Thus, the counties included do not necessarily have no emissions.

Table 6-4 presents the top ten counties by daily ammonia emissions. Four of the top 10 counties exceed both national averages of minority population and the population with income below the poverty level.

**Table 6-4. Top 10 Counties in Daily Ammonia Emissions**

| Rank | County | Estimated Daily Ammonia Emissions (lb) | Population | Black or African America Only | American Indian or Alaskan Native Only | Asian or Pacific Islander Only | Other and Two or More Races | Hispanic or Latino | Total Minority Population | Income Below Poverty Level |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Duplin County, North Carolina | 421,280 | 59,350 | **24.81%** | 0.27% | 0.38% | 7.42% | **21.74%** | **48.20%** | **26.27%** |
| 2 | Sampson County, North Carolina | 377,108 | 63,664 | **25.32%** | **1.86%** | 0.56% | **8.69%** | **18.87%** | **48.37%** | **24.31%** |
| 3 | Sioux County, Iowa | 284,105 | 34,692 | 0.37% | 0.37% | 0.75% | 5.19% | 10.20% | 12.49% | 7.88% |

| Rank | County | Estimated Daily Ammonia Emissions (lb) | Population | Black or African America Only | American Indian or Alaskan Native Only | Asian or Pacific Islander Only | Other and Two or More Races | Hispanic or Latino | Total Minority Population | Income Below Poverty Level |
|---|---|---|---|---|---|---|---|---|---|---|
| 4 | Lancaster County, Pennsylvania | 265,379 | 536,494 | 4.27% | 0.15% | 2.15% | 4.86% | 10.03% | 17.29% | 10.37% |
| 5 | Washington County, Iowa | 250,527 | 22,095 | 0.95% | 0.26% | 0.60% | 1.50% | 5.86% | 8.50% | 9.13% |
| 6 | Texas County, Oklahoma | 224,154 | 21,409 | 4.04% | 0.57% | 3.05% | **31.01%** | **45.07%** | **54.39%** | **16.77%** |
| 7 | Lyon County, Iowa | 218,444 | 11,745 | 0.07% | 0.56% | 0.36% | 1.97% | 2.51% | 3.93% | 4.89% |
| 8 | Tulare County, California | 210,742 | 458,809 | 1.56% | **1.26%** | 3.64% | **14.65%** | **63.61%** | **70.49%** | **27.09%** |
| 9 | Hamilton County, Iowa | 188,749 | 15,201 | 1.14% | 0.05% | 3.02% | 1.97% | 5.95% | 10.39% | 9.36% |
| 10 | Plymouth County, Iowa | 179,483 | 25,027 | 0.44% | 0.34% | 0.67% | 3.07% | 4.54% | 7.21% | 9.14% |

Sources: USCB (2017a, 2017b, 2017c) and USDA (2022)

Note: **Bolded** values are those exceeding the national average.

Note: Emissions are estimated from five animal sectors: chicken broilers, chicken layers, beef, dairy, and hogs.

44

## 6.2. Tribal-Level Analysis

Next, still utilizing the county-level data, EPA incorporated a tribal lands geographic information system (GIS) layer (U.S. Census Bureau 2022) and created a variable estimating the percentage of land area in each county that is tribal land (i.e., identify the counties or portions of counties that comprise tribal lands). Once estimated, the Agency tallied the number of farms, heads, and emissions on tribal lands at the county level. For example, if tribal lands comprise 10 percent of a county, the analysis assumes that 10 percent of the county's emissions derive from tribal lands.

Table 6-5 presents a comparison of counties with some tribal lands, to all counties. The analysis looks at counties with farms exceeding the RQ for the 5 animal sectors analyzed above (beef, broilers, dairy, layers, and swine).

**Table 6-5. Counties With Farms Exceeding the RQ and the Percentage of Total Counties**

| Threshold (lb of ammonia) | Counties with Tribal Lands* | | | All Counties with Farms (Percent) Exceeding the RQ |
|---|---|---|---|---|
| | Number of Counties with Tribal Lands Exceeding the RQ | Percent of All Counties (3,078)[1] | Percent of Counties with Tribal Lands (387) Exceeding the RQ | |
| 100 | 184 | 5.98% | 47.55% | 2,774 (80.4%) |

*Counties with Tribal Lands mean that at least 0.01 percent tribal land comprises county land.
[1] Only 3,078 counties are included in this portion of the analysis because that is the number of counties in the 2017 USDA Census.

As shown in the table, the percentage of all counties with farms exceeding the RQ is much greater than the counties with tribal lands exceeding the RQ.

Figure 6-2 displays estimated daily ammonia emissions on tribal lands from five animal sectors: beef, broilers, dairy, layers, and swine. The estimate applies the amount of tribal land within a county and multiplies that percentage by the daily ammonia emissions in the county.

**Figure 6-2. County-Level Estimated Daily Ammonia Emissions on Tribal Lands***



EPA also analyzed additional USDA data in order to pinpoint emissions on tribal lands specifically than can be achieved with county-level information. EPA utilized USDA data presenting farm characteristics for 73 selected reservations (USDA 2019).[25] The USDA (2019) data includes inventory numbers for cattle and calves, hogs and pigs, layers, and broilers for each reservation. The tribal analysis applies the emissions factors in Table 6-6 to the animal inventory numbers that are available for each of the 73 selected reservations in USDA 2019.

**Table 6-6. Ammonia Emission Factors Used in the Tribal-Level Analysis**

| Animal Sectors | Ammonia Emissions Factor | Animals Inventory Data Available |
|---|---|---|
| Beef Pasture | 0.0348 | Cattle and calves (includes beef and milk cows) |
| Swine Finish (>55lb) only: | 0.146 | Hogs and pigs |
| Poultry Layers | 0.0088 | Layers |
| Poultry Broilers* | 0.0033 | Broilers Sold |

*The source, USDA 2019, provide broilers, and other meat-type chickens, in terms of heads sold, rather than inventory. The heads value is divided by 5 to account for the number of broiler heads on an ongoing inventory basis.

Applying the ammonia emissions factors to the animal inventories of each reservation, Table 6-7 presents the top ten reservations by total daily ammonia emissions.

**Table 6-7. Top Ten Reservations for Estimated Daily Ammonia Emissions**

| # | Reservation | Total Number of Farms* | Estimated Daily Ammonia Emissions* (lb) |
|---|---|---|---|
| 1 | Blackfeet | 419 | 8,052 |
| 2 | Rosebud | 337 | 4,621 |
| 3 | Cheyenne River | 370 | 4,026 |
| 4 | Crow | 199 | 3,899 |
| 5 | Standing Rock | 313 | 3,876 |
| 6 | Pine Ridge | 313 | 3,600 |
| 7 | Navajo Nation | 7,808 | 2,643 |
| 8 | Flathead | 655 | 2,590 |
| 9 | Winnebago | 69 | 2,414 |
| 10 | Yakama | 161 | 1,986 |

* Emissions are estimated from farms with inventories of cattle, hogs, layers, and broilers.

Figure 6-3 presents the 73 select reservations and the estimated daily ammonia emissions per square mile. Table 6-8 presents all 73 of the select reservations ranked by daily ammonia emissions per square mile.

---

[25] USDA. 2019. 2017 Census of Agriculture: American Indian Reservations. Available at:
https://www.nass.usda.gov/Publications/AgCensus/2017/Online_Resources/American_Indian_Reservations/AMINDIAN.pdf

**47**

**Figure 6-3. Tribal-Level Estimated Daily Ammonia Emissions per Square Mile from 73 Select Reservations**



**Table 6-8. Select Reservations Ranked by Ammonia Emissions (lb) per Square Mile**

| Reservation Name | State Location(s) | Tribal Area (sq. miles) | Ammonia Emissions on Tribal Lands (lb per sq. mile) | Total Ammonia Emissions on Tribal Lands (lb)* |
|---|---|---|---|---|
| Oneida Nation Reservation | WI | 0.08 | 5,638.19 | 463.0 |
| Burns Paiute Indian Colony | OR | 1.28 | 61.70 | 78.7 |
| Winnebago Reservation | NE | 177.93 | 13.57 | 2414.0 |
| Lower Sioux Indian Community | MN | 2.74 | 9.28 | 25.4 |
| Crow Creek Reservation | SD | 461.36 | 8.45 | 3898.5 |
| Omaha Reservation | IA, NE | 309.99 | 5.37 | 1664.8 |
| Blackfeet Indian Reservation | MT | 2399.24 | 3.36 | 8052.3 |
| Rosebud Indian Reservation | SD | 1390.85 | 3.32 | 4620.6 |
| Santee Reservation | NE | 184.51 | 3.27 | 603.1 |
| Lower Brule Reservation | SD | 383.93 | 2.62 | 1004.4 |
| Spirit Lake Reservation | ND | 399.42 | 1.32 | 528.7 |
| Yankton Reservation | SD | 684.53 | 1.28 | 874.1 |
| Flathead Reservation | MT | 2057.81 | 1.26 | 2590.0 |
| Lake Traverse Reservation | ND, SD | 1508.46 | 1.07 | 1610.8 |
| Standing Rock Reservation | ND, SD | 3662.58 | 1.06 | 3875.7 |
| Yakama Nation Reservation | WA | 2155.11 | 0.92 | 1985.9 |
| Cheyenne River Reservation | SD | 4411.10 | 0.91 | 4025.8 |
| Umatilla Reservation | OR | 270.40 | 0.86 | 231.3 |
| Pine Ridge Reservation | SD | 4353.30 | 0.83 | 3600.0 |
| Fort Belknap Reservation | MT | 973.42 | 0.79 | 767.4 |
| Fort Hall Reservation | ID | 854.82 | 0.77 | 660.7 |
| Rocky Boy's Reservation | MT | 88.15 | 0.73 | 64.5 |
| Turtle Mountain Reservation | ND | 71.83 | 0.67 | 48.4 |
| Fort Berthold Reservation | ND | 1582.61 | 0.62 | 989.1 |
| Nez Perce Reservation | ID | 1204.25 | 0.53 | 635.1 |
| Fort Peck Indian Reservation | MT | 3301.90 | 0.41 | 1343.7 |
| Bad River Reservation | WI | 196.62 | 0.37 | 71.8 |
| Crow Reservation | MT | 3576.06 | 0.36 | 1271.3 |
| Northern Cheyenne Indian Reservation | MT | 697.21 | 0.35 | 245.5 |
| Santo Domingo Pueblo | NM | 106.33 | 0.33 | 35.6 |
| Lac Courte Oreilles Reservation | WI | 123.19 | 0.29 | 35.4 |
| Wind River Reservation | WY | 3524.59 | 0.29 | 1008.7 |
| Jemez Pueblo | NM | 139.66 | 0.28 | 39.4 |
| Zuni Reservation | NM | 659.48 | 0.26 | 170.5 |
| White Earth Reservation | MN | 1163.00 | 0.21 | 241.1 |
| Colville Reservation | WA | 2184.91 | 0.18 | 391.3 |
| Isleta Pueblo | NM | 330.92 | 0.16 | 54.4 |
| Coeur d'Alene Reservation | ID | 536.45 | 0.14 | 74.0 |
| Navajo Nation Reservation | AZ, NM, UT | 22264.22 | 0.12 | 2643.1 |
| Gila River Indian Reservation | AZ | 583.77 | 0.10 | 60.9 |
| Spokane Reservation | WA | 249.93 | 0.10 | 24.4 |
| Fort McDowell Yavapai Nation Reservation | AZ | 38.93 | 0.08 | 3.1 |
| Fond du Lac Reservation | MN | 158.87 | 0.08 | 12.5 |
| Menominee Reservation | WI | 360.83 | 0.06 | 22.0 |
| Lummi Reservation | WA | 37.59 | 0.06 | 2.2 |
| Leech Lake Reservation | MN | 1310.36 | 0.06 | 74.5 |

| Reservation Name | State Location(s) | Tribal Area (sq. miles) | Ammonia Emissions on Tribal Lands (lb per sq. mile) | Total Ammonia Emissions on Tribal Lands (lb)* |
|---|---|---|---|---|
| Pueblo de Cochiti | NM | 82.11 | 0.05 | 4.4 |
| San Carlos Reservation | AZ | 2926.28 | 0.05 | 132.6 |
| Kaibab Indian Reservation | AZ | 188.93 | 0.04 | 7.9 |
| Hopi Reservation | AZ | 2532.85 | 0.04 | 99.0 |
| Hualapai Indian Reservation | AZ | 1594.37 | 0.04 | 58.1 |
| Warm Springs Reservation | OR | 1014.56 | 0.03 | 31.1 |
| Colorado River Indian Reservation | AZ | 464.15 | 0.02 | 8.4 |
| Tohono O'odham Nation Reservation | AZ | 4454.02 | 0.02 | 70.0 |
| Mille Lacs Reservation | MN | 159.31 | 0.01 | 1.6 |
| Red Lake Reservation | MN | 1260.31 | 0.01 | 6.3 |
| Cocopah Reservation | AZ | 10.03 | 0.00 | 0.0 |
| Bois Forte Reservation | MN | 211.84 | 0.00 | 0.0 |
| Salt River Reservation | AZ | 85.25 | 0.00 | 0.0 |
| Mississippi Choctaw Reservation | MS | 47.06 | 0.00 | 0.0 |
| Fort Mojave Reservation | AZ | 52.63 | 0.00 | 0.0 |
| Lac du Flambeau Reservation | WI | 135.26 | 0.00 | 0.0 |
| St. Croix Reservation | WI | 3.19 | 0.00 | 0.0 |
| Red Cliff Reservation | WI | 22.08 | 0.00 | 0.0 |
| Ho-Chunk Nation Reservation | MN, WI | 3.46 | 0.00 | 0.0 |
| Fort Yuma Indian Reservation | AZ, CA | 70.34 | 0.00 | 0.0 |
| Upper Sioux Community | MN | 2.05 | 0.00 | 0.0 |
| Stockbridge Munsee Community | WI | 23.61 | 0.00 | 0.0 |
| Sokaogon Chippewa Community | WI | 3.29 | 0.00 | 0.0 |
| Sac and Fox Nation Reservation | IA, KS, NE | 23.05 | 0.00 | 0.0 |
| Flandreau Reservation | MT | 3.50 | 0.00 | 0.0 |
| Prairie Island Indian Community | MN | 0.93 | 0.00 | 0.0 |
| Maricopa (Ak Chin) Indian Reservation | AZ | 32.82 | 0.00 | 0.0 |

* Animal sectors included in the ammonia emissions are beef, broilers, dairy, layers, and swine.

## 6.3. Census Block Group-Level Analysis of Select States

As noted above, while the county-level data allows for a consistent, nation-wide analysis, there are significant gaps in the published data. In addition, the county-level may obscure potential EJ concerns in areas in close proximity to animal operations, which are most directly affected by the operation and its emissions. The county-level analysis indicates the potential[26] for substantial EJ concerns in some of the counties identified in Table 6-4.

To assess the demographics of populations in closer proximity to animal operations, the Agency obtained farm location specific data from five states, including states with some of the top ammonia emitting counties from Table 6-4 (i.e., North Carolina and Iowa). The Agency also obtained data published by Indiana, Michigan, and Minnesota. Although the specific coverage of each dataset differs by state, these data include the location and numbers of animals (heads). EPA considered these states to have the best publicly available farm location data for analysis. Table 6-9 shows, for each state analyzed, the year the state most recently updated its farm data, the types of farms included in the dataset, the number of unique farms with cattle, swine, and/or poultry, whether farm location data (latitude/longitude) is available, and whether the farm data includes the number of heads by animal type so that ammonia emissions can be estimated.

**Table 6-9. Description of State-Level Data Sources**

| State | Data Year Updated Last | Farm Types Included | Number of Farms Analyzed | Available Lat/Long? | Able to Estimate Emissions? |
|-------|------------------------|----------------------|--------------------------|---------------------|------------------------------|
| Indiana[27] | 2021 | CAFOs and Confined Feeding Operations more than 600 swine, 300 cattle, 500 horses, or 30,000 poultry | 1,625 | Yes | Yes |
| Iowa[28] | 2022 | Medium and large Animal Feeding Operations (AFO)[29] | 10,690 | Yes | Yes |

---

[26] EPA's 2016 Technical Guidance for Assessing Environmental Justice in Regulatory Analysis defines "Potential environmental justice concern" as "Where the opportunity exists for a group of people to experience disproportionate impacts resulting from…on minority populations, low-income populations, or indigenous peoples that exist prior to or may be created by a proposed regulatory action. It can also indicate the actual or potential lack of fair treatment or meaningful involvement of minority populations, low-income populations, or indigenous peoples in the development, implementation, and enforcement of environmental laws, regulations, and policies." Available at: https://www.epa.gov/sites/default/files/2016-06/documents/ejtg_5_6_16_v5.1.pdf

[27] Indiana's CAFO data can be found at:
https://maps.indiana.edu/previewMaps/Environment/Agribusiness_Confined_Feeding_Operations.html

[28] Iowa's AFO data can be found at:
https://geodata.iowa.gov/documents/abfbd972640d4e87b6c48dc669775767/about

[29] As defined by EPA, "AFOs are agricultural operations where animals are kept and raised in confined situations. An AFO is a lot or facility (other than an aquatic production facility) where the following conditions are met: (1) animals have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12-month period, and (2) crops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility." Source: EPA. 2023. Animal Feeding Operations (AFOs). Available at: https://www.epa.gov/npdes/animal-feeding-operations-afos.

| State | Data Year Updated Last | Farm Types Included | Number of Farms Analyzed | Available Lat/Long? | Able to Estimate Emissions? |
|---|---|---|---|---|---|
| Michigan[30] | 2021 | CAFOs | 276 | Yes | Yes |
| Minnesota[31] | 2023 | CAFOs | 23,107 | Yes | Yes |
| North Carolina[32] | 2020 | More than 250 swine, 100 confined cattle, 75 horses, 1,000 sheep, or 30,000 poultry with a liquid waste management system. | 2,077 | Yes | Yes |

While the five states' datasets do allow for analysis of populations in closer proximity to farms and include some of the same data elements such as farm location data and estimated animal heads by type, they are not directly comparable.

The data from each state is analyzed at the census block group (BG) level, based on the BG associated with each reporting farm's location. Following the same conceptual approach as the county-level analysis, the Agency estimated the quantity of animal operation emissions in each BG as well as the demographic composition of the BG using Census American Community Survey (ACS) data at the BG level.[33] Table 6-10 presents the percent of population in counties, BGs, and BGs that have farms for each state. The percent of counties with farms far outstrips the percent of the population living in BGs with farms because large farms with animals tend to be located in rural, less dense areas. Additionally, the population in BGs is similar to the number of BGs because U.S. Census defines a BG as containing between 600 and 3,000 people.[34]

**Table 6-10. Percent of Population in BGs, Counties, and BGs with Farms**

| State | Percent of Counties with Farms | Percent Population in BGs with Farms | Percent of BGs with Farms |
|---|---|---|---|
| Indiana | 89% | 9.8% | 10.5% |
| Iowa | 100% | 26.5% | 30.5% |
| Michigan | 48% | 2.3% | 2.2% |
| Minnesota | 99% | 24.4% | 25.1% |
| North Carolina | 74% | 7.6% | 8.0% |

For each state, the analysis followed these steps:

---

[30] Michigan's CAFO data can be found at: https://gis-egle.hub.arcgis.com/datasets/michigan-concentrated-animal-feeding-operations-cafos/explore?location=44.288415%2C-84.884774%2C6.62

[31] Minnesota's feedlot data can be found at: https://gisdata.mn.gov/dataset/env-feedlots

[32] North Carolina's farm data can be found at: https://deq.nc.gov/cafo-map

[33] Including the percent of population that is Black or African American Only, American Indian or Alaskan Native Only, Asian or Pacific Islander Only, Other and Two or More Races, Hispanic or Latino, and Income Below Poverty Level.

[34] U.S. Census Bureau. n.d. Glossary. Available at: https://www.census.gov/programs-surveys/geography/about/glossary.html#:~:text=Block%20Groups%20(BGs)%20are%20statistical.data%20and%20control%20block%20numbering.

**(1) Retrieve data**. Data included in the analysis comprises each state's published the farm data and ACS data[35] at the BG level. One exception is that the available data for ACS Table S1701-Poverty Status in the Past 12 Months reflects percent of the population for whom poverty status is determined is reflected at the tract-level. The analysis also included EJSCREEN's estimate of "Less than or equal to twice the federal poverty level,"[36] another measure for low-income that reflects the BG-level.

**(2) Assign each farm a BG**. Using the location data provided by each state, the locations were mapped to a BG using a geographic information system (GIS).

**(3) Estimate farm-level emissions.** As stated in Table 6-9, each state's data includes a number of heads by animal type. The analyses of all five states applied the following ammonia emission rates per head.

**Table 6-11. Ammonia Emissions Applied per Animal Head**

| Animal Type | Maximum Daily Ammonia Emissions Rate per Head |
|---|---|
| Dairy Cows | 0.416 |
| Beef[1] | 0.107 |
| Broilers (sold)[2] | 0.0033 |
| Layers | 0.009 |
| Average Swine[3] | 0.1865 |

1. Due to data inconsistencies in the reflection of specific cattle type, this analysis applied the beef feedlot ammonia emission estimate per head to all non-dairy cattle to be conservative.
2. If the state specified that the reported number of broiler heads reflected the number of broilers sold, then this analysis divided the number of broiler heads by 5. If the state did not specify, the ammonia emissions estimate per head (0.003) was not divided by 5.
3. Due to data inconsistencies, EPA calculates the average emission factor for all swine [(0.146+0.227)/2=0.1865].

**(4) Estimate BG totals.** Using the assigned BGs created in step 2, the number of farms and estimated ammonia emissions were summed at the BG level.

**(5) Merge.** The racial/ethnic/socio-economic data included in step 1 is then merged with BG total estimates of farms and emissions at the BG level.

**(6) Analyze data.** For each BG with animal operation, the Agency compared the percentage of minority and low-income population in the BG to the state average for all BGs. The Agency assessed whether each BG was disadvantaged or underserved on the basis of race and income, using the following three criteria:

- **The percentage of any non-white population exceeds the state average by 10 percent or more** (i.e., the percent of BG population that is Black or African American Alone, American Indian or Alaskan Native Alone, Asian or Pacific Islander Alone, Other and

---

[35] ACS data included the 2021 5-year estimates for B02001-RACE (Available at: https://data.census.gov/table?q=B02001), B03002 - HISPANIC OR LATINO ORIGIN BY RACE (Available at: https://data.census.gov/table?q=B03002), and S1701- POVERTY STATUS IN THE PAST 12 MONTHS (Available at: https://data.census.gov/table?q=S1701)
[36] EJSCREEN data can be accessed here: https://gaftp.epa.gov/EJSCREEN/.

Two or More Races, Hispanic or Latino, or Total Minority Population exceeds the state average);

- **The percentage of population with income below the poverty level exceeds the state average by 10 percent or more** (i.e., based on the ACS Income Below Poverty Level metric, which is Census tract-level, or the EJSCREEN metric, Less than or equal to twice the federal poverty level); and,

- **Combined race and income criteria**, where the BG exceeds the state average by 10 percent or more for both of the above criteria.

If at least one of a BG's racial/ethnic metrics exceeded 10 percent of the state's average, the BG is denoted below as a "potential[37] minority community." If at least one of a BG's low-income metrics exceeded 10 percent of the state's average, the BG is denoted below as a "potential low-income community." If a BG was considered both a "potential minority community" and "potential low-income community," it is denoted below as a "potential minority and low-income community."

North Carolina deviates from the other states as it has its own environmental justice definition. North Carolina defines "Potentially Underserved Block Groups" as those:[38]

- Racial/Ethnic composition:
    - Share of nonwhites and Hispanic or Latino (of any race) is over 50 percent OR
    - Share of nonwhites and Hispanic or Latino (of any race) is at least 10 percent higher than County or State share.
- AND Poverty rate:[39]
    - Share of population experiencing poverty is over 20 percent AND
    - Share of households in poverty is at least 5 percent higher than the County or State share.

The results for Indiana are summarized in Table 6-12. The top two rows of the table summarize information for the state across all BGs, and for BGs with animal operations, and indicate the proportion of BGs that exceed the above-described criteria. For example, 59.4 percent of Indiana's BGs exceed the state's average for minority population by at least 10 percent. Also, for Indiana overall, 37 percent of BGs exceed both the race and income criteria. For the subset of BGs in Indiana with animal operations, these percentages are lower, at 29.5 percent and 10.3 percent, respectively. The remaining rows in the table show the same information for different subsets of BGs, based on animal waste emissions: the top 10, 20, 30, and so on. For example, the table indicates that the top 100 BGs in terms of estimated ammonia emissions in Indiana account for 65.6 percent of statewide animal waste emissions, and that 9 percent of those BGs exceed

---

[37] The word "potential" is used to clarify that "the opportunity exists for a group of people to experience disproportionate impacts," and that it is not necessarily determined that is a disproportionate impact exists.
[38] North Carolina DEQ. n.d. Community Mapping System. Available at
https://deq.nc.gov/media/26866/download?attachment
[39] North Carolina uses the ACS metric "S1701—Poverty Status in the Past 12 Months."

both race and income criteria. In comparison to all farming BGs and the state overall, the top 100 farming emission BGs have a lower proportion of disadvantaged communities.

The results for Iowa, Minnesota, and Michigan are very similar: the BGs with animal operations generally include a lower proportion of disadvantaged populations in comparison to the state average, whether on a race, income, or joint criteria basis (see Table 6-14, Table 6-16, and Table 6-18).

Table 6-13, Table 6-15, Table 6-17, Table 6-25, and Table 6-21 display the top 20 BGs in terms of estimated ammonia emissions for each of the five states. The tables compare the BGs to the state's low-income and minority populations, highlighted in red if the value exceeds the state average of that metric by 10 percent. For example, in Table 6-13, the 10th highest BG in emissions, White County, exceeds the state average in three of the six racial/ethnic metrics and both low-income metrics by 10 percent. These tables demonstrate the variability in socio-economic make-up of the highest emitting BGs in each state. Nineteen of North Carolina's top 20 BGs exceed the state average in at least one metric.

**Table 6-12. Indiana's Top Emitting BGs as Potential EJ Communities**

| Geography/Top BGs | Number of Farms | Daily Ammonia Emissions (lb) | | Population | | Potential Minority Communities | | Potential Low-Income Communities | | Potential Minority and Low-Income Communities |
|---|---|---|---|---|---|---|---|---|---|---|
| Indiana[1] | 1,624 | 1,729,478 | | 6,751,340 | | 3,144 | 59.4% | 2,811 | 53.1% | 1959 | 37.0% |
| IN–BGs w/ Farms[2] | 1,624 | 1,729,478 | | 660,508 | | 164 | 29.5% | 172 | 30.9% | 57 | 10.3% |
| 10 | 100 | 366,438 | 21.2% | 14,035 | 0.2% | 6 | 60% | 5 | 50% | 3 | 30% |
| 20 | 195 | 541,560 | 31.3% | 24,719 | 0.4% | 8 | 40% | 8 | 40% | 4 | 20% |
| 30 | 276 | 665,247 | 38.5% | 33,139 | 0.5% | 12 | 40% | 12 | 40% | 4 | 13% |
| 40 | 366 | 770,130 | 44.5% | 44,405 | 0.7% | 16 | 40% | 13 | 33% | 5 | 13% |
| 50 | 434 | 853,943 | 49.4% | 52,262 | 0.8% | 19 | 38% | 18 | 36% | 6 | 12% |
| 60 | 518 | 923,918 | 53.4% | 65,906 | 1.0% | 22 | 37% | 20 | 33% | 6 | 10% |
| 70 | 584 | 983,374 | 56.9% | 77,369 | 1.1% | 25 | 36% | 21 | 30% | 6 | 9% |
| 80 | 639 | 1,037,532 | 60.0% | 87,449 | 1.3% | 27 | 34% | 23 | 29% | 7 | 9% |
| 90 | 696 | 1,088,074 | 62.9% | 96,963 | 1.4% | 29 | 32% | 27 | 30% | 8 | 9% |
| 100 | 743 | 1,134,597 | 65.6% | 105,617 | 1.6% | 31 | 31% | 30 | 30% | 9 | 9% |

[1] IN has 5,290 BGs

[2] IN BGs with estimated ammonia emissions include 556 BGs

**Table 6-13. Indiana's 20 BGs with the Largest Estimated Ammonia Emissions**

| BG | County | Daily Ammonia Emissions (lb) | Farms | Population | Black or African American Alone | American Indian or Alaskan Native Alone | Asian or Pacific Islander alone | Other and Two or More Races | Hispanic or Latino | Total Minority Population | Income Below Poverty Level (Tract-Level) | Less than or equal to twice the federal poverty level (EJSCREEN) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Indiana | | 1,729,478 | 1,624 | 6,751,340 | 9.4% | 0.2% | 2.5% | 6.7% | 7.3% | 22.2% | 12.5% | 30.7% |
| 180759629001 | Jay County | 69,468 | 15 | 1,270 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 10.3% | 27.8% |
| 180759628003 | Jay County | 55,949 | 12 | 1,214 | 0.0% | 0.7% | 0.0% | 0.0% | 0.7% | 0.7% | 18.0% | 51.3% |
| 180759628002 | Jay County | 37,078 | 21 | 1,473 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 18.0% | 33.1% |
| 181319592001 | Pulaski County | 33,029 | 8 | 1,496 | 0.0% | 0.7% | 0.0% | 0.0% | 0.7% | 0.7% | 8.2% | 18.3% |
| 180719675012 | Jackson County | 32,832 | 1 | 1,641 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 2.2% | 3.8% |
| 181691023002 | Wabash County | 32,547 | 16 | 993 | 0.0% | 0.0% | 0.0% | 1.4% | 5.3% | 5.3% | 14.4% | 42.5% |
| 180379536001 | Dubois County | 30,075 | 6 | 1,059 | 0.0% | 0.0% | 0.0% | 11.0% | 8.4% | 11.0% | 8.0% | 16.3% |
| 180859624001 | Kosciusko County | 29,143 | 12 | 2,841 | 0.2% | 0.1% | 0.0% | 6.2% | 9.2% | 11.5% | 7.3% | 22.2% |
| 181691023001 | Wabash County | 23,627 | 4 | 966 | 0.0% | 0.0% | 5.2% | 0.0% | 0.0% | 5.2% | 14.4% | 7.8% |
| 181819582002 | White County | 22,691 | 5 | 1,082 | 0.3% | 0.0% | 0.0% | 36.2% | 37.0% | 37.6% | 18.5% | 56.2% |
| 181719511001 | Warren County | 19,808 | 9 | 659 | 0.0% | 0.0% | 0.0% | 0.0% | 20.6% | 20.6% | 11.5% | 26.9% |
| 180759627003 | Jay County | 19,721 | 14 | 824 | 2.7% | 0.0% | 0.2% | 0.5% | 0.0% | 3.4% | 10.5% | 33.1% |
| 180859625002 | Kosciusko County | 19,275 | 8 | 1,344 | 1.2% | 0.0% | 0.0% | 0.0% | 0.7% | 1.9% | 5.8% | 19.3% |

| BG | County | Daily Ammonia Emissions (lb) | Farms | Population | Black or African American Alone | American Indian or Alaskan Native Alone | Asian or Pacific Islander alone | Other and Two or More Races | Hispanic or Latino | Total Minority Population | Income Below Poverty Level (Tract-Level) | Less than or equal to twice the federal poverty level (EJSCREEN) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 180159599001 | Carroll County | 17,547 | 13 | 1,225 | 0.0% | 0.0% | 0.0% | 5.7% | 1.1% | 6.8% | 8.7% | 18.4% |
| 181819581002 | White County | 17,171 | 15 | 568 | 0.0% | 0.0% | 0.0% | 3.2% | 4.4% | 6.2% | **12.7%** | 19.0% |
| 181691023004 | Wabash County | 17,093 | 8 | 1,224 | 0.0% | **1.2%** | 0.0% | 1.6% | 2.5% | 4.1% | **14.4%** | 32.1% |
| 180799602003 | Jennings County | 16,660 | 1 | 1,278 | 0.0% | 0.0% | 0.0% | 2.8% | 2.8% | 2.8% | **14.2%** | 47.0% |
| 181111006002 | Newton County | 16,470 | 1 | 1,009 | 0.0% | 0.0% | 0.0% | 3.3% | 2.4% | 4.5% | 13.0% | **42.7%** |
| 180759629002 | Jay County | 16,014 | 13 | 956 | 0.0% | 0.0% | 0.0% | 2.8% | 4.3% | 6.2% | 10.3% | 29.8% |
| 180159599002 | Carroll County | 15,363 | 13 | 1,597 | 0.0% | 0.0% | 0.0% | 0.9% | 0.0% | 0.9% | 8.7% | 28.8% |

Note: **Bolded** values are those exceeding the state average.

## Table 6-14. Iowa's Top Emitting BGs as Potential EJ Communities

| Geography/Top BGs | Number of Farms | Daily Ammonia Emissions (lb) | | Population | | Potential Minority Communities | | Potential Low-Income Communities | | Potential Minority and Low-Income Communities | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Iowa – All[1] | **10,690** | **2,338,977** | | **3,179,090** | | **1,651** | **61.1%** | **1,354** | **50.1%** | 975 | **36.1%** |
| IA–BGs w/ Farms[2] | **10,690** | **2,338,977** | | **843,580** | | **297** | **36.0%** | **280** | **33.9%** | 120 | **14.5%** |
| 10 | 1,101 | 292,382 | 12.5% | 9,641 | 0.3% | 2 | 20% | 3 | 30% | 2 | 20% |
| 20 | 1,817 | 468,975 | 20.1% | 17,522 | 0.6% | 6 | 30% | 8 | 40% | 3 | 15% |
| 30 | 2,462 | 614,963 | 26.3% | 32,145 | 1.0% | 10 | 33% | 10 | 33% | 3 | 10% |
| 40 | 2,969 | 741,623 | 31.7% | 41,064 | 1.3% | 13 | 33% | 13 | 33% | 4 | 10% |
| 50 | 3,454 | 855,008 | 36.6% | 51,439 | 1.6% | 14 | 28% | 19 | 38% | 4 | 8% |
| 60 | 3,936 | 957,830 | 41.0% | 59,814 | 1.9% | 18 | 30% | 21 | 35% | 5 | 8% |
| 70 | 4,352 | 1,047,964 | 44.8% | 68,131 | 2.1% | 21 | 30% | 22 | 31% | 5 | 7% |
| 80 | 4,680 | 1,125,804 | 48.1% | 77,392 | 2.4% | 24 | 30% | 26 | 33% | 6 | 8% |
| 90 | 4,961 | 1,194,908 | 51.1% | 86,313 | 2.7% | 28 | 31% | 28 | 31% | 7 | 8% |
| 100 | 5,245 | 1,258,235 | 53.8% | 95,621 | 3.0% | 30 | 30% | 32 | 32% | 7 | 7% |

[1] IA has 2,703 BGs

[2] IA BGs with estimated ammonia emissions include 825 BGs

**Table 6-15. Iowa's 20 BGs with the Largest Estimated Ammonia Emissions**

| BG | County | Daily Ammonia Emissions (lb) | Farms | Population | Black or African American Alone | American Indian or Alaskan Native Alone | Asian or Pacific Islander alone | Other and Two or More Races | Hispanic or Latino | Total Minority Population | Income Below Poverty Level (Tract-Level) | Less than or equal to twice the federal poverty level (EJSCREEN) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Iowa** | | **2,338,977** | **10,690** | **3,179,090** | **3.7%** | **0.3%** | **2.6%** | **5.4%** | **6.4%** | **15.6%** | **11.0%** | **28.1%** |
| 191670704001 | Sioux County | 46,626 | 183 | 1,179 | 0.0% | 0.0% | 0.6% | 1.5% | 0.0% | 2.1% | 7.4% | 4.6% |
| 191479601002 | Palo Alto County | 44,320 | 159 | 922 | 0.0% | 0.0% | 0.0% | 5.0% | 2.1% | 5.0% | 5.3% | 14.4% |
| 191414901003 | O'Brien County | 33,530 | 103 | 1,027 | 0.0% | **0.8%** | 0.0% | **8.8%** | 0.3% | 9.8% | **12.9%** | 26.0% |
| 190834804001 | Hardin County | 30,278 | 93 | 919 | 3.4% | 0.0% | 0.0% | 0.1% | 0.0% | 3.5% | 9.0% | 14.6% |
| 191670703002 | Sioux County | 26,013 | 103 | 1,100 | 0.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.4% | 2.6% | 0.0% |
| 191199503005 | Lyon County | 24,029 | 114 | 1,087 | 0.0% | 0.0% | 2.5% | 0.0% | 0.0% | 2.5% | 5.3% | 4.2% |
| 191670703001 | Sioux County | 23,399 | 99 | 1,327 | 0.0% | 0.0% | 0.0% | 2.9% | 0.5% | 2.9% | 2.6% | 11.8% |
| 190693603002 | Franklin County | 23,154 | 75 | 778 | 0.0% | 0.0% | 0.0% | 3.3% | **13.9%** | 14.8% | 8.9% | **39.5%** |
| 190799602003 | Hamilton County | 20,959 | 66 | 479 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 4.2% | 4.6% |
| 191199501003 | Lyon County | 20,073 | 106 | 823 | 0.0% | 0.0% | 0.0% | 5.2% | 0.4% | 5.6% | 5.3% | **32.9%** |
| 191499705003 | Plymouth County | 19,424 | 91 | 659 | 0.0% | 0.0% | 0.0% | 3.0% | 0.0% | 3.0% | 4.8% | 0.0% |
| 190219603001 | Buena Vista County | 19,235 | 95 | 904 | 0.0% | 0.0% | 2.4% | **7.3%** | **17.1%** | **19.7%** | 9.0% | 25.5% |
| 191434601004 | Osceola County | 18,866 | 80 | 450 | 3.6% | 0.0% | 0.0% | 0.0% | 0.0% | 3.6% | **12.1%** | 3.8% |
| 191670701004 | Sioux County | 18,360 | 71 | 493 | 0.0% | 0.0% | **3.2%** | 4.1% | 4.1% | 7.3% | 8.1% | 22.5% |
| 191414902001 | O'Brien County | 18,274 | 62 | 1,025 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 10.9% | 23.1% |
| 190799602002 | Hamilton County | 17,325 | 66 | 716 | 0.0% | 0.0% | 0.0% | 0.8% | 1.3% | 1.8% | 4.2% | **33.4%** |
| 191499704003 | Plymouth County | 16,551 | 67 | 961 | 0.0% | 0.0% | 0.0% | 0.3% | **7.4%** | 7.7% | 7.9% | 13.0% |
| 191199503006 | Lyon County | 16,495 | 69 | 1,335 | 0.0% | 0.0% | 0.0% | 3.1% | 4.3% | 5.7% | 5.3% | **32.4%** |
| 190630701001 | Emmet County | 16,083 | 57 | 793 | 0.3% | 0.0% | 0.0% | 1.5% | 3.0% | 3.9% | 9.7% | **38.4%** |
| 191099501001 | Kossuth County | 15,980 | 58 | 545 | 0.0% | **0.9%** | 0.0% | 0.0% | 0.9% | 0.9% | **17.8%** | 15.0% |

Note: **Bolded** values are those exceeding the state average.

**Table 6-16. Michigan's Top Emitting BGs as Potential EJ Communities**

| Geography/Top BGs | Number of Farms | Daily Ammonia Emissions (lb) | | Population | | Potential Minority Communities | | Potential Low-Income Communities | | Potential Minority and Low-Income Communities | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Michigan[1]** | **276** | **432,415** | | **10,062,512** | | **5,615** | **67.0%** | **4,041** | **48.2%** | **3,122** | **37.2%** |
| **MI–BGs w/ Farms[2]** | **276** | **432,415** | | **235,977** | | **73** | **38.8%** | **77** | **41.0%** | **30** | **16.0%** |
| 10 | 34 | 194,946 | 45.1% | 16,557 | 0.2% | 4 | 40% | 3 | 30% | 1 | 10% |
| 20 | 60 | 235,929 | 54.6% | 27,628 | 0.3% | 8 | 40% | 6 | 30% | 3 | 15% |

| Geography/Top BGs | Number of Farms | Daily Ammonia Emissions (lb) | | Population | | Potential Minority Communities | | Potential Low-Income Communities | | Potential Minority and Low-Income Communities | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 82 | 265,695 | 61.4% | 40,853 | 0.4% | 11 | 37% | 10 | 33% | 4 | 13% |
| 40 | 103 | 288,662 | 66.8% | 53,323 | 0.5% | 13 | 33% | 16 | 40% | 5 | 13% |
| 50 | 118 | 307,841 | 71.2% | 65,004 | 0.6% | 17 | 34% | 23 | 46% | 8 | 16% |
| 60 | 132 | 324,773 | 75.1% | 76,287 | 0.8% | 20 | 33% | 26 | 43% | 9 | 15% |
| 70 | 145 | 340,006 | 78.6% | 87,238 | 0.9% | 28 | 40% | 30 | 43% | 13 | 19% |
| 80 | 156 | 354,340 | 81.9% | 96,566 | 1.0% | 32 | 40% | 34 | 43% | 13 | 16% |
| 90 | 170 | 366,681 | 84.8% | 109,773 | 1.1% | 34 | 38% | 41 | 46% | 14 | 16% |
| 100 | 183 | 377,489 | 87.3% | 124,584 | 1.2% | 39 | 39% | 44 | 44% | 15 | 15% |

[1] MI has 8,386 BGs.

2 MI BGs with estimated ammonia emissions include 188 BGs.

## Table 6-17. Michigan's 20 BGs with the Largest Estimated Ammonia Emissions

| BG | County | Daily Ammonia Emissions (lb) | Farms | Population | Black or African American Alone | American Indian or Alaskan Native Alone | Asian or Pacific Islander alone | Other and Two or More Races | Hispanic or Latino | Total Minority Population | Income Below Poverty Level (Tract-Level) | Less than or equal to twice the federal poverty level (EJSCREEN) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Michigan** | | **432,415** | **276** | **10,062,512** | **13.6%** | **0.5%** | **3.2%** | **6.0%** | **5.4%** | **26.0%** | **13.2%** | **30.7%** |
| 260670313021 | Ionia County | 73955 | 1 | 2137 | 0.0% | 0.0% | 2.5% | 5.1% | 3.6% | 8.6% | 3.0% | 18.3% |
| 260050324022 | Allegan County | 41421 | 9 | 1563 | 0.2% | 0.1% | 0.8% | 3.4% | 2.9% | 5.8% | 7.1% | 11.1% |
| 261390230013 | Ottawa County | 23100 | 1 | 3263 | 0.0% | 0.0% | 4.0% | 1.6% | 6.3% | 7.9% | 3.4% | 17.0% |
| 260050313002 | Allegan County | 20255 | 2 | 2333 | 0.5% | 0.9% | 0.5% | 1.6% | 1.0% | 4.1% | 13.0% | 33.0% |
| 260570008001 | Gratiot County | 6495 | 5 | 915 | 1.3% | 0.0% | 0.0% | 6.1% | 2.1% | 8.2% | 8.1% | 35.3% |
| 260050318001 | Allegan County | 6354 | 1 | 1422 | 2.2% | 0.0% | 0.0% | 7.3% | 4.9% | 9.5% | 4.7% | 18.7% |
| 261239701001 | Newaygo County | 6291 | 2 | 1577 | 4.4% | 1.9% | 0.0% | 4.8% | 2.0% | 11.3% | 15.7% | 50.3% |
| 260050303012 | Allegan County | 6000 | 6 | 1211 | 0.0% | 0.0% | 0.0% | 1.5% | 2.9% | 3.6% | 3.2% | 23.3% |
| 260639507001 | Huron County | 5602 | 2 | 876 | 0.0% | 0.0% | 3.0% | 2.9% | 2.4% | 6.8% | 11.9% | 34.3% |
| 260370106001 | Clinton County | 5474 | 5 | 1260 | 0.0% | 0.3% | 0.0% | 2.2% | 1.8% | 3.3% | 12.0% | 13.2% |
| 260770034002 | Kalamazoo County | 4793 | 4 | 1123 | 0.0% | 0.0% | 0.0% | 1.5% | 0.8% | 2.3% | 7.0% | 18.3% |
| 260050307022 | Allegan County | 4475 | 2 | 1709 | 0.0% | 0.0% | 1.1% | 1.5% | 0.6% | 3.2% | 8.2% | 23.6% |
| 261519703002 | Sanilac County | 4372 | 3 | 1095 | 0.0% | 0.0% | 0.4% | 4.8% | 9.2% | 11.1% | 19.0% | 38.6% |
| 260050309021 | Allegan County | 4369 | 2 | 1013 | 0.6% | 0.2% | 0.8% | 9.4% | 19.1% | 21.5% | 9.2% | 26.4% |
| 260639511002 | Huron County | 4146 | 3 | 642 | 0.0% | 0.0% | 0.0% | 1.4% | 0.9% | 1.4% | 11.8% | 15.3% |
| 260239511003 | Branch County | 3983 | 4 | 831 | 0.4% | 0.2% | 0.0% | 4.6% | 4.2% | 5.2% | 13.9% | 32.4% |
| 260239508004 | Branch County | 3982 | 1 | 1417 | 0.0% | 0.0% | 0.1% | 5.8% | 4.7% | 6.1% | 17.2% | 59.4% |
| 261550302001 | Shiawassee County | 3666 | 2 | 640 | 0.0% | 0.0% | 0.6% | 5.6% | 4.8% | 8.4% | 10.2% | 32.6% |

59

| BG | County | Daily Ammonia Emissions (lb) | Farms | Population | Black or African American Alone | American Indian or Alaskan Native Alone | Asian or Pacific Islander alone | Other and Two or More Races | Hispanic or Latino | Total Minority Population | Income Below Poverty Level (Tract-Level) | Less than or equal to twice the federal poverty level (EJSCREEN) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 260570009004 | Gratiot County | 3655 | 3 | 1011 | 12.1% | **0.7%** | 0.2% | 1.6% | 0.8% | 15.3% | **15.7%** | **52.3%** |
| 260270010002 | Cass County | 3544 | 2 | 1590 | 0.0% | **0.9%** | 1.5% | 0.9% | 0.0% | 3.3% | 3.8% | 9.7% |

Note: **Bolded** values are those exceeding the state average.

### Table 6-18. Minnesota's Top Emitting BGs as Potential EJ Communities

| Geography/ Top BGs | Number of Farms | Daily Ammonia Emissions (lb) | | Population | | Potential Minority Communities | | Potential Low-Income Communities | | Potential Minority and Low-Income Communities | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minnesota[1] | 23,104 | 2,963,811 | | 5,670,472 | | 2,928 | 62.2% | 2,166 | 46.0% | 1,771 | 37.6% |
| MN–BGs w/ Farms[2] | 23,104 | 2,963,811 | | 1,383,109 (24%) | | 436 | 36.9% | 318 | 26.9% | 191 | 16.2% |
| 10 | 1,065 | 359,662 | 12.1% | 10,958 | 0.2% | 4 | 40% | 4 | 40% | 2 | 20% |
| 20 | 1,730 | 605,930 | 20.4% | 18,802 | 0.3% | 7 | 35% | 8 | 40% | 4 | 20% |
| 30 | 2,554 | 806,329 | 27.2% | 28,620 | 0.5% | 9 | 30% | 11 | 37% | 6 | 20% |
| 40 | 3,135 | 987,089 | 33.3% | 37,187 | 0.7% | 11 | 28% | 15 | 38% | 7 | 18% |
| 50 | 3,715 | 1,142,566 | 38.6% | 46,833 | 0.8% | 13 | 26% | 17 | 34% | 8 | 16% |
| 60 | 4,399 | 1,283,822 | 43.3% | 55,724 | 1.0% | 15 | 25% | 21 | 35% | 9 | 15% |
| 70 | 5,171 | 1,409,749 | 47.6% | 66,058 | 1.2% | 16 | 23% | 25 | 36% | 10 | 14% |
| 80 | 5,707 | 1,524,356 | 51.4% | 74,842 | 1.3% | 19 | 24% | 26 | 33% | 11 | 14% |
| 90 | 6,180 | 1,625,730 | 54.9% | 83,461 | 1.5% | 19 | 21% | 31 | 34% | 11 | 12% |
| 100 | 6,591 | 1,717,623 | 58.0% | 90,752 | 1.6% | 21 | 21% | 37 | 37% | 12 | 12% |

1. MN has 4,706 BGs
2. MN BGs with estimated ammonia emissions include 1,181 BGs

### Table 6-19. Minnesota's 20 BGs with the Largest Estimated Ammonia Emissions

| BG | County | Daily Ammonia Emissions (lb) | Farms | Population | Black or African American Alone | American Indian or Alaskan Native Alone | Asian or Pacific Islander alone | Other and Two or More Races | Hispanic or Latino | Total Minority Population | Income Below Poverty Level (Tract-Level) | Less than or equal to twice the federal poverty level (EJSCREEN) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Minnesota | | 2,963,811 | 23,104 | 5,670,472 | 6.6% | 0.9% | 5.0% | 6.7% | 5.6% | 21.7% | 9.1% | 23.3% |
| 270917901001 | Martin County | 59,169 | 139 | 1,059 | 0.0% | 0.0% | 0.5% | 2.5% | 1.4% | 4.1% | 8.3% | 15.7% |
| 270917903001 | Martin County | 43,321 | 112 | 1,138 | 0.0% | **1.5%** | 0.9% | 0.8% | 0.8% | 3.4% | **10.1%** | 20.0% |

| BG | County | Daily Ammonia Emissions (lb) | Farms | Population | Black or African American Alone | American Indian or Alaskan Native Alone | Asian or Pacific Islander alone | Other and Two or More Races | Hispanic or Latino | Total Minority Population | Income Below Poverty Level (Tract-Level) | Less than or equal to twice the federal poverty level (EJSCREEN) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 271051052001 | Nobles County | 43,259 | 130 | 942 | 0.2% | 0.6% | 1.6% | 2.1% | 3.6% | 6.4% | 7.6% | **30.1%** |
| 271051052002 | Nobles County | 35,229 | 125 | 937 | 0.1% | **1.1%** | 0.4% | 4.2% | **14.5%** | 17.1% | 7.6% | **28.0%** |
| 270917904001 | Martin County | 34,719 | 89 | 1,000 | 0.4% | 0.0% | 0.0% | 2.6% | 0.1% | 3.0% | 6.4% | 20.3% |
| 271335703001 | Rock County | 29,941 | 146 | 1,007 | 0.7% | 0.3% | 1.5% | 3.2% | 2.4% | 5.7% | **13.1%** | 21.6% |
| 271034802003 | Nicollet County | 29,284 | 50 | 1,929 | 0.8% | **1.4%** | 0.1% | 3.9% | 3.5% | 9.7% | 8.0% | 15.5% |
| 271335701001 | Rock County | 28,890 | 133 | 655 | 0.0% | **1.2%** | 0.0% | 0.6% | 0.3% | 2.1% | 9.4% | 21.6% |
| 271711013004 | Wright County | 28,882 | 18 | 873 | 1.3% | 0.7% | 0.0% | 1.0% | 0.8% | 3.0% | 6.1% | 11.1% |
| 270634801002 | Jackson County | 26,968 | 123 | 1,418 | 0.1% | 0.0% | 0.0% | 2.3% | 1.6% | 2.5% | 5.9% | 13.5% |
| 271174605001 | Pipestone County | 26,658 | 124 | 668 | 0.0% | 0.0% | 0.0% | 0.4% | 1.3% | 1.8% | 3.6% | 19.0% |
| 271174604001 | Pipestone County | 25,940 | 105 | 824 | 0.6% | 1.0% | 0.1% | 3.3% | 1.8% | 5.0% | **11.4%** | 16.3% |
| 271494803001 | Stevens County | 25,662 | 52 | 1,061 | 2.4% | 0.0% | 3.2% | 2.5% | 3.2% | 9.0% | **17.9%** | 15.5% |
| 271431703002 | Sibley County | 25,548 | 3 | 1,238 | 0.6% | 0.5% | 1.8% | 6.1% | **14.6%** | 21.0% | 5.6% | 20.6% |
| 271297904002 | Renville County | 24,517 | 43 | 498 | 0.0% | **3.4%** | 0.0% | 0.2% | 2.6% | 6.2% | **11.8%** | 18.6% |
| 270917902002 | Martin County | 24,324 | 69 | 465 | 0.0% | 0.6% | 0.2% | 1.3% | 0.0% | 2.2% | 8.4% | 17.8% |
| 270917902004 | Martin County | 24,125 | 54 | 583 | 0.0% | 0.0% | 0.0% | 1.0% | 0.9% | 1.0% | 8.4% | 24.4% |
| 270731803002 | Lac qui Parle County | 23,764 | 51 | 1,424 | 0.1% | 0.2% | 0.1% | 4.4% | 5.7% | 7.0% | 6.3% | 19.7% |
| 271051053002 | Nobles County | 23,256 | 81 | 613 | 0.0% | 0.0% | 0.0% | **16.5%** | **20.2%** | 20.7% | 5.4% | **28.6%** |
| 270634802002 | Jackson County | 22,475 | 83 | 470 | 0.0% | 0.0% | 0.0% | 1.1% | 0.9% | 1.1% | 6.4% | 17.9% |

Note: **Bolded** values are those exceeding the state average.

The results for North Carolina, presented in Table 6-20, differ substantially from the other four states in that they indicate areas of disproportionate effects relative to the state averages. The table shows that among all BGs in North Carolina, 21.6 percent are underserved on a joint race and income basis (1,536 of the 7,111 BGs in North Carolina). By comparison:

- 25.3 percent of BGs with animal operations exceed these joint criteria, which is comparable to the state average but exceeds it by 17 percent, suggesting that farming BGs overall are disproportionately disadvantaged, or underserved.

- 20 percent of the top 10 farming BGs in North Carolina, by emissions, are underserved on a joint race and income basis, which is very close to the state average.

- However, looking more broadly at the top 100 BGs in North Carolina, these BGs account for 65.5 percent of statewide animal waste emissions. Among these BGs, 42 percent (i.e., 42 of them) are underserved on a joint race and income basis, which substantially exceeds the state average of 21.6 percent of all BGs. This relationship holds for the top 20 through the top 100

and indicates that areas in North Carolina with the most animal waste emissions are disproportionately disadvantaged or underserved.

**Table 6-20. North Carolina's Top Emitting BGs as Potential EJ Communities**

| Geography/Top BGs | Number of Farms | Ammonia Emissions (lb) | | Population | | Potential Minority Communities | | Potential Low-Income Communities | | Potentially Underserved Communities | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| North Carolina | 2,077 | 1,805,118 | | 10,386,227 | | 4,155 | 58.4% | 1,928 | 27.1% | 1,536 | 21.6% |
| NC – BGs w/ Farms | 2,077 | 1,805,118 | | 791,473 (8%) | | 377 | 66.3% | 190 | 33.4% | 144 | 25.3% |
| 10 | 226 | 289,612 | 16.0% | 12,407 | 0.1% | 7 | 70% | 3 | 30% | 2 | 20% |
| 20 | 427 | 471,740 | 26.1% | 24,972 | 0.2% | 14 | 70% | 10 | 50% | 7 | 35% |
| 30 | 563 | 606,462 | 33.6% | 37,560 | 0.4% | 22 | 73% | 16 | 53% | 13 | 43% |
| 40 | 678 | 718,579 | 39.8% | 47,264 | 0.5% | 32 | 80% | 21 | 53% | 18 | 45% |
| 50 | 777 | 819,408 | 45.4% | 60,507 | 0.6% | 40 | 80% | 24 | 48% | 20 | 40% |
| 60 | 867 | 909,209 | 50.4% | 72,044 | 0.7% | 49 | 82% | 30 | 50% | 25 | 42% |
| 70 | 954 | 988,643 | 54.8% | 86,059 | 0.8% | 58 | 83% | 36 | 51% | 31 | 44% |
| 80 | 1,034 | 1,059,654 | 58.7% | 99,449 | 1.0% | 67 | 84% | 43 | 54% | 37 | 46% |
| 90 | 1,100 | 1,123,862 | 62.3% | 113,555 | 1.1% | 74 | 82% | 46 | 51% | 39 | 43% |
| 100 | 1,157 | 1,181,990 | 65.5% | 128,168 | 1.2% | 83 | 83% | 49 | 49% | 42 | 42% |

1. NC has 7,111 BGs
2. NC BGs with estimated ammonia emissions include 569 BGs
Note - due to NC's DEQ definition, only the "Income below poverty level" is considered for this metric.
Source: North Carolina Department of Environmental Quality. 2022. Environmental Justice Report: Biogas Digester General Permit Development. Available at: https://deq.nc.gov/media/30369/download?attachment.

**Table 6-21. North Carolina's BGs with the Largest Estimated Ammonia Emissions**

| BG | County | Daily Ammonia Emissions (lb) | Farms | Population | Black or African American Alone | American Indian or Alaskan Native Alone | Asian or Pacific Islander alone | Other and Two or More Races | Hispanic or Latino | Total Minority Population | Income Below Poverty Level (Tract-Level) | Less than or equal to twice the federal poverty level (EJSCREEN) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State of North Carolina | | 1,805,118 | 2,077 | 10,386,227 | 21.4% | 1.2% | 3.0% | 6.9% | 9.5% | 37.4% | 14.4% | 33.2% |
| 370610904013 | Duplin County | 38,050 | 39 | 1,077 | 14.9% | 0.0% | 0.0% | 0.3% | 0.6% | 15.4% | 24.0% | 48.1% |
| 370959201023 | Hyde County | 35,863 | 2 | 427 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 19.8% | 33.7% |
| 370610908011 | Duplin County | 34,043 | 11 | 1,536 | 17.6% | 0.0% | 0.0% | 17.5% | 52.4% | 70.2% | 29.4% | 45.1% |
| 371639710011 | Sampson County | 31,661 | 24 | 418 | 66.7% | 0.0% | 0.0% | 0.0% | 0.0% | 66.7% | 16.9% | 14.1% |

62

| BG | County | Daily Ammonia Emissions (lb) | Farms | Population | Black or African American Alone | American Indian or Alaskan Native Alone | Asian or Pacific Islander alone | Other and Two or More Races | Hispanic or Latino | Total Minority Population | Income Below Poverty Level (Tract-Level) | Less than or equal to twice the federal poverty level (EJSCREEN) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 370179501012 | Bladen County | 30,813 | 21 | 1,058 | 23.3% | **2.5%** | 0.0% | **26.8%** | **24.1%** | **52.6%** | 10.3% | **44.9%** |
| 371639701011 | Sampson County | 28,044 | 23 | 2,117 | **35.2%** | 0.0% | 0.9% | **9.4%** | 9.1% | **50.0%** | **17.1%** | **51.5%** |
| 370610906001 | Duplin County | 23,371 | 29 | 1,126 | 4.4% | 0.0% | 0.0% | 0.0% | 0.0% | 4.4% | **15.9%** | 33.7% |
| 370610902011 | Duplin County | 23,049 | 19 | 1,275 | 15.4% | 0.0% | 1.1% | **8.8%** | **52.7%** | **74.5%** | 8.0% | **69.6%** |
| 371639710031 | Sampson County | 22,542 | 28 | 1,464 | **62.7%** | 0.0% | 0.0% | 0.0% | **15.6%** | **76.9%** | **24.5%** | **41.0%** |
| 371639710012 | Sampson County | 22,175 | 30 | 1,909 | 13.1% | 0.0% | 0.0% | **20.9%** | **48.8%** | **60.3%** | **16.9%** | 29.8% |
| 371639701024 | Sampson County | 21,941 | 24 | 974 | 6.2% | 0.0% | 0.0% | **25.2%** | **27.5%** | 33.7% | **31.6%** | **45.8%** |
| 371639710021 | Sampson County | 20,743 | 19 | 1,296 | **53.2%** | 0.2% | 0.0% | 4.9% | 9.0% | **62.7%** | 13.1% | **38.0%** |
| 371639701022 | Sampson County | 19,364 | 20 | 789 | 17.0% | 0.0% | 0.0% | 6.0% | **30.3%** | **53.2%** | **31.6%** | **47.8%** |
| 370610901023 | Duplin County | 18,789 | 21 | 1,424 | 11.9% | 0.0% | 2.8% | 0.0% | 7.7% | 22.5% | **21.5%** | 32.4% |
| 371639709001 | Sampson County | 18,068 | 23 | 972 | **44.9%** | 0.0% | 0.0% | 2.5% | 7.9% | **52.8%** | **37.1%** | **50.5%** |
| 370610901022 | Duplin County | 17,913 | 20 | 846 | 5.1% | 0.0% | **5.7%** | **16.8%** | **56.5%** | **69.9%** | **21.5%** | **61.9%** |
| 370610908032 | Duplin County | 17,407 | 17 | 896 | 11.8% | 0.0% | 0.0% | 0.0% | 0.0% | 11.8% | **22.6%** | **62.5%** |
| 370610901011 | Duplin County | 16,248 | 21 | 1,402 | 17.3% | 0.0% | 0.0% | 1.1% | **14.3%** | 32.7% | **19.6%** | **46.7%** |
| 371639705021 | Sampson County | 15,861 | 18 | 2,466 | 17.2% | **7.9%** | 0.5% | 6.7% | **13.4%** | 40.9% | **30.8%** | **69.0%** |
| 371910010001 | Wayne County | 15,794 | 18 | 1,500 | 6.8% | 0.0% | 0.9% | 5.3% | 3.6% | 14.0% | 11.9% | 28.7% |

Note: **Bolded** values are those exceeding the state average.

Figure 6-4 presents the southeastern region of North Carolina across three thresholds, swine operations emitting more than 100, 500, and 1,000 lbs per day. Only seven percent of swine operations, for which North Carolina reports data, do not exceed the 100 lb per day threshold. Recall from Section 2.4, Assessing RQ Adjustments, approximately 15,000 operations would be subject to reporting under a 500 pound RQ, and approximately 5,000 operations would report using an RQ of 1,000 pounds (see Table 2-5). The figure also denotes if a census block group is in the upper 80th percentile of the nationwide EJSCREEN Demographic Index and overlays the swine operations.

**Figure 6-4. Zoomed in Section of North Carolina's Southeast Region, Comparing Thresholds**

EJSCREEN's Demographic Index ≥ 80 percentile[1]

EJSCREEN's Demographic Index < 80 percentile

Ammonia Emissions per Swine Operations[2]

- 100-500 lbs/day (33% of swine operations)
- 500-1000 lbs/day (35% of swine operations)
- >1,000 lbs/day (25% of swine operations)

1 Demographic Index is based on the average of two demographic indicators; low-income and people of color. EJSCREEN's Demographic Index is represented at the census block group level. Percentile reflected is the 80th percentile of block group EJ data nationwide.

2 Animal operations are agricultural operations where animals are kept and raised in confined situations. Swine operations are point sources and each dot represents an operation.

Sources: EPA (2022) and North Carolina Department of Environmental Quality (2022)

Table 6-22 and Figure 6-5 summarize the results of the state analyses for all five states. The table summarizes the percentage of BGs in the state that are disadvantaged/underserved, along with the percentage of BGs with animal operations that are disadvantaged/underserved. As described above, except for North Carolina, the results indicate that BGs with animal operations tend to be *less* disadvantaged/underserved, in the five states for which data are available. The results from North Carolina indicate the opposite – that BGs with the most substantial animal operations are disproportionately disadvantaged/underserved. The state-level analyses overall are consistent with the county-level analysis in indicating that concerns may exist in certain communities with EJ concerns but does not show an overall correlation between locations of substantial animal waste air emissions and communities with EJ concerns. At the same time, the North Carolina results illustrate the utility of the BG analysis, relative to the county-level analysis, in identifying and highlighting specific areas that may present EJ concerns.

**Table 6-22. Percent of BGs that are Potential Minority and Low-Income Communities, based on Joint Race and Income Criteria**

| State | All BGs Meeting Joint Criteria, Statewide | All Farming BGs Meeting Joint Criteria | Top 100 Farming BGs, by Emissions Meeting Joint Criteria | Top 100 Emissions, Percent of Total Emissions |
|-------|------|------|------|------|
| NC | 22% | 25% | 42% | 65% |
| IA | 36% | 15% | 7% | 54% |
| IN | 37% | 10% | 9% | 66% |
| MI | 37% | 16% | 15% | 87% |
| MN | 38% | 16% | 12% | 58% |

**Figure 6-5. Percent of BGs that Meet Joint Criteria, by Animal Operation Status**



# Chapter 7: References

Asman, W.A.H. 1992 Ammonia Emission in Europe: Updated Emission and Emission Variations, National Institute of Public Health and Environmental Protection, Bilthoven, Netherlands presented in Battye, R., W. Battye, C. Overcash, and S. Fudge. (1994) *Development and Selection of Ammonia Emission Factors*. Final Report, August.

Bae, H., P. Wilcoxen, and D. Popp, 2010. Information disclosure policy: Do state data processing efforts help more than the information disclosure itself? *Journal of Policy Analysis and Management*, *29*(1), pp.163-182.

Bogan, B.W., K. Wang, W.P. Robarge, J. Kang, and A.J. Heber. 2010. National Air Emissions Monitoring Study: Emissions Data from Three Swine Finishing Barns in North Carolina – Site NC3B. Final Report. Purdue University, West Lafayette, IN, July 2. https://archive.epa.gov/airquality/afo2012/web/pdf/nc3bsummaryreport.pdf

Bouwman, A.F., D.S. Lee, W.A.H. Asman, F.J. Dentener, K.W. Van der Hoek and J.G.J. Olivier, 1997. A Global High-Resolution Emission Inventory for Ammonia. Global Biogeochemical Cycles 11(4): 561-587.

Cortus, E.L., J. Koziel, L. Cai, S.J. Hoff, J. Harmon, J. Mickelson, and A.J. Heber. 2010. National Air Emissions Monitoring Study: Emissions Data from Two Sow Barns and One Swine Farrowing Room in Iowa- Site IA4B. Final Report. Purdue University, West Lafayette, IN, July 26. https://archive.epa.gov/airquality/afo2012/web/pdf/ia4bsummaryreport.pdf

Cortus, E.L., X.-J. Lin, R. Zhang, and A.J. Heber. 2010. National Air Emissions Monitoring Study: Emissions Data from Two Broiler Chicken Houses in California – Site CA1B. Final Report. Purdue University, West Lafayette, IN, July 2. https://archive.epa.gov/airquality/afo2012/web/pdf/ca1bsummaryreport.pdf

Hutchinson, G.L., A.R. Moser, and C.E. Andre. 1982. Ammonia and Amine Emissions from a Large Cattle Feedlot. Journal of Environmental Quality 11(2): 288-293.

Ni, Ji-Qin, Claude A. Diehl, Teng Teeh Lim, Bill W. Bogan, Lide Chen, Lilong Chai, and Albert J. Heber. 2010. National Air Emissions Monitoring Study: Emissions Data from Two High-Rise Layer Houses in Indiana – Site IN2H. Final Report. Purdue University, West Lafayette, IN, July 30. https://archive.epa.gov/airquality/afo2012/web/pdf/in2hsummaryreport.pdf

North Carolina Department of Environmental Quality. 2022. Animal Operations Data. Available at: https://deq.nc.gov/cafo-mapRamirez-Dorronsoro, J.C., H.S. Joo, P. Ndegwa, and A.J. Heber. 2010. National Air Emissions Monitoring Study: Data from Two Dairy Freestall Barns in Washington WA5B, Final Report. Purdue University, West Lafayette, IN, July 30. https://archive.epa.gov/airquality/afo2012/web/pdf/wa5bsummaryreport.pdf

U.S. Bureau of Economic Analysis. 2022. Table 1.1.9. Implicit Price Deflators for Gross Domestic Product, Seasonally adjusted. December 22, 2022

U.S. Bureau of Labor Statistics. 2022a. May 2021 data: National industry-specific and by ownership. Available: https://www.bls.gov/oes/

U.S. Bureau of Labor Statistics. 2022b. December 15, 2022. Employer Costs for Employee Compensation – September 2022, Table 4. https://www.bls.gov/news.release/archives/ecec_06172021.pdf

U.S. Bureau of Labor Statistics. 2022c. December 15, 2022. Employer Costs for Employee Compensation – September 2022, Table 3. State and local government workers by occupational and industry group. https://www.bls.gov/news.release/ecec.t03.htm

U.S. Department of Agriculture. 2022. "2017 Census of Agriculture." Accessed July 21, 2022. Available at https://www.nass.usda.gov/Publications/AgCensus/2017/index.php

U.S. Environmental Protection Agency (U.S. EPA). 2006. EPA's Action Development Process: Final Guidance for EPA Rulewriters: Regulatory Flexibility Act as amended by the Small Business Regulatory Enforcement Fairness Act (November 2006). https://19january2017snapshot.epa.gov/sites/production/files/2015-06/documents/guidance-regflexact.pdf

U.S. Environmental Protection Agency (U.S. EPA). 2015. Regulatory Definitions of Large CAFOs, Medium CAFO, and Small CAFOs. https://www.epa.gov/sites/default/files/2015-08/documents/sector_table.pdf. Accessed October 25, 2022

U.S. Environmental Protection Agency (U.S. EPA). 2016. *Technical Guidance for Assessing Environmental Justice in Regulatory Analysis*. https://www.epa.gov/sites/production/files/2016-06/documents/ejtg_5_6_16_v5.1.pdf

U.S. EPA. 2017. ICR for Collection Under CERCLA 103 for Farms - December 04, 2017 - OMB Version. Available: https://www.regulations.gov/document/EPA-HQ-SFUND-2007-0469-1370

U.S. Environmental Protection Agency (U.S. EPA). 2022. Learn About Environmental Justice. https://www.epa.gov/environmentaljustice/learn-about-environmental-justice. Accessed February 10, 2022

U.S. Office of Management and Budget (OMB). 2003. *Circular A-4.* September 17, 2003, p. 33-34. https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf.

U.S. Office of Personnel Management (OPM). 2021. SALARY TABLE 2021-DCB. January 2021. Retrieved from: https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2021/DCB_h.pdf

U.S. Small Business Administration (SBA). 2017. *A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act.* SBA Office of Advocacy, August 2017

U.S. Small Business Administration (SBA). 2022. *Table of Size Standards,* effective July 14, 2022. https://www.sba.gov/document/support--table-size-standards.

# Appendix A – USDA 2017 Census of Agriculture Data

**Table A-1. Excerpted from Table 12, 2017 USDA Census of Agriculture, Cattle and Calves – Inventory**

| Item | Operations with Inventory | Number | Item | Operations with Inventory | Number |
|---|---|---|---|---|---|
| **Cattle and calves** | **882,692** | **93,648,041** | **Milk cows** | **54,599** | **9,539,631** |
| 1 to 9 | 228,611 | 1,102,366 | 1 to 9 | 16,932 | 39,147 |
| 10 to 19 | 156,128 | 2,147,031 | 10 to 19 | 2,556 | 34,508 |
| 20 to 49 | 214,091 | 6,640,164 | 20 to 49 | 8,923 | 312,357 |
| 50 to 99 | 118,805 | 8,194,726 | 50 to 99 | 12,137 | 824,707 |
| 100 to 199 | 80,326 | 10,940,187 | 100 to 199 | 6,757 | 891,988 |
| 200 to 499 | 56,079 | 16,757,973 | 200 to 499 | 3,830 | 1,144,357 |
| 500 to 999 | 17,634 | 12,036,890 | 500 to 999 | 1,511 | 1,023,374 |
| 1,000 to 2,499 | 7,775 | 11,293,032 | 1,000 to 2,499 | 1,239 | 1,938,306 |
| 2,500 to 4,999 | 1,973 | 6,681,843 | 2,500 to 4,999 | 525 | 3,330,887 |
| 5,000 or more | 1,270 | 17,853,199 | 5,000 or more | 189 | 706,940 |
| **Beef cows** | **729,046** | **31,722,039** | **Cattle on feed** | **25,776** | **15,025,052** |
| 1 to 9 | 244,836 | 2,525,904 | 1 to 19 | 3,563 | 51,492 |
| 10 to 19 | 148,259 | 3,602,204 | 20 to 49 | 6,476 | 199,887 |
| 20 to 49 | 183,640 | 9,806,208 | 50 to 99 | 5,215 | 352,062 |
| 50 to 99 | 80,411 | 9,808,936 | 100 to 199 | 3,907 | 522,381 |
| 100 to 199 | 42,774 | 10,517,457 | 200 to 499 | 3,444 | 1,031,062 |
| 200 to 499 | 23,188 | 12,281,573 | 500 to 999 | 1,826 | 1,268,565 |
| 500 to 999 | 4,538 | 5,413,155 | 1,000 to 2,499 | 645 | 973,247 |
| 1,000 to 2,499 | 1,202 | 3,002,683 | 2,500 or more | 700 | 10,626,356 |
| 2,500 to 4,999 | 147 | 1,024,614 | | | |
| 5,000 or more | 51 | 639,479 | | | |

Source: Table 12. Cattle and Calves – Inventory: 2017 Census of Agriculture. U.S. Department of Agriculture.
https://www.nass.usda.gov/Quick_Stats/CDQT/chapter/1/table/12/state/US/year/2017

**Table A-2. Excerpted from Table 17, 2017 USDA Census of Agriculture, Milk Cow Herd Size – Inventory**

| Milk cow herd | Total | | Cows and heifers that calved | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Total | | Milk Cows | | Other Cattle (see text) | |
| | Farms | Number | Farms | Number | Farms | Number | Farms | Number |
| **Total** | 54,599 | 17,756,793 | 54,599 | 10,104,099 | 54,599 | 9,539,631 | 48,271 | 7,652,694 |
| 1 to 9 | 16,932 | 593,204 | 16,932 | 308,551 | 16,932 | 39,147 | 12,854 | 284,253 |
| 10 to 19 | 2,556 | 105,139 | 2,556 | 54,130 | 2,556 | 34,508 | 2,136 | 51,009 |
| 20 to 49 | 8,923 | 663,986 | 8,923 | 356,847 | 8,923 | 312,357 | 8,292 | 307,139 |
| 50 to 99 | 12,137 | 1,662,141 | 12,137 | 890,141 | 12,137 | 824,707 | 11,697 | 772,000 |
| 100 to 199 | 6,757 | 1,818,385 | 6,757 | 964,912 | 6,757 | 891,988 | 6,432 | 853,473 |
| 200 to 499 | 3,830 | 2,146,530 | 3,830 | 1,188,377 | 3,830 | 1,144,357 | 3,614 | 958,153 |
| 500 to 999 | 1,511 | 1,816,444 | 1,511 | 1,039,069 | 1,511 | 1,023,374 | 1,411 | 777,375 |
| 1,000 to 2,499 | 1,239 | 3,317,917 | 1,239 | 1,956,438 | 1,239 | 1,938,306 | 1,166 | 1,361,479 |
| 2,500 to 4,999 | 525 | 2,952,230 | 525 | 1,776,263 | 525 | 1,767,468 | 490 | 1,175,967 |
| 5,000 or more | 189 | 2,680,817 | 189 | 1,568,971 | 189 | 1,563,419 | 179 | 1,111,846 |
| No milk cow herd | 828,093 | 75,891,248 | 713,943 | 31,157,571 | (X) | (X) | 658,669 | 44,733,677 |

Source:  Table 17. Milk Cow Herd Size – Inventory and Sales: 2017, 2017 Census of Agriculture, U.S. National Level Data, US Department of Agriculture.
https://www.nass.usda.gov/Quick_Stats/CDQT/chapter/1/table/17/state/US/year/2017
Other cattle: Data include heifers that had not calved, steers, calves, and bulls.

**Table A-3. Excerpted from Table 30, 2017 USDA Census of Agriculture, Poultry – Inventory and Number Sold**

| Poultry | Farms | Number | Poultry | Farms | Number |
|---|---|---|---|---|---|
| Layers - Operations with Inventory | 232,500 | 368,241,393 | Layers - Operations with Sales | 36,012 | 207,440,241 |

69

| Poultry | Farms | Number | Poultry | Farms | Number |
|---|---|---|---|---|---|
| 1 to 49 | 202,403 | 3,260,087 | 1 to 99 | 29,196 | 549,734 |
| 50 to 99 | 17,066 | 1,063,287 | 100 to 399 | 2,657 | 463,597 |
| 100 to 399 | 7,871 | 1,253,342 | 400 to 3,199 | 994 | 1,070,005 |
| 400 to 3,199 | 1,482 | 1,464,135 | 3,200 to 9,999 | 471 | 3,256,798 |
| 3,200 to 9,999 | 513 | 3,499,325 | 10,000 to 19,999 | 1,120 | 17,007,392 |
| 10,000 to 19,999 | 1,095 | 16,185,116 | 20,000 to 49,999 | 1,133 | 32,541,028 |
| 20,000 to 49,999 | 1,484 | 42,059,552 | 50,000 to 99,999 | 197 | 13,142,604 |
| 50,000 to 99,999 | 266 | 17,973,810 | 100,000 or more | 244 | 139,409,083 |
| 100,000 or more | 320 | 281,482,739 | | | |
| Broilers - Operations with Inventory | 42,226 | 1,506,276,846 | Pullets for laying flock replacement - Operations with Inventory | 35,005 | 130,530,985 |
| Broilers - Operations with Sales | 32,751 | 8,889,759,283 | Pullets for laying flock replacement - Operations with Sales | 6,100 | 220,460,912 |
| 1 to 1,999 | 17,403 | 1,848,106 | 1 to 1,999 | 4,373 | 264,813 |
| 2,000 to 15,999 | 599 | 3,275,099 | 2,000 to 15,999 | 170 | 1,544,674 |
| 16,000 to 29,999 | 93 | 2,101,310 | 16,000 to 29,999 | 232 | 4,977,929 |
| 30,000 to 59,999 | 100 | 4,178,760 | 30,000 to 59,999 | 487 | 20,655,059 |
| 60,000 to 99,999 | 263 | 20,957,369 | 60,000 to 99,999 | 403 | 29,605,031 |
| 100,000 to 199,999 | 1,391 | 206,319,172 | 100,000 or more | 435 | 163,413,406 |
| 200,000 to 299,999. | 1,965 | 479,850,660 | | | |
| 300,000 to 499,999 | 3,726 | 1,457,192,115 | Turkeys - Operations with Inventory | 23,173 | 104,322,709 |
| 500,000 or more | 7,211 | 6,714,036,692 | Turkeys | 11,154 | 285,317,097 |
| | | | Farms with sales, measured in heads- | | |
| Other Poultry - Operations with Inventory | | | 1 to 1,999 | 8,640 | 329,960 |
| Ducks | 31,541 | 4,952,694 | 2,000 to 7,999 | 67 | 278,666 |
| Geese | 12,107 | 101,619 | 8,000 to 15,999 | 97 | 1,143,142 |
| Roosters | 34,996 | 6,997,595 | 16,000 to 29,999 | 222 | 5,056,778 |
| Guineas | 18,941 | 360,421 | 30,000 to 59,999 | 645 | 28,011,500 |
| Pheasants | 2,290 | 2,474,991 | 60,000 to 99,999 | 653 | 49,106,441 |
| Quail | 3,061 | 7,367,055 | 100,000 or more | 830 | 201,390,610 |

Source: Table 30. Poultry – Inventory and Number Sold: 2017, 2017 Census of Agriculture, Volume 1, Chapter 1:
U.S. National Level Data, US Department of Agriculture.
https://www.nass.usda.gov/Quick_Stats/CDQT/chapter/1/table/30/state/US/year/2017

## Table A-4. Excerpted from Table 25, 2017 USDA Census of Agriculture, Hogs and Pigs – Inventory by Type of Operations

| Herd size | Total Hogs and Pigs Inventory | | Finishing Hogs | |
|---|---|---|---|---|
| | Farms | Number | Farms | Number |
| Total inventory | 66,439 | 72,381,007 | 21,032 | 32,521,336 |
| 1 to 24 | 46,475 | 278,691 | 13,048 | 63,660 |
| 25 to 49 | 3,759 | 122,915 | 412 | 13,124 |
| 50 to 99 | 1,889 | 122,090 | 246 | 16,453 |
| 100 to 199 | 1,220 | 160,882 | 164 | 22,121 |
| 200 to 499 | 1,451 | 454,960 | 507 | 167,917 |
| 500 to 999 | 1,305 | 905,123 | 684 | 477,852 |
| 1,000 to 2,499 | 2,016 | 2,741,382 | 1,208 | 1,627,136 |
| 2,500 to 4,999 | 4,724 | 14,893,679 | 3,105 | 9,693,231 |
| 5,000 or more | 3,600 | 52,701,285 | 1,658 | 20,439,842 |

| Herd size | Farrow to Wean | | Farrow to Finish | | Farrow to Feeder | |
|---|---|---|---|---|---|---|
| | Farms | Number | Farms | Number | Farms | Number |
| Total inventory | 6,329 | 8,975,159 | 20,627 | 19,036,228 | 6,194 | 990,269 |
| 1 to 24 | 4,621 | 35,411 | 14,326 | 101,916 | 4,865 | 35,607 |
| 25 to 49 | 439 | 14,273 | 1,867 | 61,697 | 669 | 21,941 |
| 50 to 99 | 197 | 11,963 | 1,048 | 68,284 | 280 | 17,856 |
| 100 to 199 | 79 | 10,115 | 730 | 95,686 | 167 | 21,733 |
| 200 to 499 | 82 | 27,394 | 664 | 199,723 | 81 | 23,207 |
| 500 to 999 | 68 | 49,145 | 376 | 256,411 | 29 | 17,661 |
| 1,000 to 2,499 | 129 | 185,604 | 388 | 532,143 | 15 | 19,605 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2,500 to 4,999 | 235 | 770,575 | 534 | 1,701,317 | 39 | 123,622 |
| 5,000 or more | 479 | 7,870,679 | 694 | 16,019,051 | 49 | 709,037 |

| | Nursery | | Other Practices | |
|---|---|---|---|---|
| | **Farms** | **Number** | **Farms** | **Number** |
| **Total inventory** | **1,775** | **5,761,968** | **10,482** | **5,096,047** |
| 1 to 24 | 564 | 3,263 | 9,051 | 38,834 |
| 25 to 49 | 51 | 1,587 | 321 | 10,293 |
| 50 to 99 | 17 | 1,131 | 101 | 6,403 |
| 100 to 199 | 6 | 904 | 74 | 10,323 |
| 200 to 499 | 40 | 12,705 | 77 | 24,014 |
| 500 to 999 | 70 | 46,704 | 78 | 57,350 |
| 1,000 to 2,499 | 148 | 190,473 | 128 | 186,421 |
| 2,500 to 4,999 | 451 | 1,433,759 | 360 | 1,171,175 |
| 5,000 or more | 428 | 4,071,442 | 292 | 3,591,234 |

Sources:

Table 25. Hogs and Pigs - Inventory by Type of Operation: 2017, 2017 Census of Agriculture, U.S. National Level Data, US Department of Agriculture.

https://www.nass.usda.gov/Quick_Stats/CDQT/chapter/1/table/25/state/US/year/2017

## Table A-5. Excerpted from Table 27 and Table 28, 2017 USDA Census of Agriculture, Sheep, Lambs, and Goats

| Item | Farms | Number | Item | Farms | Number |
|---|---|---|---|---|---|
| **Sheep and lamb inventory** | **101,387** | **5,391,252** | **Goats - Operations with Inventory** | **136,442** | **2,698,636** |
| 1 to 24 | 70,455 | 681,962 | Angora and kids | 11,293 | 154,398 |
| 25 to 99 | 24,089 | 1,059,197 | Milk goats and kids | 35,682 | 537,799 |
| 100 to 299 | 4,750 | 727,202 | Meat goats and other goats and kids | 101,578 | 2,006,439 |
| 300 to 999 | 1,438 | 682,506 | | | |
| 1,000 to 2,499 | 396 | 610,033 | | | |
| 2,500 to 4,999 | 152 | 514,294 | | | |
| 5,000 or more | 107 | 1,116,058 | | | |

Sources:

Table 27. Sheep and Lambs – Flock Size by Inventory, Sales, and Wool Production: 2017 Census of Agriculture, US Department of Agriculture.

https://www.nass.usda.gov/Quick_Stats/CDQT/chapter/1/table/27/state/US/year/2017

Table 28. Goats, Kids, and Mohair – Inventory, Mohair Production and Sales: 2017 Census of Agriculture, US Department of Agriculture. https://www.nass.usda.gov/Quick_Stats/CDQT/chapter/1/table/28/state/US/year/2017

## Table A-6. Excerpted from Table 29, 2017 USDA Census of Agriculture, Equines - Inventory

| Item | Farms | Number | Item | Farms | Number |
|---|---|---|---|---|---|
| **Total horses and ponies** | **459,526** | **2,847,289** | **Total mules, burros and donkeys** | **117,126** | **317,563** |
| 1 to 24 | 446,564 | 2,200,904 | 1 to 24 | 116,742 | 290,016 |
| 25 to 49 | 9,680 | 310,972 | 25 to 49 | 298 | 8,967 |
| 50 to 99 | 2,491 | 158,307 | 50 or more | 86 | 18,580 |
| 100 or more | 791 | 177,106 | | | |

Source: Table 29. Equine – Inventory and Sales: 2017 Census of Agriculture, Volume 1, Chapter 1: U.S. National Level Data, US Department of Agriculture.

https://www.nass.usda.gov/Quick_Stats/CDQT/chapter/1/table/29/state/US/year/2017

**Table A-7. Excerpted from Table 32, 2017 USDA Census of Agriculture, Other Animals – Inventory**

| Item | Farms | Number |
|---|---|---|
| Colonies of bees | 60,650 | 2,876,496 |
| Bison | 1,775 | 183,780 |
| Deer in captivity | 3,172 | 212,449 |
| Elk in captivity | 759 | 31,555 |
| Alpacas | 10,054 | 121,904 |
| Llamas | 9,098 | 39,599 |
| Mink, live | 236 | 963,895 |
| Rabbits, live | 8,864 | 280,336 |
| Other livestock | 3,611 | (X) |

Source: Table 32. Other Animals – Inventory: 2017 Census of Agriculture, Volume 1, Chapter 1: U.S. National Level Data, US Department of Agriculture.
https://www.nass.usda.gov/Quick_Stats/CDQT/chapter/1/table/32/state/US/year/2017

**Appendix B – Animal Waste Health Impacts Literature Review**

# Emergency Release Notification Requirements for Animal Waste Air Emissions under the Emergency Planning and Community Right-to-Know Act (EPCRA)

## Animal Waste Health Impacts Literature Review

## March 2023

This document was developed under EPA contract WA 4-74 Technical Directive #4 for Environmental Protection Agency, Washington, D.C., Office of Policy, Office of Regulatory Policy and Management with support from:

**INDUSTRIAL ECONOMICS, INCORPORATED**

**2067 MASSACHUSETTS AVENUE**

**CAMBRIDGE, MA 02140**

TABLE OF CONTENTS

**1.   INTRODUCTION AND OVERVIEW** ...................................................... **75**

**AFOs AND AIR POLLUTION** ...................................................... 75

**2.   SUMMARY OF RESULTS** ..................................................Error! Bookmark not defined.

**HEALTH EFFECTS** ...................................................... 76
  **Asthma** ...................................................... 76
  **Lung Function** ...................................................... 78
  **Mortality** ...................................................... 79
  **Odor Annoyance** ...................................................... 80
  **Gastrointestinal Illness** ...................................................... 82
**ENVIRONMENTAL JUSTICE IMPLICATIONS** ...................................................... 84
  **Disproportionate Exposure** ...................................................... 84

**3.   LIMITATIONS OF STUDIES** ...................................................... **87**

**4.   CONCLUSION** ..................................................Error! Bookmark not defined.

**5.   REFERENCES** ..................................................Error! Bookmark not defined.

**APPENDIX** ..................................................Error! Bookmark not defined.

  **LITERATURE SEARCH METHODOLOGY** ...................................................... 92
  **SOURCES USED** ...................................................... 92
  **LITERATURE SEARCH TERMS** ...................................................... 93

# 1. Introduction and Overview

## AFOs and Air Pollution

Animal feeding operations (AFOs) are agricultural operations where animals are kept and raised in confined situations for a total of 45 days or more in any 12-month period (U.S. EPA). A concentrated animal feeding operation, or CAFO, is a specific type of AFO that confines more than 1,000 animal units; or confines between 301 and 1,000 animal units and discharges pollutants into waters of the United States; or is designated a CAFO by EPA upon determining that the operation, regardless of its size, is a significant source of pollution (U.S. EPA).[40] Due to the large number of animals they house, CAFOs produce substantial amounts of animal waste in a single location. For example, a 2,000-head hog operation can produce approximately 5,000 metric tons of waste annually (Pavilonis et al., 2013). At these facilities, animal waste is stored in a pit or lagoon and undergoes anaerobic fermentation, which can produce large concentrations of harmful emissions, including ammonia ($NH_3$), hydrogen sulfide ($H_2S$), volatile organic compounds (VOCs), and endotoxin (Pavilonis et al., 2013). Many studies have analyzed specific air pollutants associated with AFOs, including $H_2S$, $NH_3$, endotoxin, particulate matter, and odor. (Blanes-Vidal et al., 2012; Donham et al., 2008; Godbout et al., 2009; Hooiveld et al., 2015; Loftus et al., 2015; Loftus et al., 2020; Ogneva-Himmelberger et al., 2015; Radon et al., 2007; Schinasi et al., 2011; Wilson and Serre, 2007a; Wilson and Serre, 2007b). It should be noted that this overview considers only the direct impacts of air emissions from AFOs and does not discuss indirect effects, such as the contribution of ammonia to $PM_{2.5}$ formation and its potential impact on human health.

Communities in the vicinity of AFOs are at a greater risk of exposure to these pollutants, which may be associated with adverse health outcomes. A study in North Carolina found that sites with homes and schools in close proximity to a hog CAFO, i.e., less than 2 km (1.2 miles), had a mean weekly $NH_3$ level of 12.8 ppb, which was over 2 times higher than the mean weekly level of 5.5 ppb at sites located greater than 2 km from a hog CAFO, indicating there may be possible exposure risks for populations residing near these exposed sampling sites (Wilson and Serre, 2007a). A related study in North Carolina (Wilson and Serre, 2007b) found that at distances of 0.5, 0.5–1, and 1 km (0.3, 0.3–0.6, and 0.6 miles) from a hog CAFO, weekly average $NH_3$ levels were 29, 16, and 11 ppb respectively, revealing a decreasing trend with distance. Time weighted average concentrations of $H_2S$ (8.42 ppb) at homes in Iowa were found to be greater in an area with six swine CAFO facilities, each housing from 4,500 to 16,500 animals, than a control area (3.48 ppb) nearly devoid of livestock (Donham et al., 2008). Air pollution and adverse health effects associated with AFOs are of particular concern because these industrial facilities are often located in areas with high proportions of EJ-relevant demographic groups, particularly in North Carolina, which is the second leading producer of hogs in the country. A North Carolina study found that average $NH_3$ concentrations in hotspots of EJ-relevant demographic groups for 2000 and 2010 were 2.5–3 times higher than the average concentration in the entire study region (Ogneva-Himmelberger et al., 2015).

---

[40] Throughout this report, the term AFOs is used when broadly discussing animal feeding operations and specify the term CAFOs where studies use this term.

## 2. Summary of Results

### Health Effects

The following section includes a summary of 21 articles reporting on health effects associated with air releases from AFOs. These effects fall under four main categories: respiratory, mortality, odor annoyance, and gastrointestinal illness. Respiratory studies primarily reported on asthma or lung function outcomes in both adults and children. Mortality studies covered all-cause, cause-specific, and infant mortality. Odor annoyance includes studies reporting on both the quality of life and health effects associated with exposure to odorant compounds. Gastrointestinal illness studies covered diarrhea, nausea, and vomiting. Some of these studies also analyzed health effects at varying distances from AFOs, ranging from 500 m (0.3 miles) to 20 km (12.4 miles). Throughout this report, we identify the specific distance associated with each finding wherever possible.

Fourteen of these studies took place in the United States; of these, 6 studies examined health effects in North Carolina study populations. The remaining seven studies were international, located in Germany (3 studies), the Netherlands (2 studies), Denmark (1 study), and Canada (1 study). Notably, 5 of the 7 international studies focused on the effects of odor. Table 1 provides counts of articles by health effects and relevant subcategories.

**Table 1. Counts of articles ($n = 21$) by health effect and subcategory**

| Health Effects | Number of Articles* |
|---|---|
| *Asthma* | **5** |
| Adults | 2 |
| Children | 3 |
| *Lung function* | **7** |
| Adults | 5 |
| Children | 2 |
| *Mortality* | **3** |
| *Odor annoyance* | **6** |
| *Gastrointestinal illness* | **2** |

*Two of the articles that addressed asthma also addressed lung function.*

### Asthma

Several studies link proximity to AFOs to asthma, in both adults and children. Studying asthma exacerbations among asthma patients (sample size [$n$] = 35,269) from the Geisinger Clinic in Pennsylvania, Rasmussen et al. (2017) found that proximity to swine or dairy/veal industrial food animal production was associated with increased odds of oral corticosteroid orders (odds ratio [OR] = 1.11, 95% confidence interval [CI]: 1.04, 1.19) and increased odds of asthma hospitalizations (OR = 1.29, 95% CI: 1.15–1.46). The authors defined proximity to swine or dairy/veal industrial food animal production as a facility within a 3-mile buffer of a patient's home address (Rasmussen et al., 2017). This was the same distance (4.8 km) used in Pavilonis et al. (2013), who looked at environmental exposure to swine AFOs and two asthma outcomes,

76

physician-diagnosed asthma and physician-diagnosed asthma or medication for wheeze, in a rural Iowa pediatric cohort ($n$ = 565) from Round 2 (1999– 2004) of the Keokuk County Rural Health Study. The authors developed a metric of environmental exposure to AFOs located within a 4.8 km radius of study participants' homes ($E_{relative}$), which took into account the area of the AFO, distance between the AFO and residence, and percentage of time wind was blowing < 4 m s$^{-1}$ from the AFO to the home (Pavilonis et al., 2013). In unadjusted models, they found a positive association (OR = 1.29, p-value [$p$] = 0.043) between childhood asthma and $E_{relative}$. When analyzed as a continuous variable in covariate adjusted[41] models, $E_{relative}$ was significantly associated with childhood asthma (OR = 1.51, $p$ = 0.014) and medication for wheeze or asthma (OR = 1.38, $p$ = 0.023) (Pavilonis et al., 2013).

Previously, using data from Round 1 (1994– 1998) of the Keokuk County Rural Health Study, Merchant et al. (2005) found a high prevalence (55.8% or 29/52, $p$ = 0.013) of one or more asthma outcomes (doctor-diagnosed asthma, doctor-diagnosed asthma/medication for wheeze, current wheeze, and cough with exercise) among children living on farms that raise swine and add antibiotics to feed, which also had larger mean numbers of livestock than those that did not add antibiotics to feed.

Another study in rural Iowa (Sigurdarson and Kline, 2006) examined asthma outcomes in children attending two elementary schools: the study school, located a half-mile (0.8 km) from a 3,800-hog operation ($n$ = 61), and the control school, located greater than 10 miles (16.1 km) from any CAFO ($n$ = 248). The authors found a statistically significant difference ($p$ < 0.01) between the prevalence of physician-diagnosed asthma in the study school (19.7%) and control school (7.3%), which was similar to the overall asthma rate reported in Iowa of 6.7%. In addition, after adjusting for smoking status, pet ownership, age, and residence in a rural area or on a farm, they still found a positive association between the study school and physician diagnosed asthma (adjusted OR = 5.719, $p$ = 0.0035). However, without data on concentrations of specific environmental pollutants, the authors noted that future research is necessary to support the hypothesis that CAFOs contribute to environmental pollution adversely affecting respiratory health in young children (Sigurdarson and Kline, 2006).

Studying a cohort of rural adults ($n$ = 1,547)[42] instead, Schultz et al. (2019) explored current asthma, doctor diagnosed asthma, asthma attacks, and asthma medication usage at varying distances from CAFOs in Wisconsin. Overall, among study participants living 1–3 miles (1.6– 4.8 km) versus 5 miles (8.0 km) from a CAFO, reporting current asthma was about 1.8–1.9 times greater, and odds of an asthma attack were consistently 2-fold higher. Compared to living 5 miles from a CAFO, living 1.5 miles (2.4 km) from a CAFO was associated with increased odds of doctor diagnosed asthma (OR = 2.67, 95% CI: 1.39, 5.13), asthma medication use in the last

---

[41] These covariates included age (not included in model with "physician-diagnosed asthma or medication for wheeze" as dependent variable), diagnosed allergies, male gender, parental history of asthma (not included in model with "physician-diagnosed asthma or medication for wheeze" as dependent variable), premature birth, and respiratory illness before 2 years.

[42] The authors conducted analyses on data from three subsets of the 2008–2016 Survey of the Health of Wisconsin cohort, a state-wide sample of 5,338 adults aged 18 and over in Wisconsin. After excluding urban residents, occupational farmers, and participants missing allergy and asthma outcomes, the first subset consisted of 1,547 participants with complete asthma and allergy data. After excluding participants with missing spirometry data, the second subset consisted of 1,395 participants with complete lung function data. A final subset consisted of 1,019 participants with detailed allergy data for further analyses.

12 months (OR = 3.31, 95% CI: 1.65, 6.62), and an asthma episode in the last 12 months (OR = 2.34, 95% CI: 1.11, 4.92). In study participants living 1, 1.5, 2, and 2.5 miles (1.6, 2.4, 3.2, and 4.0 km) from a CAFO respectively, asthma medication use was 4 times greater, 3 times greater, 2.5 times greater, and 2 times greater, when compared to study participants living 5 miles from a CAFO (Schultz et al., 2019). Overall, these results indicated that residential proximity to CAFOs is associated with various respiratory health effects, but more research is necessary to identify any etiological agents that may be associated with asthma, allergies, or lung function in residents living near large livestock facilities (Schultz et al., 2019).

Lung Function

Studies examining respiratory health effects of exposure to AFOs also focused on lung function, typically measured by FEV1.[43] Two studies (Loftus et al., 2015; Loftus et al., 2020) explored respiratory health effects of $NH_3$ concentrations from AFOs, and although not finding any associations with self-reported asthma symptoms, they found negative associations with FEV1. Both studies followed pediatric cohorts from the Aggravating Factors of Asthma in a Rural Environment project in the Yakima Valley of Washington State. These cohorts were primarily Hispanic/Latino, children of farm workers, and low-income; the study region was home to 97 AFOs ranging in size from 6,500 to 900,000 $m^2$ (1.6 to 222 acres) (Loftus et al., 2015; Loftus et al., 2020). Fifty-one children were followed for 13 months from 2011 to 2012 in Loftus et al. (2015), while 58 children were followed for 26 months in Loftus et al. (2020). Loftus et al. (2015) found that 1 day following $NH_3$ measurement, FEV1%[44] decreased by 3.8% (96% CI: 0.2, 7.3) per interquartile range (IQR) increase in $NH_3$. This decrease was 2% (95% CI: -3.5, −0.5) per IQR increase in predicted exposure in Loftus et al. (2020). Two days following $NH_3$ measurement, FEV1% decreased by 3.0% (96% CI: 0.5, 5.8) per IQR increase in $NH_3$ in Loftus et al. (2015); the association for this lag in Loftus et al. (2020) was not significant. The results from these studies added to existing evidence that exposure to AFO air emissions causes adverse short-term health effects in asthmatic children residing nearby (Loftus et al., 2015; Loftus et al., 2020)

Schultz et al. (2019) found decrements in FEV1 percent predicted and FEV1/FVC[45] at varying distances from CAFOs, although results were not statistically significant. Compared with living 5 miles from a CAFO, FEV1 percent predicted was 11.31 L/s (95% CI: 0.51, 23.14) lower at 1 mile from a CAFO and 7.00 L/s (95% CI: 2.26, 16.26) lower at 1.5 miles from a CAFO. FEV/FVC was also 0.039 (95% CI: 0.008, 0.07) and 0.027 (95% CI: 0.003, 0.051) lower at 1 mile and 1.5 miles respectively from a CAFO, when compared to living 5 miles from a CAFO (Schultz et al., 2019). Focusing on specific pollutants near hog operations in North Carolina, Schinasi et al. (2011) found that a 10 $\mu g/m^3$ increase in $PM_{2.5}$ measured 12 hours before study participants sat outdoors for 10 minutes while exposed to hog odor was associated with a 0.04 ± 0.02 L decrease in FEV1.

Studies in Europe have also linked exposure to AFOs with decreases in lung function. These studies typically used shorter distances for proximity analyses than U.S. studies, likely because

---

[43] Forced expiratory volume in 1 second, or FEV1, is the amount of air exhaled in one second after forcefully expelling air from the lungs.
[44] Forced expiratory volume in 1 second (FEV1) measurements from the peak flow meter were converted into percent of predicted values (FEV1%) based on standard reference equations.
[45] Forced vital capacity, or FVC, is the total amount of air expelled during a maximal forced expiration effort.

European confined livestock farms are generally smaller, densely clustered, and located in areas of higher population density (Schultz et al., 2019). The Lower Saxony Lung Study in Germany (Radon et al., 2007) and its extension (Schulze et al., 2011) found that the number of CAFOs and exposure to $NH_3$ from CAFOs was associated with lower FEV1. Radon et al. (2007) originally conducted this study between 2002 and 2004 for a target population of 10,252 adults in four German rural towns with a high density of CAFOs. The authors found lower FEV1 values (mean difference = 7.1%, 95% CI: 2.9%, 11.9%) in participants having more than 12 animal houses within 500 m (0.3 miles) of their home compared to participants with fewer than five (Radon et al., 2007). Using a subset of 457 participants from one study town in the Lower Saxony Lung Study, Schulze et al. (2011) measured $NH_3$ at 22 sampling sites between 2005 and 2006 and interpolated individual exposure using the inverse-distance method, which used the mean annual exposure at each sampling site and known distance between a participant's home and the nearest sampling site. Considering the three highest quartiles of interpolated $NH_3$ exposure to be "high" exposure, the authors found that high $NH_3$ exposure was associated with a mean decrease of 8.2% (95% CI: −13.7%, −2.7%) in FEV1 as percent of predicted and mean decrease of 3.3% (95% CI: −7.2%, 0.6%) in the FEV1/FVC ratio  as percent of predicted (Schulze et al., 2011).

A cross-sectional study (Borlée et al., 2017) of rural adults ($n = 2,308$) living in the Netherlands found a significant negative association between the number of livestock farms within 1,000 meters (0.6 miles) of a home address and maximum mid-expiratory flow (MMEF).[46] The authors identified a cutoff value of 17 farms per 1,000 m for a hotspot analysis, finding that study participants in hotspots had a 4.5% lower MMEF (95% CI: 28.64, 20.36) and a 1.86% lower FEV1 (95% CI: 23.80, 0.09) than participants from non-hotspot areas (Borlée et al., 2017). Like in Schinasi et al. (2011), an increase in pollutant concentrations in Borlée et al. (2017) was negatively associated with lung function. Using linear regression, the authors found increasing week-average $NH_3$ levels by 25.1 $\mu g/m^3$ was associated with a 2.22% lower FEV1 (95% CI: -3.69, -0.74), 1.12% lower FEV1/FVC (95% CI: -1.96, -0.28), and -5.67% lower MMEF (95% CI: -8.80, -2.55).

## Mortality

A smaller number of studies we identified explored exposure to AFOs and mortality, both cause-specific and infant mortality. Kravchenko et al. (2018) studied all-cause mortality, infant mortality, and mortality from anemia, kidney disease, tuberculosis, and septicemia in three groups of North Carolina communities: Study group 1 (communities with hog CAFOs), Study group 2 (communities with more than 215 hogs/$km^2$), and the Control group (communities without hog CAFOs).[47] Compared to the North Carolina and United States averages, residents from Study group 2 had higher mortality rates for all diseases. Apart from tuberculosis, age-adjusted mortality rates were higher in Study group 1 than in the Control group, but lower in Study group 2. After adjusting by age, median household income, education, health insurance coverage, number of primary care providers, and smoking prevalence, mortality odds ratios (ORs) for Study group 2 compared to the Control group were 1.50 for anemia ($p < 0.0001$), 1.31

---

[46] MMEF is the flow where half of forced vital capacity (FVC) remains to be exhaled.
[47] Study group 1 consisted of North Carolina communities located in 221 ZIP codes with hog CAFOs (approximately 2,260,000 residents). Study group 2, a subset of Study group 1, consisted of North Carolina communities located in 56 ZIP codes with more than 215 hogs/$km^2$ (approximately 400,000 residents). The Control group consisted of North Carolina communities located in 601 ZIP codes without hog CAFOs (approximately 7,200,000 residents).

for kidney disease ($p < 0.0001$), 2.30 for septicemia ($p < 0.0001$), and 2.22 for tuberculosis ($p = 0.0061$) (Kravchenko et al., 2018). There were also statistical differences between the mortality odds ratios for anemia, kidney disease, and septicemia in Study group 1 and Study group 2 as compared to the Control group. Although the authors did not explore this finding through this study, they cited two studies (Hribar and Schultz, 2010; Nikolić et al., 2008) that suggest that anemia may be linked to exposure to $NH_3$, $H_2S$, methane, and particulate matters near CAFOs.

In a similar study, Son et al. (2021a) estimated associations between exposure to CAFOs in North Carolina and cause-specific mortality, finding significant results only for cardiovascular mortality. The authors obtained individual-level data spanning 2000–2017 on cause-specific mortality for cardiovascular disease, respiratory disease, asthma, anemia, and kidney disease and calculated the number of CAFOs within buffers of 5, 10, 15, and 20 km (3.1, 6.2, 9.3, and 12.4 miles) around each participant's residential location. Compared to the absence of CAFOs, the presence of CAFOs increased the risk of cardiovascular mortality for all buffer sizes; these ORs were 1.022 (95% CI: 1.011, 1.032) for a 5 km buffer, 1.040 (95% CI: 1.031, 1.048) for 10 km, 1.036 (95% CI: 1.027, 1.046) for 15 km, and 1.039 (95% CI: 1.027, 1.050) for 20 km. Compared to the no exposure group, ORs for cardiovascular mortality were 1.014 (95% CI: 1.002, 1.025) for the low exposure group (< 3 CAFOs in a 15 km buffer), 1.044 (95% CI, 1.033, 1.055) for the medium exposure group (3–7 CAFOs in a 15 km buffer), and 1.060 (95% CI, 1.047, 1.073) for the high exposure group ($\geq$ 8 CAFOs in a 15 km buffer), revealing an increasing trend with the number of CAFOs (Son et al., 2021a).

In a longitudinal study, Sneeringer (2009) used county-level national data from 1982–1987 on livestock numbers and births and deaths[48], finding that a 100,000-animal unit increase in a county corresponded to 123 more deaths of infants (i.e., under one year old) per 100,000 births. Further analyses indicated that causes of death were primarily respiratory distress syndrome and perinatal conditions, with larger effects in areas of low well water usage, suggesting that air pollution, rather than water pollution, underlay these findings (Sneeringer, 2009). Similarly, in Kravchenko et al. (2018), the rate of mortality of infants under one year in Study group 2 (high CAFO exposure group) was 495/100,000, higher than both the North Carolina (398/100,000) and United States (317/100,000) averages.

### Odor Annoyance

Five international studies (Blanes-Vidal et al., 2012; Godbout et al., 2009; Hooiveld et al., 2015; Radon et al., 2004; Radon et al., 2007) and one U.S. study (Wing et al., 2008) focused on the effects of odor from air pollution associated with AFOs, including quality of life and respiratory symptoms. Analyzing the results of a mail-in questionnaire to 3,112 rural German adults living in an area with a high concentration of animal farms, Radon et al. (2004) found that quality of life, as measured by the SF-12[49], decreased significantly with increasing self-reported level of odor annoyance. Similarly, Wing et al. (2008) found a 62% increase in the odds of activity change per odor unit ($t = 7.17$). In this study, 101 volunteers from 16 neighborhoods in North Carolina sat outside their homes for 10 minutes twice a day for two weeks and completed odor

---

[48] Sneeringer (2009) reports that "Information on livestock numbers comes from a proprietary data set created by Robert Kellogg at the National Resource Conservation Service. Dr. Kellogg created this data set using the 1982, 1987, 1992, and 1997 Censuses of Agriculture."

[49] The SF-12 is a short form of the SF-36 Health Survey that quantifies health status and measures health-related quality of life.

diaries. Odor ratings, measured as the current strength of hog odor at the end of the 10-min period outside, increased $0.17 \pm 0.02$ for every 1-ppb increase in $H_2S$, $0.04 \pm 0.02$ for a 10-$\mu g/m^3$ increment in $PM_{10}$, and $0.03 \pm 0.01$ per 1 $\mu g/m^3$ of semivolatile $PM_{10}$. Participants rating odor less than or equal to 1 on a 9-point scale reported changing activity due to odor on 1.4% of occasions, while participants rating odor greater than or equal to 5 reported changing activities due to odor on 16.2% of occasions (Wing et al., 2008).

Other studies reported on health effects associated with odor. Results from the questionnaire data in Radon et al. (2007) revealed that the odds of wheezing without a cold, physician-diagnosed asthma, and allergic rhinitis increased with increasing levels of self-reported odor annoyance. For wheezing without a cold, ORs were 2.19 (95% CI, 1.42, 3.37) for respondents "moderately" annoyed by odor and 2.96 (95% CI, 1.80, 4.86) for those "strongly" annoyed by odor, compared to those "not at all" annoyed by odor (Radon et al., 2007). A cross-sectional study of 753 adults in the Netherlands reported a strong association between the number of animals in an AFO and odor annoyance, as well as between odor annoyance and various health effects (Hooiveld et al., 2015). Within 500 m of a home address, the authors found higher odds of odor annoyance with the presence of 2,656 or more pigs (OR = 2.30, 95% CI: 1.18, 4.46), 39,901 or more poultry (OR = 2.95, 95% CI: 1.08, 8.06), and 401 or more cattle (OR = 2.32, 95% CI: 1.22, 4.39). Odor annoyance was also associated with a number of respiratory, gastrointestinal, neurological, and stress related symptoms, as detailed in Table 2.

**Table 2. Association between odor annoyance in neighborhood and a cluster of symptoms in last month ($n = 751$) (Hooiveld et al., 2015)***

| Specific Reported Symptoms | Percentage | OR (95% CI) |
| --- | --- | --- |
| **Respiratory symptoms** | | |
| Cold/flu | 39.4 | 1.43 (1.02–2.00) |
| Cough | 47.0 | 1.43 (1.02–2.00) |
| **Gastrointestinal symptoms** | | |
| Stomach complaints | 15.3 | 1.58 (1.03–2.43) |
| Stomachache (pain in belly) | 17.8 | 1.73 (1.15–2.62) |
| Obstipation | 14.0 | 2.04 (1.29–3.22) |
| **Neurological symptoms** | | |
| Dizziness | 20.2 | 1.62 (1.10–2.37) |
| **Stress related symptoms** | | |
| Anxiousness | 11.9 | 1.67 (1.04–2.69) |

*This table includes statistically significant results only.

Two other studies also measured $NH_3$ (Blanes-Vidal et al., 2012) and $H_2S$ and $NH_3$ (Godbout et al., 2009) concentrations in their respective study regions, finding significant associations with odor annoyance. Blanes-Vidal et al. (2012) measured $NH_3$ concentrations in six 12 km x 12 km (7.5 miles x 7.5 miles) regions in Denmark and collected data on odor annoyance from a variety of environmental factors using anonymous surveys sent to 470 households in these regions, with a 38% response rate. Livestock odor was the most prevalent source of annoyance, which was correlated with $NH_3$ exposure. Thirteen percent of respondents with household $NH_3$ exposure less than 1 $\mu g/m^3$ reported odor annoyance; this figure rose to 63% for respondents with $NH_3$ exposure greater than 2.5 $\mu g/m^3$. Degree of annoyance also differed at different $NH_3$ exposure

81

levels. With exposure higher than 2.05 μg/m$^3$, respondents were more likely to be annoyed by livestock odors than not annoyed; with exposure higher than 7.75 μg/m$^3$, participants were more likely to be moderately, highly or extremely annoyed, than slightly annoyed or not annoyed by odor (Blanes-Vidal et al., 2012).[50]

Godbout et al. (2009) found that odor intensity, as measured by trained odor assessors, differed between three communities in Québec in swine production areas with 151 animal unit (AU)[51] pig/km$^2$ (exposed communities) and three communities outside of these areas (nonexposed communities). Monitoring odor intensities twice a week over three periods in 2006, the authors found a statistically significant difference in odor intensity measured in the evening between these two types of communities. Odor intensities ranged from 101 to 144 ppm (n-butanol scale equivalent) in exposed communities and only 1 to 10 ppm for nonexposed communities. Although H$_2$S and NH$_3$ concentrations were higher in communities in swine production areas than in communities not in these areas, this difference was not statistically significant, and these concentrations were still within air quality standards (Godbout et al., 2009).

### Gastrointestinal Illness

Two North Carolina studies (Quist et al., 2022; Wing and Wolf, 2000) examined gastrointestinal illness associated with exposure to hog and cattle operations, which may arise from exposure to either air or water contamination by fecal waste produced by animals. Quist et al. (2022) compared emergency department visits for acute gastrointestinal illness[52] in 104 ZIP codes with high hog CAFO exposure, with an average hog density of 830 hogs/mile$^2$, with 242 control ZIP codes with no hog exposure, finding an 11% higher (rate ratio [RR] = 1.11, 95% CI: 1.06, 1.17) acute gastrointestinal illness emergency department visit rate for high hog CAFO exposure ZIP codes. Patients in these ZIP codes were also more likely than patients in no hog exposure areas to visit an emergency department for *Salmonella* infections (RR = 1.60, 95% CI: 0.94, 2.29) compared to those who lived in areas without hog CAFO exposure. Positive associations for emergency department visits for pathogenic *E. coli*, *Campylobacter*, *C. difficile*, and rotavirus were not observed (Quist et al., 2022).

Wing and Wolf (2000) looked at specific gastrointestinal symptoms, including heartburn, nausea/vomiting, no appetite, and diarrhea. They found that the percentage of respondents experiencing these four symptoms was higher in residents near a hog operation than residents in the vicinity of intensive cattle operations or living in a rural agricultural area without livestock operations that use liquid waste management systems (the control group). In the hog area, households were located within 2 miles of a 6,000-head hog operation; in the cattle area, households were located within 2 miles of two neighboring dairy operations with a combined head capacity of approximately 300; while in the control group, households were located greater than 2 miles from any intensive livestock operation. The authors developed a questionnaire to obtain information about the frequency of occurrence of a variety of symptoms over the 6

---

[50] Estimated NH$_3$ exposure in this study ranged from 0.14 to 5.05 μg/m$^3$, which the authors noted is below odor detection thresholds for pure NH$_3$ (i.e., 28 μg/m$^3$). However, they cited one study (Schiffman et al., 2001), which observed that although the vast majority of chemical compounds emitted from swine operations were present at concentrations below published odor detection and irritation thresholds, these compounds together gave a detectable odor in the vicinity of the swine houses.

[51] An AU represents a number of pigs that is equivalent to a 500-kg pig.

[52] Acute gastrointestinal illness includes diarrhea, vomiting, nausea, or other gastrointestinal tract distress.

months preceding the interview. A response of "sometimes" corresponded to 12 episodes, "often" corresponded to 26 episodes, and "very often" corresponded to 52 episodes. Table 3 shows the percentage of survey respondents in each of these three areas reporting 12 or more episodes during the 6-month period.

**Table 3. Number and percent of respondents reporting 12 or more episodes of gastrointestinal symptoms (Wing and Wolf, 2000)**

| Symptom | No Livestock Operation No. (%) | Cattle Operation No. (%) | Hog Operation No. (%) |
|---|---|---|---|
| *Total respondents* | 50 (100.0) | 50 (100.0) | 55 (100.0) |
| *Heartburn* | 10 (20.0 | 10 (20.0) | 17 (30.9) |
| *Nausea/Vomiting* | 7 (14.0) | 7 (14.0) | 15 (27.3) |
| *No appetite* | 8 (16.0) | 8 (16.0) | 12 (21.8) |
| *Diarrhea* | 2 (4.0) | 4 (8.0) | 10 (18.2) |

The three study regions in Wing and Wolf (2000) were predominantly African American, while ZIP codes with high hog CAFO exposure in Quist et al. (2022) had a higher proportion of American Indian, Hispanic, as well as Black individuals and lower proportions of non-Hispanic white and Asian individuals. Associations between race and acute gastrointestinal illness in Quist et al. (2022) moved in different directions. In high hog exposed areas, American Indians (RR = 1.60, 95% CI: 1.28, 1.92) and Asians (RR = 1.95, 95% CI: 1.30, 2.61) had a positive association with acute gastrointestinal illness emergency department visit rates; non-Hispanic whites (RR = 0.88, 95% CI: 0.66, 1.00) and Others[53] (RR = 0.45, 95% CI: 0.04, 0.86) showed a negative association with acute gastrointestinal illness emergency department visit rates. In rural high hog exposed areas compared to rural areas with no hog exposure, American Indian (RR = 4.29, 95% CI: 3.69, 4.88) and Black (RR = 1.45, 95% CI: 0.98, 1.91) patients had higher acute gastrointestinal illness emergency department visit rates. Occupational exposure may have explained higher rates among Black individuals, as many rural meatpacking workers in North Carolina are Black (Quist et al., 2022)

### Environmental Justice Implications

The following section summarizes nine studies that provide evidence that EJ-relevant populations[54] are disproportionately exposed to AFOs and CAFOs in several states, including North Carolina, Maryland, Delaware, Mississippi, and Ohio. These studies describe disparities based on race/ethnicity, income, education, and age.

#### Disproportionate Exposure

Overall, the environmental justice literature we identified indicates that EJ-relevant populations are disproportionately exposed to CAFOs, although results differ by state. Studies in North Carolina, the second leading producer of hogs in the United States, have shown that CAFOs are located primarily in areas with more low-income populations and people of color. As shown in Figure 1, geographically, swine production is concentrated in Eastern North Carolina in the Coastal Plain region (Son et al., 2021b; Wilson and Serre, 2007). Using a list of permitted industrial hog operations from the North Carolina Department of Environment and Natural Resources and block-level race/ethnicity-specific population counts from the US Census of 2010,

---

[53] Other Race includes patients identifying as 'Other Race" and Pacific Islanders.
[54] The use of "EJ-relevant populations" or "EJ-relevant demographic groups" refer to the demographic groups as specifically presented in the literature summarized. "EJ-relevant demographic groups" includes the following groups from the search terms: environmental justice communities, communities of color, disadvantaged communities, minorities, and low-income communities

Wing and Johnston (2014) found that in the study area[55], the percentage of people of color living within 3 miles of an industrial hog operation was 1.52 times higher than the percentage of non-Hispanic White individuals. The percentages of Black, Hispanic and American Indian individuals living within 3 miles of an industrial hog operation were 1.54, 1.39 and 2.18 times higher, respectively, than non-Hispanic White individuals. Statewide, the percentages of people of color (all people not categorized as non-Hispanic white), Black, Hispanic, and American Indian individuals living within 3 miles of an industrial hog operation were 1.38, 1.40, 1.26 and 2.39 times higher than the percentage of non-Hispanic White individuals, respectively. Overall, for every 10 percent increase in people of color, the proportion of people residing within 3 miles of an industrial hog operation increased by 10.7%, on average; when adjusted for rurality, 14.8% more people resided within 3 miles of an industrial hog operation for each additional 10 percent increase in people of color (Wing and Johnston, 2014).

**Figure 1. Locations of permitted CAFOs in North Carolina in 2019 (Son et al., 2021b)**



In addition to racial/ethnic disparities, studies also reported on socioeconomic disparities in CAFOs exposure. Using a list of all animal operations registered with the North Carolina Division of Water Quality as of February 1998 and Census data from 1990, Wing et al. (2000) looked at 4,177 census block groups in North Carolina and found that block groups in the lowest quintile of population percent in poverty (0 to < 4.9%) contained only 43 hog CAFOs, while there were over 800 CAFOs in the fourth (13.6 to < 21.0%) and fifth (21.0 to 100%) quintiles of population percent in poverty. Adjusting for population density, the third, fourth, and fifth quintiles of the percentage nonwhite population had approximately five times as many hog CAFOs as those in the lowest quintile (Wing et al. 2000). In a similar analysis, Wilson et al. (2002) studied 2,392 census block groups in Mississippi and found that block groups in the three highest quintiles of percentage of African Americans had 64 of the 67 industrial swine operations examined in the study, while block groups in the lowest quintile of percentage of African

---

[55] The study area excluded census blocks in the five major metropolitan areas of North Carolina (Charlotte, Winston Salem, Greensboro, Durham, and Raleigh) as well as 19 western counties that neither have an industrial hog operation nor border a county that has an industrial hog operation.

Americans had no hog operations. Using block groups in the 0–25% poverty and 0–29% African American as the reference group and adjusting for population density, the authors found 2.84 (95% CI: 0.98–8.22) times as many CAFOs in high African American, low-poverty block groups; 2.68 (95% CI: 0.75–9.56) times as many in high-poverty, low African American block groups; and 1.35 (95% CI: 0.54–3.39) times as many CAFOs in high African American, high-poverty groups (Wilson et al., 2002).

In Kravechenko et al. (2018), the demographic and socioeconomic characteristics of Study group 1 (ZIP codes with hog CAFOs) and Study group 2 (ZIP codes with more than 215 hogs/km$^2$) differed from the Control group (ZIP codes without hog CAFOs). Compared to the Control group, Study group 1 had more African American (28.8% vs. 19.3%, $p < 0.001$) and American Indian (2.4% vs. 0.8%, $p < 0.05$) residents, lower median household income ($39,005 vs. $46,414, $p < 0.001$), and fewer college-educated individuals with bachelor's or higher degrees (16.5% vs. 24.2%, $p < 0.001$). Compared to both Study group 1 and the Control group, Study group 2 had the highest percentage of African American residents (31.3%, $p < 0.001$) and American Indian residents (4.1%, $p < 0.001$), the lowest median household income ($36,520, $p < 0.001$), and lowest percent of residents with bachelor's or higher degrees (13.7%, $p < 0.001$) (Kravechenko et al., 2018).

Similarly, Son et al. (2021b) observed that CAFOs exposure was higher in areas in North Carolina with higher percentages of Non-Hispanic Black individuals and Hispanic individuals, higher percentages of persons in poverty, higher percentages of households with lower median income, higher percentages of persons with less than high school education, higher racial residential isolation index score for Non-Hispanic Blacks, and higher educational residential isolation for population without a college degree. These results held for both exposure metrics used in the study: the "count method," which involved summing the number of CAFOs within each ZIP code, and the "buffer method," which was based on the area-weighted number of CAFOs using a 15 km buffer. Using the buffer method, the average percentage of Non-Hispanic Black individuals was 15.48% for the lowest quartile of CAFOs exposure and 26.42% at the highest quartile of CAFOs exposure. In these two quartiles, median household income was on average $50,772.02 and $39,421.47, respectively (Son et al., 2021b).

Studying schools in North Carolina with varying sociodemographic characteristics, Mirabelli et al. (2006) provided more evidence of racial/ethnic and socioeconomic disparities in CAFOs exposure. Selecting 226 schools ranging from 0.2 to 42 miles (mean ± SE, 8.3 ± 0.5) (0.3 km to 67.6 km) to the nearest swine CAFO, the authors found that a swine CAFO located within 3 miles was most prevalent in schools with low-white/low-socioeconomic-status (SES) enrollment[56] (prevalence ratio [PR] = 2.93; 95% CI: 1.79, 4.80) compared with schools in the highest category of white enrollment and SES. Restricting this distance to 2 miles, a swine CAFO was more prevalent in schools with low-white/low-SES enrollment ($n = 26$; PR = 2.62; 95% CI: 1.38, 4.97), high-white/low-SES enrollment ($n = 5$; PR = 2.43; 95% CI: 0.97, 6.06), and low-white/ high-SES enrollment ($n = 2$; PR = 1.39; 95% CI: 0.34, 5.71) compared with schools

---

[56] The authors classified schools into race and SES categories using the median values of white enrollment (median, 63%) and enrollment in the National School Lunch Program (median, 47%), used as a proxy for SES. The resulting matrix of race and economics was used to identify schools as high white/high SES (96 schools), low white/high SES (16 schools), high white/low SES (18 schools), and low white/low SES (96 schools).

with high-white/high-SES enrollment ($n = 11$). Additionally, schools with the highest survey-based prevalence of noticeable livestock odor outside or inside school buildings had low SES enrollment (high white/low SES: n = 5, 28%; low white/low SES: n = 23, 24%), while the lowest prevalence of such odor was observed in schools with high-white/high-SES enrollment ($n = 16$, 17%) (Mirabelli et al., 2006).

Studies outside of the South and Southeast in Maryland, Delaware, and Ohio (Hall et al., 2021; Galarraga et al., 2022; Lenhardt Ogneva-Himmelberger, 2013) had similar results to those of the North Carolina and Mississippi studies. However, a study in Iowa (Carrel et al., 2016) did not find associations between high densities of swine and traditional EJ populations, as minority populations in Iowa are primarily located in urban areas or areas not suitable for CAFOs, while rural areas are predominantly white with lower poverty rates due to high agricultural revenue. In Maryland, chicken CAFO hotspots on the Eastern Shore, a region with a high concentration of CAFOs, were primarily in counties with median household incomes lower than the 2014 median household income of Maryland, although these hotspots had a lower percentage of people of color residents (25.7%) compared to the percentage of people of color residents (54.7%) in CAFO "coldspots" in the Baltimore–Washington Metropolitan area (Hall et al., 2021). In Delaware, more urbanized census tracts hosting poultry CAFOs had a higher percentage of people of color residents (23.2%) than rural industrial chicken farm host tracts (16.8%) and the rural average for the state of Delaware (19.3%) (Galarraga et al., 2022). Industrial chicken farm hotspots also had a higher percent Hispanic residents (11.0 percent compared to 10.2 percent in the coldspot) and a larger percentage of people living in poverty (15.4 percent compared to 13.7 percent) (Galarraga et al., 2022). In Ohio, Hispanic populations were higher in census tracts with high densities of all CAFOs, dairy CAFOs, and swine CAFOs, although these relationships were only significant at the 10 percent significance level (Lenhardt and Ogneva-Himmelberger, 2013).

## 3. Limitations of Studies

Many health effects studies we identified did not measure specific pollutants released from CAFOs, instead using the number of CAFOs within a specified buffer distance, geographic area, or the presence/absence of CAFOs as an indicator of CAFOs exposure (Kravchenko et al., 2018; Merchant et al., 2005; Pavilonis et al., 2013; Rasmussen et al., 2017; Schultz et al., 2019; Siguardson and Kline, 2006; Sneeringer, 2009; Son et al., 2021a; Quist et al., 2022; Wing and Wolf, 2000). Exposure to animal operations is complex, with multiple potential pathways, including air, soil, and water (Kravechenko et al., 2018; Son et al., 2021b). In addition to multiple exposure pathways, identifying potential causative agents and evaluation of dose-response relationships in studies in residential communities is challenging because of complexities associated with dispersion of environmental agents and variability of individual susceptibility to contaminants (Kravechenko et al., 2018). Also, the size and type of CAFO, including number of animals and manure production, may affect the intensity of CAFOs exposure (Rasmussen et al., 2017; Schultz et al., 2019; Son et al., 2021a). Furthermore, in a state like North Carolina, CAFOs are located near areas with a high prevalence of septic systems, private wells, and other polluting facilities and in under-resourced communities, increasing the difficulty of isolating the effect of hog CAFOs on communities (Quist et al., 2022). Even among studies linking pollutants to health effects, the association of $NH_3$ with lung function may be causal, or $NH_3$ may be a marker for other pollutants released by AFOs (Loftus et al., 2015);

similarly, the association between particulate matter and respiratory symptoms may be due to PM released from hog operations, other sources, or both AFOs and other sources (Schinasi et al., 2011).

## 4. Conclusion

The current literature provides an overview of the various health effects associated with air releases from AFOs including respiratory health effects, mortality, odor annoyance, gastrointestinal illness, and trends in exposure to AFOs among various EJ-relevant demographic groups. They also reveal that populations located in close proximity to animal operations are at a greater risk for adverse health effects compared to populations located farther away or residing in areas without AFOs. Finally, these studies provide evidence that EJ-relevant demographic groups, including people of color and low-income individuals, in the South, Southeast, and parts of the Midwest of the United States may be disproportionately located near AFOs.

## 5. References

Blanes-Vidal, V., Suh, H., Nadimi, E. S., Løfstrøm, P., Ellermann, T., Andersen, H. V., & Schwartz, J. (2012). Residential exposure to outdoor air pollution from livestock operations and perceived annoyance among citizens. *Environment international*, *40*, 44-50.

Borlée, F., Yzermans, C. J., Aalders, B., Rooijackers, J., Krop, E., Maassen, C. B., ... & Smit, L. A. (2017). Air pollution from livestock farms is associated with airway obstruction in neighboring residents. *American Journal of Respiratory and Critical Care Medicine*, *196*(9), 1152-1161.

Carrel, M., Young, S. G., & Tate, E. (2016). Pigs in space: Determining the environmental justice landscape of swine concentrated animal feeding operations (CAFOs) in Iowa. *International Journal of Environmental Research and Public Health*, *13*(9), 849.

Donham, K. J., Lee, J. A., Thu, K., & Reynolds, S. J. (2006). Assessment of air quality at neighbor residences in the vicinity of swine production facilities. *Journal of Agromedicine*, *11*(3-4), 15-24.

Galarraga, J., Khanjar, N., Berman, I., Hall, J., Edwards, C., Bara-Garcia, S., ... & Wilson, S. (2022). Environmental Injustice and Industrial Chicken Farming in Delaware. *NEW SOLUTIONS: A Journal of Environmental and Occupational Health Policy*, *31*(4), 441-451.

Godbout, S., Lemay, S. P., Duchaine, C., Pelletier, F., Larouche, J. P., Belzile, M., & Feddes, J. J. (2009). Swine production impact on residential ambient air quality. *Journal of Agromedicine*, *14*(3), 291-298.

Hall, J., Galarraga, J., Berman, I., Edwards, C., Khanjar, N., Kavi, L., ... & Wilson, S. (2021). Environmental Injustice and Industrial Chicken Farming in Maryland. *International Journal of Environmental Research and Public Health*, *18*(21), 11039.

Hooiveld, M., van Dijk, C. E., van der Sman-de Beer, F., Smit, L. A., Vogelaar, M., Wouters, I. M., ... & Yzermans, C. J. (2015). Odour annoyance in the neighbourhood of livestock farming–perceived health and health care seeking behaviour. *Annals of Agricultural and Environmental Medicine*, *22*(1).

Hribar C., Schultz M. Understanding Concentrated Animal Feeding Operations and their Impact on Communities. Bowling Green, OH: National Association of Local Boards of Health; 2010.

Kravchenko, J., Rhew, S. H., Akushevich, I., Agarwal, P., & Lyerly, H. K. (2018). Mortality and health outcomes in North Carolina communities located in close proximity to hog concentrated animal feeding operations. *North Carolina Medical Journal*, *79*(5), 278-288.

Lenhardt, J., & Ogneva-Himmelberger, Y. (2013). Environmental injustice in the spatial distribution of concentrated animal feeding operations in Ohio. *Environmental Justice*, *6*(4), 133-139.

Loftus, C., Yost, M., Sampson, P., Torres, E., Arias, G., Vasquez, V. B., ... & Karr, C. (2015). Ambient ammonia exposures in an agricultural community and pediatric asthma morbidity. *Epidemiology (Cambridge, Mass.)*, *26*(6), 794.

Loftus, C., Afsharinejad, Z., Sampson, P., Vedal, S., Torres, E., Arias, G., ... & Karr, C. (2020). Estimated time-varying exposures to air emissions from animal feeding operations and childhood asthma. *International journal of hygiene and environmental health*, *223*(1), 187-198.

Merchant, J. A., Naleway, A. L., Svendsen, E. R., Kelly, K. M., Burmeister, L. F., Stromquist, A. M., ... & Chrischilles, E. A. (2005). Asthma and farm exposures in a cohort of rural Iowa children. *Environmental Health Perspectives*, *113*(3), 350-356.

Mirabelli, M. C., Wing, S., Marshall, S. W., & Wilcosky, T. C. (2006). Race, poverty, and potential exposure of middle-school students to air emissions from confined swine feeding operations. *Environmental health perspectives*, *114*(4), 591-596.

Nikolić, M., Nikić, D., & Stanković, A. (2008). Effects of air pollution on red blood cells in children. *Pol. J. Environ. Stud.*, 17(28), 267.

Ogneva-Himmelberger, Y., Huang, L., & Xin, H. (2015). CALPUFF and CAFOs: air pollution modeling and environmental justice analysis in the North Carolina hog industry. *ISPRS International Journal of Geo-Information*, *4*(1), 150-171.

Pavilonis, B. T., Sanderson, W. T., & Merchant, J. A. (2013). Relative exposure to swine animal feeding operations and childhood asthma prevalence in an agricultural cohort. *Environmental Research*, *122*, 74-80.

Quist, A. J., Holcomb, D. A., Fliss, M. D., Delamater, P. L., Richardson, D. B., & Engel, L. S. (2022). Exposure to industrial hog operations and gastrointestinal illness in North Carolina, USA. *Science of The Total Environment*, *830*, 154823.

Radon, K., Peters, A., Praml, G., Ehrenstein, V., Schulze, A., Hehl, O., & Nowak, D. (2004). Livestock odours and quality of life of neighbouring residents. *Annals of Agricultural and Environmental Medicine*, *11*(1).

Radon, K., Schulze, A., Ehrenstein, V., van Strien, R. T., Praml, G., & Nowak, D. (2007). Environmental exposure to confined animal feeding operations and respiratory health of neighboring residents. *Epidemiology*, 300-308.

Rasmussen, S. G., Casey, J. A., Bandeen-Roche, K., & Schwartz, B. S. (2017). Proximity to industrial food animal production and asthma exacerbations in Pennsylvania, 2005–2012. *International Journal of Environmental Research and Public Health*, *14*(4), 362.

Schinasi, L., Horton, R. A., Guidry, V. T., Wing, S., Marshall, S. W., & Morland, K. B. (2011). Air pollution, lung function, and physical symptoms in communities near concentrated swine feeding operations. *Epidemiology (Cambridge, Mass.)*, *22*(2), 208.

Schultz, A. A., Peppard, P., Gangnon, R. E., & Malecki, K. M. (2019). Residential proximity to concentrated animal feeding operations and allergic and respiratory disease. *Environment International*, 130, 104911.

Schulze, A., Römmelt, H., Ehrenstein, V., van Strien, R., Praml, G., Küchenhoff, H., ... & Radon, K. (2011). Effects on pulmonary health of neighboring residents of concentrated

animal feeding operations: exposure assessed using optimized estimation technique. *Archives of Environmental & Occupational Health*, *66*(3), 146-154.

Sigurdarson, S. T., & Kline, J. N. (2006). School proximity to concentrated animal feeding operations and prevalence of asthma in students. *Chest*, *129*(6), 1486-1491.

Sneeringer, S. (2009). Does animal feeding operation pollution hurt public health? A national longitudinal study of health externalities identified by geographic shifts in livestock production. *American Journal of Agricultural Economics*, *91*(1), 124-137.

Son, J. Y., Muenich, R. L., Schaffer-Smith, D., Miranda, M. L., & Bell, M. L. (2021). Distribution of environmental justice metrics for exposure to CAFOs in North Carolina, USA. *Environmental Research*, *195*, 110862.

Son, J. Y., Miranda, M. L., & Bell, M. L. (2021). Exposure to concentrated animal feeding operations (CAFOs) and risk of mortality in North Carolina, USA. *Science of The Total Environment*, *799*, 149407.

Wilson, S. M., Howell, F., Wing, S., & Sobsey, M. (2002). Environmental injustice and the Mississippi hog industry. *Environmental Health Perspectives*, *110*(suppl 2), 195-201.

Wilson, S. M., & Serre, M. L. (2007). Use of passive samplers to measure atmospheric ammonia levels in a high-density industrial hog farm area of eastern North Carolina. *Atmospheric Environment*, *41*(28), 6074-6086.

Wilson, S. M., & Serre, M. L. (2007). Examination of atmospheric ammonia levels near hog CAFOs, homes, and schools in Eastern North Carolina. *Atmospheric Environment*, *41*(23), 4977-4987.

Wing, S., Cole, D., & Grant, G. (2000). Environmental injustice in North Carolina's hog industry. *Environmental Health Perspectives*, 108(3), 225-231.

Wing, S., & Johnston, J. (2014). Industrial hog operations in North Carolina disproportionately impact African-Americans, Hispanics and American Indians. *The University of North Carolina at Chapel Hill.*

Wing, S., Horton, R. A., Marshall, S. W., Thu, K., Tajik, M., Schinasi, L., & Schiffman, S. S. (2008). Air pollution and odor in communities near industrial swine operations. *Environmental Health Perspectives*, *116*(10), 1362-1368.

Wing, S., & Wolf, S. (2000). Intensive livestock operations, health, and quality of life among eastern North Carolina residents. *Environmental Health Perspectives*, 108(3), 233-238.

## Literature Search Methodology

The goal of this search was to identify literature that investigated a connection between air releases from animal waste and adverse health effects, particularly for waste generated by animal feeding operations. Waste containing $NH_3$ and $H_2S$ was of special concern, but searches were not limited to these compounds. Searches were limited to items from the year 2000 through 2022 and included both U.S. and international items. The search included items describing persons of any race, ethnicity, or socioeconomic status or health indicators associated with vulnerable, susceptible, or overburdened communities.

The search focused on items containing objective data and practically applicable information. The search discarded items that solely addressed political issues, legal analysis, or activism. The search effort also discarded results that only described history, theory, frameworks, or methodologies.

## Sources Used

**Scopus**: Scopus is a major academic abstracts database, containing approximately 36,000+ peer reviewed titles and 81 million documents. As an abstracts-only database, Scopus searches are limited to matches on specific fields such as abstracts, titles, and author-provided keywords. Full text searching is not possible.

**Dimensions**: Also, a major academics abstracts database, Dimensions contains 129,000,000+ publications as of August 2022, not counting other record types. It is larger than Scopus but less capable of extremely fine-tuned searches. The different weighting algorithms of the two databases result in different items being prioritized in each database, and it was used as a complement to Scopus for the purposes of this work.

**Google Scholar**: Google Scholar (GS) is a well-known public resource and has been estimated to contain over 100 million documents. Google Scholar was used as final backup to Scopus and Dimensions. Compared to Dimensions and Scopus, GS offers significantly fewer tools to refine searches, and the review included the first 10 pages of results and then continued until we had reviewed at least three pages with no relevant results.

**Hein Online**: HeinOnline is a legal database containing legal journals, case law, and other legal commentary. This resource was used to search for material covering the legal challenges associated with animal feeding operations, such as odor and noise ordinances and zoning rulemakings.

**Gray Literature**: Following the search for published literature, a search of targeted websites and gray literature was included. Sources chosen included newspapers (The *Food & Environment Reporting Network*, The *New York Times*, *Vox*, *ProPublica*, and The *Guardian*), as well as NGOs and think tanks (Environmental Integrity Project, the Sierra Club, the Environmental Working Group, Food & Water Watch, and the National Resources Defense Council). The search effort also completed an online search for relevant literature published by universities (The Johns Hopkins University Press and The Johns Hopkins Center for a Livable Future). Of the 27 potentially workable results were identified through this search, none of them made it to the final list of 34 articles summarized in this report.

**Trade Groups**: The search for trade coverage of this issue included the following sources: National Cattlemen's Beef Association, American Association of Meat Processors, Niche Meat

Processor Assistance Network, US Poultry and Egg Association, National Pork Producers Council, and North American Meat Institute.

Also included in the review were the Publications or Resources pages (or similar) for each source, reviewing all titles in the case of small quantities and using the search functions for larger collections. Google Advanced Search was used to search individual domains for top-level terms.

## Literature Search Terms

The list of search terms began with specific requested terms from EPA staff. Boolean-logic searches were then constructed that paired terms in group 1 with terms in each group 2 in turn. The initial group of terms in this review were found to be very broad. When searching Scopus for group 1 + group [2a] [2b] [2c] and [2d] results were [140] [3,958] [2,523] and [9,238] respectively. The first 100 result of each were reviewed, and then the results were limited using the expanded terms list. Terms in the "expanded terms" list were used as extra modifiers rather than main terms because they were flagged as less relevant by EPA staff.

These limiting terms generally presented a modified list of under 100 results that were then assessed individually. No specific terms were found to be irrelevant, and many of the pertinent results overlapped from search to search.

**Table 4.** Primary Search Terms

| 1A | 1B |
|---|---|
| **CONCENTRATED ANIMAL FEEDING OPERATION** | Swine |
| **ANIMAL FEEDING OPERATION** | Cattle |
| **FEEDLOT** | Dairy |
| | Chicken |
| | Poultry |
| | Layers |
| | Broilers |
| | Meat birds |
| | Beef cattle |
| | Turkey |
| | Egg production |
| | livestock |

**Table 5.** Secondary Search Terms

| 2A | 2B | 2C | 2D |
|---|---|---|---|
| **AMMONIA** | Manure pit | Respiratory illness | National Air Emissions Monitoring Study |
| **HYDROGEN SULFIDE** | Open grazing | Asthma | exposure assessment |
| **AIR EMISSIONS** | Lagoon | Lightheaded | risk assessment |

| | | | |
|---|---|---|---|
| **RELEASE** | housing | Respiratory effect | proximity analysis |
| **POLLUTANT** | Storage | Hives | epidemiological study |
| **ANIMAL WASTE** | Pasture grazing | Health effect | body burden |
| | | | documented noncompliance |
| | | | accidental release |
| | | | unintentional release |
| | | | contribution factor |
| | | | models |

# Appendix C – Summary of EPCRA Literature Search and Review Activities for Beef and Turkey Animal Feeding Operations

## 1.0 Introduction

This appendix summarizes the literature search and review activities conducted by EPA with contractor support to identify information and data that could be used to develop emissions factors for ammonia ($NH_3$) and hydrogen sulfide ($H_2S$) released from turkey and beef animal feeding operations (AFOs) and from manure land application operations.

## 2.0 Literature Search

In May 2022, the EPA conducted an online search for literature related to emissions from turkey and beef animal feeding operations (AFOs) and land application of animal manure that were published between 2000 and May 2022. The EPA's search returned 1,448 references covering all animal types (e.g., broilers, turkeys, beef, dairy, swine). In 2023, EPA also conducted a targeted online search of the USDA National Agricultural Library (Agricola) and Google Scholar for published literature regarding emissions from beef cattle raised on pasture-based systems, rather than on feedlots. A search using the terms "beef grazing ammonia" returned 90 references from Agricola and approximately 90,000 references from Google Scholar. The default sorting of results from Google Scholar is by relevance. Because of the large number of search results returned from the Google Scholar query, the review was limited to the references contained in the first 10 web pages (98 references). After removing the duplicates from the 1,636 references (1,448+90+98), the searches resulted in 1,589 references for review.

## 3.0 Reference Review and Data Extraction

For each of the references identified under Section 2.0 of this appendix, EPA conducted a screening review of the title and abstract to assess whether the reference pertained to the target pollutants ($NH_3$, $H_2S$) and AFO processes (beef and turkey AFOs and manure land application). For example, 1,084 references were not relevant because they did not discuss either the target animal type, pollutant, or process. In total, the screening review identified and removed from further review 1,290 references. For each of the 299 references remaining after the screening review, EPA conducted a detailed review to determine whether the refence contained data or emissions factors for $NH_3$ and $H_2S$ released from the target AFO processes (i.e., turkey and beef AFOs and manure land application operations).

Key parameters used to characterize each study include:
- Year of reference.
- Reference title.
- Study location.
- AFO process.
- Pollutant(s).
- Measurement technique.

- Sampling location(s).
- Averaging frequency.
- Basis for determining flow rate.
- Study duration.
- Reported emissions.

Based on the screening and detailed reviews, EPA identified 24 references for beef AFOs and 6 references for turkey AFOs that were potentially relevant for developing emissions factors. These references are listed below in Table 1 and Table 2, respectively.

**Table 1. Studies Relevant for Beef Emission Factors**

| Authors | Year | Title |
|---|---|---|
| Bai, M., T. K. Flesch, S. M. McGinn and D. Chen | 2015 | A Snapshot of Greenhouse Gas Emissions from a Cattle Feedlot. |
| Todd, R. W., N. A. Cole, R. N. Clark, T. K. Flesch, L. A. Harper and B. H. Baek | 2008 | Ammonia emissions from a beef cattle feedyard on the southern High Plains |
| Shonkwiler, K. B. and J. M. Ham | 2018 | Ammonia emissions from a beef feedlot: Comparison of inverse modeling techniques using long-path and point measurements of fenceline NH3. |
| Rhoades, M. B., D. B. Parker, N. A. Cole, R. W. Todd, E. A. Caraway, B. W. Auvermann, D. R. Topliff and G. L. Schuster | 2010 | CONTINUOUS AMMONIA EMISSION MEASUREMENTS FROM A COMMERCIAL BEEF FEEDYARD IN TEXAS |
| Todd, R. W., N. A. Cole, M. B. Rhoades, D. B. Parker and K. D. Casey | 2011 | Daily, Monthly, Seasonal, and Annual Ammonia Emissions from Southern High Plains Cattle Feedyards. |
| Flesch, T. K., J. D. Wilson, L. A. Harper, R. W. Todd and N. A. Cole | 2007 | Determining ammonia emissions from a cattle feedlot with an inverse dispersion technique |
| Ross, E. G., J. J. Ball, S. J. Werth, S. E. Mejia-Turcios, Y. J. Zhao, Y. Pan, P. C. Taube, T. R. Meinert, N. K. Van Engen and F. M. Mitloehner | 2021 | Effect of ractopamine hydrochloride on environmental gas emissions, growth performance, and carcass characteristics in feedlot steers. |
| Teeter, J. S., S. J. Werth, S. L. Gruber, J. C. Kube, J. A. Hagenmaier, J. B. Allen, C. T. Herr, M. S. Brown, D. Boler, A. C. Dilger, Y. J. Zhao, Y. E. Pan and F. M. Mitloehner | 2021 | Effects of feeding lubabegron on gas emissions, growth performance, and carcass characteristics of beef cattle housed in small-pen environmentally monitored enclosures during the last 3 mo of the finishing period. |
| Sun, J. L., M. Bai, J. L. Shen, D. W. T. Griffith, O. T. Denmead, J. Hill, S. K. Lam, A. R. Mosier and D. L. Chen | 2016 | Effects of lignite application on ammonia and nitrous oxide emissions from cattle pens. |
| Dumont, P. A., D. R. Chadwick, T. H. Misselbrook, J. S. Robinson, K. A. Smith, E. Sagoo, V. Camp, R. Murray, P. French, R. A. Hill and A. Scott | 2012 | Effluent quality and ammonia emissions from out-wintering pads in England, Wales and Ireland. |

| Authors | Year | Title |
|---------|------|-------|
| Denmead, O. T., D. Chen, D. W. T. Griffith, Z. M. Loh, M. Bai and T. Naylor | 2008 | Emissions of the indirect greenhouse gases NH3 and NOx from Australian beef cattle feedlots |
| Baek, B. H., J. A. Koziel, J. D. Spinhirne, D. B. Parker, N. A. Cole and asae | 2003 | Estimations of ammonia and hydrogen sulfide fluxes from cattle feedlot surfaces in Texas High Plains. |
| Misselbrook, T. H., J. Webb, D. R. Chadwick, S. Ellis and B. F. Pain | 2001 | Gaseous emissions from outdoor concrete yards used by livestock |
| Salomon, E. and L. Rodhe | 2011 | Losses of N2O, CH4 and NH3 from a grass sward used for overwintering beef heifers. |
| Loh, Z., D. Chen, M. Bai, T. Naylor, D. Griffith, J. Hill, T. Denmead, S. McGinn and R. Edis | 2008 | Measurement of greenhouse gas emissions from Australian feedlot beef production using open-path spectroscopy and atmospheric dispersion modelling |
| Haarlem, R. P. van, Desjardins, R. L., Gao, Z., Flesch, T. K. and Li, X. | 2008 | Methane and ammonia emissions from a beef feedlot in western Canada for a twelve-day period in the fall |
| Todd, R. W., N. A. Cole, M. B. Rhoades and D. B. Parker | 2009 | Monthly, seasonal. and annual ammonia emissions from southern High Plains cattle feedyards |
| Bai, M., J. L. Sun, K. B. Dassanayake, M. A. Benvenutti, J. Hill, O. T. Denmead, T. Flesch and D. L. Chen | 2016 | Non-interference measurement of CH4, N2O and NH3 emissions from cattle. |
| Sun, K., L. Tao, D. J. Miller, M. A. Zondlo, K. B. Shonkwiler, C. Nash and J. M. Ham | 2015 | Open-path eddy covariance measurements of ammonia fluxes from a beef cattle feedlot. |
| Herman, D. I., C. Weerasekara, L. C. Hutcherson, F. R. Giorgetta, K. C. Cossel, E. M. Waxman, G. M. Colacion, N. R. Newbury, S. M. Welch, B. D. DePaola, I. Coddington, E. A. Santos and B. R. Washburn | 2021 | Precise multispecies agricultural gas flux determined using broadband open-path dual-comb spectroscopy. |
| Yang, Y. Y., W. H. Liao, X. J. Wang, C. J. Liu, Q. Xie, Z. L. Gao, W. Q. Ma and Y. He | 2016 | Quantification of ammonia emissions from dairy and beef feedlots in the Jing-Jin-Ji district, China. |
| McGinn, S. M., T. K. Flesch, B. P. Crenna, K. A. Beauchernin and T. Coates | 2007 | Quantifying ammonia emissions from a cattle feedlot using a dispersion model |
| Staebler, R. M., S. M. McGinn, B. P. Crenna, T. K. Flesch, K. L. Hayden and S.-M. Li | 2009 | Three-dimensional characterization of the ammonia plume from a beef cattle feedlot |
| Gilhespy, S. L., J. Webb, D. R. Chadwick, T. H. Misselbrook, R. Kay, V. Camp, A. L. Retter and A. Bason | 2009 | Will additional straw bedding in buildings housing cattle and pigs reduce ammonia emissions |

**Table 2. Studies Relevant for Turkey Emission Factors**

| Authors | Year | Title |
|---|---|---|
| Li, H., H. Xin, R. T. Burns, L. D. Jacobson, S. Noll, S. J. Hoff, J. D. Harmon, J. A. Koziel and B. P. Hetchler | 2011 | Air Emissions from Tom and Hen Turkey Houses in the U.S. Midwest |
| Gay, S. W., E. F. Wheeler, J. L. Zajaczkowski and P. A. Topper | 2006 | Ammonia emissions from US tom turkey growout and brooder houses under cold weather minimum ventilation |
| Liu, Z., W. Powers, D. Karcher, R. Angel and T. J. Applegate | 2011 | EFFECT OF AMINO ACID FORMULATION AND SUPPLEMENTATION ON AIR EMISSIONS FROM TOM TURKEYS. |
| Skybova, M. | 2002 | Quantification, sources, and control of ammonia emissions in the Czech Republic. |
| Wood, D. J. and B. J. Van Heyst | 2016 | THE EFFECTS OF PLT POULTRY LITTER TREATMENT ON AMMONIA AND PARTICULATE MATTER EMISSIONS IN A COMMERCIAL TURKEY GROW-OUT FACILITY. |
| Galecki, R., M. Dabrowski, T. Bakula, K. Obremski, M. Baranowski, A. Nowak and B. Gutarowska | 2020 | The Influence of the Mineral-Microbial Deodorizing Preparation on Ammonia Emission and Growth Performance in Turkey Production. |

## Appendix D – EPA Animal Feeding Operation (AFO) Air Emissions Calculator

This appendix includes screenshots for a draft air emissions calculator web tool. These screenshots are included to give the reader a sense of EPA's expectations for how farms would estimate emissions.

# EPA Animal Feeding Operation (AFO) Air Emissions Calculation Web Tool

Welcome to EPA's Web Tool for estimating emissions from animal feeding operations (AFOs). Before continuing, have the information shown in the table below readily available:

**Input Data (Design Values) Needed for the AFO Web Tool**

| AFP Processes | Farm County and State | Beginning Weight (kg) | Ending Weight (kg) | Inventory (number of animals) | Production Cycle Duration (days) | Operating Days per Year | Surface Area (ft$^2$) |
|---|---|---|---|---|---|---|---|
| Broilers houses and Swine barns | X | X | X | X | X | X | |
| Egg-layer houses and manure sheds, Turkey houses, Beef Cattle feedlots, Diary barns | X | | | X | | X | |
| Dairy (milking centers) | X | | | | | | |
| Swine lagoons and basines, and Dairy lagoons | X | | | | | | X |
| Dairy (corrals) | X | | | X | | | X |

**Continue to Data Entry for EPA Air Compliance Agreement Calculations**     **Continue to Data Entry for EPCRA Reportable Quantity Calculations**



99

# EPA AFO Air Emissions Calculation Web Tool Disclaimer

The content provided in the AFO Air Emissions Calculations Web Tool is intended solely as assistance in estimating emissions of ammonia ($NH_3$) and hydrogen sulfide ($H_2S$) from AFOs and in assessing reporting applicability under EPCRA. The AFO Web Tool and its contents do not constitute rulemaking or a decision by EPA and may not be relied upon to create a substantive or procedural right or benefit enforceable by law, or in equity, by any person. The EPA does not store or maintain the information entered by the user or the calculated emissions, and the results generated by the tool do not constitute a submission for purposes of EPCRA reporting.

**Accept**

# EPA Animal Feeding Operation (AFO) Air Emissions Calculation Web Tool

The EPA's Web Tool estimates air emissions using:

- Farm- and process-level data (e.g., farm location, animal inventory) provided by the tool user.
- Meteorological data (e.g., ambient temperature) from the National Weather Service database.
- Emissions estimating methodologies from Section 9.4 (Livestock & Poultry Feed Operations) of EPA's AP-42, Compilation of Air Emissions Factors (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-9-food-and-0).

To use the tool, follow these sequential steps:

1. Enter farm-level information (e.g., name, location, animal type).
2. Enter process-level data (e.g., animal inventory).
3. Confirm data entry values.
4. Generate the air emissions estimates and downloadable report.

**Begin Step 1: Enter Farm-Level Information**

## Step 1: Farm–Level Information

Year of emissions estimate *

Farm name *

Farm street address *

Farm county *

Farm state *

Farm ZIP code *

Farm animal type(s) *

☐ Broiler
☐ Egg-Layer
☐ Turkey
☐ Beef
☐ Dairy
☐ Swine

**Continue to Step2: Enter Process-Level Data**

# Step 2: Process-Level Data Entry for Broiler Operations

| House ID | Beginning bird weight (kilograms) | Ending bird weight (kilograms) | House inventory (No. of birds) | No. of days in production cycle | No. of days per year without birds | |
|---|---|---|---|---|---|---|
| | | | | | | **Remove** |

**Add Broiler House**

**Continue to Step 2: Process-Level Data Entry**

## Step 2: Process-Level Data Entry for Egg-Layer Operations

### High-Rise Houses



|  | House ID | House Inventory | No. of days per year without birds |  |
|---|---|---|---|---|

**Add a High-Rise House**

### Manure Belt Houses

|  | House ID | House Inventory | No. of days per year without birds |  |
|---|---|---|---|---|

**Add a Manure Belt House**

### Manure Sheds Houses

| Shed ID | House ID(s) contributing manure to the shed | Total inventory of contributing houses | No. of days per year without manure in shed |  |
|---|---|---|---|---|

**Add a Manure Shed**

**Continue to Step 2: Process-Level Data Entry**

## Step 2: Process-Level Data Entry for Turkey Operations



| House ID | House inventory | No. of days per year without animals | |
|---|---|---|---|
| | | | **Remove** |

**Add Turkey House**

**Continue to Step 2: Process-Level Data Entry**

## Step 2: Process-Level Data Entry for Beef Operations

| Feedlot ID | Feedlot inventory | No. of days per year without animals | |
|---|---|---|---|
| | | | **Remove** |

**Add Turkey House**

**Continue to Step 2: Process-Level Data Entry**

105

## Step 2: Process–Level Data Entry for Dairy Operations

### Mechanically-Ventilated Barns with Manure Flushisng

| Barn ID | Barn inventory | No. of days per year without animals | |
|---------|----------------|--------------------------------------|---|
| | | | Remove |

Add a Mechanically-Ventilated Barn w/Manure Flushing

### Mechanically-Ventilated Barns with Manure Scraping

| Barn ID | Barn inventory | No. of days per year without animals | |
|---------|----------------|--------------------------------------|---|
| | | | Remove |

Add a Mechanically-Ventilated Barn w/Manure Scraping

### Naturally-Ventilated Barns

| Barn ID | Barn inventory | No. of days per year without animals | |
|---------|----------------|--------------------------------------|---|
| | | | Remove |

Add a Naturally-Ventilated Barn

### Milking Centers

| Milking Center ID | No. of cows milked per day | |
|-------------------|----------------------------|---|
| | | Remove |

Add a Milking Center

### Lagoon

| Lagoon ID | Lagoon surface area (m$^2$) | |
|-----------|-----------------------------|---|
| | | Remove |

Add a Gestation Lagoon

## Step 2: Process-Level Data Entry for Swine Operations

**Farrowing Barns**

| Barn ID | Beginning animal weight | Ending animal weight | Barn inventory | No. of days in production cycle | No. of days per year without animals | |
|---------|------------------------|---------------------|----------------|--------------------------------|--------------------------------------|--------|
| | | | | | | Remove |

Add a Farrowing Barn

**Gestation Barns (Without Manure Pit)**

| Barn ID | Beginning animal weight | Ending animal weight | Barn inventory | No. of days in production cycle | No. of days per year without animals | |
|---------|------------------------|---------------------|----------------|--------------------------------|--------------------------------------|--------|
| | | | | | | Remove |

Add a Gestation Barn (w/o-Pit)

**Gestation Barns (Shallow Manure Pit)**

| Barn ID | Beginning animal weight | Ending animal weight | Barn inventory | No. of days in production cycle | No. of days per year without animals | |
|---------|------------------------|---------------------|----------------|--------------------------------|--------------------------------------|--------|
| | | | | | | Remove |

Add a Gestation Barn (Shallow-Pit)

**Finishing Barns (No Manure Pit)**

Add a Finishing Barn (w/o-Pit)

| Barn ID | Beginning animal weight | Ending animal weight | Barn inventory | No. of days in production cycle | No. of days per year without animals | |
|---------|------------------------|---------------------|----------------|--------------------------------|--------------------------------------|--------|
| | | | | | | Remove |

**Finishing Barns (Shallow Manure Pit)**

| Barn ID | Beginning animal weight | Ending animal weight | Barn inventory | No. of days in production cycle | No. of days per year without animals | |
|---------|------------------------|---------------------|----------------|--------------------------------|--------------------------------------|--------|
| | | | | | | Remove |

Add a Finishing Barn (Shallow Pit)

**Gestation Lagoon**

| Lagoon ID | Lagoon surface area (m²) | |
|-----------|-------------------------|--------|
| | | Remove |

Add a Gestation Lagoon

**Gestation Lagoon**

| Lagoon ID | Lagoon surface area (m²) | |
|-----------|-------------------------|--------|
| | | Remove |

Add a Finishing Lagoon

**Basin**

| Basin ID | Basin surface area (m²) | |
|----------|-------------------------|--------|
| | | Remove |

Add a Basin

Continue to Step 3: Process-Level Data Entry

107

## Appendix E – Emissions Modeling for Low-End Cutoffs

This appendix has two purposes: (1) to show how the Agency could model air emissions from specific animals at certain types of farming operations to develop a cutoff for number of animals below which the farm could not exceed the Reportable Quantity for ammonia; and (2) the models in this appendix were used to demonstrate that the lowest quantity range of each livestock type captured in the USDA Census could would not exceed the Reportable Quantity, thus were treated differently when calculating the burden of rule familiarization on non-reporting farms (see section 3.2.2)

# Appendix E-1 – Swine Operations Emissions Modeling (NH3)

## 1. Summary of meteorological parameters

Models were tested with a variety of meteorological conditions to determine whether a specific size farm would exceed the 100 lb/day threshold. Minimum and maximum values were determined from NECI data on extreme for the US, and represent possible extreme values for somewhere in the US. These extreme values may not be present in every growing area. Most parameters were tested for every one unit increment between the minimum and maximum value. For example, for ambient relative humidity all humidity values between 1 and 100, in 1% increments were tested.

For wind speed, NAEMS measured winds at 2.5 meters, and the models are tuned to winds at that height. To adjust the NWS measurement, taken at a standard 10 m height, the winds (in ms$^{-1}$) are multiplied by 0.812252 to reduce the wind speeds to account for increased friction at the lower measurement height. Please see the model documentation for more details on how the conversion factor was developed.

This data was used to test all the farm sources.

Table 23. Summary of meteorological parameters.

| variable | min | mean | max |
|---|---|---|---|
| 10m Wind speed (mph) | 0 | 6.0 | 12.0 |
| 10m Wind Speed (ms) | 0 | 2.7 | 5.4 |
| 2.5m Wind Speed (ms) | 0 | 2.2 | 4.4 |
| Ambient Relative Humidity (%) | 1 | 50.5 | 100.0 |
| Ambient Temperature (C) | -50 | 0.0 | 50.0 |
| Ambient Temperature (F) | -58 | 32.0 | 122.0 |

## 2. Swine Individual Source Results

### a. Breeding and Gestation

Breeding and gestation operations provide feeder stock to growing and finishing farms. Operations can consist of gestation barn, where pregnant pigs are housed, and farrowing barn where mothers and piglets are kept until they are weaned (~14 days). Some smaller operations might combine the gestation and farrowing units into a single barn. The calculations presented here show the emissions separately for the gestation barn and farrowing rooms. Farms also include a manure storage system, which could be in the house (e.g., pit), exterior to the house (e.g., yard, lagoon), or a combination of both. The collected manure is often applied to surrounding farmland as fertilizer.

To calculate possible emissions for a small farm, additional assumptions about the operation were made.

For gestation barns, we assumed:

- An inventory of 25 head per barn, and
- Weight set to a maximum of 227 kg per sow.

For farrowing rooms, we assumed:

- A single farrowing room could accommodate all 24 sows.
- Weight for each sow was calculated as the maximum weight of 227 kg per sow, plus 7.7 kg per piglet assuming 14 piglets per sow. This was a total maximum weight of 334.8 kg per sow at cycle day of 14.

Any lagoon was assumed to have a surface area of 300 m$^2$.

This should produce the highest emissions for a breeding gestation site for the various meteorological conditions.

### i. Gestation Barn, Deep Pit



Figure 1: NH3 emissions range for a gestation deep pit barn

### ii.  Gestation Barn, Shallow Pit



**Figure 2: NH3 emissions range for a gestation shallow pit barn**

### iii.  Gestation Barn, unspecified



**Figure 3: NH3 emissions range for a gestation barn, unspecified pit**

### iv.  Farrowing room



**Figure 4: NH3 emissions range for a farrowing room**

### v.  Breeding gestation lagoon



**Figure 5: NH3 emissions range for a breeding gestation lagoon**

### b. Growing and Finishing

Growing and finishing farms grow a piglet to market weight. They are generally composed of some confinement structure to house the pigs and a manure storage system, which could be in the house (e.g., pit), exterior to the house (e.g., yard, lagoon, basin), or a combination of both. The collected manure is often applied to surrounding farmland as fertilizer.

To calculate possible emissions for a small farm, additional assumptions about the operation were made.

For growing and finish farms, we assumed:

- An inventory of 25 head per barn
- A weight set to a maximum growing weight of 130 kg per pig, at a cycle day of 176
- Any basin or lagoon would have a surface area of 700 m$^2$.

This should produce the highest emissions for a grow-finish site at the various meteorological conditions.

#### i. Barn, Deep Pit



**Figure 6: NH3 emissions range for a grow-finish deep pit barn**

### ii.  Barn, Shallow Pit



**Figure 7: NH3 emissions range for a grow-finish shallow pit barn**

### iii.  Barn, Pit not specified



**Figure 8: NH3 emissions range for a grow-finish, with no indication of pit type**

### iv. Basin



**Figure 9: NH3 emissions range for a grow-finish basin**

### v. Lagoon



**Figure 10: NH3 emissions range for a grow-finish, lagoon (700 sq m)**

### vi.  Land application

Estimates of land application presented here are based on on the 2001 EPA report for liquid land application. For Swine, the average emission factor was 29.4 lb/yr-AU, where and animal unit (AU) for a hog >55 lb was 2.5 hog/AU and for 10 swine weighing 55 pounds or less, which are consistent with NPDES definitions (66 FR 2960).

We assumed land application would occur 4 times a year, for at least a week at a time (30 days per year). The total annual land application emission estimate was divided by 30 day, to represent the emission that could occur on any single day.

For a barn of 25 hogs, the equation was:

- GF, land app = (29.4*(25/2.5))/30 = 9.80 lb/day*
- *BG, land app = (29.4*(25/10))/30 = 2.45 lb/day

## 3.  Combinations (model farms)

To estimate farm total emissions for all sources, EPA developed "model farms" that represent possible farm configurations (i.e., combinations of farm sources). The model farms are loosely based on the 2001 report, updated for based on the representative farms monitored under NAEMS. In total, 12 model farms were calculated. Figure 11 shows the model farms used for calculations.

A farm of 25 or fewer pigs would most likely be a hoop barn or a barn with a covered floor. Either barn type could also have an adjacent open yard. Any of the model farms in Figure 11 would represent a conservatively high estimate of emissions of this type of operation.

The following figures show the possible combined emissions for each model farm under a wide range of meteorological conditions.



**Figure 11: Swine model farms**

Combo S1: BG Deep pit, lagoon, land application



**Figure 12: NH3 emissions for a breeding gestation farm, model S1(BG-D)**

### i. Combo S2: BG Shallow pit, lagoon, land application



**Figure 13: NH3 emissions for a breeding gestation farm, model S2(BG-S)**

### ii.   Combo S3: BG unspecified pit, lagoon, land application



**Figure 14: NH3 emissions for a breeding gestation farm, model S3(BG-U)**

### iii.   Combo S4: GF Deep pit, lagoon, land application



**Figure 15: NH3 emissions for a grow-finish farm, model S4(GFD-L)**

#### iv.  Combo S5: GF Deep pit, basin, land application



**Figure 16: NH3 emissions for a grow-finish farm, model S5(GFD-B)**

#### v.  Combo S6: GF Shallow pit, lagoon, land application



Figure 17: NH3 emissions for a grow-finish farm, model S6(GFS-L)

### vi.  Combo S7: GF Shallow pit, basin, land application



Figure 18: NH3 emissions for a grow-finish farm, model S7 (GFS-B)

### vii.  Combo S8: unspecified pit, lagoon, land application



Figure 19: NH3 emissions for a grow-finish farm, model S8 (GFU-L)

### viii.   Combo S9: unspecified pit, basin, land application



Figure 20: NH3 emissions for a grow-finish farm, model S9 (GFU-B)

### ix.   Combo S10: Deep pit, lagoon, land application



Figure 21: NH3 emissions for a grow-finish farm, model S10 (COMBO-DL)

### x.   Combo S11: Shallow pit, lagoon, land application



Figure 22: NH3 emissions for a grow-finish farm, model S11 (COMBO-SL)

### xi.   Combo S12: unspecified pit, lagoon, land application



Figure 23: NH3 emissions for a grow-finish farm, model S12 (COMBO-UL)

### xii.  Combo S13: Deep pit, land application



Figure 24: NH3 emissions for a grow-finish farm, model SX (GFD)

# Appendix E-2 – Dairy Operations Emissions Modeling (NH3)

## 1.  Summary of meteorological parameters

Models were tested with a variety of meteorological conditions to determine whether a specific size farm would exceed the 100 lb/day threshold. Minimum and maximum values were determined from NECI data on extreme for the US, and represent possible extreme values for somewhere in the US. These extreme values may not be present in every growing area. Most parameters were tested for every one unit increment between the minimum and maximum value. For example, for ambient relative humidity all humidity values between 1 and 100, in 1% increments were tested.

For wind speed, NAEMS measured winds at 2.5 meters, and the models are tuned to winds at that height. To adjust the NWS measurement, taken at a standard 10 m height, the winds (in ms$^{-1}$) are multiplied by 0.812252 to reduce the wind speeds to account for increased friction at the lower measurement height. Please see the model documentation for more details on how the conversion factor was developed.

This data was used to test all the farm sources.

**Table 24. Summary of meteorological parameters.**

| variable | min | mean | max |
|---|---|---|---|
| 10m Wind speed (mph) | 0 | 6.0 | 12.0 |
| 10m Wind Speed (ms) | 0 | 2.7 | 5.4 |
| 2.5m Wind Speed (ms) | 0 | 2.2 | 4.4 |
| Ambient Relative Humidity (%) | 1 | 50.5 | 100.0 |
| Ambient Temperature (C) | -50 | 0.0 | 50.0 |
| Ambient Temperature (F) | -58 | 32.0 | 122.0 |

## 2. Dairy Individual Source Results

Dairy operations can consist of barns, which can be mechanically ventilated or naturally ventilated, and milking centers. In smaller operations, the barns housing the animals may also serve as the milking area. These structures can utilize a manure removal system that either removes manure from the floor by either scraping or flushing with water. Cows can often be given access corral areas, which are areas outside the barn for grazing, feeding, and exercise. Farms also include a manure storage system, which can include lagoons, basins, or a combination of both. The collected manure is often applied to surrounding farmland as fertilizer.

To calculate possible emissions for a small farm, additional assumptions about the operation were made.

- The total head count at the farm was 10 cows.
- Any lagoon was assumed to have a surface area of 500 m$^2$.

This should produce the highest emissions for a dairy site for the various meteorological conditions.

**Mechanically ventilated barn, Flush**



Figure 25: NH3 emissions range for a mechanically ventilated dairy barn using flush system for manure removal

**Mechanically ventilated barn, scrape**



Figure 26: NH3 emissions range for a mechanically ventilated dairy barn using a scrape system for manure removal

**Naturally ventilated barn**



Figure 27: NH3 emissions range for a naturally ventilated dairy barn

**Milking Center**



Figure 28: NH3 emissions range for a milking center

127

**Dairy lagoon**



Figure 29: NH3 emissions range for a dairy lagoon

**Dairy corral**



Figure 30: NH3 emissions range for a dairy corral

**Land application**

Estimates of land application presented here are based on the 2001 EPA report for liquid land application. For Swine, the average emission factor was 18.7 lb/yr-AU, where and animal unit (AU) for a dairy cow was 0.7 mature cows/AU, which is consistent with NPDES definitions (66 FR 2960).

We assumed land application would occur 4 times a year, for at least a week at a time (30 days per year). The total annual land application emission estimate was divided by 30 day, to represent the emission that could occur on any single day.

For a barn of 10 cows, the equation was: Dairy, land app = (18.7*(10/.7))/30 = 8.9 lb/day

## 3. Combinations (model farms)

To estimate farm total emissions for all sources, EPA developed "model farms" that represent possible farm configurations (i.e., combinations of farm sources). The model farms are loosely based on the 2001 report, updated for based on the representative farms monitored under NAEMS. In total, 12 model farms were calculated. Figure 7 shows the model farms used for calculations.

For farms with 10 or fewer cows, the farm would most likely be a naturally ventilated barn or a hoop barn. Either style of barn would likely have an adjacent open area for the cow to roam and graze. These small farms would most likely resemble the final model, D5, but may exclude the land application component. Combination 5 would likely be a conservatively high estimate of emission from these small farms.

The following figures show the possible combined emissions for each model farm under a wide range of meteorological conditions.



**Figure 31: Model dairy farms.**

Combo D1: mechanically ventilate, scrape barn, milking center, lagoon, land application



Figure 32: NH3 emissions for a dairy farm, model D1(MVS-MC-L-LA)

**Combo D2: mechanically ventilate, flush barn, milking center, lagoon, land application**



Figure 33: NH3 emissions for a dairy farm, model D2(MVF-MC-L-LA)

**Combo D3: naturally ventilated barn, milking center, lagoon, land application**



Figure 34: NH3 emissions for a dairy farm, model D3(NV-MC-L-LA)

**Combo D4: naturally ventilated barn, milking center, corral, lagoon, land application**



Figure 35: NH3 emissions for a dairy farm, model D4(NV-MC-C-L-LA)

**Combo D5: naturally ventilated barn, corral, land application**



Figure 36: NH3 emissions for a dairy farm, model D4(NV-C-LA)

# Appendix E-3 – Poultry Operations Emissions Modeling (NH3)

## 1. Summary of meteorological parameters

Models were tested with a variety of meteorological conditions to determine whether a specific size farm would exceed the 100 lb/day threshold. Minimum and maximum values were determined from NECI data on extreme for the US, and represent possible extreme values for somewhere in the US. These extreme values may not be present in every growing area. Most parameters were tested for every one unit increment between the minimum and maximum value. For example, for ambient relative humidity all humidity values between 1 and 100, in 1% increments were tested.

For wind speed, NAEMS measured winds at 2.5 meters, and the models are tuned to winds at that height. To adjust the NWS measurement, taken at a standard 10 m height, the winds (in ms) are multiplied by 0.812252 to reduce the wind speeds to account for increased friction at the lower measurement height. Please see the model documentation for more details on how the conversion factor was developed.

This data was used to test all the farm sources.

Table 25. Summary of meteorological parameters.

| variable | min | mean | max |
|---|---|---|---|
| 10m Wind speed (mph) | 0 | 6.0 | 12.0 |
| 10m Wind Speed (ms) | 0 | 2.7 | 5.4 |
| 2.5m Wind Speed (ms) | 0 | 2.2 | 4.4 |
| Ambient Relative Humidity (%) | 1 | 50.5 | 100.0 |
| Ambient Temperature (C) | -50 | 0.0 | 50.0 |
| Ambient Temperature (F) | -58 | 32.0 | 122.0 |

## 2. Broiler Individual Source Results

Broiler production is raising birds, or either sex, for meat. Birds are raised from hatchlings to market weight in 28 to 63 days, depending on the final market weight. For a 4.5 to 5.5 lb market weight, the grow-out period is approximately 49 days. Litter and manure are typically stored in the house, with full removal at the end of the flock to a manure storage (e.g., pile, storage shed). The collected manure can be applied to surrounding farm land as fertilizer.

To calculate possible emissions for a small farm, additional assumptions about the operation were made:

- 400 birds per flock, 5 flocks annually (2,000 birds sold annually)

- max weight of 3.1 kg (6.8 lb)

This should produce the highest emissions for a broiler site for the various meteorological conditions.

**Broiler Barn**



Figure 37: NH3 emissions range for a broiler house

## Layers

Layer operations house female chickens capable of producing eggs. They are generally composed of some confinement structure to house the layer and a manure storage system, which could be in the house (e.g., pit), exterior to the house (e.g., yard, manure shed, manure pile), or a combination of both. The collected manure can be applied to surrounding farm land as fertilizer. Confinement structures are either stacked cages that collect manure under the cages, which is removed by front loader (high rise house) or can have a conveyor belt that runs under the cages to remove the manure to a manure shed (manure belt house + manure shed).

To calculate possible emissions for a small farm, additional assumptions about the operation were made.

For layer farms, we assumed an inventory of 50 head per house.

This should produce the highest emissions for a layer site at the various meteorological conditions.

**High Rise House**



Figure 38: NH3 emissions range for a layer high rise house

**Manure Belt House**



Figure 39: NH3 emissions range for a layer manure belt house

**Manure Shed**



Figure 40: NH3 emissions range for a layer manure shed

**Land application**

Estimates of land application presented here are based on on the 2001 EPA report for liquid land application. For broilers, the average emission factor was 23 lb/yr-AU. For layers, the average emissions factor was 24 lb/yr-AU. In both cases an animal unit (AU) is equal to 100 chickens, which are consistent with NPDES definitions (66 FR 2960).

We assumed land application would occur 2 times a year, for at least a week at a time (14 days per year). The total annual land application emission estimate was divided by 14 day, to represent the emission that could occur on any single day.

For poultry barns, the equation become:

- Broiler, land app = (23*(200/100))/14 = 3.29 lb/day*
- *Layer, land app = (24*(50/100))/14 = 0.86 lb/day

# 3. Combinations (model farms)

To estimate farm total emissions for all sources, EPA developed "model farms" that represent possible farm configurations (i.e., combinations of farm sources). The model farms are loosely

136

based on the 2001 report, updated for based on th representative farms monitored under NAEMS. In total 3 model farms were calculated. Figure 5 shows the model farms used for calculations.

For a layer farm with 50 or fewer birds, the house would more likely resemble the broiler barn or large coop than the model farms offered here. As such the broiler model would likely be a better approximation of emissions from these small farms.

The following figures show the possible combined emissions for each model farm under a wide range of meteorological conditions.



**Figure 41: Model poultry farms**

**Combo B1: Broiler house, land application**



Figure 42: NH3 emissions for a broiler farm, model B1 (Broiler house & land application)

**Combo L1: Layer high rise house, land application**



Figure 43: NH3 emissions for a layer farm, model L1 (Layer high rise house & land application)

**Combo L2: Layer manure belt house house, manure shed, land application**



Figure 44: NH3 emissions for a layer farm, model L2 (Layer manure belt house, manure shed, & land application)

# EXHIBIT 4

*** E.O. 12866 Review – Draft—Revised Version – Do Not Cite, Quote, or Release During Review***

EO12866_Response2CommentsonAir Emissions from Animal Waste at Farms EPCRA 304(a)(2) Interpretation_2050-AH00_Final_RTC_20190508.docx

**Response to Comment Document**


**Amendment to Emergency Release Notification Regulations
on Reporting Exemption for Air Emissions from Animal Waste at Farms
Emergency Planning and Community Right-to-Know Act**


**Docket # EPA-HQ-OLEM-2018-0318**


**40 CFR Part 355**


**June 4, 2019**


**U. S. Environmental Protection Agency**

**Office of Land and Emergency Management**

**Office of Emergency Management**

# TABLE OF CONTENTS

**Response to Comments for Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act**

**Page**

Introduction……………………………………………………………………………    **3**

  **I.**    **Proposal to add the Reporting Exemption for Air Emissions from Animal Waste at Farms to EPCRA section 304 Emergency Release Notification Regulations……………………………………………………….**    **4**

 **II.**    **Proposal to add the definitions of "Animal Waste" and "Farm" to EPCRA Regulations in 40 CFR part 355……………………………………………**    **6**

**III.**    **Legal Rationale for the Proposed Rule…………………………………………**    **7**

      **A. Statutory Text**
      **B. Legislative History and Prior Agency Actions**
      **C. Decision in Waterkeeper Alliance v. EPA and related Rulemaking**

**IV.**    **Other Comments on the Proposed Rule…………………………………**    **16**

      **A. Health and Environmental Impacts**
      **B. Environmental Justice Considerations**
      **C. National Environmental Policy Act & Endangered Species Act**
      **D. Economic Considerations**
      **E. Availability of Information**
      **F. Request for Public Comment Period Extension & Public Hearings**
      **G. Reporting Burden and Farm Size**
      **H. Reporting Liability**
      **I. Animal Cruelty**

Appendix A……………………………………………………………………………    **27**

# Introduction

## Purpose of this Document

On November 14, 2018, the U.S. Environmental Protection Agency (EPA) published a notice of proposed rulemaking titled "Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act" (83 FR 56791).  The public comment period closed on December 14, 2018.

The Agency decided to finalize the action as proposed.  The final rule amends section 304 of the Emergency Planning and Community Right to Know Act (EPCRA) emergency release notification regulations to add the reporting exemption for air emissions from animal waste at farms provided in section 103(e) of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA).  In addition, the proposed definitions of "animal waste" and "farm" are added to the EPCRA regulations as provided in CERCLA section 103(e). The final rule maintains consistency between the emergency release notification requirements of EPCRA and CERCLA in accordance with the statutory text, framework and legislative history of EPCRA, and is consistent with Agency's prior regulatory actions.

The purpose of this document is to summarize public comments received on the proposed rule. To develop this response to comment document, the Agency reviewed each submission made to public docket number EPA-HQ-OLEM-2018-0318.  Submissions to this public docket for this rulemaking appear in their entirety is available at http://www.regulations.gov.  We organized the relevant comments according to the Agency's specific requests for public comment in the proposed rule and other topics in the proposed rule (83 FR 56791, November 14, 2018).

We also received comments that addressed issues outside the scope of the proposed rule. While EPA appreciates these comments, we responded to them to the extent they are relevant to the rulemaking.

Appendix A of this document comprises the list of commenters and the docket number assigned to each.

EPA received 87,473 comments, of which 380 comments are individual letters.  The remaining comments are part of mass mail campaigns. To better organize the Agency's responses to significant comments, and to assist the reader, EPA categorized the comments into sections based on the issues raised. This support document, however, should be read as a whole as there will inevitably be some overlap among these issues and EPA's responses. Specific comments that may be cited are to be considered representative of the voluminous comments the Agency received on the varying issues. EPA reviewed all comments submitted to the docket for this rulemaking.

<div align="center">**COMMENT SUMMARY & RESPONSE**</div>

I.    **Proposal to add Reporting Exemption for Air Emissions from Animal Waste at Farms to EPCRA section 304 Emergency Release Notification Regulations**

The Agency proposed to amend the emergency release notification regulations under the Emergency Planning and Community Right-to-Know Act (EPCRA) to exempt the reporting of air emissions from animal waste at farms consistent with section 103(e) of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA).

**Supporting Comments**

Several commenters (National Association of SARA Title III Program Officials; Private citizens; Agricultural trade associations; West Virginia and North Dakota State Departments of Agriculture; Farm bureaus) expressed general support for the proposed amendment to the EPCRA section 304 release reporting regulations to add the reporting exemption for air emissions from animal waste at farms provided in CERCLA section 103(e). Commenters stated that the proposed rule lays out the proper reading of the law and is consistent with Congress' clear intent that EPCRA section 304 and CERCLA release reporting requirements be applied consistently except in certain very limited circumstances. Some of the commenters stated that EPCRA was never intended to govern agricultural operations, where emissions from livestock are a part of everyday life and are certainly not emergency situations. The natural breakdown of livestock manure does not constitute an emergency release pursuant to the CERCLA and EPCRA laws. One commenter stated that EPCRA was created to protect citizens from disasters such as 1984 Bhopal tragedy, however, animal agriculture cannot be compared to or included in a similar category designed to address toxic chemicals, hazardous substances and chemical emergencies.

**Response**

The EPA acknowledges the commenters' support for amending the EPCRA section 304 release notification regulations to add the reporting exemption for air emissions from animal waste at farms provided in CERCLA section 103(e). Issues raised by the commenters are further discussed below in this support document.

**Opposing Comments**

The Agency received numerous mass mail campaigns (public, citizen & environmental groups) opposing the proposed amendment to add the reporting exemption to the EPCRA section 304 emergency release notification regulations for air emissions from animal waste at farms. Many commenters strongly urge the EPA to withdraw its proposed rule, which commenters said would exempt concentrated animal feeding operations (CAFOs) from EPCRA reporting requirements so that reports of hazardous releases will be available to the public. Certain members of the

Senate Environment and Public Works Committee strongly urges EPA to withdraw this proposed rule and faithfully execute and enforce EPCRA and CERCLA reporting requirements consistent with the laws passed by Congress.

In addition, EPA also received individual comment letters opposing the proposed amendment. One commenter stated that it is the job of the EPA to regulate sources of hazardous emissions and protect the population from known sources of these emissions. One commenter asked EPA not to ignore and vacate their right-to-know by exempting the CAFO's responsibility to control and report the toxic emissions they are required to control and report. Another commenter stated that the solution to pollution is not to exempt the polluter and ignore the environmental damage and harm to human health. The automobile, power plant, and municipal landfill regulations progressed as those sources of pollution got larger and more common. The same approach must be done for the growing industrial animal factories.

Commenters also said EPA has a statutory obligation to do everything possible to keep the ambient air as pure as possible. Reporting emissions from animal agriculture is an important and necessary tool. Removing that tool would show flagrant disregard for the EPA mission and for the health of people who trust our government to act responsibly. Do not remove reporting of emissions from animal agriculture from EPCRA.

**Response**

While EPA recognizes commenters' concerns regarding animal waste emissions, the amendment is based on the statutory language in EPCRA section 304 and its relationship to CERCLA section 103 release reporting requirements.

The basic purpose of emergency release notification requirements under EPCRA section 304 is for facilities to inform state and local agencies of accidental releases so that these agencies can exercise the local emergency response plan if necessary. This may include, but is not limited to, providing shelter or evacuating the community to prevent acute exposure from accidental releases of chemicals. There is no provision under EPCRA section 304 to regulate or reduce emissions to air, water or land. Other programs at EPA carry out these functions.

Furthermore, in the Agency's experience, it is unlikely a response action will be taken for these types of emissions. As indicated by correspondence to EPA from the National Association of SARA Title III Program Officials (NASTTPO), dated June 1, 2017, release reports for air emissions from animal waste at farms provide little value to local agencies and first responders, and are generally ignored. NASTTPO states that open dialogue and coordination among farms and local agencies can be more effective than release reporting to address animal waste management at farms. NASTTPO reiterated this principle in its comment to this rulemaking dated December 14, 2018. In addition, regardless of reporting, EPA can still enforce applicable laws and regulations to address threats to human health and the environment. This rulemaking does not limit the Agency's authority under CERCLA sections 104 (response authorities), 106 (abatement actions), 107 (liability), or any other provisions of CERCLA to address releases of hazardous substances at farms.

Issues raised by the commenters are further discussed below in this support document.

## II.     Proposal to add definitions of "Animal waste" and "Farm" to EPCRA regulations in 40 CFR part 355

EPA requested comments on adding the definitions of "animal waste" and "farm" to the definition section of EPCRA regulations in 40 CFR part 355 to delineate the scope of the reporting exemption for air emissions from animal waste at farms.  EPA received 17 adverse comments and 8 comments to support adding the definition of the terms "animal waste" and "farm" to EPCRA regulations.

**Supporting Comments**

Commenters generally support adding definitions of "animal waste" and "farm" to the EPCRA regulations to delineate the scope of this reporting exemption.  A few commenters expressed that the incorporation of the FARM Act's definitions of "animal waste" and "farm" into the EPCRA regulations provides important regulatory clarity to agricultural producers.  In their comments, NASTTPO expressed that EPA has crafted a narrow and specific exemption from the reporting of releases from animal waste from farms. They support the definitions and the resulting exemption from release reporting.

**Response**

EPA recognizes commenters' general support for adding the definitions of "animal waste" and "farm" to EPCRA regulations in 40 CFR part 355.

**Opposing Comments**

Many commenters as part of mass mail campaigns as well as few individual commenters opposed adding the definitions of "animal waste" and "farm" to the EPCRA regulations in 40 CFR part 355.  One of the commenters specifically stated that limiting definitions of what constitutes a farm, or animal waste merely hides problems and that we should be striving for more transparency on issues concerning emissions that affect climate and public health, not trying to limit transparency.  Another commenter stated that it is only the large CAFOs that can release sufficient volumes of toxic pollutants, as ammonia and hydrogen sulfide into the air which obviously will then end up in our soil and water.

**Response**

In March 2018, the Fair Agricultural Reporting Method (FARM) Act of 2018 amended CERCLA section 103 to exempt the reporting of air emissions from animal waste at a farm. *See* Fair Agricultural Reporting Method Act, Pub. L. 115-141 §§ 1101-1103 (2018). The FARM Act includes definitions for "animal waste" and "farm." On August 1, 2018, EPA promulgated a final rule to incorporate the FARM Act legislation into the CERCLA reporting regulations at 40 CFR part 302 (see 83 FR 37446), including definitions for "animal waste" and "farm." This rule is based on EPA's interpretation of EPCRA section 304(a)(2) and its relationship to CERCLA

section 103 as amended by the FARM Act. Due to this relationship between CERCLA section 103 and EPA's interpretation of EPCRA section 304(a)(2), the Agency believes it is reasonable to promulgate the same definitions for "animal waste" and "farm" into the EPCRA release reporting regulations to maintain consistency between the statutes and to effectuate the exemption under EPCRA.

### III. Legal Rationale for the Proposed Rule

EPA received comments both supporting and opposing the legal rationale for the proposed rule. Below is a summary of significant comments received, and EPA's responses. To assist the reader with reviewing the comments and responses, EPA is providing a summary of its rationale for the proposed rule below. For a full discussion of the proposed rule and its rationale, the reader is directed to the Federal Register notice for this rulemaking. *See* 83 FR 56919 (November 14, 2018).

### Summary of EPA's Legal Rationale for the Proposed Rule

CERCLA and EPCRA are two separate but interrelated environmental statutes that work together to provide emergency release notifications to Federal, state and local officials. CERCLA section 103 requires the person in charge of a vessel or facility to immediately notify the National Response Center (NRC) when there is a release of a hazardous substance, as defined under CERCLA section 101(14), in an amount equal to or greater than the reportable quantity for that substance within a 24-hour period. EPCRA section 304 governs when owners or operators of certain facilities need to immediately notify the State Emergency Response Commission (SERC) and the Local Emergency Planning Committee (LEPC) when there is a release of an extremely hazardous substance (EHS), as defined under EPCRA section 302, or of a CERCLA hazardous substance in an amount equal to or greater than the reportable quantity for that substance within a 24-hour period. Generally speaking, release notifications go to federal authorities under CERCLA, while release notifications go to state and local authorities under EPCRA.

EPCRA sections 304(a)(1)-(3) provide for release reporting under three scenarios, each of which depend in some way on whether the release requires notice under CERCLA. If a release requires notice under CERCLA section 103(a), the release may be subject to EPCRA section 304 reporting if the release meets the requirements of EPCRA section 304(a)(1) or 304(a)(3). Importantly for this rulemaking, a release of an EPCRA EHS that is *not* subject to notification under CERCLA section 103(a) need only be reported if the release meets all three criteria in EPCRA section 304(a)(2):

- The release is not a federally permitted release as defined in CERCLA section 101(10),
- The release is in an amount in excess of the reportable quantity as determined by EPA, and
- The release occurs in a manner that would require notification under CERCLA section 103(a).

When Congress passed the FARM Act it exempted air emissions from animal waste at farms from reporting under CERCLA section 103(a). Thus, these types of releases do not fall within the reporting scenarios of EPCRA sections 304(a)(1) or (a)(3). Instead, reporting for these types of releases would be required under EPCRA section 304(a)(2) *but only if* all three criteria listed above are met. Air emissions from animal waste at farms could meet the first two criteria because such releases are generally not federally permitted and may exceed the applicable reportable quantity. A release of this type or manner (i.e., an emission into the air), however, does not "occurs in a manner" that would require notification under CERCLA section 103(a) after passage of the FARM Act. Accordingly, the three criteria are not met, and reporting is not required under EPCRA section 304(a)(2).

As discussed in the Federal Register notice for the proposed rule, EPA's interpretation concerning this type of release – air emissions from animal waste at farms – is supported by the legislative history of EPCRA and prior regulatory actions by EPA.

**Supporting Comments**

Commenters stated that EPA has the authority to amend the EPCRA emergency release notification regulations to include the reporting exemption for air emissions from animal waste at farms provided in CERCLA section 103(e). Commenters state that Congress intended for EPCRA reporting requirements to be consistent with or "linked to" CERCLA reporting requirements, which is evinced by the statutory language in EPCRA section 304(a)(2). The operative language in EPCRA section 304(a)(2) would require reporting if the release "occurred in a manner" which would require reporting under CERCLA. Since air emissions from animal waste at farms are exempt from CERCLA reporting under CERCLA section 103(e), as enacted by the FARM act, no reporting would be required under EPCRA pursuant to EPCRA section 304(a)(2).

Commenters stated that the EPCRA reporting mandates are parallel with or "piggybacked" on to the CERCLA reporting mandates is supported by the D.C. Circuit opinion in *Waterkeeper Alliance, et al. v. EPA*, 853 F.3d 527 (D.C. Cir. 2017), the legislative history of EPCRA and CERCLA section 103(e) as amended by the FARM Act, and prior agency action aligning EPCRA reporting with CERCLA reporting. Commenters note that an analysis prepared by the Congressional Research Service (CRS) at the request of the Senate Committee on Environment and Public Works (EPW) supports EPA's interpretation as presented in the proposed rule. In sum, commenters state the proposed rule is a sound and lawful codification based on the statutory language in EPCRA and CERCLA.

**Response**

EPA acknowledges the comments in support of the rule. EPA agrees it has reasonably interpreted EPCRA and CERCLA to promulgate the reporting exemption for air emissions from animal waste at farms. Further discussion of the *Waterkeeper* case, the legislative history, including the CRS analysis, and prior agency action is included below in EPA's response to the opposing comments. EPA acknowledges there may be several ways to draft the rule, but the

Agency believes the proposed language appropriately carries out the intended effect of exempting air emissions from animal waste at farms from release reporting under EPCRA.

**Opposing Comments**

EPA received comments with a wide range of arguments opposing the Agency's legal rationale for the proposed rule. For the purposes of presentation, EPA has categorized the arguments below, followed by the Agency's response to each. This section on opposing comments, however, should be read as a whole as there will be some overlap among the arguments. As indicated in the Introduction to this support document, specific comments that are identified in this section are representative of the many comments the Agency received. EPA reviewed all comments.

**A. Statutory Text**

Commenters argue the proposed rule is in direct contravention of the plain language of EPCRA and CERCLA and is therefore "fundamentally flawed" and "illegal."

In enacting the FARM Act, the Senate EPW requested an analysis from the CRS of the potential effects of the FARM Act's amendments to CERCLA on EPCRA release reporting. The CRS issued two memorandums in March 2018 addressing the FARM Act (the memorandums are cited by several commenters). The first memorandum, entitled "Fair Agricultural Method Act/FARM Act (S. 2421)," dated March 7, 2018, provided an overview of CERCLA and EPCRA release reporting, statutory exemptions, the 2008 CERCLA/EPCRA rule and resulting litigation in the *Waterkeeper* case, EPA guidance on "routine agricultural operations," and the FARM Act. The March 7, 2018 memorandum states that if the FARM Act exempts the reporting of air releases of hazardous substances emitted by animal waste at farms, the FARM Act would have the effect of exempting the same releases of hazardous substances from reporting under EPCRA sections 304(a)(1) and (a)(3); reporting is required under both of these provisions contingent upon CERCLA reporting. The memorandum's analysis, however, also states that the FARM's Act CERCLA exemption may not necessarily apply to extremely hazardous substances covered under EPCRA section 304(a)(2), and also notes that any potential applicability of EPCRA to releases from animal waste may depend on EPA's guidance concerning "routine agricultural operations." The CRS memorandum also notes that the phrase "occurs in a manner" in EPCRA section 304(a)(2) has been implemented over time to mean the nature of the release in terms of how a substance enters the environment. Commenters supporting EPA's interpretation point to such language in the CRS analysis as evidence supporting the legality of the proposed rule.

To elaborate on its initial analysis, the CRS issued a second memorandum, entitled "Supplemental Analysis: Fair Agricultural Reporting Method Act/FARM Act (S. 2421)," dated March 13, 2018. In that memorandum, the CRS explains that "occurs in a manner" means the nature of the release in terms of how a substance enters the environment; not that reporting is required under CERCLA section 103. The CRS argues that the release is not contingent on actual CERCLA reporting. As stated in the letter from certain Senate EPW members:

> In other words, as CRS explains, if an extremely hazardous substance (as defined by EPCRA), is emitted in excess of the reportable quantity, and is released into the environment in a manner which would generally trigger reporting (as those terms are defined in CERCLA), then reporting is required under EPCRA 304(a)(2), even though reporting is not required under CERCLA. There is no condition-precedent that a substance first be reported under CERCLA in order to trigger the reporting requirements that exist under EPCRA 304(a)(2). [Senate EPW comment page 6].

Other commenters also cite to the CRS analysis to argue that EPA's interpretation in the proposed rule is erroneous. Earthjustice expresses its support for CRS's analysis and provides additional comments to elaborate on the proper interpretation of EPCRA section 304(a)(2). Earthjustice argues that the "occurs in a manner" language makes it clear that even if a release is not reported under CERCLA, EPCRA reporting would still be required if the "factual" circumstances of the release would otherwise require CERCLA reporting. Earthjustice states:

> It makes clear that even if a release need not be reported under CERCLA, that release must still be reported under EPCRA if the **factual** circumstances of the release would otherwise require CERCLA reporting.

Earthjustice offers a few examples to posit that if the release factually qualifies as release into the environment under CERCLA, then reporting could still be triggered under EPCRA even if the release does not require reporting under CERCLA as a matter of law.

Earthjustice provides additional comments asserting that EPA wrongly interpreted the operative language in EPCRA section 304(a)(2) as "occurs in a manner which *does* require notification," instead of properly interpreting it as "occurs in a manner which *would* require notification." Earthjustice describes this difference as the subjunctive mood vs. the indicative mood. Congress' use of the term "would" in EPCRA section 304(a)(2) indicates the statute should be interpreted in a hypothetical or counterfactual scenario (i.e., subjunctive), rather than as a statement of fact (i.e., indicative):

> Thus, Congress's use of the term "would" has meaning – it plainly describes a situation in which CERCLA reporting is not required, but **would** be required but for some factual predicate or operation of law that excludes it from CERCLA's reporting requirements. It must mean something other than occurs in a manner that **does** require reporting under CERCLA. [EJ comment page 24].

Earthjustice cites several cases in general support of its theory on subjunctive statutory construction, and further argues that EPA's interpretation conflicts with EPCRA sections 304(a)(1) and 304(a)(3) and impermissibly results in an EPCRA exemption for any extremely hazardous substance whenever there is no parallel CERCLA reporting requirement. Relatedly, certain members of the Senate EPW assert that the interpretation in the proposed rule leads to illogical results:

> Under EPA's proposed interpretation of the FARM Act, if instead of limiting the CERCLA exemption to emissions into the air, Congress had instead carved out a broader

exemption for reporting requirements under CERCLA and exempted releases into *all environmental media*, then the EPCRA reporting requirements under Section 304(a)(2) (into the air or any other media) would apply. In other words, EPA is arguing that a more expansive reporting exemption under CERCLA would require more extensive reporting under EPCRA. This is an illogical and unreasonable interpretation of the statute. [Senate EPW comment page 8].

Earthjustice also asserts that EPA arbitrarily based its interpretation of "occurs in a manner" on the method or type of release (i.e., into the air) rather than on the substance emitted. Earthjustice argues the statute provides no support for such an interpretation.

The Center for Biological Diversity states that EPA's interpretation is manifestly contrary to EPCRA:

> [T]he plain language of EPCRA is unambiguous in that it prohibits EPA from exempting animal feeding operations from EPCRA's reporting requirements. But even if there was some ambiguity in the statute, the Proposed Rule is arbitrary and capricious because EPA has not provided a reasoned explanation to justify its departure from the statute or supported that explanation with substantive record evidence. [CBD comment page 13].

**Response**

EPA's interpretation in this rule is lawful and based on the plain language of EPCRA and CERCLA. EPA reasonably interpreted the operative language in EPCRA section 304(a)(2) as requiring EPCRA reporting when the release "occurs in a manner" which would require notification under CERCLA section 103(a). Because air emissions from animal waste at farms do not "occur in a manner" that would require notification under CERCLA section 103(a), such releases are not reportable under EPCRA section 304(a)(2).

EPA disagrees with the analysis of the CRS, as advanced by the letter from certain Senate EPW members, Earthjustice and other commenters, that reporting of these types of air emissions would still be required under EPCRA so long as they are factually releases under CERCLA. EPA understands these comments to propose that the "occurs in a manner" language in EPCRA section 304(a)(2) means that a release only has to satisfy the definition of a "release" under CERCLA to be eligible for EPCRA reporting. Such a reading is unnecessary as the definition of a "release" in EPCRA already mirrors the definition of a "release" in CERCLA. EPCRA section 329(8) defines "release" as:

> …any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles) of any hazardous chemical, extremely hazardous substance, or toxic chemical.

Similarly, CERCLA section 101(22) defines "release," in part, as:

> …any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the

abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)…

While the CERCLA definition may focus more on hazardous substances and the EPCRA definition focusses more on extremely hazardous substances and hazardous or toxic chemicals, both definitions list similar types, ways, or manners of a release.

EPA believes it is not a full and fair reading of EPCRA section 304(a)(2) to say that EPCRA reporting would still be necessary if a release to the environment qualifies as a release to the environment under CERCLA, regardless of whether reporting is legally required under CERCLA. An EPCRA release into the environment already follows the definition of a release into the environment under CERCLA. Applied to the present rulemaking, emissions into the air from animal waste at farms already qualify as releases into the environment under both statutes (i.e., they are "emitting" or "escaping" under the statutory definitions). Further analysis of what factually is a release to the environment does not shed light on the Congressional intent of EPCRA section 304(a)(2) and does not follow the plain language of the statute, which requires, in part, that a release occurs in a manner which would require notification under CERCLA section 103(a).

A more complete and reasoned interpretation of EPCRA section 304(a)(2) is presented in the Federal Register notice for the proposed rule. When air emissions from animal waste at farms meet the first two criteria of 304(a)(2), the remaining question is whether such a release occurs in a manner that would require notification under CERCLA section 103(a). The Oxford Online Dictionary and the American Heritage Online Dictionary define "manner" as a "way in which a thing is done or happens" or a "kind or sort." The Merriam-Webster Online Dictionary similarly defines "manner" as a "kind or sort." EPA believes that, under such definitions, air emissions from animal waste at farms would qualify as a way or kind of release into the environment. CRS agreed with this interpretation in its memorandum dated March 7, 2018, which states:

> [T]he phrase "occurs in a manner" generally has been implemented over time to mean the nature of the release in terms of how the substance enters the environment. [CRS March 7, 2018 memorandum page 6].

The next question is whether the release would require notification under CERCLA section 103(a). As discussed in the proposed rule and this support document, the FARM Act exempted only releases of a certain kind or manner – air emissions from animal waste at farms – from notification under CERCLA section 103(a). Accordingly, these types of releases do not occur in a manner that would require notification under CERCLA section 103(a). Because the third criteria of EPCRA section 304(a)(2) is not met, no reporting under EPCRA is required.

EPA believes its interpretation follows the plain language of the statute and carries out the Congressional intent of EPCRA section 304(a)(2). In contrast, the commenters' arguments are insufficient as they do not give full meaning to the phrase "occurs in a manner which would require notification under section 103(a) of CERCLA."

EPA also disagrees that it wrongly construed the language in EPCRA 304(a)(2) as "occurs in a manner" which "does" require notification under CERCLA section 103(a), instead of "occurs in a manner" which "would" require notification under CERCLA section 103(a). Throughout the proposed rule, EPA includes analysis of air emissions from animal waste at farms in the context of "would" require notification under CERCLA section 103(a):

> Yet these types of releases do not ''occur[] in a manner'' that would require notification under CERCLA section 103(a) and thus do not meet the third criterion of EPCRA section 304(a)(2)…

> Air emissions from animal waste at farms no longer ''occur[] in a manner'' that would require notification under CERCLA section 103(a) because the recent amendment exempted these types of releases from CERCLA reporting…

> Because air emissions from animal waste do not ''occur[] in a manner'' that would require notification under CERCLA section 103(a), these types of releases do not meet the third criterion of EPCRA section 304(a)(2) and are thus not subject to EPCRA reporting. *See* 83 FR 56793.

While EPA may have also used the word "does" in replace of "would" at times in the discussion of the proposed rule, that does not mean the Agency ignored the statutory text. The cases cited by Earthjustice to generally discuss subjunctive or hypothetical scenarios are inapposite as applied to this EPCRA rulemaking and provide no clarity on EPCRA section 304(a)(2). Contrary to Earthjustice's assertions, EPA did address different or hypothetical scenarios where releases at farms would require reporting under EPCRA, such as a reportable release from an anhydrous ammonia storage tank into the air.

EPA also disagrees that its interpretation conflicts with EPCRA sections 304(a)(1) and (a)(3), or that it arbitrarily based its interpretation on the method or manner of the release (i.e., into the air). As discussed above, the phrase "occurs in a manner" in EPCRA section 304(a)(2) could reasonably be read to mean the way in which something happens; EPCRA section 304(a)(2) does not identify specific substances. Likewise, the FARM Act amendment to CERCLA exempted air emissions from animal waste at farms, not specific substances. Because these air emissions are a type or way such releases enter into the environment, and these releases do not "occur in a manner" that requires reporting under CERCLA section 103(a), the releases do not meet the criteria to require reporting under EPCRA section 304(a)(2).

Based on a plain reading of the statutory language, EPA believes this rule presents a rational interpretation of EPCRA section 304(a)(2) and its relation to CERCLA section 103 as amended by the FARM Act. EPA believes its interpretation more reasonably represents Congress' intent than the interpretation presented by the commenters. If the statutory language is unclear or ambiguous, EPA believes its interpretation is reasonable and consistent with the legislative history and statutory framework of EPCRA as well as prior regulatory actions.

13

**B. Legislative History and Prior Agency Actions**

Commenters argue that the legislative history of the FARM Act makes it clear that Congress intended for EPCRA reporting to continue notwithstanding the FARM Act's CERCLA exemption. Certain members of the Senate EPW cites to testimony by Senators and witnesses explaining that the FARM Act makes no changes to reporting requirements for releases of extremely hazardous substances under EPCRA. Commenters assert that the proposed rule violates the legislative intent of the FARM Act. Earthjustice argues that EPCRA's legislative history does not support EPA's prior actions exempting certain releases from EPCRA reporting, such as the CERCLA continuous release provision.

**Response**

In enacting the FARM Act, Congress amended the CERCLA section 103 reporting requirements; it did not amend the EPCRA section 304 reporting requirements. While the FARM Act legislative history has relevance with respect to the statutory changes to reporting under CERCLA section 103, EPA considered the EPCRA legislative history when interpreting the statutory text in EPCRA section 304. As stated throughout the proposed rule, EPA has interpreted EPCRA section 304(a)(2) as carrying over CERCLA reporting exemptions related to the manner or nature of release. In this way, EPCRA section 304(a)(2) promotes consistency between EPCRA and CERCLA reporting. The legislative history of the FARM Act does not address the legislative history of EPCRA, and if Congress wished to ensure that the exemption in the FARM Act did not carry over into EPCRA reporting, it could have expressly enacted such statutory text, but it did not.

The legislative history of the FARM Act is correct to the extent that the amendment does not exempt all releases from animal waste at farms from reporting under EPCRA. Rather, this rule tracks the FARM Act to provide that a limited type of release, air emissions from animal waste at farms, are not subject to reporting under EPCRA. This rule does not apply to releases of substances from animal waste into non-air environmental media, nor to releases into the air from sources other than animal waste or decomposing animal waste at a farm. For example, a release from animal waste into water (e.g., a lagoon breach) or a release from an anhydrous ammonia storage tank into the air might trigger reporting requirements if the release exceeds the applicable reportable quantities. This is because the releases occur in a manner that require reporting under CERCLA because they are releases into a non-air media or they are not emissions from animal waste.

The proposed rule also explains how, in the 1986 committee conference report addressing EPCRA, Congress expressed its intent that EPCRA release reporting be aligned with CERCLA reporting. As an example, the committee conference report explains how continuous releases which are not subject to immediate reporting requirements under CERCLA should likewise not be subject to EPCRA reporting. As a result, EPA promulgated reduced reporting requirements that cross-reference and follow the CERCLA reduced reporting requirements for continuous releases. In this manner, EPA reasonably followed Congressional intent to state that numerous types of releases are not subject to reporting under EPCRA when reporting wasn't required under

CERCLA, including vehicle emissions, the normal application of fertilizer, and the application of registered pesticide products (see the Federal Register notice for the proposed rule for a more detailed discussion).

Using pesticides as an example, there is no disagreement that the proper application of a federally registered pesticide product is exempt from reporting under CERCLA section 103(a). After all, Congress expressly provided for the exemption in CERCLA section 103(e). Thus, no reporting is required under CERCLA section 103(a). Only a certain manner of pesticide release – proper application – would not require reporting under CERCLA. In light of this and EPCRA section 304(a)(2), EPA reasonably promulgated an exemption in the EPCRA regulations at 40 CFR 355.31(c). EPCRA section 304(a)(2) works to align EPCRA with CERCLA and logically exclude such an application from EPCRA reporting. A similar analysis applies to air emissions from animal waste at farms as set out in the proposed rule.

In contrast to the application of pesticides, CERCLA section 101(14) excludes petroleum (including crude oil or any fraction thereof) and natural gas from the definition of a CERCLA hazardous substance. Reporting is not required because reporting is only required for releases of hazardous substances. To put it another way, the reason petroleum releases are not reported under CERCLA is unrelated to the *manner* of a release. Thus, as stated in the proposed rule, EPA has interpreted EPCRA section 304(a)(2) as still requiring the reporting of an eligible petroleum release even when reporting wouldn't be required under CERCLA section 103(a).

The legislative history of the FARM Act's amendment to CERCLA did not nullify the statutory text in EPCRA section 304(a)(2). EPA reasonably interpreted that text and this rule is supported by EPCRA's legislative history. EPA notes that in the legislative history of the FARM Act the Senate reprinted the CRS memorandum, entitled "Supplemental Analysis: Fair Agricultural Reporting Method Act/FARM Act (S. 2421)," dated March 13, 2018. EPA's response to that memorandum is discussed above in this support document.


### C. Decision in *Waterkeeper Alliance v. EPA* and Related Rulemaking

Commenters state that the proposed rule contravenes the opinion in *Waterkeeper Alliance, et al. v. EPA*, 853 F.3d 527 (D.C. Cir. 2017). Commenters argue that the opinion held that EPCRA has a "sweeping reporting mandate" which requires farms to comply with statutory requirements for releases. Commenters state that EPA already unsuccessfully tried to create an EPCRA reporting exemption for farms in 2008 when it promulgated the final rule entitled, "CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances From Animal Waste at Farms," (73 FR 76948 December 18, 2008) ("2008 CERCLA/EPCRA Rule"). Commenters assert that the analysis used in the *Waterkeeper* decision to invalidate the 2008 CERCLA/EPCRA Rule also invalidates the current proposed rule.

Commenter Earthjustice argues that the *Waterkeeper* decision found that EPA has no general rulemaking authority for the proposed rule and therefore it is invalid.

**Response**

As explained in the Federal Register notice for the proposed rule, the current rulemaking is based on a different rationale than the 2008 CERCLA/EPCRA Rule. Thus, this rule is an independent action that is not limited by the *Waterkeeper* decision.

The 2008 CERCLA/EPCRA Rule exempted all farms from CERCLA's reporting requirements for air releases from animal waste, but provided only a limited exemption from EPCRA reporting requirements for farms that had fewer animals than a large concentrated animal feeding operation as defined by the Clean Water Act. In contrast to the current rule, the 2008 CERCLA/EPCRA Rule did not rely on a CERCLA exemption since one did not exist at that time, and it did not rely on a statutory interpretation of EPCRA section 304(a)(2). The court in *Waterkeeper* ultimately vacated the rule, finding the Agency could not rely on its general rulemaking authority or a de minimis exception, particularly where the Agency did not identify a statutory ambiguity to support its position.

The statutory landscape has changed markedly since the *Waterkeeper* decision. In passing the FARM Act in March 2018, Congress amended CERCLA to expressly exempt farms from reporting air emissions from animal waste under CERCLA section 103. As explained in the proposed rule and in this support document, EPA reasonably interpreted the plain language of EPCRA section 304(a)(2) as carrying the FARM Act's CERCLA reporting exemption over to EPCRA reporting. The proposed rule is an independent action from the 2008 CERCLA/EPCRA Rule and is based on a separate rationale. It is therefore not a fair reading of the court's opinion to find that the *Waterkeeper* decision invalidates the proposed rule. To the contrary, EPA finds support for the proposed rule where the *Waterkeeper* court states: "Thus all of EPCRA's reporting mandates are piggybacked on the CERCLA mandates in one form or another." *Waterkeeper*, 853 F.3d at 533. As explained in the proposed rule, EPA has lawfully interpreted EPCRA section 304(a)(2) to align EPCRA and CERCLA reporting requirements and promote consistency between the statutes.

EPA believes commenter Earthjustice mischaracterizes the *Waterkeeper* decision regarding the Agency's authority for the proposed rule. The *Waterkeeper* opinion did not invalidate EPA's authority to promulgate rules under EPCRA section 328. Rather, the opinion found that the general rulemaking authority in EPCRA section 328 was not a sufficient basis for the 2008 CERCLA/EPCRA Rule. In contrast, the authority for this rulemaking is based on EPCRA section 328, and EPA's interpretation of EPCRA section 304(a)(2) and its relationship with CERCLA section 103 as amended by the FARM Act.

## IV. Other Comments

Although not specifically requested, the Agency received other comments on the proposed rule. Commenters assert that the proposed rule is arbitrary and capricious because EPA failed to consider a number of different factors in its analysis of the proposed rule. These factors include health impacts, environmental justice, the National Environmental Policy Act, the Endangered Species Act, and the need for information. These comments are discussed below.

## A. Health and Environmental Impacts

**Supporting Comments**

Agricultural trade associations expressed general support stating that the proposed rule is fully protective of the communities' health and welfare where our producers and their families also live and work. An anonymous commenter stated that although it is difficult to protect their family from the impacts created by CAFOs, they want to support the farming industry and their ability to produce healthy food for our population so we must explore best practices that focus on sustainability and environmental impact.

One of the commenters quoted the Congressional Research Service analysis prepared for the Senate EPW Committee regarding the effects of air releases from animal waste," if such quantity were released into the ambient air, the concentrations generally would decline with increasing distance from the point of release as a result of dispersion." The analysis went on to point out that a study performed in 2003 by the National Research Council noted, "that potential risks from air releases would depend on exposure that may vary by site and among individuals. The Council found 'little scientific evidence' that exposures beyond the boundaries of animal feeding operations have significant effects on human health because the concentrations 'usually' are below threshold levels that would present a health risk."

**Opposing comments**

Numerous commenters, including mass mail campaigns and individuals expressed their concerns that emissions from farms affect their health as well as farm workers.  Some commenters stated that CAFO air emissions are not normal farm odors, they are toxic emissions containing hazardous substances such as ammonia and hydrogen sulfide. Even at low levels these toxic emissions are dangerous to human health, and at high levels they can be deadly.  Additionally, the commenters stated that sources of air pollution should be monitored and regulated or there will be negative economic and health consequences for all. One commenter quoted studies that showed a relationship between ammonia emissions and decreased lung capacity. This commenter stated that exempting ammonia emissions would fundamentally oppose EPCRA's goal to inform communities on the presence of hazardous pollutants.  The purpose of the EPA is to ensure safety of? the environment, which this proposal making livestock operations exempt conflicts. Another commenter stated that toxic emissions are dangerous to human health even at low levels that it's irresponsible for the EPA to exempt those responsible from reporting them to state and local emergency responders.  Another commenter stated that there should be no exemption for emissions from animal waste farms, large-scale animal farm operations, or any animal waste operations because this animal waste (1) emits methane, known to contribute hugely to global warming and (2) emits vile, noxious odors which are known to be both hazardous to human health and a severe impact on local air quality to the point of making nearby residents' homes uninhabitable by depriving them of the peaceful quiet use and enjoyment of their homes. Further, such an exemption would support continued and expanded factory farming operations, which are both abusive of animals and whose waste operations already have proven to contaminate waterways particularly in the event of flooding or other natural or man-made disasters.

A university research organization commented that EPA should take account of the scientific literature on emissions of these substances, reviews of their toxicity, and related health effects observed in people living or attending school near animal feeding operations. This literature demonstrates that ammonia and hydrogen sulfide releases from animal waste may pose multiple risks. It makes clear the importance of public access, including access by affected communities, independent experts, and emergency responders to information about these releases.

In their comments, an environmental group noted that when the D.C. Circuit struck down EPA's last illegal disclosure exemption, the court noted that the risk of harm from CAFOs "isn't just theoretical; people have become seriously ill and even died as a result" of CAFO emissions. The letter states that their members can confirm that the harm is real, suffering from burning airways and decreased lung capacity because of the toxic emissions that emanate from CAFOs every day.

A university research organization commented that of the air contaminants emitted by animal feeding operations, ammonia and hydrogen sulfide are considered especially dangerous to human health, which is why they are listed as extremely hazardous substances under EPCRA. Human exposure to ammonia triggers respiratory problems, causes nasal and eye irritation, and in extreme circumstances can even be fatal.  Thus, from a public health and environmental quality standpoint, the proposed rule ignores the growing body of scientific studies and government reports showing that ammonia and hydrogen sulfide releases from animal feeding operations have an effect, potentially a significant effect, on human health, the environment, and wildlife. This commenter also added that this proposed action will severely and unlawfully undermine EPCRA by limiting governmental oversight of air pollution from animal feeding operations and eliminating fundamental protections for communities and emergency workers across the country. The commenter therefore strongly urges EPA to withdraw the proposed rule and instead take prompt action to reduce releases of harmful air pollutants from these operations and mitigate the damage from this pollution to public health, the environment, and wildlife.

**Response**

EPA takes no position in this rulemaking on the health or environmental effects of air emissions from animal waste at farms. As set out in the proposed rule and this support document, EPA's rationale for this rule is based on an interpretation of the statutory language in EPCRA section 304(a)(2) and its relationship with CERCLA section 103. Because this rule is not based on health or risk, it was not necessary to consider health or environment effects and related studies.

In addition, as stated in the proposed rule and previous sections of this document, the basic intent of EPCRA section 304 release reporting is for state and local agencies to initiate emergency response if necessary. EPCRA section 304 does not contain any provision to reduce or prevent any emissions that occurs at any facility.  EPA has other programs under Office of Air and Office of Water to prevent or reduce emissions from certain facilities or their operations.

Furthermore, on a federal and local level, it is unlikely a response action will be taken for these types of emissions. As indicated by correspondence from NASTTPO, dated June 1, 2017, release reports for air emissions from animal waste at farms are generally ignored as they provide little to no value to local agencies and first responders. NASTTPO states that open dialogue and

coordination among farms and local agencies can be more effective than release reporting to address animal waste management at farms.

Comments regarding health or environmental impacts are outside the scope of this rulemaking.

## B. Environmental Justice Considerations

EPA received a few opposing comments, including mass mail campaigns stating that EPA did not conduct environmental justice analyses prior to issuing the proposed rule. Two commenters stated that those who pollute the environment should be forced to pay for cleaning up or pay medical bills for those that affected by the contamination. One commenter requested that EPA should hold public hearings in various locations near to communities affected by CAFOs. These commenters also added that costs should not be borne by those families unlucky enough to live in the contamination zone of factory farms, where confined animals emit dangerous levels of ammonia and hydrogen sulfide, which can cause asthma, scar the respiratory tract and even cause death. Two commenters, a university research organization and a community group, expressed that siting and operation of industrial animal feeding operations across the country disproportionately impacts low income communities, communities of color, and indigenous people.

## Response

As stated in Section VII, Statutory and Executive Orders Review, of the proposed rule, this rulemaking is not subject to Executive Order 12898 regarding environmental justice or Executive Order 13045 regarding child risk because the rule is not based on environmental, health or safety risks and does not establish an environmental, health or safety standard. EPA has no authority under EPCRA to prevent or reduce emissions from certain facilities or their operations. The rule presents a statutory interpretation intended to maintain consistency between EPCRA section 304(a) and CERCLA section 103 release notification requirements and does not have any impact on human health or the environment.

## C. National Environmental Policy Act & Endangered Species Act

Commenters expressed that the proposed rulemaking did not include an environmental impact statement under the National Environmental Policy Act (NEPA). EPA has also disregarded its obligations under the Endangered Species Act (ESA). A university research organization commented that any change to the agency's oversight of air pollution from animal feeding operations is likely to cause significant effects to the human environment that must be analyzed under the NEPA. Those significant effects include, but are not limited, to: an increase in air and water quality degradation and other environmental harm; impacts to endangered or threatened species or their habitats; impacts to public health and safety; and a variety of cumulative impacts. Accordingly, before EPA takes any action here, it must prepare an EIS detailing the myriad adverse environmental impacts associated with this proposal, and consider reasonable

alternatives. EPA's failure to conduct an environmental analysis is arbitrary and capricious and contrary to its legal obligations under NEPA.

**Response**

This rule is legal in nature and is based on a reasonable interpretation of the statutory language in EPCRA section 304(a)(2) and its relationship with CERCLA section 103 as amended by the FARM Act. This action will have no direct effect on listed species or critical habitats.

Furthermore, courts have long held that EPA rulemakings are exempt from the requirements of NEPA. EPA rulemakings promulgated under the environmental laws administered by the Agency provide the "functional equivalent" of NEPA compliance. *See Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1051 (D.C. Cir. 1978); *Environmental Defense Fund, Inc. v. EPA*, 489 F.2d 1247, 1256 (D.C. Cir. 1973); *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 384 (D.C. Cir. 1973).

Similarly, no consultation is required under the ESA as this rule has no indirect effects and therefore, there is no reasonable certainty that EPA's interpretation in this rule may affect listed species. Any such effects are too speculative or conjectural to be subject to further NEPA review.

## D. Economic Considerations

Commenters assert that EPA did not conduct any meaningful economic analysis as part of the proposed rule. Commenters also expressed concerns that concentrated animal feeding operations reduce the property value those communities near them.

**Response**

As stated in Section VII, Statutory and Executive Orders Review, of the proposed rule, it was not necessary to conduct any type of economic analysis. The rule is a reasonable codification reflecting the statutory language in EPCRA and CERCLA. The rule does not impose any new information collection burden on businesses and does not result in any additional economic costs. No economic analysis is required under Executive Order 13771 or the Regulatory Flexibility Act. In addition, comments concerning property value are outside the scope of this rulemaking.

## E. Availability of Information

**Supporting Comments**

Although not specifically requested, EPA received comments from state and local emergency responders that animal waste air emission reports they received from large CAFOs in 2009 did not provide any valuable information, but rather it was needless paperwork and acted as an impediment.  EPA also received comments from agricultural trade associations referencing a

letter dated June 2017 from NASTTPO organization to EPA regarding the emissions reports from animal manure management:

> We have had experience with EPCRA emergency release reports as well as CERCLA continuous release reports from farms primarily regarding ammonia from animal manure management. These reports are of no particular value to LEPCs and first responders and they are generally ignored because they do not relate to any particular event … the most important thing to LEPCs and first responders is not detailed regulatory requirements for a facility's relationship to these groups, but rather the simple act of open dialog and coordination … NASTTPO believes that open dialog and coordination can be more effective than release reporting for farms that do not handle quantities of EPCRA EHS chemicals but are nevertheless expected to report regarding animal manure management.

In addition to the June 2017 letter to EPA, the NASTTPO organization submitted comments on the proposed rule. The members of this organization states that it is important to continue getting information from farms on accidental releases from water treatment chemicals or spill of ammonia nurse tanks. The members of NASTTPO expect that farms will coordinate and cooperate with emergency planning and emergency response organizations on the chemicals present at these farms and the processes and the nature of the risks.

EPA also received comments from several farm bureaus that emission reports from farms do not provide pertinent information for effective planning for chemical emergencies; but establishing relationships between responders and livestock operators can go a long way in helping responders do their jobs efficiently and safely.

Agricultural trade associations commented that adequate information is already available to the public on animal operations and animal waste management as well as the resulting emissions from the US Department of Agriculture (USDA) census. In addition, there are also research studies on most animal operations about the chemical composition of what is released into the air or the range of concentration of substances in these emissions. These commenters also mentioned that their members paid over $11 million to participate on the National Air Emissions Monitoring Study (NAEMS) with EPA to characterize the emissions from dairy, beef, swine and poultry operations. Numerous papers have already been published from this work and the Agency is now developing "Emissions Estimation Methodologies" from these datasets for use in the context of the Clean Air Act, where applicable. Members of communities with questions related to how emissions from animal operations can draw upon this body of knowledge to educate themselves about these emissions.

**Response**

EPA encourages trade associations and farm bureaus to educate farm owners and operators to participate in the local emergency planning process and inform emergency responders of the chemicals stored at their facility and any potential risks associated with their operations.

**Opposing Comments**

Several commenters expressed that the proposed exemption will prevent communities from accessing information critical to their health. EPA received comments from private citizens as well as mass mail campaigns stating the public has the right-to-know on emissions from farms. The commenters state that exemption only serves to benefit CAFOs and will prevent local communities from accessing information that is critical to protecting public health. It is irresponsible for the EPA to exempt those responsible for such emissions from reporting them to state and local emergency responders. The public has a right to know anytime something is released in the air/water that might affect their health. The commenters also stated that EPA should not ignore and vacate their right-to-know by exempting the CAFO's responsibility to control and report the toxic emissions they are required to control and report. One commenter stated that residents deserve to be informed about toxic emissions near them and state and local authorities need this information to respond to releases, when necessary.

Comments from environmental groups state that local emergency response agencies are denied critical information not only about continuous releases of harmful toxins, but also about spikes in such releases from activities such as pit agitation – a process through which "hydrogen sulfide, methane, and ammonia 'are rapidly released from the manure and may reach toxic levels or displace oxygen, increasing the risk to humans and livestock,'" leading to illness and even death. Local and state emergency response agencies may use these reports to take actions to prevent environmental harms and hazardous emissions from CAFOs.

In their comments, certain members of the Senate Environment and Public Works Committee (SEPW) states that citizens have come to rely upon having access to this data and larger farms already had substantial experience with the EPCRA reporting requirements for hazardous air emissions because they had been reporting those emissions for nearly a decade. When enacting the FARM Act, Congress was able to strike a careful balance which simultaneously reduced reporting burdens on farms while preserving the public's access to valuable information to which they remain legally entitled under EPCRA.

A university research organization expressed that if this rule is finalized, it would unjustly and unlawfully deprive citizens and emergency workers of vital information about releases of extremely hazardous substances such as ammonia and hydrogen sulfide from industrial animal feeding operations. This rule would also significantly limit the ability of communities – including a disproportionate number of low-income and minority communities – to protect their health and wellbeing against such noxious pollution, hinder the public health and safety missions of state and local emergency response agencies, and reduce governmental oversight of these operations. Yet, through its present rulemaking EPA is seeking to undermine these legislatively granted rights by removing EPCRA's keystone reporting requirements, and all-but eliminating the public's right-to-know. Such action is contrary to the plain language and intent of EPCRA.

A university research organization commented that EPA should require animal feeding operations to report releases using current methodologies while pursuing improvements that could generate necessary data. A novel interpretation of EPCRA that exempts operations from reporting requirements, however, would limit development of these models even as methodologies advance, blocking many communities from assessing exposures and associated risks.

**Response**

As stated in earlier sections of this document, the intent of EPCRA section 304 is for facilities to notify the state and local emergency responders of accidental releases of EPCRA EHSs and CERCLA hazardous substances so that these agencies can initiate evacuation of the community or provide shelter from acute exposure to these chemicals.  Comments from NASTTPO as well as their letter to EPA (June 2017) express that the emission reports from animal manure management are not vital to local emergency responders, but instead open dialogue is more important.  In response to comments that local and state emergency response agencies may use these reports to take action to prevent environmental hazardous emissions from CAFOs, EPA is not aware of any of these agencies using animal waste emission reports to prevent emissions.

As a statutory matter, release information can only be made available to the extent that a release report is required. EPCRA section 304(b)(1) provides for release notification to the LEPC and the SERC if notice is required under one of the mechanisms in EPCRA section 304(a). As set out in the proposed rule and this support document, EPA interprets EPCRA 304(a) as not requiring notification for air releases from animal waste at farms. Accordingly, no notice is required to the state and local entities under EPCRA section 304(b)(1). Similar reasoning applies to public availability under EPCRA section 324. Because reporting for these releases are not required under EPCRA section 304(a), there are no reports to be made available to the public under EPCRA section 324. Comments regarding information availability or data availability are outside the scope of this rulemaking.

EPA notes that this EPCRA rulemaking does not limit the Agency's authority under CERCLA sections 104 (response authorities), 106 (abatement actions), 107 (liability), or any other provisions of CERCLA to address releases of hazardous substances at farms.

## F. Request for Public Comment Period Extension & Public Hearings

Three commenters, a university research organization, mass mail campaign and community group, requested EPA to extend the public comment period for the proposed rule.  These commenters stated that the proposed rule may have significant consequences on the ability of local governments and their residents to protect their health and wellbeing, none of which seems to have been considered by EPA during the preparation of the proposed rule.  Additionally, these commenters expressed that they need an additional 60 days to collect information from studies on health and environmental impacts of CAFO air emissions on surrounding communities as rulemaking docket does not contain any scientific studies or other documents about toxic emissions from CAFOs and their impact on surrounding communities.

Two groups, mass mail campaigns and community organization, requested public hearings on the proposed rule stating that given the impact that the proposed rule will have on communities across the country, including a disproportionate number of low-income and minority communities, EPA should schedule at least three public hearings in various locations across the country to ensure adequate public participation in the rulemaking process. EPA should hold these hearings in locations near to communities affected by CAFOs, for example, communities in North Carolina, Maryland, Iowa, or Oklahoma, to name a few.

**Response**

EPA believes that the 30-day comment period was appropriate. This rule is based on a reasonable interpretation of the statutory language in EPCRA section 304(a)(2) and its relationship with CERCLA section 103 as amended by the FARM Act. EPA's rationale is set out in the Federal Register notice for the proposed rule and all the supporting documents the Agency relied on are available in the associated docket.

This rule is not based on health or environmental risk, so no such associated studies are necessary. Because this rule is based on a statutory interpretation, the record is not extensive, and therefore EPA did not believe such an extension should be granted. EPA also generally set out its statutory interpretation in the guidance document entitled "How does the Fair Agricultural Reporting Method (FARM) Act impact reporting of air emissions from animal waste under CERCLA Section 103 and EPCRA Section 304?" dated April 2018. That guidance document states: "EPA intends to conduct a rulemaking to address the impact of the FARM Act on the reporting of air emissions from animal waste at farms under EPCRA." Accordingly, the commenters were provided ample time and no extensions were necessary to comment on EPA's statutory interpretation. Similarly, no public meetings or hearing were required or deemed necessary to allow for comment on EPA's interpretation.

## G. Reporting Burden & Farm Size

**Supporting Comments**

Agricultural trade associations and farm bureaus expressed that reporting emissions from manure management is burdensome for farms.  First responders and county management agencies commented that release reports received from large CAFOs in 2009 resulted from the December 2008 rulemaking were never used to respond to any emergencies, but instead impeded response efforts by creating a new onerous layer of information.  These commenters also stated that fire fighters, police officers, and emergency medical technicians in rural communities already operate on limited budgets and precious time. They need important information in a timely manner to effectively respond to natural disasters, not unnecessary paperwork that impairs their ability to respond to on-farm emergencies. Additionally, having EPCRA and CERCLA with contradicting requirements on air emissions only provide continuous burdensome regulations in which animal operations must abide by. These contradicting requirements also disproportionately impact smaller farms and ranches, forcing some out of production.

An anonymous commenter expressed that EPCRA reporting of continuous, routine releases from animal manure management is of no value or use in emergency response efforts. In addition, it places an unnecessary burden on the agriculture industry and can only lead to more expense and higher food costs.

**Response**

EPA acknowledges the supporting comments received. This rule seeks to codify the Agency's interpretation that air emission from animal waste at farms are not subject to the reporting

requirements of EPCRA section 304 consistent with CERCLA section 103 as amended by the FARM Act.

**Opposing Comments**

Commenters expressed that EPCRA reporting requirements create minimal paperwork burden for large CAFOs while providing invaluable health and safety information to rural communities. One commenter stated that farmers can set up air monitors which would allow them to accurately measure air emissions.

An environmental group commented that smaller animal feeding operations and ranching/grazing operations are unlikely to be subject to EPCRA reporting requirements, even without the proposed rule. Most farms are not expected to release the reportable quantity of these toxic chemicals and thus would not need to report agricultural emissions under EPCRA. Rather, it is the larger, industrial animal feeding operations, typically those that house thousands or even millions of animals that release toxic emissions surpassing the reportable quantities of ammonia and hydrogen sulfide and that pose grave public health risks to surrounding communities. These massive industrial facilities that emit hundreds of pounds of toxic chemicals into the air every day are the facilities that EPA seeks to exempt from EPCRA's reporting requirements under the proposed rule.

**Response**

This rule is not based on the burden imposed for reporting emissions from animal waste. It is based on the relationship between EPCRA section 304 and CERCLA section 103 release reporting requirements as amended by the FARM Act. Those statutory sections, as interpreted by EPA, also do not consider reporting based on the number of animals present at a farm. These comments are outside the scope of this rulemaking.

## H. Reporting Liability

In their comments, agricultural trade associations express that emission reports from manure management create liabilities for farmers due to the lack of data and methodologies to calculate emissions. They also state that cattle operators and producers continue to struggle with what type of release need to be reported and at the same time question how such reports will improve response safety.

**Response**

EPA acknowledges commenters' concerns, but these comments are outside the scope of this rulemaking.

## I. Animal Cruelty

Commenters expressed their concerns that animals are tortured and they would also like to see some legislation preventing cruel killing of these animals. These farms need to be held

accountable for providing safe conditions for the animals and those living in the vicinity of the CAFO or stop these horrible facilities. Further, a reporting exemption would support continued and expanded factory farming operations, which are both abusive of animals and whose waste operations already have proven to contaminate waterways, particularly in the event of flooding or other natural or man-made disasters.

**Response**

EPA acknowledges commenters' concerns, but these comments are outside the scope of this rulemaking.

# Appendix A

## List of Commenters

| DCN | Name | Affiliation | Number of individuals |
|---|---|---|---|
| EPA-HQ-OLEM-2018-0318-0020 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0021 | K. Gould | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0022 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0023 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0024 | J. Judkins | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0025 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0026 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0027 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0028 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0029 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0030 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0031 | K. Barth | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0032 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0033 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0034 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0035 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0036 | M. Elwood | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0037 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0038 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0039 | Mass Comment Campaign sponsored by Earthjustice (web) | Earthjustice | 143 |
| EPA-HQ-OLEM-2018-0318-0040 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0041 | Jack Field, Executive Director | Washington Cattle Feeders Association | 1 |
| EPA-HQ-OLEM-2018-0318-0042 | Michelle Roos, Executive Director | Environmental Protection Network | 1 |
| EPA-HQ-OLEM-2018-0318-0043 | Anonymous public comment | West Virginia Department of Agriculture | 1 |
| EPA-HQ-OLEM-2018-0318-0044 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0045 | E. McCarthy | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0046 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0047 | Anonymous public comment | Anonymous | 1 |

| DCN | Name | Affiliation | Number of individuals |
|---|---|---|---|
| EPA-HQ-OLEM-2018-0318-0048 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0049 | Anonymous public comment | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0050 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0051 | R. King | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0052 | M. Lundgren | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0054 | "I strongly oppose" Mass Comment Campaign | Anonymous | 6,880 |
| EPA-HQ-OLEM-2018-0318-0055 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0056 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0057 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0058 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0059 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0060 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0061 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0062 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0063 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0064 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0065 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0066 | Vicki Tanner | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0067 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0068 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0069 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0070 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0071 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0072 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0073 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0074 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0075 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0076 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0077 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0078 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0079 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0080 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0081 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0082 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0083 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0084 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0085 | Anonymous public comment | Anonymous | 1 |

| DCN | Name | Affiliation | Number of individuals |
|---|---|---|---|
| EPA-HQ-OLEM-2018-0318-0086 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0087 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0088 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0089 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0090 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0091 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0092 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0093 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0094 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0095 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0096 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0097 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0098 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0099 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0100 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0101 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0102 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0103 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0104 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0105 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0106 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0107 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0108 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0109 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0110 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0111 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0112 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0113 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0114 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0115 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0116 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0117 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0118 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0119 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0120 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0121 | John Lahr | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0122 | Anonymous public comment | Anonymous | 1 |

| DCN | Name | Affiliation | Number of individuals |
|---|---|---|---|
| EPA-HQ-OLEM-2018-0318-0123 | Brooke Bowman | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0124 | Anonymous comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0125 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0126 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0127 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0128 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0129 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0130 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0131 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0132 | A. Eisenberg | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0133 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0134 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0135 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0136 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0137 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0138 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0139 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0140 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0141 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0142 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0143 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0144 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0145 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0146 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0147 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0148 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0149 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0150 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0151 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0152 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0153 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0154 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0155 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0156 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0157 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0158 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0159 | Anonymous public comment | Anonymous | 1 |

| DCN | Name | Affiliation | Number of individuals |
|---|---|---|---|
| EPA-HQ-OLEM-2018-0318-0160 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0161 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0162 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0163 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0164 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0165 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0166 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0167 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0168 | D. Seabloom | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0169 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0170 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0171 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0172 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0173 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0174 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0175 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0176 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0177 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0178 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0179 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0180 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0181 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0182 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0183 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0184 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0185 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0186 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0187 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0188 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0189 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0190 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0191 | C. Souder | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0192 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0193 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0194 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0195 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0196 | N. Tilleraas | General Public | 1 |

| DCN | Name | Affiliation | Number of individuals |
|---|---|---|---|
| EPA-HQ-OLEM-2018-0318-0197 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0198 | C. Guffey | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0199 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0200 | A. Feltman | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0201 | F. Salatino | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0202 | J. Wulling | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0203 | K. Nagarajan | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0204 | F. Kloucek | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0205 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0206 | R. Peters | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0207 | W. Sharfman | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0208 | K. Vaughn | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0209 | J. Bradbury | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0210 | K. Kemps | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0211 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0212 | M. Migdal | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0213 | Jon C. Dahmen | Whitman County Cattlemen's Association and Whitman County Fire Chiefs Association (WCFCA) | 1 |
| EPA-HQ-OLEM-2018-0318-0214 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0215 | Bill Tensfeld | Whitman County Emergency Management | 1 |
| EPA-HQ-OLEM-2018-0318-0216 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0217 | Federal Trade Commission | FTC | 1 |
| EPA-HQ-OLEM-2018-0318-0218 | A. Moriarity | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0219 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0220 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0221 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0222 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0223 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0224 | Michael Formica | National Pork Producers Council | 1 |
| EPA-HQ-OLEM-2018-0318-0225 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0226 | Anonymous public comment | Anonymous | 1 |

| DCN | Name | Affiliation | Number of individuals |
|---|---|---|---|
| EPA-HQ-OLEM-2018-0318-0227 | E. Wallace | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0228 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0229 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0230 | N. Williams | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0231 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0232 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0233 | D. Gaines | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0234 | C. Lish | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0235 | Clay Detlefsen | National Milk Producers Federation (NMPF) | 1 |
| EPA-HQ-OLEM-2018-0318-0236 | Thomas Hebert | United Egg Producers (UEP) | 1 |
| EPA-HQ-OLEM-2018-0318-0237 | M. Finsterwalder | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0238 | Timothy R. Gablehouse | National Association of SARA Title III Program Officials (NASTTPO) | 1 |
| EPA-HQ-OLEM-2018-0318-0239 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0240 | MJM | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0241 | Blake E. Roderick | Pike-Scott Farm Bureau | 1 |
| EPA-HQ-OLEM-2018-0318-0242 | Daniel Heady | Iowa Farm Bureau Federation (IFBF) | 1 |
| EPA-HQ-OLEM-2018-0318-0243 | M. Kawecki | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0244 | Kendra Jones | Tyson Foods, Inc. | 1 |
| EPA-HQ-OLEM-2018-0318-0245 | Keeve E. Nachman | Department of Environmental Health and Engineering, Johns Hopkins Center for a Livable Future et al. | 8 |
| EPA-HQ-OLEM-2018-0318-0246 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0247 | Brandon Schmidt | Kittitas County Cattlemen's Association | 1 |
| EPA-HQ-OLEM-2018-0318-0248 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0249 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0250 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0251 | Anonymous public comment | Anonymous | 1 |

| DCN | Name | Affiliation | Number of individuals |
|---|---|---|---|
| EPA-HQ-OLEM-2018-0318-0252 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0253 | A. James | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0254 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0255 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0256 | L. Rosin | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0257 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0258 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0259 | A. Miccio | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0260 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0261 | J. Michael | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0262 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0263 | Keith Larick | North Carolina Farm Bureau Federation (NCFB) | 1 |
| EPA-HQ-OLEM-2018-0318-0264 | J. V. Freeman | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0265 | M. Genaze | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0266 | C. Reade | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0267 | S. Davis | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0268 | S. Harris | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0269 | J. Toth | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0270 | M. Starr | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0271 | R. Arquette | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0272 | R. Elam | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0273 | M. Verdeyen | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0274 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0275 | J. Thompson | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0276 | R. Fletcher | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0277 | D. Markey | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0278 | V. Valentine | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0279 | W. Dann | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0280 | G. Reyes-Illg | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0281 | D. Kisor | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0282 | P. Reagan | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0283 | Levi Berry | Texas Cattle Feeders Association (TCFA) | 1 |
| EPA-HQ-OLEM-2018-0318-0284 | D. Long | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0285 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0286 | J. Kunz | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0287 | S. Deans | General Public | 1 |

| DCN | Name | Affiliation | Number of individuals |
|---|---|---|---|
| EPA-HQ-OLEM-2018-0318-0288 | K. Hedberg | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0289 | K. Watts | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0290 | E. Feuerbacher | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0291 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0292 | A. Mega | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0293 | David Trowbridge | Iowa Cattlemen's Association | 1 |
| EPA-HQ-OLEM-2018-0318-0294 | Ryan Collins, Michael Collins | Allamakee County Cattlemen's Association and Harper's Ferry Fire Department | 2 |
| EPA-HQ-OLEM-2018-0318-0295 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0296 | D. Clarahan | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0297 | N. Clarahan | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0298 | R. Clarahan | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0299 | David Fisher | New York Farm Bureau (NYFB) | 1 |
| EPA-HQ-OLEM-2018-0318-0300 | Jean Mendoza | Friends of Toppenish Creek (FOTC) | 1 |
| EPA-HQ-OLEM-2018-0318-0301 | Charles F. Conner | National Council of Farmer Cooperatives (NCFC) | 1 |
| EPA-HQ-OLEM-2018-0318-0302 | M. Rosczyk | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0303 | Laura A. Campbell | Michigan Farm Bureau | 1 |
| EPA-HQ-OLEM-2018-0318-0304 | Tom Sidwell | New Mexico Cattle Growers Association (NMCGA) | 1 |
| EPA-HQ-OLEM-2018-0318-0305 | K. Tonnies | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0306 | S. Saplin | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0307 | SierraRise (web) | SierraRise | 24,104 |
| EPA-HQ-OLEM-2018-0318-0308 | In Defense of Animals (web) | In Defense of Animals | 5,881 |
| EPA-HQ-OLEM-2018-0318-0309 | A. J. Lauver | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0310 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0311 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0312 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0313 | Anonymous public comment | Anonymous | 1 |

| DCN | Name | Affiliation | Number of individuals |
|---|---|---|---|
| EPA-HQ-OLEM-2018-0318-0314 | L. Beebe | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0315 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0316 | K. Kujawa | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0317 | D. Judge | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0318 | K. Lerner | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0319 | L. Glaeske | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0320 | P. Moody | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0321 | M. Lyons | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0322 | C. Lee | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0323 | V. McDonald | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0324 | L. Arrandale | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0325 | C. Marks | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0326 | L. Cox | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0327 | M. Mataisz | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0328 | J. Glenn | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0329 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0330 | E. Kinney | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0331 | J. Herman | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0332 | N. Kropp | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0333 | R. Avila | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0334 | J. Emel | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0335 | L. Schenck | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0336 | S. Hahn | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0337 | C. Rucker | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0338 | B. Richards | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0339 | J. Pask | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0340 | S. Racine | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0341 | C. Donahue | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0342 | K. Ruopp | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0343 | M. Farone | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0344 | A. Gaspero | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0345 | D. DesLauriers | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0346 | Alicia LaPorte (Mass Mailing) | Fair Farms Maryland | 171 |
| EPA-HQ-OLEM-2018-0318-0347 | Jonathan Smith (Mass Mailing) | Earthjustice | 115 |
| EPA-HQ-OLEM-2018-0318-0348 | Joanna Lee (Mass Mailing) | Center for Food Safety | 12,750 |
| EPA-HQ-OLEM-2018-0318-0349 | Anonymous public comment | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0350 | C. Ampel | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0351 | B. Sloss | General Public | 1 |

| DCN | Name | Affiliation | Number of individuals |
|-----|------|-------------|------------------------|
| EPA-HQ-OLEM-2018-0318-0352 | L. Mazzola | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0353 | M. Frazier | Anonymous | 1 |
| EPA-HQ-OLEM-2018-0318-0354 | P. Gorer | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0355 | Anonymous public comment | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0356 | J. Mainiero | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0357 | N. Ortman | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0358 | D. Little | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0359 | S. Hearon | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0360 | K. Doerr | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0361 | E. McCorry | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0362 | M. Smith | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0363 | U. Eagly | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0364 | S. Rudnicki | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0365 | A. Gaspero | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0366 | J. Chase | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0367 | Janet Crow | North Dakota Department of Agriculture | 1 |
| EPA-HQ-OLEM-2018-0318-0368 | Doug Goehring | North Dakota Department of Agriculture | 1 |
| EPA-HQ-OLEM-2018-0318-0369 | Stefanie Smallhouse | Arizona Farm Bureau Federation | 1 |
| EPA-HQ-OLEM-2018-0318-0370 | Lauren Lurkins | Illinois Farm Bureau | 1 |
| EPA-HQ-OLEM-2018-0318-0371 | Bronson Corn | New Mexico Wool Growers, Inc. | 1 |
| EPA-HQ-OLEM-2018-0318-0372 | Chad Vorthmann | Colorado Farm Bureau | 1 |
| EPA-HQ-OLEM-2018-0318-0373 | Tom Carper, et. al | Certain members of the Senate Committee on Environment and Public Works | 10 |

| DCN | Name | Affiliation | Number of individuals |
|---|---|---|---|
| EPA-HQ-OLEM-2018-0318-0374 | Dan Rorvig | North Dakota Stockmen's Association | 1 |
| EPA-HQ-OLEM-2018-0318-0375 | Leslie Bennett | Franklin County Cattleman's Association | 4 |
| EPA-HQ-OLEM-2018-0318-0376 | Hannah Connor and Robert Martin | Center for Biological Diversity and Johns Hopkins Center for Livable Future | 2 |
| EPA-HQ-OLEM-2018-0318-0377 | Robert E. McKnight, Jr | Texas and Southwestern Cattle Raisers Association | 1 |
| EPA-HQ-OLEM-2018-0318-0378 | Corinne Madison | California Farm Bureau Federation | 1 |
| EPA-HQ-OLEM-2018-0318-0379 | Mary Anne Cooper | Oregon Farm Bureau Federation | 1 |
| EPA-HQ-OLEM-2018-0318-0380 | Valerie Huerta | New Mexico Farm and Livestock Bureau | 1 |
| EPA-HQ-OLEM-2018-0318-0381 | Barbara A. Downey and Joseph D. Carpenter | Kansas Livestock Association (KLA) and Wabaunsee County Fire Department | 2 |
| EPA-HQ-OLEM-2018-0318-0382 | Barbara Downey, President and Amy Terrapin | Kansas Livestock Association (KLA) and County Emergency Management | 2 |
| EPA-HQ-OLEM-2018-0318-0383 | D. Casper | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0384 | M. Laws | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0385 | R. Schoemer | General Public | 1 |
| EPA-HQ-OLEM-2018-0318-0386 | Grant R. Gulibon | Pennsylvania Farm Bureau | 1 |

| DCN | Name | Affiliation | Number of individuals |
|---|---|---|---|
| EPA-HQ-OLEM-2018-0318-0387 | National Cattlemen's Beef Association (NCBA) et al. | National Cattlemen's Beef Association (NCBA) et al. | 20 |
| EPA-HQ-OLEM-2018-0318-0388 | Dale Moore | American Farm Bureau Federation | 1 |
| EPA-HQ-OLEM-2018-0318-0389 | Steve Ollerich and Todd Mortenson | South Dakota Cattlemen's Association, First Responder | 2 |
| EPA-HQ-OLEM-2018-0318-0390 | Jon Greenwood | Northeast Dairy Producers Association | 1 |
| EPA-HQ-OLEM-2018-0318-0391 | Lisa Feldt | Chesapeake Bay Foundation | 1 |
| EPA-HQ-OLEM-2018-0318-0392 | Don Lee | New Mexico Federal Lands Council | 1 |
| EPA-HQ-OLEM-2018-0318-0393 | Tom Carper et. al (Duplicate comment) | Certain members of the Senate Environment and Public Works Committee | 10 |
| EPA-HQ-OLEM-2018-0318-0394 | Mass Comment Campaign sponsored by Friends of the Earth (web) | Friends of the Earth | 36,064 |
| EPA-HQ-OLEM-2018-0318-0395 | Paul Bredwell | U.S. Poultry & Egg Association et al. | 17 |
| EPA-HQ-OLEM-2018-0318-0396 | Lyman L. Nuss, Keith A. Habery | Russell County, Kansas Livestock Association (KLA) and Russell County Emergency Management | 2 |
| EPA-HQ-OLEM-2018-0318-0397 | Jim Macy | Nebraska Department of Environmental Quality (NDEQ) | 1 |
| EPA-HQ-OLEM-2018-0318-0398 | Carrie Apfel | Earthjustice et al. | Already counted above |
| EPA-HQ-OLEM-2018-0318-0399 | Carrie Apfel | Earthjustice et al. | Already counted above |

| DCN | Name | Affiliation | Number of individuals |
|---|---|---|---|
| EPA-HQ-OLEM-2018-0318-0400 | Carrie Apfel | Earthjustice et al. | Already counted above |

# EXHIBIT 5

*B. Paperwork Reduction Act (PRA)*

This action does not impose an information collection burden under the PRA. This action contains no provisions constituting a collection of information under the PRA.

*C. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small entities.

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain any unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments.

*E. Executive Order 13132 (Federalism)*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have tribal implications as specified in Executive Order 13175. Thus, Executive Order 13175 does not apply to this action.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive order. This action is not subject to Executive Order 13045 because it does not concern an environmental health or safety risk.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer and Advancement Act*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes that this action does not have disproportionately high and adverse human health or environmental effects on minority populations, low-income populations and/or indigenous peoples, as specified in Executive Order 12898 (59 FR 7629, February 16, 1994).

**List of Subjects in 40 CFR Part 16**

Environmental protection, Administrative practice and procedure, Confidential business information, Government employees, Privacy.

**Kimberly Y. Patrick,**

*Principal Deputy Assistant Administrator, Office of Mission Support.*

For the reasons stated in the preamble, title 40, chapter I, part 16 of the Code of Federal Regulations is proposed to be amended as follows:

**PART 16—IMPLEMENTATION OF PRIVACY ACT OF 1974**

■ 1. The authority citation for part 16 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552a (as revised).

■ 2. Amend § 16.12 by:
■ a. Revising paragraphs (a)(1), (a)(4)(i), (a)(5) introductory text, and (b)(1);
■ b. Adding paragraph (b)(4)(iii); and
■ c. Revising paragraph (b)(5) introductory text.

The revisions and addition read as follows:

**§ 16.12  Specific exemptions.**

(a) * * *

(1) *Systems of records affected.* (i) EPA–17 Online Criminal Enforcement Activities Network (OCEAN).

(ii) EPA–21 External Compliance Case Tracking System (EXCATS).

(iii) EPA–30 Inspector General Enterprise Management System (IGEMS) Hotline Module.

(iv) EPA–40 Inspector General Enterprise Management System (IGEMS) Investigative Module.

(v) EPA–63 eDiscovery Enterprise Tool Suite.

(vi) EPA–79 NEIC Master Tracking System.

(vii) EPA–100 OIG Data Analytics Enterprise.

(viii) EPA–83 Personnel Security System (PSS) 2.0.

*        *        *        *        *

(4) * * *
(i) EPA systems of records 17, 30, 40, 63, 79, and 100 are exempted from the following provisions of the PA, subject to the limitations set forth in 5 U.S.C. 552a(k)(2): 5 U.S.C. 552a(c)(3); (d); and (e)(1). EPA system of records 21 is exempt from the following provisions of the PA, subject to limitations set forth in 5 U.S.C. 552a(k)(2): 5 U.S.C. 552a(c)(3), (d), and (e)(1). EPA system of records 83 is exempt from the following provisions of the PA, subject to the limitations set forth in 5 U.S.C. 552a(k)(2): 5 U.S.C. 552a(c)(3); (d); and (e)(1).

*        *        *        *        *

(5) *Reasons for exemption.* EPA systems of records 17, 21, 30, 40, 63, 79, 83, and 100 are exempted from the provisions of the PA in paragraph (a)(4) of this section for the following reasons:

*        *        *        *        *

(b) * * *
(1) *Systems of records affected.* (i) EPA 36 Research Grant, Cooperative Agreement, and Fellowship Application Files.

(ii) EPA 40 Inspector General Enterprise Management System (IGEMS) Investigative Module.

(iii) EPA 83 Personnel Security System (PSS) 2.0.

(iv) EPA 100 OIG Data Analytics Enterprise.

*        *        *        *        *

(4) * * *
(iii) EPA 83 is exempted from the following provisions of the PA, subject to the limitations of 5 U.S.C. 552a(a)(k)(5): 5 U.S.C. 552a(c)(3), and (d).

*        *        *        *        *

(5) *Reasons for exemption.* EPA 36, 40, 83, and 100 are exempted from the above provisions of the PA for the following reasons:

*        *        *        *        *

[FR Doc. 2023–24668 Filed 11–16–23; 8:45 am]

**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 355**

**[EPA-HQ-OLEM–2023–0142; FRL–10285–01–OLEM]**

**RIN 2050–AH31**

**Potential Future Regulation for Emergency Release Notification Requirements for Animal Waste Air Emissions Under the Emergency Planning and Community Right-to-Know Act (EPCRA)**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Advance Notice of Proposed Rulemaking (ANPRM).

**SUMMARY:** The Environmental Protection Agency (EPA or Agency) is soliciting information pertaining to and is requesting comments to assist in the potential development of regulations to reinstate the reporting of animal waste air emissions at farms under the Emergency Planning and Community Right-to-Know Act (EPCRA). The Agency is soliciting comments under five general categories: health impacts; implementation challenges; costs and benefits; small farm definition and potential reporting exemption; and national report on animal waste air emissions. Requiring reporting of animal waste air emissions may advance the community right-to-know aspect of EPCRA by providing the public with information that may impact their health and the environment. This information may advance EPA's environmental justice goals of increasing the awareness of the potential impact these emissions have on communities with environmental justice concerns. We solicit comments on all aspects of this potential action.

**DATES:** Comments must be received on or before February 15, 2024.

**ADDRESSES:** You may send comments, identified by Docket ID No. EPA–HQ–OLEM–2023–0142, by any of the following methods:

• *Federal eRulemaking Portal: https://www.regulations.gov/* (our preferred method). Follow the online instructions for submitting comments.

• *Mail:* U.S. Environmental Protection Agency, EPA Docket Center, EPA–HQ–OLEM–2023–0142 Docket, Mail Code 28221T, 1200 Pennsylvania Avenue NW, Washington, DC 20460.

• *Hand Delivery or Courier:* EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operations are 8:30 a.m.–4:30 p.m., Monday–Friday (except Federal Holidays).

*Instructions:* All submissions received must include the Docket ID No. for this rulemaking. Comments received may be posted without change to *https:// www.regulations.gov/,* including any personal information provided. For detailed instructions on sending comments and additional information on the rulemaking process, see the "Public Participation" heading of the **SUPPLEMENTARY INFORMATION** section of this document.

**FOR FURTHER INFORMATION CONTACT:** William Noggle, U.S. Environmental Protection Agency, Office of Emergency

Management, 1200 Pennsylvania Avenue NW, Washington, DC 20460; 202–566–1306; *noggle.william@epa.gov.*

**SUPPLEMENTARY INFORMATION:** *Organization of this document.* The information in this preamble is organized as follows:

I. Public Participation
  A. Written Comments
  B. Comment Headings
II. General Information
  A. Does this ANPRM apply to me?
  B. What is the purpose of this ANPRM?
  C. Legal authority
III. Background
  A. Overview
  B. Release Reporting Requirements Under CERCLA and EPCRA
  C. Continuous Release Reporting (CRR) Regulations
  D. Regulatory and Legal Background
    1. 2008 CERCLA/EPCRA Reporting Exemption Rule and Related Litigation
    2. 2018 FARM Act and Related 2018 CERCLA Rule
    3. 2019 EPCRA Rule and Related Litigation
    4. Executive Order 13990, January 20, 2021
IV. What information is EPA seeking?
  A. Health Impacts From Animal Waste Air Emissions
  B. Implementation Challenges
    1. National Air Emissions Monitoring Study (NAEMS)
    2. Emissions Calculator and Guidance on Estimating Amounts of Air Releases
    3. Grazing Operations
    4. Use of Continuous Release Reporting by Farms
    5. Citizen Suits
    6. Privacy Concerns
    7. EPCRA National Database
  C. Costs and Benefits
    1. Estimated Regulated Universe
    2. Burden Estimates
    3. Environmental Justice and Community Right-to-Know
  D. Small Farms
    1. Potential Reporting Exemption for "Small Farms"
    2. Defining "Small Farms"
    3. Animal Waste Management Methods for "Small Farms"
    4. Health Impacts From "Small Farms"
    5. State, Tribal, and Local Emergency Planners and Responders Use of "Small Farm" Animal Waste Air Emissions Information
    6. Adjusting the RQs of Ammonia and Hydrogen Sulfide for Animal Waste Air Emissions
  E. National Report on Animal Waste Emissions
V. Request for Comment and Additional Information
VI. What are the next steps EPA will take?
VII. Statutory and Executive Order Reviews

## I. Public Participation

### A. Written Comments

Submit your comments, identified by Docket ID No. EPA–HQ–OLEM–2023–0142, at *https://www.regulations.gov* (our preferred method), or the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit to EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI), Proprietary Business Information (PBI), or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system). Please visit *https://www.epa.gov/dockets/ commenting-epa-dockets* for additional submission methods; the full EPA public comment policy; information about CBI, PBI, or multimedia submissions; and general guidance on making effective comments.

### B. Comment Headings

Commenters should review the discussions in the preamble and are encouraged to comment on any matter that is addressed by this ANPRM. For comments submitted through postal mail or *https://www.regulations.gov,* EPA is requesting that commenters identify their comments on specific issues by using the appropriate number and comment headings listed below to make it simpler for the Agency to process your comment. If your comment covers multiple issues, please use all the heading numbers and names that relate to that comment. These are the comment headings for specific issues in this ANPRM:

#1—Health Impacts (see Section IV.A)
#2—Emissions Estimating Methodologies (see Section IV.B.1)
#3—2005 Compliance Agreement (see Section IV.B.1)
#4—Emissions Calculator—General (see Section IV.B.2)
#5—Emissions Calculator—Continuous Release Reporting (see Section IV.B.2)
#6—Accuracy of Reported Release Quantity (see Section IV.B.2)
#7—Turkey and Beef Contribution Factors (see Section IV.B.2)
#8—Estimating Emissions from Less Common Species (see Section IV.B.2)
#9—Estimating Emissions from Atypical Farming Operations (see Section IV.B.2)
#10—Cutoffs for Estimating (see Section IV.B.2)
#11—Other Guidance (see Section IV.B.2)
#12—Grazing Operations (see Section IV.B.3)
#13—Application of Continuous Release Reporting (see Section IV.B.4)

#14—Application of Upper and Lower Bounds (see Section IV.B.4)

#15—Exceptions to Continuous Release Reporting (see Section IV.B.4)

#16—Benefit of Continuous Release Reporting Data (see Section IV.B.4)

#17—Continuous Release Reporting—Other (see Section IV.B.4)

#18—Citizen Suits—Wholly Past Violations (see Section IV.B.5)

#19—Citizen Suit Cost and Benefits (see Section IV.B.5)

#20—Citizen Suit—Guidance (see Section IV.B.5)

#21—Citizen Suit—Other (see Section IV.B.5)

#22—Privacy Concerns (see Section IV.B.6)

#23—Privacy Concerns—Other (see Section IV.B.6)

#24—National EPCRA Database—General (see Section IV.B.7)

#25—National Database—Managing Right-to-Know Data (see Section IV.B.7)

#26—National Database—Managing Reports from Facilities (see Section IV.B.7)

#27—National Database—Animal Waste Air Emissions Reporting (see Section IV.B.7)

#28—National Database—Facility Benefits and Disadvantages (see Section IV.B.7)

#29—National Database—Managing FOIA Requests (see Section IV.B.7)

#30—National Database—Other (see Section IV.B.7)

#31—Regulated Universe—Number of Farms Reporting (see Section IV.C.1)

#32—Burden—Reporting Farms (see Section IV.C.2)

#33—Burden—Non-Reporting Farms (see Section IV.C.2)

#34—Burden—Small Farms (see Section IV.C.2)

#35—Burden—Qualitative Costs (see Section IV.C.2)

#36—Benefits—Environmental Justice (see Section IV.C.3)

#37—Indirect Benefits (see Section IV.C.3)

#38—Small Farm Exemption—General (see Section IV.D.1)

#39—Small Farm Exemption—Criteria (see Section IV.D.1)

#40—Small Farm Definition (see Section IV.D.2)

#41—Small Farm—Waste Handling (see Section IV.D.3)

#42—Small Farm—Health Impacts (see Section IV.D.4)

#43—State, Local, and Tribal Impacts (see Section IV.D.5)

#44—RQ Adjustment—General (see Section IV.D.6)

#45—Industry-Specific RQ Adjustment (see Section IV.D.6)

#46—National Report based on USDA or State Data (see Section IV.E)

#47—Other Technology for Estimating Air Releases (see Section IV.E)

#48—Other Solutions (see Section IV.E) Other Comments (see Section V)

## II. General Information

### A. Does this ANPRM apply to me?

A list of entities that could be affected by a potential future rulemaking include, but are not limited to:

TABLE 1—ENTITIES POTENTIALLY AFFECTED BY A FUTURE RULEMAKING

| Type of entity | Examples of potentially affected entities |
|---|---|
| Industry ................................. | NAICS Code 112—Animal Production. |
| State and/or Local Governments. | NAICS Code 999200—State Government, excluding schools and hospitals. |
| | NAICS Code 999300—Local Government, excluding schools and hospitals. |
| | State Emergency Response Commissions, Tribal Emergency Response Commissions, Tribal Emergency Planning Committees and Local Emergency Planning Committees. |

NAICS = North American Industry Classification System.

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be affected by a future rulemaking. If you have questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

### B. What Is the purpose of this ANPRM?

On June 13, 2019, the Agency published a final rule (84 FR 27533) which exempted reporting of animal waste air emissions under EPCRA for all farms, regardless of size. The Agency is reconsidering that final rule and through this ANRPM is seeking information that may assist with a potential future rulemaking requiring farms to report air emissions of extremely hazardous substances from animal waste under EPCRA.

EPA is specifically soliciting information on the following five topics: (1) health impacts; (2) implementation challenges; (3) costs and benefits; (4) small farm definition and reporting exemption, and (5) a national report on animal waste air emissions. Information collected during the public comment period for this ANPRM will better inform the Agency on whether to pursue a proposed rule, as well as assist the Agency on how best to implement the reinstating of EPCRA reporting from farms, if such a rule is finalized. The Agency is also requesting comments and information on any other topics relevant to conducting a future rulemaking on EPCRA reporting of air emissions from animal waste on farms. The solicitation of information in this ANPRM does not necessarily mean any action on farms will occur.

The solicitation of comment on these matters should not be read as EPA suggesting legal ambiguity in the relevant regulations or recognizing a particular interpretation by EPA of either EPCRA, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), or their implementing regulations. For purposes of this comment solicitation, exploration of ways to further clarify particular aspects of the existing regulations should not be viewed as an indication that the existing language is inadequate, or in any way be seen to undermine the Agency's ability to enforce these regulations as written.

### C. Legal authority

This advanced notice of proposed rulemaking (ANPRM) is being issued under EPCRA, which was enacted as Title III of the Superfund Amendments and Reauthorization Act (SARA) of 1986 (Pub. L. 99–499). Any future rulemaking would fall under the authority of EPCRA section 304 (42 U.S.C. 11004) and the Agency's general rulemaking authority under EPCRA section 328 (42 U.S.C. 11048).

## III. Background

### A. Overview

Animal waste air emissions reporting from farms has been subject to a complex history of EPA regulatory actions, subsequent legal challenges, and Congressional legislation. Animal waste can generate potentially harmful air emissions of ammonia and hydrogen sulfide,[1] which are listed as hazardous substances (HSs) under CERCLA and as extremely hazardous substances (EHSs) under EPCRA. The following sections provide a discussion of the regulatory reporting requirements and the history of prior regulatory and legal actions leading to this ANPRM.

---

[1] Air emissions from animal wastes on farms are generally a result of decomposition of the animal waste.

## B. Release Reporting Requirements under CERCLA and EPCRA

CERCLA and EPCRA are separate, but interrelated, environmental statutes that work together to provide notification of qualifying releases of HSs and EHSs to the appropriate government authorities. In general, CERCLA section 103 provides for notice to federal officials, whereas EPCRA section 304 provides for notice to state, tribal, and local officials. Section 103 of CERCLA requires the person in charge of a vessel or facility to immediately notify the National Response Center (NRC)[2] when there is a release of an HS, as defined under CERCLA section 101(14), in an amount equal to or greater than the reportable quantity (RQ) for that substance within a 24-hour period. These requirements are codified in the CERCLA regulations at 40 CFR part 302. In addition to these CERCLA reporting requirements, EPCRA section 304 generally requires owners or operators of certain facilities[3] to immediately notify state, tribal and local authorities when there is a release of an EHS, as defined under EPCRA section 302, or of a CERCLA hazardous substance in an amount equal to or greater than the RQ for that substance within a 24-hour period. These requirements are codified in the EPCRA regulations at 40 CFR part 355 subpart C.

Notice given to the NRC under CERCLA serves to inform the federal government of a release so that federal personnel can evaluate the need for a response in accordance with the National Oil and Hazardous Substances Contingency Plan (NCP), the federal government's framework for responding to both oil discharges and hazardous substance releases. Related, notice under EPCRA is given to the State or Tribal Emergency Response Commission (SERC or TERC)[4] for any state or tribal region likely to be affected by the release and to the community emergency coordinator for the Local or Tribal Emergency Planning Committee (LEPC or TEPC)[5] for any area likely to be affected by the release so that state, tribal and local authorities have information to help protect the community. As stated in the title of the statute, EPCRA also has an important community right-to-know component that provides for public availability of release notifications pursuant to EPCRA section 324.

Release reporting under EPCRA depends, in part, on whether reporting is required under CERCLA. Specifically, EPCRA section 304(a) provides for reporting under the following three release scenarios:

1. EPCRA section 304(a)(1) requires notification if a release of an EPCRA EHS occurs from a facility at which a hazardous chemical is produced, used or stored, and such release requires a notification under CERCLA section 103(a).

2. EPCRA section 304(a)(2) requires notification if a release of an EPCRA EHS occurs from a facility at which a hazardous chemical is produced, used or stored, and such release is not subject to the notification requirements under CERCLA section 103(a), but only if the release:

○ Is not a federally permitted release as defined in CERCLA section 101(10),

○ Is in an amount in excess of the reportable quantity as determined by EPA, and

○ Occurs in a manner that would require notification under CERCLA section 103(a).

3. EPCRA section 304(a)(3) requires notification if a release of a substance not designated as an EPCRA EHS occurs from a facility at which a hazardous chemical is produced, used or stored, and such release requires a notification under CERCLA section 103(a).

## C. Continuous Release Reporting (CRR) Regulations

There are situations where known or anticipated releases may be subject to significantly reduced reporting requirements, rather than the immediate or occurrence-based reporting of CERCLA section 103(a) and EPCRA section 304(a) as outlined above. CERCLA section 103(f) and its attendant regulations at 40 CFR 302.8 provide such relief for a release of a hazardous substance that is continuous and stable in quantity and rate. Similarly, EPA relied on EPCRA section 304(a)(2) to promulgate analogous reduced reporting regulations for continuous releases under EPCRA at 40 CFR 355.32. Those EPCRA regulations instruct a facility to rely on and follow, in part, the related CERCLA regulations at 40 CFR 302.8. As discussed further in this document, the continuous release reporting option is meant to save facilities and response authorities from the unnecessary burden of notification each time a repeated release—that is continuous and stable—occurs.

Under CERCLA section 103(a), regulated entities are required to immediately report releases of CERCLA hazardous substances that meet or exceed the RQ threshold. In lieu of reporting for each release, however, certain continuous releases can qualify for reduced reporting (see 40 CFR 302.8), which allows the regulated entity to only provide the following:

(1) Initial telephone notification made to the NRC;

(2) Initial 30-day written notification to the EPA;

(3) One-year follow-up written notification to the EPA;

(4) Notification to the EPA of a change in the composition or source(s) of the release or in the other information submitted in the initial written notification; and

(5) Notification to the NRC of any increase in the quantity of the hazardous substance being released during any 24-hour period, which represents a statistically significant increase (SSI).

Reduced release reporting provisions are also available under EPCRA, which requires reporting of CERCLA hazardous substances and EPCRA extremely hazardous substances. Under the EPCRA continuous release reporting regulations codified at 40 CFR 355.32, which cross-reference the CERCLA regulations at 40 CFR 302.8, facilities are required to report only items 1, 2, and 5 (from the list above) to their SERC or TERC and LEPC or TEPC. Any changes in source or composition (item 4) may be considered a new release, which is also required to be reported to the SERC or TERC and the LEPC or TEPC. A first anniversary report (item 3) is not required under EPCRA section 304.

---

[2] NRC is a part of the federally established National Response System and staffed 24 hours a day by the U.S. Coast Guard. It is the designated federal point of contact for reporting all oil, chemical, radiological, biological and etiological discharges into the environment, anywhere in the United States and its territories.

[3] The EPCRA definition of facility at 40 CFR 355.16: means all buildings, equipment, structures, and other stationary items that are located on a single site or on contiguous or adjacent sites and that are owned or operated by the same person (or by any person that controls, is controlled by, or under common control with, such person). Facility includes manmade structures, as well as all natural structures in which chemicals are purposefully placed or removed through human means such that it functions as a containment structure for human use. For purposes of emergency release notification, the term includes motor vehicles, rolling stock, and aircraft.

[4] SERC is defined at 40 CFR 355.61 as: the State Emergency Response Commission for the state in which the facility is located except where the facility is located in Indian Country, in which case, SERC means the Emergency Response Commission for the tribe under whose jurisdiction the facility is located. In the absence of a SERC for a state or Indian Tribe, the governor or the chief executive officer of the tribe, respectively, shall be the SERC. Where there is a cooperative agreement between a state and a tribe, the SERC shall be the entity identified in the agreement.

[5] LEPC is defined at 40 CFR 355.61 as: the Local Emergency Planning Committee appointed by the State Emergency Response Commission. TEPCs are appointed by the TERCs.

CERCLA and the implementing regulations of both CERCLA and EPCRA [6] and their implementing regulations define whether a release qualifies for continuous release reporting. The continuous release regulations in 40 CFR 302.8(d)(1) provide that a facility can establish a continuous release by "[u]sing release data, engineering estimates, knowledge of operating procedures, or best professional judgment to establish the continuity and stability of the release." There is no specific requirement for release monitoring or collecting release data if a facility is relying on engineering estimates, best professional judgment, or knowledge of operations.

The definitions in the continuous release regulations in 40 CFR 302.8(b) provide further assistance to determine what qualifies as a continuous release. There, a continuous release is defined as a release "that occurs without interruption or abatement or that is routine, anticipated, and intermittent and incidental to normal operations or treatment processes." A routine release is defined as a release "that occurs during normal operating procedures or processes." And the phrase "stable in quantity and rate" is defined as a release "that is predictable and regular in amount and rate of emission."

The continuous release regulations also include reporting the normal range of releases defined in 40 CFR 302.8 as "all releases (in pounds or kilograms) of a hazardous substance reported or occurring over any 24-hour period under normal operating conditions during the preceding year." The upper and lower bounds of the normal range of the release are reported in the 30-day written report under EPCRA.

### D. Regulatory and Legal Background

As previously noted, the history of release reporting for air emissions from animal waste at farms is long and complex. The following summary of events leading to this ANPRM is not meant to be exhaustive. Publicly available documents cited below and included in the docket provide further background information.

#### 1. 2008 CERCLA/EPCRA Reporting Exemption Rule and Related Litigation

Prior to 2008, all farms were subject to release reporting for air emissions under both CERCLA and EPCRA but were eligible for reduced continuous release reporting. In December 2008, EPA published a final rule that

exempted all farms from reporting animal waste air emissions under CERCLA and exempted small and medium concentrated animal feeding operations (CAFOs) [7] from reporting such emissions under EPCRA (73 FR 76948, December 18, 2008). Large CAFOs with emissions equal to or exceeding an RQ were still required to report under EPCRA with the continuous release reporting option, as applicable. EPA intended the 2008 rulemaking to reduce the reporting burden on farms and emergency response agencies.

In April 2017, the 2008 rule was vacated by the United States Court of Appeals for the District of Columbia Circuit as arbitrary and capricious. *See Waterkeeper Alliance, et al.* v. *EPA,* 853 F.3d 527 (D.C. Cir. 2017). In so holding, the court acknowledged the potential health risks of some animal waste air emissions and found that reporting could be useful to local and state authorities who may need to investigate or respond to these releases. The effect of the court's vacatur was to reinstate reporting requirements for air emissions from animal waste at all farms under CERCLA and EPCRA. The court delayed the effective date of its ruling until May 2, 2018, to grant EPA time to develop guidance to assist farms with meeting their reporting obligations.

#### 2. 2018 FARM Act and Related 2018 CERCLA Rule

On March 23, 2018, President Trump signed into law the Consolidated Appropriations Act, 2018 ("Omnibus Bill"). Title XI of the Omnibus Bill is entitled the "Fair Agricultural Reporting Method Act" or the "FARM Act." *See* Fair Agricultural Reporting Method Act, Public Law 115–141, sections 1101–1103 (2018). The FARM Act amended CERCLA section 103 to expressly exempt the reporting of air emissions from animal waste (including decomposing animal waste) at a farm. As a result, in August 2018, the Agency published a final rule to amend the CERCLA regulations at 40 CFR part 302 by adding the reporting exemption for air emissions from animal waste at farms and adding definitions of "animal waste" and "farm" from the FARM Act (83 FR 37444, August 1, 2018).

The FARM Act expressly exempted all farms from reporting air emissions

from animal waste under CERCLA but did not amend EPCRA in any way.

#### 3. 2019 EPCRA Rule and Related Litigation

EPA proposed a rule on November 14, 2018, to exempt all farms from reporting air emissions from animal waste under EPCRA (83 FR 56791, November 14, 2018). EPA received considerable comments from the public both supporting and opposing the proposed rule. Supporters largely agreed with EPA's interpretation of the statutes and expressed concerns over the burden that would be placed on farms if animal waste emission reporting was not exempt under EPCRA. Opposing commenters expressed concerns over the environmental and health impacts of animal waste air emissions and the public's right-to-know about these emissions. They argued that EPA's interpretation of the statute in support of the proposed rule was unlawful.

After consideration of all these comments, EPA finalized the rule to promulgate the EPCRA exemption on June 13, 2019 (84 FR 27533) (the June 2019 EPCRA Rule).

On July 9, 2019, several environmental groups, including the Rural Empowerment Association for Community Help (REACH), the Center for Biological Diversity, the Environmental Integrity Project, and the Waterkeeper Alliance, amended an existing complaint to challenge the final rule in the U.S. District Court for the District of Columbia. *See REACH* v. *EPA,* No. 1:18–CV–02260 (Sept. 28, 2018) (the *REACH* case). A number of agricultural trade associations joined the action as intervenors, including the National Cattlemen's Beef Association, the National Pork Producers Council, and the American Farm Bureau Federation.

#### 4. Executive Order 13990, January 20, 2021

On January 20, 2021, shortly after the change in administration, President Biden issued Executive Order (E.O.) 13990, which states that it is the policy of the new administration: "to listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change; to restore and expand our national treasures and monuments; and to prioritize both environmental

---

[6] The EPCRA continuous release reporting regulation at 40 CFR 355.32 cross-references the CERCLA definition of continuous releases at 40 CFR 302.8(b).

[7] EPA defined different sizes of farms using the National Pollution Discharge Elimination System (NPDES) size definitions for concentrated animal feeding operations (CAFOs). A table of EPA's NPDES regulatory definitions of large, medium, and small CAFOs can be viewed here: *https://www3.epa.gov/npdes/pubs/sector_table.pdf.*

justice and the creation of the well-paying union jobs necessary to deliver on these goals.'' (86 FR 7037, January 25, 2021).

E.O. 13990 further directed federal agencies to ''immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the 4 years prior to the E.O. that conflict with these important national objectives, and to immediately commence work to confront the climate crisis.'' *See Id.* In keeping with E.O. 13990, EPA moved the court in the *REACH* case to remand the June 2019 EPCRA Rule back to the EPA on November 23, 2021. The district court granted the remand on February 14, 2022 ''without vacatur,'' meaning the EPCRA exemption for farms remains in place while EPA reconsiders the rule.

## IV. What information is EPA seeking?

EPA is seeking comments and data that will better inform the Agency on whether to pursue a proposed rule, as well as assist the Agency on how best to implement the reinstating of EPCRA reporting from farms, if such a rule is finalized. The Agency is specifically soliciting information on the following five topics: (1) health impacts; (2) implementation challenges; (3) costs and benefits; (4) small farm definition and potential reporting exemption, and (5) a national report on animal waste air emissions.

### A. Health Impacts From Animal Waste Air Emissions

EPA reviewed literature about health impacts to communities in the vicinity of farms with animal waste. A summary of the health impact studies can be found in the Technical Background Document (TBD) in the docket for this action. The literature review of 21 studies reporting on health effects associated with air releases from Animal Feeding Operations (AFOs) add to a body of evidence that exposure to AFOs is associated with respiratory health effects, mortality, odor annoyance, gastrointestinal illness, and other health effects. They also reveal that populations located in close proximity to animal operations are at a greater risk for adverse health effects compared to populations located farther away or residing in areas without AFOs. The literature search identified several studies showing a correlation between proximity and exposure to animal waste and respiratory health effects, including increased likelihood of asthma in both adults and children and reduced lung function. Some of the studies also identified exposure to animal waste as

being correlated with mortality rates, gastrointestinal illness, and other human health effects. The size and type of operation, number of animals, and species may affect the intensity of animal waste exposure. The studies also concluded that populations located in closer proximity to animal farm operations are at an increased risk for adverse health effects when compared to populations located farther away or residing in areas without animal farm operations. The studies also provided specific cases where communities with environmental justice concerns, including those comprising people of color, low-income individuals, and children in specific geographic locations of the country are disproportionately located near animal feeding operations. The location of these populations has the potential to result in significant health impacts on the members of these communities.

Request for Information

EPA requests the following information relating to health impacts:

*#1—Health Impacts:* The Agency is soliciting comment on the literature search provided in the TBD and requesting any additional relevant literature or other information on health impacts from animal waste air emissions, including any indirect health impacts. The Agency is also requesting any information on health impacts to communities with environmental justice concerns.

### B. Implementation Challenges

If the Agency reinstates EPCRA reporting, EPA anticipates a certain level of uncertainty with determining or calculating the amount of animal waste air emissions of ammonia and hydrogen sulfide to trigger reporting. In the subsequent sections, the Agency is soliciting information on estimating amounts of air emissions, as well as other implementation challenges such as whether the continuous release reporting requirements are applicable to farm operations and how the influx of release reporting data could be managed.

1. National Air Emissions Monitoring Study (NAEMS)

EPA's Office of Air and Radiation (OAR) is developing methodologies, based on data collected under the National Air Emissions Monitoring Study (NAEMS), to estimate air emissions of ammonia, hydrogen sulfide, particulate matter (PM), and volatile organic compounds (VOCs) from animal waste from poultry (egg-layers and chicken broilers), swine, and

dairy livestock. The NAEMS originated in 2005 from the EPA and agriculture industry's understanding of the difficulty in estimating air emissions from animal feeding operations. To address the issue, the Agency entered into the Air Consent Agreement with the animal production industry, which included approximately 2,600 entities covering about 14,000 farms. As part of the agreement, EPA agreed not to pursue enforcement actions for certain past violations of the Clean Air Act, CERCLA, and EPCRA during development of the methodologies. The methodologies, based on the NAEMS data, are being developed for poultry (egg-layers and chicken broilers), swine, and dairy operations utilizing air monitoring data from animal operations and statistical analyses. The initial methodologies were released to the public starting in 2020. EPA anticipates holding a formal public comment period starting in late 2023 and finalizing the methods by spring 2024. In the existing draft form, the methods use a set of variables easily accessible to estimate emissions. These variables include type and number of animals at the farm; beginning and ending animal weight; waste management method(s) and if applicable; the housing type and number of days without animals in the barn or house; and ambient relative humidity, ambient temperature, and wind speed. Additional information can be found at *https://www.epa.gov/afos-air/national-air-emissions-monitoring-study* or in docket EPA–HQ–OAR–2004–0237.

The Agency acknowledges there are livestock types, such as turkey and beef, and operational configurations that are not covered under the NAEMS methodologies. The subsequent section, IV.B.2, solicits comment and information on these gaps and how to address them, if EPCRA reporting is reinstated.

Request for Information

EPA requests the following information relating to EPA's emissions estimating methodologies developed using data collected as part of the NAEMS:

*#2—Emissions Estimating Methodologies:* EPA requests comments on the applicability of the NAEMS methodologies for estimating air emissions from animal waste for farm types not included as part of NAEMS for a potential future reporting under EPCRA. For instance, data were not collected from cage-free layer facilities and recent trends in the industry have been toward more eggs being produced from cage-free facilities. As part of the

NAEMS program, emissions data were collected from high-rise and belt-battery layer facilities which may have different emissions than a cage-free facility.

#3—*2005 Compliance Agreement Reporting:* If EPA requires reporting under EPCRA, would there be confusion around the timing of reporting for participants of the 2005 compliance agreement? If the Agency were to pursue and finalize a rulemaking to reinstate EPCRA reporting for animal waste air emissions prior to the NAEMS methods being finalized, then NAEMS Agreement participants would not have to report until the timeframes triggered by publication of the final NAEMS methodologies. This point may be moot since the NAEMS methods are scheduled to be finalized well in advance of the time needed for a possible rulemaking to reinstate EPCRA reporting. The Agency is soliciting comment on any outreach that EPA should conduct to avoid potential confusion.

2. Emissions Calculator and Guidance on Estimating Amounts of Air Releases

If EPA moves forward with reinstating the EPCRA reporting requirement for farms, the Agency may need to develop tools and guidance to minimize the reporting burden.

EPA could develop a calculator for farms to estimate their animal waste air emissions. The web-based emissions calculator would use the estimation methods developed with the NAEMS data, enabling farms to input a limited number of variables to estimate the amount of ammonia and hydrogen sulfide air releases from animal waste. The input variables would be information that farmers are assumed to already know, such as location of the farm, species of animals at the farm, species population size, waste management method(s) and if applicable, the housing type, number of days without animals in the barn or house and beginning and ending animal weight. The emissions calculator could use the farm location (*e.g.,* county or ZIP code) to obtain meteorological data (*e.g.,* ambient relative humidity, ambient temperature, wind speed). The emissions calculator would perform the calculations using the formulas derived from the NAEMS data, which provide an estimate of release amount per day in pounds. This screening step would identify whether a farm meets or exceeds the reportable quantity and therefore, be subject to reporting under EPCRA. If the emissions calculator shows that the reportable quantity is exceeded, the farm may be able to meet the reporting requirements with

continuous release reporting. The applicable information in the emissions calculator could then auto-populate an EPA webform for the continuous release report form. Finally, instructions with the webform could instruct the farmer on how to submit the continuous release report to their appropriate state, tribal and local agencies responsible for collecting EPCRA release reports. The Agency recognizes that the NAEMS data does not cover all livestock species or operational configurations. For example, common species such as turkey and beef are not included in the Air Consent Agreement, nor are less common livestock species, such as goat, llama, and aquaculture. If the Agency pursues a rule to require EPCRA reporting, the Agency does not want farmers to struggle with estimating air emissions, thus the Agency is soliciting input and recommendations for tools and/or guidance the Agency could develop to assist farms in estimating air emissions for livestock and operational configurations not covered under the NAEMS methods.

Finally, if farms are required to report under EPCRA, ideally, EPA would provide a mechanism or threshold upfront to farms as to whether an estimate of their emissions is even necessary (*i.e.,* does a farm have enough livestock to even come close to the reportable quantity?). EPA has considered developing guidance on a minimum number of animals, where under typical farm operations, any number of livestock below the cutoff could not exceed the 100 pounds of air emissions for either hydrogen sulfide or ammonia. If possible, these types of cutoffs could be provided on EPA's website and on the front end of the emissions calculator, so that farms with numbers of animals below the cutoff, can quickly determine they would not need to report. EPA understands this may not provide the level of regulatory certainty to assure farmers that they are complying with the regulations. The Agency seeks input on whether this type of cutoff would be helpful and what unforeseen issues with providing such cutoffs through guidance and outreach materials could arise. Of note, the Agency contemplated including such a cutoff in regulatory text for a potential future rule. Under the prior 2008 rulemaking (73 FR 76948), only large CAFOs were required to report under EPCRA, where the definition of a large CAFO (by number of livestock) provided regulatory certainty.

Request for Information

EPA requests the following information relating to a potential emissions calculator:

#4—*Emissions Calculator—General:* EPA requests comments on the utility and function of an emissions calculator. Should EPA create a webform tool that can calculate an estimate of air emissions from animal wastes on farms? The Agency has a draft design of an emissions calculator included in an appendix of the TBD to provide readers with the look and feel of the tool. Separately, is there a need for EPA to create a paper form or phone hotline to assist users that do not have access to the internet? Are there other, more efficient, ways to provide air emission estimates to farms other than through a webform calculator?

#5—*Emissions Calculator— Continuous Release Reporting:* If the emissions calculator provides an estimate that exceeds the reportable quantity, should farmers (users) be routed from the emissions calculator to the continuous release reporting form and the instructions for submission to the specific state, tribal and local agencies? The Agency is soliciting comment on this approach in general, and on whether this is the most efficient process EPA can establish for reporting animal waste air emissions under EPCRA (*i.e.,* Would farms find this helpful? Are there any other steps in the process which could be streamlined by EPA and/or state, tribal and local agencies? Are there alternatives that may be more efficient?

#6—*Accuracy of Reported Release Quantity:* Should the calculator include a disclaimer that the emissions are estimates of uncontrolled emissions, and may not reflect actual emissions due to differences in each farm operation and applications of controls? The Agency solicits comment on adding a disclaimer and any other guidance that may be needed.

#7—*Turkey and Beef Contribution Factors:* Turkey and beef are two of the most prevalent livestock species not included in the Air Consent Agreement. If EPCRA reporting is reinstated, the Agency would consider publishing contribution factors for turkey and beef livestock. The contribution factor would be a quantity of ammonia and hydrogen sulfide emitted per animal. The farmer would only need to conduct a "bookkeeping exercise," of multiplying the number of livestock by the contribution factor, which would provide the air emission estimate. Potential contribution factors for turkey and beef are in an appendix in the TBD.

Federal Register / Vol. 88, No. 221 / Friday, November 17, 2023 / Proposed Rules

**80229**

The Agency is soliciting comment and information on whether developing contribution factors would be useful and appropriate for turkey and beef. The Agency is also soliciting any information that could be used to develop contribution factors for turkey and beef. See the TBD for the Agency's preliminary review into turkey and beef emissions studies. The contribution factors and literature search in the TBD are only drafts to give the reader an estimate of what a turkey and beef contribution factor may be, as well as show the relevant literature EPA would review to develop contribution factors.

*#8—Estimating Emissions from Less Common Species:* The Agency is requesting information that could be used in development of contribution factors for less common livestock which are not included in the NAEMS. Additionally, if the Agency reinstates EPCRA reporting, would it be appropriate for the Agency to devote time and resources to develop contribution factors for all conceivable farming operations? The Agency has included some preliminary draft cutoffs in the TBD for estimating the initial burden to all farms when determining if they will exceed the RQs.

*#9—Estimating Emissions from Atypical Farming Operations:* There may be farms unable to use the NAEMS methods because they do not apply to their specific operation configuration. For example, cage-free egg laying houses were not prevalent in the industry when the NAEMS was conducted, and no data were collected to support method development. In those cases, farms would need to use other information to estimate the air emissions, if EPCRA reporting is reinstated. For examples of operations that are included in the emissions calculator, see the screenshots of a mock-up of the calculator in the appendices of the TBD. EPA requests comment on operational configuration scenarios not covered by the NAEMS methodologies, and subsequently not covered by the emissions calculator, that should be included in guidance to assist the regulated community. EPA requests comment on operational configurations not covered by the methodologies developed from NAEMS data and requests any information that could be used to develop tools or guidance on how to calculate emissions from atypical farming operations.

*#10—Cutoffs for Estimating:* Should EPA develop guidance with de minimis thresholds which would make clear that a farm with livestock inventory below the threshold could not conceivably produce over 100 pounds of ammonia or hydrogen sulfide in a 24-hour period, and thus would not have to estimate air emissions or have to report under EPCRA? The Agency is requesting any information that could be used to develop thresholds. Are there farming operations that could be exceptions to such a threshold where very few animals are on the farm, but the farming operation would have enough manure on site to emit over 100 pounds of ammonia or hydrogen sulfide in a 24-hour period?

*#11—Other Guidance:* EPA solicits comment on additional implementation information EPA should consider in development of guidance, and other implementation tools EPA could provide to farms to reduce reporting burden and costs.

3. Grazing Operations

EPA is also seeking comment on having emissions from animals living and being raised in grazing or pasture situations covered by a potential future rule. A common example is beef cattle that are raised grazing or pastured over large areas of land for a period of time in their growth cycle. The animal waste generated while grazing or pastured is generally widely dispersed across the landscape and is not in a concentrated area. The beef cattle can then be transferred from the grazing or pastured areas to feedlots or other concentrated feeding operations to complete their life cycle. Other species similarly are raised grazing or pastured for a period of their life cycle.

If reporting is reinstated under a potential future rule, only farming operations that are defined as a "facility" would need to report. Under EPCRA section 329 (Definitions), the term "facility" means "all buildings, equipment, structures, and other stationary items which are located on a single site or on contiguous or adjacent sites . . ." The term "facility" is further defined in the EPCRA regulations at 40 CFR 355.61 to include "manmade structures, as well as all natural structures in which chemicals are purposefully placed or removed through human means such that it functions as a containment structure for human use." In general, the Agency does not currently believe grazing operations fall under the definition of "facility," unless the manure is collected and managed.

Request for Information

EPA requests the following information relating to grazing operations:

*#12—Grazing Operations:* EPA seeks comment on whether the Agency's interpretation of "facility" relating to grazing operations is correct and appropriate. The Agency also seeks information on whether clarifications of the applicability of the regulations to other farming operations is needed.

4. Use of Continuous Release Reporting by Farms

The animal waste that farms handle or manage as part of their normal operations of raising animals may have regular air emissions which could fall within the scope of continuous release reporting (see section III.C. for an overview of continuous release reporting). As mentioned previously, continuous release reporting under EPCRA encompasses the following three requirements, found at 40 CFR 355.32: (1) Initial telephone notification made to the LEPC and SERC; (2) Initial 30-day written notification to the LEPC and SERC; and (3) notification to the LEPC and SERC of any increase in the quantity of the hazardous substance being released during any 24-hour period, which represents a statistically significant increase (SSI). The 30-day written notification is submitted using a range for the quantity released, and an SSI is anything that exceeds the upper bound of the range identified in the initial 30-day notification. Of note, there are no requirements for updating a continuous release report if the release decreases below the lower bound provided in the report, and there are no federal requirements for reporting when a continuous release has ceased.[8] Furthermore, the initial notification does not require monitoring data to support the upper and lower bounds of the quantity released; instead, the regulations allow for "using release data, engineering estimates, knowledge of operating procedures, or best professional judgment" (see 40 CFR 355.32(a) via 40 CFR 302.8(d)(1)). Finally, a continuous release is defined as "a release that occurs without interruption or abatement or *that is routine, anticipated, and intermittent and incidental to normal operations or treatment processes,*" (see 40 CFR 302.8(b); emphasis added).

Request for Information

EPA requests the following information relating to continuous release reporting:

*#13—Application of Continuous Release Reporting:* The Agency is soliciting comment on the appropriateness of defining all air releases from animal waste on farms as

---

[8] Note: State, tribal, and local EPCRA implementing agencies may have additional reporting requirements.

continuous releases, because they are routine, anticipated, and intermittent and incidental to normal operations.

*#14—Application of Upper and Lower Bounds:* The Agency is soliciting comment on allowing farms to apply upper and lower bounds on their continuous release reports to estimate the highest or lowest quantity released at any point during the year, regardless of seasonal fluctuations in farming operations.

*#15—Exceptions to Continuous Release Reporting:* Given the flexibility of the EPCRA continuous release reporting requirements, the Agency is soliciting comment on whether there are scenarios for which releases from animal waste at farms could not be covered under continuous release reporting. If that is the case, the Agency requests any information on such farming operations, so the Agency can account for the burden these operations would incur from episodic release reporting, instead of continuous release reporting.

*#16—Benefits and Costs of Continuous Release Reporting Data:* The Agency is soliciting comment and supporting data on the usefulness of continuous release reporting data to the surrounding communities and SERCs and LEPCs (*i.e.,* If the report is submitted with a large range for the quantity released, would that help the public understand what's in their community?).

*#17—Continuous Release Reporting— Other:* The Agency is soliciting information and comment on any other issue relating to the application of continuous release reporting by farms subject to a potential future rule.

## 5. Citizen Suits

Reinstating animal waste air emissions reporting requirements would create potential liability for farms that meet or exceed the RQ, but fail to report, under the citizen suit provisions of EPCRA. Under EPCRA section 326(a)(1)(A)(i), a citizen may file suit against an owner or operator of a facility, including a farm, for failing to submit the follow-up emergency notice of release required by EPCRA section 304(c).[9] Before filing a citizen suit, the citizen must provide 60 days' notice of the alleged violation to the facility, the state, and EPA, as required by EPCRA section 326(d)(1). If the alleged violator files the missing report in that time (*i.e.,* the violation is ''wholly past''), EPA

believes an actual lawsuit would be unlikely. Pursuant to the Supreme Court decision in *Steel Co.* v. *Citizens for a Better Environment,* 523 U.S. 83 (1998), citizens may not be able to demonstrate that they have standing to bring a suit for wholly past violations. In practice, if a facility files a release report within 60 days of receiving notice of a citizen suit, the suit may be dismissed with no award of attorney's fees or investigative costs. A suit also may not be brought if EPA has ''commenced and is diligently pursuing'' an action to enforce a requirement or impose a civil penalty under EPCRA.

The Agency does not have a list of past citizen suits, but believes they are infrequent and not focused on small farms. EPA requests comment on potential citizen suit issues and concerns that are related to non-reporting farms. If there are other citizen suit considerations, EPA requests comment on these issues and concerns, including benefits of this potential remedy. These comments may assist in the development of guidance and outreach information to be shared with the regulated community as part of future compliance assistance if reporting is reinstated.

Comments received on the 2018 proposed rule included a concern of liabilities that reporting requirements could create for farmers because the information is ''inherently imprecise and therefore subject to dispute.''[10] The Agency notes that under EPCRA section 326(a)(1)(A)(i), a citizen suit can be brought against an owner or operator for failing to submit the follow-up emergency notice of release required by EPCRA section 304(c). That notice includes an ''estimate of the quantity of any such substance that was released . . .'' (see EPCRA section 304(b)(2)(C)).

### Request for Information

EPA requests the following information relating to potential impacts on farms from citizen suits:

*#18—Citizen Suits—Wholly Past Violations:* Given that EPCRA requires 60 days' notice before filing a citizen suit, and the decision in *Steel Co.* v. *Citizens for a Better Environment,* 523 U.S. 83 (1998), could citizen suits create more than a minimal burden on farms? Given that only an estimate needs to be provided to fulfill the requirements, the Agency is also soliciting comment and information for the potential for additional citizen suits based on the accuracy of the reporting estimate.

*#19—Citizen Suit Benefits and Costs:* What are the potential costs and liabilities of EPCRA citizen suits for non-reporting farms if reporting is reinstated? The Agency is also soliciting any information on realized benefits of a citizen suit being filed against a farm. Finally, the Agency is soliciting information on the frequency and number of previous citizen suits for failing to submit the follow-up emergency notice of release required by EPCRA section 304(c), as well as the frequency and number of 60-day notices provided to farms in advance of the citizen suit. We realize that EPCRA reporting for animal waste air emissions at farms is not currently required, however, reporting was required for large CAFOs prior to 2019, which is the time period for which EPA was seeking information.

*#20—Citizen Suit—Guidance:* If the Agency develops guidance on citizen suits, what information should the guidance include?

*#21—Citizen Suit—Other:* The Agency is soliciting information and comment on any other issues related to citizen suits in the context of a potential future rulemaking to reinstate EPCRA reporting for farms.

## 6. Privacy Concerns

If reporting is reinstated in a future rulemaking for farms, the public may seek access to the report under the right-to-know provision in EPCRA section 324(a). EPA understands there may be privacy concerns by the farmers when their personal residence is the same as the address for the farm, in which case the submitted reports may contain personal information that was previously unavailable from any other source to the public. The Agency expects that most small farms will not meet the applicable release reporting thresholds and will therefore fall outside the scope of any EPCRA reporting requirement entirely; however, the Agency still appreciates the concern for the small farms that would need to report.

### Request for Information

*#22—Privacy Concerns:* EPA seeks comment, generally, on the privacy concerns of farmers who would be required to report animal waste air emissions. The Agency is also seeking creative solutions that could provide communities with information on air emissions from a farm without disclosing the location (*i.e.,* personal address) of a ''small'' farm.

*#23—Privacy Concerns—Other:* The Agency is soliciting information and comment on any other issues related to

---

[9] When using continuous release reporting, the 30-day initial written notification under 40 CFR 355.32(a), further specified under 40 CFR 302.8(e), is considered the follow-up emergency notice under EPCRA section 304(c).

[10] See comment with docket ID EPA–HQ–OLEM– 2018–0318–0224.

privacy concerns in the context of a potential future rulemaking to reinstate EPCRA reporting for farms.

## 7. EPCRA National Database

Under EPCRA's statutory authority (42 U.S.C.11004), EPCRA emergency release notifications (Section 304; 40 CFR 355.30) are submitted to the SERCs or TERCs and LEPCs or TEPCs, but not to the EPA or another federal agency. EPA recognizes that reinstatement of EPCRA animal waste air emissions reporting will increase the number of release reports submitted to state, tribal, and local agencies (the implementing agencies). Under the existing authorities, the implementing agencies will have the responsibility of receiving and managing the reports and making the information publicly available as part of the EPCRA right-to-know provisions.

The EPA requests comment and information on creating an EPCRA database for animal waste air emissions information at the national level, that would be housed at EPA. The Agency believes a centralized EPCRA submission portal and management system can improve the reporting program by centralizing and standardizing reporting and reducing burden on both the implementing agencies and the regulated community. Recognizing that existing statutory reporting requirements under EPCRA may need to be amended to allow it, EPA also seeks comment from the implementing agencies and the regulated community on the benefits and challenges of creating an EPCRA national database. EPA requests comment not only for animal air emissions, but for reporting under all sections of EPCRA, except section 313, which is the Toxics Release Inventory (TRI) program. Following is a list of applicable EPCRA reporting requirements that could be built into a national system:

—Facility emergency planning notifications (40 CFR part 355, subpart B; EPCRA section 302).
—Emergency release notifications (40 CFR part 355, subpart C; EPCRA section 304)
—Hazardous chemical inventory reports (40 CFR part 370; EPCRA sections 311 and 312).

Currently, reporting methods are determined by the state or tribe. These SERCs and TERCs are using a variety of submission and data management platforms to meet their statutory obligations. Over half of the states are using three existing submission platforms for annual Section 312 Tier II submissions: Tier2 Submit, E-Plan, and TIER II MANAGER. The other states use other commercial software or have state-specific programs. Through a centralized database, EPA could collect EPCRA reports and make those reports immediately available to state, tribal, and local agencies, thus improving the efficiency, efficacy, and transparency of EPCRA reporting compliance and removing the burden to state, tribal, and local agencies receiving and managing the submittals. The database can also reduce the burden on these implementing agencies by providing a public right-to-know information center. The clearinghouse would be a "one-stop shop" for industry, the EPCRA implementing agencies, and the public. A national database would provide industry the opportunity to report to multiple states and local entities in one platform. The implementing agencies would have access to all of the submitted information for their covered area, reducing their administrative burden and allowing them to focus on implementation, community safety, and compliance. The database would handle all reporting requirements, as well as requests from the public for information, allowing entities to use their limited resources to improve compliance efficacy.

The EPCRA emergency planning provisions, codified under 40 CFR part 355, subpart B, include several required communications with the SERC or TERC and/or LEPC or TEPC, such as the initial notification that a facility is subject to EPCRA emergency planning requirements; notification of the facility emergency coordinator; notification of any relevant changes to emergency planning; and providing information to the LEPC or TEPC upon request. A national database could manage, track, and store all these required communications. Furthermore, with the planning data, the EPA could facilitate coordination between LEPCs or TEPCs with similar types of facilities to share best practices and lessons learned on how to plan for specific risks.

The emergency release notification requirements, under 40 CFR part 355, subpart C, include immediate notification via phone and follow-up written reports to the SERC or TERC and LEPC or TEPC, as well as specific requirements for continuous release reporting requirements. A national EPCRA database could handle these notifications, although initial release notification may not be ideal, because initial notifications are time-sensitive and are typically phone calls to the LEPC or TEPC and SERC or TERC. However, the 30-day follow-up written reports and continuous release reports could be well-suited for a national database. LEPCs, TEPCs, TERCs and SERCs would have the benefit of having the data standardized and stored. Additionally, EPA could coordinate discussions on clean-up and response activities among LEPCs and TEPCs with similar releases.

Request for Information

EPA requests the following information relating to a National EPCRA Database:

*#24—National EPCRA Database— General:* The Agency is soliciting information and comment in general about a national EPCRA database, as well as any input on how such a system should be designed, developed, and implemented. EPA seeks quantitative information characterizing how a centralized reporting clearinghouse could reduce burden to stakeholders. The Agency also solicits information on conducting a pilot of a national database with a small number of states and local implementing agencies.

*#25—National Database—Managing Right-to-Know Data:* EPA requests comment and information from LEPCs, TEPCs, SERCs, and TERCs on whether a national EPCRA database would be beneficial to receive and manage reports and, pursuant to the right-to-know requirements, make those reports available to the public.

*#26—National Database—Managing Reports from Facilities:* EPA seeks input on both the potential benefits and any disadvantages for LEPCs, TEPCs, SERCs, and TERCs of creating a national database for receiving and managing EPCRA sections 302, 304, 311, and 312 reports.

*#27—National Database—Animal Waste Air Emissions Reporting:* EPA seeks input on the potential efficiencies or inefficiencies to the regulated community of submitting EPCRA animal waste air emissions reports to one centralized portal. EPA also seeks input on both the potential benefits and disadvantages to the communities near animal farming operations and the general public of a national database to receive and manage reports and, pursuant to right-to-know requirements, make reports available to the public.

*#28—National Database—Facility Benefits and Disadvantages:* EPA seeks input on potential benefits and disadvantages for the regulated community of a national database for complying with EPCRA sections 302, 304, 311, and 312 reporting requirements.

*#29—National Database—Managing FOIA Requests:* EPA seeks input from

LEPCs, TEPCs, SERCs, and TERCs about EPA managing Freedom of Information Act (FOIA) requests and releasing EPCRA data from a national system. The Freedom of Information Act generally provides the public with access to federal agency records, however FOIA does not apply to state and local agencies. Each state has their own laws and procedures for releasing records to the public. The EPA is soliciting comment and information on what issues may need to be addressed if EPA were to manage FOIA requests on what would be considered state and local data under EPCRA.

*#30—National Database—Other:* The Agency is soliciting information and comment on any other issues related to a national EPCRA database.

*C. Costs and Benefits*

1. Estimated Regulated Universe

EPA estimates the total number of farms with livestock to be approximately 1.25 million based on data from the United States Department of Agriculture's (USDA) 2017 Census of Agriculture. However, only a fraction of these farms is expected to exceed the reportable quantity for either ammonia and/or hydrogen sulfide, and thus be regulated under a potential future rule that would reinstate reporting. The Agency used data from NAEMS and literature reviews to estimate contribution factors (*i.e.,* estimate of quantity of air emissions per animal per day), which were applied to the livestock numbers from the USDA Census, to generate an estimate of 37,891 farms that would be expected to exceed the reportable quantity. All of the estimates, calculations and assumptions are in the TBD in the docket.

The reporting burden is expected to be relatively minimal because the Agency anticipates that continuous release reporting would be used in a majority of instances (see Section D.2 for burden estimates). Even though the reporting burden is expected to be low and only encompass approximately 38,000 farms, other farms may not know whether their operations will exceed the reportable quantity. The following section (Section D.2) solicits comment on estimating the burden to all 1.25 million farms with livestock.

Request for Information

EPA requests the following information relating to estimating the regulated universe:

*#31—Regulated Universe—Number of Farms Reporting:* The Agency is soliciting information and comments on the estimate of farms expected to exceed the reportable quantity. The Agency is specifically soliciting information and comment on the methods for estimating the number of regulated farms, the data sources used, and the estimated contribution factors, which are all detailed in the TBD. Regarding the contribution factors, the Agency realizes that the contribution factors EPA used, for estimating the regulated universe, may not take into account all the variables that impact any given farm's animal waste air emissions, and is soliciting information and comment on the accuracy of the contribution factors used to estimate the regulated universe; any additional information that may provide a more accurate estimate of the regulated universe; and the utility of refining the contribution factors or the method used.

2. Burden Estimates

In analyzing whether to pursue a rulemaking to rescind the reporting exemption, EPA considered the costs associated with reinstating reporting requirements. EPA estimated the total costs by combining unit costs of compliance per farm with the estimate of the affected farm universe. The Agency used animal inventory data from USDA's 2017 Census of Agriculture in the affected NAICS codes to identify the regulated universe of 37,891 farms. Farm operations with continuous air releases of ammonia or hydrogen sulfide from animal waste that meet or exceed the RQ would qualify for reduced reporting requirements, including:

• Providing initial continuous release telephone notification to the SERC (or TERC) and LEPC (or TEPC);

• Submitting initial written report to the appropriate SERC (or TERC) and LEPC (or TEPC);

• Providing notification of a statistically significant increase (SSI) in a release to the SERC (or TERC) and LEPC (or TEPC); and,

• Providing notification of a new release resulting from a change in source or composition.

EPA estimated the annualized cost of a potential future rule over a 10-year analysis period. The total annualized cost of reinstating EPCRA reporting would be approximately $2.9 or $2.8 million using three and seven percent discount rates, respectively, as detailed in the TBD.

Table 2 summarizes the total undiscounted cost of a future rule, by year. For reporting farms, first-year costs are $16.8 million, and total first-year costs for SERCs (or TERCs) and LEPCs (or TEPCs) is $6.5 million. Costs in years 2 through 10 of the analysis are significantly less, at approximately $0.1 million per year for both sets of affected entities.

TABLE 2—TOTAL COST BY YEAR (UNDISCOUNTED) (2022$)

| Compliance requirement | Animal operations | | State, local, tribal gov't | |
|---|---|---|---|---|
| | First year | Years 2–10 | First year | Years 2–10 |
| Rule Familiarization and Applicability Determination ............................................ | $3,710,295 | $0 | $0 | $0 |
| CRRR Reporting: | | | | |
| *Labor Costs* .................................................................................................. | *11,782,802* | *164,451* | *6,481,555* | *108,026* |
| Initial Notification ..................................................................................... | 1,073,190 | 0 | 2,160,518 | 0 |
| Initial Written Report ................................................................................ | 10,709,612 | 0 | 4,321,037 | 0 |
| Reporting an SSI ....................................................................................... | 0 | 164,451 | 0 | 108,026 |
| *O&M Costs* ................................................................................................... | *1,307,223* | *0* | *0* | *0* |
| Initial Notification ..................................................................................... | 0 | 0 | 0 | 0 |
| Initial Written Report ................................................................................ | 1,307,223 | 0 | 0 | 0 |
| Reporting an SSI or New Release .............................................................. | 0 | 0 | 0 | 0 |
| Total Cost ............................................................................................. | 16,800,321 | 164,451 | 6,481,555 | 108,026 |

The Agency has also prepared a screening analysis to assess small entity impacts, documented in the TBD. The Agency used sales data from the USDA's 2017 Census of Agriculture in the affected NAICS codes, along with Small Business Administration (SBA)-specified small business thresholds, to identify the potential set of affected small operations. EPA combined these data with the affected universe data to estimate the subset of reporting farms that meet SBA size standards for small entities. EPA estimates that 31,921 out of the 37,891 farms in the regulated universe (84 percent) are small operations under SBA size standards. EPA performed a cost-to-sales test for these entities and found that none of the affected operations would experience costs greater than one percent of annual sales. Based on the results of the cost-to-sales test, EPA concludes that a future rulemaking would not have a significant economic impact on a substantial number of small entities.

Request for Information

EPA requests the following information relating to the costs of a potential future rule:

*#32—Burden—Reporting Farms:* The Agency is soliciting information and comments on the cost estimates for farms and state and local agencies. See the TBD for a detailed analysis. The Agency made assumptions for hours for specific tasks; labor rates; how many SSIs would be submitted; how many new farms would report in the out years; and other variables. EPA is requesting information and comment on these assumptions and variables that could result in more accurate burden estimates.

*#33—Burden—Non-Reporting Farms:* The Agency is soliciting information and comments on the cost estimates for all farms to understand and potentially estimate their air emissions. The Agency estimates that all 1.25 million farms with livestock (both reporting and non-reporting farms) would incur between 1 and 2.5 hours of burden per farm for rule familiarization, which totals to $97.6 million burden for all farms. See section 3.2 in the TBD for a detailed analysis.

*#34—Burden—Small Farms:* The Agency is soliciting information and comments on the analysis of impacts to small farms. See the TBD for a detailed analysis.

*#35—Burden—Qualitative Costs:* The Agency is soliciting information and comments on any qualitative costs of a reinstating reporting. In the TBD, the Agency attempted to quantify as many costs of a potential future rule as it was able to.

3. Environmental Justice and Community Right-To-Know

Any rulemaking resulting from this ANPRM would impact only the reporting requirements for animal waste air emissions; a new rule would not directly lessen air emissions from animal waste on farms, nor directly change disproportionate and adverse effects experienced by communities with environmental justice concerns. However, one of the benefits of requiring reporting is the availability and accessibility of this information to surrounding communities. This reporting is critical to advancing the Agency's environmental justice goals by increasing the understanding of potential impacts of air emissions from animal waste on communities with environmental justice concerns. As a result, fenceline communities may benefit from the reporting of animal waste air emissions at farms.

Although a potential future rule would not directly address human health or environmental conditions, the EPA investigated potential environmental justice concerns by conducting geospatial analyses. To conduct a thorough, national-level environmental screening analysis, publicly available data of source locations of air emissions are required. These data do not exist at the national level. While the 2017 USDA Census is a complete count of U.S. farms and ranches and the individuals who operate them, publicly available data are aggregated to the county level to protect the confidentiality of the information provided by individual respondents. The EPA conducted three levels of analysis to identify communities that may be affected by the reporting rule based on the level of animal operations' ammonia emissions for 5 animal sectors (Beef, Broilers, Dairy, Layers, and Swine) at the county-level, tribal-level, and available state-level data.

As shown with the 2017 USDA Census data in the environmental justice analysis provided in TBD, that while the upper quintile of counties emitting ammonia from animal waste on average does not exceed the national average for minority populations or low-income populations, four of the top ten counties in ammonia emissions from animal waste comprise populations exceeding the national average for minority populations and low-income populations. The EPA believes that in some localities, minority and low-income populations may be disproportionately impacted by air emissions from animal wastes, which is shown in the TBD at the county level and census block level using the USDA Census data and the state-specific farm data.

Request for Information

EPA requests the following information relating to the benefits of a potential future rule:

*#36—Benefits—Environmental Justice:* The Agency is soliciting information and comments on the environmental justice analysis. See the TBD for details.

*#37—Indirect Benefits:* The Agency is soliciting information and comments on the indirect benefits of a potential future rule to reinstate EPCRA reporting by farms. A future rule would only be a reporting rule to provide state, tribal and local implementing agencies and communities information on releases of ammonia and hydrogen sulfide from animal wastes on farms. However, after air emission information is shared with states, locals, and communities, there are potential indirect benefits, such as communities experiencing greater capacity for meaningful involvement in the development and implementation of local pollution management policies or the information leading to voluntary initiatives by farms to review farming and waste management practices and set goals for reductions in emissions, and institute "good neighbor" policies. Potential changes in farm operations—including reductions in the releases and changes in the waste management practices—could yield health and environmental benefits. Indirect benefits of a potential future rule have not been quantified.

*D. Small Farms*

Based on the existing EPCRA RQs of 100 pounds per day for both ammonia and hydrogen sulfide, EPA estimates the regulated universe of the proposed rule to be 37,891 farms. The regulated universe is 3 percent of approximately 1.25 million farms nationwide in the 2017 USDA Agriculture census. Of the 37,891 reporting farms, 31,921 farms are estimated to be small businesses as defined by the Small Business Administration (SBA), see the TBD in the docket. Separately, using the National Pollution Discharge Elimination System (NPDES) farm size CAFO categories, only approximately 3,000 of the 37,891 farms would be considered small CAFOs and limited to swine and dairy operations, also see the TBD in the docket. Even though there are relatively few "small farms" that would be required to report releases from animal waste, EPA recognizes that

**80234**    **Federal Register** / Vol. 88, No. 221 / Friday, November 17, 2023 / Proposed Rules

most farms would not know whether they exceed the reporting threshold (*i.e.,* be in the regulated universe). This section is designed to gather information relating to a reporting exemption for small farms, which could create regulatory certainty for farmers.

**1. Potential Reporting Exemption for "Small Farms"**

If the Agency reinstates reporting for farms, EPA seeks information on whether "small farms," which would need to be defined in a potential future rule, should be exempted from reporting animal waste air emissions.

EPA considered relevant comments received during the previous 2008 [11] and 2019 [12] rulemakings, as discussed in the response to comment documents in those dockets. For both the 2008 and the 2019 rules, commenters acknowledged that "small farms," as described but not defined by the commenters, would not be expected to report because they are likely to fall below the RQ-based reporting threshold. In 2008, commenters stated that they did not think "small farms" would reach the established 100-pound RQs even without a reporting exemption. One commenter stated that EPA should establish an exemption for farms under an income level threshold which was not specified but would differentiate between "true" family farms and larger industrial-type operations. The 2019 rule received a comment from an environmental group that smaller animal feeding operations are unlikely to be subject to EPCRA reporting.

*Request for Information*

EPA requests the following information:

*#38—Small Farm Exemption— General:* EPA requests comment on whether "small farms" should be exempted from reporting animal waste air emissions. If so, how should they be exempted? EPA requests any information that the Agency can use to develop a justification to exempt "small farms" from reporting air emissions under EPCRA. Similarly, the Agency is requesting any information that supports not exempting "small farms."

*#39—Small Farm Exemption— Criteria:* EPA requests comment on the criteria that should be considered in establishing a potential exemption for small farms. For example, should an exemption be based on animal number thresholds at the operation; animal

waste management methods; single species-focused operations; or other criteria? The Agency requests information that could be used to differentiate small farms from medium and large operations that would support exempting small farms from EPCRA reporting.

**2. Defining "Small Farms"**

Any potential action for small farms requires defining "small farm." The term "farm" is already defined in 40 CFR 355.61. If the Agency pursues reinstatement of EPCRA reporting, and further pursues an exemption from that reporting for small farms, the Agency would not be seeking to change the definition of "farm," but rather to expand on the existing definition to categorize "small farms."

In the 2008 rule exempting farms from reporting animal waste air emissions (73 FR 76948), EPA defined different sizes of farms using the NPDES size definitions for CAFOs, due to familiarity with these size categorization terms within the agriculture industry. [13] The NPDES farm size categories of small, medium, and large are based on animal threshold numbers for each species. For example, mature dairy cattle have species-specific threshold ranges as follows: less than 200 defined as a small CAFO, 200 to 699 defined as a medium CAFO, and 700 or above defined as a large CAFO.

EPA seeks input on whether using the NPDES CAFO farm size categories for defining small farms is the best choice, and if not, EPA is seeking input on an alternative definition for "small farm." EPA is aware of and has considered other ways to define "small farms." For example, an alternate definition for small farm could come from the Economic Research Service at USDA, [14] which classifies sizes based on revenue. The USDA defines small farms to have annual gross cash farm income (GCFI) of less than $350,000. If revenue is used to define "small farms", the farms would make the determination as to whether they were subject to the exemption, unless they voluntarily provide the applicable information. Any revenue-based definition would make it challenging for EPA, or other agencies, to conduct reporting compliance and independently determine whether a

farm meets the exemption threshold. For example, EPA, or other another agency, would have to determine if revenue information is available, and whether the source of revenue (*e.g.,* from the livestock at the farm or from another source such as crop production) is significant in defining farm size for EPCRA reporting purposes.

No direct comments were received to assist the Agency in defining "small farms" in the 2008 nor 2019 rulemakings.

*Request for Information*

EPA requests the following information:

*#40—Small Farm Definition:* The Agency is soliciting comment and information on how to define "small farm" in the context of creating a potential reporting exemption. Specifically, EPA is soliciting input on applying the definition of small farms from NPDES or USDA to EPCRA reporting. Are there other small farm definitions that may be more appropriate for EPCRA reporting? Are there certain attributes from "small farms" that correlate with quantity of air emissions (*e.g.,* is there a certain level of farm revenue that correlates to farms with smaller manure management operations)?

**3. Animal Waste Management Methods for "Small Farms"**

EPA seeks information on animal waste management methods that could be used to differentiate farm size and how such methods would affect air emissions of ammonia and hydrogen sulfide.

In examining this issue, the Agency reviewed comments received on the 2008 and 2019 rules, though no comments explicitly addressed how to differentiate farms by size.

*Request for Information*

EPA requests the following information:

*#41—Small Farm—Waste Handling:* EPA is soliciting information and comment on certain waste management practices that could be used to support an exemption for small farms, if EPCRA reporting is reinstated. Specifically, the Agency seeks information on various animal waste handling methods based on size of operation (number of animals) and species of animals that would be different at small farms versus medium and large farms and may affect air emissions of ammonia and hydrogen sulfide.

---

[11] *https://www.regulations.gov/document/EPA-HQ-SFUND-2007-0469-1359.*

[12] *https://www.regulations.gov/document/EPA-HQ-OLEM-2018-0318-0405.*

[13] A table of EPA's NPDES regulatory definitions of large, medium, and small CAFOs can be viewed here: *https://www3.epa.gov/npdes/pubs/sector_table.pdf.*

[14] USDA. 2022. Economic Research Service. Farm Structure and Contracting. Available at: *https://www.ers.usda.gov/topics/farm-economy/farm-structure-and-organization/farm-structure-and-contracting/.*

4. Health Impacts From ''Small Farms''

Section IV.A in this document outlines the health impacts from animal waste air emissions, which are further detailed in the TBD. This section is intended to solicit comment and information regarding any distinction that could be made between adverse health impacts from air emissions from small farms versus medium and large farms.

Request for Information

EPA requests the following information:

*#42—Small Farm—Health Impacts:* The Agency is soliciting information on health impacts from different size farms to determine if lack of adverse health impacts would support a reporting exemption for small farms, if EPCRA reporting is reinstated through a potential future rule. Conversely, the Agency is also soliciting information that demonstrates adverse health impacts from animal waste air emissions from ''small farms.'' When submitting information, the Agency requests the commenters to provide any information on how the requester or information is defining ''small farm.''

5. State, Tribal, and Local Emergency Planners and Responders Use of ''Small Farm'' Animal Waste Air Emissions Information

Reinstating animal waste air emissions reporting requirements would require owners or operators of covered farms to provide initial notification to either the SERC or TERC, and the LEPC or TEPC in the event of a release of an EPCRA EHS, as required by EPCRA section 304, or of a CERCLA hazardous substance in an amount equal to or greater than the RQ for that substance within a 24-hour period. Within 30 days of the initial notification, farms must submit a written follow-up report to these agencies. EPA recognizes that reinstating EPCRA animal waste air emissions reporting will increase the number of notifications (ex: telephone, email, etc.) and written release reports submitted to SERCs or TERCs and LEPCs or TEPCs. These agencies will have the responsibility of receiving initial notifications and managing the reports as well as making the information publicly available as part of the EPCRA right-to-know provisions.

Previous comments submitted to EPA on the 2008 rulemaking include comments from LEPCs stating their support for a reporting exemption because there would likely be no federal, state or local emergency response to such release reports.[15] EPA also received comments from the National Association of SARA Title III Program Officials (NASTTPO), an EPCRA-related association for state, tribal, and local EPCRA implementing agencies, supporting the 2019 EPCRA reporting exemption (84 FR 27533).[16] NASTTPO stated that these reports are of no particular value to LEPCs and first responders and instead are generally ignored because they do not relate to any specific event. The NASTTPO noted that open dialogue and coordination between local emergency authorities and animal farming operations can be more effective than EPCRA-required release reporting for farms that do not handle quantities of chemicals designated under EPCRA as EHSs.[17] While some state and local agencies have stated they support not receiving release reports of animal waste air emissions from farms, the EPA believes there may be value in providing these reports for fenceline communities.

Request for Information

EPA requests information from SERCs, TERCs, LEPCs, and TEPCs on the usefulness of information pertaining to ''small farm'' animal waste air emissions for the purposes of emergency planning and response.

*#43—State, Local, and Tribal Impacts:* Through prior public comment periods from previous rulemakings, as well as the ongoing coordination between EPA and SERCs, TERCs, and LEPCs, the Agency has heard that state, tribal, and local emergency planners and responders would not use EPCRA release reports of animal waste air emissions from farms, and so, the Agency is inferring that if EPCRA reporting is reinstated, an exemption for small farms would be well received by state, tribal, and local emergency planners and responders. The Agency is requesting any new comments and information that would support or contradict this position. Regarding small farms, if EPCRA reporting is reinstated without a small farm exemption, EPA is requesting comment on whether state, tribal, and local implementing agencies would process and utilize release reports for animal waste air emissions from small farms differently from reports from larger farms.

6. Adjusting the RQs of Ammonia and Hydrogen Sulfide for Animal Waste Air Emissions

One way EPA could potentially reduce reporting of air emissions from animal waste for small farms is by adjusting the RQs or creating industry and media-specific RQs. The existing RQs for ammonia and hydrogen sulfide are both set at 100 pounds. Any release of either of these substances at or above the RQ in a 24-hour period would require reporting under EPCRA.

Establishing Category-Specific Animal Waste Air Emissions RQs

CERCLA section 103 requires immediate notification to the National Response Center whenever an RQ or more of a CERCLA hazardous substance is released in a 24-hour period. Similarly, EPCRA section 304 requires notification to the SERC or TERC and the LEPC or TEPC when there is a release of an RQ or more of either a CERCLA hazardous substance or an EPCRA EHS in any 24-hour period. For substances listed under both CERCLA (40 CFR 302.4) and EPCRA (40 CFR part 355, Appendices A and B), the applicable RQ is established under CERCLA and adopted under EPCRA (April 22, 1987, 52 FR 13378). For EHSs not listed under CERCLA, EPA used the EPCRA threshold planning quantities (TPQs) to assign RQs, by raising the statutory RQ (one lb) to be the same as their TPQs.

EPA adopted a five-level system for RQs of 1, 10, 100, 1,000, and 5,000 pounds for CERCLA reporting. These levels were originally established pursuant to CWA section 311 (40 CFR part 117). EPA has authority to establish and adjust RQs for hazardous substances under CERCLA and for EPCRA EHSs.

EPCRA additionally requires EPA to consider and establish TPQs for EHSs, which is the quantity of the substance present at a facility for which emergency planning notification is required under EPCRA section 302. Currently, the TPQ for ammonia and hydrogen sulfide is 500 lb for all industry sectors. The TPQ methodology is separate from the RQ methodology and was developed specifically to reflect a quantity that could cause serious health consequences if accidentally released. Generally, the TPQ for a substance should be higher than the RQ, which is the case for most EHSs. For other EHSs, the TPQ is the same quantity as the RQ, which is dependent on the criteria and the ranking factor established for TPQ and RQ. In a future rulemaking, if EPA were

---

[15] See comments submitted with docket IDs: EPA–HQ–SFUND–2007–0469–0498; EPA–HQ–SFUND–2007–0469–0215.

[16] See comment submitted with docket ID: EPA–HQ–OLEM–2018–0318–0238.

[17] See NASTTPO letter as part of comment submitted with docket ID: EPA–HQ–OLEM–2018–0318–0236.

to raise the RQs for hydrogen sulfide and ammonia from animal waste air emissions at farms above the existing 500-pound TPQ (*i.e.,* to either 1,000 or 5,000 lb), the Agency may need to address the TPQs for ammonia and hydrogen sulfide emitted from animal waste from farms, since those situations may not be appropriate for emergency planning purposes.

Based on publicly available information, EPA developed preliminary estimates of the reporting universe and the numbers of small farms under several possible RQs. Under the existing RQ of 100 pounds, approximately 37,891 of the 1.25 million farms, based on USDA's 2017 Census of Agriculture, would be required to report releases of air emissions from animal waste, which comprises approximately 3% of farms. Using the NPDES CAFO size categories, this estimate of 37,891 farms includes approximately 3,000 small farms. If the RQ for both ammonia and hydrogen were raised to 500 pounds, the preliminary estimated regulated universe would decrease from 37,891 to approximately 15,000 farms; at 1,000 pounds RQ, the estimated regulated universe would decrease even further to approximately 5,000 reporting farms. Additionally, at an RQ of 1,000 pounds, EPA estimates that no small farms, under the NPDES definition, would exceed the reportable quantity. See the TBD for the analysis of number of regulated farms at different RQs.

Request for Information

EPA requests the following information relating to adjusting the RQs of ammonia and hydrogen sulfide for animal waste air emissions:

*#44—RQ Adjustment—General:* EPA requests comments and supporting information, if available, on the potential of adjusting the RQs for ammonia and hydrogen sulfide to reduce the reporting burden for small farms, based on the existing RQ methodology.

*#45—Industry-Specific RQ Adjustment:* The Agency is soliciting comment and information on creating industry and/or media-specific animal waste air emissions RQs for farms only, where all non-farming industries would retain the existing 100-pound RQs for ammonia and hydrogen sulfide, but animal waste at farming operations would have separate, higher RQs for ammonia and hydrogen sulfide. Additionally, the Agency is requesting comment and information on what the ''farm-specific'' RQs should be. The Agency is seeking information that supports or refutes the concept of separate RQs for the same hazardous substance.

*E. National Report on Animal Waste Emissions*

The issue of whether farms should report under EPCRA has been through various rulemakings and litigation since 2008. The decision seems to be binary (*i.e.,* farms report or they do not). The Agency is including this section of the ANPRM to solicit comment and information on potential creative solutions to provide information to fenceline communities on air emissions from animal wastes without requiring farms with having to estimate and report to their state, tribal and local agencies.

Request for Information

EPA requests the following information on finding a creative solution to reporting animal waste air emissions:

*#46—National Report based on USDA or State Data:* EPA contemplated developing a national report using USDA Census data to gather locations of farms and applying the contribution factors developed under NAEMS. However, the USDA Census dataset only supplies farm locations at the county-level, and there are additional restrictions on sharing farm data when an individual farm can be identified. The EPA conducted the county-level analysis with the USDA data, which can be found in the TBD. However, EPA does not believe that county-level data will be granular enough for fenceline communities to understand the amounts and impacts of animal waste air releases. The EPA also evaluated all the state datasets we found that included farm locations (see the TBD). However, the handful of state datasets are well short of building a national report on animal waste air emissions. The Agency is soliciting comment and information on our assessment of using USDA Census data and datasets from state agencies. We are also soliciting comment and information on any other datasets that may be used to develop a national report of air emissions. Finally, the Agency is soliciting comment on whether this type of national report would/should be a compromise for this long-standing issue.

*#47—Other Technology for Estimating Air Releases:* The Agency is soliciting comment and information on newer technologies that could be applied to understanding animal waste air emissions and then distributing that information to fenceline communities. For example, are there existing technologies, such as satellite-based instruments, to measure ammonia and/ or hydrogen sulfide that can be applied at a granular enough level to show quantities released from individual farms?

*#48—Other Solutions:* The Agency is soliciting comment and information on other possible solutions to providing animal waste air emissions to fenceline communities without requiring farms with reporting.

**V. Request for Comment and Additional Information**

EPA is seeking comment on all questions and topics described in this ANPRM. In addition, EPA encourages all interested persons to identify and submit comments on other issues relevant to EPA's consideration of the potential development of future regulations pertaining to animal waste air emission reporting under EPCRA. EPA requests that commenters making specific recommendations include supporting documentation, where appropriate.

Instructions for providing written comments are provided under **ADDRESSES**, including how to submit any comments that contain CBI or PBI.

**VI. What are the Next Steps EPA will take?**

EPA intends to carefully review all comments and information received in response to this ANPRM. Once that review is completed, EPA will determine whether to pursue a proposed rule to reinstate air emission reporting from animal waste at farms under EPCRA.

**VII. Statutory and Executive Order Reviews**

Under Executive Order 12866, entitled *Regulatory Planning and Review* as amended by *Executive Order 14094: Modernizing Regulatory Review,* EPA submitted this action to the Office of Management and Budget (OMB). Any changes made in response to recommendations received as part of Executive Order 12866 review have been documented in the docket for this action. Because this action does not propose or impose any requirements, other statutory and executive order reviews that apply to rulemaking do not apply. Should EPA subsequently determine to pursue a rulemaking, EPA will address the statutes and executive orders as applicable to that rulemaking.

Nevertheless, the Agency welcomes comments and/or information that would help the Agency to assess any of the following: the potential impact of a rule on small entities pursuant to the Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*); potential impacts on

**Federal Register** / Vol. 88, No. 221 / Friday, November 17, 2023 / Proposed Rules  **80237**

state, local, or tribal governments pursuant to the Unfunded Mandates Reform Act (UMRA) (2 U.S.C. 1531–1538); federalism implications pursuant to Executive Order 13132, entitled *Federalism* (64 FR 43255, November 2, 1999); availability of voluntary consensus standards pursuant to section 12(d) of the National Technology Transfer and Advancement Act of 1995 (NTTAA), Public Law 104–113; tribal implications pursuant to Executive Order 13175, entitled *Consultation and Coordination with Indian Tribal Governments* (65 FR 67249, November 6, 2000); environmental health or safety effects on children pursuant to Executive Order 13045, entitled *Protection of Children from Environmental Health Risks and Safety Risks* (62 FR 19885, April 23, 1997); energy effects pursuant to Executive Order 13211, entitled *Actions Concerning Regulations that Significantly Affect Energy Supply, Distribution, or Use* (66 FR 28355, May 22, 2001); paperwork burdens pursuant to the Paperwork Reduction Act (PRA) (44 U.S.C. 3501); or human health or environmental effects on minority or low-income populations pursuant to Executive Order 12898, entitled *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* (59 FR 7629, February 16, 1994) and Executive Order 14096, entitled *Revitalizing Our Nation's Commitment to Environmental Justice for All* (88 FR 25251, April 21, 2023). The Agency will consider such comments during the development of any subsequent rulemaking.

Additional information about statutes and executive orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

**List of Subjects in 40 CFR Part 355**

Environmental protection, Air pollution control, Chemicals, Disaster assistance, Hazardous substances, Hazardous waste, Natural resources, Penalties, Reporting and recordkeeping requirements, Superfund.

**Michael S. Regan,**
*Administrator, Environmental Protection Agency.*

[FR Doc. 2023–25270 Filed 11–16–23; 8:45 am]
**BILLING CODE 6560–50–P**

**DEPARTMENT OF THE INTERIOR**

**Bureau of Land Management**

**43 CFR Part 2360**

**[BLM_HQ_FRN_MO4500175868]**

**RIN 1004–AE95**

**Management and Protection of the National Petroleum Reserve in Alaska; Extension of Comment Period**

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Proposed rule; extension of comment period.

**SUMMARY:** On September 8, 2023, the Bureau of Land Management (BLM) published in the **Federal Register** a proposed rule that would revise the framework for designating and assuring maximum protection of Special Areas' significant resource values and protect and enhance access for subsistence activities throughout the National Petroleum Reserve in Alaska (NPR–A). The proposed rule would also incorporate aspects of the NPR–A Integrated Activity Plan approved in April 2022. On October 24, 2023, the BLM extended the comment period to November 17, 2023. The BLM has determined that it is appropriate to further extend the comment period for the proposed rule by 20 days, until December 7, 2023, to allow for additional public comment.

**DATES:** The comment period for the proposed rule that originally published on September 8, 2023, at 88 FR 62025, and was extended on October 24, 2023, at 88 FR 72985, ends on November 17, 2023. Under this further extension, comments must now be submitted on or before December 7, 2023. The BLM need not consider or include in the administrative record for the final rule comments that the BLM receives after the close of the comment period or comments delivered to an address other than those listed in the **ADDRESSES** section.

**ADDRESSES:** *Mail, personal, or messenger delivery:* U.S. Department of the Interior, Director (HQ–630), Bureau of Land Management, 1849 C St. NW, Room 5646, Washington, DC 20240, Attention: 1004–AE80. *Federal eRulemaking Portal: https:// www.regulations.gov.* In the Search-box, enter "RIN 1004–AE95" and click the "Search" button. Follow the instructions at this website.

**FOR FURTHER INFORMATION CONTACT:** James Tichenor, Advisor—Office of the Director, at 202–573–0536 or *jtichenor@*
*blm.gov* with a subject line of "RIN 1004–AE95." For questions relating to regulatory process issues, contact Faith Bremner at *fbremner@blm.gov.* Individuals in the United States who are deaf, blind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:**

**Public Comment Procedures**

If you wish to comment on this proposed rule, you may submit your comments to the BLM, marked with the number RIN 1004–AE95, by mail, personal or messenger delivery, or through *https://www.regulations.gov* (see the **ADDRESSES** section). Please note that comments on this proposed rule's information collection burdens should be submitted to the OMB as described in the **ADDRESSES** section. Please make your comments on the proposed rule as specific as possible, confine them to issues pertinent to the proposed rule, and explain the reason for any changes you recommend. Where possible, your comments should reference the specific section or paragraph of the proposal that you are addressing. The comments and recommendations that will be most useful and likely to influence agency decisions are:

1. Those supported by quantitative information or studies; and

2. Those that include citations to, and analyses of, the applicable laws and regulations.

The BLM is not obligated to consider or include in the Administrative Record for the final rule comments that we receive after the close of the comment period (see **DATES**) or comments delivered to an address other than those listed above (see **ADDRESSES**). Comments, including names and street addresses of respondents, will be available for public review at the physical location listed under **ADDRESSES** during regular business hours (7:45 a.m. to 4:15 p.m. EST), Monday through Friday, except holidays. Before including your address, telephone number, email address, or other personal identifying information in your comment, be advised that your entire comment—including your personal identifying information—may be made publicly available at any time. While you can ask us in your comment to withhold from public review your personal identifying information, we

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Rural Empowerment Association for Community Health, et al., | |
| Plaintiffs, | **CASE NO. 18-cv-02260-TJK** |
| v. | |
| United States Environmental Protection Agency, et al., | **DECLARATION OF ROSEMARY PARTRIDGE** |
| Defendants. | |

## DECLARATION OF ROSEMARY PARTRIDGE

I, Rosemary Partridge, declare that I am over 18 years of age and competent to testify. Unless otherwise stated, I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1.      I reside on a family farm in rural Iowa outside the town of Wall Lake in Sac County. I have lived there with my husband for approximately 50 years. I am a member of Food & Water Watch (FWW), and I make this declaration in support of FWW's Motion for Summary Judgment in *REACH, et al., v. EPA, et al.*, which challenges EPA's unlawful guidance and rule exempting livestock operations from requirements to publicly report toxic air emissions under the Emergency Planning and Community Right-to-Know Act (EPCRA).

2.      When I moved to Sac County about 50 years ago, the community was mainly made up of small family farms, including many independent hog farmers who owned their livestock. During the time that I have lived here, agriculture in the county and in my neighborhood has become far more industrialized. There are fewer independent, small family farmers, and most of the hogs raised in the county are now raised in confinement in large animal feeding operations (AFOs) where the animals are owned by corporate integrators. There are currently approximately 42,500 finishing (near market-weight) hogs within four miles of our house. These hogs are in concentrated animal feeding operations (CAFOs) housing approximately 2,500 hogs each. About 10,000 of these hogs are within half a mile of our house; one large confinement operation is about half a mile to our west, and another is about a mile to our east, and each of these houses approximately 5,000 finishing hogs. These operations spread millions of gallons of liquid manure on fields surrounding my

farm and directly across from my house. The field across from our house occasionally receives one and a half million gallons of liquid manure. Our bedroom is about 175 feet from where the manure is spread. And as more confinements are built across the state, manure tankers from other facilities farther from our home also sometimes spread on nearby fields.

3.      The influx of CAFO development in our community has harmed our quality of life and affected how we live our lives in numerous ways. One of the most serious problems is that we are frequently subjected to significant air pollution – including ammonia, hydrogen sulfide, particulates, and odors – emitted by the CAFO confinement buildings, waste storage facilities, and land application fields.

4.      We frequently cannot spend time outside on our farm due to the air pollution, particularly on hot summer evenings. When it begins cooling down at night, an inversion layer often forms where warmer air overlies cooler air, preventing mixing that would allow the air pollution to dissipate and causing the ammonia and other emissions to sink and linger over our house and farm. When this happens, if we have windows or the patio door open we have to immediately shut them to keep the odor out. But even when it is not unbearable, we can almost always smell hydrogen sulfide. We recognize the odor, which is like the smell of "rotten eggs," and it causes us to feel sick if we are exposed for more than a few minutes.

5.      My husband was diagnosed with chronic obstructive pulmonary disease (COPD) after the two CAFOs nearest our home began operating, and it has become much more severe in recent years. Ammonia irritates it, making it difficult for him to breathe. He also suffers from heart failure. Summer nights are the worst times for the emissions, particularly after

3

8:00 p.m. As a result, he must now stay at our lake cottage full-time during summer and into the fall to avoid the emissions. The cottage is only eight miles north of our home, but because it does not have any CAFOs close to it, it does not have the emissions we have at home. The night breezes from the lake also help keep the air a little cleaner. The emissions and poor air quality also affect my health. We both often experience red, itchy eyes, runny noses, and sore throats when manure is spread nearby.

6.    I stay at home when my husband is at our lake cottage, to supervise farm work and try to enjoy our home and the life we have built here over the past 50 years. But over the years we have tended to keep the air conditioner on full-time and must keep our doors and windows closed when the pollution is bad. The air is foul on many summer evenings and we are always acutely aware of wind direction and air quality.

7.    When a CAFO is spreading manure on the fields across the street from our house, the air pollution has sometimes been so bad that we have both had to leave our home. But the pollution continues after spreading. Some odor can last for months under certain conditions, such as when the manure is applied to frozen or partially frozen ground. The soil doesn't seal in the manure under these conditions, and the emissions can continue until a hard freeze or until snow covers it. This happened last winter, when it was apparent the soil had not sealed over applied manure. Every day during the winter when the temperature was above freezing it was obvious because the smell was horrible.

8.    I am also concerned about the air emissions we are exposed to that we cannot always smell or identify, and worry about the impacts those emissions may be having on our health. My doctor has expressed similar concerns. I am aware that people chronically exposed to hydrogen sulfide can lose their ability to smell it, and realize that could

happen to me and my husband. If that happens, we will be even less able to take precautions like going indoors or leaving home when the emissions may be most harmful to our health.

9.      The air pollution is not constant and is unpredictable, which makes it impossible to plan when we can safely invite people to our home. We enjoy having guests to sit on the porch and enjoy the farm and the breeze. When we have guests and the air pollution gets bad, they often have to leave. I had visitors from Alabama in October when the manure was being spread, and it was so embarrassing to hear their children complain that it smells like poop at Grandma Rosie's house, but yes, it did.

10.     One recent summer we also hosted visitors from Texas and California, and they got sore throats from the CAFO emissions. I have a sore throat more often than not from the pollution when it is bad, even though I am not sick. When my daughter visits, even when the pollution and odor are not at their worst, the hydrogen sulfide emissions make her nauseated. Several years ago, we hired a roofer, who was working while one of the CAFOs was spreading manure on nearby fields. The air emissions were so bad that he began throwing up and could not continue working. I had to tell him to stop and go home.

11.     Sometimes we also smell dead animals and other foul odors from the CAFOs, and it disturbs me that we do not know what we are being exposed to and breathing on a daily basis.

12.     Although we do not know exactly what we are being exposed to on our farm and in our home, we know that these emissions are extremely toxic and dangerous at high levels. My acquaintance's son used to work at a CAFO to earn the extra income that he needed to continue farming. He was spreading manure when the tank became plugged. After he

went into the waste storage area to fix it, he became overcome with hydrogen sulfide and asphyxiated and died. In rural communities with many CAFOs, such accidental deaths due to hydrogen sulfide are not uncommon.

13.    My own grandson, like many young people in our community, formerly worked at a CAFO, and had no protection at all from the emissions he was exposed to on a daily basis. I feared for his safety. Many others in our area work at CAFOs because there are very few other jobs for those who want to stay in the community, and they are not aware of what they are exposing themselves to because that information is not available. These CAFOs are visited daily by feed truck drivers, crews that load and unload the hogs, rendering truck drivers that load and haul away the dead animals, the regular workers who check on the operation once a day, and the workers who remove and spread the liquid manure in the fields. All of these people are exposed to the emissions at high levels, and there is no way for them to know how much they are being exposed to or what the possible health effects are until it is too late.

14.    Because the air pollution is affected by the weather, some months and years are worse than others. For example, one recent summer we had record-breaking heat waves in Iowa, and very little wind to alleviate the inversions that occur after high temperature days. Over the years we have also become more aware of the weather patterns that carry CAFO emissions from a much wider area than we previously realized. Hot summer days are becoming more and more frequent, and as a result our exposures to odors and toxic emissions will likely continue to worsen over time. We find it ironic that while there are frequently air quality alerts about smoke from Canadian and Western U.S. wild fires,

there are no warnings to inform us of the polluted and toxic air we are breathing here in our own home and community.

15.    I have worked to learn more about CAFO pollution in my community and fill the gaps in information created by lax EPA and state oversight of this industry's water and air pollution. For example, EPA has previously proposed, and then withdrawn, a rule that would have collected basic information about CAFOs, including where they are and what they are discharging, leaving me and other rural citizens in the dark about the safety of our water. Because EPA and Iowa's Department of Natural Resources have failed to track and report this information to the public, I became a trained IOWATER volunteer water monitor years ago. Through this work, I was seeking to at least partially fill information gaps about what CAFOs are discharging into my local waterways.

16.    EPA's recent guidance and rule similarly leaves me and my neighbors in the dark about what toxic CAFO emissions we are being exposed to. I am unable to even partially address this lack of information myself by monitoring the air quality at my farm for ammonia and hydrogen sulfide, much less monitor the total quantity of these pollutants emitted by specific nearby CAFOs. Nor should I or other citizens have to expend time and resources attempting to estimate exposure to toxic emissions from industrial livestock operations. EPA is responsible for ensuring that polluters like CAFOs report this information as the law requires. These facilities are factories, not farms, and their pollution should be reported and regulated like air pollution emitted by smokestacks.

17.    If I had access to reports of emissions from the CAFOs in my community, and therefore knew more about what my husband and I are being exposed to, I would be able to make wiser decisions about when we need to leave our house, avoid having people over to our

home, or avoid being outside on our farm. It would also help me and my husband inform

our doctor about issues that may be affecting our health, and could help us determine

whether the CAFO emissions are causing or contributing to our ongoing health issues.

18.    Having access to publicly reported data about livestock emissions would also help me

educate my community about how they can similarly act to better protect their health and

avoid the worst toxic exposures to ammonia and hydrogen sulfide. I believe that many of

my neighbors are unaware of the risks of exposure to CAFO emissions, and if they knew

more about the pollution in our community they could be smarter about their own

activities and more informed about how they can reduce their exposures.

19.    Having access to the required emissions reports would also help me better educate

policymakers about the need for real regulation of CAFO air pollution. This transparency

would not only make people more aware of the scale and impact of this pollution, it

would also help them stand up and demand policy changes, including requirements that

livestock operations use technology to achieve actual reductions in emissions and

restrictions on locating CAFOs so close to residences.

20.    Air pollution from livestock operations does not get enough attention from policymakers,

and I believe this is in part because we have so little information and transparency about

what these facilities are emitting. But these emissions are one reason rural home values –

including mine – are declining and rural towns are depopulating. I do not want to have to

leave my farm like so many of my neighbors have, and I want my grandchildren to be

able to farm here without risking their health and wellbeing. Having the information

about CAFO air pollution we need to protect our home, health, and quality of life is

essential to my ability to stay on my farm and try to make my family and community

safer.

I hereby certify that the facts set forth above are true and correct to the best of my

knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. §

1746.

<div style="text-align:right">

_____/s/ Rosemary Partridge_____
Rosemary Partridge

</div>

Dated: August 22, 2024

# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

Rural Empowerment Association for
Community Help, et al.,

                        Plaintiffs,

            v.

United States Environmental Protection
Agency, et al.,

                        Defendants,
          and

National Cattlemen's Beef Association, et al.,

                        Intervenor-
                        Defendants.

**CASE NO. 18-cv-02260-TJK**

**Declaration of Max Wilson**

---

## DECLARATION OF MAX WILSON

I, Max Wilson, declare that I am over 18 years of age and am competent to testify. I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1.      I am a member of the Sierra Club and have been since approximately 2007. I joined the Sierra Club because I am concerned and personally affected by the large animal feeding operations near my home. I believe that Sierra Club does important work on my behalf and on behalf of its other members who are affected by industrial animal agriculture. I support Sierra Club in its efforts to ensure the safety of individuals and communities that live near animal feeding operations.

2.      I reside in Hickman, Kentucky.

3.      At least three animal feeding operations that house approximately 5,000 hogs each are located within 3.5 miles of my home.

4.      I understand that the breakdown of animal waste at animal feeding operations, such as those located near my home, generates toxic gases such as ammonia and hydrogen sulfide. I am very concerned about the negative impact that such toxic releases may have on my health and the health of my family.

5.      I regularly spend time outdoors near my home for professional and recreational purposes. I own and operate a crop farming operation and have my shop and machinery storage area next to my residence. I work outside nearly every day during warm weather and many days during the winter months. My home is the basis of operations for my 575-acre farm operation.

6.      The yard around my home is approximately three acres and requires about five hours of weekly maintenance. My wife and I frequently enjoy spending time in our yard and on

our deck where we grill, entertain guests and relax. We also take walks and ride bicycles on the road next to our home.

7.     We began to experience foul odors after a hog feeding operation began operating near our home in 2008. Since that time we have frequently experienced extremely powerful odors or fumes at our residence and in the shop work area. At times, the fumes become so overpowering that I feel a sense of physical panic and urgent desire to get away from the odor as quickly as possible. I have often experienced a burning of the airway passages when I inhale these fumes. During such times, I am forced to stop working and go inside to get away from the smell. When I've had no choice but to remain outside, I've gotten headaches. I've seen the odor make an employee of mine gag, and would describe it as intensely nauseating.

8.     When the odors are present around our home, we retreat inside. We have been forced to curtail entertainment activities and outside recreation because of these odors. The fumes invade our home, even though we make sure to keep the doors and windows closed when they are present. My wife and I find it difficult to sleep while smelling these odors and we have been kept up at night because of them.

9.     Because of my concern about the effects from these facilities on my health and the health of my family and neighbors, I took part in an effort to stop the State of Kentucky from permitting these large animal feeding operations without adequate emissions controls. I have participated in Sierra Club efforts to educate and inform people and the media about the problems and personal effects on neighbors of these large animal feeding operations. I have notified the state air quality department on numerous occasions about experiencing these strong odors and toxic gases.

10.     Access to information about toxic gases being released from animal feeding operations located in my community would benefit me by enabling me to take steps as needed to protect my health and that of my family. I would make use of this information to support my advocacy efforts to persuade these local large animal feeding operations to take steps to reduce or even eliminate such releases. This might involve voluntary actions by the operations in response to local community pressure, or it might involve government intervention.

11.     Information about the toxic chemicals emitted from animal feeding operations would also benefit my health and safety. If such information were routinely provided to emergency responders in Kentucky and the National Response Center, under severe circumstances, the government may decide to evacuate the area or take other action to reduce my community's exposure to toxic gases from animal feeding operations. Simply knowing that emergency responders are receiving information needed to ensure that my family and community are not being subjected to unsafe levels of noxious gases would benefit me, my family, and my community.

12.     I would also benefit from animal feeding operations being required to provide information about their toxic air releases to regulators, whom I rely on to regulate such operations in a way that is protective of my health and the health of those around me. Ensuring that environmental regulators have access to reliable information about emissions from animal feeding operations is critical for developing effective regulations for these facilities. I am aware that this argument has been made by the U.S. Government Accountability Office in a September 2008 report entitled "Concentrated Animal Feeding Operations: EPA Needs More Information and a Clearly Defined Strategy to Protect Air and Water Quality from Pollutants of Concern." (http://www.gao.gov/assets/290/280229.pdf).

13.    Finally, if animal feeding operations are required to report publicly their toxic chemical releases, this would encourage some operations to take voluntary steps to reduce and perhaps even eliminate emissions above reportable levels. My family and I would benefit from any such reductions that occur at animal feeding operations located in our community.

14.    For all of these reasons, I oppose EPA's exemption of CAFOs from having to report their toxic releases.  I would have liked to express that opposition to EPA by commenting on a proposed rule, but EPA denied me that opportunity by ramming through the exemption without any public notice or public comment period.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of August, 2024

Max Wilson

# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

Rural Empowerment Association for
Community Help, et al.,

                        Plaintiffs,

           v.

United States Environmental Protection
Agency, et al.,

                        Defendants,
        and

National Cattlemen's Beef Association, et al.,

                        Intervenor-
                        Defendants.

**CASE NO. 18-cv-02260-TJK**


**Declaration of Candice Cook**

---

## DECLARATION OF CANDICE COOK

I, CANDICE COOK, declare that if called as a witness in this action I would competently testify of my own personal knowledge as follows:

1.      I submit this declaration in support of the motion for summary judgment filed by Plaintiffs Rural Empowerment Association for Community Help, Animal Legal Defense Fund, Center for Food Safety, Don't Waste Arizona, Environmental Integrity Project, Food and Water Watch, Humane Society of the United States, Sierra Club, Sound Rivers, Center for Biological Diversity, and Waterkeeper Alliance (collectively, "Plaintiffs") challenging the Environmental Protection Agency's ("EPA") decision to exempt Animal Feeding Operations ("AFOs") from requirements to inform state and local officials about releases of dangerous levels of air pollutants as required by Section 304 of the Emergency Planning and Community Right-to-Know Act ("EPCRA").

2.      I am a member of Center for Food Safety ("CFS"). I joined CFS because I am concerned about the environmental, health, and public safety impacts of food and agriculture. I support CFS's efforts to advocate for better and more accurate environmental reporting and for agencies, including EPA, to be more vigilant in requiring animal factories to turn over significant information to the public.

2

3.      I am a resident of Huntingburg, Indiana. My home is approximately seven miles southwest of Huntingburg in an area that is largely agricultural mixed with wooded areas.

4.      I am retired from the Gibson-Pike-Warrick Special Education Cooperative, Oakland City, Indiana.

5.      I am concerned about how the EPA's EPCRA Exemption may affect my health and quality of life.

6.      When my husband and I moved to the Huntingburg area in 1999, there were no animal feeding operations ("AFOs") or confined animal feeding operations ("CAFOs") near our home. We moved here because we love the outdoors and the rural setting outside of Huntingburg. Our property is wooded and borders a small lake. For many years, we spent a lot of time outside in the woods and enjoying the lake. All of that drastically changed about three years ago.

7.      Approximately three years ago, the Denu Turkey House began operation one-half mile from my home. The Denu Turkey House is a CAFO that confines an estimated 20,000 – 25,000 turkeys. The Denu Turkey CAFO consists of three barns. Each barn is approximately 500 feet long by 65 feet wide. I based my estimation of 20,000 – 25,000 turkeys on two sources that said CAFO turkeys get 2.5 – 4.0 square feet per bird. In addition, I found a permit online that showed some building sizes and a number of turkeys proposed in each.

3

8.      The operation of the Denu Turkey CAFO has significantly affected my quality of life and enjoyment of my property. When the wind blows out of the southeast, I cannot open my windows because the foul odor is overpowering. There are even times when the odor is overpowering without the wind blowing. This overpowering smell impacts me at least once a week and sometimes as many as 4-5 days per week.

9.      The foul odor from the Denu Turkey CAFO is a rotten, disgusting stench similar to sulfur (rotten eggs) mixed with confined feces. It is not the natural, earthy aroma of manure from farm animals on pasture land that most rural people are used to.

10.     The stench from the Denu Turkey CAFO affects us in many ways. My husband and I used to sit out on a screened-in porch enjoying the sights, sounds, and clean air of the country, but now we often cannot because of the stench from the Denu Turkey CAFO. We often cannot take our dog for a walk or spend time with our grandchildren outside because of the smell. Sometimes, when I open the door just to let our dog outside, the smell hits me in the face and I have to immediately clap my hand over my nose and retreat into the house.

11.     The Denu Turkey CAFO affects me in other ways as well. The Denu Turkey CAFO has almost certainly lowered my property value. I am aware that one study shows that property values on average decrease by 6.6% within a 3-mile

4

radius of a CAFO and by 88% within one-tenth of a mile from a CAFO. Knowing that the smell from the Denu Turkey CAFO could impact our health, our property value, and the enjoyment of our property at any time has caused constant stress and significant worry about our health and future well-being. I am very concerned that in addition to our reduced quality of life, air-borne particulates from the CAFO are damaging to our health. I worked hard for years and expected to enjoy my retirement but the operation of the Denu Turkey CAFO has substantially and negatively affected the realization of those expectations.

12.     I do not believe that the risks of exempting AFOs from reporting under EPCRA have been properly assessed in regards to public health. I pay hard-earned taxes for an EPA that protects my health and well-being, not an EPA that serves big business at the expense of public health. Facilities such as the Denu Turkey CAFO should not be exempt from federal reporting requirements.

13.     The EPCRA Exemption threatens my health by allowing industrial facilities like the Denu Turkey CAFO to avoid reporting toxic releases of air pollutants that are known to be hazardous to human health. If the Denu Turkey CAFO followed EPCRA's requirement to report its toxic emissions, then I would be better equipped to protect my health and avoid these toxic gases and smells. In addition, my local emergency responders would be able to use the information to better protect my health and the health of my neighbors.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on December 20, 2021 in Huntingburg, Indiana.



_____
CANDICE COOK

# EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

Rural Empowerment Association for
Community Help, et al.,

                          Plaintiffs,


               v.

United States Environmental Protection
Agency, et al.,

                        Defendants,
            and

National Cattlemen's Beef Association, et al.,

                     Intervenor-
                     Defendants.

**CASE NO. 18-cv-02260-TJK**


**Declaration of Curtis Ramer**

---

**DECLARATION OF CURTIS RAMER IN SUPPORT OF PLAINTIFFS'
RURAL EMPOWERMENT ASSOCIATION FOR COMMUNITY HELP, ET
AL. COMPLAINT**

I, CURTIS RAMER, declare that if called as a witness in this action I would

competently testify of my own personal knowledge as follows:

1.      I submit this declaration in support of the complaint filed by Plaintiffs Rural

Empowerment Association for Community Help, Animal Legal Defense

Fund, Center for Food Safety, Don't Waste Arizona, Environmental Integrity

Project, Food and Water Watch, Humane Society of the United States, Sierra Club,

Sound Rivers, Center for Biological Diversity, and Waterkeeper Alliance

(collectively, "Plaintiffs") challenging the Environmental Protection Agency's

("EPA") decision to exempt Animal Feeding Operations ("AFOs") from

requirements to inform state and local officials about releases of dangerous levels

of air pollutants as required by Section 304 of the Emergency Planning and
Community Right-to-Know Act ("EPCRA").

2.      I am a member of Center for Food Safety ("CFS"). I joined CFS
because I am concerned about the environmental, health, and public safety impacts
of food and agriculture. I support CFS's efforts to advocate for better and more
accurate environmental reporting and for agencies, including EPA, to be more
vigilant in requiring animal factories to turn over significant information to the
public.

3.      I am a resident of 4395 West 400 South, Winchester, Indiana 47394.
Winchester is the county seat of Randolph County. Randolph County is rural and
agricultural. I have lived at this residence since 2002.

4.      I earned a Bachelor of Science degree in mechanical engineering from
Purdue University. I am an engineer by trade and work in Bloomington, which is
about two and a half hours from my home in Winchester. I have an apartment near
my job in Bloomington and live there during the week. I spend weekends at my
home in Winchester.

5.      I am worried about how the EPA's EPCRA Exemption may affect my
health and quality of life.

6.      When I moved to Winchester in 2002, there were no animal feeding
operations ("AFOs") or concentrated animal feeding operations ("CAFOs") near

2

my home.  In 2005, Union-Go Dairy opened a 2000-cow dairy operation moved in approximately 1.3 miles northeast from my home.  Union-Go Dairy is classified as a CAFO.

7.    Around 2007-2008, Maxwell Foods (aka Maxwell Farms) opened its Buena Vista Sow Farm approximately a half-mile east from my home.  The Buena Vista Sow Farm is classified as a CAFO and is permitted for 6,000 sows.  The Buena Vista CAFO is also permitted to have an additional 1,500 pigs over various stages of development.

8.    The Buena Vista CAFO consists of four barns. Two barns are approximately 600 feet long by 75 feet wide. The other two barns are approximately 550 feet long by 80 feet wide.  Manure is gathered and stored in a pit under each barn.  Each pit is approximately 7-9 feet deep.

9.    Buena Vista CAFO spreads manure from these pits on its fields every spring and fall.  The manure is spread by a drag line system.  The manure is pumped out of the pits with a pumper truck and pumped through a large hose that is connected to a tractor.  An assemblage attached to the tractor allows the manure to be sprayed onto the ground as the tractor operator drives across the farm field.

10.    The operation of the Buena Vista CAFO has significantly affected my quality of life.  Not long after Buena Vista CAFO began operating, I stopped using the sunroom in my home.  The sunroom faces east in the direction of the Buena

Vista CAFO and it is not possible to enjoy this part of my home anymore because of the smell from Buena Vista CAFO.

11.    For approximately five years, I kept a calendar of how bad the smell was from Buena Vista CAFO.  I used a scale of 1 to 10, with 1 being "no smell" and 10 being "overpowering."  I would estimate that 20%-25% of the time, the smell is significant and at times overpowering.  The smell is especially bad when the wind shifts and blows from the east.  It is also really bad in the evenings when the wind dies down and the moisture in the air drags the particulates straight down. I never sleep with the windows open anymore because there have been too many times when I woke up in the middle of the night and the whole house is saturated with the smell of manure.

12.    The Buena Vista CAFO has also affected my relationships with friends.  I used to have friends over to visit prior to Buena Vista CAFO began operating.  I also used to have friends from church over to play softball before Buena Vista CAFO began operating.  Now, I do not have friends over as often because of the smell of manure from Buena Vista CAFO.

13.    The opening and operation of the Buena Vista CAFO (and the Union-Go Dairy CAFO) has divided this community.  When the CAFOs moved in, they bought most of the surrounding residential properties.  Of the residents who remain, some have been outspoken about the air quality impacts of the CAFOs

4

while others have not been.  Those residents who are not as directly impacted by the CAFOs air emissions are not sympathetic and consider me and others who are affected by the emissions to be troublemakers.

14.     I have attended meetings with the Indiana Department of Environmental Management ("IDEM"), emailed IDEM, and called IDEM on about improper manure handling and application, as well as other issues, with respect to the Union-Go Dairy and the Maxwell Sow Facility.

15.     The barns and pits at the Buena Vista CAFO, however, are the main problem.  While the manure spreading only lasts for a couple of weeks in the spring and fall, the barns and pits are permanent fixtures on the land.  When the exhaust fan kicks on at the end of each barn, the smell of manure permeates the surrounding area, including my home.  During the summer, these exhaust fans run almost all of the time and there is sometimes no escaping the overpowering smell of manure.

16.     I do not believe that the risks of exempting AFOs from reporting under EPCRA have been properly assessed in regards to public health.  Facilities such as the Buena Vista CAFO and Union-Go Dairy CAFO are industrial factory farms that should not be exempt from federal reporting requirements.  The EPCRA Exemption threatens my health by allowing AFOs, such as the ones located near

my home, to avoid reporting toxic releases of air pollutants that are known to be hazardous to human health.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 20, 2021 in Winchester, Indiana.

CURTIS RAMER

# EXHIBIT 10

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

Rural Empowerment Association for
Community Help, et al.,

                        Plaintiffs,

             v.

United States Environmental Protection
Agency, et al.,

                     Defendants,
        and

National Cattlemen's Beef Association, et al.,

                     Intervenor-
                     Defendants.

**CASE NO. 18-cv-02260-TJK**

**Declaration of Cynthia Parke**

---

## DECLARATION OF CYNTHIA PARKE

I, Cynthia Parke, declare that if called as a witness in this action I would competently testify of my own personal knowledge, as follows:

1.       I am a resident of Imboden, in Randolph County, Arkansas. My county is ground zero for chicken houses, or concentrated animal feeding operations (CAFOs), in Arkansas. Randolph County is home to a Peco Foods processing facility, which has expanded the chicken CAFO industry in our area.

2.       I became a member of the Animal Legal Defense Fund (ALDF) because I care about animals and believe they need to be protected. ALDF stands up for animals who cannot do it on their own.

3.       My husband is 81 years old. He and I moved to our current home about eleven years ago, when we sold our home and left California, because we wanted to live in a rural place where we could keep our windows and doors open in a house full of fresh air. While we both have health issues, we now also suffer from allergies that have become worse since CAFOs have been built locally.

4.       Unfortunately, the CAFOs near us have ruined our air quality to the point that we cannot enjoy any fresh air in our community. Many days, our air quality is horrible. We live 3 miles southeast of 6 to 8 chicken CAFOs concentrated in one area, about .5 miles from a major highway, and about 15 miles from flat farmland. In heavy wind when the trucks drive down the highway to dump chicken litter from the CAFOs onto the farmland, so much dust, dirt, feathers, and particles blow out the back of the trucks onto our cars, the road, trees, bushes, everything. It gets picked up in the wind and deposited everywhere in such a thick layer that it is clearly visible.

5.      The days when the chickens are moved out are especially bad, with feathers flying

out of the trucks doing the transporting. On those days, big rig trucks carrying cages full of

chickens can drive back and forth for twelve hours straight. When residents started complaining,

they started to make these trips in the middle of the night. We do not receive any notice in

advance of these days and when the trucks drive overnight we are even less able to prepare

ourselves since we cannot see it happening. They really degrade our quality of life.  Now we

keep our windows closed and air conditioning running constantly. Many students, especially

those with asthma, cannot go to school on the days when the chicken houses .5 miles from the

school are being cleaned out due to how severely the litter trucks impact air quality.

6.      Our water quality has also suffered a great deal. We rely on well water. The

chicken CAFOs pump so much water out of the ground that wells in our community have gone

dry. Neighbors have had to shut down their farming businesses because they no longer have

enough water to irrigate their crops. Without our wells we have no other water source; there are

no water lines out to our neighborhood and we cannot afford to pay the water company to pipe

water out to us.

7.      CAFO pollution has affected our ability to enjoy the Eleven Point River, as well.

The Eleven Point River became one of the 8 initial units of the National Wild and

Scenic River system in 1968, but that designation stops at the Arkansas border. There are

approximately 60 CAFOs along the Eleven Point River just within the first fourteen miles or so

south from the Missouri border along Highway 93. In heavy rain events, they all drain into the

river. The river used to be full of fish and fishermen, but now they are few and far between.

Plenty of people have stopped fishing on the Eleven Point River altogether, and I personally will

not eat fish caught there anymore. My husband and I head to the Lake of the Ozarks for fishing, swimming, and boating now.

8.      It is nearly impossible to get information about plans for existing or future CAFOs in my community. I first realized the lack of transparency in February 2014 when the Quorum Court approved $150,000 in funding for an unknown infrastructure project. (The Quorum Court functions as a Board of Supervisors, made up of the Justices of the Peace from each of nine districts within Randolph County. They approve loans/grants, the County budget, et cetera.) Only after the Quorum Court approved the funding did they inform us it was actually for a chicken processing plant, and only *then* did they call a public meeting. This lack of access to information makes it very difficult to stay informed about what is happening in my community, and to protect myself accordingly.

9.      I am very concerned about the potential for these CAFOs to contaminate the air and water. Many more people are concerned about the effects of these CAFOs and would be interested in learning more about them, but it is very difficult to inquire openly because we are a very close-knit community. Everyone knows everyone, and everyone is someone's brother or sister-in-law or fellow member of their church. Plus there is a very tense relationship between the business owners and the local residents. It is not a safe environment to speak out against the industry, or to ask questions about their effects on our environment and our health.

10.     Part of my concern stems from local weather events, which are becoming more extreme and common each year due to climate change, and our location in the floodplain. At least once a year for the past eleven years there has been a big weather event; either heavy rains flood the area or there are ice storms that cause power outages. Early in 2017 the town of Pocahontas flooded and the National Guard had to rescue people by boat. I have seen heavy rains

wash out access to the CAFOs nearby, which leads me to believe the rains are washing away manure and litter from the facilities, too. In these big weather events the utility companies seem to make sure power is restored to the CAFOs first and the local residents second, even when residents are on oxygen and at risk during storms. This makes it clear to me that, short of being required to by law, neither these companies nor the local authorities feel obligated to protect the environment or do what is right for our communities.

11.     One of my only sources of information about water quality for the waters around me is the Randolph County Conservation District, which started water testing in different locations. Their tests have shown some really high numbers of nitrates and other pollutants. However, they will not disclose the location of testing, and they only provide monthly reports for the previous month. There is no way for me to know about water contamination in real time, so that I can avoid certain waterways to protect myself.

12.     I am very concerned with the lack of notice about potential contamination of my air or water. I could be drinking contaminated water from my well. To protect myself against this, I must pay the local health department to run minor tests; no in-depth testing is available locally whatsoever. And I could be breathing toxic air and have no way of knowing that, either. Because I am not able to use stairs I have stopped attending the monthly meetings of the Quorum Court, but I still review the minutes each month and send in my thoughts. If the Court ever announced any emissions leak—which I am not confident it would—

it would likely be too late for me to protect myself by the time I learned about it. If the U.S. Environmental Protection Agency (EPA) required CAFOs to provide notice of hazardous emissions to me or my local emergency planning board, I would monitor the designated sources to stay informed and act accordingly.

13.     If CAFOs were required to provide notice of hazardous emissions to me or my local emergency planning board, I could stay informed and protect myself from potential contamination without having to speak out at public meetings or draw any attention to myself. I would have my wells tested to make sure my drinking water was not impacted. I would keep my clothes off the line in the yard and stay inside. These minor changes are important to me since I already suffer from health issues that are made worse by poor air quality.

14.     I also value my right to know what is happening in my community, which the EPA has undermined by exempting CAFOs from regulations that apply to other potentially hazardous industries. Without access to information, it is impossible to participate in my local government in a meaningful way. It also takes away my ability to organize with my neighbors, and to be informed about effects to my property value, environment, and personal health.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Respectfully submitted this 17th day of December, 2021, in Imboden, Arkansas.


Cynthia Parke

# EXHIBIT 11

## DECLARATION OF DEVON HALL

I, DEVON HALL, declare and state as follows:

1.      I am the Co-Founder and Executive Director at the Rural Empowerment Association for Community Help ("REACH").  Since 2002, REACH has worked to address social, economic, and environmental inequities in and around Duplin County, North Carolina, a rural area with a significant proportion of low-income African-American residents.  REACH's primary focus is educating and empowering our community about issues that matter.  We work to help people understand that everybody is somebody and has a right to be heard.

2.      REACH has about 40 official members, and more than 30 people in our community regularly attend our meetings.  In connection with our mission, and in partnership with our members and other people in our community, we have chosen to concentrate on five areas: civil engagement, research and citizen science, public education, expanding our own capacity to assist the community, and working to enforce and improve laws and policies that affect life in and around Duplin County.  For years, much of our work has focused on pollution from industrial animal agriculture.  For example, we often provide our members with information about pollution from industrial animal operations.

3.      I am African-American.  I was born and raised in Duplin County, and I've lived here my whole life.  I am now 69 years old.  My three brothers and three sisters live in Duplin County too, and our children grew up together.  Our roots are here.  I started REACH because I saw that there was a lack of resources in Duplin County to help people like us, and I worried that my grandchildren's generation might not have any future here.

4.      According to the North Carolina Department of Environmental Quality, there are approximately 500 industrial hog operations in Duplin County.  Together, these facilities confine over two million pigs.

5.      Over the past 15 years or so, the poultry industry has expanded in Duplin County as well.  It can be difficult to find information about the poultry industry because many poultry facilities are exempt from federal and state permit requirements.  I am aware of one report indicating that, in 2019, industrial poultry-growing operations confined more than 113 million chickens and turkeys in Duplin, Sampson, and Robeson counties alone. Sarah Graddy et al., *Exposing Fields of Filth: Factory Farms Disproportionately Threaten Black, Latino and Native American North Carolinians* (July 30, 2020), https://www.ewg.org/interactive-maps/2020-fields-of-filth/.  That number represents a 36 percent increase over the estimated number of birds confined in these counties in 2012, and based on my personal experience, I believe the number of poultry-growing operations has continued to increase since 2019.  It seems like I can't travel two miles from my house or from REACH's office without seeing a new poultry facility being built.

6.      Industrial animal operations generate a staggering quantity of waste.  Hog facilities in Duplin County produce nearly two-and-a-half billion gallons of urine and feces every year.  Most facilities store that waste in giant uncovered pits, before spraying it on fields without any prior treatment or disinfection, often using mechanized sprinkler systems that spray waste high into the air.  According to one report, industrial poultry-growing operations in North Carolina generate at least 5 million tons of urine and feces each year. *See* Soren Rundquist & Don Carr, *Under the Radar: New Data Reveals N.C. Regulators Ignored Decade-Long Explosion of Poultry CAFOs*, Env't Working G. (Feb. 2019),

2

https://www.ewg.org/research/under-radar.  Like hog operations, poultry facilities usually dispose of their waste by spreading it on fields without any prior treatment.

7.      I live at 2584 West Wards Bridge Road in Warsaw, North Carolina.  REACH's office is located less than a mile away, at 2394 West Wards Bridge Road.  As the map in Attachment 1 shows, there are at least 30 swine CAFOs within three miles of my home.  *See* Attachment 1.  Together, these CAFOs confine up to 150,388 pigs.  The closest CAFOs are only about a half-mile from my home.  I drive by those CAFOs almost every day, and I can see the confinement barns when I drive by.

8.      The first thing most people notice about industrial animal operations is the terrible odor.  To avoid the nearly constant stench of animal waste, most people in Duplin County close their windows and stay indoors, relying on expensive air conditioning to keep cool.  People here have given up some of the most cherished aspects of rural life, like gardening, drying clothes on a line, hosting cookouts, and spending time outdoors.  Many of us worry about declining home values.  One REACH member has said that he looks for excuses to leave home and stays away longer than necessary, "because the smell that is there depresses [him]."

9.      REACH uses scientific research as a tool to educate and empower our community.  Common sense tells you that it is not healthy to breathe air that smells bad enough to make you gag, that makes your nose run and your eyes water.  At first, I didn't know what chemicals were in the air, causing it to smell so terrible.  I began to work as a citizen scientist in 2004, because I wanted to understand exactly what I was breathing and how it was likely to affect my body, so that I could better protect myself and help my neighbors protect themselves.

10.     Through my work at REACH, I've learned that industrial animal operations smell terrible because they release toxic gases, like ammonia and hydrogen sulfide.  I have spoken to

<div align="center">3</div>

hundreds of people whose health has suffered as a result of exposure to these gases.  I have

personally experienced watery eyes, headaches, and nausea on days when the smell is bad. I have

also spoken to hundreds of people whose health has suffered as a result of exposure to these

gases.  People have shared that they have experienced nausea, shortness of breath, watery eyes,

and runny noses. I know one gentleman who was overcome by hydrogen sulfide while working

at a rendering plant—that is, a facility that converts dead animals into industrial fats and oils.  He

is currently disabled. I am also familiar with studies showing that CAFO odors cause people's

stress levels to increase.

11.    As REACH's Executive Director, I have co-authored about 15 published studies

documenting the threats that under-regulated industrial animal operations pose to community

health.  For instance, I contributed to a study showing that kids who attend school downwind of

industrial hog operations are exposed to relatively high levels of hydrogen sulfide, putting them

at greater risk of symptoms like difficulty breathing and impaired lung function.  *See* Virginia T.

Guidry et al., *Hydrogen Sulfide Concentrations at Three Middle Schools Near Industrial*

*Livestock Facilities*, 27 J. of Exposure Science and Envtl. Epidemiology 167 (2017),

https://www.nature.com/articles/jes20167.

12.    There are probably many people who have suffered health consequences that I do

not know about.  If you are not aware that industrial animal operations emit toxic gases, you

probably would not realize that exposure to those gases could be the cause of your breathing

problems.

13.    REACH has no interest in putting anybody out of business.  But we believe it is

possible for industrial animal operations to be more environmentally friendly and more

community-friendly.  It is not enough for members of our community to talk about our

symptoms and our diminished quality of life.  No matter what we say, there will always be some people who think we are just complaining or making things up.  My neighbors and I need access to reliable information about toxic air emissions from industrial animal operations so that we can convince government officials to pay attention and take some kind of action to protect us from the chemicals that we breathe on a daily basis.

14.    I am aware that EPA published guidance exempting industrial animal operations from the requirement to report dangerous emissions of toxic gases under the Emergency Planning and Community Right-to-Know Act "EPCRA").  If REACH had been given the opportunity to comment on the guidance, we absolutely would have opposed it.  It seems to me that government officials have bent over backwards to protect the livestock industry, but they haven't given much thought to protecting ordinary people who suffer and get sick because they live near industrial animal operations.

15.    I am also aware that in 2019, EPA formally exempted industrial animal operations from EPCRA's reporting requirements.  Because of this exemption, I believe industrial animal feeding operations will not make information about their emissions publicly available.

16.    If REACH could access EPCRA reports about toxic gases released from industrial animal operations, we would find a way to share that information with our community, so that everyone would have a better chance of staying healthy.  Daycare centers and schools might decide to keep kids inside on days when the air quality is especially bad.  I hope that government officials would help spread this information too.  When a bad storm comes to town, the government sends out alerts on television and radio.  I don't see why releases of toxic gases should be treated any differently.

17.     Over the past few years, the odor from industrial animal operations in Duplin County has gotten much worse, because existing facilities haven't changed their practices and new poultry facilities keep opening up.  Unless the government starts to regulate toxic gases from industrial animal operations, the odor will keep getting worse.  As long as they can keep their emissions a secret from community-members and government regulators, these facilities have no incentive to clean up.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.  Executed this 26th day of August 2024, in Warsaw, North Carolina.


Devon Hall
Rural Empowerment Association for Community Help

**ATTACHMENT 1**



Source: *See* N.C. Dep't of Env't Quality, List of Permitted Animal Facilities – 4-1-2020, https://deq.nc.gov/cafo-map; *see also* Esri, DigitalGlobe, GeoEye, Earthstar Geographics, CNES/Airbus DS, USDA, USGS, AEX, Getmapping, Aerogrid, IGN, IGP, swisstopo, and the GIS User Community.

# EXHIBIT 12

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RURAL EMPOWERMENT ASSOCIATION FOR COMMUNITY HELP, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | Civ. No. _____ <br><br> **DECLARATION OF JUDY JOLIN** |

**DECLARATION OF JUDY JOLIN**

I, Judy Jolin, declare that I am over 18 years of age and that if called as a witness in this action I would competently testify of my own personal knowledge as follows:

1. I am a member of the Humane Society of the United States ("HSUS"). I am not sure exactly when I joined HSUS, but I think it was probably about twelve years ago. I joined HSUS because I appreciate that the organization is broad in what it represents—that it represents all animals. I was particularly impressed when I learned that the organization does work to protect farm animals, animals that many other nonprofits don't represent.

2. I live in Picket, Wisconsin in a home that my husband and I purchased in the 1970s. In addition to our home, we own a 95-acre property in Rosendale Township. This property is about two miles from our home.

3. I grew up on a dairy farm in Wisconsin. My dad was a farmer, and he had about 100 cows on his farm.

1

4. I have long had a deep respect for the natural world and have always loved animals. As a result of these interests, I am a member of various environmental and animal welfare nonprofits.

5. In recent years, several large concentrated animal feeding operations ("CAFOs") have been built in my community and in neighboring communities in Wisconsin. I don't think local authorities in Wisconsin have ever denied a CAFO permit. These farms are nothing like the traditional farms I grew up with. I don't even like to call them farms. In my view, they are industrial operations, not farms.

6. Given the industrial nature of CAFOs, I am very concerned about the impact these operations have on the environment, public health, and animal welfare. CAFOs have so many animals. My dad's farm had 100 cows. At the time, we thought that was big, but the CAFOs being built in Wisconsin now can have thousands of animals. In addition, many of these CAFOs store the massive amounts of animal waste they produce in lagoons, where the waste ferments and produces terrible smells and air emissions. The smell from these lagoons is totally different from manure produced on traditional (and much smaller) farms. I sometimes smell the noxious odors emitted from these lagoons when I am driving in various parts of Wisconsin.

7. In 2008, a CAFO began to operate about a quarter mile from the property we own in Rosendale Township ("Rosendale property"). The CAFO has at least 10,000 dairy cows. It stores the massive amounts of feces these animals produce in manure lagoons.

8. My husband and I, along with other concerned community members, tried to fight the building of the CAFO but were ultimately unsuccessful.

9. This CAFO has drastically impacted our everyday lives. The traffic near our home has increased significantly with semi-trucks coming to and from the CAFO, hauling feed and

manure. The smell coming from the manure trucks is terrible, and I try to avoid leaving my home when I see one coming.

10. In addition, the construction of the CAFO has had a significant impact on our use of the Rosendale property.

11. My husband and I purchased the Rosendale property with several other couples around 1990. At the time, we used it for recreating—we enjoyed walking on the property, swimming in the pond there, and observing the wildlife living on the land. In addition, we regularly had family picnics on the property, enjoying the chance to spend times outdoors with our family and friends.

12. Over time, my husband and I purchased the other couples' shares of the Rosendale property and became the sole owners around 2000. We purchased the property in its entirety with the intention of building our retirement home there.

13. When the CAFO began operating in 2008, my husband and I realized that we would not be able to build our retirement home on the Rosendale property. When the wind blows from the south, the stench of the waste produced by the cows on the CAFO is unbearable. It overwhelms your entire being. Your eyes smart, your throat hurts, and you begin to feel sick to your stomach if you are exposed for too long. Once the CAFO was built, my husband and I knew there was no way that we could live on Rosendale property.

14. We thought about selling the property but didn't know how much money we would be able to get for it once the CAFO was built. And, we truly love the land. So, we decided to keep the Rosendale property and continue to use it for recreating as much as we are able.

15. However, when the wind blows from the south, we cannot use the Rosendale property because of the smell. The effect is even worse when it's humid. So, when we want to use the

Rosendale property, we drive over from our house in Picket. If we get out of our truck and can smell the CAFO's animal waste, we return home. If the smell is absent, we use our property.

16. When the CAFO was first built, we were unable to use the Rosendale property for recreating about a third of the time. The CAFO covered its manure lagoons a few years ago, after being pressured by the local community, and we are able to use our property a little more now. But even with the covered lagoons, we are still frequently unable to use the Rosendale property for recreating because of the smells emitting from the CAFO.

17. We can no longer have family picnics at the Rosendale property. We can't predict which way the wind will be blowing, so we can't plan big events outside for fear that the smell will be unbearable on the day of the event.

18. When we can use the Rosendale property, my husband tends to the garden he planted there, and we walk on the land twice a day for exercise. We also swim in the pond on the property and enjoy observing the wildlife on the land. We have developed a prairie for wildlife, and we see deer, coyote, waterfowl, sand hill cranes, opossum, raccoons, song birds, frogs, snakes, monarch butterflies, dragonflies, and other species of insects. Our daughter and granddaughters often come with us to the property.

19. I am aware that there is a federal law—the Emergency Planning and Community-Right-to-Know Act ("EPCRA")—that is intended to provide the public and government authorities with access to information about industrial facilities' releases of extremely hazardous substances above certain threshold amounts, including the types and amounts of substances released. I am also aware that ammonia and hydrogen sulfide, which are produced by CAFOs as animal waste decomposes, must be reported if they are released above certain threshold amounts. I understand that the Environmental Protection Agency ("EPA")

recently exempted CAFOs and other animal feeding operations from reporting these types of emissions under EPCRA.

20. I am concerned that the EPA has exempted CAFOs from reporting their air emissions under EPCRA. I am harmed by EPA's action because it deprives me of information that I am entitled to under EPCRA.

21. I would like to have access to information about the types and amounts of hazardous pollutants coming from the CAFO near the Rosendale property, including the amounts of hydrogen sulfide and ammonia released.

22. I have often wondered about what I—and my husband and other family members—are inhaling when we use the Rosendale property and when we travel to the property and have to leave because of the smells being blown onto our property from the CAFO. I am concerned about the impact inhaling the air pollutants coming from the CAFO could have on my health, my husband's health, and my other family members' health.

23. If I had access to information about the types and amounts air pollutants coming from the CAFO, I could use it to make informed decisions about how to protect my health and the health of my family members. I would share this information with my doctor, so that we could use this information to make decisions about my health.

24. In addition, depending on what we learned about the types and amounts of pollutants emitted from the CAFO, my husband and I may change how we use our property. We are both nearing 80 years of age and are fortunate to be in relatively good health. We would not want to risk this if we learned that dangerous levels of air pollutants are being released from the CAFO near the Rosendale property. This is especially true for my husband, who has allergies and heart problems.

25. In addition, I would share information about the emissions from the CAFO with members of my community, including family members and friends, so that they could make informed decisions about their health and well-being.

26. I would also share this information with local representatives to help them understand the impact CAFOs have on the surrounding communities and to attempt to influence their decisions about approving future CAFOs.

27. I also think that it is possible that requiring CAFOs to publicly reveal information about their emissions of hazardous air pollutants could serve as a first step in forcing them to change their production practices and to consider the impact they have on local communities. CAFOs have been trying to hide this information for years and making them disclose it could have an impact on how they operate. My family, friends, and I could benefit from measures that would lead to reductions in the volume of pollutants released from the CAFO near the Rosendale property and other CAFOs in Wisconsin.

28. If the Court were to rule for the plaintiffs in this case, I believe that the harms I have outlined above would be significantly reduced or eliminated because CAFOS, like the one near the Rosendale property, would be subject to EPCRA reporting and would have to provide local officials and the general public with information about the extremely hazardous substances they are releasing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this **_20th_** day of August 2024, in **_Pickett, Wisconsin._**

*Judy Jolin*

Judy Jolin

# EXHIBIT 13

## DECLARATION OF DOCTOR MELISSA SIEBKE

I, Melissa Siebke, declare that I am over 18 years of age and that if called as a witness in this action I would competently testify of my own personal knowledge as follows:

1. I am a member of the Humane Society of the United States ("HSUS"). I first joined HSUS about ten or twelve years ago because I'm very impressed by how the group advocates for animals and works to educate people in the U.S. and abroad on how helping animals can and should go hand in hand with helping people. HSUS does a great job of moving society towards recognizing this interconnectedness between protecting animals, the environment, and human wellbeing. I believe people can't do better unless they know better, and that's why I value HSUS's work to educate the public, legislators, agencies, and the general public on these issues that are very close to my heart.

2. I spent my childhood in Medford and I currently live in Owatonna, which are both in Steele County in Minnesota. My mom also lives in Steele County. I teach Spanish, French, English and English as a Second Language for a community college with several campuses. I primarily teach in Austin, Minnesota (in Mower County) and I sometimes also teach in Owatonna and Albert Lea, Minnesota. I also frequently take classes at a university in Mankato, Minnesota.

3. Growing up in Steele County on my parents' small pig and crop farm of about 100 acres, I learned to appreciate pigs as sensitive and intelligent animals, and to appreciate the then-unspoiled countryside around our family home. As a child, I spent a good deal of time around the pigs in the barns, helping my dad. I always loved petting and interacting with the pigs, and this may be where my general lifelong love of animals originated.

4. I've always profoundly appreciated the pastoral beauty of parts of Steele County, and I try to enjoy it still by regularly taking long walks in the country near my home. My dear dog,

Charlie, used to accompany me on my walks until he passed away. I am a lifelong animal and nature lover, so I also greatly enjoy walking in the countryside to take in the beautiful diversity of wildlife, plant life, and scenery around where I live, work, and visit. Because the welfare of non-human animals and the preservation of our natural environment are so important to me, I regularly contact my state and federal legislators to express my views on these issues.

5. Given my interest in animal welfare and the environment, I'm worried about the risks associated with the increasing proliferation of the large industrial factory farms in Minnesota that confine animals by the thousands in cruel and dangerous conditions. I am very concerned about the impacts these factory farms' production practices have on the welfare of the farmed animals, the environment (including wildlife), and the health of humans and their pets. Several years ago, after learning from HSUS of a pending bill to insulate factory farms from nuisance lawsuits in Minnesota, I wrote letters to the editors of two local newspapers and contacted a state legislator to voice my opposition to the measure.

6. During my lifetime things have changed so much in Steele County and Minnesota's other agricultural counties. In a lot of ways, they've changed for the worse for animals, people, and the environment. For example, over the years I've seen an increase in factory farm operations filled with pigs or other farm animals in Steele and Mower Counties. This greatly concerns me because it's bad for animals, the environment, and wildlife, and could be dangerous for my family and me as well.

7. I really enjoy the scenery I see when I drive to the various community college campuses where I work. I look forward to my drives, in part because I've always loved the Minnesota countryside and the great diversity of plant and animal life it supports. However, these days, my drives remind me that factory farms are prevalent in Steele and Mower Counties. During my

drives, I often see evidence of these farms, for example, semi-trucks packed with pigs being transported in horrible conditions. In addition, I know Hormel Foods—which produces various meat products—has a large presence in the area.

8. I know that factory farms produce huge amounts of animal waste. I can remember when I was a child in Steele County, smelling noxious odors from the waste produced at a neighbor's hog farm. The hog waste was stored in a pit as liquid manure, which our neighbor would spread on his fields. When he did so, the smell was horrible. My neighbor had a lot of animals, but it was nothing compared to the number of animals factory farms in Minnesota today. Given the numbers of animals they have, today's factory farms produce huge amounts of waste.

9. Sometimes when I am walking within a half a mile of my home, or when I am driving to work in Owatonna or Austin, I smell a noxious odor of what I believe to be liquid manure.

10. I am concerned about my exposure to pollutants released by factory farms when I travel to work and also when I am near my home and in other areas of my community.

11. I have learned that as of 2018, there are at least twenty very large animal farms within my county. These are farms have more than 1,000 animal units, which equates to farms that have *at least* 3,334 grown pigs, 200,000 broiler chickens, or 55,000 turkeys. I also believe that I come within five miles of factory farms when I drive to the Owatonna and Austin campuses for work.

12. I have learned that exposure to hydrogen sulfide can harm the respiratory tract and the nervous system. I have also learned that exposure to low concentrations of hydrogen sulfide could cause headaches, poor memory, tiredness, and balance problems. In addition, I have learned that there is evidence that communities neighboring factory farms have higher rates of asthma. And, I have learned that exposure to odors from factory farms can lead to mental health deterioration and an increased sensitization to smell for those living near these farms.

13. I am aware that there is a federal law—the Emergency Planning and Community-Right-to-Know Act ("EPCRA")—that is intended to provide the public and local government authorities with access to information about industrial facilities' releases of extremely hazardous substances above certain threshold amounts, including the types and amounts of substances released. I am also aware that factory farms must report the release of ammonia and hydrogen sulfide from animal waste if they are released above certain threshold amounts. I understand that the Environmental Protection Agency ("EPA") recently exempted factory farms from reporting these types of emissions under EPCRA.

14. The fact that EPA has exempted factory farms from EPCRA reporting—and thus allowed them to hide information about the extremely hazardous substances they release, including the air pollutants created by the animal waste—makes me angry, sad, and concerned. As a community college professor, I know how important it is to have access to credible and reliable information. The more information and knowledge we have, the better we can do for ourselves, our families, and the world.

15. The fact that EPA is permitting factory farms to hide information about the pollutants they release into our communities is deeply concerning to me, and it harms me because it deprives me of information to which I am entitled under EPCRA.

16. I would like to have access to information about the types and amounts of hazardous pollutants coming from factory farms in the communities where I live, work, and commute. In fact, I believe that my family, my community, and I have the right to know about the hazardous air pollutants to which we are potentially being exposed. As mentioned above, I smell noxious gases sometimes when I am walking and driving, but I am also concerned about other pollutants that could be released without exuding smells. I am concerned about the impacts factory farms'

emissions of pollutants could have on my health, and my family and friends' health. And, I am worried about the impacts these releases have on the environment, including wildlife. I am not only concerned about present effects but also about how this will harm the environment and future generations of animals including wildlife and people.

17. If information about factory farms' release of pollutants above the threshold amounts set by EPCRA were made publicly available, I would regularly access these EPCRA reports submitted by factory farms located in the areas where I live, work, and commute. I would check this information as frequently as once a month if it changed that often.

18. If I had access to this information, I would use it to assess my risk of exposure to dangerous pollutants released by factory farms. I would try to avoid areas where there are factory farms releasing high levels of pollutants when I drive to work and in other aspects of my day-to-day life. But, without the reports required under EPCRA—which EPA has exempted factory farms from submitting—I don't have a way of knowing what pollutants factory farms in my area are releasing.

19. If I had access to factory farms' EPCRA reports, I would also share this information with family, friends, and like-minded colleagues, and I would encourage them to check and track this information for themselves. In fact, I have shared information about the social ramifications of factory farms' production practices with family members in the past. For example, I knew my brother, his wife and three sons ate chicken produced by Tyson, so I provided them with information about the company's practices that are harmful to the chickens' welfare. I think family members, including my three nephews, who visit me and my mother would be concerned about the pollutants released by factory farms here in Steele County. So, I would share this information

with them if I had access to it. I think it's important for people to have this information so that they can take better care of themselves and their loved ones.

20. I also think it is important for people to have access to information about the substances factory farms release because it could serve as a rallying cry for people to hold industry accountable for the harm it causes to human health and the environment through their purchasing decisions. But, without this type of information, people may not know that they need to act.

21. Additionally, I think it is important for communities to have access to this information so that they can make informed decisions about the types of facilities that are coming into their communities. They could use information in factory farms' EPCRA reports to influence local decision-makers to do what is truly best for the community, not the animal agriculture industry. If I had this information, I would share it with my legislators to better inform them about the harmful effects factory farms have on us, their constituents. In addition, I would use this information to ask my legislators to push forward legislation to help protect non-human animals (including wildlife) and the environment.  Having the data required under EPCRA reporting requirements would give me concrete, credible, and reliable data to show my legislators to support my requests.

22. If factory farms are required to publicly report their release of hazardous pollutants, I believe it is possible that these operations will take voluntary measures to reduce and potentially even eliminate their releases of such pollutants. My family, friends, colleagues and I could benefit from measures that would lead to reductions in the volume of pollutants released from factory farms in the communities where we live and work.

23. If the Court were to rule for the plaintiffs in this case, I believe that the harms I have outlined above would be significantly reduced or eliminated because factory farms would be

subject to EPCRA reporting and would have to provide local officials and the general public with information about the extremely hazardous substances they are releasing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 26ᵗʰ day of August 2024, in _Austin, MN_ .

_Melissa Siebke_

Melissa Siebke

8

# EXHIBIT 14

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

Rural Empowerment Association for
Community Help, et al.,

                        Plaintiffs,

         v.

United States Environmental Protection
Agency, et al.,

                        Defendants,
        and

National Cattlemen's Beef Association, et al.,

                    Intervenor-
                    Defendants.

**CASE NO. 18-cv-02260-TJK**

**Declaration of Abel Russ**

---

# DECLARATION OF ABEL RUSS

I, Abel Russ, declare and state as follows:

1. My name is Abel Russ, I am over 18 years of age, and I suffer from no impairment or disability affecting my ability to give truthful testimony. I have been an attorney at the Environmental Integrity Project (EIP) since September 2010, and I also serve as the Director of EIP's Center for Applied Environmental Science.

2. EIP is a non-profit organization based in Washington, D.C., dedicated to ensuring the effective enforcement of state and federal environmental laws to protect public health and the environment from Animal Feeding operations (AFOs) and other large sources of pollution. EIP's main office is located at 888 17th Street, NW, Suite 810, Washington, D.C., 20006; EIP also has staff located in California, Colorado, Illinois, Maryland, Pennsylvania, Vermont, Virginia, and Washington.

3. EIP prioritizes work related to AFOs because these industrial facilities are a significant source of air and water pollution. AFOs emit many hazardous air pollutants, including ammonia, hydrogen sulfide, and volatile organic compounds. These pollutants are associated with numerous adverse public health and environmental impacts.

4. EIP's work takes many forms. We routinely monitor compliance with environmental statutes such as the Clean Air Act and the Clean Water Act, reviewing discharge monitoring data, comparing pollution loads to permit limits, and evaluating the impacts of pollution loads on air quality and water quality.

5. EIP also files petitions for rulemaking with the EPA, seeking stronger environmental regulation of AFOs. For example, together with a coalition of other environmental and public health organizations, EIP filed a petition asking EPA to regulate industrial AFOs as stationary sources of air pollutants under the Clean Air Act and filed a separate petition asking EPA to list ammonia as a criteria pollutant under the Clean Air Act.

6. EIP's efforts rely heavily on access to information. Regulatory agencies can only effectively protect environmental quality if they have access to information, and citizens deserve to know how nearby sources of pollution may be affecting their health. Pollution data is often hard to synthesize, interpret, and use. EIP devotes considerable time and effort, using its technical and legal expertise, to making technical information available to the public and useful to state and federal agencies. This is true for all sources of pollution that we work with, including AFOs.

7. EIP operates on the premise that when the public learns that a company or facility is polluting the environment, or that regulators are failing to adequately regulate that pollution, the company is more likely to voluntarily eliminate or reduce its pollution and regulators are more likely to strengthen oversight. I am aware of at least one study showing that mandated reporting of toxic emissions is likely to result in reduced emissions and improved environmental performance. *See, e.g.*, Konar, S., et al., *Information as Regulation: The Effect of Community Right to Know Laws on Toxic Emissions*, 32 Journal of Environmental Economics and Management 109 (1997).

8. EIP uses public pollution data to advocate on behalf of the public for policies promoting environmental protection and the well-being of rural communities impacted by pollution from AFOs. EIP also regularly drafts data-driven reports about various industrial sources of pollution, including AFO pollution. This helps us fulfil our goal of empowering citizens exposed to AFO pollution by helping them gain access to environmental data for use in their community-based advocacy efforts.

9. EIP has been engaged in efforts to secure better pollution reporting from AFOs for over ten years. Among other things, in 2008 EIP submitted comments to EPA opposing the Agency's exemption of AFOs from certain reporting requirements, including the requirements of the Emergency Planning and Community Right-to-Know Act (EPCRA). In 2009, EIP joined a legal challenge of that 2008 exemption as a petitioner. *See Waterkeeper Alliance, et al., v. United States Environmental Protection Agency*, Nos. 09-1017, 09-1104 (consolidated) (D.C. Cir., filed Jan. 15, 2009).

10. I am aware that in 2005, EPA entered into a consent agreement with a large number of AFOs whereby participating AFOs were granted immunity from EPA enforcement of certain reporting requirements (including EPCRA requirements) in exchange for their participation in a national study of AFO emissions. That study came to be known as the National Air Emissions Monitoring Study, or NAEMS.

11. EIP closely follows EPA's progress with respect to the NAEMS study because EIP has a strong organizational interest in ensuring that AFO pollution is accurately estimated and reported. In 2010, 2013 and 2016, EIP submitted Freedom of Information Act Requests to EPA seeking records associated with the NAEMS study.

3

12. In 2011, EIP released a report that analyzed NAEMS pollution data. See EIP,

    *Hazardous Pollution from Factory Farms* (Mar. 9, 2011), available at

    http://www.environmentalintegrity.org/reports/hazardous-pollution-from-factory-

    farms/.

13. In March and June of 2012, EIP submitted comments to EPA on draft Emissions

    Estimating Methodologies that the Agency developed pursuant to the 2005 consent

    agreement and in association with the NAEMS study, providing our professional

    opinions regarding the best ways to ensure accurate emissions estimates, but also

    expressing our strong organizational interest in having EPA finalize Emissions

    Estimating Methodologies as quickly as possible.

14. After more than ten years, EPA has not yet concluded the NAEMS study, or finalized

    any Emissions Estimating Methodologies. As a result, the public has virtually no way

    of knowing how much ammonia, hydrogen sulfide, volatile organic compounds, and

    other pollutants are being emitted from AFOS.

15. EIP has devoted significant organizational resources to trying to fill the information

    gap created by EPA. For example, in January 2018, I authored an EIP report that

    analyzed ammonia emissions studies, including the NAEMS study and other

    published research, in order to provide the public with some sense of how much

    ammonia is emitted by AFOs that produce broiler chickens. See EIP, Ammonia

    Emissions from Broiler Operations Higher than Previously Thought (Jan. 2018),

    available at http://www.environmentalintegrity.org/reports/ammonia-emissions/. EIP

    concluded that a typical broiler operation on the Delmarva Peninsula emits between

    19 and 24 tons of ammonia each year. EIP is trying to compensate for the absence of

information caused by EPA's regulatory failures. However, EIP's organizational interest in informing the public and evaluating the impact of AFO emissions on communities and the environment would be much better served if we could provide the public with analyses of actual emissions monitoring data, or with site-specific, empirically based estimates of emissions.

16. I am aware that the D.C. Circuit Court of Appeals vacated EPA's 2008 CERCLA/EPCRA reporting exemption rule, and that EPA implemented that vacatur in July 2018. I am also aware that Congress exempted AFOs from CERCLA reporting obligations in March 2018.

17. I am aware that in 2019, EPA formally exempted AFOs from EPCRA reporting requirements. EPA's position deprives the public of critical information about pollution releases that may affect their health, and it further frustrates EIP's longstanding efforts to secure, for the public, information about such releases.

18. If AFOs were required to publicly report their pollution releases under EPCRA, EIP would use the information in a variety of ways to serve the interests of our clients and the public, many of whom reside near AFOs. EIP would use this information to improve transparency regarding industrial livestock operations in order to encourage voluntary measures to reduce pollution releases and promote better regulation of these releases.

19. In addition, one of EIP's longstanding objectives is to ensure environmental justice, meaning that EIP seeks to ensure that the burdens of environmental pollution do not fall disproportionately on low-income communities or communities of color. One of

the first steps in ensuring that communities are not over-burdened is ensuring equal access to information about hazardous substances to which community members are potentially exposed. EPA's impermissible interpretation of EPCRA deprives low-income communities and communities of color of critical information about their air quality and the risks they face, while also minimizing the likelihood that polluting facilities will voluntarily reduce their emissions.

20. While EPA continues to obstruct public access to information, AFOs will continue to emit undisclosed amounts of toxic pollutants, communities will continue to live under a cloud of uncertainty about the risks they face, and EIP will continue to suffer from a lack of information that it could use to inform the public and regulatory agencies about AFO pollution.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this _23ʳᵈ_ day of _Aug._, 2024.

Abel Russ, Senior Attorney

Environmental Integrity Project

# EXHIBIT 15

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Rural Empowerment Association for Community Help, et al., | |
| Plaintiffs, | **CASE No. 1:18-cv-02260-TJK** |
| v. | |
| United States Environmental Protection Agency, et al., | **Declaration of Anthony Eliseuson** |
| Defendants, | |
| and | |
| National Cattlemen's Beef Association, et al., | |
| Intervenor-Defendants. | |

## DECLARATION OF ANTHONY ELISEUSON

I, Anthony T. Eliseuson, declare as follows:

1.      My name is Anthony T. Eliseuson. I am an attorney licensed to practice law in the states of Minnesota and Illinois, and I am based in Illinois.

2.      The facts set forth in this declaration are based on my personal knowledge, including based upon reliable records of my employer the Animal Legal Defense Fund, which are compiled and maintained in the ordinary course of its business. If called as a witness, I could and would testify competently to these facts. Any opinions contained in this declaration reflect my personal opinion and judgment.

3.      I am currently the Litigation Program Director for the Animal Legal Defense Fund. I've been in that position since July of 2020. I initially joined the Animal Legal Defense Fund as a Senior Staff Attorney in the Litigation Program in March 2017. Prior to the Animal Legal Defense Fund, I was a litigation partner with Dentons US LLP in its Chicago, Illinois office, where I practiced complex commercial litigation for approximately 14 years.

4.      ALDF is a national nonprofit animal protection organization founded in 1979 that uses education, public outreach, legislation, and litigation to protect the lives and advance the interests of animals, including those raised for food on animal feeding operations (AFOs). ALDF is supported by thousands of dedicated attorneys and more than 300,000 members and supporters nationwide, many of whom live and recreate in close proximity to AFOs.

5.      ALDF works against AFOs in order to decrease the suffering and improve the lives of farmed animals who are forced to suffer at ground zero of AFO pollution throughout their entire lives.

6.      In order to bring an end to the practices that lead to such dismal lives for farmed animals, ALDF's advocacy to improve the lives of farmed animals focuses on increasing transparency, accountability, and regulation of the AFO industry. ALDF regularly participates in federal administrative advocacy related to factory-farmed animal products. When necessary, ALDF engages in litigation against private corporations and the federal government to address the mistreatment of factory-farmed animals and misleading labeling of factory-farmed animal products under applicable law.

7.      ALDF also advocates for more responsible animal agriculture practices that protect the health of the surrounding communities, which include ALDF members. Noises, odors, and air and water pollution from AFOs impact ALDF members' health and quality of life.  In addition, ALDF members across the country – not just those that live near AFOs – are concerned about the negative impacts that these facilities have on the health and wellbeing of the thousands of animals confined within them.

8.      ALDF also engages in cases relating to false advertising and consumer protection litigation that aims to increase transparency in the AFO industry through truth in labeling. ALDF regularly engages with administrative agencies and companies that mislead consumers into purchasing factory-farmed products that are deceptively advertised and labeled as high-welfare and sustainable, essentially making conventional products appear to align with consumers' perceptions of organic products. One such example is ALDF's settlement with Trader Joe's regarding misleading hen raising representations on Trader Joe's Cage Free eggs cartons. *See Carolyn Claybaugh v. Trader Joe's Company*, Case No. RG18897085 (Cal. Sup. Ct. 2018). ALDF also served as counsel for the Organic Consumers Association in a 2016 action over misleading "pasture raised" labeling and marketing claims made by egg seller Handsome Brook

Farm. *Organic Consumers Association v. Handsome Brook Farm et al.*, Case No. 2016 CA 006223 B (D.C. Sup. Ct. 2016). In 2020, ALDF submitted regulatory comments to USDA regarding the Food Safety and Inspection Service's (FSIS's) unlawful rubber-stamping of misleading animal raising claims such as "free range" on factory-farmed products without any uniform definitions of the claims or adequate method to ensure their accuracy. In June 2021, ALDF sued the FSIS for approving poultry product labels that depict pastured animals, when in fact they are factory-farmed without access to the outdoors. The suit specifically challenges FSIS's approval of a line of Perdue products, as well as the agency's overall failure to consider imagery when approving product labels.

9.     ALDF also regularly submits rulemaking petitions and administrative comments to, and files complaints and lawsuits against, state and federal agencies seeking transparent and adequate regulation of the AFO industry with respect to their effects on animals and the environment, including air and water. In 2010 ALDF submitted rulemaking petitions to the Food and Drug Administration (FDA), Federal Trade Commission (FTC), and U.S. Department of Agriculture (USDA) seeking disclosure of egg production method (caged, cage-free, or free-range) on egg cartons, to correct rampant consumer deception in the egg market. ALDF later served as both plaintiff and counsel in litigating the agency denials that followed. In 2013, ALDF submitted a rulemaking petition to USDA seeking accurate labeling of antibiotic use in meat and poultry products. From 2014 to 2017 ALDF litigated against FDA for its failure to comply with the National Environmental Policy Act (NEPA) when approving the animal drug ractopamine, which is used widely on AFOs and is toxic to aquatic organisms when released into the environment. In April 2018, ALDF submitted comments in opposition to an FSIS proposed rule to expand nationwide a dangerous pilot program allowing privatized, high-speed hog slaughter;

ALDF then sued FSIS in December 2019 for finalizing the flawed rule and allowing

implementation of the dangerous program. At the same time, ALDF sued FSIS for failing to

respond to a rulemaking petition seeking regulations prohibiting the slaughter of non-ambulatory

pigs. ALDF also continues to litigate years-long suits that seek to force the Environmental

Protection Agency to regulate slaughterhouse emissions, to force the Farm Service Agency and

the Council on Environmental Quality to comply with the National Environmental Policy Act

when granting loans to AFOs, and to stop a chicken slaughterhouse's flagrant abuse of water

resources in Central California. These are just a small fraction of ALDF's factory farming

docket.

   10. ALDF also engages in administrative advocacy to curb AFO pollution. In 2016

and 2017 ALDF submitted comments in response to a proposal by the Arkansas Farm Service

Agency to provide federal funding to establish a 30,000-head chicken AFO in northern

Arkansas. ALDF's advocacy was successful in forcing the agency to consider the environmental

impacts of AFOs in two Environmental Assessments under NEPA. In 2017, ALDF submitted a

rulemaking petition to the agency requesting, among other things, that the agency prepare a

programmatic Environmental Impact Statement adequately considering the cumulative effects of

funding AFOs in the region under NEPA before providing any additional funds. In 2018 ALDF

submitted comments to the Arkansas Department of Environmental Quality opposing

modification of a National Pollutant Discharge Elimination System under the Clean Water Act

that would have allowed a poultry processing facility to discharge untreated waste into the

municipal wastewater treatment plant. The Department ultimately required the facility to pre-

treat its wastewater.

   11. Similarly in California, in 2014, ALDF submitted a petition for rulemaking urging

the California Air Resources Board to regulate greenhouse gas emissions from dairy AFOs under the state's cap-and-trade program. The Board formally committed to regulating the dairy industry's greenhouse gas emissions in 2017. In 2016, ALDF submitted a rulemaking petition to the California Department of Water Resources and State Water Resources Control Board seeking a moratorium on new water rights permits and registrations for AFOs, curtailment on surface water diversion for AFOs, and inclusion of AFOs in future groundwater sustainability plans. The petition highlighted the harmful environmental impacts of the overuse of water at AFOs in California, especially during drought years. ALDF also recently submitted a rulemaking petition urging the California Air Resources Board to stop allowing AFOs to profit from air pollution by selling manure methane credits under California's Low Carbon Fuel Standard program.

12.     ALDF also regularly seeks information through the Freedom of Information Act (FOIA) and brings suit to compel compliance with FOIA when the government withholds information. Specifically with regard to AFOs, in 2013, ALDF sued FDA for withholding documents related to the animal drug ractopamine. ALDF also brought suit to challenge the Food and Drug Administration's decision to withhold information about hen population and living conditions on large AFOs, which ALDF had requested through the Freedom of Information Act. In 2016 the Ninth Circuit Court of Appeals reversed and remanded the decision, eventually leading to a landmark victory for AFO transparency in 2021.

13.     Access to information and transparency about AFO practices and emissions are central to ALDF's efforts on behalf of itself, its members, and the farmed animals whose interests it represents. ALDF relies heavily on access to public data about AFOs and AFO pollution to further its organizational mission and achieve its goals, including the litigation and administrative advocacy described above. ALDF utilizes information about the environmental

impacts of AFOs to advance its legal advocacy on behalf of the farmed animals who are directly harmed by air emissions from the facilities in which they are confined.

14.    Like FOIA, the Emergency Planning and Community Right-to-Know Act (EPCRA) is an essential information gathering tool that, if properly implemented, would provide ALDF with information it would use in furtherance of its mission. This information is especially valuable in light of the general dearth of publicly-available information about AFO emissions and practices due to, for example, many AFOs being exempt from animal cruelty laws and permitting requirements under the Clean Water Act. As a result of the U.S. Environmental Protection Agency (EPA)'s decision to exempt AFOs from EPCRA reporting requirements, many AFOs have never reported emissions data under EPCRA, further depriving ALDF, its members, and the public of information about AFO emissions.

15.    ALDF members are harmed by EPA's decision to exempt AFOs from EPCRA's reporting requirements. This is because those members who live and recreate in close proximity to AFOs would have impacts to the quality of their life and heath, including air quality and water quality as detailed in the allegations of the complaint.

16.    If EPA were enforcing EPCRA's reporting mandate, rather than exempting AFOs from it, ALDF and its members would have access to information about AFO emissions to use in our respective advocacy work. AFO reporting under EPCRA would provide ALDF and its members with the opportunity to obtain accurate emissions information generated by AFOs and reported directly to responsible agencies. This information would empower ALDF and its members to advocate for more effective regulation of AFOs and to hold AFO operators accountable for hazardous emissions. It would also increase transparency by making the public and regulators aware of the true effects of the AFO industry.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: August 27, 2024

_____
Anthony T. Eliseuson

# EXHIBIT 16

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RURAL EMPOWERMENT ASSOCIATION FOR COMMUNITY HELP, et al., )<br><br>Plaintiffs, )<br>v. )<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., )<br><br>Defendants. ) | Civ. No. 18-cv-02260-TJK<br><br>**DECLARATION OF LORI ANN BURD** |

**DECLARATION OF LORI ANN BURD**

I, Lori Ann Burd, state and declare as follows:

1.    I am over eighteen years of age and a citizen of the United States. I have personal knowledge of the facts and statements contained herein and, if called as a witness, could and would competently testify thereto.

2.    I am the director of the Environmental Health program at the Center for Biological Diversity (Center), and I have been since 2015. I am also a member of the Center, and I have been since 2012.

3.    The Center is a 501(c)(3) non-profit, membership organization based in Tucson, Arizona with approximately 79,143 members throughout the United States and the world, including in Arizona, North Carolina, Iowa, California, Oregon, and other states with significant numbers of industrial animal feeding operations (AFOs). In addition to maintaining its headquarters in Tucson, Arizona, the Center also maintains offices across the United States and Mexico, including in Asheville, North Carolina; Oakland, California; Denver, Colorado; Portland, Oregon; and Washington, D.C.

4.      The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and water, and public health through science, policy, and law. Based on an understanding that the health and vigor of human societies and the natural environment are closely linked, the Center works to protect natural resources like air and water and to secure a future for animals and plants, especially those hovering on the brink of extinction, for the ecosystems they need to survive, and for the people that interact with, depend on, and cherish these natural resources.

5.      The Environmental Health program, which I direct, is focused on protecting biodiversity and human health from toxic substances. In my role at the Center, I am involved in strategic decision making and setting policy priorities for the work that the Center does to reduce threats to the environment and public health from such toxic substances, including from industrial animal agriculture and as they relate to air pollution.

6.      The Center's Environmental Health program works to help reduce the threats to people and the environment posed by air pollution through scientific, legal, and policy mechanisms. I have a personal interest in environmental protection and believe that we have a responsibility to keep clean the air we breathe and the water we drink safe for ourselves, wildlife, and future generations. I strive to represent the interests of our members in areas affected by air pollution and am concerned about how negative air quality impacts them, their families, and the environment that they enjoy.

7.      Combating air pollution is an issue that is very important to me, as well as to the Center, because I understand the health impacts of air pollutants. I am deeply troubled by the effects that they have on the environment, wildlife, and human health. I am aware of studies linking air pollutants such as ammonia and hydrogen sulfide to a range of health impacts,

such as respiratory problems, increased incidences of hospitalization, and premature

mortality. I have a close friend, a physician, who suffers from severe asthma, and on many

occasions, I have witnessed the devastating effects asthma has had on her ability to work,

care for her young child, and function. I have seen specific instances where increased air

pollution has exacerbated her asthma.

8.      I am further aware that air pollution can also negatively affect the health of the

wildlife and plant life that I and the Center seek to protect and that the Center's members

appreciate viewing in the outdoors. Air pollution can lead to haze and negatively affect my

and other Center members' experiences in nature and the outdoors. Air pollution can also

lead to broader ecosystem effects, including by affecting water quality and nutrient cycles,

which harms the Center's mission and objectives.

9.      The Center's Environmental Health and Population and Sustainability programs

also works to advance public campaigns to combat the extensive risks that pollution from

industrial animal agriculture poses to ecosystems, public health, sustainable food systems,

and environmental health. The Center prioritizes work related to industrial animal

agricultural operations because of their significant role in producing air and water pollution,

causing freshwater scarcity issues, driving climate change, and exacerbating harmful land-

use practices and associated habitat losses. Among other actions, the Center has been

involved in litigation, policy advocacy, and campaigns that seek to improve transparency

around, and federal oversight over, pollution from industrial-scale animal agriculture,

including AFOs, slaughterhouses, and rendering facilities, under the United States

Constitution, Freedom of Information Act, the Clean Water Act, the Clean Air Act, the Safe

Drinking Water Act, the Emergency Planning and Community Right-to-Know Act, and the

National Environmental Policy Act. The Center further uses public pollution data to advocate on behalf of the public and its members for policies promoting environmental protection and public health.

10.     The Center regularly submits rulemaking petitions and administrative comments to, and files complaints and lawsuits against, state and federal agencies seeking transparent and adequate regulation of the animal agricultural industry. For example, in 2020 the Center submitted two petitions to the U.S. Department of Agriculture seeking to ensure the humane killing and safe disposal of farm animals killed during COVID-19 on AFOs. Since 2016, the Center has also filed numerous petitions and lawsuits related to improving the regulation of animal agricultural operations under the federal clean water laws, including the Clean Water Act and Safe Drinking Water Act, and federal clean air laws, including the Clean Air Act.

11.     I am aware that the U.S. Environmental Protection Agency (EPA) enacted a rule in 2019 that exempts industrial AFOs from having to comply with hazardous substance emission reporting requirements under the Emergency Planning and Community Right-to-Know Act (EPCRA). EPA, *Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to Know Act,* 84 Fed. Reg. 27533 (June 13, 2019). I am further aware that because of this rule many industrial facilities that emit reportable quantities of ammonia and hydrogen sulfide—two air pollutants that EPA has defined as "extremely hazardous" under EPCRA—will no longer be required to report those emissions and make that information available for use by affected communities, emergency responders, and the public, despite Congress's clear mandate that they do so.

4

12.     In exempting industrial AFOs from essential air pollution reporting requirements, this rule harms the Center and its members' long-standing interests in improving air quality; protecting front-line communities, the environment, and wildlife against exposure to air pollution, including from industrial AFOs; and advocating for greater transparency around, and federal oversight over, pollution from industrial AFOs. For example, the Center has members in California who experience air pollution from industrial AFOs in their communities and who would benefit from being able to access EPCRA reports detailing the amount and type of hazardous pollution coming from these operations. If available, those members could use the information that is required to be reported under EPCRA to protect themselves and their fellow community members against preventable exposure to reported pollution. Understanding where and to what extent these facilities are releasing reportable amounts of hazardous air pollution, both individually and cumulatively, could also inform Center members' use and enjoyment of nature, including by informing them about where they are able to hike, birdwatch, or otherwise recreate without being exposed to reportable air pollution from AFOs. It harms the Center's interests and the interests of its members to not have access to these reports, which should lawfully be required under EPCRA, or to be able to share these reports with other potentially affected community members.

13.     Further, access to information and transparency about AFO practices and pollution emissions are central to the Center's efforts on behalf of itself and its members. Indeed, the Center relies heavily on access to public data about AFOs to further its organizational mission and to achieve its goals, as described in the preceding paragraphs. EPCRA is an essential transparency law that, if properly implemented, would provide the Center with valuable information that it would use in furtherance of its mission. The

information required to be reported under EPCRA is especially valuable to the Center since the EPA does not effectively regulate or otherwise make available information about AFO air emissions. As a result of the EPA's decision to exempt AFOs from EPCRA reporting requirements, many AFOs have never reported emissions data under EPCRA, further depriving the Center, its members, and the public of vital pollution information.

14.     In sum, if EPA were to enforce EPCRA's reporting mandate, rather than exempting AFOs from it, the Center and its members would have access to essential information about AFO emissions to use in our advocacy work and to protect public health and the environment. AFO reporting under EPCRA would provide the Center and its members with the opportunity to obtain accurate emissions information generated by AFOs and reported directly to responsible agencies. This information would help the Center and its members advocate for more effective regulation of AFOs and to hold AFO operators accountable for hazardous air pollution emissions.

15.     For the foregoing reasons, the Center, its missions-specific goals, and its members are injured by EPA's action to exempt industrial AFOs from lawfully complying with EPCRA's hazardous substance reporting requirements. An order from the Court vacating EPA's 2019 rulemaking and thereby requiring industrial AFOs to fully comply with the reporting obligations of EPCRA, would remedy the injuries experienced by the Center and its members. Such an order would also help guarantee that EPA will act lawfully under EPCRA to protect the environment and public health from extremely hazardous air pollutants such as ammonia and hydrogen sulfide, which would remedy the Center and its members concerns in this regard. Participation of the Center's individual members in this lawsuit is not required to achieve this requested relief.

6

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 22, 2024 in Portland, Oregon.

Lori Ann Burd

# EXHIBIT 17

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Rural Empowerment Association for
Community Help, et al.,

<div align="center">Plaintiffs,</div>

<div align="center">v.</div>

United States Environmental Protection
Agency, et al.,

<div align="center">Defendants.</div>

**CASE NO. 18-cv-02260-TJK**

**DECLARATION OF
JAYDEE HANSON**

## DECLARATION OF JAYDEE HANSON

I, JAYDEE HANSON, declare that if called as a witness in this action I would competently testify of my own personal knowledge as follows:

1. I submit this declaration in support of the motion for summary judgment filed by Plaintiffs Rural Empowerment Association for Community Help, Animal Legal Defense Fund, Center for Food Safety, Don't Waste Arizona, Environmental Integrity Project, Food and Water Watch, Humane Society of the United States, Sierra Club, Sound Rivers, Center for Biological Diversity, and Waterkeeper Alliance (collectively, "Plaintiffs") challenging the Environmental Protection Agency's ("EPA") decision to exempt Animal Feeding Operations ("AFOs") from requirements to inform state and local officials about releases of dangerous levels of air pollutants as required by Section 304 of the Emergency Planning and Community Right-to-Know Act ("EPCRA").

2. I am the policy director at the Center for Food Safety ("CFS").

3. CFS is a tax-exempt, nonprofit membership organization with offices in the District of Columbia; San Francisco, California; and Portland, Oregon. CFS has over one million members across the country. CFS's fundamental mission is to empower people, support farmers, and protect the environment from the harms of industrial agriculture, while supporting sustainable ecological and organic farming.

4. CFS works to protect the environment from harmful food production

methods. These include concentrated animal feeding operations ("CAFOs"). Among CFS's primary concerns are the negative environmental impacts of industrial agriculture technologies: water and air contamination from factory farming, pollution from chemical pesticides, and biological pollution from genetically engineered crops and animals. In addition, CFS protects the interests of its staff and its members in ensuring that food and agriculture are safe for human health and the environment, which includes protecting the natural habitats and wildlife that CFS's staff and members enjoy.

5.    I know that many of our members live in communities where industrial livestock operations are present. For many of them, the experience of living near these facilities—especially due to the emissions of odors, gases, and particulate matter—is a large part of what motivated them to join CFS.

6.    To that end, CFS provides oversight of governmental activities surrounding industrial agriculture. CFS develops a wide array of educational and informational materials that address the environmental impacts of industrial agriculture, and disseminates the materials to CFS members; policymakers; local, state and federal government personnel; international governmental officials; nonprofit organizations; and interested members of the public. These educational and informational materials include, but are not limited to, reprints of news articles, policy reports, legal briefs, press releases, newsletters, action alerts, and

fact sheets. Through these materials, CFS provides its members with a means of identifying the origin of foods on the market, supporting the public's right to know, and to encourage full public participation in defining the issues presented by industrial agriculture. CFS sends out action alerts to its members, who submit comments and letters to government agencies and officials, respectively, on issues related to industrial agriculture and other issues affecting the sustainability of our food system.

7.      Due to CFS's concerns about the human health impacts of emissions of harmful contaminants into the air from CAFOs, we submitted comments to EPA on March 25, 2008, on proposed CAFO exemptions to the release reporting requirements of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and EPCRA. After EPA finalized that rule, CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances From Animal Waste at Farms, 73 Fed. Reg. 76,948 (Dec. 18, 2008), CFS was a petitioner in a legal challenge to the rule. *See Waterkeeper Alliance v. EPA*, Nos. 09-1017, 09-1104 (consolidated) (D.C. Cir. filed Jan. 15, 2009). In 2017, the D.C. Circuit vacated EPA's 2008 CERCLA/EPCRA exemption, rejecting EPA's argument that the statutory reporting requirements serve no regulatory purpose. *See Waterkeeper All. v. EPA*, 853 F.3d 527, 537-38 (D.C. Cir. 2017).

8.      CFS has a vested interest in opposing CAFOs given the significant

negative environmental and human health impacts that result from their use of

industrial agriculture methods. One of the greatest threats to the environment that

CAFOs present stems from their significant concentration and production of

animal waste, estimated at 500 million tons annually. Environmental

mismanagement of animal waste results in excessive pollution of our nation's

waterways, causing eutrophication and hypoxia that deplete waters of their

nutrients, reduce biodiversity and aquatic life, and exacerbate greenhouse gas

emissions. Large concentrations of animal waste can also result in emissions of

harmful contaminants into the air, including ammonia, hydrogen sulfide,

endotoxins, particulate matter, and volatile organic compounds. Residents and

farmworkers living near CAFOs are greatly affected by animal waste. Groundwater

contamination by nitrates is common in areas with shallow water supplies located

near CAFOs. In addition, mounting research suggests that as CAFOs are

established in certain areas, corresponding health problems, including respiratory,

intestinal, and neurological issues, increase in local communities. These symptoms

are consistent with those found in CAFO workers. The human health effects on our

children may be even greater.

9.      Because of these impacts, CFS has an entire program area devoted to

opposing animal factories. CFS uses both legal and policy approaches to defend

animal welfare and public health, and prevent further environmental pollution from and corporate control of these facilities. *See*

https://www.centerforfoodsafety.org/issues/307/animal-factories.

10.    In August 2018, CFS published a report, *Opting Out of Industrial Meat: How to Stand Against Cruelty, Secrecy, and Chemical Dependency in Food Animal Production*. The report provides tools and information to help people shift away from eating meat sourced from CAFOs and to identify alternative, healthier protein sources. Contemporaneous with the publication of this report, CFS launched a companion website. *See* https://endindustrialmeat.org. The website provides a wealth of information about how industrial meat impacts human health and the environment, including how CAFOs impact nearby communities from enormous levels of manure and toxic emissions.

11.    This year, CFS published its sixth annual *Chain Reaction Scorecard*, ranking the top twenty fast food and fast casual U.S. restaurant chains that serve beef on the policies and actions related to antibiotic use in their beef supplies. This report highlights the public health crisis of antibiotic resistance resulting from irresponsible antibiotic use in CAFOs.

12.    The challenge to the EPCRA Exemption is of fundamental importance to CFS, as information about pollution from CAFOs is critical to our advocacy, to our oversight of governmental activities related to CAFOs, and to the interests of

our members.  Because of the EPCRA Exemption, CFS and its members are

denied information about emissions from CAFOs to which they have a statutory

right.  This information is central to CFS's purpose and mission, and is vital for

CFS members to be able to live healthy and enjoyable lives on their properties.

I declare under penalty of perjury that the foregoing is true and correct.

Executed August 13, 2024 in Washington, D.C.

Jaydee Hanson

# EXHIBIT 18

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

Rural Empowerment Association for
Community Help, et al.,

                    Plaintiffs,

          v.

United States Environmental Protection
Agency, et al.,

                    Defendants,
        and

National Cattlemen's Beef Association, et al.,

                  Intervenor-
                  Defendants.

**CASE NO. 18-cv-02260-TJK**

**Declaration of Stephen Brittle**

---

## DECLARATION OF STEPHEN BRITTLE

I, Stephen Brittle, do hereby declare that if called as a witness in this action I would competently testify of my own personal knowledge as follows:

1. I am the president and co-founder of Don't Waste Arizona (DWAZ).

2. DWAZ is a tax-exempt, nonprofit membership organization with one office in Phoenix, Arizona. DWAZ has about 100 members across the state of Arizona. I know that many of our members live in communities where industrial livestock operations are present. For many of them, the experience of living near these facilities—especially due to the emissions of odors, gases, and particulate matter—is a large part of what motivated them to join DWAZ.

3. I co-founded DWAZ in 1990, but DWAZ formally incorporated in 1992 to be eligible to participate in a TAG grant for the Motorola Superfund site in Phoenix, Arizona. In so doing, I helped create its organizational purpose and goals. I am a member of DWAZ's Board of Directors, and have been since the organization's inception. Since the organization's founding, DWAZ's activities have focused on the environmental, human health, and economic impacts of environmental pollution, especially toxic chemical exposure from reportable hazardous chemical releases. DWAZ has always been an advocate for environmental justice. Starting in 2015, DWAZ has focused on the development of industrial agriculture. Principal among these activities are analyses and actions to mitigate the impact of industrial agriculture and its emissions of ammonia and hydrogen sulfide on human health and the environment.

4. In creating DWAZ, I sought to establish a nonprofit organization that addressed many of my personal interests in protecting the environment from harmful chemicals and pollution. This includes concentrated animal feeding operations (CAFOs). Chief among my concerns about CAFOs are the negative environmental impacts of industrial agriculture technologies: water and air contamination from factory farming, and reportable quantity releases under the Emergency Planning and Community Right-To-Know Act (EPCRA) and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of ammonia and hydrogen sulfide from

CAFOs. In addition, I created DWAZ to protect the interests of its members in ensuring that the environment is safe for human health and the environment.

5. Among the ideals that DWAZ was built upon is the education of its members and the public about the various environmental laws, including the information that is available to the public through permitting processes and the regulatory agencies. This education of its members and the public also includes education about federal citizen suit enforcement of the various environmental laws. DWAZ has conducted over 90 successful federal citizen suit enforcement actions, ranging from the Clean Water Act and the Resource, Conservation, and Recovery Act (RCRA) to EPCRA.

6. To that end, DWAZ provides oversight of governmental activities surrounding environmental regulations and the emergency response and planning system set up by EPCRA. This includes the state emergency response commission, the local emergency planning committees, and fire departments, especially regarding two severe chemical fire disasters in an ethnic minority community in south Phoenix.

7. As president of DWAZ, I served for ten years as a member of the Maricopa County LEPC, where I also chaired the committee that reviewed and updated that LEPCs Emergency Plan as required by EPCRA. DWAZ also has participated in numerous hazardous materials and EPCRA conferences over a period of years so that it would be proficient in its expertise in these matters.

8. DWAZ has also engaged in the following activities: worked cooperatively with the EPA to develop internet resources regarding EPCRA and other emergency response laws (www.chemicalspill.org); required a defendant in an EPCRA Section 313 case (Toxics Releases Inventory) to fund a Supplemental Environmental Project to increase citizen awareness of the Toxics Releases Inventory; prepared a curriculum for LEPC members in Arizona to better understand the members' responsibilities under EPCRA pursuant to a contract with the Arizona Emergency Response Commission; and got media attention for issues related to the different types of community right to know information.

DWAZ has developed educational and informational materials that address the environmental impacts of various forms of pollution in a variety of

industries, focusing largely on EPCRA, and disseminates the materials to DWAZ members; policymakers; local, state and federal government personnel; international governmental officials; nonprofit organizations; and interested members of the public. These educational and informational materials include, but are not limited to, websites, press releases, newsletters, action alerts, and fact sheets.

9. Through these materials, DWAZ provides its members with a means of supporting the public's right to know, and to encourage full public participation in defining the issues presented by industrial agriculture. DWAZ sends out action alerts to its members, who submit comments and letters to government agencies and officials, respectively, on issues related to industrial agriculture.

10. DWAZ also engages in litigation to enforce federal environmental laws. DWAZ has conducted over 90 successful federal citizen suit enforcement actions, ranging from Clean Water Act and RCRA to EPCRA. The EPCRA cases involved enforcing Section 313 (Toxics Release Inventory), Section 312/302, which requires reporting quantities of chemicals stored on-site, and Section 304, for failing to provide the written follow-up report when there has been a reportable quantity release.

11. DWAZ has also worked on multiple campaigns that aim to mitigate the effects of pollution and chemical exposures that harm the environment and the public, as well as environmental justice education.

12. DWAZ has a vested interest in opposing CAFOs given the significant negative environmental and human health impacts that result from their use of industrial agriculture methods. One of the greatest threats to the environment that CAFOs present stems from their significant concentration and production of animal waste, estimated at 500 million tons annually. Large concentrations of animal waste can also result in emissions of harmful contaminants into the air, including ammonia, hydrogen sulfide, endotoxins, particulate matter, and volatile organic compounds. Residents and farmworkers living near CAFOs are greatly affected by animal waste and their emissions. Mounting research suggests that as CAFOs are established in certain areas, corresponding health problems, including respiratory, intestinal, and neurological issues, increase in local communities. These symptoms are consistent with those found in CAFO workers. The human health effects on our children may be even greater.

13. DWAZ has been concerned about the environmental and human health impacts of industrial agriculture for more than three years, when members of the public asked for assistance in response to environmental issues caused by two CAFO facilities in Arizona.

14. Due to DWAZ's concerns about the human health impacts of emissions of harmful contaminants into the air from CAFOs, DWAZ has contacted EPA Region 9, the various environmental regulatory agencies in Arizona, the governor of Arizona, the Maricopa County Board of Supervisors, fire departments, the Arizona Emergency Response Commission, the Maricopa County LEPC and the Maricopa County Department of Emergency Management, the Maricopa County Board of Health, and others about these concerns.

15. It is my opinion as a ten-year LEPC member that the information contained in the written follow up reports from CAFOs is useful to LEPCs. This is because the LEPC has a duty to include in its comprehensive emergency plan, which has to be updated annually, a method to determine that a reportable quantity release -- a release of ammonia and/or hydrogen sulfide -- has occurred, as well as a statutory obligation for the plan to have a way to notify affected communities when a release has occurred.

16. The releases of ammonia and hydrogen sulfide from CAFOs may cause ambient air concentrations of these hazardous chemicals to reach levels that require shelter in place or evacuations. The LEPC would use the daily release amounts reported by CAFOs to calculate the off-site consequences, generally using the ALOHA software developed by EPA that determines the footprint of the release into affected areas downwind. Then there should be planning for an emergency response.

17. I was first alerted that a nearby CAFO was emitting dangerous levels of ammonia when I emerged from a meeting at a school three miles from a CAFO. Given my Ammonia Safety Training I had as an LEPC member, I instantly realized there was an immediate health threat that warranted shelter in place or an evacuation because I was suffering from burning eyes and choking on the fumes. This led me to contact emergency response agencies to determine what releases were being reported by the CAFO, only to learn that it had not been reporting at all.

18. The challenge to the EPCRA reporting exemption for CAFOs is of fundamental importance to DWAZ, as information about pollution from CAFOs is critical to our advocacy, to our oversight of governmental activities related to CAFOs, and to the interests of our members. Without this information, we cannot effectively conduct our advocacy activities or adequately inform our members about how to protect their health.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 14, 2024

Stephen Brittle

# EXHIBIT 19

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Rural Empowerment Association for
Community Help, et al.,

                Plaintiffs,

        v.

United States Environmental Protection
Agency, et al.,

                Defendants.

**CASE NO. 18-cv-02260-TJK**


**DECLARATION OF
WENONAH HAUTER**

## DECLARATION OF WENONAH HAUTER

I, Wenonah Hauter, declare that I am over 18 years of age and competent to testify.

Unless otherwise stated, I have personal knowledge of the facts stated below and, under penalty

of perjury, declare as follows:

1.      I am the Executive Director of Food & Water Watch (FWW), a position I have held since

the organization's founding in 2005. In my capacity as Executive Director, I oversee and

am intimately familiar with the organization's mission, membership, activities, and

operations. My business address is 1616 P St. NW, Suite 300, Washington, D.C. 20036.

2.      In addition to being Executive Director of FWW, I also reside on a farm in the

Chesapeake Bay watershed where we employ a diversified system of crop and animal

production, including chickens. My experience living on the farm has made me acutely

aware of the need for diversification and sustainability in our food production systems.

3.      I make this declaration in support of FWW's challenge to the U.S. Environmental

Protection Agency's (EPA) unlawful guidance and rule exempting animal feeding

operations (AFOs) from emissions reporting requirements under the Emergency Planning

and Community Right-to-Know Act (EPCRA) ("EPCRA Guidance").

4.      FWW is a national non-profit membership organization with its headquarters in

Washington, D.C., offices in Washington, D.C., California, Iowa, New Jersey, and New

York, and campaign staff in California, Florida, Maryland, New Jersey, New Mexico,

New York, Oregon, and Pennsylvania. We have more than one million members and

supporters. Our organization's mission is to champion healthy food and clean water for

all, stand up to corporations that put profits before people, and advocate for a

democracy that improves people's lives and protects our environment. FWW uses

2

grassroots organizing, policy advocacy, research, communications, and litigation to further this mission.

5.    One of our organization's primary purposes is to educate the public regarding food systems that guarantee safe, wholesome food produced in a humane, sustainable manner that simultaneously protect the environment. Integral to this purpose is working to both counter the many harms of our current food system and promote cleaner, healthier, and more equitable systems of food production. FWW advocates on behalf of the public for policies promoting environmental protection and the long-term wellbeing of communities.

6.    FWW works to empower people through advocating for clean, healthy, and sustainable food systems. Part of our work within this mission is to ensure that our food production systems, including livestock production systems, operate sustainably with minimal impacts on both community and environmental health. Pollution from large animal feeding operations (AFOs), or factory farms, including air emissions subject to reporting under EPCRA, is one of FWW's priority issues.

7.    We believe transparency is vital to all of our work, including our AFO work. We strive to obtain and provide citizen access to information about AFO activities and pollution data, including helping citizens obtain access to information about pollution from AFOs in their community. FWW relies heavily on access to public data about AFOs and AFO pollution to further our goal of increasing transparency about how factory farms operate, where they are located, and the pollutants they emit into communities and waterways, as well as to further our goal of reducing that pollution and improving EPA regulation of the AFO industry.

8.     We also believe that it is vitally important that the EPA fulfill its mission to protect our environment and communities from the harm of pollution from facilities like AFOs. We are aware that, to date, EPA has failed to properly oversee and regulate this industry, including its air emissions of ammonia, hydrogen sulfide, and other toxic pollutants. EPA's ongoing failure harms FWW and its many members.

9.     FWW is aware that EPA has previously illegally exempted many AFOs from EPCRA reporting requirements, has failed to enforce EPCRA reporting requirements against large AFOs, and has failed to finalize emissions estimating tools for AFOs to use to accurately estimate and report air emissions. FWW is also aware that several years ago EPA revised its interpretation of EPCRA, declaring through guidance and regulations that AFOs are no longer required to report emissions. As a result of these actions and failures to act, many AFOs have never reported emissions data under EPCRA and the public has very little information about AFO emissions and community exposures to those emissions.

10.    One of our organizational responsibilities is to provide information to members regarding AFOs and their pollution.

11.    To that end, we maintain a website and communications network whereby we keep our members, policy makers, media, and the public informed about the current model of food production in the United States, including the operation of AFOs. Access to publicly reported pollution documents and other records related to the AFO industry is an integral part of our work.

12.    To help fill gaps in public access to information about factory farms, FWW regularly obtains public data about the locations and density of livestock production across the U.S., public financing of AFOs, factory farm pollution, and related issues through

Freedom of Information Act (FOIA) requests to the U.S. Department of Agriculture and EPA, as well as state public records requests to state environmental and agricultural agencies.

13.    FWW makes this and other information about the factory farm industry and its pollution available to the public through data-driven policy reports, white papers, fact sheets, and web pieces. Access to information about individual AFOs and their pollution is essential to this work. Due to the lack of air emissions reporting from AFOs, however, it is impossible for our organization to understand the true breadth of AFO air pollution and the harmful impacts of that pollution, and subsequently to provide this information to our members and the public.

14.    FWW advocates extensively for greater transparency and regulation of AFO air emissions to fill these gaps. This work includes petitioning EPA to regulate ammonia as a Clean Air Act criteria pollutant; advocating against the 2018 federal Fair Agricultural Reporting Method (FARM) Act, which exempted AFOs from emissions reporting requirements under the Comprehensive Environmental Response, Compensation, and Liability Act; campaigning in support of Maryland's proposed Community Healthy Air Act legislation to measure AFO air emissions; petitioning the Iowa Environmental Protection Commission to increase local control and air pollution protections over factory farms in Iowa; petitioning EPA to strengthen its Clean Water Act regulation of CAFOs, including controlling deposition of pollutants like ammonia, which are emitted via ventilation systems, into waterways; and petitioning EPA to abandon its failed National Air Emissions Monitoring Study process and end its longstanding amnesty for thousands of factory farms from enforcement of clean air laws.

15.     FWW's members understand that there is inadequate information about air emissions from AFOs available to the public. One consequence of these gaps in information is that our members are exposed to unknown quantities of hazardous air pollutants in their communities and at their homes. Their ability to use and enjoy their homes, as well as their aesthetic and recreational interests in their communities, are negatively impacted. EPCRA's reporting requirement for AFOs is critical to helping close this information gap about air emissions exposures.

16.     Air pollution from AFOs impacts communities' quality of life and public health, air quality, and even water quality across the country. AFO emissions contain hundreds of gases and compounds, including ammonia and hydrogen sulfide, both of which are subject to reporting requirements under EPCRA if emitted in sufficient quantities.

17.     Ammonia is a potent respiratory irritant with an offensive odor, and can cause eye, nose, throat, and chest irritation, headache, dizziness, and general discomfort. Ammonia gas reacts with other gases to form ammonium aerosols, which are extremely small particles that are inhalable and increase the risk of aggravated asthma symptoms, bronchitis, heart attack, and premature death. Ammonia emitted by AFOs also subsequently deposits on land and waterways, where it contributes to nitrogen pollution. Nitrogen is a nutrient responsible for numerous impairments of waterways across the country, causing algae blooms and areas known as dead zones that are devoid of oxygen needed to sustain fish and other aquatic life.

18.     Hydrogen sulfide is a dangerous neurotoxin with the odor of rotten eggs, and causes headaches, nausea, aggravated asthma symptoms, convulsions, and eye and skin irritation. Hydrogen sulfide is heavier than air, and sinks in valleys and other low places,

where it can adversely affect health and quality of life. Despite its odor, sense of smell alone is insufficient to detect hydrogen sulfide and warn of potentially harmful conditions, because continuous low-level exposure can cause people to lose their ability to smell the gas. It can also prove fatal and has been responsible for several incidents of asphyxiation and death in and near manure pits at large AFOs.

19.    As an organization that works to inform the public about pollution from AFOs and partner with community groups and rural residents to mitigate the harms of this pollution, FWW is concerned that EPA's EPCRA guidance and rule will permanently prevent access to a critical source of information about AFO emissions and pollution exposure for rural communities impacted by factory farms. In this absence of nationwide emissions reporting under EPCRA, FWW is largely unable to provide emissions information to our members and the public, despite our efforts to obtain similar information by searching for alternative sources of data or estimates of AFO air emissions and advocating to fill the gaps created by EPA through state legislation.

20.    If EPA had begun enforcing EPCRA's reporting mandate, rather than issuing the challenged EPCRA guidance and rule, FWW would have far more information about AFO emissions to use in our communications and advocacy work. Specifically, FWW would benefit from reinstatement of EPCRA's AFO reporting requirements because it would provide FWW with the opportunity to obtain emissions estimates reported by AFOs directly from responsible agencies. FWW could analyze this information and provide the data and analysis to our members. This would shed significant light on hazardous emissions exposures in rural communities across the country, increasing

transparency around the impacts of an unsustainable industry whose air pollution remains virtually unregulated. These issues are closely related to FWW's mission.

21.     FWW believes that the nation's environmental laws have been successful in large part due to transparency. An open government that requires AFOs to provide basic information estimating their air pollution emissions would greatly benefit our work and promote FWW's goals and mission. FWW would use this information to advocate for stronger regulation of dangerous AFO air pollution and to otherwise help address the suffering that our members living on the fence lines of AFOs are forced to endure. This information would also directly empower our members who are adversely affected by AFOs, providing them with emissions data they can use in their own local advocacy and enabling them to make informed decisions to avoid exposure to hazardous pollution. We believe that EPA must reinstate emissions reporting requirements and enable citizens to access information about what toxic pollution they are being exposed to, if it is to get closer to fulfilling its mandate to protect the nation's citizens from the dangers of AFOs.

I hereby certify that the facts set forth above are true and correct to the best of my knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_____
                                    Wenonah Hauter

Dated:  July 24,2024    , 2024

# EXHIBIT 20

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RURAL EMPOWERMENT ASSOCIATION
FOR COMMUNITY HELP, et al.,

   Plaintiffs,

  v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Civ. No. 1:18-cv-02260-TJK

**DECLARATION OF**
**CHRISTOPHER HOLBEIN**

1

## DECLARATION OF CHRISTOPHER HOLBEIN

I, Christopher Holbein, am over 18 years of age and am competent to testify. I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1. I serve as Public & Corporate Policy Director, of Farm Animal Protection for the Humane Society of the United States ("HSUS"). I have worked for HSUS from 2013 to present. I am responsible for coordinating our public and corporate policy efforts to improve the welfare of farm animals.

2. In my capacity with the organization, I am familiar with HSUS' structure, function, purpose, and membership. I have personal knowledge of the following based on my experience and based on materials I have reviewed.

3. HSUS is a national nonprofit organization that promotes the protection of all animals; it has millions of members and constituents nationwide, including members in all 50 states and in the District of Columbia. HSUS is headquartered in the Washington, D.C. area, and has offices, affiliates, or staff throughout the country. Since its inception in 1954, HSUS has actively advocated for better laws to protect animals and their environment; conducted campaigns to combat animal abuse and promote strong animal welfare policies; and advocated against practices that injure, harass, or otherwise harm animals. Specifically, with its mission to create a humane and sustainable world for all animals—including people and their communities—HSUS endeavors to ensure that its members are aware of, and not injured by, practices that can result in animal feeding operations ("AFOs") releasing or otherwise discharging pollutants into the natural environment.

4. HSUS' work on the issue of farm animal welfare—and its relation to the environment and public health and safety—is a top organizational priority. In addition to the Farm Animal Protection team of which I am a part, HSUS employs veterinarians and scientists, who, along with

other experts and HSUS staff, focus on the animal welfare, human health, and environmental impacts of industrialized animal agriculture.

5. HSUS' farm animal welfare campaign is strongly committed to educating the public about pollution from AFOs and the consequences these operations have on the health and quality of life of the communities surrounding them. Due to the amount of animal waste an AFO can produce, the number of animals it maintains, and common AFO waste management practices, these facilities can generate and release numerous environmental pollutants, including ammonia and hydrogen sulfide. Such emissions from industrial farms affect not only wildlife and farm animals, but also the neighbors, independent farmers, and employees of these farms.

6. Exposure to ammonia and hydrogen sulfide emissions can cause numerous human health problems, including respiratory symptoms, nausea, headaches, exacerbated asthma, eye irritation, and effects on mood. HSUS has members throughout the United States, including members who work and reside in communities neighboring AFOs, and they are concerned about the negative impacts these emissions could have on their health and the health of their families and communities.

7. The organization's members rely on HSUS for information regarding the impacts of animal agriculture on human health, the environment (including wildlife), and farm animal welfare. And the organization engages in efforts to mitigate these impacts on behalf of its members. To these ends, HSUS has invested considerable organizational resources in public education, research and investigation, and litigation concerning farm animal welfare, public health, and the environment. *See, e.g.*, HSUS, *Factory Farming in America: The True Cost of Animal Agibusiness for Rural Communities, Public Health, Families, Farmers, the Environment, and Animals*, *available at* http://www.humanesociety.org/assets/pdfs/farm/hsus-factory-farming-in-

america-the-true-cost-of-animal-agribusiness.pdf; HSUS, *An HSUS Report: Human Health Implications of Non-Therapeutic Antibiotic Use in Animal Agriculture*, *available at* http://www.humanesociety.org/assets/pdfs/farm/HSUS-Human-Health-Report-on-Antibiotics-in-Animal-Agriculture.pdf; HSUS, *An HSUS Report: The Impact of Industrialized Animal Agriculture on Rural Communities*, *available at* http://www.humanesociety.org/assets/pdfs/farm/hsus-the-impact-of-industrialized-animal-agriculture-on-rural-communities.pdf; HSUS, *An HSUS Report: The Impact of Industrialized Animal Agriculture on the Environment*, *available at* http://www.humanesociety.org/assets/pdfs/farm/hsus-the-impact-of-industrialized-animal-agriculture-on-the-environment.pdf; *see also Humane Soc'y of U.S. v. HVFG, LLC*, No. 06 CV 6829(HB), 2010 WL 1837785 (S.D.N.Y. May 6, 2010); *Avila v. Olivera Egg Ranch, LLC*, No. 2:08-cv-02488-JAM-KJN, Dkt 1 (E.D. Cal. Oct. 20, 2008).

8. In addition, HSUS supports public policies addressing AFOs' environmental, health, and animal welfare impacts at the federal, state, and local levels. To this end, HSUS regularly drafts and participates in sign-on letters, mobilizes its members and other organizations with similar interests, participates in coalitions to support or oppose proposals on key issues, works directly with legislators and agency officials, and provides testimony before legislative bodies.

9. Relatedly, HSUS actively participates in the federal regulatory process with respect to AFOs and their impacts by submitting comments on relevant rulemakings and other regulatory actions, petitioning agencies for regulatory actions, and challenging unlawful agency actions. For instance, HSUS, together with a coalition of environmental and public health organizations, petitioned the Environmental Protection Agency ("EPA") to regulate AFOs under the federal Clean Air Act as stationary sources of air pollution. *See* HSUS et al., *Petition to List Concentrated*

*Animal Feeding Operations Under Clean Air Act Section 111(B)(1)(A) of the Clean Air Act, and to Promulgate Standards of Performance under Clean Air Act Sections 111(B)(1)(B) and 111(D)* (Sept. 21, 2009), *available at* http://www.humanesociety.org/assets/pdfs/litigation/hsus-et-al-v-epa-cafo-caa-petition.pdf. The petition urged EPA to hold industrial animal feeding operations accountable for the harm they inflict on local communities, independent farmers, and the environment, and discussed how reduction of emissions from these operations will improve human health, reduce suffering of farm animals, protect habitat for wildlife, and reduce the effects of climate change. HSUS, together with a coalition of environmental and public health organizations, also petitioned EPA to list ammonia as a criteria pollutant under the federal Clean Air Act due to the substantial impacts of ammonia on human health and the environment. *See* Envtl. Integrity Project et al., *Petition for the Regulation of Ammonia as a Criteria Pollutant under Clean Air Act Sections 108 and 109*, *available at* http://www.environmentalintegrity.org/documents/PetitiontoListAmmoniaasaCleanAirActCriteriaPollutant.pdf.

10. In addition, HSUS, with a coalition of environmental groups, filed a challenge against a rule that EPA promulgated in 2008 under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and Emergency Planning and Community-Right-to-Know Act ("EPCRA"). This rule exempted most farms from reporting air releases of hazardous substances emitted by animal waste. HSUS, with other nonprofits and concerned citizens, first raised its concerns about the lawfulness of the rule through comments to EPA during the rulemaking process. HSUS and the coalition ultimately prevailed in their legal challenge; the U.S. Court of Appeals for the D.C. Circuit vacated the 2008 rule. *Waterkeeper All. v. Envtl. Prot. Agency*, 853 F.3d 527 (D.C. Cir. 2017).

11. HSUS, in collaboration with environmental and public health focused nonprofits, also submitted comments in response to the 2017 Interim Guidance EPA issued for AFOs regarding their EPCRA and CRCLA reporting obligations after the 2008 rule was vacated. *See* Letter from Earthjustice et al. to Envtl. Prot. Agency re: CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms (Nov. 22, 2017); Letter from Food & Water Watch et al. to Envtl. Prot. Agency re: Interim Guidance on CERCLA and ECPRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms (Nov. 22, 2017). In addition to this 2017 guidance, in 2019 EPA finalized a rule which contains the same purported reporting exemptions as the earlier Interim Guidance does. Envtl. Prot. Agency, *Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to Know Act,* 84 Fed. Reg. 27533 (June 13, 2019) (collectively with the 2017 guidance: "Reporting Exemptions"). As with the 2017 Interim Guidance, HSUS submitted comments (also in collaboration with environmental and public health focused nonprofits) opposing EPA's proposed regulatory AFO reporting loophole.

12. The varied work HSUS undertakes with respect to industrialized animal agriculture is central to the organization's mission and to protecting HSUS members from the deleterious impacts of AFOs on their lives, animals, and property, as well as on the environment and the habitats of the wild animals our members cherish. HSUS often relies upon information about pollutants released from AFOs when it engages in this work to protect animals, disseminate information to the public and our members, and pressure authorities for changes regarding pollutant releases.

13. I am aware that EPCRA is intended to provide the public—including HSUS and its members—and government authorities with access to information about industrial facilities' releases of extremely hazardous substances above certain threshold amounts. I am also aware that ammonia and hydrogen sulfide are classified as "extremely hazardous substances" under EPCRA. Additionally, I am aware that EPCRA requires the owner or operator of a facility to report the release of more than 100 pounds of ammonia or hydrogen sulfide per day to the relevant local and state authorities. I am aware that EPCRA further requires this reported information to be made available to the general public.

14. AFOs can release more than 100 pounds of ammonia or hydrogen sulfide into the air per day. I understand that EPA's Reporting Exemptions exempt AFOs from reporting, to relevant state and local authorities, the specific information required by EPCRA about these releases, which also prevents this information from being made available to the general public, including HSUS and its members.

15. The EPCRA Reporting Exemptions for AFOs harms HSUS' members and the organization itself because it deprives both HSUS and its members of information to which they are entitled under EPCRA, because it could lead to adverse health impacts for HSUS members living or working near AFOs, and because the exemption's promulgation deprived HSUS of its procedural rights.

16. The EPCRA reporting exemption for AFOs deprives HSUS members of information, including the types and amounts of extremely hazardous substances, such as ammonia and hydrogen sulfide, released from AFOs.

17. EPA's exemption of AFOs from EPCRA reporting could also cause harm to the health of HSUS members living or working near AFOs. Exposure to ammonia and hydrogen sulfide

emissions can be harmful to human health, causing respiratory symptoms, nausea, headaches, exacerbated asthma, eye irritation, and effects on mood. If HSUS members do not have access to information about the types and amounts of extremely hazardous substances released from AFOs, they may not be able to take steps to protect themselves from these adverse health impacts. In addition, EPA's EPCRA reporting exemption harms HSUS members because it deprives them of protections they otherwise would have if local response authorities received release reports from AFOs and were better informed about the sources of toxic emissions in their jurisdictions. Further, this lack of information could undermine opportunities for citizen-driven legal and legislative actions aimed at preventing the health and environmental harms caused by AFOs.

18. Further, HSUS is harmed because, without information about extremely hazardous substances released from AFOs, the organization is limited in its ability to adequately educate and serve its membership, protect animals and wildlife from further harm, and advocate for meaningful change in the regulation of pollution from AFOs, all of which negatively impact its organizational mission and goals. In short, when HSUS cannot obtain this information—because EPA has exempted AFOs from EPCRA reporting requirements—work central to HSUS' mission is made impossible. Ensuring that HSUS has reasonable access to information about the releases of extremely hazardous substances from AFOs, such as ammonia and hydrogen sulfide, will save HSUS the time, money, and effort associated with attempting to obtain this information through other means, to the extent it can be obtained at all.

19. If this Court were to rule for the plaintiffs, the harms I have outlined above would be significantly reduced or eliminated. If the Court vacates the EPCRA Reporting Exemptions, AFO's would be required to comply with EPCRA and report information about the extremely hazardous substances they release in excess of threshold amounts (including ammonia and

hydrogen sulfide releases of more than 100 pounds per day) to state and local authorities, and this information would be made available to the general public, including HSUS and its members. HSUS would use this information to educate its members and advance its mission in the ways detailed above. In addition, HSUS members living near AFOs could use this information to protect themselves and their families from the adverse health impacts exposure to pollutants released from AFOs can cause. HSUS members could also use this information to protect their animals and property from the harms pollutants released from AFOs cause or threaten to cause.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 21st day of August 2024, in Greensboro, Vermont

_____

Christopher Holbein

# EXHIBIT 21

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

Rural Empowerment Association for
Community Help, et al.,

                Plaintiffs,

                v.

United States Environmental Protection
Agency, et al.,

                Defendants,
        and

National Cattlemen's Beef Association, et al.,

                Intervenor-
                Defendants.

**CASE NO. 18-cv-02260-TJK**

**Declaration of Jane Williams**

---

## DECLARATION OF JANE WILLIAMS

I, Jane Williams, declare that I am over 18 years of age and am competent to testify. I have

personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1.  I am the Chair of the Sierra Club's national Air Grassroots Network Team. The Sierra

Club is a national nonprofit organization of approximately 795,000 members dedicated to

exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the

responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to

protect and restore the quality of the natural and human environment; and to using all lawful

means to carry out these objectives.

2.  The Sierra club is very concerned about pollution and public health impacts from

Concentrated Animal Feeding Operations (CAFOs). Sierra Club's CAFO campaign began over

two decades ago when it was designated one of our four national priority campaigns.  Its goal

was to keep factory farm pollution out of America's drinking water, lakes and rivers, and

eliminating the threats that CAFOs pose to our public health and rural heritage.

3.  Sierra Club members live near CAFOs, recreate downstream from CAFOs and receive

drinking water from sources that may be affected by pollution from CAFOs. CAFOs are poorly

controlled or uncontrolled sources of nutrients, pathogens, hormones, antibiotics and toxic

chemicals. Pollution from CAFOs poses a threat to our members, recreational activities, health

and quality of life.

4.  Sierra Club lobbies for stronger environmental controls over CAFOs at the federal and

state levels. It comments on proposed rules and challenges inadequate agency actions through

litigation. It engages in shareholder actions as a means of improving the environmental

performance of companies that own or operate CAFOs. It sues individual CAFOs that violate laws. It produces training material to strengthen our members' ability to fight CAFO pollution.

5.   I myself, along with many other Sierra club volunteers and staff, have worked for many years with Sierra Club members around the nation who are confronting CAFO facilities operating in or attempting to locate in their communities. In assisting these communities the Sierra Club has been a major player in the national effort to address pollution from factory farms. Specific examples of Sierra Club's work in some states follows:

6.   In Mississippi, we worked with our Mississippi chapter to address the environmental justice problems associated with where CAFOs were located. In Iowa, the local Club became involved as large CAFO operations bought out small farms and turned family farmers into contract laborers. In Missouri and Oklahoma, Sierra Club staff assisted local residents faced with air and water pollution. Rivers in Texas are impacted by many large dairy operations, so the Sierra Club funded a water sentinels project for these watersheds for years – creating teams of trained volunteers to sample and develop a database of water quality on these rivers.

7.   Ultimately, CAFO developers moved west and Sierra Club staff and volunteers have now assisted communities in many western states. California has always had many large factory farms, but opposition to CAFOs increased because of threats to the Central Valley, the headwaters of the rivers that feed the San Francisco Bay Delta. Here the Sierra Club legal team won a major victory by preventing a 29,000-cow dairy from locating near Bakersfield.

8.   I am aware also that the Kansas Chapter recently sponsored a lawsuit challenging the expansion of a large hog operation where the state sought to avoid restrictions on the size of CAFOs by arbitrarily treating the operation as two separate CAFOs.  I am aware that the Atlantic

Chapter recently won a challenge to New York's general discharge permit for CAFOs that failed to provide adequate opportunities for public participation in the permitting process.

9.   More broadly, the Club has fought to secure strong air reporting requirements for CAFOs by challenging EPA's 2008 decision to exempt CAFOS from hazardous substance reporting requirements under the Emergency Planning and Community Right-to-Know Act (EPCRA) and Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). I am aware that, in *Waterkeeper Alliance v. EPA*, 853 F.3d 527, 537–38 (D.C. Cir. 2017), the D.C. Circuit struck down EPA's attempt to exempt CAFOs from reporting requirements under both EPCRA and CERCLA.

10. I am also aware that, despite the D.C. Circuit ruling striking down EPA's exemption of CAFOs form air reporting requirements, EPA has nevertheless implemented new guidance that exempts CAFOs from reporting under EPCRA.  EPA has denied the public information about CAFO air emissions for over a decade now.  This lack of information hampers Sierra Club's efforts to inform its members about the harms of CAFO air emissions and to advocate for decreases or better protections from these emissions.

11. EPA also failed to provide adequate public notice and opportunity for public comment when it published its air reporting exemption guidance.  EPA failed to provide any notice in the federal register or invite public comment through the Administrative Procedure Act, which is an obstacle to Sierra Club's and the public's participation in the rulemaking process as required by law.  It is only by hiding its actions from public scrutiny that EPA was able to pass such an illegal and harmful "guidance."

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 23, 2024

Jane Williams

# EXHIBIT 22

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

Rural Empowerment Association for
Community Help, et al.,

                          Plaintiffs,


                   v.

United States Environmental Protection
Agency, et al.,

                           Defendants,
          and

National Cattlemen's Beef Association, et al.,

                          Intervenor-
                          Defendants.

**CASE NO. 18-cv-02260-TJK**


**Declaration of Heather Deck**

---

## DECLARATION OF HEATHER JACOBS DECK

I, Heather Deck, declare that I am over 18 years of age and am competent to testify. I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1.    I am the Executive Director of Sound Rivers, Inc. (Sound Rivers), formerly the Pamlico-Tar River Foundation.  Prior to becoming Executive Director, from 2003 to 2017, I served as the Pamlico-Tar Riverkeeper for Sound Rivers.

2.    Sound Rivers is a member organization of the Waterkeeper Alliance.

3.    Sound Rivers works to monitor, protect, and enhance the Neuse and Tar-Pamlico Rivers and their watersheds through advocacy, conservation, and education. These watersheds cover more than 12,000 square miles and include the Pamlico Sound—a major component of the second largest estuary in the United States. Sound Rivers has t  o Riverkeepers who serve as investigators, advocates, and educators for the watersheds. Sound Rivers further represents the interests of its thousands of members and donors who live in, visit, or love this beautiful region of North Carolina. Sound Rivers and its members seek to ensure clean, safe water, and an ecologically sound and healthy environment for today and for future generations.

4.    I reside in Washington, North Carolina with my husband and two daughters.

5.    As the Executive Director of Sound Rivers, I am responsible for supervising all employees of Sound Rivers and for providing overall direction to the organization's campaigns and fulfillment of the organization's mission.  In addition, I continue some of the activities of my prior role as Riverkeeper when support is required by Sound Rivers' t  o Riverkeepers.  These duties included serving as an advocate for the Tar-Pamlico and Neuse Rivers, their tributaries and estuarine areas; observing, documenting, and reporting environmentally harmful activities; responding to and investigating citizen complaints; and when necessary, calling for enforcement action or initiating litigation.  I maintained an on-the-river presence to investigate pollution sources, help support monitoring efforts and clean-up

programs, and administer Sounds Rivers' volunteer programs. My work also entailed coordinating and providing educational programs, as well as assisting with fundraising, membership activities, and grants.

6.   In addition to these duties, I ke    abreast of academic studies, reports, and publications relating to the health of the Tar-Pamlico River Basin.  I regularly communicate with state and federal agencies about threats to the watershed, water quality in the watershed, and what more can be done to protect the watershed's environmental integrity.

7.   Since its founding in 1981, Sound Rivers' efforts to protect the Tar-Pamlico and Neuse Rivers and the interests of its members have taken a number of forms.  Our work has included efforts to mitigate adverse impacts on the watershed caused by air pollution and toxic releases.  For over t    t   years, Sound Rivers has worked with the Department of Environmental Quality's (DEQ's) Estuarine Monitoring team, by alerting them to environmental problems facing the Rivers, such as fish kills or pollutant discharges.

8.   Sound Rivers has focused much of its water quality advocacy on protecting the Tar-Pamlico and Neuse Rivers from degradation resulting from too many nutrients (primarily nitrogen, phosphorus and ammonia) in the water.  As a result of human activities, the levels of nitrogen and phosphorus entering the Tar-Pamlico and Neuse Rivers has increased, greatly exceeding natural levels.  Excessive amounts of nitrogen and phosphorus result in an ecosystem out of balance that leads to extensive algae blooms. When the algae die, the decomposition process robs the water of oxygen, particularly during the summer months.  This results in fish kills, including crabs and other biota, in the estuary. Algae blooms also pose a public health risk and the public is advised to avoid contact with waters while blooms are occurring.

9.   Unfortunately, the waters of the Tar-Pamlico River Basin have far higher nutrient levels than is optimal. Indeed, the River has been designated by the State, in part as a result of Sound Rivers' advocacy, as "nutrient sensitive."  Since the "nutrient sensitive" designation was made, Sound Rivers has worked extensively with the State and other stakeholders to develop implementation strategies to reduce the flow of nitrogen, ammonia, phosphorous, and other nutrients into the River.  In particular, Sound Rivers helped develop buffer rules for the Tar-Pamlico, and currently holds seats on the Basinwide Oversight

Committee, a     Albermarle-Pamlico National Estuarine Partnership

10.  Sound Rivers and its members have long been concerned about the impacts of concentrated animal feeding operations ("CAFOs") on the waters of the Tar-Pamlico and Neuse River Basins.  Sound Rivers staff, including myself, has spoken at numerous public meetings advocating for Tar-Pamlico and Neuse nutrient management programs and improved management for CAFOs to prevent nutrient impacts to our waterways.

11.  One of the key contributors to degradation of water quality in our Basin is deposition of nitrogen caused by the emission of ammonia from livestock operations such as CAFOs.  Ammonia from CAFOs is carried by prevailing winds for up to 100 miles, and is deposited through wet and dry deposition on land and in water in the form of nitrogen. As a result of emissions from CAFOs, ammonia levels and other forms of nitrogen in the Tar-Pamlico and Neuse watersheds have increased. This contributes to the eutrophication of the waters, which degrades water quality and interferes with our members' ability to safely and enjoyably recreate and live in the River Basins. Through my work with local scientists, I understand that approximately 40% of nitrogen entering the estuary is attributable to ammonia from livestock operations.

12.  Despite Sound Rivers' efforts to improve the water quality and reduce the nutrient loading in the Tar-Pamlico and Neuse River Basins, Sound Rivers and its members' interests are injured by the EPA's failure to adequately regulate and monitor air emissions from animal waste at livestock operations.

13.  One of the biggest challenges faced by Sound Rivers and its members is the lack of information regarding air emissions of toxic chemicals such as ammonia from CAFOs.  Sound Rivers staff members and regulators and emergency responders lack the information necessary to protect the water quality of the Tar-Pamlico and Neuse Rivers.  Without monitoring and mandatory reporting of air emissions from CAFOs, accurate estimation of the impacts of these emissions on water quality is impossible.

14.  If information about the emissions from animal waste at livestock operations had to be reported in the same way that emissions from other industrial emissions were reported, emergency responders would

be better able to protect the health and safety of the surrounding communities, and Sound Rivers and its members could use this information to take actions to protect their health. This would benefit me and my family. In addition, Sound Rivers would directly benefit from such information and would use it to better assess and address the impacts that air emission from CAFOs have on the Tar- Pamlico and Neuse River Basins. Furthermore, providing regulators with accurate and consistent information on emissions of hazardous pollutants from livestock operations would enable them to better regulate these sources to protect the community's health and support sustained environmental quality. This would provide Sound Rivers with additional legal tools for improving water quality, better enabling us to fulfill our mission.

15.    Sound Rivers submitted comments along with other groups opposing EPA's proposed rule exempting CAFOs from reporting under EPCRA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed August 23, 2024

*Heather Deck*

Heather Deck

# EXHIBIT 23

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Rural Empowerment Association for Community Help, et al., | |
| Plaintiffs, | **CASE NO. 18-cv-02260-TJK** |
| v. | |
| United States Environmental Protection Agency, et al., | **Declaration of Daniel E. Estrin** |
| Defendants, and | |
| National Cattlemen's Beef Association, et al., | |
| Intervenor-Defendants. | |

## DECLARATION OF DANIEL E. ESTRIN

I, Daniel E. Estrin, declare that I am over 18 years of age and am competent to testify. I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1.     I am the General Counsel and Legal Director of Waterkeeper Alliance, Inc. ("Waterkeeper Alliance"), and have worked with the Waterkeeper movement for more than 30 years. As Waterkeeper Alliance's General Counsel and Advocacy Director, I am responsible for supervising all of Waterkeeper Alliance's legal work, including all litigation to which Waterkeeper Alliance is a party.

2.     Waterkeeper Alliance is a not-for-profit corporation organized under the laws of the State of New York, and a charitable organization under section 501(c)(3) of the Internal Revenue Code. Waterkeeper Alliance maintains its headquarters at 180 Maiden Lane, Suite 603, New York, New York 10038.

3.     Waterkeeper Alliance is a global movement of on-the-water advocates who patrol and protect over 5.9 million square miles of rivers, streams and coastlines in North and South America, Europe, Australia, Asia, and Africa. Waterkeeper Alliance seeks to protect water quality in every major watershed around the world, and to restore and maintain all waterways as drinkable, fishable, and swimmable, consistent with the goals of the federal Clean Water Act, the Emergency Planning and Community Right- to-Know Act ("EPCRA"), and other state, federal, and international laws.

4.     Waterkeeper Alliance works toward this vision through direct advocacy and through the grassroots advocacy of its Waterkeeper Member and Affiliate organizations ("Waterkeeper g r o u p s"), which are connected and supported by

Waterkeeper Alliance to provide a voice for waterways and their communities. Waterkeeper Alliance (1) supports and empowers Waterkeeper groups to protect communities, ecosystems, and water quality; (2) promotes the Waterkeeper model for watershed protection worldwide; and (3) advocates for issues common to Waterkeeper groups.

5.     Waterkeeper Alliance currently comprises and connects approximately 300 Waterkeeper groups in 47 countries on six continents. This includes approximately 150 Basinkeepers, Bayoukeepers, Canalkeepers, Channelkeepers, Coastkeepers, Creekkeepers, Inletkeepers, Lakekeepers, Riverkeepers, Shorekeepers, Soundkeepers, and Waterkeepers chartered and licensed by Waterkeeper Alliance in the United States ("U.S. Member Organizations") and approximately 20 Waterkeeper affiliate organizations in the United States ("U.S. Affiliate Organizations").

6.     Waterkeeper Alliance supports its U.S. Member and Affiliate Organizations, and individual members of all these organizations, in many ways. For example, we engage in direct litigation and other advocacy coordinated with the organizations. We also provide a centralized hub for sharing scientific, legal, and administrative resources with these groups across the country. We expand local Waterkeeper group abilities and provide legal support to address environmental issues. And we protect and administer the trademarks covering the U.S. Member Organization license names described above.

7.     Many of Waterkeeper Alliance's U.S. Member and Affiliate Organizations are actively working to protect their watersheds from pollution caused by dense concentrations of cattle, dairy, poultry, and/or swine Animal Feeding Operations ("AFOs)

and Concentrated Animal Feeding Operations ("CAFOs"). Additionally, these U.S. Member and Affiliate Organizations cumulatively have tens of thousands of individual members who live, work and recreate on waterways and in watersheds across the United States. Some of these members live, work, and recreate in areas affected by AFOs and CAFOs, and they are detrimentally affected by the EPA's failure to monitor and regulate air emissions from animal waste at these facilities.

8.    Several Waterkeeper Member and Affiliate Organizations, their members, and their communities are adversely affected by emissions of hazardous substances such as ammonia and hydrogen sulfide released from nearby AFOs and CAFOs. For example, Local Environmental Action Demanded Agency, Inc. ("L.E.A.D. Agency"), an Oklahoma nonprofit corporation, has been a licensed Waterkeeper Member Organization since on or about January 3, 2005 for its Grand Riverkeeper program, and since on or about May 13, 2016 for its Tar Creekkeeper program. L.E.A.D. Agency and its members are adversely impacted by ammonia and hydrogen sulfide emissions, and the resulting water pollution, from a dense concentration of poultry AFOs and CAFOs throughout the Grand River and Tar Creek watersheds, as well as from a large mushroom growing operation that utilizes poultry waste for composting.

9.    L.E.A.D. Agency is also aware of a rapid expansion of poultry AFOs and CAFOs in northeast Oklahoma in 2018 within the Grand River watershed. Ammonia and hydrogen sulfide emissions from these facilities are currently, or will in the near future, adversely affect these programs, their members, and the surrounding communities. Based on L.E.A.D. Agency reports to Waterkeeper Alliance, many community members in the areas where new poultry AFOs and CAFOs are located have reported severe impacts on

their health and quality of life from the newly constructed poultry AFOs and CAFOs, including children reporting increasingly severe allergies, older residents with Chronic Obstructive Pulmonary Disease being unable to go outdoors, and breathing problems in people with asthma.

10.    Similar issues impact the Pamlico Tar Riverkeeper and the Neuse Riverkeeper programs of Sound Rivers, a not-for-profit North Carolina corporation licensed as a Waterkeeper Member Organization since on or about June 23, 2015. Sound Rivers and its members are adversely impacted by ammonia emissions and the resulting water pollution from a dense concentration of swine and poultry CAFOs throughout the Neuse and Tar Pamlico watersheds.

11.    Waterkeeper Alliance also has more than 15,000 individual members that support Waterkeeper Alliance through financial contributions. Waterkeeper Alliance supports these members by advocating on behalf of their interests in local and national forums, including legislative bodies, government agencies, and courts of law, and keeping them informed about environmental issues that impact their communities and others around the country. Some of these members live, work, and recreate in areas affected by AFOs and CAFOs, and are detrimentally affected by the EPA's failure to regulate air emissions from animal waste at AFOs and CAFOs.

12.    Waterkeeper Alliance is a strong advocate for controlling pollution from AFOs and CAFOs. Waterkeeper Alliance regularly organizes training courses and informational panels at topic summits, regional meetings, and at annual Waterkeeper Alliance conferences that include workshops addressing air and land emissions from AFOs and CAFOs and how such pollution affects neighboring waterbodies and

communities. Additionally, Waterkeeper Alliance maintains information on a webpage devoted to AFOs and CAFOs, including information on their regulation, their impacts, and legislative measures to prevent or reduce such impacts. Waterkeeper Alliance also advocates for more stringent regulation of AFOs and CAFOs before state and national officials, and for implementation and enforcement of existing law through litigation. *See e.g.*, *Waterkeeper All. v. EPA*, 853 F.3d 527, 537–38 (D.C. Cir. 2017) (D.C. Circuit held EPA's exemption of CAFOs from the statutory reporting mandates under CERCLA and EPCRA unlawful and vacated the rule) and *Waterkeeper All. v. EPA*, 399 F.3d 486 (2d Cir. 2005) (Second Circuit held portions of EPA's CAFO Regulations were unlawful).

13.     As a result of my work at Waterkeeper Alliance and with Waterkeeper groups, including my work on previous litigation challenging EPA's attempt to exempt CAFOs from reporting hazardous substances under EPCRA, I am aware that many AFOs and CAFOs emit significant quantities of ammonia and hydrogen sulfide that can pollute the air and be deposited into surface waters, contaminating the receiving waters with nitrogen and other substances. This process can result in water quality degradation, community health problems, and significant environmental harm, particularly contributing to algal blooms that can become widespread and toxic to people and wildlife. I am also aware that pollutants released from AFOs and CAFOs, such as ammonia and hydrogen sulfide, pose a health and welfare risk to Waterkeeper Alliance's and Waterkeeper Organization's members and their communities, and impact the environment in a variety of ways that limit the use and enjoyment of the environment by Waterkeeper Alliance members and their communities.

14.     Waterkeeper Alliance's, Waterkeeper Organizations' and their members' interests are injured by the EPA's continuing efforts to exempt AFOs and CAFO's from their statutory legal obligation to report emissions of hazardous substances under EPCRA, including this most recent attempt to exempt AFOs and CAFOs from reporting their emissions through a final rule finalized on June 19, 2019, 84 Fed. Reg. 27533. Access to information about the hazardous substances emitted from AFOs and CAFOs would benefit Waterkeeper Alliance and Waterkeeper Organizations by providing data that will help our advocacy efforts to combat the negative impacts of air emissions from these facilities. Waterkeeper Alliance would use such data to advocate for better regulation of AFO's and CAFOs' air emissions, as well as distribute this information to our members who have a right to know about the hazardous air pollutants released from these facilities near their homes and in their communities, especially given the serious health impacts than can be caused by AFO and CAFO emissions.

15.     Waterkeeper Alliance's and Waterkeeper Organizations' members would benefit from the information and knowledge that AFOs and CAFOs are required to provide to regulators about releases of hazardous pollutants so that those regulators can adequately assess and respond to the releases in a manner that is protective of public health and safety. Waterkeeper Alliance believes that if environmental regulators have accurate information about releases of hazardous air pollutants, they will better regulate these sources. This information is also necessary for emergency responders to effectively monitor and respond to communities exposed to unsafe levels of hazardous air pollutants.

16.    If AFOs and CAFOs are required to publicly report their releases of hazardous aerial pollutants, Waterkeeper Alliance expects that some facilities will take voluntary measures to mitigate or even eliminate emissions of hazardous substances from animal waste. Waterkeeper Alliance's mission to protect the environment from AFOs and CAFOs would directly benefit from any mitigation measures undertaken by these facilities in response to mandatory reporting requirements.

I declare under penalty of perjury that to the best of my knowledge the foregoing is true and correct.

Executed on this 26th day of July, 2024 in Norwalk, CT.


_____
          Daniel E. Estrin

# EXHIBIT 24

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

Rural Empowerment Association for
Community Help, et al.,

                        Plaintiffs,

             v.

United States Environmental Protection
Agency, et al.,

                      Defendants,
          and

National Cattlemen's Beef Association, et al.,

                   Intervenor-
                   Defendants.

**CASE NO. 18-cv-02260-TJK**

**Declaration of Rebecca Jim**

---

## DECLARATION OF REBECCA JIM

I, Rebecca Jim, declare that I am over 18 years of age and am competent to testify. I have personal knowledge of the facts stated below and, under penalty of perjury, declare as follows:

1)     I am a co-founder and current Executive Director of Local Environmental Action Demanded Agency, Inc. ("L.E.A.D. Agency"), a non-profit corporation organized under the laws of Oklahoma in 1997, with offices located in Vinita and Miami, Oklahoma. L.E.A.D. Agency was established to achieve the following goals: (1) Educating the community on environmental concerns in Northeast Oklahoma; (2) taking action to counter environmental hazards that put Northeast Oklahoma's residents at risk both physically and financially; (3) conducting environmental workshops and seminars concerning environmental issues in Northeast Oklahoma and other areas; and (4) enhancing our efforts by partnering with other environmental organizations throughout Oklahoma and the nation.

2)     I also serve as the Tar Creekkeeper, a program of L.E.A.D. Agency, the mission of which is to protect and restore Tar Creek, a tributary of the Neosho River. Beginning in 1984, portions of the Tar Creek watershed have been designated as a part of a large-scale Superfund site due to extensive industrial pollution of surface water and groundwater, surrounding residential areas, and the sites of several former mining, milling, smelting, storage, disposal, and other related operations. Tar Creek, its watershed and the surrounding community, including L.E.A.D Agency members, are also increasingly being adversely impacted by ammonia and hydrogen sulfide emissions from animal waste generated by large poultry Animal Feeding Operations ("AFOs") and/or Concentrated Animal Feeding Operations ("CAFOs"), including J&M Farms, which operates a large mushroom farm with animal waste composting and a poultry AFO.

3)     Grand Riverkeeper is another program of the L.E.A.D. Agency, and my colleague

Martin Lively serves as Grand Riverkeeper. The mission of Grand Riverkeeper is to protect and restore the Grand River watershed, which is located in the northeastern portion of Oklahoma and encompasses the Neosho and Spring Rivers and their tributaries. The two rivers merge and form the Grand River at the southern edge of Ottawa County, before they converge at the top portion of Grand Lake. Below Grand Lake, the Grand (Neosho) flows northeast into two other important reservoirs and ultimately flows into the Arkansas River north of Muskogee, Oklahoma. The Neosho and Spring Rivers are important  water resources to the nine tribes of the Inter-Tribal Council of North Eastern Oklahoma and other subsistence and sports users, and Grand Lake is an important resource to the Cherokee Nation, in whose jurisdiction it is located. Grand River, its watershed and the surrounding community, including its members, are also increasingly  being adversely impacted by the proliferation of large poultry AFOs and CAFOs.

4)      Both Grand Riverkeeper and Tar Creekkeeper are programs of L.E.A.D. Agency and are licensed members of Waterkeeper Alliance.

5)      I am aware that poultry AFOs and CAFOs emit ammonia and hydrogen sulfide that can pollute the air and be deposited into surface water, contaminating water with nitrogen and other substances. This can cause water pollution, community health problems, and significant environmental harm, including dissolved oxygen problems, fish kills and toxic algal blooms. I am also aware that pollutants released from poultry AFOs and CAFOs, such as ammonia and hydrogen sulfide, pose a health and welfare risk to our members and their communities, and impact the environment in a variety of ways that limit the use and enjoyment of the environment by our members and their communities.

6)      Ammonia emissions from poultry AFOs and CAFOs have adversely impacted water quality in the Grand and Tar Creek watersheds. For example, Grand Lake is polluted by excess nutrients that cause low dissolved oxygen and periodic toxic algal blooms, which have

resulted in closure of the lake. Grand Lake is an important source of drinking water for surrounding communities and for me personally.

7)     Hydrogen sulfide and ammonia emissions from J&M Mushroom farm and the associated poultry AFO have adversely impacted air and water quality in the Tar Creek watershed.

8)     There was also a rapid expansion of poultry AFOs and CAFOs in northeast Oklahoma over during 2018, including within the Grand River watershed. In 2018, Oklahoma issued more than 30 permits for new or expanding poultry CAFOs with more than 140 poultry confinement barns that house more than 5,000,000 birds - the majority of which are concentrated in one area near communities, homes, schools, and businesses in Delaware County, Oklahoma near Spring Creek, a tributary of the Grand River. An aerial map showing the Grand Lake watershed, including Tar Creek, poultry AFO and CAFO density, and new or expanding poultry AFOs is attached as Attachment 1 to this declaration.

9)     Ammonia and hydrogen sulfide emissions from these facilities are currently or will, in the near future, adversely affect L.E.A.D. Agencies' programs, their members, and the surrounding communities. Many community members are reporting severe impacts on their health and quality of life from the newly constructed poultry AFOs and CAFOs, including children reporting increasingly severe allergies, older residents with Chronic Obstructive Pulmonary Disease being unable to go outdoors, and breathing problems in people with asthma.

10)     Data regarding the amount of hydrogen sulfide and ammonia emissions, which is currently unavailable, is desperately needed to protect the public health in northeast Oklahoma.

11)     On September 12, 2018, the State of Oklahoma and the Cherokee Nation, in response to public outcry regarding the impacts to their environment, health and quality of life from the newly permitted poultry AFOs and CAFOs, announced the formation of the Poultry

Coordinating Council on Poultry Growth to study the impacts of the rapid expansion on citizens. Additionally, on October 8, 2018, the Oklahoma Department of Agriculture announced a suspension on the issuance of additional permits for new or expanding operations until the impacts are evaluated. Permit issuance was reinitiated in 2019 without any controls over hazardous air emissions from the facilities.

12)    L.E.A.D Agency and its members' interests are injured by the EPA's efforts to exempt AFOs and CAFOs from their statutory legal obligation to report emissions of hazardous substances under EPCRA, including the attempt to exempt AFOs and CAFOs from reporting their emissions through the final rule adopted on June 19, 2010, 84 Fed. Reg. 27,533, and we filed comments in opposition to that rule on December 14, 2018, see EPA-HQ-OLEM-2018- 0318-0347. Access to information about the hazardous substances emitted from AFOs and CAFOs would benefit L.E.A.D Agency and its members by providing data that will help our advocacy efforts to combat the negative impacts of air emissions from AFOs and CAFOs.

13)    L.E.A.D Agency and its members would use this data to advocate for better regulation of AFO's and CAFOs' air emissions, as well as distribute this information to our members who have a right to know about the hazardous air pollutants released from the operations near their homes and in their communities, especially given the serious health impacts that emissions from poultry AFO and CAFO can cause.

14)    L.E.A.D Agency and its members would benefit from knowing that AFOs and CAFOs are required to provide regulators with information about releases of hazardous pollutants so that those regulators can adequately assess and respond to the releases in a manner that is protective of public health and safety. L.E.A.D Agency believes that if environmental regulators have accurate information about releases of hazardous air pollutants, they will better

regulate these sources. This information is also necessary for emergency responders to effectively monitor and respond to communities exposed to unsafe levels of hazardous air pollutants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___27th___ day of _July_, 2024

_____ Rebecca Jim

Declaration of Rebecca Jim
ATTACHMENT 1



Source:   Cherokee   Nation,   Poultry   Operations   within   Oklahoma:   http://geodata.cherokee.org/poultry/

# EXHIBIT 25

Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the Clean Air Act; and

• Does not provide EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

In addition, this rule does not have tribal implications as specified by Executive Order 13175 (65 FR 67249, November 9, 2000), because the SIP is not approved to apply in Indian country located in the state, and EPA notes that it will not impose substantial direct costs on tribal governments or preempt tribal law.

The Congressional Review Act, 5 U.S.C. 801 *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this action and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the Clean Air Act, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by February 17, 2009. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements (see section 307(b)(2)).

List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen dioxide, Ozone, Reporting and recordkeeping requirements, Volatile organic compounds.

Dated: September 24, 2008.

**Wayne Nastri,**

*Regional Administrator, Region IX.*

■ Part 52, Chapter I, Title 40 of the Code of Federal Regulations is amended as follows:

PART 52—[AMENDED]

■ 1. The authority citation for Part 52 continues to read as follows:

Authority: 42 U.S.C. 7401 *et seq.*

Subpart F—California

■ 2. Section 52.220 is amended by adding paragraph (c)(358) to read as follows:

§ 52.220    Identification of plan.

*    *    *    *    *

(c) * * *

(358) The 8–Hour Ozone Reasonable Available Control Technology State Implementation Plans (RACT)(SIP) for the following Air Quality Management Districts (AQMDs)/Air Pollution Control Districts (APCDs) were submitted on January 31, 2007, by the Governor's designee.

(i) Incorporation by reference.

(A) South Coast Air Quality Management District.

(*1*) Resolution 06–24 (A Resolution of the South Coast Air Quality Management District (SCAQMD) Board certifying that the SCAQMD's current air pollution rules and regulations fulfill the 8-hour Reasonably Available Control Technology (RACT) requirements, and adopting the RACT SIP revision, dated July 14, 2006.

(*2*) South Coast Air Quality Management District (SCAQMD) Staff Report, SCAQMD 8–Hour Ozone Reasonably Available Control Technology (RACT) State Implementation Plan (SIP) Demonstration, including appendices, dated June 2006.

(*3*) Notice of Exemption from the California Environmental Quality Act, SCAQMD 8–Hour Ozone Reasonably Available Control Technology (RACT) State Implementation Plan (SIP), dated June 2, 2006.

(*4*) EPA comment letter to South Coast Air Quality Management District dated June 28, 2006, on 8-hour Ozone Reasonably Available Control Technology—State Implementation Plan (RACT SIP) Analysis, draft staff report dated May 2006, from Andrew Steckel, Chief, Rulemaking Office, U.S. EPA to Mr. Joe Cassmassi, Planning and Rules Manager, South Coast Air Quality Management District.

*    *    *    *    *

[FR Doc. E8–29641 Filed 12–17–08; 8:45 am]

BILLING CODE 6560–50–P

---

ENVIRONMENTAL PROTECTION AGENCY

40 CFR Parts 302 and 355

[EPA–HQ–SFUND–2007–0469; FRL–8753–9]

RIN 2050–AG37

CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances From Animal Waste at Farms

AGENCY: Environmental Protection Agency (EPA).

ACTION: Final rule.

SUMMARY: This final rule provides an administrative reporting exemption from particular notification requirements under the Comprehensive Environmental, Compensation, and Liability Act of 1980, as amended. In addition, this final rule provides a limited administrative reporting exemption in certain cases from requirements under the Emergency Planning and Community Right-to-Know Act, also known as Title III of the Superfund Amendments and Reauthorization Act. Specifically, the administrative reporting exemption applies to releases of hazardous substances to the air that meet or exceed their reportable quantity where the source of those hazardous substances is animal waste at farms.

Nothing in this final rule changes the notification requirements if hazardous substances are released to the air from any source other than animal waste at farms (*e.g.*, ammonia tanks), or if any hazardous substances from animal waste are released to any other environmental media, (*e.g.*, soil, ground water, or surface water) when the release of those hazardous substances is at or above its reportable quantity. Also, the administrative reporting exemption under section 103 of the Comprehensive Environmental, Compensation, and Liability Act, does not limit any of the Agency's other authorities under the Comprehensive Environmental, Compensation, and Liability Act sections 104 (response authorities), 106 (abatement actions), 107 (liability), or any other provisions of the Comprehensive Emergency Response, Compensation, and Liability Act or the

Emergency Planning and Community Right to Know Act.

Accordingly, EPA believes this administrative reporting exemption not only leaves in place important Agency response authorities that can be used to protect human health and the environment if needed, but also is consistent with the Agency's goal to reduce reporting burden, particularly considering that Federal, State or local response officials are unlikely to respond to notifications of air releases of hazardous substances from animal waste at farms.

**DATES:** This final rule is effective on January 20, 2009.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. [EPA–HQ–SFUND–2007–0469]. All documents in the docket are listed on the *www.regulations.gov* Web site. Although listed in the index, some information is not publicly available, *e.g.*, Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the Superfund Docket, EPA/DC, EPA West, Room 3334, 1301 Constitution Ave., NW., Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone

number for the Public Reading Room is (202) 566–1744, and the telephone number for the Superfund Docket is (202) 566–0276.

**FOR FURTHER INFORMATION CONTACT:** Lynn Beasley, Regulation and Policy Development Division, Office of Emergency Management (5104A), Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460; telephone number: (202) 564–1965; fax number: (202) 564–2625; e-mail address: *Beasley.lynn@epa.gov*.

**SUPPLEMENTARY INFORMATION:** The contents of this preamble are listed in the following outline:

I. General Information
  A. Does This Action Apply to Me?
  B. What Is the Statutory Authority for This Rulemaking?
  C. Which Hazardous Substances Are We Exempting From the Notification Requirements of CERCLA and EPCRA?
II. Background
III. Summary of This Action
  A. What is the Scope of This Final Rule?
  B. How Does This Rule Differ From the Proposed Rule?
  i. Exemption From CERCLA Section 103 Reporting
  ii. Thresholds for Exemption From EPCRA Section 304 Reporting
  iii. Continuous Release Reporting
  C. Definitions
  i. Animal Waste
  ii. Farm
  D. What Is Not Included Within the Scope of This Rule?
  E. What Is EPA's Rationale for This Administrative Reporting Exemption?
  F. What Are the Economic Impacts of This Administrative Reporting Exemption?
  G. Response to Comments
  i. Comments Regarding Elimination of Reporting Requirement
  ii. Comments Regarding Risk, Harm, and Exposure
  iii. Comments Regarding the Agency's Statutory Authority to Issue This Rulemaking
  iv. Comments Indicating a Misunderstanding of the Proposed Rule
  v. Comments Regarding Definitions
  (1) Animal Waste
  (2) Farm
  vi. Comments Regarding Other Facilities
  vii. Comments Regarding Possible Situations That Would Necessitate a Response
IV. Statutory and Regulatory Reviews
  A. Executive Order 12866 (Regulatory Planning and Review)
  B. Paperwork Reduction Act
  C. Regulatory Flexibility Act
  D. Unfunded Mandates Reform Act
  E. Executive Order 13132 (Federalism)
  F. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
  G. Executive Order 13045 (Protection of Children From Environmental Health & Safety Risks)
  H. Executive Order 13211 (Actions That Significantly Affect Energy Supply, Distribution, or Use)
  I. National Technology Transfer Advancement Act
  J. Executive Order 12898 (Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations)
  K. Congressional Review Act

**I. General Information**

*A. Does This Action Apply to Me?*

| Type of entity | Examples of affected entities |
| --- | --- |
| Industry ............................................................... | NAICS Code 111—Crop Production. NAICS Code 112—Animal Production. |
| State and/or Local Governments ....................... | State Emergency Response Commissions, and Local Emergency Planning Committees. |
| Federal Government ........................................... | National Response Center. |

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be affected by this action. This table lists the types of entities that EPA is currently aware could potentially be affected by this action; however, other types of entities not listed in the table could also be affected. To determine whether your facility is affected by this action, you should carefully examine the criteria in section III.A of this final rule and the applicability criteria in § 302.6 of title 40 of the Code of Federal Regulations (CFR) and 40 CFR Part 355, Subpart C-Emergency Release Notification.[1] If you have questions

to-Know Act; Amendments to Emergency Planning and Notification; Emergency Release Notification and Hazardous Chemical Reporting" ("EPCRA rule"). (*See* 73 FR 65452.) That rule included revisions to the Emergency Planning Notification, Emergency Release Notification and Hazardous Chemical Reporting regulations. One of the revisions included reorganizing the Code of Federal Regulations (CFR) so that it follows a plain language format. This final rule uses the CFR citations of the EPCRA rule.

Subpart C—Emergency Release Notification includes regulations for, "Who Must Comply" (355.30—What facilities must comply with the emergency release notification requirements? 355.31—What types of releases are exempt from the emergency release notification requirements of this subpart?, 355.32—Which emergency release notification requirements apply to continuous releases?, and 355.33—What release quantities of EHSs and CERCLA hazardous substances trigger the emergency release notification requirements of this subpart?) "How to Comply" (355.40—What

regarding the applicability of this action to a particular entity, consult the person listed in the preceding **FOR FURTHER INFORMATION CONTACT** section.

*B. What Is the Statutory Authority for This Rulemaking?*

Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. 9601 *et seq.*, as amended by the Superfund Amendments and Reauthorization Act (SARA) of 1986, gives the Federal government broad authority to respond

information must I provide?, 355.41—In what format should the information be submitted?, 355.42—To Whom Must I Submit the Information?, and 355.43—When Must I Submit the Information?).

---

[1] On November 3, 2008, EPA published a final rule, "Emergency Planning and Community Right-

to releases or threats of releases of hazardous substances from vessels and facilities. The term *hazardous substance* is defined in section 101(14) of CERCLA primarily by reference to other Federal environmental statutes. Section 102 of CERCLA gives the Environmental Protection Agency (EPA or the Agency) authority to designate additional hazardous substances. Currently, there are approximately 760 CERCLA hazardous substances, exclusive of Radionuclides, F-, K-, and Unlisted Characteristic Hazardous Wastes.

CERCLA section 103(a) calls for immediate notification to the National Response Center (NRC) when the person in charge of a facility has knowledge of a release of a hazardous substance equal to or greater than the reportable quantity (RQ) established by EPA for that substance. In addition to the notification requirements established pursuant to CERCLA section 103, section 304 of the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA), 42 U.S.C. 11001 *et seq.*, requires the owner or operator of certain facilities to immediately report to State and local authorities releases of CERCLA hazardous substances or any extremely hazardous substances (EHSs) if they exceed their RQ (see 40 CFR 355.33). This final rule only applies to CERCLA section 103 notification requirements, including the provisions that allow for continuous release reporting found in paragraph (f)(2) of CERCLA section 103, and EPCRA section 304 notification requirements.

The Agency has previously granted such administrative reporting exemptions (AREs) under the CERCLA section 103 and EPCRA section 304 notification requirements where the Agency has determined that a Federal response to such a release is impracticable or unlikely. For example, on March 19, 1998, the Agency issued a final rule (see 63 FR 13459) that granted exemptions for releases of naturally occurring radionuclides. The rule, entitled Administrative Reporting Exemptions for Certain Radionuclide Releases (''Radionuclide ARE''), granted exemptions for releases of hazardous substances that pose little or no risk or to which a Federal response is infeasible or inappropriate (see 63 FR 13461).

The Agency relies on CERCLA sections 102(a), 103, and 115 (the general rulemaking authority under CERCLA) as authority to issue regulations governing section 103 notification requirements. The Agency relies on EPCRA section 304 as authority to issue regulations governing EPCRA section 304 notification requirements, and EPCRA section 328

for general rulemaking authority. The Agency will continue to require certain reports under EPCRA section 304, specifically for those facilities that meet the size thresholds in 40 CFR 355.31(g) and outlined below in section III.B.ii of this preamble.

*C. Which Hazardous Substances Are We Exempting From the Notification Requirements of CERCLA and EPCRA?*

EPA is exempting certain releases of hazardous substances to the air from the notification requirements of CERCLA and to a limited extent EPCRA emergency notifications, as implemented in 40 CFR 302.6 and 40 CFR Part 355, Subpart C-Emergency Notification Requirement, respectively. Specifically, we are exempting those hazardous substance releases that are emitted to the air from animal waste at farms. The exemption to the CERCLA section 103 notification requirements will apply to all releases of hazardous substances to the air from animal waste at farms. However, to respond to comments expressing the desire to receive information regarding releases from large concentrated animal feeding operations (CAFOs), EPA is bifurcating these administrative reporting exemptions in order to continue to require EPCRA section 304 emergency notifications for those CAFO operations that confine the large CAFO threshold of an animal species or above, as defined in the National Pollutant Discharge Elimination System (NPDES) program regulations. As such, the exemption to EPCRA section 304 emergency notification requirements will apply to air releases of hazardous substances from animal waste at farms that are below the thresholds in 40 CFR 355.31(g) and for those farms that have animals that are not stabled or confined. (See 40 CFR 355.31(h)) For the purposes of this rule, EPA considers animals (*i.e.*, cattle) that reside primarily outside of an enclosed structure (*i.e.*, a barn or a feed lot) and graze on pastures, not to be stabled or confined, and thus are exempted from the reporting requirements under EPCRA Section 304.

Section 324 of EPCRA requires that the follow-up emergency notice shall be made available to the general public; thus emergency notifications filed under EPCRA section 304 will be available to the public. Farms that are required to report their releases under EPCRA section 304 emergency notifications may continue to use continuous release reporting as described in 40 CFR 355.32.

Ammonia and hydrogen sulfide are the most recognized hazardous substances that are emitted from animal waste. Specifically, ammonia is a by-

product of the breakdown of urea and proteins that are contained in animal waste, while hydrogen sulfide is another by-product of the breakdown of animal waste under anaerobic conditions. However, other hazardous substances, such as nitrogen oxide (NO) and certain volatile organic compounds (VOCs) may also be released from animal waste. This rule extends the administrative reporting exemption to all hazardous substances emitted to the air from animal waste at farms.

These hazardous substances can be emitted when animal waste is contained in a lagoon or stored in under-floor manure pits in some animal housing, manure stockpiles, or where animals are stabled or confined.

## II. Background

Under CERCLA section 103(a), the person in charge of a vessel or facility from which a CERCLA hazardous substance has been released into the environment in a quantity that equals or exceeds its RQ must immediately notify the NRC of the release. A release is reportable if an RQ or more is released into the environment within a 24-hour period (see 40 CFR 302.6). This reporting requirement serves as a trigger for informing the Federal government of a release so that Federal personnel can evaluate the need for a response in accordance with the National Contingency Plan (NCP) and undertake any necessary response action in a timely fashion.

The NRC is located at the United States Coast Guard (USCG) headquarters and is the national communications center for the receipt of all pollution incidents reporting. The NRC is continuously staffed for processing activities related to receipt of the notifications. The NCP regulations, 40 CFR 300.125, require that notifications of discharges and releases be made by telephone and state that the NRC will immediately relay telephone notices of discharges or releases to the appropriate predesignated Federal on-scene coordinator (OSC). The NRC receives an average of approximately 34,000 notifications of releases or discharges per year, 99 percent of which are relayed to EPA.

Under EPCRA section 304(a), three release scenarios require notification.

• First, if a release of an extremely hazardous substance occurs from a facility at which a hazardous chemical is produced, used, or stored, and such release requires a notification under section 103(a) of CERCLA, the owner or operator of a facility shall immediately provide notice to the community emergency coordinator for the local

emergency planning committees (LEPC) for any area likely to be affected by the release and to the State emergency response commission (SERC) of any State likely to be affected by the release. (EPCRA section 304(a)(1))

• EPCRA section 304(a) also requires the owner or operator of the facility to immediately provide notice under EPCRA section 304(b) for either of the following two scenarios:

○ If the release is an extremely hazardous substance, but not subject to the notifications under section 103(a) of CERCLA. (EPCRA section 304(a)(2))

○ If the release is not an extremely hazardous substance and only subject to the notifications under section 103(a) of CERCLA. (EPCRA section 304(a)(3))

EPCRA notification is to be given to the community emergency coordinator for each LEPC for any area likely to be affected by the release, and the SERC of any state likely to be affected by the release. Through this notification, state and local officials can assess whether a response action to the release is appropriate. EPCRA section 304 notification requirements apply only to releases that have the potential for off-site exposure and that are from facilities that produce, use, or store a "hazardous chemical," as defined by regulations promulgated under the Occupational Safety and Health Act of 1970 (OSHA) (29 CFR 1910.1200(c)) and by section 311 of EPCRA.

Owners and operators of farms, like all other facilities, are required to report the release of hazardous substances into the environment in accordance with CERCLA section 103 and EPCRA section 304 when it meets or exceeds the RQ of the hazardous substance. For example, releases into the environment of ammonia or any other hazardous substance, from tanks located on a farm, at or above an RQ are required to be reported under CERCLA section 103 and EPCRA section 304.

In 2005, EPA received a petition (poultry petition) from the National Chicken Council, National Turkey Federation, and U.S. Poultry & Egg Association, seeking an exemption from the CERCLA and EPCRA reporting requirements for ammonia emissions from poultry operations. The Agency published a notice in the **Federal Register** on December 27, 2005 (70 FR 76452), that acknowledged receipt of the poultry petition and requested public comment. The comment period closed on March 27, 2006. This final rule does not address that petition. EPA will respond to the petition in a separate action.

Also, in 2005, EPA offered the owners and operators of animal agricultural operations an opportunity to participate in the National Air Emissions Monitoring Study (air monitoring study), that is being conducted by an independent, non-profit organization and overseen by EPA, through a consent agreement with the Agency. The purpose of the air monitoring study is to develop emissions estimating methodologies for all animal agricultural operations. Over 2,600 animal feeding operations, representing over 14,000 farms, signed up to participate in the study. The monitoring study, which began in the spring of 2007 includes 25 representative sites (lagoons or barns) on 21 different farms in ten states (NC, NY, IA, WI, CA, KY, TX, WA, IN, and OK). The sites will be monitored for a period of two years, allowing the Agency to account for emissions variability by season, and for the effect of any seasonal operational changes (such as pumping out lagoons), that could have an effect on emission levels.

The consent agreement also requires that within 120 days after receiving an executed copy of the consent agreement, for any farm that confines more than ten times the large CAFO threshold of animal species, as defined in the NPDES program regulations, the animal feeding operation provide to the NRC and to the relevant State and local emergency response authorities written notice describing its location and stating substantially as follows:

"This operation raises [species] and may generate routine air emissions of ammonia in excess of the reportable quantity of 100 pounds per 24 hours. A rough estimate of those emissions is [    ] pounds per 24 hours, but this estimate could be substantially above or below the actual emission rate, which is being determined through an ongoing monitoring study in cooperation with the U.S. Environmental Protection Agency. When that emission rate has been determined by this study, we will notify you of any reportable releases pursuant to CERCLA section 103 or EPCRA section 304. In the interim, further information can be obtained by contacting [insert contact information for a person in charge of the operation]."

The requirement that these very large animal feeding operations (AFOs) immediately report estimated releases of ammonia was solely for the purposes of the air compliance agreement and not for purposes of reporting under CERCLA or EPCRA. (*See* 70 FR 4958, Jan. 31, 2005.)

At the end of the monitoring study, EPA will use the data along with other relevant available data to develop emissions estimating methodologies. The monitoring study results will be publicly available upon completion of the study. In addition, EPA will publish the emissions estimating methodologies based on these results within 18 months of the study's conclusion. Thus, such information will be widely available to the public. Further details on the air monitoring study are available at *http://www.epa.gov/oecaagct/ airmonitoringstudy.html.*

### III. Summary of This Action

*A. What Is the Scope of This Final Rule?*

The scope of this rule is limited to releases of hazardous substances to the air from animal waste at farms. Specifically, the Agency is issuing an administrative reporting exemption from the CERCLA section 103 notification requirements to the NRC (Federal government) as implemented in 40 CFR 302.6 and a limited administrative reporting exemption from the EPCRA section 304 notification requirements as implemented in 40 CFR Part 355, Subpart C—Emergency Notification Requirement. (*See* Section III.B.ii. for the thresholds that limit the administrative reporting exemption for EPCRA section 304.) The scope of this rule is intended to include all hazardous substances that may be emitted to the air from animal waste at farms that would otherwise be reportable under those sections. The Agency is not, in this rule, defining facility, normal application of fertilizer, or routine agricultural operations.

*B. How Does This Rule Differ From the Proposed Rule?*

On December 28, 2007, the Agency proposed an administrative reporting exemption from the CERCLA section 103 notification requirements and the EPCRA section 304 emergency notification requirements for air releases of hazardous substances that meet or exceed their RQ from animal waste at all farms. The public comment period lasted 90 days and closed on March 27, 2008. Through the public comment process, the Agency received approximately 12,900 comments. A substantial number of those comments (about 11,600) came in the form of 15 mass mail campaigns that either supported or opposed the proposed rule. We also received many comments from people who appear to have misunderstood the proposed rule, or assumed that the proposed rule was a response to the poultry petition. Our response to significant comments are generally addressed below in Section III.G of this preamble, with all comments addressed in a response to comment document, which is in the

docket (EPA–HQ–SFUND–2007–0469) to this final rule.[2]

i. Exemption From CERCLA Section 103 Reporting

This rule finalizes the administrative reporting exemption from the CERCLA section 103 notification requirements as proposed, but limits the administrative reporting exemption to EPCRA section 304 emergency notification requirements by adding a size threshold. That is, at or above the threshold adopted in this final rule, farms that generate animal waste that release hazardous substances to the air at or above the RQ must still report under EPCRA section 304, using the existing notification procedures, including the use of continuous release reporting. EPCRA section 304 notification requirements apply only to releases that have the potential for off-site exposure.

The Agency is finalizing the administrative reporting exemption from the CERCLA section 103 notification requirements because EPA continues to believe that Federal on-scene coordinators are unlikely to respond to notifications of air releases of hazardous substances from animal waste at farms.

The Agency also believes that State or local emergency response authorities are unlikely to respond to notifications of air releases of hazardous substances from animal waste at farms. However, the Agency did receive comments from the public, as well as from environmental groups, a coalition of family farmers and others expressing the desire for information regarding emissions of hazardous substances to the air from large animal feeding operations. Accordingly, EPA decided to bifurcate the administrative reporting exemption for EPCRA section 304 so as to retain certain emergency notification for large CAFOs. In addition, we sought comment on possible alternative definitions for *farm*, indicating EPA might take factors such as size into account. Although not specifically addressing the definition of a *farm*, we did receive many comments asserting that very large farms are no different than other industrial sources and should be regulated as such. We believe that our threshold approach addresses those concerns.

ii. Thresholds for Exemption From EPCRA Section 304 Reporting

A *farm* is above the threshold if it stables or confines [3] animals in numbers equal to or more than the numbers of animals specified for each category given in the NPDES program regulations for large CAFOs. These thresholds are discussed further in section II*I E.* below.

(1) 700 mature dairy cows, whether milked or dry.

(2) 1,000 veal calves.

(3) 1,000 cattle other than mature dairy cows or veal calves. Cattle includes but is not limited to: heifers, steers, bulls and cow/calf pairs.

(4) 2,500 swine each weighing 55 pounds or more.

(5) 10,000 swine each weighing less than 55 pounds.

(6) 500 horses.

(7) 10,000 sheep or lambs.

(8) 55,000 turkeys.

(9) 30,000 laying hens or broilers, if the farm uses a liquid manure handling system.

(10) 125,000 chickens (other than laying hens), if the farm uses other than liquid manure handling system.

(11) 82,000 laying hens, if the farm uses other than a liquid manure handling system.

(12) 30,000 ducks (if the farm uses other than a liquid manure handling system).

(13) 5,000 ducks (if the farm uses a liquid manure handling system).

iii. Continuous Release Reporting

Continuous release reporting is available for those farms that are at or above the threshold described above in section II.B.ii. In general, the Agency believes that emissions from animal waste into the air are usually continuous and stable in quantity and rate to qualify as continuous releases pursuant to 40 CFR 302.8. The regulations implementing EPCRA section 304 are found in 40 CFR Part 355, Subpart C—Emergency Release Notification and describe the information required for the EPCRA emergency notifications. At the present time, EPA has not adopted conversion factors from which to derive quantities of common hazardous substances from numbers of particular species of farm animals. One purpose of the air monitoring study is to develop estimating methodologies. In the meantime, when reports are submitted pursuant to EPCRA section 304 for animal waste from farms, the Agency expects reports to reflect good faith estimates from reporting entities. In addition, EPA intends to issue guidance to assist those farms that are required to submit reports under EPCRA section 304 with continuous release reporting, as provided in 40 CFR 355, Subpart C—Emergency Release Notification.

*C. Definitions*

The Agency believes it is important to provide clarity with respect to the scope of the reporting exemption. Therefore, the Agency is providing definitions for *animal waste* and *farm* that only pertain to regulations promulgated pursuant to CERCLA section 103 and EPCRA section 304, specifically 40 CFR 302.3. and 40 CFR 355.61. These definitions are not promulgated to apply for any other purpose.

i. Animal Waste

Animal Waste—means manure (feces, urine, and other excrement produced by livestock), digestive emissions, and urea. The definition includes animal waste when mixed or commingled with bedding, compost, feed, soil, and other materials typically found with animal waste.

We sought comment on our proposed definition for *animal waste*, and whether an alternative definition may be more appropriate. A few commenters asked that we clarify that compost includes composted manure and manure-based compost. EPA agrees that the definition of *animal waste* does include such compost and to lend further clarity to the definition, we made a slight change. Other comments on our proposed definition for *animal waste*, along with our responses are addressed below in section III.G.v.1 of this preamble and in the response to comment document available in the docket (EPA–HQ–SFUND–2007–0469) to this rule.

ii. Farm

The Agency is limiting the reporting exemption to animal waste that is generated on farms, and is using a specific definition for *farm* for this administrative reporting exemption. For the purpose of this administrative reporting exemption only, EPA defines farm by using the same definition as that found in the National Agricultural Statistics Service (NASS) Census of Agriculture, and adopting it.

Farm—means a facility on a tract of land devoted to the production of crops or raising of animals, including fish, which produced and sold, or normally would have produced and sold, $1,000 or more of agricultural products during a year.

---

[2] The docket for EPA–HQ–SFUND–2007–0469 can be accessed through *www.regulations.gov*.

[3] Animals that reside primarily outside of an enclosed structure (*i.e.*, a barn or a feed lot) and graze on pastures are not stabled or confined. Animals that are not stabled or confined at concentrated animal feeding operations are not counted toward the threshold. Any emissions to the air of hazardous substances from the waste of such animals while they are not stabled or confined are not counted towards the calculation of a reportable quantity at a farm that is above the threshold and subject to reporting, unless such waste is consolidated into a storage unit.

We sought comment on our proposed definition for a *farm*, and whether an alternative definition may be more appropriate. Based on the comments received, we concluded that the proposed definition for *farm* was not consistent with other Agency uses for the term; that is, we realized that the definition proposed had deviated from the NASS definition, as well as the definition used by the Agency in its Spill Prevention, Control and Countermeasure (SPCC) rule. As a result, the definition for this rule has now been modified. Other comments on our proposed definition for *farm*, along with our responses are addressed below in section III.G.v.2 of this preamble and in the response to comment document available in the docket (EPA–HQ–SFUND–2007–0469) to this rule.

## D. What Is Not Included Within the Scope of This Rule?

As noted previously, the administrative reporting exemption from the CERCLA section 103 notification requirements is limited in scope to those releases of hazardous substances to the air that meet or exceed their RQ from animal waste at farms and in the case of Section 304 of EPCRA, only those releases of hazardous substances to the air from animal waste at farms that are below the thresholds in 40 CFR 355.31(g) are exempt. EPA is not exempting from the CERCLA section 103 or EPCRA section 304 notification requirements releases of hazardous substances from animal waste that meet or exceed the RQ to any other environmental media or at any other facilities other than farms (*i.e.*, meat processing plants, slaughter houses, tanneries). Thus, notifications must still be submitted if, for example, there was a release of any hazardous substances that meet or exceed the RQ from animal waste into water (*e.g.*, a lagoon burst) or if there was a release of any hazardous substances that meets or exceeds the RQ from animal waste into the air or water at a slaughter house or meat processing plant. Likewise, EPA is not exempting from the CERCLA section 103 or EPCRA section 304 notification requirements any release of hazardous substances to the air that meets or exceeds the RQ from any source other than animal waste at farms. Thus, for example, EPA is not proposing to exempt ammonia releases from ammonia storage tanks at farms.

The Agency believes that in these situations, the release of hazardous substances that meets or exceeds the RQ should continue to be reported because it is less clear that they will not result in a response action from Federal, State

or local governments. That is, such notifications would alert the government to a situation that could pose serious environmental consequences if not immediately addressed.

Finally, it should be noted that no CERCLA or EPCRA statutory requirements, other than the emergency hazardous substance notification requirements under CERCLA section 103 and EPCRA section 304, are included within this rule. The rule also does not limit the Agency's authority under CERCLA sections 104 (response authorities), 106 (abatement actions), 107 (liability), or any other provisions of CERCLA and EPCRA to address releases of hazardous substances from animal waste at farms.

## E. What Is EPA's Rationale for This Administrative Reporting Exemption?

EPA's rationale for this administrative reporting exemption is based on the purpose of notifying the NRC, and SERCs and LEPCs when a hazardous substance is released, and then the likelihood that a response to that notification would be taken by any government agency.

Upon receipt of a notification from the NRC, EPA determines whether a response is appropriate. See 40 CFR 300.130(c). If it is determined that a response is appropriate, the NCP regulations describe the roles and responsibilities for responding to the release. Thus, EPA considered whether the Agency would ever take a response action, as a result of such notification, for releases of hazardous substances to the air that meet or exceed their RQ from animal waste at farms. Based on our experience, the Agency believes that Federal on-scene coordinators are unlikely to respond to such notifications. Specifically, to date, EPA has not initiated a response to any NRC notifications of ammonia, hydrogen sulfide, or any other hazardous substances released to the air where animal waste at farms is the source of that release. Moreover, we can not foresee a situation where the Agency would initiate a response action as a result of such notification. Under this rule, however, EPA retains its authority to respond to citizen complaints or requests for assistance from State or local government agencies to investigate releases of hazardous substances from animal waste at farms and respond if appropriate. Furthermore, the Agency does not need to receive such notifications in order to enforce applicable Clean Water Act (CWA), Clean Air Act (CAA), Resource Conservation and Recover Act (RCRA),

and/or other applicable CERCLA and EPCRA regulations at farms. EPA retains the enforcement authority to address threats to human health and the environment.

Several States and localities also indicated that such response actions are unlikely to be taken as a result of a notification of releases of hazardous substances from animal waste at farms. Specifically, EPA received 13 comment letters from State and/or local emergency response agencies in response to our proposed rule, as well as comments from 10 state agricultural departments that agreed with the proposal to not require such notifications.[4] These commenters all affirmed EPA's belief that a response to a notification of air emissions of hazardous substances from animal wastes is highly unlikely. In fact, while we also received comment letters from government officials and others, including environmental groups, that the proposed rule is not appropriate due to potential harmful effects of air pollution emanating from animal feeding operations, we received no comments from any government official suggesting a response action should or would be taken.

The Agency did receive comments expressing a concern that air emissions of hazardous substances from animal waste at the largest animal feeding operations may pose a risk and therefore State and local governments and the public should continue to receive reports of such emissions. CERCLA and EPCRA do not require release reports under section 103 of CERCLA and 304 of EPCRA, respectively, to be made publicly available. However, section 324 of EPCRA does require the LEPC and the SERC to make publicly available each follow-up emergency notice provided under section 304(c).

Based on these comments, the Agency has bifurcated the final rule and is promulgating an administrative reporting exemption in order to maintain the EPCRA section 304 reporting requirements for the largest farms, that is, those farms that meet or exceed the thresholds described in section III.B.ii, above. For this rule, the threshold that will trigger reporting requirements is the same as the numbers of animals specified in the categories regulated by the NPDES program for

---

[4] The Agency also received 23 comment letters from State and/or local emergency response agencies in response to the December 2005 **Federal Register** notice that acknowledged receipt of the rulemaking petition from the National Chicken Council, the National Turkey Federation, and the U.S. Poultry and Egg Association which also agreed that such notifications were not necessary.

large CAFOs. Comments regarding the elimination of the reporting requirements are discussed below in section III.G.i.

*F. What Are the Economic Impacts of This Administrative Reporting Exemption?*

This administrative reporting exemption will reduce the costs to farms that release hazardous substances to the air that meet or exceed their RQ from animal waste. Entities that are expected to experience a reduction in burden and cost include both the farms that are no longer required to report those releases, as well as the Federal government. The economic analysis completed for this rule is available in the docket for this rulemaking and is based on the underlying economic analyses that were completed for the regulations that established the notification requirements. We estimate that this final rule will reduce burden on farms associated with making notifications under CERCLA section 103 and EPRCRA section 304 by approximately 1,290,000 hours over the ten-year period beginning in 2009 and associated costs by approximately $60,800,000 over the same period. We estimate that this rule will also reduce burden on government (including Federal, State and local governments) for receipt and processing of the notifications under CERCLA section 103 and EPCRA section 304 by approximately 161,000 hours over the ten-year period beginning in 2009 and associated costs by approximately $8,110,000 over the same period. In evaluating the potential burden and cost savings to those farms that would no longer be required to make notifications under CERCLA section 103 and EPCRA section 304 and for the government entities that are no longer required to receive and process such notifications, we used the same universe as used in the 2008 CAFO Rule (see 73 FR 70417, Nov. 20, 2008).

*G. Response to Comments*

The Agency received comments on: (1) The elimination of the reporting requirement; (2) the risk, harm, and exposure related to air emissions from animal waste at farms; and (3) the Agency's statutory authority to issue this rulemaking. Some comments also indicated a misunderstanding of the proposed rule. Lastly, the Agency sought specific comments in four areas. *Those were:* (1) Definitions (animal waste and farm); (2) whether it is appropriate to expand the reporting exemption to other facilities where animal waste is generated (*i.e.,* zoos and circuses); (3) whether there might be a

situation where a response would be triggered by such a notification of the release of hazardous substances to the air from animal waste at farms; and (4) if so, what an appropriate response would be. The following is our response to those substantive comments received. Comments not addressed in this preamble are addressed in the response to comment document that can be found in the Agency's docket for this rule (EPA–HQ–SFUND–2007–0469).

i. Comments Regarding Elimination of Reporting Requirement

We received mixed comments on whether it is appropriate for the Agency to eliminate the notification requirements under CERCLA section 103 and EPCRA section 304 for hazardous substances released to the air at farms where the source of those hazardous substances is animal waste.

Many commenters expressed general support for the proposed elimination of the reporting requirements under CERCLA section 103 and EPCRA section 304. Many of these commenters, including some local emergency response agencies, stated that reporting emissions of hazardous substances to the air that meet or exceed their RQ from animal waste is of little value as it is common knowledge that agricultural operations release ammonia on an ongoing basis and receipt of such notifications could prove to be a hindrance in performing their mission by overwhelming the system with notifications that will not be responded to. Many commenters supporting the elimination of the reporting requirements, particularly commenters representing the agricultural community, also stated that emissions reporting is costly and could put them out of business should they have to adhere to such a regulation. Moreover, these same commenters defended the proposal by pointing out that information about the location and emissions of CAFOs is already publicly available. For example, one could readily determine the number of laying hens there are in a particular county through county specific data published by the U.S. Department of Agriculture's (USDA's) National Agricultural Statistical Service. According to these commenters, CERCLA/EPCRA reporting does not add in any meaningful way to this knowledge base.

On the other hand, the Agency received many comments that were opposed to the elimination of the notification requirements under CERCLA section 103 and EPCRA section 304. Many commenters opposed the proposed elimination of these reporting

requirements on the grounds that reports provide good documentation, even if the content is not reviewed and no response is appropriate. Several commenters stated that reporting information about emissions enables citizens to hold companies and local governments accountable in terms of how toxic chemicals are managed and even allows agencies to identify a facility's proximity to schools where children may be at higher risk of adverse health effects due to exposure.

In addition, many commenters asserted that the proposed rule interferes with the public's right to know about large releases of toxic chemicals. Others stated that factory farms should not be protected from the laws that affect all other industries. Several commenters asserted that CAFOs are not family farms, arguing that they are industries that produce high amounts of pollutants and should be treated as such.

Finally, a commenter suggested that farms should be exempt from the monitoring and reporting of pollutant releases until measuring and testing procedures become more accurate and that the exemptions should apply until there are more feasible monitoring practices enacted. The commenter argued that it was unfair to require such reporting when the science surrounding ammonia releases is uncertain.

The Agency appreciates the perspectives of both sides of the reporting issue. We understand that the regulated community and some SERCs and LEPCs believe that, in general, the release reports are unnecessary, burdensome, and would not likely result in "new" information regarding emissions from farms. The Agency agrees. However, many commenters also argued that reporting, especially for large CAFOs, is important. Therefore, we have adopted a final rule that seeks to address both concerns. As such, farms would be exempt from reporting under CERCLA section 103 for the reporting of air releases of hazardous substances from animal waste to the NRC; but, at the same time, those farms that exceed the threshold established in 40 CFR 355.31(g), and described above in section III.B.ii of this preamble, will still be required to notify the community emergency coordinator for the LEPC for any area likely to be affected by the release and to the SERC of any State likely to be affected by the release under EPCRA section 304(b). We believe the threshold is appropriate to continue to make available information regarding large CAFOs sought by commenters. In accordance with 40 CFR 355.31(h), farms that have animals that

are not stabled or confined are also exempt from reporting under EPCRA section 304. For the purposes of this rule, EPA considers animals (*i.e.*, cattle) that reside primarily outside of an enclosed structure (*i.e.*, a barn) and graze on pastures not to be stabled or confined.

In addition, after completion of the Air Monitoring Study and the development and publication of emission estimating methodologies, the Agency intends to review the results and consider if the threshold for the EPCRA exemption is appropriate.

ii. Comments Regarding Risk, Harm, and Exposure

EPA's rationale for the proposed rule is based on the purpose of notifying the NRC, and SERCs and LEPCs when a hazardous substance is released, and then the likelihood that a response to that release would be taken by any government agency. The comments that cited risk, harm, and exposure were used to either support or oppose the proposed rule.

In supporting the proposed rule, many commenters provided general statements to the effect that emissions from CAFOs pose no threat to public health or the environment. Many other commenters also argued that there is no evidence or studies that emissions pose any public health risks or have environmental impacts that would warrant emergency release reports from farms to the Federal level.

In opposing the proposed rule, a number of commenters submitted studies to support their conclusion that emissions from some farms pose levels of risk, harm, and exposure that should be taken into consideration by the Agency. Several commenters specifically cited a 2002 study entitled, "Iowa Concentrated Animal Feeding Operations Air Quality Study," conducted by Iowa State University and the University of Iowa Study Group.[5]

Several commenters suggested delaying any decisions on finalizing the proposal until the Agency's air monitoring study is complete. These commenters argued that EPA may find that these airborne contaminants are more dangerous to human health than thought. Many of the commenters who opposed the proposed rule also provided information pertaining to the health impacts associated with CAFOs. Some provided anecdotal evidence, while others cited published literature drawing a causal link. Additional information regarding the anecdotal

evidence and published literature is provided in the response to comment document available in the docket (HQ–EPA–SFUND–2007–0469) to this rule. Finally, a number of commenters suggested that the adverse health effects that have been demonstrated should be sufficient to continue to mandate CERCLA and EPCRA reporting of "toxic air emissions" and step up enforcement, as well.

EPA appreciates the information provided by commenters, especially those who submitted study information indicating the potential health issues associated with the emissions from animal waste at farms. We would first note that a number of the studies or information provided addressed risk or health issues for workers on the farm; reporting under section 304 of EPCRA addresses releases that are off-site of the facility. In addition, as we noted previously, EPA is currently overseeing a comprehensive study of CAFO air emissions (air monitoring study) that is being conducted by an independent, non-profit organization. The purpose of the air monitoring study is to develop emissions estimating methodologies for all animal agricultural operations. Over 2,600 agreements, representing over 14,000 farms, signed up for the study. The monitoring study, which began in the spring of 2007, includes 25 representative sites (lagoons or barns) on 21 different farms in ten states (NC, NY, IA, WI, CA, KY, TX, WA, IN, and OK). The sites will be monitored for a period of two years, allowing the Agency to account for emissions variability by season, and for the effect of any seasonal operational changes (such as pumping out lagoons), that could have an effect on emission levels. At the conclusion of the air monitoring study, EPA will use the data along with any other relevant, available data to develop emissions estimating methodologies. The air monitoring study results will be publicly available upon completion of the study. In addition, EPA will publish the emissions estimating methodologies based on these results, within 18 months of the study's conclusion. The notification requirements under CERCLA section 103 would not provide the type of data required in order to draw the same conclusions that the more comprehensive air monitoring study can provide. This rule does not address how air emissions from CAFOs should be controlled.

As we have discussed, EPA believes that a response to a notification about an air release of a hazardous substance from animal waste at a farm is unlikely and impracticable. We are therefore

exempting those notifications from CERCLA section 103 notification requirements and to a limited extent EPCRA section 304 emergency notification requirements. As discussed above, EPA does recognize that the public may have a separate use for the notifications, and therefore, the reporting exemption under Section 304 of EPCRA is limited to farms that fall below the threshold discussed in III.B.ii. Moreover, EPA is not limiting any of its response authorities in this rule (should a State or local agency request assistance), nor are we limiting any of our other authorities under CERCLA and EPCRA.

iii. Comments Regarding the Agency's Statutory Authority To Issue This Rulemaking

A number of commenters challenged EPA's legal authority to grant these exemptions by stating that CERCLA and EPCRA do not give EPA the authority to grant reporting exemptions. Another commenter argues that EPA may not rest its basis for the exemption solely on evidence that a Federal response to animal waste releases is unlikely.

EPA disagrees with the commenters that challenge our authority to provide administrative reporting exemptions. First, we would note that EPA has on two other occasions exercised its authority to extend administrative reporting exemptions to certain well-defined release scenarios. Specifically, on March 19, 1998, the Agency issued a final rule (see 63 FR 13459) that granted exemptions for releases of naturally occurring radionuclides. The rule entitled, Administrative Reporting Exemptions for Certain Radionuclide Releases ("Radionuclide ARE"), granted exemptions for releases of hazardous substances that pose little or no risk or to which a Federal response is infeasible or inappropriate (see 63 FR 13461). Moreover, on October 4, 2006, the Agency issued a final rule (see 71 FR 58525) that broadened the existing reporting exemptions to include releases of less than 1,000 pounds of nitrogen oxide (NO) and less than 1,000 pounds of nitrogen dioxide ($NO_2$) to the air in 24 hours ("$NO_X$ ARE") that are the result of combustion. The NO and $NO_2$ exemptions were granted for releases of hazardous substances at levels for which the CAA regulates nitrogen oxides that are considerably higher than ten pounds.

EPA also disagrees that it is barred from basing its exemption on evidence that a Federal response to a notification of a release of hazardous substances to the air from animal waste releases is unlikely. Rather, for this rule, EPA has

---

[5] This study is available in the Superfund Docket at: EPA–HQ–SFUND–2007–0469–0531.8.

made a determination that these reports are unnecessary because, in most cases, a federal response is impractical and unlikely (*i.e.*, we would not respond to them since there is no reasonable approach for the response). We also believe that because this administrative reporting exemption is narrowly focused to the source (animal waste) and location (at farms) of the hazardous substance emissions, it is appropriate to base our rationale for this rule on the unlikelihood and inappropriateness of a response.

iv. Comments Indicating a Misunderstanding of the Proposed Rule

A number of the commenters seem to misunderstand what the Agency was proposing. For example, commenters expressed general opposition to removing air quality and clean air standards; removing clean air protections; reducing pollution or emission standards; exemptions to clean air standards; allowing farms to emit more pollutants; deregulation of hazardous emissions; and an exemption from the CAA and CWA. This rule would do none of this. Rather, this rule addresses only the notification requirements under CERCLA section 103 and in a limited manner, EPCRA section 304. EPA retains all other authorities under both CERCLA and EPCRA, and the CAA and CWA standards also are unaffected by this action.

v. Comments Regarding Definitions

In order to provide clarity with respect to the scope of the proposed reporting exemption, the Agency proposed definitions for *animal waste* and *farm*. The definitions, as proposed, would be limited in application to the regulations promulgated pursuant to CERCLA section 103 specifically 40 CFR 302.3 and 40 CFR 355.61. We solicited comment on those definitions.

(1) Animal Waste

Because the Agency does not have an existing definition for *animal waste*, EPA proposed to add a definition for *animal waste* to the Code of Federal Regulations. The definition for *animal waste* in the proposed rule was, "manure (feces, urine, other excrement, and bedding, produced by livestock that has not been composted), digestive emissions, and urea. The definition includes animal waste when mixed or commingled with bedding, compost, feed, soil and other materials typically found with animal waste." We sought comment from the public on the appropriateness, clarity and completeness of the definition.

In general, the public was generally supportive of our proposed definition of *animal waste*, as long as it is understood that this definition is used solely for the purposes of CERCLA and EPCRA reporting; however, there were a few requests for further clarification. In particular, several commenters requested clarification regarding the treatment of compost material, and specifically whether composted manure is included in the definition of *animal waste*. Similarly, other commenters suggested that EPA clarify that manure-based compost is included in the definition of *animal waste*. We have clarified in the discussion in section III.C.i., above, that such composted manure and manure-based compost is included in the definition of *animal waste*. Furthermore, we made a small change to the definition of *animal waste* to help clarify this point.

Several other commenters submitted alternative definitions. For example, to reflect the need for controlling emissions of dangerous and toxic emissions, a commenter suggested that *animal waste* be defined as "manure (livestock produced feces, urine, other excrement, and bedding that has not been composted), digestive emissions, and urea, which emit dangerous and/or toxic gases in any quantity. This definition includes animal waste when mixed or commingled with bedding, compost, feed, soil and other materials typically found in animal waste." Another commenter suggested an alternate definition which would define *animal waste* as "all constituents and byproducts of the decomposition of manure (feces, urine, other excrement, and bedding, produced by livestock or poultry that has not been composted), digestive emissions, and urea." This suggested definition would also include "animal waste when mixed or commingled with water, bedding, compost, feed, soil and other materials typically found with animal waste." Still another commenter suggested the following definition for *animal waste*, "manure (feces, urine, or other excrement produced by livestock, and including bedding), and any other livestock digestive emissions, regardless of how stored, handled, composted or otherwise stockpiled. The definition includes animal waste used in biogas production or other treatment processes, or when mixed or commingled with bedding, compost, feed, soil, and other materials typically found with animal waste."

While the Agency appreciates the suggestions provided by the commenters, we believe that the proposed definition of *animal waste* is broad enough to serve the purpose of defining the source of hazardous substances emitted from farms for this administrative reporting exemption, with the one clarification noted above. The definitions proposed by the commenters do not offer additional clarity and in the case of "animal waste used in biogas production or other treatment processes," suggest a broader use of manure that would extend to facilities other than farms, and thus, beyond the scope of the final rule.

(2) Farm

EPA proposed a definition for *farm* by slightly modifying the definition found in the National Agricultural Statistics Service (NASS) Census of Agriculture, as well as included Federal and State research farms that utilize farm animals subject to the conditions experienced on other farms (*e.g.*, poultry, swine, dairy, and livestock research farms). However, in the proposal, we incorrectly stated that the proposed definition was used by USDA. Thus, the proposed definition for *farm* was "(a) any place whose operation is agricultural and from which $1,000 or more of agricultural products were produced and sold, or normally would have been sold, during the census year. Operations receiving $1,000 or more in Federal government payments are counted as farms, even if they have no sales and otherwise lack the potential to have $1,000 or more in sales; or, (b) a Federal or state poultry, swine, dairy or livestock research farm." The purpose of specifying that Federal and State research farms that utilize farm animals subject to the conditions experienced on other farms was to respond to concerns that Federal and State research farms were included in the exemption. The Agency sought comment on the proposed definition, and whether an alternative definition may be more appropriate.

Commenters generally expressed support for the definition of *farm* because they understood it to be the definition used by USDA and because it promotes consistency in definitions between agencies; however, one commenter pointed out that the proposed definition is inconsistent with the definition of *farm* used by EPA in its SPCC rule (see 71 FR 77266, December 26, 2006) and therefore the Agency has two differing definitions that could place a hardship on the regulated community and gives the impression that the Agency is picking and choosing definitions without considering the regulatory implications of its decisions. The Agency agrees with this commenter and thus, EPA has decided to use for this rule the same

definition of *farm* as the definition used in the SPCC rule. This definition is also now the same definition found in the NASS Census of Agriculture. Although not specifically stated in the definition, this definition is broad and includes Federal or State poultry, swine, dairy or livestock research farms that were included in the proposed definition.

Another definition suggested by a commenter was to expand the definition to include "[any] operation that produces eggs, poultry, swine, dairy, or other livestock in any amount," as well as all production areas and land application areas. Another commenter suggested that the definition be expanded to include non-Federal or State research farms. EPA disagrees with the commenters that suggested an expanded definition of farm. We believe that the definition in this rule encompasses the universe of operations that the commenters are suggesting without adding confusion to the regulated facilities, especially in light of the SPCC regulations.

**vi. Comments Regarding Other Facilities**

The Agency is aware that animal waste is also generated at other facilities, such as zoos and circuses. Because the focus of the proposal was on animal waste generated or found at farms, EPA did not propose to expand the reporting exemption beyond such facilities. However, because the potential for release to the air of hazardous substances from animal waste at other such facilities may present the same issues that are presented by animal waste at farms, we did specifically request comment on whether the administrative reporting exemption should be expanded to include other types of facilities that also generate animal waste, and if so, what other types of facilities should be included in the reporting exemption.

There was general support by the commenters for including within the exemption other types of facilities (besides farms) that produce animal waste. That is, while commenters generally agreed that the rule should stay narrowly focused, they also argued that other types of facilities that produce animal waste should also be included within the exemption. Several other commenters stated that because the generation of animal waste is a normal biological process, all animals' waste should be administratively excluded from reporting.

EPA appreciates the commenters' arguments that all animals' waste should be excluded; however, we have decided to limit the final rule to animal waste generated or produced at farms,

and not include other types of facilities, because the Agency has not looked sufficiently at these other types of facilities to determine the likelihood that the Agency would take a response action, if there was such a release to the air of hazardous substances that meet or exceed their RQ from animal waste.

**vii. Comments Regarding Possible Situations That Would Necessitate a Response**

EPA specifically sought comment on whether there might be a situation where a response would be triggered by such a notification of the release of hazardous substances to the air that meet or exceeds the RQ from animal waste at farms, and if so, what an appropriate response would be to such notifications. Several commenters responded that there are no circumstances where a manure-related release of emissions would trigger an emergency response.

On the other hand, there were some commenters that offered scenarios that described the importance of receiving the notifications. Specifically, one commenter noted that extreme weather fluctuations and various pit pumping techniques may cause emissions to exceed reportable quantities. Such fluctuations (*e.g.*, differences in temperature, rainfall frequency and intensity, wind speed, topography and soils) could impact the amount of air emissions released from farms. Another commenter cited a 2004 study entitled, Concentrated Animal Feeding Operations: Health Risks from Air Pollution Institute for Agriculture and Trade Policy,[6] which noted that "when pits are agitated for pumping, some or all of these gases are rapidly released from the manure and may reach toxic levels or displace oxygen, increasing the risk to humans and livestock."

With respect to responses, one commenter stated that responses may be needed to protect children who live in nearby homes and communities from elevated levels of airborne ammonia and/or the fine particulates that result from the ammonia releases. The commenter suggests that adequate monitoring will provide facility operators with sufficient warning to take remedial actions that will reduce ammonia formation and release before regulatory thresholds are exceeded.

Finally, one commenter stated that EPA has not examined such situations that may arise when maintaining feeding operations and that the Agency

has not proven that emergency personnel would not benefit from continuous release reports of hazardous substances from these operations when attempting to save lives or prevent injury quickly in the future.

From a CERCLA section 104 response perspective, based on EPA's experience, the Agency would rarely respond to such scenarios. In any event, we retain our response authorities and would assist State and local officials in their response, if requested. State or local agencies (*i.e.*, SERCs and LEPCs) also may require information for emergency planning purposes under section 303(d) of EPCRA and make this information available to the public under section 324 of EPCRA.

**IV. Statutory and Regulatory Reviews**

*A. Executive Order 12866 (Regulatory Planning and Review)*

Under Executive Order (EO) 12866 (58 FR 51735, October 4, 1993), this action is a "significant regulatory action" because it has been determined that it raises novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order. Accordingly, EPA submitted this action to the Office of Management and Budget (OMB) for review under EO 12866 and any changes made in response to OMB recommendations have been documented in the docket for this action.

*B. Paperwork Reduction Act*

This action does not impose any new information collection burden. Rather, this final rule represents a reduction in burden for both industry and the government by administratively exempting the reporting requirement for releases of hazardous substances to the air that meet or exceed their RQ from animal waste at farms from the CERCLA section 103 notification requirements and to a limited extent, the EPCRA section 304 emergency notification requirements.

However, the Office of Management and Budget (OMB) has previously approved the information collection requirements contained in the existing regulation 40 CFR 302 under the provisions of the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.* and has assigned OMB control number 2050–0046, EPA ICR number 1049.11 for 40 CFR 302.6 (Episodic releases of oil and hazardous substances), OMB control number 2050–0086, EPA ICR number 1445.07 for 40 CFR 302.8 (Continuous release reporting requirements) (pending approval) and OMB control

---

[6] This document is available on line at: *http://www.healthobservatory.org/library.cfm?refID=37388.*

number 2050–0092, EPA ICR number 1395.06 for 40 CFR 355 (Emergency planning and notification). The OMB control numbers for EPA's regulations in 40 CFR are listed in 40 CFR part 9.

We estimate that this final rule will reduce burden on farms associated with the notification requirements under CERCLA section 103 and EPCRA section 304 by approximately 1,290,000 hours over the ten year period beginning in 2009 and associated costs by approximately $60,800,000 over the same period. We estimate that this rule will also reduce burden on government (including Federal, State and local governments) for receipt and processing of the notifications under CERCLA section 103 and EPCRA section 304 by approximately 161,000 hours over the ten year period beginning in 2009 and associated costs by approximately $8,110,000 over the same period. In evaluating the potential burden and cost savings to those farms that would no longer be required to make notifications under CERCLA section 103 and EPCRA section 304 and for the government entities that are no longer required to receive and process such notifications, we used the same universe as used in the 2008 CAFO Rule (see 73 FR 70417, Nov. 20, 2008).

*C. Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements under the Administrative Procedure Act or any other statute unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. Small entities include small businesses, small organizations, and small governmental jurisdictions.

For purposes of assessing the impacts of this rule on small entities, *small entity* is defined as: (1) A small business as defined by the Small Business Administration's (SBA) regulations at 13 CFR 121.201; (2) a small governmental jurisdiction that is a government of a city, county, town, school district or special district with a population of less than 50,000; and (3) a small organization that is any not-for-profit enterprise which is independently owned and operated and is not dominant in its field.

Under the statutory and regulatory analyses of the Regulatory Flexibility Act for the proposed rule, we concluded that EPA expects the net reporting and recordkeeping burden associated with reporting air releases of hazardous substances that meet or exceed their RQ

from animal waste at farms under CERCLA section 103 and EPCRA section 304 to decrease. We stated that this reduction in burden will be realized by businesses of all sizes. Although we concluded that the rule will relieve regulatory burden for all affected small entities as the statute requires, EPA requested comment on the potential impacts of the proposed rule on small entities and on issues related to such impacts.

One commenter explicitly concurred with EPA's analysis and conclusion that the proposed rule will provide relief from regulatory burden for small entities, stating that: "Small farms should not be affected even if the reporting requirements stay in place because these farms do not generally have a large enough herd of animals to reach the requisite levels of toxins." EPA appreciates the commenter's perspective that small farms would probably not be affected by the reporting requirements, even if we did not issue this administrative reporting exemption.

After considering the economic impacts of this final rule on small entities, I certify that this action will not have a significant economic impact on a substantial number of small entities. This final rule will not impose any additional requirements on small entities. Rather, this rulemaking will relieve regulatory burden because we are eliminating the reporting requirement for releases of hazardous substances to the air that meet or exceed their RQ from animal waste at farms under the CERCLA section 103 notification requirements and for those entities below the large CAFO threshold of animal species, as defined under the NPDES program regulations, under the EPCRA section 304 notification requirements. We expect the net reporting and recordkeeping burden associated with reporting air releases of hazardous substances from animal waste at farms under CERCLA section 103 and EPCRA section 304 to decrease. This reduction in burden will be realized by both small and large businesses. We have therefore concluded that this final rule will relieve regulatory burden for all affected small entities.

*D. Unfunded Mandates Reform Act*

This action contains no Federal mandates under the provisions of Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), 2 U.S.C. 1531– 1538 for State, local, or tribal governments or the private sector.

This action is also not subject to the requirements of section 203 of UMRA because it contains no regulatory

requirements that might significantly or uniquely affect small governments. That is, the final rule imposes no enforceable duty on any State, local or tribal governments or the private sector; rather, this final rule will result in burden reduction in the receipt of notifications under section 103 of CERCLA and for those entities below the large CAFO threshold of animal species, as defined under the NPDES program regulations, under section 304 of EPCRA notification requirements of the release to the air of hazardous substances, primarily ammonia and hydrogen sulfide, that meet or exceed their RQ from animal waste at farms.

Additionally, EPA has determined that this final rule contains no regulatory requirements that might significantly or uniquely affect small governments. This final rule reduces regulatory burden and the private sector is not expected to incur costs exceeding $100 million. Thus, the final rule is not subject to the requirements of Sections 202 and 205 of UMRA.

*E. Executive Order 13132 (Federalism)*

Executive Order 13132, entitled "Federalism" (64 FR 43255, August 10, 1999), requires EPA to develop an accountable process to ensure "meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications." Policies that have federalism implications are defined in the Executive Order to include regulations that have "substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government."

This final rule does not have federalism implications. It will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132. There are no State and local government bodies that incur direct compliance costs by this final rule. Thus, Executive Order 13132 does not apply to this rule.

*F. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

This action does not have tribal implications, as specified in Executive Order 13175 (65 FR 67249, November 9, 2000). This rule does not significantly or uniquely affect the communities of Indian tribal governments, nor would it impose substantial direct compliance

costs on them. Thus, Executive Order 13175 does not apply to this action.

### G. Executive Order 13045 (Protection of Children From Environmental Health & Safety Risks)

EPA interprets EO 13045 (62 FR 19885, April 23, 1997) as applying only to those regulatory actions that concern health or safety risks, such that the analysis required under section 5–501 of the EO has the potential to influence the regulation. This action is not subject to EO 13045 because it does not establish an environmental standard intended to mitigate health or safety risks.

### H. Executive Order 13211 (Actions That Significantly Affect Energy Supply, Distribution, or Use)

This action is not a "significant energy action" as defined in Executive Order 13211 (66 FR 28355 (May 22, 2001)), because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. This final rule will reduce the burden associated with the notification of releases to air of hazardous substances that meet or exceed their RQ from animal waste at farms.

### I. National Technology Transfer Advancement Act

Section 12(d) of the National Technology Transfer and Advancement Act of 1995 ("NTTAA"), Public Law 104–113, 12(d) (15 U.S.C. 272 note) directs EPA to use voluntary consensus standards in its regulatory activities unless to do so would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (e.g., materials specifications, test methods, sampling procedures, and business practices) that are developed or adopted by voluntary consensus standards bodies. NTTAA directs EPA to provide Congress, through OMB, explanations when the Agency decides not to use available and applicable voluntary consensus standards.

This action does not involve technical standards. Therefore, EPA did not consider the use of any voluntary consensus standards.

### J. Executive Order 12898 (Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations)

Executive Order (EO) 12898 (59 FR 7629 (Feb. 16, 1994)) establishes Federal executive policy on environmental justice. Its main provision directs Federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations and low-income populations in the United States.

EPA has determined that this final rule will not have disproportionately high and adverse human health or environmental effects on minority or low-income populations because it does not affect the level of protection provided to human health or the environment. As discussed in the Background section of the preamble for this final rule, the requirement to notify the government under CERCLA section 103 or EPCRA section 304 does not require the notifying entity to take any specific action to address the release. Therefore, because EPA has determined that a response action would be unlikely, EPA does not believe that exempting these releases from CERCLA section 103 notification requirements or to a limited extent EPCRA section 304 emergency notification requirements will have a disproportionately high and adverse human health or environmental effect on minority or low-income populations, especially since the Agency is not limiting any of its other authorities under CERCLA, such as CERCLA sections 104 (response authorities), 106 (abatement actions), 107 (liability), or any other provisions of CERCLA or EPCRA. The Agency also retains its authority to apply existing statutory provisions in its efforts to prevent minority and or low-income communities from being subject to disproportionately high and adverse impacts and environmental effects. We therefore have determined that this final rule does not have disproportionately high and adverse human health or environmental effects on minority or low-income populations.

### K. Congressional Review Act

The Congressional Review Act, 5 U.S.C. 801 et seq., as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a "major rule" as defined by 5 U.S.C. 804(2). This rule will be effective January 20, 2009.

### List of Subjects

#### 40 CFR Part 302

Air pollution control, Chemicals, Hazardous substances, Hazardous waste, Intergovernmental relations, Natural resources, Reporting and recordkeeping requirements, Superfund, Water pollution control, Water supply.

#### 40 CFR Part 355

Air pollution control, Chemicals, Disaster assistance, Hazardous substances, Hazardous waste, Intergovernmental relations, Natural resources, Penalties, Reporting and recordkeeping requirements, Superfund, Water pollution control, Water supply.

Dated: December 12, 2008.

**Stephen L. Johnson,**

*Administrator.*

■ For the reasons set out in the preamble, title 40, chapter I of the Code of Federal Regulations is amended as follows:

## PART 302—DESIGNATION, REPORTABLE QUANTITIES, AND NOTIFICATION

■ 1. The authority citation for part 302 continues to read as follows:

**Authority:** 42 U.S.C. 9602, 9603, 9604; 33 U.S.C. 1321 and 1361.

■ 2. Section 302.3 is amended by adding in alphabetical order the definitions of "Animal waste" and "Farm" to read as follows:

### § 302.3   Definitions.

\*    \*    \*    \*    \*

*Animal Waste* means manure (feces, urine, and other excrement produced by livestock), digestive emissions, and urea. The definition includes animal waste when mixed or commingled with bedding, compost, feed, soil and other typical materials found with animal waste.

\*    \*    \*    \*    \*

*Farm* means a facility on a tract of land devoted to the production of crops or raising of animals, including fish, which produced and sold, or normally would have produced and sold, $1,000 or more of agricultural products during a year.

\*    \*    \*    \*    \*

■ 3. Section 302.6 is amended by adding paragraph (e)(3) to read as follows:

### § 302.6   Notification requirements.

\*    \*    \*    \*    \*

(e) \*    \*    \*

(3) Releases to the air of any hazardous substance from animal waste at farms.

## PART 355—EMERGENCY PLANNING AND NOTIFICATION

■ 4. The authority citation for part 355 continues to read as follows:

**Authority:** 42 U.S.C. 11002, 11003, 11004, 11045, 11047, 11048 and 11049.

■ 5. Section 355.31 is amended by adding paragraphs (g) and (h) to read as follows:

### § 355.31   What types of releases are exempt from the emergency release notification requirements of this subpart?

\*    \*    \*    \*    \*

(g) Any release to the air of a hazardous substance from animal waste at farms that stable or confine fewer than the numbers of animal specified in any of the following categories.

(1) 700 mature dairy cows, whether milked or dry.

(2) 1,000 veal calves.

(3) 1,000 cattle other than mature dairy cows or veal calves. Cattle includes but is not limited to heifers, steers, bulls and cow/calf pairs.

(4) 2,500 swine each weighing 55 pounds or more.

(5) 10,000 swine each weighing less than 55 pounds.

(6) 500 horses.

(7) 10,000 sheep or lambs.

(8) 55,000 turkeys.

(9) 30,000 laying hens or broilers, if the farm uses a liquid manure handling system.

(10) 125,000 chickens (other than laying hens), if the farm uses other than liquid manure handling system.

(11) 82,000 laying hens, if the farm uses other than a liquid manure handling system.

(12) 30,000 ducks (if the farm uses other than a liquid manure handling system).

(13) 5,000 ducks (if the farm uses a liquid manure handling system).

(h) Any release to the air of a hazardous substance from animal waste at farms from animals that are not stabled or otherwise confined.

■ 6. Section 355.61 is amended by adding in alphabetical order the definitions of "Animal waste" and "Farm" to read as follows:

### § 355.61   How are key words in this part defined?

*Animal Waste* means manure (feces, urine, and other excrement produced by livestock), digestive emissions, and urea. The definition includes animal waste when mixed or commingled with bedding, compost, feed, soil and other typical materials found with animal waste.

\*    \*    \*    \*    \*

*Farm* means a facility on a tract of land devoted to the production of crops or raising of animals, including fish, which produced and sold, or normally would have produced and sold, $1,000 or more of agricultural products during a year.

\*    \*    \*    \*    \*

[FR Doc. E8–30003 Filed 12–17–08; 8:45 am]
**BILLING CODE 6560–50–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Office of the Secretary

### 45 CFR Part 144

**[ASPE:LTCI–F]**

**RIN 0991–AB44**

### State Long-Term Care Partnership Program: Reporting Requirements for Insurers

**AGENCY:** Office of the Assistant Secretary for Planning and Evaluation (OASPE), HHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule sets forth reporting requirements for private insurers that issue qualified long-term care insurance policies in States participating in the State Long-Term Care Partnership Program established under the Deficit Reduction Act of 2005 (DRA) (Pub. L. 109–171). Section 6021 of the DRA requires that the Secretary of Health and Human Services (the Secretary) specify a set of reporting requirements and collect data from insurers on qualified long-term care insurance policies issued under the program and the subsequent use of the benefits under these policies. Under a State Long-Term Care Partnership Program, an amount equal to the benefits received under the long-term care insurance policy is disregarded in determining the assets of an individual for purposes of Medicaid eligibility and estate recovery.

**DATES:** *Effective Date:* This final rule is effective on April 17, 2009.

**ADDRESSES:** *Electronic Access:* This **Federal Register** document is also available from the **Federal Register** online database through *GPO Access,* a service of the U.S. Government Printing Office. Free public access is available on a Wide Area Information Server (WAIS) through the Internet and via asynchronous dial-in. Internet users can access the database by using the World Wide Web; the Superintendent of Documents' home page address is *http://www.gpoaccess.gov/,* by using local WAIS client software, or by telnet to swais.access.gpo.gov, then login as guest (no password required). Dial-in users should use communications software and modem to call (202) 512–1661; type swais, then login as guest (no password required).

**FOR FURTHER INFORMATION, CONTACT:**
Hunter McKay, (202) 205–8999.

**SUPPLEMENTARY INFORMATION:**

### I. Issuance of a Proposed Rule

On May 23, 2008 (73 FR 30030), the Department of Health and Human Services (the Department) published in the **Federal Register** a proposed rule with a 60-day comment period that described the reporting requirements that we proposed to require of all insurers that issue qualified long-term care insurance policies under the State Long-Term Care Partnership Program. We received three timely pieces of correspondence in response to the proposed rule. Each piece of correspondence addressed multiple issues relating to the provisions of the proposed rule. We summarize these public comments and present the Department's responses to them under the applicable subject-area headings below. In addition, we have posted, for reviewers' convenience, all of the public comments received on the following Web site: *http://www.regulations.gov.*

### II. Scope of the Proposed Rule and This Final Rule

The proposed rule and this final rule describe the reporting requirements that the Department is requiring of all insurers that issue long-term care insurance policies under a State Long-Term Care Partnership Program for a State with as Medicaid State plan amendment approved after May 14, 1993. We point out that neither the proposed rule nor this final rule requires participating insurers to report data from States with a Partnership Medicaid State plan amendment approved as of May 14, 1993. In addition to the promulgation of the proposed rule and this final rule, the Department anticipates taking other actions to further the implementation of the Long-Term Care Partnership Program. One such action is publication of a separate **Federal Register** notice containing Partnership State Reciprocity Standards. These standards outline an agreement whereby States can provide Medicaid asset disregards for

# EXHIBIT 26

United States
Environmental Protection
Agency

Office of Land
and
Emergency Management

October 25, 2017
www.epa.gov/epcra

# Does EPA interpret EPCRA Section 304 to require farms to report releases from animal waste?

EPA interprets the statute to exclude farms that use substances in "routine agricultural operations" from reporting under EPCRA section 304.

As written, EPCRA section 304 requires all facilities "at which a hazardous chemical is produced, used or stored" to report releases of reportable quantities of any EPCRA Extremely Hazardous Substance and of any CERCLA hazardous substance. Congress, however, created an exception relevant to farms. As indicated above, EPCRA reporting turns on whether a facility produces, uses, or stores a hazardous chemical. The term "hazardous chemical," as defined in EPCRA sections 329(5) and 311(e), does not include "any substance to the extent it is used in routine agricultural operations."

Therefore, if a farm only uses substances in "routine agricultural operations", the farm would not be a facility that produces, uses or stores "hazardous chemicals," and would therefore not be within the universe of facilities which are subject to EPCRA section 304 release reporting. Because such farms fall outside of EPCRA section 304, they are not required to report any releases of EPCRA extremely hazardous substances or CERCLA hazardous substances, including any releases from animals or animal waste.

Based on the language of the statute described above, EPA believes Congress did not intend to impose EPCRA reporting requirements on farms engaged in routine agricultural operations. The statute does not define "routine agricultural operations," and EPA has previously identified examples of routine agricultural operations. Those examples were not intended to be exhaustive. EPA clarifies here that it interprets the term "routine agricultural operations" to encompass regular and routine operations at farms, animal feeding operations, nurseries, other horticultural operations and aquaculture.

Additionally, as stated in previous policy interpretations, the following are examples of substances used in routine agricultural operations:
- Paint used for maintaining farm equipment;
- Fuel used at the farm to operate machinery or to heat buildings in a farm for housing animals; and
- Chemicals used for growing and breeding fish and aquatic plants in an aquacultural operation.

These examples were not intended to be exhaustive. EPA interprets the statute to include other substances used in routine agricultural operations, including animal waste stored on a farm and animal waste that is used as fertilizer. EPA also notes that use of a substance in routine agricultural operations includes the storage of that substance necessitated by such use. To illustrate based on one of the examples cited above, an inherent part of using fuel to operate machinery is storage of that fuel.

EPA clarifies here that, just as an aquaculture operation involving the feeding and breeding of fish would be considered a routine agricultural operation, the feeding and breeding of animals, as well as the expected handling and storage of the animals' waste, would also be considered a routine agricultural operation. EPA thus interprets the phrase "used in routine agricultural operations" to include, for example, the handling and storage of waste for potential use as fertilizer. In creating the routine agricultural operation exception, Congress demonstrated its intent to treat farms differently than other types of facilities. EPA does not believe Congress intended the generation, handling or storage of animal waste to subject farms to reporting if they do not otherwise produce, use or store hazardous chemicals.

Under EPA's interpretation, a farm where substances are used only in routine agricultural operations is not within the scope of EPCRA section 304; however, farms are still required to report releases of CERCLA hazardous substances under CERCLA 103 (see EPA's implementing regulations at 40 CFR part 302 and the continuous release reporting form).

*Note: EPA intends to conduct a rulemaking on the interpretation of "used in routine agricultural operations" as it pertains to EPCRA reporting requirements.*

# EXHIBIT 27


An official website of the United States government.



# CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms

**Attention!**

Due to legislative changes in the Consolidated Appropriations Act, 2018 (Omnibus Bill), "air emissions from animal waste at a farm" are exempt from reporting under CERCLA. When the D.C. Circuit Court of Appeals issues its mandate vacating the 2008 final rule (expected as soon as May 1, 2018), farms will remain exempt from the CERCLA reporting requirements as a result of the FARM Act. Additionally, these types of releases do not need to be reported under EPCRA.

- Overview
- History
- Frequent Questions

## Overview

Two environmental laws, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and Emergency Planning and Community Right-to-Know Act (EPCRA), require reporting of releases of hazardous substances that exceed reportable quantities within a 24-hour period. The purpose of the notification is for federal, state, and local officials to evaluate the need for an emergency response to mitigate the effects of a release to the community.

However, due to legislative changes in the "Fair Agricultural Reporting Method Act" or "FARM Act" in March 2018, "air emissions from animal waste at a farm" are exempt from reporting under CERCLA. These types of releases also do not need to be reported under EPCRA. For more information, please see: FARM Act Q&A.

## History

### Regulatory Reporting Exemption for Animal Waste and Resulting Litigation

On December 18, 2008, EPA published a final rule that exempted most farms from certain release reporting requirements in CERCLA and EPCRA. Specifically, the rule exempted farms releasing hazardous substances from animal waste to the air above threshold levels from reporting under CERCLA. For EPCRA reporting, the rule exempted reporting of such releases if the farm had fewer animals than a large concentrated animal feeding operation (CAFO).

In short, all farms were relieved from reporting hazardous substance air releases from animal waste under CERCLA, and only large CAFOs were subject to EPCRA reporting.

Several citizen groups challenged the validity of the final rule in the U.S. Court of Appeals for the District of Columbia Circuit. On April 11, 2017, the Court struck down the final rule, eliminating the regulatory reporting exemptions for farms. The Court is expected (as soon as May 1, 2018) to issue its mandate vacating the final rule.

## Legislative Changes

On March 23, 2018, the Consolidated Appropriations Act, 2018 (Omnibus Bill), was signed into law. Title XI of Division S of the Omnibus Bill, called the "FARM Act" exempts the reporting of "air emissions from animal waste at a farm" under CERCLA. When the D.C. Circuit Court of Appeals issues its mandate vacating the 2008 final rule (expected as soon as May 1, 2018), farms will remain exempt from the CERCLA reporting requirements as a result of the FARM Act.

# Frequent Questions

**Questions?**

For compliance assistance, please call the EPCRA, RMP & Oil Information Center at: 1-800-424-9346.

## Reporting Requirements

- CERCLA Requirements
- EPCRA Reporting Requirements

## CERCLA Requirements

### Do I need to submit a CERCLA report?

No. The FARM Act amended CERCLA section 103(e) to exempt reporting of air emissions from animal waste (including decomposing animal waste) at a farm. Other release of hazardous substances exceeding reportable quantities still require reporting under CERCLA.

**If a farmer made an initial notification to the National Response Center before the FARM Act was passed, do they need to submit a written report to the EPA regional office?**

No. Additional reporting is not required.

**EPCRA Reporting Requirements**

**Do I need to submit an EPCRA report?**

No. In light of the FARM Act's exemption of air emissions from animal waste (including decomposing animal waste) at a farm from reporting under CERCLA, these types of releases do not need to be reported under EPCRA. For more information, see: FARM Act Q&A.

Furthermore, the statute excludes farms that only use substances in "routine agricultural operations" from reporting releases of hazardous substances under EPCRA section 304. For more information, please see: EPCRA Q&A.

LAST UPDATED ON APRIL 30, 2018